**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**GREENVILLE DIVISION**

ROBERT BRANCH,

      Plaintiff,

                             CIVIL ACTION NO.  4:23-CV-217-MPM-JMV

v.

ILLINOIS CENTRAL RAILROAD
COMPANY,

      Defendant.

## MEMORANDUM OF LAW IN OPPOSITION TO PAINTIFF'S
## PARTIAL MOTION FOR SUMMARY JUDGMENT

*"Plaintiff asserts it has never been disputed that he struck Mr. Melton."*[1]

## INTRODUCTION

In what can only be viewed as a transparent attempt to muddy the waters on Defendant
Illinois Central Railroad Company's ("IC") well supported Motion for Summary Judgment (Doc.
No. 60) establishing that no material issue of fact exists and that dismissal is mandated as to each
of Plaintiff Robert Branch's claims in this matter, Branch has filed his own motion. Branch's
Partial Motion for Summary Judgment ("Branch's Motion"), however, is riddled with legal
inaccuracies and, more importantly, is devoid of evidentiary support. As such, it must be denied.

Indeed, Branch admits that he physically fought a coworker. Specifically, after Branch's
coworker struck him, rather than retreat or otherwise engage in a defensive posture, Branch chose
to fight back and began advancing on, swinging at, and striking his coworker. Even after his
coworker fell to the ground and covered his face with his arms in a defensive position, Branch

---

[1] Plaintiff's Memorandum of Law in Support of His Partial Motion for Summary Judgment (ECF Doc. 59).

went to the ground to continue swinging at him until others forcefully pulled Branch off his coworker. Branch has admitted all these facts. Moreover, while IC has never disputed that Branch was not the initial aggressor, it has always been equally clear to IC that, during the fight – and as supported by Branch's own admissions – Branch abandoned any self-defense justification and instead became an aggressor himself. In other words, the facts supporting IC's reasonable conclusion that Branch violated the Workplace Violence Prevention Policy ("WVPP") in this respect are undisputed.

While Branch did report that this fight took place, **Branch has repeatedly and consistently explained he did not believe the fight was racially motivated. He further admits he never experienced or reported race discrimination in his fourteen years of employment with IC, up to and including his report of the fight.** It logically and necessarily follows that Branch did not engage in any activity protected under either Title VII or Section 1981 when he reported the fight to IC, and his purported retaliation claims fail at the most fundamental level. Nor is there any evidence that IC's legitimate, non-retaliatory reason for terminating his employment (and that of the other employee involved in the fight) was pretextual.

Seeking to avoid the mandated dismissal of his retaliation claim, Branch wholly misunderstands and misrepresents an internal IC disciplinary hearing, claiming that it was a public hearing held by the Public Law Board ("PLB"); it was not. Branch also misrepresents the PLB's function and the issues presented to it. The PLB's function is only to determine minor disputes under the collectively bargained agreement ("CBA") between IC and Branch's Union. In doing so, the PLB was presented the issue and issued an Interim Award, premised on the fact that Branch violated IC policy during the fight, and explicitly stating that "he should have disengaged more than he did." This Interim Award makes clear that even the PLB believed that significant discipline

2

was appropriate for Branch's policy violation. The PLB was not presented, and did not opine on, whether Branch's employment termination was the result of unlawful retaliation. Notably, while the PLB has the discretion to reduce the discipline assessed and exercised that discipline here, this Court does not have the same latitude. *Bienkowski v. Am. Airlines, Inc.*, 851 F.2d 1503, 1507-08 (5th Cir. 1988) (Employment discrimination laws are "not intended to be a vehicle for judicial second-guessing of business decisions, nor to transform the courts into personnel managers."); *Bryant v. Compass Group USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005). In short, the PLB Interim Award actually supports IC's position, and to the extent any collateral estoppel applies, it is as to the issue of whether Branch's conduct constituted a violation of IC's WVPP and Code of Conduct – clearly, it did. Accordingly, IC respectfully requests the Court deny Branch's Partial Motion for Summary Judgment and instead enter judgment in favor of IC on all counts pursuant to Fed. R. Civ. P. 56.

Finally, to the extent summary judgment is not granted for IC in full, Branch also moves for summary judgment as to two of IC's affirmative defenses. IC has properly supported the defense that Branch failed to appropriately mitigate his damages. Therefore, if this matter is not dismissed its entirety, IC respectfully requests Branch's motion to dismiss IC's failure to mitigate defense as against Branch be denied.

## BRANCH'S IMPROPER PURPORTED FACTUAL BACKGROUND

Before speaking to the few substantive claims in Branch's Motion, IC must first address the irreparable and self-defeating procedural deficiencies upon which Branch's Motion must necessarily be dismissed. In support of his purported statement of undisputed material facts, Branch cites *exclusively* to his own Complaint. ECF Doc. 1. But it is axiomatic that a party may not rely on his own allegations in a pleading to support his own motion for summary judgment. *Collins v. Jackson Public School Dist.*, 609 F. App'x 792, 795 (5th Cir. 2015); *Wallace v. Texas*

3

*Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996); *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994); *Eason v. Thaler,* 73 F.3d 1322, 1325 (5th Cir. 1996). Nor may a party rely on his own assertions or self-serving statements to support summary judgment. *BMG Music v. Martinez*, 74 F.3d 87, 91 (5th Cir. 1996); *DIRECTV, Inc. v. Budden*, 420 F.3d 521, 531 (5th Cir. 2005). In other words, Branch's purported statement of undisputed material facts is nothing more than Branch's (or his attorneys') own perceptions, speculation, and conclusory allegations which are legally prohibited from serving as evidence on his motion for summary judgment. Accordingly, the Court must disregard each purported statement of fact by Branch supported only by his Complaint, and because Branch has *only* cited to his Complaint to support his purported facts, the Court must disregard Branch's entire statement of facts. With exactly *zero* evidence to support his woefully flawed legal position, Branch's Motion fails and must be denied on those ground.

In addition to citing *only* his Complaint to support his factual background, Branch's flawed legal analysis is equally devoid of evidentiary support. For example, in support of his request that IC's failure to mitigate defense be dismissed, Branch seeks to rely on his unsworn and unverified answers to interrogatories from a separate and distinct lawsuit, currently pending in front of the Office of Administrative Law Judges ("OALJ"). *See* Exhibit A to Branch's Motion. But here, again, it is well settled that unsworn responses to interrogatories are not competent evidence to support summary judgment. *Scales v. Lackey Mem'l Hosp.*, 988 So.2d 426, 434 (Miss. Ct. App. 2008); *DEW v. TCHULA GRAIN CO*, 816 So. 2d 1008, 1010 (Miss. Ct. App. 2001) ("Unless they are sworn, interrogatory answers serve no better purpose than unsworn pleadings that specifically are not to be considered"). Particularly in light of the lack of oath or verification as to the answers, they are nothing more than mere allegations by Branch's counsel which, in fact, directly conflict

4

with Branch's actual sworn testimony in this matter and, like his Complaint, are legally prohibited from serving as evidence on his motion for summary judgment.

All Branch is left with, then, is the PLB decision (*see* Exhibit B to Branch's Motion) and IC's June 7, 2022, investigation hearing transcript (*see* Exhibit C to Branch's Motion), neither of which Branch has authenticated. Nor has he authenticated Exhibit A to Branch's Motion, and none of this purported evidence may therefore be considered. *See Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 192 (5th Cir. 1991) (holding that documents submitted as summary judgment evidence must be authenticated); *Cox v. State*, 586 So.2d 761, 767 (Miss. 1991) (holding that documents that are not properly authenticated cannot be accepted as evidence); *R.R. Mgmt. Co. v. CFS La. Midstream Co.*, 428 F.3d 214, 220 (5th Cir. 2005) (explaining that courts have discretion to exclude evidence that has not been properly authenticated); *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (holding that "unauthenticated documents are improper as summary judgment evidence," particularly when the nonmovant has objected to their use). Notwithstanding these procedural deficiencies, however, both documents actually support IC's consistently reiterated, legitimate, non-retaliatory reason for terminating Branch – i.e., his violation of IC's WVPP by engaging in a physical fight with a coworker, who was also terminated for the same reason.

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

## I. IC IS COMMITTED TO PROVIDING A SAFE WORKPLACE FREE FROM UNLAWFUL RETALIATION.

IC is a freight railroad operating in various states throughout the United States, including Mississippi. IC is committed to providing a safe and violence-free workplace for all employees; in fact, safety is the number one priority for IC. Declaration of Duane Spears ("Spears Dec."), ¶ 2-3 & Ex. B; Tr. 42:24 – 43:5. IC also maintains and enforces both an Equal Employment Opportunity policy that prohibits discrimination and a clear-cut Prohibited Harassment, Discrimination and

Anti-Retaliation Policy expressing IC's commitment to maintaining a workplace free from discrimination and harassment based on race, color, or any other legally protected characteristic. Spears Dec., Exs. A & C. The Prohibited Harassment, Discrimination and Anti-Retaliation Policy sets forth the procedures IC employees should follow to report instances of discrimination or harassment and assures employees that the Company strictly prohibits retaliation for making any reports of the same. *Id.* IC's Code of Business Conduct also prohibits IC and its employees from retaliating against any person for reporting in good faith any allegations of discrimination or for filing a complaint or participating in an investigation. Spears Dec., Ex. B.

**A.      IC's WVPP and Relevant Code of Conduct Provisions.**

As part of its commitment to a safe workplace, IC maintains the WVPP. Spears Dec., Ex. D; Tr. 96:17-22. The WVPP contains the following relevant definitions:

- **"Workplace violence"** is defined as "any action, conduct, threat or gesture towards a CN[2] employee in a workplace that can reasonably be expected to cause harm, injury or illness to the CN employee, excluding situations of justified self-defense." *Id.* The WVPP further clarifies that intentionally causing physical harm falls within the definition of prohibited workplace violence. Spears Dec., Ex. D.

- **"Workplace"** is defined as "any location where CN employees are currently performing work-related activities while in the scope of their employment. Examples include…any other location where CN business or sponsored activity is being conducted." *Id.*

Likewise, IC informs all employees in its Code of Business Conduct that it "will not tolerate any action, conduct, threat or gesture towards a CN employee in the workplace that can reasonably be expected to cause harm, injury or illness to the CN employee." Spears Dec., ¶ Ex. B. IC managers and employees, including Branch, receive annual training on both the Code of Business Conduct and the WVPP. Tr. 43:23 – 44:18, 148:6-16; Deposition of Robert Branch, dated August

---

[2] IC is one of the operating railroads that operates under the trade name "CN".

6, 2024 ("Branch 2024 Dep.")[3], 15:20 – 18:5; Spears Dec., ¶ 9 & Ex. E. Employees are explicitly informed that violation of the WVPP will lead to appropriate remedial action, "up to and including termination." Spears Dec., ¶ 3 & Ex. D.

**B.** **IC's Discipline Policy Applicable to Unionized Employees, Including Branch.**

In addition to the WVPP and Code of Business Conduct, IC maintains a Discipline Policy that, pursuant to the CBA, is applicable to its unionized employees, including Branch. Spears Dec., ¶ 11-12 & Ex. F; Tr. 151:4 – 152:14, 161:22 – 162:25, 189:19-24. Pursuant to the Discipline Policy, rule violations are categorized within four levels ranging from Level 1 (the least serious) to Level 4 (the most serious). Spears Dec., Ex. F.

Under the Discipline Policy and CBA, before discipline may be assessed, unionized employees are entitled to a formal investigation hearing. Spears Dec., ¶ 12 & Ex. F; Tr. 161:22 – 162:25, 208:9 – 209:8. During this internal IC process, among other procedural safeguards, IC must set forth the rules that the employee is accused of violating, as well as the factual information that it believes supports that a rule violation occurred. *Id.* In response, employees are entitled to call witnesses on their own behalf and present any evidence they believe to be exculpatory. *Id.*; Tr. 92:10-21, 64:11 – 66:6, 130:9-15. Any decision regarding whether a unionized employee may be subject to discipline is limited to the rules and information presented in the investigation hearing. Tr. 142:2-12, 153:9-18, 179:21 – 181:19. Notably, this is an internal discipline hearing that is **_not_** conducted before the Public Law Board. Spears Dec., ¶ 13.

If a rule violation is established, IC's Discipline Policy also contains a matrix that ascribes the level of discipline to be assessed. Spears Dec., Ex. F. Under the Discipline Policy, "workplace violence" and "intentional acts that cause harm to other persons" are examples of conduct that can

---

[3] The transcript of Branch's August 6, 2024, deposition testimony pursuant to the present lawsuit is attached to the Declaration of Susan Fitzke in ¶ 3, Exhibit B. IC will be referred to herein as "Branch 2024 Dep."

constitute a Level 4 offense. *Id.*, at page 10. Level 4 violations result in immediate termination. *Id.* IC has consistently considered cases of physical fighting to be Level 4 violations subject to immediate discharge. *Id.*; Tr. 112:22 – 113:1, 149:12-23, 169:20-22, 179:6-12.

The Discipline Policy has instituted additional safeguards in cases where an established rule violation may lead to termination. Spears Dec., Ex. F. For example, the Discipline Policy provides for a Discipline Review Panel ("DRP") to review disciplinary decisions in circumstances when termination is recommended. Tr. 208:14-17. After the investigation hearing, the DRP members read the transcript and review the exhibits to determine whether any policy or rule violations have occurred and, if so, what the appropriate discipline should be. Tr. 142:2-12, 153:9-18, 179:21 – 181:19, 208:12-17.

For the investigation into Branch's fight, each member of the DRP –Senior Manager of Human Resources Duane Spears, Director of Labor Relations Thomas Sullivan, and Chief of Signals and Communications (United States Track) Thomas Hilliard – agreed that Branch's conduct constituted a Level 4 violation, which should result in termination of employment. Tr. 108:19 – 109:1, 137:8-11, 138:14-24, 185:2-15; Spears Dec., ¶ 13-14.

## C. Engaging in a Physical Altercation Results in Termination Under the Clear Application of IC Rules.

It is undisputed that IC maintains polices which prohibit workplace violence, and which provide for disciplinary schemas that include immediate termination of employment for fighting. Spears Dec., Exs. D & F. It is also undisputed that Branch knew of these policies, understood them, and nevertheless engaged in fighting in violation of IC's policies. Spears Dec., ¶ 9 & Ex. E.; Tr. 51:7-19.

Simply put, when an IC employee engages in a physical altercation in violation of the workplace violence policy, the result has consistently been termination of employment. Spears

4896-1801-7523.2 / 046769-1415

Dec., ¶ 4 & Ex. F.; Tr. 112:22 – 113:1, 149:12-23, 169:20-22, 179:6-12. This is reflected in both IC policy and practice: no member of IC's management or Human Resources involved in the decision to discharge Branch's and his coworker, Tracy Todd Melton (Caucasian)), is aware of a situation where an IC employee engaged in a physical fight and did not lose their job. *Id.* In fact, Branch knew his actions were grounds for termination pursuant to the Discipline Policy:

> A: [] I know fighting is going to lead to something else.
> ***
> Q: You understood that fighting would also be a violation of Illinois Central's workplace violence policy?
> A: I understood that too.
> ***
> Q: And Mr. Manojlovic, as your union representative, explained to you in that phone call [on May 30, 2022] that you may lose your job as a result of your conduct on May 26, 2022; correct?
> A: He did say that.

Branch 2023 Dep., 70:15-16; 71:3-6; Branch 2024 Dep., 70:4-8.

## II. BRANCH NEVER EXPERIENCED OR REPORTED RACE DISCRIMINATION DURING HIS EMPLOYMENT WITH IC.

Branch started working for IC in February 2008 as a Machine Operator. Tr. 18:7-14. In his more than fourteen years of employment with IC, Branch never complained of or experienced race discrimination:

> Q: [Prior to the incident with Melton on May 26, 2022 []] you didn't have --- you hadn't made any complaints or didn't really have any complaints about your employment; is that right?
> A: No, ma'am, I didn't.
> ***
> Q: And it's my understanding that at no time during your employment with Illinois Central did you make a complaint to human resources or call the human resources support center that you believed you were being discriminated against on the basis of your race; correct?
> A: Not while I was working.
> Q: And it's my understanding that while you were working for the company, you did not make a complaint to human resource or call the human resources support center to claim that you were being retaliated against during your employment with Illinois Central; correct?

A: Not while I was working, no, ma'am.

\*\*\*

Q: Okay. In fact, I think you told me last time that you had no issues at all with your employment before May 26 of 2022; is that right?

A: I did not.

Branch 2023 Dep., 35:1-4; Branch 2024 Dep., 18:6-19, 21:19-22. In other words, Branch never engaged in activity protected by Title VII or Section 1981.

## III. BRANCH ENGAGES IN A PHYSICAL FIGHT IN A MANNER BEYOND ANY POSSIBLE JUSTIFIED SELF-DEFENSE IN VIOLATION OF IC'S WVPP.

On May 26, 2022, Branch was working as a Machine Operator on a mobile production gang on assignment. Tr. 12:6-17, 62:5-11. That evening, Branch and other IC employees had a barbecue outside the Magnolia Hotel in Columbia, Mississippi where they were staying. Tr. 18:16–19:11. Melton, exited the hotel, shouting about an incident that occurred weeks prior outside of work with a different IC employee who was not present at the Hotel.[4] Tr. 19; Spears Dec., Ex. G-4. Specifically, according to Branch, Melton, who appeared intoxicated, proclaimed he was "from Lil Egypt, where we bury mf[s]! And ima [sic] bury [the other IC employee, not present]." Tr. 47:12- 48:6; Spears Dec., Ex. G-9. Branch's Motion alleges that Melton was cursing at, threatening, and hurling racial slurs *at Branch*. Branch's Motion, p. 2. But, that is not consistent with the actual evidence. Indeed, Branch has admitted that no threats, insults, or racial language was *ever* directed at him or used at all by Melton (or anyone else) the night of the fight:

> Q: And when Mr. Melton was yelling and said something about being from Little Egypt and something about killing the MF-ers, after that, he said he was going to kill someone named [a different IC employee]. Is that right?
> A: Yes, ma'am. That's correct.
> Q: So, Mr. Melton's comments, those weren't directed at you personally, were they?

---

[4] On or around April 30, 2022, at a union meeting, unrelated to IC work, Branch claims Melton got into an argument with a different IC employee and union member. Branch 2024 Dep., 24:7-10. During the argument, Branch claims Melton referred to the other union member involved as "boy." *Id.*, 27:2-4. Others stepped in and the situation quickly dissipated without any physical violence. Branch 2023 Dep., at 98:23-25. After that union meeting, Branch believed the issue was resolved. *Id*. at 54:5-10.

> A: No, ma'am. They wasn't.
> ***
> Q: And you don't have any reason to believe that Mr. Melton hit you because you're Black; correct?
> A: I don't feel like Mr. Melton hit me because I'm Black.
> ***
> Q: And on May 26, of 2022, Mr. Melton did not use the term "boy"; correct?
> A: May 26, 2022?
> Q: Yes, on the date where you had the –
> A: No, he didn't use – he didn't use it.
> ***
> Q: Was that statement [the allegation that Melton was making racial slurs calling a different IC employee "boy"] – did that have anything to do with the incident you [Branch] and I [Melton] had?
> A: No, sir.

Tr. 47:24 – 48:6; Branch 2024 Dep., 47:16-20; *Id.*, 55:15-19; Spears Dec., Ex. G, 80:18 – 81:1.

Although Melton was not addressing Branch, Branch engaged Melton, telling him to "chill out." Tr. 19, 48:12-15. In response, Branch claims Melton pushed him to the ground. *Id.* After Branch stood up, Branch claims Melton hit him twice in the face. Tr. 19; Spears Dec., Ex. G-4. At this point, Branch admits he engaged and began swinging at Melton, who was backing away.[5] Tr. 51:7-9. As Melton retreated, he fell over backwards onto the ground, and assumed a defensive posture with his hands covering his face in an effort to block Branch's punches. Tr. 51:10-19. Branch went down onto the ground after Melton and continued swinging. Tr. 51:7-19; Branch 2024 Dep., 48:22 – 49:2, 49:18-21. Branch was on top of Melton on the ground when other IC employees intervened, pulling him off:

> Q: Where were you physically located when the group came over to pull you apart.
> A: I was on the ground on top of him.
> ***
> A: [] They pulled me off of him.
> ***

---

[5] At the February 2024 hearing in front of the OALJ, Branch stated for the first time that when he started taking swings at Melton, it was because Melton had his fists up to strike Branch again. Tr. 49:9-16. However, Branch explicitly testified that he did not provide this purported information to IC prior to his termination, including at the June 7, 2022, investigation hearing, nor was this information relayed in Branch's 2023 deposition. Tr. 50:15-23.

> A: [] I started swinging so – he backed – he was backing up and he slipped down. So when I got ready to hit him, the guys pulled me off of him.

Tr. 20:17-21; Branch 2024 Dep., 49:15; Branch 2023 Dep., 58:8-11.

It has always been undisputed that Melton was the initial instigator of this altercation. *See* Tr. 164:4-10, 217:7-11. This, however, does not absolve Branch of responsibility for his own conduct. Indeed, Branch made intentional choices during this incident that demonstrate he was not in a position of self-defense throughout the altercation, and instead Branch also became an aggressor. Tr. 172:3-18, 212:23 – 213:3. After Melton struck Branch, Branch could have covered up, moved away, or asked for help. Tr. 96:24 – 97:3. In fact, Branch has explicitly testified that he *could have retreated from the situation*:

> Q: Right. And before that, before they broke you up, after Mr. Melton fell backwards on the ground and assumed a defensive posture, is there anything preventing you from either going into the hotel on the side door here or departing around the front of the hotel?
> A: No, it's not.

Branch 2024 Dep., 52:16-22.

Simply put, Branch could have deescalated or refrained from engaging with Melton, thereby avoiding further confrontation. Tr. 137:16-19, 172:15-18. But Branch did neither – instead he fought back. Spears Dec., Ex. G-4; Tr. 49:9-14, 51:7-19.  Branch's own admissions are clear: while Melton started the fight, Branch made a choice to engage and to fight back, returning physical violence with physical violence, rather than to walk away or deescalate. Tr. 51:7-19.

## IV. BRANCH REPORTS HIS FIGHT WITH MELTON TO IC MANAGEMENT AND IC INVESTIGATES.

### A. IC Management Reviews the Incident

The day after the fight, on the morning of May 27, 2022, Branch informed his supervisor, Production Supervisor Chance Garner, of the altercation and that he was considering filing a report. Tr. 23:4-10; Tr. 24:7-8. Garner elevated this conversation to his boss, Production Manager

Christopher Day, who called Branch to discuss the matter. Tr. 127:2-10. When Day spoke with Branch on the telephone over what was a Memorial Day holiday weekend, Branch explained there had been an altercation between himself and another IC employee. *Id.* Branch also informed Day he was not certain he wanted to go through with the report yet. Tr. 122:14-18; Spears Dec., Ex. G, 44:19-22. Importantly, during this conversation, which occurred less than three days after the fight, Branch did not provide *any* additional details. Tr. 127:15 – 128:14, 129:1-4. Specifically, Branch did not state he believed the fight was racially motivated nor that he wanted to report racial discrimination. *Id.*; Branch 2024 Dep., 61:3-7, 61:16-23, 62:5-8.

Branch's assertion that he "reached out to Mr. Garner, but Mr. Garner said he needed to talk to Mr. Melton before any decision was made about how to proceed" is certainly disputed and demonstrably false. Branch's Motion, at p. 2. In reality, while Branch did initially report there had been a fight to Garner, Garner did not state that he needed to speak with Melton to determine how to proceed. Rather, during their first conversation, Branch told Garner that he was not sure whether he wanted to make an official report; it was not until May 30 that Branch informed Garner that he changed his mind and wanted to report what happened the previous Thursday night. This was the first time Branch told someone in IC he wanted to move forward with a formal complaint. *Id.* Branch 2024 Dep., 63:19 – 64:14. Further, Garner only spoke to Melton later, when directed to do so by Day to take Melton's statement and remove him from service. Garner Dep. at 9:1-10:7.

Moreover, Branch admits Garner did nothing to discourage him from filing the report. Tr. 56:22 – 57:5; Branch 2024 Dep., 66:2-6. And, while Branch tries to emphasize his allegation that Day tried to dissuade Branch from making the report, this, too, is untrue. Although Day gave Branch the option of reporting or not reporting the incident, he did not try to discourage him from doing so. Tr. 121:19-24. Moreover, the very reason Day gave Branch the option of not reporting

the fight *was because Day knew what the likely outcome would be for **both** employees who engaged in the fight*. Tr. 121:25 – 122:4. Day was trying to save Branch's job. Tr. 122:14-18.

Following Branch's text to Garner and a second conversation with Day, Day instructed Branch to provide a handwritten statement regarding the incident. Tr. 128:18-19. On Monday, May 30, 2022, Branch provided IC the following statement:

> *** On Thursday, May 26, 2022, around 9:00 p.m. at Magnolia Inn, 816 US 98, Columbus, Mississippi, 34929, my co-workers and I was grilling after work peacefully and relaxing time Tracey (Todd) Melton approached us with no shirt and no shoes and started acting and speaking belligerent. He was speaking about a situation at a union meeting I attended. He and another employee had a disturbing violence confrontation while Todd was saying racial slurs calling the CN employee BOY. He proceeded to approach the group. I said you need to let that go. Todd said he was from Egypt Plantation. Todd pushed me in the chest and I felled to the ground. I got back up and he hit me twice in the mouth and nose. I was in shock, my head bounced off the pavement in shock and disbelief. I was being attack so I attempted to protect myself by fighting back. I have several witnesses that was in total disbelief of what had just transpired. I am a mild mannered man. I come to work and conduct myself in a safe and professional manner. I am extremely grateful I survived this attack however my mind will not stop wondering what did I do. I am emotionally depressed and fearful for what Todd Melton has planned for me. I fear for my life around him. ***

Spears Dec., Ex. G-4.

Day provided this statement, which does not allege the fight was racially motivated, to his immediate supervisor, then Senior Production Manager Wade Clark. Tr. 129:21–130:1. Clark informed Labor Relations Manager Patrick Crain, who instructed that field operations should gather statements. Tr. 109:2 – 110:10. Day collected statements from seven witnesses, in addition to Branch and Melton. Spears Dec., ¶ 6, Exs. G-4 – G-12; Tr. 130:2-15. After reviewing them, Crain and Clark decided an investigation hearing should be held for both Melton and Branch, due to their respective potential policy violations. Tr. 208:16 – 209:8.

While Branch's Motion now alleges he reported "racially discriminatory and harassing comments" (*see* Branch's Motion, p. 2) and that he "complained about the assault and racist

14

remarks he faced from a coworker" (*see id.*, p. 10), this conflicts with Branch's actual sworn testimony. Branch's admissions confirm he *never* reported to Garner, Day, or any member of IC management or Human Resources that he believed the fight was racially motivated or that racially insensitive language was used the night of the fight:

> Q: [] **So did you not say anything to Mr. Garner anything on May 27 about any use of racially inappropriate language by Mr. Melton; correct?**
> **A: No, ma'am, I did not.**[6]
> ***
> Q: And did you report to Mr. Garner during that [second] call the use of any racially inappropriate language by Mr. Melton?
> A: No, I did not.
> Q: And it's my understanding that at no time did you ever claim to the company that this attack by Mr. Melton was racially motivated; correct?
> A: No ma'am.
> ***
> Q: Is it true that at no time did you ever report to the company that you believe this attack by Mr. Melton was racially motivated?
> A: I did not.

Branch 2024 Dep., 61:3-7, 61:16-23, 62:5-8 (emphasis added).

On the contrary, Branch has made abundantly clear that the fight on May 26, 2022, was not racially motivated and that no racial terms were directed at him or even used that night. *See* Branch 2024 Dep., 47:16-20, 55:15-19; Spears Dec., Ex. G, 80:18 – 81:1. Branch has also made clear that prior to his altercation with Melton, Branch had not previously experienced any incidents or issues with Melton (*see* Branch 2023 Dep., 49:8-12; 56:11-14) and to the extent Melton used racially insensitive language (i.e., the term "boy") at an earlier union meeting, this was a one-time, isolated incident, not directed at Branch, and Melton did not use that language again on the night of the fight. Branch 2024 Dep., 31:16-24, 55:2-19; Branch 2023 Dep., 53:11-23.

---

[6] This admission directly undercuts Branch's Complaint allegation that "On May 27, 2022, Plaintiff reported the incident, including the racially discriminatory and harassing comments, to Supervisor Jerome Chance Garner (white male)." *See* ECF Doc. 2, ¶ 17; Branch's Motion, p. 2.

Branch also confirmed the only thing Melton said on the night of May 26, 2022, that Branch alleges relates to race is Melton's statement that he is from Little Egypt Plantation. Branch 2024 Dep., 57:23–58:2. Branch has further explained that his only basis for concluding this statement relates to race is because plantations generally have a negative racial history (*see* Branch 2024 Deposition, at 58:3-7) and that he does not have any personal knowledge of what Little Egypt Plantation is known for and that this comment was not directed at Branch. Tr. 47:24 – 48:6. Simply put, when reporting the fight to IC, Branch did not report – nor did he believe he was reporting – treatment motivated by his race. Branch 2024 Dep., 61:3-7, 61:16-23, 62:5-8.

### B.     A Formal Investigation Hearing Is Held

Pursuant to the CBA, and notice to Branch and Melton, a formal internal investigation hearing was held by IC on June 7, 2022. Spears Dec., ¶ 13 & Exs. G – G-2. This is an internal IC disciplinary hearing to establish the record on which disciplinary decisions are made; it is ***not*** conducted publicly or before the PLB. Spears Dec., ¶ 13. At the hearing, Branch was provided a full and fair opportunity to give his version of events, including any mitigating information, documentary evidence, or witness statements, and was further represented by a union representative. Branch's Motion, p. 17; Tr. 64:11–66:6, 67:9-16. Branch and Melton read their statements into the record and were given the opportunity to add any additional information. Spears Dec., Ex. G. When prompted, the only additional information Branch provided was that he accepted Melton's apology and did not believe Melton intended to harm him; Branch made no mention whatsoever of perceived racial or retaliatory animus. *Id.*, at 74:8 – 75:3, 77:7-12, 110:12-14.

The witnesses identified by Branch and from whom statements were collected also read their statements into the record and were given the opportunity to provide any additional

16

information. Spears Dec., Exs. G and G-4 – G-12. Even a cursory overview of the witness statements – including Branch's own description of the incident – makes clear that while Branch was initially the victim of workplace violence, he quickly relinquished any claim of self-defense and became an aggressor engaged in unacceptable physical violence, rather than retreating, asking for help, assuming a defensive posture, or otherwise deescalating. Tr. 107:13-18. Even Branch's witnesses confirmed that after Branch was struck, he advanced on Melton, swinging at – and hitting – him, and that the two were entangled to such an extent that other employees had to physically separate them. Spears Dec., Exs. G-4, G-5, G-9, G-10, G-11, G-12 & G, 84:4-9, 49, 60, 63, 67, 68:18-21, 70-71, 97:7-9.

Throughout this investigation, which Branch knew could result in his discharge for violating IC's policies against workplace violence, Branch never raised any concern he was being investigated in retaliation for having opposed or having raised concerns of race discrimination:

> Q: And you didn't raise any concern during that June 7 investigation that you were being investigated in retaliation for having opposed or raised concerns of race discrimination; correct?
> A: I don't think we talked about that.

Branch 2024 Dep., 80:17 – 81:2. Branch also explicitly confirmed that he provided *all relevant information* when he reported the fight to IC. Spears Dec., Ex. G, 79:5-7.

After the June 7, 2022, hearing, Branch was given the opportunity to review the transcript and make any additions or corrections. Tr. 64:11 – 66:6, 67:9-16. Branch did not make any changes and confirmed the transcript accurately reflected the testimony given during the hearing, thereby confirming he had provided *all* relevant information. *Id.*

17

## V. IC TERMINATES MELTON'S AND BRANCH'S EMPLOYMENT DUE TO THEIR RESPECTIVE VIOLATIONS OF IC POLICY.

### A. IC Makes the Decision to Terminate Melton and Branch Because Each Participated in a Physical Fight as Demonstrated by the Investigation Hearing Record.

Following the June 7, 2022, investigation hearing, the transcript and corresponding exhibits were provided to the DRP with a recommendation of a Level 4 violation for fighting. Tr. 139:25 – 140:14, 153:13-18, 210:12-17; Spears Dec., ¶ 13. This is standard and required procedure for union employees, pursuant to the Discipline Policy and CBA. Spears Dec., ¶ 12 & Ex. F; Tr. 147:5-13, 152:10-14. When the DRP reviewed the matter, the decision with respect to Melton was easy, and all quickly agreed that Melton should be discharged for his conduct. Tr. 140:14-16. When it came to Branch, however, determining an appropriate consequence was not an easy task for the DRP. Tr. 185:16-24. As DRP member Spears explained, the DRP evaluated the situation and determined that Branch had engaged in physical violence to an extent that gave rise to a Level 4 violation of IC policies. Tr. 140:9 – 141:3. In other words, while it was clear to the DRP that Branch did not start the fight, it was equally clear that at a certain point in the fight, Branch became the aggressor and was in a position of offense or attack. As Spears further explained:

> One of the big things is that Branch admits that, "Yes, I swung and I engaged. I punched him. I touched him." Another part is they're on the ground where someone had to pull them apart. Had the employees that were around at the time not pulled them apart, they could have continued with the fight. There didn't seem that either employee was willing to just take a breath and say enough. *** For me, what I did not see, I did not see any form of retreat or trying to get out of the way or take a defensive posture. Therefore, he was actively engaged.

Tr. 157:21 – 158:3, 164:15-18, 137:22-25, 110:19-25.

IC terminated Branch's employment *exclusively* due to his violation of the WVPP and the Code of Conduct. Spears Dec., ¶ 14-15 & Ex. H; Tr. 113:2-11, 159:21 – 160:6, 187:5-13, 199:21-25, 230:2-13. That Branch reported the fight that night had absolutely no bearing on IC's decision

to discharge him:

> Q: Would your recommendation that Mr. Branch be terminated, would have been any different if Mr. Melton had reported the fight or if you had found out about it from another source?
> A: No.
> ***
> Q: Would your recommendation with respect to the termination of Mr. Branch have been any different if Mr. Melton or another co-worker had reported the incident?
> A: It did not matter.
> ***
> Q: If Mr. branch had not come forward to make this report, but another employee had reported this incident, would Mr. Branch still have been fired?
> A: We would have gone through the same process. We would have accumulated statements. We would have proceeded through much of the same process. I'm assuming that that would obviously just lead to the same type of determination.

Tr. 113:2-6, 159:21-24, 187:5-12.

## B. The DRP Considers and Rejects Branch's Claim of Self-Defense.

Branch's Motion cites to the Equal Employment Opportunity Commission's ("EEOC") hearsay determination letter which incorrectly states that IC made its decision to terminate Branch "without regard to [IC's] policy exemption of justified self-defense and [Branch's] admirable work history." Branch's Motion, p. 4. There is no actual evidence supporting this hearsay supposition. In reality, the DRP considered and rejected Branch's assertion of self-defense, and IC has consistently explained why Branch's work history was irrelevant: a Level 4 violation mandates dismissal irrespective of past work history. Spears Dec., Ex. F.

The DRP thoroughly considered, and ultimately rejected, Branch's assertion that he was engaged in self-defense:

> Q: And what did you identify in the transcript that led you to the conclusion that Mr. Branch had committed a Level 4 violation and should be terminated?
> A: So, my review of this was based completely on, almost solely on was this self-defense or wasn't it? Did it move to a different level when he was engaged in actual fighting? So, the review was very much focused on statements and the statements as to what facts were determined based on those statements, what happened, and it was through that that I came to the determination that this was beyond just a self-defense situation and it rose to the level of engaging and fighting.

Tr. 180:12 – 181:19; *see also,* Tr. 140:8 – 141:3, 157:8 – 158:3, 163:22 – 165:3.

Crain corroborated the explanation of Clark, Spears, Sullivan, and Hilliard: "the analysis turned on the evidence that was submitted by multiple witnesses, including Branch, that substantiated that both employees were swinging punches at each other. That is what tipped the scale." Tr. 211:25 – 212:3. Crain further testified his belief that Branch abandoned any right to the self-defense exception when "he punched back." Tr. 213:2-3. Sullivan likewise explained in terms of the DRP's review that Branch's conduct went beyond self-defense. Tr. 180:15-23.

Once the DRP concluded Branch had actively engaged in the fight, rather than deescalating or retreating, and thus committed a Level 4 violation, the necessary result was clear: Branch, too, must be dismissed. Spears Dec., ¶ 15 & Ex. F. This is why Branch's work record and history were irrelevant to IC's discharge decision. Tr. 116:1-2, 138:14-24, 185:4-15. Under the Discipline Policy, a Level 4 violation leads to dismissal. Spears Dec., Ex. F; Tr. 108:19 – 109:1, 138:23-24, 112:22 – 113:1, 149:12-23, 168: 15-22, 169:20-22, 179:6-12, 185:4-15.

## VI. BRANCH'S EMPLOYMENT TERMINATION WAS CONSISTENT WITH HOW IC HAS ADDRESSED PAST INCIDENTS OF WORKPLACE VIOLENCE.

### A. Similarly Situated Employees Who Have Engaged in a Physical Fight Have Been Terminated for Workplace Violence.

The most obvious comparator – Melton (who did not make any report, protected or otherwise) – was also terminated for the same reason as Branch: his violation of the WVPP. Spears Dec., ¶ 7 & Ex. I. Second, every member of IC's management and Human Resources department testified at the February 2024 hearing in front of the OALJ that they were not aware of *any* IC employee who engaged in a physical fight and was not terminated[7]. Tr. 149:14-19-23, 179:6-12.

---

[7] Branch may attempt to liken his behavior to an incident that occurred between Day and a contractor. However, the circumstances are not at all comparable given that (1) Day did not engage in a fight but rather walked away from and deescalated a situation after being hit by a contractor and (2) the Discipline Policy

Although the Discipline Policy is clear, given that Melton was the undisputed initial aggressor in the fight, IC made additional efforts to ensure its decision was consistent with past precedent. Unable to identify any mutual fights in the United States, Crain consulted a counterpart in Winnipeg to determine if he had experienced anything similar. Tr. 225:6-23. Crain's counterpart confirmed that he had and explained that in cases where both employees engaged or took swings, both are dismissed. Tr. 225:21-23. IC was following standard procedure in line with its policies.

## VII.   THE PLB REINSTATES BRANCH'S EMPLOYMENT BUT EXPLICITLY NOTES THAT BRANCH WAS A PARTICIPANT IN THE FIGHT AND SHOULD HAVE DISENGAGED.

Following his discharge, Branch's union appealed his termination to the PLB. Branch makes much ado about the PLB's August 19, 2024, Interim Award on this appeal. *See* Exhibit B to Branch's Motion. Branch's union's appeal of his discharge is a "minor dispute" arising under the CBA, which controlled the terms of Branch's employment with IC. Spears Dec., ¶ 12. In other words, the PLB's decision making was related *exclusively* to the CBA. *See* Argument Section II.C, *infra*. The PLB did not consider or evaluate the separate and legally distinct claims at issue in the present matter, namely, whether IC's "reason [for terminating Branch's employment] was discriminatory or retaliatory." *Id.*; Branch's Motion, p. 16. Nor were these claims presented to the PLB. Indeed, neither Branch's union's statement to the PLB, nor the PLB's Interim Award make any reference whatsoever to these allegations. *See* Exhibit B to Branch's Motion.

The PLB did not consider or decide whether Branch's termination was retaliatory because he made a report protected by Title VII and Section 1981.[8] What the PLB did consider and decide was that Branch did violate IC's policies by participating in the fight. *See* Exhibit B to Branch's

---

does not apply to non-union employees and there was no need for a formal investigation in light of the fact that Day did not engage in workplace violence. Tr. 124:11-13, 126:14-22. *See* Declaration of Patrick Jones in Support of IC's Motion for Summary Judgment (ECF Doc. 60-3).

[8] The PLB also did not consider whether Branch's employment was terminated because of his race.

Motion, p. 2. Specifically, although the PLB reinstated Branch, the PLB made clear that Branch should still receive a record of discipline for his conduct – a long-term suspension[9] – and explicitly stated that Branch "should have disengaged more than he did." *Id.* In other words, Branch *did* violate a policy for which *discipline was appropriate. Id.* The PLB further warned Branch he was being reinstated on a last-chance basis with respect to similar conduct, i.e., engaging in physical violence in the workplace. *Id.* Significantly, this Interim Award lacks any reference to or discussion of retaliation while at the same time explicitly acknowledging Branch's misconduct. *Id.*

## **ARGUMENT**

### I. **LEGAL STANDARD.**

Summary judgment is appropriate if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). Rule 56 "mandates the entry of summary judgment… against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party seeking summary judgment bears the initial burden of informing the district court of the basis for its motion. *Id.*, at 323. Only if the movant has satisfied this burden must the party opposing summary judgment put forth affirmative evidence establishing a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, all facts must be viewed in the light most favorable to the nonmovant, IC. *Jones v. New Orleans*

---

[9] The PLB elected to award Branch only one year of backpay, despite Branch being out of work for over two years. Exhibit B to Branch's Motion. That the PLB did not award Branch full backpay – combined with its choice to reduce Branch's discipline rather than erase it and its affirmative statement that Branch should have "disengaged" from the fight – confirms the PLB's affirmation that Branch violated IC policy.

*Reg'l Physician Hosp. Org., Inc.*, 981 F.3d 428, 432 (5th Cir. 2020).

Here, there is no genuine dispute of material fact; *however*, the undisputed material facts necessitate summary judgment in favor of IC on all Branch's claims. Accordingly, Branch's Motion should be denied, and summary judgment entered in favor of IC on all four of his claims.

## II.     BRANCH'S RETALIATION CLAIMS UNDER 42 U.S.C. § 1981 AND TITLE VII FAIL AS A MATTER OF LAW.

For Branch to prevail on his Title VII or Section 1981 retaliation claims, which are analyzed under the same framework, he must first establish a *prima facie* case of retaliation by showing (1) he has engaged in activity protected by Title VII or Section 1981; (2) he has suffered from an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action. *DeCorte v. Jordan*, 497 F.3d 433, 437 (5th Cir. 2007); *Alkhawaldeh v. Dow Chem. Co.*, 851 F.3d 422, 427 (5th Cir. 2017). At all times, Branch retains the burden to establish that his alleged protected conduct was the but-for cause of his discharge. *Alkhawaldeh*, 851 F.3d at 427; *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 339 (2013). Branch cannot meet his legal burdens here because he cannot demonstrate that he engaged in protected activity under Title VII or Section 1981 nor that there was a causal connection between his unprotected report and the termination of his employment. Moreover, IC has articulated clear, legitimate, non-retaliatory reasons for Branch's termination which Branch has not demonstrated to be pretextual. As such, far from Branch being entitled to summary judgment, Branch's retaliation claims under both Title VII and Section 1981 fail as a matter of law and judgment should be entered in favor of IC.

4896-1801-7523.2 / 046769-1415

### A.     Branch Cannot Establish a *Prima Facie* Case of Retaliation.

#### 1.     Branch Did Not Engage in Protected Activity.

To establish that he engaged in protected activity, Branch must show he opposed a "practice rendered unlawful by Title VII [or Section 1981], including making a charge, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII." *Ackel v. Nat'l Commc'n, Inc.*, 339 F.3d 376, 385 (5th Cir. 2003) (quotation omitted); *McCoy v. City of Shreveport*, 492 F.3d 551, 556-557 (5th Cir. 2007). Branch cannot do so because he never reported concerns of discrimination or retaliation during his employment with IC, including pursuant to his report of the May 26, 2022, fight. Branch 2023 Dep., 35:1-4; Branch 2024 Dep., 18:6-19, 21:19-22. In other words, Branch never reported activity unlawful under – or engaged in conduct protected by – either Title VII or Section 1981.

Reporting a physical altercation is not protected activity under Title VII or Section 1981. *See e.g., Green v. Trimac Transportation S., Inc.*, 2012 WL 12893293, at *16 (E.D. Tex. Sept. 12, 2012), *aff'd sub nom. Green v. Trimac Transp, Inc.*, 546 F. App'x 333 (5th Cir. 2013) (explaining that "complaining of an employer's safety violations is not a protected activity under Title VII" and holding that a plaintiff cannot make a *prima facie* showing of retaliation when it is premised on a report of alleged safety concerns); *Washington v. M. Hanna Constr. Inc.*, 299 Fed. App'x 399, 401-02 (5th Cir. 2008) ("vague allegations regarding complaints ... none of which are facially directed at the enforcement of rights protected by Title VII, are insufficient to state a retaliation claim"); *McIntire v. Hamilton Beach*, No. 3:19-cv-261-NBB-JMV, 2020 WL 5821969, *1-2 (N.D. Miss. Sept. 30, 2020) (explaining that "a vague complaint, without any reference to an unlawful employment practice under Title VII, does not constitute protected activity" and recognizing that "[c]ourts in the Fifth Circuit have consistently rejected retaliation claims that alleged only 'hostile'

conditions, 'unfair treatment,' or other grievances untethered to any legally protected activity") (quotations and citations omitted).

While Branch now argues he "made a complaint with a reference to an unlawful employment practice under Title VII" when he "complained about the assault and racist remarks he faced from a coworker" (*see* Branch's Motion, p. 10),[10] Branch, however, offers no evidentiary cite to support this allegation. Quite the contrary, Branch's sworn testimony confirms the inaccuracy of this assertion. **<u>Branch has affirmatively testified that no racially discriminatory comments were ever directed at him, that no racially insensitive language was used by Melton on the night of the fight, and that the fight was not racially motivated.</u>** Tr. 47:24 – 48:6; Branch 2024 Dep., 47:16-20, 55:15-19, 61:3-7, 61:16-23, 62:5-8; Spears Dec., Ex. G, 80:18 – 81:1. As such, it is clear that Branch's statement reporting the fight was not a protected report, as it could not have included concerns of race discrimination when Branch admits he had none. That Branch did not make a report of alleged race discrimination is further evident by the fact that Branch made no mention of racial animus or discrimination during his conversations with either Day or Garner, or any other member of IC management or Human Resources, nor during the formal investigation on June 7, 2022.[11] Branch 2024 Dep., 61:3-7, 61:16-23, 62:5-8, 80:17 – 81:2. Branch never engaged in activity protected under Title VII or Section 1981; he therefore is

---

[10] Branch's Motion seems to be parroting the EEOC's determination, but these assertions in the EEOC finding when offered for the truth of the matter asserted, as Branch offers them, are inadmissible hearsay. Fed. R. Evid. 802; *Okoye v. Univ. of Tex. Hous. Health Sci. Ctr.*, 245 F.3d 507, 501, n.5 (5th Cir. 2001). Nor does this determination comport with Branch's under oath admissions, and it has no evidentiary value whatsoever.

[11] Branch's allegation that he "reported the incident, including the racially discriminatory and harassing comments" to Garner is not supported by any evidence, and is, in fact, contradicted by Branch's own admission that he never reported to Garner (or anyone else at IC) any racial or harassing comments. Branch 2024 Dep., 61:3-7, 61:16-23. Moreover, Garner, too, testified that Branch only reported to him that there was an altercation. Deposition of Chance Garner, November 27, 2023, 9:13-16 (attached to the Fitzke Dec. as Exhibit D).

certainly not entitled to summary judgment, which should instead be granted in favor of IC. *See e.g., Long v. Eastfield College*, 88 F.3d 300, 304 (5th Cir. 1996) (holding that while complaints made to a personnel or human resources director may be a protected activity under Title VII, such complaints are protected only to the extent that they concern unlawful discrimination).

### 2. Branch Cannot Demonstrate a Causal Connection Between His Report of the Fight and His Termination.

Branch likewise cannot show a causal connection between his report of the fight and the termination of his employment. Notably, Branch believed he was *exclusively* reporting a safety concern when he reported the fight; he was not reporting race discrimination or other conduct illegal under Title VII or Section 1981, and therefore was not engaging in activity protected under Title VII or Section 1981. Branch 2024 Dep., 47:16-20, 55:15-19, 61:3-7, 61:16-23, 62:5-8; Tr. 47:24 – 48:6, 92:3; Spears Dec., Ex. G, 80:18 – 81:1.

Even had Branch had engaged in protected activity (which he did not), Branch cannot shield himself from the consequences of his own behavior merely by reporting an incident in which he also engaged in a violation of company policy. *See Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188, n.3 (5th Cir. 1997) (holding that Title VII's protections do not insulate an employee from discipline for work rule violations); *Raggs v. Mississippi Power Light Co.*, 278 F.3d 463, 471-472 (5th Cir. 2002) (same); *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 417 (8th Cir. 2010) (same); *Trimmer v. Dep't of Labor*, 174 F.3d 1098, 1104 (10th Cir. 1999) (explaining that the whistleblower protection laws "are not… intended to be used by employees to shield themselves from the consequences of their own misconduct or failures"); *Yowell v. Admin. Review Bd.*, 993 F.3d 418, 421 (5th Cir. 2021) (same). Nor does the fact that Branch was not the initial aggressor mean that he did not violate IC's policies nor that IC could not discipline him for the

same. *Jackson v. BNSF Railway Co.*, No. 16-CV-5518, 2018 WL 4003377 (N.D. Ill. Aug. 22, 2018).

Branch now argues that IC incorrectly applied its policies, specifically, that "given the terms of the policy, it is clear that it allows exceptions for self-defense… [and] Plaintiff's termination… should not have occurred if the company had applied its policy correctly, considering that Plaintiff acted in self-defense." Branch's Motion, p. 12. Branch argues that this somehow demonstrates a causal connection between his report and his termination. *Id.* However, IC considered and rejected the self-defense exception in its policy as applied to Branch, and Branch's disagreement with IC's application of its own policies is nothing more than an impermissible request that the Court sit as a super personnel department and reverse IC's well-reasoned termination decision. *Scott v. Univ. of Miss.*, 148 F.3d 493, 509-10 (5th Cir. 1998), abrogated on other grounds by *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 72 (2000) (citation omitted) ("Even if evidence suggests that a decision was wrong, [the court] will not substitute our judgment . . . for the employer's business judgment"); *Eyob v. Mitsubishi Caterpillar Forklift Am., Inc.*, 745 Fed.Appx. 209, 214-15 (5th Cir. 2018) (per curiam) ("employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination").

There is no dispute that after Melton initiated the fight and struck Branch, Branch fought back, swinging and advancing on Melton, even after Melton fell to the ground covering himself in what was a truly defensive posture. Tr. 51:7-19. It is also undisputed that physical violence is a Level 4 violation of IC's policies, resulting in immediate discharge. Accordingly, the causal connection rests between Branch's participation in the fight and his termination, not his

unprotected report of the fight and termination, and his claim fails for this additional reason.

**B.      IC Has Demonstrated a Legitimate, Lawful, Non-Retaliatory Reason for Terminating Branch's Employment and Branch Has Not Shown This Reason to Be Pretextual.**

Denial of Branch's Motion and summary judgment in favor of IC is also warranted on the grounds that IC has articulated a lawful, legitimate, non-retaliatory reason for terminating Branch's employment, and Branch has not shown this reason to be pretextual.

More specifically, to demonstrate pretext sufficient to defeat IC's legitimate and non-retaliatory reason for terminating Branch's employment, Branch must produce evidence that could lead a reasonable factfinder to conclude that "the adverse [employment] action would not have occurred 'but for' the employee's decision to engage in an activity protected by Title VII." *Alkhawaldeh*, 851 F.3d at 427. In other words, Branch must prove that IC would have acted differently if it were not for Branch's report of the fight. *Id.*; *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 806 (5th Cir. 2007). Regardless of "'[w]hether or not there were other reasons for the employer's action, the employee will prevail only by proving that 'but for' the protected activity she would not have been subjected to the action of which she claims.'" *McDaniel v. Temple Indep. Sch. Dist.*, 770 F.2d 1340, 1346 (5th Cir. 1985) (quoting *Jack v. Texaco Research Center*, 743 F.2d 1129, 1131 (5th Cir. 1984)). Again, Branch has not and cannot do so because he cannot present *any* evidence that his violation of IC's policies against workplace violence is not the true reason for his discharge or that it is a pretext for retaliation. While Branch argues that the short period of time between his report of the fight and his ultimate termination suggests pretext, it is well settled that, at the pretext stage, close temporal proximity alone is not sufficient to prove but-for causation. *Strong*, 482 F.3d at 808. Nor may Branch shield himself from discipline for his own workplace misconduct merely by reporting the same. *Yowell*, 993 F.3d at 422.

As delineated in Sections I, V, and VI, *supra*, Branch's employment was terminated *exclusively because* he engaged in workplace violence, thereby committing a Level 4 offense in violation of the WVPP, which, pursuant to the Discipline Policy, calls for immediate discharge. *See e.g., Wheat v. The Michaels Org.*, Civil Action 5:21-CV-88-DCB-BWR, 2023 WL 2391006 at *21 (S.D. Miss. Mar. 7, 2023) (following a discipline policy is a legitimate, nondiscriminatory explanation for employment actions). When an employee's termination is premised on accusations of misconduct or a violation of company policy, the relevant inquiry becomes whether the employer had a good faith belief that the employee engaged in misconduct or a violation of company policy and whether the employer's decision to terminate the employee was based on that good faith belief. *Waggoner v. City of Garland*, *Tex.*, 987 F.2d 1160, 1165-66 (5th Cir. 1993); *Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 379 (5th Cir. 2010). In other words, an employer may be wrong in its assessment of an incident, as long as it relied in good faith on non-retaliatory reasons for termination. Branch must do more than "just dispute the underlying facts and argue that [IC] made the wrong decision." *LeMaire v. La. Dep't of Transp.*, 480 F.3d 383, 391 (5th Cir. 2007). "[T]he issue at the pretext stage is whether [the employer's] reason, even if incorrect, was the real reason for" its decision. *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 476 (5th Cir. 2015). Here, Branch admits his part in the fight, and considering his handwritten statement and testimony in the investigation hearing – coupled with eyewitness testimony corroborating that of Branch's – IC had a strong and legitimate good faith belief that Branch violated IC's policies against workplace violence. Branch has never offered a single shred of evidence undercutting IC's reason for terminating his employment, and he has not done so here.

Simply put, Branch has not set forth *any* evidence, let alone the requisite substantial evidence, to show that IC's true reason for terminating him – his violation of IC's policies against

workplace violence – is false or pretext for retaliation. As such, Branch's Motion must be denied and judgment entered in favor of IC.

### C. The PLB's Award Does Not Preclude IC From Presenting Its Legitimate, Non-Retaliatory Reason for Terminating Branch's Employment.

Branch confoundingly argues that IC is "collaterally estopped from articulating that it had a legitimate, non-discriminatory reason for terminating [Branch], which was because [Branch] had violated the" WVPP because "the issue as to whether [IC's] reasoning was discriminatory or retaliatory had already been concluded in a former arbitration held by the" PLB. Branch's Motion, p. 16; Exhibit B to Branch's Motion. This is false, however, as the PLB did not evaluate or decide whether IC's reason for terminating Branch's employment was discriminatory, retaliatory, or even untrue.

Another court  determining whether to apply collateral estoppel to PLB findings to a FELA personal injury matter put the PLB findings in context, noting:

> The RLA provides a comprehensive framework for the resolution of both major and minor labor disputes in the railroad industry. The court finds this is a minor dispute, as defined by 45 U.S.C. § 153(I), which states that "minor disputes" are those growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, **rules**, or working conditions. The Public Law Board's resolution of minor disputes is deemed compulsory arbitration for the purpose of the RLA. *Brotherhood of Railroad Trainmen v. Chicago River & Indiana Railroad Company*, 353 U.S. 30, 39, 77 S. Ct. 635, 640, 1 L.Ed.2d 622 (1957).

*Graves v. Burlington Northern and Santa Fe Ry. Co*., 77 F.Supp.2d 1215, 1218 (1999) (emphasis added, citations in original).[12] "The distinguishing feature of [a minor dispute] is that the dispute may be conclusively resolved by interpreting the existing [CBA]." *Conrail,* 491 U.S. at 305, 109

---

[12] By contrast, "major disputes," relate to "'the formation of collective [bargaining] agreements or efforts to secure them.'" *Consolidated Rail Corp. v. Railway Labor Executives' Ass'n.*, 491 U.S. 299, 302, 109 S. Ct. 2477, 105 L.Ed.2d 250 (1989) (Conrail ) (quoting Elgin, J. & E. Ry. Co. v. Burley, 325 U.S. 711, 723, 65 S. Ct. 1282, 89 L.Ed. 1886 (1945)).  Major disputes are not at issue here as it relates to the relevant CBA.

S. Ct. 2477. Here, issues regarding IC's motive and whether it discriminated against or retaliated against Branch cannot be determined with reference to the CBA and were not presented to the PLB. As such, collateral estoppel cannot apply.

As Branch admits, collateral estoppel can only apply when the issue a party seeks to preclude *has been actually litigated and decided*. *Anderson, Clayton Co. v. United States*, 562 F.2d 972, 991 (5th Cir. 1977); *Walker v. Kerr-McGee Chem. Corp.*, 793 F. Supp. 688, 694 (N.D. Miss. 1992). However, nothing in the PLB's Interim Award – or anything else on the record – suggests that the PLB decided or even considered whether IC's stated reason for terminating Branch was discriminatory or retaliatory. *See* Exhibit B to Branch's Motion. For example, even the internal IC investigation hearing transcript and exhibits on which IC – and later the PLB – made their decisions (*see* Exhibit C to Branch's Motion) contains exactly zero reference to or mention or allegation of retaliation and presents no evidence of retaliatory animus, despite Branch having "the opportunity to present [his] case," which included "represent[ation] by independent counsel" and the opportunity "to cross examine every witness." Branch's Motion, p. 17. Because the discipline hearing transcript and its exhibits contains no allegation that Branch's termination was discriminatory or retaliatory, and this issue was not presented to the PLB, it necessarily follows that the PLB could not have decided those issues when it reviewed the same, and IC is not precluded from presenting its legitimate, non-retaliatory reason for terminating Branch's employment. *See Koger v. Norfolk Southern Ry. Co.*, No. 1:08–0909, 2010 WL 772883, *3 (S.D. W.Va. Mar. 3, 2010) (rejecting collateral estoppel application to PLB Interim Award where issue sought to be estopped was not presented to PLB). To the extent that collateral estoppel only applies when the issue was both adjudicated and litigated – and the "determination was necessary to the decision" – it is absurd for Branch to argue that the PLB found IC's reasoning to be racially

discriminatory and retaliatory *and yet still admonished Branch for his violation of IC's policies, affirmed that Branch should be disciplined for the same, and only gave Branch backpay for less than half the time he was out of work*. Branch's Motion, p. 14; Exhibit B to Branch's Motion.

Branch's attempted advancement of collateral estoppel in this posture is further surprising, given that PLB decisions rarely – if ever – collaterally estop separate civil actions *See Graves*, 77 F.Supp.2d at 1218 (citing *McDonald v. West Branch*, 466 U.S. 284, 104 S. Ct. 1799, 80 L.Ed.2d 302 (1984) (holding arbitration does not preclude a subsequent 42 U.S.C. § 1983 action); *Barrentine v. Arkansas–Best Freight Sys., Inc.*, 450 U.S. 728, 101 S. Ct. 1437, 67 L.Ed.2d 641 (1981) (holding arbitration has no preclusive effect on a claim under the Fair Labor Standards Act); *Alexander v. Gardner–Denver Co*., 415 U.S. 36 (1974) (holding arbitration has no preclusive effect on a Title VII claim)); *see also Alexander v. Medpoint Prof'l Staffing, LLC*, No. 1:11-CV-00256-GHD, 2014 WL 60199, at *1 (N.D. Miss. Jan. 7, 2014) (holding that collateral estoppel does not apply to retaliation claims under Title VII or Section 1981 and further that plaintiff was not collaterally estopped from arguing that she was terminated for any other reason than cause even where the issue of plaintiff's termination had been litigated in a separate proceeding); *Vaughn v. Starkville Manor Healthcare, LLC*, No. 1:15CV174-SA-DAS, 2017 WL 1014368, at *4 (N.D. Miss. Mar. 14, 2017) (rejecting plaintiff's argument that defendants were collaterally estopped from alleging plaintiff was terminated for falsifying her time where the ALJ had held plaintiff had not done so because the ALJ did not determine whether defendant discriminated against plaintiff). Quite the opposite of applying collateral estoppel, courts have stated in the face of a PLB Award, "[t]he federal court should consider the employee's claim *de novo*." *Horton*, 102 F.Supp.2d at 338 (citing *Gardner-Denver*, 415 U.S. at 60).

Accordingly, Branch has failed his burden to establish IC is collaterally estopped from

4896-1801-7523.2 / 046769-1415

presenting its legitimate, non-retaliatory reason for Branch's termination, i.e., his violation of the WVPP. *Kulavic v. Chicago & Illinois Midland Railway Co*., 1 F.3d 507, 517, n. 6 (7th Cir.1993).

## III.   BRANCH FAILED TO MITIGATE HIS ALLEGED DAMAGES AND IC PROPERLY ASSERTED THE FAILURE TO MITIGATE DEFENSE.

In support of his contention that IC has "failed to identify any facts or evidence that [Branch] failed to make reasonable efforts to obtain work," Branch cites to his unsworn and unverified answers to interrogatories from a separate and distinct lawsuit, currently pending in front of the OALJ. Branch's Motion, p. 8; Exhibit A to Branch's Motion. To the contrary, IC can present evidence that, at a minimum, creates a material issue of fact sufficient to permit a jury to decide whether Branch failed to make reasonable efforts to obtain work, applying to less than two jobs per month following his termination in May 2022, and completely abandoning his search after a little more than one year. Tr. 68:25 – 69:12.

This testimony, given in February 2024, mirrored Branch's testimony in his November 2023 deposition, indicating that between November 2023 and February 2024, ***Branch did not apply for a single job***. Branch 2023 Dep. 136:11-14. Moreover, in response to an interrogatory that requested *every* job to which Plaintiff applied since May 1, 2022, Branch named ***only five applications***, with none since November 2023. *See* Fitzke Dec., Ex. E. Inarguably, applying to less than two jobs per month – and completely ceasing a job search after a little more than a year – does not equate to a reasonable effort to obtain work. *See Sellers v. Delgado Cmty. Coll.*, 902 F.2d 1189, 1196 (5th Cir. 1990) (finding plaintiff failed to mitigate where she filed no job applications during six of twelve months); *Hansard v. Pepsi-Cola Metro. Bottling*, 865 F.2d 1461, 1468 (5th Cir. 1989) (denying back pay where employee searched for work for four years, then stopped and began selling items part-time at a flea market for a year, then "stopped looking for work altogether and began receiving Social Security early retirement benefits"); *Scudiero v. Radio One of*

*Tex. II*, *LLC*, No. 4:12-CV-1088, 2015 WL 6859146, at *17 (S.D. Tex. Sept. 30, 2015) (denying front pay where employee met with a few contacts from time-to-time only for about a month, never submitted an application or resume to anyone in his industry in the relevant markets, and started his own business for substantially lower pay). While Branch initially testified in his 2024 deposition that he had applied to additional jobs since November 2023, when IC requested documentation reflecting the same, Branch's counsel stated that Branch "was mistaken" and there were no additional job applications beyond what had already been produced. Fitzke Dec., ¶ 7. Indeed, a plaintiff cannot simply abandon his job search and seek to recover backpay. *Hansard*, 865 F.2d at 1468.

Thus, IC has sufficiently demonstrated that Branch failed to mitigate his damages. As Branch correctly notes, "if an employer proves that an employee has not made reasonable efforts to obtain work, the employer does not also have to establish the availability of substantially comparable employment." *Sellers v. Delgado Cmty. Coll.*, 839 F.2d 1132, 1139 (5th Cir. 1988); *Sellers*, 902 F.2d at 1193 (same); *Griggs v. Chickasaw Cnty.*, No. 1:16-cv-13-SA-RP, 2018 WL 2074190, at *4 (N.D. Miss. May 3, 2018) (same). Branch suggestion that *Sellers* is not good law (*see* Branch's Motion, p. 7-8) is simply untrue, as evidenced by the plethora of subsequent cases citing to *Sellers* for the proposition that if an employer proves that an employee failed to make reasonable efforts to obtain work, the employer does not also have to establish the availability of substantially comparable work. *See W. v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 393 (5th Cir. 2003); *Powers v. Northside Indep. Sch. Dist.*, 951 F.3d 298, 309 (5th Cir. 2020); *Rybar v. Corp. Mgmt., Inc.*, No. 1:14-CV-242-KS-MTP, 2015 WL 12912342, at *1 (S.D. Miss. July 16, 2015); *Pickett v. Mississippi Bd. of Animal Health*, No. 2:18-CV-214-KS-JCG, 2021 WL 3373806, at *3 (S.D. Miss. Aug. 3, 2021).

4896-1801-7523.2 / 046769-1415

In sum, IC has set forth plentiful evidence, by way of Branch's own testimony and written discovery responses, that Branch failed to make reasonable efforts to obtain comparable work by only applying to one or two jobs per month and completing ceasing his job search in November 2023. Because IC has established this fact, IC is relieved of any obligation to demonstrate that substantially comparable work was available. *Sellers*, 839 F.2d at 1139; *Sellers*, 902 F.2d at 1193. Therefore, IC has properly submitted this affirmative defense and Branch's request that the same be dismissed should be denied.

## IV.  BECAUSE BRANCH HAS NOT MADE A CLAIM FOR HOSTILE WORK ENVIRONMENT, IC WITHDRAWS ITS *FARAGHER/ELLERTH* DEFENSE.

Branch states the "*Faragher/Ellerth* defense generally applies to hostile work environment claims under Title VII." Branch's Motion, p. 20. Although Branch has not made a claim for hostile work environment (*see* ECF Doc. 1), IC asserted this defense out of an abundance of caution in light of the EEOC's finding and to ensure that IC did not waive its right to assert the same in the event Branch sought to add such a claim. Because we are at the conclusion of this case, and Branch has not asserted a hostile work environment claim, nor could he based on his admissions (see, e.g., Statement of Material Facts Not in Dispute Section II, *supra*, detailing Branch's admission that he experienced no race discrimination prior to his employment termination). IC hereby withdraws its *Faragher/Ellerth* defense.

### <u>CONCLUSION</u>

For the foregoing reasons, IC respectfully submits Branch has not provided any evidence in support of his retaliation claims under Title VII and Section 1981. On the other hand, IC has consistently explained its reason – and provided a full, undisputed evidentiary record in support thereof – for terminating Branch, i.e., his engagement in workplace violence thereby violating IC's policies. There is no genuine dispute as to any material fact, and IC is entitled to summary

judgment. Therefore, Branch's Motion must be denied in its entirety.

Dated: November 7, 2024

/s/ *Susan K. Fitzke*

Susan K. Fitzke (admitted *Pro Hac Vice*)
sfitzke@littler.com
Grace F. Jacobson (admitted *Pro Hac Vice*)
gjacobson@littler.com

LITTLER MENDELSON P.C.
1300 IDS Center
80 South 8th Street
Minneapolis, MN 55402.2136
Telephone:    612.630.1000
Facsimile:    612.630.9626

/s/ *Matthew G. Gallagher*

Matthew G. Gallagher, Bar No. 103159
mgallagher@littler.com

LITTLER MENDELSON, P.C.
3725 Champion Hills Drive
Suite 3000
Memphis, TN 38125
Telephone: 901.795.6695
Facsimile: 901.881.4333

***Attorneys for Defendant***

4896-1801-7523.2 / 046769-1415

## **CERTIFICATE OF SERVICE**

The undersigned certifies that a true and exact copy of the foregoing has been served, via electronic mail, through the Court's Electronic Case Filing System, this 7th day of November 2024, upon the following:

> Nick Norris (MB# 101574)
> WATSON & NORRIS, PLLC
> 4209 Lakeland Drive # 365
> Flowood, MS 39232-9212
> Telephone: (601) 968-0000
> Facsimile: (601) 968-0010
> Email: nick@watsonnorris.com
>
> ***Attorneys for Plaintiff Robert Branch***

*/s/ Susan K. Fitzke*
Attorneys for Defendant
