# MSJ Exhibit 1

**Declaration of Duane Spears and Exhibits**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION**

ROBERT BRANCH,

        Plaintiff,

    v.

ILLINOIS CENTRAL RAILROAD
COMPANY,

        Defendant.

CIVIL ACTION NO.  4:23-CV-217-MPM-JMV

## DECLARATION OF DUANE SPEARS IN OPPOSITION TO PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT

*I, DUANE SPEARS, hereby declare as follows:*

1.     My name is Duane L. Spears.  I am employed by Illinois Central Railroad Company ("IC"), Defendant in the above-referenced action. I submit this Declaration in support of IC's Memorandum of Law in Opposition to Plaintiff Robert Branch's Partial Motion for Summary Judgment.  I am over 18 years of age, this Declaration is based on my personal knowledge, and I am competent to testify about the matters stated below.

2.     I have worked for IC since 2001 and I am a Black male. My current position, which I have held since 2023, is Senior Manager, Diversity Equity & Inclusion. In 2010, I was promoted to Senior Human Resources Manager. Prior to that, I held the position of Human Resources Manager, Employer Planning.

3.     IC is a freight rail carrier that operates in various states within the United States, including Mississippi.

4.     In my role and because of my job duties, I have access to personnel and demographic records relating to IC employees.

5.     Attached as **Exhibit A** is a true and correct copy of IC's Equal Employment Opportunity Policy.

6.     Attached hereto as **Exhibit B** is a true and correct copy of IC's Code of Business Conduct.

7.     Attached as **Exhibit C** is a true and correct copy of IC's Prohibited Harassment, Discrimination and Anti-Retaliation Policy.

8.     Attached hereto as **Exhibit D** is a true and correct copy of IC's Workplace Violence Prevention Policy.

9.     IC's policies are communicated to employees and managers in several ways, including at the beginning of their employment and throughout their tenure during trainings, coaching sessions, and daily briefings.

10.     Attached hereto as **Exhibit E** is a true and correct copy of Mr. Branch's training records.

11.     Attached as **Exhibit F** is a true and correct copy of IC's Discipline Policy.  The Discipline Policy is applicable to union employees, including Mr. Branch.

12.     IC has a Collective Bargaining Agreement with the union of which Mr. Branch is a member, the Brotherhood of Maintenance of Way Employes Division. The Collective Bargaining Agreement governs certain terms and conditions of union employees' employment with IC, including disciplinary procedures.

13.     I was the Human Resources member of the Discipline Review Panel following the June 7, 2022, investigation hearing for Mr. Branch and Tracy Todd Melton. Attached hereto as **Exhibit G** is a true and correct copy of June 7, 2022, hearing transcript. The June 7, 2022, hearing was an internal IC disciplinary hearing that was not conducted before or by the Public Law Board.

2

Attached hereto as **Exhibit G-1** through **Exhibit G-16** are true and correct copies of the exhibits admitted at the June 7, 2022, hearing.

14.     Based on the Discipline Review Panel's determination that Branch and Melton had both engaged in physical violence thereby violating IC's policies against the same, the employment of both Mr. Branch and Melton was terminated on June 24, 2022. Attached hereto as **Exhibit H** is a true and correct copy of Mr. Branch's termination letter. Attached hereto as **Exhibit I** is a true and correct copy of Melton's termination letter.

15.     Neither the fact that Mr. Branch reported the fight with Melton to IC, nor Mr. Branch's race, played any role in IC's decision to terminate his employment.

**PURSUANT TO 28 U.S.C. § 1746, I VERIFY UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES THAT THE FOREGOING IS TRUE AND CORRECT.**

Signature: _____          Date: _November 4, 2024_

# Exhibit A

**IC's Equal Employment Opportunity Policy**

# Equal Employment Opportunity Policy - U.S.

| Target Audience: | Applicable in: | View corresponding policy: |
|---|---|---|
| Non-unionized Employees - U.S. 🇺🇸 | 🇨🇦 | |
| Unionized Employees - U.S. | | |
| Others (see scope) | | |

## Objective

CN, in accordance with applicable law, is committed to assuring that there will be no discrimination against any applicant or employee on the grounds of race, color, religion, sex, age (40 and older), sexual orientation, gender identity, national origin, physical or mental disability, veteran's status or any other protected characteristic as established by law.

## Scope

This policy applies to all employees of CN's U.S. operation and all applicants for employment in the U.S.

## Complete policy

### Scope

This policy applies to all employees of CN's US operation and all applicants for employment in the US.

### Policy

In accordance with applicable law, the company is committed to assuring that there will be no discrimination against any applicant or employee on the grounds of race, color, religion, sex, age (40 and older), sexual orientation, gender identity, national origin, physical or mental disability, veteran's status or any other protected characteristic as established by law. The company will provide reasonable accommodation where necessary and feasible, and it will otherwise treat equally all qualified individuals with disabilities. The company will provide a workplace free from all prohibited harassment. This policy extends to recruiting and hiring, reassignment, working conditions, training programs, advancements, promotions, compensation, use of company facilities, and all other terms, conditions and privileges of employment. Appropriate disciplinary action may be taken against any employee wilfully violating the policy.

The Human Resources Department has overall responsibility for this policy including implementation of Affirmative Action programs. If you have a problem or concern, the Company encourages you to use the internal complaint procedure found in the **Prohibited Harassment, Discrimination and Anti-Retaliation Policy**. Any person may discuss at length

with the HR Manager, Human Resources Department, any question as to compliance and be assured of expeditious processing of any complaint. Any person filing a complaint or assisting in an investigation is protected from coercion, intimidation, interference, discrimination or retaliation.

[Poster - Equal Employment Opportunity (EEO) is the Law (pdf)](#)

**Last revision date:** February 2015

# Exhibit B

**IC's Code of Business Conduct**



# CODE OF BUSINESS CONDUCT
## DOING  THE  RIGHT  THING

## DOING THE RIGHT THING

The Code of Business Conduct establishes the values and expectations that underpin our ethical approach. It reflects our commitment to engage with our stakeholders with trust and integrity and the importance of maintaining a positive reputation. *Doing the Right Thing* is all about dealing professionally with issues as they arise, ensuring we make the right choices and bringing integrity in all aspects of our business. At a minimum, *doing the right thing* means:

- Complying with applicable laws, rules and regulations;

- Being familiar and complying with the principles set out in CN policies and the Code of Business Conduct;

- Not allowing any personal interest to compromise CN's or our own integrity;

- Providing a diverse, safe and supportive work environment;

- Treating customers, competitors, suppliers and other business partners with respect, honesty and fairness;

- Reporting promptly in good faith any violation or potential violation of the Code of Business Conduct that we may become aware of;

- Supporting others in doing the right thing and in making the right choices.

Exhibit B: IC's Code of Business Conduct



Exhibit B: IC's Code of Business Conduct

CN-Branch 001280

## A MESSAGE
## FROM THE PRESIDENT AND CEO

Dear fellow railroaders,

As one of North America's leading railroads, we know people expect the best of CN. And we take that responsibility very seriously.

A good reputation takes years to earn but can be lost very quickly. There is no asset more valuable than our reputation. That is why we must always engage our many stakeholders with trust and integrity and maintain a positive image in all aspects of our organization. We are close to 24,000 employees strong across the Company, and every connection we make with each other, our customers and all the other stakeholders who affect our business must be beyond reproach. Acting responsibly is essential to achieving sustainable business success.

In our daily activities we face a variety of issues, and good judgment and responsible practices help us do the right thing in many cases. For problematic situations there are always resources and tools at our disposal. For example, our leadership values and competencies provide a clear, consistent and simple model of behaviour. Our Code of Business Conduct also helps us deal professionally with issues as they arise.

CODE OF BUSINESS CONDUCT

Exhibit B: IC's Code of Business Conduct

CN-Branch 001281

With real-life examples, CN's Code of Business Conduct is a practical guide for our actions as railroaders and outlines our commitment to the highest standards of ethical business principles.

We made sure to keep this Code in an easy-to-read format so you can refer to it as often as needed. To maintain our reputation in the industry we cannot just read the Code – we must live it and apply it every day.

Whether you recently joined CN or have been working for the Company for many years, I encourage you to read the Code of Business Conduct and let it guide you in your day-to-day duties. If you have any questions or concerns about anything contained in the Code, do not hesitate to talk to your supervisor first and, if need be, to contact the appropriate resources listed in this booklet.

JJ Ruest
President and CEO

CODE OF BUSINESS CONDUCT

Exhibit B: IC's Code of Business Conduct

In this document, Canadian National Railway Company, together with its wholly owned subsidiaries, is sometimes referred to as "the Company" or "CN," "we" or "us," and in the possessive sense as "our" or "ours." CN employees are sometimes referred to as "you," and in the possessive sense as "your" or "yours."

Additionally, first names used in the examples in the Code are used for illustrative purposes only and do not refer to any current or former CN employee.

"The Code" or "this Code" refers to this document.

This Code summarizes or references various Company policies and practices in a single document for your convenience. All CN policies referenced in the Code are accessible on CN's electronic portal (ePortal) in the Employee Self-Service section under Policies and Guidelines. Should there be a contradiction between the Code and a policy, the policy will prevail.

# TABLE OF CONTENTS

2 Building for the Future: What CN Stands For

GETTING ON BOARD

5 Getting Help
6 What This Code Means to You
7 Who Is Subject to This Code?
7 Amendments and Waivers

KNOW AND ACT

9 Employee Responsibilities
10 Additional Responsibilities for Leaders
11 Duty to Report Code Violations – Real or Potential

RESPECT IN THE WORK ENVIRONMENT

14 Safe, Secure, Violence-Free
16 Drugs and Alcohol
19 Diversity and a Non-Discriminatory, Harassment-Free Environment
23 Environment

PUTTING OUR REPUTATION FIRST

27 Conflicts of Interest
33 Competition and Antitrust
38 International Operations and Trade Controls

SAFEGUARDING WHAT'S OURS

44 Protecting CN's Assets
47 Confidentiality
50 Compliance with Insider Trading and Other Legal Requirements
53 Communication of Corporate Information
55 Financial Records Integrity
57 Contractual Obligations and Authorization
58 Information Security
63 Social Media
67 Records and Document Retention

MAKING A DIFFERENCE

71 Community Activities and Investment
72 Political Activities

A DUTY TO REPORT

80 Reporting Violations of the Code
81 Compliance Standards and Procedures
81 CN's Ombudsman
83 CN's Promise

REFERENCES

CODE OF BUSINESS CONDUCT

CN-Branch 001284

# WHAT CN STANDS FOR

*A leading North American Transportation and Logistics Company.* CN is a true backbone of the economy whose team of approximately 24,000 railroaders transports more than C$250 billion worth of goods annually for a wide range of business sectors, ranging from resource products to manufactured products to consumer goods, across a rail network of approximately 20,000 route-miles spanning Canada and mid-America.

## BUSINESS INTEGRITY AND FAIR DEALING
CN supports free enterprise and believes in fair competition in an open market. We work diligently to bring integrity and excellence to all aspects of our business. You should always promote and practice these values through your work at CN.

## RESPECTING THE LAW, RULES AND REGULATIONS
CN employees must comply with the laws, rules and regulations applicable in their jurisdiction, as well as with CN policies and other Company rules relevant to their work. That means always

Exhibit B: IC's Code of Business Conduct

CN-Branch 001285

asking yourself "Am I doing the right thing?" If you aren't sure of the answer, ask for help by contacting your immediate supervisor, your Human Resources representative, the CN Law Department or the CN Ombudsman. You can help safeguard against actions that could potentially involve CN in unlawful or improper practices.

At CN, we take pride in being regarded internationally as one of the best-performing transportation and logistics companies. Our commitment is to create value for both customers and shareholders by deepening customer engagement, leveraging the strength of our franchise and delivering Operational and Service Excellence.



BUILDING FOR THE FUTURE
CODE OF BUSINESS CONDUCT

Exhibit B: IC's Code of Business Conduct

# GETTING
## ON  BOARD

This document   refers  you  to  individuals
or  groups  who  can  help  you  deal  with
Code-related issues.

CN-Branch 001287

# GETTING HELP

**CN Ombudsman**
1-866-226-8968
ombudsman@cn.ca

**CN Law Department**
514-399-6627
1-866-996-6627

**Human Resources Centre**
1-877-399-5421

**CN Police**
1-800-465-9239 or to report non-urgent suspicious activities:
cnpolicetipline@cn.ca

**CN Public Affairs Department**
1-888-888-5909

**CN Investor Relations Department**
514-399-0052

**CN Environment Group**
1-800-465-9239 to report environmental incidents

**CN Corporate Information Security Unit**
514-399-4357
http://cnis
infosec@cn.ca

**CN's Hotline**
1-800-925-5974
www.reportanissue.com

Exhibit B: IC's Code of Business Conduct

CN-Branch 001288

## WHAT THIS CODE MEANS TO YOU

While the Code covers many situations you might face, it can't specifically address every situation you might encounter.

Should you find yourself in a situation not covered in the Code that causes concerns, contact your immediate supervisor or your Human Resources representative for assistance. While the Code mentions some of the key policies applicable at CN, other CN documentation and policies may also provide useful information.

As a CN employee, you are expected to be familiar with the Company's Code of Business Conduct and policies, and understand how they apply to you and your job. Should there be a contradiction between the Code and a CN policy, the policy will prevail. All Company policies referenced in the Code, as well as other policies applicable to a range of topics relevant to your employment at CN, are accessible on CN's electronic portal (ePortal) in the Employee Self-Service section under Policies and Guidelines. We must go beyond merely complying with the various applicable laws and regulations – we must understand that everything we do and say can have a potential impact on the Company and on the people we encounter every day on the job. Both your own personal reputation and CN's corporate reputation are on the line.

This Code outlines best practices for you and your colleagues to follow in fulfilling this responsibility. Use it as a resource for general guidance on the ethical values you and your fellow employees are expected to demonstrate in your work.

## WHO IS SUBJECT TO THIS CODE?

The Code of Business Conduct applies to all CN employees, officers, and members of the Board of Directors.

We expect every third party we do business with, including consultants, agents, suppliers and business partners, to obey the law and adhere to high ethical standards. CN employees must not ask a third party to engage in any activity that violates our ethical standards.

## AMENDMENTS AND WAIVERS

**Amendments to the Code** must be approved by the Chief Legal Officer and the Corporate Governance and Nominating Committee of the Board

**Waivers to the Code** may be granted only in exceptional circumstances, as follows:

- **Only CN's Board of Directors** can grant a waiver of the Code to a director or an executive officer.

- **Only the Chief Executive Officer,** the Chief Legal Officer or their delegates can grant a waiver of the Code to a non-executive officer or other employee.

Exhibit B: IC's Code of Business Conduct

CN-Branch 001290

# KNOW
## AND  ACT

Understanding  and following  the Code is everyone's  responsibility.  The Code helps  us  to  ensure  we  maintain  trust, honesty and integrity at CN.

## EMPLOYEE RESPONSIBILITIES

As an employee, you must:

- Read, understand and follow the Code;

- Periodically review the Code online or keep a copy for easy reference;

- Use the resources available for guidance and assistance;

- Contact your supervisor, your Human Resources representative, the CN Law Department or the CN Ombudsman if you are uncertain about any situation or element of this Code;

- Promptly report in good faith any violation or potential violation of the Code;

- Cooperate in internal investigations about a reported violation;

- Respect all applicable laws in the jurisdiction(s) in which you work;

- Act with integrity at all times;

- Inform your supervisor and your Human Resources representative if you are charged or found guilty of a criminal offence that may affect CN's operations or reputation or impair your ability to perform your duties;

- Immediately notify your supervisor if a licence, permit, certificate or professional designation that is necessary for you to perform your CN duties is revoked or not renewed for any reason.

KNOW AND ACT
CODE OF BUSINESS CONDUCT

Exhibit B: IC's Code of Business Conduct

# ADDITIONAL RESPONSIBILITIES FOR LEADERS

While every employee can be a leader in terms of ethical behaviour, those who supervise the work of others carry additional responsibilities. Leaders must lead by example, fostering a culture that reflects the Code's goals and standards. They must also build and maintain a workplace where employees feel comfortable raising issues and voicing their concerns.

Leaders must:

## Prevent
- Identify business compliance risks.
- Implement and communicate processes relevant to their group's risk areas.
- Help employees understand the Code and how it applies to their jobs.
- Answer employees' questions and direct them to the right information sources.

## Detect
- Implement compliance measures that can detect issues before they become problems.
- Assure employees they will not be penalized for reporting violations of the Code or the law.

## Respond
- Take prompt action to address situations where a violation of the Code or of any other CN policy has or may have occurred.
- Report any violations of the Code to senior management immediately.
- Be prepared, when necessary, to take appropriate disciplinary action after consultation with the CN Human Resources Department or the CN Law Department.

KNOW AND ACT
CODE OF BUSINESS CONDUCT

Exhibit B: IC's Code of Business Conduct

## DUTY TO REPORT CODE VIOLATIONS – REAL OR POTENTIAL

As a CN employee, you have a duty to report in good faith any real or potential violation of the Code and to seek advice if you have a question or a concern regarding the Code. CN offers many avenues for raising concerns.

The first step is to raise your concern with your direct supervisor. He or she knows your job and your work environment and is usually in the best position to help you deal with the issue raised. Most issues are resolved this way. Other resources include the next level of management, your Human Resources representative, or the CN Law Department.

If your supervisor is unavailable or involved in the issue, or if you are uncomfortable reporting the problem to the next level of management, or you are dissatisfied with management's handling of the issue, contact your Human Resources representative, the CN Law Department or the CN Ombudsman.

**It is important that you take action quickly when you discover a potential violation of the Code. This helps CN to:**

- **Correct mistakes –** whether unintentional or resulting from bad judgment.
- **Minimize liabilities** and harm to others.
- **Preserve** our corporate integrity and reputation.
- **Safeguard** our commitment to maintaining high standards in all aspects of our business.

Employees who report suspected violations in good faith are doing the right thing. CN will in no way penalize, discharge, demote, suspend or discriminate against any employee for doing so. This also applies if you are simply asking about potentially unethical conduct or seeking guidance on how to handle a specific situation.

CN will investigate possible violations of this Code and, where a breach of the Code is found to have occurred, will impose appropriate corrective measures, including disciplinary action, up to and including termination of employment.

KNOW AND ACT
CODE OF BUSINESS CONDUCT

Exhibit B: IC's Code of Business Conduct

12

CN-Branch 001295

# RESPECT
## IN THE WORK
## ENVIRONMENT

At CN, we are dedicated to providing a safe, supportive work environment where we treat one another fairly, with respect and professionalism.

## SAFE, SECURE AND VIOLENCE-FREE

At CN, nothing is more important than safety. It is everyone's responsibility. In the performance of your job you must safeguard yourself, your colleagues, our customers and the communities where we operate.

- **Do your job** according to Company policies, rules and procedures as well as the law. If in doubt, consult your supervisor.
- **Take the necessary steps** to deal with any situation that could endanger you, your fellow employees, customers, the general public or CN's assets.
- **Be aware of your surroundings,** as you know best who belongs in your office, on your train, on any given right-of-way or in a restricted area.
- **Report** trespassers or suspicious persons or activities immediately to your supervisor or the CN Police.

CN will not tolerate any action, conduct, threat or gesture towards a CN employee in the workplace that can reasonably be expected to cause harm, injury or illness to the CN employee. For more information, refer to CN's Workplace Violence Prevention Policy.

> Firearms (loaded or empty) are not permitted on CN property, except for CN Police officers and other designated persons performing authorized work and when authorized to do so by law. In all cases, any firearms must be accompanied with a written authorization from the Chief of CN Police and the person should have in his/her possession all pertinent government permits at all times.

Exhibit B: IC's Code of Business Conduct

CN-Branch 001297

## DOING THE RIGHT THING

Safety and a willingness to obey policies, rules and procedures are most important when at work or otherwise performing your duties. If in doubt, the safe course must be taken.

Safe behaviour takes many forms, such as:

- Being aware of, and complying with, all Company health and safety policies, rules and procedures at all times;
- Reporting suspected hazards as quickly as possible;
- Making sure you have the proper personal protective equipment, tools, and training for the job at hand;
- Keeping fire and emergency exits clear and walking surfaces in good condition;
- Driving safely, wearing seatbelts and following traffic laws when operating a Company vehicle or other vehicle as part of your job;
- Expecting the movement of trains, cars, or track equipment, on any track, at any time, in either direction.



---

Thomas and Yves are under pressure to complete an urgent job and John, their supervisor, asks them to disregard a safety rule in order to meet their deadline. What should they do?

At CN, everyone is responsible for safety – their own and their co-workers'. Their supervisor is wrong to ignore the safety rule. The employees should continue to observe all safety rules and remind the supervisor of the safety rules. If necessary, the employees should report the supervisor's actions to management or their Human Resources representative, as soon as practicable. Taking action could prevent someone from being injured.

---

# DRUGS AND ALCOHOL

As a CN employee, you have the right to a healthy and safe workplace.

You must be drug- and alcohol-free at work at all times, in order to be able to perform your duties productively, professionally and safely.

All employees must read and be aware of CN's Policy to Prevent Workplace Alcohol and Drug Problems (Canada) and Substance and Alcohol Free Environment (S.A.F.E.) Policy (U.S.), which address the issue of alcohol and drugs in the workplace. These policies apply to all CN employees.

## WHAT'S PROHIBITED

You cannot be on duty, subject to be on duty (on call) or in control of a CN vehicle or other equipment while under the influence of or suffering the after-effects of alcohol or drugs.

You cannot use, possess, distribute, sell or consume illegal drugs, alcoholic beverages or cannabis while working on or off CN premises or in CN vehicles or other equipment, except when alcoholic beverages are exceptionally and explicitly permitted.

If you take over-the-counter or prescription drugs, you must use them responsibly. This includes finding out from your doctor or pharmacist if the medication could impair your ability to do your job safely and reliably. If you are required to take medication that may impair your abilities, inform your supervisor and the CN Occupational Health Services (in Canada) or the CN Medical Services (in the U.S.).

### DOING THE RIGHT THING

Report to a supervisor any colleague, visitor, supplier, or other individual who appears under the influence while on CN premises. This is necessary for their safety – and yours!

If you work in a safety-sensitive or safety-critical position and feel you have or may have a drug and alcohol problem, you must advise your supervisor, Human Resources representative or CN's Occupational Health Services (in Canada) or CN Medical Services (in the U.S.).

Seeking help for a substance abuse issue is essential. CN's Employee and Family Assistance Program (EFAP) helps employees and their families deal with abuse, addiction and other problems. We strongly encourage you to seek help through the voluntary and confidential EFAP. The program provides proven methods to help you improve your health, the quality of your life and your ability to fully contribute to your job. EFAP can be reached at:

| **Canada** | |
| --- | --- |
| English or French | 1-800-268-5211 |
| Hearing Impaired (TDD - English) | 1-800-363-6270 |
| Hearing Impaired (TDD - French) | 1-800-263-8035 |
| Web | www.workhealthlife.com |
| **U.S.** | 1-800-554-6931 or www.cignabehavioral.com |

If you have any questions about drugs and alcohol in the workplace or CN's policies on the subject, contact your supervisor or your Human Resources representative.

Exhibit B: IC's Code of Business Conduct

CN-Branch 001300

# Q+A

---

While on break, Alice has noticed a co-worker who smells of alcohol and seems unsteady. What should Alice do?

Coming to work under the influence of alcohol is a violation of CN's policy and rules and may put people's safety in jeopardy. Alice should contact her supervisor to report this situation.

---

Richard has a drug addiction and has been told by his doctor to get help, but he is afraid of the consequences if he tells someone at work.

Drug addiction is a serious condition and our goal is to help employees overcome it. Richard should contact CN's Employee and Family Assistance Program (EFAP) whose staff will provide him with advice and assistance.

---

RESPECT IN THE WORK ENVIRONMENT
CODE OF BUSINESS CONDUCT

Exhibit B: IC's Code of Business Conduct

18

CN-Branch 001301

## DIVERSITY AND A NON-DISCRIMINATORY, HARASSMENT-FREE ENVIRONMENT

CN is committed to providing a non-discriminatory, harassment-free work environment. This commitment extends to our dealings with customers, suppliers and contractors.

Inclusivity, diversity and tolerance are three important principles at CN. Each of us has the right to expect equitable and respectful treatment in the workplace. Differences are to be valued. Employees' actions must be consistent with the Company's standards and values.

At CN, there is no place for discrimination or harassment. Employees should treat each other with respect at all times and comply with Company policies, as well as relevant legal obligations including, but not limited to, standards of appropriate conduct with respect to:

- Age
- Colour
- Disability
- Family status
- Gender
- National or ethnic origin
- Marital status
- Pardoned conviction
- Veteran status
- Race
- Religion
- Sexual orientation
- Or any other characteristic protected by law

Exhibit B: IC's Code of Business Conduct

CN-Branch 001302

## NO HARASSMENT IN THE WORKPLACE

Harassment is behaviour or communications, whether written or verbal, which a reasonable person would consider to cause offence or humiliation or affect the dignity of a person and, in the context of employment, results in an intimidating, hostile or offensive atmosphere. At CN, harassment is considered employee misconduct and is not tolerated.

We each have the responsibility to take measures to prevent harassment. For more information, consult the Harassment-Free Environment Policy (Canada) and Prohibited Harassment, Discrimination and Anti-Retaliation Policy (U.S.).

Harassment can occur at or away from the workplace and during or outside working hours if individuals are in a work situation.

As an employee, it is your duty to intervene to stop the harassment where appropriate or report incidents of harassment.

**CN will respond to complaints to resolve them promptly and fairly.**

## NON-DISCRIMINATORY WORKING ENVIRONMENT

CN's policies and practices aim to ensure respect for people and their differences. CN strictly prohibits discrimination in employment on the basis of any legally prohibited ground. For more information, consult CN's Accommodation Guidelines, Employment Equity Policy and Human Rights Policy (Canada), as well as the Equal Employment Opportunity Policy and Prohibited Harassment, Discrimination and Anti-Retaliation Policy (U.S.).

## REPORTING AND PROHIBITION AGAINST RETALIATION

If you are subjected to what you believe is harassment, discrimination or retaliation at CN, or witness this conduct involving another employee, you should use the internal reporting procedures outlined in CN's policies referenced above or contact your supervisor, your Human Resources representative, the CN Law Department or the CN Ombudsman.

The Company strictly prohibits retaliation against any person by another employee or by the Company for reporting, in good faith, allegations of harassment or discrimination, or for filing a complaint or testifying, assisting, or participating in any manner in any investigation, proceeding, or hearing conducted by a government enforcement agency. Prohibited retaliation includes, but is not limited to, termination, demotion, suspension, failure to hire or consider for hire, failure to give equal consideration in making employment decisions, failure to make employment recommendations impartially, adversely affecting working conditions, or otherwise denying any employment benefit because an employee has reported alleged prohibited conduct or participated in an investigation.

### DOING THE RIGHT THING

**Treat people fairly,** openly and with respect.

**Do not permit coercion or intimidation** in the workplace.

**Speak up** and do not allow prohibited discrimination or harassment.

CN-Branch 001304

# Q+A

---

Some of Paul's co-workers make derogatory comments about some colleagues' ethnic origin and sexual orientation. No one complains but it makes Paul and his team feel uncomfortable. What, if anything, can Paul do?

Such comments are inappropriate and should not be tolerated. Paul should remind his co-workers that this behaviour is inappropriate and report this conduct to his supervisor or his Human Resources representative.

---

One of Alexander's co-workers has posted a sexually explicit photo near the coffee machine. When Alexander suggested to his colleague that this was not appropriate, the colleague said it didn't matter because there weren't any women on the team.

Such photos on Company property create an unsuitable work environment and violate CN's policies. Alexander should promptly report the situation to his supervisor or his Human Resources representative. The photo should be removed immediately.

---

RESPECT IN THE WORK ENVIRONMENT
CODE OF BUSINESS CONDUCT

Exhibit B: IC's Code of Business Conduct

CN-Branch 001305

# ENVIRONMENT

Delivering responsibly is one of the pillars of *What CN Stands For.* It determines how we conduct our business every day and defines our contribution to building a more sustainable future. Five principles anchor our sustainability commitment:

- **Environment** Conduct our operations with minimal environmental impact, while providing cleaner, more sustainable transportation services to our customers.
- **Safety** Be the safest railroad in North America by establishing an uncompromising safety culture and implementing a management system designed to minimize risk and drive continuous improvement.
- **People** Provide a safe, supportive and diverse work environment where our employees can grow to their full potential and be recognized for their contributions to our success.
- **Community** Build safer, stronger communities by investing in community development, creating positive socio-economic benefits and ensuring open lines of communication.
- **Governance** Continuously improve our culture of integrity and ethical business, building trust and confidence with all our stakeholders.

In that spirit, CN commits to:

- Respect the applicable laws and regulations and adopt the required rules, procedures, contingency measures and management systems in order to ensure CN operations are managed safely, ecologically and sustainably;
- Integrate environmentally responsible actions throughout all our regular activities and significant aspects of business development;

RESPECT IN THE WORK ENVIRONMENT
CODE OF BUSINESS CONDUCT

CN-Branch 001306

- Take necessary measures in order to prevent pollution, and conserve, recycle and rationally use the natural resources required for our operations;
- Implement relevant emergency response plans and procedures;
- Take active measures to reduce greenhouse gas emissions and other pollutants;
- Communicate to management, employees and contractors CN's commitment to improving health, safety and the environment and to providing training adapted to their needs;
- Implement relevant environmental training programs for employees and management.

## DOING THE RIGHT THING

CN needs your commitment and involvement to meet our environmental goals. You should at all times:

- Comply with applicable environmental laws and regulations;
- Take specific environmental management or technical training if your tasks could have an impact on the environment;
- Reduce or eliminate waste of all types at the source by promoting practices such as modifying production, maintenance and facility processes; substituting materials; and conserving, recycling and reusing materials;
- Quickly and effectively respond, in conformity with CN rules and procedures, to any environmental event, as required by your job or the situation;
- Report any issues that may affect the environment to your supervisor, the CN Environment and Sustainability Department or CN Police as soon as you become aware of them.

Exhibit B: IC's Code of Business Conduct

CN-Branch 001307

# Q+A

Jim is involved in bidding on a major piece of business for CN. He worries that what is being proposed goes against some of our environmental policies. But if he raises the red flag, CN likely won't get the business and it could mean people will lose their jobs. What should Jim do?

Jim shouldn't hesitate – he should report the situation immediately to the CN Environment Group. By raising the issue, he gives CN the opportunity to have experts investigate to see if a problem exists and correct the situation.

David needs to dispose of some toxic waste, but can't remember the exact procedure for this particular type of waste. What should he do?

Never dispose of waste unless you know and follow the correct disposal procedure. David should contact his supervisor or the CN Environment Group to find out the proper disposal method.

Exhibit B: IC's Code of Business Conduct

28

CN-Branch 001308

# PUTTING OUR REPUTATION FIRST

CN strives to sustain and project a culture of integrity where employees recognize, value and practice ethical conduct. Your first business allegiance is to CN and you must not allow any personal interest to compromise CN's or your own integrity.

# CONFLICTS OF INTEREST

You should always avoid situations where your personal interests could conflict or could be seen to conflict with CN's interests or your responsibilities as a CN employee.

Even the appearance of a conflict must be avoided, regardless of your intentions. It is important to avoid or fully disclose outside activities, relationships or business ventures that may affect the objectivity of your judgment or that could interfere with how you do your job. If you think you have, or might have, a conflict of interest, let your supervisor know.

CN's Guidelines for Avoiding Conflict of Interest Situations provides more information.

## DOING THE RIGHT THING

### PERSONAL RELATIONSHIPS AT WORK

We aim to maintain a workplace that is free of actual, potential or perceived conflicts of interest that can potentially result from personal relationships at work. In that spirit:

- You must always act in CN's best interest, which must supersede the interests of people with whom you have a personal relationship. Personal relationships include family (including in-laws), household and intimate/dating relationships.

- You must not have authority over, influence or take part in employment decisions (e.g., hiring, assignments, salary, bonuses, evaluations, promotion, discipline, termination) concerning an employee with whom you have a personal relationship. If such an issue arises during a meeting or

conversation, decline to comment and excuse yourself from the discussion.

- You must disclose to Human Resources (or to your supervisor, who must disclose it to Human Resources) any personal relationship between yourself and someone within your reporting authority. The Company will take appropriate measures to avoid or resolve any conflict of interests or the appearance of such a conflict.

## DOING THE RIGHT THING

### OUTSIDE INTERESTS

- Your first business allegiance is to CN.
- Avoid outside activities and interests that could impair – or could be viewed as impairing – the effective performance of your responsibilities as a CN employee.
- This could occur if the outside interest places excessive demands on your time, conflicts with your obligations to CN or competes with CN's business interests.



---

Can Lyne accept a part-time job outside of her employment with CN?

Secondary employment must not conflict with Lyne's duties as a CN employee. Lyne's first business allegiance is to CN. In order to avoid any potential legal, ethical or work conflicts, she should consult her supervisor or her Human Resources representative before accepting or engaging in secondary employment.

Part-time jobs that create excessive demands on employee time or whose nature is inconsistent with employees' obligations to CN are not permitted.

---

## DOING THE RIGHT THING

### CUSTOMER, CONTRACTOR AND SUPPLIER RELATIONS

- Be impartial and fair in all dealings with customers, suppliers and business partners.
- Realize that a conflict of interest or perceived conflict of interest can easily arise when your family members or others with whom you have a close personal relationship have material interests with suppliers, contractors, competitors or customers of CN.
- It is strictly forbidden to give or accept any bribes or kickbacks to or from anyone, including any customer, contractor, supplier or any other party with a business interest with CN.

- When working on a CN-related project, do not, directly or indirectly through a customer, supplier or contractor, arrange to hire a family member or close friend without informing your immediate supervisor for approval.



Can Elana accept an invitation to lunch offered by a current supplier who comes to town three or four times a year?

Yes. Lunch or dinner meetings that involve business discussions and are in the normal course of business are permitted, provided that they remain within reasonable terms. However, if the lunches become too frequent or extravagant, they could affect Elana's business judgment or appear to do so, which could constitute a conflict of interest.

A current supplier of CN has offered to fly Zdenek to his time-share for a golf vacation. They have a good relationship and have worked together for years. Can Zdenek accept the offer?

No. The relationship exists because of Zdenek's position with CN and the supplier's offer does not constitute an incidental gift, customary hospitality, or benefit of nominal value.

## DOING THE RIGHT THING

### CORPORATE OPPORTUNITIES

- Your first duty is to serve the Company's interests.
- Never put yourself in a position where you are competing against the Company or find yourself in a conflict of interest with CN while employed by CN.
- While employed by CN – and even after you leave the Company – you must not take advantage of any corporate opportunity that is available through the use of CN property or through access to non-public information available to you because of your position at CN.



Raymond owns a controlling interest in a company that offers services to the railway industry. He has no active participation in the company, which offers the lowest prices in the marketplace. Can the company contract with CN?

Raymond's controlling interest must be fully disclosed to his supervisor for review and decision. In any event, he must not influence or be involved in CN's awarding of the contract or its management, including the approval of invoices, even in the normal course of business.

Exhibit B: IC's Code of Business Conduct

CN-Branch 001314

## DOING THE RIGHT THING

### GIFTS AND ENTERTAINMENT

- You or a member of your family cannot, because of your position with CN, solicit or accept gifts, entertainment services, gratuities, favours or unusual hospitality from suppliers or customers, which may compromise – or appear to compromise – your ability to make fair and objective business decisions, or may unfairly influence a business interaction. This does not apply to incidental gifts, customary hospitality or other benefits of nominal value or approved corporate rebates.

- If an inappropriate gift is sent to you or is accepted by mistake, return it promptly.

- If you are ever in doubt, contact your supervisor, your Human Resources representative or the CN Law Department for guidance.

- For more Information on the solicitation by CN employees of sponsorships or donations, please consult the Sponsorships Solicitation Guidelines.



How do I identify a situation of real or perceived conflict of interest? Ask yourself the following questions:

- Do I stand to personally gain from my actions?
- Will my actions give an advantage to a relative or a friend?
- Would I feel uncomfortable or embarrassed if the situation were reported to my supervisor or to senior management or covered on the front page of a national newspaper or featured as the lead story in a national newscast?

> If you answered "yes" to any of these questions, a conflict of interest or the appearance of a conflict of interest likely exists.

Based on that, seek advice from your supervisor, your Human Resources representative or the CN Law Department.

---

## COMPETITION AND ANTITRUST

Canada, the United States and most countries have "competition" or "antitrust" laws. The premise of antitrust laws is that competition is valuable and fosters economic growth. These laws seek to preserve fair, honest and vigorous competition that benefits consumers.

Competition and antitrust laws generally:

- **Prohibit** any type of agreement between competitors that is likely to undermine, restrict or lessen competition or affect prices;
- **Prohibit companies** in a dominant or strong market position from abusing their market power by practicing anti-competitive or monopolistic behaviour by using predatory pricing practices, pricing below cost, or exclusionary practices such as tying services to eliminate or exclude competitors and thus threaten to create a monopoly position.

**CN must comply fully with all applicable antitrust and competition laws. Violation of these laws, whether deliberate or accidental, can result in significant civil and criminal penalties, including imprisonment.**

GENERAL PRINCIPLES

Except as provided in applicable legislation, **employees may not** discuss or enter into any agreement – whether express or implied, formal or informal, written or oral – with any competitor to:

- Fix prices for a given customer, including rebates and discounts;
- Allocate customers, or divide up sales opportunities, territories, markets, or services;
- Agree to not solicit each other's customers or to not sell a service to certain customers (refusal to deal);
- Control or limit the supply of services;
- Rig a competitive bid process by agreeing with a competitor not to bid or to submit a bid above or below a certain price. Joint bids must be carefully managed.

**Employees may not** condition the sale of a product, a service or a discount on a customer's purchase of a separate product or service without seeking guidance first from the Law Department.

**Do not discuss** with a competitor any competitive factor such as prices, discounts, terms and conditions of service, including prepayment and delivery terms, costs and profit margins. Contacts with other carriers regarding pricing of joint line movements are permissible, but must be limited to the essential elements of the specific joint rate or undertaking.

Threats of retaliatory rate action against a competitor or suggestions of using predatory pricing are strictly prohibited. Conversely, should a competitor threaten retaliatory action or propose an anti-competitive conduct, you should refuse to engage in the discussion and immediately report the incident to the CN Law Department. Joining with a competitor to arrange a boycott of a third party by refusing to buy its products or sell services to it is also not permitted under law. Note that many of these principles

Exhibit B: IC's Code of Business Conduct

CN-Branch 001317

apply with respect to our relations with suppliers as well; joint purchasing activities need to be managed carefully.

## TRADE ASSOCIATIONS

Memberships in trade associations or industry groups can pose significant competition or antitrust risk because they involve meetings of competitors who sometimes also undertake common or joint activities. While some protection is afforded for collective undertakings addressing common regulatory issues through associations such as the Association of American Railroads and the Railway Association of Canada, such protection is narrowly construed. When attending association meetings which could lend themselves to informal discussions of business matters, avoid all discussions of competitive factors, such as pricing and conditions of service, that could lead to violations of antitrust or competition laws.

## BUSINESS INTELLIGENCE

It is legitimate to obtain commercial business intelligence concerning competitors' activities from customers and public sources such as the Internet or trade publications in order to offer effective competition. You are not allowed, however, to obtain information directly from a competitor or by using a third party to exchange information with a competitor. Also, you cannot obtain competitor information through unlawful or unethical means such as inducing an employee or former employee of a competitor or any other third party to disclose proprietary, trade secret or confidential information where he or she is breaching an obligation of confidentiality. In addition, even information obtained through legitimate means may not be accurate and you should use caution in relying on it. If you have any questions with respect to the disclosure of competitive information, be sure to consult with the CN Law Department.

### DOING THE RIGHT THING

Before joining a trade association, make sure it serves legitimate purposes and that:

- Discussions stick to a clear and written agenda;
- Competitive factors will not be discussed.

Use caution in any written or oral communications; avoid ambiguity and statements that imply any unlawful activity or lessening of competition.

Avoid any arrangement with a competitor, including joint ventures, strategic alliances and joint purchasing agreements, unless you have obtained clearance from the CN Law Department.

Compliance with antitrust and competition laws is important, and applying them to CN's complex business in certain situations may not always be clear. Do not hesitate to seek guidance from the CN Law Department.

# Q+A

---

A customer contacted Joachim and requested a 10% rebate from CN to maintain their business. The customer says one of our competitors is doing this. Can Joachim confirm with the competitor whether they are in fact offering the rebate?

No, it is prohibited to discuss customer pricing with a competitor. Joachim may obtain documents relating to competitors' pricing and rebates from the customer unless he is aware that such disclosure breaches an agreement between the competitor and the customer. Joachim must clearly record that the information was obtained from the customer.

---

Tanya has been working on getting a key customer to give CN more business in a new region. To impress upon the customer CN's commitment and to get the business, she drafts an e-mail to reassure the customer that CN will crush the competition. Should she send this e-mail?

No. Employees should not use excessive language or overstated, emotional terms when communicating with customers and competitors such as "taking pricing action" or "undercutting prices." What could seem like a harmless e-mail to you could be misinterpreted or misunderstood by an investigator or a competitor as suggesting anti-competitive practices.

---

# INTERNATIONAL OPERATIONS AND TRADE CONTROLS

CN is subject to the laws of Canada, the United States and other jurisdictions where we operate, all of which have anti-bribery and anti-corruption laws. For our increasingly global Company, we have to meet the challenge of adhering to many different laws at the same time. Sometimes, there may be a conflict between countries' laws. If you encounter such a situation, contact the CN Law Department for proper resolution of this conflict.

As CN becomes more global in its operations, compliance with trade export controls, economic sanctions, anti-corruption and anti-money laundering laws becomes increasingly important. Always remember it is never acceptable to make improper payments to obtain or retain business. That applies regardless of where you work.

## ANTI-BRIBERY AND ANTI-CORRUPTION LAWS

Bribery means directly or indirectly making a payment or giving a reward, advantage, kickback or benefit or anything of value to a foreign government official or to a government official of one's own country to obtain or retain business or any other improper advantage or for any improper or corrupt purpose, whether for the benefit of CN or the employee. This includes directly or indirectly making a payment to a person knowing, or being reasonably expected to know, that the person will forward it, or have it forwarded, to a foreign or domestic government official.

Commercial bribery means paying a secret bribe or commission to or conferring a secret benefit on an employee, representative or agent of any third party, without that company's knowledge, to induce the recipient to act or forbear to act in relation to that company's affairs.

CN and its employees may also be held liable for bribery committed by its agents, consultants or business partners.

## DOING THE RIGHT THING

You must properly record payments made to any third party in CN's books and records and must not inaccurately make, falsify, conceal or destroy any records of payments that could constitute a bribe.

You should remain vigilant regarding the activities and behaviour of CN's agents, consultants and business partners and ensure they have read and comply with CN's Anti-Corruption Policy.

Ensure all meals and entertainment expenses, including those of agents and contract employees, are reimbursed in compliance with CN's Corporate Travel Policy and Business Expense Reimbursement Process.

Obtain approval for the engagement of all foreign agents outside of North America from each relevant department's EVP or SVP and the VP Law.

Do not:
- Offer, promise, give or authorize the giving of a bribe;
- Accept a bribe as an inducement to confer a benefit on a third party; or
- Make monetary gifts, including facilitation payments (including through an intermediary) that is, payments intended to accelerate the performance of local administrative government services such as permits or utilities (other than those authorized under the laws of Canada and the local country), or goods or services to foreign government officials, unless cleared by the CN Law Department, which should be contacted in case you have any questions.

For more information, please read the Anti-Corruption Policy. Any related questions should be referred to the CN Law Department.

Exhibit B: IC's Code of Business Conduct
99
CN-Branch 001322

# Q+A

Fred works in Engineering in Canada and is responsible for the construction of radio towers in the U.S. He interfaces with Tom from the Army Corp of Engineers in the U.S. to get permits for clearances to build towers. Over the years he has established a good relationship with Tom. Tom advises Fred that for an extra fee CN will be granted the permit on an expedited basis. Fred finds this odd, as he never heard of an expedited process before. What should Fred do?

Fred should not pay the extra fee and should advise his supervisor. This is considered a facilitation payment which is prohibited under CN's Anti-Corruption Policy and Canadian anti-corruption laws. Furthermore, if this extra fee is going into Tom's pocket, it is considered a bribe.

## TRADE, ECONOMIC AND MONEY LAUNDERING CONTROLS

Anti-money laundering is a term typically used to describe the legal controls placed on cash generated by illegal means, which is then transferred or converted into other assets in order to hide its origin. The Company and its employees must comply with all legislation and cooperate with financial institutions to ensure CN is not involved in the use and destination of funds that could involve money laundering.

Export control laws may also require special licences to allow the shipment and transfer of sensitive goods, software, technology, cryptology or services. Such laws also typically contain requirements for shipping documents, reporting and/or recordkeeping.

Customs laws typically require an importer to provide complete and accurate information about the tariff classification, value and origin of the goods shipped by CN. This information may be used to assess the admissibility of goods into a country and any duties or taxes at the time of entry. Economic sanctions or embargo laws may prohibit dealings with the governments of certain countries, individuals, entities or organizations or their property, wherever situated. Some countries maintain "blocking" laws that prohibit a company from complying with the embargoes of other countries.

Many countries also have laws which prohibit dealing with named terrorist groups or their property, wherever situated. Employees who work in these areas must familiarize themselves with international trade export controls and economic sanction laws and regulations in the jurisdiction(s) where they work, and understand how they relate to their business activities, including transactions across borders. If you suspect that a customer is trying to avoid compliance with international trade requirements or that a CN shipment could be subject to these laws, you must promptly report your suspicions to the CN Law Department.

### DOING THE RIGHT THING

Contract only with reputable, qualified agents and financial institutions.

Require agents and partners to comply with CN's payment procedures.

Know which international trade control regulations apply to your activities.

Know which countries, individuals and entities are subject to economic sanctions in the jurisdiction where you work, and do your due diligence before engaging in any contractual relationship or business dealing.

Obtain any required licences.

Ensure that all shipping, import and export documents and any required reports are accurate, complete and filed in a timely manner.

Know your customer and be aware of any unusual circumstances or "red flags" suggesting that the customer is trying to avoid compliance with international trade controls.

Exhibit B: IC's Code of Business Conduct

CN-Branch 001325

# SAFEGUARDING WHAT'S OURS

It is incumbent upon each of us to protect the Company's physical and intellectual assets as well as our customers' or suppliers' assets from damage, loss, vandalism, theft or unauthorized use, copying, disclosure or disposal.

CN-Branch 001326

## PROTECTING CN'S ASSETS

Every CN employee is personally responsible for safeguarding CN's assets and for using these assets and resources appropriately. This includes your time while on the job as well as:

**Physical Assets**
- Buildings
- Documents
- Equipment
- Supplies
- Other physical property

**Intellectual Property**
- Computer programs
- Copyrights
- Data
- Patents
- Information technology
- Know-how
- Any other intellectual property

CN property is to be used only for officially approved activities. Improperly using CN's assets – including for personal gain – could undermine our integrity. It could also be illegal, adversely affect our business strategies and decisions and weaken investor confidence. You should not take CN assets off CN premises, except as strictly required for work and only for the time required to perform such work.

Some of these obligations continue even after you leave the Company. Any real or suspected threat to CN's assets should be reported promptly by calling the CN Police or through the CN Police tip line at cnpolicetipline@cn.ca .

### INTELLECTUAL PROPERTY
CN's intellectual property is a valuable competitive asset and must be protected at all times. For example, the CN logo is a registered trademark that is known throughout North America and beyond. It is a symbol of the products and services we

Exhibit B: IC's Code of Business Conduct

CN-Branch 001327

provide to our customers. Our brand is one of our most valuable assets. The same holds true for the various products and bodies of knowledge that CN creates and protects under intellectual property law, such as copyright, patent and industrial design. This includes software programs, applications, publications, documentation, written reports, photographs, creative materials, works of authorships and inventions that employees create to foster innovation in our workplace. Copying, altering or disclosing the Company's intellectual property to customers or others without permission is prohibited.

CN owns the intellectual property that employees, contractors and agents create while working for CN or using CN resources, regardless of whether such intellectual property has been created on CN's premises or outside of regular work hours. If you create, discover, or develop methods, processes, systems, improvements, designs, ideas, technologies or other patentable inventions, you must promptly disclose them to the CN Law Department and maintain accurate records as CN may want to protect them with, for example, patents or industrial designs. You should also do everything that is requested by CN (at the expense and on behalf of CN) in order to obtain, establish, preserve and protect CN's rights in its intellectual property, including preparing and signing applications and other documents. Finally, you should help to ensure that the intellectual property you create for CN is original and does not infringe on the rights of third parties.

Regarding a third party's intellectual property, you should get written permission from such third party to use its copyrights, patents, industrial designs, trademarks, service marks or other intellectual property. For example, you should not copy or publish intellectual property of others without permission. You should not copy or distribute a third party's software or related

Exhibit B: IC's Code of Business Conduct

CN-Branch 001328

documentation without determining first that you have the right to do so under a licensing or assignment agreement with the third party. Also, ensure that you are not impairing CN's rights, for example, by incorporating open source software with CN developed software.

You agree that all such intellectual property is owned by CN and agree to transfer or assign ownership to CN and waive any moral rights in favour of CN.

If you have any questions, contact the CN Law Department.

### DOING THE RIGHT THING

Promptly report any real or suspected threat (loss, theft, damage, misuse) against CN's assets, including unauthorized use of CN intellectual property, to the CN Police or CN Law Department. Do not intervene if you think the situation may be dangerous.

Do not use the CN logo or other CN trademarks on any external document without first getting the approval of the CN Public Affairs Department.

Put copyright notices on all CN materials, information, products, services, and other documents or products intended for public dissemination.

Cooperate with CN in applying for patents and protecting CN's assets.

Exhibit B: IC's Code of Business Conduct

CN-Branch 001329

# Q+A

Alan has been working on a project to develop enhanced systems for tracking and managing CN's traffic. As the project develops, he realizes that he has developed unique designs that could create a competitive advantage for CN. What should he do?

Alan should contact the CN Law Department as soon as possible. The Law Department can help protect the designs so that they are not vulnerable to being copied or patented by others, including competitors of CN.

## CONFIDENTIALITY

If you have access to confidential information about the Company, you must take care to prevent improper or unauthorized disclosure.

Any unauthorized release of confidential Company information can directly harm CN, causing:
- **Loss** of competitive advantage and investor confidence;
- **Damage** to relationships with customers and suppliers; and
- **Harm** to employees and other stakeholders.

### WHAT IS CONFIDENTIAL INFORMATION?

Confidential information includes personal information about other employees and any type of information or knowledge that has been developed by CN employees (or that CN otherwise owns and controls) and which CN does not want disclosed outside the Company. It is often competitively sensitive information.

SAFEGUARDING WHAT'S OURS
CODE OF BUSINESS CONDUCT

Examples of confidential information include:

- Personal employee information, including compensation and health and medical records;
- Company legal matters;
- Computer software programs;
- Customer and supplier information such as transportation contracts and rate quotations;
- Financial records and non-public financial information;
- Intellectual property, including patents;
- Processes practices or designs;
- Sales and marketing information;
- Strategic plans, including information relating to acquisitions and divestitures.

Your job is to keep confidential information just that: confidential. Such information can only be disclosed if specifically authorized by CN or if required by law. You should not discuss confidential information even with other colleagues, unless they have a need to know the information for the performance of their duties at CN.

Keeping CN strong means keeping our confidential information safe. It means using information effectively to accomplish our business objectives and never using Company information for personal gain or any other non-business reason. This also means using CN's information technology with care, in accordance with CN's information technology guidelines, to avoid releasing sensitive information without authority or creating weaknesses in CN's efforts to secure its information technology equipment. You can find more details on keeping information confidential in CN's Information Security Policy, Communications Policy, Working from Home and Co-Working Policy (Canada) and Protection of Personal Information Policy (Canada).

### DOING THE RIGHT THING

**Do not disclose** any confidential information for any non-business reason; and obtain your supervisor's approval to disclose such information in a business context.

**Do not use** confidential information for personal gain, such as obtaining favourable customer, supplier or competitor treatment.

**Do not discuss** confidential information with colleagues or on cellular phones in public places where conversations can be overheard – including elevators, airports, planes, trains, taxis and restaurants.

**Store** confidential information in a secure location and mark and classify it appropriately.

**Do not access** confidential information unless it is directly related to your job duties.

**Be aware** of suspicious e-mails that could be scams, phishing or attempts to hack into CN's systems.

# Q+A

Sarah sometimes gets detailed questions from customers regarding CN's operations. She really wants to keep these people happy, but to answer their questions would mean providing them with confidential information. Is this OK?

No. Sarah can only give out confidential information if the customer has signed a confidentiality agreement and if the information is truly needed and appropriate given the business context. She should consult with her supervisor before sharing the information.

If you are unsure, call your supervisor or the CN Law Department.

# Q+A

Gordon was recently hired by CN. In his former job, he acquired confidential information about a new customer with which CN is negotiating. This information could give CN a competitive edge and Gordon plans to use it to improve CN's position to ensure we get the business. Is Gordon doing the right thing?

No. CN employees must not use another company's confidential business information without its express authorization, even for the benefit of CN. Gordon should refer to his supervisor and/or the CN Law Department for guidance before disclosing or using any of that confidential information.

## COMPLIANCE WITH INSIDER TRADING AND OTHER LEGAL REQUIREMENTS

Insider trading is the buying or selling of shares or other securities of CN or of another public company while aware of material information that has not been publicly disclosed.

It is against the law for employees to trade CN securities or securities of another public company while in possession of material information that has not yet been publicly disclosed. This applies whether you conduct the trades personally or through another party. The law also forbids you from passing on such information to others or recommending that others trade CN securities or securities of another public company, a process known as "tipping." The penalties for insider trading may include criminal prosecution.

We actively promote compliance with all laws and regulations that apply to us, including our strict prohibition against insider trading. This goes beyond our legal liability. It is also important to CN's credibility in the capital markets.

We strongly encourage every employee to consult CN's Insider Trading and Reporting Policy. You should also contact the CN Law Department with any questions on this subject. If you plan to trade in CN securities or securities of other public companies and aren't sure if you have knowledge of undisclosed material information, ask the CN Law Department before doing anything. In such instances, the best practice is caution.

## DOING THE RIGHT THING

Ensure you do not use non-public information for personal gain.

Never pass along such information to someone else who has no need to know (i.e., friends, family members, spouse, etc.).

These are examples of material information:
- Annual and quarterly financial results before publicly reported;
- Development of new products;
- Negotiations with business partners or key employees;
- Results of operations;
- Strategic plans or negotiations regarding acquisitions or disposals;
- Threatened litigation.

If you fall into the category of employees subject to a blackout period, the following section applies to you.

Under CN's Insider Trading and Reporting Policy, certain CN senior officers and employees are subject to "blackout periods." During a blackout period, these senior officers and employees

Exhibit B: IC's Code of Business Conduct

CN-Branch 001334

are forbidden to trade in CN securities. Outside blackout periods, trades by these employees must be pre-approved by the EVP Corporate Services and Chief Legal Officer, or the Vice-President, Deputy Corporate Secretary and General Counsel.

# Q+A

Philippe has been planning to sell some of his CN shares this month to pay down his mortgage. Yesterday, he was shown our quarterly financial results because he needs them for planning purposes. The results won't be released for another three weeks. Can Philippe still sell his shares since he had planned to do this all along?

No. He must wait to sell his CN shares until our financial results are made public.

In addition, providing others with information not yet publicly disclosed may violate insider trading laws which cover the disclosure of such information to a third party, other than as required in the course of business.

It is also a violation of our own rules to discuss confidential information other than with someone who is required to have knowledge of that information and has signed a confidentiality agreement with CN.

## COMMUNICATION OF CORPORATE INFORMATION

CN's external and internal communications are open, straightforward and truthful. As a public company, we work to ensure that all reports and documents we file with regulators, along with our normal public communications, are:

- Complete
- Timely
- Full
- Understandable
- Accurate

The same applies to all of our public communications.

CN must communicate with the public with one voice. So it's extremely important that all employees and service providers understand and respect the CN Communications Policy.

With the exception of identified spokespersons, all officers, directors and employees should avoid discussing non-public Company affairs with anyone outside CN, except for CN business reasons. Employee questions and concerns should be directed to the CN Law or Public Affairs Department.

CN is committed to protecting investors by making sure the public has equal access to material information that could:

- Affect the market price or value of CN's securities;
- Be relevant to a reasonable investor's decision to trade in CN's securities.

When material information does arise, it will be immediately disclosed to the public at large via a news release. We do not disclose material information to select individuals, companies, partners or organizations prior to public disclosure unless

SAFEGUARDING WHAT'S OURS
CODE OF BUSINESS CONDUCT

CN-Branch 001336

required or permitted by law or if a confidentiality agreement is in place.

### DOING THE RIGHT THING

Ensure that confidential information is not disclosed unless necessary for business purposes and the other party has signed a confidentiality agreement.

Never speak on CN's behalf unless you are authorized to be an official spokesperson.

Refer any questions you receive from the media or the investment community to the appropriate CN spokesperson.

Do not use CN letterhead or e-mail for communications in which you express your personal views.



***

A local reporter asked Leo about acquisition rumours. Leo is involved in negotiations concerning this transaction, which is not public information. Should he deny the rumour?

First, Leo should make no comment of any sort. He should refer the reporter to the CN Public Affairs Department. If the reporter presses for an answer, Leo should merely state: "I am not authorized to speak on the Company's behalf. I will have someone from Public Affairs call you back."

***

Exhibit B: IC's Code of Business Conduct

CN-Branch 001337

# FINANCIAL   RECORDS  INTEGRITY

The Company's financial records contain vital and certain confidential information about our operations and constitute the basis upon which key decisions about CN are made. The accuracy and completeness of such financial records are critical to meeting our obligations to shareholders, employees, suppliers and other stakeholders. They are also required for compliance with tax and financial laws and regulations.

All employees involved in financial reporting of any nature must report financial information promptly, accurately, completely and honestly. Entries must be classified properly, in particular as operating or capital expenses, and with sufficient detail to understand the nature of the transaction. Ensure that all entries are recorded in the proper accounts and are properly documented. No financial entry or disclosure should disguise or incorrectly characterize the true nature of a financial transaction. Sign only those documents that you believe are accurate and truthful.

## REPORTING ACCOUNTING AND AUDITING MATTERS

CN has a confidential method for employees to use when reporting potential or real wrongdoing concerning accounting or auditing matters. Investigations are reported to the CN Board of Directors. Employees or other related parties can express their concerns about these matters by contacting CN's Hotline.

Exhibit B: IC's Code of Business Conduct

CN-Branch 001338

All CN employees are strictly prohibited from coercing, manipulating, misleading or fraudulently influencing the Company's internal or external auditing process.

**CN's Hotline**
1-800-925-5974
www.reportanissue.com

# Q+A

Peter is asked by his supervisor to record an invoice against a capital project as their operating budget for the month is tight and this invoice may put them over budget. Should he record the invoice against a capital project as requested?

No, intentionally mis-classifying an invoice, either as between operating and capital or between capital projects, could constitute financial reporting fraud, and could place CN at risk legally and jeopardize CN's reputation with shareholders, employees, suppliers, and regulators.

## CONTRACTUAL OBLIGATIONS AND AUTHORIZATION

All employees who enter into contracts, commit CN funds, agree price or consideration for the procurement of equipment, material, goods or services, or approve financial management transactions on the Company's behalf, whether with a supplier or a customer, must ensure i) they have proper authorization pursuant to CN's Consolidated Standing Resolutions on Delegation of Authority, ii) the transaction is covered by a contract, unless an exception exists under the Procurement Policy, and iii) the contract, as applicable, is executed in accordance with such authorization. As well, employees approving payment against a contract through the payment of invoices and vouchers must ensure they have proper authorization.

A contract provides a good measure of certainty in CN's business relationships as it captures the rights and obligations of each party and the terms and conditions of their respective performance.

### DOING THE RIGHT THING

Ensure you have the proper delegation of authority before approving any transactions.

Do not sign a contract on behalf of CN unless you are authorized.

Consult the SAP system to find out what authority you have or if you need to request further authority to be able to perform your daily responsibilities.

Do not make contractual commitments or authorize spend against such commitments if it exceeds your delegation of authority.

Do not directly or indirectly divide or break up expenditures or other commitment into smaller projects, or otherwise attempt to bypass your authority limit.

SAFEGUARDING WHAT'S OURS
CODE OF BUSINESS CONDUCT

Exhibit B: IC's Code of Business Conduct

CN-Branch 001340

## INFORMATION   SECURITY

Anyone working for the Company or on its behalf must secure and protect all CN business information, whether electronic or in print.

We make information technology and electronic communications resources widely available to employees, consultants, agents and suppliers to increase productivity and share information. We are all responsible for preventing disruptions, overloading or otherwise misusing these resources.

Always protect your work-related user IDs and passwords and keep your security cards safe. You must never allow unauthorized people to use or access them. Whenever you leave your personal computer, laptop or work station unattended, make sure you log off or otherwise lock your system. Anyone with a system identity and password is responsible for activities performed under that identity.

You should conduct information exchanges with both internal and external parties in such a manner as to protect the confidentiality and integrity of the information. This applies to all manner of communications, from documents and e-mail messages to telephone conversations and voice messages. For more information, please consult CN's Information Security Policy regarding information security.

CN's information technology assets are made available to facilitate business communications and the productivity and performance of employees. While limited personal use of CN computer and network systems is allowed, you must make sure that your personal use does not detract from or interfere

Exhibit B: IC's Code of Business Conduct

CN-Branch 001341

with your work nor jeopardize the security of CN's confidential information. Any such non-business use must be reasonable, comply with CN's Information Security Policy and, in all circumstances:

- Occur on the employee's own time;
- Not interfere with the performance of the employee's professional responsibilities;
- Not incur any additional costs to CN;
- Not damage CN's IT assets in any way; and
- Not compromise the integrity and speed of CN's protected network.

You must never use CN information technology assets like your CN computers, Company-issued mobile phones or network systems for improper uses such as to:

- Store files, access websites or send messages containing, or linking to websites that contain discriminatory, defamatory, libellous, pornographic, sexually suggestive, slanderous, harassing, threatening or obscene materials; or
- Act in a way that constitutes a violation of criminal law.

Equipment available to CN employees remains the Company's sole property, and CN employees should have no expectation of privacy when using CN's information technology assets. In particular, CN may, at any time and without notice, access the contents of employees' CN-supplied computers and e-mail messages stored on its servers. CN may also, from time to time as it sees fit, monitor, review, intercept, access, modify or delete any files or communications stored on or exchanged through the Company's information technology assets, including non-business information, without notice. Employees should not

expect that anything that is stored on, received on or sent from CN's IT assets is their private property or information.

For more information, consult CN's Information Security Policy or contact CN's Corporate Information Security Unit at 514-399-4357 or via e-mail at infosec@cn.ca or consult the website at http://cnis .

### DOING THE RIGHT THING

Be careful about where you discuss CN's business.

Safeguard your passwords.

Use CN e-mail for business purposes only.

Do not use the Internet to access inappropriate sites or information.

Exhibit B: IC's Code of Business Conduct

CN-Branch 001343

# Q+A

Shelly's co-worker has asked for her password because they are working together on a project. Should she give it?

No. There is no business reason for her to share her password and thus her personal access.

Lili-Anna often works in the office after regular hours. Sometimes, when she is in the office alone, she downloads music or surfs the Internet. Lili-Anna figures that she is not disturbing anyone and she doesn't think she's harming CN since she is doing it after operating hours. Is Lili-Anna right?

No. It is never acceptable to use CN computers or network systems to download personal media files such as music and movies, even if you are alone in the office, at home or on a business trip.

She should consider Internet access at work as if it were personal phone calls, which should be:

- Infrequent
- Brief
- In no way interfering with Lili-Anna's job performance

All Internet activity by employees is logged and may be monitored for abuse or inappropriate use.

# Q+A

Sophie works in IT in software and application develop-ment. Her desk is in an open space where she works closely with her neighbouring colleagues. She notices that a new employee is accessing information on projects that he is not working on and making copies on a USB key. What should she do?

Sophie should not talk to the employee directly. She should communicate with her supervisor and/or the CN Police about her suspicions and they can do a forensic investigation. Industrial espionage is a real threat to CN's competitive position and does occur. Watch for suspicious behaviour and inappropriate downloading of information.

ADDITIONAL RESOURCES FOR EMPLOYEES

Policies and standards dealing with CN's information security can be accessed on the CN intranet at http://cnis or via e-mail at infosec@cn.ca

SAFEGUARDING WHAT'S OURS
CODE OF BUSINESS CONDUCT

Exhibit B: IC's Code of Business Conduct

CN-Branch 001345

# SOCIAL MEDIA

Social networking tools and platforms for online collaboration such as, but not limited to, Facebook, Instagram, Twitter, LinkedIn, YouTube, Yahoo! Groups, internal and external blogs and Wikis are fundamentally changing the way we work, communicate and connect, offering new ways to engage with colleagues, customers, suppliers, potential employee candidates and the world at large. While this creates new opportunities for communication and business development, it also creates new responsibilities for CN employees.

Social media platforms and tools are similar to traditional communication tools. However, social media's high speed, level of interactivity and global access to published information merit particular consideration. In the social media world, the line between what is public or private and professional or personal may not be as clear as it used to be. In addition to CN's Social Media Policy, common sense is the best guide if you decide to post any CN-related information on social media sites.

Your postings should not include derogatory comments about other CN employees identifiable as such, as those can affect CN's workplace or reputation. Remember that any communication is subject to CN's Communications Policy.

Your postings should not disclose any information that is confidential or proprietary to CN or to a third party who has disclosed information to CN. Unauthorized and/or selective disclosure of material information, in breach of corporate policies or disclosure obligations may compromise CN's credibility and can result in legal liability for CN, its officers and directors, and others. If you comment on any aspect of CN's business, you

must clearly identify yourself as a CN employee in your postings and include a disclaimer that the views are your own and not those of CN. Be conscious that your postings are or may become public and can affect CN's reputation and that you are personally responsible for your postings.

When posting your point of view, you should neither claim nor imply that you are speaking on CN's behalf, unless you are authorized to do so. If you are unsure about any postings, contact the social media desk at socialmedia@cn.ca for guidance.

The following guidelines apply whether you are posting CN-related information on a public platform or on CN-administered social networking tools and platforms.

### DOING THE RIGHT THING

**Read the Code and use your best judgment.** Treat others, and their intellectual property, with respect. Be conscious of others' privacy.

**Be yourself and be transparent.** If you are posting about your work at CN, use your real name, identify that you work at CN, and be clear about your role. Unless authorized, do not present yourself as a representative or spokesperson of CN. If space permits, please use this statement: "Opinions expressed here are my own, and do not necessarily reflect those of CN." Even with the appropriate disclaimer, employees, especially those in leadership positions, should be aware that any personal opinions may be misunderstood as those of CN. Also, do not include CN brand symbols or those of other companies in your postings.

**Always think before posting.** You are personally responsible for your postings.

SAFEGUARDING WHAT'S OURS
CODE OF BUSINESS CONDUCT

**Provide informative, individual perspectives,** while sticking to your area of expertise, and adding value to discussions.

**Protect sensitive, confidential and financial information** regarding CN, its customers, its suppliers and other stakeholders. Online conversations are not private. Therefore, never discuss or disclose any information that is confidential or proprietary to either CN or to a third party who has disclosed information to CN, and avoid identifying and discussing about others – including customers, suppliers, your friends or co-workers – unless you have their permission. If discussing CN's business, do not make any untrue or unsubstantiated claims about the services we offer or events that have occurred. To learn more about "confidential information," see the "Confidentiality" section of this Code.

**Respect others' rights.** Obtain permission before posting information, pictures, articles or other information to which their authors may have exclusive rights. This includes obtaining CN's permission to post pictures of CN's premises, employees or property.

**Stay respectful and polite.** Always express ideas and opinions in a respectful manner, never in a threatening, harassing, defamatory or discriminatory manner. Do not denigrate or insult others, including colleagues and competitors.

**Never post inappropriate content.** This includes any illegal or illicit behaviour whether depicted in words, links or photos. Do not post any material that is obscene, defamatory, libellous, threatening, or embarrassing to another person or entity, or could constitute harassment, including with respect to CN, your colleagues, our customers, our suppliers and our competitors.

**Be upfront about your own mistakes.** If you make an error, admit it and correct it quickly. If you choose to modify content that was previously posted, such as editing a blog post, make it clear that you have done so.

**Remember that the Internet is permanent.** Once information is published online, it is essentially part of a permanent record, even if you remove/delete it later or try to make it anonymous. It is public and can also be shared by others. Think of your audience today, and in the future – it can include existing and potential customers, co-workers, present and future supervisors, investors and regulators, among many others. Whether you are an official CN spokesperson or not, you are a goodwill ambassador for the Company.

Consult CN's Social Media Policy for additional information.



# Q+A

Can I talk about CN business on my personal blog or Facebook page?

Yes, but avoid disclosing any information that is confidential or is not already public. Do not make any untrue or unsubstantiated claims about CN. Do not make disparaging comments that may affect CN's reputation.

Do not talk about your co-workers unless they confirm they are OK with that, because they might not be comfortable about having information circulating about them on the Internet.

## RECORDS AND DOCUMENT RETENTION

CN must comply with legal requirements that govern the recording, processing, retention and destruction of its documents and records.

**CN's records include, among others:**

- Records that are in paper, electronic or other format;
- Records in employees' offices, at CN's storage facilities, in off-site storage, or otherwise stored.

  Examples of off-site storage sites include:

  - Employees' home computers
  - Laptops
  - Tablets
  - Mobile phones
  - Websites
  - Facebook

**Examples of documents and records include:**

- Letters or memoranda
- Presentations
- Web pages
- Text messages
- Spreadsheets
- Maps
- Pictorial or graphic work
- Films
- Sound recordings
- Machine-readable records
- Agreements
- E-mails
- Instant messages
- Voicemails
- Plans
- Drawings
- Photographs
- Microfilm
- Audio/video tapes
- DVDs, CDs, memory sticks

We must keep these documents and records and safeguard their confidentiality based on:

- Value to CN;
- Relevant laws and regulations;
- CN's contractual obligations;
- CN's Records Management Policy.

These documents and records should never be tampered with, removed or destroyed in a manner that is contrary to CN's Records Management Policy.

In the context of potential or actual litigation or in the event of a government investigation or audit, CN may be legally prohibited from disposing of relevant documents or deleting electronically stored information for some period of time (referred to as "legal hold" periods). In such circumstances, you must follow the specific instructions provided by the CN Law Department, including any instructions to preserve or otherwise not dispose of documents or electronically stored information.

### DOING THE RIGHT THING

**Ensure that all entries** in CN's books, records and accounts, and all documents created in the course of CN's business, are:

- Accurate
- Complete
- A fair reflection of their subject matters
- Recorded on time

**Ensure that no relevant** information is omitted or concealed from our documents or records.

**Do not dispose** of old files and records unless you have first verified that disposal is consistent with relevant laws and CN's Records Management Policy.

If you have any questions on this policy and how to apply it, contact the CN Law Department.

To consult CN's Record Retention Policy and Schedule, please see CN's Records Management website, which is available here: http://cninet.cn.ca/legal/records_management/main.html .

# Q+A

Jonathan is an account manager for one of our major customers. Relations have been a bit "rocky" recently and he is concerned that CN might be sued. Should Jonathan save his e-mail correspondence with the customer's account manager?

Yes. Any document or record, including any e-mails, must be kept until the applicable retention period or the legal hold period (whichever is later) has expired. If an adversarial situation is possible, then no document concerning the potential litigation should be altered, deleted or destroyed. If you are uncertain as to whether or not to preserve documents (including e-mails), contact the CN Law Department.

Erica frequently works from home by logging in remotely from her personal PC, storing some work files on her local drive. She needs to free up some space on her hard disk to accommodate some computer games played by her 12-year-old son. She considers her home PC to be personal and therefore not subject to any official record retention policy. Can Erica simply delete any files she chooses from her home PC?

No. Official Company records remain such, even on an employee's personal computer held at home. Before deleting any work-related files from a home computer, one should ensure that the destruction is permitted by CN's Record Retention Policy or that a copy exists on a work computer or server.

# MAKING A DIFFERENCE

CN is an active member of the com-
munities in which we operate. It is im-
por tant that we do the right thing in
managing our relationships with these
communities and the governments that
serve them.

## COMMUNITY ACTIVITIES AND INVESTMENT

CN is committed to building safer, stronger communities. We support communities through employment, by paying taxes and through other economic benefits. But we have a responsibility to go further. We are a concerned corporate citizen in the towns and cities where CN employees live and work. CN demonstrates this commitment through responsible community investment by supporting not-for-profit organizations.

Through our community investment program, the "CN Stronger Communities Fund," we work with not-for-profit groups in Canada and the U.S. on opportunities consistent with our expertise, business strengths and resources. This allows us to share our knowledge and experience.

CN receives more requests from worthwhile projects than it can possibly support. We must focus our charitable donations, gifts-in-kind, scholarships and sponsorships on requests in those areas where we can have the most impact.

All intended corporate donations must be evaluated by the CN Public Affairs Department using the Community Investment Program Guidelines. After consulting with Public Affairs, funding of local projects may be made in certain cases even though they represent an exception to the program guidelines. If you have any questions, contact the CN Public Affairs Department.

### DOING THE RIGHT THING

**If approached by** an organization, refer them to the community investment program web page at: www.cn.ca/community . No request under the community investment program will be evaluated until a request is duly submitted online.

**Do not commit** to any organization before the request has been evaluated by Public Affairs.

**Consult the Sponsorships Solicitation Guidelines** prior to soliciting customers and suppliers for personal charities.

## POLITICAL ACTIVITIES

CN actively and openly communicates with all levels of governments and legislators in Canada and the United States. This includes communicating Company and industry views on:

- Proposed legislation and regulations;
- Government programs and policies that can affect our operations and our ability to conduct business;
- Key CN initiatives.

Lawmakers and decision makers need to have a full understanding of CN's business, our impact, and our role in the economy and the marketplace. This is accomplished through regular interactions coordinated and managed by the Government Affairs team. From time to time, the Government Affairs team may call on you to help play a part in these conversations. This is an integral part of the democratic process. All contacts with government or public officials must respect government relations and lobbying legislation in the local jurisdiction. They must also respect CN's own high ethical standards. Preserving CN's reputation, image and integrity must always be the main consideration.

CN-Branch 001355

LOBBYING ACTIVITY IN CANADA

The Canadian Lobbying Act mandates an increased level of transparency for lobbyists in their dealings with the Government of Canada. It also defines the types of activities that are considered "registrable lobbying." These include communications with those who hold public office and designated members of their staffs and public servants about:

- The making or amending of federal laws, regulations, policies or programs;
- Obtaining a federal grant, contribution or other financial benefit.

**They do not include:**

- Requests for information;
- Providing normal sales and marketing information;
- Help in interpreting or enforcing any laws that apply to CN.

Companies are required to register under the Act and list the departments and agencies of government they deal with. They must also provide a general account of the subjects on which they carry out lobbying activities. Corporate in-house lobbyists must file their own lobbyist registrations if their lobbying activities constitute a "significant part" of their work duties. This is defined as 20% or more of an employee's time. The senior officer in an organization must ensure all employees who lobby are registered if their combined lobbying activity would constitute 20% or more of the duties of one employee.

Also under the Act, companies are required to file monthly reports revealing any communications (face-to-face meetings or phone conversations) they have had with "Designated Public Office Holders" in the previous month. This includes members of Parliament, senators, ministers, ministerial staff and public

servants at the level of Assistant Deputy Minister or higher. Casual unscheduled conversations at social events are not reportable.

CN is registered under the Act and expects that all of its employees will conform to it. All employees who deal with the Government of Canada are required to determine whether they need to be included in CN's registration. They must also determine whether they have had any communications that need to be included in CN's monthly report to the Commissioner of Lobbying.

If CN employees undertake any meetings or conversations that may meet the definitions in the Act, they must inform CN Government Affairs for inclusion of these activities in CN's monthly report.

Most Canadian provinces and some cities have also instituted laws regulating lobbying. CN registers under these provisions in all jurisdictions in which our activities require us to do so. Again, CN employees must inform CN Governmental Affairs of their dealings with a Canadian province or city to ensure compliance with applicable legislation.

### LOBBYING ACTIVITY IN THE UNITED STATES

Lobbying reform legislation put in place in late 2007 prohibits CN and other companies from offering or providing any "gift" to a member or employee of Congress. A "gift" is anything of value, from a cup of coffee, to a book or a meal, or a ride from the airport. Anything that has a monetary value is considered a "gift" under the law. Many states have similar laws as well.

CN employees are prohibited from providing anything of monetary value to a congressional member or employee, to a

MAKING A DIFFERENCE
CODE OF BUSINESS CONDUCT

U.S. federal official, a state official or to a government employee in states where such activity is prohibited by law.

In addition, federal and state laws regulate and define "lobbying" differently in every jurisdiction. Contacts with legislative and executive branch agencies, officials and employees could trigger lobbying registration, depending on the type of contact or communication. Because of that, no CN employee may communicate with or contact a U.S. government agency on behalf of the Company without prior consultation with the CN Government Affairs Department.

CN must also file periodic reports with the U.S. Congress listing any employee who spends 20% of his or her time or more lobbying U.S. federal government officials on CN's behalf. CN files lobby registration reports in states where CN operates as well.

### DOING THE RIGHT THING

**Refrain from responding to or initiating a contact or communication** with a legislative or executive branch government agency or official prior to authorization or clearance from the CN Government Affairs Department.

**Refrain from offering or providing any "gift"** to a member or employee of Congress or asking the Company to reimburse you for any costs associated with a member of Congress or congressional employee.

**Contact the CN Government Affairs Department** if you have any questions about the rules in Canada and the United States for any interaction at the federal, provincial/state or municipal level.

CN-Branch 001358

## POLITICAL CONTRIBUTIONS AND ACTIVITIES

CN strictly follows the law when it comes to making contributions in Canada and the United States to political parties, political organizations or their representatives. We also take part in party politics, including fundraising activities, only as permitted by law. No corporate funds or assets can be loaned or contributed to any political party or organization or to a candidate or elected politician, unless allowed by law and authorized by the CN Government Affairs Department.

At CN, we have a responsibility to participate in public debate on certain public policy issues – specifically on issues that may have an impact on our legitimate business goals, and matters that may affect the communities where we operate.

CN employees and agents who work with various governments to present CN's point of view must know and obey the relevant laws at all times.

As a U.S. employee, you may make a financial contribution to a company Political Action Committee (PAC). Political Action Committees provide individuals a practical means of participating in the political process.

Our U.S. operations' PAC is registered with the U.S. Federal Election Commission and complies with the regulations implemented by that agency. CN employees who are U.S. citizens or have permanent resident status and who wish to voluntarily donate from personal funds to the PAC should contact the Assistant Vice-President and Head of Public and Government Affairs to learn more about this important tool.

As either a U.S. or Canadian citizen, you can participate in the legitimate political process on your own time and away from

CN property. You may also choose to run for political office at any level of government on your own time and at your own expense.

Before running for political office you must notify your supervisor. If elected, you must disclose your elected position to the CN Law Department and Public and Government Affairs to avoid any actual or perceived conflict of interest between your elected position and your responsibilities at CN.

**In the United States:**
- If you run for political office, you may be eligible for unpaid leave of absence while campaigning. If elected, you may be eligible for unpaid leave of absence for the duration of your term of office.

**In Canada:**
- Subject to applicable laws, leave will not be granted to campaign on behalf of others or to hold office in a political organization.

If you have any questions about CN's government relations programs, or about political activities in Canada or the U.S., you should contact the CN Government Affairs Department.

### DOING THE RIGHT THING

**Do not contribute** to candidates or political or activist organizations from Company funds, even when local laws and regulations permit it, unless you are authorized by the CN Government Affairs Department.

**Speak out on community issues** of importance to you, but never give the impression that you are speaking on behalf of CN. All employees, especially those in leadership positions, should be aware that they still could be perceived by others as representing the Company.

**Do not use Company time,** telephones, e-mail, communications services or systems, or any other type of Company resource to work or solicit for a political campaign or candidate.

**Do not lend Company property** for use in a political campaign.



Renée's sister-in-law is running for office in a local election. She has asked Renée to write a letter of support to the editor of the local newspaper using Renée's CN letterhead. Is this OK?

No. We encourage employee participation in all aspects of the political process, but Renée cannot appear in any way to be representing CN, unless she is officially designated to do so.

Mei's supervisor wants her to do research for a national environmental pressure group that she supports. It's a good cause, but should Mei be doing this while at work?

No, this is not appropriate use of time on the job. Mei should speak to her supervisor and raise the concern that such work would contravene the Code of Business Conduct and could cause a conflict of interest. If the supervisor tells Mei to do the work anyway, Mei should contact the Human Resources Department or the CN Law Department.

# A DUTY
## TO REPORT

Following the standards of this Code and underlying policies is a serious matter at CN.

- High standards of business conduct are critical to maintaining public confidence.

- Violations can hurt our relationships and reputation with our customers, suppliers, investors and partners.

- Such violations can even result in our loss of the privilege to do business in Canada, the United States or elsewhere.

CN-Branch 001362

## REPORTING  VIOLATIONS   OF  THE  CODE

This Code of  Business Conduct  covers CN's fundamental principles governing  ethical  business conduct.  It  also  deals with  measures for  overseeing and  reporting  violations. All employees have an  individual responsibility to  report  in  good faith  any actual or  potential violations of  this Code or  the law. If  you believe that  such a  violation has  taken place, it  is critical that  you bring the  matter in  good faith  to  the attention of  your supervisor, your Human Resources representative or  the CN Law Department by telephone, e-mail or  mail. For additional contact information  of  other resources at  CN which may assist you with questions about the Code or  to report a violation, please refer to the section called "Getting  Help" for  contact information.

Alternatively, employees or  other  related  parties can  express their  concerns about  these matters  confidentially  by  calling CN's Hotline or  by communicating electronically as indicated on the following page.

Exhibit B: IC's Code of Business Conduct

80

CN-Branch 001363

## COMPLIANCE STANDARDS AND PROCEDURES

CN will take all reasonable steps to respond appropriately, promptly and consistently to violations or potential violations outlined in this Code. This may include administrative and disciplinary action, up to and including:

- Termination of employment;
- Contract termination;
- Other legal action such as seeking damages.

**CN's Hotline**
1-800-925-5974
www.reportanissue.com

## CN'S OMBUDSMAN

The Office of the Ombudsman provides an independent, confidential, neutral and informal avenue that offers advice to both internal and external parties and facilitates fair and equitable resolutions to concerns of any nature arising in the organization or in the community. The Ombudsman is independent and reports directly to CN's Board of Directors, through the Corporate Governance and Nominating Committee.

The Ombudsman helps individuals to:

- Evaluate the situation;
- Assess their attempts to resolve the situation;
- Become familiar with existing CN policies, procedures and available means of problem-solving; and
- Explore various options and potential actions.

A DUTY TO REPORT
CODE OF BUSINESS CONDUCT

Exhibit B: IC's Code of Business Conduct

Because of the informal nature of its role, the Ombudsman does not conduct or participate in formal investigations.

Prior to contacting the Office of the Ombudsman to address an issue, we encourage you to use the appropriate internal reporting mechanism. Most issues should be escalated through your supervisor, your Human Resources representative or the CN Law Department prior to you contacting the Office of the Ombudsman.

All requests made to the CN Ombudsman are handled promptly and in strict confidence unless you authorize disclosure. The only exception to this confidentiality is where there appears to be imminent risk of serious harm or when there is no other reasonable option. The CN Ombudsman suggests that you provide contact information (name, telephone number, e-mail address) to enable the Ombudsman to contact you when necessary, although reporting can also be made anonymously.

The various ways to contact the Office of the Ombudsman are listed below. The Office of the Ombudsman has a confidential voicemail available 24 hours a day on which you can leave a message.

| | |
|---|---|
| E-mail: | ombudsman@cn.ca |
| Mail: | CN Office of the Ombudsman |
| | 935 de La Gauchetière Street West |
| | Montreal, Quebec  H3B 2M9 Canada |
| Tel.: | 514-399-5581 |
| | 1-866-226-8968 |

## CN'S PROMISE

All good faith inquiries will be handled **promptly and confidentially** unless disclosure is authorized by you, required by law or necessary to conduct a review or negotiation.

**You will not be penalized***, discharged, demoted, or suspended, nor will you suffer any retaliation, for reporting potentially unethical conduct in good faith.

There will also be **no repercussions** for seeking guidance on how to handle suspected illegal acts or violations of the rules.

## GETTING HELP

**CN Ombudsman**
1-866-226-8968
ombudsman@cn.ca

**CN Law Department**
514-399-6627
1-866-996-6627

**Human Resources Centre**
1-877-399-5421

**CN Police**
1-800-465-9239
or to report non-urgent suspicious activities:
cnpolicetipline@cn.ca

**CN Public Affairs Department**
1-888-888-5909

**CN Investor Relations Department**
514-399-0052

**CN Environment Group**
1-800-465-9239
to report environmental incidents

**CN Corporate Information Security Unit**
514-399-4357
http://cnis
infosec@cn.ca

**CN's Hotline**
1-800-925-5974
www.reportanissue.com

A DUTY TO REPORT
CODE OF BUSINESS CONDUCT

# REFERENCES

Policies referenced in this Code are all accessible through the ePortal. If required, a paper copy can also be obtained from your Human Resources representative.

- Accommodation Guidelines (Canada)
- Anti-Corruption Policy
- Business Expense Reimbursement Process
- Communications Policy
- Community Investment Program Guidelines
- Corporate Travel Policy
- Employment Equity Policy
- Equal Employment Opportunity Policy (U.S.)
- Guidelines for Avoiding Conflict of Interest Situations
- Harassment-Free Environment Policy (Canada)
- Human Rights Policy (Canada)
- Information Security Policy
- Information Technology Guidelines

- Insider Trading and Reporting Policy
- Policy to Prevent Workplace Alcohol and Drug Problems (Canada)
- Procurement Policy
- Prohibited Harassment, Discrimination and Anti-Retaliation Policy (U.S.)
- Protection of Personal Information Policy (Canada)
- Records Management Policy
- Social Media Policy
- Sponsorships Solicitation Guidelines
- Substance and Alcohol Free Environment (S.A.F.E.) Policy (U.S.)
- Working from Home and Co-Working Policy (Canada)
- Workplace Violence Prevention Policy

REFERENCES
CODE OF BUSINESS CONDUCT

Exhibit B: IC's Code of Business Conduct

CN-Branch 001367



Exhibit B: IC's Code of Business Conduct

CN-Branch 001368



WWW.CN.CA

# Exhibit C

**IC's Prohibited Harassment, Discrimination, and Anti-Retaliation Policy**

# Prohibited Harassment, Discrimination and Anti-Retaliation Policy - U.S.

| Target Audience: | Applicable in: | View corresponding policy: |
|---|---|---|
| Non-unionized Employees - U.S. <br> Unionized Employees - U.S. |  |  |

### Objective

The Company is committed to providing a work environment free of harassment. The Company maintains a strict policy prohibiting sexual harassment and other forms of unlawful workplace harassment, including harassment based on race, color, sex, national origin, religion, disability, age, sexual orientation, gender identity, veteran status, or any other basis protected by federal, state or local law, ordinance or regulation, which may include marital status. All such harassment is prohibited.

### Scope

This policy applies to all persons involved in the operations of the Company and prohibits harassment by any employee of the Company, including managers and coworkers. This prohibition also applies to the Company's vendors, independent contractors, or customers. No employee is expected to tolerate any conduct prohibited by this policy from anyone at work or engaged in Company business.

This policy applies to employees of the following companies, each of which operates as "CN" (hereinafter collectively referred to as the "Company"):

- Bessemer and Lake Erie Railroad Co.
- Chicago, Central & Pacific Railroad Company
- Cedar River Railroad Company
- Grand Trunk Western Railway Company
- Illinois Central Railroad Company
- The Pittsburgh and Conneaut Dock Company
- Wisconsin Central Ltd.

### Complete Policy

### Scope

This policy applies to all persons involved in the operations of the Company and prohibits harassment by any employee of the Company, including managers and coworkers. This prohibition also applies to the Company's vendors, independent contractors, or customers. No employee is expected to tolerate any conduct prohibited by this policy from anyone at work or engaged in Company business.

### Prohibited Harassment

The Company is committed to providing a work environment free of harassment. The Company maintains a strict policy prohibiting sexual harassment and other forms of unlawful workplace harassment, including harassment based on race, color, sex, national origin, religion, disability, age, sexual orientation, gender identity, veteran status, or any other basis protected by federal, state or local law, ordinance or regulation, which may include marital status. All such harassment is prohibited.

### Sexual Harassment Defined

Federal law defines sexual harassment as unwanted sexual advances, requests for sexual favors, or visual, verbal or physical conduct of a sexual nature when:

1. submission to such conduct is made a term or condition of employment; or
2. submission to or rejection of such conduct is used as a basis for employment decisions affecting the individual; or
3. such conduct has the purpose or effect of unreasonably interfering with an employee's work performance *or* creating an intimidating, hostile or offensive working environment.

State and local law definitions of sexual harassment include various forms of offensive behavior. The following is a partial list:

- Unwanted sexual advances.
- Offering employment benefits in exchange for sexual favors.
- Making or threatening reprisals after a negative response to sexual advances.
- Visual conduct such as leering, making sexual gestures, displaying sexually suggestive objects or pictures, cartoons, or posters.
- Verbal conduct such as making or using derogatory comments, epithets, slurs, sexually explicit jokes, comments about an employee's body or dress.
- Verbal sexual advances or propositions.
- Verbal abuse of a sexual nature, graphic verbal commentary about an individual's body, sexually degrading words to describe an individual, or suggestive or obscene letters, notes, or invitations.
- Physical conduct such as touching, assault, impeding or blocking movements.
- Retaliation for making harassment reports or threatening to report harassment.

It is unlawful for males to sexually harass females or other males, and for females to sexually harass males or other females.

This policy also protects employees from harassment by vendors or clients. If harassment occurs on the job by someone not employed by the Company, the procedures in this policy should be followed as if the harasser were a Company employee.

**Other Types of Harassment**

Prohibited harassment on the basis of gender, race, color, national origin, ancestry, religion, creed, physical or mental disability, veteran status, age, sexual orientation, gender identity, or other protected basis, includes behavior similar to sexual harassment such as:

- Verbal conduct such as threats, epithets, derogatory comments, or slurs;
- Visual conduct such as derogatory posters, photography, cartoons, drawings, or gestures;
- Physical conduct such as assault, unwanted touching, or blocking normal movement;
- Retaliation for making harassment reports or threatening to report harassment.

**The Company's Complaint Procedure**

The Company's reporting procedure provides for a prompt, thorough, and objective investigation of any claim of harassment and/or discrimination. If the Company determines that prohibited activity has occurred, it will take appropriate remedial action. The discipline will be commensurate with the severity of the offense. Appropriate action will also be taken to deter any future prohibited activity. All reported incidents of harassment or discrimination will be investigated. Designated representatives of the Company will promptly undertake an effective, thorough, and objective investigation of the allegations. When the investigation is completed, a determination regarding the allegations will be made and communicated to the person who filed the report as soon as practical.

1. An individual subjected to what he/she believes is sexual, racial, or other improper harassment should immediately tell the harasser to stop his/her unwanted behavior and/or immediately report that behavior, preferably in writing, to the Human Resources Director or Human Resources Manager in Homewood, Illinois. If any further incident(s) of harassment occur, the incident(s) must be immediately reported. An employee can also call the Human Resources Center at ███████████ to report an incident.

2. If an employee becomes aware of harassing or discriminatory conduct engaged in or suffered by a Company employee, regardless of whether such harassment directly affects that employee, the employee should immediately report that behavior, preferably in writing, to the Human Resources Director or Human Resources Manager in Homewood, Illinois. An employee can also call the Human Resources Center at ███████████ to report an incident.

**Retaliation Prohibited**

The Company strictly prohibits retaliation against any person by another employee or by the Company for using this complaint procedure, reporting harassment, or for filing, testifying, assisting, or participating in any manner in any investigation, proceeding, or hearing conducted by a governmental enforcement agency. Prohibited retaliation includes, but is not limited to, termination, demotion, suspension, failure to hire or consider for hire, failure to give equal consideration in making employment decisions, failure to make employment recommendations impartially, adversely affecting working conditions, or otherwise denying any employment benefit.

Any person who is found to have engaged in unlawful harassment is subject to disciplinary action up to and including discharge from employment. Any employee who engages in prohibited harassment or retaliation, including any Manager who knew about the harassment but took no action to stop it, may be held personally liable for monetary damages.

The Company does not consider conduct in violation of this policy to be within the course and scope of employment or the direct consequence of the discharge of one's duties. Accordingly, to the extent permitted by law, the Company reserves the right not to provide a defense or pay damages assessed against an employee for conduct that violates this policy.

**Additional Enforcement Information**

The Company hopes that incidents or violations of this policy can be resolved through the internal process outlined above. The Company encourages employees to use the resources and complaint procedure provided, so that the company can investigate and remedy any problems as soon as possible. All employees, however, have the right to file a charge with the federal Equal Employment Opportunity Commission (EEOC) and, also, for Illinois employees, with the Illinois Department of Human Rights (IDHR), which investigate and prosecute complaints of harassment in employment. A charge with IDHR must be filed within 180 days of the incident of harassment. A charge with the EEOC must be filed within 300 days of the incident.

If you are in Illinois, the Illinois Department of Human Rights may be contacted as follows:

CHICAGO        312-814-6200

CHICAGO TDD 312-263-1579

SPRINGFIELD   217-785-5100 or 217-785-5125

The United States Equal Employment Opportunity Commission can be contacted as follows:

CHICAGO   312-353-2713 or 800-669-3362

TDD         800-800-3302

**Policy Revision Date:** December 2014

**Last revised date:** December 2014

Disclaimer

---

# Exhibit D

**IC's Workplace Violence
Prevention Policy**

# CN Workplace Violence Prevention policy

## Target Audience:

All Employees - Canada and U.S.

## Applicable in:



## Objective

CN is committed to providing a safe, healthy and violence-free workplace for all employees. The objective of this policy is to reiterate the prohibition of workplace violence at CN and set out how threats, acts or risks of workplace violence are to be reported and addressed.

## Scope

This Policy applies to all CN employees.

## Complete Policy

### 1. Policy Statement and objective

CN will not tolerate workplace violence and is committed to making reasonable efforts to:

- Provide its employees with a safe, healthy and violence-free workplace;
- Dedicate sufficient attention, resources and time to address factors that contribute to workplace violence and to prevent and protect against it;
- Communicate to its employees information in its possession about factors that can contribute to workplace violence; and
- Provide assistance to employees who have been subject to workplace violence*.

All employees are encouraged to identify and promptly report threats, acts or risks of workplace violence.

CN will promptly investigate and address allegations of workplace violence and will impose appropriate corrective measures, up to and including dismissal, against any employee who has engaged in workplace violence.

*Note: While CN acknowledges that violence can occur in its workplace, as it can in any workplace, CN cannot foresee specific acts of workplace violence. In promulgating this policy, CN does not intend to enlarge the scope of duties imposed by law. This Policy is not intended to create any individual right or cause of action not already existing and recognized under applicable federal, provincial or state law.*

EXHIBIT
17

Exhibit D: IC's Workplace Violence Prevention Policy

## 2. Definitions

For purposes of this policy, a "workplace" is any location where CN employees are currently performing work-related activities while in the scope of their employment. Examples include CN-owned or controlled buildings, parking lots, rail yards, railroad tracks, trains, machinery, company vehicles, and any other location where CN business or sponsored activity is being conducted.

For purposes of this policy, "workplace violence" is defined as any action, conduct, threat or gesture of a person towards a CN employee in a workplace that can reasonably be expected to cause harm, injury or illness to the CN employee, excluding situations of justified self-defence.

Examples of workplace violence include:

- Intentionally threatening or causing physical harm;
- Communications threatening violent acts, made verbally or in writing (e.g., through bulletin boards, e-mail, blogs, etc.);
- Intentionally causing property damage for the purpose of intimidation;
- Possession, display or use of a weapon;
- Possession, display or use of an object in a threatening or harmful manner;
- Bullying involving violent behaviour and other abusive and aggressive behavior.

## 3. Reporting threats, acts or risks of workplace violence

If you are subjected to or witness threats, acts or risks of workplace violence, immediately report the matter to your direct supervisor, a Human Resources representative or the CN Ombudsman. If the conduct involves your direct supervisor, immediately report the situation to your supervisor's manager, a Human Resources representative or to the CN Ombudsman. If you are unsure who your Human Resources representative is, call the HR call center at the number below.

Reports can be made anonymously. Reports or incidents warranting confidentiality will be handled appropriately and information will be disclosed to others only on a need-to-know basis, or as required by law.

If you believe that you or another person is at immediate risk of physical harm:

- Remain calm;
- Move to safety;
- If warranted by the circumstances, immediately call 911;
- Although you should first seek any immediate assistance from your local police service, you may also reach the CN Police for assistance at 1-800-465-9239;
- As soon as possible after the incident, report the situation to your direct supervisor.

## 4. Investigation

**EXHIBIT**

18

Exhibit D: IC's Workplace Violence Prevention Policy

Allegations of workplace violence reported to CN will be investigated. All information relating to the investigation will be kept confidential to the extent possible.

However, information may be disclosed in certain circumstances, including the following: where consent is given by a person to disclose his or her involvement in the investigation, when required as part of the investigation or discipline process or in the implementation of corrective measures, or as required by law.

If CN determines that an employee has engaged in workplace violence, CN will take appropriate remedial action, which may include disciplinary action, up to and including termination. If appropriate, proper law enforcement officials will be notified and the action will be fully prosecuted as a criminal matter.

Where the risk of workplace violence is brought to CN's attention, CN will provide information, instruction or training, where appropriate, in order to prevent or minimize the risk of workplace violence.

## 5. Contact information

| CN Police (Canada & U.S.): | 1-800-465-9239 |
| CN Human Resources center (Canada & U.S.): | 1-877-399-5421 |
| CN Ombudsman (Canada & U.S.): | 1-866-226-8968 |

CN offers its employees an **Employee & Family Assistance Program (EFAP),** which can be reached at the following numbers. However, please note that complaints under this policy must be directed to CN management, as described in the policy.

| **CANADA** | • Employee and Family Assistance Program: 1-800-268-5211<br>• Hearing Impaired (TDD - English): 1-800-363-6270<br>• Hearing Impaired (TDD - French): 1-800-263-8035 |
| **U.S.** | • Employee and Family Assistance Program: 1-800-554-6931 |

**Effective date:** February 2014

**Last revision date:** February 2014

EXHIBIT

19

Exhibit D: IC's Workplace Violence Prevention Policy

# Exhibit E

**Branch's training
records on IC's policies**

| Certification Title | Due | Expiry | Status |
|---|---|---|---|
| US Fall Protection Mechanical | 2012/11/04 | 2013/01/04 | Expired |
| Canada Continuous Welded Rail (CWR) | 2014/03/13 | 2014/05/13 | Expired |
| CA & US Fall Protection Basics | 2019/01/23 | 2019/03/23 | Expired |
| US Continuous Welded Rail | 2019/11/30 | 2019/12/30 | Expired |
| US Continuous Welded Rail | 2020/11/21 | 2020/12/30 | Certified (Renewal In Progress)/Past Due |
| US Hazmat Engineering | 2022/12/12 | 2023/02/12 | Certified (Renewal In Progress) |
| Canada Movement Over Rail Breaks (MORB) | 2022/12/13 | 2023/02/13 | Certified (Renewal In Progress) |
| US OPS Rules Engineering | | 2018/01/03 | Certified |
| CA & US Basic Machine Operator | | | Certified |
| CA & US Crane Fundamentals | | | Certified |

| DATE | COURSE TITLE | DUE | TRAINING TYPE | STATUS |
|------|--------------|-----|---------------|--------|
| 2021/12/16 | US Continuous Welded Rail Final Exam | | Test | Completed |
| 2021/12/06 | Crane Fundamentals | | Session | Completed |
| 2021/12/06 | Life Critical Rules Engineering | | Session | Completed |
| 2021/12/05 | Crane Grandfathering | | Material | Completed |
| 2021/11/12 | CN Prevention Employer Responsibilities Countering Sexual Harassment Illinois | | Online Class | Completed |
| 2021/11/11 | Prevention of Workplace Harassment for Employees Part IV | | Online Class | Completed |
| 2021/11/11 | Prevention of Workplace Harassment for Employees Part III | | Online Class | Completed |
| 2021/11/11 | Prevention of Workplace Harassment for Employees Part II | | Online Class | Completed |
| 2021/11/11 | Prevention of Workplace Harassment for Employees Part I | | Online Class | Completed |
| 2021/11/11 | CN Prevention Employer Responsibilities Countering Sexual Harassment  Illinois - Gr Session | | Session | Completed |
| 2021/11/11 | Prevention of Harassment and Sexual Harassment State of Illinois based Employees - Group Session | 2021/11/14 | Curriculum | Completed |
| 2021/11/11 | CN Prevention Taking Action Against Sexual Harassment Illinois - Unionized Gr Session | | Session | Completed |
| 2021/11/11 | Prevention of Workplace Harassment for Employees Part IV - Eng  Gr Session | | Session | Completed |
| 2021/11/11 | Prevention of Workplace Harassment for Employees Part II - Eng  Gr Session | | Session | Completed |
| 2021/11/11 | Prevention of Workplace Harassment for Employees Part I - Eng  Gr Session | | Session | Completed |
| 2021/11/11 | Prevention of Workplace Harassment for Employees Part III - Eng  Gr Session | | Session | Completed |
| 2021/09/17 | Continuous Welded Rail (CWR) - US | | Session | Completed |
| 2021/09/16 | US Roadway Worker Safety Final Exam | | Test | Completed |
| 2021/09/16 | Roadway Worker Safety | | Session | Completed |
| 2020/02/13 | Continuous Welded Rail (CWR) - US | | Session | Completed |
| 2020/02/13 | Movement Over Rail Breaks (MORB) | | Session | Completed |
| 2020/02/12 | Improvised Explosive Device Training | | Session | Completed |
| 2020/02/12 | HAZMAT Engineering | | Session | Completed |
| 2020/02/12 | Hazard Communications / WHMIS | | Session | Completed |
| 2020/02/12 | Rail Security Awareness | | Session | Completed |
| 2020/02/12 | Roadway Worker Safety | | Session | Completed |
| 2020/02/12 | Respirator Training | | Session | Completed |
| 2020/02/12 | Crystalline Silica, Not Just Dust (US) | | Session | Completed |
| 2020/02/12 | Hearing Conservation - Two Hours | | Session | Completed |

| 2020/02/11 | Life Critical Rules Engineering | | Session | Completed |
|---|---|---|---|---|
| 2020/02/11 | Operational Rules - Engineering (US) | | Session | Completed |
| 2020/02/10 | Lock out / Tag out Training Engineering | | Session | Completed |
| 2019/02/07 | Improvised Explosive Device Training | | Session | Completed |
| 2019/02/07 | Rail Security Awareness | | Session | Completed |
| 2019/02/07 | HAZMAT Engineering | | Session | Completed |
| 2019/02/06 | Continuous Welded Rail (CWR) - US | | Session | Completed |
| 2019/02/06 | Continuous Welded Rail (CWR) Initial | | Material | Completed |
| 2019/02/06 | Continuous Welded Rail (CWR) Initial V.6 | | Material | Completed |
| 2019/02/06 | Continuous Welded Rail (CWR) Initial V.3 | | Material | Completed |
| 2019/02/06 | Continuous Welded Rail (CWR) Initial V.7 | | Material | Completed |
| 2019/02/06 | Continuous Welded Rail (CWR) Initial V.2 | | Material | Completed |
| 2019/02/05 | Roadway Worker Safety | | Session | Completed |
| 2019/02/05 | Roadway Worker Safety - US (85%) | | Session | Completed |
| 2018/08/31 | Basic Machine Orientation | | Session | Completed |
| 2018/08/31 | Basic Machine Operator | | Material | Completed |
| 2018/08/30 | Rail Security Awareness | | Session | Completed |
| 2018/08/27 | Lock out / Tag out Training Engineering | | Session | Completed |
| 2018/01/06 | Continuous Welded Rail (CWR) - US | | Session | Completed |
| 2018/01/05 | Roadway Worker Safety | | Session | Completed |
| 2018/01/05 | Hearing Conservation - Two Hours | | Session | Completed |
| 2018/01/04 | Operational Rules - Engineering (US) | | Session | Completed |
| 2018/01/03 | TMS Expiry Date for US OPS Rules Engineering | | Material | Completed |
| 2017/11/23 | Continuous Welded Rail (CWR) - US | | Session | Completed |
| 2017/11/22 | Roadway Worker Safety | | Session | Completed |
| 2017/09/09 | Safety Engagement Engineering | | Session | Completed |
| 2017/03/05 | Fall Protection Requirements Review February 2017 | | Session | Completed |
| 2017/01/30 | Engineering Track Standards (ETS) Exam | | Online Class | Completed |
| 2017/01/23 | Engineering PTC Operational Readiness | | Online Class | Completed |
| 2017/01/14 | Fall Protection Requirements Review | | Session | Completed |
| 2017/01/03 | US Conductor Initial Start Date | | Material | Completed |
| 2016/11/10 | Looking Out For Each Other (LOFEO) Three | | Session | Completed |
| 2016/11/01 | Engineering PTC Critical Assets | | Online Class | Completed |
| 2016/09/21 | Proper flagging for crossings summary update | | Session | Completed |

| | | | | |
|---|---|---|---|---|
| 2016/04/13 | Engineering Job Briefing Book | | Session | Completed |
| 2016/03/24 | Fall Protection Basics | | Session | Completed |
| 2016/03/23 | Fall Protection Basics CA & US - Initial | | Material | Completed |
| 2016/01/06 | Roadway Worker Safety | | Session | Completed |
| 2016/01/06 | Prohibited Harassment Discrimination & Anti-Retaliation (Non-Mgmt) - US | | Session | Completed |
| 2016/01/05 | Operational Rules - Engineering (US) | | Session | Completed |
| 2016/01/05 | Respirator Training | | Session | Completed |
| 2015/11/18 | Looking Out For Each Other (LOFEO) | | Session | Completed |
| 2015/11/07 | Critical Task: Track Protection and Track Unit Checklist (CT 05) September 2015 | | Session | Completed |
| 2015/09/03 | Critical Task: Crane Operation Checklist (CT 04) August 2015 | | Session | Completed |
| 2015/07/09 | Critical Task: Turnout Inspection Checklist (CT 03) June 2015 | | Session | Completed |
| 2015/06/13 | Critical Task: Disturbed Track Checklist (CT 02) May 2015 | | Session | Completed |
| 2015/05/20 | Critical Task: Plug Rail Replacement Checklist (CT 01) April 2015 | | Session | Completed |
| 2015/05/14 | Critical Task: Plug Rail Replacement Checklist (CT 01) April 2015 | | Session | Completed |
| 2015/05/05 | Critical Task: Plug Rail Replacement Checklist (CT 01) April 2015 | | Session | Completed |
| 2015/03/19 | Dye Penetrant Review | | Session | Completed |
| 2015/01/13 | Roll-By Inspection/Passing Train Inspection | | Session | Completed |
| 2015/01/10 | Lock out / Tag out Training Engineering | | Session | Completed |
| 2015/01/10 | Work Equipment Brake Inspection | | Session | Completed |
| 2015/01/08 | Prohibited Harassment Discrimination & Anti-Retaliation (Non-Mgmt) - US | | Session | Completed |
| 2015/01/08 | Defensive Driving (DDC) | | Session | Completed |
| 2015/01/07 | Rail Security Awareness | | Session | Completed |
| 2015/01/07 | HAZMAT Engineering | | Session | Completed |
| 2015/01/07 | Improvised Explosive Device Training | | Session | Completed |
| 2015/01/07 | Continuous Welded Rail (CWR) - US | | Session | Completed |
| 2015/01/06 | Roadway Worker Safety | | Session | Completed |
| 2014/06/20 | Engineering: Peer to Peer Communication Quiz (Paper-based) | | Session | Completed |
| 2014/06/14 | Fall Protection - Rescue - Bridge Deck | | Session | Completed |
| 2014/02/12 | Roadway Worker Safety | | Session | Completed |
| 2014/02/12 | Operational Rules - Engineering (US) | | Session | Completed |
| 2014/01/24 | Hearing Conservation for Locomotive Train Crews (mail out) | | Session | Completed |
| 2013/06/06 | Crane Fundamentals | | Session | Completed |
| 2013/06/05 | Crane US & Canada Initial | | Material | Completed |
| 2013/04/27 | Hearing Conservation for Locomotive Train Crews (mail out) | | Session | Completed |

| 2013/04/17 | Continuous Welded Rail (CWR) - US | | Session | Completed |
|---|---|---|---|---|
| 2013/04/17 | Roadway Worker Safety | | Session | Completed |
| 2013/03/14 | Fall Protection - B&S - Employees | | Session | Completed |
| 2013/03/13 | Fall Protection - Rescue - Bridge Deck | | Session | Completed |
| 2012/08/10 | Continuous Welded Rail (CWR) - US | | Session | Completed |
| 2012/08/09 | Rail Security Awareness | | Session | Completed |
| 2012/08/09 | Improvised Explosive Device Training | | Session | Completed |
| 2012/08/09 | HAZMAT Engineering | | Session | Completed |
| 2012/08/08 | Roadway Worker Safety | | Session | Completed |
| 2012/08/08 | Operational Rules - Engineering (US) | | Session | Completed |
| 2012/02/01 | Hearing Conservation for Locomotive Train Crews (mail out) | | Session | Completed |
| 2011/12/06 | Fall Protection - Rescue - Bridge Deck | | Session | Completed |
| 2011/10/27 | Respirator Training | | Session | Completed |
| 2011/05/20 | Roadway Worker Safety | | Session | Completed |
| 2011/05/13 | Continuous Welded Rail (CWR) - Canada | | Session | Completed |
| 2011/05/11 | Bridges & Structures Construction Safe Practices Overview | | Session | Completed |
| 2010/10/01 | Hazard Prevention Program Engineering | | Session | Completed |
| 2010/09/29 | Hazard Prevention Program Engineering | | Session | Completed |
| 2010/06/30 | Fall Protection - Rescue - Bridge Deck | | Session | Completed |
| 2010/06/30 | Fall Protection - B&S - Employees | | Session | Completed |
| 2010/06/07 | Lead in Construction | | Session | Completed |
| 2010/01/09 | Roadway Worker Safety | | Session | Completed |
| 2010/01/08 | Operational Rules - Engineering (US) | | Session | Completed |
| 2010/01/07 | Continuous Welded Rail (CWR) - Canada | | Session | Completed |
| 2010/01/06 | Engineering Track Standards Review | | Session | Completed |
| 2010/01/05 | Fall Protection - Mechanical | | Session | Completed |
| 2010/01/04 | Mechanical Fall Protection Induction - US | | Material | Completed |
| 2009/11/11 | Fall Protection - B&S - Employees | | Session | Completed |
| 2009/10/30 | Engineering Safety Review 2009 | | Session | Completed |
| 2009/01/08 | Improvised Explosive Device Training | | Session | Completed |
| 2009/01/08 | Fall Protection - Engineering - Employees | | Session | Completed |
| 2009/01/08 | Rail Security Awareness | | Session | Completed |
| 2009/01/07 | HAZMAT Mechanical- WBT | | Online Class | Completed |
| 2009/01/07 | Roadway Worker Safety | | Session | Completed |

| | | | | |
|---|---|---|---|---|
| 2009/01/06 | Continuous Welded Rail (CWR) - Canada | | Session | Completed |
| 2008/05/09 | Operational Rules - Engineering (US) | | Session | Completed |
| 2008/05/08 | Roadway Worker Safety | | Session | Completed |
| 2008/05/07 | Continuous Welded Rail (CWR) - Canada | | Session | Completed |
| 2008/02/20 | Respirator Training | | Session | Completed |
| 2008/02/12 | New Hire Engineering US | | Session | Completed |
| 2008/02/12 | Rail Security Awareness | | Session | Completed |
| 2008/02/11 | HAZMAT Mechanical- WBT | | Online Class | Completed |
| | Roadway Worker Safety | | Session | Incomplete |
| | CN Workplace Violence Prevention - U.S | 2020/01/30 | Online Class | Registered / Past Due |
| | Life Critical Rules Engineering - WBT | | Online Class | Registered |
| | Life Critical Rules Engineering - WBT | | Online Class | Registered |
| | Life Critical Rules Engineering - WBT | | Online Class | Registered |
| | CN Workplace Violence Prevention - U.S | 2020/01/30 | Online Class | Registered / Past Due |
| | CN Workplace Violence Prevention - U.S | 2020/01/30 | Online Class | Registered / Past Due |
| | CN Workplace Violence Prevention - U.S | 2020/01/30 | Online Class | Registered / Past Due |
| | Job Aid – Prevention of Harassment and Sexual Harassment Illinois- 2021 | | Material | Registered |
| | Prevention of Harassment and Sexual Harassment State Illinois based employees – 2021 | 2021/11/14 | Curriculum | Completed (Equivalent) |
| | CN Prevention Taking Action Against Sexual Harassment Illinois | | Online Class | Registered |

# Exhibit F

**IC's Discipline Policy**



# CN Discipline Policy
# Southern Region

CN Discipline Policy – Version 1.2
Effective 10/23/2017

# CN Discipline Policy
# Southern Region

## Purpose

CN intends for its rules and standards to promote the safe, orderly, and efficient operation of the railroad. CN expects employees to comply with the company's standards, including its policies, rules, and guidelines. When a guideline, policy, or rule violation (a "Violation") occurs, CN will take appropriate corrective action.

CN designed this Disciplinary Policy ("Policy") to provide a structured corrective action process, improve performance, and prevent a recurrence of unsafe or undesirable conduct. This policy is in line with CN's organizational values, including its focus on safety. In addition, this Policy provides direction for the administration of discipline in a consistent and fair manner, with a focus on deterring and preventing future Violations.

## Scope

This Policy applies to all union-represented employees, except those who are in their probationary period.

## General Information

This Policy is non-exhaustive. Further, it does not replace or supersede existing CN policies or guidelines. If this Policy conflicts with federal, state, or local law, another CN policy that provides for a different disciplinary process or outcome (such as the Attendance Guidelines), or the applicable collective bargaining agreement, that law, policy, or collective bargaining agreement will take

Exhibit F: IC's Discipline Policy

precedence over this Policy. CN, at its discretion, may amend or rescind this policy.

## Discipline

CN has categorized its policies and rules into classifications of Level 1, Level 2, Level 3, and Level 4 in the attached Appendix A: Categories of Violations. Each level carries its own discipline outcome, taking into consideration the seriousness of the conduct.

In addition, although this Policy provides the general framework for handling disciplinary matters, CN reserves the right to depart from this Policy, including the appendices, in appropriate circumstances. Any such departure must follow the Review Process outlined below prior to the assessment of such discipline.

Determining Discipline: After concluding that discipline is appropriate following the formal disciplinary investigation process, CN will consider the severity of the Violation, as set forth in Appendix A, and review the employee's past disciplinary record. CN will limit its look-back to discipline assessed within three years from the date of incident in question (i.e., not from the date of investigation, the date that the discipline is assessed, the date any prior discipline is served, etc.). In addition, when considering the appropriate discipline, only time spent in active service will be considered, and the review window will be extended to account for any time that the employee was not in active service.

If a single incident results in multiple Violations, discipline will be assessed and reviewed based on a single Violation of the highest level of severity. For example, if an individual is determined to have committed a Level 1 Violation and two Level 2 Violations during the same incident, the individual will be assessed discipline consistent with that assessed for a single Level 2 Violation. Multiple Violations

Exhibit F: IC's Discipline Policy

Confidential                                                     CN-Branch 000605

arising from a single incident may not be stacked to increase the severity of the discipline assessed. In addition, if the same employee is disciplined again within three years from the incident resulting in the first discipline, the progression should only consider the single Violation of the highest level of severity associated with the past event.

In responding to Violations that do not result in discharge, the focus should be on correcting behavior, to help the employee understand his/her error and the steps needed to be in compliance with the rules going forward. The disciplinary response should generally be progressive in accordance with the disciplinary matrix contained in the attached Appendix B.

<u>Waivers</u>: When an employee violates a rule, it is most important that he/she understands what is required of him/her to prevent a similar future violation. CN will give each employee the opportunity to waive the formal disciplinary investigation process. However, before agreeing to any waiver, an employee must engage in a conversation with his/her manager to clearly identify the Violation, and the factors that contributed to the Violation and the steps that the employee will take (including remedial training where appropriate) to prevent a recurrence of the Violation. For those employees electing to waive the disciplinary investigation for a Level 1 or Level 2 Violation that would result in a reprimand or suspension, the suspension will be converted to a "record suspension." All record suspensions will appear on the employee's discipline record and be treated as a suspension in the assessment of subsequent discipline, but the employee will not actually serve the suspension. An employee may waive a formal investigation related to a Level 3 violation, but the employee will serve the suspension. Level 4 rule violations or violations where the next step in the discipline matrix is dismissal will not be waived.

Exhibit F: IC's Discipline Policy

Confidential     

## Removal from Service Pending Investigation

When practical, operational management should consult a Labor Relations manager before removing an employee from service pending investigation. When safety, operational, or other circumstances do not permit consultation with Labor Relations prior to removal from service, in all cases, a Labor Relations manager must be consulted within twenty-four (24) hours of an employee's removal from service.

## Review Process

Operational managers must consult with a Labor Relations manager both when they first learn of a possible Violation, and before assessing discipline due to an established Violation or when electing not to assess discipline where a Violation is found. The Labor Relations manager, in consultation with the appropriate Human Resources manager and the operational manager, will determine the appropriate discipline under this policy. If the Labor Relations manager, Human Resources manager and the operational manager cannot reach a consensus on the level of discipline to assess, the matter will be referred to a three-person Discipline Review Panel (DRP) for a final determination as to the appropriate level of discipline, if any, to be assessed.

<u>Discipline Review Panel</u>

The DRP will be made up of 1) the senior executive to whom the employee responsible for the Violation ultimately reports (e.g., a conductor ultimately reports to the Senior Vice President, Southern Region); 2) the Senior Manager, Labor Relations; and 3) the senior Human Resources manager in the Southern Region charged with overseeing EEO compliance.

Exhibit F: IC's Discipline Policy

Confidential

The DRP may agree to meet on a regular basis or ad hoc. Meetings and communications may be in person, by phone, or through email. After reviewing the case specifics, each DRP member will make a recommendation relating to the discipline to be assessed, if any, as a result of the Violation. The recommendation agreed upon by at least 2 of the 3 DRP members will be the final decision. However, if any DRP member is dissatisfied with a decision made by the other 2 DRP members, he/she may bring the disagreement to the attention of the Vice President, Human Resources (VP-HR), or the highest-ranking HR manager in the Southern Region as his or her designee, for a review of the DRP determination. The VP-HR or his or her designee will be provided a copy of the investigation hearing transcript and exhibits and consult with the DRP members who agreed on the Violation response. The VP-HR or his or her designee will decide to either accept the DRP decision or issue a different level of discipline.

The VP-HR's or his or her designee's decision is the final decision with respect to the discipline to be assessed, if any, as a result of a Violation.

Exhibit F: IC's Discipline Policy

Confidential                                                        CN-Branch 000608

# Appendix A

# Categories of Violations

## Part 1 – Level 1 Violations

A Violation that is non-critical, and does not otherwise meet the criteria for a Level 2, 3, or 4 Violation.

**Examples of Level 1 Violations include, but are not limited to, the following:**

- Failure to follow radio rules and procedures
- Peer to peer rule violations
- Incorrect operation of headlights/ditch lights on locomotive
- Failure to wear prescribed personal protective equipment
- Failure to wear seat belts in a motor vehicle or other moving equipment
- Smoking in non-designated areas or onboard a locomotive or moving equipment

## Part 2 – Level 2 Violations

A Violation that is serious and/or has the potential to result in an accident or incident, damage equipment, or cause injury and does not meet otherwise the criteria for a Level 3 or Level 4 Rule Violation.

Exhibit F: IC's Discipline Policy

Confidential

**Examples of Level 2 Violations include, but are not limited to, the following:**

- Late reporting of accident or injury
- Improperly mounting and dismounting equipment
- Failure to properly line switches for intended movement
- Leaving cars in the foul
- Failure to maintain an up- to- date rule book
- Failure to restore a derail
- Improperly coupling and uncoupling cars
- Improperly moving equipment through doors
- Failure to properly secure cars or locomotives
- Failure to protect a shoving movement
- Failure to use correct communication methods when going between equipment
- Failure to maintain required documentation
- Failure of communication and electronic device rule

## Part 3 – Level 3 Violations

A Violation of a critical rule, or that is related to or implicates a critical rule, which does not otherwise meet the criteria for a level 4 Rule Violation.  A Level 3 Violation also includes conduct that may subject the employee to mandatory decertification as required by FRA regulations.

**Examples of Level 3 Violations include, but are not limited to, the following:**

- Stop signal violations
- Blue Flag violations
- Track Protection and Track Authority violations

CN Discipline Policy – Version 1.2                     Page 7

Exhibit F: IC's Discipline Policy

- Locomotive speeding - 10 mph over maximum authorized speed
- Failure to perform a required initial, intermediate, or transfer air test
- Tampering with a Safety Device
- Failure to correctly perform brake test
- Failure of any rule that may subject the employee to decertification by FRA regulations

## Part 4 – Level 4 Violations

A Violation that involves conduct that is extremely serious enough to result in immediate termination.

**Examples of Level 4 Violations include, but are not limited to, the following:**

- Improper securement of key trains
- Refusal to submit at any time to required testing for drug or alcohol use, or adulteration of test sample or collection process
- Violence in the workplace
- Making material false statements or concealing material facts concerning matters under investigation
- Intentional acts that cause harm to other persons or recklessly endanger the safety of employees or the public
- Purposeful disregard for rules or policies
- Insubordination
- Failure or refusal of a drug or alcohol test

---

CN Discipline Policy – Version 1.2          Page 8

Exhibit F: IC's Discipline Policy

**Appendix B**
**Discipline Matrix**

| Level 1 Rule Violations | How Many Past <u>Level 1 Rule</u> Violations in the Last Three Years? | | | | |
|---|---|---|---|---|---|
| | **None** | **One** | **Two** | **Three** | **Four** |
| | Consequence is: **Letter of Caution**[1] | Discipline is: **Letter of Reprimand** | Discipline is: **15-day Suspension** | Discipline is: **30-day Suspension** | Discipline is: **Discharge** |

| Level 2 Rule Violations | How Many Past <u>Level 2 Rule</u> Violations in the Last Three Years? | | |
|---|---|---|---|
| | **None** | **One** | **Two** |
| | Discipline is: **15-day suspension** | Discipline is: **30-day suspension** | Discipline is: **Discharge** |

| Level 3 Rule Violations | How Many Past <u>Level 3 Rule</u> Violations in the Last Three Years? | |
|---|---|---|
| | **None** | **One** |
| | Discipline is: **30-day suspension** | Discipline is: **Discharge** |

| Level 4 Rule Violations | Discipline is: **Discharge** |
|---|---|

---

1. A Letter of Caution is not discipline. It is a non-disciplinary coaching letter that documents the event and the steps the employee must take to prevent a future occurrence.

Exhibit F: IC's Discipline Policy

## Appendix B
## Consequences of Mixed Levels of Rules Violations

| New Violation with mixed combination of past violation(s) | How Many Past Combination of Level 1, Level 2, and Level 3 Rule Violations in the Last Three Years? | | | | | |
|---|---|---|---|---|---|---|
| | **One Past Level 1 Violation** | **One Past Level 2 Violation** | **One Past Level 1 and One Past Level 2 Rule Violation** | **Two Past Level 1 Violations** | **Three or More Past Level 1 Violations** | **One Past Level 2 and Two or More Past Level 1 Rule Violations** |
| Discipline is: | Discipline for new Level 2 Violation is: **15-day Suspension** | Discipline for new Level 1 Violation is: **15-day Suspension** | Discipline for new Level 1 Violation is: **30-day Suspension** | Discipline for new Level 2 Violation is: **30-day Suspension** | Discipline for new Level 2 Violation is: **Discharge** | Discipline for new Level 1 Violation or new Level 2 Violation is: **Discharge** |
| **New Violation with mixed combination of past violation(s)** | **One Past Level 1 Violation** | **One Past Level 2 Violation** | **One Past Level 1 and One Past Level 2 Rule Violation** | **Two Past Level 1 Violations** | **Three or More Past Level 1 Violations** | **One Past Level 2 and Two or More Past Level 1 Rule Violations** |
| Discipline is: | Discipline for new Level 3 Violation is: **45-day Suspension** | Discipline for new Level 3 Violation is: **60-day Suspension** | Discipline for new Level 3 Violation is: **Discharge** | Discipline for new Level 3 Violation is: **60-day Suspension** | Discipline for new Level 3 Violation is: **Discharge** | Discipline for new Level 3 Violation is: **Discharge** |

For purposes of assessing discipline for a combination of mixed levels of rules violations, the consequence is the same regardless of the order in which the violation occurred. Example: One past Level 1 Violation and a new Level 3 Violation is a 45 day suspension. The opposite example of this is also true: One past Level 3 Violation and a new Level 1 Violation is a 45 day suspension.

Confidential                                                                                        CN-Branch 000613

Exhibit F: IC's Discipline Policy

**Appendix B**
**Attendance Violations and Discipline Matrix**
**New Attendance Violation** with mixed combination of **Past Rule Violation(s) on Record**

| New Attendance Violation with mixed combination of past Rule Violation(s) on Record | 1st Attendance Violation | 2nd Attendance Violation | 3rd Attendance Violation |
|---|---|---|---|
| Level 1 Violation on Record | Consequence is: **Letter of Caution [1]** | Discipline is: **5-day Suspension** | Discipline is: **20-day Suspension** |
| Two Level 1 Violations on Record | Consequence is: **Letter of Caution [1]** | Discipline is: **20-day Suspension** | Discipline is: **Discharge** |
| Three Level 1 Violations on Record | Consequence is: **Letter of Caution [1]** | Discipline is: **Discharge** | |
| Four Level 1 Violations on Record | Discipline is: **Discharge** | | |
| Level 2 Violation on Record | Consequence is: **Letter of Caution [1]** | Discipline is: **20-day Suspension** | Discipline is: **Discharge** |
| Level 2 Violation and One Level 1 Violation on Record | Consequence is: **Letter of Caution [1]** | Discipline is: **20-day Suspension** | Discipline is: **Discharge** |
| Level 2 Violation and Two Level 1 Violations on Record | Consequence is: **Letter of Caution [1]** | Discipline is: **Discharge** | |
| Level 2 Violation and Three or more Level 1 Violations on Record | Discipline is: **Discharge** | | |
| Two Level 2 Violations on Record | Consequence is: **Letter of Caution [1]** | Discipline is: **Discharge** | |
| Level 3 Violation on Record | Discipline is: **45-day Suspension** | Discipline is: **60-day Suspension** | Discipline is: **Discharge** |
| Level 3 Violation and One Level 1 Violation on Record | Discipline is: **60-day Suspension** | Discipline is: **Discharge** | |
| Level 3 Violation and Two Level 1 Violations on Record or Level 3 Violation with One Level 2 Violation on Record | Discipline is: **Discharge** | | |

[1] A Letter of Caution is not discipline. It is a non-disciplinary coaching letter that documents the event and the steps the employee must take to prevent a future occurrence.

Confidential

Exhibit F: IC's Discipline Policy

**Appendix B**
**Attendance Violations and Discipline Matrix**
**New Rule Violation** with **Past Attendance Violation(s) on Record**

| New Rule Violation with past Attendance Violation(s) on Record | 1st Level 1 Violation | 2nd Level 1 Violation | 3rd Level 1 Violation | 4th Level 1 Violation | Level 2 Violation | 2nd Level 2 Violation or 3rd Level 1 Violation with One Level 2 on Record | 1st Level 1 Violation with One Level 2 Violation on Record or 1st Level 2 Violation with One Level 1 Violation | 2nd Level 1 Violation with One Level 2 Violation on Record or 1st Level 2 Violation with Two Level 1 Violations on Record | Level 3 Violation | Level 3 Violation with One Level 1 Violation on Record | Level 3 Violation with Two Level 1 Violations on Record or Level 3 Violation with One Level 2 Violation on Record |
|---|---|---|---|---|---|---|---|---|---|---|---|
| One Active Attendance Violation on Record | Consequence is: **Letter of Caution [1]** | Discipline is: **Letter of Reprimand** | Discipline is: **15-day Suspension** | Discipline is: **30-day Suspension** | Discipline is: **15-day Suspension** | Discipline is: **Discharge** | Discipline is: **15-day Suspension** | Discipline is: **30-day Suspension** | Discipline is: **45-day Suspension** | Discipline is: **60-day Suspension** | Discipline is: **Discharge** |
| Two Active Attendance Violations on Record | Discipline is: **15-day Suspension** | Discipline is: **30-day Suspension** | Discipline is: **Discharge** | Discipline is: **Discharge** | Discipline is: **30-day Suspension** | | Discipline is: **30-day Suspension** | Discipline is: **Discharge** | Discipline is: **60-day Suspension** | Discipline is: **Discharge** | |
| Three Active Attendance Violations on Record | Discipline is: **30-day Suspension** | Discipline is: **Discharge** | | | Discipline is: **Discharge** | | Discipline is: **Discharge** | | Discipline is: **Discharge** | | |

[1] A Letter of Caution is not discipline. It is a non-disciplinary coaching letter that documents the event and the steps the employee must take to prevent a future occurrence.

Confidential     CN-Branch 000615

Exhibit F: IC's Discipline Policy

# Exhibit G

**Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker**

Page 1

CNRR FORMAL INVESTIGATION

TRACY MELTON, MACHINE OPERATOR - 104462

ROBERT BRANCH, TRACKMAN - 150680

JOSHUA GLAUSE, HEARING OFFICER

Investigation held at 2151 North Mill Street,
Jackson, Mississippi
Jackson Conference Room
Tuesday, June 7, 2022
Commencing at 9:00 a.m.

APPEARANCES

Darrell McGuire, Brotherhood of Maintenance
   Of Way
William Walker Yuille, Witness
Al B. Thomas, Witness
Ty Peterson, Witness
Darrell Hudson, Witness
Randall S. Duren, Witness
Earl Honeysucker, Witness
Dylan Boutte, Witness
Christopher Day, Witness
Barry Bishop, Silent Observer

REPORTED BY:  THERESA S. LUMLEY, CSR, RPR
              EMM, INC. REPORTING
              EMMREPORTING@GMAIL.COM

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential                                   CN-Branch 000124

Page 2

1                     INDEX

                                            PAGE
2    TITLE                                   1
     APPEARANCES                             1
3    INDEX                                   2

4    EXAMINATION OF TODD MELTON
          BY THE HEARING OFFICER            11
5
     EXAMINATION OF ROBERT BRANCH
6         BY THE HEARING OFFICER            14

7    EXAMINATION OF CHRISTOPHER DAY
          BY THE HEARING OFFICER            16
8         BY MR. McGUIRE                    36
          BY MR. BRANCH                     42
9         BY MR. MELTON                     46

10   EXAMINATION OF DYLAN BOUTTE
          BY THE HEARING OFFICER            48
11        BY MR. McGUIRE                    50

12   EXAMINATION OF DARRELL HUDSON
          BY THE HEARING OFFICER            51
13        BY MR. McGUIRE                    52

14   EXAMINATION OF RANDALL DUREN
          BY THE HEARING OFFICER            54
15        BY MR. McGUIRE                    57
          BY MR. BRANCH                     57
16        BY MR. MELTON                     57

17   EXAMINATION OF EARL HONEYSUCKER
          BY THE HEARING OFFICER            59
18        BY MR. McGUIRE                    60
          BY MR. BRANCH                     61
19
     EXAMINATION OF TY PETERSON
20        BY THE HEARING OFFICER            62
          BY MR. McGUIRE                    63
21        BY MR. BRANCH                     64
          BY MR. MELTON                     64
22
     EXAMINATION OF WALKER YUILLE
23        BY THE HEARING OFFICER            65
          BY MR. McGUIRE                    67
24        BY MR. BRANCH                     67
          BY MR. MELTON                     68
25

EMM, INC. REPORTING  601.506.8261
EMMREPORTING@GMAIL.COM

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Page 3

1    **INDEX:** (Continued)

2    EXAMINATION OF AL THOMAS
          BY THE HEARING OFFICER                    69
3         BY MR. McGUIRE                            71
          BY MR. BRANCH                             71
4         BY MR. MELTON                             72

5    EXAMINATION OF ROBERT BRANCH
          BY THE HEARING OFFICER                    73
6         BY MR. McGUIRE                            77
          BY MR. MELTON                             80
7         BY THE HEARING OFFICER                    82

8    EXAMINATION OF TODD MELTON
          BY THE HEARING OFFICER                    86
9         BY MR. McGUIRE                            90
          BY MR. BRANCH                             91
10

     EXAMINATION OF CHRISTOPHER DAY
11        BY THE HEARING OFFICER                    93
          BY MR. McGUIRE                            94
12

     EXAMINATION OF EARL HONEYSUCKER
13        BY THE HEARING OFFICER                    96
          BY MR. McGUIRE                            97
14        BY MR. BRANCH                             97
          BY MR. MELTON                             98
15        BY MR. MCGUIRE                            98

16   EXAMINATION OF TY PETERSON
          BY THE HEARING OFFICER                    99
17        BY MR. McGUIRE                           100
          BY MR. BRANCH                            102
18

     EXAMINATION OF CHRISTOPHER DAY
19        BY THE HEARING OFFICER                   103

20   EXAMINATION OF TODD MELTON
          BY MR. McGUIRE                           105
21

     EXAMINATION OF ROBERT BRANCH
22        BY MR. McGUIRE                           106

23   EXAMINATION OF CHRISTOPHER DAY
          BY THE HEARING OFFICER                   108
24

     CLOSING STATEMENT BY MR. McGUIRE             112
25

Page 4

```
 1   CERTIFICATE OF COURT REPORTER                45

 2   EXHIBITS:

 3   EXHIBIT 1   NOTICE OF INVESTIGATION           7
     EXHIBIT 2   NOTICE OF INVESTIGATION           7
 4   EXHIBIT 3   LETTER DATED 6/26/09              9
     EXHIBIT 4   BRANCH STATEMENT                 18
 5   EXHIBIT 5   BRANCH STATEMENT PAGE 2          13
     EXHIBIT 6   BOUTTE STATEMENT                 19
 6   EXHIBIT 7   MELTON STATEMENT                 20
     EXHIBIT 8   HUDSON STATEMENT                 21
 7   EXHIBIT 9   DUREN STATEMENT                  21
     EXHIBIT 10  HONEYSUCKER STATEMENT            21
 8   EXHIBIT 11  PETERSON STATEMENT               21
     EXHIBIT 12  YUILLE STATEMENT                 22
 9   EXHIBIT 13  THOMAS STATEMENT                 22
     EXHIBIT 14  CN USOR RULES                    24
10   EXHIBIT 15  "SAFE SECURE AND VIOLENCE FREE"  26
     EXHIBIT 16  "DOING THE RIGHT THING"          26
11   EXHIBIT 17  CN WORKPLACE VIOLENCE PREVENTION 28
                 POLICY
12   EXHIBIT 18  PAGE 2 OF THE CN WORKPLACE VIOLENCE 28
                 PREVENTION POLICY
13   EXHIBIT 19  PAGE 3 OF THE CN WORKPLACE VIOLENCE 28
                 PREVENTION POLICY
14   EXHIBIT 20  GREENWOOD LEFLORE HOSPITAL RECORD  82

15

16

17

18

19

20

21

22

23

24

25
```

EMM, INC. REPORTING   601.506.8261
EMMREPORTING@GMAIL.COM

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential                                        CN-Branch 000127

Page 5

1          **HEARING OFFICER:**  Let the record show

2     that the time is 9 o'clock a.m., June 7, 2022.

3     And this investigation is herewith called to

4     order.

5               My name is Joshua Glause, and my

6     title is senior manager of engineering, and I

7     will be conducting these proceedings as the

8     hearing officer.

9               Persons present at this time are as

10    follows.  I'm going to start with you, Robert.

11         **MR. BRANCH:**  Robert L. Branch.

12         **HEARING OFFICER:**  And your purpose of

13    attending this investigation is charged

14    employee?

15         **MR. BRANCH:**  Yes, sir.

16         **MR. McGUIRE:**  Darrell McGuire,

17    Brotherhood of Maintenance of Way.  I'm the

18    union rep that will be representing these two

19    gentlemen today.

20         **MR. MELTON:**  Todd Melton, charged

21    employee.

22         **MR. YUILLE:**  Walker Yuille, witness.

23         **MR. THOMAS:**  Al Thomas, witness.

24         **MR. PETERSON:**  Todd Peterson,

25    witness.

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential                                              CN-Branch 000128

Page 6

1           **MR. HUDSON:**  Darrell Hudson, witness.

2           **MR. BISHOP:**  Barry Bishop, silent

3    observer.

4           **MR. HONEYSUCKER:**  Earl Honeysucker,

5    witness.

6           **MR. DAY:**  Chris Day, supervisor,

7    witness.

8           **MR. BOUTTE:**  Dylan Boutte, witness.

9           **HEARING OFFICER:**  All right.  So this

10   investigation is being held to develop all the

11   facts relative to the charges set forth in the

12   following Notices of Investigation.  I won't

13   read the entire notice into the record, but I

14   will identify the document by date and I'll read

15   the charged paragraph into the record.

16           There's two investigation notices.

17   They are identical except for the mailing info

18   is all that's different.

19           So I have a notice of investigation

20   dated June 2nd, 2022, to Mr. Robert Branch and

21   Mr. Tracy Melton.  "You're hereby notified to

22   attend a formal investigation to be held as

23   directed below:  Tuesday June 7, 2022.  0900,

24   Conference Room in Jackson, Mississippi.

25           "The investigation is being held to

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000129

Page 7

1    develop the facts and to determine your

2    responsibility, if any, in connection with an

3    incident that occurred at approximately

4    2100 hours, May 26th, 2022, at or near the

5    Magnolia Inn located at 816 US 98 in Columbus,

6    Mississippi 39429, in which the two of you were

7    allegedly involved in a verbal and physical

8    altercation in the presence of other employees

9    and whether you violated any company rules,

10   regulations and/or policies in connection with

11   the incident.

12           "You may, without expense to the

13   company, arrange for representation as provided

14   under the applicable provisions of your

15   collective bargaining agreement and to call

16   witnesses to testify on your behalf.  A copy of

17   your personal work record may be reviewed at

18   this investigation."

19           Signed by Wade Clark, senior manager

20   of production.  And I'll enter these as

21   Exhibits 1 and 2 into the record.

22           (Exhibit No. 1, Notice of

23   Investigation, and Exhibit No. 2, Notice of

24   Investigation, were marked.)

25           **HEARING OFFICER:**  I would like to

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000130

Page 8

1    outline the procedures to be followed.  I ask

2    that you do not interrupt while an individual is

3    being questioned.  Please save your questions

4    until after the testimony has been fully

5    completed.  You will be given full opportunity

6    to cross-examine any person giving testimony and

7    you will be given full opportunity to present

8    testimony and evidence before these proceedings

9    are closed.  If anyone has a cell phone, I ask

10   that you turn it off or turn it to vibrate.  It

11   is also requested, for the benefit of all

12   present, especially the court reporter, that

13   each of you speak slowly and distinctly so that

14   the court reporter can be assured of placing all

15   remarks in the transcript accurately and without

16   difficulty.

17           **MR. McGUIRE:**  The organization has an

18   objection to the hearing.  First of all, the

19   organization states that due to the collective

20   bargaining agreement violation that the carrier

21   has committed, I would like to introduce this

22   into the record.  It's a side agreement between

23   the carrier and the organization which states

24   that you must have the hearing within five days

25   of being taken out of service.  This is day six.

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000131

Page 9

1   These gentlemen were removed Thursday morning

2   before shift.  So Thursday, Friday, Saturday,

3   Sunday, Monday.  Monday would be your last day

4   to contractually have the hearing.  And we would

5   like to have the whole hearing squashed due to

6   the collective bargaining agreement violation by

7   the carrier.

8           **HEARING OFFICER:**  Okay.  I'm going to

9   mark this as Exhibit Number 3, and with your

10  objection, we are going to proceed with this

11  hearing.

12          (Exhibit No. 3, Letter dated June 25,

13  2009, was marked.)

14          **HEARING OFFICER:**  From my

15  understanding, the five days was why we were

16  having it today, but it will be noted in the

17  transcript and it will be on the record for

18  those who review the transcript.

19          **MR. McGUIRE:**  Thank you.  And I do

20  have a follow-up objection.  First off, the

21  organization feels that the carrier has no

22  jurisdiction here.  This happened off property,

23  off company time.  No police were called, you

24  know.  Whatever happened between these two

25  gentlemen, they've settled it.  And we feel the

EMM, INC. REPORTING   601.506.8261
EMMREPORTING@GMAIL.COM

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

1  carrier just has no jurisdiction in this area

2  because it was not a company-provided hotel

3  room, it was not company property, it was not

4  company time.  They were on their own dime.

5        **HEARING OFFICER:**  And just from the

6  charged paragraph, I did ask the same question

7  myself.  But what I am told is it was a

8  work-related matter due to it being them

9  traveling for work.  Even though it was off

10  property, they are on per diem traveling for

11  work.  Your objection is noted in the record,

12  and, again, it will be reviewed -- when they

13  review the transcript, it will be noted in the

14  transcript, your objection.

15        **MR. McGUIRE:**  Understood.  And I have

16  a last follow-up objection.  The organization,

17  when we found out about this hearing, we

18  requested to have the hearing separate.  We feel

19  in situations like this, in order to gain

20  knowledge of truth and justice of what happened

21  and to give a fair and impartial hearing, that

22  the hearings should have been separate.  The

23  organization was denied, so that's our third

24  objection there.  And to have a fair and

25  impartial hearing, we feel it's not conductive

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000133

Page 11

1    to get a fair and impartial hearing when the two

2    charged employees have the hearing together in

3    this situation.

4              **HEARING OFFICER:**  Understood.  Again,

5    with this objection, it's noted in the

6    transcript and it will be reviewed at the time

7    of review of the transcript.

8              **MR. McGUIRE:**  Thank you.  No further

9    objections.

10             **HEARING OFFICER:**  And with all the

11   objections, we're going to proceed with this

12   investigation.

13             Okay.  So next I'm going to call Todd

14   Melton to the witness stand first just for

15   preliminary questions only.

16                  TODD MELTON,

17   EXAMINATION BY THE HEARING OFFICER:

18       **Q.**    Todd, please state your full name.

19       **A.**    Tracy Todd Melton.

20       **Q.**    How long have you been employed by

21   the IC Railroad?

22       **A.**    Over 21 years.

23       **Q.**    And what is your current occupation?

24       **A.**    Machine operator over the fuel truck.

25       **Q.**    What was your occupation on the date

Page 12

1    of the incident stated in the Notice of

2    Investigation?

3        **A.**      On the fuel truck.

4        **Q.**      And how long have you worked this

5    position?

6        **A.**      This round, probably I been on it

7    four or five months.

8        **Q.**      And can you state what other

9    positions you filled besides fuel truck

10   operator?

11       **A.**      I've held section foreman, track

12   inspector, machine operator, welder helper,

13   bridge foreman, bridge assistant foreman,

14   carpenter, bridgeman.

15       **Q.**      Okay.  Did you receive the notice of

16   investigation that was previously identified for

17   the transcript?

18       **A.**      Yes, sir.

19       **Q.**      Do you understand that you have the

20   right to be present during the entire

21   investigation and that you or your

22   representative may question any person who may

23   testify and to present witnesses and evidence in

24   your own behalf?

25       **A.**      Yes, sir.

Page 13

1    **Q.**    Do you have any witnesses present on

2  your behalf today?

3    **A.**    No, sir.

4    **Q.**    Are you qualified on the U. S.

5  Operating and Safety Rules?

6    **A.**    Yes, sir.

7    **Q.**    Do you know when you last attended a

8  class of instruction on Operating and Safety

9  Rules?

10    **A.**    I can't remember exactly the last

11  time I have taken it.

12    **Q.**    Sometime within the past year?

13    **A.**    Yeah.

14    **Q.**    And please identify your

15  representative for the record.

16    **A.**    Darrell McGuire.

17    **Q.**    And are you ready to proceed with

18  this investigation?

19    **A.**    Yes, sir.

20        **HEARING OFFICER:**  Okay.  I have no

21  further questions for Mr. Melton at this time.

22  I release Mr. Melton subject to recall, and I

23  would next call Mr. Branch for the same

24  preliminary questions.

25                ROBERT BRANCH

Confidential                                    CN-Branch 000136

Page 14

1    EXAMINATION BY THE HEARING OFFICER:

2        Q.     Mr. Branch, please state your full

3    name.

4        A.     Robert Louis Branch.

5        Q.     And how long have you been employed

6    by the IC Railroad?

7        A.     Almost 15 years.

8        Q.     What is your current occupation?

9        A.     Trackman on the rail gain.

10       Q.     How long have you worked the position

11   of trackman on the rail gain?

12       A.     For the last four or five months.

13       Q.     And have you worked any other

14   positions besides trackman?

15       A.     Yes, sir, machine operator, worked in

16   the bridge department for six years, assistant

17   foreman, carpenter, carpenter helper, bridge.

18       Q.     All right.  Did you receive the

19   Notice of Investigation that I previously

20   identified for the transcript?

21       A.     Yes, sir, I did.

22       Q.     Do you understand that you have the

23   right to be present during the entire

24   investigation and that you or your

25   representative may question any person who may

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000137

Page 15

1   testify and to present witnesses and evidence in

2   your own behalf?

3        **A.**     Yes, sir.

4        **Q.**     Do you have any witnesses present on

5   your behalf today?

6        **A.**     Yes, sir.

7        **Q.**     Are you qualified on the U. S.

8   Operating and Safety Rules?

9        **A.**     Yes, I am.

10       **Q.**     And when did you last attend a class

11  of instruction on the Operating and Safety

12  Rules?

13       **A.**     Last year, in August or either

14  September, in Memphis.

15       **Q.**     Please identify your representative

16  for the record.

17       **A.**     Mr. Darrell McGuire.

18       **Q.**     Are you ready to proceed with this

19  investigation?

20       **A.**     Yes, I am.

21            **HEARING OFFICER:**   Okay.  I have no

22  further questions for Mr. Branch at this time.

23  I release Mr. Branch subject to recall.  And I

24  am next going to call Mr. Day to the stand.  And

25  this is where I will be sequestering everyone

EMM, INC. REPORTING   601.506.8261
EMMREPORTING@GMAIL.COM

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000138

1   else, the other witnesses.

2          (All witnesses leave conference

3   room.)

4                CHRISTOPHER DAY,

5   EXAMINATION BY THE HEARING OFFICER:

6      Q.     Mr. Day, please state your name.

7      A.     Christopher Day.

8      Q.     And how long have you been employed

9   by the IC Railroad?

10     A.     Eleven years.

11     Q.     Please state your occupation at the

12  time of the incident that is the subject of this

13  investigation.

14     A.     Production supervisor.

15     Q.     And how long have you worked the

16  position of production supervisor?

17     A.     Four years.

18     Q.     Please state, for the record, what

19  other positions you have held.

20     A.     Track foreman, machine operator and

21  trackman.

22     Q.     Please state what knowledge you have

23  of the incident that is the subject of this

24  investigation.

25     A.     I was called on Memorial Day, Monday,

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000139

Page 17

1    during our off time, and Mr. Robert Branch

2    notified Supervisor Chance Gardner that there

3    was an incident that happened the Thursday prior

4    to that Monday, and that there was an

5    altercation and some argument that he would like

6    to proceed with talking to somebody about, you

7    know, what the possibilities were, that they

8    could do for this not to happen again.

9             **MR. BRANCH:**  Can I object to

10   something he said?

11   BY THE HEARING OFFICER:

12       **Q.**     Okay.  And then from there -- so you

13   -- I'm sorry, so it was reported that there was

14   an altercation or argument that had happened and

15   that Mr. Branch wanted to make sure or wanted to

16   prevent this type thing from happening again.

17   So what did you do from there?

18       **A.**     I had spoke with Mr. Branch.  There

19   was no one that I could call on the day since

20   most of everybody was off work that day for

21   observing the holiday, and I told him that, you

22   know, once I got into the office the following

23   day on that Tuesday, that I would arrange to

24   make some phone calls to find out, you know, the

25   situation that had happened.  When I got in the

Confidential

CN-Branch 000140

Page 18

1    office on Tuesday, I had talked to Wade Clark.

2    I had already got a statement from Mr. Branch as

3    to what happened, and I talked to him to see if

4    he still wanted to proceed with it, and I went

5    ahead and sent the information and talked to my

6    peers and sent the information over to them to

7    see how we could go about handling what had

8    happened.

9        **Q.**    Okay.  Do you have -- so you took a

10   statement from Mr. Branch?

11       **A.**    I did.

12       **Q.**    Do you have that available?

13       **A.**    I do.  The statement from Mr. Branch

14   is on the very top.

15           **HEARING OFFICER:**  We're going to mark

16   the statement from Mr. Branch as Exhibit

17   Number 4.

18           (Exhibit No. 4, Branch Statement, was

19   marked.)

20   BY THE HEARING OFFICER:

21           **MR. McGUIRE:**  May I cut in here?  Do

22   you have copies for everybody?

23           **MR. DAY:**  I probably can get more

24   printed out, but I've got another copy.  I

25   couldn't get a fourth one printed out.

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000141

Page 19

1          **MR. McGUIRE:**  I think the two parties

2     involved need to have one.

3          **HEARING OFFICER:**  I guess should we

4     take a quick break and make another copy?

5          **MR. McGUIRE:**  Sure.

6          **HEARING OFFICER:**  The time is 9:18.

7     We're going to take a couple minute break to

8     make another set of copies here.

9          (A short break was taken.)

10         **HEARING OFFICER:**  The time is now

11    9:25 and we're back from a recess and back on

12    the record at this time.

13    BY THE HEARING OFFICER:

14         **Q.**     So we have copies now for everyone.

15    Can you tell me what this next statement is?

16         **A.**     The first two pages is Mr. Branch's

17    statement of the incident that took place on

18    Thursday and -- yeah, it's two pages for the

19    first one.

20         **HEARING OFFICER:**  So I'm going to

21    mark the second page of Mr. Branch's statement

22    as Exhibit Number 5.

23         **MR. MELTON:**  I don't have but one

24    page Branch.  Okay.  Thank you.

25         (Exhibit No. 5, Page 2 of Branch

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential                                                                                        CN-Branch 000142

Page 20

1    Statement, was marked.)

2        **A.**    And the first two pages of

3    Mr. Branch's statement, do you want me to read

4    through it?

5    BY THE HEARING OFFICER:

6        **Q.**    No, I'll have Mr. Branch read his own

7    statement into the record.

8        **A.**    The rest of the statements are from

9    the other employees.  I was given direction to

10   get statements from everybody as far as what had

11   happened, so all the witnesses that were listed

12   on Mr. Branch's statement, everyone had wrote a

13   statement out and they were given to Chance

14   Gardner and then sent to myself and Wade Clark.

15           **HEARING OFFICER:**  So the next one I

16   have here is Dylan Boutte.  It will be marked as

17   Exhibit Number 6.

18           (Exhibit No. 6, Boutte Statement, was

19   marked.)

20   BY THE HEARING OFFICER:

21       **Q.**    Can you tell me who this next one is

22   from?

23       **A.**    What's the -- Darrell Hudson.

24       **Q.**    I just want to make sure I have the

25   correct one here.  This one is Darrell Hudson.

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000143

Page 21

1    I can't read this one.

2        **A.**    I believe that is Todd Melton.

3            **HEARING OFFICER:**  Next I'll mark as

4    Exhibit Number 7 the statement from Todd Melton.

5            **MR. McGUIRE:**  Hold on one second.  I

6    don't think these are in order because I can't

7    find Todd Melton's statement.

8            (Off the record.)

9            (Exhibit No. 7, Todd Melton's

10   Statement, was marked.)

11           **HEARING OFFICER:**  Next I'll mark the

12   statement from Darrell Hudson as Exhibit

13   Number 8.

14           **MR. McGUIRE:**  I don't have that one

15   either.  Okay.

16           **HEARING OFFICER:**  Exhibit Number 8.

17           (Exhibit No. 8, Hudson Statement, was

18   marked.)

19           **HEARING OFFICER:**  Next is Randall

20   Duren marked as Exhibit Number 9.

21           (Exhibit No. 9, Duren Statement, was

22   marked.)

23           **HEARING OFFICER:**  Earl Honeysucker

24   will be Exhibit Number 10.

25           (Exhibit No. 10, Honeysucker

Confidential                                    CN-Branch 000144

Page 22

1   Statement, was marked.)

2          **HEARING OFFICER:**  Statement from Ty

3   Peterson will be Exhibit Number 11.

4          (Exhibit No. 11, Peterson Statement,

5   was marked.)

6          **HEARING OFFICER:**  Statement from

7   Walker Yuille will be Exhibit Number 12.

8          (Exhibit No. 12, Yuille Statement,

9   was marked.)

10         **HEARING OFFICER:**  Then I have a

11  statement from Al Thomas will be marked as

12  Exhibit Number 13.

13         (Exhibit No. 13, Thomas Statement,

14  was marked.)

15  BY THE HEARING OFFICER:

16      **Q.**    Is that all the statements?

17      **A.**    Yes.

18         **HEARING OFFICER:**  Just for

19  clarification, we'll have the witnesses read

20  their own statement in the essence of time here.

21         **MR. McGUIRE:**  Sure.

22  BY THE HEARING OFFICER:

23      **Q.**    Okay.  Is there anything else about

24  the incident that you have knowledge of, Mr.

25  Day?

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000145

Page 23

1    **A.**    I do not.

2    **Q.**    Based on your knowledge of this

3  incident, do you believe Mr. Branch or Mr.

4  Melton violated any CN rules, policies and

5  procedures?

6    **A.**    I'm only a witness.  I don't have an

7  opinion on the incident.  Based on the

8  altercation at the hotel and withholding the

9  information, I do believe that there was a rule

10  broken as far as furnishing the information and

11  giving some time.  This is a sheet, it's USOR

12  Rule H, "Furnishing Information and Conduct."

13  The rule states, "USOR Rule H, Furnishing

14  Information and Conduct.  Dishonesty,

15  disloyalty, insubordination, willful neglect,

16  making false reports, or statements, concealing

17  facts concerning matters under investigation,

18  immoral conduct, including but not limited to

19  conduct of any employee leading to the

20  conviction of any felony, and serious violations

21  of the law are prohibited.  Employees must not

22  be quarrelsome, vicious or enter into disputes,

23  arguments, or fights with any person, regardless

24  of provocation.  Any incidents are to be

25  reported to the proper authority.

Confidential

CN-Branch 000146

Page 24

1            "As a CN employee, you are expected

2    to be familiar with, read and be governed by the

3    company's code of business conduct and policies,

4    and understand how they apply to you and your

5    job.  Company policies are accessible on CN's

6    electronic portal in the Employee Self-Service

7    section under Policies and Guidelines.

8            "Any employee convicted of a felony

9    or other serious violation of the law must

10   notify their supervisor no later than the end of

11   the first day immediately following the day the

12   employee received notice of the conviction.

13           "Employees must not withhold

14   information or, or fail to provide all the facts

15   to those authorized to receive information

16   regarding accidents, injuries, rule violations,

17   breaches of company security, or unusual events.

18   This duty to furnish information includes but is

19   not limited to accident and injury reports,

20   recorded statements, full cooperation in injury

21   investigations, and safety rules violations.

22   Employees must also take all reasonable measures

23   to protect and preserve evidence where it is

24   within their control and ability to do so."

25   That is USOR Rule H.

Page 25

1      **HEARING OFFICER:**  Okay.  USOR Rule H,

2   Furnishing Information and Conduct, will be

3   marked as Exhibit 14.

4           (Exhibit No. 14, USOR Rule H, was

5   marked.)

6      **A.**      This is for the conduct, pages 14 and

7   15, work environment, "Safe, Secure and Violence

8   Free.  At CN, nothing is more important than

9   safety.  It is everyone's responsibility.  In

10  the performance of your job, you must safeguard

11  yourself, your colleagues, our customers and the

12  communities where we operate.

13          "Do your job according to company

14  policies, rules and procedures as well as the

15  law.  If in doubt, consult your supervisor."

16          Bullet 2, "Take the necessary steps

17  to deal with any situation that could endanger

18  you, your fellow employees, customers, the

19  general public or CN's assets."

20          Bullet 3, "Be aware of your

21  surroundings as you know best who belongs in

22  your office, on your train, on any given

23  right-of-way or in a restricted area."

24          Bullet 4, "Report trespassers or

25  suspicious persons or activities immediately to

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000148

Page 26

1    your supervisor or the CN police.

2              "CN will not tolerate any action,

3    conduct, threat or gesture towards a CN employee

4    in the workplace that can reasonably be expected

5    to cause harm, injury or illness to the CN

6    employee.  For more information, refer to CN's

7    Workplace Violence Prevention Policy."

8              Statement underneath, I'll just go

9    through it, "Firearms, loaded or empty, are not

10   permitted on CN property, except for CN police

11   officers and other designated persons performing

12   authorized work and when authorized to do so by

13   law.  In all cases, any firearms must be

14   accompanied with a written authorization from

15   the chief of CN police and the person should

16   have in his/her possession all pertinent

17   government permits at all times."

18             Page 15 of the code of business

19   conduct.

20             **HEARING OFFICER:**  Hang on one second,

21   Chris.  I'm going to mark Page 14 as Exhibit 15.

22   And then we'll do Page 15 as Exhibit 16.

23             (Exhibit No. 15, "Safe, Secure, and

24   Violence Free," and Exhibit No. 16, "Doing the

25   Right Thing," were marked.)

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

Page 27

1    BY THE HEARING OFFICER:

2        **Q.**    All right.  You can proceed, Mr. Day.

3        **A.**    Page 15 from the code of business

4    conduct, "Doing the Right Thing.  Safety and a

5    willingness to obey policies, rules and

6    procedures are most important when at work or

7    otherwise performing your duties.  If in doubt,

8    the safe course must be taken.

9            "Safe behavior takes many forms, such

10   as:  Being aware of, and complying with, all

11   company health and safety policies, rules and

12   procedures at all times; reporting suspected

13   hazards as quickly as possible; making sure you

14   have the proper personal protective equipment,

15   tools, and training for the job at hand; keeping

16   fire and emergency exits clear and walking

17   surfaces in good condition; driving safely,

18   wearing seat belts and following traffic laws

19   when operating a company vehicle or other

20   vehicle as part of your job; expecting the

21   movement of trains, cars, or track equipment, on

22   any track at any time in either direction.

23            "At CN everyone is responsible for

24   safety, their own and their coworkers'.  Their

25   supervisor is wrong to ignore the safety rule.

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential                                                            CN-Branch 000150

Page 28

1    The employees should continue to observe all

2    safety rules and remind the supervisor of the

3    safety rules.  If necessary, the employees

4    should report the supervisor's actions to

5    management or their human resources

6    representative as soon as practicable.  Taking

7    action could prevent someone from being

8    injured."

9              That is the code of business conduct.

10   The next thing we have is the --

11             **HEARING OFFICER:**  Before you get into

12   this one, I'm going to mark this 17, 18 and 19

13   in order, the three pages here.  So 17 says "CN

14   Workplace Violence Prevention Policy" up at the

15   top.  18 starts with "2.  Definitions."  And 19

16   says, "Allegation of workplace violence" are the

17   first three words on it.

18             (Exhibits No. 17, 18 and 19, CN

19   Workplace Violence Prevention Policy, were

20   marked.)

21        **A.**     "CN Workplace Violence Prevention

22   Policy.  CN is committed in providing a safe,

23   healthy and violence-free workplace for all

24   employees.  The objective of this policy is to

25   reiterate the prohibition of workplace violence

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

Page 29

1    at CN and set out how threats, acts or risks of

2    workplace violence are to be reported and

3    addressed.

4              "This policy applies to all CN

5    employees.

6              "Complete policy.  Number 1, Policy

7    Statement and Objective:

8              "CN will not tolerate workplace

9    violence and is committed to making reasonable

10   efforts to:

11             "Provide its employees with a safe,

12   healthy and violence-free workplace; dedicate

13   sufficient attention, resources and time to

14   address factors that contribute to workplace

15   violence and to prevent and protect against it;

16   communicate to its employees information in its

17   possession about factors that can contribute to

18   workplace violence; and provide assistance to

19   employees who have been subject to workplace

20   violence.

21             "All employees are encouraged to

22   identify and promptly report threats, acts, or

23   risks of workplace violence.

24             "CN will promptly investigate and

25   address allegations of workplace violence and

Confidential                                    CN-Branch 000152

Page 30

1    will impose appropriate corrective measures, up

2    to and including dismissal, against any employee

3    who has engaged in workplace violence.

4         "While CN acknowledges that violence

5    can occur in its workplace, as it can in any

6    workplace, CN cannot foresee specific acts of

7    workplace violence.  In promulgating this

8    policy, CN does not intend to enlarge the scope

9    of duties imposed by law.  This policy is not

10   intended to create any individual right or cause

11   of action not already existing and recognized

12   under applicable federal, provincial or state

13   law."

14        The second page, "Number 2.

15   Definitions.

16        "For purposes of this policy, a

17   'workplace' is any location where CN employees

18   are currently performing work-related activities

19   while in the scope of their employment.

20   Examples include CN-owned or controlled

21   buildings, parking lots, rail yards, railroad

22   tracks, trains, machinery, company vehicles, and

23   any other location where CN business or

24   sponsored activity is being conducted.

25        "For purposes of this policy,

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

Page 31

1    'workplace violence' is defined as any action,

2    conduct, threat or gesture of a person towards a

3    CN employee in a workplace that can reasonably

4    be expected to cause harm, injury or illness to

5    the CN employee, excluding situations of

6    justified self-defense.

7              "Example of workplace violence

8    include:  Intentionally threatening or causing

9    physical harm; communications threatening

10   violent acts, made verbally or in writing

11   (through bulletin boards, email, blogs, etc.);

12   intentionally causing property damage for the

13   purpose of intimidation; possession, display or

14   use of a weapon; possession, display or use of

15   an object in a threatening or harmful manner;

16   bullying involving violent behavior and other

17   abusive and aggressive behavior.

18              "Number 3.  Reporting threats, acts

19   or risks of workplace violence.

20              "If you are subjected to or witness

21   threats, acts or risks of workplace violence,

22   immediately report the matter to your direct

23   supervisor, a human resources representative or

24   the CN ombudsman.  If the conduct involves your

25   direct supervisor, immediately report the

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000154

Page 32

1    situation to your supervisor's manager, a human

2    resources representative, or to the CN

3    ombudsman.  If you are unsure who your human

4    resources representative is, call the HR call

5    center at the number below.

6               "Reports can be made anonymously.

7    Reports or incidents warranting confidentiality

8    will be handled appropriately and information

9    will be disclosed to others only on a

10   need-to-know basis, or as required by law.

11              "If you believe that you or another

12   person is at immediate risk of physical harm:

13   Remain calm.  Move to safety.  If warranted by

14   the circumstances, immediately call 911.

15   Although you should first seek any immediate

16   assistance from your local police service, you

17   may also reach the CN police for assistance at

18   1-800-465-9239.  As soon as possible after the

19   incident, report the situation to your direct

20   supervisor.

21              "Number 4.  Investigation.

22   Allegations of workplace violence reported to CN

23   will be investigated.  All information relating

24   to the investigation will be kept confidential

25   to the extent possible.

Page 33

1               "However, information may be

2  disclosed in certain circumstances, including

3  the following:  Where consent is given by a

4  person to disclose his or her involvement in the

5  investigation, when required as part of the

6  investigation or discipline process or in the

7  implementation of corrective measures, or as

8  required by law.

9               "If CN determines that an employee

10  has engaged in workplace violence, CN will take

11  appropriate remedial action, which may include

12  disciplinary action, up to and including

13  termination.  If appropriate, proper law

14  enforcement officials will be notified and the

15  action will be fully prosecuted as a criminal

16  matter.

17               "Where the risk of workplace violence

18  is brought to CN's attention, CN will provide

19  information, instruction or training, where

20  appropriate, in order to prevent or minimize the

21  risk of workplace violence.

22               "CN offers its employees an Employee

23  & Family Assistance Program, EFAP, which can be

24  reached at the following numbers.  However,

25  please note that complaints under this policy

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000156

Page 34

1    must be directed to CN management, as described

2    in the policy."

3            And it lists the numbers for Canada

4    and the U.S.

5        Q.    Is that all you have?

6        A.    That is all I have.

7        Q.    So you stated earlier that you

8    weren't a witness to the incident, correct?

9        A.    No, I was not physically there,

10   correct.

11       Q.    So you took statements or coordinated

12   the statements, to get the statements from all

13   the employees involved who witnessed it.  With

14   that, you entered rules into the investigation.

15   We're going to start with Exhibit Number 14,

16   USOR Rule H.  Are you charging both employees

17   with Rule H, both Mr. Branch and Mr. Melton?  I

18   just want to clarify what the employees are

19   being charged with here because there is a lot

20   of information here.

21       A.    Both employees are being charged with

22   Rule H because of the incident that happened.

23   No one -- no direct management employee was

24   contacted on the day of or the following day, I

25   should say, at the end of the business day.

Confidential

Page 35

1      **Q.**      Okay.  And that would be it with
2  Exhibit 14?
3      **A.**      That's correct, USOR Rule H.
4      **Q.**      For Exhibit 15, are both Mr. Branch
5  and Mr. Melton charged with this exhibit?
6      **A.**      Yes.
7      **Q.**      And how would that -- how are they
8  being charged on this one?
9      **A.**      Because according to the incident,
10 they weren't complying with the rules and the
11 code of business conduct.
12     **Q.**      Exhibit Number 15 is actually
13 Page 14?
14     **A.**      Yes.  14 and 15 are both under the
15 same -- both the code of business conduct.
16 Those actually go together.
17     **Q.**      So Exhibit 15 and 16, you said it's
18 both in the Code of Conduct?
19     **A.**      That's correct.
20     **Q.**      I'm asking how are they charged?
21 Like, what is the charge from this rule on
22 Exhibit 15 and 16?
23     **A.**      Safety and a willingness to obey
24 policies, rules and procedures.  If this is to
25 be considered, you know, a workplace incident,

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential                                                                 CN-Branch 000158

1   then it wasn't -- you know, safety was being

2   ignored and rules weren't being followed when it

3   comes to safety.

4      **Q.**    All right.  And then next, I guess,

5   we'll -- it will be 17, 18 and 19, Workplace

6   Violence Prevention Policy.  Are both employees

7   charged with violating this?

8      **A.**    Yes.

9      **Q.**    And can you explain your reasoning?

10     **A.**    There's no tolerance for workplace

11  violence.  As far as even with the Workplace

12  Violence Prevention Policy, both employees

13  engaged and goes against everything that the

14  policy defines listed on all three pages.

15           **HEARING OFFICER:**  I have no questions

16  at this time, but I would like to take a recess.

17  The time is now -- did you have any questions

18  before we take a recess?

19           **MR. McGUIRE:**  After the recess.

20           **HEARING OFFICER:**  Okay.  The time is

21  now 9:52.  Let's take about a five- or

22  ten-minute recess here and we'll reconvene.

23           (A short break was taken.)

24           **HEARING OFFICER:**  The time is now

25  10:02.  We took a recess.  That recess is done

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

Page 37

1   and we're back on the record now.  I don't have

2   any further questions for Mr. Day at this time.

3           **MR. McGUIRE:**  I do, yes, sir.

4   EXAMINATION BY MR. McGUIRE:

5       **Q.**      I would like you guys to take a look

6   at the CN Workplace Violence Prevention Policy.

7   I've got it marked as Exhibit 17, 18 and 19.

8   Both are being charged with this rule, according

9   to your earlier testimony.  I would like to

10  direct your attention to the second page,

11  Exhibit 18, Number 2, Definitions.  And it

12  defines what a workplace is with CN.  And it

13  says, "For purposes of this policy, a workplace

14  is any location where CN employees are currently

15  performing work-related activities while in the

16  scope of their employment.  Examples include CN

17  owned or controlled buildings, parking lots,

18  rail yards, CN tracks, trains, machinery,

19  company vehicles and any other locations where

20  CN business or sponsored activity is being

21  conducted."

22          This hotel in question, does CN own

23  that property?

24      **A.**      No.

25      **Q.**      Do they conduct business there?

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

Page 38

1    **A.**    No.

2    **Q.**    Well, based on CN's own policy of

3    what a workplace is, I think that stands to

4    strengthen my objection that this is an

5    off-property incident, not controlled by CN, and

6    therefore, they have no jurisdiction there.   I

7    would just like to point that out for you.

8             "For purposes of this policy,

9    'workplace violence' is defined as any action,

10   conduct, threat or gesture of a person towards a

11   CN employee in a workplace that can reasonably

12   be expected to cause harm, injury or illness to

13   the CN employee, excluding situations of

14   justified self-defense."

15            I would like to also -- let's talk

16   about Exhibit 14, "H.  Furnishing Information

17   and Conduct."

18            You stated earlier that both are

19   being charged for not reporting the situation

20   that day.  Can you show me anywhere in that rule

21   where it has to be reported that day?  Is there

22   a time limit of any sort?

23   **A.**    The only thing that's specified is a

24   felony or other serious violation, no later than

25   the end of the day --

Confidential                                      CN-Branch 000161

Page 39

1    **Q.**    Where does it say that, sir?  I'm
2  sorry?

3    **A.**    It's more towards the bottom.  The
4  second small paragraph in the very bottom.

5    **Q.**    Sure.  Understood.  Do you feel that
6  that paragraph applies here?

7    **A.**    If two employees are obviously
8  violating a CN rule and there was an altercation
9  -- I'm sorry, an altercation that was conducted
10  in an appropriate manner and the employee
11  brought it to my attention, then I do believe
12  that would be a serious violation because the
13  employees are breaking CN rules.

14    **Q.**    The rule states or the rule states
15  any employee convicted of a felony or other
16  serious violation.  Are either one of these two
17  convicted of a felony or other serious
18  violation?

19    **A.**    No, sir, were not convicted.

20    **Q.**    I'm going to go ahead and read the
21  rest of the rule.  "Any employee convicted of a
22  felony or other serious violation of the law
23  must notify their supervisor no later than the
24  end of the first day immediately following the
25  day the employee received notice of the

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential                                                    CN-Branch 000162

Page 40

1    conviction."

2              I would just like to point out for

3    the record that neither one of these employees

4    were convicted of anything, and we feel this

5    portion of the rule does not apply.

6              It also states, "Employees must not

7    withhold information or fail to provide all the

8    facts to those authorized to receive information

9    regarding accidents, injuries, rule violations,

10   breaches of company security or unusual events.

11   This duty to furnish information -- this duty to

12   furnish information includes, but is not limited

13   to, accident and injury reports, recorded

14   statements, full cooperation in injury

15   investigations and safety rules violations.

16   Employees must also take all reasonable measures

17   to protect and preserve evidence where it is

18   within their control and ability to do so."

19             Do you feel they violated that

20   portion of the rule?

21      **A.**    I believe that -- that specific rule,

22   I believe that if there was an incident related

23   to one of my employees and they did not bring it

24   to me, I believe that it's something violated

25   because we're here today because one of the

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000163

Page 41

1    employees wanted to bring this to measure.  So I

2    do believe that, you know, the CN that conducts

3    the rules as far as safety and responsibility of

4    each employee, I do believe that in general, a

5    safety rule violation was, you know, what

6    happened with the altercation with these

7    employees, but this specific -- employees must

8    not withhold information.  You know, they would

9    have held it over the weekend.  No one was

10   notified, and I feel like if this was truly

11   something serious, trying to protect one

12   employee against another, they should have

13   brought it to my attention earlier.

14       **Q.**     But when they brought it to your

15   attention, did they withhold information?  Did

16   any of them withhold information?

17       **A.**     I don't know.  I wasn't physically

18   there.

19       **Q.**     All right.  How do employees receive

20   these policies?

21       **A.**     Through the CN INET and then when

22   employees are hired, usually they have a

23   week-long training of going over CN standards,

24   policies, rules, regulations, and each employee

25   is given a black book with all the rules and all

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000164

Page 42

1    that, USOR, OTS, CWR.  So as far as this, USOR,

2    an employee is -- you know, they have to have

3    this every two years, and this is in their

4    handbook that employees are required to keep on

5    them at all times.

6        Q.    Now, specify the policy -- the

7    Exhibit 17, 18 and 19, CN Workplace Violence

8    Prevention Policy, how do they receive that

9    training?

10       A.    Workplace Violence Prevention Policy,

11   this is a class that we actually have on a

12   program called My360.  Every employee is

13   required to take it.  I'm not sure as far as

14   like how long, how far apart, but there is a

15   prevention policy within 360 that every employee

16   is required to take, whether you're a manager or

17   unionized.

18            **MR. McGUIRE:**  No further questions,

19   subject to recall.

20            **HEARING OFFICER:**  Okay.  I don't have

21   any further questions for Mr. Day either.

22            **MR. BRANCH:**  I have a question.

23            **HEARING OFFICER:**  Go ahead.

24   EXAMINATION BY MR. BRANCH:

25       Q.    Mr. Day, you said you didn't know

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential                                    CN-Branch 000165

Page 43

1    anything about the incident until you -- I

2    notified you.  You knew about it because Chance

3    knew about it Friday because Chance came to my

4    machine and spoke with me about the incident.

5    So what position do Chance have under you?

6        **A.**    I mean, he's a supervisor.  He's the

7    same level as I am.

8        **Q.**    So you tell me that Chance is a

9    supervisor like you and you are over the rail

10   gain, so Chance is not going to come tell you

11   what happened?

12       **A.**    He would tell me, but I specifically

13   asked Chance, and he said you directly didn't

14   tell him.

15       **Q.**    What now?

16       **A.**    I was told by Mr. Gardner that you

17   did not directly talk to him about the incident,

18   that everything was rumor.

19       **Q.**    Everything was rumor when his foreman

20   was out there, Ty Peterson, and the assistant

21   foreman was out there, and they all reported to

22   him so how you saying --

23       **A.**    Did you speak to him, though?

24       **Q.**    Yes, sir.  He came to my machine.  He

25   asked me did I want to take action.  He also

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000166

1    asked me, I can change my mind.  So in this

2    incident, I had an opportunity to change my

3    mind, so you can't say that you didn't know

4    about it.  You knew about it.

5        **A.**    I really did not.

6        **Q.**    Then you also on Tuesday, June 1st,

7    did I have a conversation with you when I asked

8    about dropping it and you said that you were

9    trying to squash it earlier?  You are biased.

10   You're very biased.

11           **MR. McGUIRE:**  Just ask questions.

12   BY MR. BRANCH:

13       **Q.**    You told me that you tried to squash

14   it earlier.  Did you not try to tell me that?

15       **A.**    I asked you did you want to continue

16   --

17       **Q.**    Did you not tell me that, yes or no?

18       **A.**    Repeat the question.

19       **Q.**    Did you not tell me you tried to

20   squash the incident?

21       **A.**    By talking to you, yes, I wanted to

22   let it go.  You asked me if I could let it.

23       **Q.**    No, you told me earlier you were

24   trying to squash it because you told me on

25   Sunday when I spoke with you on the phone, you

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000167

Page 45

1    told me have I talked to the union and I --

2         A.     And I told you I would talk to HR.

3         Q.     And I told you -- no, I said I'm

4    going to talk to the union.  I'm supposed to go

5    through the chain of command.  Did I not tell

6    you that?  Then you did not tell me -- you text

7    me and told me to write a statement.  You did

8    not tell me to write a statement.  I got it on

9    my phone.

10        A.     You're right.  I did text you.

11        Q.     But you could have -- when I spoke to

12   you on the phone, why not tell me to write a

13   statement then?

14        A.     Because I was trying to gather the

15   information and what happened.  It was a

16   holiday.  We were on the last day.  I was

17   visiting --

18        Q.     And another thing, when I spoke to

19   you, I did not tell you that Todd and I had a

20   verbal altercation.  I did not tell you that.  I

21   said we was involved in an incident.  I did not

22   tell you that we were involved in a verbal

23   altercation.  I did not tell you that.  You

24   throwed that in there.  You wasn't there, just

25   like you said.

Confidential

Page 46

1    **A.**     I wasn't there.

2    **Q.**     Thank you.

3              **MR. BRANCH:**  No further questions.

4              **HEARING OFFICER:**  Do you have any

5    questions for Mr. Day?

6              **MR. MELTON:**  No, not at this time.

7              **MR. McGUIRE:**  No further questions

8    for Mr. Day at this time, subject to recall.

9              **HEARING OFFICER:**  Okay.  Mr. Day -- I

10   have no further questions for Mr. Day at this

11   time.

12             **MR. MELTON:**  Could I change my mind

13   about that?

14             **HEARING OFFICER:**  Yes.

15   EXAMINATION BY MR. MELTON:

16   **Q.**     The only thing, Mr. Day, is you

17   brought up when you were reading this policy,

18   company procedure policy down here, I don't know

19   what -- down here in the note -- your statement

20   was, it was your opinion about the way we broke

21   the rule.  Then you said it was your opinion

22   that your employees broke the rule.  Was that

23   true?  You said it was your opinion?

24   **A.**     I'm not here to answer based on my

25   opinion.  I'm only here based on --

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000169

Page 47

1    **Q.**    But did you not say it was your

2    opinion that we broke the rule?

3    **A.**    No, I said it was not based on my

4    opinion.  All I'm here for is to present

5    evidence and facts, what information you guys

6    have given me.

7            **MR. MELTON:**  All right.  No further

8    questions.

9            **HEARING OFFICER:**  Any other questions

10   before we release him?

11           **MR. McGUIRE:**  No, sir.

12           **HEARING OFFICER:**  Okay.  There being

13   no further questions for Mr. Day at this time,

14   I'm going to release Mr. Day subject to recall.

15   Mr. Day, please step out of the room.  You may

16   be recalled for additional questioning.  Please

17   do not discuss this case while you're outside of

18   the room.

19           (Christopher Day leaves room.)

20           **HEARING OFFICER:**  Next I'm going to

21   -- I'm going to start calling the witnesses that

22   have written statements, besides the two charged

23   employees.  So we'll start with Mr. Dylan

24   Boutte.

25           At 10:16, we're off the record.

Confidential

CN-Branch 000170

Page 48

1            (Off the record.)

2            **HEARING OFFICER:**  The time is now

3    10:20.  We're back on the record.  And we have

4    Mr. Dylan Boutte.

5                    DYLAN BOUTTE,

6    EXAMINATION BY THE HEARING OFFICER:

7        **Q.**    Mr. Boutte, please state your name.

8        **A.**    Dylan Boutte.

9        **Q.**    How long have you been employed by

10   the IC Railroad?

11       **A.**    One year.

12       **Q.**    Please state your occupation at the

13   time of the incident that is the subject of this

14   investigation.

15       **A.**    Trackman rail gain.

16       **Q.**    And how long have you worked the

17   position of trackman on the rail gain?

18       **A.**    Four or five months this time around.

19       **Q.**    And please state, for the record,

20   what other positions you've held.

21       **A.**    Only trackman, sir.

22       **Q.**    Okay.  And then we have a statement

23   here that was presented by Mr. Day, Exhibit

24   Number 6, and I have a copy of it there in front

25   of you.  Could you read your statement into the

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential                                                    CN-Branch 000171

Page 49

1   record and then I'm going to ask you a couple

2   questions after that, I suppose.

3      **A.**    Yes, sir. "On May 26, 2022, a couple

4   of co-workers and I were grilling outside the

5   hotel when I witnessed Todd Melton come outside.

6   Todd immediately began talking about a situation

7   that seemed to have happened months prior to May

8   26, 2022. Robert Branch" -- and in parentheses

9   it says, "One of my co-workers present at the

10  grill" -- "asked Todd Melton to leave the

11  situation alone and reminded him whoever the

12  conversation was about wasn't there and to leave

13  it in the past. Todd Melton became aggressive.

14  I witnessed him shove Robert Branch, which then

15  led to the two men wrestling on the ground. The

16  two men were quickly broken apart and calmed

17  down by the co-workers present."

18          That's it.

19     **Q.**    Do you have any other knowledge of

20  the incident that you would like to state?

21     **A.**    No, sir.

22       **HEARING OFFICER:** I really don't have

23  any other questions at this time. Mr. McGuire,

24  do you have any?

25       **MR. McGUIRE:** I have no further

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000172

Page 50

1    questions, subject to recall.

2           **HEARING OFFICER:** Mr. Branch, any

3    questions?

4           **MR. BRANCH:** No, sir.

5           **MR. MELTON:** No, sir.

6           **HEARING OFFICER:** All right.

7           **MR. McGUIRE:** I'm sorry, I do have

8    one question.

9    EXAMINATION BY MR. McGUIRE:

10      **Q.**    This is your statement, correct?

11      **A.**    Yes, sir.

12      **Q.**    Which this is from your own words.

13   You weren't coerced on how to write anything?

14      **A.**    No, sir.

15          **MR. McGUIRE:** Thank you. No further

16   questions.

17          **HEARING OFFICER:** All right. With no

18   further questions -- with there being no further

19   questions of Mr. Boutte at this time, I'm going

20   to release Mr. Boutte subject to recall. Again,

21   you cannot discuss this case outside of this

22   room. As we talked before -- so we're done with

23   the initial interrogation of you or your

24   testimony. So, like, if you want to go out to

25   your car or something like that. You just can't

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000173

Page 51

1    leave.

2              (Dylan Boutte leaves room.)

3              **HEARING OFFICER:**  All right.  And

4    next we will recall Mr. Darrell Hudson.  The

5    time is 10:24.  We'll go on recess again while

6    we wait.

7              (Off the record.)

8              **HEARING OFFICER:**  The time is now

9    10:26.  We're back on the record, and we have

10   Mr. Darrell Hudson.

11                  DARRELL HUDSON,

12   EXAMINATION BY THE HEARING OFFICER:

13       **Q.**    Mr. Hudson, please state your name.

14       **A.**    Darrell Michael Hudson.

15       **Q.**    How long have you been employed by

16   the IC Railroad?

17       **A.**    Four years.

18       **Q.**    Please state your occupation at the

19   time of the incident that is the subject of this

20   investigation.

21       **A.**    Trackman on rail gain.

22       **Q.**    And how long have you worked on that

23   position?

24       **A.**    Four or five months.

25       **Q.**    And please state, for the record,

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential                                                    CN-Branch 000174

Page 52

1   what other positions you have held.

2       **A.**     Assistant foreman and briefly welder

3   helper for a short period of time.

4       **Q.**     I have a copy of Exhibit Number 8,

5   which is a statement from you is what it appears

6   to be here.

7       **A.**     Yes.

8       **Q.**     Is this a statement that you wrote?

9       **A.**     Yes.

10      **Q.**     Could you read that statement into

11  the record?

12      **A.**     "We were outside listening to music

13  when Todd walked out of the hotel shouting

14  talking about stuff that happened at a union

15  meeting between him and another CN employee.

16  Robert Branch told Todd to leave it alone.  Todd

17  then rushed Branch pushing and hitting him in

18  the face."

19      **Q.**     Okay.  Do you have any other

20  additional information that is the subject of

21  this investigation that's not brought out in

22  this statement?

23      **A.**     No.

24      **HEARING OFFICER:**  Okay.  I have no

25  further questions for Mr. Hudson at this time.

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000175

Page 53

1    Mr. McGuire?

2    EXAMINATION BY MR. McGUIRE:

3        **Q.**    Were you coerced in any way, shape or

4    form when you developed this statement?

5        **A.**    Was I coerced?

6        **Q.**    Yeah.  Did anybody help you write the

7    statement?

8        **A.**    No.

9        **Q.**    This statement is from on your own

10   words and your own records of actually what

11   happened?

12       **A.**    Yes.

13           **MR. McGUIRE:**   I have no further

14   questions, subject to recall.

15           **HEARING OFFICER:**  Mr. Branch, any

16   questions?

17           **MR. BRANCH:**  No questions.

18           **MR. MELTON:**  Can we take a quick

19   recess?

20           **HEARING OFFICER:**  Time is 10:29.

21   We'll take a brief recess.

22           (Off the record.)

23           **HEARING OFFICER:**  The time is now

24   10:31.  The brief recess is over.  And we still

25   have Mr. Hudson for questioning.  Is there any

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000176

Page 54

1  other additional questions for Mr. Hudson at

2  this time?

3          **MR. McGUIRE:**  I have no further

4  questions, subject to recall.

5          **MR. BRANCH:**  I have no further

6  questions.

7          **MR. MELTON:**  No.

8          **HEARING OFFICER:**  I am going to

9  release Mr. Hudson at this time subject to

10  recall.  And, Mr. Hudson, again, can't discuss

11  this case outside of this room.  You can go to

12  your vehicle or something if you would or hang

13  out in the break room downstairs.  It's up to

14  you.

15          (Mr. Hudson leaves room.)

16          **HEARING OFFICER:**  I'm next going to

17  recall Mr. Randall Duren, if you'll grab him.

18  And we'll go on recess.  It is 10:32.

19          (Off the record.)

20          **HEARING OFFICER:**  The time is now

21  10:34 and we have Mr. Randall Duren.  And we're

22  back on the record.

23                  RANDALL DUREN,

24  EXAMINATION BY THE HEARING OFFICER:

25      **Q.**     Mr. Duren, please state your full

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000177

Page 55

1    name.

2         **A.**    Randall Semarj Duren.

3         **Q.**    How long have you been employed by

4    the IC Railroad?

5         **A.**    Nine years.

6         **Q.**    Please state your occupation at the

7    time of the incident that is the subject of this

8    investigation.

9         **A.**    Speed swing operator.

10        **Q.**    And how long have you been in the

11   position of speed swing operator?

12        **A.**    I guess about 20 days, 25 days,

13   something like that.

14        **Q.**    And please state, for the record,

15   what other positions you have held.

16        **A.**    Trackman, carpenter helper,

17   bridgeman.

18        **Q.**    Okay.  I have a -- you have a copy of

19   a statement.  This is Exhibit Number 9.  Is this

20   your handwritten statement?

21        **A.**    Yeah.

22        **Q.**    Could you read it into the record?

23        **A.**    All right.  "On Thursday the 26th, we

24   were barbecuing on the back of my truck.  Later

25   that evening, Ty Peterson and two other

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000178

Page 56

1    employees came out to join us.  Todd came out

2    the side door talking reckless about he was from

3    Egypt Plantation and went on to bring up

4    Sweeney, and that's when Robert Earl told him to

5    chill out and that we wasn't on that and that we

6    had nothing to do with it.  Todd got into Robert

7    Earl's personal space still talking about the

8    Sweeney thing, and he pushed Robert Earl and

9    punched him twice."

10        Q.     Okay.  And Robert Earl, is that in

11   reference to Robert Branch?

12        A.     Yeah.

13        Q.     Okay.  Do you have anything -- do you

14   have any other knowledge of this incident that

15   you would like to bring up in this

16   investigation?

17        A.     Knowledge as of like what?  Like what

18   do you mean, knowledge of?

19        Q.     Do you have any other information

20   that's not in your statement that you would like

21   to present?

22        A.     Yeah, Robert Earl, it wasn't no

23   verbal confrontation between them.  Robert Earl

24   didn't raise his voice, didn't cuss, just told

25   him, "Chill out.  We ain't -- we ain't on that."

Confidential

1    That's when Todd got aggressive with him.  He

2    was the aggressor.

3            **HEARING OFFICER:**  Mr. McGuire, do you

4    have any questions?

5            **MR. McGUIRE:**  Just my basic question.

6    EXAMINATION BY MR. McGUIRE:

7       **Q.**    Is this your statement written with

8    your own thoughts and no one helped you write

9    it?

10      **A.**    No.

11      **Q.**    This is your eye witness statement?

12      **A.**    Yes, sir.

13           **MR. McGUIRE:**  Thank you, sir.

14   EXAMINATION BY MR. BRANCH:

15      **Q.**    I've got a question.  For the record,

16   I would like for you to restate that I did not

17   have a verbal altercation with Mr. Melton there.

18      **A.**    No, he did not have no verbal

19   altercation with him.

20           **MR. BRANCH:**  Thank you.  No further

21   questions.

22           **HEARING OFFICER:**  Hang on a second.

23   I've got to release you.  Mr. Melton, do you

24   have any questions for Mr. Duren?

25           **MR. MELTON:**  Yeah.

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential                                                      CN-Branch 000180

Page 58

EXAMINATION BY MR. MELTON:

1

2      **Q.**      So did not have a verbal altercation,

3   so he was not discussing it with me about what

4   happened?

5      **A.**      No, he didn't discuss it.  He asked

6   you -- he told you to chill out.

7      **Q.**      Did he discuss it or not?

8      **A.**      He didn't.

9           **MR. MELTON:**  No more questions.

10           **HEARING OFFICER:**  Okay.  Nobody else

11   has any further questions for Mr. Duren?

12           **MR. McGUIRE:**  No further questions,

13   subject to recall.

14           **HEARING OFFICER:**  So I'm going to

15   release Mr. Duren subject to recall.  Mr. Duren,

16   again, you're sequestered so you can't discuss

17   this case outside this room.  You are welcome to

18   go to your vehicle or something like that.

19   We'll come and get you if we do need you for

20   further questioning.  And we'll let you know

21   when the investigation is complete as well.  I

22   forgot to tell that to the other guys.  You

23   can't leave.  You've got to stay somewhere close

24   by.

25           (Mr. Duren leaves room.)

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

Page 59

1          **HEARING OFFICER:**  The time is 10:39.

2     We'll take a brief recess.

3               (A short break was taken.)

4          **HEARING OFFICER:**  The time is now

5     10:42.  Back on the record.  And we have Mr.

6     Earl Honeysucker as our witness.

7                    EARL HONEYSUCKER

8     EXAMINATION BY THE HEARING OFFICER:

9       **Q.**     Mr. Honeysucker, please state your

10    full name.

11      **A.**     Earl Honeysucker, Jr.

12      **Q.**     And how long have you been employed

13    by the IC Railroad?

14      **A.**     A little over eight years.

15      **Q.**     Please state your occupation at the

16    time of the incident that is the subject of this

17    investigation.

18      **A.**     Assistant track foreman.

19      **Q.**     And how long have you worked the

20    position of assistant track foreman?

21      **A.**     It would have been rail gain for a

22    couple of months, three or four months maybe.

23      **Q.**     And can you please state, for the

24    record, what other positions you have held?

25      **A.**     Trackman, welder helper, foreman.  I

Confidential                                                          CN-Branch 000182

Page 60

1    think that's it.  Assistant foreman.

2        Q.    Okay.  I have a copy of a statement

3    from you, I assume.

4        A.    Yes.

5        Q.    And if you could, read -- it's

6    Exhibit Number 10, for the record.  But could

7    you read that for the record?

8        A.    "On May 26, 2022, we were outside the

9    hotel just having a good time when Todd Melton

10   came outside of the hotel and started yelling,

11   'I'm from Little Egypt where we bury MFs.'"  Do

12   you want me to use the profanity?

13       Q.    No, that's fine.

14       A.    "'And I'm going to bury Sweeney.'

15   Robert Branch told him to leave that alone, and

16   Todd asked him, 'So you're backing Sweeney.'

17   And Robert Branch said, 'No, just leave that

18   alone.'  And Todd charged Robert and pushed him

19   and hit him twice and then they exchanged a

20   couple licks back and forth and fell on the

21   ground, and then I, Earl Honeysucker, stepped in

22   to help break it up."

23       Q.    Okay.  And do you have anything else

24   about the incident that you would like to state?

25       A.    No, not really.  That's it.

Page 61

1          **HEARING OFFICER:** Okay.  I have no

2    further questions at this time.  Mr. McGuire, do

3    you have any questions for Mr. Honeysucker?

4    EXAMINATION BY MR. McGUIRE:

5      **Q.**    Yes.  Just for the record, this is

6    your handwritten statement?  You were not

7    coerced in any way to write it?  This is your

8    free thoughts and what you witnessed?

9      **A.**    Yes, sir.

10          **MR. McGUIRE:**  No further questions,

11    subject to recall.

12    EXAMINATION BY MR. BRANCH:

13      **Q.**    Yeah, I got a question.  For the

14    record, Mr. Honeysucker, did I in any form,

15    shape, or fashion provoke Mr. Melton to attack

16    me?

17      **A.**    No.

18          **MR. BRANCH:**  Thank you.  No further

19    questions.

20          **HEARING OFFICER:**  Mr. Melton, do you

21    have any questions?

22          **MR. MELTON:**  No.

23          **HEARING OFFICER:**  Okay.  There being

24    no further questions for Mr. Honeysucker at this

25    time, I'm going to release Mr. Honeysucker

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential                                                                CN-Branch 000184

Page 62

1    subject to recall.  Again, please step out of

2    the room.  You are free to go to your vehicle.

3    You can't leave the property.  But if you want

4    to go to your vehicle or back down to the break

5    room, and we'll let you know when the

6    investigation is complete.

7              (Mr. Honeysucker leaves the room.)

8              **HEARING OFFICER:**  Next we're going to

9    bring in Mr. Ty Peterson.  We're still on the

10   record here.  We have Mr. Ty Peterson.

11                   TY PETERSON,

12   EXAMINATION BY THE HEARING OFFICER:

13       **Q.**     Mr. Peterson, please state your full

14   name.

15       **A.**     Ty Peterson.

16       **Q.**     And how long have you been employed

17   by the IC railroad?

18       **A.**     Three years, a couple months.

19       **Q.**     Please state your occupation at the

20   time of the incident that is the subject of this

21   investigation.

22       **A.**     Foreman on the rail gain.

23       **Q.**     And how long have you been in that

24   position?

25       **A.**     Four to five months.

Page 63

1    Q.    And please state, for the record,
2    what other positions you have held.
3    A.    Welder, assistant foreman, and
4    machine, boom truck.
5    Q.    Okay.  In front of you is a copy of
6    your statement.  It's Exhibit Number 11 for the
7    record.  Could you read your statement into the
8    record?
9    A.    "On Thursday, the 26th of May, me and
10   a group of guys were outside the hotel talking
11   about work when Todd Melton walked out the door
12   intoxicated and confronted Robert Branch about a
13   sore subject that happened in the past.  Robert
14   Branch responded, 'Leave that subject alone.'
15   After that, Todd Melton went out after Branch
16   and struck him with his fist which resulted in
17   both of them fighting with each other.  After a
18   brief amount of time, it was broken up and
19   separated."
20   Q.    Do you have -- do you know anything
21   else about this incident that you would like to
22   say other than what's in your statement?
23   A.    I do not.
24   HEARING OFFICER:  Mr. McGuire, do you
25   have any questions for Mr. Peterson?

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential                                                          CN-Branch 000186

Page 64

1   EXAMINATION BY MR. McGUIRE:

2       **Q.**     Mr. Peterson, this is your

3   handwritten statement?  Were you coerced in any

4   way to write it?  This is your free thinking and

5   your thoughts?

6       **A.**     That's correct.

7           **MR. McGUIRE:**  No further questions,

8   subject to recall.

9           **HEARING OFFICER:**  Mr. Branch.

10  EXAMINATION BY MR. BRANCH:

11      **Q.**     Mr. Peterson, on May 26, was I in any

12  way, form or fashion provoking Mr. Todd to hit

13  me or attack me in any --

14      **A.**     No, like I said in my statement, you

15  just said, "leave this sore subject alone."

16          **MR. BRANCH:**  Thank you.  No further

17  questions.

18          **HEARING OFFICER:**  Mr. Melton, do you

19  have any questions?

20  EXAMINATION BY MR. MELTON:

21      **Q.**     Yeah.  Here in your statement, you

22  said Mr. Todd Melton walked out the door

23  intoxicated.

24      **A.**     That was just my opinion.

25      **Q.**     You got to have a -- opinions don't

EMM, INC. REPORTING  601.506.8261
EMMREPORTING@GMAIL.COM

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000187

Page 65

```
1   mean anything when we're in here, so --
2       A.      No, I don't have any truth or
3   anything like that.  That was just my opinion.
4           MR. MELTON:  Thank you.
5           HEARING OFFICER:  Any other questions
6   for Mr. Peterson?  There being no further
7   questions for Mr. Peterson at this time, I'm
8   going to release Mr. Peterson subject to recall.
9   Again, step out of the room.  You are being
10  sequestered, so you can't discuss this case
11  outside the room.  You are free to go to your
12  vehicle or back down to the break room.  We will
13  let you know when the investigation is all over.
14          (Mr. Peterson leaves the room.)
15          HEARING OFFICER:  And next we're
16  going to call in Mr. Walker.  You can send him
17  in.
18          We now have Mr. Walker Yuille in the
19  room.
20              WALKER YUILLE,
21  EXAMINATION BY THE HEARING OFFICER:
22      Q.      Mr. Yuille, please state your full
23  name.
24      A.      William Walker Yuille.
25      Q.      Yuille?
```

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

1    **A.**    Yes, sir.

2          **MR. McGUIRE:**  I'm sorry, which

3    exhibit is that?

4          **HEARING OFFICER:**  It's Exhibit

5    Number 12.

6    BY THE HEARING OFFICER:

7    **Q.**    Mr. Yuille, how long have you been

8    employed by the IC Railroad?

9    **A.**    A year.

10   **Q.**    And please state your occupation at

11   the time of the incident that is the subject of

12   this investigation.

13   **A.**    Trackman on the rail gain.

14   **Q.**    And how long have you worked that

15   position?

16   **A.**    Two months.

17   **Q.**    And please state, for the record,

18   what other positions you have held.

19   **A.**    Just trackman on the rail gain.

20   That's about it.

21   **Q.**    Okay.  In front of you is a written

22   statement, Exhibit 12, for the record.  Could

23   you read that statement into the record?

24   **A.**    Yes, sir.  "Thursday, on the 26th of

25   May, me and some of my co-workers were out

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000189

Page 67

1    cooking at the hotel in Columbia [sic],

2    Mississippi.  One of the guys came out and

3    engaged into an argument with Robert Branch.

4    Todd Melton approached Robert about something

5    that happened in the past and Robert told him to

6    leave it alone.  That's when Todd pushed him and

7    hit him in the face.  They immediately went to

8    the ground and were broke apart."

9        **Q.**    And this is your statement?

10       **A.**    Yes, sir.

11       **Q.**    Do you have anything else about the

12   incident that you would like to state?

13       **A.**    No, sir.

14           **HEARING OFFICER:**  Mr. McGuire, do you

15   have any questions for Mr. Yuille?

16   EXAMINATION BY MR. McGUIRE:

17       **Q.**    This is your handwritten statement.

18   You were not coerced in any way to write this?

19   This is your free will and thoughts?

20       **A.**    Yes, sir.

21           **MR. McGUIRE:**  No further questions,

22   subject to recall.

23   EXAMINATION BY MR. BRANCH:

24       **Q.**    Mr. Yuille, in your statement you

25   spoke about an argument.  Was Todd and I

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000190

Page 68

1    arguing?

2        **A.**    No.

3        **Q.**    But your statement stated we was

4    arguing.  Can you justify that?

5        **A.**    Okay.  When Mr. Todd walked out, he

6    was speaking about a past event that happened at

7    a union meeting between him and Roosevelt

8    Sweeney, and all Mr. Branch said was to leave it

9    alone.

10           **MR. BRANCH:**  Thank you.  No further

11    questions.

12           **HEARING OFFICER:**  Mr. Melton, any

13    questions?

14    EXAMINATION BY MR. MELTON:

15       **Q.**    In here you said I hit Mr. Branch in

16    the face.

17       **A.**    Yes, sir.

18       **Q.**    Did Mr. Branch ever strike me?

19       **A.**    Yes, sir, when they got to the ground

20    before it was broke up, it was a cluster, but

21    Mr. Branch did swing.

22           **MR. MELTON:**  Thank you.

23           **HEARING OFFICER:**  Anyone have any

24    further questions for Mr. Yuille at this time?

25           **MR. BRANCH:**  No further questions.

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000191

Page 69

1          **MR. McGUIRE:**  No further questions.

2          **HEARING OFFICER:**  Okay.  Mr. Yuille,

3     I'm going to release you, subject to recall.

4     Again, you're still sequestered.  You can't

5     discuss this case outside of this room until

6     this investigation is over.  You can go either

7     back to the break room or downstairs, out to

8     your vehicle.  We'll find you if we have further

9     questions for you.  And we'll let you know when

10    the investigation is complete.

11               (Mr. Yuille leaves room.)

12          **HEARING OFFICER:**  And next will be

13    recalling Mr. Al Thomas, if you can send him in.

14               We now have Mr. Al Thomas for

15    questioning.

16                    AL THOMAS,

17    EXAMINATION BY THE HEARING OFFICER:

18       **Q.**     Mr. Thomas, please state your full

19    name.

20       **A.**     Al B. Thomas.

21       **Q.**     And how long have you been employed

22    by the IC Railroad?

23       **A.**     15 years.

24       **Q.**     15 years you said?

25       **A.**     Yes, sir.

Page 70

1    **Q.**    And what was your occupation at the

2  time of the incident that is the subject of this

3  investigation?

4    **A.**    Machine operator.

5    **Q.**    And how long have you been on this

6  position?

7    **A.**    About four weeks.

8    **Q.**    And please state, for the record,

9  what other positions you have held.

10    **A.**    Machine operator, trackman, welder

11  helper, bridge gain.  That's it.

12    **Q.**    All right.  And in front of you is

13  Exhibit Number 13, for the record.  Is this your

14  written statement?

15    **A.**    Yes, it is.

16    **Q.**    Could you please read it into the

17  record?

18    **A.**    "On Thursday, May 26, Todd Melton

19  came around the corner and was talking and made

20  a statement about Roosevelt Sweeney and what

21  happened at the union meeting, and Robert Branch

22  told Todd to leave the union mess alone, so Todd

23  walked up to Robert Earl and shoved him, and he

24  shoved him back, and Todd drawed back and hit

25  Robert, and Robert fell, and Todd hit him again,

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential                                                                           CN-Branch 000193

Page 71

1    and somehow they both ended up on the ground.

2    And we broke them up and Earl Honeysucker pulled

3    Todd away, and Todd went one way and Robert Earl

4    went another."

5        Q.    And do you have any other information

6    about this incident that you would like to say

7    other than what's in your statement?

8        A.    No.  That pretty well sums it up.

9             HEARING OFFICER:  Mr. McGuire, do you

10    have any questions for Mr. Thomas?

11    EXAMINATION BY MR. McGUIRE:

12        Q.    This statement here was written by

13    you, your own thoughts?  No one coerced you into

14    saying anything?

15        A.    No.

16             MR. McGUIRE:  No further questions,

17    subject to recall.

18             HEARING OFFICER:  Mr. Branch, do you

19    have any questions for Mr. Thomas?

20    EXAMINATION BY MR. BRANCH:

21        Q.    Mr. Thomas, on Thursday, May 26, did

22    I, Robert Earl Branch, initiate the incident?

23        A.    No.

24        Q.    You have on your statement here, it

25    reads, "'Todd leave that union mess alone.'  So

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential                                                           CN-Branch 000194

Page 72

1    Todd walked up to Robert Earl Branch and shoved

2    him.  He shoved him back."  I don't recall

3    shoving him back, Mr. Thomas.

4        **A.**    It all happened so fast.  I know

5    that, as I can recall, Todd just came up on you,

6    and I thought maybe y'all bumped and you kind of

7    like pushed him.

8        **Q.**    No.

9        **A.**    But, I mean, it happened so fast, but

10   I do remember that when he walked up on him, it

11   was like he just -- Todd just drawed off and hit

12   him.  I mean, I could have it wrong as far as

13   the shoving part, but I know it happened so fast

14   to -- I mean, wasn't nobody looking for it to

15   happen, I mean, just being honest.

16        **MR. BRANCH:**  Thank you.  No further

17   questions.

18        **HEARING OFFICER:**  Mr. Melton, do you

19   have any questions for Mr. Thomas at this time?

20   EXAMINATION BY MR. MELTON:

21        **Q.**    Now, you said I shoved him and he

22   shoved me back.  Now at any time did Mr. Branch

23   strike me?

24        **A.**    No, sir, he did not.

25        **Q.**    You didn't see him strike me?

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000195

1      **A.**      No, I did not.

2              **MR. MELTON:**  No further questions.

3              **HEARING OFFICER:**  Does anyone have

4      any further questions for Mr. Thomas at this

5      time?

6              **MR. McGUIRE:**  No further questions.

7              **HEARING OFFICER:**  Okay.  There being

8      no further questions for Mr. Thomas at this

9      time, I'm going to release Mr. Thomas subject to

10     recall.  Again, you're still sequestered.  You

11     can't discuss this case outside this room.  You

12     are welcome to go back down to the break room or

13     out to your vehicle.  We'll get you if we need

14     you for further questioning.

15              (Mr. Thomas leaves room.)

16              **HEARING OFFICER:**  I think that's all.

17              **MR. McGUIRE:**  That's all the

18     witnesses.

19              **HEARING OFFICER:**  Would you guys like

20     a recess before we --

21              **MR. McGUIRE:**  We can move right into

22     it.

23              **HEARING OFFICER:**  I'm going to go

24     with Mr. Branch next.  We now have Mr. Branch on

25     the witness stand.

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000196

Page 74

1                    ROBERT BRANCH

2  EXAMINATION BY THE HEARING OFFICER:

3      **Q.**      Mr. Branch, please look at Exhibit

4  Number 4 and 5, which is your written statement.

5  Is everything that you wrote in your statement

6  true and accurate?

7      **A.**      Yes, sir.

8      **Q.**      Okay.  Mr. Branch, you've heard the

9  testimony and you've seen the exhibits up to

10  this point.  Would you like to comment on

11  anything that has been said?

12      **A.**      Only thing I wanted to say is that

13  even though me and Mr. Melton had an incident --

14  but I truly think on Mr. Melton's part, it was a

15  mistake.  I mean, I don't think it was

16  intentional.  I mean, it wasn't his intention to

17  hit me or anything because he came back on

18  Tuesday and he apologized.  And I think he

19  apologized to me from his heart.  And, you know,

20  I'm not here to try to take Mr. Melton's job and

21  not even trying to give my job away.  It's just

22  things happen in the workplace.  We have to get

23  somebody's attention because things are going

24  around in the world, and I think we should

25  always act professionally and conduct ourself in

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential                                    CN-Branch 000197

1   a professional way. I don't have nothing

2   against Todd then; I don't have nothing against

3   him today. That's all I want to say.

4       **Q.**     Okay. I'm going to have you read

5   your statement into the record and then I may

6   have a couple questions for you, but if you

7   could do that, please.

8       **A.**     Yes, sir. "To the management at CN

9   Railroad. From Robert Branch. Dated May 30,

10   2022. On Thursday, May 26, 2022, around

11   9:00 p.m. at Magnolia Inn, 816 US 98, Columbus,

12   Mississippi, 39429, my co-worker and I was

13   grilling afterward peacefully and relaxing time

14   when Todd Tracy Melton approached us with no

15   shirt, no shoes and started acting and speaking

16   belligerent. He was speaking about a situation

17   at a union meeting I attended. He and another

18   employee had a disturbing, violent confrontation

19   while Todd was saying racial slurs, calling the

20   CN employee 'Boy.'

21       "He proceeded to approach the group.

22   I said, 'You need to let that go.' Todd said he

23   was from Egypt Plantation. Todd pushed me in

24   the chest and I fell to the ground, got back up,

25   and he hit me twice in the mouth and in the

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential        CN-Branch 000198

Page 76

1    nose.  I was in shock.  My head bounced off the

2    pavement in shock and disbelief.  I was being

3    attacked.  So I attempted to protect myself by

4    fighting back.  I have several witnesses that I

5    was in totally disbelief of what had just

6    transpired.

7              "I'm a mild-mannered man.  I come to

8    work and conduct myself in a safe and

9    professional manner.  I am extremely grateful I

10   survived his attack; however, my mind would not

11   stop wondering what did I do.  I am emotionally

12   depressed and fearful for what Todd Melton has

13   planned for me.  I fear for my life when I'm

14   around him.  All I said was 'This is not the

15   place,' and the next thing I know I am being

16   attacked.  I have not gotten a full night's

17   rest.  I keep tossing and turning, thinking this

18   man could have killed me.  I spoke to Supervisor

19   Gardner about the attack on Friday morning and

20   he asked me what do you want to do.

21             "This was embarrassing and

22   unacceptable.  A person with that attitude can

23   hurt or kill someone -- somebody.  CN has a

24   conduct policy with zero tolerance for that kind

25   of behavior.  I talked to my wife about it.  She

Confidential                                                                CN-Branch 000199

Page 77

1    is worried and scared.  I fear for my life

2    around Todd.

3            "Witness:  Randall S. Duren, Darrell

4    Hudson, Ty Peterson, Earl Honeysucker, Al

5    Thomas, Dylan Boutte, Walker Young [sic] and

6    Rashard Brown."

7        Q.    Do you have any other information

8    that you would like to bring out at this time?

9        A.      Only information that I have, Todd

10   did come to me on Tuesday around about 11:30.

11   He came to my machine and he apologized and told

12   me he was sorry.  And I did accept his apology.

13           **HEARING OFFICER:**  I don't have any

14   questions at this time.  Mr. McGuire, do you

15   have any further questions?

16           **MR. McGUIRE:**  Yes, I do.  I have a

17   couple here.

18   EXAMINATION BY MR. McGUIRE:

19       Q.    I think we covered this earlier in

20   testimony from Supervisor Day.  Did you have --

21   just to refresh my memory and refresh the

22   record, did you object to his statement when he

23   presented it in any way, shape or form, the

24   information that he presented?

25       A.     Yes, I did.

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000200

Page 78

1    **Q.**    Can you elaborate a little bit?

2    **A.**    Mr. Day, he stated that he didn't

3    know anything about the incident.  Well, Gardner

4    came to me on Friday and spoke to me about the

5    incident and asked me -- he said he wanted to

6    talk to Todd about it also.  He said he was

7    going to call Todd because Todd was on the case.

8    So I knew if Gardner knew, Mr. Day knew.  Mr.

9    Day trying to say that he did not know.  But

10   Gardner also told me that he was going to tell

11   Chris about the incident.

12   **Q.**    You are being charged with rule

13   violation H, Furnishing Information and Conduct.

14   Do you feel like you violated that rule?

15   **A.**    No, sir.

16   **Q.**    Did you furnish all the information

17   that you had on hand about the incident?

18   **A.**    Yes, sir.

19   **Q.**    Was you convicted of a felony or

20   other serious violation of the law?

21   **A.**    No, sir.

22   **Q.**    Exhibit Number 15, you're being

23   charged with "Safe, Secure, And Violent-Free

24   Workplace.  Item 2, Do your job according to

25   company policies, rules and procedures as well

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

Page 79

1    as the law.  If in doubt, consult your

2    supervisor."  Did you do your job according to

3    company policies, rules and procedures?

4        **A.**    Yes, sir.

5        **Q.**    When you reported everything, you

6    didn't withhold any information or anything?

7        **A.**    No, sir.

8        **Q.**    And then Exhibit 16, second page

9    here, "Doing the Right Thing.  Safety and a

10   willingness to obey policies, rules and

11   procedures are most important when at work and

12   otherwise performing your duties.  If in doubt,

13   the safe course must be taken."

14           Did you feel you took the safest

15   course?

16       **A.**    Yes, sir.

17       **Q.**    Exhibit 17, 18 and 19 is the CN

18   Workplace Violence Prevention Policy.  Are you

19   familiar with that policy?

20       **A.**    Somewhat.

21       **Q.**    How are you familiar with it?  Did

22   you take a course?

23       **A.**    It's been a while.

24       **Q.**    But you do remember taking a course

25   on this?  You just don't know when?

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000202

Page 80

1      **A.**     I just don't know when.  It could

2  have been years ago.  I don't know.

3      **Q.**     There's actually no date on -- oh,

4  effective date, February 2014.  Does that seem

5  about a right time period when you would have

6  gotten this policy?

7      **A.**     Somewhat.

8      **Q.**     And you've had no retraining on this

9  policy whatsoever since 2014?

10     **A.**     No, sir.

11          **MR. McGUIRE:**  I have no further

12  questions, subject to recall.

13          **HEARING OFFICER:**  Mr. Melton, do you

14  have any questions for Mr. Branch?

15          **MR. MELTON:**  Yeah, I got a couple if

16  you don't mind.

17  EXAMINATION BY MR. MELTON:

18     **Q.**     All right.  Mr. Branch, here's a

19  statement I don't remember saying and I haven't

20  heard anybody else say it.  You said, "Todd was

21  making racial slurs calling the CN employee

22  'boy.'"  Who did I make that statement towards?

23     **A.**     Mr. Sweeney.

24     **Q.**     Was that statement -- did that have

25  anything to do with the incident you and I had?

Confidential

CN-Branch 000203

Page 81

1    **A.**    No, sir.

2    **Q.**    And --

3        **MR. McGUIRE:**   The organization would

4    like to object on the grounds that that portion

5    should be remitted from the record because that

6    has nothing to do with the date of the incident

7    involved.

8        **HEARING OFFICER:**   Okay.  I'll make

9    note of that.  So you're objecting to the

10   sentence that says, "Todd was saying racial

11   slurs and calling the CN employee 'boy'"?

12       **MR. McGUIRE:**   Anything to do with the

13   date outside of the date of the incident.

14   That's referring to something that happened

15   maybe a month ago, and in these investigations

16   we're here to discuss what happened on the date

17   in question, and anything in the past or in the

18   future is irrelevant to this investigation.

19       **HEARING OFFICER:**   It's noted and I

20   would agree with that.

21   BY MR. MELTON:

22    **Q.**    All right.  And now, I mean, I know

23   things are said when we're angry and we're

24   upset.  The statement you made that you were

25   fearful of your life that I was going to do

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000204

Page 82

1  something to you.  Did I ever do anything -- I

2  mean, in your statement it just says that.  I

3  mean, is that your personal opinion?  Is that

4  the way you felt?  Or did I say something?

5      **A.**    That was my personal opinion, Todd.

6      **Q.**    Do you feel at this time that I'm a

7  threat to you?

8      **A.**    No, I do not.

9          **MR. MELTON:**  I have no further

10  questions.

11          **HEARING OFFICER:**  Okay.  I do have a

12  couple questions here.

13  EXAMINATION BY THE HEARING OFFICER:

14      **Q.**    Mr. Branch, were you struck by Mr.

15  Melton?

16      **A.**    Yes, sir.

17      **Q.**    On the day in question?

18      **A.**    Yes, sir.  I mean, for the record --

19      **Q.**    You would like to enter this into the

20  record?

21      **A.**    Yes, sir.

22      **Q.**    This is -- can you explain what this

23  is?

24      **A.**    It's a statement from the doctor when

25  I went to the emergency room.

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential                                                                    CN-Branch 000205

Page 83

1          **HEARING OFFICER:**  Mark this as

2  Exhibit Number 20.  It's from Greenwood Leflore

3  Hospital.

4          (Exhibit No. 20, Medical Record, was

5  marked.)

6          **MR. McGUIRE:**  Can we request a copy

7  of that?  I don't know if we can, but I need to

8  -- that is something that's possibly under HIPAA

9  laws.  I don't really know if we should --

10          **HEARING OFFICER:**  Well, he's entering

11  it as a -- into the record, into an

12  investigation, so it's -- yeah, you can get a

13  copy of it and it will be included in the

14  transcript.  You can look at it if you'd like.

15  You both are free.

16  BY THE HEARING OFFICER:

17    **Q.**    So with that exhibit, you've seen a

18  physician then?

19    **A.**    Yes, sir.

20    **Q.**    After the -- after you were in this

21  altercation?

22    **A.**    Yes, sir.

23    **Q.**    Can you tell me how many times you

24  were struck?

25    **A.**    Mr. Todd Melton struck me here and he

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential                                                          CN-Branch 000206

Page 84

1    struck me here and my skin was lacerated.

2        **Q.**    So in the jaw and like near your eye?

3        **A.**    Yeah, between both my eyes.

4        **Q.**    And at any time did you strike Mr.

5    Melton?

6        **A.**    Of course, I got him and I defended

7    myself, yes.

8        **Q.**    So you would say you struck him or...

9        **A.**    Yeah, you can say I struck him.

10       **Q.**    And when this incident started to

11   happen, did you have -- did you provoke it in

12   any way?

13       **A.**    No, sir.

14       **Q.**    Did you -- was there anything said by

15   you that could have been construed as being as

16   provoking the incident?

17       **A.**    No, sir.  I mean, telling him to

18   leave me alone.  I don't think that would

19   provoke any argument.  I'm not that type of

20   person.

21       **HEARING OFFICER:**  Okay.  I have no

22   further questions at this time.  Mr. McGuire, do

23   you have any further questions?

24       **MR. McGUIRE:**  Yes, I do have a

25   statement.  I'm going to have to object to this

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000207

1  exhibit just for the sole purpose that he was

2  seen by the doctor on 6/2, over a week past the

3  incident.  And it alleges he was attacked.

4  There's no -- we haven't proven that yet.  As a

5  whole, I've got to object to this completely

6  because it says headaches from being attacked on

7  5/26/22, and he waited until 6/2 to go see the

8  doctor.

9        **HEARING OFFICER:**  I'll make note of

10  your objection.

11        **MR. McGUIRE:**  As of right now, I feel

12  that, you know, we haven't gathered all the

13  information yet.  A decision hadn't been made.

14  And that could be leaning someone towards a

15  false decision on this.

16        **HEARING OFFICER:**  So for the record,

17  there is an objection by the union

18  representative for Exhibit Number 20 on the

19  basis of it being appointment -- I'm sorry,

20  being seen on 6/2/2022, from an incident that

21  happened on May 26, 2022.

22        And I have no further questions for

23  Mr. Branch.  Mr. Melton, do you have any further

24  questions before we release him?

25        **MR. MELTON:**  No, I do not.

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

1          **HEARING OFFICER:** Okay. There being

2    no further questions for Mr. Branch at this

3    time, you're released from the stand, subject to

4    recall, and we'll next recall Mr. Melton to the

5    witness stand. Does anybody need a recess

6    before we get into this?

7          **MR. McGUIRE:** I'm fine.

8          **HEARING OFFICER:** Okay.

9               TODD MELTON,

10   EXAMINATION BY THE HEARING OFFICER:

11     **Q.**    Mr. Melton, please look at Exhibit

12   Number 7. Is this a copy of your written

13   statement?

14     **A.**    Yes, sir.

15     **Q.**    Is everything you wrote in your

16   statement true and accurate?

17     **A.**    Yes, sir.

18     **Q.**    Could you please read the statement

19   into the record?

20     **A.**    "Robert Branch and I had a

21   disagreement about a union meeting in the

22   parking lot of the Magnolia. Turned into a

23   slight altercation. Then cooled off and

24   returned to our rooms, and this incident

25   happened off the clock and off company

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

1    property."

2       **Q.**    Okay.  Mr. Melton, you have heard the

3    testimony and you have seen the exhibits up to

4    this point.  Would you like to comment on

5    anything that has been said so far?

6       **A.**    No, sir.

7       **Q.**    And would you like to state anything

8    else you know about this incident at this time?

9       **A.**    No, sir.

10      **Q.**    I have a couple questions for you.

11   Mr. Branch stated you struck him twice; is that

12   correct?

13      **A.**    Well, I mean, we -- I don't know that

14   I struck him twice.  I know we swang.  We shoved

15   each other and it was -- we went to the ground

16   and it was some swinging.  As far as contacting

17   people, breaking things up, I don't remember who

18   making contact.

19      **Q.**    And did Mr. Branch strike you at any

20   time during the altercation?

21      **A.**    Like I just said, we were all being

22   broken up.  I mean, we were -- I was struck and

23   by who -- who all I was struck by in the middle

24   of breaking everything up, I don't know.

25      **Q.**    Okay.  And leading up to the physical

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential                                    CN-Branch 000210

Page 88

1    altercation, was there anything that Mr. Branch

2    did to provoke you?

3       **A.**    We were just -- you know, we were

4    having words about the union meeting and that

5    led into the altercation -- that led into the

6    argument.

7       **Q.**    So for USOR Rule H, Exhibit

8    Number 14, do you feel that you violated this

9    rule in any way, Furnishing Information and

10   Conduct?

11      **A.**    No, sir.

12      **Q.**    Would you like to elaborate on that

13   at all?

14      **A.**    Nothing really to elaborate on.

15      **Q.**    As far as Exhibit 15 and 16, from the

16   code of business conduct, do you feel you

17   violated this code in any way?

18      **A.**    No, sir, and code of conduct, I don't

19   believe I violated it because we were not on

20   company property as this reads what company

21   property is.  And as far as my per diem, per

22   diem doesn't pay for the hotel, and I don't

23   believe we were -- you know, it was after hours.

24   What happened with me and Mr. Branch was between

25   us.

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000211

Page 89

1    **Q.**     And as far as the CN Workplace

2    Violence Prevention Policy, Exhibit 17, 18, and

3    19, do you feel that you were in violation of

4    this policy in any way?

5    **A.**     No, sir.

6    **Q.**     So just to clarify, for the record,

7    to clarify, you were at the hotel in Columbus,

8    Mississippi; is that correct?

9    **A.**     That is correct.

10   **Q.**     And this happened at approximately

11   what time?

12   **A.**     Between 8:00 and 9:00.

13   **Q.**     Between 8:00 and 9:00 p.m.?

14   **A.**     P.m.

15   **Q.**     And do you know approximately what

16   time you got off of work that day?

17   **A.**     No, I really can't.  I can't recall.

18   **Q.**     Hours prior to the incident or --

19   **A.**     We had been -- yeah, we had been off

20   several hours.

21   **Q.**     And why were you staying at the

22   hotel?

23   **A.**     For lodging.

24   **Q.**     And you stated that the per diem does

25   not cover your hotel?

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential                                    CN-Branch 000212

Page 90

1    **A.**     No.  Per diem does not cover your

2    hotel expenses and meals.

3    **Q.**     What is per diem for?

4    **A.**     It's money you're paid for your job.

5    I mean, that money is not necessarily for -- I

6    mean, you could be staying at home.  I mean,

7    people draw per diem staying at home.

8    **Q.**     Is it to offset the cost of travel?

9    **A.**     I don't know that I would say that.

10   Like I said, I mean, how does it offset travel

11   when you're saying that and you've got people

12   that are at home every day driving CN trucks

13   back and forth home and drawing a per diem, and

14   so how does that -- how does that offset them?

15   How does it offset them?

16   **Q.**     And just for the record, I'm trying

17   to just clarify a few questions here just to

18   make it a little more clear when someone is

19   reviewing the transcript.

20   **A.**     Yes, sir.

21   **HEARING OFFICER:**  I think that's all

22   I have for questions at this time for Mr.

23   Melton.  Mr. McGuire, do you have any questions

24   for Mr. Melton at this time?

25   EXAMINATION BY MR. McGUIRE:

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000213

Page 91

1    **Q.**    Mr. Melton, this policy here starting

2  out on Exhibit 17, 18 and 19, CN Workplace

3  Violence Prevention Policy.  Are you familiar

4  with that policy?

5    **A.**    Not that I know of.  I've never, as

6  far as I know, been given that policy.

7    **Q.**    As far as you know, you've never been

8  given it, never seen it, never had classroom

9  training on it?

10    **A.**    No, sir.

11          **MR. McGUIRE:**  I have no further

12  questions, subject to recall.

13          **HEARING OFFICER:**  Okay.  Mr. Branch,

14  do you have any questions for Mr. Melton?

15          **MR. BRANCH:**  Yes, sir.  I don't have

16  a copy of Mr. Melton's statement.

17          **MR. MELTON:**  I'm a man of few words.

18  It wasn't very long.

19          **MR. BRANCH:**  I understand.

20  EXAMINATION BY MR. BRANCH:

21    **Q.**    Mr. Melton, on May 26, when you

22  stepped out of the hotel, did I not provoke you

23  to hit me?

24    **A.**    Well, as we were having a

25  conversation, we got closer to each other.

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

Page 92

1    Whether that's provoking or not, we were in each

2    other's face.

3        **Q.**    No, no, no.

4            **MR. McGUIRE:**  Just ask questions.

5    BY MR. BRANCH:

6        **Q.**    Okay.  So you're saying that I

7    provoked you to attack me?

8        **A.**    I'm saying we were in each other's

9    face.  I never said the word "provoke."  We were

10   just in each other's face.

11           **MR. BRANCH:**  No further questions.

12           **HEARING OFFICER:**  I have no further

13   questions.  No further questions from you,

14   Mr. McGuire?

15           **MR. McGUIRE:**  No further questions.

16           **HEARING OFFICER:**  I would like to

17   take a recess here just to kind of go through

18   everything and make sure we're not missing

19   something and see if there's anybody else that

20   needs to be recalled for further questioning.

21   The time is now 11:29.  I'm going to say

22   probably about 15 minutes here just to kind of

23   go through things.

24           **MR. MELTON:**  Do we get a chance to

25   make a closing statement?

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential                                    CN-Branch 000215

Page 93

1          **HEARING OFFICER:**  Yes.  You'll still

2     have an opportunity for that.

3               (A short break was taken.)

4          **HEARING OFFICER:**  The time is now

5     11:49.  We're done with our recess there.  And I

6     have recalled Mr. Chris Day back to the witness

7     stand.

8               CHRISTOPHER DAY,

9     EXAMINATION BY THE HEARING OFFICER:

10      **Q.**     Mr. Day, just a couple questions for

11    you here.  Mr. Day, what is per diem for?

12      **A.**     Per diem is for any expenses for the

13    employees to accommodate while traveling for

14    hotel, meals and such.

15      **Q.**     So does a per diem cover hotel

16    expense or is it to help offset the cost of it?

17      **A.**     Well, it's supposed to cover the

18    expense, but I can't control what hotels charge,

19    you know, for where the guys stay at.

20      **Q.**     And the altercation or the incident

21    in question on the investigation here happened

22    around between 8 and 9 o'clock p.m. I'm told.

23    Do you know approximately what time the shift

24    ended?

25      **A.**     I don't know the proximate time, but

Page 94

1   it was between 1500 and 1530.

2           **HEARING OFFICER:**  Okay.  I guess the

3   purpose of my questioning here for you guys, so

4   you'll understand as well, just asking what the

5   company's position is on -- what the company's

6   witness' position is on whether or not they were

7   at work.

8           **MR. McGUIRE:**  I understand.

9   BY THE HEARING OFFICER:

10      **Q.**     So you would -- Mr. Day, you would

11  agree that the incident happened at the hotel

12  after hours; is that correct?

13      **A.**     That's right.

14      **Q.**     And the company's position is that

15  it's work related due to the per diem that they

16  are paid or --

17      **A.**     Yes.  CN gives money to help

18  accommodate CN employees when traveling, and

19  they are representing CN at the hotels that we

20  help accommodate them to pay for.

21          **HEARING OFFICER:**  And do you guys

22  have any questions for Mr. Day at this time?

23          **MR. McGUIRE:**  Yes, I do.

24  EXAMINATION BY MR. McGUIRE:

25      **Q.**     The per diem rule that's in the

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

Page 95

1    collective bargaining agreement, does it require

2    the employee to stay in a motel?

3        **A.**     Honestly, I do not know.  I don't

4    believe I have read anything that requires an

5    employee that has to necessarily stay at a

6    hotel.

7        **Q.**     So an employee can stay at home, stay

8    in his car, and the company doesn't have a

9    problem with that as long as they're giving him

10   a per diem?

11       **A.**     To my understanding, yeah, they can

12   stay wherever they are -- they're a mobile

13   employee, so they're required to be -- report

14   for duty wherever we tell them to the following

15   day.

16       **Q.**     So with saying that, you stated

17   earlier -- I think -- I just want to clear it up

18   for the record.  The per diem is to offset the

19   cost.  Would you agree with that statement?

20       **A.**     Well, I wouldn't say offset, but with

21   the way prices are, then, yes, it would probably

22   help offset the cost.

23       **Q.**     He wanted the carrier's position on

24   the per diem.  I would like to know the

25   carrier's position on an employee getting a per

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000218

Page 96

1   diem who's staying at home who enters into a

2   verbal conflict with his child.  Would that be a

3   violation of the CN policy?

4       **A.**    I don't believe so because they're at

5   their own residence.

6           **MR. McGUIRE:**  Thank you.  No further

7   questions, subject to recall.

8           **HEARING OFFICER:**  Mr. Melton, do you

9   have any further questions for Mr. Day?

10          **MR. MELTON:**  No, sir.

11          **HEARING OFFICER:**  Mr. Branch, do you

12  have any further questions for Mr. Day?

13          **MR. BRANCH:**  No, sir.

14          **HEARING OFFICER:**  I have no further

15  -- there being no further questions for Mr. Day,

16  I'm going to again release Mr. Day subject to

17  recall.  Do not discuss this case outside of the

18  investigation.  And next I am going to recall

19  Mr. Honeysucker for a couple of questions.

20          (Mr. Day leaves room.)

21              EARL HONEYSUCKER,

22  EXAMINATION BY THE HEARING OFFICER:

23      **Q.**    Mr. Honeysucker, I just had one or

24  two followup questions here.  In your statement

25  and in your testimony, you testified that -- it

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000219

1    says, "Todd charged Robert and pushed and hit

2    him twice and then they exchanged a couple licks

3    back and forth and fell on the ground."  Then

4    you stepped in to help break it up.  Did you

5    witness Mr. Melton strike Mr. Branch?

6        **A.**    Yes.

7        **Q.**    And did you witness -- did Mr. Branch

8    strike Mr. Melton?

9        **A.**    Yes.

10           **HEARING OFFICER:**  That's all the

11   questions I have at this time.  Mr. McGuire, do

12   you have any further questions for Mr.

13   Honeysucker?

14           **MR. McGUIRE:**  Judging from his

15   statement -- let me think for a minute here.

16   EXAMINATION BY MR. McGUIRE:

17       **Q.**    Who struck the first blow?

18       **A.**    Todd hit Mr. Branch.

19           **MR. McGUIRE:**  No further questions,

20   subject to recall.

21           **HEARING OFFICER:**  Mr. Branch, do you

22   have any further questions for Mr. Honeysucker?

23           **MR. BRANCH:**  Yes.

24   EXAMINATION BY MR. BRANCH:

25       **Q.**    Mr. Honeysucker, were I in Mr. Todd's

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000220

Page 98

1    face or did Mr. Todd rush you?

2        **A.**    He approached you and rushed you.

3            **MR. BRANCH:**  Thank you.  No further

4    questions.

5            **HEARING OFFICER:**  Mr. Melton, do you

6    have any further questions?

7            **MR. MELTON:**  Yes.

8    EXAMINATION BY MR. MELTON:

9        **Q.**    The statement you just made, what's

10   the difference between approach and rush?

11       **A.**    Okay.  Well, when you come out --

12       **Q.**    How do you do an approach and a rush?

13       **A.**    Okay.  When you come out, you was

14   talking and you were slowly walking, but the

15   closer you got, he lunged at him.  That's why I

16   said he approached him and he rushed him.

17           **MR. MELTON:**  That's all I got.

18           **HEARING OFFICER:**  Okay.  Any --

19           **MR. McGUIRE:**  I got one more followup

20   question.

21           **HEARING OFFICER:**  Go ahead.

22   EXAMINATION BY MR. McGUIRE:

23       **Q.**    Are you familiar with the CN

24   Workplace Violence Prevention Policy dated 2014?

25       **A.**    I have looked over it before.  I

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000221

1  haven't read it.

2      **Q.**     Where did you look it over at?

3      **A.**     I had been to an investigation

4  before.  But I'm not sure if they had that, but

5  I have seen it before.

6      **Q.**     Do you recall where you seen it at?

7  Was you provided any training on it?

8      **A.**     No, not as I know of.  I don't think

9  anybody trained me on it.

10     **Q.**     How long have you been here?

11     **A.**     Eight years.  Over eight years.

12         **MR. McGUIRE:**  Okay.  Thank you.  No

13  further questions, subject to recall.

14         **HEARING OFFICER:**  Okay.  There being

15  no further questions for Mr. Honeysucker at this

16  time, I'll release Mr. Honeysucker subject to

17  recall.  If you could, send Ty Peterson in.

18         (Mr. Honeysucker leaves the room.)

19             TY PETERSON,

20  EXAMINATION BY THE HEARING OFFICER:

21     **Q.**     We now have Mr. Ty Peterson on the

22  witness stand again.  Mr. Peterson, in your

23  statement, you stated that after the verbal

24  altercation, Todd Melton went after Branch and

25  struck him with his fist which resulted in both

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

Page 100

1    of them fighting with each other.  I guess the

2    two questions I have is:  Did you see Mr. Melton

3    strike Mr. Branch?

4      **A.**    After words were said, he went

5    towards him.  I didn't physically see -- I mean,

6    I didn't see him hit his face.  I mean, I know

7    that's what he was going for, but I kept my

8    distance.  So, yeah.

9      **Q.**    And did you -- your statement says

10   both of them were fighting with each other.  Did

11   Mr. Branch --

12     **A.**    What I saw is they both went to the

13   ground.  I stepped back.  I kept my distance.

14   And everybody else pretty much was around them,

15   so I really didn't see anything after they went

16   to the ground.

17     **Q.**    And about how long do you think the

18   physical altercation lasted?

19     **A.**    Not long.  Ten seconds.  Fifteen

20   maybe.

21            **HEARING OFFICER:**  Okay.  That's all

22   the questions I have for Mr. Peterson.

23   Mr. McGuire, any further questions?

24            **MR. McGUIRE:**  Yes, I have a couple.

25   EXAMINATION BY MR. McGUIRE:

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000223

Page 101

1    **Q.**    Did you witness the incident from the

2    beginning to end?

3    **A.**    Yes.  I mean, it didn't last very

4    long.

5    **Q.**    Can you elaborate, explain from

6    beginning to the end?  Sometimes these

7    statements, they get a little blurry.

8    **A.**    What I saw, Todd came out of the

9    door, words were mentioned, like my statement

10   said, and he responded to them, and right after

11   that, it started.  And --

12   **Q.**    Who threw the first punch?

13   **A.**    That would have been Todd.

14   **Q.**    One more question for you.  Are you

15   familiar with this CN Workplace Violence

16   Prevention Policy?

17   **A.**    If I had, I haven't seen it in a

18   while.

19   **Q.**    So you don't recall ever being

20   trained on this or made to sign for this policy

21   or anything like that?

22   **A.**    No.

23   **Q.**    Would you consider the motel that you

24   stay at company property?

25   **A.**    Considering we don't even get enough

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential                                                        CN-Branch 000224

Page 102

1   money to pay for the hotel, I don't think so.

2       Q.      How long have you been here, sir?

3       A.      Three years.

4           MR. McGUIRE:  No further questions,

5   subject to recall.

6           HEARING OFFICER:  Mr. Melton, do you

7   have any further questions for Mr. Peterson?

8           MR. MELTON:  No, sir.

9           HEARING OFFICER:  Mr. Branch, any

10  further questions?

11          MR. BRANCH:  I have got one question.

12  EXAMINATION BY MR. BRANCH:

13      Q.      Peterson, did you see me rush Mr.

14  Melton first?

15      A.      Did I see you hit him first?

16      Q.      Did you see me rush towards him?

17      A.      No, it was the other way around.

18          MR. BRANCH:  Thank you.  No further

19  questions.

20          HEARING OFFICER:  Okay.  No further

21  questions.

22          MR. McGUIRE:  No further questions.

23          HEARING OFFICER:  There being no

24  further questions for Mr. Peterson at this time,

25  I'm going to release Mr. Peterson subject to

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000225

1    recall, so sequester, and you can't discuss this

2    case outside of the room.

3              (Mr. Peterson leaves the room.)

4              **HEARING OFFICER:**  And I'm going to

5    grab Mr. Day again.

6                    CHRISTOPHER DAY,

7    EXAMINATION BY THE HEARING OFFICER:

8      **Q.**      Mr. Day, I've just got a couple

9    questions about the Workplace Violence

10   Prevention Policy.  I don't recall what you said

11   earlier in your testimony, but are CN employees

12   trained on the CN Work Violence Prevention

13   Policy?

14     **A.**      That's correct.  There's -- in My360,

15   every employee is required to take certain, more

16   or less, online courses, and every employee --

17   as far as I know, this is one of them that we're

18   supposed to be taking, code of business conduct

19   and Workplace Violence Prevention, I believe

20   these are two of the courses in My360 that

21   employees are required to take every so often.

22     **Q.**      Do you know when the last time that

23   that was required?

24     **A.**      I do not.  Everyone, as far as I know

25   and from what I've been told, everyone is

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000226

Page 104

1    responsible for -- they all get e-mails.  I

2    don't know if it's through their personal or

3    whatever e-mails they get through the company to

4    let them know they've got so long to take these

5    courses.

6         Q.    Okay.  But this isn't something

7    that's covered in a rules class.  It's online

8    training; is that correct?

9         A.    That I'm unsure of.  I would have to

10   talk to a trainer.  This might be something,

11   more or less, that they bring up in the

12   beginning.  Maybe from time to time, depending

13   on who's teaching the class, it would all depend

14   if they implement this into the class not.  I

15   know every trainer is a little bit different.

16              HEARING OFFICER:  I think that's all

17   the questions I have.

18              MR. McGUIRE:  No questions, subject

19   to recall.

20              HEARING OFFICER:  Mr. Branch?

21              MR. BRANCH:  No questions.

22              HEARING OFFICER:  Mr. Melton?

23              MR. MELTON:  No, sir.

24              HEARING OFFICER:  Release Mr. Day

25   subject to recall and you're still sequestered.

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000227

Page 105

1          **MR. McGUIRE:**  I would like to recall

2     Mr. Melton, if that's okay, to ask just a couple

3     of preliminary questions to both of them.

4          **HEARING OFFICER:**  Okay.

5               TODD MELTON,

6     EXAMINATION BY MR. McGUIRE:

7     **Q.**     Explain to me what Workplace 360 is.

8     Do you know what that is?

9     **A.**     No idea.  I don't have a work

10    computer and they changed up the e-mails where

11    you can't hardly get on them and I can't get on

12    them on my phone.

13    **Q.**     Okay.  So you have no clue what the

14    360 is?  And you have no company computer to get

15    this training?

16    **A.**     No, sir.

17    **Q.**     Nobody has ever approached you during

18    work hours and say, hey, you need to take this

19    training?

20    **A.**     No, sir.  I've been approached one

21    time, I can't remember how many years ago it's

22    been, to take training online with an OTS or

23    something, but that's --

24    **Q.**     When you did that, did the company

25    provide you a computer?

EMM, INC. REPORTING  601.506.8261
EMMREPORTING@GMAIL.COM

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

Page 106

```
1      A.      They made -- we went to the depot,
2   the whole section gang went to the depot and
3   took the OT -- I can't remember if it's OTS.  It
4   was one of them.  That's been a year and a half.
5   It's been a while back.
6           MR. McGUIRE:  No further questions,
7   subject to recall.
8           HEARING OFFICER:  I have no further
9   questions.
10          MR. McGUIRE:  I would like to recall
11  Mr. Branch.
12          HEARING OFFICER:  I'll release Mr.
13  Melton, subject to recall, and we'll recall Mr.
14  Branch for further questioning.
15               ROBERT BRANCH,
16  EXAMINATION BY MR. McGUIRE:
17     Q.      Mr. Branch, I'm going to ask you the
18  same question.  Do you know what CN360 is or
19  what he was talking about, the supervisor?
20     A.      Well, I know what CN360 is.  It's got
21  a lot of, what you'll say, classes or whatever
22  because I had to go online back here when we was
23  down in New Orleans, they had us go through that
24  -- something dealing with -- some kind of class.
25  I can't really recall, but I think I did go on
```

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000229

Page 107

1    360, but the company had to advise me, sent out

2    an e-mail, and the supervisor told the foreman

3    to make sure we fill it out because it's

4    mandatory, but they haven't gave me a mandatory

5    Workplace Violence Policy.  Do you understand?

6    I haven't had that mandatory.

7         Q.    So CN approached you and told you

8    that you needed to go online and take some

9    classes off of this CN360?

10        A.    Right.

11        Q.    Did you perform that on company time?

12        A.    Yes, we did.

13        Q.    With a company computer?

14        A.    Yes, we did.

15             MR. McGUIRE:  All right.  Thank you.

16   No further questions, subject to recall.

17             HEARING OFFICER:  Okay.  I have no

18   further questions for Mr. Branch at this time.

19   I release Mr. Branch subject to recall.  I think

20   I'm going to need another recess here, be a

21   quick one, maybe five minutes here just to

22   gather my thoughts, make sure I'm not missing

23   something.  The time is now 12:10.  Let's take a

24   10-minute break here.

25             (A short break was taken.)

Confidential

Page 108

1          **HEARING OFFICER:**  The time is 12:15,

2     and we're back on the record after a recess.  We

3     have Mr. Day back on the witness stand.

4                    CHRISTOPHER DAY,

5     EXAMINATION BY THE HEARING OFFICER:

6          **Q.**     Mr. Day, in the Notice of

7     Investigation, it states that a copy of Mr.

8     Branch's and Mr. Melton's personal work record

9     may be reviewed at this investigation.  Do you

10    have a copy of their personal work record?

11         **A.**     I do not.  The website could not pull

12    it up.

13         **HEARING OFFICER:**  I think that's the

14    only question I had there.  There's nothing to

15    enter in.  That's all I needed from you.  Any

16    further questions from anyone else before I

17    release him?

18         **MR. McGUIRE:**  No further questions.

19         **HEARING OFFICER:**  Okay.  Mr. Day,

20    you're released, subject to recall.

21              (Mr. Day leaves room.)

22              Okay.  If there are no further

23    questions for anyone at this investigation, it

24    is my intention to start closing out the

25    investigation.

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000231

Page 109

1          Mr. Branch, is there anyone who has

2   testified at this investigation that you would

3   like recalled for further questions?

4          **MR. BRANCH:**  No, sir.

5          **HEARING OFFICER:**  And Mr. Melton?

6          **MR. MELTON:**  No, sir.

7          **HEARING OFFICER:**  Okay.  Mr. McGuire,

8   is there anyone who has testified at this

9   investigation that you would like recalled for

10  further questions?

11         **MR. McGUIRE:**  No, sir.

12         **HEARING OFFICER:**  And, again, do you

13  guys need a recess at all before we proceed to

14  close out?

15         **MR. McGUIRE:**  No, sir, we're ready

16  with our closing statements.

17         **HEARING OFFICER:**  Okay.  So for

18  closing questions, I'll go with you first, Mr.

19  Branch.  Mr. Branch, is there anything that you

20  wish to state in regard to the incident that has

21  not already been brought out?

22         **MR. BRANCH:**  Only thing I would like

23  to say is that before this -- before the

24  incident happened, I didn't have anything

25  against Mr. Melton.  I feel like that we're two

Confidential                                          CN-Branch 000232

Page 110

1   grown adults.  I mean, we should conduct ourself

2   in a professional manner not only for me and

3   him, but for our peers, our supervisors, upper

4   management.

5            I am a deacon in the church.  I try

6   to carry myself in a respectful way at all

7   times.  I try to not involve myself in

8   situations like this because I've never been to

9   -- this is my first being to an investigation.

10  I see how it go.  I see how things can be

11  against you even when you in the right.

12           But I got a lot of respect for Mr.

13  Melton and I always have, and I'm not here to

14  try to deter his demeanor.  I just want to see

15  we as people live in this world, love one

16  another, respect one another, and treat one

17  another right.  That's it.

18           **HEARING OFFICER:**  Do you admit any

19  responsibility in regard to the incident?

20           **MR. BRANCH:**  If telling Mr. Melton

21  "leave the situation alone," if that cause

22  harmful -- you know, if I knew he was going to

23  escalate for me and him to get into any kind of

24  confrontation, I would have never even opened my

25  mouth because I'm the type of person to try to

1    deescalate a situation, not enhance it.

2         **HEARING OFFICER:**  And are you

3    satisfied with the manner in which this

4    investigation has been conducted?

5         **MR. BRANCH:**  Yes, sir.

6         **HEARING OFFICER:**  Next, Mr. Melton,

7    is there anything that you wish to state in

8    regard to the incident that has not already been

9    brought out?

10        **MR. MELTON:**  Everything has been

11   brought out.  No, sir.

12        **HEARING OFFICER:**  Do you admit any

13   responsibility in regard to the incident?

14        **MR. MELTON:**  Yes, sir.

15        **HEARING OFFICER:**  Do you wish to

16   expand on that?

17        **MR. MELTON:**  Things just -- I mean,

18   certain things get out of hand sometimes.

19   People do things in anger when they're upset,

20   whatever may caused it or not.  I'm sorry for

21   what happened and the way things did turn out.

22   I have no trouble -- me and Mr. Branch have no

23   hard feelings toward each other, and, you know,

24   I don't want to see him lose his job and I

25   surely don't want to lose mine.  I need my job.

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000234

Page 112

1    I have things that happened.  I can honestly say

2    that I hate it happened, and I can honestly say

3    that if they do give me an opportunity to come

4    back, it will never, ever happen again.

5              **HEARING OFFICER:**  Okay.  Are you

6    satisfied with the manner in which this

7    investigation has been conducted?

8              **MR. MELTON:**  Yes, sir.

9              **HEARING OFFICER:**  Okay.  Mr. McGuire,

10   do you have --

11             **MR. McGUIRE:**  I'm considering these

12   are closing statements, correct?

13             **HEARING OFFICER:**  Yes.

14             **MR. McGUIRE:**  Yeah, the organization

15   will stand by the record.  I think we've got

16   enough in the record to show that to the

17   carrier's own policies, statements, information,

18   that this is not considered a workplace.  They

19   were at a motel.  That's covered.  Your per diem

20   is to be used to help offset the cost of gas,

21   fuel, meals, and lodging.  It's not you have to

22   stay there.  You have to eat.  It's to just help

23   you compensate.  It's something that's

24   collectively bargained for to help offset the

25   cost.

EMM, INC. REPORTING  601.506.8261
EMMREPORTING@GMAIL.COM

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential                                                        CN-Branch 000235

Page 113

1          We feel that once they're off their

2     shift, they're grown men, they go wherever they

3     went to, and the carrier has no jurisdiction to

4     reach out into someone's off time, whether it be

5     at a hotel, a house or ditch or car and control

6     what these gentlemen do.

7          You've got two very good long-term

8     employees here who I can imagine are some of the

9     greatest workers you've got.  I mean, they've

10    got nothing on their work record that would

11    dispute otherwise.  Everyone we've talked to

12    respects both these employees.

13         I think the record shows that an

14    altercation happened.  It happened off property,

15    off company time.  In the heat of the moment,

16    things happen, and I don't think anyone should

17    lose their job over this incident.

18         They both apologized to each other.

19    I sincerely feel that it's sincere.  If that's

20    -- whatever.  The point is to lose your job over

21    a heated moment or to be disciplined so harshly

22    that you can't survive, I don't think that is

23    the cure here.

24         I think we've proven through

25    testimony that the carrier may hold a little bit

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential                                     CN-Branch 000236

Page 114

1    of liability here with their training policies.

2    Our men are not trained on this stuff.  I think

3    if we had more awareness of how important

4    violence in the workplace can be -- I mean, look

5    around you in the news and how it escalates and

6    it tends -- you know, the damage it does to

7    people.

8              This was, in my opinion, a squabble

9    between two grown men.  It should have never

10   escalated to this point.  They handled it like

11   men by apologizing to each other.  They didn't

12   violate any of these rules.  They reported it

13   like they were supposed to and they reported it

14   in a timely fashion, even though he says it's

15   not -- the supervisor says it's not a timely

16   fashion.  They reported it the next day.  I

17   think there's evidence to that in statements,

18   and if you would examine the other supervisor

19   who took it, he'll probably corroborate your

20   story.

21             The point is, they didn't violate any

22   rules.  They got into a little squabble off

23   property, off time, and I don't think they

24   should be terminated for something like this for

25   whoever is reviewing the record.

Confidential                                                      CN-Branch 000237

Page 115

1          I would like to outline, again, the

2    objections that the organization had with the

3    time limits.  We feel that that collective

4    bargaining agreement is the Bible, and if the

5    carrier cannot hold the investigation within a

6    timely fashion, then that's a direct violation

7    of contract which should moot this whole

8    investigation completely.  Whoever is reviewing

9    that, I hope they understand that, and if not,

10   we'll have an arbitrator decide on that.  But in

11   the interim, I can't express enough, the two

12   gentlemen come here -- this is very hard to do,

13   to sit here in this room and talk like this and

14   tell what happened, and these gentlemen were

15   very diligent, they were very polite, they told

16   the truth.  They weren't trying to hide nothing,

17   and I hope they take that into consideration.

18   Thank you.

19          **MR. MELTON:**  Can I make one more

20   statement?  I mean, in the closing --

21          **HEARING OFFICER:**  This is Mr. Melton

22   for the record.

23          **MR. MELTON:**  In the closing I just

24   want to point out I've been on the railroad

25   going on 22 years, and I have never had any

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000238

Page 116

1   altercation with anyone I've worked with or

2   worked for.  And I want my work record to stand,

3   you know.

4            I don't want to lose my job.  You

5   know, I hope they will see the sincerity in

6   realizing that what we did, even though we were

7   off company time and property, it was still two

8   men who had a little altercation that should

9   have never progressed into that, and for that, I

10  am sincerely sorry.  Thank you.

11           **HEARING OFFICER:**  Mr. Branch,

12  anything more before we close out?

13           **MR. BRANCH:**  I'm finished.

14           **HEARING OFFICER:**  Okay.  There being

15  no further questions or testimony to be entered

16  into the record, this investigation is closed at

17  12:25 on June 7, 2022.

18

19

20

21

22

23

24

25

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential

CN-Branch 000239

Page 117

1          CERTIFICATE OF COURT REPORTER

2          I, THERESA S. LUMLEY, C.S.R., Court

3    Reporter and Notary Public, in and for the County

4    of Copiah, State of Mississippi, hereby certify

5    that the foregoing pages contain a true and

6    correct transcript of the testimony of the

7    witnesses, as taken by me at the time and place

8    heretofore stated, and later reduced to

9    typewritten form by computer-aided transcription

10   under the supervision, to the best of my skill

11   and ability.

12          I further certify that I am not in the

13   employ, or related to, any counsel or party in

14   this matter, and have no interest, monetary or

15   otherwise, in the final outcome of the

16   proceedings.

17          Witness my signature and seal, this the

18   _____ day of _____, 2022.

19

20          _____

21                  Theresa S. Lumley, CSR #1231

22

23

24

25

Exhibit G: Transcript of IC's June 7, 2022, investigation hearing into the fight between Branch and his coworker

Confidential                                                   CN-Branch 000240

# Exhibit G1

**Notice of Investigation to Branch and Tracy Todd Melton**



File #: AARY-20220602-169892

**FedEx Priority Overnight: 7770 2337 9172**

June 2, 2022

**U.S. Operations**
Wade Clark
IC-Manager Sr Production
1 N Buchanan Street
Gary, IN 46402-1060

## Notice of Investigation - Incident

Robert Branch
Trackman



Tracy Melton
Machine Operator Grp B Fuel

You are hereby notified to attend a formal investigation to be held as directed below:

**Date:** Tuesday, June 07, 2022
**Time:** 0900 Hours CST
**Location:** CN Railway
Conference Room - 2nd Floor
2151 North Mill Street
Jackson, MS 39202

The investigation is being held to develop the facts and to determine your responsibility, if any, in connection with an incident that occurred at approximately 2100 hours, May 26, 2022 at or near the Magnolia Inn located at 816 US 98 in Columbus, MS 39429, in which the two of you were allegedly involved in a verbal and physical altercation in the presence of other employees, and whether you violated any Company rules, regulations and/or policies in connection with the incident.

You may, without expense to the Company, arrange for representation as provided under the applicable provisions of your Collective Bargaining Agreement, and to call witnesses to testify on your behalf.

A copy of your Personal Work Record may be reviewed at this investigation.

*Wade Clark*

Wade Clark
IC-Manager Sr Production

Witness (es): Christopher Day - IC-Supervisor Production
Darrell Hudson - Trackman
Randall Duren - Operator Machine Speed Swing Grp C
Earl Honeysucker - Foreman Assistant
Ty Peterson - Foreman Track
Al Thomas - Operator Machine Grp C Speed Swing
Dylan Boutte - Trackman
William Yuille - Trackman

cc:  Patrick Crain - IC-Manager Labour Relations
BMWED



Exhibit G-1: Notice of Investigation to Branch and Tracy Todd Melton

# Exhibit G2

**Notice of Investigation to Branch and Melton**



**U.S. Operations**
Wade Clark
IC-Manager Sr Production
1 N Buchanan Street
Gary, IN 46402-1060

File #: AARY-20220602-169892

**FedEx Priority Overnight: 7770 2340 0057**

June 2, 2022

## Notice of Investigation - Incident

Robert Branch
Trackman

▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬

Tracy Melton
Machine Operator Grp B Fuel

▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬

You are hereby notified to attend a formal investigation to be held as directed below:

**Date:** Tuesday, June 07, 2022
**Time:** 0900 Hours CST
**Location:** CN Railway
Conference Room - 2nd Floor
2151 North Mill Street
Jackson, MS 39202

The investigation is being held to develop the facts and to determine your responsibility, if any, in connection with an incident that occurred at approximately 2100 hours, May 26, 2022 at or near the Magnolia Inn located at 816 US 98 in Columbus, MS 39429, in which the two of you were allegedly involved in a verbal and physical altercation in the presence of other employees, and whether you violated any Company rules, regulations and/or policies in connection with the incident.

You may, without expense to the Company, arrange for representation as provided under the applicable provisions of your Collective Bargaining Agreement, and to call witnesses to testify on your behalf.

A copy of your Personal Work Record may be reviewed at this investigation.

*Wade Clark*

Wade Clark
IC-Manager Sr Production

Witness (es): Christopher Day - IC-Supervisor Production
Darrell Hudson - Trackman
Randall Duren - Operator Machine Speed Swing Grp C
Earl Honeysucker - Foreman Assistant
Ty Peterson - Foreman Track
Al Thomas - Operator Machine Grp C Speed Swing
Dylan Boutte - Trackman
William Yuille - Trackman

cc:  Patrick Crain - IC-Manager Labour Relations
BMWED



EXHIBIT
2

Exhibit G-2: Notice of Investigation to Branch and Melton

# Exhibit G3

**Letter regarding the Collective Bargaining Agreement applicable to Branch**



EXHIBIT

3

June 25, 2009

Mr. Tom Legner, General Chairman
BMWED
2212 Argaugh Avenue
Crest Hill, IL 60403

Mr. Hayward J. Granier, General Chairman
BMWED
1101 Paris Road
Mayfield, KY 42066

Mr. Joe Letizia, General Chairman
BMWED
912 Redwood Road
Green Bay, WI 54304

Gentlemen:

This will confirm our further understanding, in regards to the Implementing Agreement signed on January 30, 2009, that allows for the consolidation of the BMWE agreements concerning the Illinois Central, the Wisconsin Central and the EJ&E West Company.

We agreed to the following:

A.  Mobile positions will be awarded based on prior rights designations as outlined in Paragraph #3.  Prior rights will be determined by which former territory the gang is originally bulletined.  For example, if a gang will begin work on the EJ&E territory, all positions will be listed with a "G" or "J" prior rights designation.  Any time such gang would cross over former seniority territory lines, those individuals with prior rights designations on the new working territory will, within fifteen (15) days, be allowed to bump.  Any employee so bumped will be allowed to exercise seniority in accordance with the collective bargaining agreement.  Any employees not bumped, must remain with the gang, regardless of its moves, unless they are able to successfully bid to another position under normal bid procedures of the IC agreement. **Changed within the Implementing Agreement of July 02, 2009**

B.  Rule 33(g) is amended as follows:

Employees may be held out of service pending hearing and decision, and if discipline be assessed, the period so held from service shall be deemed to be included in any disciplinary period thereafter involved.  Such hearing must be held within five (5) calendar days from the date removed from service, unless postponed as outlined in 33(b). **Changed within the Working Agreement.**

C.  Rule 14(a) is amended as follows:

All new positions or vacancies expected to last more than 30 days, except for Group D machine operators, will be posted for a period of 15 days at the headquarters of the gangs in the

156

Exhibit G-3: Letter regarding the Collective Bargaining Agreement applicable to Branch

Confidential

CN-Branch 000293

subdepartment of the employees entitled to consideration in filling the positions, during which time employees may file their applications with the official, whose name appears on the bulletin. Such bulletin will show headquarters' point, title of position, temporary or permanent, rate of pay, hours of service, gang, machine or position number, and rest days of position bulletined. Appointments will be made not less than 15 days or more than 30 days from date of bulletin. Name of successful applicant will be posted. Copy of bulletin and award will be furnished local chairman and general chairman. Successful applicants must remain on the position assigned for a minimum of 180 days for Bridge Department positions, 60 days for Machine Operator positions or 45 days for all other positions, unless the position is abolished, the employee is displaced, or the employee has an opportunity to bid on a bulletined position which is ranked higher or has a higher rate of pay. When differentials are applicative to particular positions, such differential will be included when calculating higher rate of pay. **Changed within the Working Agreement.**

**D.**    The thirty (30) day time periods referenced in Paragraphs 2(A) and 18 are waived. **Changed within the Implementing Agreement of July 02, 2009**

**E.**    Side Letter #10 is eliminated in its entirety. We agreed that Article I, (d) of the New York Dock conditions applicable to this transaction will be a maximum of six (6) years for employees subject to this agreement, subject to the employee's length of service with the Carrier on which employed on the day preceding the effective date of the Implementing Agreement. **Changed within the Implementing Agreement of July 02, 2009**

Sincerely,

We concur:

(Original Signatures Not Reproduced)
Roger K. MacDougall-Sr., Director. Labor Relations

(Original Signatures Not Reproduced)
Hayward J. Granier-General Chairman, IC

(Original Signatures Not Reproduced)
Joe Letizia-General Chairman, WC

(Original Signatures Not Reproduced)
Tom Legner-General Chairman-EJ&EW

157

Exhibit G-3: Letter regarding the Collective Bargaining Agreement applicable to Branch

Confidential

CN-Branch 000294

# Exhibit G4

**Branch's handwritten
statement**

EXHIBIT
4

To: Mangement at CN Railroad
From: Robert Branch
Date: May 30, 2022

On Thursday, May 26, 2022 around 9:00 PM at Magnolia Inn, 816 U598, Columbus, MS 39429. My co-workers and I was grilling after work peacefully and relaxing time when Stacey (Todd) Melton approached us with no shirt and no shoes and started acting and speaking belligerent. He was speaking about a situation at a union meeting I attended. He and another employee had a disturbing violent confornlation while Todd was saying racial slurs calling the CN employee BOY. He proceeded the approach the group. I said you need to let that go. Todd said he was from Egypt Plantation. Todd pushed me in the chest and I felled to the ground. I got back up and he hit me twice in the mouth and nose. I was in shock, my head bounced off the pavement in shock and disbelief. I was being attacks so I attempted to protect myself by fighting back. I have several withess that was in total disbelief of what had just transpired. I am a mild mannered man. I come to work and conduct myself in a safe and professional manner. I am extremely grateful I survived this attack however my mind will not stop wondering what did I do.

Confidential

CN-Branch 000295



I am emotionally depressed and fearful for what Todd Melton has planned for me. I fear for my life around him. All I said was this is not the place and next thing I know I am being attacked. I have not gotten a full night rest. I keep tossing and turning thinking this man could have killed me. I spoke to Supervisor Gardner about the attack on Friday morning and he asked me what do you want to do. This was embarassing and unacceptable. A Person with that attitude can hurt or kill somebody. CN have a Conduct Policy with zero tolerance for that kind of behavior. I talked to my wife about it, she is worried and scared. I fear for my life around Todd.

Witness:
Randall S. Duren
Daniel Hudson
Ty Peterson
Carl Honeysucker
Al Thomas
Dylan Boutte
Walker Young
Rashard Brown

**EXHIBIT**

5

Exhibit G-4: Branch's handwritten statement

Confidential

# Exhibit G5

**Dylan Boutte's handwritten statement**

On May 26th 2022 a couple coworkers & I were grilling outside the hotel when I witnessed Todd Melton come outside. Todd immediately began talking about a situation that seemed to have happened a month prior to May 26th 2022. Robert Branch (one of my coworkers present at the grill) Aas asked Todd Melton to leave the situation alone & reminded him that whoever the conversation was about wasn't there, & to leave it in the past. Todd Melton became aggressive as I witnessed him shove Robert Branch which then led to the two men wrestling on the ground. The two men were quickly broken apart & calmed down by the co-workers present.

Dylan Boutte
05-31-2022

EXHIBIT

6

Exhibit C-5: Dylan Boutte Statement

# Exhibit G6

**Melton's handwritten statement**

5-24-22

Robert Branch I had A disagreement About Union meeting in the parking lot of the Magional. Tuned into A slight Alter cation. Then cooled off And returned to our room. This happen off the Clock And off Company Property.

5-31-22

*[signature]*

EXHIBIT

Exhibit G-6: Melton's handwritten statement

CN-Branch 000298

# Exhibit G7

**Darrell Hudson's
handwritten statement**

5-31-22

We were outside listening to music when Todd walked out the hotel shouting. He was ~~saying~~ talking about stuff that happened a union meeting between him and another CN employee. Robert Branch told Todd to leave it alone, Todd then rushed Branch pushing and hitting him in the face.

Darrell Hudson
182576

**EXHIBIT**

8

Exhibit G-7: Darrell Hudson's handwritten statement

# Exhibit G8

**Randall Duren's
handwritten statement**

5/31/22                          Randall S. Duren

On Thursday the 26th we was bbq on the back of my Truck. Later that evening Tye Peterson and two other employess came Out to Join us. Tod Came out the side door talking reckless about he was From Egypt Plantation and went on to bring up the ~~Swee~~ Swinney and thats when Robert Earl told him to chill out and that we wasn't on that and that we had nothing to do with it. Todd Got into Robert Earl's Personal Space still talking about the Swinney thing then he Pushed Robert Earl then Punched him twice.



EXHIBIT

9

Exhibit G-8: Randall Duren's handwritten statement

# Exhibit G9

**Earl Honeysucker's handwritten statement**

Earl Honeysucker #169428
On may 26.2022 we were outside
the hotel just having a goodtime
when Todd melton come out of the hotel
and started yelling im from lil Egypt
where we bury mf! and ima bury Sweeny.
Robert Bronch told him. to leave that
alone. And Todd asked him so you backing
Sweeny and Robert Bronch said no just
leave that alone. And Todd Charged Robert
and pushed and hitt him twice and
Then they exchanged a couple licks back and
forth and fell on the ground then I
Earl Honeysucker stepped in to help break it
up!

EXHIBIT
10

Exhibit G-9: Earl Honeysucker's handwritten statement

CN-Branch 000970

# Exhibit G10

**Ty Peterson's handwritten statement**

On Thursday the 26th of May me and a group of guys was outside of the hotel talking about work when Todd Melton walked out the door intoxicated and confronted Robert Branch about a sore subject that happened in the past and Robert Branch responded "Leave that subject alone" and after that Todd Melton went after Branch and struck him with his fist which resulted in both of them fighting with each other. After a breif amount of time it was broken up and seperated.

Ty Peterson
5/31/22

**EXHIBIT**

11

Confidential

CN-Branch 000971

Exhibit G-10: Ty Peterson's handwritten statement

# Exhibit G11

**Walker Yuille's handwritten statement**

Thursday on the 26th of May me and some of my coworkers were at cookers at the hotel in Columbia, MS. One of our sups came out and engaged into an argument with Robert Branch. Todd Melton approached Robert about something that had happened in the past then Robert told him to leave that alone. Thats when Todd pushed him and hit him in the face. They imediatly went to the ground and were broke apart.

Walker Yuille
5-31-22

Confidential

**EXHIBIT**

12

Exhibit G-11: Walker Yuille's handwritten statement

# Exhibit G12

**Al B. Thomas's handwritten statement**

ON Thursday May 26 Todd Melton came around the corner and was talking And made a statement about Roosevelt Swinney And what happen at the union meeting and Robert Branch said Todd leave that Union Mess alone so Todd walk up to Robert Earl Branch shoulved him He shoulved him Back and Todd drawey back and Hit Robert and Robert fell And Todd hit him again and somehow they both end up on the ground and we Broke them up And Earl Honeysucker pulled Todd away and Todd went one way and Robert Earl went another

Al B. Thomas
Al B. Thomas
148814
5-31-22

**EXHIBIT**

13

Exhibit G-12: Al B. Thomas's handwritten statement

CN-Branch 000973

# Exhibit G13

**IC's USOR Rule H**

CN

USOR - January 1st 2022

• mode of transportation must be indicated (e.g., train, cab, bus, motor vehicle, or personal auto).

## F. ALERT TO TRAIN MOVEMENT

Employees must at any time, on any track and in any direction, expect the movement and remain clear of trains, engines, cars or other moveable equipment. Be aware of structures or obstructions creating close clearances. Close clearance locations are:



• Identified by Close Clearance Signs

• Specified in Timetable Special Conditions, or

• Other locations when visually identified

When a close clearance exists on the same side of equipment where the employee is riding, as identified above, employees are prohibiting from riding equipment in these locations and must stop and dismount the equipment prior to passing. From the ground, employees must also remain clear of these locations. Riding equipment on the other side, if no close clearance exists, is permitted.

## G. DRUGS AND ALCOHOL

The use or possession of alcoholic beverages while on duty, on company property, or while occupying facilities paid for or furnished by the company is prohibited. Employees must not have any measurable alcohol in their breath or in their bodily fluids when reporting for duty, while on duty, or while on company property.



While on duty or on company property, the use or possession of intoxicants, over-the-counter or prescription drugs, narcotics, controlled substances, or medication that may adversely affect safe performance is prohibited. Employees must not possess, sell, use, or have in their bodily fluids any illegal drug or controlled substance while on or off duty.

Employees covered by the Federal Hours of Service Act must consent to breath, urine, and blood testing and the release of information required in connection with these tests, under circumstances specified in federal regulations (49 CFR Part 219). When there is evidence of violation of this rule, the employee will be immediately removed from service.



## H. FURNISHING INFORMATION AND CONDUCT

Dishonesty, disloyalty, insubordination, willful neglect, gross carelessness, desertion from duty, making false reports or statements, concealing facts concerning matters under investigation, immoral conduct, including but not limited to conduct of any employee leading to the conviction of any felony, and serious violations of the law are prohibited. Employees must not be quarrelsome, vicious or enter into disputes, arguments, or fights with any person, regardless of provocation. Any incidents are to be reported to the proper authority.



As a CN employee, you are expected to be familiar with, read and be governed by the Company's Code of Business Conduct and policies, and understand how they apply to you and your job. Company policies are accessible on CN's electronic portal (ePortal) in the Employee Self-Service section under Policies and Guidelines.



Any employee convicted of a felony or other serious violation of the law must notify their supervisor no later than the end of the first day immediately following the day the employee received notice of the conviction.

Employees must not withhold information, or fail to provide all the facts to those authorized to receive information regarding accidents, injuries, rule violations, breaches of company security, or unusual events. This duty to furnish information includes but is not limited to accident and injury reports, recorded statements, full cooperation in injury investigations, and safety rules violations. Employees must also take all reasonable measures to protect and preserve evidence where it is within their control and ability to do so.





EXHIBIT

14

Exhibit G-13: IC's USOR Rule H

# Exhibit G14

**Excerpts from IC's Code of Business Conduct**

## SAFE, SECURE AND VIOLENCE-FREE

At CN, nothing is more important than safety. It is everyone's responsibility. In the performance of your job you must safeguard yourself, your colleagues, our customers and the communities where we operate.

- **Do your job** according to Company policies, rules and procedures as well as the law. If in doubt, consult your supervisor.
- **Take the necessary steps** to deal with any situation that could endanger you, your fellow employees, customers, the general public or CN's assets.
- **Be aware of your surroundings**, as you know best who belongs in your office, on your train, on any given right-of-way or in a restricted area.
- **Report** trespassers or suspicious persons or activities immediately to your supervisor or the CN Police.

CN will not tolerate any action, conduct, threat or gesture towards a CN employee in the workplace that can reasonably be expected to cause harm, injury or illness to the CN employee. For more information, refer to CN's Workplace Violence Prevention Policy.

> Firearms (loaded or empty) are not permitted on CN property, except for CN Police officers and other designated persons performing authorized work and when authorized to do so by law. In all cases, any firearms must be accompanied with a written authorization from the Chief of CN Police and the person should have in his/her possession all pertinent government permits at all times.

RESPECT IN THE WORK ENVIRONMENT
CODE OF BUSINESS CONDUCT

14



EXHIBIT
15

Exhibit G-14: Excerpts from IC's Code of Business Conduct

CN-Branch 000384

## DOING THE RIGHT THING

Safety and a willingness to obey policies, rules and procedures are most important when at work or otherwise performing your duties. If in doubt, the safe course must be taken.

Safe behaviour takes many forms, such as:

- Being aware of, and complying with, all Company health and safety policies, rules and procedures at all times;
- Reporting suspected hazards as quickly as possible;
- Making sure you have the proper personal protective equipment, tools, and training for the job at hand;
- Keeping fire and emergency exits clear and walking surfaces in good condition;
- Driving safely, wearing seat belts and following traffic laws when operating a Company vehicle or other vehicle as part of your job;
- Expecting the movement of trains, cars, or track equipment, on any track, at any time, in either direction.



Thomas and Yves are under pressure to complete an urgent job and John, their supervisor, asks them to disregard a safety rule in order to meet their deadline. What should they do?

At CN, everyone is responsible for safety – their own and their co-workers'. Their supervisor is wrong to ignore the safety rule. The employees should continue to observe all safety rules and remind the supervisor of the safety rules. If necessary, the employees should report the supervisor's actions to management or their Human Resources representative, as soon as practicable. Taking action could prevent someone from being injured.



EXHIBIT
16

Exhibit G-14: Excerpts from IC's Code of Business Conduct

CN-Branch 000385

# Exhibit G15

**Exhibit G-15: IC's Workplace
Violence Prevention Policy**

# CN Workplace Violence Prevention policy

## Target Audience:

All Employees - Canada and U.S.

## Applicable in:



## Objective

CN is committed to providing a safe, healthy and violence-free workplace for all employees. The objective of this policy is to reiterate the prohibition of workplace violence at CN and set out how threats, acts or risks of workplace violence are to be reported and addressed.

## Scope

This Policy applies to all CN employees.

## Complete Policy

### 1. Policy Statement and objective

CN will not tolerate workplace violence and is committed to making reasonable efforts to:

- Provide its employees with a safe, healthy and violence-free workplace;
- Dedicate sufficient attention, resources and time to address factors that contribute to workplace violence and to prevent and protect against it;
- Communicate to its employees information in its possession about factors that contribute to workplace violence; and
- Provide assistance to employees who have been subject to workplace violence*.

All employees are encouraged to identify and promptly report threats, acts or risks of workplace violence.

CN will promptly investigate and address allegations of workplace violence and will impose appropriate corrective measures, up to and including dismissal, against any employee who has engaged in workplace violence.

*Note: While CN acknowledges that violence can occur in its workplace, as it can in any workplace, CN cannot foresee specific acts of workplace violence. In promulgating this policy, CN does not intend to enlarge the scope of duties imposed by law. This Policy is not intended to create any individual right or cause of action not already existing and recognized under applicable federal, provincial or state law.*

EXHIBIT

17

Exhibit G-15: IC's Workplace Violence Prevention Policy

## 2. Definitions

For purposes of this policy, a "workplace" is any location where CN employees are currently performing work-related activities while in the scope of their employment. Examples include CN-owned or controlled buildings, parking lots, rail yards, railroad tracks, trains, machinery, company vehicles, and any other location where CN business or sponsored activity is being conducted.

For purposes of this policy, "workplace violence" is defined as any action, conduct, threat or gesture of a person towards a CN employee in a workplace that can reasonably be expected to cause harm, injury or illness to the CN employee, excluding situations of justified self-defence.

Examples of workplace violence include:

- Intentionally threatening or causing physical harm;
- Communications threatening violent acts, made verbally or in writing (e.g., through bulletin boards, e-mail, blogs, etc.);
- Intentionally causing property damage for the purpose of intimidation;
- Possession, display or use of a weapon;
- Possession, display or use of an object in a threatening or harmful manner;
- Bullying involving violent behaviour and other abusive and aggressive behavior.

## 3. Reporting threats, acts or risks of workplace violence

If you are subjected to or witness threats, acts or risks of workplace violence, immediately report the matter to your direct supervisor, a Human Resources representative or the CN Ombudsman. If the conduct involves your direct supervisor, immediately report the situation to your supervisor's manager, a Human Resources representative or to the CN Ombudsman. If you are unsure who your Human Resources representative is, call the HR call center at the number below.

Reports can be made anonymously. Reports or incidents warranting confidentiality will be handled appropriately and information will be disclosed to others only on a need-to-know basis, or as required by law.

If you believe that you or another person is at immediate risk of physical harm:

- Remain calm;
- Move to safety;
- If warranted by the circumstances, immediately call 911;
- Although you should first seek any immediate assistance from your local police service, you may also reach the CN Police for assistance at 1-800-465-9239;
- As soon as possible after the incident, report the situation to your direct supervisor.

## 4. Investigation

EXHIBIT
18

Exhibit G-15: IC's Workplace Violence Prevention Policy

Allegations of workplace violence reported to CN will be investigated. All information relating to the investigation will be kept confidential to the extent possible.

However, information may be disclosed in certain circumstances, including the following: where consent is given by a person to disclose his or her involvement in the investigation, when required as part of the investigation or discipline process or in the implementation of corrective measures, or as required by law.

If CN determines that an employee has engaged in workplace violence, CN will take appropriate remedial action, which may include disciplinary action, up to and including termination. If appropriate, proper law enforcement officials will be notified and the action will be fully prosecuted as a criminal matter.

Where the risk of workplace violence is brought to CN's attention, CN will provide information, instruction or training, where appropriate, in order to prevent or minimize the risk of workplace violence.

## 5. Contact information

| CN Police (Canada & U.S.): | 1-800-465-9239 |
|---|---|
| CN Human Resources center (Canada & U.S.): | 1-877-399-5421 |
| CN Ombudsman (Canada & U.S.): | 1-866-226-8968 |

CN offers its employees an **Employee & Family Assistance Program (EFAP),** which can be reached at the following numbers. However, please note that complaints under this policy must be directed to CN management, as described in the policy.

| | |
|---|---|
| **CANADA** | • Employee and Family Assistance Program: 1-800-268-5211<br>• Hearing Impaired (TDD - English): 1-800-363-6270<br>• Hearing Impaired (TDD - French): 1-800-263-8035 |
| **U.S.** | • Employee and Family Assistance Program: 1-800-554-6931 |

**Effective date:** February 2014

**Last revision date:** February 2014



EXHIBIT

19

Exhibit G-15: IC's Workplace Violence Prevention Policy

# Exhibit G16

**Medical note dated June 2, 2022**



*TB Discharge Packet (Group) - EDR - Print - Page 1 of 2*

**Greenwood Leflore Hospital**

1401 River Road
Greenwood MS 38930
Phone: 662-459-7000

| Soarian© Tracking Board Discharge Report - Discharge Instructions | | |
|---|---|---|
| **Name:** ROBERT BRANCH | | **MRN:** ▇▇ |
| **DOB:** ▇▇ | | **Patient ID:** ▇▇ |
| **Age/Sex:** ▇▇ | | **MPI:** |
| **Arrival Date/Time:** 06/02/2022 14:01 | | |
| **Provider:** Stephanie M Hodnett, FNP | | |
| **Primary Care Physician:** | | |
| **PCP Phone Number:** | | |

---

### Visit Information

You were seen in the Greenwood Leflore Hospital Emergency Department.

| Arrival Date/Time: | 06/02/2022 at 2:01 pm |
|---|---|
| Your chief complaint was: | HEADACHES FROM BEING ATTACKED ON 5/26/22 |
| Your diagnosis is: | Victim of Physical Assault, Abrasion of Face |

### Discharge Instructions

**Patient Education**
You were seen in the emergency department following an assault that occurred approximately one week ago.
You are to keep the abrasions/laceration clean, you may rinse with warm water and soap.
Schedule a follow up appointment with the primary care provider of your choice if elevated blood pressures persist.
Keep a log of your daily blood pressures to take to a primary care provider of your choice.
Return to the emergency department for any concerning changes or worsening in condition.

**Discharge Plan**
What You Need to Do
  Activity As Tolerated,
  Diet No Restriction,
  Seek medical attention immediately if you experience worsening symptoms or have any concerns Yes.

Electronically signed by Stephanie M Hodnett, FNP on 06/02/2022 15:30

| Name: ROBERT BRANCH | MRN: ▇▇ | | Patient ID: ▇▇ |
|---|---|---|---|

Discharge Instructions  Page 1 of 1

Copyright © Cerner Health Services, Inc. All rights reserved.
Crystal Reports © 2022 Business Objects SA. All rights reserved.

Printed By: Hodnett, Stephanie FNP
Printed On: 02-Jun-22 15:30

Exhibit G-16: Medical note dated June 2, 2022

# Exhibit H

**Branch's termination letter**



File #: AARY-20220602-169892

**U.S. Operations**
Wade Clark
IC-Manager Sr. Production
1 N Buchanan Street
Gary, IN 46402-1060

June 23rd, 2022

**UPS**
Mr. Robert Branch
Trackman, █████████
█████████
█████████

I have reviewed the transcript of the formal investigation, which was held on Tuesday, June 7, 2022, to develop the facts and to determine your responsibility, if any, and whether or not you violated any CN rules, regulations and/or policies in connection with an incident that occurred at approximately 2100 hours, Thursday, May 26, 2022 at or near the Magnolia Inn located at 816 US 98 in Columbus, MS 39429, in which the two of you were allegedly involved in a verbal and physical altercation in the presence of other employees.

The record contains credible testimony and substantial evidence proving that you violated:

**Violation Level & Rules Associated:**
**Violation Type: Level 4**
**CN Code of Business Conduct**
**CN Workplace Violence Prevention Policy**

In consideration of the incident, the proven rule violations, and your past discipline record, you are hereby assessed the following discipline(s):

**Dismissal**
**Record Date: Friday, June 24, 2022**

Wade Clark
IC-Manager Sr. Production

Exhibit H: Branch's termination letter

# Exhibit I

**Exhibit I: Melton's termination letter**

Exhibit I - Melton's termination letter



File #: AARY-20220602-169892

**U.S. Operations**
Wade Clark
IC-Manager Sr. Production
1 N Buchanan Street
Gary, IN 46402-1060

June 23rd, 2022

**UPS**
Mr. Tracy Melton
Machine Operator Fuel Truck



I have reviewed the transcript of the formal investigation, which was held on Tuesday, June 7, 2022, to develop the facts and to determine your responsibility, if any, and whether or not you violated any CN rules, regulations and/or policies in connection with an incident that occurred at approximately 2100 hours, Thursday, May 26, 2022 at or near the Magnolia Inn located at 816 US 98 in Columbus, MS 39429, in which the two of you were allegedly involved in a verbal and physical altercation in the presence of other employees.

The record contains credible testimony and substantial evidence proving that you violated:

**Violation Level & Rules Associated:**
**Violation Type: Level 4**
**CN Code of Business Conduct**
**CN Workplace Violence Prevention Policy**

In consideration of the incident, the proven rule violations, and your past discipline record, you are hereby assessed the following discipline(s):

**Dismissal**
**Record Date: Friday, June 24, 2022**

Wade Clark
IC-Manager Sr. Production

Exhibit I - Melton's termination letter