# MSJ Exhibit 2

**Declaration of Susan K. Fitzke and Exhibits**

Exhibit 2 - Declaration of Susan K. Fitzke Exhibit

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION**

ROBERT BRANCH,

       Plaintiff,

       v.

ILLINOIS CENTRAL RAILROAD
COMPANY,

       Defendant.

CIVIL ACTION NO.  4:23-CV-217-MPM-JMV

## <u>DECLARATION OF COUNSEL IN OPPOSITION TO PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT</u>

*I, SUSAN K. FITZKE, hereby declare as follows:*

1.    I am one of the attorneys representing the Defendant Illinois Central Railroad Company ("IC") in the above-referenced action.  I submit this Declaration in support of IC's Memorandum of Law in Opposition to Plaintiff Robert Branch's Partial Motion for Summary Judgment.

2.    Attached hereto as **Exhibit A** is a true and accurate copy of the transcript of the February 13 and 14, 2024, hearing in front of the Office of Administrative Law Judges pursuant to Plaintiff Robert Branch lawsuit in which he alleged IC terminated his employment because Branch reported a safety concern (OALJ Case No. 2023FRS00026). IC was represented during this proceeding by myself and my colleague, Grace F. Jacobson. Branch's counsel in the present matter has also produced these transcripts to IC in the present lawsuit pursuant to discovery.

3.    Attached hereto as **Exhibit B** is a true and accurate copy of excerpts from the transcript of the deposition I took of Branch on August 6, 2024, pursuant to this lawsuit.

Exhibit 2 - Declaration of Susan K. Fitzke Exhibit

4.      Attached hereto as **Exhibit C** is a true and accurate copy of excerpts from the transcript of the deposition I took of Branch on November 7, 2023, pursuant to his lawsuit against IC in front of the Office of Administrative Law Judges (OALJ Case No. 2023FRS00026). Branch's counsel in the present matter also produced this transcript to IC in the present lawsuit pursuant to discovery.

5.      Attached hereto as **Exhibit D** is a true and accurate copy of excerpts from the transcript of the deposition of Chance Garner, dated November 27, 2023, pursuant to Branch's lawsuit against IC in front of the Office of Administrative Law Judges (OALJ Case No. 2023FRS00026).

6.      Attached hereto as **Exhibit E** is a true and correct copy of Branch's March 28, 2024, answers to IC's First Set of Interrogatories.

7.      Following Branch's 2024 deposition, we requested that Branch supplement his answer to Interrogatory 2 to corroborate his allegation he had applied to jobs since November 2023. On September 11, 2024, counsel for Branch, via email, informed counsel for IC that "Branch informed [his attorneys] he was mistaken" and that all relevant documents had already been produced, thereby confirming that Branch has not applied to a job since November 2023.

**PURSUANT TO 28 U.S.C. § 1746, I VERIFY UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES THAT THE FOREGOING IS TRUE AND CORRECT.**

Signature: *_/s/ Susan K. Fitzke_*          Date: _11/07/2024_

Exhibit 2 - Declaration of Susan K. Fitzke Exhibit

# Exhibit A

**Transcript of February 13 and 14, 2024, hearing in front of the Office of Administrative Law Judges**

# UNITED STATES DEPARTMENT OF LABOR
# OFFICE OF ADMINISTRATIVE LAW JUDGES

**In the Matter of:**

**ROBERT BRANCH,**                    )
                                       )
   **Complainant,**                )
**v.**                                 )   **Case No.  2023-FRS-00026**
                                       )
**ILLINOIS CENTRAL RAILROAD,**         )
                                       )
   **Respondent.**                 )
                                       )

**Condensed Transcript and Key Word Index**

| | |
|---|---|
| **PAGES:** | 1 through 203 |
| **PLACE:** | Video Hearing |
| **DATE:** | February 13, 2024 |

## BAYLEY REPORTING, INC.
### *OFFICIAL FEDERAL REPORTERS*
#### Florida
#### (727) 585-0600

Robert Branch    2023-FRS-00026    February 13, 2024

## Page 1

UNITED STATES DEPARTMENT OF LABOR
OFFICE OF ADMINISTRATIVE LAW JUDGES

In the Matter of:
ROBERT BRANCH,                    )
                                  )
       Complainant,               )
                                  )
v.                                )    Case No.   2023-FRS-00026
                                  )
ILLINOIS CENTRAL RAILROAD, )      )
                                  )
       Respondent.                )
                                  )

Video Hearing
Tuesday,
February 13, 2024
The above-entitled matter came on for hearing
pursuant to notice, at 9:00 a.m., CST.

BEFORE: ANGELA F. DONALDSON
Administrative Law Judge

Bayley Reporting, Inc.
(727)585-0600

## Page 2

A P E A R A N C E S
On behalf of the Complainant:
CHARLES EDWARD SOREY, II, ESQ.
Sherman & Lacey, LLP
1000 Highland Colony Parkway, Suite 5203
Ridgeland, Missouri 39157
(601) 341-6929
JAMES FERGUSON, ESQ.
201 West Broadway, Suite G12
North Little Rock, Arkansas 72114
On behalf of the Respondent:
SUSAN FITZKE, ESQ.
GRACE JACOBSON, ESQ.
Littler Mendelson
80 South 8th Street, Suite 1300
Minneapolis, Minnesota 55402

## Page 3

I N D E X

COMPLAINANT'S WITNESSES: DIRECT CROSS REDIRECT RECROSS
Robert Branch              17    42      84        88
Wade Clark                 96   106     113
Christopher Day           121   126     132
Duane Spears              135   145     161
Thomas Sullivan           168   175     181       190
Thomas Hilliard           193   198
RESPONENT'S WITNESSES: DIRECT CROSS REDIRECT RECROSS
None

E X H I B I T S

EXHIBIT                IDENTIFIED  IN EVIDENCE  WITHDRAWN
COMPLAINANT'S
None
RESPONDENT'S
None
DIRECTOR'S
None
ALJ'S
None
JOINT
1 through 48               9          10

## Page 4

P R O C E E D I N G S

1
2   February 13, 2024                    9:21 A.M., CST
3        JUDGE DONALDSON:   All right.  Good morning
4   again, everyone.  We are present for a Federal Rail Safety
5   Act whistleblower proceeding.  We're present by video
6   conference using Microsoft Teams.  We are docket number
7   with OALJ of 2023-FRS-26.  Again, Claimant is Robert
8   Branch.  Respondent is Illinois Central Railroad Company.
9   My name is Angela Donaldson and I'm an administrative law
10  judge with the Covington, Louisiana Office of
11  Administrative Law Judges.  We are part of the U.S.
12  Department of Labor.  As the attorneys are aware, the
13  parties may not all be aware, we are a separate entity from
14  the OSHA agency which originally had the claim for review
15  investigation entering some findings.  This is a de novo
16  proceeding so there are no fact findings that have been
17  entered or conclusions reached that I am required to adopt
18  from the OSHA findings.  When the Complainant, Mr. Branch,
19  requested a hearing and that the matter be transferred to
20  OALJ, it is a new proceeding and I will be entering
21  findings of fact and conclusion of law once the record is
22  closed.  This is the important part of the record, of
23  course, the evidence received in the form of the exhibits
24  the parties have tendered which will be shortly admitted
25  and then the witnesses will be testifying in this

Exhibit A - Transcript of February 13 and 14, 2024, hearing in front of the Office of Administrative Law Judges

Robert Branch    2023-FRS-00026    February 13, 2024

Page 5

1  administrative proceeding.
2         So, we have legal representatives for both
3  parties.  Let's get an introduction from Mr. Branch's
4  attorneys and for the record, identify for the record who's
5  lead counsel for today's proceedings starting with
6  Complainant.
7         MR. SOREY:    I'm C. Sorey, II.  I'm the lead
8  counsel for Mr. Branch.
9         JUDGE DONALDSON:    All right and you're seated
10 with Mr. Ferguson.  You're just off camera right now, okay?
11        MR. SOREY:    Great.
12        JUDGE DONALDSON:    All right.  Go ahead, Mr.
13 Ferguson.
14        MR. FERGUSON:    Yes, this is James Ferguson for
15 the Complainant.
16        JUDGE DONALDSON:    All right and are your
17 business addresses of record the same as what you've
18 entered in the Notice of Appearance?
19        MR. FERGUSON:    Yes, Your Honor.
20        JUDGE DONALDSON:    Okay and you have with you
21 Mr. Robert Branch, your client, who's going to be a witness
22 today.  Is that right?
23        MR. FERGUSON:    That is correct.
24        JUDGE DONALDSON:    Okay, great.  Let me do the
25 same and get introductions as well from Respondent.

Page 6

1         MS. FITZKE:    I'm Susa Fitzke, lead counsel for
2  Respondent.
3         JUDGE DONALDSON:    And who is present with you
4  as co-counsel and your representatives or other individuals
5  present for Respondent today?
6         MS. FITZKE:    Sure.  My colleague, Grace
7  Jacobson, is also counsel for Respondent and she is present
8  with me along with in-house legal counsel for the Carrier,
9  Gillian Marshall, and Duane Spears, who is a senior manager
10 of Human Resources.
11        JUDGE DONALDSON:    All right, thank you and
12 since I'm aware of your witness list, we don't have Ms.
13 Marshall or Ms. Spears present in any testified capacity,
14 correct?
15        MS. FITZKE:    Mr. Spears will be a testifying
16 witness in the matter, but is present in his capacity as a
17 company representative.
18        JUDGE DONALDSON:    All right.  I see his name
19 now.  Okay, thank you.  So, as I mentioned, we're here for
20 a formal hearing under the Federal Rail Safety Act
21 specifically under the whistleblower protection provisions.
22 I want to cover just very briefly that the protections and
23 remedies and the Act that the claim is presented under are
24 those found under AIR-21 which is the Wendall H. Ford
25 Aviation Investment and Reform Act for the 21st Century.

Page 7

1  The rules and regulations that will apply to our formal
2  hearing are found under Part 29 CFR Part 1982.  A couple of
3  mentions here.  Under 1982.107(d), Formal Rules of evidence
4  will not apply.  It doesn't mean that no rules apply or no
5  evidentiary rules apply, but as provided in the
6  regulations, I am charged with excluding evidence that
7  would be immaterial, irrelevant or unduly repetitious.
8         So, I know the tendency is to present perhaps if
9  you have any objections to a question, to an item of
10 evidence, you may object as hearsay or other traditional
11 type of objection which is fine, but I will be keeping in
12 mind the framework of the regulatory provisions that were
13 under and maybe asking you to tell me what why the evidence
14 you're objecting to is immaterial, irrelevant or unduly
15 repetitious.  I do want to keep us moving at the right
16 pace.  I do want you to get the evidence in for the claims
17 and defenses that you need to have in, but we do not have
18 as quite a strict application of the formal Rules of
19 Evidence that you may be used to proceeding under in other
20 state or Federal forums other than administrative.  This is
21 fairly typical for an administrative proceeding of the type
22 that we handle here.
23        The Rules of Procedure do apply under the rules
24 you're familiar with for OALJ 29 CFR Part 18 and that's a
25 regulatory provision as well.  Under 1982.109(a), the

Page 8

1  Complainant here needs to show by a preponderance of the
2  evidence that protected activity that he engaged in was a
3  contributing factor to the adverse action that he is
4  alleging occurred and if that happens, under 109(b),
5  Respondent must prove by clear and convincing evidence that
6  it would have taken the same adverse action in the absence
7  of any protected activity.  The relief that can be awarded
8  is also identified by regulation under 1982.109(d).
9         So, some general rules for the hearing itself.
10 Ms. Wynn probably covered these with you during your
11 prehearing conference maybe this morning as well.  As a
12 general rule, we have control over meeting you as well.
13 All but those asking questions, participating with me in
14 the preliminary matters will be muted.  Please turn off
15 other phones and remove any distractions of any kind.  If
16 you have technical difficulties at any time, you can either
17 use their raise hand function in this video Prevrium (ph)
18 platform or just simply get my attention in some way.
19 We're going to take regular breaks.  We have more than
20 today.  We have a two-day hearing set aside.  We have a lot
21 of witnesses to get through, but that doesn't mean that we
22 need to exhaust the attorneys and the witnesses by not
23 taking breaks.  We're going to take those because I think
24 it benefits everyone to do so.  We'll cover post-hearing
25 briefs in just a second and let me just note for the record

Exhibit A - Transcript of February 13 and 14, 2024, hearing in front of the Office of Administrative Law Judges

Robert Branch    2023-FRS-00026    February 13, 2024

**Page 9**

1  that you're aware of the order that was issued late
2  yesterday, February 12th and on Respondent's Motion in
3  Limine and Respondent's objections to CX-1 through 8. I'm
4  not going to restate what the ruling is. Generally, the
5  outcome though is the deposition transcript of Mr. Gardener
6  is going to be submitted by agreement of the parties. We
7  discussed off-record to maybe, in fact, mark as Joint
8  Exhibit. The parties will have a chance to review the
9  excerpts portions you want to submit. Consider whether
10 there's a video that you say can be accompanying and you
11 want to submit that, but I'm going to let you all continue
12 to confer and then present to me what you want to do.
13         All right. Exhibits JX-1 through 48 have been
14 submitted. There was a substitution of JX-18 and JX-19.
15 We're going with the most recent version of those that were
16 submitted February 8, 2024. These are jointly submitted.
17 I don't have the objections to these exhibits including the
18 amended ones so I'm going to admit at this time JX-1
19 through 48 and the substituted JX-18 and JX-19.
20                   (Whereupon, the documents referred
21                   to were marked for identification
22                   as Joint Exhibits 1 through 48.)
23 //
24 //
25 //

**Page 10**

1                   (Whereupon, the documents marked
2                   for identification as Joint
3                   Exhibits 1 through 48 were
4                   admitted into evidence.)
5         JUDGE DONALDSON:    Is there any procedural or
6  housekeeping matter, Mr. Ferguson, that you think we need
7  to address?
8         MR. FERGUSON:  I don't think so, Your Honor.
9         JUDGE DONALDSON:    All right. Ms. Fitzke,
10 anything?
11        MS. FITZKE:    No. Thank you, Your Honor.
12        JUDGE DONALDSON:    All right. We can do ---
13 well, let me cover some issues that have been stipulated.
14 These are in the prehearing statement. I'm going to try
15 not to get any of these wrong, but they're in the record
16 and they're prehearing statements filed, I show, January
17 16, but that might be January 26, 2024. Let me review the
18 basic stipulations here. We have (1) the Complainant was
19 an employee within the meaning of and subject to the
20 provisions of the FRSA, the Act that I described earlier,
21 (2) that Illinois Central is a railroad carrier within the
22 meaning of the same Act. I have a stipulation that on May
23 26, 2022, Complainant, Mr. Branch, was employed by Illinois
24 Central as a fuel truck driver, a stipulation that the
25 employment of the Complainant was terminated June 24, 2022.

**Page 11**

1  We have a stipulation that Complainant filed a complaint
2  with OSHA alleging the termination of the employment was in
3  violation of FRSA. We have a stipulation the Secretary of
4  Labor issued a no reasonable cause finding and dismissed
5  that complaint that had been filed with OSHA. Those
6  findings are dated October 26, 2022 and another
7  stipulation, the only procedural one that Complainant filed
8  objections to those findings of the Secretary and requested
9  a hearing before administrative law judge. All right, are
10 there any stipulations that you would add, Mr. Ferguson or
11 Ms. Fitzke?
12        MR. FERGUSON:    The only one that I don't think
13 was in there, Susan, did we make a stipulation as to his
14 termination date? I couldn't remember if that was read.
15        MS. FITZKE:    I believe that we did, yes. Did I
16 not read that one?
17        MR. FERGUSON:    You may have. I may have just
18 missed it. My apologies.
19        MS. FITZKE:    Okay. Yes, the termination date,
20 June 24, 2022.
21        JUDGE DONALDSON:    Okay. All right, yes. It
22 appears to me that this matter arises in the jurisdiction
23 of the 5th Circuit Court of Appeals given the residence of
24 Mr. Branch, underlying conduct, the location of that that
25 has alleged to have occurred and the investigation that

**Page 12**

1  occurred in Mississippi. Mr. Ferguson, do you believe we
2  are in the 5th circuit here?
3         MR. FERGUSON:    Yes, Your Honor.
4         JUDGE DONALDSON:    Okay. Ms. Fitzke, do you
5  agree?
6         MS. FITZKE:  I do agree and I was just as you
7  were reading those, I'm not sure if it's material, but I do
8  believe there is a point of clarification for the
9  stipulations in terms of stipulation number 23 where the
10 parties agree that on May 26, 2022, Complainant was
11 employed as a fuel truck driver. I believe the other
12 individual involved in this incident was a fuel truck
13 driver and Mr. Branch was a machine operator and I think
14 I've seen Mr. Ferguson refer to with them and so I think
15 it's like clarification of that stipulation.
16        JUDGE DONALDSON:    Okay. Mr. Branch was
17 employed as a machine operator?
18        MR. FERGUSON:    Yes, Your Honor.
19        JUDGE DONALDSON:    All right. The issues to be
20 adjudicated appear to track generally what the burdens are
21 that I summarized from the regulations a couple of minutes
22 ago. Issue 1 is whether the Complainant can prove that he
23 engaged in protected activity under the Act, whether he can
24 prove that protected activity was a contributing factor to
25 an adverse action. Here, it's a discharge or termination.

Robert Branch    2023-FRS-00026    February 13, 2024

**Page 13**

1 Then we would have if those are proven, we would have a
2 shift to the burden to Respondents to prove by clear and
3 convincing evidence that the termination would have taken
4 place even without protected activity and then lastly, if
5 Complainant succeeds with the burden and Respondent does
6 not, I would be addressing any relief that Complainant is
7 seeking under the Act and regulations.
8          I show --- just briefly before we get to opening
9 statements, of course, Complainant would go first with
10 those. Mr. Ferguson and Ms. Fitzke, I show that at the
11 heart of the Act, that is an issue here. It's
12 20109(B)(1)(A). There's different kinds of protected
13 activity that can be at issue here. I want to make sure I
14 understand that Mr. Branch alleges the type of protected
15 activity that triggered his claim under the whistleblower
16 provisions is (B)(1)(A) which is the reporting in good
17 faith of a hazardous safety or security condition. Is that
18 right?
19          MR. FERGUSON:    That is correct.
20          JUDGE DONALDSON:    Okay. No other types of
21 protected activity are alleged here?
22          MR. FERGUSON:    They have not been throughout
23 this case.
24          JUDGE DONALDSON:    Okay. All right. Do you
25 want to make any opening statement, Mr. Sorey or Mr.

**Page 14**

1 Ferguson?
2          MR. FERGUSON:    Your Honor, I think that the
3 stipulations in the prehearing brief cover opening
4 statements adequately. We'll be post-briefing so I don't
5 think there's any reason to waste the court's time on that.
6          JUDGE DONALDSON:    Okay. Ms. Fitzke?
7          MS. FITZKE:    Well, I had a statement planned
8 for you. I think in light of Complainant's deferral, we
9 can defer our statement as well.
10          JUDGE DONALDSON:    All right. Let me turn to
11 the first witness today. Actually, let's review the
12 witnesses real quick in the order that you want to go in.
13 We're starting with Mr. Branch and then who else do you
14 plan to call, Mr. Ferguson?
15          MR. SOREY:    This is Mr. Sorey.
16          JUDGE DONALDSON:    Mr. Sorey. Can you get in
17 the camera while we're talking? Great. Thank you, Mr.
18 Sorey. Oh, I lost you. Well, that turned out to be fatal.
19 That's odd. We're going to wait for them to be rejoined.
20 Renee, we can go off the record for a second.
21          (Off the record at 10:36 a.m.)
22          (On the record at 10:36 a.m.)
23          JUDGE DONALDSON:    Okay.
24          MR. SOREY:    Sorry about that.
25          JUDGE DONALDSON:    That's fine.

**Page 15**

1          MR. SOREY:    We would have Mr. Christopher Day
2 first and Susan had said that Mr. Wade Clark needs to be
3 out of here or need be somewhere and he has to leave before
4 4:00. So, I'm willing to move him up if that's okay.
5          JUDGE DONALDSON:    I appreciate that.
6          MR. SOREY:    Okay. So, we'll take Wade Clark
7 second then.
8          JUDGE DONALDSON:    All right.
9          MR. SOREY:    And then I think the other listed
10 are Duane Spears, Tom Sullivan, Tom Hilliard and Patrick
11 Crain.
12          JUDGE DONALDSON:    Okay.
13          MR. SOREY:    And that's all that we have.
14          JUDGE DONALDSON:    So, the order, I might have
15 missed something here. The order, you are starting with
16 Christopher Day. Is that right?
17          MR. SOREY:    After Mr. Branch.
18          JUDGE DONALDSON:    Got it. Okay, that's what I
19 was missing, okay.
20          MR. SOREY:    And, of course, we're submitting
21 Chance Gardener. He won't be here as a live witness.
22          JUDGE DONALDSON:    Right. Okay. All right.
23          MR. SOREY:    I'm going to move around to try to
24 accommodate everyone as far as being able to see me when
25 I'm asking questions.

**Page 16**

1          JUDGE DONALDSON:    Okay.
2          MR. SOREY:    Not to be too chummy here.
3          JUDGE DONALDSON:    All right. That works for
4 me. I know that's not a usual setup that you have in a
5 hearing setting. We're video anyway so we're flexible
6 here. We can do those. All right. So, Mr. Branch,
7 ordinarily in an in-person formal hearing setting,
8 obviously you'd be in your own chair and you'd be probably
9 closer to me and your attorney would be across from you,
10 but this is a somewhat less formal setting anyway as we're
11 appearing by video. I'm very appreciative that everyone is
12 ready and handled all the preliminary so quickly. We're
13 already getting to your testimony. So, if you have any
14 questions, Mr. Branch, at any time, of course, you can rely
15 on --- let your attorney know, for example, if you don't
16 understand something that's being asked of you, but the
17 other attorney know when they have an opportunity to ask
18 you questions on cross-examination as well, you can also
19 let me know as well. That goes for any of the witnesses
20 testifying today. Before I swear you in, I don't see any
21 other witnesses that are present, but if this comes up
22 during the hearing today, does anybody want witnesses
23 sequestered?
24          MR. SOREY:    Yes, we do.
25          JUDGE DONALDSON:    You do?

Robert Branch    2023-FRS-00026    February 13, 2024

Page 17

1       MR. SOREY:   Yes.
2       JUDGE DONALDSON:   Okay.  So, sequestration is
3   invoked and we're going to make sure --- please help me
4   stay alert in case any witnesses joint because they've been
5   given the link and we'll make sure that only the witness
6   testifying is the witness present at that time.  All right,
7   Mr. Branch, would you please raise your right hand?  I'll
8   swear you in.
9   Whereupon,
10              ROBERT BRANCH
11  having been duly sworn, was called as a witness herein and
12  was examined and testified as follows:
13      WITNESS:   Yes, ma'am.  I do.
14      JUDGE DONALDSON:   Okay, great and I'll let you
15  know if we can't hear you at any time, but that's great.
16  So, your attorney is asking questions first on what's
17  called direct examination and I take it, that's Mr. Sorey,
18  so you can go ahead with your witness.
19      MR. SOREY:   Thank you, Your Honor.
20              DIRECT EXAMINATION
21  BY MR. SOREY:
22      Q   Robert, would you state your full name, please?
23      A   My full name is Robert L. Branch.
24      Q   And your address?
25      A   My address is 26 County Road 143, Colia, that's

Page 18

1   C-O-L-I-A, Mississippi 38923.
2       Q   Is that in Carroll County, Mississippi?
3       A   Yes, sir.  It's Carroll County, Mississippi.
4       MR. SOREY:   Your Honor, I threw that in because
5   it's a very rural address.
6   BY MR. SOREY:
7       Q   What is your seniority date with the railroad?
8       A   My seniority date is 2008, February 11, 2008.
9       Q   Okay and what positions have you held with the
10  railroad?
11      A   In the Engineering Department, I was a trackman
12  and a machine operator and then in the Bridge Department, I
13  was assistant foreman, a commoner, commoner helper and a
14  bridge.
15      Q   In June of 2022, where were you working?
16      A   We were working in White Bluff working for
17  Colonial, Mississippi.
18      Q   And what was your position at that job?
19      A   At that time, I was a machine operator pulling
20  spikes.
21      Q   Okay.  Before May 26, 2022, had you had any
22  problems with Mr. Melton?
23      A   No, sir.  I hadn't.
24      Q   Before Mr. Melton arrived at the hotel, what were
25  you doing?

Page 19

1       A   I was standing behind the back of the truck
2   cooking on  barbecue grill.
3       Q   And where were you all located?
4       A   We were located at Colonial Inn and Suites in
5   Colonial Mississippi.
6       Q   And what time of day was this?
7       A   It was approximately 8:00, 7:00 or 8:00 when we
8   started cooking.  It was 9:00 when the incident took place.
9       Q   Who all was there?
10      A   It was myself and a group of railroad workers
11  from the railroad.
12      Q   Okay.  When Mr. Melton came out of the hotel,
13  what did he have to say?
14      A   Mr. Melton stated that he was from "a plantation
15  where they killed and buried mother-fuckers.  I'm going to
16  kill Mr. Sweeny."
17      Q   And how did you respond to that?
18      A   I said Sweeny wasn't here.  Chill out.
19      Q   After that statement by you, describe what Mr.
20  Melton did.
21      A   After the statement, Mr. Melton, he rushed over
22  to me and pushed me down as hard as he could.  When I got
23  up, Mr. Melton hit me in the face twice between my eyes
24  when he drew blood and the time I got up again, he had his
25  fist balled up to hit me again.

Page 20

1       Q   Prior to Mr. Melton pushing you down, what
2   direction were you facing?
3       A   I had my back turned to Mr. Melton.  I didn't
4   even see him coming.
5       Q   And after he pushed you down, exactly what took
6   place?
7       A   After he pushed me down, I got up and asked me
8   why did he push me and then he hit me in the face twice.
9       Q   And what did you do at that point?
10      A   At the point, I barely got up off the ground and
11  he was still standing over me with a fist balled up and I
12  went into defense mode.
13      Q   Okay and from there, what happened?
14      A   From there, what happened, a fellow broke us up.
15      Q   When you say broke you up, were you all ---
16      A   He pulled us loose.
17      Q   Where were you physically located when the group
18  came over to pull you all apart?
19      A   I was on the ground on top of him.
20      Q   Were you on top or he was on top?
21      A   I was on top.
22      Q   Okay.  Could you have run --- excuse me.  Go
23  ahead.
24      A   -- because we had fell.
25      Q   All right.  How did you all get on the ground?

Exhibit A - Transcript of February 13 and 14, 2024, hearing in front of the Office of Administrative Law Judges

Robert Branch    2023-FRS-00026    February 13, 2024

Page 21

1    A    We sort of fell.  Both of us fell.
2    Q    Okay.
3    A    -- going forward.
4    Q    Could you have run away from Mr. Melton?
5    A    No, because I didn't know Mr. Melton was going to
6    attack me.  I was behind the grill and was caught between
7    the truck and the fence next to us.
8    Q    Were you in the parking lot of the hotel?
9    A    Yes, sir.  I was.
10   Q    Now, after the group got Mr. Melton off of you
11   all or you all broke up from the ground, what happened
12   next?
13   A    Mr. Melton stated that he was going to the truck
14   to get his gun.
15   Q    And what did he actually do?  Do you know?
16   A    All I know is he went to his truck, but I don't
17   know what happened because a co-worker, Mr. Hunsucker (ph)
18   which was the assistant foreman drove him to his truck to
19   keep him to come back to do any more harm.
20   Q    After Mr. Melton attacked you, how did you feel?
21   A    After Mr. Melton attacked me, I felt fearful.  I
22   felt fearful.  I was embarrassed.  I was hurt and I was
23   threatened because of the fact that he was going to get his
24   gun.
25   Q    Did you do anything about the altercation that

Page 22

1    night?
2    A    No, I didn't.  I was in total disbelief because I
3    never actually really know that had in the truck with
4    anyone on the railroad and I didn't do anything because my
5    foreman said he was going to report it the next day.
6    Q    And who was your foreman?
7    A    Ty Peterson.
8    Q    And to your knowledge, did he report it?
9    A    Yes, he did.
10   Q    To whom did he report it?
11   MS. FITZKE:    I just want to assert an objection
12   that this is hearsay.  It's traditional hearsay.  I
13   understand Your Honor's instruction.  It's also immaterial.
14   This claim is about Mr. Branch's reports, not the reports
15   of any other employee.
16   JUDGE DONALDSON:    Mr. Sorey, how is it
17   material, the information you're asking for?
18   MR. SOREY:    Well, it puts the railroad on
19   notice of what took place and it leads to what took place
20   after that, the foreman reporting it to the supervisor and
21   then the supervisor getting involved.
22   JUDGE DONALDSON:    Okay.  I'm going to overrule
23   the objection.  You can go ahead.
24   BY MR. SOREY:
25   Q    Okay and Mr. Peterson informed who?

Page 23

1    A    He informed the supervisor, Chance Gardener.
2    Q    All right and who was Chance Gardener?
3    A    He was a supervisor on the rail gang.
4    Q    Did you discuss what had happened at the
5    altercation with Mr. Chance Gardener the day after?
6    A    Mr. Chance Gardener, I did.  Mr. Chance Gardener
7    came to my machine and asked me what happened and I told
8    him I was attacked by Mr. Melton and Mr. Melton went to the
9    truck to get his gun to come back and shoot.  I said I felt
10   threatened by Mr. Melton's actions.
11   Q    Okay.  All right, what took place next as far as
12   you --- you were at work on that Friday.  This took place
13   what, on a Thursday?  Is that correct?
14   A    The incident took place on a Thursday.
15   Q    And then the meeting with Mr. Chance Gardener was
16   on Friday?
17   A    Was on Friday morning.
18   Q    Just to give the court an idea of the time period
19   and stuff, this was Memorial Day weekend?
20   A    That is correct.
21   Q    All right.  As far as speaking with members of
22   the railroad or supervisors about it, what took place next?
23   A    When I talked to Mr. Gardener that morning, he
24   told me that he had to talk to Todd first.
25   Q    And who is Todd?

Page 24

1    A    Todd Melton, the employee who attacked me.
2    Q    And did that take place?
3    A    Well, all I know was on the Saturday, I called
4    Mr. Gardener and asked him did he speak to Mr. Melton and
5    he told me he did and he said that Mr. Melton said that he
6    didn't remember anything.
7    Q    What did you do next?
8    A    And I told him that I'm thinking about filing a
9    report because the way --- it shouldn't have happened.  He
10   shouldn't have attacked me.  He shouldn't have --- I did
11   nothing to him to attack me.
12   Q    How did you feel about being around Mr. Melton at
13   work?
14   A    Personally, I tried to avoid Mr. Melton when I
15   was at work because I didn't know what he would do next.
16   Q    Did Mr. Melton threaten you any more at work?
17   A    No, he did not.
18   Q    What took place next as far as communication
19   between you and the foreman?
20   A    What took place next between me and the
21   supervisor, I called Chance and I made my mind up to file
22   the incident report.  I called Chance on a Sunday.  He
23   wouldn't answer the phone so I gave him all day that Sunday
24   to respond to me so he didn't.  So, on that Monday which
25   was Memorial Day, I texted him.

Robert Branch   2023-FRS-00026   February 13, 2024

Page 25

1    Q    Were you all working on Memorial Day?
2    A    No, we wasn't.
3    Q    Okay.  What did you text?
4    A    I texted him that I had changed my mind.  I said,
5  I'm going to go forward with the incident because with what
6  Todd, what Mr. Melton had done was unacceptable and it
7  could have got --- somebody could have gotten seriously
8  hurt or killed.  I told him if I let it go, it'd be out if
9  he'd go out and do to something else like he did me and
10  somebody get hurt or killed, then the blood would be on my
11  hands.
12    Q    Were you and the witnesses that were there at the
13  altercation, were you all asked to give statements?
14    A    Yes, sir.  We did.
15    Q    Did all of you give statements?
16    A    Yes, sir.  They did.
17    Q    Now, do you know whether these witnesses or did
18  these witnesses testify in your investigation hearing?
19    A    Yes, sir.  They did.
20    Q    And do you know what they testified to?
21    A    All I know is they all had a statement and they
22  testified that I didn't do anything to provoke, anything to
23  cause the incident that happened.
24    Q    Do you recall the day that you were given notice
25  of an investigation charging you with a violation of the

Page 26

1  Illinois Central workplace violence policy?
2    A    If I'm not mistaken, I think it was that Friday
3  on the 3rd.
4    Q    Okay.
5    A    FedEx brought it to my door.
6    Q    Okay.  Did all eight co-employees read their
7  statements at the hearing?
8    A    All the ones that was there present.  Being a
9  witness, they read their statement.
10    Q    What happened as a result of the hearing?
11    A    I was terminated.
12    Q    Do you remember the date that you were
13  terminated?
14    A    To my recollection, it was --- FedEx brought
15  another letter to my door on June 24th stating that I was
16  terminated.
17    Q    Now, Mr. Branch, how has the firing affected you?
18    A    The firing has affected me mentally.  Here I am.
19  I'm on medication and before I got fired, I was not on any
20  medication.  I wasn't seeing a doctor neither.
21    Q    Well, what doctor are you seeing and why?
22    A    I'm seeing a doctor, Dr. Redgrove.  He's a
23  psychiatrist doctor and he has me on medication for
24  depression, anxiety and nerve pain.
25    Q    And do you know how to spell the doctor's name by

Page 27

1  the way for the record?
2    A    I think I got something with the name of the
3  doctor.  The doctor got a funny name.
4    Q    Well, we'll get to ---
5    JUDGE DONALDSON:  Yes.  Don't look at anything
6  unless you're asked to, Mr. Branch.
7    WITNESS:  Yes, ma'am.
8    JUDGE DONALDSON:  You may be asked to.  Thank
9  you.
10    WITNESS:  Yes, ma'am.  I'm sorry.
11    JUDGE DONALDSON:  That's fine.
12    BY MR. SOREY:
13    Q    Mr. Branch, had you ever been fired before?
14    A    One time, sir.  That was in my youth days.
15    Q    And how long have you worked?
16    A    Actually, I've been working ever since I was 12
17  years old.
18    Q    How did you feel about not working?
19    A    It sort of --- it plays with your mind.  It plays
20  with your intellect.  I'm used to getting up, going to
21  work, doing what I got to do, taking care of my family,
22  what I always did all my life.
23    Q    Did the people in your community know that you
24  were fired?
25    A    Some of them did because my neighbor, he don't

Page 28

1  see my car leaving out the yard.  I'm not there no Monday
2  morning, he know that I'm either at work.  I mean, he know
3  I'm mostly at work.  Whenever they see me at home, they
4  know something is wrong.
5    Q    And how did you feel about that?
6    A    Well, I was feeling a little embarrassed because
7  I didn't want to tell them that I had lost my job because
8  of somebody else's negligence.  So, I sort of downplayed
9  it.
10    Q    How much in salary have you lost?
11    A    If I'm not mistaken, I think it's like $185,000.
12    Q    Is that from February of '24?
13    A    Yes, sir.
14    Q    You've been off approximately 20 months?
15    A    Yes, sir.
16    Q    Does the amount of $185,000 include the new ILA
17  amount with the new union contract?
18    A    No, sir.
19    Q    At the time of the incident and altercation when
20  you got fired, how much per hour were you making?
21    A    Like it was --- I think it was $30.00 an hour
22  because I run a machine.
23    Q    All right and how much would you be making now
24  under the new contract?
25    A    If I'm an assistant now, I'd be making $37.00 an

Robert Branch   2023-FRS-00026   February 13, 2024

---

Page 29

1 hour.
2    Q    Okay.  Were you able to get the back pay from the
3 new union contract?
4    A    No, sir.  I wasn't.
5    Q    Why not?
6    A    Because I was terminated.
7    Q    How much did you miss out on?
8    A    Well, to my knowledge, I think it's about $8,000
9 to $10,000, but I'm not --- it's not accurate.  It's not
10 accurate.
11    Q    What are you basing that $8,000 to $10,000 on?
12    A    I'm basing it on overtime also, the hours that I
13 worked.
14    Q    Are you basing it upon your co-employees?
15    A    To some point, but I'm looking at the things I
16 put in at some point.  At some point, I'm not.
17    Q    Mr. Branch, have you applied for any other jobs
18 since you were fired?
19    A    Yes, sir.  I have.
20    Q    How many would you say you've applied for?
21    A    I applied for about 25 to 30 jobs.
22    Q    Okay and have you provided that list to the
23 railroad?
24    A    Yes, sir.  I have.
25    Q    Have you been successful in getting a job?

---

Page 30

1    A    I have some interviews.  I had some close
2 interviews.  Don't mean I had the job and I wasn't selected
3 and I started feeling a little discomfort and I had a job
4 with Columbia Railroad also.  I interviewed with Columbia
5 Railroad.  I thought I had it because I was at home, but I
6 wasn't selected.
7    Q    That's Columbus Railroad?
8    A    Yes, Columbus.
9    Q    Okay.  Not Columbia?
10    A    No, not Columbia.
11    Q    Okay.
12    A    Columbia is in Greenville.
13    Q    Now, Mr. Branch, you've been without a job for
14 some 20 months.  How have you survived?
15    A    I had railroad stocks which I was able to sell
16 them and when I left the railroad, I had $32,000 in my
17 savings account and I had a land deal that I sold right
18 before --- a couple years ago and I had $20,000 in cash
19 saved up.  So, that's how I was able to survive.
20    Q    Now, you mentioned settling your IC stock for
21 $97,000.  Have you spent all that?
22    A    No, sir.  I haven't.
23    Q    Do you have some left?
24    A    Yes, sir.  I do.
25    Q    Approximately how much do you have left?

---

Page 31

1    A    I have between $45,000 and $50,000 left.
2    Q    All right.  You mentioned a savings account of
3 $32,350.  Do you have any of that left?
4    A    All gone.
5    Q    What about the land, the cash from the land sale,
6 $20,000?
7    A    All gone.
8    Q    Okay.  What are your normal expenses per month?
9    A    My normal expenses are about $5,000 or more.
10    Q    Now, during this time period, have you had any
11 major expenses over that amount?
12    A    Yes.  My baby girl goes to the state university
13 which I pay 20 grand a year and I was in the process before
14 I left work, I was getting my house, doing some home
15 improvements.  I was replacing board, painting my house
16 inside, painting on the outside, things of that nature.
17 Materials and labor, it was $15,000 and also ---
18    Q    When did that take place?
19    A    That took place around July, somewhere along
20 there.
21    Q    July of what year?
22    A    '22.
23    Q    Okay.  Had you already planned this prior to you
24 being terminated?
25    A    The carpenter was working on my house doing what

---

Page 32

1 I was telling him.
2    Q    Have you had any other major expenses?
3    A    Yes, sir.  I had a roof repair, I mean replaced
4 and with out-of-pocket $6,000.
5    Q    How much?
6    A    Out-of-pocket, $6,000.
7    Q    Okay.
8    A    -- because they also replaced the roofs on my
9 storage too.
10    Q    Okay.  Have you had any other expenses?
11    A    Other than paying for --- I had my older daughter
12 living with us and she was going through a divorce.  So, I
13 had to pay for --- the divorce was for $2,500 and my second
14 older daughter who works for the railroad, she's the
15 financial specialist, her transmission went out and I had
16 to spend $15,000 more.
17    Q    We never lose them completely, do you?
18    A    No, we don't.
19    Q    Mr. Branch, when you were fired, did you lose
20 your health insurance, dental insurance and vision
21 insurance?
22    A    Yes, sir.  I did.
23    Q    And have you had to replace it?
24    A    Yes, sir.  I did.
25    Q    And how much is that a month?

Robert Branch    2023-FRS-00026    February 13, 2024

Page 33

1    A    A month is $966.38.
2    Q    Okay. Mr. Branch, how long were you planning to
3    work for the IC before you retired?
4    A    I was planning to work till I'm 67.
5    Q    And why 67?
6    A    Because of the fact that I wanted to try to get
7    my full benefit because I started sort of late and I have
8    to work till I'm 67 in order to get the full benefit. If I
9    would have started earlier and got 30 years at 60, I could
10   go ahead. Unfortunately, it didn't happen and I got to go
11   to 67.
12   Q    Mr. Branch, did you enjoy your job with the
13   railroad?
14   A    Yes, I did. The railroad was my livelihood. It
15   paid great money. I mean, I met a lot of great people
16   there.
17   Q    Did they provide you fringe benefits too?
18   A    Yes, sir. They did.
19   Q    Such as what?
20   A    Such as Tier 1, Tier 2.
21   Q    What is Tier 1 and Tier 2?
22   A    Tier 1 is my retirement. Tier 2 is I pay for my
23   wife's retirement. They supply my retirement, health,
24   dental, vision insurance.
25   Q    Was it good insurance?

Page 34

1    A    Yes, sir. The railroad insurance is some of the
2    best insurance around, I must say.
3    Q    Now, a moment ago when we were talking about
4    reporting to the railroad and discussed it, I think we
5    ended up on Monday which was Memorial Day.
6    A    Yes, sir.
7    Q    And your conversation was with whom that day,
8    Chance Gardener?
9    A    It was with Chris Day.
10   Q    All right. It was with Chris on Monday, Memorial
11   Day?
12   A    Yes, sir.
13   Q    And what took place then?
14   A    Chris called me and he said Chance had called him
15   and said I wanted to report an incident and he asked me
16   have I talked to the union. I told him now and he asked me
17   what happened and I told him that what happened at the
18   hotel that Todd had attacked me and he threatened to go to
19   the truck to get a gun and come back and shoot me.
20   Q    All right. Why was it necessary or do you feel
21   it was necessary to talk to your union about what went on?
22   A    I mean, I asked him that question, but he didn't
23   give me an answer.
24   Q    Did you at any point then talk to the union?
25   A    Nick called me.

Page 35

1    Q    Who is Nick now?
2    A    The union rep. He just called me on Tuesday and
3    asked me what happened and that's about it. I told him the
4    same thing that I told Chris.
5    Q    Okay. After you talked with Chris Day, did you
6    do anything else?
7    A    Chris Day, he texted me back. I got off the
8    phone and he told me to write an incident report and then
9    he texted me again and said, "Don't type it. Write it."
10   Q    And did you do that?
11   A    Yes, sir.
12   Q    And who did you send that incident report to?
13   A    To Christopher Day.
14   Q    And when did you send that?
15   A    I sent it that evening when I got to writing it.
16   Q    Okay. Now, when did you all go back to work?
17   A    We went back to work on a Tuesday.
18   Q    Okay. Did anything occur on that Tuesday
19   concerning the altercation?
20   A    Not that I know of.
21   Q    All right. Did you talk with Mr. Melton at work?
22   A    Yes, I did.
23   Q    Did that take place then?
24   A    Yes, it took place.
25   Q    All right. When did that take place?

Page 36

1    A    It was around about 11:00.
2    Q    Tell us what occurred.
3    A    Mr. Day or I mean, Mr. Melton, when I was on the
4    machine on the track, I saw Mr. Melton walking through the
5    woods coming towards my machine.
6    Q    And how far was he away when you first saw him?
7    A    Probably about 5 foot, something like that, 5 or
8    6 foot.
9    Q    And what did he do next?
10   A    He came and knocked on my door on my machine.
11   Q    And what took place after that?
12   A    He asked me could he come in. I told him sure
13   and he came in and asked me --- told me that he was sorry,
14   that he didn't mean to hit me. He didn't mean to attack
15   me. He told me that he was drinking. He told me that he
16   needed to quit drinking. He told me that his wife told him
17   he needed to quit drinking and he also told me when he told
18   his wife about the incident, the wife told him that, "You
19   were wrong for attacking Mr. Branch. Mr. Branch didn't do
20   anything to you" and I showed him the scar that he had put
21   between my eyes and I showed him that he had busted my lip
22   when he hit me, when he knocked me to the ground.
23   Q    Did you have any other injuries as a result of
24   the altercation?
25   A    When he pushed me down, my knee was swollen and I

**Page 37**

1  actually didn't really know that it was swollen till when I
2  --- it kept hurting and then I sort of like started moving
3  it back and forth. I said, "Man, my knee is swollen." So,
4  that's when I realized my knee was swollen too from the
5  incident.
6      Q    All right. Have we discussed before the full
7  discussion with Mr. Melton?
8      A    (Affirmative response). As far as I know.
9      Q    Did Mr. Melton ask you to do anything?
10     A    He asked me would I drop the incident.
11     Q    And what did you tell him?
12     A    I told him that I would think about it, but I
13  told him it's not in my hands. It's in somebody else's
14  hands, Chris Day's hands.
15     Q    What did he ask you to do at that point?
16     A    He asked me to call Chris Day and have Chris Day
17  drop the incident report. I mean, yes, drop the report.
18     Q    And what did you tell him as far as what you
19  would do?
20     A    I told him that I might call him or I might not.
21     Q    All right. What happened after that?
22     A    So, if I'm not mistaken, Chris Day called me and
23  when Chris Day called me, I said, he came to my machine and
24  wanted me to drop that and I said no. "I tried to get you
25  to drop that incident earlier and you wouldn't drop it" so

**Page 38**

1  I turned it over to HR and Labor Relations. So, I told
2  him, I said, "Chris, I didn't do anything." I said, "He
3  attacked me." I said, "It's the reason why I wrote the
4  incident report because he's so --- he told Chance Gardener
5  that he didn't remember attacking me" and I said --- I told
6  Chris, "Not only did he attack me, he went to his truck to
7  get a gun" and I told him that was threat, threat to shoot.
8  I told him, "Things like that shouldn't happen." At the
9  railroad, we're a family and family don't hurt family
10  unless something is totally wrong.
11     Q    That was on Tuesday after Memorial Day?
12     A    Yes. Yes, sir.
13     Q    What took place next as far as any of the
14  ramifications from it?
15     A    All I know is that they asked everybody to write
16  an incident report. Had all the guys write as incident
17  report.
18     Q    Did you get pulled out of service?
19     A    Yes, I did get pulled out of service.
20     Q    When did that take place?
21     A    I think on a Thursday.
22     Q    What was the date?
23     A    It was June the 2nd.
24     Q    All right and then what took place next?
25     A    What took place next, I wound up going to ---

**Page 39**

1  when I got pulled out of service, when I got home, I went
2  to the doctor. I was hurting. I went to the doctor at the
3  emergency room.
4      Q    Did you receive notice of an investigation?
5      A    Yes, I did.
6      Q    When did you receive that?
7      A    I received it on the 3rd.
8      Q    June?
9      A    June the 3rd of 2022.
10     Q    And did you all have a hearing?
11     A    Yes, we did.
12     Q    And when did the hearing take place?
13     A    The hearing took place June the 7th.
14     Q    Okay and you were terminated?
15     A    Yes, sir. I was.
16     Q    On what date?
17     A    June the 24th.
18     Q    All right. 2022?
19     A    2022.
20     Q    Now, during the time of this 20 months, how have
21  you occupied your time?
22     A    I --- my parents got a big yard. I cut their
23  grass, weed eater, blow off. I cut my grass. I have my
24  uncle. We raise vegetables. We raise peas, okra,
25  watermelons. We have to work it. I was doing sometimes

**Page 40**

1  working in the garden, in the fields, then I had to go back
2  and harvest it in the later months when it's ready, then
3  sometimes when I was looking for a job, I was helping my
4  uncle. He's got cows. I was helping him with the cows and
5  stuff like that. When we had a disaster, we had a storm
6  last year.
7      Q    A tornado?
8      A    We had a tornado. We're lucky we weren't killed.
9  I think three people got killed in our community and a lot
10  of people lost their houses and it was devastating. So, my
11  brother took water and supplies around to people, old
12  people and different ones who didn't have or were less
13  fortunate, didn't have food or whatever, then we cooked ---
14  the church --- we cooked food and we delivered food to
15  people, the workers, people who were working during the
16  storm.
17     Q    Who did the cooking? Who had that organized?
18         MS. FITZKE:    Objection. This entire line of
19  testimony here is completely irrelevant and immaterial to
20  the case.
21         MR. SOREY:    Okay. We'll move it along, Your
22  Honor.
23         JUDGE DONALDSON:    Okay. Sustained then.
24  BY MR. SOREY:
25     Q    Mr. Branch, would you be willing to go back to

Robert Branch    2023-FRS-00026    February 13, 2024

Page 41

1  Illinois Central Railroad?
2      A    Yes, sir.  I would.
3      Q    Do you think returning to work would cause any
4  problems with your supervisors?
5      A    No, sir.  I didn't have any problems with the
6  supervisors.  Before I left, never had any problems.
7      Q    Now, during the 16 years that you've been with
8  the railroad, have you ever been charged with any rule
9  violations or have you had any charges brought against you?
10     A    No, sir.  I haven't.
11     Q    Have you ever been suspended?
12     A    No, sir.  I haven't.
13     Q    Now, during this 20 months that you've been off,
14  did you earn any money anywhere?
15     A    No, sir.  I didn't.
16     Q    When you talked about working in the garden and
17  all that, what did you all do with all those vegetables?
18     A    What we did, we gave them to family, family
19  people, neighbors, elderly people.  That's what we did and
20  along with the process also.
21         MR. SOREY:    Okay.  Your Honor, that concludes
22  our direct examination.
23         JUDGE DONALDSON:    I appreciate that, Mr. Sorey
24  and Mr. Branch.  That wasn't not quite an hour, but I do
25  want to take a break before we do cross-examination.  So,

Page 42

1  let's take ---- I show 10:14 Central.  Let's do to 10:25
2  Central, do a 10-minute break.  We'll go off the record for
3  that duration and then when we come back, Ms. Fitzke,
4  you're going to be conducting the cross-examination?
5         MS. FITZKE:    That's right.
6         JUDGE DONALDSON:    Okay.  We'll see you in 10
7  minutes.  Just stay on this call.  Mute yourself if you
8  don't want to be overheard.
9         MR. SOREY:    Thank you, Your Honor.
10         JUDGE DONALDSON:    Okay, thanks.
11         (Off the record at 10:14 a.m., CST)
12         (On the record at 10:25 a.m., CST)
13         JUDGE DONALDSON:    Back from break, we have all
14  the same participants and observers.  Ms. Fitzke, your
15  witness?  Mr. Branch, you remain under the oath that I gave
16  you earlier.
17         WITNESS:    Yes, ma'am.
18              CROSS EXAMINATION
19  BY MS. FITZKE:
20     Q    Mr. Branch, I believe in your testimony you
21  mentioned you started working for Illinois Central in about
22  2008, correct?
23     A    Yes, ma'am.
24     Q    And throughout your time with Illinois Central,
25  you observed that safety on the railroad was important,

Page 43

1  correct?
2      A    Yes, ma'am.
3      Q    In fact, I think in your deposition, you told us
4  it was a number 1 importance, correct?
5      A    Yes, ma'am.
6      Q    And in your observation, IC, Illinois Central,
7  which I will refer to sometimes as IC if that's okay with
8  you?
9      A    Yes, ma'am.  That's fine.
10     Q    All right.  IC takes safety of its rail workers
11  seriously in your observation, correct?
12     A    Yes, ma'am.
13     Q    Before this incident with Mr. Melton in May of
14  2022, in fact, you had reported various safety issues to
15  the railroad, issues with machines, broken rails, trip
16  hazards, things of that nature, correct?
17     A    Yes, ma'am.
18     Q    And those issues were always addressed, correct?
19     A    Yes, ma'am.
20     Q    And you didn't experience any adverse outcome as
21  a result of having made those complaints?
22     A    No, ma'am.
23     Q    When you worked at Illinois Central, you worked
24  under a number of different rules.  There were a number of
25  different rules that applied to you as an employee of

Page 44

1  Illinois Central, correct?
2      A    That's correct.
3      Q    And some of those rules included the US operating
4  rules, on track safety rules, Code of Conduct, correct?
5      A    Yes, ma'am.
6      Q    And you were regularly trained on the US
7  operating rules and on track safety rules, correct?
8      A    That's correct.
9      Q    And you were trained on the Code of Conduct as
10  well, correct?
11     A    That's correct.
12     Q    Another policy that applied to you as an employee
13  of Illinois Central was the workplace violence policy,
14  correct?
15     A    Yes, ma'am.
16     Q    And that's another policy under which you
17  received training, correct?
18     A    Yes, ma'am.
19     Q    And you understood that physical fighting, that
20  was a violation of the workplace violence policy at
21  Illinois Central, correct?
22     A    What I understood was in the latter part of it,
23  it also said except in self-defense so ---
24     Q    And ---
25     A    That's what I understood also.

Robert Branch    2023-FRS-00026    February 13, 2024

Page 45

1    Q    Okay.  I believe the verbiage, Mr. Branch, says,
2  "Except in justified cases of self-defense", correct?
3    A    That is correct.
4    Q    Okay, but if you are not engaged in self-defense
5  or you cross the line from self-defense to engaging
6  actively in a physical fight, you have violated the
7  workplace violence policy, correct?
8    A    I suppose.
9    Q    Mr. Branch, you mentioned in your earlier ---
10   COURT REPRRTER:    I apologize, Your Honor.  I
11  didn't get that answer.
12   WITNESS:    In other words, what I was saying,
13  Your Honor ---
14   JUDGE DONALDSON:    But let me make sure we get
15  exactly what you said a second ago.  I heard it as I
16  suppose.  Is that what you said?
17   WITNESS:    Yes.  Yes, ma'am.
18   JUDGE DONALDSON:    Okay.  Do you need to explain
19  your answer?
20   WITNESS:    Yes, ma'am.  I need to explain that
21  because I don't know what their definition of self-defense
22  is.  It don't explain.  That rule don't explain what self-
23  defense is.  When do it become self-defense when someone
24  attacks you?
25   JUDGE DONALDSON:    Okay.

Page 46

1    WITNESS:    The railroad ruled under that
2  statement.
3  BY MS. FITZKE:
4    Q    And you understand that it's up to the railroad
5  to both make its own rules and interpret its work rules,
6  correct?
7    A    Yes, ma'am.  I do.  Correct.
8    Q    And you understand that you're responsible for
9  your own behavior, correct?
10   A    Yes, that is correct.
11   Q    Mr. Branch, you mentioned Chris Day in your
12  earlier testimony as one of the supervisors that you spoke
13  with over that Memorial Day weekend and in the days
14  following.  I understand that before this incident that you
15  had a good working relationship with Mr. Day, that you
16  didn't have any issues with him.  Is that true?
17   A    That is correct.
18   MS. FITZKE:    I want to talk to you about what
19  happened at the hotel.
20  BY MS. FITZKE:
21   Q    I understand from your testimony and from the
22  record in this case that you were staying at a property
23  called The Magnolia Inn.
24  Is that right?
25   A    That is correct.

Page 47

1    Q    And with regard to that evening, you mentioned
2  Mr. Melton.  Well, I think it was your counsel that talked
3  about Mr. Melton coming out, but why don't you describe for
4  us?  Where did Mr. Melton come from?
5    A    He came out the door of the hotel.
6    Q    And ---
7    A    The side door of the hotel.
8    Q    You previously provided some observations of Mr.
9  Melton that he had shoes off.  He was barefoot and dancing
10  as he came out.  Is that right?
11   A    Yes, at one point.
12   Q    And did Mr. Melton appear to you that he had been
13  drinking?
14   A    Yes, ma'am.  Drinking and I don't know what else.
15   Q    And when he came out, you mentioned Mr. Melton
16  started yelling and you testified a moment ago that he made
17  a statement about being from Little Egypt Plantation.  It's
18  my understanding from your deposition testimony that you
19  don't have any reason to believe that Little Egypt is known
20  for violence of any kind?
21   A    Ma'am, I never been to Little Egypt.  I can't
22  tell you what they're known for.  I don't know because I've
23  never been there.
24   Q    And when Mr. Melton was yelling and said
25  something about being from Little Egypt and something about

Page 48

1  killing the MF-ers, after that, he said he was going to
2  kill someone named Sweeny.  Is that right?
3    A    Yes, ma'am.  That's correct.
4    Q    So, Mr. Melton's comments, those weren't directed
5  at you personally, were they?
6    A    No, ma'am.  They weren't.
7    Q    And Mr. Sweeny, you understood that just a very
8  short time earlier, Mr. Melton and Mr. Sweeny had had an
9  argument of some kind at one of your union meetings,
10  correct?
11   A    That is correct.
12   Q    And it was at that point, I understand, that you
13  interjected and advised Mr. Melton to chill out or words to
14  that affect because Sweeny isn't here, right?
15   A    That's correct.
16   Q    Okay.  It's at that point that you claim that Mr.
17  Melton pushed you down?
18   A    Yes, ma'am.  He did.
19   Q    And then I understand he hit you twice in the
20  face, correct?
21   A    Yes, ma'am.  He did.
22   Q    And it was at that point after he had hit you
23  twice in the fact that you started swinging, correct, Mr.
24  Branch?
25   A    I was hallucinating.  I was out of it.  When I

Robert Branch    2023-FRS-00026    February 13, 2024

Page 49

1  started swinging when I started standing up with his fists
2  balled and he hit me again so I had to --- it was at a
3  point of self-defense.
4       MS. FITZKE:    Okay.  Mr. Branch, object as non-
5  responsive first of all.  That's not my question.
6       JUDGE DONALDSON:    What was your question again,
7  Ms. Fitzke?
8       BY MS. FITZKE:
9       Q    My question was simply it was at that point, Mr.
10 Branch, that you stood up and started swinging?
11      JUDGE DONALDSON:    Please answer that question
12 first if you need to explain it, let me know.
13      WITNESS:    Yes, ma'am.  At that point, I did get
14 up swinging, but I only got up, Your Honor, because of the
15 fact that when I stood up, he was still standing over me
16 with his fists balled ready to hit me again.  So, what
17 point do I have to defend myself to keep from getting
18 knocked down again?  Do I keep getting knocked down?
19      BY MS. FITZKE:
20      Q    Mr. Branch, can I ask another question, sir?  Are
21 you done talking?
22      A    Yes, ma'am.  You can.
23      Q    Okay.
24      JUDGE DONALDSON:    Ms. Fitzke, I don't need that
25 kind of commentary and I'll let Mr. Branch know if he's not

Page 50

1  being responsive at that point or going on too far, but Mr.
2  Branch, I got the point that you were making with your
3  statement and you don't have to repeat it in the future.
4       WITNESS:    Yes, ma'am.
5       JUDGE DONALDSON:    Okay.
6       BY MS. FITZKE:
7       Q    So, Mr. Branch, after you started swinging at Mr.
8  Melton, you chose not to walk away.  You chose to swing at
9  him, correct?
10      A    Not really.  Like I said, Ms. Susan, he throwed
11 his hands up.  He had his hands to hit me again.
12      Q    And you chose to swing at Mr. Melton and you
13 chose not to walk away, correct?
14      A    I couldn't walk away.
15      Q    And, Mr. Branch, you said a couple times today
16 something I haven't heard before which is you're claiming
17 now that Mr. Melton had his hands up again to swing at you
18 again, but when you participated in the investigation
19 hearing with the company that was reviewed as part of the
20 process to discipline you and on which the decision was
21 made to terminate you, you didn't provide that information
22 to the company at that time, did you?
23      A    No, I did not.
24      Q    And when you wrote a written statement, a
25 multiple page written statement describing the events of

Page 51

1  that night to make your report to the company.  You didn't
2  provide that information that Mr. Melton had his hands up
3  again ready to swing at you.  You didn't provide that
4  information in that statement either, did you?
5       A    No, because I said I used the statement of
6  attack.
7       Q    And after you started swinging at Mr. Melton, Mr.
8  Melton started backing away from you, correct?
9       A    Yes.
10      Q    And in fact, if Mr. Melton was backing away from
11 you, he fell over backwards, correct?
12      A    I assume.
13      Q    And after Mr. Melton fell over, you continued
14 swinging at him, correct?
15      A    I assume.
16      Q    And as you continued to swing at Mr. Melton, he
17 assumed a defensive posture and put his hands up in front
18 of his face to block your punches, correct?
19      A    That is correct.
20      Q    And while you were swinging at Mr. Melton, you
21 struck him, correct?
22      A    No, I did not.
23      Q    When you participated in the investigation
24 hearing with the company, do you recall testifying that you
25 struck Mr. Melton?

Page 52

1       A    Like I said, when it happened, I thought I struck
2  him, but when I really realized, I didn't hit Mr. Melton.
3       Q    When did you realize you didn't hit Mr. Melton?
4       A    When I realized I didn't hit him.  When I
5  realized I didn't hit him.  I mean, when I went back and
6  evaluated the incident, that's when I realized I didn't hit
7  him.  It was probably a month ago.  It happened quick.
8       Q    But when you testified in the investigation
9  hearing, you understood you were creating the record on
10 which the company would make a determination as to whether
11 to assess discipline to you, correct?
12      A    Yes, I did.  That's correct.
13      Q    And during that investigation hearing, you told
14 the company, "Yes, you can say I struck him."  Did you tell
15 the company that?
16      A    I might have did during that time.  I might have
17 did.
18      Q    If that's in the investigation hearing
19 transcript, do you have any reason to believe that you
20 didn't say that, sir?
21      A    I said I might have did.  I don't have the
22 investigative report in front of me.
23      Q    And you're aware, sir, that the witnesses who
24 testified at the investigation hearing, multiple witnesses
25 who testified at the investigation hearing also testified

Robert Branch    2023-FRS-00026    February 13, 2024

Page 53

1  that they saw you strike Mr. Melton, correct?
2      A   Okay.  Okay, correct.
3      Q   Do you recall that, sir?
4      A   Yes, I recall that.
5      Q   All right and while Mr. Melton was on the ground
6  kind of in his defensive posture and you were swinging at
7  him, I think you then testified that the other guys from
8  your crew that were around had to pull you off Mr. Melton,
9  correct?
10     A   They pulled us apart.
11     Q   You gave some testimony here today about Mr.
12 Melton indicating after you were pulled apart something
13 about going to get a gun from a truck or going to get a
14 gun.  You also testified a moment ago that that's something
15 that when you spoke to Mr. Chris Day that you told Chris
16 Day and I just want to give you a chance, Mr. Branch, if
17 you need to clarify that statement.  Did you tell Mr.
18 Day that Mr. Melton indicated that he had a gun?
19     A   Yes, I did.
20     Q   Okay.  Do you recall in November of 20 --- well,
21 first of all, you didn't put that information in the
22 written statement that you submitted to the company
23 describing the events of that night?
24     A   No, I did not.  I did not.
25         MR. SOREY:  Let her finish.

Page 54

1         WITNESS:  Oh, okay.
2      BY MS. FITZKE:
3      Q   And you didn't say at any point during the
4  investigation hearing when the company was making a
5  decision as to your employment that Mr. Melton indicated
6  that he had a gun or was going to get a gun, did you?
7      A   No, I did not.
8      Q   Okay and you recall when you were deposed in this
9  case when I came down to Mississippi to meet with you and
10 we sat in a conference room across from one another and I
11 asked you some questions.  Do you recall that deposition in
12 this case?
13     A   Yes, I do.
14         MS. FITZKE:  Okay.  I'd like to show you, Mr.
15 Branch, a page of that deposition transcript and, Your
16 Honor, I'm not sure logistically you want to handle this
17 form of impeachment if you'd like.  I don't know if they
18 have transcripts or if we should put it up on the screen.
19         JUDGE DONALDSON:  Are you referring to a JX
20 marked --- ?
21         MS. FITZKE:  No, it's Mr. Branch's deposition in
22 this case.  It's not one of the exhibits.
23         JUDGE DONALDSON:  Okay.  What we can do is if
24 you or co-counsel are comfortable presenting that on the
25 screen, we can do that so I have the benefit of it as well

Page 55

1  and then you can, if you want to, also mark and submit it
2  as a document later, we can handle that before we conclude
3  today.
4          MS. FITZKE:  Great, great.  I think we would
5  like to do both of those things.
6          JUDGE DONALDSON:  Okay.
7          MS. FITZKE:  We're going to pull up page 96.
8       BY MS. FITZKE:
9       Q   All right.  So, Mr. Branch, in your deposition,
10 you did have some questioning around this statement that
11 Mr. Melton made about --- or that you claim that Mr. Melton
12 made about having a firearm.  On page 96, I asked you,
13 Question, "Okay, did you ever report to the railroad to
14 Illinois Central management or Human Resources that Todd
15 Melton indicated he had a firearm in his truck?"  Answer,
16 "No, I did not."  Question, "Is there any reason why you
17 didn't report that?"  Answer, "I thought maybe a foreman or
18 someone or an assistant foreman walked out there and he
19 said it wasn't in the truck so that's why I didn't report
20 it."  Did I read that accurately, sir?
21      A   Yes, you did.
22      Q   And was that your testimony sworn under oath in
23 November of 2023?
24      A   Yes, ma'am.  It was.
25      Q   And is it your sworn testimony that we just read

Page 56

1  into the record for November 2023?  Is that accurate, sir?
2      A   Yes, ma'am.
3          MS. FITZKE:  Is there any reason why --- Grace
4  you can take that down.
5      BY MS. FITZKE:
6      Q   Is there any reason why your testimony here today
7  is different from your testimony in November of 2023?
8      A   Well, my point is I didn't --- when he went to
9  the truck to get his gun, I didn't know whether the gun was
10 there or not because I didn't go near his truck.
11     Q   Okay.
12     A   He made those statements.
13     Q   And, Mr. Branch, you understand that Chris Day is
14 a member of Illinois Central management, correct?
15     A   That is correct.
16     Q   And you understood that in May and June of 2022?
17     A   Yes, ma'am.  I do.  I did.
18     Q   And you understood when I asked you that question
19 in November of 2023 that Mr. Day was a member of Illinois
20 Central management?
21     A   Yes, ma'am.
22     Q   I understand, Mr. Branch, that with the
23 conversations that you indicated having with Mr. Chance
24 Gardener over that Memorial Day weekend with regard to your
25 report about Mr. Melton or your thinking about it and then

Robert Branch    2023-FRS-00026    February 13, 2024

Page 57

1  deciding to make a report about Mr. Melton that Mr.
2  Gardener didn't do or say anything that you thought was
3  trying to not report the incident, correct?
4      A    Mr. Gardener, all he said was that he was going
5  to talk with Mr. Melton.
6      Q    And my understanding from your prior testimony
7  was that Mr. Gardener did not try to dissuade or discourage
8  you from making any kind of report, did he?
9      A    I don't recall.
10     Q    And Mr. Day, he asked that you submit a written
11 statement of the incident?
12     A    Yes, he did.
13     Q    And you, in fact, wrote that statement and
14 submitted it to Mr. Day?
15     A    Yes, ma'am.  I did.
16     Q    All right and my understanding is that you tested
17 the statement to Mr. Day?
18     A    Yes, ma'am.  I did.
19     MS. FITZKE:    We have Joint Exhibit 48 that I
20 would just like to show the witness and again, Your Honor,
21 I'm not sure logistically how you best like to handle this
22 right now.
23     JUDGE DONALDSON:    Well, we can assist you with
24 that, but it looks like you're able to present your own
25 exhibits.  If you're able, I welcome that because you have

Page 58

1  control over what you want to show.  So, you can proceed.
2  Do exactly what you've been doing and tell us what you're
3  showing before you show it.
4      MS. FITZKE:    Okay, terrific.  I just didn't
5  know if it was different for the exhibits I want to
6  confirm.  Appreciate that.
7      JUDGE DONALDSON:    No, it's good so far.
8      MS. FITZKE:    Grace, are you able to pull up 48?
9      MS. JACOBSON:    Yes.
10     MS. FITZKE:    Okay, great.
11     JUDGE DONALDSON:    The only thing I would
12 caution for the witness and right now, it's Mr. Branch.  If
13 you need that enlarged in order to see it, you may not have
14 the vision I do, but just let us know if it needs to be a
15 bigger type so you can read what you're being shown.
16     MS. FITZKE:    And, Mr. Branch, if you need us to
17 scroll up or down at any point to get a full view, just let
18 us know.
19     MR. SOREY:    If you would like, I have a copy of
20 it on my desk.  I could retrieve it.
21     MS. FITZKE:    We're just going to get just a
22 little confirmatory testimony here.  If we get to something
23 that is a little more detailed, I think that would be
24 helpful.
25     BY MS. FITZKE:

Page 59

1      Q    Mr. Branch, are you able to see the exhibit?
2      A    I can't see it, but you can read it out.  That
3  will be fine.
4      MS. FITZKE:    Maybe, Eddy, if you have the
5  exhibits in your office, that would be helpful.
6      MR. SOREY:    It will take a second.
7      JUDGE DONALDSON:    Let's give them a chance to
8  retrieve it and Mr. Branch, while we're waiting, just make
9  sure from your perspective that what you have in front of
10 you from your attorney looks like what you're being shown.
11     WITNESS:    Yes, ma'am.
12     JUDGE DONALDSON:    The exact page, the exact
13 portion of the page because I don't want there to be any
14 confusion about what you are responding to.
15     WITNESS:    Yes, ma'am.
16     JUDGE DONALDSON:    Okay.  So, why don't we see
17 if you can enlarge the text that you're presenting?
18     MS. FITZKE:    This is the top of the exhibit.
19 Scroll as needed.
20     JUDGE DONALDSON:    Okay.  That looks good to me.
21 How about you, Mr. Branch?
22     WITNESS:    Yes.  Yes, ma'am.
23     JUDGE DONALDSON:    Okay.
24     MS. FITZKE:    Thank you.
25     BY MS. FITZKE:

Page 60

1      Q    So, Mr. Branch, we're looking at what's marked
2  and entered into the record as Joint Exhibit 48 which is a
3  text exchange.  I understand from previous testimony that
4  this is a text message exchange that you had with Mr. Chris
5  Day.  Is that right?
6      A    Yes, ma'am.
7      Q    And is this the text exchange that you spoke
8  about a moment ago with Mr. Day where he asked you to send
9  him a handwritten statement?
10     A    Yes, ma'am.
11     Q    All right and then he is --- the bubbles that are
12 in grey, my understanding is that those are Mr. Day's
13 comments and then the okay in blue, that's your response?
14 Is that right?
15     A    Yes, ma'am.
16     Q    All right.  Can we scroll down,
17 Grace?  All right and then --- oh, too far.
18     BY MS. FITZKE:
19     Q    Then there's a date there, May 30, 2022, at 8:00
20 p.m.  Do you see that there?
21     A    Yes, ma'am.
22     Q    All right.  Do you understand that's where you
23 sent the next message, the attachment that was attached?
24     A    Yes, ma'am.
25     Q    All right and is this the text message where you

Robert Branch    2023-FRS-00026    February 13, 2024

Page 61

1  attached and sent Mr. Day the handwritten statement?
2      A    Yes, ma'am.
3      Q    All right and it's my understanding that you did
4  not write this statement, that your wife wrote this
5  statement on your behalf?
6      A    Yes, ma'am. She did.
7      Q    But she did it based on information you provided
8  and asked that she include?
9      A    Yes, ma'am. That's correct.
10     Q    And you reviewed it and confirmed that it was
11 accurate and that this was what you wanted to say in your
12 statement to the railroad?
13     A    Yes, ma'am.
14         MS. FITZKE:    All right. There is --- if we can
15 take this down. I think we have the full statement as
16 another one of our Joint Exhibits. It's Joint Exhibit
17 Number 5. We'll have Grace pull that one up for us.
18     BY MS. FITZKE:
19     Q    Mr. Branch, are you able to see this exhibit?
20     A    Yes, ma'am.
21     Q    Okay. Do you recognize and we can scroll through
22 it, but at least the top of this at the first page at
23 least of this statement that you wrote and provided to Mr.
24 Day in that text message we just looked at?
25     A    Yes, ma'am.

Page 62

1      Q    All right. This statement is dated May 30, 2022.
2  Is that when you prepared this with the assistance of your
3  wife as your scribe so to speak?
4      A    Yes, ma'am.
5      Q    Okay and in the first paragraph, the first couple
6  sentences, you indicate that "On Thursday, May 26, 2022
7  around 9:00 p.m. at Magnolia Inn" and then you provide an
8  address in Columbus, Mississippi. It's my understanding
9  that this hotel was in Columbia, Mississippi. Is that
10 right?
11     A    That is correct.
12         MS. FITZKE:    Okay. So, I just wanted to
13 clarify that. I wanted to look and I think we see that,
14 Columbus, repeated in some of the other documents later.
15 So, I just wanted to confirm the identity of where it came
16 from. Grace, can you scroll down on this first page of
17 this statement? A little bit farther. Actually, why don't
18 we take this down? I don't have any other questions for
19 you right now on this document. We may come back to it.
20     BY MS. FITZKE:
21     Q    When you spoke with Branch, Mr. Branch, I'm
22 sorry. When you spoke with Mr. Day over that Memorial Day
23 weekend, I think you spoke with him on Monday on Memorial
24 Day. Is that right?
25     A    That is correct.

Page 63

1      Q    And do you recall Mr. Branch telling you --- I
2  did it again, Mr. Branch. I'm so sorry.
3      A    No problem.
4      Q    Do you recall Mr. Day telling you that a number
5  of folks were out because of the Memorial Day holiday and
6  he'd need to circle back with you the next day when folks
7  were back in the office?
8      A    Yes, ma'am. I did.
9      Q    And following your call with Mr. Day on Tuesday,
10 you understood that Mr. Day had reported the incident along
11 to Illinois Central Human Resources and Labor Relations?
12     A    That's what he told me when we had the phone
13 call.
14     Q    When we talked a minute ago about you having been
15 removed from service on --- I think you were advised on
16 June 2nd that you were being removed from service so it's my
17 understanding June 3rd was your first day out of work of
18 2022. Is that right?
19     A    That is correct.
20     Q    And while you were being held out of service
21 pending investigation, you received compensation from the
22 company during that period, correct?
23     A    Yes, ma'am. I did.
24     Q    And you were paid both your regular compensation
25 and the per diem during that period of time?

Page 64

1      A    I wasn't paid per diem.
2      Q    You don't think you were paid your per diem?
3      A    I know I wasn't. I have my paycheck. I wasn't
4  paid per diem.
5      Q    All right. When you received the Notice of
6  Investigation, you understood that you were also being
7  called to investigation to examine whether you in
8  connection with this incident had violated any company
9  rules, correct?
10     A    Correct.
11     Q    And you mentioned a moment ago the investigation
12 hearing was on June 7, 2022. You appeared in person for
13 that hearing, correct?
14     A    Yes, ma'am. I did.
15     Q    And during that investigation hearing, you were
16 allowed to make statements and tell your side of the story,
17 correct?
18     A    Yes, ma'am. I did.
19     Q    Okay. You were able to call witnesses on your
20 behalf, anyone you thought might have relevant information?
21     A    Yes, ma'am.
22     Q    You were also represented there by a union
23 representative. Is that right?
24     A    Yes, ma'am I was.
25     Q    And your union representative also had the

Robert Branch     2023-FRS-00026     February 13, 2024

Page 65

1 ability to question witnesses on your behalf?
2      A     Yes, ma'am.
3      Q     You had the ability to present or submit any
4 documentary evidence you thought might be helpful to your
5 case?
6      A     That's correct.
7      Q     And in your written statement that you provided
8 to the company, you identified eight co-workers that had
9 been in that area around the time that this altercation
10 with Mr. Melton took place. Is that right?
11      A     That is correct.
12      Q     And all of those individuals provided statements
13 to the company?
14      A     That is correct.
15      Q     And each of those witnesses came in and read
16 their statements into the record at the investigation
17 hearing?
18      A     That is correct.
19      Q     And following the investigation hearing or
20 written transcript of that investigation was prepared. Do
21 you recall that?
22      A     Yes, ma'am.
23      Q     And you received a copy of that transcript?
24      A     Yes, ma'am. I did.
25      Q     You were able to review it after your received

Page 66

1 it?
2      A     Yes, ma'am. I did.
3      Q     And that transcript accurately reported what
4 happened during the investigation hearing and what the
5 individual stated?
6      A     Yes, ma'am.
7      Q     During the investigation hearing, one of the ---
8 I understand you went to hearing along with Mr. Melton,
9 correct?
10      A     Yes, ma'am.
11      Q     He was also accused of rule violations in
12 conjunction with this altercation on May 26?
13      A     Yes, ma'am.
14      Q     So, Mr. Melton also had the ability to question
15 any of the witnesses at the hearing. Did you observe that?
16      A     Yes, ma'am.
17      Q     And Mr. Melton took that opportunity to ask you a
18 couple questions. Do you recall that?
19      A     Yes, ma'am. I did.
20      Q     And during the investigation hearing, Mr. Melton
21 asked you specifically, "Do you feel that I'm a threat to
22 you" and you answered, "No, I do not." Do you recall that?
23      A     Yes, I recall.
24      Q     And in the investigation hearing, you testified
25 truthfully to all the facts as you knew and understood them

Page 67

1 at the time, correct?
2      A     Repeat the question.
3      MS. FITZKE:     Sure.
4 BY MS. FITZKE:
5      Q     In the investigation hearing that you had with
6 the company, I understand you weren't sworn under oath like
7 you were here this morning, correct?
8      A     Correct.
9      Q     But you nevertheless testified truthfully and
10 fully as to the information that you thought pertinent to
11 the company's decision, correct?
12      A     Correct.
13      Q     And at no time after the transcript was prepared
14 or the hearing was concluded did you come back to the
15 company and try to add any additional information, correct?
16      A     No, ma'am. I didn't.
17      Q     At the conclusion of the investigation, you, some
18 days later, I think you mentioned on June 24th received a
19 letter from the company terminating your employment. Is
20 that right?
21      A     That is correct.
22      Q     And you were advised at that time that your
23 employment was being terminated because the record in that
24 investigation hearing record and exhibits contained
25 credible testimony and substantial evidence proving that

Page 68

1 you violated the IC Code of Business conduct and IC
2 workplace violence prevention policy, correct?
3      A     Right.
4      Q     And that the violation of those policies was
5 identified as a Level 4 violation. Do you understand what
6 a Level 4 violation at Illinois Central was?
7      A     Yes, ma'am. I do.
8      Q     Okay and you understand that under the company's
9 disciplinary policy, that Level 4 violations are the most
10 serious violations that result in immediate terminations?
11      A     Yes, ma'am.
12      Q     You understand, Mr. Melton was also terminated as
13 a result of the events of the events of May 26?
14      A     Yes, ma'am.
15      Q     Mr. Branch, what was the last job that you
16 applied for?
17      A     The last job I applied for, I applied for a job
18 at Milwaukee Tools.
19      Q     At the time of your deposition in May of 2023,
20 that was also the last job, because me, in November of
21 2023, that was also the last job that you had applied for,
22 a job with Milwaukee Tools. Is this the same job or a
23 different job?
24      A     Different job.
25      Q     Okay. I understand that you've been out of work

Robert Branch     2023-FRS-00026     February 13, 2024

Page 69

1 roughly 20 months and you've applied for roughly 25 to 30
2 jobs. Is that your testimony?
3     A    Yes, ma'am.
4     Q    Okay. So, right around a job, a job and a half a
5 month is the rate at which you're applying for alternative
6 employment?
7     A    Ma'am? Can you say that again?
8         MS. FITZKE:    Sure. Sorry.
9     BY MS. FITZKE:
10    Q    So, I'm asking, you've applied for jobs at about
11 one job to one and a half jobs a month if I'm ---
12    A    Maybe.
13    Q    It's my understanding that with respect to your
14 benefits, your company-provided benefits, you were able to
15 stay on the Illinois Central benefit plan through November
16 of 2022, correct?
17    A    Correct.
18        MS. FITZKE:   I'm sorry, Mr. Branch. I'm not
19 trying to mislead you. I made a misstatement.
20        WITNESS: Yes, you did.
21    BY MS. FITZKE:
22    Q    You had company benefits until October 31, 2022.
23 So, you would have rolled off in November. Is that right?
24    A    Yes, ma'am.
25    Q    Okay. So, in terms of any lost benefit claim in

Page 70

1 this case, any damages you claim with respect to the loss
2 of your company-provided benefits, those losses would not
3 start until November of 2022, correct?
4     A    Correct.
5     Q    And then after you rolled off your Illinois
6 Central benefits, you started obtaining benefits through
7 your wife's employer, correct?
8     A    That is correct.
9     Q    And so it's my understanding that you did not
10 have an period of time where you went without what we call
11 health and welfare benefits, medical, dental, vision care.
12 Is that right?
13    A    That's correct.
14    Q    And then when you started, you went onto your
15 wife's plan for medical insurance and then I understand you
16 participated in the company's Cobra offering with respect
17 to dental and vision care. Is that right?
18    A    Yes, ma'am.
19        MS. FITZKE:   Grace, are we able to pull up,
20 please, Joint Exhibit 39?
21    BY MS. FITZKE:
22    Q    While my colleague is pulling up that document,
23 you mentioned a moment ago having to pay $966.36 a month
24 for healthcare insurance. When did your healthcare
25 insurance increase to $966.00 a month?

Page 71

1         MR. SOREY:   I'm going to object to that
2 question. He testified that amount to health, dental and
3 vision insurance. It was a total combined group.
4         JUDGE DONALDSON:     All right. So, that was the
5 testimony that you believe the record shows. I don't
6 recall exactly what he was answering at the time. Ms.
7 Fitzke wanted to know when there was an increase in his
8 amount that he pays monthly?
9         MS. FITZKE:    In light of Mr. Sorey's
10 statements, maybe I can ask the questions a different way.
11 I don't think the record reflects that, but I think I can
12 clear it up and I think Mr. Sorey has given some helpful
13 information to do that. So, Mr. Branch, we're looking at
14 what's been marked as Joint Exhibit 38 which is a memo.
15 So, can we make it just a little bit bigger? It looks like
16 I can --- I want to make sure Mr. Branch can read it.
17        WITNESS:   I can see it.
18        MS. FITZKE:   You guys can see it? Okay,
19 terrific. Can we scroll down just a tiny bit? Thank you.
20 I think that's the full text of the exhibit now on the
21 screen.
22    BY MS. FITZKE:
23    Q    Mr. Branch, is this a memo that you prepared,
24 sir?
25    A    Yes, ma'am.

Page 72

1     Q    Okay. My understanding of what this document is
2 is a document that you prepared to try to summarize what
3 you believe your or what your out-of-pocket expenditure was
4 for the healthcare insurance that you obtained following
5 the time that you rolled off the Illinois Central plan. Is
6 that right?
7     A    It's dental and vision.
8     Q    Is this though, sir, this memo, this Exhibit 38,
9 does this include dental and vision or is this just the
10 healthcare?
11    A    No, it's included.
12    Q    I'm sorry.
13    A    No, that's just the health. That's just the
14 health.
15        JUDGE DONALDSON:   Do you want ---
16        WITNESS:   I said just the health.
17        JUDGE DONALDSON:   Excuse me, Mr. Branch. I
18 want to rely on the attorneys to use the exhibits the way
19 they want to, but there's a difference between JX-38 and
20 39, correct? Do you want to just show them both so he can
21 differentiate?
22        MS. FITZKE:   That may be helpful. Can we
23 scroll, Grace, to JX-39 because I think, Mr. Branch, no one
24 is trying to trick you here. We want to get the correct
25 numbers into the record.

Robert Branch    2023-FRS-00026    February 13, 2024

Page 73

1     WITNESS:  Yes, ma'am.  No problem.
2     BY MS. FITZKE:
3     Q    So, is JX-39, what's in front of you now, is this
4  a summary of what you've paid for the dental and vision
5  through Cobra?
6     A    Yes, ma'am.
7     MS. FITZKE:    All right.  If we could scroll
8  back to 38?  Can you scroll back to 38?
9     MS. JACOBSON:    Yes.
10    MS. FITZKE:    You all can't see.  Grace was
11 looking at me in a way that I thought she's like, "I'm
12 done" and it was on there.  So, thank you.  Sorry.  So
13 sorry.
14    BY MS. FITZKE:
15    Q    All right.  Sir, I think we're all hopefully all
16 back to 38.  So, is that --- has looking at 39 helped
17 refresh your memory as to what is contained in Exhibit 38?
18 Can you tell, Mr. Branch, what JX-38, the one that's in
19 front of you now, what that's about?
20    A    If I'm not mistaken, I think the 769, I mean, to
21 be honest, I don't know the $769 ---
22    Q    I didn't catch that.  Can you say that again?
23    A    I'm thinking.  Give me a minute.
24    Q    Okay.  I understand.
25    A    $769, October.

Page 74

1     Q    Mr. Branch, can I ask a different question
2  perhaps?  Have you had any increase in the amount that you
3  have to pay for your family coverage through your wife's
4  employer in the year 2024?
5     A    Yes, ma'am.  It increased from $814.00 to
6  $854.00.
7     Q    All right and you mentioned $814.00 a moment ago.
8  Do you believe that in each month of 2023 that for your
9  family coverage just for the medical insurance that you
10 paid $814.00 a month for your family plan through your
11 wife's insurance?
12    A    Yes, ma'am.  I did.
13    Q    Okay and in 2022, for the couple months of 2022
14 that you were on your wife's health plan, do you believe
15 that you paid $769.00 a month for those benefits?
16    A    I think I did because I think I had to pay --- it
17 was a premium to join it.  That would have the dental
18 insurance.
19    Q    And I understand ---
20    A    -- the general insurance.
21    MS. FITZKE:    If we can look again at 38?  If we
22 can scroll down again?
23    MS. JACOBSON:    I believe this one is 39.
24    MS. FITZKE:    I'm sorry, 39.
25    MS. JACOBSON:    Okay, got you.  I just want to

Page 75

1  make sure.
2     BY MS. FITZKE:
3     Q    And then Exhibit 39, Mr. Branch, do you recognize
4  this as a summary of the Cobra expenses that you prepared
5  reflecting the expenses you incurred while you ---
6  following your separation from Illinois Central and your
7  removal from their benefits plan?
8     A    Yes, ma'am.
9     Q    And while you worked for Illinois Central, you
10 did have to pay for an employee portion of your premium for
11 your medical, dental and vision benefits while you worked
12 for the company and for that period of time that you
13 remained on their benefits plan.  Do you recall that?
14    A    Yes, ma'am.
15    Q    And do you recall that you were paying
16 approximately $228.00 per month to the company for that
17 coverage?
18    A    Yes, ma'am.  That's correct, but dental and
19 vision, it was different.  That was just the health
20 insurance I was paying the $228 for.
21    Q    While you worked for the company, did you have to
22 pay a portion of the premium to the company that was in
23 addition to that for your vision and dental care?
24    A    Yes, ma'am.  It wasn't like --- the $228 wasn't
25 included.  No, ma'am.  They took out a different premium

Page 76

1  for vision and dental.
2     Q    And what was the additional premium for vision
3  and dental?
4     A    I really can't recall.  I know it was $40.00-some
5  a month or every two weeks.  Something like that.  It was
6  something like that for the payment plan.
7     Q    You think it was $48.00 a month or ---
8     A    It was $40.00-something.
9     Q    Did you say it was per paycheck then every two
10 weeks?
11    A    It was every two weeks.
12    Q    Okay.  So, around --- roughly $40.00 every two
13 weeks.  Is that a fair estimate?
14    A    I would say to my recollection, but I haven't
15 looked at my pay stub in a while.
16    MS. FITZKE:    All right, fair enough.  We can
17 take down the exhibit.  Thank you.
18    BY MS. FITZKE:
19    Q    I understand that part of what you have had to do
20 since you left the company --- well, while you were at the
21 company and when you left, you have certain prescriptions
22 that you obtain that for personal health conditions,
23 correct?
24    A    Yes, ma'am.
25    Q    And just to make our record on this, I understand

Robert Branch     2023-FRS-00026     February 13, 2024

**Page 77**

1  that you had some medication relating to a heart condition
2  that while you worked at Illinois Central and for the
3  period you were covered under their plan, you paid about
4  $50.00 a month for those prescriptions and subsequently
5  while under your wife's plan, they now cost you
6  approximately $30.00 a month more and you pay now around
7  $80.00 a month.  Is that right?
8      A    That is correct.
9      Q    With respect to --- you gave some testimony
10 earlier with respect to your home expenses, expenses in
11 conjunction with your daughter's education or your home
12 renovation.  Those are expenses that you both would have
13 paid if you worked for the company and had to continue to
14 --- and chose to continue paying after you left the
15 company, correct?
16     A    Run that by me again.  I missed a part.
17     Q    Right.  The expenses that you incurred in
18 conjunction with your home renovation, for example, you
19 didn't have to make that expenditure because your
20 employment was terminated, correct?
21     A    No.
22     Q    That was money that you were choosing to spend on
23 your home care and upkeep, correct?
24     A    That is correct.
25     Q    And the same is true with the expenses you

**Page 78**

1  identified with respect to your daughter's education or the
2  care of your family, correct?
3      A    Well, my job was based on my daughter's
4  education.
5      Q    That was something that you wanted to be able to
6  do and were happy you were able to do for your daughter,
7  correct?
8      A    Based on my job.
9      Q    And I think you also testified you kept doing it
10 after.  You were fortunate to be in a position to be able
11 to do that after you left the company, correct?
12     A    That is correct.
13     Q    You mentioned a moment ago in your testimony that
14 you estimate that the amount you lost in salary to be
15 $184,000 over the last approximately 20 months since you
16 were terminated.  How did you calculate that $184,000, sir?
17         MR. SOREY:    It was actually $185,000 in the
18 testimony.
19         MS. FITZKE:    Well, my notes say $184,000 and
20 I'm the questioner, Mr. Sorey.
21         WITNESS:    You're wrong.
22         JUDGE DONALDSON:    Let me just back up here so
23 we can ---
24         WITNESS:    It was actually $185,000.
25         JUDGE DONALDSON:    Just a moment, please.  Mr.

**Page 79**

1  Sorey is trying to correct the record, but let's let the
2  witness answer the question if he disagrees with any
3  premise of it.  Can you restate your question, Ms. Fitzke?
4          MS. FITZKE:    Yes.
5      BY MS. FITZKE:
6      Q    Mr. Branch, I had in my notes that you testified
7  that you lost approximately $184,000 and I may have dropped
8  off some hundreds that you said after that, but I rounded
9  to the $184,000.  If I did get that wrong, again, I'm not
10 trying to trick or mislead you and please do clarify.  What
11 I want to know is what number do you claim the loss was, I
12 guess, and how did you calculate it, sir?
13     A    It was actually $185,000 and I calculated from
14 one of my pay stubs.  I looked at the highest pay stub that
15 I made with overtime and I multiplied it by monthly.  Every
16 two weeks, I multiplied by 2 and then I came up with a
17 total and then I multiplied by the month and I took and
18 multiplied it by 12 months.
19     Q    Did I understand correctly that you said you
20 picked the highest pay stub that you could find?
21     A    Well, the last pay stub that I got during the
22 month of June.  It was the highest and it had the overtime
23 and that's how I came up with the $185,000 and I also took
24 and multiplied my hourly months that I made, my salary I
25 made.  Like I made $30.00 so I multiplied it times 80, then

**Page 80**

1  I turned around and took the 80 and multiplied the time for
2  months, I mean, two times, then I turned around and
3  multiplied that figure by 12 months.
4          MS. FITZKE:    Okay.  So, I just want to make
5  sure I'm following because I'm not sure I completely am.
6      BY MS. FITZKE:
7      Q    So, I understand you took your last wage times 80
8  to get what your biweekly wage was.  Do I have that right
9  so far?
10     A    Yes, ma'am.
11     Q    Okay and how did you use that final pay stub?
12 Was that just to try to estimate what your total overtime
13 hours in that one period were?
14     A    Sort of.
15     Q    Okay and did you assume the same overtime hours
16 to each of the biweekly periods then as you calculated
17 them?
18     A    I didn't use the overtime I was in the year 2023.
19 I didn't use --- in 2023, I used the overtime hours.  Only
20 used them, if I'm not mistaken, I think continued in 2022
21 in June from the time I was laid off to the time I was ---
22 in December of 2022.  I didn't use the overtime hours in
23 2023 at all.
24     Q    And do you recall how you factored in the
25 overtime hours to your estimated wage loss in 2022?

Robert Branch     2023-FRS-00026     February 13, 2024

Page 81

1     A     I just used the last pay stub with the overtime.
2     Q     And did you use that last pay stub to estimate
3 your biweekly rate for each week during the remainder of
4 the year?
5     A     I think I did, ma'am. I'm not for sure. I think
6 I did.
7     Q     I think I'm following and with respect to the
8 overtime that you worked while you worked for Illinois
9 Central, is it fair to say that the overtime wasn't
10 consistent every week, but would be higher some weeks and
11 lower other weeks or not at all in some weeks?
12     A     Well, it was plus the rate. We always got some
13 overtime. It was barely that I didn't get any.
14     Q     And when you calculated that $185,000 estimated
15 wage loss, did you calculate it through today's date or was
16 there a different end date?
17     A     Could you repeat that? Today's date or what?
18     Q     Or was there a different end date on your
19 calculation?
20     A     I don't recall. I don't recall.
21     MS. FITZKE:     Thank you, Mr. Branch. I don't
22 have any other questions for you at this moment.
23     WITNESS:     Okay.
24     JUDGE DONALDSON:     All right. I'd like to ask a
25 few questions. Usually I wait until the very end, but it

Page 82

1 might help if you have any redirect or recross. This is
2 mainly just sometimes I need information to fill in the
3 gaps to make sure I understood some things that you said so
4 if you'll hold off just a minute there, Mr. Sorey.     Mr.
5 Sorey, do you, in fact, have some redirect?
6     MR. SOREY:     I have a few.
7     JUDGE DONALDSON:     Okay. Let me understand and
8 again, you may have answered some of this earlier, Mr.
9 Branch, and I just missed it. You were asked about Tier 1
10 and Tier 2 benefits. I didn't catch what you said about
11 them. Can you just --- I'm not asking you to be a Human
12 Resources officer for the company, but what is your
13 understanding of what those benefits are?
14     WITNESS:     Yes, ma'am. My understanding of
15 Tier 1 is my retirement and Tier 2 is I'm paying my wife's
16 retirement. That's my understanding.
17     JUDGE DONALDSON:     I see. How old are you
18 today?
19     WITNESS:     I am 58 today.
20     JUDGE DONALDSON:     58 today and how old were you
21 when you were terminated in June of 2022?
22     WITNESS:     I was 57.
23     JUDGE DONALDSON:     All right. What month is
24 your birthday in?
25     WITNESS:     I have a birthday next month. I will

Page 83

1 be 59 on XX-XX.
2     JUDGE DONALDSON:     Okay, understood. Did your
3 wife always take the benefit of having health insurance,
4 health benefits through her employment up to the time you
5 started taking advantage of it too?
6     WITNESS:     No, ma'am. I was always --- every
7 job I ever had, I would always carry the family insurance.
8     JUDGE DONALDSON:     So, she was on your plan?
9     WITNESS:     Yes, ma'am.
10     JUDGE DONALDSON:     Until you didn't have a plan
11 and then you went on her plan through her employer. Is
12 that right?
13     WITNESS:     Well, until I didn't have a plan.
14 Well, I actually looked for insurance other than my wife
15 because I was trying to find something cheaper, but the
16 fact of the matter was, it was expensive and it was cheaper
17 for me to ask her to place myself and our daughter and my
18 wife on her insurance and I would just pay her premium
19 because it was going to be more higher if I would have went
20 to another company. So, that's why I didn't go with
21 another --- I searched, but it was higher so I chose to go
22 with my wife's insurance which it was cheaper than the
23 insurance that I was looking at.
24     JUDGE DONALDSON:     You were looking in the open
25 market then? I understand.

Page 84

1     WITNESS:     Yes, ma'am. The open market, right.
2     JUDGE DONALDSON:     Yes. Okay. Lastly, I'm not
3 from Mississippi or this might cover other territories
4 covered by the Employer, but what's Little Egypt
5 Plantation? Is that an area?
6     WITNESS:     Ma'am, all I know is it's a little
7 town off of 49 and you can go through 49, you see Egypt
8 Plantation. That's all I know about it.
9     JUDGE DONALDSON:     Okay. So, there's actually a
10 road sign to this place?
11     WITNESS:     It's a road sign that says Little
12 Egypt Plantation so that's all I know.
13     JUDGE DONALDSON:     Okay. Sounds like it's not
14 much more than what I know, but anyway, I appreciate you
15 clarifying a few things for me. I don't know if any of the
16 answers matter, but I just found myself wanting the
17 information. So, Mr. Sorey --- well, Mr. Branch, can you
18 continue with some questions from your attorney? Do you
19 need a break?
20     WITNESS:     No, ma'am. I can continue.
21     JUDGE DONALDSON:     Okay. You can go ahead, Mr.
22 Sorey.
23     MR. SOREY:     Thank you, Your Honor.
24          REDIRECT EXAMINATION
25 BY MR. SOREY:

Exhibit A - Transcript of February 13 and 14, 2024, hearing in front of the Office of Administrative Law Judges

Robert Branch    2023-FRS-00026    February 13, 2024

Page 85

1    Q    Were you given any opportunity to correct the
2  investigation transcript?
3    A    No, sir.
4    Q    Now, where you live in Carroll County, are there
5  many opportunities around there for jobs?
6    A    No, sir.
7    Q    Just for instance, how far are the jobs you
8  applied for with Milwaukee Tools?
9    A    It's 30 to 40 miles.
10   Q    Okay and what towns are located near you?
11   A    Greenwood and Winona which they don't have any---
12  one manufacturer up there.  I applied up there and you got
13  Grenada which is about 45 miles away.
14   Q    Now, when did you actually lose your retirement
15  benefits?
16   A    I lost my retirement benefits on June when I was
17  terminated.
18   Q    Okay.  So, that didn't go over till November
19  2022?
20   A    No, sir.
21   Q    And on Cobra expenses, how long did you pay Cobra
22  expenses and what did you pay for?
23   A    I paid Cobra expenses from November to up to now.
24   Q    Okay.
25   A    And I was paying for dental and vision.

Page 86

1    Q    And your health insurance was through your wife?
2    A    My health insurance was through my wife.
3    Q    Okay.  When you were working on the traveling
4  gang, did you normally get overtime?
5    A    When we worked on the rail gang, I always got
6  overtime.
7    Q    Okay.
8    A    Unless they say that overtime is --- they used
9  the word --- they put out a memo that said no overtime.
10   Q    Now, your wage calculation, did it go through
11  February of 2024?
12   A    Yes, sir.
13   Q    Now, in Exhibit 5 that you were shown a while ago
14  that was put up on the screen, did it contain the statement
15  that you feared for your life from Mr. Melton?
16   A    I believe it contained I was threatened, yes.
17       MR. SOREY:    We're seeing under our group thing
18  here if we could pull it up.
19       JUDGE DONALDSON:    Okay.
20       MR. SOREY:    Exhibit 5.  Do you want her to pull
21  it up?
22       MR. FERGUSON:    Can you see it now?
23       MR. SOREY:    Yes.  It's a little bit hard to
24  see.
25       BY MR. SOREY:

Page 87

1    Q    All right.  Look at the third line down.
2    A    "I feared for my life."
3    Q    All right and you advised the railroad of that
4  particular situation?
5    A    That is correct.
6    Q    All right.  Now, again, we got to talking a while
7  ago about walk away.  Could you have walked away from the
8  situation?
9    A    I mean, I tried.  I was until I was struck.
10   Q    Okay.  Were you physically able to walk away at
11  that point?
12   A    Not really.
13   Q    Why not?
14   A    I was hurting and blood was coming down my
15  forehead and my face.
16   Q    Did you have any problem with your leg?
17   A    Yes, I did.
18   Q    What problem did you have with your leg?
19   A    My leg was swollen and my knee was twisted.
20       MR. SOREY:    That's all the questions we have,
21  Your Honor.
22       JUDGE DONALDSON:    All right.  Anything further
23  that needs to be limited to that set of questions just now?
24  Ms. Fitzke, do you want to ask anything like that?
25       MS. FITZKE:    Yes, please.

Page 88

1       JUDGE DONALDSON:    Okay.  Go ahead.
2                    CROSS EXAMINATION
3  BY MS. FITZKE:
4    Q    Mr. Branch, just to confirm.  With respect to the
5  portion of benefits, vision and dental that you had through
6  the Cobra continuation with the railroad, it's my
7  understanding that Cobra continuation is for a period of 18
8  months.  Did you have that benefit for 18 months or did you
9  have it for a different period of time?
10   A    I had it for 18 months.
11   Q    And with respect to the --- you were asked a
12  question about whether you were given the opportunity to
13  correct the investigation hearing transcript.  My
14  understanding of your testimony, sir, was that you had read
15  the transcript after you received it and that there were no
16  errors in the transcript, correct?
17   A    I read it, but nobody told me I could correct it.
18  That's my point.
19   Q    And my question was slightly different, sir.  My
20  question was as you read the transcript, you didn't note
21  anything in there that was taken down by the court reporter
22  incorrectly or mistakenly, did you?
23   A    No, ma'am.  I did not.
24   Q    Okay.  With respect to the questioning about the
25  statement where you indicated that you feared for your life

Exhibit A - Transcript of February 13 and 14, 2024, hearing in front of the Office of Administrative Law Judges

Robert Branch    2023-FRS-00026    February 13, 2024

Page 89

1  around Mr. Melton, Mr. Melton came on Monday or excuse me,
2  Tuesday, May 31st when you returned to work and Mr. Melton
3  came to you and apologized.  It's my understanding you
4  accepted his apology, correct?
5      A    Yes, ma'am.  I accepted the apology, but it
6  didn't erase what --- I didn't forget what had happened.
7      Q    And it's my understanding that as of the time Mr.
8  Melton apologized to you that you no longer feared for your
9  safety around him.  Is that right?
10     A    I didn't say that.
11     Q    And it's my understanding that --- well, it's not
12 my understanding.  As you communicated to the company in
13 the June 7 investigation hearing as outlined in the
14 transcript, as of June 7 when Mr. Melton asked you if you
15 considered him to be a threat, you no longer considered him
16 to be a threat at that time.  Is that right.
17     A    That was on June 7th, but before when the incident
18 happened, he was a threat.  They only asked me about the
19 investigation hearing without the threat, but he was a threat on
20 May 26, 2022.
21     Q    On the day of the fight, right?
22     A    Yes, ma'am.
23     Q    And after that day, you didn't consider Mr.
24 Melton to be an ongoing threat from the Tuesday when you
25 returned to work and he apologized going forward, correct?

Page 90

1      A    Actually, like I said, I was only agreeing with
2  him just to get him out of my way because I really didn't
3  want to deal with it at all, but I was trying to be nice
4  and be compassionate at the same time.
5      Q    And in terms of what you told the company, when
6  Mr. Branch, sorry, when Mr. Melton asked you, Mr. Branch,
7  in the investigation hearing whether you considered him to
8  be a threat and in the investigation hearing and in that
9  transcript and you indicated you did not, you didn't tell
10 the railroad at that time or any company manager that you
11 were just saying that to be nice to Mr. Melton, did you?
12     A    No, because of the fact that the day of the
13 investigation, the union, Dale Maquire, God bless his soul,
14 he had gone onto Heaven, he came to my vehicle when I
15 pulled up and asked me to say something nice about Mr.
16 Melton and he said that he was going to ask Mr. Melton to
17 say something nice about me.  So, I was just going with
18 what Mr. Dale Maquire asked me, but other than that, I
19 asked him, I don't know why that they gave at the hearing,
20 me and him the same hearing at the same time because I
21 asked for the hearing from --- my investigation to be
22 separate, but they wouldn't honor that.  They said that's
23 what the railroad wanted.  So, the railroad did what they
24 want.
25     Q    You're describing conversations you had with your

Page 91

1  union representative, correct, Mr. Maquire?
2      A    Right.  He also told me that the Carrier said
3  that I wasn't going to get terminated, but I'm at the
4  house.
5      Q    And ---
6      A    I am without a job.
7      Q    Sorry, sir.  I was looking away.  Were you
8  finished?
9      A    So, he also told me that the Carrier said that I
10 wasn't going to get terminated because I didn't do
11 anything, but guess what, June 24th, I got a letter saying
12 dismissed.
13     Q    And Mr. Maquire, he's not a member of company
14 management, correct?
15     A    No, he's not.
16     Q    And during the investigation hearing, when you
17 indicated that you no longer viewed or at that time, you
18 did not view Mr. Melton as a threat, you didn't tell anyone
19 from the railroad that you were just saying that to be
20 nice and that you didn't really mean it, correct?
21     A    Correct, but again, Ms. Susan, I also told Mr.
22 Day on June 31st that Mr. Melton was a threat.  He had a
23 gun, went to his truck to get a gun, threatened to shoot
24 me.  So, I feel like that until I said anything about the
25 incident, the railroad was sweeping it under the rug.  When

Page 92

1  I spoke about the incident, that's when they called me for
2  an investigation and did an investigation and guess what?
3  I was fired because I felt like I reported a safety matter
4  and that's when they wanted to hear what happened, but in
5  reality, I couldn't change the fact what happened.  What
6  happened happened and I couldn't stop it from happening.
7  All I could do is report it and now that's what they tell
8  us in the rules.  Report it in good faith so I reported it
9  in good faith and I got out.
10     Q    And in the investigation hearing, sir, you were
11 given a full opportunity to say anything that you wanted to
12 say about the incident with Mr. Melton, correct?
13     A    That's correct.
14     Q    You were given the opportunity to say on the
15 record that you believed Mr. Melton had a firearm or
16 threatened to go get a firearm, correct?
17     A    That's correct.
18     Q    And you did not provide that information to any
19 member of company management or Human Resources as
20 indicated in your deposition testimony, correct?
21     A    That's correct.
22     MS. FITZKE:    I don't have any other questions.
23 Thank you.
24     JUDGE DONALDSON:    All right.  Thanks to both
25 attorneys and thank you to Mr. Branch.  You're going to

Robert Branch    2023-FRS-00026    February 13, 2024

Page 93

1  remain, of course, part of our hearing as a party.
2          WITNESS:  Yes, ma'am.
3          JUDGE DONALDSON:    But as I understand, your
4  testimony is complete at this point.  There are instances
5  where someone is re-called to testify under certain
6  conditions.  We'll just have to see what happens there, but
7  for now and maybe for the duration of the hearing, your
8  testimony is over.  Thank you for your attention to
9  everyone's questions including my own.
10         WITNESS:  Thank you, Your Honor.
11         JUDGE DONALDSON:    Thank you.  Mr. Sorey, Mr.
12 Ferguson, we're going to take a short break, but who is the
13 next witness?
14         MR. SOREY:    Chris Day.
15         JUDGE DONALDSON:    Chris Day is?  Okay and then
16 we have a witness that needs to be completed by 4:00 p.m.
17 Central and that is Mr. Clark?
18         MR. SOREY:    Yes, ma'am.  We'll take his next.
19         JUDGE DONALDSON:    Okay.
20         MR. SOREY:    I could do him next if you'd like.
21         JUDGE DONALDSON:    It's --- when you have
22 planned for the witnesses ---
23         MR. SOREY:    It doesn't make any difference to
24 me.
25         JUDGE DONALDSON:    Okay.  Could ---

Page 94

1          MR. SOREY:    I will just switch pages.
2          JUDGE DONALDSON:    Okay.  Will Mr. Clark be
3  available sooner then?
4          MS. FITZKE:    He would be.  We thought Mr. Day
5  was being called next so Mr. Clark just left to get a
6  sandwich, I understand, but he is in the building here.
7          JUDGE DONALDSON:    Okay.  We're going to take a
8  break anyway.  So, let's see if you can have him ---
9          MS. FITZKE:    All right.
10         JUDGE DONALDSON:    -- take the place and go
11 next, but let's take a little bit longer break.  It's
12 11:43.  Let's start at 12:00 noon.  Not a terribly long
13 break, but a little bit longer, but please stay on the
14 meeting and mute yourselves and we'll go off the record.
15         (Off the record at 11:44 a.m., CST)
16         (On the record at 12:02 p.m., CST)
17         JUDGE DONALDSON:    Thank you for joining us, Mr.
18 Clark.  You are our next witness in a proceeding under the
19 whistleblower protection provisions of the Federal Rail
20 Safety Act brought by Robert Branch against his former
21 employer, Illinois Central.  Your testimony will be under
22 oath if you take the oath.  Would you please raise your
23 right hand?
24 //
25 //

Page 95

1  Whereupon,
2                  WADE CLARK
3  having been duly sworn, was called as a witness herein and
4  was examined and testified as follows:
5          WITNESS:  Yes.
6          JUDGE DONALDSON:    All right.  Thank you very
7  much.  So, the direct examination will be by Mr. Soley at
8  first and it says James Ferguson, guest, but Mr. Soley has
9  ---
10         MR. SOLEY:    Yes, I'm here.
11         JUDGE DONALDSON:    This is a --- yes, I think I
12 need to correct something that needs to --- go ahead, Ms. Fitzke.
13         MS. FITZKE:    Oh, I just wanted for purposes of
14 everyone to clarify that Mr. Clark is not able to see the
15 meeting on the computer in front of him.  So, if it looks
16 like he's staring off, we have a large screen in the room
17 that is displaying the Zoom so he's just trying to see.  I
18 just noticed that it's a bit at least on my screen a bit of
19 an awkward setup.  So, I just wanted to make sure you all
20 know as to why he's doing that.
21         JUDGE DONALDSON:    Yes, I appreciate that
22 explanation.  I often do the same myself with certain
23 setups and I take the benefit of a very large screen I
24 sometimes have and I'm usually looking over there so I can
25 see everyone really well.  So, that's fine.  You don't have

Page 96

1  to --- you can do whatever you need to do to have the best
2  visual of the hearing, Mr. Clark.  All right, so with that
3  said, Mr. Sorey, you can proceed.
4          MR. SOREY:    Thank you, Your Honor.  Mr. Clark,
5  I apologize for taking you away from your sandwich, but
6  we're trying to get you out of here early so we thought
7  you'd appreciate that more than the sandwich.
8                  DIRECT EXAMINATION
9  BY MR. SOREY:
10     Q    All right, Mr. Clark, in June of 2022, you were
11 senior manager of production for Illinois Central Railway,
12 correct?
13     A    Correct.
14     Q    And Mr. Chris Day directly reported to you in
15 June of 2022, did he not?
16     A    Yes.
17     Q    All right.  Now, the Illinois Central Railroad
18 has a workplace violence policy, does it not?
19     A    Yes.
20     Q    Does it apply to all employees of the Illinois
21 Central including supervisors and union employees?
22     A    Yes.
23     Q    What is your definition of self-defense?
24     A    Well, my definition of self-defense would be a
25 position of retreat so covering up if you're being attacked

Robert Branch    2023-FRS-00026    February 13, 2024

Page 97

1  or trying to move yourself away, running or walking away
2  from a situation, asking for help from any bystanders. I'd
3  say that would be my definition of self-defense.
4      Q   So, you would have the person to retreat. Is
5  that correct?
6      A   State that again.
7      Q   So, you would have a person involved in an
8  altercation to retreat?
9      A   Yes.
10     Q   Meaning leave the scene?
11     A   Retreat or cover up or walk away, yell for help.
12 Those would be the things that I would expect.
13     Q   If you had been in Mr. Branch's situation as you
14 discussed earlier and we discussed in your deposition, what
15 would you have done?
16     A   I would have done exactly what I just said. I
17 would have took a position of retreat, whether that be
18 cover myself up to ask for help, try to get away from the
19 situation he was in.
20     Q   Okay. Were you aware that this altercation took
21 place in the parking lot of a hotel?
22     A   Yes.
23     Q   And were you aware that there was a barbecue pit
24 and a truck directly behind Mr. Branch at the time he was
25 pushed down?

Page 98

1      A   No.
2      Q   Okay. Were you aware that there were other cars
3  in the parking lot and a fence that joined the parking lot?
4      MS. FITZKE:   Objection. States evidence not in
5  record.
6      WITNESS:   No.
7      MR. SOREY:   Okay.
8      JUDGE DONALDSON:   Hold on just a second. So,
9  you're saying the --- to the record already. I'm going to
10 sustain the objection and raise it as necessary.
11     MR. SOREY:   Thank you.
12 BY MR. SOREY:
13     Q   Mr. Clark, did you participate in the ruling to
14 fire Mr. Branch as part of the disciplinary panel?
15     A   Yes.
16     Q   Who all was on that disciplinary panel?
17     A   I'm not exactly sure. I know of a few people
18 that were on it. I don't know if it encompasses the entire
19 panel, but I know I read the transcript. I gave my
20 recommendation and then I believe Tom Hilliard, Thomas
21 Sullivan and I'm not exactly sure who the rest of the
22 people are on the panel, but I think there's maybe one or
23 two other people, but I'm not sure who they are.
24     Q   So, you think it was more than three people on
25 the disciplinary panel?

Page 99

1      A   I'm not sure. Yes, I would think it's more than
2  two. I know of two of them.
3      Q   Okay. Now, Mr. Patrick Crain is the person that
4  contacted you to tell you that the panel was moving forward
5  to fire Mr. Branch, was he not?
6      A   Yes.
7      Q   Now, in Mr. Branch's termination letter, it
8  stated, "You" and that's referring to Mr. Branch "were
9  allegedly involved in a verbal and a physical altercation.
10 Is that correct?
11     MS. FITZKE:   Objection. It misstates the
12 evidence. The evidence misstates the letter.
13     JUDGE DONALDSON:   Are you quoting directly from
14 the letter? What's your response to that, Mr. Sorey?
15     MR. SOREY:   My response is that the letter had
16 it in there. That's the reason I read it to him. That's
17 the reason I was asking him.
18     JUDGE DONALDSON:   Restate your question,
19 please. Can you restate your question?
20 BY MR. SOREY:
21     Q   In Mr. Branch's termination letter, it stated
22 that Mr. Branch was allegedly involved in a verbal and
23 physical altercation. Is that correct?
24     A   Yes.
25     JUDGE DONALDSON:   Did you have an objections to

Page 100

1  that, Ms. Fitzke?
2      MS. FITZKE:   No, that is a different question.
3  It restates the investigation notice where it was alleged
4  that they were involved in a verbal and physical
5  altercation which is what the termination letter reads.
6  So, I don't have an objection to that.
7      JUDGE DONALDSON:   All right and the witness,
8  Mr. Clark, answered yes to that question?
9      WITNESS:   Yes.
10     JUDGE DONALDSON:   Okay. Thank you.
11 BY MR. SOREY:
12     Q   Mr. Clark, you said that you gathered your
13 information of a verbal altercation from the transcript.
14 Is that correct?
15     A   No, I don't believe so.
16     Q   You don't believe ---
17     A   Mostly physical.
18     MR. SOREY:   Okay. Well, I don't understand
19 your answer. I'm sorry.
20     WITNESS:   Okay. Please restate the question.
21 I don't really understand what you're asking.
22 BY MR. SOREY:
23     Q   Okay. You stated in your deposition that you
24 gathered your information of a verbal altercation from the
25 transcript. Is that correct or not?

Robert Branch     2023-FRS-00026     February 13, 2024

Page 101

1      A    I gathered my information of a verbal and
2   physical altercation from the transcript.
3           MR. SOREY:    Okay, thank you.
4      BY MR. SOREY:
5      Q    And in your reasoning to terminate Mr. Branch,
6   part of it was involved, part of it was surrounded what you
7   perceived as a verbal confrontation.  Is that correct?
8      A    Yes.
9      Q    Okay.  Do you know who Patrick Jones is, Mr.
10  Clark?
11     A    Yes.
12     Q    Who is he?
13     A    He's currently the senior manager of production
14  for the Southern Region.
15     Q    Did Mr. Jones work for you in June of 2022?
16     A    No, sir.
17     Q    Has he worked for you at any time?
18     A    No, sir.
19          MR. SOREY:    Okay.  Thank you.
20     BY MR. SOREY:
21     Q    Now, we had asked you earlier whether or not you
22  were made aware that Mr. Christopher Day had reported an
23  altercation for him in an Illinois bar to Patrick Crain and
24  Patrick Jones.  Do either of these men or did either of
25  these men report to you at that time?

Page 102

1      A    No, they did not.
2      Q    What is your relationship to Patrick Crain?
3      A    Patrick Crain is the Labor Relations manager so
4   he doesn't work for me, but he works in the LR department.
5      Q    Would it be Mr. Crain's duty to report to you any
6   instances of altercations of employees that worked under
7   you at the time?
8      A    I don't know anything about ---
9           MS. FITZKE:    Well ---
10          JUDGE DONALDSON:    Just a moment.  Just a
11  moment.
12          MS. FITZKE:    Yes.  I need to object that this
13  is cumulative.  It's also irrelevant.  He's already
14  testified that these gentlemen didn't report to him and
15  weren't in his supervisory chain at the time so pretty far
16  field.  Immaterial and irrelevant.
17          JUDGE DONALDSON:    Your response, Mr. Sorey?
18          MR. SOREY:    He had stated that Patrick Crain
19  had told him about Mr. Branch's altercation and I was
20  asking him if he had Mr. Patrick Crain report to him Mr.
21  Christopher Day's altercation.
22          JUDGE DONALDSON:    I'm going to overrule it and
23  let's get the answer to that question and we'll just take
24  it one question at a time.
25          MR. SOREY:    Okay.

Page 103

1           JUDGE DONALDSON:    Mr. Clark, do you recall the
2   question?
3           WITNESS:    Can you ask again, please?
4           MR. SOREY:    Sure.
5      BY MR. SOREY:
6      Q    Patrick Crain reported to you Mr. Branch's
7   participation or the situation of the altercation.  Did
8   Patrick Crain ever report to you an altercation on behalf
9   of Christopher Day?
10     A    No.
11     Q    Okay.  Now, would Mr. Crain normally report to
12  you any of your employees, supervisors or union people that
13  were involved in altercations?
14          MS. FITZKE:    Yes, I'm going to object.
15  Immaterial and irrelevant.  Mr. Clark has already testified
16  that Mr. Day did not report to him at that time or at the
17  time of the incident Mr. Sorey is asking about.
18          JUDGE DONALDSON:    Mr. Sorey, your response?
19          MR. SOREY:    The point I'm trying to get to,
20  Your Honor, is that Christopher Day was involved in an
21  altercation and reported it, he says, and we'll find it
22  later in his deposition that he reported it to Patrick
23  Jones and Patrick Crain.  It appears that Patrick Crain
24  never reported this altercation to Mr. Clark and I'm
25  attempting to find out what the difference is between a

Page 104

1   supervisor being reported and a union man being reported.
2           JUDGE DONALDSON:    All right.  I'm going to
3   overrule it.  I do feel like we're --- it's relevant so
4   it's not totally immaterial, but let's --- maybe approach
5   it from a different way to get it that difference that
6   you're trying to understand.
7           MS. FITZKE:    Well ---
8           MR. SOREY:    Go ahead.
9           JUDGE DONALDSON:    You look like you're frozen
10  for a second, but just approach it in a different way.
11     BY MR. SOREY:
12     Q    Mr. Clark, when altercations take place on the
13  railroad within your division and at the time you were
14  production supervisor for Illinois Central for the United
15  States, did the Labor Relations Department normally report
16  these altercations to you?
17     A    No, it would be a situation where if anything
18  were to come up like this, it would be us reporting it to
19  Labor Relations.
20     Q    Okay.  Now, I believe you had advised us earlier
21  or at least in your deposition, you stated that the
22  workplace violence policy applied to all the supervisors
23  and all the labor people for the Illinois Central Railroad.
24  Is that correct?
25     A    Yes.

Robert Branch     2023-FRS-00026     February 13, 2024

Page 105

1    Q   Do you know of any reason why Mr. Day would not
2  have been brought before a disciplinary panel and have an
3  investigation like Mr. Branch for his altercation?
4        MS. FITZKE:    Objection. Foundation. He hasn't
5  established that this witness understands or even knows
6  what he's talking about. The witness indicated it was
7  never reported to him.
8        JUDGE DONALDSON:    I'm going to sustain that,
9  Mr. Sorey. I haven't heard a foundation yet.
10       MR. SOREY:    Okay.
11     BY MR. SOREY:
12     Q   Are all employees supposed to be brought before a
13 disciplinary panel or have an investigation if they're
14 involved in an altercation?
15     A   What type of altercation?
16     Q   A fight.
17     A   Fight?
18     Q   A fight, F-I-G-H-T.
19     A   Physical in nature?
20     Q   I don't know of an unphysical fight.
21     A   Okay.
22       JUDGE DONALDSON:    You're asking him about a
23 physical altercation, Mr. Sorey?
24       MR. SOREY:    Yes.
25       JUDGE DONALDSON:    Okay.

Page 106

1        WITNESS:    I would say if we had knowledge of
2  the event and then yes, there would be an investigation if
3  there was a physical altercation per the workplace violence
4  rules that we would have an investigation.
5        MR. SOREY:    Okay. That's all the questions I
6  have.
7        JUDGE DONALDSON:    Who is going to conduct the
8  examination on behalf of Respondent, Ms. Fitzke?
9        MS. FITZKE:    I will. Thank you.
10       JUDGE DONALDSON:    All right.
11              CROSS EXSAMINATION
12     BY MS. FITZKE:
13     Q   Mr. Clark, if the information received is that a
14 vendor head butts one of your managers after hours in a bar
15 and our manager does not respond physically, is there a
16 reason to investigate further?
17     A   No, there wouldn't be in my opinion. If he
18 didn't respond or he acted in a position of retreat that
19 there would be an investigation based at least on the right
20 thing.
21     Q   And the formal investigation hearing process that
22 we were talking about, I guess you weren't in the room, but
23 Mr. Branch went through as part of his process that
24 generated the process that he read, does that same process
25 apply to management?

Page 107

1    A   I do not know how the process goes.
2    Q   With respect to Mr. Branch's investigation
3  hearing, did you read the entire transcript?
4    A   Yes.
5    Q   Did you review the exhibits that were part of the
6  record?
7    A   Yes.
8    Q   And when you --- did you consider --- what did
9  you consider in concluding that Mr. Branch had engaged in a
10 violation of the workplace violence policy? In other
11 words, on what did you base your conclusion that he had
12 violated the policy?
13     A   So, I based my conclusion on a lot of the witness
14 testimony and the statements that concluded that Mr. Branch
15 had an active role in the fight, that he was not in a
16 position of retreat or trying to deescalate the situation
17 that he participated in the fight that witnesses had stated
18 he had struck the other employee.
19     Q   When reviewing incidents of workplace violence
20 and trying to determine the level of discipline to a
21 assess, how are cases of physical finding reviewed under
22 Illinois Central's discipline policy?
23     A   Well, the process would be to take statements.
24 Obviously, we've got to have a report and then we would
25 work through any witness statements, statements from anyone

Page 108

1  involved and then from there, we would have a discussion on
2  discipline level, go through an investigation and then
3  determine through the record what would be assessed.
4    Q   Did you consider anything outside of the
5  investigation hearing transcripts and exhibits in making
6  your recommendation that Mr. Branch should be terminated?
7    A   No.
8    Q   Before this incident, had you ever had any issues
9  with Mr. Melton of this nature in the past?
10     A   No.
11     Q   How about Mr. Branch?
12     A   No.
13     Q   In determining that this should be assessed as a
14 Level 4 violation which resulted in termination, did you
15 consider or could you consider Mr. Branch's work record?
16     A   Yes.
17     Q   And how did you consider it?
18     A   That was read into the record.
19     Q   Okay. Outside of the fact that it made it in the
20 transcript, could you assess lesser discipline for physical
21 fighting because Mr. Branch had a clean work record before
22 this incident?
23     A   No.
24     Q   Why is that?
25     A   That's our discipline policy and our tolerance on

Robert Branch    2023-FRS-00026    February 13, 2024

Page 109

1  workplace violence.  It's termination.
2      Q    When did you first learn that there had been a
3  fight between these two gentlemen at the hotel on the night
4  of May 26?
5      A    I believe it was the following Tuesday.
6      Q    And who did you hear from?
7      A    Chris Day.
8      Q    What did Mr. Day tell you?
9      A    He sent me --- he called me and he told me he was
10 going to be sending me a statement from Mr. Branch so he
11 sent me that.  I read through it and Mr. Branch was
12 reporting a situation that occurred at the hotel.
13     Q    And what did you do after you received that
14 information?
15     A    I sent it to our LR department for advice for
16 handling.
17     Q    And when you sent it to the LR department for
18 advice and handling, did you tell them at the time that Mr.
19 Branch indicated that this other employee had punched him
20 and he fought back to defend himself?
21     A    Yes.
22     Q    And did you get the guidance you were looking for
23 from the LR department or Labor Relations?
24     A    Yes.
25     Q    And who in Labor Relations did you get advice

Page 110

1  from?
2      A    Patrick Crain.
3      Q    What did Mr. Crain tell you to do?
4      A    He told me that we needed to get statements from
5  any witnesses, statements from Mr. Branch and Mr. Melton
6  which we did and to get those in to him for review.
7      Q    Did you take the statements yourself?
8      A    No, I did not.
9      Q    And who did you receive them from?
10     A    I believe it was Chris Day.
11     Q    Did you read the statements when you received
12 them?
13     A    Yes.
14     Q    Did you have any role in determining that the
15 company should move forward with an investigation hearing
16 for both Mr. Melton and Mr. Branch?
17     A    I was involved in similar discussions about that,
18 yes.
19     Q    Did you have any disagreement as to whether Mr.
20 Branch should also be accused of rule violations in
21 conjunction with this incident?
22     A    No.
23     Q    Why was that?
24     A    Well, based on what I've read, they both were
25 active participants in the fight.

Page 111

1      Q    And that's based on what you read in the
2  statements you received?
3      A    (Witness nods head "yes")
4      Q    You have to answer out loud.
5      A    Yes.
6      Q    Thank you and then after you received and
7  reviewed the transcript and exhibits from the investigation
8  hearing, did you speak with anyone about it?
9      A    I did.
10     Q    And ---
11     A    Spoke with Patrick Crain.
12     Q    What do you recall discussing with Mr. Crain?
13     A    That the transcript would go in front of the
14 panel and they would come back with a recommendation.
15     Q    Do your recall providing your recommendation that
16 it should be a Level 4 violation, excuse me, a Level 4
17 discipline for violation for the workplace violence
18 prevention policy?
19     A    Yes.
20     Q    And did you communicate that recommendation to
21 Mr. Crain?
22     A    I did.
23     Q    Other than Mr. Crain, do you recall talking with
24 anyone else about that potential discipline or
25 investigation during or after the investigation was

Page 112

1  concluded?
2      A    No.
3      Q    Did you ever tell Mr. Day that he should convince
4  Mr. Branch not to move forward with the investigation?
5      A    No.
6      Q    Did anybody approach you and ask you to not move
7  forward with the investigation?
8      A    Yes.
9      Q    Who was that?
10     A    Mr. Branch's union.
11     Q    What did the union ask you to do?
12     A    Shortly after Mr. Branch had submitted the
13 statement to Chris Day about the altercation in the parking
14 lot, I was approached by the union, his representation,
15 that the gentlemen shook hands and squashed the issue and
16 they'd just like to move forward and go as if nothing
17 happened.
18     Q    And what did you tell the union at that time?
19     A    I told them that that was not going to happen
20 because we've already gotten the reports and we need to
21 investigate it.
22     Q    Are you aware of any other employees who have
23 engaged in a physical altercation at the railroad where
24 they were individuals who participated in a fight who did
25 not lose their jobs?

Robert Branch    2023-FRS-00026    February 13, 2024

Page 113

1    A    No.
2    Q    Would your recommendation that Mr. Branch be
3 terminated, would have been any different if Mr. Melton had
4 reported the fight or if you had found out about it from
5 another source?
6    A    No.
7    Q    Did Mr. Branch's statements that he viewed Mr.
8 Melton as a threat or that he feared him, did those
9 statements impact your decision with respect to the
10 termination of Mr. Branch's employment?
11    A    No.
12    MS. FITKE:    Thank you, Mr. Clark.  I don't have
13 any other questions for you right now.
14    JUDGE DONALDSON:    Do you want me to go further,
15 Mr. Sorey?
16    MR. SOREY:    Yes, Your Honor.  I do.  I was
17 waiting to see if you had any questions.
18    JUDGE DONALDSON:    I don't this time.  Thank
19 you.  You go ahead.
20                    REDIRECT EXAMINATION
21    BY MR. SOREY:
22    Q    Mr. Clark, in Ms. Fitzke's situation that she
23 gave you about a supervisor being head butted in a bar in
24 Illinois and reporting that he retreated or didn't
25 participate in it, does the railroad always take the word

Page 114

1 of the supervisors reporting about a fight?
2    MS. FITZKE:    Object to the form of the
3 question.  Improper hypothetical.
4    JUDGE DONALDSON:    Overruled.  Mr. Clark,
5 answer?
6    WITNESS:    I'm not sure.  I've never been --- I
7 guess, Chris Day didn't work for me at the time, neither
8 did Mr. Crain so I had no way of even knowing about this
9 situation, I guess.  So, I don't understand, I guess, fully
10 the question.  The gentlemen didn't report to me at the
11 time.
12    BY MR. SOREY:
13    Q    Well, the reason I asked the question was because
14 Ms. Fitzke gave you that hypothetical, let's say, a few
15 minutes ago and you said well, you would take the word of
16 the supervisor and not have an investigation.  Is that
17 correct?
18    A    I don't think so.  I don't think I said that.  I
19 think I said that if he acted in retreat, then there
20 wouldn't be a reason to have an investigation.
21    Q    Okay and normally the way you would make sure
22 that happened would be to have an investigation of the
23 facts and actually talk to the contractor too, would you
24 not?
25    A    I'm not exactly sure what took place.  I don't

Page 115

1 know if that happened or if it did not happen because I
2 wasn't --- this gentleman didn't report to me at the time
3 so I was never made aware of that situation.  So, honestly,
4 I don't know how it was handled.  I'm not sure.
5    Q    Let's assume for the purpose of the question that
6 it took place, would you normally then have recommended
7 that an investigation take place to find out what occurred?
8    A    I would definitely have taken statements at the
9 time to find out exactly what the participants' roles were
10 and I'm not saying that didn't happen.  I'm not sure, but
11 that's what I would have done.
12    Q    Okay.  Is there a definition of self-defense in
13 the workplace violence policy?
14    A    No.
15    Q    Now, it he workplace violence policy talking
16 about penalties, it actually says up to and including
17 termination, does it not?
18    A    Yes.
19    Q    So, it indicates that you could give a lesser
20 penalty than termination if coming up with violations of
21 the workplace policy, correct?
22    A    Yes, I would probably read it that way.
23    Q    Now, where did you come up with a Level 4
24 statement?  Where in IC literature does that appear?
25    A    I think it appears in the letter that you just

Page 116

1 phrased.  It's up to termination so a Level 4 is
2 termination and that's what the severity of the incident
3 called for.
4    MR. SOREY:    Okay.  That really wasn't my
5 question.  My question, I guess I should have stated it
6 better and I'm sorry.
7    BY MR. SOREY:
8    Q    In what document do the definitions of Level 4
9 appear for IC?
10    A    There's a discipline policy that we have at IC.
11    Q    And it's in writing?
12    A    Yes, and it states violation level, rules,
13 violations and where they fall in that rubric of
14 discipline.
15    Q    And does it say that fighting is a Level 4
16 violation?
17    A    Yes.
18    Q    Okay and that's what you were basing your
19 decision on, not the workplace violence policy?
20    A    I think it had been fighting is tied to the
21 workplace violence, therefore, it comes as a Level 4.
22    Q    Does the workplace violence policy specifically
23 mention fighting?
24    A    When it says violence, I take that as fighting.
25    Q    Okay.  So, you equate violence with fighting?

Robert Branch    2023-FRS-00026    February 13, 2024

Page 117

1      A    Yes.
2      Q    Okay, but the word itself, fighting, does not
3  appear in workplace violence?
4      A    No, I don't believe it does.
5          MR. SOREY:    Okay. Let me ask you one more
6  question here.
7  BY MR. SOREY:
8      Q    If Mr. Branch had not submitted a statement about
9  the altercation, IC would have never conducted an
10  investigation of the matter, would they?
11     A    I don't know. It would depend if anybody else
12  gave a statement or the hotel or anything like that. I
13  mean, if it was brought to our knowledge, then yes, I would
14  have had an investigation. I would have --- it wouldn't
15  have been something that we did not look into. We
16  definitely would have looked into that situation.
17  BY MR. SOREY:
18     Q    Under the workplace violence policy, are the
19  employees supposed to immediately report any type of
20  violent situation?
21     A    The employees are encouraged to.
22     Q    But not required?
23     A    Yes, I mean, it doesn't say they're required to.
24         MR. SOREY:    Okay. That's all the questions I
25  have, Your Honor.

Page 118

1          MS. FITZKE:    I don't have anything further.
2          JUDGE DONALDSON:    All right, thank you. Thank
3  you both. So, that mean --- I don't have any questions for
4  you, Mr. Clark. That means all the questions have been
5  presented. Can he be excused, not expected to be recalled?
6          MR. SOREY:    Yes, ma'am. I hope he makes his
7  flight.
8          JUDGE DONALDSON:    Okay. All right, thank you
9  very much for being on standby today and for joining us as
10  quickly as you could, Mr. Clark. I very much appreciate
11  your participation. I know you have other things to get to
12  so you're free to go.
13         WITNESS:    Thank you. Appreciate it.
14         JUDGE DONALDSON:    Thank you.
15         WITNESS:    Thanks.
16         JUDGE DONALDSON:    I think we can go ahead with
17  the next witness unless you expect that witness to be a
18  particularly long one. In that case, I would suggest
19  perhaps something of a lunch break before we reach the next
20  witness. So, Mr. Sorey, what are your thoughts on that?
21         MR. SOREY:    Your Honor, I tried to streamline
22  all my questions of these gentlemen and I anticipate most
23  of them to be about the length of Mr. Clark's deposition or
24  statement. I'm sorry.
25         JUDGE DONALDSON:    Yes. Okay, I would recommend

Page 119

1  that we just go ahead and go forward with that witness and
2  let's see how much ground we can cover in the next hour
3  before taking another break. Does that sound good to you
4  all?
5          MR. SOREY:    It's fine with me.
6          MS. FITZKE:    He's not here with me physically
7  so we'll see if we can get him onto the meeting as soon as
8  possible here.
9          JUDGE DONALDSON:    Okay. I do want to --- you
10  gave me an opening to say this, Mr. Sorey. I do usually
11  wait a little bit to make sure this is justified, but I do
12  want to say I am really encouraged by your efficiency, your
13  professionalism and your skill by both parties, all
14  representatives and I appreciate it. I think you are
15  moving at a pace that is very encouraging to reach the
16  witnesses. You're covering information that I would expect
17  to be covered. I don't feel like you're doing so at the
18  expense of doing so with the evidence you need to. I will
19  express my appreciation at this point because I don't have
20  any sense that that's going to change. So, I appreciate it
21  and keep up the good work.
22         MR. SOREY:    Your Honor, my wife told me
23  tomorrow is Valentine's and I better be through by tomorrow
24  night.
25         JUDGE DONALDSON:    Oh, well, I think she carries

Page 120

1  more weight than I do so I would listen to her. All right,
2  so we can take a break. Let's go off the record while we
3  get the next witness on board and make sure he can join us
4  within a few minutes.
5          (Off the record at 12:40 p.m., CST)
6          (On the record at 12:45 p.m., CST)
7          JUDGE DONALDSON:    Christopher Day is the next
8  witness in this proceeding. Mr. Day, you are testifying in
9  a proceeding by Mr. Robert Branch against Illinois Central
10  under whistleblower protection provisions of the Federal
11  Rail Safety Act which is overseen by the Department of
12  Labor and I'm the administrative law judge with the
13  Department of Labor in Louisiana. So, thank you for
14  joining our video hearing. I'm going to swear you in now.
15  Are you on a phone or a laptop?
16         MR. DAY:    I'm on my phone.
17         JUDGE DONALDSON:    Okay, good. So, that works
18  usually just as --- well, if you need any assistance
19  technically, if you need to see or hear someone or you have
20  any issues, let me know, but usually the phone works just
21  as well. You don't have any distractions or documents in
22  front of you?
23         MR. DAY:    No.
24         JUDGE DONALDSON:    Okay. Would you raise your
25  right hand?

Robert Branch     2023-FRS-00026     February 13, 2024

Page 121

1  Whereupon,
2                 CHRISTOPHER DAY
3  having been duly sworn, was called as a witness herein and
4  was examined and testified as follows:
5           WITNESS:  I do.
6           JUDGE DONALDSON:   All right.  Thank you very
7  much.  Mr. Sorey, are you still handling the questioning?
8           MR. SOREY:  Yes, ma'am.
9           JUDGE DONALDSON:   All right.  You can go ahead.
10              DIRECT EXAMINATION
11  BY MR. SOREY:
12      Q    Mr. Day, in June of 2022, you were the supervisor
13  for both IC production gangs, correct?
14      A    Yes, sir.
15      Q    Now, you found out from Mr. Branch about an
16  incident that took place between he and Mr. Melton.  Is
17  that correct?
18      A    Yes.
19      Q    And Mr. Robert Branch wanted to report the
20  incident?
21      A    Yes.
22      Q    Okay.  Did you try to discourage him from
23  reporting this incident?
24      A    I did not.
25      Q    Did you give him the option of not reporting it?

Page 122

1      A    I did.
2      Q    And why did you do that?
3      A    Because of the situation that had arose.  I had
4  an idea of what the outcome may be for both employees.
5      Q    Okay.  Now, Mr. Day, are you familiar with the IC
6  workplace violence policy?
7      A    Yes.
8      Q    Now, are the employees required under the
9  workplace violence policy to report any violence that they
10  know about?
11      A    Yes.
12      Q    Well, if they are required to report it, why did
13  you give Mr. Branch the option of not reporting it?
14      A    Because like I had just mentioned, I knew what
15  the outcome would be.  I was trying to protect what was
16  going to happen to both employees.  At the time, he had
17  told me that he wasn't sure if he wanted to go through with
18  it or not.
19      Q    Okay.  Now, I believe you told us in your
20  deposition you believe the workplace violence policy
21  applies to all IC employees, correct?
22      A    Right.
23      Q    Now, at the time of the incident, IC was only
24  providing a per diem toward an employee's hotel room.  Is
25  that correct?

Page 123

1      A    Yes, sir.  That's correct.
2      Q    So, the employees had the right to check or stay
3  at any hotel they wanted to?
4      A    Yes, sir.
5      Q    Now, do you know whether or not the workplace
6  violence policy includes the definition of self-defense?
7      A    I do not honestly.
8      Q    Okay.  What is your definition of self-defense?
9      A    My definition of self-defense is either to try
10  and deescalate the situation or walk away, but not
11  returning any sort of gesture or anything else towards
12  another employee.
13      Q    So, your idea of protecting yourself if you're
14  being struck is not striking back.  Is that correct?
15      A    That's correct.
16      Q    Do you know whether Mr. Branch had any problems
17  at the IC as far as discipline or anything?
18      A    I did not at the time, no.  As far as I knew, he
19  had nothing on his record.
20      Q    Had he ever been involved in any investigations
21  that you're aware of?
22      A    No, sir.
23      Q    Now, Mr. Day, in your deposition, we talked about
24  an off-duty altercation with a contractor at an Illinois
25  bar that you said took place a little over a year ago, did

Page 124

1  we not?
2      A    Yes, sir.
3      Q    And I asked if you reported this incident and
4  your answer was yes?
5      A    Yes.
6      Q    All right.  I also asked you, "Did you undergo an
7  investigation for reporting this altercation" and what was
8  your answer?
9      A    No, I have not undergone an investigation.
10      Q    Why not?
11      A    Because technically it wasn't a fight.  I wasn't
12  the aggressor.  I didn't strike back.  I deescalated the
13  situation and walked away.
14      Q    Okay.  Are supervisors included in the workplace
15  violence policy?
16      A    I think everybody is included in the workplace
17  policy whether it's union or management.
18      Q    Okay.  Now, you reported this altercation to Pat
19  Crain and Patrick Jones.  Who are these gentlemen and what
20  positions were they in?
21      A    Patrick Crain was Labor Relations ---
22           JUDGE DONALDSON:   Can you just --- I think I
23  missed part of that question.  I don't mean to cut you off,
24  Mr. Day, but I want to make sure the full question gets in
25  the record.

Robert Branch    2023-FRS-00026    February 13, 2024

---

Page 125

1    MR. SOREY:   Okay.
2    BY MR. SOREY:
3    Q    Mr. Day, you reported this altercation to Pat
4 Crain and I believe he's with HR and Patrick Jones who I
5 believe was your supervisor.  Is that correct?
6    A    That's correct.
7    Q    Now, how did the railroad determine if you
8 truthfully reported this fight without an investigation?
9    A    I don't know they determined it.  I told them
10 about it and that's all --- I did my part as far as
11 reporting to my immediate supervisor.
12    Q    Do you know whether they took statements from the
13 contractor?
14    A    They did not.
15    Q    Do you know whether they took statements of the
16 railroad employees who were also in the bar?
17    A    No, I don't think they took statements from
18 anybody.
19    Q    Well, did you report to Mr. Jones and Mr. Crain
20 that there were other railroad employees in the bar at the
21 time the head butt took place?
22    A    I don't recall.
23    Q    Did Mr. Crain or Mr. Jones ever talk to you again
24 after you reported the incident to them about the incident?
25    A    No, they did not.

---

Page 126

1    MR. SOREY:    Okay.  I believe that's all the
2 questions I have, Your Honor.
3    JUDGE DONALDSON:    That's all you have, Mr.
4 Sorey?  Okay.
5    MR. SOREY:    Yes, ma'am.
6    JUDGE DONALDSON:    All right.  Ms. Fitzke, you
7 can go ahead.
8    MS. FITZKE:    Thank you.
9        CROSS EXAMINATION
10    BY MS. FITZKE:
11    Q    Mr. Day, what exactly did you report to your
12 supervisor and to Mr. Crain who I believe is in Labor
13 Relations?
14    A    I had told them that we were out at a place
15 eating and having a drink and me and the contractor  were
16 having a conversation and that out of the blue, he had
17 struck me with his face and head butted me.
18    Q    Did you ever tell them that you fought back?
19    A    I think I --- I'm not 100 percent sure, but I do
20 know I told them I did not strike back.  There's been
21 fighting and striking.  I never --- I told then I
22 deescalate it, I talk and I walk away.
23    Q    With respect to your communications with Mr.
24 Branch, tell me with respect to the May 26 incident how you
25 first learned that there had been an altercation between

---

Page 127

1 Mr. Branch and Mr. Melton?
2    A    Over the weekend of that holiday, I had received
3 a phone call from Chance Gardener who was a new supervisor
4 at the time and he had called me and told me that I needed
5 to call Mr. Robert Branch because of something that
6 happened not on duty, off duty.  He said, "Talk to him,
7 call him, see what the situation is."  I had called Mr.
8 Branch and that's why I kind of had learned just the
9 general knowledge that there was an altercation between him
10 and another employee.
11    Q    And did Mr. Gardener tell you what the
12 altercation was or why you needed to give Mr. Branch a call
13 specifically?
14    A    No, he did not.
15    Q    And when you spoke with Mr. Branch, do you recall
16 when it was over the course of that weekend that you spoke
17 with Mr. Branch?
18    A    I believe it was on that Sunday before the
19 holiday.
20    Q    And what, if --- can you tell us the best you can
21 recall what Mr. Branch reported to you at that time about
22 the incident?
23    A    He had told me that he and another employee had
24 gotten into an argument, had an altercation and that he was
25 thinking on reporting it.

---

Page 128

1    Q    And did he provide any other information or
2 details to you about the incident at that time?
3    A    No.
4    Q    And we've heard testimony and seen text messages
5 indicating that you asked Mr. Branch to write a statement.
6 When did you do that?  Was that the same phone call or a
7 different phone call?
8    A    I think it was on that Monday on the actual
9 holiday because I remember talking to him and there was
10 nobody in the office at the time.  So, there was nobody
11 that I could really talk to.
12    Q    So, it sounds like you talked to him on Sunday
13 and then you talked to him again on Monday.  Is that right?
14    A    Yes.
15    Q    Okay and on Monday, tell us what you can recall
16 about your conversation with Mr. Branch.
17    A    I know we had talked about it.  I can't remember
18 if we had gotten cut off.  I asked him to write a
19 statement.  He had sent me the statement via text message.
20 I had read through it and that was as far as it went for
21 that day.
22    Q    When you read through the statement, was there
23 anything that you noted in the statement that was different
24 or that you thought struck you as different from what Mr.
25 Branch told you on the telephone?

---

Robert Branch    2023-FRS-00026    February 13, 2024

Page 129

1    A    Well, he didn't give me the full story on the
2  telephone.  He only had given me kind of the gist of what
3  happened.  It was when I read that statement that I knew
4  they had gotten into a fight.
5    Q    So, was the statement the first time that you
6  understood that Mr. Branch was a participant in the
7  physical altercation?
8    A    Yes.
9    Q    Now, after you received the statement from Mr.
10 Branch, did you speak to him again?
11   A    I don't recall.
12   Q    And after you received the statement from Mr.
13 Branch, what did you do next with respect to reporting it
14 within the company, the incident within the company?
15   A    The very next day, I talked to Mr. Branch again
16 because as I mentioned, he was still undecided actually if
17 he wanted to report it or not report it, but after I had
18 gotten a statement from him the day before, I had
19 everything I needed or at least I thought that I needed
20 because I had never encountered a situation like this
21 before.  After I had talked to him, I kind of talked to the
22 union and after he gave me the green light to go ahead and
23 say that he wanted to report it, I went ahead and gave it
24 to my immediate senior manager.
25   Q    And who is your immediate senior manager?

Page 130

1    A    Mr. Wade Clark.
2    Q    What, if anything, did Mr. Clark say to you about
3  the incident or the statement you had provided to him?
4    A    He had wanted me to start collecting statements
5  from other employees that were around the area.
6    Q    Did Mr. Clark ever do or say anything to you that
7  indicated he didn't want you to proceed with the matter?
8    A    No, he did not.
9    Q    Did you obtain the statements that Mr. Clark
10 asked you to get?
11   A    Yes.
12   Q    And how did you go about determining which
13 statements to collect?
14   A    It was everybody that Mr. Robert Branch had
15 listed at his statement that he had wrote as witnesses.
16   Q    Did you read those statements?
17   A    I did not.
18   Q    What did you do with them?
19   A    I wound up collecting them.  I scanned them all
20 into a pdf file and sent them off for examination for what
21 was going to happen later on.
22        MS. FITZKE:    I'm sorry.  That might have been a
23 poor question on my part.
24        BY MS. FITZKE:
25   Q    Who did you send them to?

Page 131

1    A    I believe I sent them to Wade Clark and Mr. Pat
2  Crain.
3    Q    After you sent off the statements, did you have
4  any further involvement in determining whether the
5  employees would be called to investigation for potential
6  rule violations and in particular, whether Mr. Branch would
7  be called for investigation for potential rule violations?
8    A    No, I had no further involvement on that.
9    Q    When you spoke with Mr. Branch over the course of
10 that Memorial Day weekend, did he ever at any time ever
11 give you any indication that any of the --- that Mr. Melton
12 claimed to have a firearm with him at the hotel?
13   A    No, he did not.
14   Q    Have you ever heard that before, sir?
15   A    I have not.  Not until you said it right now.
16   Q    Did you play any role, Mr. Day, in terms of
17 determining after the investigation hearing was concluded
18 in terms of determining whether discipline or termination
19 would be assessed for Mr. Melton or Mr. Branch?
20   A    I did not, no.
21   Q    Did anybody ever ask your opinion as to what
22 should happen with these two?
23   A    No, they did not.
24        MS. FITZKE:    Thank you, sir.  I don't have any
25 other questions for you right now.

Page 132

1        JUDGE DONALDSON:  I think you cut out a little
2  bit.  Do you have any further questions, Ms. Fitzke?
3        MS. FITZKE:    Oh, apologies.  No further
4  questions right now.
5        JUDGE DONALDSON:    Okay.  I thought that's what
6  you said.  All right, anything further, Mr. Sorey?
7        MR. SOREY:  Yes, ma'am.
8              REDIRECT EXAMINATION
9  BY MR. SOREY:
10   Q    Mr. Day, you said you were meeting with the
11 contractor when out of the blue, you were struck by the
12 contractor.  Is that correct?
13   A    Yes, we were eating and having a drink, yes.
14   Q    Okay and basically, you were put in the same
15 situation Mr. Branch was put in, were you not?
16   A    I don't believe that was the same situation, no.
17   Q    How do you feel the situation was different?
18   A    Because I didn't return what had happened to me.
19   Q    Okay and that's what you reported to the
20 railroad?
21   A    Yes, sir.
22        MR. SOREY:    Okay.  That's all the questions I
23 have.
24        JUDGE DONALDSON:    All right.  I don't have any
25 questions for you, Mr. Day, so believe it or not, your

Robert Branch    2023-FRS-00026    February 13, 2024

Page 133

1  testimony is concluded.  That was very efficient as the
2  attorneys have been all day so I appreciate that.  Mr. Day
3  or to the attorneys, can he be excused at least at this
4  time, you're not expecting to ask him to return?
5       MR. SOREY:    It's fine with us.
6       MS. FITZKE:    Yes.
7       JUDGE DONALDSON:    All right, on both parts.
8  All right, thank you very much, Mr. Day, for joining us and
9  for your attention to all of the questions that the
10 attorneys had for you.  We're going to excuse you and hope
11 you have a good rest of your day.
12      WITNESS:    Okay.  I hope you all have a good day
13 too.  Thank you.
14      JUDGE DONALDSON:    Thank you very much.  Who's
15 the next witness, Mr. Sorey?
16      MR. SOREY:    I don't have my list.  Who do you
17 have, Susan?
18      MS. FITZKE:    I have Mr. Duane Spears next on
19 the order you gave us this morning.
20      MR. SOREY:    That's fine.
21      JUDGE DONALDSON:    I want to take a break.  I'm
22 not going to do a longer lunch break unless someone feels
23 it's really necessary.  Speak up now.  What I'd like to do
24 is since I think we are moving at a good pace, I don't know
25 who --- let's talk about this right now.  Based on how it's

Page 134

1  going so far, who do you ideally want to have testify this
2  afternoon and then who would we start with tomorrow?  So,
3  Mr. Sorey, we have Mr. Spears next.  Is there anybody else
4  you wanted to reach today?
5       MR. SOREY:    Probably Patrick Crain.
6       JUDGE DONALDSON:    Okay.
7       MR. SOREY:    We almost could finish today to be
8  honest.
9       JUDGE DONALDSON:    If you would like to try to
10 do that, we certainly can.
11      MR. SOREY:    What do you think, Susan?
12      MS. FITZKE:    I have a sense that, for example,
13 Tom Hilliard will be very short, but some of the other HR
14 and Labor Relations gentlemen will have a little bit more
15 information I think to share.  So, I do expect we'll be
16 done by lunch tomorrow given the way this is proceeding,
17 but I'm not quite sure that we're going to finish today.
18 Believe me, I would also like to catch a plane today, but I
19 don't think that's going to happen.
20      JUDGE DONALDSON:    Okay.  All right, so let's
21 take a 20-minute break till 1:25 p.m. Central.  When we
22 return, we'll start with Mr. Spears and then when he's
23 done, we'll just talk about how we want to handle --- just
24 think about how you want to handle the rest of the
25 witnesses and I'll see you back in 20 minutes.

Page 135

1       MR. SOREY:    Thank you.
2       MS. FITZKE:    Thank you.
3       JUDGE DONALDSON:    Thank you.
4       (Off the record at 1:05 p.m., CST)
5       (On the record at 1:27 p.m., CST)
6       JUDGE DONALDSON:    Okay.  Mr. Spears, you've
7  heard all the instructions and you see how the proceeding
8  is going so unless you have any questions, we're going to
9  go right into your testimony.  Could you raise your right
10 hand for me, please?
11 Whereupon,
12                  DUANE SPEARS
13 having been duly sworn, was called as a witness herein and
14 was examined and testified as follows:
15      WITNESS:    Yes.
16      JUDGE DONALDSON:    Okay.  All right, so Mr.
17 Sorey, go ahead, please.
18      MR. SOREY:    Thank you, Your Honor.
19              DIRECT EXAMINATION
20 BY MR. SOREY:
21   Q    Mr. Spears, in June of 2022, you were senior
22 Human Resources manager for the IC Railroad?
23   A    That is correct.
24   Q    Do you know who was on Mr. Branch's disciplinary
25 panel?

Page 136

1   A    No, I do not.
2       JUDGE DONALDSON:    Can you say that again?
3       MR. SOREY:    Yes.
4       JUDGE DONALDSON:    The question cut out for me.
5       MR. SOREY:    Okay.  I asked him who was on Mr.
6  Branch's disciplinary panel.
7       WITNESS:    Oh, I misunderstood your question.  I
8  thought you said district.  When you say disciplinary ---
9       JUDGE DONALDSON:    Can we hold on for just a
10 moment?  I'm so sorry to interrupt you both, but I need to
11 make sure that Renee is hearing everything because this is
12 --- I'm getting significant gaps in the questions and
13 answers so far.
14      COURT REPORTER:    Yes, Your Honor.  I'm hearing
15 clearly.
16      JUDGE DONALDSON:    Oh, good.  So, it's just me.
17 Sorry about that.  I hear it too.
18      COURT REPORTER:    And I don't know if it's
19 intentional, but you are not on screen.
20      JUDGE DONALDSON:    I'm not on screen?
21      MR. SOREY:    That's why I was asking what
22 happened to the judge.
23      MS. FITZKE:    Yes, Judge, their video is off.
24      JUDGE DONALDSON:    Yes and I have it activated.
25 I have my camera activated.  If you all will hold tight a

Robert Branch    2023-FRS-00026    February 13, 2024

Page 137

1 second, I'm going to leave and come back into the meeting
2 and see if that fixes the feed issues on my end. I'll be
3 right back. Okay, that should fix it. That needed to be
4 done. We're on the record and sorry about that
5 interruption, Mr. Sorey. Can you just start again?
6        MR. SOREY:  Sure. No problem.
7 BY MR. SOREY:
8    Q    Mr. Spears, do you know who was on Mr. Branch's
9 disciplinary panel?
10   A    With respect to this particular case, it was
11 myself, Tom Sullivan and Tom Hilliard.
12   Q    And Patrick Crain was not on that panel, was he?
13   A    That is correct.
14   Q    Okay. Now, what is your definition of self-
15 defense?
16   A    Self-defense would be a situation where there's
17 retreat. There is not engaged, further engagement, not
18 escalating the situation, trying to move away from the
19 situation.
20        MR. SOREY:  Okay, thank you.
21 BY MR. SOREY:
22   Q    Now, do you feel Mr. Branch was guilty of
23 fighting because he did not walk away? Is that correct?
24   A    In the transcript that I read, there was no
25 evidence of him trying to deescalate the situation.

Page 138

1    Q    Okay and that included walking away?
2    A    It might, it might not have included walking
3 away, but he did not deescalate the situation.
4    Q    And how would you try to prevent the fight from
5 going further or deescalate?
6    A    Well, to your point, he could have walked away.
7 He could have gone into a defensive posture, but he did not
8 have to continue to swing or make contact with Mr. Melton.
9    Q    Okay. Now, do you know the setup that was around
10 the parking lot where these two gentlemen were located?
11   A    I don't know the specific setup.
12   Q    Okay. That didn't come up in the hearing then?
13   A    It's not on the transcript.
14   Q    Okay. Was Mr. Branch's past good working history
15 discussed at all by the disciplinary panel?
16   A    I don't recall whether or not Mr. Branch's or Mr.
17 Melton's past history was brought up.
18   Q    Okay. That's not something that was even
19 considered in deciding whether to terminate an employee or
20 not?
21   A    In this particular case, what we're facing here
22 is a Level 4 violation and it would not be something that
23 would be important. A Level 4 violation is very serious
24 and if proven, would lead to termination.
25   Q    Is fighting an absolute dismissal offense?

Page 139

1    A    It has generally been the practice in my
2 experience that it is a dismissible offense.
3    Q    Now, that I see workplace violence policy uses
4 the terms up to and including dismissal, does it not?
5    A    I do recall that is what it states.
6    Q    And that would indicate that there are penalties
7 other than termination or dismissal, correct?
8    A    There are penalties other than dismissal.
9 However, there are also situations that fall within that
10 policy that would help make that determination.
11   Q    Okay. Is fighting mentioned at all in the
12 workplace violence policy?
13   A    I'm not sure. It does reference causing harm to
14 another person.
15   Q    Is there a definition for self-defense in the
16 workplace violence policy?
17   A    I do not believe there is a definition in the
18 policy itself.
19   Q    Do you know why?
20   A    I did not write the policy so no, I do not know
21 why.
22   Q    Now, as senior officer as Human Resources
23 manager, wouldn't that give you a position to make comments
24 about the workplace violence policy?
25   A    Again, my role in this particular case was to

Page 140

1 review the transcript and the exhibits, present it during
2 the hearing. I did not go outside of that. That is not my
3 role. It is simply to review the transcript and determine
4 whether or not based on the evidence presented that a
5 violation of policy occurred.
6    Q    Okay, then you did not consider it self-defense?
7    A    I'm sorry. Could you repeat the question again?
8    Q    I said then you did not consider self-defense?
9    A    What we did was we looked at all the situation.
10 The situation that came to us was there's a recommendation
11 for a Level 4 violation for fighting. Within that policy,
12 I mean, the transcript is reviewed and we sort of start
13 there and then we look at mitigating circumstances for both
14 employees. With Mr. Melton, it was obvious that he made
15 the first physical contact. That sort of put him in the
16 termination box if you would say. After that, we clearly
17 looked at the situation that existed with Mr. Branch and
18 this was not an easy decision. We recognize that the --- I
19 should say the discipline review panel recognized that he
20 did not start this situation. Apparently, it was started
21 on the physical with Mr. Melton. So, we considered all
22 that. We looked at the witness statements that were
23 presented in the transcript as one of the exhibits. We
24 looked at the testimony of Mr. Branch as well as Mr. Melton
25 as well as anyone who was brought forth as a witness and we

Robert Branch    2023-FRS-00026    February 13, 2024

---

**Page 141**

1  determined that Mr. Branch did engage in that situation
2  which led to our conclusion that he had violated --- this
3  was a Level 4 violation.
4      Q    Now, Mr. Spears, I believe you just said that
5  this came with a recommendation for a Level 4 termination.
6  Who gave the recommendation to you all?
7      A    The department.  I do not remember specifically
8  and it wasn't for a Level 4.  It was for a Level 4
9  violation, not a Level 4 termination.
10     Q    Well, aren't they the same?
11     A    Not necessarily.
12     Q    When can you get a Level 4 violation and it not
13  be termination?
14     A    You're absolutely right with respect to a Level 4
15  violation.  However, that's not the only type of violation
16  that we encounter.  That could lead to an employee's
17  termination.
18     Q    From whom did the recommendation for the Level 4
19  violation come from?  You said the department.  What
20  department are we talking about?
21     A    That was the department that he worked for and
22  that would be the Engineering Department.
23     Q    So, the Engineering, Department recommended that
24  this be a Level 4 violation?
25     A    The case came to the discipline review panel as a

---

**Page 142**

1  Level 4 violation.
2      Q    Okay and the case was not turned over to you all
3  until the hearing was over?
4      A    That is correct.
5      Q    So, when you get the transcript, the department
6  tells you, "Hey, handle this as a Level 4 violation"?
7      A    That's not quite what happened.  The transcript
8  and exhibits come to us.  The department will say, "We
9  believe this is a Level 4 violation" and our job is to go
10  through the transcript, look at the exhibits and determine
11  whether or not the information contained in the transcript
12  supports a Level 4 violation.
13     Q    All right.  Do we know or do you not know who
14  from the Department of Engineering recommended it be looked
15  at as a Level 4 violation?
16     A    I don't remember specifically how that came to
17  us.
18     Q    Now, if you know that fighting equals a Level 4
19  violation, then why even have a workplace violence policy?
20     A    I'm sorry.  I don't understand our question.
21     Q    Okay.  What is the purpose of having the
22  workplace violence policy when you say fighting equals a
23  Level 4 termination?
24     A    I can't tell you.  I can only speculate that the
25  policy itself is to let all the employees know what will be

---

**Page 143**

1  and what will not be tolerated in the company.
2      Q    Okay.  Where does a Level 4 violation appear in
3  documents at the Illinois Central Railroad?
4      A    It appears as causing harm in the discipline
5  review policy.
6      Q    Okay and are you talking about in the workplace
7  violence policy?
8      A    No, I'm not.  I'm talking about the discipline
9  review policy.  The discipline policy, I should say.
10     Q    Does it specifically state fighting equals Level
11  4 termination?
12     A    It references causing harm.
13     Q    Okay.  So, if you cause harm, what is the
14  definition of causing harm?
15     A    I don't have a specific definition for causing
16  harm.  It could be injury.  It could be other things.  It
17  could be fighting.  That would be within that category for
18  me.
19     Q    Does Illinois Central have definitions in any of
20  its documents?
21         MS. FITZKE:    Objection to the form of the
22  question.  It's argumentative.  Judge, you're on mute.
23         JUDGE DONALDSON:    Thank you.  I'm going to
24  sustain it in part on that and in part, to me, the question
25  is very broad.

---

**Page 144**

1         MR. SOREY:    Okay.
2         JUDGE DONALDSON:    So, if you could take another
3  stab at that, Mr. Sorey.
4         MR. SOREY:    Okay.
5  BY MR. SOREY:
6      Q    Now earlier, you told us that Mr. Patrick Crain
7  was not on the disciplinary panel, correct?
8      A    That is correct.
9      Q    Then why was Mr. Crain recommending that Mr.
10  Branch be terminated?
11         MS. FITZKE:    Objection.  I states facts not in
12  the record and foundation.  This witness hasn't established
13  foundation to talk about that.
14         JUDGE DONALDSON:    That is sustained.  I don't
15  see the foundation, Mr. Sorey.
16  BY MR. SOREY:
17     Q    Okay.  Are you aware that Mr. Patrick Crain
18  recommended to Mr. Tom Hilliard that Mr. Branch being
19  terminated?
20     A    I don't know if I knew that at the time.  It
21  might be in the course of being deposed, so on and so forth
22  that I'm aware of that.
23     Q    Are you aware of it now?
24     A    I'm aware of it now.
25     Q    Okay and does someone outside of the disciplinary

---

Robert Branch    2023-FRS-00026    February 13, 2024

Page 145

1 panel normally make recommendations for punishment?
2    A    Yes.
3    Q    Okay.  That's the procedure for IC Railroad?
4    A    That is the procedure that we use with respect to
5 the discipline policy.
6    Q    Okay.  Mr. Spears, if you remember, I asked you
7 in your deposition what you would do if a co-employee came
8 up to you and knocked you to the ground.  Do you recall
9 your answer?
10    A    I'm not sure if that's how you phrased the
11 question, but I remember something similar to that.  I
12 don't know what I would do because that is a matter of
13 anger.  The adrenalin gets going and people do what they
14 do.
15    Q    Okay.  Have you ever had any conversations with
16 Mr. Patrick Crain concerning an altercation between Chris
17 Day and a contractor?
18    A    No.
19    Q    Were you aware of that situation?
20    A    Could you repeat the question because I believe
21 you froze in the video?
22    Q    Oh, I'm sorry.
23    A    That's okay.
24    Q    I said did Mr. Crain ever tell you that Chris Day
25 had been involved in an altercation with a contractor in an

Page 146

1 Illinois bar?
2    A    No.
3    Q    Have you ever been made aware of that by anyone
4 else?
5    A    No.
6    Q    Normally, when an employee is reporting or it's
7 reported that some type of altercation took place, would
8 your department be notified?
9    A    Not necessarily.
10    Q    Okay.  What does Human Resources do at Illinois
11 Central?  What are you responsible for?
12    A    Are you asking what Human Resources is
13 responsible for or are you asking me what am I responsible
14 for?
15    Q    Let's limit to what you're responsible for.
16    A    I'm responsible for the diversity, equity and
17 inclusion for our company.
18    Q    Okay and that's your sole responsibility?
19    A    That is my responsibility right now.  That's my
20 main responsibility.  However, as a Human Resources
21 manager, I might get involved in other situations.
22    Q    Okay.  Did you have the same responsibilities in
23 June of 2022?
24    A    No, I did not.
25    Q    What were your responsibilities at that time?

Page 147

1    A    My responsibilities at that time included making
2 sure that the various government reports such as the EEO1
3 and the VES 4212 were done, the affirmative action,
4 investigating complaints of discrimination and harassment.
5    Q    Well, then how did you get put on the
6 disciplinary panel?
7    A    I cannot tell you.  It is written into the
8 discipline policy.
9    Q    That someone from Human Resources will be on the
10 disciplinary panel?
11    A    It is very specific about who that person is and
12 it specifies, I do believe it specifies HR compliance and
13 that was my title at the time.
14    Q    HR compliance?
15    A    Yes.
16    Q    What does that mean?
17    A    As I explained before, that means that I am the
18 person that gets involved in matters of harassment,
19 discrimination, various government reports.
20    MR. SOREY:    I believe that's all the questions
21 I have.  Thank you.
22    JUDGE DONALDSON:    All right, thank you.  So,
23 now your attorney for Respondent, since you're aware of the
24 other witnesses, Mr. Spears, they can ask you questions.
25 Please go ahead.

Page 148

1    CROSS EXAMINATION
2 BY MS. FITZKE:
3    Q    Mr. Spears, are you aware of the code of conduct
4 for the company?
5    A    Yes, I am.
6    Q    And are you aware of the workplace violence
7 policy?
8    A    Yes, I am.
9    Q    With respect to the code of conduct policy, do
10 managers and employees receive training on that policy?
11    A    I do believe so, yes.
12    Q    And how often?
13    A    Annually.
14    Q    With respect to the workplace violence policy,
15 does the company also provide training on that?
16    A    Yes.
17    MS. FITZKE:    Okay.  Grace, can you pull up
18 Exhibit 16 for us?  There's a book of hard copy exhibits if
19 you want to follow along in hard copy.  Just let us know if
20 you need Grace to make it a little bit bigger for you.
21    MR. SOREY:    No, I can actually see this one.
22    MS. FITZKE:    Okay, great.
23 BY MS. FITZKE:
24    Q    Mr. Spears, can you tell us what Exhibit 16 is?
25    A    Exhibit 16 is the CM workplace violence

Robert Branch    2023-FRS-00026    February 13, 2024

---

Page 149

1  prevention policy.
2       MS. FITZKE:    With respect to the policy, Grace,
3  if we could scroll down to the second page of the document?
4  It gives some examples in the middle of the page what
5  workplace violence might include.
6       BY MS. FITZKE:
7       Q    Do you see that there?
8       A    Yes.
9       Q    Okay.  Is this policy limited to addressing
10 incidents of physical fighting?
11      A    No, it covers several situations.
12      Q    With respect to incidents of physical fighting
13 that would violate the workplace violence prevention
14 policy, are you aware of someone who has actually thrown a
15 punch or engaged in a situation, an incident of workplace
16 violence in that aspect, thrown a punch who was not
17 terminated for violation of this policy?
18      A    I'm not aware of anyone that has not been
19 terminated.
20      Q    Are you aware of any incidents of an employee
21 throwing a punch at a co-worker that hasn't been reviewed
22 as a potential Level 4 violation?
23      A    I am not aware of such actions.
24      Q    When the policy talks about the potential to
25 discipline up to and including termination as Mr. Sorey

---

Page 150

1  pointed out, there could be incidents of discipline for a
2  violation of this policy that are less than termination,
3  are you familiar with any kind of situations that have
4  violated this policy, but have not resulted in termination?
5       A    I'm not sure.  Yes, I'm just not sure at this
6  point.
7       Q    None that you recall?
8       A    None that I can recall.
9       MS. FITZKE:    Okay.  You can take that exhibit
10 down.
11      BY MS. FITZKE:
12      Q    How would employees if they had a question about
13 what the company policy was, how could they access or find
14 out what the policy says?
15      A    Oh, the easiest thing would be to check with
16 their managers.  That's easier if they're not sure what the
17 policy is, but everyone has access through the Internet.
18 Any employee can see it.  Sometimes it's even posted in
19 various locations.  So, there are several ways, but
20 employees are responsible for knowing what the company
21 policies are.
22      MS. FITZKE:    Grace, can you bring up Exhibit
23 30?  Just the first page for now.
24      WITNESS:    It's kind of small.
25      MS. FITZKE:    It's just catching up on my end.

---

Page 151

1  Sorry.  It should pop up in a second a little bigger.
2  There we are.
3       BY MS. FITZKE:
4       Q    Mr. Spears, can you tell us what Joint Exhibit 30
5  is?
6       A    Exhibit 30 is the CM discipline policy for the
7  Southern Region.
8       Q    Okay and does that include employees working
9  under the operating subsidiary Illinois Central?
10      A    That is correct.
11      MS. FITZKE:    And if we can scroll down just a
12 little bit, Grace.
13      BY MS. FITZKE:
14      Q    I see there's an effective date of this policy,
15 10-23-2017.  Did you have another version of this policy in
16 place before October of 2017?
17      A    No.
18      Q    Okay.  Was this a new policy at that time?
19      A    Yes.
20      MS. FITZKE:    If we could go to the next page of
21 the policy, please?
22      BY MS. FITZKE:
23      Q    On the scope of this policy, it indicates that it
24 applies to all union representative employees except those
25 in their probationary period.  Is that right?

---

Page 152

1       A    That is what the policy states.
2       Q    Would this discipline policy apply to managers or
3  supervisors of the company?
4       A    No.
5       MS. FITZKE:    On the next page of the policy
6  which is the third page of the exhibit, but it's identified
7  as page 2 of the policy.  There is a section.  There we go.
8  Right there.
9       BY MS. FITZKE:
10      Q    Does this policy then address and outline as you
11 as a member of the company with responsibilities over
12 discipline is to go about assessing discipline to the
13 unionized workers?
14      A    Yes.
15      MS. FITZKE:    If we can look at the fifth page
16 of the document which is the fourth page of this policy.
17 There is toward the bottom of the page a section called
18 Discipline Review Panel.  Go down to that.
19      BY MS. FITZKE:
20      Q    You mentioned earlier, Mr. Spears, that there is
21 in the policy language about who must be included in the
22 discipline review panel?
23      A    Yes.
24      Q    Is this the language that you were referring to?
25      A    Yes.

---

Exhibit A - Transcript of February 13 and 14, 2024, hearing in front of the Office of Administrative Law Judges

Robert Branch    2023-FRS-00026    February 13, 2024

---

Page 153

1    Q    And above that, there is some language about the
2  review process.  Did you --- with respect to the issuance
3  of discipline in June of 2022 time frame, did you have any
4  role in that review process to determine --- is that review
5  process, let me back up, I'm sorry.  That was a terrible
6  question.  The review process, is that the process that
7  occurs after the transcript is made available?
8    A    Yes.
9    Q    Okay.  For Mr. Branch and Mr. Melton and their
10  discipline in June of 2022, can you describe for us your
11  role in the discipline review panel and the review process
12  for that discipline that was assessed?
13    A    Yes.  The first thing that happens is we receive
14  the investigation hearing along with the exhibits and each
15  member of the discipline review panel, we review it
16  separately and then we come together to determine whether
17  or not there's agreement as far as whether or not there has
18  been a violation of company policy.
19    MS. FITZKE:    And with respect to the level of
20  discipline to be assessed, if we can look at page 7 of the
21  exhibit, page 6 of the policy?
22    BY MS. FITZKE:
23    Q    It talks about categories of violations.
24    A    Yes.
25    Q    Well, I'll ask you.  Can you explain to us what

---

Page 154

1  these levels of violation are and what they're intended to
2  do?
3    A    They're in the violation, level violations go
4  from 1 to 4, 4 being the most, I'll say, egregious or the
5  serious violations.  So, it starts out with Level 1 and
6  these are examples.  The bullet points that you see on the
7  screen are just examples of what this might include, what
8  Level 1 violations might include and it does the same for
9  Level 2 violations, Level 3 violations as well as Level 4
10  violations.
11    Q    Let's look at Level 4 violations if we could.
12  It's on page 9 of the exhibit, page 8 of the policy.  As
13  you mentioned, it indicates here that it is extremely
14  serious and the third bullet point down indicates violence
15  in the workplace.  What do you understand that to be?
16    A    Anything that coincides what the actual violence
17  in the workplace policy.  So, that's how we determine if
18  there's violence.
19    Q    And is that what you would typically consider
20  physical fighting, an employee who punches another
21  employee?
22    A    Yes.
23    Q    Before you received the investigation hearing
24  transcripts, when did you first --- well, let me ask you
25  this.  Before you received the investigation hearing

---

Page 155

1  transcript, had you been made aware that there was an
2  incident that took place between Mr. Melton and Mr. Branch?
3    A    Yes.
4    MS. FITZKE:    Grace, you can take the exhibit
5  down.  Thank you.
6    BY MS. FITZKE:
7    Q    How did you find out about it?
8    A    There might have been conversations with myself,
9  Tom Sullivan and perhaps Patrick Crain who report to Tom
10  Sullivan.
11    Q    Do you recall who specifically made you aware at
12  this point?
13    A    I don't remember.  It might have been Tom.  It
14  could have been Patrick.  I'm not sure.
15    Q    And with respect to bringing you into discussions
16  that there had been an incident that occurred, what would
17  have been your role?
18    A    My role as part of the discipline review panel is
19  to advise whether or not they should proceed or what do you
20  think about the case, should we proceed, how should we
21  proceed.
22    Q    And when you say, should we proceed, do you mean
23  to proceed to an investigation hearing?
24    A    To issue a Notice of Investigation.  That is
25  correct.

---

Page 156

1    Q    And do you know --- well, why are you weighing in
2  at that point?  What's the purpose of having a discipline
3  review panel if you know as to whether to go forward to
4  hearing?
5    A    Well, it's generally the Labor Relations manager
6  will come if they have a question about what's going on and
7  they're just not sure about.  So, they just need further
8  guidance on what should happen.
9    Q    And did you give some guidance in this case?
10    A    I don't recall.
11    Q    All right.  Did you --- when you were asked to
12  weigh in prior to the investigation hearing, do you recall
13  if you had seen any of the written statements at that time?
14    A    I've seen the statements so many times.  I'm not
15  sure when I first saw them.
16    Q    Fair enough.  Okay and you mentioned that after
17  the hearing and reviewing the transcript and exhibits as
18  part of your role on the discipline review panel.  What do
19  you recall about your conversations with other members of
20  the discipline review panel about what level of discipline
21  to access, if any, to Mr. Branch?
22    A    Again, it comes to us as a Level 4 violation.
23  So, that's why we're looking at it.  So, that's sort of set
24  in stone, but we reviewed it and went back and forth.
25  Again, for Mr. Melton, it was sort of self-executing, I'll

---

Exhibit A - Transcript of February 13 and 14, 2024, hearing in front of the Office of Administrative Law Judges

Page 157

1 say that, where he did the first physical contact with Mr.
2 Branch. So, that was sort of we can put that to the side.
3 Now, let's consider Mr. Branch and we looked at all the
4 situation. We looked at the statements. We looked at Mr.
5 Branch's statement, not only his written statement, but
6 what he provided in the investigation during the
7 investigation.
8     Q    And was there discussion amongst members of the
9 discipline review panel as to whether Mr. Branch was
10 engaged in self-defense during this incident?
11    A    I'm not sure specifically if we say it was self-
12 defense or whatever. Our situation was we looked at
13 whether or not Mr. Branch engaged. What was he doing
14 during that time, was he in a defense posture? Was he
15 trying to get away? Did he run? Did he cover up? What
16 did he do during that time? That's how we looked at it.
17    Q    And what facts that you read in the hearing
18 transcript and in the statements were important to you in
19 your role in concluding that termination of Mr. Branch was
20 also appropriate here?
21    A    One of the big things is that Mr. Branch admits
22 that, "Yes, I swung and I engaged. I punched him. I
23 touched him." Another part is they're on the ground where
24 someone had to pull them apart. Had the employees that
25 were around at the time not pulled them apart, they could

Page 158

1 have continued with the fight. There didn't seem that
2 either employee was willing to just take a breath and say
3 enough.
4     Q    When you participated in the decision to
5 terminate Mr. Branch's employment, did you consider that or
6 did you believe he had reported to the company a hazardous
7 safety or security condition?
8     A    Could you restate the question, please?
9     Q    (Affirmative response). I understand that you
10 made a recommendation that concurred with the decision to
11 terminate Mr. Branch's employment. Is that right?
12    A    Well, we believe that it was a Level 4 violation.
13    Q    And you agreed with that? When you say we, that
14 included you? You also agreed?
15    A    Yes, yes.
16    Q    And when you concluded that Mr. Branch had
17 engaged in a Level 4 violation. Did you believe that Mr.
18 Branch had engaged in conduct that was reporting a
19 hazardous safety or security condition?
20    A    I don't know if you would consider it safety, if
21 it was an issue of safety with Mr. Branch. It was a matter
22 of them fighting.
23    Q    And Mr. Branch had submitted a statement that we
24 looked at earlier in the testimony where he indicated that
25 in his statement, he was referred to the language where he

Page 159

1 said, "I fear for my life around him, Mr. Melton." Did you
2 read that part of his statement too?
3     A    Yes, that was part of it. Yes, I did read that.
4     Q    And during the investigation hearing, did you
5 also read the part where Mr. Melton asked Mr. Branch if he
6 believed he was a threat to him and Mr. Branch said no?
7     A    Yes.
8     Q    When you were reviewing the transcript and the
9 potential termination of Mr. Branch, what weight, if any,
10 did you give to Mr. Branch's statements that he feared Mr.
11 Melton?
12    A    I did not give a lot of weight to that at one
13 point early when he wrote his statement, he indicated that
14 he was afraid for his life so that sort of neutralized the
15 situation and then the focus because were the employees
16 fighting.
17    Q    And if you made a decision with the panel to
18 return Mr. Branch to work, was Mr. Melton going to be there
19 with him?
20    A    At work, if he returned, no.
21    Q    Would your recommendation with respect to the
22 termination of Mr. Branch have been any different if Mr.
23 Melton or another co-worker had reported the incident?
24    A    It did not matter. The company knew about it so
25 we had to move forward.

Page 160

1     Q    Would your decision to terminate Mr. Branch have
2 been any different if Mr. Branch reported that there had
3 been a fight, but hadn't indicated that he felt threatened
4 or afraid of Mr. Melton?
5     A    No. Again, we looked at what was in the
6 transcript.
7         MS. FITZKE:   Thank you, Mr. Spears. I don't
8 have any --- wait, sorry. One more question that came up
9 today.
10        BY MS. FITZKE:
11    Q    Mr. Spears, did anybody ever make you aware
12 before Mr. Branch and Mr. Melton were terminated that Mr.
13 Melton was alleged to have had a gun at the Magnolia Inn or
14 said he was going to go get his gun that night?
15    A    Until this particular hearing, that was the first
16 time I heard anything about a gun.
17        MS. FITZKE:   Okay, thank you. I don't have any
18 other questions for you, sir.
19        JUDGE DONALDSON:   Okay. So, Mr. Sorey, why
20 don't you go ahead? Do you have any questions? Are you---
21        MR. SOREY:   I'm still writing them down.
22        JUDGE DONALDSON:   You're still writing some
23 questions down?
24        MR. SOREY:   Yes, Your Honor.
25        JUDGE DONALDSON:   Let's pause for a minute.

Robert Branch    2023-FRS-00026    February 13, 2024

Page 161

1          MR. SOREY:   I got it.
2          JUDGE DONALDSON:   You got it now?  All right,
3   let's go forward.
4                    REDIRECT EXAMINATION
5   BY MR. SOREY:
6      Q   Mr. Spears, do you think with Mr. Branch filing a
7   statement about the altercation and then getting
8   terminated, do you think that will encourage other
9   employees to file?
10     A   I'm not sure what other employees might do.
11     Q   If an employee is involved in an altercation,
12  does the IC normally hold an investigation of the facts?
13         MS. FITZKE:   Object to the question.  I'm not
14  sure of the circumstances.  Object to the form as vague.  I
15  can't understand it.
16         JUDGE DONALDSON:   Overruled.  I understood it,
17  but if the witness doesn't, you can let us know.
18         WITNESS:   Could you repeat the question again,
19  please?
20         MR. SOREY:   Sure.
21  BY MR. SOREY:
22     Q   If an employee for the railroad, IC Railroad, is
23  involved in an altercation, does the IC normally hold an
24  investigation of the facts?
25     A   It depends on what the situation is.  It's a case

Page 162

1   by case situation once the company knows.
2      Q   So, you're saying one person involved in
3   altercation might be investigated while another person
4   involved in an altercation will not be investigated?
5      A   What I'm saying is case by case situation and it
6   depends upon the facts that lead to during the
7   investigation.
8      Q   How would IC know what the facts are without the
9   investigation or a hearing?
10     A   Without a formal hearing or investigation, they
11  can ask people.  They can take statements that might not be
12  part of the investigation as you framed it.
13     Q   Well, is that the normal policy for Illinois
14  Central?
15     A   There's no specific policy that says that it
16  would be investigated or won't be investigated.  We look
17  into the situation as I mentioned on a case by case basis.
18     Q   Does it make any difference if it's a union
19  employee or a manager involved in the altercation?
20     A   The way the investigation is done, it does make a
21  difference whether it's a union represented employee or
22  management employee.  Management employers are not as I
23  mentioned earlier are not subject to the discipline policy.
24  So, would not necessarily go through those procedural
25  methods.

Page 163

1      Q   Okay, the managerial people are part of the
2   workplace violence policy, are they not?
3      A   They are subject to the workplace violence
4   policy, yes.
5      Q   Does the IC Railroad normally just take the word
6   of a supervisor about an altercation that they hadn't been
7   involved with?
8      A   I don't know.
9      Q   Now, I noticed a while ago, we were looking at
10  the code and it said for the Southern Region.  What makes
11  up the Southern Region for the IC?
12     A   That is the United States.
13     Q   All right, sir.  So, everything in the United
14  States is considered the Southern Region?
15     A   That is correct.
16     Q   Okay.  It must have been written by the Canadians
17  then.
18     A   Is that a question?
19         MR. SOREY:   No, it was a joke.
20         JUDGE DONALDSON:   No, it's not.
21  BY MR. SOREY:
22     Q   So, if I listen and I tried to listen to you
23  carefully and I could be wrong so I'll give you a chance to
24  tell me, but it seems like you said that you all did not
25  consider self-defense?

Page 164

1      A   That's not exactly what I said and if I implied
2   that, that's not true.  We considered the actions of both
3   employees.  That's what we did and again, we have employees
4   fighting.  So, right away, we're at a Level 4.  The next
5   step is to determine whether or not there's some mitigating
6   circumstances surrounding what happened, okay?  The first
7   thing that we noticed is that Mr. Melton did initiate the
8   first contact.  That's a given.  Then we look at he's going
9   to be terminated more likely than not.  Yes, he's
10  terminated.  Now, let's look at Mr. Branch.  We look at his
11  statements.  We look at the fact that earlier he said he
12  was afraid for his life, but later on, he said, "No.  No
13  issue there."  The next thing we look at is the witness
14  statements as far as who swung and who made contact, so on
15  and so forth.  For me, what I did not see, I did not see
16  any form of retreat or traying to get out of the way or
17  take a defensive posture.  Therefore, he was actively
18  engaged.  It was a tough decision.  It wasn't the easiest
19  decision that I ever made in my life, but that is the fact
20  according to what I read in the transcript.
21     Q   So, according to the disciplinary panel group, if
22  you put up your arms to prevent being struck or you
23  actually swing back in order to keep from being struck, you
24  abandon self-defense?
25     A   I can't tell what the disciplinary panel felt.  I

Robert Branch    2023-FRS-00026    February 13, 2024

Page 165

1 can only speak for myself and I can say there was no
2 evidence of trying to move away or try to not engage by Mr.
3 Branch. That's how I saw it.
4        Q    Now, if Mr. Branch did not report the
5 altercation, IC would have never investigated this matter,
6 would they?
7        A    Not necessarily. If the company knew about it
8 some other method, the company would have investigated.
9        Q    Now, under the workplace violence policy, are
10 employees required to report workplace violence?
11       A    We would expect all employees to report any type
12 of altercation that they get involved with or witness.
13            MR. SOREY:    Okay. That's all the questions I
14 have.
15            JUDGE DONALDSON:    Okay. Ms. Fitzke, did you
16 have any further questions for Mr. Spears?
17            MS. FITZKE:    One moment, please. I don't have
18 any other questions right now.
19            JUDGE DONALDSON:    Okay. Thank you very much,
20 Mr. Spears. The attorneys handled all the topics. I don't
21 have any other questions for you myself. They handled
22 everything very well and comprehensively. So, I understand
23 you're going to stay a part of the hearing as the
24 Respondent's representative?
25            WITNESS:    That is correct.

Page 166

1            JUDGE DONALDSON:    Okay. All right, you can
2 return to turn your camera off if you so choose which most
3 people are doing if you're not speaking or engaging. So,
4 thank you again for your participation as a witness.
5            WITNESS:    You're welcome.
6            JUDGE DONALDSON:    Mr. Sorey, what's the game
7 plan? Who are you turning to next?
8            MR. SOREY:    Well, it depends on our time
9 period, Judge. Patrick Crain is going to take a good bit
10 of time, I think. We have Mr. Tom Sullivan and Tom
11 Hilliard and I don't think either one of those gentlemen
12 would be very long. It depends on time-wise what you want
13 to do.
14            JUDGE DONALDSON:    Okay. Sounds like if they're
15 not going to take long, it sounds feasible to have Mr.
16 Sullivan and Mr. Hilliard to testify this afternoon. Same
17 amount of time used holds true for these witnesses. It
18 looks like that's doable and we can likely finish in a
19 couple hours or less and then we can reserve the morning
20 for Mr. Crain.
21            MR. SOREY:    That would be fine, Your Honor.
22            JUDGE DONALDSON:    -- if that's not an issue.
23 Am I cutting out again?
24            MS. FITZKE:    No.
25            JUDGE DONALDSON:    That sounds feasible to me.

Page 167

1 Does that sound feasible to you, Mr. Sorey?
2            MR. SOREY:    Yes, it's fine. I'm sorry. I was
3 reading.
4            JUDGE DONALDSON:    Okay, that's fine. Ms.
5 Fitzke, is there an issue of availability if we take Mr.
6 Sullivan and Mr. Hilliard and then tomorrow take Mr. Crain?
7            MS. FITZKE:    We'll just have to confirm. I
8 know that Tom Sullivan is around. We had anticipated based
9 on the prior order that Tom Hilliard would likely be
10 tomorrow, but we'll reach out to him on the --- we can take
11 a short break and just make sure he's going to be available
12 yet this afternoon.
13            JUDGE DONALDSON:    Okay.
14            MR. SOREY:    We can do it in the morning if you
15 want to. I think even though Mr. Crain is going to be
16 longer, it's not going to take up all morning.
17            JUDGE DONALDSON:    Okay. Let's take a 10-minute
18 break. We'll actually just come back at 2:30. It's just
19 easier to get timed that way and you can let us know, Ms.
20 Fitzke, what works best for the party, the witnesses at
21 that time. All right, I'll see you all back in about a
22 little under than 15 minutes.
23            MS. FITZKE:    Thank you.
24            MR. SOREY:    Thank you, Your Honor.
25            (Off the record at 2:17 p.m., CST)

Page 168

1            (On the record at 2:36 p.m., CST)
2            JUDGE DONALDSON:    We have another witness
3 before us. It is Tom Sullivan. Mr. Sullivan, you can hear
4 and we can see you well so at this time, would you raise
5 your right hand so I can swear you in?
6 Whereupon,
7                  THOMAS SULLIVAN
8 having been duly sworn, was called as a witness herein and
9 was examined and testified as follows:
10            WITNESS:    I do.
11            JUDGE DONALDSON:    All right, thank you. Mr.
12 Sorey, please go ahead.
13            MR. SOREY:    Okay.
14            DIRECT EXAMINATION
15 BY MR. SOREY:
16       Q    Mr. Sullivan, during June of 2022, you were the
17 director of Labor Relations for Illinois Central Railroad?
18       A    That's correct, yes.
19       Q    Now, in your deposition, you told us the process
20 for setting up an investigation and I want to go through it
21 to make sure I understood it. I think you said first when
22 you were made aware of an incident, you'd do a review to
23 determine whether or not there would be disciplinary
24 consequences from it. If the disciplinary panel agrees,
25 then the hearing is held and the panel decides if there is

Robert Branch    2023-FRS-00026    February 13, 2024

Page 169

1  sufficient facts to support the violation of a rule. Now,
2  did I state that correctly?
3      A    Fairly closely. The initial review to determine
4  is a look to see based on initial evidence and facts that
5  we've gathered to see if there is sufficient information to
6  move forward with an investigation. We do that because
7  under our discipline policy, the employees not facing a
8  dismissible offense would be offered a waiver so they could
9  waive the formal investigation and accept a record
10  suspension. So, that's why we do that initial cursory
11  review and if we move forward with the investigation, it's
12  more a full development of facts.
13      MR. SOREY:    Thank you.
14  BY MR. SOREY:
15      Q    Now, you said in your deposition that you, Duane
16  Spears and Patrick Crain decided that there should be a
17  disciplinary hearing. Is that correct?
18      A    Yes. The three of us consulted about that, yes.
19      Q    Is the only discipline for fighting dismissal?
20      A    Fighting is a dismissible offense, yes. I'm not
21  aware of any example of a fight where it resulted in
22  anything less than dismissal.
23      Q    Okay. Is there any exception for self-defense in
24  the workplace violence policy?
25      A    There is, yes.

Page 170

1      Q    Okay. What is it?
2      A    What's the exception?
3      MR. SOREY:    Yes. I asked a poor question. I'm
4  sorry.
5  BY MR. SOREY:
6      Q    How does it define self-defense?
7      A    I don't have the policy in front of me so I would
8  have to read the policy to find out if there is a
9  definition of self-defense. I can do that.
10      MR. SOREY:    We can put it up for you if you
11  would like.
12      JUDGE DONALDSON:    Mr. Sorey, do you want us to
13  --- is this putting up an exhibit for your witness?
14      MR. SOREY:    No, I think James is pulling up.
15      JUDGE DONALDSON:    Okay.
16      MR. SOREY:    It's just taking him a second.
17      MS. FITZKE:    Are you pulling up Joint Exhibit
18  16, the policy?
19      MR. SOREY:    Right.
20      JUDGE DONALDSON:    16? Okay.
21      MR. SOREY:    Yes, we can see it there.
22  BY MR. SOREY:
23      Q    Can you see that, Mr. Sullivan?
24      A    I can, yes.
25      Q    All right. Let us know when you want us to move

Page 171

1  further down.
2      JUDGE DONALDSON:    Have you directed him to a
3  part of it yet or do you want him to review all of page 1?
4      MR. SOREY:    I thought he wanted to review the
5  whole thing. I didn't ---
6      JUDGE DONALDSON:    Oh, okay.
7      WITNESS:    I can review the whole thing. You
8  asked me specifically about if there's a definition of
9  self-defense and that's what I would look for in the
10  policy.
11      MR. SOREY:    He's slowly scrolling it down so if
12  you see anything you want to stop, let us know.
13      WITNESS:    So, if you move back the other way,
14  this is where it speaks to, "Workplace violence as defined
15  as any action, conduct or gesture of a person towards a CN
16  employee in the workplace that can reasonably be expected
17  to cause harm, injury or illness to the CN employee
18  excluding situations justified self-defense."
19  BY MR. SOREY:
20      Q    Is that the only place or you need to continue to
21  look?
22      A    I don't know. We can continue to see if there is
23  any further --- it doesn't look to be --- keep scrolling
24  down to see if there is any further mention of it. I didn't
25  see anything further so it's the mention of self-defense is

Page 172

1  in connection with that paragraph excluding situations of
2  justified self-defense.
3      Q    All right. So, the only thing that we can find
4  in there states justified self-defense. Now, in your
5  ruling that is part of the disciplinary panel, without a
6  definition of self-defense, how do you rule on it?
7      A    Well, we would apply what we would know to be
8  what is perhaps a customary definition of what you would
9  look to for self-defense and did the person --- there's a
10  line, I suppose, that we would establish where it's self-
11  defense and where it's not. So, we would apply some
12  standard that we would talk through, did you cross that
13  line or didn't you is what the conversation that we had.
14      Q    And what is that standard?
15      A    Well, what we look to is really what when it
16  became more an incident of a fight versus somebody trying
17  to defend oneself or avoid further confrontation is what we
18  looked to in this case and other cases.
19      Q    Do you all ever use the state definition of self-
20  defense?
21      A    We do not use a state definition of self-defense.
22      Q    Are you aware of Mississippi's self-defense
23  definition?
24      A    I'm not.
25      Q    Now, in your deposition, I asked you what would

Robert Branch    2023-FRS-00026    February 13, 2024

Page 173

1  you do if a co-employee hit you and knocked you to the
2  ground and I believe your answer was, "I don't know." Is
3  that correct?
4      A    That's how I answered then, yes.
5      Q    Okay.  Is that still your statement on that?
6      A    Yes.
7      Q    If you don't know how you would react, how do you
8  judge someone else for acting?
9      A    I look solely at the action is what we looked
10  here.  I didn't judge anybody for the action.  I looked at
11  the actions and that's what we used to reach our
12  determination.  There's no judgment.  It was just the facts
13  developed and what took place through those facts as we saw
14  them and reading the transcript from the investigation.
15     Q    Well, I disagree with you on the judgment theory
16  because I think it was a judgment and you judged that he
17  was fighting and fired him, did you not?
18     A    Did we judge?  We came to a determination that
19  the facts established that he was fighting.  Judged that or
20  how we can to that determination, I don't know if I'd call
21  it judgment in other words.
22     Q    Now, do you feel with Mr. Branch reporting the
23  incident and then getting fired, do you think that's going
24  to encourage other CN or IC employees from reporting
25  workplace violence?

Page 174

1      A    I don't know.  I don't know.
2      Q    Now, when I asked you a question about Mr.
3  Branch, basically all you said was, "Mr. Branch should not
4  have engaged in fighting."  Is that correct?
5      A    That's correct.  I don't remember the exact words
6  I used.  You're reading them so if I --- that's correct.
7      Q    Okay.  Now, Mr. Sullivan, are you aware of an
8  altercation involving Mr. Chris Day, one of your managers
9  with a contractor in an Illinois bar about a year ago?
10     A    I am not, no.
11     Q    Now, in your opinion, does the workplace violence
12  policy apply to all employees of the IC Railroad?
13     A    The workplace violence policy applies to all
14  employees, all CN employees.
15     Q    If Mr. Day testified that he reported this
16  altercation to Mr. Patrick Crain and to Mr. Patrick Jones,
17  his supervisor, would you normally expect them to have a
18  hearing of the facts of that altercation?
19         MS. FITZKE:    Object to the form of the
20  question.  Object on foundational grounds.  He hasn't
21  established what the altercation was or what was reported
22  sufficient for Mr. Sullivan to respond.
23         JUDGE DONALDSON:    That's sustained, Mr. Sorey.
24         MR. SOREY:    Okay.
25  BY MR. SOREY:

Page 175

1      Q    Mr. Sullivan, if Mr. Day reported that he was
2  having dinner and drinks with a contractor for the IC
3  Railroad and at some point, "Out of the blue, the contract
4  head butted him and then he left."  Consider that
5  hypothetical, but in that hypothetical, would you normally
6  think that Illinois Central Railroad would have had a
7  hearing to investigate the facts of that altercation?
8      A    We would not have a hearing to investigate facts
9  in that setting.  Hypothetically, that setting, we would
10  not have a hearing, no and there may be a follow-up with
11  the contractor with regards to further following up as to
12  what happened, but we would not have a hearing in that
13  setting that I ever encountered.  The hearings are reserved
14  for union represented employees pursuant to the due process
15  obligations under the collective bargaining agreement.
16     Q    Okay.  So, it doesn't apply to managers?
17     A    We don't hold management hearings, no.
18     Q    Do you all do investigations for manager
19  problems?
20     A    Yes.
21     Q    Do you take statements?
22     A    I think in the normal --- I've not participated n
23  them.  It's not my area of responsibility, but I do know
24  that we do follow up and investigate on instances involving
25  non-union employees, yes.

Page 176

1      Q    Did Mr. Crain tell you about the allegations
2  concerning Mr. Chris Day advising him of an altercation?
3      A    No, he did not.
4      Q    Would you normally expect him to report that to
5  you?
6      A    No, I really wouldn't.
7      Q    Did he report to you the problem of Mr. Branch
8  and Mr. Melton?
9      A    It came --- I don't know if it came directly from
10  Patrick, but we were all involved in it.  Whether it was
11  him that brought it to me or we learned about it at the
12  same time through whatever source, but he may have brought
13  it to my attention, but it came to light in a group setting
14  as I remember it.
15         MR. SOREY:    Okay.  I believe that's all the
16  questions I have, Your Honor.
17         JUDGE DONALDSON:    Okay, thank you.  Ms. Fitzke,
18  do you have any questions for this witness?
19         MS. FITZKE:    I do.  I do.
20              CROSS EXAMINATION
21  BY MS. FITZKE:
22     Q    Mr. Sullivan, you told us a moment ago that you
23  were the director of Labor Relations in the May/June 2022
24  time frame.  How long have you held that position?
25     A    I've held it since I joined CN in March of 2012.

Robert Branch    2023-FRS-00026    February 13, 2024

Page 177

1    Q    And with respect to your role, can you just
2  briefly tell us what your duties and responsibilities are?
3    A    So, the director of Labor Relations, the
4  principle responsibility is managing collective bargaining
5  across all of the unions with which we have union
6  representative employees.  I also oversee the grievance and
7  arbitration process, the negotiations, contract
8  negotiations and then I also oversee the discipline policy.
9    Q    It sounds like your responsibilities are
10  primarily focused on the unionized workers?
11    A    Almost exclusively, yes.
12         MS. FITZKE:    I want to talk to you a little bit
13  --- you mentioned overseeing the discipline policy.  We can
14  pull it up if it's helpful.  Just let us know.
15         BY MS. FITZKE:
16    Q    With respect to that policy, we looked at it
17  earlier and it looks like it had an effective date in
18  October of 2017.  Was there a discipline policy like that
19  in effect before October 2017?
20    A    There was not, no.
21    Q    Did you have any role in the creation of the
22  discipline policy?
23    A    I did, yes.
24    Q    And what was that role?
25    A    The role was we gathered examples of similar

Page 178

1  policies across the industry and worked with many people to
2  put together what was the final discipline policy.
3    Q    So, with respect to, for example, determining
4  what would be identified in the discipline policy as a
5  Level 1, 2, 3 or 4 violation, who determined what would go
6  in those buckets?
7    A    So, that was a consultative effort.  Labor
8  Relations worked with field management to get to align what
9  would be the appropriate response for the various rule
10  violations.
11    Q    And when you say field operations consultant with
12  Labor Relations, were you the Labor Relations individual
13  that was being consulted?
14    A    Yes.
15    Q    With respect to the discipline policy in
16  specifically a Level 4 violations, what are Level 4
17  violations under the policy?
18    A    A Level 4 violation under the policy is an
19  incident that in and of itself would result in dismissal.
20  The other levels all lead to some progressive step towards
21  a less progressive response.  Level 4 is in and of itself a
22  dismissible event.
23    Q    And with respect to the policy and the Level 4
24  violations which are identified to include violence in the
25  workplace, have you had any other incidents of physical

Page 179

1  fighting come up since October of 2017 when the policy was
2  put in place that you had to adjudicate, if you will, under
3  the discipline policy?
4    A    I don't know right offhand, but I seem to recall,
5  yes, that we have had instances of fighting, yes.
6    Q    Do you recall any individual who was a
7  participant in a fight in terms of throwing punches or
8  engaging in other physically violent acts that during your
9  time here at Illinois Central that wasn't terminated as
10  result of their behavior?
11    A    No, if we move forward with a response, it would
12  be termination.
13    Q    And with respect to the situation involving Mr.
14  Branch, how did that situation come to your attention?
15    A    As I said, there was a lot of discussion around
16  that event, whether it was Patrick or a group.  We very
17  quickly were in discussion around it likely from Patrick,
18  but it could have been also from the field and Patrick.
19  There were a lot of people involved in the discussions with
20  me.
21    Q    And then after the investigation hearing was
22  concluded, did you receive a copy of the transcripts?
23    A    Yes.
24    Q    Did you also receive the exhibits?
25    A    The transcript and exhibits, yes.

Page 180

1    Q    And did you review them?
2    A    I did.
3    Q    As you reviewed them, with respect to Mr.
4  Branch's conduct and the reasons that you supported ---
5  well, let me ask you.  Did you support termination of Mr.
6  Branch based on the conduct identified in the investigation
7  hearing transcript and exhibits?
8    A    I did, yes.
9    Q    When you reached that conclusion, did you rely
10  upon anything not contained in the transcript and exhibits?
11    A    It was all based on the transcript.
12    Q    And what did you identify in the transcript that
13  led you to the conclusion that Mr. Branch had committed a
14  Level 4 violation and should be terminated?
15    A    So, my review of this was based completely on,
16  almost solely on was this self-defense or wasn't it?  Did
17  it move to a different level when he was engaged in actual
18  fighting?  So, the review was very much focused on
19  statements and the statements as to what facts were
20  determined based on those statements, what happened and it
21  was through that that I came to the determination that this
22  was beyond just a self-defense situation and it rose to the
23  level of engaging and fighting.
24    Q    And when you talk about the statements, there is
25  both the written statements and then the individuals that

Robert Branch    2023-FRS-00026    February 13, 2024

Page 181

1  testified in the investigation hearing that provided some
2  testimony beyond the statements.  Did you review and
3  consider all of that?
4      A    Al of that.
5      Q    And did you review and consider the parts of the
6  statements where the individuals testified or wrote in
7  their statements that Mr. Branch struck Mr. Melton?
8      A    I did, yes.
9      Q    And did you review and rely upon the portion of
10 the investigation hearing transcript where Mr. Branch
11 indicated that he struck Mr. Melton?
12     A    Yes.
13     Q    And were there other facts in the investigation
14 hearing transcript that you relied upon to conclude that
15 Mr. Branch had engaged in incident of workplace violence
16 that was not excusable or justifiable self-defense under
17 the policy?
18     A    No, it was pretty much the altercation that was
19 almost exclusively what I relied on.
20     Q    Have you ever had a circumstance in your time
21 here where you had a situation where employees were engaged
22 in --- had a mutual fight where someone started it, but
23 someone else swung back?  Had that happened before?
24     A    That's usually what the fight is when we've
25 encountered fighting.  I mean, that's generally what we've

Page 182

1  dealt with.  Since the discipline policy and certainly
2  before, fighting has been a situation that we've dealt
3  with, but it's usually that and somebody starts a fight and
4  somebody else continues.
5      Q    Have you --- with respect to this situation, do
6  you recall directing Mr. Crain to get any further guidance
7  looking for consistency from your peers in Canada?
8      A    I do, yes.
9      Q    Can you tell us about that, please?
10     A    What I was trying to do was we didn't have a case
11 that was directly on point in the U.S. where we had a
12 situation like this with the self-defense.  So, I did ask
13 Patrick to follow up with our colleagues in Canada to see
14 if they had any arbitral precedent or any case precedent
15 with regard to similar circumstances.
16     Q    And when you say a circumstance in self-defense,
17 do you mean a circumstance where an individual was raising
18 self-defense as a defense to their participation in the
19 fight?
20     A    That's right.
21     Q    And what did you learn from your Canadian
22 colleagues?
23     A    I remember that the basic --- once there was
24 engagement with physical contact that they held both
25 individuals accountable in the Canadian rules.

Page 183

1      Q    And by physical engagement, you mean when Mr.
2  Branch hit back?
3      A    Yes.
4      Q    Under the discipline policy that we've been
5  talking about, I understand that in cases of potential
6  discipline, in cases of Level 4 violations, I should say
7  that differently, in cases of Level 4 violations, a
8  disciplinary review panel is formed?
9      A    Right.  The policy requires that the disciplinary
10 review panel review any case that would result in
11 dismissal.
12     Q    Right.  That happened here as I understand it?
13     A    Yes.
14     Q    Okay and who was the disciplinary review panel in
15 this case?
16     A    So, the disciplinary review panel in this case
17 would have been me, Duane Spears and Tom Hilliard.
18     Q    And Mr. Patick Sullivan, what was his role in
19 conjunction with the situation involving Mr. Melton and Mr.
20 Branch?
21     A    Patrick Crain?
22     Q    Yes.
23     A    I'm Mr. Sullivan.
24          MS. FITZKE:   Oh, I'm sorry.
25          WITNESS:    Patrick Crain?

Page 184

1          MS. FITZKE:   Sorry, Tom.  I was looking right
2  at you.
3          WITNESS:   So, you're asking me what was
4  Patrick's role?
5          MS. FITZKE:   Let me just ask a new question
6  again if I can.  I've confused everyone.
7          WITNESS:   Yes.  Sure.
8  BY MS. FITZKE:
9      Q    So, can you tell us what Mr. Patrick Crain's role
10 was in conjunction with the review and assessment of
11 discipline in this case?
12     A    So, Patrick is a Labor Relations manager and his
13 role would be to work with the field management to gather
14 all the statements and to put together all that's needed to
15 proceed to hold the investigation.  So, he would do all of
16 the leg work working with the field to put the case
17 together if you will and facts together that would be
18 introduced at the investigation hearing.
19     Q    Would he provide advice to the function?
20     A    Yes.
21     Q    Did he also consult with you and Mr. Spears as
22 part of your consultant process to get alignment on the
23 level of discipline to be assessed?
24     A    We certainly talked, yes.
25     Q    With regard to Mr. Branch's work history, do you

Robert Branch   2023-FRS-00026   February 13, 2024

Page 185

1  understand that he had not previously been disciplined?
2       A    I didn't know that, but I did not know that.  I
3  did not look at any work history in this case.
4       Q    And why wouldn't you look at work history when
5  you're considering a Level 4 violation?
6       A    Because again, the disciplinary result for a
7  Level 4 violation would be dismissal.  You look at a work
8  record and a work history if we're looking at progressive
9  discipline to find out what the appropriate next step would
10  be in the policy.
11      Q    Right and if you conclude that both engaged in a
12  physical fight and at some point in the process both had
13  engaged, is there any level of discipline that you would
14  assess other than termination?
15      A    Not for fighting, no.
16      Q    Was this a quick decision for you, Mr. Sullivan,
17  to decide to terminate Mr. Branch?
18      A    It was not, no.  There was a lot of discussion, a
19  lot of review.  It's a dismissal so we always put a lot of
20  attention and detail into our review, but this one was a
21  lot because it was a very unusual case.  As I said, we have
22  not had a self-defense case like this so there was a lot of
23  effort or part to make sure that we were aligned on the
24  facts.
25      Q    Did you --- you understood that in Mr. Branch's

Page 186

1  statement that he submitted prior to the investigation
2  hearing, he indicated in his statement that he feared Mr.
3  Melton, that he was afraid of what Mr. Melton might do,
4  that --- I can just make sure that I don't misquote it
5  here, that he feared for his life around Mr. Melton.  Do
6  you recall reading that statement?
7       A    I do, yes.
8       Q    When you were determining whether Mr. Branch
9  should be terminated as part of the discipline assessed
10  here, did that factor into your decision that he had made a
11  report that he thought his co-worker was a dangerous
12  condition?
13      A    It did, but we reviewed the totality of all the
14  facts introduced.  So, certainly we took into consideration
15  the statement and other evidence introduced.
16      Q    Did that cause you to want to terminate Mr.
17  Branch?
18      A    Taking in all the information, that's where I
19  reached the determination that I thought and felt that
20  termination was appropriate.
21      Q    And did you also read in the investigation
22  hearing transcript a portion of the transcript where Mr.
23  Melton questioned Mr. Branch about whether he viewed Mr.
24  Melton as a threat as of June 7, 2022 before the decision
25  to terminate was made, Mr. Branch said he did not?  Did you

Page 187

1  read that?
2       A    I did read that, yes.
3       Q    And you recall that from the time?
4       A    I do.
5       Q    If Mr. Branch had not come forward to make this
6  report, but another employee had reported this incident,
7  would Mr. Branch still have been fired?
8       A    We would have gone through the same process.  We
9  would have accumulated statements.  We would have proceeded
10  through much of the same process.  I'm assuming that that
11  would obviously just lead to the same type of
12  determination.  It would just depend on the facts and
13  statements and all, but they likely would all be the same.
14      Q    And you're saying that because you wouldn't have
15  had Mr. Branch's ---
16      A    We would have recreated the incident as we would
17  when we are put on notice of any complaint.
18      MS. FITZKE:    I don't have any other questions
19  for you now, Tom.  Thank you.
20      WITNESS:    Okay.
21      JUDGE DONALDSON:    Mr. Sorey, do you have any
22  more questions?
23      MR. SOREY:    I do.
24                  REDIRECT EXAMINATION
25  BY MR. SOREY:

Page 188

1       Q    Mr. Sullivan, since you're in charge of
2  discipline policy, why is there no definition for self-
3  defense in the workplace violence policy?
4       MS. FITZKE:    Well, objection.  Foundation.
5  Those are two separate policies.
6       MR. SOREY:    What specific policies?
7       MS. FITZKE:    Workplace violence policy and the
8  discipline policy, sir.
9  BY MR. SOREY:
10      Q    Well, Mr. Sullivan, are you in charge of
11  discipline policies?
12      A    In my role, I oversee the application of that
13  policy in charge of --- I don't know why I say that, but
14  yes, I oversee the application of that policy.
15      Q    And what all does that policy include?
16      A    The policy includes --- it's a progressive
17  discipline policy.  So, it breaks out levels of discipline
18  based on severity of the event and it also spells out the
19  consequence for various disciplinary infractions and the
20  steps that progress throughout the progressive discipline
21  system outlined in the policy.
22      Q    Does the Level 4 violation contain a definition
23  of self-defense?
24      A    It does not.
25      Q    Now, did you have anything to do with the

Robert Branch    2023-FRS-00026    February 13, 2024

Page 189

1  workplace violence policy in constructing it?
2      A    I did not.
3      Q    Okay.  Do you know where it came from?
4      A    It was --- I do not know.  I know it's a
5  collaborative effort across the company.  I do not know who
6  was responsible for the policy though.
7      Q    Now, Mr. Spears told us in his statement, sir, in
8  the hearing a while ago that the hearing transcript on Mr.
9  Branch came with a recommendation for a Level 4 violation,
10 but he could not remember who gave that recommendation.  Do
11 you know?
12     A    I don't know.
13     Q    Do you know that it came with a Level 4
14 recommendation?
15     A    I never saw any recommendation.  All that was
16 sent to me was the transcript and exhibits and if it did
17 come with a recommendation, I wouldn't have --- it was our
18 review so the --- I don't recall any recommendations.
19     Q    Between the discipline policy and the workplace
20 violence policy, which controls the union employee?
21     A    Both.
22     Q    Both?  So, you would have to consider both in
23 coming up with a penalty?
24     A    Correct.  You consider both policies.  What we
25 generally do is we look at a policy that is potentially ---

Page 190

1  where you find a violation.  The discipline policy then
2  would point us in the direction of what's the appropriate
3  disciplinary response.
4      Q    Now, would you agree with me that in the
5  workplace violence policy under the penalty phase, it says,
6  "Up to and including termination as a penalty for it."  Is
7  that correct?
8      A    I could read it, but I'm familiar with that
9  terminology and without looking at it, the policy likely
10 says that, yes.  If you want me to read it, look at it, I
11 can confirm it, but I've heard that phrase and I wouldn't
12 --- it would most likely be in that policy, yes.
13     Q    Would that suggest to you that there's a lesser
14 penalty for workplace violence than just termination?
15     A    Yes, it would.
16         MR. SOREY:    Okay.  That's all the questions I
17 have.
18            RECROSS EXAMINATION
19     BY MS. FITZKE:
20     Q    Mr. Sorey, can you explain what forms of
21 workplace violence that might violate the workplace
22 violence policy could result in the level of discipline
23 that was lesser than a Level 4?
24     A    Examples, I would say verbal bullying, something
25 along those lines where there isn't physical contact, but a

Page 191

1  line was crossed in terms of workplace behavior.  There
2  could be a lot of --- it could be language.  I would look
3  more towards language events that would be something lesser
4  than termination, but we've had anything threatening,
5  fighting, those types of cases we've dealt with dismissal.
6         MS. FITZKE:    Thank you.  I don't have any other
7  questions.
8         MR. SOREY:    I don't have any other questions.
9         JUDGE DONALDSON:    All right, thank you for
10 confirming that.  All right, so Mr. Sullivan, thanks for
11 your testimony today.
12         WITNESS:    Thank you.
13         JUDGE DONALDSON:    We greatly appreciate your
14 time and you can be excused at this time.
15         WITNESS:    All right.
16         JUDGE DONALDSON:    I appreciate it again.  So,
17 what do we think is feasible at this point, Ms. Fitzke?
18         MS. FITZKE:    Mr. Hilliard is ready.  We can get
19 him in.
20         JUDGE DONALDSON:    Mr. Sorey, how about that?
21         MR. SOREY:    That'd be fine.
22         JUDGE DONALDSON:    Okay.  Let's see here.  Let's
23 go ahead and do that without a break unless you want a
24 break, Mr. Sorey.
25         MR. SOREY:    No, I'm ready.

Page 192

1          JUDGE DONALDSON:    You're ready, good.  Okay.
2  Let's hold on for Mr. Hilliard then to join us.  Is he
3  going to be sitting just where Mr. Sullivan was?
4          MS. FITZKE:    No, he's not with us.  He's going
5  to be just joining on the platform here.
6          JUDGE DONALDSON:    Okay.  Good afternoon to you,
7  Mr. Hilliard.  Can you hear me fine?
8          MR. HILLIARD:    Yes.
9          JUDGE DONALDSON:    Good.  I can hear you as
10 well.  Thank you again for joining this formal
11 administrative hearing in progress.  You are a witness in a
12 complaint or administrative proceeding arising from a
13 complaint of Robert Branch against Illinois Central.  It is
14 under the whistleblower protection provisions of the
15 Federal Rail Safety Act and I'm Angela Donaldson in
16 Covington, Louisiana.  Let's see here.  You are being
17 called as a witness for Complainant, Mr. Branch's attorney,
18 Mr. Sorey.  He's the one that will first ask you questions
19 here.  Let me get you under oath first.  Would you please
20 raise your right hand?
21 Whereupon,
22             THOMAS HILLIARD
23 having been duly sworn, was called as a witness herein and
24 was examined and testified as follows:
25         WITNESS:    I do.

Robert Branch    2023-FRS-00026    February 13, 2024

Page 193

1    JUDGE DONALDSON:   All right. Thank you. You
2  can proceed.
3    MR. SOREY:   Thank you, ma'am.
4       DIRECT EXAMINATION
5  BY MR. SOREY:
6    Q   Mr. Hilliard, in June of 2022, you were in charge
7  of the U.S. tracks of the Illinois Central Railroad, were
8  you not?
9    A   Yes, sir.
10   Q   Okay. Now, your only connection to the hearing
11 for employees I see is to read the transcript and converse
12 with Labor Relations to determine an outcome for the
13 employee?
14   A   Yes, I don't read the entire transcript. I
15 usually just kind of breeze through it and then I go by the
16 recommendations of HR, LR or I ask questions if need be,
17 but I'm usually briefed on it and then make a decision from
18 there.
19   Q   You say you just breeze through the transcripts?
20   A   Yes, sir.
21   Q   Okay and you rely on the facts of the transcript?
22   A   I missed the first part of that.
23   Q   Who do you rely upon for the facts of the
24 hearing?
25   A   That would be HR or the LR team, whoever I'm

Page 194

1  working with.
2    Q   Okay. Now, what is your definition of self-
3  defense?
4    A   Self-defense. In this circumstance you're saying
5  or self-defense in general or ---
6    Q   Let's start with self-defense in general.
7    A   I would --- if I was in a fight, I would cover
8  myself up or I would take myself away from the situation.
9    Q   Okay. Do you know whether the disciplinary panel
10 considered self-defense for Mr. Branch based on the
11 affidavits of the witnesses to the incident?
12   A   I'm not sure I know that Mr. Branch was let go
13 because of fighting.
14   Q   Okay. Did the panel consider self-defense with
15 Mr. Branch and his decision?
16   A   I'm not sure.
17   Q   What, in your opinion, should Mr. Branch have
18 done once he was attacked?
19   A   Leave the situation.
20   Q   Okay. Were you aware of the surroundings of the
21 parking lot of the hotel in Columbia, Mississippi that
22 night?
23   A   I'm not sure what you mean by that.
24   Q   Okay. Did you know that there was a barbecue
25 with flames in it sitting in the back that a co-employee

Page 195

1  truck while they were cooking steaks out or did you know
2  that there were cars in the parking lot and did you know
3  whether there was a fence surrounding the parking lot?
4    A   No, I don't know exactly ---
5    MS. FITZKE:   I'm sorry. Object. He's stating
6  --- asking questions about facts that are not in the
7  record. No foundation.
8    JUDGE DONALDSON:   I do believe some --- well,
9  I'm trying to recall myself whether some of this was spoken
10 to by earlier witnesses. I'm going to sustain that in
11 part. Mr. Sorey, are you trying to recite facts from Mr.
12 Branch's testimony?
13   MR. SOREY:   Yes.
14   JUDGE DONALDSON:   He's the only person I
15 believe would have recalled would have been speaking to
16 this event, correct?
17   MR. SOREY:   Yes, ma'am. He did testify to
18 that.
19   JUDGE DONALDSON:   All right. Can you just
20 break down your question and just ask parts?
21   MR. SOREY:   Okay.
22 BY MR. SOREY:
23   Q   Mr. Hilliard, you said that he should walk away
24 from the situation. What is your definition of walk away?
25   A   Take yourself out of the situation.

Page 196

1    Q   Okay. Remove yourself from the area in which
2  you're in?
3    A   Take yourself out of the situation however you
4  have to do that.
5    Q   Okay. What is your definition of taking yourself
6  out of the situation then?
7    A   That's my definition. You take yourself out of
8  the situation. Remove yourself from the situation.
9    Q   Okay and that's what you consider self-defense in
10 reviewing this transcript?
11   A   From what I see in the transcript and what I was
12 briefed on, yes.
13   Q   Did you read the witness statements?
14   A   I don't think I did. Probably not. I'm not
15 sure.
16   Q   What do you remember that influenced your
17 decision to terminate Mr. Robert Branch?
18   A   Employees were fighting.
19   Q   Okay. As far as you know, Mr. Branch has never
20 been in any trouble with IC, has he?
21   A   I'm not --- off the top of my head, I'm not sure
22 what his prior record was.
23   (Mr. Sorey and Witness speak at same time)
24   WITNESS:   It would have been told to me when I
25 was being briefed.

Robert Branch    2023-FRS-00026    February 13, 2024

Page 197

1        MR. SOREY:    Okay.  I didn't mean to interrupt
2  you.  I'm sorry.
3        WITNESS:    I'm sorry.
4  BY MR. SOREY:
5     Q     So, his record whether it be good or bad was not
6  considered in making your decision?
7     A     I can't recall that.  I don't remember what they
8  told me during the briefing.
9     Q     Okay.  Is there any distinction between a
10  managerial employee and a union employee that's involved in
11  any type of altercation?
12     A     You mean as in fighting or ---
13     Q     Yes.  Let's say fighting.
14     A     If we had two managers fighting, they would also
15  be fired.
16     Q     Okay.  Were you aware that Mr. Christopher Day
17  was involved in an altercation with a contractor at an
18  Illinois bar when they were out eating and having drinks
19  and he advised us that the contractor head butted him and
20  he left?
21     A     Know nothing about it.
22     Q     Okay.  Would Mr. Patrick Crain normally advise
23  you of a situation that I just described to you?
24     A     If it's reported by an employee or a contractor
25  or the person involved, then I would be advised.

Page 198

1        MR. SOREY:    Okay.  I believe that's all the
2  questions I have.
3        JUDGE DONALDSON:    All right, thank you, Mr.
4  Sorey.  Ms. Jacobson, does that mean you're the attorney
5  handling the examination?
6        MS. JACOBSON:    Yes.  I do have some questions,
7  Your Honor.
8        JUDGE DONALDSON:    All right.
9              CROSS EXAMINATION
10  BY MS. JACOBSON:
11     Q     Could you please tell us what your current role
12  is?
13        MR. SOREY:    I'm having a hard time hearing you.
14        MS. JACOBSON:    Let me move my seat a little
15  closer to my microphone.
16        JUDGE DONALDSON:    Okay.
17        MS. JACOBSON:    Is that better this time?
18        MR. SOREY:    A little bit.
19        MS. JACOBSON:    A little bit?
20        JUDGE DONALDSON:    I think that's good.
21        MS. JACOBSON:    Okay.  Great.
22  BY MS. JACOBSON:
23     Q     Tom, can you please tell us what your role is,
24  your job title?
25     A     I'm chief of signals for U.S. and Canada and

Page 199

1  chief of track in the U.S.
2     Q     And is that the same position that you held in
3  May of 2022?
4     A     Yes, ma'am.
5     Q     What was your role on the discipline review panel
6  in relation to Mr. Branch?
7     A     I usually just have to approve any discipline
8  that happens, anything that's under me and I just get
9  briefed on the situation and go by what the recommendations
10  are.  If I have questions, I ask and most of the time, I
11  make my decision from that.
12     Q     So, in the case of Mr. Branch, what information
13  did you have that led you to approve his termination of his
14  employment?
15     A     He was fighting.
16     Q     And do you recall who you spoke with in reaching
17  this approval determination?
18     A     I don't remember exactly.  It's usually --- I'd
19  be speculating, but somebody usually from HR, LR.  I don't
20  remember exactly who it was.
21     Q     Okay.  When you approved Mr. Branch's termination
22  of employment, did it matter to you that Mr. Branch had
23  alleged that he had feared for his life or viewed Mr.
24  Melton as a safety threat?
25     A     I don't remember that discussion around that.

Page 200

1        MS. JACOBSON:    I think that is all of my
2  questions.  Thank you.
3        MR. SOREY:    I don't have any further questions.
4  Thank you for coming.
5        JUDGE DONALDSON:    All right and thank you very
6  much, Mr. Hilliard.  Glad you could join us this afternoon.
7  We thought you could be a short witness and I don't know
8  from your perspective, but from our perspective, that was
9  fairly short so thank you again.
10        WITNESS:    I'm all done.  I can leave the screen
11  now?
12        JUDGE DONALDSON:    You're done.  If you're told
13  you can leave, that's what that means.
14        WITNESS:    Thank you.
15        JUDGE DONALDSON:    Thank you.
16        WITNESS:    You all have a good day.  Thank you.
17        JUDGE DONALDSON:    Okay, thank you.  You too.
18  All right.  We're at 3:30, but we've already decided
19  Patrick Crain is best left for the morning, I believe,
20  right?
21        MR. SOREY:    Yes.
22        MS. FITZKE:    How long do you think you're going
23  to take with him, Eddy?  I mean he's here.  It's earlier
24  than I thought.
25        MR. SOREY:    Let's see.

Robert Branch    2023-FRS-00026    February 13, 2024

Page 201

1        MS. FITZKE:    If we can finish, we can get him
2  out.  If we're not going to finish, then I agree, we should
3  just wait until the morning.
4        MR. SOREY:    I think he's going to be the
5  longest witness.
6        MS. FITZKE:    Let's just wait till the morning
7  then if that's okay with the judge.
8        JUDGE DONALDSON:    It's fine with me.  Again,
9  I've got much more time than that reserved for this case so
10  that's fine with me and it sounds like that's probably best
11  for everyone concerned then.  Mr. Crain, as long as he can
12  be available in the morning, it's fine.
13        MR. SOREY:    I think we can easily finish by
14  noon.
15        JUDGE DONALDSON:    Okay.  Yes, I think that's
16  preferable to stopping potentially in the middle of his
17  testimony this afternoon.  I'd like to avoid that if it
18  seems like we can.  All right, that means we can wrap up
19  for the day.  Thanks to everyone's again skill,
20  proficiency, efficiency.  By my count, I think we did six
21  witnesses.  You did six witnesses today.  That's really
22  something else.  Well done.  So, I appreciate that.  I'm
23  sure you're pleased too.  Is there anything you want to
24  discuss before we adjourn for the day?
25        MR. SOREY:    I don't think so.

Page 202

1        JUDGE DONALDSON:    It doesn't --- you don't have
2  to file anything tonight necessarily, but I show that
3  remaining for the evidentiary record is the Gardener
4  deposition which will be JX-49.  There may be some
5  deposition excerpts that have been used during the hearing,
6  but we can circle back and talk about that when we're
7  concluding tomorrow to make sure and I don't need the
8  Gardener deposition before tomorrow.  So, if you're ready
9  to file it, that's fine.  If you want to wait until we're
10  done tomorrow, that's fine too.  All right, so again, I
11  appreciate everybody, your hard work that you've put into
12  it and being so prepared.  So, we will adjourn for today,
13  go off the record and I'll see you at 9:00 a.m. tomorrow
14  and you will use the same link that you got from Ms. Wynn.
15  It applies for tomorrow morning too.
16        MS. FITZKE:    Thank you.
17        MR. SOREY:    Thank you, Your Honor.
18        JUDGE DONALDSON:    All right.  Thank you all
19  very much.  See you tomorrow.
20        [Whereupon, the hearing was concluded at 3:30
21  p.m., CST and will resume the following day.]
22  //
23  //
24  //
25  //

Page 203

C E R T I F I C A T E

Name:       Robert Branch
Case Number: 2023-FRS-00026
Date:       February 13, 2024
Location:   Video Hearing
        This is to certify that the attached proceedings
before the United States Department of Labor, Office of
Administrative Law Judges, were held according to the
record and that this is the original, complete, true and
accurate transcript that has been compared to the reporting
or recording accomplished at the hearing.


/s/Jordan Bayley                February 13, 2024
Bayley Reporting, Inc.                Date
Official Federal Reporters
Building 1, Suite 14
12945 Seminole Boulevard
Seminole, FL  33778

Robert Branch   2023-FRS-00026   February 13, 2024

## A

**Abandon** - 164:24
**Ability** - 65:1, 65:3, 66:14
**Able** - 15:24, 29:2, 30:15, 30:19, 57:24, 57:25, 58:8, 59:1, 61:19, 64:19, 65:25, 69:14, 70:19, 78:5, 78:6, 78:10, 87:10, 95:14
**Above** - 153:1
**Absence** - 8:6
**Absolute** - 138:25
**Accept** - 169:9
**Accepted** - 89:4, 89:5
**Access** - 150:13, 150:17, 156:21
**Accommodate** - 15:24
**Accompanying** - 9:10
**According** - 164:20, 164:21
**Account** - 30:17, 31:2
**Accountable** - 182:25
**Accumulated** - 187:9
**Accurate** - 29:9, 29:10, 56:1, 61:11
**Accurately** - 55:20, 66:3
**Accused** - 66:11, 110:20
**Across** - 16:9, 54:10, 177:5, 178:1, 189:5
**Act** - 4:5, 6:20, 6:23, 6:25, 10:20, 10:22, 12:23, 13:7, 13:11, 94:20, 120:11, 192:15
**Acted** - 106:18, 114:19
**Acting** - 173:8
**Action** - 8:3, 8:6, 12:25, 147:3, 171:15, 173:9, 173:10
**Actions** - 23:10, 149:23, 164:2,

173:11
**Activated** - 136:24, 136:25
**Active** - 107:15, 110:25
**Actively** - 45:6, 164:17
**Activity** - 8:2, 8:7, 12:23, 12:24, 13:4, 13:13, 13:15, 13:21
**Acts** - 179:8
**Actual** - 128:8, 154:16, 180:17
**Add** - 11:10, 67:15
**Addition** - 75:23
**Address** - 10:7, 17:24, 17:25, 18:5, 62:8, 152:10
**Addressed** - 43:18
**Addresses** - 5:17
**Addressing** - 13:6, 149:9
**Adequately** - 14:4
**Adjourn** - 201:24, 202:12
**Adjudicate** - 179:2
**Adjudicated** - 12:20
**Administrative** - 4:9, 4:11, 5:1, 7:20, 7:21, 11:9, 120:12, 192:11, 192:12
**Admit** - 9:18
**Admits** - 157:21
**Admitted** - 4:24, 10:4
**Adopt** - 4:17
**Adrenalin** - 145:13
**Advantage** - 83:5
**Adverse** - 8:3, 8:6, 12:25, 43:20
**Advice** - 109:15, 109:18, 109:25, 184:19
**Advise** - 155:19, 197:22
**Advised** - 48:13, 63:15, 67:22, 87:3, 104:20, 197:19, 197:25
**Advising** - 176:2
**Affect** - 48:14
**Affected** - 26:17, 26:18
**Affidavits** - 194:11

**Afraid** - 159:14, 160:4, 164:12, 186:3
**Afternoon** - 134:2, 166:16, 167:12, 192:6, 200:6, 201:17
**Against** - 41:9, 94:20, 120:9, 192:13
**Agency** - 4:14
**Aggressor** - 124:12
**Agree** - 12:5, 12:6, 12:10, 190:4, 201:2
**Agreed** - 158:13, 158:14
**Agreeing** - 90:1
**Agreement** - 9:6, 153:17, 175:15
**Agrees** - 168:24
**AIR** - 6:24
**AI** - 181:4
**Alert** - 17:4
**Align** - 178:8
**Aligned** - 185:23
**Alignment** - 184:22
**Allegations** - 176:1
**Alleged** - 11:25, 13:21, 100:3, 160:13, 199:23
**Allegedly** - 99:9, 99:22
**Alleges** - 13:14
**Alleging** - 8:4, 11:2
**Allowed** - 64:16
**Altercations** - 102:6, 103:13, 104:12, 104:16
**Alternative** - 69:5
**Amended** - 9:18
**Amongst** - 157:8
**Amount** - 28:16, 28:17, 31:11, 71:2, 71:8, 74:2, 78:14, 166:17
**Angela** - 4:9, 192:15
**Anger** - 145:13
**Annually** - 148:13
**Anticipate** - 118:22
**Anticipated** - 167:8
**Anxiety** - 26:24
**Anyway** - 16:5, 16:10, 84:14, 94:8
**Anywhere** - 41:14
**Apologies** - 11:18, 132:3

**Apologize** - 45:10, 96:5
**Apologized** - 89:3, 89:8, 89:25
**Apology** - 89:4, 89:5
**Apparently** - 140:20
**Appeals** - 11:23
**Appear** - 12:20, 47:12, 115:24, 116:9, 117:3, 143:2
**Appearance** - 5:18
**Appeared** - 64:12
**Appearing** - 16:11
**Appears** - 11:22, 103:23, 115:25, 143:4
**Application** - 7:18, 188:12, 188:14
**Applied** - 29:17, 29:20, 29:21, 43:25, 44:12, 68:16, 68:17, 68:21, 69:1, 69:10, 85:8, 85:12, 104:22
**Applies** - 122:21, 151:24, 174:13, 202:15
**Apply** - 7:1, 7:4, 7:5, 7:23, 96:20, 106:25, 152:2, 172:7, 172:11, 174:12, 175:16
**Applying** - 69:5
**Appreciate** - 15:5, 41:23, 58:6, 84:14, 95:21, 96:7, 118:10, 118:13, 119:14, 119:20, 133:2, 191:13, 191:16, 201:22, 202:11
**Appreciation** - 119:19
**Appreciative** - 16:1
**Approach** - 104:4, 104:10, 112:6
**Approached** - 112:14
**Appropriate** - 157:20, 178:9, 185:9, 186:20, 190:2
**Approval** - 199:17
**Approve** - 199:7, 199:13

**Approved** - 199:21
**Approximately** - 19:7, 28:14, 30:25, 75:16, 77:6, 78:15, 79:7
**Arbitral** - 182:14
**Arbitration** - 177:7
**Area** - 65:9, 84:5, 130:5, 175:23, 196:1
**Aren't** - 141:10
**Argument** - 48:9, 127:24
**Argumentative** - 14:3:22
**Arises** - 11:22
**Arising** - 192:12
**Arms** - 164:22
**Arose** - 122:3
**Arrived** - 18:24
**Aspect** - 149:16
**Assert** - 22:11
**Assess** - 52:11, 107:21, 108:20, 185:14
**Assessed** - 108:3, 108:13, 131:19, 153:12, 153:20, 184:23, 186:9
**Assessing** - 152:12
**Assessment** - 184:10
**Assist** - 57:23
**Assistance** - 62:2, 120:18
**Assistant** - 18:13, 21:18, 28:25, 55:18
**Assumed** - 51:17
**Attached** - 60:23, 61:1
**Attachment** - 60:23
**Attack** - 21:6, 24:11, 36:14, 38:6, 51:6
**Attacked** - 21:20, 21:21, 23:8, 24:1, 24:10, 34:18, 38:3, 96:25, 194:18
**Attacking** - 36:19, 38:5
**Attacks** - 45:24
**Attempting** - 103:25
**Attention** - 8:18, 93:8, 133:9, 176:13, 179:14, 185:20

Robert Branch   2023-FRS-00026   February 13, 2024

**Attorney** - 16:9, 16:15, 16:17, 17:16, 59:10, 84:18, 147:23, 192:17, 198:4
**Attorneys** - 4:12, 5:4, 8:22, 72:18, 92:25, 133:2, 133:3, 133:10, 165:20
**Availability** - 167:5
**Available** - 94:3, 153:7, 167:11, 201:12
**Aviation** - 6:25
**Avoid** - 24:14, 172:17, 201:17
**Awarded** - 8:7
**Awkward** - 95:19

| B |
|---|

**Baby** - 31:12
**Backing** - 51:8, 51:10
**Backwards** - 51:11
**Balled** - 19:25, 20:11, 49:2, 49:16
**Bar** - 101:23, 106:14, 113:23, 123:25, 125:16, 125:20, 146:1, 174:9, 197:18
**Barbecue** - 19:2, 97:23, 194:24
**Barefoot** - 47:9
**Barely** - 20:10, 81:13
**Bargaining** - 175:15, 177:4
**Base** - 107:11
**Based** - 61:7, 78:3, 78:8, 106:19, 107:13, 110:24, 111:1, 133:25, 140:4, 167:8, 169:4, 180:6, 180:11, 180:15, 180:20, 188:18, 194:10
**Basic** - 10:18, 182:23
**Basing** - 29:11, 29:12, 29:14, 116:18
**Basis** - 162:17
**Became** - 172:16
**Become** - 45:23

**Behavior** - 46:9, 179:10, 191:1
**Behind** - 19:1, 21:6, 97:24
**Believed** - 92:15, 159:6
**Benefit** - 33:7, 33:8, 54:25, 69:15, 69:25, 83:3, 88:8, 95:23
**Benefits** - 8:24, 33:17, 69:14, 69:22, 70:2, 70:6, 70:11, 74:15, 75:7, 75:11, 75:13, 82:10, 82:13, 83:4, 85:15, 85:16, 88:5
**Big** - 39:22, 157:21
**Birthday** - 82:24, 82:25
**Bit** - 62:17, 71:15, 71:19, 86:23, 94:11, 94:13, 95:18, 119:11, 132:2, 134:14, 148:20, 151:12, 166:9, 177:12, 198:18, 198:19
**Biweekly** - 80:8, 80:16, 81:3
**Bless** - 90:13
**Block** - 51:18
**Blood** - 19:24, 25:10, 87:14
**Blow** - 39:23
**Blue** - 60:13, 126:16, 132:11, 175:3
**Bluff** - 18:16
**Board** - 31:15, 120:3
**Book** - 148:18
**Bottom** - 152:17
**Box** - 140:16
**Break** - 41:25, 42:2, 42:13, 84:19, 93:12, 94:8, 94:11, 94:13, 118:19, 119:3, 120:2, 133:21, 133:22, 134:21, 167:11, 167:18, 191:23, 191:24, 195:20
**Breaks** - 8:19, 8:23, 188:17

**Breath** - 158:2
**Breeze** - 193:15, 193:19
**Bridge** - 18:12, 18:14
**Brief** - 14:3
**Briefed** - 193:17, 196:12, 196:25, 199:9
**Briefing** - 14:4, 197:8
**Briefs** - 8:25
**Broad** - 143:25
**Broke** - 20:14, 20:15, 21:11
**Broken** - 43:15
**Brother** - 40:11
**Brought** - 26:5, 26:14, 41:9, 94:20, 105:2, 105:12, 117:13, 138:17, 140:25, 176:11, 176:12
**Bubbles** - 60:11
**Buckets** - 178:6
**Building** - 94:6
**Bullet** - 154:6, 154:14
**Bullying** - 190:24
**Burden** - 13:2, 13:5
**Burdens** - 12:20
**Buried** - 19:15
**Business** - 5:17, 68:1
**Busted** - 36:21
**Butt** - 125:21
**Butted** - 113:23, 126:17, 175:4, 197:19
**Butts** - 106:14
**Bystanders** - 97:2

| C |
|---|

**Calculate** - 78:16, 79:12, 81:15
**Calculated** - 79:13, 80:16, 81:14
**Calculation** - 81:19, 86:10
**Call** - 14:14, 37:16, 37:20, 42:7, 63:9, 63:13, 64:19, 70:10, 127:3, 127:5, 127:7, 127:12, 128:6,

128:7, 173:20
**Camera** - 5:10, 14:17, 136:25, 166:2
**Canada** - 182:7, 182:13, 198:25
**Canadian** - 182:21, 182:25
**Canadians** - 163:16
**Can't** - 17:15, 47:21, 59:2, 73:10, 76:4, 128:17, 142:24, 161:15, 164:25, 197:7
**Capacity** - 6:13, 6:16
**Car** - 28:1
**Care** - 27:21, 70:11, 70:17, 75:23, 77:23, 78:2
**Carefully** - 163:23
**Carpenter** - 31:25
**Carrier** - 6:8, 10:21, 91:2, 91:9
**Carries** - 119:25
**Carroll** - 18:2, 18:3, 85:4
**Carry** - 83:7
**Cars** - 98:2, 195:2
**Cases** - 45:2, 107:21, 172:18, 183:5, 183:6, 183:7, 191:5
**Cash** - 30:18, 31:5
**Catch** - 73:22, 82:10, 134:18
**Catching** - 150:25
**Categories** - 153:23
**Category** - 143:17
**Caught** - 21:6
**Cause** - 11:4, 25:23, 41:3, 143:13, 171:17, 186:16
**Causing** - 139:13, 143:4, 143:12, 143:14, 143:15
**Caution** - 58:12
**Central's** - 107:22
**Century** - 6:25
**Certain** - 76:21, 93:5, 95:22
**Certainly** - 134:10, 182:1, 184:24, 186:14
**CFR** - 7:2, 7:24

**Chain** - 102:15
**Chair** - 16:8
**Chance** - 9:8, 15:21, 23:1, 23:2, 23:5, 23:6, 23:15, 24:21, 24:22, 34:8, 34:14, 38:4, 53:16, 56:23, 59:7, 127:3, 163:23
**Change** - 92:5, 119:20
**Changed** - 25:4
**Charge** - 188:1, 188:10, 188:13, 193:6
**Charged** - 7:6, 41:8
**Charges** - 41:9
**Charging** - 25:25
**Cheaper** - 83:15, 83:16, 83:22
**Check** - 123:2, 150:15
**Chief** - 198:25, 199:1
**Chill** - 19:18, 48:13
**Choose** - 166:2
**Choosing** - 77:22
**Chose** - 50:8, 50:12, 50:13, 77:14, 83:21
**Christohper** - 120:7
**Christopher** - 15:1, 15:16, 35:13, 101:22, 102:21, 103:9, 103:20, 121:2, 197:16
**Chummy** - 16:2
**Church** - 40:14
**Circle** - 63:6, 202:6
**Circuit** - 11:23, 12:2
**Circumstance** - 181:20, 182:16, 182:17, 194:4
**Circumstances** - 140:13, 161:14, 164:6, 182:15
**Claim** - 4:14, 6:23, 13:15, 22:14, 48:16, 55:11, 69:25, 70:1, 79:11
**Claimant** - 4:7
**Claimed** - 131:12
**Claiming** - 50:16
**Claims** - 7:16

Robert Branch   2023-FRS-00026   February 13, 2024

**Clarification** - 12:8, 12:15
**Clarify** - 53:17, 62:13, 79:10, 95:14
**Clarifying** - 84:15
**Clark's** - 118:23
**Clean** - 108:21
**Close** - 30:1
**Closed** - 4:22
**Closely** - 169:3
**Closer** - 16:9, 198:15
**CM** - 148:25, 151:6
**CN** - 171:15, 171:17, 173:24, 174:14, 176:25
**Co** - 6:4, 21:17, 26:6, 29:14, 54:24, 65:8, 145:7, 149:21, 159:23, 173:1, 186:11, 194:25
**Cobra** - 70:16, 73:5, 75:4, 85:21, 85:23, 88:6, 88:7
**Code** - 44:4, 44:9, 68:1, 148:3, 148:9, 163:10
**Coincides** - 154:16
**Colia** - 17:25
**Collaborative** - 189:5
**Colleague** - 6:6, 70:22
**Colleagues** - 182:13, 182:22
**Collect** - 130:13
**Collecting** - 130:4, 130:19
**Collective** - 175:15, 177:4
**Colonial** - 18:17, 19:4, 19:5
**Columbia** - 30:4, 30:9, 30:10, 30:12, 62:9, 194:21
**Columbus** - 30:7, 30:8, 62:8, 62:14
**Combined** - 71:3
**Comes** - 16:21, 116:21, 156:22
**Comfortable** - 54:24
**Coming** - 20:4, 36:5, 47:3, 87:14,

115:20, 189:23, 200:4
**Commentary** - 49:25
**Comments** - 48:4, 60:13, 139:23
**Committed** - 180:13
**Commoner** - 18:13
**Communicate** - 111:20
**Communicated** - 89:12
**Communication** - 24:18
**Communications** - 126:23
**Community** - 27:23, 40:9
**Company's** - 67:11, 68:8, 70:16
**Compassionate** - 90:4
**Compensation** - 63:21, 63:24
**Complainant** - 4:18, 5:6, 5:15, 8:1, 10:18, 10:23, 10:25, 11:1, 11:7, 12:10, 12:22, 13:5, 13:6, 13:9, 192:17
**Complainant's** - 14:8
**Complaint** - 11:1, 11:5, 187:17, 192:12, 192:13
**Complaints** - 43:21, 147:4
**Complete** - 93:4
**Completed** - 93:16
**Completely** - 32:17, 40:19, 80:5, 180:15
**Compliance** - 147:12, 147:14
**Comprehensively** - 165:22
**Computer** - 95:15
**Concerned** - 201:11
**Concerning** - 35:19, 145:16, 176:2
**Conclude** - 55:2, 181:14, 185:11
**Concluded** - 67:14, 107:14, 112:1, 131:17, 133:1,

158:16, 179:22, 202:20
**Concludes** - 41:21
**Concluding** - 107:9, 157:19, 202:7
**Conclusion** - 4:21, 67:17, 107:11, 107:13, 141:2, 180:9, 180:13
**Conclusions** - 4:17
**Concurred** - 158:10
**Condition** - 13:17, 77:1, 158:7, 158:19, 186:12
**Conditions** - 76:22, 93:6
**Conduct** - 11:24, 44:4, 44:9, 68:1, 106:7, 148:3, 148:9, 158:18, 171:15, 180:4, 180:6
**Conducted** - 117:9
**Conducting** - 42:4
**Confer** - 9:12
**Conference** - 4:6, 8:11, 54:10
**Confirm** - 58:6, 62:15, 88:4, 167:7, 190:11
**Confirmatory** - 58:22
**Confirmed** - 61:10
**Confirming** - 191:10
**Confrontation** - 101:7, 172:17
**Confused** - 184:6
**Confusion** - 59:14
**Conjunction** - 66:12, 77:11, 77:18, 110:21, 183:19, 184:10
**Connection** - 64:8, 172:1, 193:10
**Consequence** - 188:19
**Consequences** - 168:24
**Consideration** - 186:14
**Considered** - 89:15, 90:7, 138:19, 140:21, 163:14, 164:2, 194:10, 197:6

**Considering** - 185:5
**Consistency** - 182:7
**Consistent** - 81:10
**Constructing** - 189:1
**Consult** - 184:21
**Consultant** - 178:11, 184:22
**Consultative** - 178:7
**Consulted** - 169:18, 178:13
**Contact** - 138:8, 140:15, 157:1, 164:8, 164:14, 182:24, 190:25
**Contacted** - 99:4
**Contain** - 86:14, 188:22
**Contained** - 67:24, 73:17, 86:16, 142:11, 180:10
**Continuation** - 88:6, 88:7
**Continue** - 9:11, 77:13, 77:14, 84:18, 84:20, 138:8, 171:20, 171:22
**Continued** - 51:13, 51:16, 80:20, 158:1
**Continues** - 182:4
**Contract** - 28:17, 28:24, 29:3, 175:3, 177:7
**Contractor** - 114:23, 123:24, 125:13, 126:15, 132:11, 132:12, 145:17, 145:25, 174:9, 175:2, 175:11, 197:17, 197:19, 197:24
**Contributing** - 8:3, 12:24
**Control** - 8:12, 58:1
**Controls** - 189:20
**Conversation** - 34:7, 126:16, 128:16, 172:13
**Conversations** - 56:23, 90:25, 145:15, 155:8, 156:19

**Converse** - 193:11
**Convince** - 112:3
**Convincing** - 8:5, 13:3
**Cooked** - 40:13, 40:14
**Cooking** - 19:2, 19:8, 40:17, 195:1
**Copy** - 58:19, 65:23, 148:18, 148:19, 179:22
**Correctly** - 79:19, 169:2
**Cost** - 77:5
**Couldn't** - 11:14, 50:14, 92:5, 92:6
**Counsel** - 5:5, 5:8, 6:1, 6:4, 6:7, 6:8, 47:2, 54:24
**Count** - 201:20
**County** - 17:25, 18:2, 18:3, 85:4
**Couple** - 7:2, 12:21, 30:18, 50:15, 62:5, 66:18, 74:13, 166:19
**Course** - 4:23, 13:9, 15:20, 16:14, 93:1, 127:16, 131:9, 144:21
**Court** - 11:23, 23:18, 45:10, 88:21, 136:14, 136:18
**Court's** - 14:5
**Cover** - 6:22, 8:24, 10:13, 14:3, 84:3, 97:11, 97:18, 119:2, 157:15, 194:7
**Coverage** - 74:3, 74:9, 75:17
**Covered** - 8:10, 77:3, 84:4, 119:17
**Covering** - 96:25, 119:16
**Covers** - 149:11
**Covington** - 4:10, 192:16
**Cows** - 40:4
**Crain's** - 102:5, 184:9
**Creating** - 52:9
**Creation** - 177:21
**Credible** - 67:25
**Crew** - 53:8
**Cross** - 16:18,

Robert Branch   2023-FRS-00026   February 13, 2024

41:25, 42:4, 42:18,
45:5, 88:2, 106:11,
126:9, 148:1,
172:12, 176:20,
198:9
**Crossed** - 191:1
**CST** - 4:2, 42:11,
42:12, 94:15, 94:16,
120:5, 120:6, 135:4,
135:5, 167:25,
168:1, 202:21
**Cumulative** - 102:1
3
**Current** - 198:11
**Currently** - 101:13
**Cursory** - 169:10
**Customary** - 172:8
**Cut** - 39:22, 39:23,
124:23, 128:18,
132:1, 136:4
**Cutting** - 166:23
**CX** - 9:3

| D |
| --- |

**Dale** - 90:13, 90:18
**Damages** - 70:1
**Dancing** - 47:9
**Dangerous** - 186:11
**Date** - 11:14, 11:19,
18:7, 18:8, 26:12,
38:22, 39:16, 60:19,
81:15, 81:16, 81:17,
81:18, 151:14,
177:17
**Dated** - 11:6, 62:1
**Daughter** - 32:11,
32:14, 78:6, 83:17
**Daughter's** - 77:11,
78:1, 78:3
**Days** - 27:14, 46:13,
67:18
**Day's** - 37:14,
60:12, 102:21
**De** - 4:15
**Deal** - 30:17, 90:3
**Dealt** - 182:1, 182:2,
191:5
**December** - 80:22
**Decide** - 185:17
**Decided** - 169:16,
200:18
**Decides** - 168:25
**Deciding** - 57:1,
138:19

**Deescalate** - 107:16
, 123:10, 126:22,
137:25, 138:3, 138:5
**Deescalated** - 124:
12
**Defend** - 49:17,
109:20, 172:17
**Defenses** - 7:17
**Defensive** - 51:17,
53:6, 138:7, 164:17
**Defer** - 14:9
**Deferral** - 14:8
**Define** - 170:6
**Defined** - 171:14
**Definitely** - 115:8,
117:16
**Definitions** - 116:8,
143:19
**Delivered** - 40:14
**Dental** - 32:20,
33:24, 70:11, 70:17,
71:2, 72:7, 72:9,
73:4, 74:17, 75:11,
75:18, 75:23, 76:1,
76:3, 85:25, 88:5
**Deposed** - 54:8,
144:21
**Depression** - 26:24
**Describe** - 19:19,
47:3, 153:10
**Described** - 10:20,
197:23
**Describing** - 50:25,
53:23, 90:25
**Desk** - 58:20
**Detailed** - 58:23
**Determination** - 52:
10, 139:10, 173:12,
173:18, 173:20,
180:21, 186:19,
187:12, 199:17
**Determine** - 107:20,
108:3, 125:7, 140:3,
142:10, 153:4,
153:16, 154:17,
164:5, 168:23,
169:3, 193:12
**Determined** - 125:9,
141:1, 178:5, 180:20
**Determining** - 108:
13, 110:14, 130:12,
131:4, 131:17,
131:18, 178:3, 186:8
**Devastating** - 40:10

**Developed** - 173:13
**Development** - 169:
12
**Diem** - 63:25, 64:1,
64:2, 64:4, 122:24
**Difference** - 72:19,
93:23, 103:25,
104:5, 162:18,
162:21
**Differentiate** - 72:2
1
**Differently** - 183:7
**Difficulties** - 8:16
**Dinner** - 175:2
**Directed** - 48:4,
171:2
**Directing** - 182:6
**Direction** - 20:2,
190:2
**Directly** - 96:14,
97:24, 99:13, 176:9,
182:11
**Director** - 168:17,
176:23, 177:3
**Disagree** - 173:15
**Disagreement** - 110
:19
**Disagrees** - 79:2
**Disaster** - 40:5
**Disbelief** - 22:2
**Discharge** - 12:25
**Disciplined** - 185:1
**Discomfort** - 30:3
**Discourage** - 57:7,
121:22
**Discrimination** - 14
7:4, 147:19
**Discussing** - 111:12
**Discussions** - 110:
17, 155:15, 179:19
**Dismissal** - 138:25,
139:4, 139:7, 139:8,
169:19, 169:22,
178:19, 183:11,
185:7, 185:19, 191:5
**Dismissed** - 11:4,
91:12
**Dismissible** - 139:2
, 169:8, 169:20,
178:22
**Displaying** - 95:17
**Dissuade** - 57:7
**Distinction** - 197:9
**Distractions** - 8:15,

120:21
**District** - 136:8
**Diversity** - 146:16
**Division** - 104:13
**Divorce** - 32:12,
32:13
**Doable** - 166:18
**Docket** - 4:6
**Doctor** - 26:20,
26:21, 26:22, 26:23,
27:3, 39:2
**Doctor's** - 26:25
**Document** - 55:2,
62:19, 70:22, 72:1,
72:2, 116:8, 149:3,
152:16
**Documentary** - 65:
4
**Documents** - 9:20,
10:1, 62:14, 120:21,
143:3, 143:20
**Doesn't** - 7:4, 8:21,
93:23, 102:4,
117:23, 161:17,
171:23, 175:16,
202:1
**DONALSDON** - 147
:22
**Door** - 26:5, 26:15,
36:10, 47:5, 47:7
**Downplayed** - 28:8
**Dr** - 26:22
**Drew** - 19:24
**Drink** - 126:15,
132:13
**Drinking** - 36:15,
36:16, 36:17, 47:13,
47:14
**Drinks** - 175:2,
197:18
**Driver** - 10:24,
12:11, 12:13
**Drop** - 37:10, 37:17,
37:24, 37:25
**Dropped** - 79:7
**Drove** - 21:18
**Duane** - 6:9, 15:10,
133:18, 135:12,
169:15, 183:17
**Due** - 17:11, 95:3,
121:3, 135:13,
168:8, 192:23
**Duly** - 17:11, 95:3,
121:3, 135:13,
168:8, 192:23
**Duration** - 42:3,

93:7
**Duties** - 177:2
**Duty** - 102:5,
123:24, 127:6

| E |
| --- |

**Each** - 65:15, 74:8,
80:16, 81:3, 153:14
**Early** - 96:6, 159:13
**Earn** - 41:14
**Easier** - 150:16,
167:19
**Easiest** - 150:15,
164:18
**Easily** - 201:13
**Easy** - 140:18
**Eater** - 39:23
**Eating** - 126:15,
132:13, 197:18
**Eddy** - 59:4, 200:23
**Education** - 77:11,
78:1, 78:4
**EEO1** - 147:2
**Effect** - 177:19
**Effective** - 151:14,
177:17
**Efficiency** - 119:12,
201:20
**Efficient** - 133:1
**Effort** - 178:7,
185:23, 189:5
**Egregious** - 154:4
**Egypt** - 47:17,
47:19, 47:21, 47:25,
84:4, 84:7, 84:12
**Eight** - 26:6, 65:8
**Elderly** - 41:19
**Else's** - 28:8, 37:13
**Embarrassed** - 21:2
2, 28:6
**Emergency** - 39:3
**Employed** - 10:23,
12:11, 12:17
**Employee's** - 122:2
4, 141:16
**Employer** - 70:7,
74:4, 83:11, 84:4,
94:21
**Employers** - 162:22
**Employment** - 10:2
5, 11:2, 54:5, 67:19,
67:23, 69:6, 77:20,
83:4, 113:10, 158:5,
158:11, 199:14,

Robert Branch   2023-FRS-00026   February 13, 2024

199:22
Encompasses - 98: 18
Encounter - 141:16
Encountered - 129: 20, 175:13, 181:25
Encourage - 161:8, 173:24
Encouraged - 117:2 1, 119:12
Encouraging - 119: 15
Engage - 141:1, 165:2
Engaged - 8:2, 12:23, 45:4, 107:9, 112:23, 137:17, 149:15, 157:10, 157:13, 157:22, 158:17, 158:18, 164:18, 174:4, 180:17, 181:15, 181:21, 185:11, 185:13
Engagement - 137: 17, 182:24, 183:1
Engaging - 45:5, 166:3, 179:8, 180:23
Engineering - 18:11 , 141:22, 141:23, 142:14
Enjoy - 33:12
Enlarge - 59:17
Enlarged - 58:13
Entered - 4:17, 5:18, 60:2
Entering - 4:15, 4:20
Entire - 40:18, 98:18, 107:3, 193:14
Entity - 4:13
Equals - 142:18, 142:22, 143:10
Equate - 116:25
Equity - 146:16
Erase - 89:6
Ere - 91:19
Errors - 88:16
Ers - 48:1
Escalating - 137:18
Establish - 172:10
Established - 105:5 , 144:12, 173:19, 174:21

Estimate - 76:13, 78:14, 80:12, 81:2
Estimated - 80:25, 81:14
Evaluated - 52:6
Evening - 35:15, 47:1
Events - 50:25, 53:23, 68:13, 191:3
Everybody - 38:15, 124:16, 130:14, 202:11
Everyone - 4:4, 8:24, 15:24, 16:11, 95:14, 95:25, 150:17, 184:6, 201:11
Everyone's - 93:9, 201:19
Everything - 129:19 , 136:11, 163:13, 165:22
Evidentiary - 7:5, 202:3
Examine - 64:7
Examined - 17:12, 95:4, 121:4, 135:14, 168:9, 192:24
Example - 16:15, 77:18, 134:12, 169:21, 178:3
Examples - 149:4, 154:6, 154:7, 177:25, 190:24
Except - 44:23, 45:2, 151:24
Exception - 169:23, 170:2
Excerpts - 9:9, 202:5
Exchange - 60:3, 60:4, 60:7
Excluding - 7:6, 171:18, 172:1
Exclusively - 177:1 1, 181:19
Excusable - 181:16
Excused - 118:5, 133:3, 191:14
Executing - 156:25
Exhaust - 8:22
Existed - 140:17
Expect - 97:12, 118:17, 119:16,

134:15, 165:11, 174:17, 176:4
Expected - 118:5, 171:16
Expecting - 133:4
Expenditure - 72:3, 77:19
Expense - 119:18
Expenses - 31:8, 31:9, 31:11, 32:2, 32:10, 75:4, 75:5, 77:10, 77:12, 77:17, 77:25, 85:21, 85:22, 85:23
Expensive - 83:16
Experience - 43:20, 139:2
Explain - 45:18, 45:20, 45:22, 49:12, 153:25, 190:20
Explained - 147:17
Explanation - 95:22
Express - 119:19
EXSAMINATION - 1 06:11
Eyes - 19:23, 36:21

F

Face - 19:23, 20:8, 48:20, 51:18, 87:15, 126:17
Facing - 20:2, 138:21, 169:7
Factored - 80:24
Fair - 76:13, 76:16, 81:9, 156:16
Fairly - 7:21, 169:3, 200:9
Faith - 13:17, 92:8, 92:9
Fall - 116:13, 139:9
Family - 27:21, 38:9, 41:18, 74:3, 74:9, 74:10, 78:2, 83:7
Farther - 62:17
Fatal - 14:18
Fear - 159:1
Feared - 86:15, 87:2, 88:25, 89:8, 113:8, 159:10, 186:2, 186:5, 199:23
Fearful - 21:21, 21:22

Feasible - 166:15, 166:25, 167:1, 191:17
February - 4:2, 9:2, 9:16, 18:8, 28:12, 86:11
Federal - 4:4, 6:20, 7:20, 94:19, 120:10, 192:15
Fedex - 26:5, 26:14
Feed - 137:2
Feel - 21:20, 24:12, 27:18, 28:5, 34:20, 66:21, 91:24, 104:3, 119:17, 132:17, 137:22, 173:22
Feeling - 28:6, 30:3
Feels - 133:22
Fell - 20:24, 21:1, 51:11, 51:13
Fellow - 20:14
Felt - 21:21, 21:22, 23:9, 92:3, 160:3, 164:25, 186:19
Fence - 21:7, 98:3, 195:3
Field - 102:16, 178:8, 178:11, 179:18, 184:13, 184:16
Fields - 40:1
Fifth - 152:15
Figure - 80:3
File - 24:21, 130:20, 161:9, 202:2, 202:9
Filed - 10:16, 11:1, 11:5, 11:7
Filing - 24:8, 161:6
Fill - 82:2
Final - 80:11, 178:2
Financial - 32:15
Find - 79:20, 83:15, 103:21, 103:25, 115:7, 115:9, 150:13, 155:7, 170:8, 172:3, 185:9, 190:1
Finding - 11:4, 107:21
Findings - 4:15, 4:16, 4:18, 4:21, 11:6, 11:8
Fine - 7:11, 14:25, 27:11, 43:9, 59:3,

95:25, 119:5, 133:5, 133:20, 166:21, 167:2, 167:4, 191:21, 192:7, 201:8, 201:10, 201:12, 202:9, 202:10
Fire - 98:14, 99:5
Firearm - 55:12, 55:15, 92:15, 92:16, 131:12
Fired - 26:19, 27:13, 27:24, 28:20, 29:18, 32:19, 92:3, 173:17, 173:23, 187:7, 197:15
Firing - 26:17, 26:18
Fist - 19:25, 20:11
Fists - 49:1, 49:16
FITKE - 113:12
Fitzke's - 113:22
Fix - 137:3
Fixes - 137:2
Flames - 194:25
Flexible - 16:5
Flight - 118:7
Focus - 159:15
Focused - 177:10, 180:18
Folks - 63:5, 63:6
Follow - 148:19, 175:10, 175:24, 182:13
Following - 46:14, 63:9, 65:19, 72:4, 75:6, 80:5, 81:7, 109:5, 175:11, 202:21
Follows - 17:12, 95:4, 121:4, 135:14, 168:9, 192:24
Food - 40:13, 40:14
Foot - 36:7, 36:8
Ford - 6:24
Forehead - 87:15
Foreman - 18:13, 21:18, 22:5, 22:6, 22:20, 24:19, 55:17, 55:18
Forget - 89:6
Form - 4:23, 54:17, 114:2, 143:21, 161:14, 164:16,

Robert Branch   2023-FRS-00026   February 13, 2024

**174:**19
**Formal -** 6:20, 7:1, 7:3, 7:18, 16:7, 16:10, 106:21, 162:10, 169:9, 192:10
**Formed -** 183:8
**Former -** 94:20
**Forms -** 190:20
**Forth -** 37:3, 140:25, 144:21, 156:24, 164:15
**Fortunate -** 40:13, 78:10
**Forums -** 7:20
**Forward -** 21:3, 25:5, 89:25, 99:4, 110:15, 112:4, 112:7, 112:16, 119:1, 156:3, 159:25, 161:3, 169:6, 169:11, 179:11, 187:5
**Fought -** 109:20, 126:18
**Found -** 6:24, 7:2, 84:16, 113:4, 121:15
**Foundation -** 105:4, 105:9, 144:12, 144:13, 144:15, 188:4, 195:7
**Foundational -** 174:20
**Fourth -** 152:16
**Frame -** 153:3, 176:24
**Framed -** 162:12
**Framework -** 7:12
**Free -** 118:12
**Friday -** 23:12, 23:16, 23:17, 26:2
**Fringe -** 33:17
**Front -** 51:17, 52:22, 59:9, 73:3, 73:19, 95:15, 111:13, 120:22, 170:7
**Froze -** 145:21
**Frozen -** 104:9
**FRS -** 4:7
**FRSA -** 10:20, 11:3
**Fuckers -** 19:15
**Fuel -** 10:24, 12:11, 12:12

**Full -** 17:22, 17:23, 33:7, 33:8, 37:6, 58:17, 61:15, 71:20, 92:11, 124:24, 129:1, 169:12
**Fully -** 67:10, 114:9
**Function -** 8:17, 184:19
**Funny -** 27:3
**Future -** 50:3

G

**Game -** 166:6
**Gang -** 23:3, 86:4, 86:5
**Gangs -** 121:13
**Gaps -** 82:3, 136:12
**Garden -** 40:1, 41:16
**Gardener -** 9:5, 15:21, 23:1, 23:2, 23:5, 23:6, 23:15, 23:23, 24:4, 34:8, 38:4, 56:24, 57:2, 57:4, 57:7, 127:3, 127:11, 202:3, 202:8
**Gathered -** 100:12, 100:24, 101:1, 169:5, 177:25
**Gave -** 24:23, 41:18, 42:15, 53:11, 77:9, 90:19, 98:19, 113:23, 114:14, 117:12, 119:10, 129:22, 129:23, 133:19, 141:6, 189:10
**General -** 8:9, 8:12, 74:20, 127:9, 194:5, 194:6
**Generally -** 9:4, 12:20, 139:1, 156:5, 181:25, 189:25
**Generated -** 106:24
**Gentleman -** 115:2
**Gentlemen -** 102:14, 109:3, 112:15, 114:10, 118:22, 124:19, 134:14, 138:10, 166:11
**Gesture -** 123:11, 171:15
**Gets -** 124:24, 145:13, 147:18

**Gillian -** 6:9
**Girl -** 31:12
**Gist -** 129:2
**Give -** 23:18, 25:13, 25:15, 34:23, 53:16, 59:7, 73:23, 115:19, 121:25, 122:13, 127:12, 129:1, 131:11, 139:23, 156:9, 159:10, 159:12, 163:23
**Given -** 11:23, 17:5, 25:24, 71:12, 85:1, 88:12, 92:11, 92:14, 129:2, 134:16, 164:8
**Gives -** 149:4
**Glad -** 200:6
**Gone -** 31:4, 31:7, 90:14, 138:7, 187:8
**Government -** 147:2, 147:19
**Grace -** 6:6, 56:3, 58:8, 60:17, 61:17, 62:16, 70:19, 72:23, 73:10, 148:17, 148:20, 149:2, 150:22, 151:12, 155:4
**Grand -** 31:13
**Grass -** 39:23
**Greatly -** 191:13
**Green -** 129:22
**Greenville -** 30:12
**Greenwood -** 85:11
**Grenada -** 85:13
**Grey -** 60:12
**Grievance -** 177:6
**Grill -** 19:2, 21:6
**Ground -** 20:10, 20:19, 20:25, 21:11, 36:22, 53:5, 119:2, 145:8, 157:23, 173:2
**Grounds -** 174:20
**Group -** 19:10, 20:17, 21:10, 71:3, 86:17, 164:21, 176:13, 179:16
**Guess -** 79:12, 91:11, 92:2, 106:22, 114:7, 114:9, 116:5
**Guest -** 95:8
**Guidance -** 109:22, 156:8, 156:9, 182:6
**Guilty -** 137:22

**Gun -** 21:14, 21:24, 23:9, 34:19, 38:7, 53:13, 53:14, 53:18, 54:6, 56:9, 91:23, 160:13, 160:14, 160:16
**Guys -** 38:16, 53:7, 71:18

H

**Hadn't -** 18:23, 160:3, 163:6
**Half -** 69:4, 69:11
**Hallucinating -** 48:25
**Hand -** 8:17, 17:7, 94:23, 120:25, 135:10, 168:5, 192:20
**Handle -** 7:22, 54:16, 55:2, 57:21, 134:23, 134:24, 142:6
**Handled -** 16:12, 115:4, 165:20, 165:21
**Handling -** 109:16, 109:18, 121:7, 198:5
**Hands -** 25:11, 37:13, 37:14, 50:11, 50:17, 51:2, 51:17, 112:15
**Handwritten -** 60:9, 61:1
**Happening -** 92:6
**Happy -** 78:6
**Harassment -** 147:4, 147:18
**Hard -** 19:22, 86:23, 148:18, 148:19, 198:13, 202:11
**Harm -** 21:19, 139:13, 143:4, 143:12, 143:13, 143:14, 143:16, 171:17
**Harvest -** 40:2
**Hasn't -** 105:4, 144:12, 149:21, 174:20
**Haven't -** 30:22, 41:10, 41:12, 50:16, 76:14, 105:9
**Hazardous -** 13:17,

158:6, 158:19
**Hazards -** 43:16
**Head -** 106:14, 111:3, 113:23, 125:21, 126:17, 175:4, 196:21, 197:19
**Health -** 32:20, 33:23, 70:11, 71:2, 72:13, 72:14, 72:16, 74:14, 75:19, 76:22, 83:3, 83:4, 86:1, 86:2
**Healthcare -** 70:24, 72:4, 72:10
**Hear -** 17:15, 92:4, 109:6, 120:19, 136:17, 168:3, 192:7, 192:9
**Heard -** 45:15, 50:16, 105:9, 128:4, 131:14, 135:7, 160:16, 190:11
**Hearings -** 175:13, 175:17
**Hearsay -** 7:10, 22:12
**Heart -** 13:11, 77:1
**Heaven -** 90:14
**He'd -** 25:9, 63:6
**Held -** 18:9, 63:20, 168:25, 176:24, 176:25, 182:24, 199:2
**Help -** 17:3, 82:1, 97:2, 97:11, 97:18, 139:10
**Helped -** 73:16
**Helper -** 18:13
**Helpful -** 58:24, 59:5, 65:4, 71:12, 72:22, 177:14
**Helping -** 40:3, 40:4
**Herein -** 17:11, 95:3, 121:3, 135:13, 168:8, 192:23
**Hey -** 142:6
**Higher -** 81:10, 83:19, 83:21
**Highest -** 79:14, 79:20, 79:22
**Hilliard -** 15:10, 98:20, 134:13, 137:11, 144:18,

Robert Branch   2023-FRS-00026   February 13, 2024

166:11, 166:16, 167:6, 167:9, 183:17, 191:18, 192:2, 192:7, 192:8, 192:22, 193:6, 195:23, 200:6
**History** - 138:14, 138:17, 184:25, 185:3, 185:4, 185:8
**Hit** - 19:23, 19:25, 20:8, 36:14, 36:22, 48:19, 48:22, 49:2, 49:16, 50:11, 52:2, 52:3, 52:4, 52:5, 52:6, 173:1, 183:2
**Hold** - 82:4, 98:8, 136:9, 136:25, 161:12, 161:23, 175:17, 184:15, 192:2
**Holds** - 166:17
**Holiday** - 63:5, 127:2, 127:19, 128:9
**Home** - 28:3, 30:5, 31:14, 39:1, 77:10, 77:11, 77:18, 77:23
**Honest** - 73:21, 134:8
**Honestly** - 115:3, 123:7
**Honor's** - 22:13
**Hope** - 118:6, 133:10, 133:12
**Hopefully** - 73:15
**Hotel** - 18:24, 19:12, 21:8, 34:18, 46:19, 47:5, 47:7, 62:9, 97:21, 109:3, 109:12, 117:12, 122:24, 123:3, 131:12, 194:21
**Hour** - 28:20, 28:21, 29:1, 41:24, 119:2
**Hourly** - 79:24
**Hours** - 29:12, 80:13, 80:15, 80:19, 80:22, 80:25, 106:14, 166:19
**House** - 6:8, 31:14, 31:15, 31:25, 91:4
**Housekeeping** - 10:6
**Houses** - 40:10
**HR** - 38:1, 125:4,

134:13, 147:12, 147:14, 193:16, 193:25, 199:19
**Human** - 6:10, 55:14, 63:11, 82:11, 92:19, 135:22, 139:22, 146:10, 146:12, 146:20, 147:9
**Hundreds** - 79:8
**Hunsucker** - 21:17
**Hurt** - 21:22, 25:8, 25:10, 38:9
**Hurting** - 37:2, 39:2, 87:14
**Hypothetical** - 114:3, 114:14, 175:5
**Hypothetically** - 175:9

|    I    |
| :---: |

**I'd** - 28:25, 54:14, 81:24, 97:2, 133:23, 173:20, 199:18, 201:17
**Ideally** - 134:1
**Identification** - 9:21, 10:2
**Identified** - 8:8, 65:8, 68:5, 78:1, 152:6, 178:4, 178:24, 180:6
**Identity** - 62:15
**II** - 5:7
**ILA** - 28:16
**I'll** - 17:7, 17:14, 49:25, 134:25, 137:2, 153:25, 154:4, 156:25, 163:23, 167:21, 202:13
**Illness** - 171:17
**Immaterial** - 7:7, 7:14, 22:13, 40:19, 102:16, 103:15, 104:4
**Immediate** - 68:10, 125:11, 129:24, 129:25
**Immediately** - 117:19
**Impact** - 113:9
**Impeachment** - 54:17

**Implied** - 164:1
**Importance** - 43:4
**Important** - 4:22, 42:25, 138:23, 157:18
**Improper** - 114:3
**Improvements** - 31:15
**Incidents** - 107:19, 149:10, 149:12, 149:20, 150:1, 178:25
**Inclusion** - 146:17
**Incorrectly** - 88:22
**Increase** - 70:25, 71:7, 74:2
**Increased** - 74:5
**Incurred** - 75:5, 77:17
**Indicated** - 53:18, 54:5, 55:15, 56:23, 88:25, 90:9, 91:17, 92:20, 105:6, 109:19, 130:7, 158:24, 159:13, 160:3, 181:11, 186:2
**Indicating** - 53:12, 128:5
**Indication** - 131:11
**Industry** - 178:1
**Influenced** - 196:16
**Informed** - 22:25, 23:1
**Infractions** - 188:19
**Initial** - 169:3, 169:4, 169:10
**Initiate** - 164:7
**Injuries** - 36:23
**Injury** - 143:16, 171:17
**Inn** - 19:4, 46:23, 62:7, 160:13
**Inside** - 31:16
**Instruction** - 22:13
**Instructions** - 135:7
**Intellect** - 27:20
**Intended** - 154:1
**Intentional** - 136:19
**Interjected** - 48:13
**Internet** - 150:17
**Interpret** - 46:5
**Interrupt** - 136:10, 197:1
**Interruption** - 137:5

**Interviewed** - 30:4
**Interviews** - 30:1, 30:2
**Introduced** - 184:18, 186:14, 186:15
**Introduction** - 5:3
**Introductions** - 5:25
**Investigate** - 106:16, 112:21, 175:7, 175:8, 175:24
**Investigated** - 162:3, 162:4, 162:16, 165:5, 165:8
**Investigating** - 147:4
**Investigations** - 123:20, 175:18
**Investigative** - 52:22
**Investment** - 6:25
**Invoked** - 17:3
**Involvement** - 131:4, 131:8
**Irrelevant** - 7:7, 7:14, 40:19, 102:13, 102:16, 103:15
**Isn't** - 48:14, 190:25
**Issuance** - 153:2
**Issue** - 12:22, 13:11, 13:13, 112:15, 155:24, 158:21, 164:13, 166:22, 167:5
**Issued** - 9:1, 11:4
**Issues** - 10:13, 12:19, 43:14, 43:15, 43:18, 46:16, 108:8, 120:20, 137:2
**It'd** - 25:8
**Item** - 7:9
**I've** - 12:14, 27:16, 47:22, 110:24, 114:6, 156:14, 175:22, 176:25, 184:6, 190:11, 201:9

|    J    |
| :---: |

**Jacobson** - 6:7, 58:9, 73:9, 74:23, 74:25, 198:4, 198:6, 198:10, 198:14, 198:17, 198:19, 198:21, 198:22,

200:1
**James** - 5:14, 95:8, 170:14
**January** - 10:16, 10:17
**Jobs** - 29:17, 29:21, 69:2, 69:10, 69:11, 85:5, 85:7, 112:25
**Join** - 74:17, 120:3, 192:2, 200:6
**Joined** - 98:3, 176:25
**Joining** - 94:17, 118:9, 120:14, 133:8, 192:5, 192:10
**Joint** - 9:7, 9:22, 10:2, 17:4, 57:19, 60:2, 61:16, 70:20, 71:14, 151:4, 170:17
**Jointly** - 9:16
**Joke** - 163:19
**Jones** - 101:9, 101:15, 101:24, 103:23, 124:19, 125:4, 125:19, 125:23, 174:16
**Judged** - 173:16, 173:19
**Judges** - 4:11
**Judgment** - 173:12, 173:15, 173:16, 173:21
**July** - 31:19, 31:21
**Jurisdiction** - 11:22
**Justifiable** - 181:16
**Justified** - 45:2, 119:11, 171:18, 172:2, 172:4
**JX** - 9:13, 9:14, 9:18, 9:19, 54:19, 72:19, 72:23, 73:3, 73:18, 202:4

|    K    |
| :---: |

**Kill** - 19:16, 48:2
**Killed** - 19:15, 25:8, 25:10, 40:8, 40:9
**Killing** - 48:1
**Kinds** - 13:12
**Knee** - 36:25, 37:3, 37:4, 87:19
**Knocked** - 36:10, 36:22, 49:18, 145:8, 173:1

Robert Branch   2023-FRS-00026   February 13, 2024

**Knowing** - 114:8, 150:20
**Knowledge** - 22:8, 29:8, 106:1, 117:13, 127:9
**Known** - 47:19, 47:22
**Knows** - 105:5, 162:1

| L |
| --- |

**Laid** - 80:21
**Land** - 30:17, 31:5
**Language** - 152:21, 152:24, 153:1, 158:25, 191:2, 191:3
**Laptop** - 120:15
**Large** - 95:16, 95:23
**Lastly** - 13:4, 84:2
**Late** - 9:1, 33:7
**Later** - 40:2, 55:2, 62:14, 67:18, 103:22, 130:21, 164:12
**Latter** - 44:22
**Lead** - 5:5, 5:7, 6:1, 138:24, 141:16, 162:6, 178:20, 187:11
**Leads** - 22:19
**Learn** - 109:2, 182:21
**Learned** - 126:25, 127:8, 176:11
**Leave** - 15:3, 97:10, 137:1, 194:19, 200:10, 200:13
**Leaving** - 28:1
**Led** - 141:2, 180:13, 199:13
**Left** - 30:16, 30:23, 30:25, 31:1, 31:3, 31:14, 41:6, 76:20, 76:21, 77:14, 78:11, 94:5, 175:4, 197:20, 200:19
**Leg** - 87:16, 87:18, 87:19, 184:16
**Legal** - 5:2, 6:8
**Length** - 118:23
**Lesser** - 108:20, 115:19, 190:13, 190:23, 191:3
**Letter** - 26:15,

67:19, 91:11, 99:7, 99:12, 99:14, 99:15, 99:21, 100:5, 115:25
**Levels** - 154:1, 178:20, 188:17
**Light** - 14:8, 71:9, 129:22, 176:13
**Limine** - 9:3
**Limit** - 146:15
**Limited** - 87:23, 149:9
**Line** - 40:18, 45:5, 87:1, 172:10, 172:13, 191:1
**Lines** - 190:25
**Link** - 17:5, 202:14
**Lip** - 36:21
**List** - 6:12, 29:22, 133:16
**Listed** - 15:9, 130:15
**Literature** - 115:24
**Livelihood** - 33:14
**Located** - 19:3, 19:4, 20:17, 85:10, 138:10
**Location** - 11:24
**Locations** - 150:19
**Logistically** - 54:16, 57:21
**Long** - 27:15, 33:2, 85:21, 94:12, 118:18, 166:12, 166:15, 176:24, 200:22, 201:11
**Longer** - 89:8, 89:15, 91:17, 94:11, 94:13, 133:22, 167:16
**Longest** - 201:5
**Looking** - 29:15, 40:3, 60:1, 71:13, 73:11, 73:16, 83:23, 83:24, 91:7, 95:24, 109:22, 156:23, 163:9, 182:7, 184:1, 185:8, 190:9
**Loose** - 20:16
**Lose** - 32:17, 32:19, 85:14, 112:25
**Loss** - 70:1, 79:11, 80:25, 81:15
**Losses** - 70:2
**Lost** - 14:18, 28:7,

28:10, 40:10, 69:25, 78:14, 79:7, 85:16
**Loud** - 111:4
**Louisiana** - 4:10, 120:13, 192:16
**Lower** - 81:11
**LR** - 102:4, 109:15, 109:17, 109:23, 193:16, 193:25, 199:19
**Lucky** - 40:8
**Lunch** - 118:19, 133:22, 134:16

| M |
| --- |

**Machine** - 12:13, 12:17, 18:12, 18:19, 23:7, 28:22, 36:4, 36:5, 36:10, 37:23
**Machines** - 43:15
**Magnolia** - 46:23, 62:7, 160:13
**Main** - 146:20
**Mainly** - 82:2
**Major** - 31:11, 32:2
**Making** - 28:20, 28:23, 28:25, 50:2, 54:4, 57:8, 108:5, 147:1, 197:6
**Man** - 37:3, 104:1
**Management** - 55:14, 56:14, 56:20, 91:14, 92:19, 106:25, 124:17, 162:22, 175:17, 178:8, 184:13
**Manager** - 6:9, 90:10, 96:11, 101:13, 102:3, 106:15, 129:24, 129:25, 135:22, 139:23, 146:21, 156:5, 162:19, 175:18, 184:12
**Managerial** - 163:1, 197:10
**Managers** - 106:14, 148:10, 150:16, 152:2, 174:8, 175:16, 197:14
**Managing** - 177:4
**Manufacturer** - 85:12
**Many** - 29:20, 85:5,

156:14, 178:1
**Maquire** - 90:13, 90:18, 91:1, 91:13
**March** - 176:25
**Mark** - 9:7, 55:1
**Marked** - 9:21, 10:1, 54:20, 60:1, 71:14
**Market** - 83:25, 84:1
**Marshall** - 6:9, 6:13
**Material** - 12:7, 22:17
**Materials** - 31:17
**Matters** - 8:14, 147:18
**May/June** - 176:23
**Means** - 118:4, 147:17, 200:13, 201:18
**Medical** - 70:11, 70:15, 74:9, 75:11
**Medication** - 26:19, 26:20, 26:23, 77:1
**Meet** - 54:9
**Meeting** - 8:12, 23:15, 94:14, 95:15, 119:7, 132:10, 137:1
**Meetings** - 48:9
**Melton's** - 23:10, 48:4, 138:17
**Member** - 56:14, 56:19, 91:13, 92:19, 152:11, 153:15
**Members** - 23:21, 156:19, 157:8
**Memo** - 71:14, 71:23, 72:8, 86:9
**Memorial** - 23:19, 24:25, 25:1, 34:5, 34:10, 38:11, 46:13, 56:24, 62:22, 62:23, 63:5, 131:10
**Memory** - 73:17
**Men** - 101:24, 101:25
**Mentally** - 26:18
**Mentions** - 7:3
**Message** - 60:4, 60:23, 60:25, 61:24, 128:19
**Messages** - 128:4
**Met** - 33:15
**Method** - 165:8
**Methods** - 162:25
**MF** - 48:1

**Microphone** - 198:15
**Microsoft** - 4:6
**Miles** - 85:9, 85:13
**Milwaukee** - 68:18, 68:22, 85:8
**Mislead** - 69:19, 79:10
**Misquote** - 186:4
**Miss** - 29:7
**Missed** - 11:18, 15:15, 77:16, 82:9, 124:23, 193:22
**Missing** - 15:19
**Mississippi** - 12:1, 18:1, 18:2, 18:3, 18:17, 19:5, 54:9, 62:8, 62:9, 84:3, 194:21
**Mississippi's** - 172:22
**Misstatement** - 69:19
**Misstates** - 99:11, 99:12
**Mistaken** - 26:2, 28:11, 37:22, 73:20, 80:20
**Mistakenly** - 88:22
**Misunderstood** - 136:7
**Mitigating** - 140:13, 164:5
**Mode** - 20:12
**Monday** - 24:24, 28:1, 34:5, 34:10, 62:23, 89:1, 128:8, 128:13, 128:15
**Money** - 33:15, 41:14, 77:22
**Monthly** - 71:8, 79:15
**Months** - 28:14, 30:14, 39:20, 40:2, 41:13, 69:1, 74:13, 78:15, 79:18, 79:24, 80:2, 80:3, 88:8, 88:10
**Morning** - 4:3, 8:11, 23:17, 23:23, 28:2, 67:7, 133:19, 166:19, 167:14, 167:16, 200:19, 201:3, 201:6,

Robert Branch    2023-FRS-00026    February 13, 2024

201:12, 202:15
**Mother** - 19:15
**Motion** - 9:2
**Move** - 15:4, 15:23, 40:21, 97:1, 110:15, 112:4, 112:6, 112:16, 137:18, 159:25, 165:2, 169:6, 169:11, 170:25, 171:13, 179:11, 180:17, 198:14
**Moving** - 7:15, 37:2, 99:4, 119:15, 133:24
**Multiple** - 50:25, 52:24
**Multiplied** - 79:15, 79:16, 79:17, 79:18, 79:24, 79:25, 80:1, 80:3
**Mute** - 42:7, 94:14, 143:22
**Muted** - 8:14
**Mutual** - 181:22

**N**

**Named** - 48:2
**Near** - 56:10, 85:10
**Necessary** - 34:20, 34:21, 98:10, 133:23
**Needed** - 36:16, 36:17, 59:19, 110:4, 127:4, 127:12, 129:19, 137:3, 184:14
**Negligence** - 28:8
**Negotiations** - 177:7, 177:8
**Neighbor** - 27:25
**Neighbors** - 41:19
**Neither** - 26:20, 114:7
**Nerve** - 26:24
**Neutralized** - 159:14
**Nevertheless** - 67:9
**New** - 4:20, 28:16, 28:17, 28:24, 29:3, 127:3, 151:18, 184:5
**Nice** - 90:3, 90:11, 90:15, 90:17, 91:20
**Nick** - 34:25, 35:1
**Night** - 22:1, 51:1, 53:23, 109:3,

119:24, 160:14, 194:22
**Nobody** - 88:17, 128:10
**Non** - 49:4, 175:25
**Noon** - 94:12, 201:14
**Normal** - 31:8, 31:9, 162:13, 175:22
**Normally** - 86:4, 103:11, 104:15, 114:21, 115:6, 145:1, 146:6, 161:12, 161:23, 163:5, 174:17, 175:5, 176:4, 197:22
**Note** - 8:25, 88:20
**Noted** - 128:23
**Notes** - 78:19, 79:6
**Notice** - 5:18, 22:19, 25:24, 39:4, 64:5, 100:3, 155:24, 187:17
**Notified** - 146:8
**November** - 53:20, 55:23, 56:1, 56:7, 56:19, 68:20, 69:15, 69:23, 70:3, 85:18, 85:23
**Novo** - 4:15
**Numbers** - 72:25

**O**

**OALJ** - 4:7, 4:20, 7:24
**Object** - 7:10, 49:4, 71:1, 102:12, 103:14, 114:2, 161:13, 161:14, 174:19, 174:20, 195:5
**Objecting** - 7:14
**Objection** - 7:11, 22:11, 22:23, 40:18, 98:4, 98:10, 99:11, 100:6, 105:4, 143:21, 144:11, 188:4
**Objections** - 7:9, 9:3, 9:17, 11:8, 99:25
**Obligations** - 175:15
**Observation** - 43:6,

43:11
**Observations** - 47:8
**Observe** - 66:15
**Observed** - 42:25
**Observers** - 42:14
**Obtain** - 76:22, 130:9
**Obtained** - 72:4
**Obtaining** - 70:6
**Occupied** - 39:21
**Occur** - 35:18
**Occurred** - 8:4, 11:25, 12:1, 36:2, 109:12, 115:7, 140:5, 155:16
**Occurs** - 153:7
**October** - 11:6, 69:22, 73:25, 151:16, 177:18, 177:19, 179:1
**Odd** - 14:19
**Offense** - 138:25, 139:2, 169:8, 169:20
**Offered** - 169:8
**Offering** - 70:16
**Office** - 4:10, 59:5, 63:7, 128:10
**Officer** - 82:12, 139:22
**Often** - 95:22, 148:12
**Okra** - 39:24
**Old** - 27:17, 40:11, 82:17, 82:20
**Older** - 32:11, 32:14
**Ones** - 9:18, 26:8, 40:12
**Oneself** - 172:17
**Ongoing** - 89:24
**Open** - 83:24, 84:1
**Opening** - 13:8, 13:25, 14:3, 119:10
**Operating** - 44:3, 44:7, 151:9
**Operations** - 178:11
**Operator** - 12:13, 12:17, 18:12, 18:19
**Opinion** - 106:17, 131:21, 174:11, 194:17
**Opportunities** - 85:5
**Option** - 121:25,

122:13
**Order** - 9:1, 14:12, 15:14, 15:15, 33:8, 58:13, 133:19, 164:23, 167:9
**Ordinarily** - 16:7
**Organized** - 40:17
**Originally** - 4:14
**OSHA** - 4:14, 4:18, 11:2, 11:5
**Outcome** - 9:5, 43:20, 122:4, 122:15, 193:12
**Outline** - 152:10
**Outlined** - 89:13, 188:21
**Overheard** - 42:8
**Overrule** - 22:22, 102:22, 104:3
**Overruled** - 114:4, 161:16
**Oversee** - 177:6, 177:8, 188:12, 188:14
**Overseeing** - 177:13
**Overseen** - 120:11
**Overtime** - 29:12, 79:15, 79:22, 80:12, 80:15, 80:18, 80:19, 80:22, 80:25, 81:1, 81:8, 81:9, 81:13, 86:4, 86:6, 86:8, 86:9
**Own** - 16:8, 46:5, 46:9, 57:24, 93:9

**P**

**Pace** - 7:16, 119:15, 133:24
**Paid** - 33:15, 63:24, 64:1, 64:2, 64:4, 73:4, 74:10, 74:15, 77:3, 77:13, 85:23
**Pain** - 26:24
**Painting** - 31:15, 31:16
**Parents** - 39:22
**Parking** - 21:8, 97:21, 98:3, 112:13, 138:10, 194:21, 195:2, 195:3
**Participant** - 129:6, 179:7

**Participants** - 42:14, 110:25
**Participants'** - 115:9
**Participate** - 98:13, 113:25
**Participated** - 50:18, 51:23, 70:16, 107:17, 112:24, 158:4, 175:22
**Participating** - 8:13
**Participation** - 103:7, 118:11, 166:4, 182:18
**Particularly** - 118:18
**Parties** - 4:13, 4:24, 5:3, 9:6, 9:8, 12:10, 119:13
**Parts** - 133:7, 181:5, 195:20
**Party** - 93:1, 167:20
**Past** - 108:9, 138:14, 138:17
**Pat** - 124:18, 125:3, 131:1
**Patick** - 183:18
**Patrick's** - 184:4
**Pause** - 160:25
**Paycheck** - 64:3, 76:9
**Paying** - 32:11, 75:15, 75:20, 77:14, 82:15, 85:25
**Payment** - 76:6
**Pays** - 71:8
**Pdf** - 130:20
**Peas** - 39:24
**Peers** - 182:7
**Penalties** - 115:16, 139:6, 139:8
**Penalty** - 115:20, 189:23, 190:5, 190:6, 190:14
**Pending** - 63:21
**Perceived** - 101:7
**Percent** - 126:19
**Perhaps** - 7:8, 74:2, 118:19, 155:9, 172:8
**Period** - 23:18, 31:10, 63:22, 63:25, 70:10, 75:12, 77:3, 80:13, 88:7, 88:9, 151:25, 166:9

Robert Branch   2023-FRS-00026   February 13, 2024

**Periods** - 80:16
**Person** - 16:7, 64:12, 97:4, 97:7, 99:3, 139:14, 147:11, 147:18, 162:2, 162:3, 171:15, 172:9, 195:14, 197:25
**Personal** - 76:22
**Personally** - 24:14, 48:5
**Perspective** - 59:9, 200:8
**Peterson** - 22:7, 22:25
**Ph** - 8:17, 21:17
**Phase** - 190:5
**Phone** - 24:23, 35:8, 63:12, 120:15, 120:16, 120:20, 127:3, 128:6, 128:7
**Phones** - 8:15
**Phrase** - 190:11
**Phrased** - 116:1, 145:10
**Physically** - 20:17, 87:10, 106:15, 119:6, 179:8
**Picked** - 79:20
**Pit** - 97:23
**Plan** - 14:14, 69:15, 70:15, 72:5, 74:10, 74:14, 75:7, 75:13, 76:6, 77:3, 77:5, 83:8, 83:10, 83:11, 83:13, 166:7
**Plane** - 134:18
**Planned** - 14:7, 31:23, 93:22
**Planning** - 33:2, 33:4
**Plantation** - 19:14, 47:17, 84:5, 84:8, 84:12
**Platform** - 8:18, 192:5
**Play** - 131:16
**Plays** - 27:19
**Pleased** - 201:23
**Pocket** - 32:4, 32:6, 72:3
**Pointed** - 150:1
**Points** - 154:6
**Policies** - 68:4,

**Periods** 150:21, 178:1, 188:5, 188:6, 188:11, 189:24
**Poor** - 130:23, 170:3
**Pop** - 151:1
**Portion** - 59:13, 75:10, 75:22, 88:5, 181:9, 186:22
**Portions** - 9:9
**Position** - 18:18, 78:10, 96:25, 97:17, 106:18, 107:16, 139:23, 176:24, 199:2
**Positions** - 18:9, 124:20
**Post** - 8:24, 14:4
**Posted** - 150:18
**Posture** - 51:17, 53:6, 138:7, 157:14, 164:17
**Potential** - 111:24, 131:5, 131:7, 149:22, 149:24, 159:9, 183:5
**Potentially** - 189:25, 201:16
**Practice** - 139:1
**Precedent** - 182:14
**Preferable** - 201:16
**Prehearing** - 8:11, 10:14, 10:16, 14:3
**Preliminary** - 8:14, 16:12
**Premise** - 79:3
**Premium** - 74:17, 75:10, 75:22, 75:25, 76:2, 83:18
**Prepared** - 62:2, 65:20, 67:13, 71:23, 72:2, 75:4, 202:12
**Preponderance** - 8:1
**Prescriptions** - 76:21, 77:4
**Present** - 4:4, 4:5, 6:3, 6:5, 6:7, 6:13, 6:16, 7:8, 9:12, 16:21, 17:6, 26:8, 57:24, 65:3, 140:1
**Presented** - 6:23, 118:5, 140:4, 140:23
**Presenting** - 54:24,

59:17
**Prevent** - 138:4, 164:22
**Prevention** - 68:2, 111:18, 149:1, 149:13
**Previous** - 60:3
**Previously** - 47:8, 185:1
**Prevrium** - 8:17
**Principle** - 177:4
**Prior** - 20:1, 31:23, 57:6, 156:12, 167:9, 186:1, 196:22
**Probationary** - 151:25
**Problem** - 63:3, 73:1, 87:16, 87:18, 137:6, 176:7
**Problems** - 18:22, 41:4, 41:5, 41:6, 123:16, 175:19
**Procedural** - 10:5, 11:7, 162:24
**Procedure** - 7:23, 145:3, 145:4
**Proceed** - 58:1, 96:3, 130:7, 155:19, 155:20, 155:21, 155:22, 155:23, 184:15, 193:2
**Proceeded** - 187:9
**Proceedings** - 5:5
**Production** - 96:11, 101:13, 104:14, 121:13
**Professionalism** - 119:13
**Proficiency** - 201:20
**Progress** - 188:20, 192:11
**Progressive** - 178:20, 178:21, 185:8, 188:16, 188:20
**Property** - 46:22
**Protect** - 122:15
**Protected** - 8:2, 8:7, 12:23, 12:24, 13:4, 13:12, 13:14, 13:21
**Protecting** - 123:13
**Protection** - 6:21, 94:19, 120:10, 192:14

**Protections** - 6:22
**Proven** - 13:1, 138:24
**Provide** - 33:17, 50:21, 51:2, 51:3, 62:7, 92:18, 128:1, 148:15, 184:19
**Provided** - 7:5, 29:22, 47:8, 61:7, 61:23, 65:7, 65:12, 69:14, 70:2, 130:3, 157:6, 181:1
**Providing** - 111:15, 122:24
**Proving** - 67:25
**Provision** - 7:25
**Provisions** - 6:21, 7:12, 10:20, 13:16, 94:19, 120:10, 192:14
**Provoke** - 25:22
**Psychiatrist** - 26:23
**Pull** - 20:18, 53:8, 55:7, 58:8, 61:17, 70:19, 86:18, 86:20, 148:17, 157:24, 177:14
**Pulled** - 20:16, 38:18, 38:19, 39:1, 53:10, 53:12, 90:15, 157:25
**Pulling** - 18:19, 70:22, 170:14, 170:17
**Punch** - 149:15, 149:16, 149:21
**Punched** - 109:19, 157:22
**Punches** - 51:18, 154:20, 179:7
**Punishment** - 145:1
**Pursuant** - 175:14
**Push** - 20:8
**Pushed** - 19:22, 20:5, 20:7, 36:25, 48:17, 97:25
**Pushing** - 20:1
**Puts** - 22:18
**Putting** - 170:13

| Q |

**Questioned** - 186:23
**Questioner** - 78:20

**Questioning** - 55:10, 88:24, 121:7
**Quick** - 14:12, 52:7, 185:16
**Quickly** - 16:12, 118:10, 179:17
**Quit** - 36:16, 36:17
**Quoting** - 99:13

| R |

**Rail** - 4:4, 6:20, 23:3, 43:10, 86:5, 94:19, 120:11, 192:15
**Rails** - 43:15
**Railway** - 96:11
**Raise** - 8:17, 17:7, 39:24, 94:22, 98:10, 120:24, 135:9, 168:4, 192:20
**Raising** - 182:17
**Ramifications** - 38:14
**Rate** - 69:5, 81:3, 81:12
**Re** - 93:5
**Reach** - 118:19, 119:15, 134:4, 167:10, 173:11
**Reached** - 4:17, 180:9, 186:19
**Reaching** - 199:16
**React** - 173:7
**Reads** - 100:5
**Ready** - 16:12, 40:2, 49:16, 51:3, 191:18, 191:25, 192:1, 202:8
**Reality** - 92:5
**Realize** - 52:3
**Realized** - 37:4, 52:2, 52:4, 52:5, 52:6
**Reason** - 14:5, 38:3, 47:19, 52:19, 55:16, 56:3, 56:6, 99:16, 99:17, 105:1, 106:16, 114:13, 114:20
**Reasonable** - 11:4
**Reasonably** - 171:16
**Reasoning** - 101:5
**Reasons** - 180:4
**Recalled** - 118:5,

Robert Branch   2023-FRS-00026   February 13, 2024

195:15
**Receive** - 39:4,
39:6, 110:9, 148:10,
153:13, 179:22,
179:24
**Received** - 4:23,
39:7, 44:17, 63:21,
64:5, 65:23, 65:25,
67:18, 88:15,
106:13, 109:13,
110:11, 111:2, 111:6,
127:2, 129:9,
129:12, 154:23,
154:25
**Recent** - 9:15
**Recite** - 195:11
**Recognize** - 61:21,
75:3, 140:18
**Recognized** - 140:1
9
**Recommend** - 118:
25
**Recommendation** -
98:20, 108:6,
111:14, 111:15,
111:20, 113:2,
140:10, 141:5,
141:6, 141:18,
158:10, 159:21,
189:9, 189:10,
189:14, 189:15,
189:17
**Recommen-**
**dations** - 145:1,
189:18, 193:16,
199:9
**Recommended** - 11
5:6, 141:23, 142:14,
144:18
**Recommending** - 1
44:9
**Recreated** - 187:16
**Recross** - 82:1,
190:18
**Redgrove** - 26:22
**Redirect** - 82:1,
82:5, 84:24, 113:20,
132:8, 161:4, 187:24
**References** - 143:1
2
**Referred** - 9:20,
158:25
**Reflecting** - 75:5
**Reflects** - 71:11

**Reform** - 6:25
**Regards** - 175:11
**Region** - 101:14,
151:7, 163:10,
163:11, 163:14
**Regular** - 8:19,
63:24
**Regularly** - 44:6
**Regulation** - 8:8
**Regulations** - 7:1,
7:6, 12:21, 13:7
**Regulatory** - 7:12,
7:25
**Rejoined** - 14:19
**Relation** - 199:6
**Relations** - 38:1,
63:11, 102:3,
104:15, 104:19,
109:23, 109:25,
124:21, 126:13,
134:14, 156:5,
168:17, 176:23,
177:3, 178:8,
178:12, 184:12,
193:12
**Relationship** - 46:1
5, 102:2
**Relied** - 181:14,
181:19
**Relief** - 8:7, 13:6
**Rely** - 16:14, 72:18,
180:9, 181:9,
193:21, 193:23
**Remain** - 42:15,
93:1
**Remainder** - 81:3
**Remained** - 75:13
**Remaining** - 202:3
**Remedies** - 6:3
**Removal** - 75:7
**Remove** - 8:15,
196:1, 196:8
**Removed** - 63:15,
63:16
**Renee** - 14:20,
136:11
**Renovation** - 77:12,
77:18
**Rep** - 35:2
**Repair** - 32:3
**Repeated** - 62:14
**Repetitious** - 7:7,
7:15
**Replace** - 32:23

**Replaced** - 32:3,
32:8
**Replacing** - 31:15
**Reporter** - 88:21,
136:14, 136:18
**Reporting** - 13:16,
22:20, 34:4, 104:18,
109:12, 113:24,
114:1, 121:23,
121:25, 122:13,
124:7, 125:11,
127:25, 129:13,
146:6, 158:18,
173:22, 173:24
**Reports** - 22:14,
112:20, 147:2,
147:19
**Representation** - 1
12:14
**Representative** - 6:
17, 64:23, 64:25,
91:1, 151:24,
165:24, 177:6
**Representatives** - 5
:2, 6:4, 119:14
**Represented** - 64:2
2, 162:21, 175:14
**REPRRTER** - 45:10
**Requested** - 4:19,
11:8
**Required** - 4:17,
117:22, 117:23,
122:8, 122:12,
165:10
**Requires** - 183:9
**Reserve** - 166:19
**Residence** - 11:23
**Resources** - 6:10,
55:14, 63:11, 82:12,
92:19, 135:22,
139:22, 146:10,
146:12, 146:20,
147:9
**Respond** - 19:17,
24:24, 106:15,
106:18, 174:22
**Respondent** - 4:8,
5:25, 6:2, 6:5, 6:7,
8:5, 13:5, 106:8,
147:23
**Respondents** - 13:2
**Respondent's** - 9:2,
9:3, 165:24
**Responding** - 59:14

**Response** - 37:8,
60:13, 99:14, 99:15,
102:17, 103:18,
158:9, 178:9,
178:21, 179:11,
190:3
**Responsibilities** - 1
46:22, 146:25,
147:1, 152:11,
177:2, 177:9
**Responsibility** - 14
6:18, 146:19,
146:20, 175:23,
177:4
**Responsible** - 46:8,
146:11, 146:13,
146:15, 146:16,
150:20, 189:6
**Responsive** - 49:5,
50:1
**Restates** - 100:3
**Result** - 26:10,
36:23, 43:21, 68:10,
68:13, 178:19,
179:10, 183:10,
185:6, 190:22
**Resulted** - 108:14,
150:4, 169:21
**Resume** - 202:21
**Retired** - 33:3
**Retirement** - 33:22,
33:23, 82:15, 82:16,
85:14, 85:16
**Retreat** - 96:25,
97:4, 97:8, 97:11,
97:17, 106:18,
107:16, 114:19,
137:17, 164:16
**Retreated** - 113:24
**Retrieve** - 58:20,
59:8
**Return** - 132:18,
133:4, 134:22,
159:18, 166:2
**Returned** - 89:2,
89:25, 159:20
**Returning** - 41:3,
123:11
**Reviewed** - 50:19,
61:10, 107:21,
111:7, 140:12,
149:21, 156:24,
180:3, 186:13
**Reviewing** - 107:19,

156:17, 159:8,
196:10
**Road** - 17:25,
84:10, 84:11
**Robert** - 4:7, 5:21,
17:10, 17:22, 17:23,
94:20, 120:9,
121:19, 127:5,
130:14, 192:13,
196:17
**Roles** - 115:9
**Rolled** - 69:23,
70:5, 72:5
**Roof** - 32:3
**Roofs** - 32:8
**Room** - 39:3, 54:10,
95:16, 106:22,
122:24
**Rose** - 180:22
**Rounded** - 79:8
**Rubric** - 116:13
**Rug** - 91:25
**Rule** - 8:12, 41:8,
45:22, 66:11,
110:20, 131:6,
131:7, 169:1, 172:6,
178:9
**Ruled** - 46:1
**Rules** - 7:1, 7:3, 7:4,
7:5, 7:18, 7:23, 8:9,
43:24, 43:25, 44:3,
44:4, 44:7, 46:5,
64:9, 92:8, 106:4,
116:12, 182:25
**Ruling** - 9:4, 98:13,
172:5
**Run** - 20:22, 21:4,
28:22, 77:16, 157:15
**Running** - 97:1
**Rural** - 18:5
**Rushed** - 19:21

| S |
| --- |

**Safety** - 4:4, 6:20,
13:17, 42:25, 43:10,
43:14, 44:4, 44:7,
89:9, 92:3, 94:20,
120:11, 158:7,
158:19, 158:20,
158:21, 192:15,
199:24
**Salary** - 28:10,
78:14, 79:24
**Sale** - 31:5

Robert Branch   2023-FRS-00026   February 13, 2024

Sandwich - 94:6, 96:5, 96:7
Sat - 54:10
Saturday - 24:3
Saved - 30:19
Savings - 30:17, 31:2
Saw - 36:4, 36:6, 53:1, 156:15, 165:3, 173:13, 189:15
Scanned - 130:19
Scar - 36:20
Scene - 97:10
Scope - 151:23
Screen - 54:18, 54:25, 71:21, 86:14, 95:16, 95:18, 95:23, 136:19, 136:20, 154:7, 200:10
Scribe - 62:3
Scroll - 58:17, 59:19, 60:16, 61:21, 62:16, 71:19, 72:23, 73:7, 73:8, 74:22, 149:3, 151:11
Scrolling - 171:11, 171:23
Searched - 83:21
Seat - 198:14
Seated - 5:9
Second - 8:25, 14:20, 15:7, 32:13, 45:15, 59:6, 98:8, 104:10, 137:1, 149:3, 151:1, 170:16
Secretary - 11:3, 11:8
Security - 13:17, 158:7, 158:19
Seeing - 26:20, 26:21, 26:22, 86:17
Seeking - 13:7
Seen - 12:14, 128:4, 156:13, 156:14
Selected - 30:2, 30:6
Sell - 30:15
Sending - 109:10
Senior - 6:9, 96:11, 101:13, 129:24, 129:25, 135:21, 139:22
Seniority - 18:7, 18:8

Sent - 35:15, 60:23, 61:1, 109:9, 109:11, 109:15, 109:17, 128:19, 130:20, 131:1, 131:3, 189:16
Sentences - 62:6
Separate - 4:13, 90:22, 188:5
Separately - 153:16
Separation - 75:6
Sequestered - 16:23
Sequestration - 17:2
Serious - 68:10, 138:23, 154:5, 154:14
Seriously - 25:7, 43:11
Service - 38:18, 38:19, 39:1, 63:15, 63:16, 63:20
Set - 8:20, 87:23, 156:23
Setting - 16:5, 16:7, 16:10, 168:20, 175:9, 175:13, 176:13
Settling - 30:20
Setup - 16:4, 95:19, 138:9, 138:11
Setups - 95:23
Several - 149:11, 150:19
Severity - 116:2, 188:18
Share - 134:15
She's - 32:14, 73:11
Shift - 13:2
Shoes - 47:9
Shook - 112:15
Shoot - 23:9, 34:19, 38:7, 91:23
Shortly - 4:24, 112:12
Shouldn't - 24:9, 24:10, 38:8
Show - 8:1, 10:16, 13:8, 13:10, 42:1, 54:14, 57:20, 58:1, 58:3, 72:20, 202:2
Showed - 36:20, 36:21
Showing - 58:3

Shown - 58:15, 59:10, 86:13
Shows - 71:5
Side - 47:7, 64:16, 157:2
Sign - 84:10, 84:11
Signals - 198:25
Significant - 136:12
Similar - 110:17, 145:11, 177:25, 182:15
Simply - 8:18, 49:9, 140:3
Sitting - 192:3, 194:25
Situations - 139:9, 146:21, 149:11, 150:3, 171:18, 172:1
Six - 201:20, 201:21
Skill - 119:13, 201:19
Slightly - 88:19
Slowly - 171:11
Small - 150:24
Sold - 30:17
Sole - 146:18
Solely - 173:9, 180:16
Soley - 95:7, 95:8, 95:10
Somewhat - 16:10
Sooner - 94:3
Sorey's - 71:9
Soul - 90:13
Sound - 119:3, 167:1
Sounds - 84:13, 128:12, 166:14, 166:15, 166:25, 177:9, 201:10
Source - 113:5, 176:12
Southern - 101:14, 151:7, 163:10, 163:11, 163:14
Speaks - 171:14
Specialist - 32:15
Specific - 138:11, 143:15, 147:11, 162:15, 188:6
Specifies - 147:12
Speculate - 142:24
Speculating - 199:19

Spell - 26:25
Spells - 188:18
Spend - 32:16, 77:22
Spent - 30:21
Spikes - 18:20
Spoken - 195:9
Squashed - 112:15
Stab - 144:3
Standard - 172:12, 172:14
Standby - 118:9
Standing - 19:1, 20:11, 49:1, 49:15
Staring - 95:16
Start - 70:3, 94:12, 130:4, 134:2, 134:22, 137:5, 140:12, 140:20, 194:6
Started - 19:8, 30:3, 33:7, 33:9, 37:2, 42:21, 47:16, 48:23, 49:1, 49:10, 50:7, 51:7, 51:8, 70:6, 70:14, 83:5, 140:20, 181:22
Starting - 5:5, 14:13, 15:15
Starts - 154:5, 182:3
State - 7:20, 17:22, 31:12, 97:6, 143:10, 169:2, 172:19, 172:21
Stating - 26:15, 195:5
Stay - 17:4, 42:7, 69:15, 94:13, 123:2, 165:23
Staying - 46:22
Steaks - 195:1
Step - 164:5, 178:20, 185:9
Steps - 188:20
Stipulated - 10:13
Stipulation - 10:22, 10:24, 11:1, 11:3, 11:7, 11:13, 12:9, 12:15
Stipulations - 10:18, 11:10, 12:9, 14:3
Stock - 30:20
Stocks - 30:15

Stone - 156:24
Stood - 49:10, 49:15
Stop - 92:6, 171:12
Stopping - 201:16
Storage - 32:9
Storm - 40:5, 40:16
Story - 64:16, 129:1
Streamline - 118:21
Strict - 7:18
Strike - 53:1, 124:12, 126:20
Striking - 123:14, 126:21
Struck - 51:21, 51:25, 52:1, 52:14, 87:9, 107:18, 123:14, 126:17, 128:24, 132:11, 164:22, 164:23, 181:7, 181:11
Stub - 76:15, 79:14, 79:20, 79:21, 80:11, 81:1, 81:2
Stubs - 79:14
Submitted - 9:6, 9:14, 9:16, 53:22, 57:14, 112:12, 117:8, 158:23, 186:1
Submitting - 15:20
Subsequently - 77:4
Subsidiary - 151:9
Substantial - 67:25
Substituted - 9:19
Substitution - 9:14
Succeeds - 13:5
Successful - 29:25
Sufficient - 169:1, 169:5, 174:22
Suites - 19:4
Summarize - 72:2
Summarized - 12:21
Summary - 73:4, 75:4
Sunday - 24:22, 24:23, 127:18, 128:12
Supervisor - 22:20, 22:21, 23:1, 23:3, 24:21, 104:1, 104:14, 113:23, 114:16, 121:12,

Robert Branch   2023-FRS-00026   February 13, 2024

125:5, 125:11, 126:12, 127:3, 163:6, 174:17
**Supervisors -** 23:22, 41:4, 41:6, 46:12, 96:21, 103:12, 104:22, 114:1, 124:14, 152:3
**Supervisory -** 102:15
**Supplies -** 40:11
**Supply -** 33:23
**Support -** 169:1, 180:5
**Supported -** 180:4
**Supports -** 142:12
**Suppose -** 45:8, 45:16, 172:10
**Supposed -** 105:12, 117:19
**Surrounded -** 101:6
**Surrounding -** 164:6, 195:23
**Surroundings -** 194:20
**Survive -** 30:19
**Survived -** 30:14
**Susa -** 6:1
**Susan -** 11:13, 15:2, 50:10, 91:21, 133:17, 134:11
**Suspended -** 41:11
**Suspension -** 169:10
**Sustain -** 98:10, 105:8, 143:24, 195:10
**Sustained -** 40:23, 144:14, 174:23
**Swear -** 16:20, 17:8, 120:14, 168:5
**Sweeny -** 19:16, 19:18, 48:2, 48:7, 48:8, 48:14
**Sweeping -** 91:25
**Swing -** 50:8, 50:12, 50:17, 51:3, 51:16, 138:8, 164:23
**Swinging -** 48:23, 49:1, 49:10, 49:14, 50:7, 51:7, 51:14, 51:20, 53:6
**Switch -** 94:1
**Swollen -** 36:25,

37:1, 37:3, 37:4, 87:19
**Sworn -** 17:11, 55:22, 55:25, 67:6, 95:3, 121:3, 135:13, 168:8, 192:23
**Swung -** 157:22, 164:14, 181:23
**System -** 188:21

| T |
| --- |

**Taking -** 8:23, 27:21, 83:5, 96:5, 119:3, 170:16, 186:18, 196:5
**Team -** 193:25
**Teams -** 4:6
**Technical -** 8:16
**Technically -** 120:19, 124:11
**Telephone -** 128:25, 129:2
**Telling -** 32:1, 63:1, 63:4
**Tells -** 142:6
**Tendency -** 7:8
**Tendered -** 4:24
**Terminate -** 50:21, 101:5, 138:19, 158:5, 158:11, 160:1, 185:17, 186:16, 186:25, 196:17
**Terminating -** 67:19
**Terminations -** 68:10
**Terminology -** 190:9
**Terms -** 12:9, 69:25, 90:5, 131:16, 131:18, 139:4, 179:7, 191:1
**Terrible -** 153:5
**Terribly -** 94:12
**Terrific -** 58:4, 71:19
**Territories -** 84:3
**Tested -** 57:16
**Text -** 25:3, 59:17, 60:3, 60:4, 60:7, 60:25, 61:24, 71:20, 128:4, 128:19
**Texted -** 24:25, 25:4, 35:7, 35:9

**Thanks -** 42:10, 92:24, 118:15, 191:10, 201:19
**That'd -** 191:21
**Theory -** 173:15
**Therefore -** 116:21, 164:17
**These -** 8:10, 9:16, 9:17, 10:14, 10:15, 25:17, 25:18, 101:24, 101:25, 102:14, 104:16, 109:3, 118:22, 124:19, 131:22, 138:10, 154:1, 154:6, 166:17
**They'd -** 112:16
**They're -** 10:15, 10:16, 47:22, 105:13, 117:23, 150:16, 154:1, 154:3, 156:7, 157:23, 166:14
**They've -** 17:4
**Third -** 87:1, 152:6, 154:14
**Thomas -** 98:20, 168:7, 192:22
**Threat -** 38:7, 66:21, 89:15, 89:16, 89:18, 89:19, 89:24, 90:8, 91:18, 91:22, 113:8, 159:6, 186:24, 199:24
**Threaten -** 24:16
**Threatened -** 21:23, 23:10, 34:18, 86:16, 91:23, 92:16, 160:3
**Threatening -** 191:4
**Three -** 40:9, 98:24, 169:18
**Threw -** 18:4
**Throwed -** 50:10
**Throwing -** 149:21, 179:7
**Thrown -** 149:14, 149:16
**Thursday -** 23:13, 23:14, 38:21, 62:6
**Tied -** 116:20
**Tier -** 33:20, 33:21, 33:22, 82:9, 82:10, 82:15
**Tight -** 136:25

**Timed -** 167:19
**Times -** 50:15, 79:25, 80:2, 80:7, 156:14
**Tiny -** 71:19
**Title -** 147:13, 198:24
**Today's -** 5:5, 81:15, 81:17
**Todd -** 23:24, 23:25, 24:1, 25:6, 34:18, 55:14
**Tolerance -** 108:25
**Tolerated -** 143:1
**Tom -** 15:10, 98:20, 134:13, 137:11, 144:18, 155:9, 155:13, 166:10, 167:8, 167:9, 168:3, 183:17, 184:1, 187:19, 198:23
**Tomorrow -** 119:23, 134:2, 134:16, 167:6, 167:10, 202:7, 202:8, 202:10, 202:13, 202:15, 202:19
**Tonight -** 202:2
**Tools -** 68:18, 68:22, 85:8
**Top -** 20:19, 20:20, 20:21, 59:18, 61:22, 196:21
**Topics -** 165:20
**Tornado -** 40:7, 40:8
**Total -** 22:2, 71:3, 79:17, 80:12
**Totality -** 186:13
**Touched -** 157:23
**Tough -** 164:18
**Toward -** 122:24, 152:17
**Towards -** 36:5, 123:11, 171:15, 178:20, 191:3
**Town -** 84:7
**Towns -** 85:10
**Track -** 12:20, 36:4, 44:4, 44:7, 199:1
**Trackman -** 18:11
**Tracks -** 193:7
**Traditional -** 7:10, 22:12

**Trained -** 44:6, 44:9
**Training -** 44:17, 148:10, 148:15
**Transcripts -** 54:18, 108:5, 154:24, 179:22, 193:19
**Transferred -** 4:19
**Transmission -** 32:15
**Traveling -** 86:3
**Traying -** 164:16
**Trick -** 72:24, 79:10
**Triggered -** 13:15
**Trip -** 43:15
**Trouble -** 196:20
**Truthfully -** 66:25, 67:9, 125:8
**Tuesday -** 35:2, 35:17, 35:18, 38:11, 63:9, 89:2, 89:24, 109:5
**Turn -** 8:14, 14:10, 166:2
**Turned -** 14:18, 20:3, 38:1, 80:1, 80:2, 142:2
**Turning -** 166:7
**Twice -** 19:23, 20:8, 48:19, 48:23
**Twisted -** 87:19
**Two -** 8:20, 76:5, 76:9, 76:11, 76:12, 79:16, 80:2, 98:23, 99:2, 109:3, 131:22, 138:10, 188:5, 197:14
**Ty -** 22:7
**Types -** 13:20, 191:5
**Typical -** 7:21
**Typically -** 154:19

| U |
| --- |

**Unacceptable -** 25:6
**Uncle -** 39:24, 40:4
**Undecided -** 129:16
**Undergo -** 124:6
**Undergone -** 124:9
**Underlying -** 11:24
**Understands -** 105:5
**Understood -** 44:19, 44:22, 44:25, 48:7,

Robert Branch    2023-FRS-00026    February 13, 2024

52:9, 56:16, 56:18, 63:10, 64:6, 66:25, 82:3, 83:2, 129:6, 161:16, 168:21, 185:25
**Unduly** - 7:7, 7:14
**Unfortunately** - 33:10
**Unionized** - 152:13, 177:10
**Unions** - 177:5
**United** - 104:14, 163:12, 163:13
**University** - 31:12
**Unless** - 27:6, 38:10, 86:8, 118:17, 133:22, 135:8, 191:23
**Unphysical** - 105:20
**Unusual** - 185:21
**Upkeep** - 77:23
**Used** - 7:19, 27:20, 51:5, 80:19, 80:20, 81:1, 86:8, 166:17, 173:11, 174:6, 202:5
**Uses** - 139:3
**Using** - 4:6

| V |
|---|

**Vague** - 161:14
**Valentine's** - 119:23
**Vegetables** - 39:24, 41:17
**Vehicle** - 90:14
**Vendor** - 106:14
**Verbal** - 99:9, 99:22, 100:4, 100:13, 100:24, 101:1, 101:7, 190:24
**Verbiage** - 45:1
**Version** - 9:15, 151:15
**Versus** - 172:16
**VES** - 147:3
**Via** - 128:19
**Video** - 4:5, 8:17, 9:10, 16:5, 16:11, 120:14, 136:23, 145:21
**View** - 58:17, 91:18
**Viewed** - 91:17, 113:7, 186:23, 199:23

**Violate** - 149:13, 190:21
**Violated** - 45:6, 64:8, 68:1, 107:12, 141:2, 150:4
**Violent** - 117:20, 179:8
**Vision** - 32:20, 33:24, 58:14, 70:11, 70:17, 71:3, 72:7, 72:9, 73:4, 75:11, 75:19, 75:23, 76:1, 76:2, 85:25, 88:5
**Visual** - 96:2

| W |
|---|

**Wade** - 15:2, 15:6, 95:2, 130:1, 131:1
**Wage** - 80:7, 80:8, 80:25, 81:15, 86:10
**Wait** - 14:19, 81:25, 119:11, 160:8, 201:3, 201:6, 202:9
**Waiting** - 59:8, 113:17
**Waiver** - 169:8
**Walk** - 50:8, 50:13, 50:14, 87:7, 87:10, 97:11, 123:10, 126:22, 137:23, 195:23, 195:24
**Walked** - 55:18, 87:7, 124:13, 138:6
**Walking** - 36:4, 97:1, 138:1, 138:2
**Wanting** - 84:16
**Waste** - 14:5
**Water** - 40:11
**Watermelons** - 39:25
**Ways** - 150:19
**Weed** - 39:23
**Week** - 81:3, 81:10
**Weekend** - 23:19, 46:13, 56:24, 62:23, 127:2, 127:16, 131:10
**Weeks** - 76:5, 76:10, 76:11, 76:13, 79:16, 81:10, 81:11
**Weigh** - 156:12
**Weighing** - 156:1
**Weight** - 120:1, 159:9, 159:12

**Welcome** - 57:25, 166:5
**Welfare** - 70:11
**Wendall** - 6:24
**Weren't** - 40:8, 48:4, 67:6, 102:15, 106:22
**We've** - 107:24, 112:20, 128:4, 169:5, 181:24, 181:25, 182:2, 183:4, 191:4, 191:5, 200:18
**What's** - 17:16, 60:1, 71:14, 73:3, 84:4, 99:14, 156:2, 156:6, 166:6, 170:2, 190:2
**Whereupon** - 9:20, 10:1, 17:9, 95:1, 121:1, 135:11, 168:6, 192:21, 202:20
**Whistleblower** - 4:5, 6:21, 13:15, 94:19, 120:10, 192:14
**White** - 18:16
**Whole** - 171:5, 171:7
**Who's** - 5:4, 5:21, 133:14
**Wife** - 36:16, 36:18, 61:4, 62:3, 83:3, 83:14, 83:18, 86:1, 86:2, 119:22
**Wife's** - 33:23, 70:7, 70:15, 74:3, 74:11, 74:14, 77:5, 82:15, 83:22
**Willing** - 15:4, 40:25, 158:2
**Winona** - 85:11
**Wise** - 166:12
**Won't** - 15:21, 162:16
**Woods** - 36:5
**Word** - 86:9, 113:25, 114:15, 117:2, 163:5
**Words** - 45:12, 48:13, 107:11, 173:21, 174:5
**Worked** - 27:15, 29:13, 43:23, 75:9, 75:11, 75:21, 77:2,

77:13, 81:8, 86:5, 101:17, 102:6, 141:21, 178:1, 178:8
**Worker** - 21:17, 149:21, 159:23, 186:11
**Workers** - 19:10, 40:15, 43:10, 65:8, 152:13, 177:10
**Working** - 18:15, 18:16, 25:1, 27:16, 27:18, 31:25, 40:1, 40:15, 41:16, 42:21, 46:15, 86:3, 138:14, 151:8, 184:16, 194:1
**Works** - 16:3, 32:14, 102:4, 120:17, 120:20, 167:20
**Wouldn't** - 24:23, 37:25, 90:22, 106:17, 114:20, 117:14, 139:23, 176:6, 185:4, 187:14, 189:17, 190:11
**Wound** - 38:25, 130:19
**Wrap** - 201:18
**Write** - 35:8, 35:9, 38:15, 38:16, 61:4, 128:5, 128:18, 139:20
**Writing** - 35:15, 116:11, 160:21, 160:22
**Written** - 50:24, 50:25, 53:22, 57:10, 65:7, 65:20, 147:7, 156:13, 157:5, 163:16, 180:25
**Wrote** - 38:3, 50:24, 57:13, 61:4, 61:23, 130:15, 159:13, 181:6
**Wynn** - 8:10, 202:14

| X |
|---|

**XX** - 83:1

| Y |
|---|

**Yard** - 28:1, 39:22
**Year** - 31:13, 31:21,

40:6, 74:4, 80:18, 81:4, 123:25, 174:9
**Years** - 27:17, 30:18, 33:9, 41:7
**Yell** - 97:11
**Yelling** - 47:16, 47:24
**Yesterday** - 9:2
**You'd** - 16:8, 54:17, 93:20, 96:7, 168:22
**You'll** - 82:4
**Yourselves** - 94:14
**Youth** - 27:14
**You've** - 5:17, 28:14, 29:20, 30:13, 41:7, 41:13, 58:2, 68:25, 69:1, 69:10, 73:4, 135:6, 202:11

| Z |
|---|

**Zoom** - 95:17

| ' |
|---|

**'22** - 31:22
**'24** - 28:12

| $ |
|---|

**$10,000** - 29:9, 29:11
**$15,000** - 31:17, 32:16
**$184,000** - 78:15, 78:16, 78:19, 79:7, 79:9
**$185,000** - 28:11, 28:16, 78:17, 78:24, 79:13, 79:23, 81:14
**$2,500** - 32:13
**$20,000** - 30:18, 31:6
**$228** - 75:20, 75:24
**$228.00** - 75:16
**$30.00** - 28:21, 77:6, 79:25
**$32,000** - 30:16
**$32,350** - 31:3
**$37.00** - 28:25
**$40.00** - 76:4, 76:8, 76:12
**$45,000** - 31:1
**$48.00** - 76:7
**$5,000** - 31:9
**$50,000** - 31:1

Robert Branch   2023-FRS-00026   February 13, 2024

**$50.00 -** 77:4
**$6,000 -** 32:4, 32:6
**$769 -** 73:20, 73:21, 73:25
**$769.00 -** 74:15
**$8,000 -** 29:8, 29:11
**$80.00 -** 77:7
**$814.00 -** 74:5, 74:7, 74:10
**$854.00 -** 74:6
**$966.00 -** 70:25
**$966.36 -** 70:23
**$966.38 -** 33:1
**$97,000 -** 30:21

---

**/**

**// -** 9:23, 9:24, 9:25, 94:24, 94:25, 202:22, 202:23, 202:24, 202:25

---

**1**

**1:05 -** 135:4
**1:25 -** 134:21
**1:27 -** 135:5
**10 -** 42:2, 42:6, 167:17
**10:14 -** 42:1, 42:11
**10:25 -** 42:1, 42:12
**10:36 -** 14:21, 14:22
**100 -** 126:19
**10-23-2017 -** 151:15
**109 -** 8:4
**11 -** 18:8
**11:00 -** 36:1
**11:43 -** 94:12
**11:44 -** 94:15
**12 -** 27:16, 79:18, 80:3
**12:00 -** 94:12
**12:02 -** 94:16
**12:40 -** 120:5
**12:45 -** 120:6
**12th -** 9:2
**13 -** 4:2
**143 -** 17:25
**15 -** 167:22
**16 -** 10:17, 41:7, 148:18, 148:24, 148:25, 170:18, 170:20
**18 -** 7:24, 9:14, 9:19, 88:7, 88:8,

88:10
**19 -** 9:14, 9:19
**1982 -** 7:2
**1982.107 -** 7:3
**1982.109 -** 7:25, 8:8

---

**2**

**2:17 -** 167:25
**2:30 -** 167:18
**2:36 -** 168:1
**20 -** 28:14, 30:14, 31:13, 39:20, 41:13, 53:20, 69:1, 78:15, 134:21, 134:25
**2008 -** 18:8, 42:22
**20109 -** 13:12
**2012 -** 176:25
**2017 -** 151:16, 177:18, 177:19, 179:1
**2023 -** 4:7, 55:23, 56:1, 56:7, 56:19, 68:19, 68:21, 74:8, 80:18, 80:19, 80:23
**2024 -** 4:2, 9:16, 10:17, 74:4, 86:11
**21 -** 6:24
**21st -** 6:25
**23 -** 12:9
**24 -** 10:25, 11:20
**24th -** 26:15, 39:17, 67:18, 91:11
**25 -** 29:21, 69:1
**26 -** 4:7, 10:17, 10:23, 11:6, 12:10, 17:25, 18:21, 62:6, 66:12, 68:13, 89:20, 109:4, 126:24
**29 -** 7:2, 7:24
**2nd -** 38:23, 63:16

---

**3**

**3:30 -** 200:18, 202:20
**30 -** 29:21, 33:9, 60:19, 62:1, 69:1, 85:9, 150:23, 151:4, 151:6
**31 -** 69:22
**31st -** 89:2, 91:22
**38 -** 71:14, 72:8, 72:19, 73:8, 73:16, 73:17, 73:18, 74:21

**38923 -** 18:1
**39 -** 70:20, 72:20, 72:23, 73:3, 73:16, 74:23, 74:24, 75:3
**3rd -** 26:3, 39:7, 39:9, 63:17

---

**4**

**4:00 -** 15:4, 93:16
**40 -** 85:9
**4212 -** 147:3
**45 -** 85:13
**48 -** 9:13, 9:19, 9:22, 10:3, 57:19, 58:8, 60:2
**49 -** 84:7, 202:4

---

**5**

**57 -** 82:22
**58 -** 82:19, 82:20
**59 -** 83:1
**5th -** 11:23, 12:2

---

**6**

**60 -** 33:9
**67 -** 33:4, 33:5, 33:8, 33:11

---

**7**

**7:00 -** 19:7
**7th -** 39:13, 89:17

---

**8**

**8:00 -** 19:7, 60:19
**80 -** 79:25, 80:1, 80:7

---

**9**

**9:00 -** 19:8, 62:7, 202:13
**9:21 -** 4:2
**96 -** 55:7, 55:12

# UNITED STATES DEPARTMENT OF LABOR
# OFFICE OF ADMINISTRATIVE LAW JUDGES

In the Matter of:

| | | |
|---|---|---|
| ROBERT BRANCH, | ) | |
| | ) | |
| Complainant, | ) | |
| v. | ) | Case No. 2023-FRS-00026 |
| | ) | |
| ILLINOIS CENTRAL RAILROAD, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

### Condensed Transcript and Key Word Index

PAGES: 204 through 241

PLACE: Video Hearing

DATE: February 14, 2024

## BAYLEY REPORTING, INC.
### *OFFICIAL FEDERAL REPORTERS*

Florida
(727) 585-0600

Exhibit A - Transcript of February 13 and 14, 2024, hearing in front of the Office of Administrative Law Judges

Robert Branch    2023-FRS-00026    February 14, 2024

| Page 204 | Page 205 |
|---|---|

**Page 204**

UNITED STATES DEPARTMENT OF LABOR
OFFICE OF ADMINISTRATIVE LAW JUDGES

In the Matter of:
ROBERT BRANCH,                    )
                                  )
        Complainant,              )
                                  )
v.                                )    Case No.  2023-FRS-00026
                                  )
ILLINOIS CENTRAL RAILROAD, )      )
                                  )
        Respondent.               )
                                  )

                Video Hearing
                Wednesday,
                February 14, 2024
    The above-entitled matter came on for hearing
pursuant to notice, at 9:00 a.m., CST.

    BEFORE: ANGELA F. DONALDSON
            Administrative Law Judge

            Bayley Reporting, Inc.
            (727)585-0600

**Page 205**

A P E A R A N C E S
On behalf of the Complainant:
CHARLES EDWARD SOREY, II, ESQ.
Sherman & Lacey, LLP
1000 Highland Colony Parkway, Suite 5203
Ridgeland, Missouri 39157
(601) 341-6929
JAMES FERGUSON, ESQ.
201 West Broadway, Suite G12
North Little Rock, Arkansas 72114
On behalf of the Respondent:
SUSAN FITZKE, ESQ.
GRACE JACOBSON, ESQ.
Littler Mendelson
80 South 8th Street, Suite 1300
Minneapolis, Minnesota 55402

**Page 206**

                I N D E X
COMPLAINANT'S WITNESSES:  DIRECT CROSS REDIRECT RECROSS
Patrick Crain              208   221    230
RESPONENT'S WITNESSES:    DIRECT CROSS REDIRECT RECROSS
None
                E X H I B I T S
EXHIBIT          IDENTIFIED  IN EVIDENCE  WITHDRAWN
COMPLAINANT'S
None
RESPONDENT'S
None
DIRECTOR'S
None
ALJ'S
None

**Page 207**

1                    P R O C E E D I N G S
2  February 14, 2024                    9:02 A.M., CST
3          JUDGE DONALDSON:    Okay.  So, we are reconvened
4  for the FRSA whistleblower protection provision case
5  brought by Robert Branch against Illinois Central and this
6  is Day 2 of the hearing.  I believe we have one witness
7  remaining and that is Mr. Patrick Crane.  Is it C-R-A-I-N?
8          MR. CRAIN:    Yes, ma'am.
9          JUDGE DONALDSON:    Okay.  Mr. Crain, let me
10 swear you in before you testify today.  Would you raise
11 your right hand?
12 Whereupon,
13              PATRICK CRAIN
14 having been duly sworn, was called as a witness herein and
15 was examined and testified as follows:
16         WITNESS:    Yes, ma'am.
17         JUDGE DONALDSON:    All right, thank you and let
18 me know, Mr. Crain or let the attorneys know if you have
19 any issues with any questions, if you have any confusion
20 about the proceeding.  We'll be happy to answer those
21 questions for you.
22         WITNESS:    Thank you.
23         JUDGE DONALDSON:    Let's go ahead and get
24 started.  Mr. Sorey, you can begin.
25         MR. SOREY:    Thank you, Your Honor.

Robert Branch    2023-FRS-00026    February 14, 2024

## Page 208

1    DIRECT EXAMINATION
2    BY MR. SOREY:
3    Q    Mr. Crain, you are the Labor Relations manager
4    for CNIC, are you not?
5    A    Yes, sir.
6    Q    And you've held that position since October of
7    2021?
8    A    Yes, sir.
9    Q    To get this hearing started for Mr. Branch and
10   them, you heard from Mr. Wade Clark and he advised you of
11   the incident and asked you what you should do, correct?
12   A    Yes, sir.  That's correct.
13   Q    Okay and I believe you advised him to gather
14   witness statements?
15   A    Yes.  Yes, sir.  That's correct.
16   Q    Now, after you reviewed these statements of the
17   witnesses, you decided to have a formal investigation, did
18   you not?
19   A    I would classify that as a joint decision between
20   myself and Mr. Clark.
21   Q    Okay and why did you decide it was necessary to
22   do a formal investigation?
23   A    Because of the employees that were involved in
24   the alleged incident, their employment terms are governed
25   by a collective bargaining agreement.  There was

## Page 209

1    preliminary evidence that there may have been violation of
2    company rules or policy based on the statements we received
3    and under this collective bargaining agreement, if you
4    believe that there's an incident or rules violation that
5    may result in a disciplinary event, the employees are
6    granted the right to a fair and impartial hearing in which
7    the company presents their evidence and they have the
8    opportunity to present their defense.
9    Q    Okay.  Was there a disciplinary panel to judge
10   the evidence from the hearing?
11   A    Yes, sir.
12   Q    Were you a member of that panel?
13   A    I was not a member of the decision making part of
14   the panel.  I was a member as an advisor and participated
15   in trying to gather additional facts or information that
16   the panel needed to make their decision.
17   Q    Tell us what all the disciplinary panel does, who
18   they consist of and what other groups or interested people
19   work with them?
20   A    I'm not sure what you mean by other interested
21   groups, sir.
22   Q    Well, apparently you weren't a member of the
23   disciplinary panel, but you said you worked with them or
24   for them or helped them in some way.  Let's start with the
25   disciplinary panel.  How are they selected?

## Page 210

1    A    It depends on the case.  It's Tom Sullivan, Duane
2    Spears and an official from the employee's function or
3    group.  So, in this case, it would have been Tom Hilliard
4    representing the Engineering Department.  So, to assist
5    them, I reviewed the record evidence and made a
6    recommendation based on my analysis of the facts.  I had
7    multiple discussions with Tom Sullivan and Duane Spears to
8    discuss the case.
9    Q    So, basically you functioned as part of the
10   disciplinary panel?
11   A    Not under the discipline policy.  No, sir.
12   Q    Okay.  I believe it was Mr. Sullivan that said
13   yesterday that the hearing transcripts came to him with a
14   recommendation for a Level 4 violation.  Were you the one
15   that made the recommendation for the Level 4 violation?
16   A    Yes.  The panel does not review cases unless it's
17   for a Level 4 violation.
18   Q    Okay.  Now, the disciplinary committee after your
19   recommendation concluded that Mr. Branch fought back and
20   therefore was terminated.  Is that correct?
21   A    Yes, sir.
22   Q    Okay.  Now, we talked about in your deposition
23   the definition of self-defense and I believe that we
24   concluded that there was no definition of self-defense in
25   the workplace violence policy.  Is that correct?

## Page 211

1    A    I believe so, yes.
2    Q    Okay.  Now, in the workplace violence policy, it
3    does have a statement and I will quote, "Except excluding
4    justified situations of self-defense."  Is that correct?
5    A    Yes, sir.
6    Q    And to you, what does that statement mean?
7    A    I think --- I don't have a definition for you.  I
8    think it would depend on the facts of the case that you
9    were applying the policy to.
10   Q    Well, give us some examples of what you mean by
11   facts of the case.
12   A    Well, the statements that people provided as
13   evidence, could be photographs, could be video.  I'd be
14   speculating if I answered any further.  I'm sorry.  I don't
15   understand your question.
16   Q    Okay.  What do you consider justified self-
17   defense?
18   A    I've never had a case in my career that I've had
19   to make a judgment on justifying self-defense.
20   Q    So, you never considered self-defense as a
21   defense to this particular charge?
22   A    That was considered in the discussions, yes.
23   Q    Well, if you considered it, what facts were
24   considered for justifying self-defense?
25   A    Well, really the analysis turned on the evidence

Robert Branch    2023-FRS-00026    February 14, 2024

Page 212

1  that was submitted by multiple witnesses including Mr.
2  Branch that substantiated that both employees were swinging
3  punches at each other. That is what tipped the scale.
4    Q   Okay and by swinging at someone that's swinging
5  at you, you're not trying to prevent them from hitting you
6  or get an advantage on you?
7    A   I can't make a determination on that. All we
8  could determine is both employees engaged in punching each
9  other.
10   Q   Okay. So, for my question, you can't make a
11 decision on justified self-defense?
12       MS. FITZKE:    Objection. That misstates his
13 testimony.
14       WITNESS:    No, sir.
15       JUDGE DONALDSON:    Overruled.
16       WITNESS:    No, sir.
17       MR. SOREY:    Okay. Thank you.
18 BY MR. SOREY:
19   Q   And, Mr. Crain, in your deposition, you stated
20 that you did not rule on self-defense at all. Is that
21 correct?
22   A   I don't specifically recall, Mr. Sorey.
23   Q   Okay and you also said in your opinion, if Mr.
24 Branch had a defense of self-defense that he had abandoned
25 it. Is that correct?

Page 213

1    A   Yes, I recall saying that, yes.
2    Q   And when do you say he abandoned it?
3    A   When he punched back.
4    Q   Okay. You also said in your deposition that
5  there was evidence that Mr. Branch and Mr. Melton were on
6  the ground and you thought Mr. Branch could have removed
7  himself from the situation at that time. Is that correct?
8    A   I remember saying that, yes.
9    Q   But you didn't know what the factors were
10 surrounding the parking lot that these gentlemen were in,
11 did you?
12   A   I'm sorry. The connection glitched. Would you
13 remind stating that?
14       MR. SOREY:    Sure.
15 BY MR. SOREY:
16   Q   I said, but you didn't know the situation of the
17 parking lot that these gentlemen were in at the time the
18 incident occurred, did you?
19   A   No.
20   Q   Okay. Did you not think that was important for
21 your analysis that Mr. Branch could have run away or moved
22 away?
23   A   Possibly. The witness statements made it pretty
24 clear what happened.
25   Q   Okay. Were you aware of a barbecue pit that was

Page 214

1  lit in a truck behind Mr. Branch or were you aware of the
2  fence around the parking lot or were you aware that there
3  were other cars parked in the parking lot?
4        MS. FITZKE:    Objection. States facts not in
5  evidence.
6        JUDGE DONALDSON:    Sustained.
7        MR. SOREY:    Your Honor, I would just mention
8  that Mr. Branch did testify to that.
9        JUDGE DONALDSON:    I recall only part of what
10 your question entails being stated by Mr. Branch. I could
11 be wrong about that. Maybe the record will bear out
12 differently. I don't mind if you restate it and I found
13 the question more than compound as well. So, I don't know
14 how the witness would answer all the different components.
15 If you wanted to break it down, that would be fine.
16       MR. SOREY:    Thank you.
17 BY MR. SOREY:
18   Q   Mr. Crain, were you aware that there was a ---
19 that Mr. Branch was cooking at a barbecue bit when Mr.
20 Melton came out of the hotel?
21       MS. FITZKE:    Objection. That also misstates
22 the testimony.
23       JUDGE DONALDSON:    In what way?
24       MS. FITZKE:    There was testimony about a grill
25 attached to a truck not a barbecue pit.

Page 215

1        MR. SOREY:    Oh, excuse me.
2        JUDGE DONALDSON:    That's sustained.
3        MR. SOREY:    Okay. I'll restate it.
4  BY MR. SOREY:
5    Q   Mr. Crain, were you aware of the fact that Mr.
6  Branch was standing behind a pickup truck which had a
7  barbecue pit or a barbecue, I call it pit, a barbecue
8  something or other that cooks and had a fire in it at the
9  time Mr. Melton came out of the hotel?
10   A   There was reference to that in the witness
11 statements, but there was no specific details offered on
12 the layout as you're depicting it in the investigation
13 transcript or the exhibits that I examined.
14   Q   Well, Mr. Crain, I guess the point I'm getting
15 to, in order to get to your definition of self-defense
16 removing yourself from the situation, shouldn't you have
17 been aware of the physical facts of the location in which
18 this incident took place?
19   A   Our analysis was focused on the conduct of the
20 employees and that's the purpose of the investigation
21 process under the collective bargaining agreement and for
22 the employees to offer evidence in their side of the story
23 and there was no information like that within the
24 transcript or the exhibits that I examined.
25   Q   In your definition of workplace violence in the

Robert Branch     2023-FRS-00026     February 14, 2024

Page 216

1  workplace violence policy, is fighting included within the
2  definition or is it a separate matter?
3       A    I don't specifically recall.  I could review it
4  if you'd like me to.
5       Q    Do you need to?
6       A    I don't have this policy memorized, sir.
7       MR. SOREY:    Okay.  We'll put it up for you.
8       WITNESS:    Okay.
9       MS. FITZKE:    Exhibit 16.  Is that what you're
10 going to look at, 16?  Mr. Crain also has a printed copy
11 with him here with the exhibits he brought.
12      JUDGE DONALDSON:    And, Mr. Crain, what we do in
13 the hearings is also show --- the attorney will present a
14 copy to you on the screen in front of you.  If you have the
15 hard copy and it looks the same, it should be the same,
16 looks the same to you, you can look at that too, of course.
17      WITNESS:    Thank you.
18 BY MR. SOREY:
19      Q    Now, Mr. Crain, if you would, tell us when we
20 should slowly start scrolling down the page?
21      A    It's projecting.  You can scroll.
22      Q    Okay.  Do you need to look through it again?
23      A    I'm fine.  I've got a copy here too, Mr. Sorey.
24      Q    Okay.  Is fighting included within the workplace
25 violence or is it just separate?

Page 217

1       A    I don't see where the policy specifically
2  identifies fighting.
3       Q    Okay.  Now, Mr. Crain, do you feel that Mr.
4  Branch had a right to protect himself after Mr. Melton
5  attached him?
6       A    Yes.
7       Q    Okay.  Now and I think you would agree with me
8  that Mr. Melton was obviously the aggressor in this
9  particular situation?
10      A    That's what the record evidence indicates.  Yes,
11 sir.
12      Q    Okay.  Now, in the workplace violence policy that
13 we just showed you, down toward the bottom, it says,
14 "Appropriate corrective measures will be found up to and
15 including dismissal."  What does the "up to and including
16 dismissal" mean to you?
17      A    That means that you review a case in which there
18 were allegations that the policy has been violated based on
19 the facts of the individual case involved.
20      Q    Does that indicate that there are lesser
21 punishments than termination?
22      A    Depending on the facts of the case, yes.
23      Q    Okay.  Now, Mr. Crain, has Mr. Chris Day within
24 the last year --- well, let me take that back.  Let me
25 start over.  In Mr. Day's deposition in November of '23, he

Page 218

1  told us that he had been involved in an altercation
2  approximately a year before in a bar in Illinois in which a
3  contractor head butted him.  Now, did he report that to
4  you?
5       A    I don't recall having any conversations with him
6  about that.
7       Q    Okay.  Mr. Day has told us that he did report it
8  to you and he said he also reported it to Patrick Jones.
9  Now, who is Mr. Patrick Jones?
10      A    Patrick Jones took over as a senior manager of
11 production from Wade Clark so that would be Chris Day's
12 supervisor.
13      Q    Okay.  Did you and Mr. Patrick Jones at any time
14 discuss the altercation of Mr. Chris Day?
15      A    Not to my recollection.
16      Q    Okay.  So, are you telling us that Mr. Day
17 fabricated the story that he reported it to you?
18      MS. FITZKE:    Objection to the form of the
19 question.  It's argumentative.
20      JUDGE DONALDSON:    Sustained.
21 BY MR. SOREY:
22      Q    Mr. Crain, are you telling us that you've never
23 had any conversation with Chris Day about the altercation
24 that took place in the Illinois bar?
25      A    Mr. Sorey, I don't recall that.  That would not

Page 219

1  be within my purview as a Labor Relations manager.  I
2  handle issues with employees that are covered by the
3  collective bargaining agreement.  So, I would have advised
4  to contact the HR person and/or their supervisor.
5       Q    Okay.  Would you agree with me that the workplace
6  violence policy was issued to enhance the safety of the
7  employees of Illinois Central Railroad?
8       A    Yes, sir.
9       Q    Okay.  Would you also agree with me that the
10 decision on Mr. Branch's termination by the disciplinary
11 panel and yourself was a close call?
12      A    Yes, sir.
13      Q    Okay.  Now, let me ask you this.  If this court
14 finds that Mr. Branch should be reinstated, would that
15 upset you?
16      MS. FRITZE:    Objection.  Relevance.
17      JUDGE DONALDSON:    Overruled.
18      WITNESS:    Upset me how?  Could you restate the
19 question, sir?
20      MR. SOREY:    Sure.
21      MR. SOREY:
22      Q    I said if this court should rule that Mr. Branch
23 should be reinstated to his position at the Illinois
24 Central Railroad, would you be upset with that decision?
25      A    I don't have any emotional interest in the case,

Robert Branch    2023-FRS-00026    February 14, 2024

Page 220

1 sir. I don't know how to answer your question.
2     Q    Okay. So, one way or another, you have no
3 opinion?
4     A    Correct.
5     Q    Okay. In reviewing his matter, obviously it was
6 within the state of Mississippi. Did you look to any of
7 the statutes for the state of Mississippi on a definition
8 of self-defense?
9     A    I personally did not. My analysis was confined
10 to the investigation hearing and transcript and the
11 applicable company policies and rules in place at the time.
12     Q    Now, Mr. Crain, after this case is over, do you
13 intend to recommend to Illinois Central Railroad that they
14 place a definition of self-defense in the workplace
15 violence policy?
16     MS. FITZKE:    Objection. Relevance.
17     JUDGE DONALDSON:    What's the relevance, Mr.
18 Sorey?
19     MR. SOREY:    Well, it would indicate that there
20 obviously is not a definition of self-defense in the
21 workplace violence policy and it also would make it easier
22 for the disciplinary panel to have an objective means of
23 checking or checking off the list to see if the person
24 should be granted a pass for self-defense.
25     JUDGE DONALDSON:    Can you tie that into the

Page 221

1 whistleblower protection and your burden or their burden
2 here?
3     MR. SOREY:    Well, it would affect the safety of
4 the employees there to know what they can do under the
5 workplace video, not video, excuse me, violence policy in
6 protecting themselves if they get attacked at the Illinois
7 Central Railroad. Right now, there's no guidance one way
8 or the other.
9     JUDGE DONALDSON:    I'm going to sustain the
10 objection. I'm not seeing the relevance to this statutory
11 framework.
12     MR. SOREY:    Okay. I believe that's all the
13 questions I have.
14     JUDGE DONALDSON:    Okay. All right, Ms. Fitzke,
15 you can proceed.
16     MS. FITZKE:    Thank you.
17             CROSS EXAMINATION
18 BY MS. FITZKE:
19     Q    Mr. Crain, can you please tell us just a broad
20 overview what are your duties and responsibilities as a
21 Labor Relations manager for Illinois Central?
22     A    I field questions from managers, sometimes
23 employees, payroll, HR, field managers on the
24 interpretation of collective bargaining agreements that I
25 handle for the company.

Page 222

1     Q    And do you have any responsibilities with respect
2 to management or oversight of members of the company
3 management or individuals who are not part of the
4 bargaining units?
5     A    No.
6     MS. FITZKE:    We looked a moment ago --- Grace,
7 could you pull up 16, Joint Exhibit 16? It's the workplace
8 violence protection policy we just looked at. I'd like us
9 to look at the second page of the exhibit once we get it up
10 here. It'll just take a second. If we can scroll down
11 just a little. There we go.
12 BY MS. FITZKE:
13     Q    When you were asked some questions by Mr. Sorey
14 about whether fighting is included separately within the
15 policy and I just wanted to draw your attention under the
16 examples of workplace violence to that first bullet point.
17 Does the first bullet point in your view cover fighting,
18 physical fighting?
19     A    Yes, ma'am.
20     MS. FITZKE:    And if we can scroll down a little
21 bit further. Right there.
22 BY MS. FITZKE:
23     Q    Does this policy give you any guidance as an
24 employee of the company about what to do if you believe you
25 are in risk of physical harm?

Page 223

1     A    Yes, ma'am.
2     Q    And what does it tell you to do?
3     A    It tells you to remain calm, move to safety, if
4 warranted by the circumstances, immediately call 911 and
5 then it gives you guidance on if you can, you should work
6 with the local police service. You may also call the CM
7 police for assistance and as soon as possible after the
8 incident, report the situation to your direct supervisor.
9     MS. FITZKE:    If we can, please, Grace, move to
10 Exhibit 20, Joint Exhibit 20? Eddy and Jake, just let us
11 know if you need that just a little bit better.
12     MR. SOREY:    Yes, I can see it.
13     MS. FITZKE:    Okay. Your Honor, can you read
14 it?
15     JUDGE DONALDSON:    Yes, thank you.
16     MS. FITZKE:    Okay and it might help you if you
17 flip it. You can see the whole page.
18 BY MS. FITZKE:
19     Q    You mentioned in your testimony becoming aware of
20 the situation by receiving word from Wade Clark. I'm
21 showing you Exhibit 20. Is this the message that you
22 received from Mr. Clark advising you of the situation?
23     A    Yes, it is.
24     Q    Did Mr. Clark tell you anything else at that time
25 about what occurred?

**Page 224**

1    A    No, ma'am.
2    Q    And I see that you gave Mr. Clark some guidance
3 that the field operation should gather the witness
4 statements?
5    A    Yes.
6    Q    Okay and why do you have the field folks do that?
7    A    They are with their employees and they are
8 present with them and there's urgency to gather information
9 before evidence is lost or memories fade.
10    Q    Before you received this message from Mr. Clark,
11 did you know Robert Branch or Tracy Melton?
12    A    No, ma'am.
13    Q    And did Mr. Clark --- did the field folks go out
14 and gather the statements that you requested?
15    A    Yes, ma'am.
16    Q    And did you receive them back?
17    A    I believe I received them back from Wade Clark.
18    Q    And what did you do with them after you got them?
19    A    I read them and I think Wade and I may have had a
20 telephone conversation that's very common to connect when
21 there's things that we're looking into.
22    Q    Did you participate in a determination to move
23 forward with the formal investigation hearing?
24    A    I recommended that they do so, yes.
25        MS. FITZKE:    And why did you recommend moving

**Page 225**

1 forward with an investigation with respect to --- you can
2 take the exhibit down.  Thank you.
3        BY MS. FITZKE:
4    Q    Why did you recommend moving forward with an
5 investigation hearing with respect to Mr. Branch in
6 addition to Mr. Melton?
7    A    Because there was preliminary evidence in the
8 witness statements that both employees engaged in fighting
9 and physical violence against each other.
10    Q    It sounded like from your testimony that after
11 the investigation hearing, you received a copy of the
12 transcript and exhibits.  Is that right?
13    A    That's correct.
14    Q    And I did want to ask just about the process for
15 the investigation hearing itself.  When an employee wants
16 to claim self-defense, whose obligation is it to present at
17 the investigation hearing the full records on all the facts
18 on which they base their claim of self-defense?
19    A    The employee charged at the investigation so it
20 would have been Mr. Branch and Mr. Melton ---
21    Q    Okay.
22    A    -- respectively.
23    Q    Was Mr. Melton claiming self-defense?
24    A    Mr. Melton did not claim any --- he accepted
25 responsibility for the incident.

**Page 226**

1    Q    And although he accepted responsibility for the
2 incident, did that impact the decision about whether his
3 employment would be terminated?
4    A    Yes.
5    Q    In what way?
6    A    Well, it was very clear that Mr. Melton
7 instigated the incident and what was more difficult to
8 ascertain was whether Mr. Branch's conduct also violated
9 the workplace violence policy.
10    Q    Why is that more difficult to ascertain?
11    A    Because we had the collective experience of the
12 review panel, we had not had a case of similar fact pattern
13 that this was a case of first impression.
14    Q    And did you do anything to try to determine
15 whether within the parent companies or sister companies
16 whether the situation had come up before for them?
17    A    I did connect with a colleague in Winnipeg,
18 Manitoba and had a discussion with him to ascertain if
19 corporately we had had similar cases.
20    Q    What were you told?
21    A    He told me that in cases where both employees
22 engaged --- what he told me is if both employees swang,
23 then we dismiss them both.
24    Q    Did you consider that information that you
25 received from your Canadian counterpart in making your

**Page 227**

1 recommendations or determinations with respect to Mr.
2 Branch's employment?
3    A    Yes.
4    Q    When you received and read the investigation
5 hearing transcript, did you observe anything in the
6 investigation hearing transcript or exhibits that would
7 have indicated that there were any physical barriers to
8 retreat for Mr. Branch?
9    A    No.
10        MS. FITZKE:    Can we look please at Joint Exhibit
11 23?  Thank you, Grace.
12        BY MS. FITZKE:
13    Q    If you can take a moment, sir, to take a look at
14 Joint Exhibit 23.  You were asked a moment ago in your
15 testimony about a recommendation that was made that you
16 participated in to terminate Mr. Branch and Mr. Melton for
17 a Level 4 violation of the workplace violence policy.  Does
18 Exhibit 23 contain that recommendation?
19    A    Yes, ma'am.
20    Q    And I see you made that recommendation to Mr.
21 Hilliard?
22    A    Yes, ma'am.
23    Q    Okay.  Do you recall speaking to Mr. Hilliard by
24 the phone as well or just was your communication with him
25 limited to this email exchange?

Robert Branch    2023-FRS-00026    February 14, 2024

Page 228

1   A   I think it was limited to this email exchange.
2   Q   And with respect to the recommendation itself,
3   have you told us in the hearing here today the factors on
4   which you base that recommendation?
5   A   Yes.
6   Q   When you were reviewing this situation and prior
7   to Mr. Branch's termination, had anyone ever said anything
8   to you or indicated to you that Mr. Melton claimed to have
9   a firearm or that he was going to go get a gun that night
10  out of his truck?
11  A   I don't have any knowledge of that, no.
12      MS. FITZKE:    If we can and just as a matter of
13  sort of housekeeping, I'd like to look at Joint Exhibit 33,
14  but just one page of this long document. Joint Exhibit 33
15  is the collective bargaining agreement and it's kind of a
16  marked up copy, working agreement. If we can look at page
17  33 of 151 which contains the wage scale. It's my
18  understanding this page contains one minor error that I'd
19  just like to clarify with you. Okay. It's my
20  understanding that --- we can make it a tiny bit bigger,
21  Grace? Thank you. Perfect and if we can scroll down just
22  a little bit.
23  BY MS. FITZKE:
24  Q   It's my understanding that after the agreement
25  was put in place, there have been subsequent contract

Page 229

1   negotiations and that you're working under an agreement in
2   terms of what the folks out there are getting paid. Is
3   that right?
4   A   Correct.
5   Q   All right and in the red text there is an updated
6   wage scale where it looks like on July 1, 2020, 2021, 2022
7   and 2023, there's a scheduled increase?
8   A   That is correct.
9   Q   And the scheduled increase for 2024 or excuse me,
10  it had the scheduled increase July 1, 2023 and then this
11  document reflects another increase November 1, 2023 that my
12  understanding is that should be also July 1, 2024. Is that
13  right?
14  A   That is correct.
15  Q   Okay. As you made your recommendation with
16  respect to Mr. Branch's termination, it's my understanding
17  that recommendation was based on his physical contact with
18  Mr. Melton. Is that right?
19  A   Yes, ma'am.
20  Q   In reviewing the hearing transcript, did you take
21  note of Mr. Branch's testimony where he was asked by Mr.
22  Melton if he considered Mr. Melton a threat and Mr. Branch
23  responded that he had not?
24  A   We were more focused on the conduct of the
25  employees at the time of the incident rather than the make

Page 230

1   nice afterwards.
2   Q   Did the fact that Mr. Branch had made statements
3   in his written statement that he feared Mr. Melton or that
4   he was afraid of what Mr. Melton might do or words to that
5   affect, did that contribute to your decision that he should
6   be fired?
7   A   Yes.
8   Q   In what way?
9   A   It represented a potential continuing threat
10  within the workplace for additional future incidents.
11  Q   I'm sorry. Did it contribute to your decision
12  that Mr. Branch should be fired?
13  A   Oh, no. Sorry.
14      MS. FITZKE:    Okay. Thank you, Mr. Crain. I
15  don't have any other questions for you at this time.
16      JUDGE DONALDSON:    All right. Mr. Sorey,
17  anything further?
18      MR. SOREY:    Yes, ma'am.
19          REDIRECT EXAMINATION
20  BY MR. SOREY:
21  Q   Mr. Crain, in the exhibit that you reviewed,
22  Number 16, in the things to do for an employee, at the end,
23  I believe it said, "As soon as possible, report to your
24  direct supervisor." Is that correct?
25  A   I'm flipping my book, sir.

Page 231

1   Q   Okay.
2   A   Yes, that's correct, sir.
3   Q   Okay. So, is it your opinion that the IC
4   Railroad requires the employees to report any workplace
5   violence?
6   A   In my professional opinion, yes, it would.
7   Q   Okay. So, anybody observing or seeing
8   altercations are supposed to report it?
9   A   Yes, sir.
10  Q   And that would include managers and it would
11  include union employees?
12  A   This policy applies to all employees. Yes, sir.
13  Q   Okay. Now, in listening to your testimony and I
14  believe I heard it correctly and I wrote it down, it says
15  the employee is required to prove it's self-defense. Is
16  that what you said?
17  A   What I meant was in the processes outlined in the
18  collective bargaining agreement, the employee bears the
19  burden of adding any additional information that the
20  employee wishes to be considered in the review of the
21  record.
22  Q   Well, is this a fair statement, that the burden
23  of proof is on Mr. Branch to prove his innocence rather
24  than the burden being on the railroad to prove his
25  violation of policy?

Robert Branch     2023-FRS-00026     February 14, 2024

Page 232

1     MS. FITZKE:     Objection. Argumentative.
2     JUDGE DONALDSON:     Overruled. You can answer.
3     WITNESS:     In the collective bargaining
4  agreement, adjudication space, in a disciplinary matter,
5  the burden of proof is the company's and I feel that the
6  burden of proof was met that both employees engaged in a
7  fight and that was what drove the decision to dismiss both
8  of the employees.
9     BY MR. SOREY:
10    Q     Mr. Crain, do you know approximately now many
11 railroads there are in the United States?
12    MS. FITZKE:     Objection. Relevance.
13    JUDGE DONALDSON:     Overruled.
14    WITNESS:     I know there's, I think, six Class 1
15 railroads now.
16    BY MR. SOREY:
17    Q     Okay, but you had to go to Canada to try to find
18 out a definition or policy on fighting and self-defense?
19    MS. FITZKE:     Objection. Irrelevant.
20 Argumentative.
21    MR. SOREY:     Your Honor, this is what he
22 testified to.
23    JUDGE DONALDSON:     I'll allow it. I'm going to
24 overrule that. I'm going to see how the relevance plays
25 out in the next couple of questions. So, can you restate

Page 233

1  the question? Just repeat it.
2     MR. SOREY:     Yes, ma'am.
3     BY MR. SOREY:
4     Q     So, with all the railroads in the United States
5  handling cases such as Mr. Branch's, you felt it necessary
6  to go to Canada to find out what the definition of violence
7  and self-defense is for the Illinois Central Railroad?
8     MS. FITZKE:     Objection. Assumes facts not in
9  evidence that they apply similar policies.
10    JUDGE DONALDSON:     I'll overrule it. Do you
11 understand the question, Mr. Crain? Are you able to answer
12 it?
13    WITNESS:     I can answer why I called, who I
14 called if that's what the question is.
15    MR. SOREY:     That's good.
16    JUDGE DONALDSON:     Wouldn't that work, Mr.
17 Sorey?
18    MR. SOREY:     Yes, ma'am.
19    JUDGE DONALDSON:     Okay.
20    WITNESS:     The reason I called who I called was
21 because it's a common policy, U.S. and Canada and our
22 operational footprint in Canada has about twice as many
23 employees as we have in the U.S. and so we were looking for
24 how the corporate policy had been applied across the
25 company.

Page 234

1     BY MR. SOREY:
2     Q     Okay. Now, you told us that your superior told
3  you, "If you swing, you are fired." Is that correct?
4     MS. FITZKE:     Objection. Misstates his
5  testimony. He did not say a superior said that.
6     JUDGE DONALDSON:     Okay. I'm going to overrule
7  it since Mr. Crain was asked specifically if he did in fact
8  say something to that affect so that's overruled.
9     WITNESS:     My colleague in Winnipeg told me that
10 under the application of this policy, if both employees
11 threw punches in a fight, then the corporate practice was
12 to dismiss both employees.
13    BY MR. SOREY:
14    Q     Okay and where is that written within the CM or
15 IC Railroad policies?
16    A     That specific verbiage?
17    MR. SOREY:     Yes, sir.
18    WITNESS:     It's encapsulated in the first bullet
19 point, "Intentionally threatening or causing physical
20 harm."
21    BY MR. SOREY:
22    Q     No, that's not what I was talking about. A while
23 ago, your testimony said if you swing, you are fired.
24    JUDGE DONALDSON:     So, what is the question, Mr.
25 Sorey?

Page 235

1     BY MR. SOREY:
2     Q     The question is where does that appear in the
3  written policies of Illinois Central Railroad or CN
4  Railroad?
5     A     As specifically stated in that way, it's not
6  there.
7     MR. SOREY:     Okay. That's all the questions I
8  have.
9     JUDGE DONALDSON:     Do you have any follow-up,
10 Ms. Fitzke?
11    MS. FITZKE:     I do not.
12    JUDGE DONALDSON:     Okay. I don't have any ---
13 well, I do have a quick question. I don't know that it's
14 going to have any bearing on my understanding of the facts
15 in the case, but some policies that have been presented
16 during the hearing, Southern Region of Illinois Central and
17 it could be that another witness has addressed this, but
18 what does that region cover?
19    WITNESS:     Generally, in the corporate world
20 here, the Southern Region is generally the United States
21 region of the CN operation of which Illinois Central is a
22 part, but there are other subsidiary railroads that
23 comprise the Southern Region as well.
24    JUDGE DONALDSON:     So, Southern in that
25 terminology is the United States?

Robert Branch    2023-FRS-00026    February 14, 2024

Page 236

1  WITNESS:  Yes, ma'am.
2      JUDGE DONALDSON:    As opposed to the Southern
3  Region within the United States which is how I typically
4  see that play out.  So, it means the United States region
5  of which Illinois Central is one railroad part of a
6  structure.  I might be misstating that, but is that what
7  you said?
8      WITNESS:  Yes, ma'am.
9      JUDGE DONALDSON:    Okay.  All right, so that
10  helps me understand a little bit because I was not clear
11  and that's why I thought Mr. Sorey's question helped me
12  understand why the consultation with Canada if there were
13  other geographical regions of the United States that might
14  be consulted, but you've explained to me that Southern
15  Region did in fact encompass the United States, okay.  All
16  right and you agree with that, Ms. Fitzke, as counsel for
17  Respondent.  Would you add anything to that?
18      MS. FITZKE:    No, I think you've hit it right on
19  the nose.
20      JUDGE DONALDSON:    Okay.  All right, does
21  anybody have a follow-up question based on my questions?
22      MR. SOREY:    I don't.
23      MS. FITZKE:    No.
24      JUDGE DONALDSON:    Okay.  Thank you, Mr. Crain,
25  for your testimony this morning.  Thanks for being on

Page 237

1  standby throughout the hearing as to when you would be
2  needed.  I appreciate you being available first thing this
3  morning and your testimony in this proceeding.  We can go
4  ahead and excuse you unless you want to remain.  You might
5  have other things to get to, I would imagine.
6      WITNESS:  Yes, ma'am.  Thank you very much.
7      JUDGE DONALDSON:    All right, thank you.  We'll
8  let you go.  Thanks.  Okay, so you called the witnesses,
9  Mr. Sorey and Mr. Ferguson, and I take it, is that the last
10  witness you're calling?
11      MR. SOREY:    Yes, ma'am.
12      JUDGE DONALDSON:    Okay and Respondent has
13  obviously been conducting examinations of the same
14  witnesses that do appear to have material, relevant
15  information about the case.  Are there any other additional
16  witnesses you're --- we haven't talked about any, but are
17  there any you're planning to need to call during this live
18  video hearing?  Somehow you got muted.
19      MS. FITZKE:    No additional witnesses.  Thank
20  you.
21      JUDGE DONALDSON:    Okay.  All right, let's talk
22  about how I can close the evidentiary record.  There's the
23  Gardener deposition to mark as JX-49 and submit that.  If
24  you would do that by this Friday, February 16th, that would
25  be appreciated.  There were some deposition excerpts.  I

Page 238

1  think this was very limited.  The only one I recall was Ms.
2  Fitzke's use of some testimony from Complainant, Mr.
3  Branch's deposition during his examination yesterday.  I
4  recommend marking that as JX-50 and submitting it.  You
5  probably need to send that to --- unless you plan on
6  submitting the whole thing, but whatever you plan to tender
7  and mark as JX-50, share with counsel for Mr. Branch in
8  case they want to submit any other parts that they feel are
9  necessary for completion or context.  So, you all can do
10  that under --- it's our Rule 29 CFR 1855 for submission of
11  a deposition transcript that's been used during the formal
12  hearing.  The rule allows the opposing parties to submit
13  some other portion that they believe is important for
14  context.
15      Am I right, let's see, Mr. Sorey, Mr. Ferguson,
16  is there any transcript that you --- I ruled earlier before
17  the hearing about the transcripts not being submitted.  Is
18  there anything else you plan to submit or need to submit?
19      MR. SOREY:    We don't think so.  No, ma'am.
20      JUDGE DONALDSON:    Okay.  All right, so I'm
21  going to ask for JX-50 that I described to be submitted by
22  Friday, the 16th as well.  If you need more time, just let
23  me know.  That's flexible time limit.  Post-hearing briefs
24  will be set by the --- the briefing schedule will be set by
25  order.  So, I follow fairly informal processes at first

Page 239

1  when the transcript comes in from the court reporter.
2  Sometimes I get it first, not by a lot, but I want to make
3  sure everyone has it before we set a briefing schedule.
4  So, we'll hear from Ms. Wynn to say we got it.  It will be
5  an email, nothing formal and when the last party has it and
6  I'm sure we can go forward with briefing, we'll set the
7  briefing schedule.  I usually set just by routine or habit
8  a 30-day schedule from the last party's receipt of the
9  transcript, but if we've got a trial, if you've got some
10  other conflict and you need more time, then that's --- I
11  always grant more time if you request it.  I don't do page
12  limits on briefs.  I do allow especially our rules allow it
13  because you're filing simultaneous briefs, I allow replies
14  to be filed within 14 days of the original brief and you'll
15  get all of this in the scheduling order and I do set page
16  limits on the reply brief just to make sure that they're
17  tailored to true replies and that's it from my housekeeping
18  list.  Is there anything on your housekeeping list, Mr.
19  Sorey or Mr. Ferguson?
20      MR. SOREY:    No, ma'am.
21      JUDGE DONALDSON:    No.  Ms. Fitzke, Ms.
22  Jacobson, anything on your list?
23      MS. FITZKE:    Nothing I can think of.
24      JUDGE DONALDSON:    Okay.  So, what will happen
25  is I'll sent you a very short order closing the evidentiary

Robert Branch     2023-FRS-00026     February 14, 2024

Page 240

1  record as well once everything is in and you know what the
2  complete record is so that you'll know what the body of
3  evidence is for the briefs. You'll have that confirmed.
4       So, my compliments again to all of the
5  representatives for both parties for your preparation which
6  was evident throughout the hearing and your
7  professionalism. I think the witnesses greatly appreciated
8  that as well and I'm going to call this adjourned now and
9  go off the record.
10      [Whereupon, the hearing was concluded at 9:58
11  a.m., CST.]
12  //
13  //
14  //
15  //
16  //
17  //
18  //
19  //
20  //
21  //
22  //
23  //
24  //
25  //

Page 241

C E R T I F I C A T E

Name:        Robert Branch
Case Number: 2023-FRS-00026
Date:        February 14, 2024
Location:    Video Hearing
        This is to certify that the attached proceedings
before the United States Department of Labor, Office of
Administrative Law Judges, were held according to the
record and that this is the original, complete, true and
accurate transcript that has been compared to the reporting
or recording accomplished at the hearing.

/s/Jordan Bayley                    February 14, 2024
Bayley Reporting, Inc.                   Date
Official Federal Reporters
Building 1, Suite 14
12945 Seminole Boulevard
Seminole, FL  33778

Robert Branch   2023-FRS-00026   February 14, 2024

## A

**Abandoned** - 212:24, 213:2
**Able** - 233:11
**Accepted** - 225:24, 226:1
**Across** - 233:24
**Add** - 236:17
**Adding** - 231:19
**Addition** - 225:6
**Addressed** - 235:17
**Adjourned** - 240:8
**Adjudication** - 232:4
**Advantage** - 212:6
**Advised** - 208:10, 208:13, 219:3
**Advising** - 223:22
**Advisor** - 209:14
**Affect** - 221:3, 230:5, 234:8
**Afraid** - 230:4
**Against** - 207:5, 225:9
**Aggressor** - 217:8
**Agree** - 217:7, 219:5, 219:9, 236:16
**Agreement** - 208:25, 209:3, 215:21, 219:3, 228:15, 228:16, 228:24, 229:1, 231:18, 232:4
**Agreements** - 221:24
**Ahead** - 207:23, 237:4
**Allegations** - 217:18
**Alleged** - 208:24
**Allow** - 232:23, 239:12, 239:13
**Allows** - 238:12
**Altercation** - 218:1, 218:14, 218:23
**Altercations** - 231:8
**Analysis** - 210:6, 211:25, 213:21, 215:19, 220:9
**And/Or** - 219:4
**Apparently** - 209:22
**Appear** - 235:2, 237:14
**Applicable** - 220:11
**Application** - 234:1

**0**
**Applied** - 233:24
**Applies** - 231:12
**Apply** - 233:9
**Applying** - 211:9
**Appreciate** - 237:2
**Appreciated** - 237:25, 240:7
**Appropriate** - 217:14
**Approximately** - 218:2, 232:10
**Argumentative** - 218:19, 232:1, 232:20
**Ascertain** - 226:8, 226:10, 226:18
**Assist** - 210:4
**Assistance** - 223:7
**Attached** - 214:25, 217:5
**Attacked** - 221:6
**Attention** - 222:15
**Attorney** - 216:13
**Attorneys** - 207:18
**Available** - 237:2
**Aware** - 213:25, 214:1, 214:2, 214:18, 215:5, 215:17, 223:19

## B

**Back** - 210:19, 213:3, 217:24, 224:16, 224:17
**Bar** - 218:2, 218:24
**Barbecue** - 213:25, 214:19, 214:25, 215:7
**Bargaining** - 208:25, 209:3, 215:21, 219:3, 221:24, 222:4, 228:15, 231:18, 232:3
**Barriers** - 227:7
**Base** - 225:18, 228:4
**Based** - 209:2, 210:6, 217:18, 229:17, 236:21
**Bear** - 214:11
**Bearing** - 235:14
**Bears** - 231:18
**Becoming** - 223:19
**Behind** - 214:1,

**215:6**
**Bit** - 214:19, 222:21, 223:11, 228:20, 228:22, 236:10
**Body** - 240:2
**Book** - 230:25
**Both** - 212:2, 212:8, 225:8, 226:21, 226:22, 226:23, 232:6, 232:7, 234:10, 234:12, 240:5
**Bottom** - 217:13
**Branch's** - 219:10, 226:8, 227:2, 228:7, 229:16, 229:21, 233:5, 238:3
**Break** - 214:15
**Brief** - 239:14, 239:16
**Briefing** - 238:24, 239:3, 239:6, 239:7
**Briefs** - 238:23, 239:12, 239:13, 240:3
**Broad** - 221:19
**Brought** - 207:5, 216:11
**Bullet** - 222:16, 222:17, 234:18
**Burden** - 221:1, 231:19, 231:22, 231:24, 232:5, 232:6
**Butted** - 218:3

## C

**Call** - 215:7, 219:11, 223:4, 223:6, 237:17, 240:8
**Called** - 207:14, 233:13, 233:14, 233:20, 237:8
**Calling** - 237:10
**Calm** - 223:3
**Canada** - 232:17, 233:6, 233:21, 233:22, 236:12
**Canadian** - 226:25
**Can't** - 212:7, 212:10
**Career** - 211:18
**Cars** - 214:3
**Case** - 207:4, 210:1, 210:3, 210:8, 211:8,

**211:11**, 211:18, 217:17, 217:19, 217:22, 219:25, 220:12, 226:12, 226:13, 235:15, 237:15, 238:8
**Cases** - 210:16, 226:19, 226:21, 233:5
**Causing** - 234:19
**Central** - 207:5, 219:7, 219:24, 220:13, 221:7, 221:21, 233:7, 235:3, 235:16, 235:21, 236:5
**CFR** - 238:10
**Charge** - 211:21
**Charged** - 225:19
**Checking** - 220:23
**Chris** - 217:23, 218:11, 218:14, 218:23
**Circumstances** - 223:4
**Claim** - 225:16, 225:18, 225:24
**Claimed** - 228:8
**Claiming** - 225:23
**Clarify** - 228:19
**Clark** - 208:10, 208:20, 218:11, 223:20, 223:22, 223:24, 224:2, 224:10, 224:13, 224:17
**Class** - 232:14
**Classify** - 208:19
**Close** - 219:11, 237:22
**Closing** - 239:25
**CM** - 223:6, 234:14
**CN** - 235:3, 235:21
**CNIC** - 208:4
**Colleague** - 226:17, 234:9
**Collective** - 208:25, 209:3, 215:21, 219:3, 221:24, 226:11, 228:15, 231:18, 232:3
**Come** - 226:16
**Comes** - 239:1
**Committee** - 210:18

**Common** - 224:20, 233:21
**Communication** - 227:24
**Companies** - 226:15
**Company** - 209:2, 209:7, 220:11, 221:25, 222:2, 222:24, 233:25
**Company's** - 232:5
**Complainant** - 238:2
**Complete** - 240:2
**Completion** - 238:9
**Compliments** - 240:4
**Components** - 214:14
**Compound** - 214:13
**Comprise** - 235:23
**Concluded** - 210:19, 210:24, 240:10
**Conduct** - 215:19, 226:8, 229:24
**Conducting** - 237:13
**Confined** - 220:9
**Confirmed** - 240:3
**Conflict** - 239:10
**Confusion** - 207:19
**Connect** - 224:20, 226:17
**Connection** - 213:12
**Consider** - 211:16, 226:24
**Considered** - 211:20, 211:22, 211:23, 211:24, 229:22, 231:20
**Consist** - 209:18
**Consultation** - 236:12
**Consulted** - 236:14
**Contact** - 219:4, 229:17
**Contain** - 227:18
**Contains** - 228:17, 228:18
**Context** - 238:9, 238:14
**Continuing** - 230:9

Robert Branch    2023-FRS-00026    February 14, 2024

Contract - 228:25
Contractor - 218:3
Contribute - 230:5, 230:11
Conversation - 218 :23, 224:20
Conversations - 21 8:5
Cooking - 214:19
Cooks - 215:8
Copy - 216:10, 216:14, 216:15, 216:23, 225:11, 228:16
Corporate - 233:24, 234:11, 235:19
Corporately - 226:1 9
Corrective - 217:14
Correctly - 231:14
Counsel - 236:16, 238:7
Counterpart - 226:2 5
Couple - 232:25
Course - 216:16
Court - 219:13, 219:22, 239:1
Cover - 222:17, 235:18
Covered - 219:2
Crane - 207:7
CROSS - 221:17
CST - 207:2, 240:11

**D**

Day - 207:6, 217:23, 218:7, 218:14, 218:16, 218:23, 239:8
Days - 239:14
Day's - 217:25, 218:11
Decide - 208:21
Decided - 208:17
Decision - 208:19, 209:13, 209:16, 212:11, 219:10, 219:24, 226:2, 230:5, 230:11, 232:7
Definition - 210:23, 210:24, 211:7, 215:15, 215:25, 216:2, 220:7,

220:14, 220:20, 232:18, 233:6
Department - 210:4
Depicting - 215:12
Deposition - 210:22 , 212:19, 213:4, 217:25, 237:23, 237:25, 238:3, 238:11
Described - 238:21
Determination - 21 2:7, 224:22
Determinations - 2 27:1
Determine - 212:8, 226:14
Didn't - 213:9, 213:16
Different - 214:14
Differently - 214:12
Difficult - 226:7, 226:10
Disciplinary - 209:5 , 209:9, 209:17, 209:23, 209:25, 210:10, 210:18, 219:10, 220:22, 232:4
Discipline - 210:11
Discussions - 210: 7, 211:22
Dismiss - 226:23, 232:7, 234:12
Dismissal - 217:15, 217:16
Document - 228:14, 229:11
Don't - 211:7, 211:14, 212:22, 214:12, 214:13, 216:3, 216:6, 217:1, 218:5, 218:25, 219:25, 220:1, 228:11, 230:15, 235:12, 235:13, 236:22, 238:19, 239:11
Draw - 222:15
Drove - 232:7
Duane - 210:1, 210:7
Duly - 207:14
Duties - 221:20

**E**

Each - 212:3, 212:8, 225:9
Earlier - 238:16
Easier - 220:21
Eddy - 223:10
Email - 227:25, 228:1, 239:5
Emotional - 219:25
Employee - 222:24, 225:15, 225:19, 230:22, 231:15, 231:18, 231:20
Employee's - 210:2
Employment - 208: 24, 226:3, 227:2
Encapsulated - 234 :18
Encompass - 236:1 5
Engaged - 212:8, 225:8, 226:22, 232:6
Engineering - 210:4
Enhance - 219:6
Entails - 214:10
Error - 228:18
Everyone - 239:3
Everything - 240:1
Evidence - 209:1, 209:7, 209:10, 210:5, 211:13, 211:25, 213:5, 214:5, 215:22, 217:10, 224:9, 225:7, 233:9, 240:3
Evident - 240:6
Evidentiary - 237:2 2, 239:25
EXAMINATION - 20 8:1, 221:17, 230:19, 238:3
Examinations - 237 :13
Examined - 207:15, 215:13, 215:24
Examples - 211:10, 222:16
Except - 211:3
Excerpts - 237:25
Exchange - 227:25, 228:1
Excluding - 211:3
Exhibit - 216:9, 222:7, 222:9,

223:10, 223:21, 225:2, 227:10, 227:14, 227:18, 228:13, 228:14, 230:21
Exhibits - 215:13, 215:24, 216:11, 225:12, 227:6
Experience - 226:1 1
Explained - 236:14

**F**

Fabricated - 218:17
Factors - 213:9, 228:3
Fade - 224:9
Fair - 209:6, 231:22
Fairly - 238:25
Feared - 230:3
February - 207:2, 237:24
Feel - 217:3, 232:5, 238:8
Felt - 233:5
Fence - 214:2
Ferguson - 237:9, 238:15, 239:19
Field - 221:22, 221:23, 224:3, 224:6, 224:13
Fight - 232:7, 234:11
Fighting - 216:1, 216:24, 217:2, 222:14, 222:17, 222:18, 225:8, 232:18
Filed - 239:14
Filing - 239:13
Find - 232:17, 233:6
Finds - 219:14
Fine - 214:15, 216:23
Fire - 215:8
Firearm - 228:9
Fired - 230:6, 230:12, 234:3, 234:23
First - 222:16, 222:17, 226:13, 234:18, 237:2, 238:25, 239:2
Fitzke's - 238:2

Flexible - 238:23
Flip - 223:17
Flipping - 230:25
Focused - 215:19, 229:24
Folks - 224:6, 224:13, 229:2
Follow - 235:9, 236:21, 238:25
Follows - 207:15
Footprint - 233:22
Form - 218:18
Formal - 208:17, 208:22, 224:23, 238:11, 239:5
Forward - 224:23, 225:1, 225:4, 239:6
Fought - 210:19
Found - 214:12, 217:14
Framework - 221:1 1
Friday - 237:24, 238:22
FRITZE - 219:16
Front - 216:14
FRSA - 207:4
Full - 225:17
Function - 210:2
Functioned - 210:9
Further - 211:14, 222:21, 230:17
Future - 230:10

**G**

Gardener - 237:23
Gave - 224:2
Generally - 235:19, 235:20
Gentlemen - 213:10 , 213:17
Geographical - 236 :13
Get - 207:23, 208:9, 212:6, 215:15, 221:6, 222:9, 228:9, 237:5, 239:2, 239:15
Give - 211:10, 222:23
Gives - 223:5
Glitched - 213:12
Go - 207:23, 222:11, 224:13, 228:9, 232:17, 233:6,

Robert Branch   2023-FRS-00026   February 14, 2024

237:3, 237:8, 239:6, 240:9
**Going** - 216:10, 221:9, 228:9, 232:23, 232:24, 234:6, 235:14, 238:21, 240:8
**Good** - 233:15
**Got** - 216:23, 224:18, 237:18, 239:4, 239:9
**Governed** - 208:24
**Grace** - 222:6, 223:9, 227:11, 228:21
**Grant** - 239:11
**Granted** - 209:6, 220:24
**Greatly** - 240:7
**Grill** - 214:24
**Ground** - 213:6
**Group** - 210:3
**Groups** - 209:18, 209:21
**Guess** - 215:14
**Guidance** - 221:7, 222:23, 223:5, 224:2
**Gun** - 228:9

### H

**Habit** - 239:7
**Hand** - 207:11
**Handle** - 219:2, 221:25
**Handling** - 233:5
**Happy** - 207:20
**Hard** - 216:15
**Harm** - 222:25, 234:20
**Haven't** - 237:16
**Head** - 218:3
**Hear** - 239:4
**Heard** - 208:10, 231:14
**Hearings** - 216:13
**Held** - 208:6
**Help** - 223:16
**Helped** - 209:24, 236:11
**Helps** - 236:10
**Herein** - 207:14
**Hilliard** - 210:3, 227:21, 227:23
**Hit** - 236:18

**Hitting** - 212:5
**Honor** - 207:25, 214:7, 223:13, 232:21
**Hotel** - 214:20, 215:9
**Housekeeping** - 228:13, 239:17, 239:18
**HR** - 219:4, 221:23

### I

**IC** - 231:3, 234:15
**I'd** - 211:13, 222:8, 228:13, 228:18
**Identifies** - 217:2
**I'll** - 215:3, 232:23, 233:10, 239:25
**Illinois** - 207:5, 218:2, 218:24, 219:7, 219:23, 220:13, 221:6, 221:21, 233:7, 235:3, 235:16, 235:21, 236:5
**I'm** - 209:20, 211:14, 213:12, 215:14, 216:23, 221:9, 221:10, 223:20, 230:11, 230:25, 232:23, 232:24, 234:6, 238:20, 239:6, 240:8
**Imagine** - 237:5
**Immediately** - 223:4
**Impact** - 226:2
**Impartial** - 209:6
**Important** - 213:20, 238:13
**Impression** - 226:13
**Incidents** - 230:10
**Increase** - 229:7, 229:9, 229:10, 229:11
**Indicated** - 227:7, 228:8
**Informal** - 238:25
**Innocence** - 231:23
**Instigated** - 226:7
**Intend** - 220:13
**Intentionally** - 234:19
**Interest** - 219:25
**Interpretation** - 221

:24
**Investigation** - 208:17, 208:22, 215:12, 215:20, 220:10, 224:23, 225:1, 225:5, 225:11, 225:15, 225:17, 225:19, 227:4, 227:6
**Irrelevant** - 232:19
**Issued** - 219:6
**Issues** - 207:19, 219:2
**It'll** - 222:10
**It's** - 210:1, 210:16, 216:21, 218:19, 222:7, 228:15, 228:17, 228:19, 228:24, 229:16, 231:15, 233:21, 234:18, 235:5, 235:13, 238:10
**I've** - 211:18, 216:23

### J

**Jacobson** - 239:22
**Jake** - 223:10
**Joint** - 208:19, 222:7, 223:10, 227:10, 227:14, 228:13, 228:14
**Jones** - 218:8, 218:9, 218:10, 218:13
**Judgment** - 211:19
**July** - 229:6, 229:10, 229:12
**Justified** - 211:4, 211:16, 212:11
**Justifying** - 211:19, 211:24
**JX** - 237:23, 238:4, 238:7, 238:21

### K

**Knowledge** - 228:11

### L

**Labor** - 208:3, 219:1, 221:21
**Layout** - 215:12
**Lesser** - 217:20
**Let's** - 207:23,

209:24, 237:21, 238:15
**Level** - 210:14, 210:15, 210:17, 227:17
**Limit** - 238:23
**Limited** - 227:25, 228:1, 238:1
**Limits** - 239:12, 239:16
**List** - 220:23, 239:18, 239:22
**Listening** - 231:13
**Lit** - 214:1
**Local** - 223:6
**Location** - 215:17
**Long** - 228:14
**Look** - 216:10, 216:16, 216:22, 220:6, 222:9, 227:10, 227:13, 228:13, 228:16
**Looked** - 222:6, 222:8
**Looking** - 224:21, 233:23
**Lost** - 224:9
**Lot** - 213:10, 213:17, 214:2, 214:3, 239:2

### M

**Make** - 209:16, 211:19, 212:7, 212:10, 220:21, 228:20, 229:25, 239:2, 239:16
**Making** - 209:13, 226:25
**Management** - 222:2, 222:3
**Manager** - 208:3, 218:10, 219:1, 221:21
**Managers** - 221:22, 221:23, 231:10
**Manitoba** - 226:18
**Many** - 232:10, 233:22
**Mark** - 237:23, 238:7
**Marked** - 228:16
**Marking** - 238:4
**Material** - 237:14

**Means** - 217:17, 220:22, 236:4
**Meant** - 231:17
**Measures** - 217:14
**Melton** - 213:5, 214:20, 215:9, 217:4, 217:8, 224:11, 225:6, 225:20, 225:23, 225:24, 226:6, 227:16, 228:8, 229:18, 229:22, 230:3, 230:4
**Member** - 209:12, 209:13, 209:14, 209:22
**Members** - 222:2
**Memories** - 224:9
**Memorized** - 216:6
**Message** - 223:21, 224:10
**Met** - 232:6
**Minor** - 228:18
**Mississippi** - 220:6, 220:7
**Misstates** - 212:12, 214:21, 234:4
**Misstating** - 236:6
**Morning** - 236:25, 237:3
**Move** - 223:3, 223:9, 224:22
**Moved** - 213:21
**Moving** - 224:25, 225:4
**Much** - 237:6
**Multiple** - 210:7, 212:1
**Muted** - 237:18

### N

**Necessary** - 208:21, 233:5, 238:9
**Needed** - 209:16, 237:2
**Negotiations** - 229:1
**Nice** - 230:1
**Night** - 228:9
**Nose** - 236:19
**Note** - 229:21
**November** - 217:25, 229:11

Robert Branch   2023-FRS-00026   February 14, 2024

## O

**Objection** - 212:12, 214:4, 214:21, 218:18, 219:16, 220:16, 221:10, 232:1, 232:12, 232:19, 233:8, 234:4
**Objective** - 220:22
**Obligation** - 225:16
**Observe** - 227:5
**Observing** - 231:7
**Occurred** - 213:18, 223:25
**October** - 208:6
**Offer** - 215:22
**Offered** - 215:11
**Official** - 210:2
**One** - 207:6, 210:14, 220:2, 221:7, 228:14, 228:18, 236:5, 238:1
**Operation** - 224:3, 235:21
**Operational** - 233:22
**Opinion** - 212:23, 220:3, 231:3, 231:6
**Opposed** - 236:2
**Opposing** - 238:12
**Order** - 215:15, 238:25, 239:15, 239:25
**Original** - 239:14
**Outlined** - 231:17
**Overrule** - 232:24, 233:10, 234:6
**Overruled** - 212:15, 219:17, 232:2, 232:13, 234:8
**Oversight** - 222:2
**Overview** - 221:20

## P

**Paid** - 229:2
**Panel** - 209:9, 209:12, 209:14, 209:16, 209:17, 209:23, 209:25, 210:10, 210:16, 219:11, 220:22, 226:12
**Parent** - 226:15
**Parked** - 214:3

**Parking** - 213:10, 213:17, 214:2, 214:3
**Participate** - 224:22
**Participated** - 209:14, 227:16
**Parties** - 238:12, 240:5
**Parts** - 238:8
**Party** - 239:5
**Party's** - 239:8
**Pass** - 220:24
**Patrick** - 207:7, 207:13, 218:8, 218:9, 218:10, 218:13
**Pattern** - 226:12
**Payroll** - 221:23
**People** - 209:18, 211:12
**Perfect** - 228:21
**Person** - 219:4, 220:23
**Personally** - 220:9
**Phone** - 227:24
**Photographs** - 211:13
**Physical** - 215:17, 222:18, 222:25, 225:9, 227:7, 229:17, 234:19
**Pickup** - 215:6
**Pit** - 213:25, 214:25, 215:7
**Place** - 215:18, 218:24, 220:11, 220:14, 228:25
**Plan** - 238:5, 238:6, 238:18
**Planning** - 237:17
**Play** - 236:4
**Plays** - 232:24
**Police** - 223:6, 223:7
**Policies** - 220:11, 233:9, 234:15, 235:3, 235:15
**Portion** - 238:13
**Position** - 208:6, 219:23
**Post** - 238:23
**Potential** - 230:9
**Practice** - 234:11
**Preliminary** - 209:1, 225:7

**Preparation** - 240:5
**Present** - 209:8, 216:13, 224:8, 225:16
**Presented** - 235:15
**Presents** - 209:7
**Prevent** - 212:5
**Printed** - 216:10
**Prior** - 228:6
**Proceed** - 221:15
**Processes** - 231:17, 238:25
**Production** - 218:11
**Professional** - 231:6
**Professionalism** - 240:7
**Projecting** - 216:21
**Proof** - 231:23, 232:5, 232:6
**Protect** - 217:4
**Protecting** - 221:6
**Protection** - 207:4, 221:1, 222:8
**Provided** - 211:12
**Provision** - 207:4
**Pull** - 222:7
**Punched** - 213:3
**Punches** - 212:3, 234:11
**Punching** - 212:8
**Punishments** - 217:21
**Purview** - 219:1

## Q

**Quick** - 235:13
**Quote** - 211:3

## R

**Railroad** - 219:7, 219:24, 220:13, 221:7, 231:4, 231:24, 233:7, 234:15, 235:3, 235:4, 236:5
**Railroads** - 232:11, 232:15, 233:4, 235:22
**Raise** - 207:10
**Rather** - 229:25, 231:23
**Reason** - 233:20

**Receipt** - 239:8
**Receive** - 224:16
**Received** - 209:2, 223:22, 224:10, 224:17, 225:11, 226:25, 227:4
**Receiving** - 223:20
**Recommend** - 220:13, 224:25, 225:4, 238:4
**Recommendation** - 210:6, 210:14, 210:15, 210:19, 227:15, 227:18, 227:20, 228:2, 228:4, 229:15, 229:17
**Recommen- dations** - 227:1
**Recommended** - 224:24
**Reconvened** - 207:3
**Records** - 225:17
**Red** - 229:5
**REDIRECT** - 230:19
**Reflects** - 229:11
**Region** - 235:16, 235:18, 235:20, 235:21, 235:23, 236:3, 236:4, 236:15
**Regions** - 236:13
**Reinstated** - 219:14, 219:23
**Relations** - 208:3, 219:1, 221:21
**Relevance** - 219:16, 220:16, 220:17, 221:10, 232:12, 232:24
**Remain** - 223:3, 237:4
**Remaining** - 207:7
**Remind** - 213:13
**Removed** - 213:6
**Removing** - 215:16
**Replies** - 239:13, 239:17
**Reply** - 239:16
**Report** - 218:3, 218:7, 223:8, 230:23, 231:4, 231:8
**Reported** - 218:8, 218:17

**Reporter** - 239:1
**Representatives** - 240:5
**Represented** - 230:9
**Request** - 239:11
**Requested** - 224:14
**Required** - 231:15
**Requires** - 231:4
**Respect** - 222:1, 225:1, 225:5, 227:1, 228:2, 229:16
**Respectively** - 225:22
**Responded** - 229:23
**Respondent** - 236:17, 237:12
**Responsibilities** - 221:20, 222:1
**Responsibility** - 225:25, 226:1
**Result** - 209:5
**Retreat** - 227:8
**Reviewed** - 208:16, 210:5, 230:21
**Reviewing** - 220:5, 228:6, 229:20
**Risk** - 222:25
**Robert** - 207:5, 224:11
**Routine** - 239:7
**Rule** - 212:20, 219:22, 238:10, 238:12
**Ruled** - 238:16
**Rules** - 209:2, 209:4, 220:11, 239:12
**Run** - 213:21

## S

**Safety** - 219:6, 221:3, 223:3
**Scale** - 212:3, 228:17, 229:6
**Schedule** - 238:24, 239:3, 239:7, 239:8
**Scheduled** - 229:7, 229:9, 229:10
**Scheduling** - 239:15
**Screen** - 216:14
**Scroll** - 216:21,

Robert Branch   2023-FRS-00026   February 14, 2024

222:10, 222:20, 228:21
**Scrolling** - 216:20
**Second** - 222:9, 222:10
**See** - 217:1, 220:23, 223:12, 223:17, 224:2, 227:20, 232:24, 236:4, 238:15
**Seeing** - 221:10, 231:7
**Selected** - 209:25
**Senior** - 218:10
**Sent** - 239:25
**Separate** - 216:2, 216:25
**Separately** - 222:14
**Service** - 223:6
**Set** - 238:24, 239:3, 239:6, 239:7, 239:15
**Share** - 238:7
**Shouldn't** - 215:16
**Show** - 216:13
**Showed** - 217:13
**Showing** - 223:21
**Side** - 215:22
**Similar** - 226:12, 226:19, 233:9
**Simultaneous** - 239:13
**Sister** - 226:15
**Situation** - 213:7, 213:16, 215:16, 217:9, 223:8, 223:20, 223:22, 226:16, 228:6
**Situations** - 211:4
**Six** - 232:14
**Slowly** - 216:20
**Sorey's** - 236:11
**Sounded** - 225:10
**Southern** - 235:16, 235:20, 235:23, 235:24, 236:2, 236:14
**Space** - 232:4
**Spears** - 210:2, 210:7
**Specific** - 215:11, 234:16
**Speculating** - 211:14
**Standby** - 237:1

**Standing** - 215:6
**Start** - 209:24, 216:20, 217:25
**Started** - 207:24, 208:9
**State** - 220:6, 220:7
**Statement** - 211:3, 211:6, 230:3, 231:22
**Statements** - 208:1 4, 208:16, 209:2, 211:12, 213:23, 215:11, 224:4, 224:14, 225:8, 230:2
**Stating** - 213:13
**Statutes** - 220:7
**Statutory** - 221:10
**Story** - 215:22, 218:17
**Structure** - 236:6
**Submission** - 238:1 0
**Submitted** - 212:1, 238:17, 238:21
**Submitting** - 238:4, 238:6
**Subsequent** - 228:2 5
**Subsidiary** - 235:22
**Substantiated** - 212 :2
**Sullivan** - 210:1, 210:7, 210:12
**Superior** - 234:2, 234:5
**Supervisor** - 218:12 , 219:4, 223:8, 230:24
**Supposed** - 231:8
**Surrounding** - 213: 10
**Sustain** - 221:9
**Sustained** - 214:6, 215:2, 218:20
**Swang** - 226:22
**Swear** - 207:10
**Swing** - 234:3, 234:23
**Swinging** - 212:2, 212:4
**Sworn** - 207:14

**T**

**Tailored** - 239:17
**Telephone** - 224:20

**Telling** - 218:16, 218:22
**Tells** - 223:3
**Tender** - 238:6
**Terminate** - 227:16
**Terminated** - 210:2 0, 226:3
**Termination** - 217:2 1, 219:10, 228:7, 229:16
**Terminology** - 235: 25
**Terms** - 208:24, 229:2
**Testimony** - 212:13, 214:22, 214:24, 223:19, 225:10, 227:15, 229:21, 231:13, 234:5, 234:23, 236:25, 237:3, 238:2
**Text** - 229:5
**Thanks** - 236:25, 237:8
**Therefore** - 210:20
**There's** - 209:4, 221:7, 224:8, 224:21, 229:7, 232:14, 237:22
**These** - 208:16, 213:10, 213:17
**They're** - 239:16
**Threat** - 229:22, 230:9
**Threatening** - 234:1 9
**Threw** - 234:11
**Tie** - 220:25
**Time** - 213:7, 213:17, 215:9, 218:13, 220:11, 223:24, 229:25, 230:15, 238:22, 238:23, 239:10, 239:11
**Tiny** - 228:20
**Tipped** - 212:3
**Today** - 207:10, 228:3
**Tom** - 210:1, 210:3, 210:7
**Took** - 215:18, 218:10, 218:24
**Toward** - 217:13

**Tracy** - 224:11
**Transcript** - 215:13, 215:24, 220:10, 225:12, 227:5, 227:6, 229:20, 238:11, 238:16, 239:1, 239:9
**Transcripts** - 210:1 3, 238:17
**Trial** - 239:9
**Truck** - 214:1, 214:25, 215:6, 228:10
**Turned** - 211:25
**Twice** - 233:22
**Typically** - 236:3

**U**

**Union** - 231:11
**United** - 232:11, 233:4, 235:20, 235:25, 236:3, 236:4, 236:13, 236:15
**Units** - 222:4
**Unless** - 210:16, 237:4, 238:5
**Updated** - 229:5
**Upset** - 219:15, 219:18, 219:24
**Urgency** - 224:8
**Used** - 238:11

**V**

**Verbiage** - 234:16
**Video** - 211:13, 221:5, 237:18
**View** - 222:17
**Violated** - 217:18, 226:8
**Violation** - 209:1, 209:4, 210:14, 210:15, 210:17, 227:17, 231:25
**Violence** - 210:25, 211:2, 215:25, 216:1, 216:25, 217:12, 219:6, 220:15, 220:21, 221:5, 222:8, 222:16, 225:9, 226:9, 227:17, 231:5, 233:6

**W**

**Wade** - 208:10, 218:11, 223:20, 224:17, 224:19
**Wage** - 228:17, 229:6
**Wants** - 225:15
**Warranted** - 223:4
**We'll** - 207:20, 216:7, 237:7, 239:4, 239:6
**We're** - 224:21
**Weren't** - 209:22
**We've** - 239:9
**What's** - 220:17
**Whereupon** - 207:1 2, 240:10
**Whistleblower** - 20 7:4, 221:1
**Whole** - 223:17, 238:6
**Will** - 211:3, 214:11, 216:13, 217:14, 238:24, 239:4, 239:24
**Winnipeg** - 226:17, 234:9
**Wishes** - 231:20
**Witnesses** - 208:17, 212:1, 237:8, 237:14, 237:16, 237:19, 240:7
**Word** - 223:20
**Words** - 230:4
**Work** - 209:19, 223:5, 233:16
**Worked** - 209:23
**Working** - 228:16, 229:1
**Workplace** - 210:25 , 211:2, 215:25, 216:1, 216:24, 217:12, 219:5, 220:14, 220:21, 221:5, 222:7, 222:16, 226:9, 227:17, 230:10, 231:4
**World** - 235:19
**Wouldn't** - 233:16
**Written** - 230:3, 234:14, 235:3
**Wrote** - 231:14
**Wynn** - 239:4

Robert Branch   2023-FRS-00026   February 14, 2024

| Y | 3 | | | |
|---|---|---|---|---|
| **Year -** 217:24, 218:2 | **30 -** 239:8 | | | |
| **Yesterday -** 210:13, 238:3 | **33 -** 228:13, 228:14, 228:17 | | | |
| **You'd -** 216:4 | | | | |
| **You'll -** 239:14, 240:2, 240:3 | **4** | | | |
| **You're -** 212:5, 215:12, 216:9, 229:1, 237:10, 237:16, 237:17, 239:13 | **49 -** 237:23 | | | |
| | **5** | | | |
| | **50 -** 238:4, 238:7, 238:21 | | | |
| **You've -** 208:6, 218:22, 236:14, 236:18, 239:9 | **9** | | | |
| | **9:02 -** 207:2 | | | |
| ' | **9:58 -** 240:10 | | | |
| **'23 -** 217:25 | **911 -** 223:4 | | | |

**/**

**// -** 240:12, 240:13, 240:14, 240:15, 240:16, 240:17, 240:18, 240:19, 240:20, 240:21, 240:22, 240:23, 240:24, 240:25

**1**

**14 -** 207:2, 239:14
**151 -** 228:17
**16 -** 216:9, 216:10, 222:7, 230:22
**16th -** 237:24, 238:22
**1855 -** 238:10

**2**

**20 -** 223:10, 223:21
**2020 -** 229:6
**2021 -** 208:7, 229:6
**2022 -** 229:6
**2023 -** 229:7, 229:10, 229:11
**2024 -** 207:2, 229:9, 229:12
**23 -** 227:11, 227:14, 227:18
**29 -** 238:10

# Exhibit B

**Excerpts from the August 6, 2024, deposition of Plaintiff Robert Branch pursuant to the present matter.**

```
                                              Page 1

 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF MISSISSIPPI
 2                   GREENVILLE DIVISION

 3

 4    ROBERT BRANCH,

 5         Plaintiff,

 6

 7    v.                CIVIL ACTION NO. 4:23-CV-217-MPM-JMV

 8

 9    ILLINOIS CENTRAL RAILROAD
      COMPANY,

10

           Defendant.

11

12

13              DEPOSITION OF ROBERT BRANCH

14

15

16

17    Taken at the instance of the Respondent at the
       offices of Wise Carter Child & Caraway, P.A.,
18      401 East Capitol Street, Suite 600, Jackson,
      Mississippi on Tuesday, August 6, 2024, beginning at
19                     9:00 a.m.

20

21

22

23           * * * * * * * * * * * *

              REPORTED STENOGRAPHICALLY BY:
24        LORI W. BUSICK, CVR-S #7510, CCR #1677

25
```

Exhibit B - Excerpts from the August 6, 2024, deposition of Plaintiff Robert Branch pursuant to the present matter

Page 2

1  APPEARANCES:
2    NICK NORRIS, ESQ.
     WATSON & NORRIS, PLLC,
3    4209 Lakeland Drive, #365
     Flowood, Mississippi 39232
4
     COUNSEL FOR PLAINTIFF
5
6    SUSAN K. FITZKE, ESQ.
     LITTLER MENDELSON, P.C.
7    1300 IDS Center
     80 South 8th Street
8    Minneapolis, MN 55402.2136
     Telephone: 612.630.1000
9    Facsimile: 612.630.9626
     Email: sfitzke@littler.com
10
     COUNSEL FOR DEFENDANT
11
12  ALSO PRESENT: Matt Gallagher, Esq. (Via telephone)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1              INDEX
2  Style and Appearances............................1
3  Certificate of Deponent.......................162
4  Certificate of Court Reporter.................163
5
6           EXAMINATIONS
7  Examination by Ms. Fitzke........................4
8
9             EXHIBITS
10 EXHIBIT 1  Training ............................15
11 EXHIBIT 2  Policy ..............................16
12 EXHIBIT 3  Coaching History ...................21
13 EXHIBIT 4  Drawing ............................53
14 EXHIBIT 5  Statement ..........................53
15 EXHIBIT 6  Text Message .......................64
16 EXHIBIT 7  Text exchange ......................67
17 EXHIBIT 8  EEOC Charge ........................86
18 EXHIBIT 9  Racial Discrimination Letter .......114
19 EXHIBIT 10 Interrogatories ...................144
20 EXHIBIT 11 Application ........................147
21 EXHIBIT 12 Application ........................149
22
23
24
25

Page 4

1          Robert Branch,
2  having been first duly sworn, was examined and
3  testified as follows:
4
5  EXAMINATION BY MS. FITZKE:
6     Q.  Mr. Branch, thank you for coming down
7  today.  You and I have met on a couple of past
8  occasions --
9     A.  That's -- that is correct.
10    Q.  So you understand the oath that you were
11 just given this morning is the same oath you were
12 given in your last deposition and in the OALJ trial
13 that we had together?
14    A.  Yes, ma'am.
15    Q.  Because we've been through this together
16 before, if it's okay with you, I'll just give you a
17 couple of quick reminders?
18    A.  It's okay.
19    Q.  Just for purposes of our record, I want to
20 make sure that we have only one of us speaking at a
21 time, so if you can try to remember to let me finish
22 my full question before you start answering, I'll
23 try to afford you the same courtesy with respect to
24 your answers; okay?
25    A.  Yes, it's okay.

Page 5

1     Q.  We both are probably going to mess up with
2  that a little bit today, so if I need a reminder and
3  you need to let me know you're not done with your
4  answer, you just let me know that; all right?
5     A.  Yes, I will.
6     Q.  We're going to take regular breaks today.
7  Hopefully we won't be here too terribly long, given
8  that we've done this before, but if you find that
9  you need a break for any reason, as long as there's
10 not a question pending, just let me know that and
11 we'll be happy to accommodate you, okay?
12    A.  I will.
13    Q.  We also have to remember that -- to
14 provide a verbal answer, a yes or a no or whatever
15 other verbal answer might be appropriate.  We're not
16 going to be able to understand or read later the
17 uh-huhs (affirmative response) or uh-uhs (negative
18 response) or head shakes that we might all
19 understand in the room or think we understand.
20 Those don't translate real well to the transcript;
21 all right?
22    A.  Yes.
23    Q.  It's also important to me still in this
24 deposition that you answer, excuse me, that you
25 understand my question before you answer it.  So if

Exhibit B - Excerpts from the August 2024 deposition of Robert Branch pursuant to the present matter

Page 14

1 called to testify in any other kind of legal
2 proceeding for any other purpose since then?
3    A. No, ma'am. I haven't.
4    Q. Have you filed any other claims, either
5 with a court administrative agency or government
6 since we last met?
7    A. No, ma'am. I haven't.
8    Q. Have you been convicted of a crime since
9 we last met?
10    A. No, ma'am.
11    Q. Have you ever kept a diary or a journal?
12    A. No, ma'am. I haven't.
13    Q. Now, we talked in some detail when we last
14 met about your work history with Illinois Central
15 and kind of when you were hired on and the different
16 rules that you had and the different gangs that you
17 had over time. What I wanted to ask you about in
18 particular, you mentioned you recalled being
19 trained on the code of conduct, Illinois Central's
20 Code of Conduct?
21    A. Yes, ma'am.
22    Q. Do you also recall at different times
23 being trained on the company's policy with regard to
24 nondiscrimination and non-retaliation?
25    A. I don't remember, Ms. Susan.

Page 15

1    MS. FITZKE: Can we go ahead and mark this
2 one.
3    (Exhibit 1 marked for identification.)
4    MS. FITZKE: Mr. Branch, I'm showing you
5 what has been marked as Exhibit 1 to this
6 deposition, which is a copy of your training
7 records.
8    And, Nick, just for your understanding,
9 this was printed before the Bates labels were
10 applied, so, but it's identical to the tab of
11 training records that you received yesterday.
12    Q.  (By Ms. Fitzke) Mr. Branch, if you can
13 take just a minute and kind of eyeball this, and
14 then I'm going ask you a couple of questions about
15 the records; okay?
16    A. (Peruses document).
17    Q. Sir, have you been able to give this a
18 quick look?
19    A. Yes, ma'am.
20    Q. All right. Does this refresh your
21 recollection that over the course of your employment
22 you intermittens took training with regard to the
23 company's anti-harassment and nondiscrimination
24 policies?
25    A. Yes, ma'am.

Page 16

1    Q. And do you have any reason to dispute that
2 Exhibit 1 is a true and accurate record of the
3 training you completed while you were working for
4 Illinois Central?
5    A. I have no disputes.
6    Q. With respect to the harassment and
7 nondiscrimination policy, you understood that it was
8 against company policy for Illinois Central to
9 discriminate against employees on the basis of their
10 race; is that true?
11    A. That's what the policy say, but there --
12 it doesn't exempt things from happening.
13    Q. Okay. And you knew that was that company
14 policy during the entire duration of time that you
15 worked there; correct?
16    A. That's correct.
17    Q. And you had been trained not only on the
18 policy but how to report concerns of discrimination
19 should you have any; correct?
20    A. Correct.
21    (Exhibit 2 marked for identification.)
22    Q. All right. Sir, I'm showing you Exhibit 2
23 to your deposition, which is a copy of the
24 prohibited harassment discrimination and
25 anti-retaliation policy. And do you recognize this

Page 17

1 as the policy on which you were trained?
2    A. Yes, ma'am. I do.
3    Q. And if you can look with me, sir, at the
4 second page of the policy, on the bottom portion of
5 the page it says "Retaliation prohibited" in bold.
6 Do you see that there?
7    A. Yes, ma'am. I do.
8    Q. And you understood that the policy
9 prohibiting discrimination also provided a policy
10 that also prohibited retaliation for reporting
11 concerns or opposing discrimination under this
12 policy; correct?
13    A. Yes, ma'am.
14    Q. And just above that retaliation policy
15 there is a section called the "Company's Complaint
16 Procedure." Do you see that there?
17    A. Yes, ma'am. I do.
18    Q. And you were also trained on this
19 complaint procedure and what you could do if you had
20 concerns of discrimination or harassment or
21 opposition to discrimination in the workplace;
22 correct?
23    A. Correct.
24    Q. And under item 1, in addition to telling
25 the individual engaged in the improper conduct to

5 (Pages 14 - 17)

Exhibit B - Excerpts from the August 2024 deposition of Nathan Robert Branch pursuant to the present matter
Veritext Legal Solutions
www.veritext.com                                                              888-391-3376

Page 18

1  stop, there is the option to submit in writing to
2  the human resources department and also a number
3  there, a 1-877 number, to the human resources
4  support center; correct?
5      A.  Correct.
6      Q.  And it's my understanding that at no time
7  during your employment with Illinois Central did you
8  make a complaint to human resources or call the
9  human resources support center that you believed you
10 were being discriminated against on the basis of
11 your race; correct?
12     A.  Not while I was working.
13     Q.  And it's my understanding that while you
14 were working for the company, you did not make a
15 complaint to human resource or call the human
16 resources support center to claim that you were
17 being retaliated against during your employment with
18 Illinois Central; correct?
19     A.  Not while I was working, no, ma'am.
20     Q.  And it's my understanding that after your
21 employment was terminated by the company that you
22 did not contact the company directly to make a
23 complaint or raise a concern of discrimination or
24 retaliation; correct?
25     A.  I couldn't talk to the company.

Page 19

1      Q.  So you did not do that after your
2  termination; correct?
3      A.  I couldn't talk to the company.
4      Q.  Okay.  So you did not?
5      A.  No, I did not, because I couldn't talk to
6  them.
7      Q.  Why do you say you couldn't talk to them?
8      A.  They deleted everything off my file and
9  everything.  No one wants to talk to me.
10     Q.  You're claiming the company deleted your
11 file?
12     A.  Well, they disconnect me from being able
13 to go on the internet to access anything on my file.
14 I couldn't access anything.
15     Q.  You lost access to the CN Intranet;
16 correct?
17     A.  Right.
18     Q.  Okay.  That is an internal web page for
19 current Illinois Central employees; correct?
20     A.  Right.
21     Q.  But you did attempt to make contact with
22 people from Illinois Central following your
23 termination; correct?
24     A.  Yes, ma'am, I did.
25     Q.  And in those communications you did not

Page 20

1  raise concerns of race discrimination or
2  retaliation; correct?
3      A.  Because I didn't talk to anyone.  I didn't
4  get a chance to talk to anyone.  I tried to talk to
5  Mr. Spears, but we did not talk.
6      Q.  You were not successful in getting in
7  contact with Duane Spears?
8      A.  No, ma'am, I wasn't.
9      Q.  But you were successful in getting in
10 contact with Ms. Mendoza; correct?
11     A.  Ms. Mendoza?
12     Q.  I'm sorry.  I got the name wrong.  You
13 were successful in getting in contact with someone
14 by the name of Martina Mullen; correct?
15     A.  We talked, but we didn't talk about that.
16 I just informed her about the incident that
17 happened.
18     Q.  The fight with Mr. Melton?
19     A.  Yes, ma'am.
20     Q.  And that you had been terminated?
21     A.  Right.
22     Q.  And with Ms. Mullen you did not raise
23 concerns or complaints of race discrimination or
24 retaliation; correct?
25     A.  No, I did not.

Page 21

1      Q.  Mr. Branch, did you ever raise concerns of
2  race discrimination or retaliation to your union or
3  union representative in conjunction with your
4  separation from Illinois Central?
5      A.  I might have, but I can't recall.
6      Q.  You don't know one way or the other if you
7  did or didn't?
8      A.  I might have, but I can't recall.
9      Q.  But you know that the union isn't the
10 company; correct?
11     A.  That is correct.
12     Q.  And prior to your termination, I think my
13 questions focused on the incident surrounding your
14 termination, so I just want to clarify.  Prior to
15 your termination you also -- you didn't have any
16 concerns or complaints of race discrimination or
17 retaliation prior to your termination; correct?
18     A.  No, I did not.
19     Q.  Okay.  In fact, I think you told me last
20 time that you had no issues at all with your
21 employment before May 26 of 2022; is that right?
22     A.  I did not.
23         (Exhibit 3 marked for identification.)
24     Q.  Sir, I'm showing you Exhibit 3 to your
25 deposition, which is another document we didn't talk

Exhibit B - Excerpts from the August 2024 deposition transcript of Robert Branch pursuant to the present matter
Veritext Legal Solutions
www.veritext.com                                                    888-391-3376

Page 22

1  about last time. My understanding is that this is a
2  company record reflecting your coaching history. If
3  you can take a minute to just review this and let me
4  know after you've had a chance.
5      A. (Peruses document).
6      Q. Are you done, sir?
7      A. Yes, ma'am, I'm done.
8      Q. All right. With regard to the
9  conversations that are our documented in Exhibit
10  No. 3, some of which were coaching, some of which
11  were recognition discussions, do you recall having
12  these decisions with the managers noted in this
13  Exhibit 3?
14      A. Some of them I do and some I don't.
15      Q. Okay. And which ones do you not recall?
16      A. I do not recall June 24, 2015 with John
17  Anderson about Robert had passed, come over from the
18  bridge department. His growth level is rising, he
19  is not getting -- is getting better but not where he
20  needs to be.
21      I feel like I always go to work and always
22  advance and accomplish my goals. He didn't have a
23  conversation with me. So I feel like I would have
24  probably had him to correct that if I knew he was
25  writing it.

Page 23

1      Q. Okay. And do you see that that item is
2  actually in terms of meeting type, he recorded that
3  as a recognition meeting type.
4      A. Okay.
5      Q. Do you see that there?
6      A. Yeah, I see that.
7      Q. Okay. Are there any of these other items
8  listed, coachings or recognitions that you don't
9  recall?
10      A. Everything else as I recall.
11      Q. Okay. Thank you, sir.
12      A. Uh-huh (affirmative response).
13      Q. Now, I just want to kind of pivot and talk
14  a little bit about May 26, 2022. As we get there,
15  it's my understanding from your prior testimony that
16  prior to May 26, 2022 that you didn't have any issue
17  or problem with Chance Garner or Chris Day; is that
18  right?
19      A. No, ma'am, I did not.
20      Q. And likewise, you didn't have issues or
21  complaints or concerns with regard to Todd Melton;
22  is that right?
23      A. That is correct.
24      Q. Now, just a little -- I can't recall
25  that -- the date. It may have been up to a month

Page 24

1  before, but just before May 26, of 2022 there was
2  something that occurred at a union meeting between
3  Mr. Melton and Mr. Sweeney. Do you recall that?
4      A. Yes, ma'am.
5      Q. And you gave me some testimony last time.
6  For some reason the date of April 30th sticks in my
7  head. Do you recall what the date of the union
8  meeting was?
9      A. It was on a Saturday. I think it was
10  April 30.
11      Q. Okay. And that union meeting that was at
12  a place called the Crystal Grill; is that right?
13      A. That is correct.
14      Q. Is that a restaurant?
15      A. It's a restaurant that's been in Greenwood
16  for quite some time I think they just went out of
17  business, back here first of last month, something
18  like that, they went out of business.
19      Q. Was there a bar there as well?
20      A. They serve alcohol, but not a bar, like a
21  restaurant.
22      Q. Do you have any information one way or the
23  other as to whether Mr. Melton was drinking during
24  that meeting at the end of April, early May, 2022?
25      A. Yeah, he was drinking beer.

Page 25

1      Q. Did you observe anything with regard to
2  Mr. Melton's behavior or demeanor at that union
3  meeting that led you to any conclusion that he was
4  impaired by the alcohol?
5      A. Well, I can't really say whether he was
6  impaired because when people speak things, and
7  they're not in agreement with, it can sort of tick a
8  person off. So, no, I'm not going to say whether he
9  was impaired because I really don't know.
10      Q. How about Mr. Sweeney. Did you notice
11  whether Mr. Sweeney was drinking alcohol at that
12  union meeting?
13      A. As far as I know, Sweeney wasn't drinking
14  alcohol.
15      Q. So you didn't notice anything about
16  Mr. Sweeney that indicated he was impaired in any
17  way?
18      A. I have been around Mr. Sweeney. I never
19  saw him drink any alcohol.
20      Q. Okay. All right. Now I understand at
21  that union meeting that there was some disagreement
22  between Mr. Melton and Mr. Sweeney; correct?
23      A. That is correct.
24      Q. Can you tell me as best you can recall how
25  that disagreement came about and what exactly each

7 (Pages 22 - 25)

Exhibit B - Excerpts from the August 2024 deposition of Robert Branch pursuant to the present matter
Veritext Legal Solutions
www.veritext.com                                                                888-391-3376

Page 26

1  said to the other?
2      A.  Far as I can recall, he was asking Nick
3  about the incident that took place on the track.
4  Todd was on the regulator, and he had -- he wrecked
5  the regulator on the bridge.  The regulator was off,
6  way off the bridge.  That was on a Friday afternoon.
7  And Ray Gibson hit a handrail.  He knocked a bolt
8  off the handrail, and they give him level two.
9          And the question was asked why did Ray
10  Gibson get a level two for just knocking a bolt off
11  the handrail and Todd, who wrecked the regulator,
12  had to call in heavy equipment to get the regulator
13  back on the track, almost went off of the bridge,
14  and he get -- he don't get reprimanded at all.
15        So Nick said that -- Nick replied that
16  Wade Clark was out of town, and he couldn't be
17  reached, and he didn't get anybody to follow-up on
18  the incident.  So at that time when they asked --
19  when he asked him why didn't -- why didn't -- why
20  didn't Todd get reprimanded?  Todd replied and told
21  him it wasn't told.  When it was none of his concern
22  why he worried about it?
23        So -- Sweeney said well, I'm just trying
24  to get to the bottom of it because everybody need
25  justice out here.  You reprimand one person and you

Page 27

1  don't reprimand the other person, that where the
2  whole problem come in.  So after that Todd callid
3  Sweeney a "boy," and they jumped up started at one
4  another until the guys broke them up.
5      Q.  I'm going to go through this just to make
6  sure I'm following exactly.  Okay.  When you say --
7  you said someone asked why Melton didn't get
8  reprimand at all?  Was that Sweeney was asking why?
9      A.  Sweeney and, you know, a few other more.
10  I can't -- I think it was Big Baby, Big Baby last
11  name is -- I'll come to me in a minute -- we call
12  him Big Baby.
13      Q.  So Sweeney and Big Baby were asking Nick
14  why Ray Gibson received a level two, but Todd Melton
15  had not been reprimanded at all; is that right?
16      A.  That's correct.
17      Q.  Okay.  And then you're claiming it was
18  Nick's response that Wade, being Wade Clark,
19  correct --
20      A.  Right.
21      Q.  -- was out of town, and he didn't get
22  anyone to follow up on the incident.  Are you saying
23  Wade Clark didn't get anyone to follow-up on the
24  incident involving Todd Melton?
25      A.  He was away, and Chris Day was the

Page 28

1  supervisor, so...
2      Q.  Are you saying, though, that what Nick was
3  relaying is that someone had been out of town, so
4  there wasn't proper follow-up on the issue with
5  Mr. Melton?
6      A.  That is correct.
7      Q.  Okay.  And then at that point, Mr. Melton
8  jumped in and replied to Sweeney and Big Baby
9  that it wasn't their concern and why are they
10  worried?
11      A.  Right.
12      Q.  Okay.  And then that's when Roosevelt
13  Sweeney responded he's just trying to get to the
14  bottom of it and that they need justice out there?
15      A.  Right.
16      Q.  Okay.  By that point in the exchange in
17  dialogue, had anything with respect to the race of
18  the employees been said or referenced.
19      A.  Oh, no.  I think what the point was --
20  what the guy was trying to get across was that --
21  that if you reprimand a black guy for just knocking
22  a bolt off a handrail, and you don't give the white
23  guy, who wrecked the regulator, anything, they feel
24  like it was being unjust.  They feel like it was the
25  black get punished and the white get a hand slap.

Page 29

1      Q.  That's how you understood it; correct?
2      A.  That's how I understood it.
3      Q.  But that was not verbalized during the
4  meeting; correct?
5      A.  Well, you know, they was standing up, but
6  they was trying to do it professionally.
7      Q.  And my question is a little bit different,
8  sir.  It's just whether by that point in the
9  meeting, had anybody made a statement or comment
10  about the race of the employees involved or that
11  there might be differential treatment based on race?
12      A.  Like I said earlier, they -- they're not
13  going to just come out -- they made their points.
14      Q.  But they didn't say it directly?
15      A.  No, they didn't say it directly, but they
16  made their points.
17      Q.  And this is at a union meeting run by the
18  union; correct?
19      A.  Yes, ma'am.
20      Q.  There are no members of company management
21  or human resources present at your union meetings?
22      A.  No, ma'am.
23      Q.  So going back then, it was at that point
24  after Mr. Sweeney mentioned he was trying to get to
25  the bottom it and that we need justice out here,

8 (Pages 26 - 29)

Exhibit B - Excerpts from the August 2024 deposition testimony of Robert Branch pursuant to the present matter
Veritext Legal Solutions
www.veritext.com                                                                              888-391-3376

Page 30

1 that you claim Mr. Melton then referred to Sweeney
2 as a boy; correct?
3    A.   Yes, ma'am.
4    Q.   Do you recall what specifically Mr. Melton
5 said?
6    A.   He just told him, "Boy, shut up."  Sweeney
7 replied, told him he not no boy.  You know my name.
8    Q.   Now what, if anything, did Mr. Melton say
9 in response?
10    A.   Well, I think that's when they rushed
11 towards one another, and the guys had to pull them
12 apart.
13    Q.   And my understanding from your prior
14 testimony is that they didn't actually physically
15 fight; they were separated before that could
16 occur --
17    A.   Yes, ma'am.
18    Q.   -- if it was going to occur?
19    A.   Yes, ma'am.
20    Q.   Okay.  So fair to say that this was not a
21 violent altercation between two of them?
22    A.   No, it wasn't violent, but it didn't look
23 good.
24    Q.   It wasn't professional?
25    A.   No, ma'am, it wasn't.

Page 31

1    Q.   And I understand from your prior testimony
2 that that bothered you, that they were behaving in a
3 way that you didn't consider professional?
4    A.   Yes, it did, because I spoke to both of
5 them.  I told -- I told Todd that he got away.  It's
6 over, and he needed to let go, 'cause he got a
7 family, and you don't need to be a clowning at this
8 public place, and I actually told Sweeney, I said,
9 "Man, you don't need to be clowning in a public
10 place like that because it don't make sense."  I
11 said we supposed to be professional railroaders, and
12 it don't look good we acting a clown.
13    Q.   Was that end of exchange that you observed
14 between Mr. Melton and Mr. Sweeney on that date?
15    A.   Yes, ma'am.
16    Q.   Was that the only occasion that you ever
17 heard Mr. Melton use the term "boy" with reference
18 to an African American employee?
19    A.   Yes, ma'am.
20    Q.   Did you ever hear Mr. Melton use racial
21 epithets on any other occasion with reference to any
22 of the employees at your work?
23    A.   Well, only the night of the incident
24 between him and I.
25    Q.   On May 26?

Page 32

1    A.   Yes, ma'am, when he said that he was going
2 to Egypt Plantation where they killed and buried
3 MFs.  To me that was sort of racial, 'cause I heard
4 that -- this is what I heard.  I don't know.  I
5 heard that they killed peoples back then in Little
6 Egypt and they buried them.  I mean, that's what I
7 heard.  I don't know how true it is, but I heard
8 some people talk about it.
9    Q.   Was that -- when you heard people talk
10 about OALJ trial where you told me that you didn't
11 know anything about Little Egypt other than it was a
12 location down in Mississippi?
13    A.   It was after that.  It was afterward.
14    Q.   So it wasn't during your employment with
15 Illinois Central?
16    A.   No, ma'am.
17    Q.   It was at some point after February of
18 2024?
19    A.   Yes, ma'am.
20    Q.   Okay.  So when you were -- by the way, who
21 told you that?
22    A.   Some people that worked over there -- it's
23 a place called Glenn Miller -- Glenn Miller, the man
24 named Glenn Miller, he got a construction company
25 right down the road from there.  And some guys that

Page 33

1 worked over there, they was telling me Little Egypt,
2 they did -- they did do some things you know,
3 unethical things, discriminating things, back then.
4 When they said back then, it was -- you know, it
5 wasn't modern days.  We don't expect things like
6 this to go on in modern days.
7    Q.   Who's the guy that mentioned to you that
8 they did unethical things back then in Little Egypt?
9    A.   My uncle worked over there.  I think his
10 name was Willie Branch.
11    Q.   Are you unsure what his name was?
12    A.   I don't know, but I remember Fidel Meeks
13 telling me that, too.
14    Q.   Who?
15    A.   Fidel Meeks.
16    Q.   Fidel?
17    A.   Meeks told me that.
18    Q.   And when did Fidel Meeks tell you that?
19    A.   I think he told me that a couple months
20 ago.
21    Q.   Why were you talking a couple of months
22 ago with Fidel Meeks about Little Egypt?
23    A.   I think he called me up and asked me -- he
24 heard that Todd was coming back to work, and asked
25 me when I coming back?  I said I don't know.  And

9 (Pages 30 - 33)

Veritext Legal Solutions
Exhibit B - Excerpts from the August 2024 deposition transcript of Robert Branch pursuant to the present matter
www.veritext.com                                                    888-391-3376

Page 34

1   then we got in about the conversation the night of
2   the whatchamacall when he said, Well, I'm coming
3   back to work, and he bound to make racial remarks.
4   Are they going to let him come back to work with all
5   that? And then he said like yeah, I know somebody
6   in Little Egypt. They said something about his dad
7   or somebody used to work over there or something,
8   and what they did do whatever. So that's how that
9   came about.
10      Q.   Kind of a typical railroad gossip, sort
11  of?
12      A.   It could be. I mean, I really don't know
13  nothing.
14      Q.   And Mr. Melton, he hasn't gone back to
15  work. You know that; right?
16      A.   Right.
17      Q.   With regard to Little -- so I think with
18  regard to Little Egypt, that is, in fact, a
19  location; correct? It is an area; correct?
20      A.   Right.
21      Q.   And you know where in Mississippi that is;
22  correct?
23      A.   It's off 49 Highway.
24      Q.   And my understanding is you don't know one
25  way or the other whether Mr. Melton is from Little

Page 35

1   Egypt or not?
2       A.   No, ma'am, I do not.
3       Q.   And at the time this all happened in May
4   of 2022, you really didn't know anything at all
5   about Little Egypt other than where it was located;
6   correct?
7       A.   That's right.
8       Q.   Do you know, with regard to the incident
9   that occurred with Mr. Melton on the bridge that
10  Sweeney was asking him about in the union meeting,
11  do you know what, if anything, the railroad did to
12  investigate what happened that day?
13      A.   Railroad didn't do no investigation.
14  Chris Day came back. We had a stand-down.
15  Everybody got off the machines, and we had to go and
16  have a briefing. And after the briefing, he talked
17  about, he said, you know, Todd -- it was -- at that
18  time it had got on all -- why we stopping? We
19  trying to get through. And so Gunter called a
20  stand-down and informed us to be careful. Make sure
21  you stop and check range of vision and do your brake
22  test, all those things anew. And so we went back
23  to work.
24          Chris Day came back that evening when we
25  got off and had another stand-down. And usually

Page 36

1   when someone have an incident like that, they get
2   drug tested. And they sent him to get drug tested.
3   He didn't send Todd to get drug tested. That's
4   another thing that raised the guys' eyebrows at the
5   union. Because if you have a incident on a machine
6   out there, the first thing they supposed to do is
7   send you to get drug tested.
8       Q.   And you're saying Mr. Melton was not sent
9   for a drug test?
10      A.   No, he wasn't.
11      Q.   Okay. And I'm sorry. Why do you believe
12  no investigation was done with regard to what
13  happened with Mr. Melton and the machine?
14      A.   Reason why? Because the fact that
15  Mr. Melton and the supervisor was buddy-buddy; and
16  he wasn't going to let Mr. Melton get in trouble.
17      Q.   Okay. You don't have any firsthand
18  knowledge one way or the other with regard to what
19  the management did to look into what occurred on the
20  bridge with Mr. Melton and the machine, do you?
21      A.   I don't have what? Can you repeat that?
22      Q.   Firsthand knowledge. You don't have any
23  firsthand information about what, if anything, the
24  company did to look into what happened on the bridge
25  with Mr. Melton?

Page 37

1       A.   The company didn't do anything. I mean,
2   it was just plain cut and dry. I mean, everybody
3   saw that because if you have -- that was major. If
4   you have a major incident out there. He could have
5   had it -- he could have lost his life. If the
6   machine went over the bridge and he'd get hurt and
7   lose his life, that doesn't look good for the
8   railroad.
9           So the proper call is, you know, the
10  management supposed to do that. I mean, I'm not a
11  manager. I can't tell a manager how to do their
12  job, but the company got policies that everybody
13  supposed to follow, not just a few peoples.
14      Q.   Right.
15      A.   So my understand with the company, he did
16  not -- Chris Day, he dropped the ball.
17      Q.   I guess, sir, what I'm looking for is the
18  facts on which your understanding is based, because
19  my understanding is different. So why don't you
20  tell me what facts you have that support for your
21  conclusion that the company dropped the ball or
22  didn't do any kind of looking into what happened on
23  the bridge with Mr. Melton and the machine that day.
24      A.   Because he didn't get reprimanded. That's
25  it.

10 (Pages 34 - 37)

Exhibit B - Excerpts from the August 2024 deposition transcript of Robert Branch pursuant to the present matter

Page 38

1    Q.  Okay.  And that's the only reason you
2  believe that the company didn't look into it,
3  because he was not reprimand?
4    A.  If they would have looked into it, he
5  would have got reprimand.
6    Q.  That's your opinion?
7    A.  Yes, ma'am.
8    Q.  Now, after this union meeting that we were
9  talking about where Mr. Sweeney and Mr. Melton had
10  that argument, did you ever report that disagreement
11  between Mr. Melton and Mr. Sweeney to any member of
12  company management?
13    A.  No, ma'am, I did not.
14    Q.  Are you aware of anybody else that
15  reported Mr. Melton's conduct to company management
16  or human resources following that union meeting?
17    A.  No, ma'am, I do not.
18    Q.  In fact you told Mr. Sweeney that you were
19  a brotherhood; correct?
20    A.  What's a brotherhood?
21    Q.  Well, sir, I believe that's your language.
22    Do you recall telling Mr. Sweeney that
23  when you called him or spoke to him after this
24  incident with Mr. Melton that it's a brotherhood,
25  you guys out there on the rail?

Page 39

1    A.  That we family.
2    Q.  And that's how you felt after that
3  incident; correct?
4    A.  Yeah, we railroad people, actually we're
5  supposed to stick together for one another.  That's
6  what I was told when I hired out.
7    Q.  I want to talk to you, then, about the
8  hotel that you were at the night of May 26.  It's my
9  understanding that the Magnolia Inn is the name of
10  the hotel; do you recall that?
11    A.  Yes, ma'am.
12    Q.  From your prior testimony I understand it
13  was probably around 9:00 o'clock p.m. when the
14  incident with Mr. Melton happened; is that right?
15    A.  Yes, ma'am.
16    Q.  Was it still light out?
17    A.  It was sort of dark.
18    Q.  Kind of twilight?
19    A.  Sort of dark.
20    Q.  Sort of dark?
21    A.  Just getting dark, or dark.
22    Q.  And you had been grilling with some of the
23  guys?
24    A.  Yes, ma'am.
25    Q.  I want to get a better understanding, if I

Page 40

1  can, about how all this was set up; okay?  Can you
2  describe for me -- there was a grill.  Was that on
3  back of someone's pickup truck?
4    A.  Yes, ma'am, it were.
5    Q.  So there's a pickup truck and grill on the
6  back.  And are you standing, then, at the back of
7  the truck?
8    A.  Yes, ma'am.
9    Q.  Okay.  And then, tell me what's on either
10  side of that truck?
11    A.  Another truck, another vehicle, fence,
12  hotel wall.
13    Q.  Okay.  I want to get a sense of how this
14  was laid out.  So we have the truck here; okay?
15    A.  Yes, ma'am.
16    Q.  And then there's a grill on the back?
17    A.  Yes, ma'am.
18    Q.  What's right here?
19    A.  Another vehicle.
20    Q.  So another car?
21    A.  Or a truck.  I think it was a truck.
22    Q.  How about on the other side of that?
23    A.  Vehicle.
24    Q.  Do you know how many vehicles?
25    A.  I can't recall.

Page 41

1    Q.  Okay.  How about on this side of the
2  truck?  What's here?
3    A.  It's a vehicle.
4    Q.  Okay how about here?
5    A.  I think it was a fence.
6    Q.  Did that fence run all the way down?
7    A.  Yes, ma'am.
8    Q.  Did it run the other way, too?
9    A.  I'm not for sure.
10    Q.  What's on this side of these vehicles?
11    A.  I think some vehicles are behind them.
12    Q.  Like, are they parked right up to the
13  cars, or is there a road to drive between and then
14  more cars?
15    A.  I think there's a road in between, but I'm
16  not for sure.
17    Q.  So something like that?
18    A.  Something like that.
19    Q.  Does the fence run down here or not?
20    A.  I don't think so.
21    Q.  Okay.  So this is the fence.  Where is the
22  hotel?
23    A.  Hotel is right in here.
24    Q.  Right here?
25    A.  Right in here is the hotel.

11 (Pages 38 - 41)

Exhibit B - Excerpts from the August 2024 deposition transcript of Robert Branch pursuant to the present matter

Page 46

1    Q.  Okay.  What happened next?
2    A.  He stated that, you on Sweeney's side.  I
3  said, I'm not -- I'm not into all that.  And next
4  thing I know, I was on the ground.  He had came and
5  pushed me.
6    Q.  And he pushed you in chest, right, from
7  the front?
8    A.  No, he pushed me from the back.  I mean --
9  yeah, I wasn't facing him when he pushed me down.
10    Q.  But he pushed you from the chest; correct?
11    A.  No, ma'am.  He pushed me from the side.  I
12  wasn't facing him.  That's what I'm trying to say.
13  I wasn't facing him when he pushed me down.
14    Q.  I'll find that in a minute.  I'm not going
15  to take our time.
16      So after you were pushed down, then you
17  got back up; right?
18    A.  Yes, ma'am.
19    Q.  And then I understand Mr. Melton hit you
20  again?
21    A.  Yes, ma'am, he did.
22    Q.  And after you had hit -- after you had
23  been pushed down and after Mr. Melton hit you again,
24  at no time did you lose consciousness; correct?
25    A.  When you say lose consciousness, I was

Page 47

1  dizzy.  You know what I mean?  When somebody hit you
2  with all they might twice right in the face, it was
3  like I was stunned.  I was, you know, knocked out
4  of --
5    Q.  You got your bell rung a little bit?
6    A.  Yeah.  Yes, ma'am.  You know, it was like
7  a quick (snapping), what you say when somebody hit
8  you?  You know, you out of it for a few seconds.  So
9  that's what I meant by, you know, unconscious.
10  Because it was -- I saw more than stars.
11    Q.  Okay.  But you weren't lying there on the
12  pavement out cold; correct?
13    A.  No, ma'am.  And it was unexpected, you
14  know what I'm saying?  It was something, you know --
15  I was not there for that.
16    Q.  And you don't have any reason to believe
17  that Mr. Melton hit you because you're black;
18  correct?
19    A.  I don't feel like Mr. Melton hit me
20  because I'm black.  I feel like Mr. Melton was -- he
21  was still angry or mad about what happened at the
22  union meeting.  I mean, why, you -- you took it out
23  on me.  You took it out on me, and you was into
24  it -- y'all was into around on the other end.  You
25  and a few guys was into it, you was talking about

Page 48

1  fighting on the other end.  But you bring your
2  frustration around with my group on our end and you
3  take your -- it was more than me.  I was like the
4  smaller guy there.  So you took your frustration out
5  on a small person.
6    Q.  I think you mentioned it was at the
7  barbecue on the other side of the building where
8  some of the guys were talking about fighting?
9    A.  Right.
10    Q.  And with regard to Mr. Melton, I think you
11  testified previously you thought he was inebriated
12  and just not like in his right mind; correct?
13    A.  Something like that.  Because I feel like
14  that you had no right to take your frustration out
15  on me because I didn't do anything to you.
16    Q.  Now, Mr. Melton engaged you over here
17  behind the grill; correct?
18    A.  Right.
19    Q.  That's where he hit you those two times;
20  correct?
21    A.  Right.
22    Q.  And then I understand that when you, after
23  he hit you the second time, that you started
24  swinging at Mr. Melton; correct?
25    A.  Right.

Page 49

1    Q.  And that Mr. Melton started backing up and
2  fell over backwards; correct?
3    A.  Right.
4    Q.  Where was Mr. Melton on this sort of
5  rudimentary map we have here when he fell over
6  backwards?
7    A.  It was somewhere along in here.
8    Q.  Okay.  So I'm going to put a 2, and I'll
9  put Melton by the 2.  Did I mark correctly where you
10  identified with the 2 where Mr. Melton fell over
11  backwards?
12    A.  Yes, ma'am.
13    Q.  Okay.  Now, after Mr. Melton had fallen
14  over backwards, why did you not leave the situation?
15    A.  I did.  They pulled me off of him.  They
16  pulled us apart.
17    Q.  I think, sir, after Mr. Melton fell over
18  backwards, your prior testimony indicated that you
19  went down after Mr. Melton on the ground and
20  continued swinging at him; correct?
21    A.  That is correct.
22    Q.  And in my question to you, sir, is why
23  when Mr. Melton had fallen over backwards, instead
24  of going down after him to continue swinging at him,
25  why did you not retreat and walk away from

13 (Pages 46 - 49)

Exhibit B - Excerpts from the August 2024 Deposition of Clarence Robert Branch pursuant to the present matter
Veritext Legal Solutions
www.veritext.com                                                                888-391-3376

Page 50

1  Mr. Melton?
2      A.  Why?  Because he was still -- even though
3  he was going down, he was still swinging at me.  So
4  I need to retreat when someone -- I'm fighting --
5  I'm defending myself.  That's what I was doing; I
6  was defending myself.
7      Q.  Sir, when Mr. Melton was on the ground,
8  your prior testimony is that Mr. Melton was like
9  this, with his two arms up over his face; correct?
10     A.  Before he fell to the ground, he was still
11 swinging is what I'm saying.
12     Q.  Okay.  And Mr. Melton is now on the ground
13 with his arms up over his face.  Why did you keep
14 swinging at that man instead of walking away?
15     A.  I didn't hit him.  I swung, but I didn't
16 hit him.  That's the time Earl Honeysuckle came and
17 pulled us apart.
18     Q.  Well, that's not my question, sir.  I do
19 have prior sworn testimony from you indicating that
20 you did, in fact, hit Mr. Melton.
21         My question for you is not who broke you
22 up.  My question for you is Mr. Melton is on the
23 ground.  Mr. Melton has his hands in front of his
24 face in what you described as a defensive posture.
25 Why did you not walk away at that point?

Page 51

1      A.  Why I didn't walk away?  Because blood was
2  running down my face, and that's what -- my attitude
3  had changed.  Know why it changed?  Because I was
4  hit and attacked for no reason at all.
5      Q.  And you were going to strike back;
6  correct?
7      A.  I had no -- what choice did I have when
8  someone had attacked you?
9      Q.  The choice I'm just giving you, sir, is to
10 leave the situation.
11     A.  Okay.  What I'm saying is -- let me put it
12 to you this way.  So what you're telling me is that
13 if I sit there and hit you, you're going to --
14     MR. NORRIS:  You can't ask her questions.
15 Just give your answer.
16     THE WITNESS:  Okay.
17     Q.  (By Ms. Fitzke) I think that was part of
18 his answer, so I would like to hear it, sir.
19     A.  So you're telling me that you're going to
20 sit there if I attack you for no reason, so you're
21 going to sit there and not do anything?
22     Q.  And you agree with me, sir, that if
23 Mr. Melton is where the 2 is, that there's nothing
24 behind you at that point preventing you from leaving
25 the situation; correct?  Physically leaving the

Page 52

1  situation?
2      A.  I'm not going to say that.
3      Q.  Well, Mr. Melton -- Mr. Branch, if
4  Mr. Melton is where the 2 is, correct?  You
5  identified that he's where the 2 is on this
6  document; correct?
7      A.  Uh-huh (affirmative response).
8      Q.  Behind that, is there any barrier to your
9  either going into the door in the hotel or exiting
10 back this direction toward the other cars?  Like
11 toward the front of the building, should say.  Is
12 there any physical barrier that's preventing you
13 from getting out of that area?
14     A.  I did get out the area when they broke us
15 up.
16     Q.  Right.  And before that, before they broke
17 you up, after Mr. Melton fell backwards on the
18 ground and assumed a defensive posture, is there
19 anything preventing you from either going into the
20 hotel on the side door here or departing around the
21 front of the hotel?
22     A.  No, it's not.
23     Q.  Any physical barrier?
24     A.  The fence or the barbecue grill.
25     Q.  The fence is over here; correct, away from

Page 53

1  the front of the hotel?
2      A.  Right.
3      Q.  So my question is:  Is there any physical
4  barrier preventing you from leaving Mr. Melton on
5  the ground in a defensive posture and getting to the
6  front to the hotel?
7      A.  No, it's not.
8      MS. FITZKE:  I'll go ahead and mark this
9  drawing as an exhibit.
10     (Exhibit 4 marked for identification.)
11     THE WITNESS:  Not saying that I'm going to
12 hit you, Susan, just making --
13     MS. FITZKE:  Sir, I understand.  I do not
14 feel threatened in any way.  Thank you.
15     THE WITNESS:  I was just trying to make my
16 point across.
17     (Exhibit 5 marked for identification.)
18     Q.  (By Ms. Fitzke) Mr. Melton [sic] I'm
19 showing you Exhibit 5 to your deposition.  And this
20 is a statement that we've seen before.  I understand
21 that this is the statement that you submitted to
22 Illinois Central following the May 26, 2022
23 altercation; correct?
24     A.  Yes, ma'am.
25     Q.  And I'm just going to read part of this

14 (Pages 50 - 53)

Exhibit B - Excerpts from the August 2024 deposition transcript of Robert Branch pursuant to the present matter
Veritex Legal Solutions
www.veritext.com                                                                                    888-391-3376

Page 54

1  you.
2      My coworkers and I was grilling after work
3  peacefully and relaxing time when Tracy (Todd)
4  Melton approached us with no shirts and no shoes and
5  started acting and speaking belligerent.  He was
6  speaking about a situation at a union meeting I
7  attended.  He and another employee had a disturbing
8  and violent confrontation while Todd was saying
9  racial slurs, calling the CN employee "boy."
10     I'm going to stop there.
11     A.  Yes, ma'am.
12     Q.  This is the situation at the union meeting
13  that we just talked about; correct?
14     A.  That's correct.
15     Q.  Involving Mr. Sweeney and Mr. Melton?
16     A.  That's correct.
17     Q.  And we agreed, I believe, that the
18  situation between Mr. Sweeney and Mr. Melton was, in
19  fact, not violent at that meeting; correct?
20     A.  Like I said, it got out of hand.  I mean,
21  it wasn't -- it didn't look good.  It was not, you
22  know what I'm saying.  It was nasty.
23     Q.  No blows were thrown?
24     A.  No blows was thrown.
25     Q.  Nobody struck one another?

Page 55

1      A.  No, they did not.
2      Q.  But Mr. Melton, I believe, you indicated
3  did call Mr. Sweeney "boy" at that meeting?
4      A.  That's correct.
5      Q.  In the context that you described it here
6  in the deposition today?
7      A.  Yes, ma'am.
8      Q.  And was that the only racial slur that
9  Mr. Melton used during that union meeting that you
10  heard --
11     A.  Yes, ma'am.
12     Q.  -- or that you heard of?
13     A.  Yes, ma'am, I mean, that I heard at the
14  union meeting.
15     Q.  And on May 26, of 2022, Mr. Melton did not
16  use the term "boy"; correct?
17     A.  May 26, 2022?
18     Q.  Yes, on the date where you had the --
19     A.  No, he didn't use -- he didn't use it.
20     Q.  Okay.  So I want to continue.
21     He, being Todd, proceeded to approach the
22  group.  I said, You need to let that go.  Todd said
23  he was from Little Egypt Plantation.  Todd pushed me
24  in the chest.
25     This is what I was looking for earlier.

Page 56

1      Todd pushed me in the chest and I fell to
2  the ground.
3      Do you see that there where your statement
4  indicates that Todd pushed you in the chest?
5      A.  Yes, ma'am.  But it wasn't in the chest.
6  It was -- he pushed me from behind.
7      Q.  But what you reported to the company was
8  that he pushed you in the chest; correct?
9      A.  I made a mistake.
10     Q.  Okay.
11     A.  I made a mistake.  But it was -- he pushed
12  me from the behind.  It wasn't in the chest.
13     Q.  And when he pushed you from behind, you
14  didn't get pushed into the truck, you got pushed to
15  the ground; correct?
16     A.  Yes, ma'am.
17     Q.  Is there anything else in the statement
18  that is Exhibit 5 that is not accurate?
19     A.  Not as I knows of.
20     Q.  And you agree with me that this is the
21  third time that we've talked with you under oath
22  about this statement; correct?
23     A.  Yes, ma'am.
24     Q.  And this is the first time that you've
25  identified that mistake to me?

Page 57

1      A.  I think I identified that mistake in my
2  hearing.  I said he pushed me from the behind.
3      Q.  This is the first time you've told me your
4  statement is inaccurate; correct?
5      A.  That's the only thing, you know, I see in
6  there because I know where I got pushed.  I mean, I
7  might have said chest because it happened so quick,
8  but he pushed me from the behind.
9      Q.  Okay.  So -- and with regard to the
10  statement just before that:  Todd said he was from
11  Egypt Plantation.  And that's the Little Egypt
12  Plantation that we've been talking about; correct?
13     A.  Yes, ma'am.
14     Q.  And you understand -- we talked before
15  about Little Egypt, but there is actually a place
16  called Little Egypt Plantation; correct?
17     A.  Yes, ma'am.
18     Q.  And you don't know one way or the other
19  whether Mr. Melton is from the area that's
20  specifically called Little Egypt Plantation?
21     A.  No, I do not.
22     Q.  And my understanding is that this
23  statement here, Mr. Melton saying he's from Little
24  Egypt Plantation, is the only alleged -- the only
25  thing Mr. Melton said to you that you allege related

15 (Pages 54 - 57)

Exhibit B - Excerpts from the August 2024 deposition of Plaintiff Robert Branch pursuant to the present matter
Veritext Legal Solutions
www.veritext.com                                                                                                          888-391-3376

Page 58

1  to race; is that right?
2  A.  Yes, ma'am.
3  Q.  And your only basis for concluding that
4  that statement relates to race is because
5  plantations in general have a very negative racial
6  history; correct?
7  A.  That is correct.
8  Q.  But you don't know one way or the other
9  factually if Mr. Melton is from this geographic
10 location called Little Egypt Plantation?
11 A.  That's where he stated he's from.
12 Q.  With regard then to -- I know you spoke
13 with Mr. Chance Garner the day after this occurred,
14 so on May 27 of 2022, you claim he came up to talk
15 to you while you were at your machine; correct?
16 A.  Yes, ma'am.
17 Q.  He had heard something about an incident
18 that had taken place?
19 A.  Yes, ma'am.
20 Q.  What did you say to Mr. Garner at your
21 machine that day?
22 A.  I told him -- he asked me what happened.
23 I told him what happened.  And he asked me what I
24 wanted to do, and I told him that I'd get back with
25 him.  And he said that before he could do anything,

Page 59

1  he had to talk to Todd.
2  Q.  And when you say you told him what
3  happened, what did you tell Chance Garner happened?
4  A.  I told him that Todd attacked me last
5  night for no reason at the hotel.
6  Q.  And did you tell Mr. Garner that
7  Mr. Melton made any comments that were race-related?
8  A.  We didn't get off into -- because he told
9  me that he got to talk to Todd first, and we didn't
10 get off to what all was said.  But he was told, not
11 by me, but he was told by the other group.  That's
12 why I didn't really get off into it with him.
13 Because the assistant foreman was there and the
14 foreman was there.  The foreman and the assistant
15 foreman was there.
16 Q.  Who is the assistant foreman?
17 A.  Earl Honeysuckle was assistant foreman and
18 Todd Peterson was the foreman.  They was all there
19 standing out there that night.
20 Q.  And they both provided statements; right?
21 A.  Yes, ma'am.
22 Q.  And neither one of them identify any
23 racially inappropriate language in their statement;
24 correct?
25 A.  I don't recall.  I don't recall.

Page 60

1  Q.  All right.  In fact, there were like a
2  group -- you identified a group of people; right?
3  A.  Yes, ma'am.
4  Q.  There's eight people identified on the
5  second page of your statement, and the railroad got
6  statements from all eight; correct?
7  A.  Yes, ma'am, they did.
8  Q.  And no one in their statement identified
9  any use of any racially inappropriate language by
10 Mr. Melton other than to the extent his reference to
11 Egypt Plantation could be deemed racially
12 inappropriate; correct?
13 A.  I can't really answer that question.
14 Q.  We can agree the statements will speak for
15 themselves?
16 A.  Yeah, statements speak.
17 Q.  When you claim that Earl Honeysuckle or Ty
18 Peterson made a report to Chance Garner, but you
19 weren't present at the time either one of them spoke
20 to Mr. Garner?
21 A.  No, ma'am, I wasn't.
22 Q.  So fair to say, you don't know what
23 specifically either one of them may or may not have
24 said to Mr. Garner?
25 A.  That is correct.

Page 61

1  Q.  So you spoke with Mr. Garner, and I think
2  I understand your testimony to say you didn't get
3  far enough to talk to him at that point.  So you did
4  not say anything to Mr. Garner anything on May 27
5  about any use of racially inappropriate language by
6  Mr. Melton; correct?
7  A.  No, ma'am, I did not.
8  Q.  And did you speak to Mr. Garner again?
9  A.  I spoke to him on a Saturday.
10 Q.  Okay.  And what did you speak with
11 Mr. Garner about at that time?
12 A.  I asked Mr. Garner what did Mr. Melton --
13 did he -- have he talked to Mr. Melton and what did
14 Mr. Melton say.  And he told me he did and said
15 Mr. Melton said he didn't remember.
16 Q.  And did you report to Mr. Garner during
17 that call the use of any racially inappropriate
18 language by Mr. Melton?
19 A.  No, I did not.
20 Q.  And it's my understanding that at no time
21 did you ever claim to the company that this attack
22 by Mr. Melton was racially motivated; correct?
23 A.  No, ma'am.
24 Q.  And just to make sure that I am clear
25 because I stated my question in a negative, and you

16 (Pages 58 - 61)

Exhibit B - Excerpts from the August 2024 deposition of Plaintiff Robert Branch pursuant to the present matter
Veritext Legal Solutions
www.veritext.com                                                                                    888-391-3376

Page 62

1　answered with a negative, so I just want to make
2　sure I understand you, and you understand me. I
3　just want to make sure our record is clear.
4　　　A. Yes, ma'am.
5　　　Q. Is it true that at no time did you ever
6　report to the company that you believe this attack
7　by Mr. Melton was racially motivated?
8　　　A. I did not.
9　　　Q. All right. And then I believe in that
10　second conversation with Mr. Melton -- in that
11　second conversation with Mr. Garner where he said
12　Mr. Melton didn't recall the incident, that you were
13　still trying to decide if you wanted to move forward
14　with a formal complaint; is that right?
15　　　A. Can you repeat that question, please?
16　　　Q. Yes, it was a bad question. At the time
17　of your second conversation with Mr. Melton --
18　　　A. Mr. Melton?
19　　　Q. Strike that. I'm going to start over.
20　　　A. I got you.
21　　　Q. Okay. At the time of your second
22　conversation with Mr. Garner, it's my understanding
23　that you let Mr. Garner know at that time that you
24　were still trying to decide if you wanted to go
25　forward with a formal complaint; correct?

Page 63

1　　　A. Well, when I spoke to him on that Saturday
2　and it sort of -- I sort of sat there, and I thought
3　about when he said he didn't remember. And I sat
4　there and I thought about it, and I said, Well, what
5　if he would have really, you know, killed me,
6　anything like that. Because things happen, you
7　know, way beyond that I understand that what we can
8　think when we say would not happen, sometimes those
9　things that will happen.
10　　　And I thought about what if he'll do that
11　to someone else. And then by me not saying
12　anything, that if he go and do it to someone else
13　and then I let him got away with it and had a
14　opportunity to speak up or speak about it and
15　prevent it. And that's why I made my mind up to --
16　to write the incident report.
17　　　Q. But it's -- and I appreciate that. Thank
18　you.
19　　　My understanding is that you made your
20　mind up to do that, to go forward at some point
21　after you spoke with Mr. Garner on the 29th, on
22　Saturday?
23　　　A. Right.
24　　　Q. And then it was on Sunday, the 30th, that
25　you texted Mr. Garner and told him that you changed

Page 64

1　your mind and you wanted to go forward with a formal
2　complaint?
3　　　A. Right.
4　　　(Exhibit 6 marked for identification.)
5　　　Q. I'm showing you Exhibit 6. And this, sir,
6　as I understand, is a text message in the middle of
7　the page under May 30th in blue that you sent to
8　Mr. Garner letting him know that you wanted to go
9　forward with the complaint?
10　　　A. Yes, ma'am.
11　　　Q. And that was the first time that you told
12　Illinois Central that you wanted to move forward
13　with the formal complaint; correct?
14　　　A. Right.
15　　　Q. And just for purposes of our record, your
16　statement in Exhibit 5, this is the only statement
17　that you provided in writing to the company about
18　the incident; correct?
19　　　A. That's right.
20　　　Q. And the comment that Todd said he was from
21　Egypt Plantation is the only alleged comment that
22　you contend is of a racial nature that Mr. Melton
23　used in reference to you; correct?
24　　　A. Yes, ma'am.
25　　　Q. And that wasn't even in reference to you,

Page 65

1　correct -- that was in reference to Mr. Sweeney?
2　　　A. Yes, ma'am.
3　　　Q. He just said it in front of you?
4　　　A. Yes, ma'am.
5　　　Q. Okay. And this statement, Exhibit 5, is
6　the only report to the company that you made that
7　contains any allegation of any racially
8　inappropriate behavior by any employee; correct?
9　　　A. Yes, ma'am.
10　　　Q. And it's for this statement, Exhibit 5,
11　that you claim you were retaliated against, and your
12　employment was terminated; is that right?
13　　　A. Yes, ma'am.
14　　　Q. In Exhibit 5 -- I'm sorry if I already
15　asked you this, sir. I just want to make sure I'm
16　getting to all the questions I meant to ask today.
17　　　Exhibit 5, this is the only complaint that
18　you made during your employment with Illinois
19　Central that you contend was a report of any -- or
20　opposition of any racially inappropriate language or
21　contact by another employee?
22　　　A. Yes, ma'am.
23　　　Q. All right. And so after you made the
24　report to Mr. Garner, I understand that you heard
25　from Chris Day; correct?

17 (Pages 62 - 65)

Exhibit B - Excerpts from the August 2024 deposition transcript of Robert Branch pursuant to the present matter

Page 66

1    A. Yes, ma'am, I did.
2    Q. And it's my understanding from your
3 Mr. Garner didn't do anything to try to discourage
4 you or dissuade you from moving forward with the
5 report?
6    A. No, ma'am.
7    Q. When you spoke to Mr. Day, what do you
8 recall about your conversation with Mr. Day?
9    A. When he -- when I first spoke to Mr. Day,
10 he got on the phone, he said have you -- have you
11 consulted the union? What I need to consult the
12 union for? I suppose to talk to my immediate
13 supervisor.
14    And he asked me -- he kept saying you
15 should talk to the union. I said no, I need to -- I
16 reported to Chance. He said that's -- Chance told
17 him what happened. That's what he told me, Chance
18 told him what happened. He didn't even ask me what
19 happened that day. He said Chance told him what
20 happened. And he got on the phone telling me, he
21 said why -- have you talked to the union? I said
22 no, I haven't talked to the union. I don't need to
23 talk -- I need to talk to my supervisor. Then he
24 said, well, management is -- they off on vacation
25 today. I said I understand that.

Page 67

1    Q. It was Memorial Day weekend?
2    A. I said I understand that. I said, well,
3 I'm looking at it like tomorrow. Tomorrow we go
4 back to work. And he told me, he said well, write a
5 statement. Then he text me and said don't type it,
6 handwrite it.
7    Q. And he never told you why he wanted you to
8 write it versus type it; correct?
9    A. No, ma'am, he didn't.
10    Q. Did Mr. Day ever explain to you that he
11 thought you should talk to the union because there
12 was potential that you could be disciplined relating
13 to the fight?
14    A. No, ma'am.
15    Q. You understand that when there are events
16 that could result in discipline that your union has
17 involvement in it?
18    A. Yes, ma'am.
19    (Exhibit 7 marked for identification.)
20    Q. All right, sir. And it looks like you
21 have that text exchange with Mr. Day -- it looks
22 like Mr. Day communicated to you by a text on
23 May 30, around 3:43 p.m. to write a statement and
24 that it had to be handwritten; correct?
25    A. Right.

Page 68

1    Q. So that communication about the statement,
2 that came via text?
3    A. Yes, ma'am.
4    Q. Okay. And then it looks like from the
5 text exchange you sent Mr. Day your written
6 statement around 8:00 o'clock p.m. that night?
7    A. Yes, ma'am.
8    Q. So you got the message from Mr. Day, and
9 then did you go home and write the statement?
10    A. Yes, ma'am.
11    Q. Okay. And if we look at the text that's
12 pasted in Exhibit 5, you would agree with me that
13 that's the same statement that we looked at as
14 Exhibit 5 of your deposition?
15    A. Yes, ma'am.
16    Q. Other than to tell you to ask you to talk
17 to your union, in your first conversation with
18 Mr. Day, did he do anything to try to dissuade you
19 from moving forward with your complaint?
20    A. Mr. Day, he also stated that he was going
21 to talk to me and Todd the next morning, and he
22 never did. I mean, he said he was going to be at
23 work and he going to talk to me and Todd after the
24 briefing, and he did not.
25    Q. Okay. Other than to tell you to talk to

Page 69

1 your union and not to follow-up on a discussion with
2 you, did Mr. Day do or say anything between your
3 first conversation with him and going forward to try
4 to discourage or dissuade you from moving forward
5 with your complaint?
6    A. Not that day.
7    Q. Did he do something on a later date to try
8 discourage or dissuade you from moving forward?
9    A. The next day Nick called me, and he called
10 me, asked me what happened. And, you know, and he
11 told me that Chris had him to call me, call me to
12 try to get me to drop the incident report.
13    Q. And that's Nick, the union representative?
14    A. Yes, ma'am.
15    Q. Did he give you any reason why he said
16 Mr. Day wanted you to drop the complaint?
17    A. He said that I could get fired. He said,
18 they'll fire you. I said, that's chance I got. I
19 said, it need to be heard. I said, because no one
20 should have to get attacked at a hotel or on job. I
21 mean, that shouldn't happen.
22    Q. And in that conversation with Nick, the
23 union representative, that's Nick Manojlovich; is
24 that right?
25    A. Yes, ma'am.

18 (Pages 66 - 69)

Page 70

1      Q.   That came after you submitted your
2   statement that we've marked as Exhibit 5?
3      A.   Yes, ma'am.
4      Q.   And Mr. Manojlovich, as your union
5   representative, explained to you in that phone call
6   that you may lose your job as a result of your
7   conduct on me 26, 2022; correct?
8      A.   He did say that.
9      Q.   All right.  So you submitted the statement
10   we saw the night of May 30th.  We know from your
11   past testimony that you were taken out of service on
12   June 2?
13      A.   Right.
14      Q.   When in between there do you contend the
15   conversation with Nick Manojlovich occurred?
16      A.   That Tuesday when I got back to work.
17      Q.   And do you contend that this conversation
18   with Nick Manojlovich was the only time Mr. Day
19   tried to stop you from going forward with your
20   complaint other than asking you to talk with the
21   union initially and not following up with you upon
22   your return to work?
23      A.   I talked to -- after I got off the phone
24   with Nick, Chris called me later on, and that's when
25   he stated that -- that I tried to get you -- I tried

Page 71

1   to get you to drop it earlier.  And I said, well --
2   I said -- I asked him, I said, well, I told him
3   that -- I said Todd hit me in the face for no
4   reason.  And when I told him he drawed blood, put a
5   dent in between my eye and bust my lip and almost
6   knocked -- I told him, I said it was uncalled for --
7   I said it was totally uncalled for.  And that's when
8   he told me, he said I'm tired of Todd's mess and got
9   off the phone.  Then he got off the phone.  And he
10   said --
11      Q.   And did Mr. Day tell you that he had
12   elevated your complaint to human resources and upper
13   management at that point?
14      A.   I think he mentioned it, but before he
15   mentioned it, he told me that he tried to get me to
16   drop it.  That's what he told me.
17      Q.   Was it in that same phone call that he
18   told you he had passed on your complaint?
19      A.   Yes, ma'am.
20      Q.   And did you understand that -- strike
21   that.  Let me ask you this.
22           After your conversation with -- after you
23   were pulled out of service, did you go back to
24   Mr. Day and try to recant or withdraw your
25   complaint?

Page 72

1      A.   No, ma'am.
2      Q.   At no point in time?
3      A.   No, ma'am.
4           MS. FITZKE:  Why don't we take a short
5   break for our court reporter here.
6           THE WITNESS:  Okay.
7           (Off the record.)
8           MS. FITZKE:  We're going to make a quick
9   record that we got started this morning, but we have
10   now joined Matthew Gallagher to the deposition.  He
11   is our local counsel.  He's going to be
12   participating by a phone.  And counsel and I had a
13   brief discussion off the record, and it's my
14   understanding that there is no objection to how the
15   deposition proceeded this morning and that you would
16   waive any objection to Mr. Gallagher not having been
17   here from the commencement of the deposition; is
18   that right?
19           MR. NORRIS:  That's correct.
20           MS. FITZKE:  All right.  Cool.
21           All right, Mr. Branch, are you ready to
22   proceed, sir?
23           THE WITNESS:  Yes, ma'am.  I am.
24      Q.   (By Ms. Fitzke) Okay.  Now, just kind of
25   closing the loop on your testimony just before the

Page 73

1   break, my understanding is that Mr. Day is the only
2   individual from the railroad that you claim
3   encouraged or tried to encourage not to move forward
4   with your complaint against Mr Melton; is that
5   right?
6      A.   That's correct.
7      Q.   And once Mr. Day elevated your report to
8   human resources and upper management, at no time did
9   anybody come back and try to get you to stop moving
10   forward with the complaint?
11      A.   No, ma'am.
12      Q.   In fact, after it proceeded beyond
13   Mr. Day, you understood there was no longer an
14   option to stop the wheels that were in motion;
15   correct?
16      A.   That's correct.
17      Q.   But Mr. Day did give you a choice as to
18   whether or not to move forward; correct?
19      A.   Correct.
20      Q.   And you heard Mr. Day testify at the
21   Office of Administrative Law Judges hearing on your
22   Federal Rail Safety Act claim that he knew if this
23   went forward, he understood it was likely that both
24   you and Mr. Melton would be terminated; correct?
25      A.   Correct.

19 (Pages 70 - 73)

Page 78

1    in a bar fight.
2        Q.   And when did this happen?  Was it while
3    you were still working for the railroad or after?
4        A.   It was after.
5        Q.   And what did Mr. Meeks tell you about
6    Mr. Day's bar fight?
7        A.   He said Mr. Day got punched in the face.
8        Q.   And you heard Mr. Day's testimony about
9    that alteration a couple of times now; correct?
10       A.   Correct.
11       Q.   I believe Mr. Day indicated that he was
12   head-butted by a contractor; correct?
13       A.   Right.
14       Q.   Do you have any facts to indicate that
15   that is not true?
16       A.   No, ma'am.
17       Q.   Mr. Day testified under oath that he did
18   not strike back.  He did not hit the contractor.  Do
19   you have any information to indicate that that is
20   not true?
21       A.   No, ma'am.
22       Q.   Do you know who Mr. Day's supervisor was
23   at the time?
24       A.   No, ma'am, I do not.
25       Q.   And you don't have any information one way

Page 79

1    or the other whether Mr. Day, in fact, reported what
2    occurred with the contractor to his supervisor?
3        A.   No, I do not.
4        Q.   And you don't know what, if anything,
5    Mr. Day's supervisor might may have done to look
6    into that; correct?
7        A.   No, I do not.
8        Q.   Are you aware of any other employee that
9    you claim was involved in a physical altercation at
10   work that was not terminated?
11       A.   No, ma'am.
12       Q.   Are you aware of other individuals who
13   were involved in a physical alteration at work and
14   who were terminated?
15       A.   No, ma'am.
16       Q.   We talked a little bit about the
17   discipline pol -- oh, sorry.  Go ahead.
18       A.   Can I ask you a question?
19       Q.   Sure.
20       A.   If you get head-butted and you were taking
21   money under the table, would you report it?
22       Q.   I'm not sure I follow.  But again, I think
23   your lawyer indicated -- if you need to ask me
24   questions for purposes of clarification of the
25   question, I'm happy to answer those.

Page 80

1        With respect to the discipline policy
2    under which your employment was terminated, is it
3    your understanding that that discipline policy
4    applies only to the unionized workforce?
5        A.   So, it wasn't applied to the management?
6        Q.   I'm just asking about your understanding.
7    That's my question.
8        A.   Yes, ma'am.
9        Q.   Now, you got pulled out of service and
10   notice of the investigation on June 2, and then the
11   investigation hearing went forward June 7; correct?
12       A.   Yes, ma'am.
13       Q.   And you -- would you agree with me that
14   we've talked in detail about that investigation
15   hearing in your prior deposition?
16       A.   Yes, ma'am, we did.
17       Q.   And at no point during that investigation
18   hearing did you ever raise any concern or complaint
19   that you believed you were being called to
20   investigation due to any concern of race
21   discrimination or because of your race; correct?
22       A.   No, ma'am, I did not.
23       Q.   And you didn't raise any concern during
24   that June 7 investigation that you were being
25   investigated in retaliation for having opposed or

Page 81

1    raised concerns of race discrimination; correct?
2        A.   I don't think we talked about that.
3        Q.   During the investigation hearing, I
4    believe you testified that -- that Mr. Melton had no
5    bad intent toward you and that everything was okay
6    now; correct?
7        A.   Yeah, because of -- the union rep met me
8    at my car that morning and told me to say -- said
9    would you mind saying something good about
10   Mr. Melton, and that's why.  I mean, I thought
11   because when I went -- when I went -- when I got up
12   that morning and got dressed to go to that
13   investigation, my mind was on tell the truth and
14   nothing but the truth, so help me God.
15       Q.   And when you made those comments about
16   Mr. Melton, nice or not, you were telling the truth;
17   correct?
18       A.   I guess I were.  I mean, I mean I had
19   to -- I was following the union rep commandment.
20   I'm going to say it like that.
21       Q.   Well, but you wouldn't have said anything
22   untruthful just because the union rep told you to,
23   would you?
24       A.   Well, my point is, you know, to say
25   something -- he was changing the narrative of the

21 (Pages 78 - 81)

Exhibit B - Excerpts from the August 2024 deposition transcript of Robert Branch pursuant to the present matter
Veritext Legal Solutions
www.veritext.com                                                                           888-391-3376

# Exhibit C

**Excerpts from the November 7, 2023, deposition of Plaintiff Robert Branch pursuant to his matter in front of the OALJ**

Page 1

1            U.S. DEPARTMENT OF LABOR - OSHA
            OFFICE OF ADMINISTRATIVE LAW JUDGES

2

3

4    Robert Branch,

5          Complainant,

6

7    vs.                         OSHA Case No. 301002724

8

9    Illinois Central Railroad Company,

10         Respondent.

11

12

13

14              DEPOSITION OF ROBERT BRANCH

15

16

17

18     Taken at the instance of the Respondent at the
        offices of Wise Carter Child & Caraway, P.A.,
19      401 East Capitol Street, Suite 600, Jackson,
     Mississippi on Tuesday, November 7, 2023, beginning
20                   at 9:08 a.m.

21

22

23

24            * * * * * * * * * * * * *
              REPORTED STENOGRAPHICALLY BY:

25       LORI W. BUSICK, CVR-S #7510, CCR #1677

Exhibit C - Excerpts from the November 7, 2023, deposition of Plaintiff Robert Branch pursuant to his matter in front of the OALJ

Page 2

1 APPEARANCES:
2   CHARLES EDWARD SOREY, II, ESQ.
    Attorney at Law
3   1000 Highland Colony Pkwy Ste 5203
    Ridgeland, Mississippi 39157-2079
4   Phone: (601) 341-6929
    Email: eddysorey@gmail.com
5
      COUNSEL FOR COMPLAINANT
6
7   SUSAN K. FITZKE, ESQ.
    LITTLER MENDELSON, P.C.
8   1300 IDS Center
    80 South 8th Street
9   Minneapolis, MN 55402.2136
    Telephone: 612.630.1000
10   Facsimile: 612.630.9626
    Email: sfitzke@littler.com
11
      COUNSEL FOR RESPONDENT
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1         INDEX

2 Style and Appearances...........................1
3 Certificate of Deponent......................189
4 Certificate of Court Reporter.................190
5
6       EXAMINATIONS
7 Examination by Ms. Fitzke......................4
8
9        EXHIBITS
10 EXHIBIT 1  Handwritten Report ................97
11 EXHIBIT 2  Letter ............................108
12 EXHIBIT 3  Termination Letter ...............114
13 EXHIBIT 4  Transcript .......................122
14 EXHIBIT 5  Termination Letter ...............133
15 EXHIBIT 6  Job Search Records ...............145
16 EXHIBIT 7  Medical Record ...................147
17 EXHIBIT 8  Collection Letter ................150
18 EXHIBIT 9  Healthcare Payments ..............152
19 EXHIBIT 10 Cobra ............................153
20 EXHIBIT 11 Psychiatrist Receipt .............154
21 EXHIBIT 12 Interrogatories ..................157
22 EXHIBIT 13 Prescription .....................183
23
24
25

Page 4

1      Robert Branch,
2 having been first duly sworn, was examined and
3 testified as follows:
4
5 EXAMINATION BY MS. FITZKE:
6   Q.  Good morning, Mr. Branch.
7   A.  Hey, good morning. How are you doing?
8   Q.  My name is Susan Fitzke and I represent
9 Illinois Central in conjunction with the retaliation
10 claim that you filed with the US Department of
11 Labor.
12   A.  Yes, ma'am.
13   Q.  We've asked you to come down today to give
14 a deposition.
15     Have you ever given a deposition before?
16   A.  No, ma'am.
17   Q.  Okay. So I'm going to give you a few
18 ground rules that will hopefully help today go
19 smoothly, but also help make sure that our court
20 reporter here gets down the best record of our
21 discussion today as possible, okay?
22   A.  Yes, ma'am.
23   Q.  So because she is typing down everything
24 that you and I or your lawyer might say here in the
25 room today, it's important that we have only one

Page 5

1 person speaking at a time.
2     In normal conversation you might think you
3 understand my full question before I finish it or I
4 might think I understand your full answer before you
5 finish it and we kind of tend to talk and listen at
6 the same time, but if we try to do that today
7 there's no way for her to keep up, okay?
8   A.  Yes, ma'am.
9   Q.  For purposes of our record, I'd also ask
10 if you can please give a yes or a no or whatever
11 other verbal answer might be appropriate to the
12 questioning. The uh-huhs (affirmative response) and
13 huh-huhs (negative response), everyone in the room
14 might understand, but when we try to read it back
15 later --
16   A.  Yes, ma'am.
17   Q.  -- it won't make any sense.
18   A.  Right.
19   MR. SOREY: You've got to let her finish
20 before you start answering. You already started.
21 We talked about this yesterday.
22   Q.  (By Ms. Fitzke) And to be fair, sir,
23 everybody does tend to need reminders of that
24 particular rule. So if I give you reminders or your
25 lawyer does, it's nothing personal, it's very

2 (Pages 2 - 5)

Exhibit C - Excerpts from the November 7, 2023, deposition of Robert Branch pursuant to his matter in front of the OALJ
Veritext Legal Solutions
www.veritext.com        888-391-3376

Page 34

1  gangs more often?
2     A.  Yes, ma'am.  With rail gang I was able to
3  maintain a machine and operate a machine.
4     Q.  When did you do the training in Yazoo
5  City?
6     A.  It was in 2017.
7     Q.  So when you worked on a rail gang it
8  sounds like you held seniority and had the right
9  certification to be a machine operator?
10    A.  Yes, ma'am.  I operated a machine.
11    Q.  And when you were at a tie gang did you
12 operate a machine?
13    A.  Sometimes I did and sometimes I didn't.
14    Q.  Just depending on who else was part of the
15 gang and who had what seniority and training?
16    A.  Yes, ma'am.
17    Q.  Fair to say from your perspective that up
18 until the incident with Mr. Melton that your
19 employment with Illinois Central was fairly
20 uneventful?
21    A.  Can you restate that, ma'am?
22    Q.  Sure.  I understand that prior to the
23 incident with Mr. Melton, you didn't have any
24 discipline on your record; is that right?
25    A.  That is correct.

Page 35

1     Q.  And that you didn't have -- you hadn't
2  made any complaints or didn't really have any
3  complaints about your employment; is that right?
4     A.  No, ma'am, I didn't.
5     Q.  When you were hired by Illinois Central,
6  did you go through any kind of orientation or
7  training?
8     A.  Yes, ma'am, I did.
9     Q.  Tell me what you can recall about that?
10    A.  Every year that we take the Book of Rules,
11 within the Book of Rules you might go through
12 harassment, you have hazard material classes, you
13 have USOR, you have OTS, CWR.
14    Q.  What was the last one?
15    A.  CWR.
16    Q.  What does CWR stand for?
17    A.  Continuing weld -- continuing weld --
18 continuing weld something.  I can't think of it off
19 my head.
20    Q.  That's okay.
21    A.  Because I ain't looked at the book.
22    Q.  And what is OTS?
23    A.  OTS is operating -- operating -- oh, man,
24 I have to think about -- see, I ain't look because I
25 ain't been out there.

Page 36

1     MR. SOREY:  Time?
2     THE WITNESS:  Huh?
3     MR. SOREY:  Time?
4     THE WITNESS:  Huh-huh (negative response).
5     Q.  (By Ms. Fitzke) We can look it up, sir.
6  Don't worry about it.
7        And then the USOR is the US Operating
8  Rules?
9     A.  Yeah, US Operating Rules.
10    Q.  When you --
11    A.  Oh, OTS is On-Track Safety.  I'm sorry.
12    Q.  Thank you.  I knew I knew the acronym too
13 but for some reason --
14    A.  It's on-track safety.
15    Q.  Yeah.
16       And in terms of when you said the Book of
17 Rules at the beginning, is that the US Operating
18 Rules?
19    A.  It's the US Operating Rules and OTS.
20    Q.  Okay.
21    A.  Uh-huh (affirmative response).
22    Q.  Anything else in the Book of Rules that
23 you're referring to?
24    A.  And the CWR.
25    Q.  Okay.  And did you receive those rules

Page 37

1  upon your hire?
2     A.  Yes, ma'am.
3     Q.  And then, as I understand it, when you're
4  hired you go to training on those particular rules;
5  is that right?
6     A.  Right.
7     Q.  And then every two years you're qualified
8  on the US Operating Rules; is that right?
9     A.  Yes, ma'am.
10    Q.  Are you -- do you also receive train every
11 two years on the on-track safety and CWR rules?
12    A.  On-track safety and CWR rules you take
13 them annually.
14    Q.  Annually, okay.  And you, as I understand
15 it, have to pass a test at the end of the training?
16    A.  Yes, ma'am.
17    Q.  And you have to do that to maintain your
18 qualification for you role?
19    A.  Yes, ma'am.
20    Q.  All right.  And do you also -- are you
21 also familiar with Illinois Central's code of
22 conduct?
23    A.  Yes, ma'am.
24    Q.  Did you receive training on the code of
25 conduct?

10 (Pages 34 - 37)

Page 46

1 Book of Rules but I didn't really, you know, really,
2 really know him. I was just new on the railroad and
3 I heard guys just calling one another names and I
4 didn't really, really know a lot of guys during that
5 time went I first started.
6    Q. When was that?
7    A. That was in '08 I was at the Book of Rules
8 in Grenada.
9    Q. Is that a rules training class you were
10 at?
11    A. Yes, ma'am.
12    Q. And are you trying to say that Mr. Melton
13 was involved in calling other employees names in
14 this rules training class?
15    A. No, ma'am.
16    Q. Oh, I'm sorry. I misunderstood.
17    A. You asked me when I -- when I met him.
18    Q. Yes.
19    A. That's when I met him.
20    Q. Okay.
21    A. I didn't know -- you know what I'm saying,
22 I didn't, you know. That was like in -- I think
23 that was the question you asked me.
24    Q. Yeah. Absolutely.
25       And you said something about calling each

Page 47

1 other names, are you just mentioning that's the
2 first time you heard his name?
3    A. I said -- well, I said I didn't really
4 know the employees, I just heard, you know,
5 different ones calling one another names, you know
6 what I'm saying. I didn't know anyone, that's what
7 I'm saying, because that's when I had first started.
8 You know, I didn't know anybody by name or who was
9 who or what position they hold. That's when I
10 first, you know, met him.
11    Q. Understood.
12    A. Yeah.
13    Q. Thank you for that clarification.
14       Did you -- when was the first time that
15 you worked side by side or on a gang with
16 Mr. Melton?
17    A. I think we was on -- we was on the rail
18 gang, I think. I don't know which -- I don't know
19 which year it were or whatever, I don't really
20 recall because Mr. Melton mostly did -- he mostly
21 was a track inspector so. And when he was on the
22 gang he mostly -- mostly drove a truck because he
23 had -- he had a lot of seniority. So I wasn't
24 really, you know, around Mr. Melton like that, I
25 mean.

Page 48

1    Q. Do you know how many -- on how many
2 occasions or on how many different gangs you worked
3 with him over the course of your employment?
4    A. All I know was, I think it was -- we
5 worked on the rail gang, yeah. I don't recall
6 what -- rail gang and tie gang. Rail gang and tie
7 gang.
8    Q. So would it have been kind of over the
9 course of the years you worked there off and on that
10 you would have had Mr. Melton on your gang or was it
11 a frequent occurrence or are you able to say?
12    A. I think it was like a frequent occurrence
13 because Mr. Melton was -- like I said, I worked in
14 the Bridge Department most time than when I did
15 working the track back in the production side.
16 Mr. Melton was -- he wasn't -- he wasn't on our
17 gang.
18    Q. He was not on your gang?
19    A. No, ma'am.
20    Q. When -- after -- I think you mentioned
21 moving back to production in about 2015?
22    A. Yes, ma'am.
23    Q. After you moved back to production, when
24 was the first time that you can recall being on a
25 gang with Mr. Melton?

Page 49

1    A. I think it was somewhere in like 2020,
2 somewhere along in there. See, I don't remember
3 Melton just being on our gang, you know, constantly
4 being on our gang.
5    Q. You don't recall him constantly being on
6 your gang?
7    A. No, ma'am.
8    Q. Before the incident that occurred on
9 May 26 of 2022, had you ever had any kind of issue
10 or problem with Mr. Melton?
11    A. No, ma'am. I never had any problems with
12 him.
13    Q. Do you recall having any interactions with
14 Mr. Melton prior to May 26, 2022?
15    A. No more than I'd see him everyday fueling
16 up a machine, that's it, that I was operating,
17 that's it.
18    Q. Kind of good morning while you're fueling
19 up your machine?
20    A. That's it.
21    Q. I've seen reference in various documents
22 or transcripts that sometime before May 26 of 2022
23 that there was an incident at a union meeting
24 involving someone named Sweeney. Can you explain to
25 me your understanding of what had occurred at the

Exhibit C - Excerpts from the November 7, 2023, deposition of Eagle Robertson pursuant to this matter in front of the OALJ
Veritext Legal Solutions
www.veritext.com                                                                    888-391-3376

Page 50

1 union meeting prior to the May 26, 2022 incident?
2     A.  The best of my knowledge is that we was at
3 the Crystal Grill in Greenwood, Mississippi.  I
4 think it was a 4 o'clock meeting, four or 5o'clock
5 meeting, I can't recall the time exactly.
6     Q.  Uh-huh (affirmative response.)
7     A.  Question was asked by some of the guys at
8 the meeting --
9     Q.  Who was asked, I'm sorry?
10     A.  Mr. Sweeney, Mr. Bentley, Paul -- Mr. Paul
11 Herman, they asked the union rep why wasn't
12 Mr. Melton reprimand when his regulator almost went
13 off the bridge.  And Ray Gibson, who was operating a
14 regulator he -- his wing hit -- knocked the bolt out
15 of a handrail and he was issued a level two and
16 Mr. Melton wasn't reprimand at all.
17     Q.  And I'm sorry, who was the other
18 gentleman?
19     A.  Paul Herman.
20     Q.  Herman, did you say?
21     A.  Yes, ma'am.
22     Q.  Oh.  No, but who was the one that knocked
23 the bolt off the handrail?
24     A.  Ray Gibson.
25     Q.  Gibson.  Thank you.  Okay.  And the --

Page 51

1 Sweeney Bentley and Herman were asking -- who was
2 the union rep they were asking?
3     A.  Nick.  I don't know Nick's last name.  I
4 can't pronounce his last name.
5     Q.  Okay.  All right.  And did they receive a
6 response?
7     A.  Nick said that he was out of town, he
8 didn't know anything -- he didn't know about it,
9 what had took place.  So he said he would have to
10 talk to Wade -- Wade Clark or somebody who was in
11 charge.  So -- so by that time when Sweeney said --
12 he pointed and said Todd didn't -- Todd didn't get
13 reprimanded.  So Todd sort of got a little offended
14 and they went at -- they went at each other.
15     Q.  They fought?
16     A.  They didn't really fight because the guys
17 stepped between them and broke it up.  But it got --
18 it got out of hand.  To me, it got out of hand.  I
19 mean, it shouldn't have never really happened.  I
20 mean, we at a -- we at a public place and I mean you
21 should always conduct yourself in a professional
22 manner no matter where you at because -- I mean,
23 that's how I look at it.
24     Q.  So there was not a physical fight that
25 day?

Page 52

1     A.  No, ma'am.  It was like, you know words
2 passed.  The guys stepped in -- the guys stepped
3 between them and broke it up.
4     Q.  When you say there were words passed, what
5 did they say to one another?
6     A.  You know, they you know, maybe calling one
7 another boy and whatever.  I mean, other than that
8 I, you know, I didn't really, you know, recall ever
9 word of what was said, you know, because --
10     Q.  Did they each call the other boy?
11     A.  Yes, ma'am.
12     Q.  And were you involved in breaking up or
13 getting in between the two gentleman?
14     A.  No, ma'am.
15     Q.  Okay.
16     A.  But I spoke to both of them.
17     Q.  After the meeting?
18     A.  After the incident I spoke to both of
19 them.
20     Q.  Who did you speak to first?
21     A.  I spoke to Mr. Melton.  I told him that,
22 you know, you got a job, you got a family and, you
23 know, acting up -- acting up clown, acting a fool is
24 not the proper way, you know.  And I told him that
25 chill out man.  Then I went to talk to Mr. Sweeney.

Page 53

1 I told him basically the same thing and he told me
2 that I was over there taking to Todd, I was taking
3 Todd's side.  He told me I was taking Todd's side.
4 And I told him, I said, "Man, I'm not taking nobody
5 side, I just don't want to see y'all up in here
6 clowning."
7     Q.  So how did Mr. Melton respond when you
8 spoke with him?
9     A.  He didn't really respond, he just looked
10 at me crazy.
11     Q.  Have you ever observed Mr. Melton on any
12 other occasion engage in behavior that was similar
13 to what you saw at this union meeting?
14     A.  No, ma'am, I haven't.
15     Q.  And before May 26, and after this union
16 meeting, did you see Mr. Melton engage in any
17 conduct that was similar to this?
18     A.  Before May 26?
19     Q.  Yes.
20     A.  Did I see --
21     Q.  Uh-huh (affirmative response).
22     A.  No, I didn't seeing them but at the union
23 meeting.
24     Q.  How long after this union meeting -- or
25 let me ask it, I guess, a different way.

14 (Pages 50 - 53)

Page 54

1 How long before May 26 was this union
2 meeting?
3 A. The union meeting was April the 30th, if I
4 can recall.
5 Q. Outside of the brief discussion that you
6 mentioned with Mr. Melton at the union meeting, did
7 you speak with him at any other time before May 26
8 about what occurred?
9 A. No, ma'am. Actually, I thought it was,
10 you know, it's over with. I mean, I didn't --
11 Q. And outside of your conversation with
12 Mr. Sweeney at the union meeting had you spoken with
13 him at any other time about what occurred there?
14 A. Yeah. I spoke to him on the phone because
15 he called me and asked me to my -- he had -- he had
16 told somebody that I was taking Todd's side. And I
17 told him -- I told him that I wasn't taking no one's
18 side I was just doing it because of the fact that --
19 that's who the person I am. I mean, I don't -- I
20 don't, you know -- we said we family and we say we
21 brotherhood, we like one big family and when you see
22 railroad men going at one another, it just don't --
23 it just don't -- it just don't look right,
24 especially in a public place.
25 Q. Okay. How long was that phone call with

Page 55

1 Mr. Sweeney?
2 A. It wasn't -- it wasn't -- it wasn't long,
3 it was like brief. But I, you know I was glad he
4 called me because I wanted to let him know that I
5 didn't appreciate him, you know, telling someone
6 that I'm taking somebody's -- it wasn't about taking
7 nobody's side. It was about doing what's right.
8 Q. And was that phonecall -- was that before
9 the May 26th events?
10 A. Yes, ma'am. It was probably a week after
11 the incident that happened at Crystal Grill.
12 Q. Did you speak with Mr. Melton or
13 Mr. Sweeney at any other time prior to May 26 about
14 the incidents that occurred at the union meeting?
15 A. No, ma'am.
16 Q. All right. Then let's go ahead and talk
17 about May 26 of 2022.
18 A. Yes, ma'am.
19 Q. So it's my understanding that at that time
20 you were working on a rail gang as a machine
21 operator?
22 A. Yes, ma'am.
23 Q. And what was Mr. Melton's role on that
24 particular gang?
25 A. I think he was the fuel truck operator.

Page 56

1 Q. And so during the course of your work
2 shift, is it fair to say that you wouldn't have much
3 occasion to come in contact with one another, other
4 than maybe to fuel up in the morning?
5 A. We might see each other at the hotel,
6 might run into one another, you know. Other than
7 that maybe I'd be coming down the elevator or out of
8 his room or I might be coming out of my room, we in
9 the lobby or something like that, checking in. But
10 other than that, you know.
11 Q. And prior to May 26 of 2022, it's my
12 understanding that you didn't have any issue with
13 Mr. Melton?
14 A. No, ma'am.
15 Q. Okay. Then let's talk about the evening
16 of May 26 of 2022. Can you tell me what happened,
17 to the best of your recollection?
18 A. Yes, ma'am.
19 The evening me and a few guys that work on
20 the gang, we decide that we had got -- we didn't
21 want to go out to the restaurant and eat, we wanted
22 to just -- one of the guys had brought a grill with
23 him, we wanted to just buy some food and just grill
24 out in the parking lot. So about 9 o'clock, the
25 other guy -- the white guy, they was drilling on the

Page 57

1 other end, we was drilling on one end of the hotel.
2 So about 9 o'clock that night they got
3 finished before we did so some of them came around
4 where we were, which I was the one that was doing
5 the cooking. And I was about to wrap it up and go
6 to the room. So Mr. Melton, he came out the hotel
7 door with his barefoot, his shoes off, and he --
8 first of all, I thought he was -- he was good
9 because he was dancing to the music, one of the guys
10 had his music on his truck. And all of a sudden, he
11 just -- all of a sudden he just -- he just went in a
12 rage. He started yelling, talking loud, cussing,
13 saying he was from Little Egypt Plantation where we
14 kill and motherfuckers, I'm going to kill Sweeney.
15 By the time -- when I heard him say he's
16 going to kill Sweeney, I just asked him -- I said,
17 "Man, chill out," you know "Sweeney ain't here,
18 chill out." And when I said that, I was standing --
19 I was standing like this in front of the grill and
20 next thing I know -- he was like from here to that
21 chair there and he rushed over, he ran over there
22 and pushed me and just pushed me to the ground and
23 I -- he pushed me to the ground where I twisted my
24 knee, skint my elbow up.
25 When I got up off the ground I asked

Exhibit C - Excerpts from the November 7, 2023, deposition of Larry Robinson taken pursuant to his matter in front of the OALJ
Veritext Legal Solutions
www.veritext.com                                                                888-391-3376

Page 58

1 Mr. Melton why did he -- why did he push me and
2 before I knew it, he hit me around the face --
3 right -- two licks right in my face and knocked
4 me -- and knocked me to the ground. When he knocked
5 me to the ground, I took -- it took all that I could
6 to get up. And my -- I mean, I had a gash up here.
7 And he was still standing over me I said -- and I
8 started just swinging. I started swing so -- he
9 backed -- he was backing up and he slipped down. So
10 when I got ready to hit him, the guys pulled me off
11 of him. So when they pulled me off -- pulled me off
12 of him, he got up. I went over to him, the guys
13 were giving me some tissue and paper for the -- to
14 wipe the blood coming down from my head. I'm
15 mean -- and I'm like, man, I ain't do nothing to
16 him. I don't know why he hit me. I was in -- I was
17 in a disbelief. I mean, I was like -- all I ask --
18 all I told him was man leave it alone and, you know,
19 you attack me for no reason. That's, you know --
20 and I just -- I didn't understand it and I still
21 don't.
22        And so by that time he got -- he stated --
23 I heard him say, "I'm going to my truck and get my
24 gun." And Mr. Earl Honeysuckle, he was -- who's the
25 assistant foreman on the rail gang, he trailed him

Page 59

1 to his truck to make sure that he didn't get his
2 weapon and come back and start shooting.
3    Q. Did you ever find out from Earl where he
4 went?
5    A. Earl said he went to his truck but the gun
6 wasn't there. The gun was in the room.
7    Q. Did you ever see the gun?
8    A. No, ma'am. So he came back around where
9 we were and Mr. Ben Arnold [sic] came out there and
10 he got him and took him to the room.
11        But what I come to find out were, I came
12 to find out the next week that he was -- the white
13 guy was around on the other end, they was around
14 there talking about fighting one another, who can
15 knock who out.
16    Q. Who told you that?
17    A. His name is Walker Young. I don't think
18 he work -- I think they said he was from Kosciusko,
19 he got a job at the phone company. And I asked him,
20 I said, "Man, why were y'all around there talking
21 about jumping on one -- fighting one another and
22 then y'all bring -- y'all know y'all into it,
23 y'all bring -- y'all bring that around to us."
24 Didn't make sense.
25    Q. So you mentioned a couple of times the

Page 60

1 white guys, were there two different barbecues that
2 were kind of segregated by race?
3    A. Yes, they was segregated, right.
4    Q. Okay.
5    A. They was cooking burgers on one end by the
6 pool and we was on -- we was on the west side -- the
7 east side by the -- by the highway.
8    Q. Is that just simply why you decided to
9 hang out with that night?
10    A. No, we -- we always go out to eat, the
11 guys that I -- we always go out to eat together and
12 if we didn't go out to eat, you know we might get
13 tired of eating at the restaurant we'll -- it was
14 the last day, it was on the Thursday, out last day
15 at the hotel so we decided to do something
16 different.
17    Q. Okay. And when you go out as a group, do
18 you go out as a whole -- a whole group, the whole
19 gang?
20    A. No, ma'am. No. Everybody got their --
21 everybody got their picks, who they -- who they, you
22 know, who they hang with, you know.
23    Q. Got it. And that's who you picked to hang
24 without?
25    A. Yeah. The guys that I was cooking with?

Page 61

1    Q. Yeah.
2    A. Yeah.
3    Q. Okay. When you said that there was -- you
4 heard that the, what you called the white guys, were
5 talking about fighting one another, was it your
6 understanding that they were talking about some of
7 the white guys fighting the other white guys?
8    A. Right.
9    Q. Yeah, okay.
10    A. But they was -- they was like -- they was
11 into it. It was like -- it was like -- it was like
12 Todd was talking about telling them how you knock
13 someone out. That's what the guy told me. And I
14 didn't -- I mean, I asked them I said why were y'all
15 around there taking that -- when you is -- when you
16 is drinking in the dozens of alcohol, alcohol can
17 lead to, if you don't know how to handle it, it can
18 lead to a lot of different, you know.
19    Q. And it's your understanding that the
20 gentlemen, at the other barbecue, they were
21 drinking?
22    A. Yes, ma'am.
23    Q. And did -- did Mr. -- did you observe
24 anybody else from that other barbecue?
25    A. Did I observe anybody else from the other

16 (Pages 58 - 61)

Page 62

1 barbecue.
2    Q.  Right.  Other than Mr. Melton.
3    A.  I observed Walker and Dillon Butte.
4 They're the one that was -- when I found out -- and
5 he -- when I found out when the incident was over
6 with him, I found out that they was -- they was into
7 it and I was like --
8    Q.  Into the discussion about fighting one
9 another?
10    A.  Right.  And I'm like, why did y'all bring
11 that here, around here?
12    Q.  And Mr. Melton, did he appear to be
13 impaired by the alcohol, to you?
14    A.  He wasn't his-self.
15    Q.  So I want to go back through some of what
16 you shared and just ask some follow-up questions.
17    A.  Yes, ma'am.
18    Q.  So is it your recollection that as
19 Mr. Melton came around that the first thing you
20 recall him saying is something about being from
21 Little Egypt?
22    A.  Yes, ma'am.
23    Q.  Okay.  And I think you said he mentioned
24 he's from Little Egypt and then you said something
25 about kill and bury the MFs.  But can you tell me,

Page 63

1 to the best of your recollection, exactly what he
2 said?
3    A.  He said that "I'm from Little Egypt
4 Plantation, where we kill and bury motherfuckers.
5 I'm going to kill Sweeney."
6    Q.  Okay.  And what's your understanding of
7 what's Little Egypt?
8    A.  Little Egypt is a plantation right off 49
9 Highway, right outside, about 10 miles right outside
10 of Greenwood.
11    Q.  Does that mean anything to you, to be from
12 Little Egypt?
13    A.  To me, a plantation is where -- where they
14 had slaves and -- they had slaves and a lot of stuff
15 took place, you know what I'm saying.  So that's the
16 point.  I think of a plantation, that's what I think
17 of.  I think of you know, a lot of racism, a lot of
18 things took place that, you know, don't take place
19 in an ordinary place.
20    Q.  So forgive me, because I'm not from around
21 these parts.
22    A.  Right.
23    Q.  Does it -- is that sort of a name for area
24 where people live?
25    A.  It's a name of an area, but it's also a

Page 64

1 plantation.
2    Q.  Okay.  Do you know one way or the other
3 whether Mr. Melton is from that area?
4    A.  From what I -- what I understand is I
5 don't really know, I mean, because I don't know
6 Mr. Melton like that.
7    Q.  Is that area in or around Little Egypt or
8 Little Egypt Plantation, is that an area that's
9 known for any kind of violence?
10    A.  I mean I can't really -- I can't really
11 say because I really don't know.
12    Q.  Okay.
13    A.  I can't answer that question.
14    Q.  Okay.  And then after you heard that, it's
15 my understanding from your testimony that you
16 responded that Sweeney ain't here, chill out, or
17 words to that effect?
18    A.  Right.
19    Q.  Did you say anything else?
20    A.  No, ma'am.
21    Q.  Did anybody else respond to Mr. Melton's
22 behavior.
23    A.  No, ma'am.
24    MR. SOREY:  Would you repeat again what
25 you said that he said.

Page 65

1    MS. FITZKE:  Sweeney ain't here, chill
2 out.
3    MR. SOREY:  Okay.  I just misunderstood.
4    MS. FITZKE:  That's okay.
5    Q.  (By Ms. Fitzke) Okay.  And did you say
6 anything else at all to Mr. Melton before he pushed
7 you to the ground?
8    A.  No, ma'am.
9    Q.  So then, kind of just taking it
10 chronologically:  Mr. Melton, you testified how he
11 pushed you down.  I understand then that you got up
12 and asked Mr. Melton why he pushed you; is that
13 right?
14    A.  Yes, ma'am.
15    Q.  And then did Mr. Melton respond verbally
16 in any way to that question?
17    A.  No, ma'am.  He respond physically.
18    Q.  Okay.
19    A.  He knocked the shit out of me.
20    Q.  So it's my understanding that he punched
21 you twice in the face?
22    A.  Yes, ma'am.
23    Q.  Okay.  And that those punches cause you
24 to, again, go to the ground?
25    A.  Yes, ma'am.

17 (Pages 62 - 65)

Exhibit C - Excerpts from the November 7, 2023, deposition of Antwain Scott Burch pursuant to his matter in front of the OALJ

Page 70

1    A.  Well, when he said, I'm going to kill this
2  motherfucker, you know, I'm going to get my
3  motherfucking gun, that's tough word, them -- you
4  know what I'm saying, them frightening words, you
5  know.
6    Q.  Other than, did Mr. Melton use any other
7  curse words, other than on that one occasion?
8    A.  You know, I don't recall if he did.  I
9  mean, I don't recall.  I mean -- actually, I wasn't
10  really -- I actually wasn't really paying him no
11  attention, to be honest about it.  Like I said, he
12  snuck me.  Because if I would have saw him -- I
13  would have saw him trying to hit me, I would have --
14  I actually would have ducked or ran or something
15  because I know fighting is going to lead to
16  something else.
17    Q.  What do you mean by that?
18    A.  I mean fighting just -- it can lead to you
19  know, anything, you know what I mean, so I just
20  always try to avoid it.
21    Q.  What kinds of things did you think
22  fighting would lead to?
23    A.  Fight can lead to someone getting
24  seriously hurt, killed.  You know, it's just -- and
25  then you wake up the next day and you ask yourself

Page 71

1  what happened, I mean.  So I try -- I try to avoid
2  those things.
3    Q.  You understood that fighting would also be
4  a violation of Illinois Central's workplace violence
5  policy?
6    A.  I understand that too.
7    Q.  So did you at any time then report the
8  incident that occurred on May 26, 2022 to Illinois
9  Central management?
10    A.  Gardener -- it was reported to Gardener
11  the next morning.
12    Q.  By you?
13    A.  My foreman did.  My foreman told me that
14  night that he was going to report it.  He was out
15  there an assistant foreman.
16    Q.  And was that Tye?
17    A.  Yes, ma'am.
18    Q.  Did you ever speak with Tye and confirm
19  what, if anything, he reported to Chance Gardener?
20    A.  Yes, I did.
21    Q.  And what did Tye tell you?
22    A.  He said he told Chance everything.
23       MR. SOREY:  Move your hand.
24       THE WITNESS:  He told Chance everything
25  that happened.

Page 72

1    Q.  (By Ms. Fitzke) Did you speak with
2  Mr. Gardener?
3    A.  Yes, ma'am, I did.
4    Q.  And when did you speak with Mr. Gardener?
5    A.  After the briefing that morning.
6    Q.  On the 27th?
7    A.  Yes, ma'am.
8    Q.  And what did you say?
9    A.  He just asked me what happened and he said
10  he heard what happened and he asked me what I wanted
11  to do and I told him that I'm not for sure right
12  now.  He said that he'll get back with me later and
13  he had to talk to Todd first, to get Todd's story.
14    Q.  Where did you speak with Mr. Gardener?
15    A.  In Columbia at job briefing.
16    Q.  Was anybody else present?
17    A.  No.  It was just -- he came -- he came to
18  my machine.  No.
19    Q.  And he asked what did you want to do?
20    A.  Yes, ma'am.
21    Q.  Is that what you said?
22    A.  Yes, ma'am.
23    Q.  Okay.  What did you understand him to mean
24  at that point?
25    A.  Only thing I can understand whether did I

Page 73

1  want him to follow-up with a incident report or
2  whether I wanted to...
3    Q.  Did Mr. Gardener do anything or say
4  anything at that time by your machine on May 27 to
5  dissuade you from filing an incident report?
6    A.  He didn't say anything to dissuade me
7  filing, he didn't say anything to encourage me to
8  file it.
9    Q.  Did you speak with Mr. Gardener again
10  about the incident?
11    A.  Yes, ma'am, I did.
12    Q.  When was that?
13    A.  It was on Saturday the 28th.  I called
14  him, I asked him, "Have you spoke to Mr. Melton?"
15  And he told me he did.
16    Q.  Other than to tell you he had spoken with
17  Mr. Melton, did Mr. Gardener tell you anything about
18  that discussion?
19    A.  No, ma'am.  He just told me that Todd said
20  he didn't remember.  He said, "Mr. Melton said he
21  didn't remember."
22    Q.  How did you respond, if at all?
23    A.  I told him that I'm going to think about
24  it and the next couple -- next day or two and I'm
25  going to give him a call.  Because I told him, I

Exhibit C - Excerpts from the November 7, 2023, deposition of Edgar Robinson
Veritext Legal Solutions
www.veritext.com                                                     888-391-3376

Page 94

1  the conversation that we were just talking about,
2  had you spoken to your union representatives at all
3  about what happened at the hotel?
4     A.  Nobody but Nick called me.
5     Q.  You mentioned the name Nick a minute ago,
6  can you remind us about the phonecall that you
7  received from Nick?
8     A.  He just asked me what happened.
9     Q.  And other than to tell him what happened,
10 did you have any further discussion with Nick about
11 the incident?
12    A.  No, ma'am, I did not.
13    Q.  Do you recall Nick's last name?
14    A.  Nick is Monisque (sic) --
15    MR. SOREY:  I can't spell it I'd spell it
16 for you.  It's about this long (indicating).
17    MS. FITZKE:  That's okay.  We can -- I am
18 sure we can look it up somewhere.
19    Q.  (By Ms. Fitzke) And is he also one of your
20 union reps?
21    A.  Yes, ma'am.
22    Q.  Okay.  And how long after the May 26
23 incident did you speak with Nick?
24    A.  It was brief.
25    Q.  Like the next day, do you think?

Page 95

1     A.  No, it wasn't the next day.  It was like
2  that Tuesday.
3     Q.  Okay.  So did you have any further
4  discussion, then, with Darrel McGuire about whether
5  or not to move forward with any kind of complaint
6  against -- relating to the May 26 incident against
7  Mr. Melton?
8     A.  No, I did not.
9     Q.  Okay.  Did anybody else from your union or
10 from Illinois Central try to discourage you from
11 moving forward with the complaints against
12 Mr. Melton?
13    A.  Not as I knows of.
14    MS. FITZKE:  Why don't we stop here and
15 just take a short break?
16    THE WITNESS:  Yes, ma'am.
17    MS. FITZKE:  Thank you.
18    (Off the record at 11:10 a.m.)
19    Q.  (By Ms. Fitzke) Mr. Branch, before the
20 break when you were telling us about the May 26
21 incident, you mentioned that Mr. Melton had stated
22 that he had a firearm in his truck; is that right?
23    A.  That's what he said.
24    Q.  Say that again.
25    A.  That's what he said.

Page 96

1     Q.  Okay.  And did you ever report to the
2  railroad, to Illinois Central Management or Human
3  Resources that Mr. -- that Todd Melton indicated he
4  had a firearm in his truck?
5     A.  No, ma'am, I did not.
6     Q.  Is there any reason why you didn't report
7  that.
8     A.  I thought maybe a foreman or someone
9  with -- assistant foreman walked out there and he
10 said it wasn't in his truck so that's why I didn't
11 report it.
12    Q.  Did you ever verbally state to
13 Mr. Gardener or Mr. Day that you felt threatened by
14 Mr. Melton?
15    A.  I stated to Mr. Day on that Tuesday.
16    Q.  Is that the -- on that Tuesday phonecall
17 is that the only time you had ever stated today
18 Mr. Day or to Mr. Gardener that you felt threatened
19 by Mr. Melton?
20    A.  I know I stated it to Mr. Day.
21    Q.  Okay.  To the best of your recollection,
22 that's the only time you stated it verbally?
23    A.  Yes, ma'am.
24    Q.  Did you ever report, verbally, to Mr. Day
25 or Mr. Gardener that you believe that Mr. Melton was

Page 97

1  a danger to you or to others?
2     A.  I just -- I stated to Mr. Day that -- that
3  he might do something to somebody else worser.  I
4  did state that to Mr. Day.
5     Q.  And that was in the Tuesday call as well.
6     A.  Yes, ma'am.
7     Q.  Is that the only time you indicated to
8  Mr. Day or Mr. Melton, verbally that you thought
9  Mr. Melton might be a threat to you or to others?
10    A.  Yes, ma'am.
11    Q.  Dis you ever tell Mr. Day or Mr. Melton
12 that you felt nervous at work or that you felt you
13 had a need to look over your shoulder?
14    A.  No, ma'am.  I did not.  I said it in my
15 incident report.
16    MS. FITZKE:  Can we mark this, please.
17    (Exhibit 1 marked for identification.)
18    Q.  (By Ms. Fitzke) Showing you Exhibit No. 1,
19 sir.  A minute ago you mentioned an incident report.
20 Is the statement we've marked as Exhibit 1 what you
21 consider to be your incident report?
22    A.  Yes, ma'am.
23    Q.  Okay.  Is this written in your
24 handwriting?
25    A.  My hand was hurting that night and my wife

25 (Pages 94 - 97)

Exhibit C - Excerpts from the November 7, 2023, deposition of Dwight Robert Branch pursuant to his matter in front of the OALJ
Veritext Legal Solutions
www.veritext.com                                                                           888-391-3376

Page 98

1 wrote it.
2    Q.   Okay.
3    A.   I told her what to write.
4    Q.   Okay.  Did she take it down word for word?
5    A.   Yes, ma'am, she did.
6    Q.   All right.  So I just want to kind of go
7 through this and make sure we've covered our bases
8 on this.  About seven lines down where you indicate
9 Mr. Melton was speaking about a situation at a union
10 meeting.  Is that the situation involving
11 Mr. Sweeney that we talked about?
12    A.   Yes, ma'am.
13    Q.   You indicate or the statement indicates
14 her, "He and another employee had a disturbing,
15 violent confront while Todd was saying racial slurs,
16 calling the CN employee boy."
17       Do you see where I'm reading?
18    A.   Yes, ma'am, I see it.
19    Q.   Okay.  And is that a reference to the
20 confrontation you talked about earlier where the two
21 were --
22    A.   Yes, ma'am.
23    Q.   -- coming toward each other but never
24 engaged in physical violence towards one another?
25    A.   Yes, ma'am.

Page 99

1    Q.   And Mr. Sweeney and Mr. Melton each
2 referred to the other as boy, correct?
3    A.   Yes, ma'am.
4    Q.   Is there a reason why you didn't mention
5 that in this statement here?
6    A.   There's a reason why I mention what?
7    Q.   That Mr. Sweeney also referred to
8 Mr. Melton as boy?
9    A.   Well, actually, I didn't really -- I
10 didn't really -- didn't really hear Mr. Sweeney say
11 boy, I heard Mr. Sweeney say "you called me a boy."
12 You know what I'm saying.
13    Q.   So earlier you testified that they each
14 referred to the other as boy --
15    A.   Like I said --
16    Q.   -- are you changing your testimony?  Nope,
17 you've got to wait until I finish my question, okay.
18    A.   Okay.
19    Q.   Before the -- earlier in the testimony you
20 mentioned that each referred to the other as boy,
21 are you changing your testimony now?
22    A.   Well, I really, like I said, that was like
23 a year and a half ago and I really don't really
24 recall, you know.  My mind is not fresh like it was
25 when I wrote the statement about the incident what

Page 100

1 happened at the union -- I mean at the union
2 meeting.  There was so much going on.
3    Q.   Is this statement that we marked as
4 Exhibit 1, is this the same statement that you then
5 sent a picture to Mr. Day of?
6    A.   Yes, ma'am.
7    Q.   All right.  Why while you were having the
8 exchange with Mr. Melton on the 26th, after
9 Mr. Melton was walking back and fell down, why
10 didn't you walk away at that point?
11    A.   Why didn't I walk away?
12    Q.   Yeah.
13    A.   I mean, I was -- I was -- I got -- he hit
14 me for no reason, and I mean no reason at all.  And
15 my point is, why would you put your hand on a grown
16 man?  You had no reason putting your hand on me.
17    Q.   Did you say you were angry?
18    A.   Yes, I was upset, I had --
19    Q.   Is there any -- I'm sorry.  Go ahead.
20    A.   I had a right to be.
21    Q.   Any other reason why you didn't just walk
22 away at that point?
23    A.   So I'm going to walk away when someone --
24 when they put - violate me, so I'm going to walk
25 away?  Somebody come on and clap you, you're going

Page 101

1 to walk away or you're going to press charges?  What
2 are you going to do?
3       It's not that easy.  Just being real.
4 It's not that easy.
5    Q.   When you wrote -- well, when you told your
6 wife what to write in this statement that is Exhibit
7 1.  Did you do this -- it looks like it's dated on
8 the top, May 30, 2022.  Is that when you wife wrote
9 it?
10    A.   Yes, ma'am.
11    Q.   And after she wrote it all down, did you
12 read it?
13    A.   Yes, ma'am, I did.
14    Q.   Did you confirm that it was all accurate?
15    A.   Yes, ma'am, I did.
16    Q.   As I understand the situation on the
17 May 26 when this incident occurred that you were at
18 a hotel with a group of Illinois Central employees,
19 correct?
20    A.   Yes, ma'am.
21    Q.   And then, when did you return home?
22    A.   Friday evening.
23    Q.   Would that have been the 27th?
24    A.   Yes, ma'am.
25    Q.   Did you talk to your wife about what

Exhibit C - Excerpts from the November 7, 2023, deposition of Todd Richmond pursuant to his matter in front of the OALJ
Veritext Legal Solutions
www.veritext.com                                    888-391-3376

Page 134

1 Illinois Central, what did you do to try to find
2 another job?
3    A.   I have had interview with Columbus and
4 Greenville Railroad.  I had an -- fill out
5 application and I had an interview but I wasn't -- I
6 wasn't hired.  They didn't select me.
7        I have filled out job applications at
8 Milwaukee Tools, B. Wilder Lumber Company Greenwood,
9 Coca-Cola, Walmarts, Frito-Lay.  I mean I -- then I
10 had an interview at the paper company Revolution
11 Forest in Grenada I did an interview but I wasn't
12 selected.
13    Q.   So I think I didn't ask that question in
14 the right way.  When did you first start looking for
15 work outside of Illinois Central?
16    A.   I started looking for, work in July,
17 somewhere along in there, I started going online
18 filling out applications.  Somewhere along in there.
19    Q.   Do you recall -- well, let me ask you
20 this.  Where did you look for potential job
21 opportunities?
22    A.   I went online and start searching.
23 Because I had to go to the -- went into the
24 unemployment office in Greenwood.  Basically, I
25 searched online, jobs online.

Page 135

1    Q.   Did you like -- how did you go about
2 searching online, did you use like an Indeed or
3 Monster, some kind of job compiler or how did you go
4 about your online job search?
5    A.   Well, most of the time -- well, I did --
6 might have went on Indeed sometime, and sometimes I
7 went to a company direct job site and applied,
8 because most of the time when you go to they company
9 direct job, they let you know whether they got
10 openings or whatever.
11    Q.   How did you go about identify the
12 different companies that you wanted to look at?
13    A.   I wanted to -- I was trying to work for
14 something that can -- that I was related to.  Like I
15 have worked in a factory before, I know could, you
16 know, go in and adapt.  I had worked doing outside
17 work with Revolution Forest, it's -- they deal
18 with -- it's a paper mill and they deal with
19 machinery and stuff like that, I knew I was familiar
20 with that.  And warehouse work, I tried to get on,
21 you know, Coca-cola, in their warehouse.  I feel
22 like it would be something I would be comfortable
23 with.
24        And I tried to get me a route job with
25 Frito Lay.  Something that I feel like I wanted to

Page 136

1 do something different, maybe drive and meet peoples
2 and greet peoples, and you know, get more familiar
3 with peoples or whatever.
4    Q.   Have you ever been offered any jobs since
5 you were terminated from Illinois Central?
6    A.   No, ma'am, I haven't.
7    Q.   Did you place any limits on the kind of
8 work that you were seeking or that you would -- any
9 opportunities that you would accept?
10    A.   Not really.
11    Q.   Have you -- well, do you have any idea how
12 many jobs you've applied for since you left?
13    A.   I think 25 or 30 or something or more.
14 Something like that.
15    Q.   Are you still actively looking for work?
16    A.   Yes, ma'am, I am.
17    Q.   What are you doing now to try to find
18 work?
19    A.   Actually, I'm still going online looking,
20 seeing what -- that I'm interested in, you know,
21 doing.
22    Q.   What was the last job you applied for?
23    A.   I think the last job I applied for was
24 Milwaukee Tool, couple weeks ago.
25    Q.   Have you heard back from them?

Page 137

1    A.   No, ma'am, I haven't.  Only thing I heard
2 was, "Thank you for applying."
3        Then I talked to a neighbor of mine who
4 worked there and he told me they wasn't doing
5 anything.
6    Q.   When you applied for Milwaukee Tools, did
7 they have an open position posted?
8    A.   Yes, ma'am.
9    Q.   Prior to Milwaukee Tools -- well, first of
10 all, what kind of job is it at Milwaukee Tools that
11 you applied for?
12    A.   I think it was like where they made
13 blades, in the blades department.  Then I talk to
14 another guy at B.Wilding Lumber Company, his name is
15 Mr. Andy Bridges.  I talked to him and I sent him a
16 résumé also.  And he said that they're supposed to
17 be doing some hiring and he'll give me a call for an
18 interview but I haven't heard anything back.
19    Q.   Prior to Milwaukee Tools, do you recall
20 what the last job before that, that you applied for
21 was?
22    A.   Back up online and I did a Coca-Cola --
23 not at Coca-Cola, Pepsi-Cola, I think.
24    Q.   Do you know when that was?
25    A.   About a couple weeks ago, I think.  I'm

Exhibit C - Excerpts from the November 7, 2023, deposition of Dwight Smith
Veritext Legal Solutions
www.veritext.com                                                                                                888-391-3376

# Exhibit D

Excerpts from the Deposition Transcript of
Chance Garner

**In The Matter Of:**

*Robert Branch v.*
*Illinois Central Railroad Company*

---

*Chance Gardner*
*November 27, 2023*

---

*Tiffanie N. Harrison*

Original File Chance Gardner 11.27.23.prn
Min-U-Script® with Word Index

---

UNITED STATES DEPARTMENT OF LABOR
OFFICE OF ADMINISTRATIVE LAW JUDGES
COVINGTON DISTRICT OFFICE

ROBERT BRANCH,
     Petitioner,

v.               CASE NO.: 2023-FRS-00026

ILLINOIS CENTRAL RAILROAD COMPANY,
     Respondents.


Oral Deposition
of
Chance Gardner
(Taken November 27, 2023 at 1:10 p.m.)


TIFFANIE N. HARRISON, CCR
P.O. BOX 883
LITTLE ROCK, ARKANSAS 72203
(501) 960-2219
harrisonreporting@outlook.com

---

Page 3

INDEX

STYLE AND NUMBER. . . . . . . . . . . . . . . . . . . 1
APPEARANCES . . . . . . . . . . . . . . . . . . . . . 2
CAPTION. . . . . . . . . . . . . . . . . . . . . . . 4
PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . 5
    Examination by Mr. Sorey. . . . . . . . . . . . . 5
PROCEEDINGS CONCLUDED. . . . . . . . . . . . . . . . 23
COURT REPORTER'S CERTIFICATE . . . . . . . . . . . . 24


EXHIBITS
Exhibit 1 - CN Workplace Violence Prevention Policy . 14

Tiffanie N. Harrison, CCR
(501) 960-2219

---

Page 2

APPEARANCES

ON BEHALF OF THE PETITIONER:

    Mr. C. E. Sorey, II
    Christy-Ferguson Law Firm
    1000 Highland Colony Parkway
    Suite 5203
    Ridgeland, Mississippi 39157
    eddysorey@gmail.com

    Mr. James Ferguson
    Law Office of H. Chris Christy, P.A.
    201 West Broadway Street, Suite G12
    North Little Rock, Arkansas 72114
    jferguson.raillaw@gmail.com

ON BEHALF OF THE RESPONDENTS:

    Ms. Susan Fitzke
    Littler Mendelson, P.C.
    1300 IDS Center
    80 South 8th Street
    Minneapolis, Minnesota 55402
    sfitzke@littler.com

ALSO APPEARING:

    Ms. Gillian Marshall

Tiffanie N. Harrison, CCR
(501) 960-2219

---

Page 4

CAPTION

1
2     PROCEEDINGS in the above-styled and numbered cause
3  on the 27th day of November, 2023, before Tiffanie N.
4  Harrison, Arkansas Supreme Court Certified Court
5  Reporter #757, at 1:10 p.m., via Zoom Video
6  Conferencing, pursuant to the agreement hereinafter set
7  forth.
8
9             * * * * * * * * * *
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Exhibit D: Excerpts from the Deposition Transcript of Chance Gardner

Robert Branch v.
Illinois Central Railroad Company

Chance Gardner
November 27, 2023

Page 5

1    PROCEEDINGS
2    THEREUPON,
3        Chance Gardner,
4    THE WITNESS HEREINBEFORE NAMED,
5    having been first duly cautioned and
6    sworn by me to testify to the truth,
7    the whole truth, and nothing but the
8    truth, testified on their oath as
9    follows, to-wit:
10    EXAMINATION
11 BY MR. SOREY:
12 Q   Mr. Gardner, my name is Eddy Sorey.  And I'm one of
13 the attorneys for Mr. Branch.  I'll have several
14 questions for you today but we're not going to be here
15 real long.  If I ask you a question and you don't
16 understand it, please ask me to explain it and I'll be
17 happy to.  Otherwise, if you answer the question, I'm
18 going to assume that you understood it; is that fair?
19 A   Yes, sir.
20 Q   All right.  Thank you.
21        MR. SOREY: Susan, do you want to do read
22    and signing or what -- what do you want to do?
23        MS. FITZKE: He will read and sign.
24        MR. SOREY: All right.  Where do you want
25    the deposition sent for the court reporter

Page 6

1    then?
2        MS. FITZKE: To me.
3        MR. SOREY: All right.  Well, tell her
4    where it is because she don't know you.
5        MS. FITZKE: She's got my information or we
6    can handle that at the end here.
7        MR. SOREY: Okay.
8 Q   (BY MR. SOREY) Mr. Gardner, if you would, would you
9 tell us when you began work with the railroad?
10 A   2010, March --
11 Q   Go ahead.
12 A   Go ahead.  March 10th, 2010.
13 Q   Okay.  And what was your position then?
14 A   It was a trackman.
15 Q   All right.  And from trackman -- or how long did
16 you remain a trackman?
17 A   To 2015.
18 Q   And in 2015, what did you become?
19 A   A foreman.
20 Q   Okay.  And if you -- if you would -- just give us
21 some general information about what a foreman does.  And
22 you were a foreman over a crew, or of how many people?
23 A   Over the production gang.  Anywhere from 40 to 60
24 men.  We did the tie program and the rail programs for
25 CN.

Page 7

1 Q   With the production crew, and you -- and you told
2 us the number and I know it can be a very large group
3 and it can vary.
4 A   Yes, sir.
5 Q   But you -- you're a -- foreman over both the tie
6 and the rail group?
7 A   You're talking about now or -- I was.  I'm the
8 supervisor now.
9 Q   I'm talking about in 2015?
10 A   Yes, sir.  Yes, sir.  I started -- I got the
11 foreman job in 2015 over the production gangs.
12 Q   All right.  And what were your general duties at
13 that time?
14 A   Protecting the gang, like, on the track while they
15 was doing track work, entering their time and checking
16 behind them, checking behind their work and stuff like
17 that.
18 Q   Okay.  Did you have to get time to work on the road
19 bed from the railroad?
20 A   Yes, sir.  Protection.  Yes, sir.
21 Q   Okay.  All right.  I assume your position changed
22 again after that?  When did it change and to what did it
23 change?
24 A   It changed in May.  May 5th of last year.
25 Q   That would be May 5th of 2022?

Page 8

1 A   Yes, sir.
2 Q   And what would that position change be?
3 A   To supervisor --
4 Q   Okay.
5 A   -- of the production gang.
6 Q   All right.  And what are the general duties of the
7 supervisor?
8 A   A little bit more than the foreman.  I talk to the
9 foreman and he takes -- does my job that I used to do
10 and keep the guys supplied with tools and whatever their
11 needs and that -- that stuff.
12 Q   Okay.  Now, the production gang and rail gangs
13 travel all over the railroad system; is that a correct
14 statement?
15 A   Yes, sir.  Used to, it only traveled to -- we had a
16 border, but now we don't.  We work -- we're system wide
17 now.
18 Q   Okay.  Now, on your production gang, did you have
19 Mr. Robert Branch?
20 A   Yes, sir.
21 Q   And did you also have Mr. Tracy Melton?
22 A   Yes, sir.
23 Q   And you're generally familiar with both of these
24 men?
25 A   Yes, sir.

Robert Branch v.
Illinois Central Railroad Company

Chance Gardner
November 27, 2023

---

Page 9

1 Q    Okay.  Now, if you would, just tell us what you
2 know about the situation or the incident that has led to
3 both Mr. Branch and Mr. Melton being terminated from the
4 railroad?
5 A    Well, the only -- everything that I was told was
6 hearsay.  I did not talk to neither one of them.  Well,
7 I did not talk to Mr. Branch personally.  I talked to
8 Mr. Melton.  I didn't -- did not talk to Mr. Branch at
9 all about the situation.  The only reason I talked to
10 Todd is because I had to get a statement from him.  I
11 was told to get a statement from him and remove them
12 from service when I did.
13       But like I said I did not talk to Mr. Branch about
14 it.  And the only time I talked to Mr. Branch about the
15 situation is when he -- he told me that there was an
16 altercation and that he wanted to report it.  And that's
17 when I -- that's the day I reported it -- reported it
18 myself is when I found out about it.  It was not
19 hearsay.
20 Q    Okay.  And to whom did you report the incident to?
21 A    Chris -- Christopher Day.
22 Q    Okay.  And who is Christopher Day?
23 A    He is my manager.  He is my boss.
24 Q    Okay.  And after you reported it to Mr. Chris Day
25 did you have anything else to do with this investigation

---

Page 10

1 or with anything else that surrounds this situation?
2 A    No, sir.  Like I said the only thing that I -- when
3 I reported it and we come back to work, I got a
4 statement from Todd Melton and then I removed them from
5 service, when they told me -- when I was told to remove
6 them from service.  That's my -- the only time I had
7 anything to do with it.
8 Q    Okay.  And when was Mr. Melton removed from
9 service?  Do you know?
10 A    I don't -- I do not remember the exact date.  It
11 was -- we come back after Memorial Day, which I'd have
12 to look.  I don't remember the exact date.  It was the
13 Tuesday we came back from Memorial Day.
14 Q    Okay.  And so far, you've told us everything you
15 know about this particular incident?
16 A    Yes, sir.  That I was told -- when I was told about
17 it, when Mr. Branch told me about it, I reported it to
18 Chris.
19 Q    Now, did you have anything with issuing the -- or
20 let me -- that's not a good question.  I'm sorry.
21       Did you have anything to do with the investigation
22 itself?
23 A    No, sir.
24 Q    Did you participate in the investigative period?
25 A    No, sir.

---

Page 11

1 Q    Okay.  Are you familiar with CN about -- and I say
2 CN, of course, Mississippi I'm used to saying IC so if I
3 say IC, I really mean both of them because they just.
4 That's the way it's done here.  Are you familiar with
5 the CN Workplace Violence Prevention Policy?
6 A    Yes, sir.
7 Q    And how are you familiar with that?
8 A    I do not know it word for word but I understand
9 that if -- like if -- what I'm saying is you report
10 stuff and if -- Hold on.  Give me a second.  I know it
11 -- I do not know it word for word, but I understand if
12 you report something -- you report something you need to
13 report it.  We ask for you to report stuff, but it's
14 your decision to report it or not report it.
15 Q    So you're telling me that workplace violence on the
16 CN property is -- it is not mandatory to report it to
17 the railroad?
18 A    That's -- yes, sir.  It's your choice.
19 Q    Okay.  And that's even if you're on the railroad
20 tracks that's owned by CN; is that correct?
21 A    That's correct.
22 Q    Okay  Now, do you have to teach or do anything as
23 far as let the men know about the CN Workplace Violence
24 Prevention Policy?
25 A    No, sir.  We have a team for that.

---

Page 12

1 Q    And do you know who is own that particular team?
2 A    I don't -- I'd have to -- it's our -- we go over it
3 like in our -- we have special meetings every year, with
4 the OSHA team and they go over it.  Like HR comes and
5 goes over it with us and all that.
6 Q    And do you remember any of the people who came and
7 spoke to the production crew?
8 A    No, sir.  I do not.
9 Q    Okay.  And normally when do y'all do this?  The
10 meeting, I should say.  I'm sorry.
11 A    We have a meeting once a year.
12 Q    Okay.  Would that be at the start of the season or
13 it --
14 A    It all depends on when we have time to do it.  We
15 have our rules class once a year and that's when it's
16 done, once a year, once a calendar year.
17 Q    And when they speak to the production crew about
18 the workplace violence, do they explain to them what
19 workplace violence is?
20 A    Yes, sir.
21 Q    And what is your general understanding of what
22 workplace violence is?
23 A    My -- my definition of workplace violence is
24 anything that's harmful to you like can be harm -- be
25 harmful to you like -- like fighting.  It can be

---

Tiffanie N. Harrison
501-960-2219

Exhibit D: Excerpts from the Deposition Transcript of Chance Gardner

# Exhibit E

Branch's March 28, 2024, answers to IC's
First Set of Interrogatories

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**GREENVILLE DIVISION**

ROBERT BRANCH,

       Plaintiff,

      v.

ILLINOIS CENTRAL RAILROAD
COMPANY,

       Defendant.

CIVIL ACTION NO.  4:23-CV-217-MPM-JMV

<u>**PLAINTIFF'S RESPONSE TO INTERROGATORIES OF DEFENDANT'S (SET I)**</u>

<u>**INTERROGATORIES**</u>

<u>**INTERROGATORY NO. 1.**</u>  Identify every source of income you have had since May 1, 2022, and for each source of income identified, state the amount you received and the reason for the payment (e.g., wages, consultant's fee, etc.), and identify all Documents and ESI that refer or relate to the source of income.

<u>**ANSWER NO. 1:**</u>  Plaintiff has produced herewith all documents not previously objected to, and which have been identified as responsive to this interrogatory are being produced contemporaneously with these responses. Please refer to Plaintiff's bates stamped documents as BRANCH 000704-000713 INCOME RECEIPTS. Plaintiff was employed by the Defendant until June 24, 2022.  Plaintiff's employment file is in the possession of the Defendant, therefore, Defendant has knowledge of Plaintiff's employment from May 1, 2022, until his wrongful termination date of June 24, 2022. However, in Plaintiff's attempt to respond to interrogatory 1, he received the following income from the Defendant as follows:

May 20, 2022 -  Gross $4,265.36 (2 weeks' pay) June  3, 2022- Gross $4,308.90  (2 weeks' pay);

June 17, 2022 - Gross $3,645.87 (2 weeks' pay) July I, 2022- Gross $3,065.20 (vacation pay) July; 15, 2022- Gross $3,309.76 (final check); and Railroad Retirement Board Unemployment - $9,000.00 total for year 2022.

**INTERROGATORY NO. 2.** Identify every prospective employer or entity to whom you have applied for a job and/or independent contractor or consultant position since May 1, 2022, and for each state:

  a.  the date of your application;

  b.  the position applied for and its salary or hourly wage;

  c.  whether you had an interview, and if so, who was present;

  d.  the date of the interview(s);

  e.  whether or not you were offered a job;

  f.  if you were not offered a job, the reasons you were given;

  g.  if you were offered a job, whether you accepted or declined the job offer;

  h.  for any offer declined, the reason you did not accept the job; and

  i.  identify all Documents and ESI that refer or relate to the application process.

**ANSWER NO. 2:** Plaintiff has produced herewith all documents not previously objected to, and which have been identified as responsive to this interrogatory are being produced contemporaneously with these responses. Please refer to BRANCH 000714-000737 EMPLOYMENT SOUGHT.

Columbus and Greenville Railway Company, Track Laborer Interview on October 7, 2022, at 9 am with Garth Studstill-General Manager. I was not selected.

Biewer Lumber-Applied in August 2022. No interview. Applied online. Received no emails or phone calls.

Paper Mill Entry - Received email on 3/7/23. Salary $22.12 hr with potential earnings up to $46 hr. No interview.

Milwaukee Tool-Received email on 2/16/23. The salary was to start at $15.00 hr. No interview.

Grenada Railroad-Applied on November 15, 2023. No interview. Applied online. Received no

emails or phone calls.

**INTERROGATORY NO. 3.** Identify every person or entity with whom you have been employed or otherwise provided services during the period of May 1, 2022, and ongoing, including separately for each your dates of employment, positions held, compensation promised or received, benefits promised or received, any discipline and the reason stated for the same, reason(s) for separation, and immediate supervisor(s).

**ANSWER NO. 3:** Plaintiff objects to this Interrogatory as overbroad, vague, unduly burdensome. To the extent not objectionable, Plaintiff has not been employed since his termination from the Defendant.

**INTERROGATORY NO. 4.** Identify each person that you intend to call as a trial witness in this matter and, for each, separately state the facts and observations to which the witness is expected to testify and the identity of each document on which the witness is expected to testify.

**ANSWER NO. 4:** Objection to the extent this calls for speculation, overly broad and unduly burdensome, calls for speculation, and is vague. Notwithstanding, and in the interest of efficiency, I claim that all the individuals named throughout discovery, potentially have discoverable information may also possibly be called as trial witnesses in this matter whether disclosed by the Defense or by Plaintiffs. This is set forth based on reasonable information and belief while necessarily deferring to the witnesses to verify and in case they may provide further information. Notwithstanding, please refer to Plaintiff's Pre-Discovery Disclosure, filed on January 30, 2024. Plaintiff also incorporates any persons whose names have been disclosed by the Defense (or otherwise associated with the Defendant in any way) to the extent they are truthful which I reserve the right to verify. Plaintiff incorporates anyone whom he may later determine has discoverable information as this matter is ongoing. Plaintiff contends that representatives of Defendant mentioned or stated in any way in this action potentially have such information. This includes but is not limited to HR reps, supervisors, co-workers, managers, owners or other Employees. The EEOC has such information and Plaintiff has identified and

produced same herewith as BRANCH 000000-000000 EEOC. Plaintiff may call any individual identified during the discovery process. This includes, but is not limited to, individuals identified in the parties' initial disclosures, interrogatory responses, response to document requests, document productions and depositions. Plaintiff will identify all "will call" and "may call" witnesses in the Pretrial Order when it is due, except witnesses only offering impeachment or rebuttal. Additionally, Plaintiff objects to this Interrogatory to the extent it can be construed as seeking information protected from disclosure by the attorney work production protection or attorney-client privilege. The Plaintiff objects to this Interrogatory on grounds that it is overbroad and unduly burdensome in seeking identification of "relevant knowledge" Plaintiff further objects on grounds that it is vague and ambiguous as it is unclear what "you expect to elicit", means as this calls for speculation. Plaintiff objects to this Interrogatory as it calls for information falling under the attorney client privilege and work product doctrine. In addition, Plaintiff further objects as requests speculation of information not capable of being known with exact certainty, which is an overly broad range of information. Plaintiff reserves the right to supplement his response prior to trial or upon receipt of a more focused question. Furthermore, without waiving all objections herewith, please refer to BRANCH 000001-000703 EEOC, BRANCH 000738-000757 WITNESS STATEMENTS, BRANCH 000758-000760 GTS APPEAL, BRANCH 000790-000859 CNRR INVESTIGATION BRANCH 000761-000789 MEDICAL and BRANCH 000860-000862 TEXT MESSAGES. Said documents contain the names of individuals which may be called as trial witnesses, however, Plaintiff will supply said individuals at the appropriate time in accordance with the Federal Rules of Civil Procedure.

**INTERROGATORY NO. 5.** Identify each person known or believed by you to have personal knowledge of any of the facts at issue or involved in the above-captioned lawsuit or any of the events underlying the allegations in the Complaint, Answer, or any other pleading; and separately state the facts and observations within each such person's knowledge.

**ANSWER: NO. 5:** Plaintiff may call any individual identified during the discovery process. This includes, but is not limited to, individuals identified in the parties' initial disclosures, interrogatory responses, response to document requests, document productions and depositions. Plaintiff will identify all "will call" and "may call" witnesses in the Pretrial Order when it is due, except witnesses only offering impeachment or rebuttal. Additionally, Plaintiff objects to this Interrogatory to the extent it can be construed as seeking information protected from disclosure by the attorney work production protection or attorney-client privilege. The Plaintiff further objects to this Interrogatory on grounds that it is overbroad and unduly burdensome in seeking identification of "each person known or believed by you". Plaintiff further objects on grounds that it calls for speculation and is vague and ambiguous as it is unclear what "each person believed by you", means. Without waiving these or any other objections, Plaintiff has produced herewith all documents not previously objected to, and which have been identified as responsive to this interrogatory are being produced contemporaneously with these responses. Please refer to Plaintiff's Pre-Discovery Disclosures, BRANCH 000001-000703 EEOC, BRANCH 000738-000757 WITNESS STATEMENTS and BRANCH 000758-000760 GTS APPEAL, BRANCH 000790-000859 CNRR INVESTIGATION, BRANCH 000761-000789 MEDICAL, and BRANCH 000000-000000 TEXT MESSAGES. Also, Al B. Thomas, Ty Peterson, Darrell Hudson, Randall S Duren, Earl Honeysucker, Dylan Boutle, and William Yuille. Named individuals are employees of the Defendant and their information is listed in their witness statements included herewith.

**INTERROGATORY NO. 6.**Identify each person from whom written and signed (or otherwise adopted or approved), recorded or transcribed statements or reports have been secured with respect to any of the matters relating to the allegations in the Complaint or Answer, and for each person identified, identify all Documents or ESI that evidence such statements or reports.

**ANSWER NO. 6:** Plaintiff objects to this Interrogatory to the extent it can be construed as seeking information protected from disclosure by the attorney work production protection or attorney-client privilege. The Plaintiff further objects to this Interrogatory on grounds that it is overbroad and unduly burdensome. However, without waiving these or any other objections, Plaintiff has attached all documents of written communications which contain statements and have been identified as responsive to this interrogatory are being produced contemporaneously with these responses. Plaintiff has no recorded or transcribed statements or reports in his possession. Please refer to Plaintiff's bates stamped document as BRANCH 000738-000757 WITNESS STATEMENTS, BRANCH 000758-000760 GTS APPEAL, BRANCH 000001-000703 EEOC, BRANCH 000761-000789 MEDICAL, BRANCH 000790-000859 CNRR INVESTIGATION, BRANCH 000860-000862 TEXT MESSAGES.

**INTERROGATORY NO. 7.** Identify each person you intend to call as an expert witness at trial, and as to each such person:

      a.      state the subject matter on which the person is expected to testify;

      b.      state the substance of the person's testimony and the summary of the basis for the testimony;

      c.      identify any papers, articles, treatises or books which the person has wholly or partially authored, or to which the person has contributed; and

      d.      identify all prior proceedings in which the person has given any testimony.

**ANSWER NO. 7:** Plaintiff objects this Interrogatory on the grounds it is premature, as it has not yet determined the identity of expert witnesses Plaintiff may call at trial. Without waiving this objection, Plaintiff has no expert witnesses at this time. Further, Plaintiff will supplement this response as necessary at the appropriate time in accordance with the Federal Rules of Civil Procedure.

**INTERROGATORY NO. 8.** Identify any communications (either verbal or written) with any of Defendant's employees or agents, or former employees or agents, regarding any of the allegations which are at issue in this matter, including each and every employee or agent, or former employee or agent of Defendant with whom you communicated; the date of each communication; and all Documents and ESI which relates to said communication.

**ANSWER NO.8**:     Plaintiff objects to this Interrogatory as it calls for information falling under the attorney client privilege and work product doctrine. In addition, Plaintiff further objects as requests speculation of information not capable of being known with exact certainty, which is an overly broad range of information. Plaintiff reserves the right to supplement his response prior to trial or upon receipt of a more focused question. However, without waiving these or any other objections Plaintiff has continued his friendship with his coworker Randall Duren since his wrongful termination, however, Plaintiff does not maintain a record of his verbal communications with Mr. Duren. Plaintiff has had no contact with any other of Defendant's employees, agents, or former employees.

**INTERROGATORY NO. 9.** State separately each and every item of pecuniary or monetary expense, damage, and/or loss, of any kind whatsoever, whether alleged in your Complaint or not, which you contend that you have incurred or sustained, or which you contend resulted by reason of the facts alleged in your Complaint, describing in detail:

    a.     a description of each type of damage claimed (for example, lost wages, medical expenses, etc.);

    b.     the specific dollar amount of each type of damage claimed and a complete explanation of how the dollar amount was determined;

    c.     the date or dates upon which the claimed damage was incurred;

    d.     each person with knowledge or information related to the claimed damage, including each person, if any, that you were required to pay for the item of expense, damage or loss; and

    e.     all Documents and ESI that contain information that refers to the claimed damage.

**ANSWER NO. 9**:     Plaintiff objects to Interrogatory No. 9 as its, overly broad and unduly burdensome, compound and confusing. Notwithstanding, and while reserving objections, I

contend that I am entitled to non-economic damages at an amount to be determined at trial by jury. I reserve the right to later determine a specific amount I may ask for but at this time I intend to ask the jury to determine my non-economic losses referred to in the Complaint and incorporated here. Non-economic losses are supported by all matters raised in the Complaint and these discovery responses. I reserve the right to use all documents and things requested to be produced or actually produced by either party so as to support my claim for non-economic damages and any other damages. I reserve the right to claim all damages referred to in the Complaint. I reserve the right to claim economic losses as may be further determined in discovery. I reserve the right to calculate attorney's fees, costs and expenses of this case to the extent they may be recovered. Punitive damages are sought in an amount to be determined by jury. I claim compensation for all interest accrued, sums owed, expenses incurred, and costs however related to the actionable conduct. I claim all sums incurred or to be incurred as a result of my garden variety emotional damages, which may be recommended. I otherwise claim all recoverable amounts related to the actionable conduct. I reserve the right to supplement or amend a calculation of any part of my claim for damages as discovery is ongoing. I seek all damages outlined in my Complaint incorporated herein and a calculation of damages is ongoing when considering I need accurate wage information to arrive at a final calculation. I contend that I lost wages and I reserve the right to arrive at a final calculation as discovery is ongoing and dependent on information requested to be produced or actually produced in discovery. I therefore reserve the right to supplement or amend upon information produced by either party or requested by either party in Discovery relevant to lost pay or other things of value incurred, or which may be incurred as a result of the Defendant's wrongful termination of my employment. Further, please refer to my Pre-Discovery Disclosures which were filed on January 30, 2024.

**INTERROGATORY NO. 10.**During the past ten years, have you consulted with or received treatment from any health care provider including, but not limited to, physicians, psychiatrists, psychologists, counselors, and any other mental health or social service provider?  If your answer is "yes," please identify the health care provider, including the provider's name, facility name, and address, and execute the attached Authorization for Release of Medical Information by completing the patient address, birth date, and social security number sections, and by signing the document. If you received treatment for psychological care from a mental health care provider, please identify the health care provider, including the provider's name, facility name, and address, and complete the specific Authorization for Release of Medical Information for psychotherapy records.

**ANSWER NO. 10:**   Plaintiff has produced herewith all documents not previously objected to, and which have been identified as responsive to this interrogatory are being produced contemporaneously with these responses. Please refer to Plaintiff's bates stamped documents as BRANCH 000761-000789 MEDICAL. Furthermore, Plaintiff  has been treated with the following medical providers:

Dr. Fawaz Abdrabbo, M.D, PA
General Psychiatry and Human Behavior
576 Highland Colony Parkway-Paragon Center-Suite 100
Ridgeland, MS 39157
Plaintiff began seeing Dr. Abdrabbo, M.D., PA on July 13, 2022, and continues his psychiatric treatment until the present date, monthly. The plaintiff has been diagnosed with depression and anxiety.

Dr. Charles Nause M.D. Primary Care Provider,
110 E. Market Street,
Greenwood, MS  38930
Dr. Nause has been Plaintiff primary physician from 2012 to the current date. Plaintiff sees Dr. Nause on an as needed basis.

Greenwood Leflore Hospital
1401 River Road
Greenwood, MS 38930
6/2/2022 - Stephanie M Hornet FNP

Dr. Pande Ravi, M.D
Neurologist
1317 River Road
Greenwood, MS 38930
The year of 2017

**INTERROGATORY NO. 11.** Have you ever been party to any other lawsuits, bankruptcy proceedings, or administrative proceedings?  If your answer is "yes," identify the caption or title,

and the court number of each and every lawsuit, bankruptcy proceeding, or administrative proceeding; set forth a detailed summary of the nature of each action; and state the current status or ultimate disposition of each such action.

**ANSWER NO. 11:** Plaintiff objects to this Interrogatory as overbroad, vague, unduly burdensome. Plaintiff has produced herewith all documents not previously objected to, and which have been identified as responsive to this interrogatory are being produced contemporaneously with these responses. Please refer to Plaintiff's bates stamped documents as BRANCH 000758-000760 GTS APPEAL. Case No: 2023-FRS-00026; United States Department of Labor Office of Administrative Law Judges, Covington District Office.

**INTERROGATORY NO. 12.**Identify all personal e-mail addresses (such as Gmail, Yahoo!, Hotmail, AOL, AT&T, Blackberry, Comcast, Skype, etc.), social networking accounts (for services such as Facebook, Twitter, MySpace, Google+, Instagram, Picasa, Tumblr, Friendster, etc.), professional networking accounts (for services such as LinkedIn, Monster.com, CareerBuilder.com etc.), accounts with blogs or other on-line discussion or chat forums, accounts with internet- or "cloud"-based services that store documents and data (such as iCloud, Dropbox, SugarSync, Evernote, Google Documents, Google Drive, Zoho, etc.), accounts with services that provide internet- or "cloud"-based backups of data or devices (such as iCloud, BackBlaze, Crashplan, Mozy, etc.) or any other accounts with on-line sites, services, blogs, wikis or message boards, that you have used or maintained since May 1, 2022, and ongoing, and that you have used to create, store, or disseminate communications, documents, or any other information relating to the claims and defenses in this lawsuit.

**ANSWER NO. 12:** Plaintiff objects to this request as being grossly overbroad, outside the scope of permissible discovery, insufficiently descriptive of the documents sought as required by Rule 34(b) of the Federal Rules of Civil Procedure, seeking irrelevant and confidential information pertaining to persons not parties to this litigation, and beyond the issues framed by the pleadings in this cause. However, without waiving said objection, Plaintiff has no social media accounts. Plaintiff's email address is rbrtbranch20@yahoo.com.

**INTERROGATORY NO. 13.** Identify (by manufacturer, type, model number and phone-number, as applicable) each and every electronic computing, communication or data storage device, including those that are capable of sending or receiving emails, text messages, instant messages or similar communications, or storing documents or data, that you have owned or leased since May 1, 2022, and ongoing, including but not limited to the following examples and categories of devices: computers, tablets, cellular phones, iPhones, iPads, smartphones, personal digital

assistants, cameras, video recorders, or any other electronic computing, communication or data storage device, and that you have used to create, store, or disseminate communications, documents, or any other information relating to the claims and defenses in this lawsuit**.**

**ANSWER NO. 13:** Plaintiff objects to this request as being grossly overbroad, outside the scope of permissible discovery, insufficiently descriptive of the documents sought as required by Rule 34(b) of the Federal Rules of Civil Procedure, seeking irrelevant and confidential information pertaining to persons not parties to this litigation, and beyond the issues framed by the pleadings in this cause. However, without waiving said objection, (662) 392-8746 and rbrtbranch20@yahoo.com.

This, the 28th day of March 2024.

Respectfully submitted,

s/Nick Norris
Nick Norris (MSB #101574)
Attorney for Plaintiff

OF COUNSEL:

WATSON & NORRIS, PLLC.
4209 Lakeland Drive, # 365
Flowood, Mississippi 39232-9212
Telephone: (601) 968-0000
Facsimile: (601) 968-0010
nick@watsonnorris.com

## CERTIFICATE OF SERVICE

I, NICK NORRIS, attorney for the Plaintiff, do hereby certify that I have this day served via ECF filing or by United States mail, postage prepaid, a true and correct copy of the above and foregoing document to all counsel of record.

SO CERTIFIED, this the 28th day of March 2024.

s/Nick Norris
NICK NORRIS

**VERIFICATION**

STATE OF MISSISSIPPI
COUNTY OF MADISON

Robert Branch, being first duly sworn, states that he is a plaintiff in this action, that he has

read the foregoing questions and answers and knows their contents, and that they are true to the

best of his knowledge, information, and belief.

_____
**ROBERT BRANCH**

Sworn to and subscribed before me on this

the _28th_ day of _March_, 2024.

_____
NOTARY PUBLIC

My Commission Expires: _10/17/2025_