# Exhibit 1

**Declaration of Susan K. Fitzke and Exhibits A - I**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION**

| | |
|---|---|
| ROBERT BRANCH,<br><br>Plaintiff,<br><br>v.<br><br>ILLINOIS CENTRAL RAILROAD COMPANY,<br><br>Defendant. | CIVIL ACTION NO. 4:23-CV-217-MPM-JMV |

**DECLARATION OF COUNSEL IN SUPPORT OF DEFENDANT'S OMNIBUS MOTION *IN LIMINE* TO EXCLUDE IRRELEVANT AND PREJUDICIAL EVIDENCE**

*I, SUSAN K. FITZKE, hereby declare as follows:*

1. I am one of the attorneys representing the Defendant Illinois Central Railroad Company ("IC") in the above-referenced action. I submit this Declaration in support of IC's Memorandum of Law in Support of its Omnibus Motion *in Limine* to Exclude Irrelevant and Prejudicial Evidence.

2. Attached hereto as **Exhibit A** is a true and accurate copy of the Equal Employment Opportunity Commission's ("EEOC") August 4, 2023, Letter of Determination and reasonable cause finding.

3. Attached hereto as **Exhibit B** are true and correct excerpts from the August 6, 2024, deposition of Plaintiff Robert Branch.

4. Attached hereto as **Exhibit C** are true and correct excerpts from the November 7, 2023, deposition of Plaintiff Robert Branch.

5. Attached hereto as **Exhibit D** is a true and correct copy the transcript of the February 13 and 14, 2024, hearing in front of the Office of Administrative Law Judges ("OALJ")

pursuant to Branch's lawsuit in which he alleged IC terminated his employment because Branch reported a safety concern (OALJ Case No. 2023FRS00026).

6. Attached hereto as **Exhibit E** is a true and accurate copy of emails which Branch submitted to the EEOC pursuant to its investigation of his Charge of Discrimination. These emails, which are heavily redacted, are dated November 3, 4, and 7, 2022, approximately five months after Branch's termination from employment by IC. Branch has not produced unredacted versions of these emails.

7. Attached hereto as **Exhibit F** is a true and accurate copy of the Public Law Board's Interim Award #450, dated August 19, 2024.

8. Attached hereto as **Exhibit G** is a true and accurate copy of Branch's January 30, 2024, Pre-Discovery Disclosures in this matter.

9. Attached hereto as **Exhibit H** is a true and accurate copy of Branch's March 28, 2024, Response to IC's First Set of Interrogatories.

10. Attached hereto as **Exhibit I** is a true and correct copy of the EEOC's activity log related to Branch's Charge. The log demonstrates that no IC employee was interviewed as part of the EEOC's investigation, including the decisionmakers of Branch's termination.

**PURSUANT TO 28 U.S.C. § 1746, I VERIFY UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES THAT THE FOREGOING IS TRUE AND CORRECT.**

Signature: */s/ Susan K. Fitzke* Date: 01/08/2025

Case: 4:23-cv-00217-MPM-JMV Doc #: 83-1 Filed: 01/08/25 4 of 189 PageID #: 2581

**CERTIFICATE OF SERVICE**

The undersigned certifies that a true and exact copy of the foregoing has been served, via electronic mail, through the Court's Electronic Case Filing System, this 8th day of January, 2025, upon the following:

Nick Norris (MB# 101574)
WATSON & NORRIS, PLLC
4209 Lakeland Drive # 365
Flowood, MS 39232-9212
Telephone: (601) 968-0000
Facsimile: (601) 968-0010
Email: nick@watsonnorris.com

***Attorneys for Plaintiff Robert Branch***

*/s/ Susan K. Fitzke*
Attorneys for Defendant

3

4890-9169-4801.1 / 046769-1415

Exhibit 1: Declaration of Susan K. Fitzke and Exhibits A - I

# Exhibit A

**Equal Employment Opportunity Commission's August 4, 2023, Letter of Determination and reasonable cause finding.**



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Jackson Area Office**

Dr. A. H. McCoy Federal Building
100 W. Capitol Street, Suite 338
Jackson, MS 39269
Intake Information Group: 800-669-4000
Intake Information Group TTY: 800-669-6820
Jackson Direct Dial: (769) 487-6910
FAX (601) 714-2202
Website: www.eeoc.gov

EEOC Charge No. 440-2022-06771
Robert L. Branch
26 County Road 143
Coila, Mississippi 38923

Charging Party

Canadian National – IC
17641 Ashland Avenue
Homewood, Illinois 60430

Respondent

**LETTER OF DETERMINATION**

The following determination is issued based on the merits of this charge.

The Respondent is an employer within the meaning of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, *et seq*. (Title VII). Timeliness and all requirements for coverage have been met.

Charging Party alleged that he was terminated from his Trackman position on June 24, 2022, after an incident on the evening of May 26, 2022. While outside a company-provided hotel after work, the Charging Party was accosted by his co-worker (a Caucasian male Machine Operator). The Charging Party alleged the co-worker cursed him, using racially charged and threatening language, before punching and knocking him to the ground, forcing the Charging Party to strike back and defend himself from the assault. The Charging Party alleged the Respondent terminated him because of his race and in retaliation after he insisted on protesting and reporting the attack.

Respondent denies all allegations of discrimination. Respondent contends that the Charging Party and his Caucasian co-worker were both terminated for violation of the Code of Conduct Policy and Workplace Violence Prevention policy after its internal investigation found both had struck one another.

It is undisputed the Charging Party and his Caucasian co-worker were terminated. It is also undisputed that witnesses to the incident agree that the co-worker, and not the Charging Party, was the aggressor in the situation, the Charging Party tried to calm his attacker, and only struck back after he was verbally and physically punched and knocked to the ground. The evidence shows that based on the co-worker's prior history, the Respondent was aware of his disruptive, alcoholic, and abusive conduct, which he had recently exhibited during a union meeting.

During the instant incident, the co-worker, while intoxicated and unprovoked, hurled murderous threats laced with profanity and levied racially charged comments against another African American co-worker before pouncing upon and physically attacking the Charging Party. A complete opposite, the Charging Party had no prior adverse work incidents during his fourteen years of employment, did nothing to provoke his Caucasian co-worker during this attack, tried to deescalate the situation, and only struck back in defense and protection of himself.

Exhibit A: Equal Employment Opportunity Commission's August 4, 2023, Letter of Determination and reasonable cause finding

Case: 4:23-cv-00217-MPM-JMV Doc #: 83-1 Filed: 01/08/25 7 of 189 PageID #: 2584

Letter of Determination
EEOC Charge No. 440-2022-06771
Page 2

Finally, the evidence shows the Charging Party correctly reported the incident- including the racially abusive threats and comments; but Respondent's management official sought to dissuade him, instead seeking to "squash" the matter. When the Charging Party persisted, an investigation was conducted, and he was ultimately discharged because of his race and in retaliation without regard to Respondent's policy exemption of justified self-defense and his admirable work history.

Accordingly, I have concluded that there is reasonable cause to believe that Charging Party was discriminated against in violation of Title VII of the Civil Rights Act of 1964, as amended, because of his race, African American, and in retaliation.

This determination is final. When the Commission finds that violations have occurred, it attempts to eliminate unlawful practices by informal methods of conciliation. Therefore, the Commission now invites the parties to join with it in reaching a just resolution of this matter. If you wish to participate in conciliation, please email Enforcement Investigator Diego Zent at Diego.Zent@eeoc.gov within 10 days from the date of this Determination.

When the Respondent declines to enter into conciliation discussions, or when the Commission's representative for any reason is unable to secure a settlement acceptable to the Commission, the Commission shall so inform the parties in writing and advise them of the court enforcement alternative available to the Charging Party, aggrieved persons, and the Commission. The confidentiality provisions of the statute and Commission Regulations apply to information discussed or given during conciliation.

On behalf of the Commission:

Eszean McDuffey Digitally signed by Eszean McDuffey Date: 2023.08.04 15:37:04 -05'00'

08/04/2023
Date

Eszean McDuffey
Area Director

cc: Respondent's Representative
Stephanie Bryant Holland
Littler Mendelson, P.C.
2301 McGee Street, Suite 800
Kansas City, MO 64108
Sholland@littler.com

Exhibit A: Equal Employment Opportunity Commission's August 4, 2023, Letter of Determination and reasonable cause finding

Confidential Branch-EE0C 000007

# Exhibit B

**Excerpts from the August 6, 2024, deposition of Plaintiff Robert Branch**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

ROBERT BRANCH,
Plaintiff,

v. CIVIL ACTION NO. 4:23-CV-217-MPM-JMV

ILLINOIS CENTRAL RAILROAD COMPANY,

Defendant.

DEPOSITION OF ROBERT BRANCH

Taken at the instance of the Respondent at the offices of Wise Carter Child & Caraway, P.A., 401 East Capitol Street, Suite 600, Jackson, Mississippi on Tuesday, August 6, 2024, beginning at 9:00 a.m.

* * * * * * * * * * * * * *

REPORTED STENOGRAPHICALLY BY:
LORI W. BUSICK, CVR-S #7510, CCR #1677

APPEARANCES:

NICK NORRIS, ESQ.
WATSON & NORRIS, PLLC,
4209 Lakeland Drive, #365
Flowood, Mississippi 39232

COUNSEL FOR PLAINTIFF

SUSAN K. FITZKE, ESQ.
LITTLER MENDELSON, P.C.
1300 IDS Center
80 South 8th Street
Minneapolis, MN 55402.2136
Telephone: 612.630.1000
Facsimile: 612.630.9626
Email: sfitzke@littler.com

COUNSEL FOR DEFENDANT

ALSO PRESENT: Matt Gallagher, Esq. (Via telephone)

INDEX

Style and Appearances............................1
Certificate of Deponent........................162
Certificate of Court Reporter..................163

EXAMINATIONS

Examination by Ms. Fitzke........................4

EXHIBITS

EXHIBIT 1 Training ............................15
EXHIBIT 2 Policy ..............................16
EXHIBIT 3 Coaching History ....................21
EXHIBIT 4 Drawing .............................53
EXHIBIT 5 Statement ...........................53
EXHIBIT 6 Text Message ........................64
EXHIBIT 7 Text exchange .......................67
EXHIBIT 8 EEOC Charge .........................86
EXHIBIT 9 Racial Discrimination Letter .......114
EXHIBIT 10 Interrogatories ....................144
EXHIBIT 11 Application ........................147
EXHIBIT 12 Application ........................149

Robert Branch,

having been first duly sworn, was examined and testified as follows:

EXAMINATION BY MS. FITZKE:

Q. Mr. Branch, thank you for coming down today. You and I have met on a couple of past occasions --
A. That's -- that is correct.
Q. So you understand the oath that you were just given this morning is the same oath you were given in your last deposition and in the OALJ trial that we had together?
A. Yes, ma'am.
Q. Because we've been through this together before, if it's okay with you, I'll just give you a couple of quick reminders?
A. It's okay.
Q. Just for purposes of our record, I want to make sure that we have only one of us speaking at a time, so if you can try to remember to let me finish my full question before you start answering, I'll try to afford you the same courtesy with respect to your answers; okay?
A. Yes, it's okay.

Q. We both are probably going to mess up with that a little bit today, so if I need a reminder and you need to let me know you're not done with your answer, you just let me know that; all right?
A. Yes, I will.
Q. We're going to take regular breaks today. Hopefully we won't be here too terribly long, given that we've done this before, but if you find that you need a break for any reason, as long as there's not a question pending, just let me know that and we'll be happy to accommodate you, okay?
A. I will.
Q. We also have to remember that -- to provide a verbal answer, a yes or a no or whatever other verbal answer might be appropriate. We're not going to be able to understand or read later the uh-huhs (affirmative response) or uh-uhs (negative response) or head shakes that we might all understand in the room or think we understand. Those don't translate real well to the transcript; all right?
A. Yes.
Q. It's also important to me still in this deposition that you answer, excuse me, that you understand my question before you answer it. So if

Q. Okay. And that's the only reason you believe that the company didn't look into it, because he was not reprimand?
A. If they would have looked into it, he would have got reprimand.
Q. That's your opinion?
A. Yes, ma'am.
Q. Now, after this union meeting that we were talking about where Mr. Sweeney and Mr. Melton had that argument, did you ever report that disagreement between Mr. Melton and Mr. Sweeney to any member of company management?
A. No, ma'am, I did not.
Q. Are you aware of anybody else that reported Mr. Melton's conduct to company management or human resources following that union meeting?
A. No, ma'am, I do not.
Q. In fact you told Mr. Sweeney that you were a brotherhood; correct?
A. What's a brotherhood?
Q. Well, sir, I believe that's your language.
Do you recall telling Mr. Sweeney that when you called him or spoke to him after this incident with Mr. Melton that it's a brotherhood, you guys out there on the rail?

A. That we family.
Q. And that's how you felt after that incident; correct?
A. Yeah, we railroad people, actually we're supposed to stick together for one another. That's what I was told when I hired out.
Q. I want to talk to you, then, about the hotel that you were at the night of May 26. It's my understanding that the Magnolia Inn is the name of the hotel; do you recall that?
A. Yes, ma'am.
Q. From your prior testimony I understand it was probably around 9:00 o'clock p.m. when the incident with Mr. Melton happened; is that right?
A. Yes, ma'am.
Q. Was it still light out?
A. It was sort of dark.
Q. Kind of twilight?
A. Sort of dark.
Q. Sort of dark?
A. Just getting dark, or dark.
Q. And you had been grilling with some of the guys?
A. Yes, ma'am.
Q. I want to get a better understanding, if I

can, about how all this was set up; okay? Can you describe for me -- there was a grill. Was that on back of someone's pickup truck?
A. Yes, ma'am, it were.
Q. So there's a pickup truck and grill on the back. And are you standing, then, at the back of the truck?
A. Yes, ma'am.
Q. Okay. And then, tell me what's on either side of that truck?
A. Another truck, another vehicle, fence, hotel wall.
Q. Okay. I want to get a sense of how this was laid out. So we have the truck here; okay?
A. Yes, ma'am.
Q. And then there's a grill on the back?
A. Yes, ma'am.
Q. What's right here?
A. Another vehicle.
Q. So another car?
A. Or a truck. I think it was a truck.
Q. How about on the other side of that?
A. Vehicle.
Q. Do you know how many vehicles?
A. I can't recall.

Q. Okay. How about on this side of the truck? What's here?
A. It's a vehicle.
Q. Okay how about here?
A. I think it was a fence.
Q. Did that fence run all the way down?
A. Yes, ma'am.
Q. Did it run the other way, too?
A. I'm not for sure.
Q. What's on this side of these vehicles?
A. I think some vehicles are behind them.
Q. Like, are they parked right up to the cars, or is there a road to drive between and then more cars?
A. I think there's a road in between, but I'm not for sure.
Q. So something like that?
A. Something like that.
Q. Does the fence run down here or not?
A. I don't think so.
Q. Okay. So this is the fence. Where is the hotel?
A. Hotel is right in here.
Q. Right here?
A. Right in here is the hotel.

Page 18

stop, there is the option to submit in writing to the human resources department and also a number there, a 1-877 number, to the human resources support center; correct?
A. Correct.
Q. And it's my understanding that at no time during your employment with Illinois Central did you make a complaint to human resources or call the human resources support center that you believed you were being discriminated against on the basis of your race; correct?
A. Not while I was working.
Q. And it's my understanding that while you were working for the company, you did not make a complaint to human resource or call the human resources support center to claim that you were being retaliated against during your employment with Illinois Central; correct?
A. Not while I was working, no, ma'am.
Q. And it's my understanding that after your employment was terminated by the company that you did not contact the company directly to make a complaint or raise a concern of discrimination or retaliation; correct?
A. I couldn't talk to the company.

Page 19

Q. So you did not do that after your termination; correct?
A. I couldn't talk to the company.
Q. Okay. So you did not?
A. No, I did not, because I couldn't talk to them.
Q. Why do you say you couldn't talk to them?
A. They deleted everything off my file and everything. No one wants to talk to me.
Q. You're claiming the company deleted your file?
A. Well, they disconnect me from being able to go on the internet to access anything on my file. I couldn't access anything.
Q. You lost access to the CN Intranet; correct?
A. Right.
Q. Okay. That is an internal web page for current Illinois Central employees; correct?
A. Right.
Q. But you did attempt to make contact with people from Illinois Central following your termination; correct?
A. Yes, ma'am, I did.
Q. And in those communications you did not

Page 20

raise concerns of race discrimination or retaliation; correct?
A. Because I didn't talk to anyone. I didn't get a chance to talk to anyone. I tried to talk to Mr. Spears, but we did not talk.
Q. You were not successful in getting in contact with Duane Spears?
A. No, ma'am, I wasn't.
Q. But you were successful in getting in contact with Ms. Mendoza; correct?
A. Ms. Mendoza?
Q. I'm sorry. I got the name wrong. You were successful in getting in contact with someone by the name of Martina Mullen; correct?
A. We talked, but we didn't talk about that. I just informed her about the incident that happened.
Q. The fight with Mr. Melton?
A. Yes, ma'am.
Q. And that you had been terminated?
A. Right.
Q. And with Ms. Mullen you did not raise concerns or complaints of race discrimination or retaliation; correct?
A. No, I did not.

Page 21

Q. Mr. Branch, did you ever raise concerns of race discrimination or retaliation to your union or union representative in conjunction with your separation from Illinois Central?
A. I might have, but I can't recall.
Q. You don't know one way or the other if you did or didn't?
A. I might have, but I can't recall.
Q. But you know that the union isn't the company; correct?
A. That is correct.
Q. And prior to your termination, I think my questions focused on the incident surrounding your termination, so I just want to clarify. Prior to your termination you also -- you didn't have any concerns or complaints of race discrimination or retaliation prior to your termination; correct?
A. No, I did not.
Q. Okay. In fact, I think you told me last time that you had no issues at all with your employment before May 26 of 2022; is that right?
A. I did not.
(Exhibit 3 marked for identification.)
Q. Sir, I'm showing you Exhibit 3 to your deposition, which is another document we didn't talk

Case: 4:23-cv-00217-MPM-JMV Doc #: 83-1 Filed: 01/08/25 13 of 189 PageID #: 2590

Page 66

A. Yes, ma'am, I did.
Q. And it's my understanding from your Mr. Garner didn't do anything to try to discourage you or dissuade you from moving forward with the report?
A. No, ma'am.
Q. When you spoke to Mr. Day, what do you recall about your conversation with Mr. Day?
A. When he -- when I first spoke to Mr. Day, he got on the phone, he said have you -- have you consulted the union? What I need to consult the union for? I suppose to talk to my immediate supervisor.
And he asked me -- he kept saying you should talk to the union. I said no, I need to -- I reported to Chance. He said that's -- Chance told him what happened. That's what he told me, Chance told him what happened. He didn't even ask me what happened that day. He said Chance told him what happened. And he got on the phone telling me, he said why -- have you talked to the union? I said no, I haven't talked to the union. I don't need to talk -- I need to talk to my supervisor. Then he said, well, management is -- they off on vacation today. I said I understand that.

Page 67

Q. It was Memorial Day weekend?
A. I said I understand that. I said, well, I'm looking at it like tomorrow. Tomorrow we go back to work. And he told me, he said well, write a statement. Then he text me and said don't type it, handwrite it.
Q. And he never told you why he wanted you to write it versus type it; correct?
A. No, ma'am, he didn't.
Q. Did Mr. Day ever explain to you that he thought you should talk to the union because there was potential that you could be disciplined relating to the fight?
A. No, ma'am.
Q. You understand that when there are events that could result in discipline that your union has involvement in that?
A. Yes, ma'am.
(Exhibit 7 marked for identification.)
Q. All right, sir. And it looks like you have that text exchange with Mr. Day -- it looks like Mr. Day communicated to you by a text on May 30, around 3:43 p.m. to write a statement and that it had to be handwritten; correct?
A. Right.

Page 68

Q. So that communication about the statement, that came via text?
A. Yes, ma'am.
Q. Okay. And then it looks like from the text exchange you sent Mr. Day your written statement around 8:00 o'clock p.m. that night?
A. Yes, ma'am.
Q. So you got the message from Mr. Day, and then did you go home and write the statement?
A. Yes, ma'am.
Q. Okay. And if we look at the text that's pasted in Exhibit 5, you would agree with me that that's the same statement that we looked at as Exhibit 5 of your deposition?
A. Yes, ma'am.
Q. Other than to tell you to ask you to talk to your union, in your first conversation with Mr. Day, did he do anything to try to dissuade you from moving forward with your complaint?
A. Mr. Day, he also stated that he was going to talk to me and Todd the next morning, and he never did. I mean, he said he was going to be at work and he going to talk to me and Todd after the briefing, and he did not.
Q. Okay. Other than to tell you to talk to

Page 69

your union and not to follow-up on a discussion with you, did Mr. Day do or say anything between your first conversation with him and going forward to try to discourage or dissuade you from moving forward with your complaint?
A. Not that day.
Q. Did he do something on a later date to try discourage or dissuade you from moving forward?
A. The next day Nick called me, and he called me, asked me what happened. And, you know, and he told me that Chris had him to call me, call me to try to get me to drop the incident report.
Q. And that's Nick, the union representative?
A. Yes, ma'am.
Q. Did he give you any reason why he said Mr. Day wanted you to drop the complaint?
A. He said that I could get fired. He said, they'll fire you. I said, that's chance I got. I said, it need to be heard. I said, because no one should have to get attacked at a hotel or on job. I mean, that shouldn't happen.
Q. And in that conversation with Nick, the union representative, that's Nick Manojlovich; is that right?
A. Yes, ma'am.

Exhibit B: Excerpts from the August 6, 2024, deposition of Plaintiff Robert Branch 18 (Pages 66 - 69)

Veritext Legal Solutions
www.veritext.com 888-391-3376

Page 90

correct?
A. Yes, ma'am.
Q. And that was a Rule G violation. Do you understand that?
A. No, ma'am, I did not.
Q. And you understand Rule G was the alcohol -- the rule that prohibited use of alcohol during work hours -- or reporting to work impaired; correct?
A. Right.
Q. And do you understand that the version of Rule G under which Mr. Melton was initially found to have violated allowed for a second chance? Do you know that from your employment with the company?
A. No, I do not.
Q. Fair to say that you don't have any firsthand information with regard to the decisions made on Mr. Melton's employment?
A. No, I do not.
Q. And that issue, the single issue that appears on Mr. Melton's work record, that was years ago; correct?
A. Correct.
Q. Mr. Branch, have you ever heard any member of Illinois Central management that was involved in

Page 91

this incident -- Mr. Garner, Mr. Day, or any of those in HR or labor relations or management who made the decisions to end your employment, have you ever heard any of those individuals use any racially insensitive terms?
A. No, ma'am.
Q. Can you tell me the facts on which you base your claim that your employment with the company was terminated because of your race?
A. Well, when I looked at when white employees get into -- have an incident out there, they get a slap on the wrist, and when the black employees, African American employees, have an incident, they get terminated. We don't get a slap on the wrist.
Q. And you're not aware of any other employee, white or black, who's gotten into a fight at work who hasn't been terminated; correct?
A. Like I said, Chris Day, you say they not on the -- management's not on the same level we are, but they work for the same company, am I correct?
Q. Well -- and we already talked about all the things you don't know about Mr. Day's circumstance, so let's set Mr. Day aside. With the possible exception of Mr. Day, are you aware of any

Page 92

employee at Illinois Central Railroad who was involved in a physical altercation whose employment was not terminated?
A. No, I do not.
Q. And in your case, Mr. Melton is white; correct?
A. That's correct.
Q. And both you and Mr. Melton were terminated; correct?
A. Correct.
Q. And what other incidents do you claim occurred where a white employee and a black employee engaged in the same conduct, but the black employee was terminated, and the white employee was not?
A. I don't know anything about a fight, but I know about machine run-in. I can tell you about those incidents.
Q. I want to know -- you said you believe you were terminated because you're black because white employees get a slap on the wrist, and black employees are terminated. I want you to tell me the circumstances to which you are referring where a white employee did the same thing as a black employee, but the black employee was terminated, and but the white employee, quote, got a slap on the

Page 93

wrist.
A. I don't know -- I don't know anything about a fight, but I do know about some machines, some other incidents have took place.
Q. That's what I'm asking you about, sir.
A. I can't think of his name, but we call him Baby G. He ran into a machine with a Snoval [sic].
Q. With a what?
A. His name was -- we call him Snoval.
Q. Snoval.
A. Sed Snoval, S-E-D. He ran into a -- Baby G ran into the machine, and Snoval got hurt.
And usually when there's a machine run-in, whoever's reliable [sic] get exit, that's the policy. And he wasn't reprimanded. He didn't get terminated or none of that. And this guy get hurt.
Q. So who's ever -- let me just make sure I'm following. If there's an incident with a machine and someone is hurt, whoever is operating the machine is terminated?
A. The one who run into the object machine.
Q. Okay. Was both Baby G and Snoval were both operating machines at this time?
A. Yes, ma'am.
Q. And did they crash?

A. Yes, ma'am.
Q. And Snoval was injured?
A. Yes, ma'am.
Q. But you believe it was Baby G's fault?
A. Yes, ma'am.
Q. And Baby G is white?
A. Yes, ma'am.
Q. Is Snoval white or black?
A. He's black.
Q. Okay. And what, if anything, do you know about the investigation into that incident done by the railroad?
A. Far as my knowledge, didn't anything happen. It was covered up.
Q. When did this occur?
A. That was after I was away from there. I was somewhere. It was in 2022.
Q. So after you were terminated?
A. Yes, ma'am.
Q. So you don't have any firsthand knowledge at all about what happened between Baby G and Snoval?
A. No, I just have what the guys -- what the guys say out there, and Eddie called me up on that also.

Q. Who told you -- oh, sorry.
A. Eddie called me, asked me did I know anything about it?
Q. Eddie your lawyer?
A. Yes, ma'am.
Q. You understood Eddie was representing Mr. Snoval then?
A. Yes, ma'am.
Q. So you were being called not because he represents you, but you were being called as a witness?
A. Not as witness, he asked me did I know anything about it, which I -- I heard about it, but I wasn't -- didn't get into details with it until the guys kept talking about it.
Q. Who else -- who else did you hear about it from before Eddie called you?
A. A few guys called. I think it was Jerome Daniels, I'm thinking. I think it was Randall Duren, if I'm not mistaken.
Q. So where did this incident take place?
A. Like I said, I didn't really, you know, find out where it took place. I'm not really sure. I'm not sure because I'm -- I'm not sure. I think it was on the Yazoo sub, if I'm not mistaken though.

They was working on the Yazoo sub.
Q. Okay. And you weren't present at the time and didn't witness any of this; correct?
A. No, ma'am, I didn't.
Q. Everything you know, you know through hearsay and gossip you heard through the union guys?
A. Yes, ma'am.
Q. Okay.
A. But it actually took place.
Q. You believe that?
A. You said that Eddie was representing --
Q. I don't know that. I was asking a question.
A. I don't -- I thought maybe that's what you said.
Q. No, it was a question to you, sir, because I want to make sure not to ask you any questions that had to do with Mr. Sorey's representation of you.
A. Yes, ma'am.
Q. So you believe that that incident occurred. Are there other incidents you believe occurred where a white employee was treated differently from a black employee in terms of termination or discipline?

A. My nephew was terminated back last year. Barry Bridges, he backed into a pole, and I don't -- my nephew was telling me both of them had fabricated -- they had fabricated the incident, and he said when he went back -- and Barry told the truth. Then he told the truth, he said that they gave Barry a wavery and sent him to investigation and fired him --
Q. Okay. Is your nephew -- is that Mr. Purnell?
A. Yes, ma'am.
Q. And Mr. Purnell admitted to essentially lying to the company; right?
A. He said that -- he told me that they both had got together and fabricated and he said Barry went back and told the truth and said when he went back and told the truth, that they sent him to investigation but they allowed Barry to get away with it. So if Barry fabricated a lie, and he gets away with it, why can my -- when my nephew, why can't they give him a waiver?
Q. Is that everything you know about that situation?
A. As far as what my nephew told me yes, ma'am.

Case: 4:23-cv-00217-MPM-JMV Doc #: 83-1 Filed: 01/08/25 16 of 189 PageID #: 2593

Page 114

Q. Right. I'm asking, do you have any information other than the hearsay that you received from Brian Horn about his father being offered a job back?
A. No, ma'am, I don't.
Q. Okay. Are you aware of any other employees who came forward to report concerns or potential concerns of race discrimination or inappropriate racial behavior who were then disciplined or terminated for having come forward and made that report?
A. No, ma'am.
Q. Since we were last together, have you spoken with any other employees of Illinois Central about what happened to you at work?
A. No, ma'am.
Q. Have you specifically asked any employees to be a witness for you in your case?
A. No, ma'am.
(Exhibit 9 marked for identification.)
Q. I'm showing you what we've marked as Exhibit 9 to your deposition, Mr. Branch. Can you tell me what we're looking at?
A. It says: Racial discrimination spurred by CN management along with termination and

Page 115

retaliation.
Q. So -- but what is this? Did you create this?
A. No, ma'am. It was sent to me.
Q. And you gave it to the EEOC?
A. Yes, ma'am, I did.
Q. Did you ever give it to any member of Illinois Central management or human resources?
A. No, ma'am, I did not because I was not there.
Q. Okay. And I want to -- I guess we've sort of learned to read emails a little bit back to front. So I think that the last, excuse me, the first email in this chain begins on page three, which is Bates stamped Branch EEOC 000102.
Are you with me?
A. You said the first email what?
Q. It starts on page three.
A. Uh-huh (affirmative response).
Q. Who is Kenneth Hankerson?
A. A ex-coworker, former coworker.
Q. What was his job at the railroad?
A. He was a trackman.
Q. Does he still work there?
A. No, ma'am. He do not.

Page 116

Q. Did he leave voluntarily?
A. No, ma'am. He got sick. He went out on sick leave.
Q. He was not terminated as far as you know?
A. No, ma'am.
Q. When did he go out on sick love?
A. It was sometime during the pandemic.
Q. So when he wrote this email in November 2022, November 3, 2022, was he out on leave at that time?
A. He was no longer working for the railroad.
Q. Who's Ronald Williams?
A. He's a CN worker.
Q. What does he do?
A. I don't really know what Ronald do. It's been a while since I talked to him. I haven't talked to Ronald in years.
Q. Was he also in the track department?
A. Yes, ma'am. He in the track department.
Q. Was he a member of a management?
A. No, ma'am.
Q. Was he a foreman?
A. Like I say, I haven't talked to him.
Q. Who's -- did you ever work on the same crew with Ronald Williams?

Page 117

A. At some point.
Q. How about in May of 2022? Was Mr. Williams on your crew at that point?
A. No, ma'am, he wasn't.
Q. How about James Jones? Who's that?
A. He's a trackman, work in the track department.
Q. And did you ever work on a crew with James Jones?
A. Yes, I have.
Q. And was he on your crew in May of 2022?
A. No, ma'am, he wasn't.
Q. Do you know whether Ronald Williams or James Jones sent this message that Mr. Hankerson wrote to Illinois Central management or human resources?
A. That I can't answer.
Q. Do you know why Mr. Hankerson prepared this email?
A. Mr. Hankerson said he prepared the email because of things that were going on out there, and he said it was -- it was -- it was being un-justice.
Q. Now, Joe Girsch? Who is Joe Girsch?
A. Joe Girsch.
Q. Yes.

Exhibit B: Excerpts from the August 6, 2024, deposition of Plaintiff Robert Branch
30 (Pages 114 - 117)
Veritext Legal Solutions
www.veritext.com 888-391-3376

Case: 4:23-cv-00217-MPM-JMV Doc #: 83-1 Filed: 01/08/25 17 of 189 PageID #: 2594

Page 118

A. He was a supervisor.
Q. Did you ever work for him?
A. It's been when I first started on the railroad.
Q. So back in 2008?
A. Somewhere, '08, '09, '10, somewheres along in there.
Q. When was the last time you were on a crew supervised by Joe Girsch?
A. I can't recall.
Q. Some years before your termination?
A. Yes, ma'am.
Q. Do you know anything about the incident that is alleged here about Mr. Girsch calling Miles Morman for an update of work being done?
A. All I know is what I've heard and the email that was sent to me. That's all I know.
Q. Just sort of the rumors that you've heard around the railroad guys?
A. Well, you know, if something take place, railroads just like -- they can't hold water; they going to tell it. If anything happen like that, they going to tell it. If anything happen out there, they going to tell it. I mean, if you don't want anything -- for them to know anything, don't

Page 119

tell them because they going to tell it.
Q. Has it been your experience that what you hear around the railroad, sometimes it's true and sometimes it turns out not to be true?
A. Sometimes. It all depends on who it's coming from.
Q. Do you know whether this comment that is alleged in this email here, that Mr. -- is it attributed to Mr. Girsch saying: I don't want a bunch of monkeys screwing the same ball.
Do you know whether that was ever reported to the railroad?
A. From my understanding, they say it were. Now I can't really tell you that it were or were not; it's my understanding it were.
Q. Who gave you that understanding that it was reported?
A. Mr. Hankerson, whoever was reporting to Mr. Hankerson, he was just reporting it to me. That's all I know.
Q. Who told you that this comment that was attributed to Mr. Girsch was reported to the railroad management or human resources?
A. Mr. Hankerson, Ken Hankerson.
Q. When did you speak to Mr. Hankerson?

Page 120

A. It was during this time it was going on.
Q. And Mr. Hankerson at this time wasn't an employee of the railroad?
A. No, ma'am.
Q. So if he believed it was reported, he had heard that from someone else?
A. Yes, ma'am.
Q. But you don't know who?
A. I don't know who.
Q. And you don't know who is alleged to have reported it?
A. No, ma'am, I do not.
Q. Do you know who was on Mr. Girsch's crew at the time?
A. No, ma'am, I do not.
Q. Do you know what else, if anything, was said in that conversation with Mr. Girsch and Mr. Morman?
A. No, ma'am, I do not.
Q. On the next page, kind of second full paragraph down, begins with a statement: For example, a white employee can have a machine running -- do you see that there?
A. For example, white employee can have machine running, and Mr. Heath Brown received no

Page 121

reprimand.
Okay. Uh-huh (affirmative response).
Q. So you see where I am?
A. Yes, ma'am. I see where you are.
Q. Okay. Do you know anything at all about the incident that is alleged to have occurred with Mr. Heath Brown receiving no formal reprimand?
A. Yep, we talked about that earlier.
Q. Which one was that?
A. I call him Baby G.
Q. Oh, he's Baby G?
A. Right.
Q. 'Cause you couldn't remember his name earlier. So this has refreshed your memory?
A. That's right.
Q. Have you told me everything you know about this incident with Heath Brown or Baby G?
A. Only thing I told you -- only thing that was told to me. I mean, I wasn't -- I wasn't on the gang at the time, but that's what was told to me.
Q. And Mr. -- there's something there about Mr. Demarcus Fontelroy getting terminated quickly -- what happened with Mr. Fontelroy, if you know?
A. Mr. Fontelroy was a new -- he was not a -- new employee, probably been there a year, maybe a

Exhibit B: Excerpts from the August 6, 2024, deposition of Plaintiff Robert Branch 31 (Pages 118 - 121)

Veritext Legal Solutions

www.veritext.com 888-391-3376

Page 122

year and half. He wasn't familiar -- from my understanding he wasn't familiar with the machines like a veteran employee. So I was told that he told the supervisor he didn't feel safe taking the machine to the hole because the operator had to go or whatever. And so when he was driving the spike or the gauger to the hole, he happened to run into the back of -- see if his name is here -- we call him -- he ran into back of another machine. I'm trying to see who the operator was 'cause the operator got hurt -- because he was black. It was two operators, both were black, but Mr. Fontelroy, he got terminated.

Q. You said he was a new employee?

A. He had been there probably a year, year and a half, something like that.

But you still, you know, but you still -- it take a while to -- if you ain't used to operating them machine and you ain't used to being on it and know what's what, and if it's slippery like, they said the rain and the slipper, you hit the brakes, they will slide into another machine, and somebody can get hurt or killed.

So that day -- that day, from my understanding, Mr. Fontelroy ran into, we call him

Page 123

Duke, but his name is something else -- what's Duke name is? He ran into Duke. I forget Duke's last name; we call him something else, but that's what we call him and Duke got hurt. And they said it was bad. But Mr. Fontelroy -- in the end, Mr. Fontelroy got terminated.

Q. Do you understand that he was operating the equipment in a manner that wasn't safe given the conditions?

A. See, that I don't know.

Q. Okay.

A. I don't know whether it was raining that day. I don't know where the sun was. All I know is that he collided in with another machine, and the guy on the other machine was hurt, and he got terminated.

Q. And fair to say that you don't know anything about what investigation the railroad did with respect to the incident involving Mr. Fontelroy; correct?

A. No, I do not.

Q. And is it fair to say that you don't know anything about the details of the -- the issues -- you don't have any -- you don't have any firsthand knowledge of what occurred either in the incident

Page 124

involving Mr. Heath Brown or the incident involving Mr. Fontelroy -- you're just drawing the conclusion that there was differential treatment because one of the gentlemen is black, and one is white, and the black was terminated, and the white employee was not. Is that a fair summary?

A. Yes, ma'am.

Q. Then it says: A white employee can threaten killing and making racial comments.

Do you understand that to be in reference to Mr. Melton and his statements that he's from Little Egypt where they bury MFers?

A. Yes, ma'am.

Q. All right. And it says: Tear up a machine and then make a comment you should have had my field truck on bed.

Do you see that there?

A. Yes, ma'am.

Q. Do you understand that also is in reference to Mr. Melton?

A. Right.

Q. Is that yes?

A. Yes, ma'am.

Q. Sorry. I was looking down. It says: And CN management laughed about it on the radio.

Page 125

What, if anything, do you know about that allegation here, that Mr. Melton tore up a machine and then made a comment, "you should have my field truck on bed," and management laughing on the radio. What do you know about that?

A. I don't know anything about that. If it took place, I don't know.

Q. I should have asked you, too: Do you know when the issue with Mr. Fontelroy or the incident involving Mr. Fontelroy occurred or when he was terminated?

A. I wasn't working out there at the time. I'm saying it happened after I was terminated.

Q. Okay. All right. And then there's reference to Todd Melton threatening to kill Roosevelt Sweeney. He was from Little Egypt. That's information you gave to Mr. Hankerson; correct?

A. Yes, ma'am. Not only me, probably some other guys also.

Q. It says that Mr. Melton made the -- threatened to kill Roosevelt Sweeney by saying he was from Egypt Plantation where they kill and bury black people in front of union management. Did Mr. Melton say something similar about being from

Case: 4:23-cv-00217-MPM-JMV Doc #: 83-1 Filed: 01/08/25 19 of 189 PageID #: 2596

Page 126

Little Egypt at the union meeting as well?
A. I think he did, ma'am.
Q. Do you recall clearly one way or the other?
A. I think he did say he was from Little Egypt at the union meeting.
Q. Did Mr. Melton ever say that they kill and bury black people in Little Egypt, or is it just that they kill and bury MFers?
A. He said MF.
Q. That's what he said?
A. Yes, ma'am.
Q. And -- okay.
All right. About two-thirds down the page it talks about Dillon Moak, who's a white foreman who was asked to check a switch because a machine operator, Mr. Omaha West, believes something happened after he traveled over the switch.
Do you know anything about the incident that's detailed here involving Dillon Moak?
A. No, what I was told because it happened while I was out there. Mr. Moak, he ran through a switch. I think he was pulled out of service, but didn't anything -- he didn't get reprimanded. If anything, they gave him a pat on the back and sent

Page 127

him back to work. And so he got $800,000 in damage.
Q. Well, this doesn't talk about Mr. Moak going over a switch. Were you told Mr. Moak went over a switch?
A. Something like that. He went through a switch or went over a switch or something like that or something happened like that, and he got pulled out of service.
Q. When did that happen?
A. It's been a few years ago.
Q. What, if anything, do you know about the railroad's investigation into that incident?
A. Only thing I knew that when they had the investigation and it was told to me that one of the supervisors called someone -- I don't even think -- he -- one supervisor call somebody in upper management and told them that Moak, he's learning, he's a good little supervisor. He's going to be all right. Let him make it and that's what happened.
Q. Who told you that one supervisor called another and that Mr. Moak was good, they should let him back in?
A. Someone told me that John Anderson made call.
Q. Who?

Page 128

A. John Anderson. Supervisor John Anderson made the call.
Q. Okay. My question to you is, who told you about this conversation amongst management?
A. It happened so many years ago I don't recall who told me.
Q. How many years ago?
A. That been a while.
Q. Was it several years before you were terminated?
A. Something like that.
Q. Okay. So you don't recall how you learned of this alleged incident?
A. No, ma'am. All I know is it happened while I was out there.
Q. And the next incident described is -- involves Leroy Purnell; that's your nephew; correct?
A. Yes, ma'am. That's my nephew.
Q. And you mentioned something before about Mr. Purnell failing to pick up a D-rail, and you were around at the time; is that right?
A. Yes, ma'am.
Q. When did that happen?
A. That happened -- I don't know whether it was '21, somewhere along '21 or '20, somewhere along

Page 129

in there.
Q. And you agree that Mr. Purnell failed to pick up the D-rail; correct?
A. Yes, ma'am.
Q. And you understand under the discipline policy, that would be a level 2 violation; correct?
A. Yes, ma'am.
Q. Now, when the incident happened with Mr. Moak, do you know if that was after the discipline policy was put in place in October 2017?
A. That I can't recall.
Q. Okay. All right. The next one identified, Mr. Melton tears a wing off of a regulator and almost goes off a cliff down into a ravine, is that the incident that there was the disagreement at the union meeting as far as you understand?
A. Yes, ma'am, that were.
Q. And that was at some point earlier in 2022; is that right?
A. Yes, ma'am.
Q. And I think you've already told me anything you know about that incident; correct?
A. Yes, ma'am.
Q. And the same with regard to Mr. Gibson who

Exhibit B: Excerpts from the August 6, 2024, deposition of Plaintiff Robert Branch 33 (Pages 126 - 129)

Veritext Legal Solutions
www.veritext.com 888-391-3376

Page 130

hit a handrail, you've told me what you know about that incident?
A. Yes, ma'am.
Q. And that was something that was raised at the union meeting as well; right?
A. Yes, ma'am.
Q. And then it says trackman Heath Brown has a machine run-in with Sedric Stoval. You've already told me everything you know about that incident?
A. Yes, ma'am, I did.
Q. Okay. On the next page it indicates Chance Garner does not divulge an incident and then makes some allegations about Mr. Garner. Do you know anything about that?
A. All I know is that he didn't report it. What he reported he fabricated and then he changed his mind or whatever. That's all I know.
Q. How do you know that?
A. I just know that from what the guys say.
Q. Gossip on the railroad?
A. Yes.
Q. And did that happen after your termination?
A. Yes, ma'am. It happened after termination.

Page 131

Q. You say Mr. -- you don't say, I'm sorry. Mr. Hankerson's email says Mr. Stoval was manipulated and coerced to take a couple of days off while being paid by foreman Todd Peterson. Do you know anything about that?
A. Only what I heard.
Q. Through the rumor mill?
A. Yes, ma'am. Only thing what I heard and what I read in this paperwork.
Q. And that again was after you were fired?
A. Yes, ma'am.
Q. You -- the email goes on to say that Supervisor Garner and Foreman Brent Rose are placing employees in danger by not having two operators on the machines that are required because of blind spots on the track. Do you know anything about that?
A. Well, on most machines, like the gaugers or the spikers, you actually when you drive the machine, you're supposed to have two people for blind spots.
Q. Are you aware of any differential between when the railroad would allow two men on the machine versus one man and if it correlated at all to the employee's race?

Page 132

A. Not as I knows of.
Q. You're not aware of any allegation that, for example, the railroad put the black employees in an unnecessary risk?
A. Well, I'm going to say with something like that, it's not -- it's up to the foreman and the supervisor because the railroad -- they not -- the upper management, they not out there on that track. It's up to the foreman and supervisor to make sure that things are operated according to the standards of the railroad.
Q. There's an incident that's described with Mr. Akeem Jefferson and his machine breaking down and Mr. Fontelroy --
A. That's what I was trying to call his name, really. We call him Duke, but his name is Akeem Jefferson.
Q. Okay. And there are machine breaking down and a plea for help going unanswered.
Do you know anything about that incident?
A. Only what I was told that Jefferson said his radio had went down. He had gave the warning on the radio that the machine was down, but he said his radio -- Fontelroy said he didn't hear the response -- he didn't hear the response on the

Page 133

radio.
So if a radio had a malfunction or whatever, and Jefferson's machine was down, well, if he don't hear the message -- if he don't hear the correspondent, yes, it's a possibility that if he speeding, he going track speed on that track and coming around the curve and Jefferson is stopped, it's very possible that he's going to hit it.
Q. Do you have any firsthand knowledge about this incident described here with Mr. Fontelroy and Mr. Jefferson?
A. I don't have any firsthand knowledge. All I know what is hearsay and what this email that I received.
Q. How about the next incident involving Mr. Duren and Will Dickerson? Do you have any information, firsthand information, about that incident?
A. No, ma'am.
Q. Do you know anything beyond having received this email?
A. No, ma'am.
Q. And do you know when this incident with Mr. Duren or Mr. Dickerson is alleged to have occurred?

Case: 4:23-cv-00217-MPM-JMV Doc #: 83-1 Filed: 01/08/25 21 of 189 PageID #: 2598

Page 134

A. No, ma'am, I do not.
Q. The next paragraph talks about Pierre Anderson, who was accused of cheating on a test and Mr. Moak or Mr. Campbell having allegedly cheated on a test. Do you know anything at all about that?
A. Only what I heard and only what this email.
Q. So what came through the rumor mill at work?
A. Ma'am?
Q. What came through the rumor mill at work?
A. Yes, ma'am.
Q. Did this happen before or after you were terminated?
A. I think that happened before I was terminated, but all I know is that -- they said Pierre had -- I don't know if he was caught cheating or he told somebody that he was cheating on the dig test, and they said Moak, somebody gave him the answers or whatever. He had the answers when he went in there and took the dig test and whatever and did the exact same thing. But Pierre's grade got taken away from him because he admitted cheating, but Moak was cheating, and his grade didn't get taken away from him. That's what I got.

Page 135

Q. Okay. Who told you that?
A. It was -- it was out there because I was doing -- at the time I was out there. It was all over the railroad.
Q. Who told you that?
A. Like I said, I can't recall who told me because when we sitting around like we maybe taking a machine, somebody machine break down, we talk, you know. Just, you know, we talk about what goes on, you know, and then guys speak up what they heard. So I just can't really tell you just like who exactly, but that was the railroad talk.
Q. Okay. So this -- do you know one way or the other whether Pierre Anderson was accused of cheating on a test by the company?
A. No, ma'am, I do not.
Q. Okay. And do you know whether the allegation here is true or not true that he had to retake the test out of concern that he was cheating and he, in fact, failed?
A. That's what I heard. That's what I'm saying, I don't have fact, but that's what I heard.
Q. And the same with regard to the next paragraph, do you have any firsthand knowledge about Mr. Moak admitting to have having somebody else take

Page 136

a test for him?
A. Like I said, only thing I can tell you what I heard. Mr. Moak never told me that.
Q. The -- so if we kind of go backwards then, back to page 3 and look at -- there's another email on page 3 higher up on the page from Friday, November 4, 2022. And it makes reference to, quote, higher-ups who are willing to testify on our behalf about the racial discrimination, intimidation, retaliation, and wrongful termination of black employees.
Did you ever learn who these supposed higher-ups were who were going support that sort of claim?
A. No, ma'am.
Q. Okay.
A. I didn't know any higher-ups were going to do that, and I work for CN.
Q. In fact, this email exchange or email by Mr. Hankerson were from November of 2022; correct?
A. Yes, ma'am.
Q. And to your knowledge, no complaint or class action complaint was ever -- or lawsuit -- was ever filed based on the allegations in this -- in this email chain; right?

Page 137

A. Correct.
MS. FITZKE: Why don't we take a short break?
THE WITNESS: Okay.
(Off the record.)
Q. (By Ms. Fitzke) Mr. Branch, have you told me now all of the facts on which you base your claims of race discrimination and retaliation in this case?
A. Yes, ma'am.
Q. It's my understanding, Mr. Branch, that you don't have a job; is that correct?
A. Yes, ma'am.
Q. And that you haven't performed gainful employment since leaving your job at the railroad?
A. Yes, ma'am.
Q. When we were together in November of 2023, you indicated if you didn't find a job soon, you were going to start cutting grass. Did you ever start cutting grass for pay?
A. No, ma'am because the fact that back in February I got sick with vertigo. I couldn't walk, my balance -- lost my balance. And ever since then, I've been under a doctor.
Q. Do you consider yourself physically unable

Exhibit B: Excerpts from the August 6, 2024, deposition of Plaintiff Robert Branch 35 (Pages 134 - 137)

Veritext Legal Solutions

www.veritext.com 888-391-3376

# Exhibit C

**Excerpts from the November 7, 2023, deposition of Plaintiff Robert Branch**

Case: 4:23-cv-00217-MPM-JMV Doc #: 83-1 Filed: 01/08/25 23 of 189 PageID #: 2600

Page 1

U.S. DEPARTMENT OF LABOR - OSHA
OFFICE OF ADMINISTRATIVE LAW JUDGES

Robert Branch,
Complainant,

vs. OSHA Case No. 301002724

Illinois Central Railroad Company,
Respondent.

DEPOSITION OF ROBERT BRANCH

Taken at the instance of the Respondent at the offices of Wise Carter Child & Caraway, P.A., 401 East Capitol Street, Suite 600, Jackson, Mississippi on Tuesday, November 7, 2023, beginning at 9:08 a.m.

* * * * * * * * * * * * * *

REPORTED STENOGRAPHICALLY BY:
LORI W. BUSICK, CVR-S #7510, CCR #1677

Veritext Legal Solutions
www.veritext.com 888-391-3376

Exhibit C: Excerpts from the November 7, 2023, deposition of Plaintiff Robert Branch

APPEARANCES:

CHARLES EDWARD SOREY, II, ESQ.
Attorney at Law
1000 Highland Colony Pkwy Ste 5203
Ridgeland, Mississippi 39157-2079
Phone: (601) 341-6929
Email: eddysorey@gmail.com

COUNSEL FOR COMPLAINANT

SUSAN K. FITZKE, ESQ.
LITTLER MENDELSON, P.C.
1300 IDS Center
80 South 8th Street
Minneapolis, MN 55402.2136
Telephone: 612.630.1000
Facsimile: 612.630.9626
Email: sfitzke@littler.com

COUNSEL FOR RESPONDENT

INDEX

Style and Appearances............................1
Certificate of Deponent........................189
Certificate of Court Reporter..................190

EXAMINATIONS

Examination by Ms. Fitzke........................4

EXHIBITS

EXHIBIT 1 Handwritten Report .................97
EXHIBIT 2 Letter ............................108
EXHIBIT 3 Termination Letter ................114
EXHIBIT 4 Transcript ........................122
EXHIBIT 5 Termination Letter ................133
EXHIBIT 6 Job Search Records ................145
EXHIBIT 7 Medical Record ....................147
EXHIBIT 8 Collection Letter .................150
EXHIBIT 9 Healthcare Payments ...............152
EXHIBIT 10 Cobra ............................153
EXHIBIT 11 Psychiatrist Receipt ..............154
EXHIBIT 12 Interrogatories ...................157
EXHIBIT 13 Prescription ......................183

Robert Branch,
having been first duly sworn, was examined and testified as follows:

EXAMINATION BY MS. FITZKE:

Q. Good morning, Mr. Branch.
A. Hey, good morning. How are you doing?
Q. My name is Susan Fitzke and I represent Illinois Central in conjunction with the retaliation claim that you filed with the US Department of Labor.
A. Yes, ma'am.
Q. We've asked you to come down today to give a deposition.
Have you ever given a deposition before?
A. No, ma'am.
Q. Okay. So I'm going to give you a few ground rules that will hopefully help today go smoothly, but also help make sure that our court reporter here gets down the best record of our discussion today as possible, okay?
A. Yes, ma'am.
Q. So because she is typing down everything that you and I or your lawyer might say here in the room today, it's important that we have only one

person speaking at a time.
In normal conversation you might think you understand my full question before I finish it or I might think I understand your full answer before you finish it and we kind of tend to talk and listen at the same time, but if we try to do that today there's no way for her to keep up, okay?
A. Yes, ma'am.
Q. For purposes of our record, I'd also ask if you can please give a yes or a no or whatever other verbal answer might be appropriate to the questioning. The uh-huhs (affirmative response) and huh-huhs (negative response), everyone in the room might understand, but when we try to read it back later --
A. Yes, ma'am.
Q. -- it won't make any sense.
A. Right.
MR. SOREY: You've got to let her finish before you start answering. You already started. We talked about this yesterday.
Q. (By Ms. Fitzke) And to be fair, sir, everybody does tend to need reminders of that particular rule. So if I give you reminders or your lawyer does, it's nothing personal, it's very

gangs more often?
A. Yes, ma'am. With rail gang I was able to maintain a machine and operate a machine.
Q. When did you do the training in Yazoo City?
A. It was in 2017.
Q. So when you worked on a rail gang it sounds like you held seniority and had the right certification to be a machine operator?
A. Yes, ma'am. I operated a machine.
Q. And when you were at a tie gang did you operate a machine?
A. Sometimes I did and sometimes I didn't.
Q. Just depending on who else was part of the gang and who had what seniority and training?
A. Yes, ma'am.
Q. Fair to say from your perspective that up until the incident with Mr. Melton that your employment with Illinois Central was fairly uneventful?
A. Can you restate that, ma'am?
Q. Sure. I understand that prior to the incident with Mr. Melton, you didn't have any discipline on your record; is that right?
A. That is correct.

Q. And that you didn't have -- you hadn't made any complaints or didn't really have any complaints about your employment; is that right?
A. No, ma'am, I didn't.
Q. When you were hired by Illinois Central, did you go through any kind of orientation or training?
A. Yes, ma'am, I did.
Q. Tell me what you can recall about that?
A. Every year that we take the Book of Rules, within the Book of Rules you might go through harassment, you have hazard material classes, you have USOR, you have OTS, CWR.
Q. What was the last one?
A. CWR.
Q. What does CWR stand for?
A. Continuing weld -- continuing weld -- continuing weld something. I can't think of it off my head.
Q. That's okay.
A. Because I ain't looked at the book.
Q. And what is OTS?
A. OTS is operating -- operating -- oh, man, I have to think about -- see, I ain't look because I ain't been out there.

MR. SOREY: Time?
THE WITNESS: Huh?
MR. SOREY: Time?
THE WITNESS: Huh-huh (negative response).
Q (By Ms. Fitzke) We can look it up, sir. Don't worry about it.
And then the USOR is the US Operating Rules?
A. Yeah, US Operating Rules.
Q. When you --
A. Oh, OTS is On-Track Safety. I'm sorry.
Q. Thank you. I knew I knew the acronym too but for some reason --
A. It's on-track safety.
Q. Yeah.
And in terms of when you said the Book of Rules at the beginning, is that the US Operating Rules?
A. It's the US Operating Rules and OTS.
Q. Okay.
A. Uh-huh (affirmative response).
Q. Anything else in the Book of Rules that you're referring to?
A. And the CWR.
Q. Okay. And did you receive those rules

upon your hire?
A. Yes, ma'am.
Q. And then, as I understand it, when you're hired you go to training on those particular rules; is that right?
A. Right.
Q. And then every two years you're qualified on the US Operating Rules; is that right?
A. Yes, ma'am.
Q. Are you -- do you also receive train every two years on the on-track safety and CWR rules?
A. On-track safety and CWR rules you take them annually.
Q. Annually, okay. And you, as I understand it, have to pass a test at the end of the training?
A. Yes, ma'am.
Q. And you have to do that to maintain your qualification for you role?
A. Yes, ma'am.
Q. All right. And do you also -- are you also familiar with Illinois Central's code of conduct?
A. Yes, ma'am.
Q. Did you receive training on the code of conduct?

Page 46

Book of Rules but I didn't really, you know, really, really know him. I was just new on the railroad and I heard guys just calling one another names and I didn't really, really know a lot of guys during that time went I first started.
Q. When was that?
A. That was in '08 I was at the Book of Rules in Grenada.
Q. Is that a rules training class you were at?
A. Yes, ma'am.
Q. And are you trying to say that Mr. Melton was involved in calling other employees names in this rules training class?
A. No, ma'am.
Q. Oh, I'm sorry. I misunderstood.
A. You asked me when I -- when I met him.
Q. Yes.
A. That's when I met him.
Q. Okay.
A. I didn't know -- you know what I'm saying, I didn't, you know. That was like in -- I think that was the question you asked me.
Q. Yeah. Absolutely.
And you said something about calling each

Page 47

other names, are you just mentioning that's the first time you heard his name?
A. I said -- well, I said I didn't really know the employees, I just heard, you know, different ones calling one another names, you know what I'm saying. I didn't know anyone, that's what I'm saying, because that's when I had first started. You know, I didn't know anybody by name or who was who or what position they hold. That's when I first, you know, met him.
Q. Understood.
A. Yeah.
Q. Thank you for that clarification.
Did you -- when was the first time that you worked side by side or on a gang with Mr. Melton?
A. I think we was on -- we was on the rail gang, I think. I don't know which -- I don't know which year it were or whatever, I don't really recall because Mr. Melton mostly did -- he mostly was a track inspector so. And when he was on the gang he mostly -- mostly drove a truck because he had -- he had a lot of seniority. So I wasn't really, you know, around Mr. Melton like that, I mean.

Page 48

Q. Do you know how many -- on how many occasions or on how many different gangs you worked with him over the course of your employment?
A. All I know was, I think it was -- we worked on the rail gang, yeah. I don't recall what -- rail gang and tie gang. Rail gang and tie gang.
Q. So would it have been kind of over the course of the years you worked there off and on that you would have had Mr. Melton on your gang or was it a frequent occurrence or are you able to say?
A. I think it was like a frequent occurrence because Mr. Melton was -- like I said, I worked in the Bridge Department most time than when I did working the track back in the production side. Mr. Melton was -- he wasn't -- he wasn't on our gang.
Q. He was not on your gang?
A. No, ma'am.
Q. When -- after -- I think you mentioned moving back to production in about 2015?
A. Yes, ma'am.
Q. After you moved back to production, when was the first time that you can recall being on a gang with Mr. Melton?

Page 49

A. I think it was somewhere in like 2020, somewhere along in there. See, I don't remember Melton just being on our gang, you know, constantly being on our gang.
Q. You don't recall him constantly being on your gang?
A. No, ma'am.
Q. Before the incident that occurred on May 26 of 2022, had you ever had any kind of issue or problem with Mr. Melton?
A. No, ma'am. I never had any problems with him.
Q. Do you recall having any interactions with Mr. Melton prior to May 26, 2022?
A. No more than I'd see him everyday fueling up a machine, that's it, that I was operating, that's it.
Q. Kind of good morning while you're fueling up your machine?
A. That's it.
Q. I've seen reference in various documents or transcripts that sometime before May 26 of 2022 that there was an incident at a union meeting involving someone named Sweeney. Can you explain to me your understanding of what had occurred at the

How long before May 26 was this union meeting?
A. The union meeting was April the 30th, if I can recall.
Q. Outside of the brief discussion that you mentioned with Mr. Melton at the union meeting, did you speak with him at any other time before May 26 about what occurred?
A. No, ma'am. Actually, I thought it was, you know, it's over with. I mean, I didn't --
Q. And outside of your conversation with Mr. Sweeney at the union meeting had you spoken with him at any other time about what occurred there?
A. Yeah. I spoke to him on the phone because he called me and asked me to my -- he had -- he had told somebody that I was taking Todd's side. And I told him -- I told him that I wasn't taking no one's side I was just doing it because of the fact that -- that's who the person I am. I mean, I don't -- I don't, you know -- we said we family and we say we brotherhood, we like one big family and when you see railroad men going at one another, it just don't -- it just don't -- it just don't look right, especially in a public place.
Q. Okay. How long was that phone call with

Mr. Sweeney?
A. It wasn't -- it wasn't -- it wasn't long, it was like brief. But I, you know I was glad he called me because I wanted to let him know that I didn't appreciate him, you know, telling someone that I'm taking somebody's -- it wasn't about taking nobody's side. It was about doing what's right.
Q. And was that phonecall -- was that before the May 26th events?
A. Yes, ma'am. It was probably a week after the incident that happened at Crystal Grill.
Q. Did you speak with Mr. Melton or Mr. Sweeney at any other time prior to May 26 about the incidents that occurred at the union meeting?
A. No, ma'am.
Q. All right. Then let's go ahead and talk about May 26 of 2022.
A. Yes, ma'am.
Q. So it's my understanding that at that time you were working on a rail gang as a machine operator?
A. Yes, ma'am.
Q. And what was Mr. Melton's role on that particular gang?
A. I think he was the fuel truck operator.

Q. And so during the course of your work shift, is it fair to say that you wouldn't have much occasion to come in contact with one another, other than maybe to fuel up in the morning?
A. We might see each other at the hotel, might run into one another, you know. Other than that maybe I'd be coming down the elevator or out of his room or I might be coming out of my room, we in the lobby or something like that, checking in. But other than that, you know.
Q. And prior to May 26 of 2022, it's my understanding that you didn't have any issue with Mr. Melton?
A. No, ma'am.
Q. Okay. Then let's talk about the evening of May 26 of 2022. Can you tell me what happened, to the best of your recollection?
A. Yes, ma'am.
The evening me and a few guys that work on the gang, we decide that we had got -- we didn't want to go out to the restaurant and eat, we wanted to just -- one of the guys had brought a grill with him, we wanted to just buy some food and just grill out in the parking lot. So about 9 o'clock, the other guy -- the white guy, they was drilling on the

other end, we was drilling on one end of the hotel.
So about 9 o'clock that night they got finished before we did so some of them came around where we were, which I was the one that was doing the cooking. And I was about to wrap it up and go to the room. So Mr. Melton, he came out the hotel door with his barefoot, his shoes off, and he -- first of all, I thought he was -- he was good because he was dancing to the music, one of the guys had his music on his truck. And all of a sudden, he just -- all of a sudden he just -- he just went in a rage. He started yelling, talking loud, cussing, saying he was from Little Egypt Plantation where we kill and motherfuckers, I'm going to kill Sweeney.
By the time -- when I heard him say he's going to kill Sweeney, I just asked him -- I said, "Man, chill out," you know "Sweeney ain't here, chill out." And when I said that, I was standing -- I was standing like this in front of the grill and next thing I know -- he was like from here to that chair there and he rushed over, he ran over there and pushed me and just pushed me to the ground and I -- he pushed me to the ground where I twisted my knee, skint my elbow up.
When I got up off the ground I asked

Exhibit C: Excerpts from the November 7, 2023, deposition of Plaintiff Robert Branch

# Exhibit D

**Transcript of the February 13 and 14, 2024, hearing in front of the Office of Administrative Law Judges ("OALJ")**

# UNITED STATES DEPARTMENT OF LABOR
# OFFICE OF ADMINISTRATIVE LAW JUDGES

**In the Matter of:**

| | | |
|---|---|---|
| **ROBERT BRANCH,** | ) | |
| | ) | |
| **Complainant,** | ) | |
| **v.** | ) | **Case No. 2023-FRS-00026** |
| | ) | |
| **ILLINOIS CENTRAL RAILROAD,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| | ) | |

**Condensed Transcript and Key Word Index**

**PAGES:** 1 through 203

**PLACE:** Video Hearing

**DATE:** February 13, 2024

**BAYLEY REPORTING, INC.**

***OFFICIAL FEDERAL REPORTERS***

**Florida**
**(727) 585-0600**

Exhibit D: Transcript of the February 13 and 14, 2024, hearing in front of the Office of Administrative Law Judges (“OALJ”)

UNITED STATES DEPARTMENT OF LABOR
OFFICE OF ADMINISTRATIVE LAW JUDGES

In the Matter of:
ROBERT BRANCH, )
)
Complainant, )
v. ) Case No. 2023-FRS-00026
)
ILLINOIS CENTRAL RAILROAD, )
)
Respondent. )
)

Video Hearing
Tuesday,
February 13, 2024

The above-entitled matter came on for hearing pursuant to notice, at 9:00 a.m., CST.

BEFORE: ANGELA F. DONALDSON
Administrative Law Judge

Bayley Reporting, Inc.
(727)585-0600

A P E A R A N C E S

On behalf of the Complainant:
CHARLES EDWARD SOREY, II, ESQ.
Sherman & Lacey, LLP
1000 Highland Colony Parkway, Suite 5203
Ridgeland, Missouri 39157
(601) 341-6929
JAMES FERGUSON, ESQ.
201 West Broadway, Suite G12
North Little Rock, Arkansas 72114

On behalf of the Respondent:
SUSAN FITZKE, ESQ.
GRACE JACOBSON, ESQ.
Littler Mendelson
80 South 8th Street, Suite 1300
Minneapolis, Minnesota 55402

I N D E X

| COMPLAINANT'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Robert Branch | 17 | 42 | 84 | 88 |
| Wade Clark | 96 | 106 | 113 | |
| Christopher Day | 121 | 126 | 132 | |
| Duane Spears | 135 | 145 | 161 | |
| Thomas Sullivan | 168 | 175 | 181 | 190 |
| Thomas Hilliard | 193 | 198 | | |
| RESPONENT'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
| None | | | | |

E X H I B I T S

| EXHIBIT | IDENTIFIED | IN EVIDENCE | WITHDRAWN |
|---|---|---|---|
| COMPLAINANT'S | | | |
| None | | | |
| RESPONDENT'S | | | |
| None | | | |
| DIRECTOR'S | | | |
| None | | | |
| ALJ'S | | | |
| None | | | |
| JOINT | | | |
| 1 through 48 | 9 | 10 | |

P R O C E E D I N G S

February 13, 2024 9:21 A.M., CST

JUDGE DONALDSON: All right. Good morning again, everyone. We are present for a Federal Rail Safety Act whistleblower proceeding. We're present by video conference using Microsoft Teams. We are docket number with OALJ of 2023-FRS-26. Again, Claimant is Robert Branch. Respondent is Illinois Central Railroad Company. My name is Angela Donaldson and I'm an administrative law judge with the Covington, Louisiana Office of Administrative Law Judges. We are part of the U.S. Department of Labor. As the attorneys are aware, the parties may not all be aware, we are a separate entity from the OSHA agency which originally had the claim for review investigation entering some findings. This is a de novo proceeding so there are no fact findings that have been entered or conclusions reached that I am required to adopt from the OSHA findings. When the Complainant, Mr. Branch, requested a hearing and that the matter be transferred to OALJ, it is a new proceeding and I will be entering findings of fact and conclusion of law once the record is closed. This is the important part of the record, of course, the evidence received in the form of the exhibits the parties have tendered which will be shortly admitted and then the witnesses will be testifying in this

administrative proceeding.

So, we have legal representatives for both parties. Let's get an introduction from Mr. Branch's attorneys and for the record, identify for the record who's lead counsel for today's proceedings starting with Complainant.

MR. SOREY: I'm C. Sorey, II. I'm the lead counsel for Mr. Branch.

JUDGE DONALDSON: All right and you're seated with Mr. Ferguson. You're just off camera right now, okay?

MR. SOREY: Great.

JUDGE DONALDSON: All right. Go ahead, Mr. Ferguson.

MR. FERGUSON: Yes, this is James Ferguson for the Complainant.

JUDGE DONALDSON: All right and are your business addresses of record the same as what you've entered in the Notice of Appearance?

MR. FERGUSON: Yes, Your Honor.

JUDGE DONALDSON: Okay and you have with you Mr. Robert Branch, your client, who's going to be a witness today. Is that right?

MR. FERGUSON: That is correct.

JUDGE DONALDSON: Okay, great. Let me do the same and get introductions as well from Respondent.

MS. FITZKE: I'm Susa Fitzke, lead counsel for Respondent.

JUDGE DONALDSON: And who is present with you as co-counsel and your representatives or other individuals present for Respondent today?

MS. FITZKE: Sure. My colleague, Grace Jacobson, is also counsel for Respondent and she is present with me along with in-house legal counsel for the Carrier, Gillian Marshall, and Duane Spears, who is a senior manager of Human Resources.

JUDGE DONALDSON: All right, thank you and since I'm aware of your witness list, we don't have Ms. Marshall or Ms. Spears present in any testified capacity, correct?

MS. FITZKE: Mr. Spears will be a testifying witness in the matter, but is present in his capacity as a company representative.

JUDGE DONALDSON: All right. I see his name now. Okay, thank you. So, as I mentioned, we're here for a formal hearing under the Federal Rail Safety Act specifically under the whistleblower protection provisions. I want to cover just very briefly that the protections and remedies and the Act that the claim is presented under are those found under AIR-21 which is the Wendall H. Ford Aviation Investment and Reform Act for the 21st Century.

The rules and regulations that will apply to our formal hearing are found under Part 29 CFR Part 1982. A couple of mentions here. Under 1982.107(d), Formal Rules of evidence will not apply. It doesn't mean that no rules apply or no evidentiary rules apply, but as provided in the regulations, I am charged with excluding evidence that would be immaterial, irrelevant or unduly repetitious.

So, I know the tendency is to present perhaps if you have any objections to a question, to an item of evidence, you may object as hearsay or other traditional type of objection which is fine, but I will be keeping in mind the framework of the regulatory provisions that were under and maybe asking you to tell me what why the evidence you're objecting to is immaterial, irrelevant or unduly repetitious. I do want to keep us moving at the right pace. I do want you to get the evidence in for the claims and defenses that you need to have in, but we do not have as quite a strict application of the formal Rules of Evidence that you may be used to proceeding under in other state or Federal forums other than administrative. This is fairly typical for an administrative proceeding of the type that we handle here.

The Rules of Procedure do apply under the rules you're familiar with for OALJ 29 CFR Part 18 and that's a regulatory provision as well. Under 1982.109(a), the

Complainant here needs to show by a preponderance of the evidence that protected activity that he engaged in was a contributing factor to the adverse action that he is alleging occurred and if that happens, under 109(b), Respondent must prove by clear and convincing evidence that it would have taken the same adverse action in the absence of any protected activity. The relief that can be awarded is also identified by regulation under 1982.109(d).

So, some general rules for the hearing itself. Ms. Wynn probably covered these with you during your prehearing conference maybe this morning as well. As a general rule, we have control over meeting you as well. All but those asking questions, participating with me in the preliminary matters will be muted. Please turn off other phones and remove any distractions of any kind. If you have technical difficulties at any time, you can either use their raise hand function in this video Prevrium (ph) platform or just simply get my attention in some way. We're going to take regular breaks. We have more than today. We have a two-day hearing set aside. We have a lot of witnesses to get through, but that doesn't mean that we need to exhaust the attorneys and the witnesses by not taking breaks. We're going to take those because I think it benefits everyone to do so. We'll cover post-hearing briefs in just a second and let me just note for the record

that you're aware of the order that was issued late yesterday, February 12th and on Respondent's Motion in Limine and Respondent's objections to CX-1 through 8. I'm not going to restate what the ruling is. Generally, the outcome though is the deposition transcript of Mr. Gardener is going to be submitted by agreement of the parties. We discussed off-record to maybe, in fact, mark as Joint Exhibit. The parties will have a chance to review the excerpts portions you want to submit. Consider whether there's a video that you say can be accompanying and you want to submit that, but I'm going to let you all continue to confer and then present to me what you want to do.

All right. Exhibits JX-1 through 48 have been submitted. There was a substitution of JX-18 and JX-19. We're going with the most recent version of those that were submitted February 8, 2024. These are jointly submitted. I don't have the objections to these exhibits including the amended ones so I'm going to admit at this time JX-1 through 48 and the substituted JX-18 and JX-19.

(Whereupon, the documents referred to were marked for identification as Joint Exhibits 1 through 48.)

//

//

//

(Whereupon, the documents marked for identification as Joint Exhibits 1 through 48 were admitted into evidence.)

JUDGE DONALDSON: Is there any procedural or housekeeping matter, Mr. Ferguson, that you think we need to address?

MR. FERGUSON: I don't think so, Your Honor.

JUDGE DONALDSON: All right. Ms. Fitzke, anything?

MS. FITZKE: No. Thank you, Your Honor.

JUDGE DONALDSON: All right. We can do --- well, let me cover some issues that have been stipulated. These are in the prehearing statement. I'm going to try not to get any of these wrong, but they're in the record and they're prehearing statements filed, I show, January 16, but that might be January 26, 2024. Let me review the basic stipulations here. We have (1) the Complainant was an employee within the meaning of and subject to the provisions of the FRSA, the Act that I described earlier, (2) that Illinois Central is a railroad carrier within the meaning of the same Act. I have a stipulation that on May 26, 2022, Complainant, Mr. Branch, was employed by Illinois Central as a fuel truck driver, a stipulation that the employment of the Complainant was terminated June 24, 2022.

We have a stipulation that Complainant filed a complaint with OSHA alleging the termination of the employment was in violation of FRSA. We have a stipulation the Secretary of Labor issued a no reasonable cause finding and dismissed that complaint that had been filed with OSHA. Those findings are dated October 26, 2022 and another stipulation, the only procedural one that Complainant filed objections to those findings of the Secretary and requested a hearing before administrative law judge. All right, are there any stipulations that you would add, Mr. Ferguson or Ms. Fitzke?

MR. FERGUSON: The only one that I don't think was in there, Susan, did we make a stipulation as to his termination date? I couldn't remember if that was read.

MS. FITZKE: I believe that we did, yes. Did I not read that one?

MR. FERGUSON: You may have. I may have just missed it. My apologies.

MS. FITZKE: Okay. Yes, the termination date, June 24, 2022.

JUDGE DONALDSON: Okay. All right, yes. It appears to me that this matter arises in the jurisdiction of the 5th Circuit Court of Appeals given the residence of Mr. Branch, underlying conduct, the location of that that has alleged to have occurred and the investigation that

occurred in Mississippi. Mr. Ferguson, do you believe we are in the 5th circuit here?

MR. FERGUSON: Yes, Your Honor.

JUDGE DONALDSON: Okay. Ms. Fitzke, do you agree?

MS. FITZKE: I do agree and I was just as you were reading those, I'm not sure if it's material, but I do believe there is a point of clarification for the stipulations in terms of stipulation number 23 where the parties agree that on May 26, 2022, Complainant was employed as a fuel truck driver. I believe the other individual involved in this incident was a fuel truck driver and Mr. Branch was a machine operator and I think I've seen Mr. Ferguson refer to with them and so I think it's like clarification of that stipulation.

JUDGE DONALDSON: Okay. Mr. Branch was employed as a machine operator?

MR. FERGUSON: Yes, Your Honor.

JUDGE DONALDSON: All right. The issues to be adjudicated appear to track generally what the burdens are that I summarized from the regulations a couple of minutes ago. Issue 1 is whether the Complainant can prove that he engaged in protected activity under the Act, whether he can prove that protected activity was a contributing factor to an adverse action. Here, it's a discharge or termination.

Then we would have if those are proven, we would have a shift to the burden to Respondents to prove by clear and convincing evidence that the termination would have taken place even without protected activity and then lastly, if Complainant succeeds with the burden and Respondent does not, I would be addressing any relief that Complainant is seeking under the Act and regulations.

I show --- just briefly before we get to opening statements, of course, Complainant would go first with those. Mr. Ferguson and Ms. Fitzke, I show that at the heart of the Act, that is an issue here. It's 20109(B)(1)(A). There's different kinds of protected activity that can be at issue here. I want to make sure I understand that Mr. Branch alleges the type of protected activity that triggered his claim under the whistleblower provisions is (B)(1)(A) which is the reporting in good faith of a hazardous safety or security condition. Is that right?

MR. FERGUSON: That is correct.

JUDGE DONALDSON: Okay. No other types of protected activity are alleged here?

MR. FERGUSON: They have not been throughout this case.

JUDGE DONALDSON: Okay. All right. Do you want to make any opening statement, Mr. Sorey or Mr.

Ferguson?

MR. FERGUSON: Your Honor, I think that the stipulations in the prehearing brief cover opening statements adequately. We'll be post-briefing so I don't think there's any reason to waste the court's time on that.

JUDGE DONALDSON: Okay. Ms. Fitzke?

MS. FITZKE: Well, I had a statement planned for you. I think in light of Complainant's deferral, we can defer our statement as well.

JUDGE DONALDSON: All right. Let me turn to the first witness today. Actually, let's review the witnesses real quick in the order that you want to go in. We're starting with Mr. Branch and then who else do you plan to call, Mr. Ferguson?

MR. SOREY: This is Mr. Sorey.

JUDGE DONALDSON: Mr. Sorey. Can you get in the camera while we're talking? Great. Thank you, Mr. Sorey. Oh, I lost you. Well, that turned out to be fatal. That's odd. We're going to wait for them to be rejoined. Renee, we can go off the record for a second.

(Off the record at 10:36 a.m.)

(On the record at 10:36 a.m.)

JUDGE DONALDSON: Okay.

MR. SOREY: Sorry about that.

JUDGE DONALDSON: That's fine.

MR. SOREY: We would have Mr. Christopher Day first and Susan had said that Mr. Wade Clark needs to be out of here or need be somewhere and he has to leave before 4:00. So, I'm willing to move him up if that's okay.

JUDGE DONALDSON: I appreciate that.

MR. SOREY: Okay. So, we'll take Wade Clark second then.

JUDGE DONALDSON: All right.

MR. SOREY: And then I think the other listed are Duane Spears, Tom Sullivan, Tom Hilliard and Patrick Crain.

JUDGE DONALDSON: Okay.

MR. SOREY: And that's all that we have.

JUDGE DONALDSON: So, the order, I might have missed something here. The order, you are starting with Christopher Day. Is that right?

MR. SOREY: After Mr. Branch.

JUDGE DONALDSON: Got it. Okay, that's what I was missing, okay.

MR. SOREY: And, of course, we're submitting Chance Gardener. He won't be here as a live witness.

JUDGE DONALDSON: Right. Okay. All right.

MR. SOREY: I'm going to move around to try to accommodate everyone as far as being able to see me when I'm asking questions.

JUDGE DONALDSON: Okay.

MR. SOREY: Not to be too chummy here.

JUDGE DONALDSON: All right. That works for me. I know that's not a usual setup that you have in a hearing setting. We're video anyway so we're flexible here. We can do those. All right. So, Mr. Branch, ordinarily in an in-person formal hearing setting, obviously you'd be in your own chair and you'd be probably closer to me and your attorney would be across from you, but this is a somewhat less formal setting anyway as we're appearing by video. I'm very appreciative that everyone is ready and handled all the preliminary so quickly. We're already getting to your testimony. So, if you have any questions, Mr. Branch, at any time, of course, you can rely on --- let your attorney know, for example, if you don't understand something that's being asked of you, but the other attorney know when they have an opportunity to ask you questions on cross-examination as well, you can also let me know as well. That goes for any of the witnesses testifying today. Before I swear you in, I don't see any other witnesses that are present, but if this comes up during the hearing today, does anybody want witnesses sequestered?

MR. SOREY: Yes, we do.

JUDGE DONALDSON: You do?

Exhibit D: Transcript of the February 13 and 14, 2024, hearing in front of the Office of Administrative Law Judges ("OALJ")

MR. SOREY: Yes.

JUDGE DONALDSON: Okay. So, sequestration is invoked and we're going to make sure --- please help me stay alert in case any witnesses joint because they've been given the link and we'll make sure that only the witness testifying is the witness present at that time. All right, Mr. Branch, would you please raise your right hand? I'll swear you in.

Whereupon,

ROBERT BRANCH

having been duly sworn, was called as a witness herein and was examined and testified as follows:

WITNESS: Yes, ma'am. I do.

JUDGE DONALDSON: Okay, great and I'll let you know if we can't hear you at any time, but that's great. So, your attorney is asking questions first on what's called direct examination and I take it, that's Mr. Sorey, so you can go ahead with your witness.

MR. SOREY: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. SOREY:

Q Robert, would you state your full name, please?

A My full name is Robert L. Branch.

Q And your address?

A My address is 26 County Road 143, Colia, that's C-O-L-I-A, Mississippi 38923.

Q Is that in Carroll County, Mississippi?

A Yes, sir. It's Carroll County, Mississippi.

MR. SOREY: Your Honor, I threw that in because it's a very rural address.

BY MR. SOREY:

Q What is your seniority date with the railroad?

A My seniority date is 2008, February 11, 2008.

Q Okay and what positions have you held with the railroad?

A In the Engineering Department, I was a trackman and a machine operator and then in the Bridge Department, I was assistant foreman, a commoner, commoner helper and a bridge.

Q In June of 2022, where were you working?

A We were working in White Bluff working for Colonial, Mississippi.

Q And what was your position at that job?

A At that time, I was a machine operator pulling spikes.

Q Okay. Before May 26, 2022, had you had any problems with Mr. Melton?

A No, sir. I hadn't.

Q Before Mr. Melton arrived at the hotel, what were you doing?

A I was standing behind the back of the truck cooking on barbecue grill.

Q And where were you all located?

A We were located at Colonial Inn and Suites in Colonial Mississippi.

Q And what time of day was this?

A It was approximately 8:00, 7:00 or 8:00 when we started cooking. It was 9:00 when the incident took place.

Q Who all was there?

A It was myself and a group of railroad workers from the railroad.

Q Okay. When Mr. Melton came out of the hotel, what did he have to say?

A Mr. Melton stated that he was from "a plantation where they killed and buried mother-fuckers. I'm going to kill Mr. Sweeny."

Q And how did you respond to that?

A I said Sweeny wasn't here. Chill out.

Q After that statement by you, describe what Mr. Melton did.

A After the statement, Mr. Melton, he rushed over to me and pushed me down as hard as he could. When I got up, Mr. Melton hit me in the face twice between my eyes when he drew blood and the time I got up again, he had his fist balled up to hit me again.

Q Prior to Mr. Melton pushing you down, what direction were you facing?

A I had my back turned to Mr. Melton. I didn't even see him coming.

Q And after he pushed you down, exactly what took place?

A After he pushed me down, I got up and asked me why did he push me and then he hit me in the face twice.

Q And what did you do at that point?

A At the point, I barely got up off the ground and he was still standing over me with a fist balled up and I went into defense mode.

Q Okay and from there, what happened?

A From there, what happened, a fellow broke us up.

Q When you say broke you up, were you all ---

A He pulled us loose.

Q Where were you physically located when the group came over to pull you all apart?

A I was on the ground on top of him.

Q Were you on top or he was on top?

A I was on top.

Q Okay. Could you have run --- excuse me. Go ahead.

A -- because we had fell.

Q All right. How did you all get on the ground?

A We sort of fell. Both of us fell.
Q Okay.
A -- going forward.
Q Could you have run away from Mr. Melton?
A No, because I didn't know Mr. Melton was going to attack me. I was behind the grill and was caught between the truck and the fence next to us.
Q Were you in the parking lot of the hotel?
A Yes, sir. I was.
Q Now, after the group got Mr. Melton off of you all or you all broke up from the ground, what happened next?
A Mr. Melton stated that he was going to the truck to get his gun.
Q And what did he actually do? Do you know?
A All I know is he went to his truck, but I don't know what happened because a co-worker, Mr. Hunsucker (ph) which was the assistant foreman drove him to his truck to keep him to come back to do any more harm.
Q After Mr. Melton attacked you, how did you feel?
A After Mr. Melton attacked me, I felt fearful. I felt fearful. I was embarrassed. I was hurt and I was threatened because of the fact that he was going to get his gun.
Q Did you do anything about the altercation that

night?
A No, I didn't. I was in total disbelief because I never actually really know that had in the truck with anyone on the railroad and I didn't do anything because my foreman said he was going to report it the next day.
Q And who was your foreman?
A Ty Peterson.
Q And to your knowledge, did he report it?
A Yes, he did.
Q To whom did he report it?
MS. FITZKE: I just want to assert an objection that this is hearsay. It's traditional hearsay. I understand Your Honor's instruction. It's also immaterial. This claim is about Mr. Branch's reports, not the reports of any other employee.
JUDGE DONALDSON: Mr. Sorey, how is it material, the information you're asking for?
MR. SOREY: Well, it puts the railroad on notice of what took place and it leads to what took place after that, the foreman reporting it to the supervisor and then the supervisor getting involved.
JUDGE DONALDSON: Okay. I'm going to overrule the objection. You can go ahead.
BY MR. SOREY:
Q Okay and Mr. Peterson informed who?

A He informed the supervisor, Chance Gardener.
Q All right and who was Chance Gardener?
A He was a supervisor on the rail gang.
Q Did you discuss what had happened at the altercation with Mr. Chance Gardener the day after?
A Mr. Chance Gardener, I did. Mr. Chance Gardener came to my machine and asked me what happened and I told him I was attacked by Mr. Melton and Mr. Melton went to the truck to get his gun to come back and shoot. I said I felt threatened by Mr. Melton's actions.
Q Okay. All right, what took place next as far as you --- you were at work on that Friday. This took place what, on a Thursday? Is that correct?
A The incident took place on a Thursday.
Q And then the meeting with Mr. Chance Gardener was on Friday?
A Was on Friday morning.
Q Just to give the court an idea of the time period and stuff, this was Memorial Day weekend?
A That is correct.
Q All right. As far as speaking with members of the railroad or supervisors about it, what took place next?
A When I talked to Mr. Gardener that morning, he told me that he had to talk to Todd first.
Q And who is Todd?

A Todd Melton, the employee who attacked me.
Q And did that take place?
A Well, all I know was on the Saturday, I called Mr. Gardener and asked him did he speak to Mr. Melton and he told me he did and he said that Mr. Melton said that he didn't remember anything.
Q What did you do next?
A And I told him that I'm thinking about filing a report because the way --- it shouldn't have happened. He shouldn't have attacked me. He shouldn't have --- I did nothing to him to attack me.
Q How did you feel about being around Mr. Melton at work?
A Personally, I tried to avoid Mr. Melton when I was at work because I didn't know what he would do next.
Q Did Mr. Melton threaten you any more at work?
A No, he did not.
Q What took place next as far as communication between you and the foreman?
A What took place next between me and the supervisor, I called Chance and I made my mind up to file the incident report. I called Chance on a Sunday. He wouldn't answer the phone so I gave him all day that Sunday to respond to me so he didn't. So, on that Monday which was Memorial Day, I texted him.

Q Were you all working on Memorial Day?
A No, we wasn't.
Q Okay. What did you text?
A I texted him that I had changed my mind. I said, I'm going to go forward with the incident because with what Todd, what Mr. Melton had done was unacceptable and it could have got --- somebody could have gotten seriously hurt or killed. I told him if I let it go, it'd be out if he'd go out and do to something else like he did me and somebody get hurt or killed, then the blood would be on my hands.
Q Were you and the witnesses that were there at the altercation, were you all asked to give statements?
A Yes, sir. We did.
Q Did all of you give statements?
A Yes, sir. They did.
Q Now, do you know whether these witnesses or did these witnesses testify in your investigation hearing?
A Yes, sir. They did.
Q And do you know what they testified to?
A All I know is they all had a statement and they testified that I didn't do anything to provoke, anything to cause the incident that happened.
Q Do you recall the day that you were given notice of an investigation charging you with a violation of the

Illinois Central workplace violence policy?
A If I'm not mistaken, I think it was that Friday on the 3rd.
Q Okay.
A FedEx brought it to my door.
Q Okay. Did all eight co-employees read their statements at the hearing?
A All the ones that was there present. Being a witness, they read their statement.
Q What happened as a result of the hearing?
A I was terminated.
Q Do you remember the date that you were terminated?
A To my recollection, it was --- FedEx brought another letter to my door on June 24th stating that I was terminated.
Q Now, Mr. Branch, how has the firing affected you?
A The firing has affected me mentally. Here I am. I'm on medication and before I got fired, I was not on any medication. I wasn't seeing a doctor neither.
Q Well, what doctor are you seeing and why?
A I'm seeing a doctor, Dr. Redgrove. He's a psychiatrist doctor and he has me on medication for depression, anxiety and nerve pain.
Q And do you know how to spell the doctor's name by

the way for the record?
A I think I got something with the name of the doctor. The doctor got a funny name.
Q Well, we'll get to ---
JUDGE DONALDSON: Yes. Don't look at anything unless you're asked to, Mr. Branch.
WITNESS: Yes, ma'am.
JUDGE DONALDSON: You may be asked to. Thank you.
WITNESS: Yes, ma'am. I'm sorry.
JUDGE DONALDSON: That's fine.
BY MR. SOREY:
Q Mr. Branch, had you ever been fired before?
A One time, sir. That was in my youth days.
Q And how long have you worked?
A Actually, I've been working ever since I was 12 years old.
Q How did you feel about not working?
A It sort of --- it plays with your mind. It plays with your intellect. I'm used to getting up, going to work, doing what I got to do, taking care of my family, what I always did all my life.
Q Did the people in your community know that you were fired?
A Some of them did because my neighbor, he don't

see my car leaving out the yard. I'm not there no Monday morning, he know that I'm either at work. I mean, he know I'm mostly at work. Whenever they see me at home, they know something is wrong.
Q And how did you feel about that?
A Well, I was feeling a little embarrassed because I didn't want to tell them that I had lost my job because of somebody else's negligence. So, I sort of downplayed it.
Q How much in salary have you lost?
A If I'm not mistaken, I think it's like $185,000.
Q Is that from February of '24?
A Yes, sir.
Q You've been off approximately 20 months?
A Yes, sir.
Q Does the amount of $185,000 include the new ILA amount with the new union contract?
A No, sir.
Q At the time of the incident and altercation when you got fired, how much per hour were you making?
A Like it was --- I think it was $30.00 an hour because I run a machine.
Q All right and how much would you be making now under the new contract?
A If I'm an assistant now, I'd be making $37.00 an

Case: 4:23-cv-00217-MPM-JMV Doc #: 83-1 Filed: 01/08/25 37 of 189 PageID #: 2614

Robert Branch 2023-FRS-00026 February 13, 2024

Page 29

hour.

Q Okay. Were you able to get the back pay from the new union contract?

A No, sir. I wasn't.

Q Why not?

A Because I was terminated.

Q How much did you miss out on?

A Well, to my knowledge, I think it's about $8,000 to $10,000, but I'm not --- it's not accurate. It's not accurate.

Q What are you basing that $8,000 to $10,000 on?

A I'm basing it on overtime also, the hours that I worked.

Q Are you basing it upon your co-employees?

A To some point, but I'm looking at the things I put in at some point. At some point, I'm not.

Q Mr. Branch, have you applied for any other jobs since you were fired?

A Yes, sir. I have.

Q How many would you say you've applied for?

A I applied for about 25 to 30 jobs.

Q Okay and have you provided that list to the railroad?

A Yes, sir. I have.

Q Have you been successful in getting a job?

Page 30

A I have some interviews. I had some close interviews. Don't mean I had the job and I wasn't selected and I started feeling a little discomfort and I had a job with Columbia Railroad also. I interviewed with Columbia Railroad. I thought I had it because I was at home, but I wasn't selected.

Q That's Columbus Railroad?

A Yes, Columbus.

Q Okay. Not Columbia?

A No, not Columbia.

Q Okay.

A Columbia is in Greenville.

Q Now, Mr. Branch, you've been without a job for some 20 months. How have you survived?

A I had railroad stocks which I was able to sell them and when I left the railroad, I had $32,000 in my savings account and I had a land deal that I sold right before --- a couple years ago and I had $20,000 in cash saved up. So, that's how I was able to survive.

Q Now, you mentioned settling your IC stock for $97,000. Have you spent all that?

A No, sir. I haven't.

Q Do you have some left?

A Yes, sir. I do.

Q Approximately how much do you have left?

Page 31

A I have between $45,000 and $50,000 left.

Q All right. You mentioned a savings account of $32,350. Do you have any of that left?

A All gone.

Q What about the land, the cash from the land sale, $20,000?

A All gone.

Q Okay. What are your normal expenses per month?

A My normal expenses are about $5,000 or more.

Q Now, during this time period, have you had any major expenses over that amount?

A Yes. My baby girl goes to the state university which I pay 20 grand a year and I was in the process before I left work, I was getting my house, doing some home improvements. I was replacing board, painting my house inside, painting on the outside, things of that nature. Materials and labor, it was $15,000 and also ---

Q When did that take place?

A That took place around July, somewhere along there.

Q July of what year?

A '22.

Q Okay. Had you already planned this prior to you being terminated?

A The carpenter was working on my house doing what

Page 32

I was telling him.

Q Have you had any other major expenses?

A Yes, sir. I had a roof repair, I mean replaced and with out-of-pocket $6,000.

Q How much?

A Out-of-pocket, $6,000.

Q Okay.

A -- because they also replaced the roofs on my storage too.

Q Okay. Have you had any other expenses?

A Other than paying for --- I had my older daughter living with us and she was going through a divorce. So, I had to pay for --- the divorce was for $2,500 and my second older daughter who works for the railroad, she's the financial specialist, her transmission went out and I had to spend $15,000 more.

Q We never lose them completely, do you?

A No, we don't.

Q Mr. Branch, when you were fired, did you lose your health insurance, dental insurance and vision insurance?

A Yes, sir. I did.

Q And have you had to replace it?

A Yes, sir. I did.

Q And how much is that a month?

Bayley Reporting, Inc.
(727) 585-0600

Exhibit D: Transcript of the February 13 and 14, 2024, hearing in front of the Office of Administrative Law Judges ("OALJ")

A A month is $966.38.
Q Okay. Mr. Branch, how long were you planning to work for the IC before you retired?
A I was planning to work till I'm 67.
Q And why 67?
A Because of the fact that I wanted to try to get my full benefit because I started sort of late and I have to work till I'm 67 in order to get the full benefit. If I would have started earlier and got 30 years at 60, I could go ahead. Unfortunately, it didn't happen and I got to go to 67.
Q Mr. Branch, did you enjoy your job with the railroad?
A Yes, I did. The railroad was my livelihood. It paid great money. I mean, I met a lot of great people there.
Q Did they provide you fringe benefits too?
A Yes, sir. They did.
Q Such as what?
A Such as Tier 1, Tier 2.
Q What is Tier 1 and Tier 2?
A Tier 1 is my retirement. Tier 2 is I pay for my wife's retirement. They supply my retirement, health, dental, vision insurance.
Q Was it good insurance?

A Yes, sir. The railroad insurance is some of the best insurance around, I must say.
Q Now, a moment ago when we were talking about reporting to the railroad and discussed it, I think we ended up on Monday which was Memorial Day.
A Yes, sir.
Q And your conversation was with whom that day, Chance Gardener?
A It was with Chris Day.
Q All right. It was with Chris on Monday, Memorial Day?
A Yes, sir.
Q And what took place then?
A Chris called me and he said Chance had called him and said I wanted to report an incident and he asked me have I talked to the union. I told him now and he asked me what happened and I told him that what happened at the hotel that Todd had attacked me and he threatened to go to the truck to get a gun and come back and shoot me.
Q All right. Why was it necessary or do you feel it was necessary to talk to your union about what went on?
A I mean, I asked him that question, but he didn't give me an answer.
Q Did you at any point then talk to the union?
A Nick called me.

Q Who is Nick now?
A The union rep. He just called me on Tuesday and asked me what happened and that's about it. I told him the same thing that I told Chris.
Q Okay. After you talked with Chris Day, did you do anything else?
A Chris Day, he texted me back. I got off the phone and he told me to write an incident report and then he texted me again and said, "Don't type it. Write it."
Q And did you do that?
A Yes, sir.
Q And who did you send that incident report to?
A To Christopher Day.
Q And when did you send that?
A I sent it that evening when I got to writing it.
Q Okay. Now, when did you all go back to work?
A We went back to work on a Tuesday.
Q Okay. Did anything occur on that Tuesday concerning the altercation?
A Not that I know of.
Q All right. Did you talk with Mr. Melton at work?
A Yes, I did.
Q Did that take place then?
A Yes, it took place.
Q All right. When did that take place?

A It was around about 11:00.
Q Tell us what occurred.
A Mr. Day or I mean, Mr. Melton, when I was on the machine on the track, I saw Mr. Melton walking through the woods coming towards my machine.
Q And how far was he away when you first saw him?
A Probably about 5 foot, something like that, 5 or 6 foot.
Q And what did he do next?
A He came and knocked on my door on my machine.
Q And what took place after that?
A He asked me could he come in. I told him sure and he came in and asked me --- told me that he was sorry, that he didn't mean to hit me. He didn't mean to attack me. He told me that he was drinking. He told me that he needed to quit drinking. He told me that his wife told him he needed to quit drinking and he also told me when he told his wife about the incident, the wife told him that, "You were wrong for attacking Mr. Branch. Mr. Branch didn't do anything to you" and I showed him the scar that he had put between my eyes and I showed him that he had busted my lip when he hit me, when he knocked me to the ground.
Q Did you have any other injuries as a result of the altercation?
A When he pushed me down, my knee was swollen and I

actually didn't really know that it was swollen till when I --- it kept hurting and then I sort of like started moving it back and forth. I said, "Man, my knee is swollen." So, that's when I realized my knee was swollen too from the incident.

Q All right. Have we discussed before the full discussion with Mr. Melton?

A (Affirmative response). As far as I know.

Q Did Mr. Melton ask you to do anything?

A He asked me would I drop the incident.

Q And what did you tell him?

A I told him that I would think about it, but I told him it's not in my hands. It's in somebody else's hands, Chris Day's hands.

Q What did he ask you to do at that point?

A He asked me to call Chris Day and have Chris Day drop the incident report. I mean, yes, drop the report.

Q And what did you tell him as far as what you would do?

A I told him that I might call him or I might not.

Q All right. What happened after that?

A So, if I'm not mistaken, Chris Day called me and when Chris Day called me, I said, he came to my machine and wanted me to drop that and I said no. "I tried to get you to drop that incident earlier and you wouldn't drop it" so

I turned it over to HR and Labor Relations. So, I told him, I said, "Chris, I didn't do anything." I said, "He attacked me." I said, "It's the reason why I wrote the incident report because he's so --- he told Chance Gardener that he didn't remember attacking me" and I said --- I told Chris, "Not only did he attack me, he went to his truck to get a gun" and I told him that was threat, threat to shoot. I told him, "Things like that shouldn't happen." At the railroad, we're a family and family don't hurt family unless something is totally wrong.

Q That was on Tuesday after Memorial Day?

A Yes. Yes, sir.

Q What took place next as far as any of the ramifications from it?

A All I know is that they asked everybody to write an incident report. Had all the guys write as incident report.

Q Did you get pulled out of service?

A Yes, I did get pulled out of service.

Q When did that take place?

A I think on a Thursday.

Q What was the date?

A It was June the 2nd.

Q All right and then what took place next?

A What took place next, I wound up going to ---

when I got pulled out of service, when I got home, I went to the doctor. I was hurting. I went to the doctor at the emergency room.

Q Did you receive notice of an investigation?

A Yes, I did.

Q When did you receive that?

A I received it on the 3rd.

Q June?

A June the 3rd of 2022.

Q And did you all have a hearing?

A Yes, we did.

Q And when did the hearing take place?

A The hearing took place June the 7th.

Q Okay and you were terminated?

A Yes, sir. I was.

Q On what date?

A June the 24th.

Q All right. 2022?

A 2022.

Q Now, during the time of this 20 months, how have you occupied your time?

A I --- my parents got a big yard. I cut their grass, weed eater, blow off. I cut my grass. I have my uncle. We raise vegetables. We raise peas, okra, watermelons. We have to work it. I was doing sometimes

working in the garden, in the fields, then I had to go back and harvest it in the later months when it's ready, then sometimes when I was looking for a job, I was helping my uncle. He's got cows. I was helping him with the cows and stuff like that. When we had a disaster, we had a storm last year.

Q A tornado?

A We had a tornado. We're lucky we weren't killed. I think three people got killed in our community and a lot of people lost their houses and it was devastating. So, my brother took water and supplies around to people, old people and different ones who didn't have or were less fortunate, didn't have food or whatever, then we cooked --- the church --- we cooked food and we delivered food to people, the workers, people who were working during the storm.

Q Who did the cooking? Who had that organized?

MS. FITZKE: Objection. This entire line of testimony here is completely irrelevant and immaterial to the case.

MR. SOREY: Okay. We'll move it along, Your Honor.

JUDGE DONALDSON: Okay. Sustained then.

BY MR. SOREY:

Q Mr. Branch, would you be willing to go back to

Case: 4:23-cv-00217-MPM-JMV Doc #: 83-1 Filed: 01/08/25 40 of 189 PageID #: 2617

Robert Branch 2023-FRS-00026 February 13, 2024

Page 41

Illinois Central Railroad?
A Yes, sir. I would.
Q Do you think returning to work would cause any problems with your supervisors?
A No, sir. I didn't have any problems with the supervisors. Before I left, never had any problems.
Q Now, during the 16 years that you've been with the railroad, have you ever been charged with any rule violations or have you had any charges brought against you?
A No, sir. I haven't.
Q Have you ever been suspended?
A No, sir. I haven't.
Q Now, during this 20 months that you've been off, did you earn any money anywhere?
A No, sir. I didn't.
Q When you talked about working in the garden and all that, what did you all do with all those vegetables?
A What we did, we gave them to family, family people, neighbors, elderly people. That's what we did and along with the process also.
MR. SOREY: Okay. Your Honor, that concludes our direct examination.
JUDGE DONALDSON: I appreciate that, Mr. Sorey and Mr. Branch. That wasn't not quite an hour, but I do want to take a break before we do cross-examination. So,

Page 42

let's take ---- I show 10:14 Central. Let's do to 10:25 Central, do a 10-minute break. We'll go off the record for that duration and then when we come back, Ms. Fitzke, you're going to be conducting the cross-examination?
MS. FITZKE: That's right.
JUDGE DONALDSON: Okay. We'll see you in 10 minutes. Just stay on this call. Mute yourself if you don't want to be overheard.
MR. SOREY: Thank you, Your Honor.
JUDGE DONALDSON: Okay, thanks.
(Off the record at 10:14 a.m., CST)
(On the record at 10:25 a.m., CST)
JUDGE DONALDSON: Back from break, we have all the same participants and observers. Ms. Fitzke, your witness? Mr. Branch, you remain under the oath that I gave you earlier.
WITNESS: Yes, ma'am.

CROSS EXAMINATION

BY MS. FITZKE:
Q Mr. Branch, I believe in your testimony you mentioned you started working for Illinois Central in about 2008, correct?
A Yes, ma'am.
Q And throughout your time with Illinois Central, you observed that safety on the railroad was important,

Page 43

correct?
A Yes, ma'am.
Q In fact, I think in your deposition, you told us it was a number 1 importance, correct?
A Yes, ma'am.
Q And in your observation, IC, Illinois Central, which I will refer to sometimes as IC if that's okay with you?
A Yes, ma'am. That's fine.
Q All right. IC takes safety of its rail workers seriously in your observation, correct?
A Yes, ma'am.
Q Before this incident with Mr. Melton in May of 2022, in fact, you had reported various safety issues to the railroad, issues with machines, broken rails, trip hazards, things of that nature, correct?
A Yes, ma'am.
Q And those issues were always addressed, correct?
A Yes, ma'am.
Q And you didn't experience any adverse outcome as a result of having made those complaints?
A No, ma'am.
Q When you worked at Illinois Central, you worked under a number of different rules. There were a number of different rules that applied to you as an employee of

Page 44

Illinois Central, correct?
A That's correct.
Q And some of those rules included the US operating rules, on track safety rules, Code of Conduct, correct?
A Yes, ma'am.
Q And you were regularly trained on the US operating rules and on track safety rules, correct?
A That's correct.
Q And you were trained on the Code of Conduct as well, correct?
A That's correct.
Q Another policy that applied to you as an employee of Illinois Central was the workplace violence policy, correct?
A Yes, ma'am.
Q And that's another policy under which you received training, correct?
A Yes, ma'am.
Q And you understood that physical fighting, that was a violation of the workplace violence policy at Illinois Central, correct?
A What I understood was in the latter part of it, it also said except in self-defense so ---
Q And ---
A That's what I understood also.

Bayley Reporting, Inc.
(727) 585-0600

Exhibit D: Transcript of the February 13 and 14, 2024, hearing in front of the Office of Administrative Law Judges ("OALJ")

Q Okay. I believe the verbiage, Mr. Branch, says, "Except in justified cases of self-defense", correct?
A That is correct.
Q Okay, but if you are not engaged in self-defense or you cross the line from self-defense to engaging actively in a physical fight, you have violated the workplace violence policy, correct?
A I suppose.
Q Mr. Branch, you mentioned in your earlier ---
COURT REPRRTER: I apologize, Your Honor. I didn't get that answer.
WITNESS: In other words, what I was saying, Your Honor ---
JUDGE DONALDSON: But let me make sure we get exactly what you said a second ago. I heard it as I suppose. Is that what you said?
WITNESS: Yes. Yes, ma'am.
JUDGE DONALDSON: Okay. Do you need to explain your answer?
WITNESS: Yes, ma'am. I need to explain that because I don't know what their definition of self-defense is. It don't explain. That rule don't explain what self-defense is. When do it become self-defense when someone attacks you?
JUDGE DONALDSON: Okay.

WITNESS: The railroad ruled under that statement.
BY MS. FITZKE:
Q And you understand that it's up to the railroad to both make its own rules and interpret its work rules, correct?
A Yes, ma'am. I do. Correct.
Q And you understand that you're responsible for your own behavior, correct?
A Yes, that is correct.
Q Mr. Branch, you mentioned Chris Day in your earlier testimony as one of the supervisors that you spoke with over that Memorial Day weekend and in the days following. I understand that before this incident that you had a good working relationship with Mr. Day, that you didn't have any issues with him. Is that true?
A That is correct.
MS. FITZKE: I want to talk to you about what happened at the hotel.
BY MS. FITZKE:
Q I understand from your testimony and from the record in this case that you were staying at a property called The Magnolia Inn.
Is that right?
A That is correct.

Q And with regard to that evening, you mentioned Mr. Melton. Well, I think it was your counsel that talked about Mr. Melton coming out, but why don't you describe for us? Where did Mr. Melton come from?
A He came out the door of the hotel.
Q And ---
A The side door of the hotel.
Q You previously provided some observations of Mr. Melton that he had shoes off. He was barefoot and dancing as he came out. Is that right?
A Yes, at one point.
Q And did Mr. Melton appear to you that he had been drinking?
A Yes, ma'am. Drinking and I don't know what else.
Q And when he came out, you mentioned Mr. Melton started yelling and you testified a moment ago that he made a statement about being from Little Egypt Plantation. It's my understanding from your deposition testimony that you don't have any reason to believe that Little Egypt is known for violence of any kind?
A Ma'am, I never been to Little Egypt. I can't tell you what they're known for. I don't know because I've never been there.
Q And when Mr. Melton was yelling and said something about being from Little Egypt and something about

killing the MF-ers, after that, he said he was going to kill someone named Sweeny. Is that right?
A Yes, ma'am. That's correct.
Q So, Mr. Melton's comments, those weren't directed at you personally, were they?
A No, ma'am. They wasn't.
Q And Mr. Sweeny, you understood that just a very short time earlier, Mr. Melton and Mr. Sweeny had had an argument of some kind at one of your union meetings, correct?
A That is correct.
Q And it was at that point, I understand, that you interjected and advised Mr. Melton to chill out or words to that affect because Sweeny isn't here, right?
A That's correct.
Q Okay. It's at that point that you claim that Mr. Melton pushed you down?
A Yes, ma'am. He did.
Q And then I understand he hit you twice in the face, correct?
A Yes, ma'am. He did.
Q And it was at that point after he had hit you twice in the fact that you started swinging, correct, Mr. Branch?
A I was hallucinating. I was out of it. When I

Exhibit D: Transcript of the February 13 and 14, 2024, hearing in front of the Office of Administrative Law Judges ("OALJ")

started swinging when I started standing up with his fists balled and he hit me again so I had to --- it was at a point of self-defense.

MS. FITZKE: Okay. Mr. Branch, object as non-responsive first of all. That's not my question.

JUDGE DONALDSON: What was your question again, Ms. Fitzke?

BY MS. FITZKE:

Q My question was simply it was at that point, Mr. Branch, that you stood up and started swinging?

JUDGE DONALDSON: Please answer that question first if you need to explain it, let me know.

WITNESS: Yes, ma'am. At that point, I did get up swinging, but I only got up, Your Honor, because of the fact that when I stood up, he was still standing over me with his fists balled ready to hit me again. So, what point do I have to defend myself to keep from getting knocked down again? Do I keep getting knocked down?

BY MS. FITZKE:

Q Mr. Branch, can I ask another question, sir? Are you done talking?

A Yes, ma'am. You can.

Q Okay.

JUDGE DONALDSON: Ms. Fitzke, I don't need that kind of commentary and I'll let Mr. Branch know if he's not

being responsive at that point or going on too far, but Mr. Branch, I got the point that you were making with your statement and you don't have to repeat it in the future.

WITNESS: Yes, ma'am.

JUDGE DONALDSON: Okay.

BY MS. FITZKE:

Q So, Mr. Branch, after you started swinging at Mr. Melton, you chose not to walk away. You chose to swing at him, correct?

A Not really. Like I said, Ms. Susan, he throwed his hands up. He had his hands to hit me again.

Q And you chose to swing at Mr. Melton and you chose not to walk away, correct?

A I couldn't walk away.

Q And, Mr. Branch, you said a couple times today something I haven't heard before which is you're claiming now that Mr. Melton had his hands up again to swing at you again, but when you participated in the investigation hearing with the company that was reviewed as part of the process to discipline you and on which the decision was made to terminate you, you didn't provide that information to the company at that time, did you?

A No, I did not.

Q And when you wrote a written statement, a multiple page written statement describing the events of

that night to make your report to the company. You didn't provide that information that Mr. Melton had his hands up again ready to swing at you. You didn't provide that information in that statement either, did you?

A No, because I said I used the statement of attack.

Q And after you started swinging at Mr. Melton, Mr. Melton started backing away from you, correct?

A Yes.

Q And in fact, if Mr. Melton was backing away from you, he fell over backwards, correct?

A I assume.

Q And after Mr. Melton fell over, you continued swinging at him, correct?

A I assume.

Q And as you continued to swing at Mr. Melton, he assumed a defensive posture and put his hands up in front of his face to block your punches, correct?

A That is correct.

Q And while you were swinging at Mr. Melton, you struck him, correct?

A No, I did not.

Q When you participated in the investigation hearing with the company, do you recall testifying that you struck Mr. Melton?

A Like I said, when it happened, I thought I struck him, but when I really realized, I didn't hit Mr. Melton.

Q When did you realize you didn't hit Mr. Melton?

A When I realized I didn't hit him. When I realized I didn't hit him. I mean, when I went back and evaluated the incident, that's when I realized I didn't hit him. It was probably a month ago. It happened quick.

Q But when you testified in the investigation hearing, you understood you were creating the record on which the company would make a determination as to whether to assess discipline to you, correct?

A Yes, I did. That's correct.

Q And during that investigation hearing, you told the company, "Yes, you can say I struck him." Did you tell the company that?

A I might have did during that time. I might have did.

Q If that's in the investigation hearing transcript, do you have any reason to believe that you didn't say that, sir?

A I said I might have did. I don't have the investigative report in front of me.

Q And you're aware, sir, that the witnesses who testified at the investigation hearing, multiple witnesses who testified at the investigation hearing also testified

Case: 4:23-cv-00217-MPM-JMV Doc #: 83-1 Filed: 01/08/25 43 of 189 PageID #: 2620

Robert Branch 2023-FRS-00026 February 13, 2024

Page 53

that they saw you strike Mr. Melton, correct?
A Okay. Okay, correct.
Q Do you recall that, sir?
A Yes, I recall that.
Q All right and while Mr. Melton was on the ground kind of in his defensive posture and you were swinging at him, I think you then testified that the other guys from your crew that were around had to pull you off Mr. Melton, correct?
A They pulled us apart.
Q You gave some testimony here today about Mr. Melton indicating after you were pulled apart something about going to get a gun from a truck or going to get a gun. You also testified a moment ago that that's something that when you spoke to Mr. Chris Day that you told Chris Day and I just want to give you a chance, Mr. Branch, if you need to to clarify that statement. Did you tell Mr. Day that Mr. Melton indicated that he had a gun?
A Yes, I did.
Q Okay. Do you recall in November of 20 --- well, first of all, you didn't put that information in the written statement that you submitted to the company describing the events of that night?
A No, I did not. I did not.
MR. SOREY: Let her finish.

Page 54

WITNESS: Oh, okay.
BY MS. FITZKE:
Q And you didn't say at any point during the investigation hearing when the company was making a decision as to your employment that Mr. Melton indicated that he had a gun or was going to get a gun, did you?
A No, I did not.
Q Okay and you recall when you were deposed in this case when I came down to Mississippi to meet with you and we sat in a conference room across from one another and I asked you some questions. Do you recall that deposition in this case?
A Yes, I do.
MS. FITZKE: Okay. I'd like to show you, Mr. Branch, a page of that deposition transcript and, Your Honor, I'm not sure logistically you want to handle this form of impeachment if you'd like. I don't know if they have transcripts or if we should put it up on the screen.
JUDGE DONALDSON: Are you referring to a JX marked --- ?
MS. FITZKE: No, it's Mr. Branch's deposition in this case. It's not one of the exhibits.
JUDGE DONALDSON: Okay. What we can do is if you or co-counsel are comfortable presenting that on the screen, we can do that so I have the benefit of it as well

Page 55

and then you can, if you want to, also mark and submit it as a document later, we can handle that before we conclude today.
MS. FITZKE: Great, great. I think we would like to do both of those things.
JUDGE DONALDSON: Okay.
MS. FITZKE: We're going to pull up page 96.
BY MS. FITZKE:
Q All right. So, Mr. Branch, in your deposition, you did have some questioning around this statement that Mr. Melton made about --- or that you claim that Mr. Melton made about having a firearm. On page 96, I asked you, Question, "Okay, did you ever report to the railroad to Illinois Central management or Human Resources that Todd Melton indicated he had a firearm in his truck?" Answer, "No, I did not." Question, "Is there any reason why you didn't report that?" Answer, "I thought maybe a foreman or someone or an assistant foreman walked out there and he said it wasn't in the truck so that's why I didn't report it." Did I read that accurately, sir?
A Yes, you did.
Q And was that your testimony sworn under oath in November of 2023?
A Yes, ma'am. It was.
Q And is it your sworn testimony that we just read

Page 56

into the record for November 2023? Is that accurate, sir?
A Yes, ma'am.
MS. FITZKE: Is there any reason why --- Grace you can take that down.
BY MS. FITZKE:
Q Is there any reason why your testimony here today is different from your testimony in November of 2023?
A Well, my point is I didn't --- when he went to the truck to get his gun, I didn't know whether the gun was there or not because I didn't go near his truck.
Q Okay.
A He made those statements.
Q And, Mr. Branch, you understand that Chris Day is a member of Illinois Central management, correct?
A That is correct.
Q And you understood that in May and June of 2022?
A Yes, ma'am. I do. I did.
Q And you understood when I asked you that question in November of 2023 that Mr. Day was a member of Illinois Central management?
A Yes, ma'am.
Q I understand, Mr. Branch, that with the conversations that you indicated having with Mr. Chance Gardener over that Memorial Day weekend with regard to your report about Mr. Melton or your thinking about it and then

Bayley Reporting, Inc.
(727) 585-0600

Exhibit D: Transcript of the February 13 and 14, 2024, hearing in front of the Office of Administrative Law Judges ("OALJ")

deciding to make a report about Mr. Melton that Mr. Gardener didn't do or say anything that you thought was trying to not report the incident, correct?

A Mr. Gardener, all he said was that he was going to talk with Mr. Melton.

Q And my understanding from your prior testimony was that Mr. Gardener did not try to dissuade or discourage you from making any kind of report, did he?

A I don't recall.

Q And Mr. Day, he asked that you submit a written statement of the incident?

A Yes, he did.

Q And you, in fact, wrote that statement and submitted it to Mr. Day?

A Yes, ma'am. I did.

Q All right and my understanding is that you tested the statement to Mr. Day?

A Yes, ma'am. I did.

MS. FITZKE: We have Joint Exhibit 48 that I would just like to show the witness and again, Your Honor, I'm not sure logistically how you best like to handle this right now.

JUDGE DONALDSON: Well, we can assist you with that, but it looks like you're able to present your own exhibits. If you're able, I welcome that because you have

control over what you want to show. So, you can proceed. Do exactly what you've been doing and tell us what you're showing before you show it.

MS. FITZKE: Okay, terrific. I just didn't know if it was different for the exhibits I want to confirm. Appreciate that.

JUDGE DONALDSON: No, it's good so far.

MS. FITZKE: Grace, are you able to pull up 48?

MS. JACOBSON: Yes.

MS. FITZKE: Okay, great.

JUDGE DONALDSON: The only thing I would caution for the witness and right now, it's Mr. Branch. If you need that enlarged in order to see it, you may not have the vision I do, but just let us know if it needs to be a bigger type so you can read what you're being shown.

MS. FITZKE: And, Mr. Branch, if you need us to scroll up or down at any point to get a full view, just let us know.

MR. SOREY: If you would like, I have a copy of it on my desk. I could retrieve it.

MS. FITZKE: We're just going to get just a little confirmatory testimony here. If we get to something that is a little more detailed, I think that would be helpful.

BY MS. FITZKE:

Q Mr. Branch, are you able to see the exhibit?

A I can't see it, but you can read it out. That will be fine.

MS. FITZKE: Maybe, Eddy, if you have the exhibits in your office, that would be helpful.

MR. SOREY: It will take a second.

JUDGE DONALDSON: Let's give them a chance to retrieve it and Mr. Branch, while we're waiting, just make sure from your perspective that what you have in front of you from your attorney looks like what you're being shown.

WITNESS: Yes, ma'am.

JUDGE DONALDSON: The exact page, the exact portion of the page because I don't want there to be any confusion about what you are responding to.

WITNESS: Yes, ma'am.

JUDGE DONALDSON: Okay. So, why don't we see if you can enlarge the text that you're presenting?

MS. FITZKE: This is the top of the exhibit. Scroll as needed.

JUDGE DONALDSON: Okay. That looks good to me. How about you, Mr. Branch?

WITNESS: Yes. Yes, ma'am.

JUDGE DONALDSON: Okay.

MS. FITZKE: Thank you.

BY MS. FITZKE:

Q So, Mr. Branch, we're looking at what's marked and entered into the record as Joint Exhibit 48 which is a text exchange. I understand from previous testimony that this is a text message exchange that you had with Mr. Chris Day. Is that right?

A Yes, ma'am.

Q And is this the text exchange that you spoke about a moment ago with Mr. Day where he asked you to send him a handwritten statement?

A Yes, ma'am.

Q All right and then he is --- the bubbles that are in grey, my understanding is that those are Mr. Day's comments and then the okay in blue, that's your response? Is that right?

A Yes, ma'am.

MS. FITZKE: All right. Can we scroll down, Grace? All right and then --- oh, too far.

BY MS. FITZKE:

Q Then there's a date there, May 30, 2022, at 8:00 p.m. Do you see that there?

A Yes, ma'am.

Q All right. Do you understand that's where you sent the next message, the attachment that was attached?

A Yes, ma'am.

Q All right and is this the text message where you

Case: 4:23-cv-00217-MPM-JMV Doc #: 83-1 Filed: 01/08/25 45 of 189 PageID #: 2622

Robert Branch 2023-FRS-00026 February 13, 2024

Page 61

attached and sent Mr. Day the handwritten statement?
A Yes, ma'am.
Q All right and it's my understanding that you did not write this statement, that your wife wrote this statement on your behalf?
A Yes, ma'am. She did.
Q But she did it based on information you provided and asked that she include?
A Yes, ma'am. That's correct.
Q And you reviewed it and confirmed that it was accurate and that this was what you wanted to say in your statement to the railroad?
A Yes, ma'am.
MS. FITZKE: All right. There is --- if we can take this down. I think we have the full statement as another one of our Joint Exhibits. It's Joint Exhibit Number 5. We'll have Grace pull that one up for us.
BY MS. FITZKE:
Q Mr. Branch, are you able to see this exhibit?
A Yes, ma'am.
Q Okay. Do you recognize and we can scroll through it, but at least at the top of this at the first page at least of this statement that you wrote and provided to Mr. Day in that text message we just looked at?
A Yes, ma'am.

Page 62

Q All right. This statement is dated May 30, 2022. Is that when you prepared this with the assistance of your wife as your scribe so to speak?
A Yes, ma'am.
Q Okay and in the first paragraph, the first couple sentences, you indicate that "On Thursday, May 26, 2022 around 9:00 p.m. at Magnolia Inn" and then you provide an address in Columbus, Mississippi. It's my understanding that this hotel was in Columbia, Mississippi. Is that right?
A That is correct.
MS. FITZKE: Okay. So, I just wanted to clarify that. I wanted to look and I think we see that, Columbus, repeated in some of the other documents later. So, I just wanted to confirm the identity of where it came from. Grace, can you scroll down on this first page of this statement? A little bit farther. Actually, why don't we take this down? I don't have any other questions for you right now on this document. We may come back to it.
BY MS. FITZKE:
Q When you spoke with Branch, Mr. Branch, I'm sorry. When you spoke with Mr. Day over that Memorial Day weekend, I think you spoke with him on Monday on Memorial Day. Is that right?
A That is correct.

Page 63

Q And do you recall Mr. Branch telling you --- I did it again, Mr. Branch. I'm so sorry.
A No problem.
Q Do you recall Mr. Day telling you that a number of folks were out because of the Memorial Day holiday and he'd need to circle back with you the next day when folks were back in the office?
A Yes, ma'am. I did.
Q And following your call with Mr. Day on Tuesday, you understood that Mr. Day had reported the incident along to Illinois Central Human Resources and Labor Relations?
A That's what he told me when we had the phone call.
Q When we talked a minute ago about you having been removed from service on --- I think you were advised on June 2nd that you were being removed from service so it's my understanding June 3rd was your first day out of work of 2022. Is that right?
A That is correct.
Q And while you were being held out of service pending investigation, you received compensation from the company during that period, correct?
A Yes, ma'am. I did.
Q And you were paid both your regular compensation and the per diem during that period of time?

Page 64

A I wasn't paid per diem.
Q You don't think you were paid your per diem?
A I know I wasn't. I have my paycheck. I wasn't paid per diem.
Q All right. When you received the Notice of Investigation, you understood that you were also being called to investigation to examine whether you in connection with this incident had violated any company rules, correct?
A Correct.
Q And you mentioned a moment ago the investigation hearing was on June 7, 2022. You appeared in person for that hearing, correct?
A Yes, ma'am. I did.
Q And during that investigation hearing, you were allowed to make statements and tell your side of the story, correct?
A Yes, ma'am. I did.
Q Okay. You were able to call witnesses on your behalf, anyone you thought might have relevant information?
A Yes, ma'am.
Q You were also represented there by a union representative. Is that right?
A Yes, ma'am. I was.
Q And your union representative also had the

Bayley Reporting, Inc.
(727) 585-0600
Exhibit D: Transcript of the February 13 and 14, 2024, hearing in front of the Office of Administrative Law Judges ("OALJ")

ability to question witnesses on your behalf?
A Yes, ma'am.
Q You had the ability to present or submit any documentary evidence you thought might be helpful to your case?
A That's correct.
Q And in your written statement that you provided to the company, you identified eight co-workers that had been in that area around the time that this altercation with Mr. Melton took place. Is that right?
A That is correct.
Q And all of those individuals provided statements to the company?
A That is correct.
Q And each of those witnesses came in and read their statements into the record at the investigation hearing?
A That is correct.
Q And following the investigation hearing or written transcript of that investigation was prepared. Do you recall that?
A Yes, ma'am.
Q And you received a copy of that transcript?
A Yes, ma'am. I did.
Q You were able to review it after your received

it?
A Yes, ma'am. I did.
Q And that transcript accurately reported what happened during the investigation hearing and what the individual stated?
A Yes, ma'am.
Q During the investigation hearing, one of the --- I understand you went to hearing along with Mr. Melton, correct?
A Yes, ma'am.
Q He was also accused of rule violations in conjunction with this altercation on May 26?
A Yes, ma'am.
Q So, Mr. Melton also had the ability to question any of the witnesses at the hearing. Did you observe that?
A Yes, ma'am.
Q And Mr. Melton took that opportunity to ask you a couple questions. Do you recall that?
A Yes, ma'am. I did.
Q And during the investigation hearing, Mr. Melton asked you specifically, "Do you feel that I'm a threat to you" and you answered, "No, I do not." Do you recall that?
A Yes, I recall.
Q And in the investigation hearing, you testified truthfully to all the facts as you knew and understood them

at the time, correct?
A Repeat the question.
MS. FITZKE: Sure.
BY MS. FITZKE:
Q In the investigation hearing that you had with the company, I understand you weren't sworn under oath like you were here this morning, correct?
A Correct.
Q But you nevertheless testified truthfully and fully as to the information that you thought pertinent to the company's decision, correct?
A Correct.
Q And at no time after the transcript was prepared or the hearing was concluded did you come back to the company and try to add any additional information, correct?
A No, ma'am. I didn't.
Q At the conclusion of the investigation, you, some days later, I think you mentioned on June 24th received a letter from the company terminating your employment. Is that right?
A That is correct.
Q And you were advised at that time that your employment was being terminated because the record in that investigation hearing record and exhibits contained credible testimony and substantial evidence proving that

you violated the IC Code of Business conduct and IC workplace violence prevention policy, correct?
A Right.
Q And that the violation of those policies was identified as a Level 4 violation. Do you understand what a Level 4 violation at Illinois Central was?
A Yes, ma'am. I do.
Q Okay and you understand that under the company's disciplinary policy, that Level 4 violations are the most serious violations that result in immediate terminations?
A Yes, ma'am.
Q You understand, Mr. Melton was also terminated as a result of the events of the events of May 26?
A Yes, ma'am.
Q Mr. Branch, what was the last job that you applied for?
A The last job I applied for, I applied for a job at Milwaukee Tools.
Q At the time of your deposition in May of 2023, that was also the last job, because me, in November of 2023, that was also the last job that you had applied for, a job with Milwaukee Tools. Is this the same job or a different job?
A Different job.
Q Okay. I understand that you've been out of work

Exhibit D: Transcript of the February 13 and 14, 2024, hearing in front of the Office of Administrative Law Judges ("OALJ")

Case: 4:23-cv-00217-MPM-JMV Doc #: 83-1 Filed: 01/08/25 47 of 189 PageID #: 2624

Robert Branch 2023-FRS-00026 February 13, 2024

Page 69

roughly 20 months and you've applied for roughly 25 to 30 jobs. Is that your testimony?
A Yes, ma'am.
Q Okay. So, right around a job, a job and a half a month is the rate at which you're applying for alternative employment?
A Ma'am? Can you say that again?
MS. FITZKE: Sure. Sorry.
BY MS. FITZKE:
Q So, I'm asking, you've applied for jobs at about one job to one and a half jobs a month if I'm ---
A Maybe.
Q It's my understanding that with respect to your benefits, your company-provided benefits, you were able to stay on the Illinois Central benefit plan through November of 2022, correct?
A Correct.
MS. FITZKE: I'm sorry, Mr. Branch. I'm not trying to mislead you. I made a misstatement.
WITNESS: Yes, you did.
BY MS. FITZKE:
Q You had company benefits until October 31, 2022. So, you would have rolled off in November. Is that right?
A Yes, ma'am.
Q Okay. So, in terms of any lost benefit claim in

Page 70

this case, any damages you claim with respect to the loss of your company-provided benefits, those losses would not start until November of 2022, correct?
A Correct.
Q And then after you rolled off your Illinois Central benefits, you started obtaining benefits through your wife's employer, correct?
A That is correct.
Q And so it's my understanding that you did not have an period of time where you went without what we call health and welfare benefits, medical, dental, vision care. Is that right?
A That's correct.
Q And then when you started, you went onto your wife's plan for medical insurance and then I understand you participated in the company's Cobra offering with respect to dental and vision care. Is that right?
A Yes, ma'am.
MS. FITZKE: Grace, are we able to pull up, please, Joint Exhibit 39?
BY MS. FITZKE:
Q While my colleague is pulling up that document, you mentioned a moment ago having to pay $966.36 a month for healthcare insurance. When did your healthcare insurance increase to $966.00 a month?

Page 71

MR. SOREY: I'm going to object to that question. He testified that amount to health, dental and vision insurance. It was a total combined group.
JUDGE DONALDSON: All right. So, that was the testimony that you believe the record shows. I don't recall exactly what he was answering at the time. Ms. Fitzke wanted to know when there was an increase in his amount that he pays monthly?
MS. FITZKE: In light of Mr. Sorey's statements, maybe I can ask the questions a different way. I don't think the record reflects that, but I think I can clear it up and I think Mr. Sorey has given some helpful information to do that. So, Mr. Branch, we're looking at what's been marked as Joint Exhibit 38 which is a memo. So, can we make it just a little bit bigger? It looks like I can --- I want to make sure Mr. Branch can read it.
WITNESS: I can see it.
MS. FITZKE: You guys can see it? Okay, terrific. Can we scroll down just a tiny bit? Thank you. I think that's the full text of the exhibit now on the screen.
BY MS. FITZKE:
Q Mr. Branch, is this a memo that you prepared, sir?
A Yes, ma'am.

Page 72

Q Okay. My understanding of what this document is is a document that you prepared to try to summarize what you believe your or what your out-of-pocket expenditure was for the healthcare insurance that you obtained following the time that you rolled off the Illinois Central plan. Is that right?
A It's dental and vision.
Q Is this though, sir, this memo, this Exhibit 38, does this include dental and vision or is this just the healthcare?
A No, it's included.
Q I'm sorry.
A No, that's just the health. That's just the health.
JUDGE DONALDSON: Do you want ---
WITNESS: I said just the health.
JUDGE DONALDSON: Excuse me, Mr. Branch. I want to rely on the attorneys to use the exhibits the way they want to, but there's a difference between JX-38 and 39, correct? Do you want to just show them both so he can differentiate?
MS. FITZKE: That may be helpful. Can we scroll, Grace, to JX-39 because I think, Mr. Branch, no one is trying to trick you here. We want to get the correct numbers into the record.

Bayley Reporting, Inc.
(727) 585-0600
Exhibit D: Transcript of the February 13 and 14, 2024, hearing in front of the Office of Administrative Law Judges ("OALJ")

WITNESS: Yes, ma'am. No problem.
BY MS. FITZKE:
Q So, is JX-39, what's in front of you now, is this a summary of what you've paid for the dental and vision through Cobra?
A Yes, ma'am.
MS. FITZKE: All right. If we could scroll back to 38? Can you scroll back to 38?
MS. JACOBSON: Yes.
MS. FITZKE: You all can't see. Grace was looking at me in a way that I thought she's like, "I'm done" and it was on there. So, thank you. Sorry. So sorry.
BY MS. FITZKE:
Q All right. Sir, I think we're all hopefully all back to 38. So, is that --- has looking at 39 helped refresh your memory as to what is contained in Exhibit 38? Can you tell, Mr. Branch, what JX-38, the one that's in front of you now, what that's about?
A If I'm not mistaken, I think the $769, I mean, to be honest, I don't know the $769 ---
Q I didn't catch that. Can you say that again?
A I'm thinking. Give me a minute.
Q Okay. I understand.
A $769, October.

Q Mr. Branch, can I ask a different question perhaps? Have you had any increase in the amount that you have to pay for your family coverage through your wife's employer in the year 2024?
A Yes, ma'am. It increased from $814.00 to $854.00.
Q All right and you mentioned $814.00 a moment ago. Do you believe that in each month of 2023 that for your family coverage just for the medical insurance that you paid $814.00 a month for your family plan through your wife's insurance?
A Yes, ma'am. I did.
Q Okay and in 2022, for the couple months of 2022 that you were on your wife's health plan, do you believe that you paid $769.00 a month for those benefits?
A I think I did because I think I had to pay --- it was a premium to join it. That would have the dental insurance.
Q And I understand ---
A -- the general insurance.
MS. FITZKE: If we can look again at 38? If we can scroll down again?
MS. JACOBSON: I believe this one is 39.
MS. FITZKE: I'm sorry, 39.
MS. JACOBSON: Okay, got you. I just want to

make sure.
BY MS. FITZKE:
Q And then Exhibit 39, Mr. Branch, do you recognize this as a summary of the Cobra expenses that you prepared reflecting the expenses you incurred while you --- following your separation from Illinois Central and your removal from their benefits plan?
A Yes, ma'am.
Q And while you worked for Illinois Central, you did have to pay for an employee portion of your premium for your medical, dental and vision benefits while you worked for the company and for that period of time that you remained on their benefits plan. Do you recall that?
A Yes, ma'am.
Q And do you recall that you were paying approximately $228.00 per month to the company for that coverage?
A Yes, ma'am. That's correct, but dental and vision, it was different. That was just the health insurance I was paying the $228 for.
Q While you worked for the company, did you have to pay a portion of the premium to the company that was in addition to that for your vision and dental care?
A Yes, ma'am. It wasn't like --- the $228 wasn't included. No, ma'am. They took out a different premium

for vision and dental.
Q And what was the additional premium for vision and dental?
A I really can't recall. I know it was $40.00-some a month or every two weeks. Something like that. It was something like that for the payment plan.
Q You think it was $48.00 a month or ---
A It was $40.00-something.
Q Did you say it was per paycheck then every two weeks?
A It was every two weeks.
Q Okay. So, around --- roughly $40.00 every two weeks. Is that a fair estimate?
A I would say to my recollection, but I haven't looked at my pay stub in a while.
MS. FITZKE: All right, fair enough. We can take down the exhibit. Thank you.
BY MS. FITZKE:
Q I understand that part of what you have had to do since you left the company --- well, while you were at the company and when you left, you have certain prescriptions that you obtain that for personal health conditions, correct?
A Yes, ma'am.
Q And just to make our record on this, I understand

Exhibit D: Transcript of the February 13 and 14, 2024, hearing in front of the Office of Administrative Law Judges ("OALJ")

Case: 4:23-cv-00217-MPM-JMV Doc #: 83-1 Filed: 01/08/25 49 of 189 PageID #: 2626

Robert Branch 2023-FRS-00026 February 13, 2024

Page 77

that you had some medication relating to a heart condition that while you worked at Illinois Central and for the period you were covered under their plan, you paid about $50.00 a month for those prescriptions and subsequently while under your wife's plan, they now cost you approximately $30.00 a month more and you pay now around $80.00 a month. Is that right?

A That is correct.

Q With respect to --- you gave some testimony earlier with respect to your home expenses, expenses in conjunction with your daughter's education or your home renovation. Those are expenses that you both would have paid if you worked for the company and had to continue to --- and chose to continue paying after you left the company, correct?

A Run that by me again. I missed a part.

Q Right. The expenses that you incurred in conjunction with your home renovation, for example, you didn't have to make that expenditure because your employment was terminated, correct?

A No.

Q That was money that you were choosing to spend on your home care and upkeep, correct?

A That is correct.

Q And the same is true with the expenses you

Page 78

identified with respect to your daughter's education or the care of your family, correct?

A Well, my job was based on my daughter's education.

Q That was something that you wanted to be able to do and were happy you were able to do for your daughter, correct?

A Based on my job.

Q And I think you also testified you kept doing it after. You were fortunate to be in a position to be able to do that after you left the company, correct?

A That is correct.

Q You mentioned a moment ago in your testimony that you estimate that the amount you lost in salary to be $184,000 over the last approximately 20 months since you were terminated. How did you calculate that $184,000, sir?

MR. SOREY: It was actually $185,000 in the testimony.

MS. FITZKE: Well, my notes say $184,000 and I'm the questioner, Mr. Sorey.

WITNESS: You're wrong.

JUDGE DONALDSON: Let me just back up here so we can ---

WITNESS: It was actually $185,000.

JUDGE DONALDSON: Just a moment, please. Mr.

Page 79

Sorey is trying to correct the record, but let's let the witness answer the question if he disagrees with any premise of it. Can you restate your question, Ms. Fitzke?

MS. FITZKE: Yes.

BY MS. FITZKE:

Q Mr. Branch, I had in my notes that you testified that you lost approximately $184,000 and I may have dropped off some hundreds that you said after that, but I rounded to the $184,000. If I did get that wrong, again, I'm not trying to trick or mislead you and please do clarify. What I want to know is what number do you claim the loss was, I guess, and how did you calculate it, sir?

A It was actually $185,000 and I calculated from one of my pay stubs. I looked at the highest pay stub that I made with overtime and I multiplied it by monthly. Every two weeks, I multiplied by 2 and then I came up with a total and then I multiplied by the month and I took and multiplied it by 12 months.

Q Did I understand correctly that you said you picked the highest pay stub that you could find?

A Well, the last pay stub that I got during the month of June. It was the highest and it had the overtime and that's how I came up with the $185,000 and I also took and multiplied my hourly months that I made, my salary I made. Like I made $30.00 so I multiplied it times 80, then

Page 80

I turned around and took the 80 and multiplied the time for months, I mean, two times, then I turned around and multiplied that figure by 12 months.

MS. FITZKE: Okay. So, I just want to make sure I'm following because I'm not sure I completely am.

BY MS. FITZKE:

Q So, I understand you took your last wage times 80 to get what your biweekly wage was. Do I have that right so far?

A Yes, ma'am.

Q Okay and how did you use that final pay stub? Was that just to try to estimate what your total overtime hours in that one period were?

A Sort of.

Q Okay and did you assume the same overtime hours to each of the biweekly periods then as you calculated them?

A I didn't use the overtime I was in the year 2023. I didn't use --- in 2023, I used the overtime hours. Only used them, if I'm not mistaken, I think continued in 2022 in June from the time I was laid off to the time I was --- in December of 2022. I didn't use the overtime hours in 2023 at all.

Q And do you recall how you factored in the overtime hours to your estimated wage loss in 2022?

Bayley Reporting, Inc.
(727) 585-0600

Exhibit D: Transcript of the February 13 and 14, 2024, hearing in front of the Office of Administrative Law Judges ("OALJ")

Case: 4:23-cv-00217-MPM-JMV Doc #: 83-1 Filed: 01/08/25 50 of 189 PageID #: 2627

Robert Branch 2023-FRS-00026 February 13, 2024

Page 81

A I just used the last pay stub with the overtime.
Q And did you use that last pay stub to estimate your biweekly rate for each week during the remainder of the year?
A I think I did, ma'am. I'm not for sure. I think I did.
Q I think I'm following and with respect to the overtime that you worked while you worked for Illinois Central, is it fair to say that the overtime wasn't consistent every week, but would be higher some weeks and lower other weeks or not at all in some weeks?
A Well, it was plus the rate. We always got some overtime. It was barely that I didn't get any.
Q And when you calculated that $185,000 estimated wage loss, did you calculate it through today's date or was there a different end date?
A Could you repeat that? Today's date or what?
Q Or was there a different end date on your calculation?
A I don't recall. I don't recall.
MS. FITZKE: Thank you, Mr. Branch. I don't have any other questions for you at this moment.
WITNESS: Okay.
JUDGE DONALDSON: All right. I'd like to ask a few questions. Usually I wait until the very end, but it

Page 82

might help if you have any redirect or recross. This is mainly just sometimes I need information to fill in the gaps to make sure I understood some things that you said so if you'll hold off just a minute there, Mr. Sorey. Mr. Sorey, do you, in fact, have some redirect?
MR. SOREY: I have a few.
JUDGE DONALDSON: Okay. Let me understand and again, you may have answered some of this earlier, Mr. Branch, and I just missed it. You were asked about Tier 1 and Tier 2 benefits. I didn't catch what you said about them. Can you just --- I'm not asking you to be a Human Resources officer for the company, but what is your understanding of what those benefits are?
WITNESS: Yes, ma'am. My understanding of Tier 1 is my retirement and Tier 2 is I'm paying my wife's retirement. That's my understanding.
JUDGE DONALDSON: I see. How old are you today?
WITNESS: I am 58 today.
JUDGE DONALDSON: 58 today and how old were you when you were terminated in June of 2022?
WITNESS: I was 57.
JUDGE DONALDSON: All right. What month is your birthday in?
WITNESS: I have a birthday next month. I will

Page 83

be 59 on XX-XX.
JUDGE DONALDSON: Okay, understood. Did your wife always take the benefit of having health insurance, health benefits through her employment up to the time you started taking advantage of it too?
WITNESS: No, ma'am. I was always --- every job I ever had, I would always carry the family insurance.
JUDGE DONALDSON: So, she was on your plan?
WITNESS: Yes, ma'am.
JUDGE DONALDSON: Until you didn't have a plan and then you went on her plan through her employer. Is that right?
WITNESS: Well, until I didn't have a plan. Well, I actually looked for insurance other than my wife because I was trying to find something cheaper, but the fact of the matter was, it was expensive and it was cheaper for me to ask her to place myself and our daughter and my wife on her insurance and I would just pay her premium because it was going to be more higher if I would have went to another company. So, that's why I didn't go with another --- I searched, but it was higher so I chose to go with my wife's insurance which it was cheaper than the insurance that I was looking at.
JUDGE DONALDSON: You were looking in the open market then? I understand.

Page 84

WITNESS: Yes, ma'am. The open market, right.
JUDGE DONALDSON: Yes. Okay. Lastly, I'm not from Mississippi or this might cover other territories covered by the Employer, but what's Little Egypt Plantation? Is that an area?
WITNESS: Ma'am, all I know is it's a little town off of 49 and you can go through 49, you see Egypt Plantation. That's all I know about it.
JUDGE DONALDSON: Okay. So, there's actually a road sign to this place?
WITNESS: It's a road sign that says Little Egypt Plantation so that's all I know.
JUDGE DONALDSON: Okay. Sounds like it's not much more than what I know, but anyway, I appreciate you clarifying a few things for me. I don't know if any of the answers matter, but I just found myself wanting the information. So, Mr. Sorey --- well, Mr. Branch, can you continue with some questions from your attorney? Do you need a break?
WITNESS: No, ma'am. I can continue.
JUDGE DONALDSON: Okay. You can go ahead, Mr. Sorey.
MR. SOREY: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. SOREY:

Bayley Reporting, Inc.
(727) 585-0600

Exhibit D: Transcript of the February 13 and 14, 2024, hearing in front of the Office of Administrative Law Judges ("OALJ")

Q Were you given any opportunity to correct the investigation transcript?
A No, sir.
Q Now, where you live in Carroll County, are there many opportunities around there for jobs?
A No, sir.
Q Just for instance, how far are the jobs you applied for with Milwaukee Tools?
A It's 30 to 40 miles.
Q Okay and what towns are located near you?
A Greenwood and Winona which they don't have any--- one manufacturer up there. I applied up there and you got Grenada which is about 45 miles away.
Q Now, when did you actually lose your retirement benefits?
A I lost my retirement benefits on June when I was terminated.
Q Okay. So, that didn't go over till November 2022?
A No, sir.
Q And on Cobra expenses, how long did you pay Cobra expenses and what did you pay for?
A I paid Cobra expenses from November to up to now.
Q Okay.
A And I was paying for dental and vision.

Q And your health insurance was through your wife?
A My health insurance was through my wife.
Q Okay. When you were working on the traveling gang, did you normally get overtime?
A When we worked on the rail gang, I always got overtime.
Q Okay.
A Unless they say that overtime is --- they used the word --- they put out a memo that said no overtime.
Q Now, your wage calculation, did it go through February of 2024?
A Yes, sir.
Q Now, in Exhibit 5 that you were shown a while ago that was put up on the screen, did it contain the statement that you feared for your life from Mr. Melton?
A I believe it contained I was threatened, yes.
MR. SOREY: We're seeing under our group thing here if we could pull it up.
JUDGE DONALDSON: Okay.
MR. SOREY: Exhibit 5. Do you want her to pull it up?
MR. FERGUSON: Can you see it now?
MR. SOREY: Yes. It's a little bit hard to see.
BY MR. SOREY:

Q All right. Look at the third line down.
A "I feared for my life."
Q All right and you advised the railroad of that particular situation?
A That is correct.
Q All right. Now, again, we got to talking a while ago about walk away. Could you have walked away from the situation?
A I mean, I tried. I was until I was struck.
Q Okay. Were you physically able to walk away at that point?
A Not really.
Q Why not?
A I was hurting and blood was coming down my forehead and my face.
Q Did you have any problem with your leg?
A Yes, I did.
Q What problem did you have with your leg?
A My leg was swollen and my knee was twisted.
MR. SOREY: That's all the questions we have, Your Honor.
JUDGE DONALDSON: All right. Anything further that needs to be limited to that set of questions just now? Ms. Fitzke, do you want to ask anything like that?
MS. FITZKE: Yes, please.

JUDGE DONALDSON: Okay. Go ahead.

CROSS EXAMINATION

BY MS. FITZKE:
Q Mr. Branch, just to confirm. With respect to the portion of benefits, vision and dental that you had through the Cobra continuation with the railroad, it's my understanding that Cobra continuation is for a period of 18 months. Did you have that benefit for 18 months or did you have it for a different period of time?
A I had it for 18 months.
Q And with respect to the --- you were asked a question about whether you were given the opportunity to correct the investigation hearing transcript. My understanding of your testimony, sir, was that you had read the transcript after you received it and that there were no errors in the transcript, correct?
A I read it, but nobody told me I could correct it. That's my point.
Q And my question was slightly different, sir. My question was as you read the transcript, you didn't note anything in there that was taken down by the court reporter incorrectly or mistakenly, did you?
A No, ma'am. I did not.
Q Okay. With respect to the questioning about the statement where you indicated that you feared for your life

around Mr. Melton, Mr. Melton came on Monday or excuse me, Tuesday, May 31st when you returned to work and Mr. Melton came to you and apologized. It's my understanding you accepted his apology, correct?

A Yes, ma'am. I accepted the apology, but it didn't erase what --- I didn't forget what had happened.

Q And it's my understanding that as of the time Mr. Melton apologized to you that you no longer feared for your safety around him. Is that right?

A I didn't say that.

Q And it's my understanding that --- well, it's not my understanding. As you communicated to the company in the June 7 investigation hearing as outlined in the transcript, as of June 7 when Mr. Melton asked you if you considered him to be a threat, you no longer considered him to be a threat at that time. Is that right.

A That was on June 7th, but before when the incident happened, he was a threat. They only asked me about the investigation without the threat, but he was a threat on May 26, 2022.

Q On the day of the fight, right?

A Yes, ma'am.

Q And after that day, you didn't consider Mr. Melton to be an ongoing threat from the Tuesday when you returned to work and he apologized going forward, correct?

A Actually, like I said, I was only agreeing with him just to get him out of my way because I really didn't want to deal with it at all, but I was trying to be nice and be compassionate at the same time.

Q And in terms of what you told the company, when Mr. Branch, sorry, when Mr. Melton asked you, Mr. Branch, in the investigation hearing whether you considered him to be a threat and in the investigation hearing and in that transcript and you indicated you did not, you didn't tell the railroad at that time or any company manager that you were just saying that to be nice to Mr. Melton, did you?

A No, because of the fact that the day of the investigation, the union, Dale Maquire, God bless his soul, he had gone onto Heaven, he came to my vehicle when I pulled up and asked me to say something nice about Mr. Melton and he said that he was going to ask Mr. Melton to say something nice about me. So, I was just going with what Mr. Dale Maquire asked me, but other than that, I asked him, I don't know why that they gave at the hearing, me and him the same hearing at the same time because I asked for the hearing from --- my investigation to be separate, but they wouldn't honor that. They said that's what the railroad wanted. So, the railroad did what they want.

Q You're describing conversations you had with your

union representative, correct, Mr. Maquire?

A Right. He also told me that the Carrier said that I wasn't going to get terminated, but I'm at the house.

Q And ---

A I am without a job.

Q Sorry, sir. I was looking away. Were you finished?

A So, he also told me that the Carrier said that I wasn't going to get terminated because I didn't do anything, but guess what, June 24th, I got a letter saying dismissed.

Q And Mr. Maquire, he's not a member of company management, correct?

A No, he's not.

Q And during the investigation hearing, when you indicated that you no longer viewed or at that time, you did not view Mr. Melton as a threat, you didn't tell anyone from the railroad that you w ere just saying that to be nice and that you didn't really mean it, correct?

A Correct, but again, Ms. Susan, I also told Mr. Day on June 31st that Mr. Melton was a threat. He had a gun, went to his truck to get a gun, threatened to shoot me. So, I feel like that until I said anything about the incident, the railroad was sweeping it under the rug. When

I spoke about the incident, that's when they called me for an investigation and did an investigation and guess what? I was fired because I felt like I reported a safety matter and that's when they wanted to hear what happened, but in reality, I couldn't change the fact what happened. What happened happened and I couldn't stop it from happening. All I could do is report it and now that's what they tell us in the rules. Report it in good faith so I reported it in good faith and I got out.

Q And in the investigation hearing, sir, you were given a full opportunity to say anything that you wanted to say about the incident with Mr. Melton, correct?

A That's correct.

Q You were given the opportunity to say on the record that you believed Mr. Melton had a firearm or threatened to go get a firearm, correct?

A That's correct.

Q And you did not provide that information to any member of company management or Human Resources as indicated in your deposition testimony, correct?

A That's correct.

MS. FITZKE: I don't have any other questions. Thank you.

JUDGE DONALDSON: All right. Thanks to both attorneys and thank you to Mr. Branch. You're going to

remain, of course, part of our hearing as a party.

WITNESS: Yes, ma'am.

JUDGE DONALDSON: But as I understand, your testimony is complete at this point. There are instances where someone is re-called to testify under certain conditions. We'll just have to see what happens there, but for now and maybe for the duration of the hearing, your testimony is over. Thank you for your attention to everyone's questions including my own.

WITNESS: Thank you, Your Honor.

JUDGE DONALDSON: Thank you. Mr. Sorey, Mr. Ferguson, we're going to take a short break, but who is the next witness?

MR. SOREY: Chris Day.

JUDGE DONALDSON: Chris Day is? Okay and then we have a witness that needs to be completed by 4:00 p.m. Central and that is Mr. Clark?

MR. SOREY: Yes, ma'am. We'll take his next.

JUDGE DONALDSON: Okay.

MR. SOREY: I could do him next if you'd like.

JUDGE DONALDSON: It's --- when you have planned for the witnesses ---

MR. SOREY: It doesn't make any difference to me.

JUDGE DONALDSON: Okay. Could ---

MR. SOREY: I will just switch pages.

JUDGE DONALDSON: Okay. Will Mr. Clark be available sooner then?

MS. FITZKE: He would be. We thought Mr. Day was being called next so Mr. Clark just left to get a sandwich, I understand, but he is in the building here.

JUDGE DONALDSON: Okay. We're going to take a break anyway. So, let's see if you can have him ---

MS. FITZKE: All right.

JUDGE DONALDSON: -- take the place and go next, but let's take a little bit longer break. It's 11:43. Let's start at 12:00 noon. Not a terribly long break, but a little bit longer, but please stay on the meeting and mute yourselves and we'll go off the record.

(Off the record at 11:44 a.m., CST)

(On the record at 12:02 p.m., CST)

JUDGE DONALDSON: Thank you for joining us, Mr. Clark. You are our next witness in a proceeding under the whistleblower protection provisions of the Federal Rail Safety Act brought by Robert Branch against his former employer, Illinois Central. Your testimony will be under oath if you take the oath. Would you please raise your right hand?

//

//

Whereupon,

WADE CLARK

having been duly sworn, was called as a witness herein and was examined and testified as follows:

WITNESS: Yes.

JUDGE DONALDSON: All right. Thank you very much. So, the direct examination will be by Mr. Soley at first and it says James Ferguson, guest, but Mr. Soley has ---

MR. SOLEY: Yes, I'm here.

JUDGE DONALDSON: This is a --- yes, I think I need to correct something on the --- go ahead, Ms. Fitzke.

MS. FITZKE: Oh, I just wanted for purposes of everyone to clarify that Mr. Clark is not able to see the meeting on the computer in front of him. So, if it looks like he's staring off, we have a large screen in the room that is displaying the Zoom so he's just trying to see. I just noticed that it's a bit at least on my screen a bit of an awkward setup. So, I just wanted to make sure you all know as to why he's doing that.

JUDGE DONALDSON: Yes, I appreciate that explanation. I often do the same myself with certain setups and I take the benefit of a very large screen I sometimes have and I'm usually looking over there so I can see everyone really well. So, that's fine. You don't have

to --- you can do whatever you need to do to have the best visual of the hearing, Mr. Clark. All right, so with that said, Mr. Sorey, you can proceed.

MR. SOREY: Thank you, Your Honor. Mr. Clark, I apologize for taking you away from your sandwich, but we're trying to get you out of here early so we thought you'd appreciate that more than the sandwich.

DIRECT EXAMINATION

BY MR. SOREY:

Q All right, Mr. Clark, in June of 2022, you were senior manager of production for Illinois Central Railway, correct?

A Correct.

Q And Mr. Chris Day directly reported to you in June of 2022, did he not?

A Yes.

Q All right. Now, the Illinois Central Railroad has a workplace violence policy, does it not?

A Yes.

Q Does it apply to all employees of the Illinois Central including supervisors and union employees?

A Yes.

Q What is your definition of self-defense?

A Well, my definition of self-defense would be a position of retreat so covering up if you're being attacked

Case: 4:23-cv-00217-MPM-JMV Doc #: 83-1 Filed: 01/08/25 54 of 189 PageID #: 2631

Robert Branch 2023-FRS-00026 February 13, 2024

Page 97

or trying to move yourself away, running or walking away from a situation, asking for help from any bystanders. I'd say that would be my definition of self-defense.
Q So, you would have the person to retreat. Is that correct?
A State that again.
Q So, you would have a person involved in an altercation to retreat?
A Yes.
Q Meaning leave the scene?
A Retreat or cover up or walk away, yell for help. Those would be the things that I would expect.
Q If you had been in Mr. Branch's situation as you discussed earlier and we discussed in your deposition, what would you have done?
A I would have done exactly what I just said. I would have took a position of retreat, whether that be cover myself up to ask for help, try to get away from the situation he was in.
Q Okay. Were you aware that this altercation took place in the parking lot of a hotel?
A Yes.
Q And were you aware that there was a barbecue pit and a truck directly behind Mr. Branch at the time he was pushed down?

Page 98

A No.
Q Okay. Were you aware that there were other cars in the parking lot and a fence that joined the parking lot?
MS. FITZKE: Objection. States evidence not in record.
WITNESS: No.
MR. SOREY: Okay.
JUDGE DONALDSON: Hold on just a second. So, you're saying the --- to the record already. I'm going to sustain the objection and raise it as necessary.
MR. SOREY: Thank you.
BY MR. SOREY:
Q Mr. Clark, did you participate in the ruling to fire Mr. Branch as part of the disciplinary panel?
A Yes.
Q Okay. Who all was on that disciplinary panel?
A I'm not exactly sure. I know of a few people that were on it. I don't know if it encompasses the entire panel, but I know I read the transcript. I gave my recommendation and then I believe Tom Hilliard, Thomas Sullivan and I'm not exactly sure who the rest of the people are on the panel, but I think there's maybe one or two other people, but I'm not sure who they are.
Q So, you think it was more than three people on the disciplinary panel?

Page 99

A I'm not sure. Yes, I would think it's more than two. I know of two of them.
Q Okay. Now, Mr. Patrick Crain is the person that contacted you to tell you that the panel was moving forward to fire Mr. Branch, was he not?
A Yes.
Q Now, in Mr. Branch's termination letter, it stated, "You" and that's referring to Mr. Branch "were allegedly involved in a verbal and a physical altercation. Is that correct?
MS. FITZKE: Objection. It misstates the evidence. The evidence misstates the letter.
JUDGE DONALDSON: Are you quoting directly from the letter? What's your response to that, Mr. Sorey?
MR. SOREY: My response is that the letter had it in there. That's the reason I read it to him. That's the reason I was asking him.
JUDGE DONALDSON: Restate your question, please. Can you restate your question?
BY MR. SOREY:
Q In Mr. Branch's termination letter, it stated that Mr. Branch was allegedly involved in a verbal and physical altercation. Is that correct?
A Yes.
JUDGE DONALDSON: Did you have an objections to

Page 100

that, Ms. Fitzke?
MS. FITZKE: No, that is a different question. It restates the investigation notice where it was alleged that they were involved in a verbal and physical altercation which is what the termination letter reads. So, I don't have an objection to that.
JUDGE DONALDSON: All right and the witness, Mr. Clark, answered yes to that question?
WITNESS: Yes.
JUDGE DONALDSON: Okay. Thank you.
BY MR. SOREY:
Q Mr. Clark, you said that you gathered your information of a verbal altercation from the transcript. Is that correct?
A No, I don't believe so.
Q You don't believe ---
A Mostly physical.
MR. SOREY: Okay. Well, I don't understand your answer. I'm sorry.
WITNESS: Okay. Please restate the question. I don't really understand what you're asking.
BY MR. SOREY:
Q Okay. You stated in your deposition that you gathered your information of a verbal altercation from the transcript. Is that correct or not?

Bayley Reporting, Inc.
(727) 585-0600

Exhibit D: Transcript of the February 13 and 14, 2024, hearing in front of the Office of Administrative Law Judges ("OALJ")

A I gathered my information of a verbal and physical altercation from the transcript.

MR. SOREY: Okay, thank you.

BY MR. SOREY:

Q And in your reasoning to terminate Mr. Branch, part of it was involved, part of it was surrounded what you perceived as a verbal confrontation. Is that correct?

A Yes.

Q Okay. Do you know who Patrick Jones is, Mr. Clark?

A Yes.

Q Who is he?

A He's currently the senior manager of production for the Southern Region.

Q Did Mr. Jones work for you in June of 2022?

A No, sir.

Q Has he worked for you at any time?

A No, sir.

MR. SOREY: Okay. Thank you.

BY MR. SOREY:

Q Now, we had asked you earlier whether or not you were made aware that Mr. Christopher Day had reported an altercation for him in an Illinois bar to Patrick Crain and Patrick Jones. Do either of these men or did either of these men report to you at that time?

A No, they did not.

Q What is your relationship to Patrick Crain?

A Patrick Crain is the Labor Relations manager so he doesn't work for me, but he works in the LR department.

Q Would it be Mr. Crain's duty to report to you any instances of altercations of employees that worked under you at the time?

A I don't know anything about ---

MS. FITZKE: Well ---

JUDGE DONALDSON: Just a moment. Just a moment.

MS. FITZKE: Yes. I need to object that this is cumulative. It's also irrelevant. He's already testified that these gentlemen didn't report to him and weren't in his supervisory chain at the time so pretty far field. Immaterial and irrelevant.

JUDGE DONALDSON: Your response, Mr. Sorey?

MR. SOREY: He had stated that Patrick Crain had told him about Mr. Branch's altercation and I was asking him if he had Mr. Patrick Crain report to him Mr. Christopher Day's altercation.

JUDGE DONALDSON: I'm going to overrule it and let's get the answer to that question and we'll just take it one question at a time.

MR. SOREY: Okay.

JUDGE DONALDSON: Mr. Clark, do you recall the question?

WITNESS: Can you ask again, please?

MR. SOREY: Sure.

BY MR. SOREY:

Q Patrick Crain reported to you Mr. Branch's participation or the situation of the altercation. Did Patrick Crain ever report to you an altercation on behalf of Christopher Day?

A No.

Q Okay. Now, would Mr. Crain normally report to you any of your employees, supervisors or union people that were involved in altercations?

MS. FITZKE: Yes, I'm going to object. Immaterial and irrelevant. Mr. Clark has already testified that Mr. Day did not report to him at that time or at the time of the incident Mr. Sorey is asking about.

JUDGE DONALDSON: Mr. Sorey, your response?

MR. SOREY: The point I'm trying to get to, Your Honor, is that Christopher Day was involved in an altercation and reported it, he says, and we'll find it later in his deposition that he reported it to Patrick Jones and Patrick Crain. It appears that Patrick Crain never reported this altercation to Mr. Clark and I'm attempting to find out what the difference is between a supervisor being reported and a union man being reported.

JUDGE DONALDSON: All right. I'm going to overrule it. I do feel like we're --- it's relevant so it's not totally immaterial, but let's --- maybe approach it from a different way to get it that difference that you're trying to understand.

MS. FITZKE: Well ---

MR. SOREY: Go ahead.

JUDGE DONALDSON: You look like you're frozen for a second, but just approach it in a different way.

BY MR. SOREY:

Q Mr. Clark, when altercations take place on the railroad within your division and at the time you were production supervisor for Illinois Central for the United States, did the Labor Relations Department normally report these altercations to you?

A No, it would be a situation where if anything were to come up like this, it would be us reporting it to Labor Relations.

Q Okay. Now, I believe you had advised us earlier or at least in your deposition, you stated that the workplace violence policy applied to all the supervisors and all the labor people for the Illinois Central Railroad. Is that correct?

A Yes.

Q Do you know of any reason why Mr. Day would not have been brought before a disciplinary panel and have an investigation like Mr. Branch for his altercation?

MS. FITZKE: Objection. Foundation. He hasn't established that this witness understands or even knows what he's talking about. The witness indicated it was never reported to him.

JUDGE DONALDSON: I'm going to sustain that, Mr. Sorey. I haven't heard a foundation yet.

MR. SOREY: Okay.

BY MR. SOREY:

Q Are all employees supposed to be brought before a disciplinary panel or have an investigation if they're involved in an altercation?

A What type of altercation?

Q A fight.

A Fight?

Q A fight, F-I-G-H-T.

A Physical in nature?

Q I don't know of an unphysical fight.

A Okay.

JUDGE DONALDSON: You're asking him about a physical altercation, Mr. Sorey?

MR. SOREY: Yes.

JUDGE DONALDSON: Okay.

WITNESS: I would say if we had knowledge of the event and then yes, there would be an investigation if there was a physical altercation per the workplace violence rules that we would have an investigation.

MR. SOREY: Okay. That's all the questions I have.

JUDGE DONALDSON: Who is going to conduct the examination on behalf of Respondent, Ms. Fitzke?

MS. FITZKE: I will. Thank you.

JUDGE DONALDSON: All right.

CROSS EXSAMINATION

BY MS. FITZKE:

Q Mr. Clark, if the information received is that a vendor head butts one of your managers after hours in a bar and our manager does not respond physically, is there a reason to investigate further?

A No, there wouldn't be in my opinion. If he didn't respond or he acted in a position of retreat that there would be an investigation based at least on the right thing.

Q And the formal investigation hearing process that we were talking about, I guess you weren't in the room, but Mr. Branch went through as part of his process that generated the process that he read, does that same process apply to management?

A I do not know how the process goes.

Q With respect to Mr. Branch's investigation hearing, did you read the entire transcript?

A Yes.

Q Did you review the exhibits that were part of the record?

A Yes.

Q And when you --- did you consider --- what did you consider in concluding that Mr. Branch had engaged in a violation of the workplace violence policy? In other words, on what did you base your conclusion that he had violated the policy?

A So, I based my conclusion on a lot of the witness testimony and the statements that concluded that Mr. Branch had an active role in the fight, that he was not in a position of retreat or trying to deescalate the situation that he participated in the fight that witnesses had stated he had struck the other employee.

Q When reviewing incidents of workplace violence and trying to determine the level of discipline to a assess, how are cases of physical finding reviewed under Illinois Central's discipline policy?

A Well, the process would be to take statements. Obviously, we've got to have a report and then we would work through any witness statements, statements from anyone

involved and then from there, we would have a discussion on discipline level, go through an investigation and then determine through the record what would be assessed.

Q Did you consider anything outside of the investigation hearing transcripts and exhibits in making your recommendation that Mr. Branch should be terminated?

A No.

Q Before this incident, had you ever had any issues with Mr. Melton of this nature in the past?

A No.

Q How about Mr. Branch?

A No.

Q In determining that this should be assessed as a Level 4 violation which resulted in termination, did you consider or could you consider Mr. Branch's work record?

A Yes.

Q And how did you consider it?

A That was read into the record.

Q Okay. Outside of the fact that it made it in the transcript, could you assess lesser discipline for physical fighting because Mr. Branch had a clean work record before this incident?

A No.

Q Why is that?

A That's our discipline policy and our tolerance on

workplace violence. It's termination.
Q When did you first learn that there had been a fight between these two gentlemen at the hotel on the night of May 26?
A I believe it was the following Tuesday.
Q And who did you hear from?
A Chris Day.
Q What did Mr. Day tell you?
A He sent me --- he called me and he told me he was going to be sending me a statement from Mr. Branch so he sent me that. I read through it and Mr. Branch was reporting a situation that occurred at the hotel.
Q And what did you do after you received that information?
A I sent it to our LR department for advice for handling.
Q And when you sent it to the LR department for advice and handling, did you tell them at the time that Mr. Branch indicated that this other employee had punched him and he fought back to defend himself?
A Yes.
Q And did you get the guidance you were looking for from the LR department or Labor Relations?
A Yes.
Q And who in Labor Relations did you get advice

from?
A Patrick Crain.
Q What did Mr. Crain tell you to do?
A He told me that we needed to get statements from any witnesses, statements from Mr. Branch and Mr. Melton which we did and to get those in to him for review.
Q Did you take the statements yourself?
A No, I did not.
Q And who did you receive them from?
A I believe it was Chris Day.
Q Did you read the statements when you received them?
A Yes.
Q Did you have any role in determining that the company should move forward with an investigation hearing for both Mr. Melton and Mr. Branch?
A I was involved in similar discussions about that, yes.
Q Did you have any disagreement as to whether Mr. Branch should also be accused of rule violations in conjunction with this incident?
A No.
Q Why was that?
A Well, based on what I've read, they both were active participants in the fight.

Q And that's based on what you read in the statements you received?
A (Witness nods head "yes")
Q You have to answer out loud.
A Yes.
Q Thank you and then after you received and reviewed the transcript and exhibits from the investigation hearing, did you speak with anyone about it?
A I did.
Q And ---
A Spoke with Patrick Crain.
Q What do you recall discussing with Mr. Crain?
A That the transcript would go in front of the panel and they would come back with a recommendation.
Q Do your recall providing your recommendation that it should be a Level 4 violation, excuse me, a Level 4 discipline for violation for the workplace violence prevention policy?
A Yes.
Q And did you communicate that recommendation to Mr. Crain?
A I did.
Q Other than Mr. Crain, do you recall talking with anyone else about that potential discipline or investigation during or after the investigation was

concluded?
A No.
Q Did you ever tell Mr. Day that he should convince Mr. Branch not to move forward with the investigation?
A No.
Q Did anybody approach you and ask you to not move forward with the investigation?
A Yes.
Q Who was that?
A Mr. Branch's union.
Q What did the union ask you to do?
A Shortly after Mr. Branch had submitted the statement to Chris Day about the altercation in the parking lot, I was approached by the union, his representation, that the gentlemen shook hands and squashed the issue and they'd just like to move forward and go as if nothing happened.
Q And what did you tell the union at that time?
A I told them that that was not going to happen because we've already gotten the reports and we need to investigate it.
Q Are you aware of any other employees who have engaged in a physical altercation at the railroad where they were individuals who participated in a fight who did not lose their jobs?

A No.
Q Would your recommendation that Mr. Branch be terminated, would have been any different if Mr. Melton had reported the fight or if you had found out about it from another source?
A No.
Q Did Mr. Branch's statements that he viewed Mr. Melton as a threat or that he feared him, did those statements impact your decision with respect to the termination of Mr. Branch's employment?
A No.
MS. FITKE: Thank you, Mr. Clark. I don't have any other questions for you right now.
JUDGE DONALDSON: Do you want me to go further, Mr. Sorey?
MR. SOREY: Yes, Your Honor. I do. I was waiting to see if you had any questions.
JUDGE DONALDSON: I don't this time. Thank you. You go ahead.

REDIRECT EXAMINATION

BY MR. SOREY:
Q Mr. Clark, in Ms. Fitzke's situation that she gave you about a supervisor being head butted in a bar in Illinois and reporting that he retreated or didn't participate in it, does the railroad always take the word

of the supervisors reporting about a fight?
MS. FITZKE: Object to the form of the question. Improper hypothetical.
JUDGE DONALDSON: Overruled. Mr. Clark, answer?
WITNESS: I'm not sure. I've never been --- I guess, Chris Day didn't work for me at the time, neither did Mr. Crain so I had no way of even knowing about this situation, I guess. So, I don't understand, I guess, fully the question. The gentlemen didn't report to me at the time.
BY MR. SOREY:
Q Well, the reason I asked the question was because Ms. Fitzke gave you that hypothetical, let's say, a few minutes ago and you said well, you would take the word of the supervisor and not have an investigation. Is that correct?
A I don't think so. I don't think I said that. I think I said that if he acted in retreat, then there wouldn't be a reason to have an investigation.
Q Okay and normally the way you would make sure that happened would be to have an investigation of the facts and actually talk to the contractor too, would you not?
A I'm not exactly sure what took place. I don't

know if that happened or if it did not happen because I wasn't --- this gentleman didn't report to me at the time so I was never made aware of that situation. So, honestly, I don't know how it was handled. I'm not sure.
Q Let's assume for the purpose of the question that it took place, would you normally then have recommended that an investigation take place to find out what occurred?
A I would definitely have taken statements at the time to find out exactly what the participants' roles were and I'm not saying that didn't happen. I'm not sure, but that's what I would have done.
Q Okay. Is there a definition of self-defense in the workplace violence policy?
A No.
Q Now, it he workplace violence policy talking about penalties, it actually says up to and including termination, does it not?
A Yes.
Q So, it indicates that you could give a lesser penalty than termination if coming up with violations of the workplace policy, correct?
A Yes, I would probably read it that way.
Q Now, where did you come up with a Level 4 statement? Where in IC literature does that appear?
A I think it appears in the letter that you just

phrased. It's up to termination so a Level 4 is termination and that's what the severity of the incident called for.
MR. SOREY: Okay. That really wasn't my question. My question, I guess I should have stated it better and I'm sorry.
BY MR. SOREY:
Q In what document do the definitions of Level 4 appear for IC?
A There's a discipline policy that we have at IC.
Q And it's in writing?
A Yes, and it states violation level, rules, violations and where they fall in that rubric of discipline.
Q And does it say that fighting is a Level 4 violation?
A Yes.
Q Okay and that's what you were basing your decision on, not the workplace violence policy?
A I think it had been fighting is tied to the workplace violence, therefore, it comes as a Level 4.
Q Does the workplace violence policy specifically mention fighting?
A When it says violence, I take that as fighting.
Q Okay. So, you equate violence with fighting?

A Yes.
Q Okay, but the word itself, fighting, does not appear in workplace violence?
A No, I don't believe it does.
MR. SOREY: Okay. Let me ask you one more question here.
BY MR. SOREY:
Q If Mr. Branch had not submitted a statement about the altercation, IC would have never conducted an investigation of the matter, would they?
A I don't know. It would depend if anybody else gave a statement or the hotel or anything like that. I mean, if it was brought to our knowledge, then yes, I would have had an investigation. I would have --- it wouldn't have been something that we did not look into. We definitely would have looked into that situation.
BY MR. SOREY:
Q Under the workplace violence policy, are the employees supposed to immediately report any type of violent situation?
A The employees are encouraged to.
Q But not required?
A Yes, I mean, it doesn't say they're required to.
MR. SOREY: Okay. That's all the questions I have, Your Honor.

MS. FITZKE: I don't have anything further.
JUDGE DONALDSON: All right, thank you. Thank you both. So, that mean --- I don't have any questions for you, Mr. Clark. That means all the questions have been presented. Can he be excused, not expected to be recalled?
MR. SOREY: Yes, ma'am. I hope he makes his flight.
JUDGE DONALDSON: Okay. All right, thank you very much for being on standby today and for joining us as quickly as you could, Mr. Clark. I very much appreciate your participation. I know you have other things to get to so you're free to go.
WITNESS: Thank you. Appreciate it.
JUDGE DONALDSON: Thank you.
WITNESS: Thanks.
JUDGE DONALDSON: I think we can go ahead with the next witness unless you expect that witness to be a particularly long one. In that case, I would suggest perhaps something of a lunch break before we reach the next witness. So, Mr. Sorey, what are your thoughts on that?
MR. SOREY: Your Honor, I tried to streamline all my questions of these gentlemen and I anticipate most of them to be about the length of Mr. Clark's deposition or statement. I'm sorry.
JUDGE DONALDSON: Yes. Okay, I would recommend

that we just go ahead and go forward with that witness and let's see how much ground we can cover in the next hour before taking another break. Does that sound good to you all?
MR. SOREY: It's fine with me.
MS. FITZKE: He's not here with me physically so we'll see if we can get him onto the meeting as soon as possible here.
JUDGE DONALDSON: Okay. I do want to --- you gave me an opening to say this, Mr. Sorey. I do usually wait a little bit to make sure this is justified, but I do want to say I am really encouraged by your efficiency, your professionalism and your skill by both parties, all representatives and I appreciate it. I think you are moving at a pace that is very encouraging to reach the witnesses. You're covering information that I would expect to be covered. I don't feel like you're doing so at the expense of doing so with the evidence you need to. I will express my appreciation at this point because I don't have any sense that that's going to change. So, I appreciate it and keep up the good work.
MR. SOREY: Your Honor, my wife told me tomorrow is Valentine's and I better be through by tomorrow night.
JUDGE DONALDSON: Oh, well, I think she carries

more weight than I do so I would listen to her. All right, so we can take a break. Let's go off the record while we get the next witness on board and make sure he can join us within a few minutes.
(Off the record at 12:40 p.m., CST)
(On the record at 12:45 p.m., CST)
JUDGE DONALDSON: Christohper Day is the next witness in this proceeding. Mr. Day, you are testifying in a proceeding by Mr. Robert Branch against Illinois Central under whistleblower protection provisions of the Federal Rail Safety Act which is overseen by the Department of Labor and I'm the administrative law judge with the Department of Labor in Louisiana. So, thank you for joining our video hearing. I'm going to swear you in now. Are you on a phone or a laptop?
MR. DAY: I'm on my phone.
JUDGE DONALDSON: Okay, good. So, that works usually just as --- well, if you need any assistance technically, if you need to see or hear someone or you have any issues, let me know, but usually the phone works just as well. You don't have any distractions or documents in front of you?
MR. DAY: No.
JUDGE DONALDSON: Okay. Would you raise your right hand?

Whereupon,

CHRISTOPHER DAY

having been duly sworn, was called as a witness herein and was examined and testified as follows:

WITNESS: I do.

JUDGE DONALDSON: All right. Thank you very much. Mr. Sorey, are you still handling the questioning?

MR. SOREY: Yes, ma'am.

JUDGE DONALDSON: All right. You can go ahead.

DIRECT EXAMINATION

BY MR. SOREY:

Q Mr. Day, in June of 2022, you were the supervisor for both IC production gangs, correct?

A Yes, sir.

Q Now, you found out from Mr. Branch about an incident that took place between he and Mr. Melton. Is that correct?

A Yes.

Q And Mr. Robert Branch wanted to report the incident?

A Yes.

Q Okay. Did you try to discourage him from reporting this incident?

A I did not.

Q Did you give him the option of not reporting it?

A I did.

Q And why did you do that?

A Because of the situation that had arose. I had an idea of what the outcome may be for both employees.

Q Okay. Now, Mr. Day, are you familiar with the IC workplace violence policy?

A Yes.

Q Now, are the employees required under the workplace violence policy to report any violence that they know about?

A Yes.

Q Well, if they are required to report it, why did you give Mr. Branch the option of not reporting it?

A Because like I had just mentioned, I knew what the outcome would be. I was trying to protect what was going to happen to both employees. At the time, he had told me that he wasn't sure if he wanted to go through with it or not.

Q Okay. Now, I believe you told us in your deposition you believe the workplace violence policy applies to all IC employees, correct?

A Right.

Q Now, at the time of the incident, IC was only providing a per diem toward an employee's hotel room. Is that correct?

A Yes, sir. That's correct.

Q So, the employees had the right to check or stay at any hotel they wanted to?

A Yes, sir.

Q Now, do you know whether or not the workplace violence policy includes the definition of self-defense?

A I do not honestly.

Q Okay. What is your definition of self-defense?

A My definition of self-defense is either to try and deescalate the situation or walk away, but not returning any sort of gesture or anything else towards another employee.

Q So, your idea of protecting yourself if you're being struck is not striking back. Is that correct?

A That's correct.

Q Do you know whether Mr. Branch had any problems at the IC as far as discipline or anything?

A I did not at the time, no. As far as I knew, he had nothing on his record.

Q Had he ever been involved in any investigations that you're aware of?

A No, sir.

Q Now, Mr. Day, in your deposition, we talked about an off-duty altercation with a contractor at an Illinois bar that you said took place a little over a year ago, did

we not?

A Yes, sir.

Q And I asked if you reported this incident and your answer was yes?

A Yes.

Q All right. I also asked you, "Did you undergo an investigation for reporting this altercation" and what was your answer?

A No, I have not undergone an investigation.

Q Why not?

A Because technically it wasn't a fight. I wasn't the aggressor. I didn't strike back. I deescalated the situation and walked away.

Q Okay. Are supervisors included in the workplace violence policy?

A I think everybody is included in the workplace policy whether it's union or management.

Q Okay. Now, you reported this altercation to Pat Crain and Patrick Jones. Who are these gentlemen and what positions were they in?

A Patrick Crain was Labor Relations ---

JUDGE DONALDSON: Can you just --- I think I missed part of that question. I don't mean to cut you off, Mr. Day, but I want to make sure the full question gets in the record.

MR. SOREY: Okay.
BY MR. SOREY:
Q Mr. Day, you reported this altercation to Pat Crain and I believe he's with HR and Patrick Jones who I believe was your supervisor. Is that correct?
A That's correct.
Q Now, how did the railroad determine if you truthfully reported this fight without an investigation?
A I don't know they determined it. I told them about it and that's all --- I did my part as far as reporting to my immediate supervisor.
Q Do you know whether they took statements from the contractor?
A They did not.
Q Do you know whether they took statements of the railroad employees who were also in the bar?
A No, I don't think they took statements from anybody.
Q Well, did you report to Mr. Jones and Mr. Crain that there were other railroad employees in the bar at the time the head butt took place?
A I don't recall.
Q Did Mr. Crain or Mr. Jones ever talk to you again after you reported the incident to them about the incident?
A No, they did not.

MR. SOREY: Okay. I believe that's all the questions I have, Your Honor.
JUDGE DONALDSON: That's all you have, Mr. Sorey? Okay.
MR. SOREY: Yes, ma'am.
JUDGE DONALDSON: All right. Ms. Fitzke, you can go ahead.
MS. FITZKE: Thank you.

CROSS EXAMINATION

BY MS. FITZKE:
Q Mr. Day, what exactly did you report to your supervisor and to Mr. Crain who I believe is in Labor Relations?
A I had told them that we were out at a place eating and having a drink and me and the contractor were having a conversation and that out of the blue, he had struck me with his face and head butted me.
Q Did you ever tell them that you fought back?
A I think I --- I'm not 100 percent sure, but I do know I told them I did not strike back. There's been fighting and striking. I never --- I told then I deescalate it, I talk and I walk away.
Q With respect to your communications with Mr. Branch, tell me with respect to the May 26 incident how you first learned that there had been an altercation between

Mr. Branch and Mr. Melton?
A Over the weekend of that holiday, I had received a phone call from Chance Gardener who was a new supervisor at the time and he had called me and told me that I needed to call Mr. Robert Branch because of something that happened not on duty, off duty. He said, "Talk to him, call him, see what the situation is." I had called Mr. Branch and that's why I kind of had learned just the general knowledge that there was an altercation between him and another employee.
Q And did Mr. Gardener tell you what the altercation was or why you needed to give Mr. Branch a call specifically?
A No, he did not.
Q And when you spoke with Mr. Branch, do you recall when it was over the course of that weekend that you spoke with Mr. Branch?
A I believe it was on that Sunday before the holiday.
Q And what, if --- can you tell us the best you can recall what Mr. Branch reported to you at that time about the incident?
A He had told me that he and another employee had gotten into an argument, had an altercation and that he was thinking on reporting it.

Q And did he provide any other information or details to you about the incident at that time?
A No.
Q And we've heard testimony and seen text messages indicating that you asked Mr. Branch to write a statement. When did you do that? Was that the same phone call or a different phone call?
A I think it was on that Monday on the actual holiday because I remember talking to him and there was nobody in the office at the time. So, there was nobody that I could really talk to.
Q So, it sounds like you talked to him on Sunday and then you talked to him again on Monday. Is that right?
A Yes.
Q Okay and on Monday, tell us what you can recall about your conversation with Mr. Branch.
A I know we had talked about it. I can't remember if we had gotten cut off. I asked him to write a statement. He had sent me the statement via text message. I had read through it and that was as far as it went for that day.
Q When you read through the statement, was there anything that you noted in the statement that was different or that you thought struck you as different from what Mr. Branch told you on the telephone?

A Well, he didn't give me the full story on the telephone. He only had given me kind of the gist of what happened. It was when I read that statement that I knew they had gotten into a fight.

Q So, was the statement the first time that you understood that Mr. Branch was a participant in the physical altercation?

A Yes.

Q Now, after you received the statement from Mr. Branch, did you speak to him again?

A I don't recall.

Q And after you received the statement from Mr. Branch, what did you do next with respect to reporting it within the company, the incident within the company?

A The very next day, I talked to Mr. Branch again because as I mentioned, he was still undecided actually if he wanted to report it or not report it, but after I had gotten a statement from him the day before, I had everything I needed or at least I thought that I needed because I had never encountered a situation like this before. After I had talked to him, I kind of talked to the union and after he gave me the green light to go ahead and say that he wanted to report it, I went ahead and gave it to my immediate senior manager.

Q And who is your immediate senior manager?

A Mr. Wade Clark.

Q What, if anything, did Mr. Clark say to you about the incident or the statement you had provided to him?

A He had wanted me to start collecting statements from other employees that were around the area.

Q Did Mr. Clark ever do or say anything to you that indicated he didn't want you to proceed with the matter?

A No, he did not.

Q Did you obtain the statements that Mr. Clark asked you to get?

A Yes.

Q And how did you go about determining which statements to collect?

A It was everybody that Mr. Robert Branch had listed at his statement that he had wrote as witnesses.

Q Did you read those statements?

A I did not.

Q What did you do with them?

A I wound up collecting them. I scanned them all into a pdf file and sent them off for examination for what was going to happen later on.

MS. FITZKE: I'm sorry. That might have been a poor question on my part.

BY MS. FITZKE:

Q Who did you send them to?

A I believe I sent them to Wade Clark and Mr. Pat Crain.

Q After you sent off the statements, did you have any further involvement in determining whether the employees would be called to investigation for potential rule violations and in particular, whether Mr. Branch would be called for investigation for potential rule violations?

A No, I had no further involvement on that.

Q When you spoke with Mr. Branch over the course of that Memorial Day weekend, did he ever at any time ever give you any indication that any of the --- that Mr. Melton claimed to have a firearm with him at the hotel?

A No, he did not.

Q Have you ever heard that before, sir?

A I have not. Not until you said it right now.

Q Did you play any role, Mr. Day, in terms of determining after the investigation hearing was concluded in terms of determining whether discipline or termination would be assessed for Mr. Melton or Mr. Branch?

A I did not, no.

Q Did anybody ever ask your opinion as to what should happen with these two?

A No, they did not.

MS. FITZKE: Thank you, sir. I don't have any other questions for you right now.

JUDGE DONALDSON: I think you cut out a little bit. Do you have any further questions, Ms. Fitzke?

MS. FITZKE: Oh, apologies. No further questions right now.

JUDGE DONALDSON: Okay. I thought that's what you said. All right, anything further, Mr. Sorey?

MR. SOREY: Yes, ma'am.

REDIRECT EXAMINATION

BY MR. SOREY:

Q Mr. Day, you said you were meeting with the contractor when out of the blue, you were struck by the contractor. Is that correct?

A Yes, we were eating and having a drink, yes.

Q Okay and basically, you were put in the same situation Mr. Branch was put in, were you not?

A I don't believe that was the same situation, no.

Q How do you feel the situation was different?

A Because I didn't return what had happened to me.

Q Okay and that's what you reported to the railroad?

A Yes, sir.

MR. SOREY: Okay. That's all the questions I have.

JUDGE DONALDSON: All right. I don't have any questions for you, Mr. Day, so believe it or not, your

Case: 4:23-cv-00217-MPM-JMV Doc #: 83-1 Filed: 01/08/25 63 of 189 PageID #: 2640

Robert Branch 2023-FRS-00026 February 13, 2024

Page 133

testimony is concluded. That was very efficient as the attorneys have been all day so I appreciate that. Mr. Day or to the attorneys, can he be excused at least at this time, you're not expecting to ask him to return?

MR. SOREY: It's fine with us.

MS. FITZKE: Yes.

JUDGE DONALDSON: All right, on both parts. All right, thank you very much, Mr. Day, for joining us and for your attention to all of the questions that the attorneys had for you. We're going to excuse you and hope you have a good rest of your day.

WITNESS: Okay. I hope you all have a good day too. Thank you.

JUDGE DONALDSON: Thank you very much. Who's the next witness, Mr. Sorey?

MR. SOREY: I don't have my list. Who do you have, Susan?

MS. FITZKE: I have Mr. Duane Spears next on the order you gave us this morning.

MR. SOREY: That's fine.

JUDGE DONALDSON: I want to take a break. I'm not going to do a longer lunch break unless someone feels it's really necessary. Speak up now. What I'd like to do is since I think we are moving at a good pace, I don't know who --- let's talk about this right now. Based on how it's

Page 134

going so far, who do you ideally want to have testify this afternoon and then who would we start with tomorrow? So, Mr. Sorey, we have Mr. Spears next. Is there anybody else you wanted to reach today?

MR. SOREY: Probably Patrick Crain.

JUDGE DONALDSON: Okay.

MR. SOREY: We almost could finish today to be honest.

JUDGE DONALDSON: If you would like to try to do that, we certainly can.

MR. SOREY: What do you think, Susan?

MS. FITZKE: I have a sense that, for example, Tom Hilliard will be very short, but some of the other HR and Labor Relations gentlemen will have a little bit more information I think to share. So, I do expect we'll be done by lunch tomorrow given the way this is proceeding, but I'm not quite sure that we're going to finish today. Believe me, I would also like to catch a plane today, but I don't think that's going to happen.

JUDGE DONALDSON: Okay. All right, so let's take a 20-minute break till 1:25 p.m. Central. When we return, we'll start with Mr. Spears and then when he's done, we'll just talk about how we want to handle --- just think about how you want to handle the rest of the witnesses and I'll see you back in 20 minutes.

Page 135

MR. SOREY: Thank you.

MS. FITZKE: Thank you.

JUDGE DONALDSON: Thank you.

(Off the record at 1:05 p.m., CST)

(On the record at 1:27 p.m., CST)

JUDGE DONALDSON: Okay. Mr. Spears, you've heard all the instructions and you see how the proceeding is going so unless you have any questions, we're going to go right into your testimony. Could you raise your right hand for me, please?

Whereupon,

DUANE SPEARS

having been duly sworn, was called as a witness herein and was examined and testified as follows:

WITNESS: Yes.

JUDGE DONALDSON: Okay. All right, so Mr. Sorey, go ahead, please.

MR. SOREY: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. SOREY:

Q Mr. Spears, in June of 2022, you were senior Human Resources manager for the IC Railroad?

A That is correct.

Q Do you know who was on Mr. Branch's disciplinary panel?

Page 136

A No, I do not.

JUDGE DONALDSON: Can you say that again?

MR. SOREY: Yes.

JUDGE DONALDSON: The question cut out for me.

MR. SOREY: Okay. I asked him who was on Mr. Branch's disciplinary panel.

WITNESS: Oh, I misunderstood your question. I thought you said district. When you say disciplinary ---

JUDGE DONALDSON: Can we hold on for just a moment? I'm so sorry to interrupt you both, but I need to make sure that Renee is hearing everything because this is --- I'm getting significant gaps in the questions and answers so far.

COURT REPORTER: Yes, Your Honor. I'm hearing clearly.

JUDGE DONALDSON: Oh, good. So, it's just me. Sorry about that. I hear it too.

COURT REPORTER: And I don't know if it's intentional, but you are not on screen.

JUDGE DONALDSON: I'm not on screen?

MR. SOREY: That's why I was asking what happened to the judge.

MS. FITZKE: Yes, Judge, their video is off.

JUDGE DONALDSON: Yes and I have it activated. I have my camera activated. If you all will hold tight a

Bayley Reporting, Inc.
(727) 585-0600

Exhibit D: Transcript of the February 13 and 14, 2024, hearing in front of the Office of Administrative Law Judges ("OALJ")

second, I'm going to leave and come back into the meeting and see if that fixes the feed issues on my end. I'll be right back. Okay, that should fix it. That needed to be done. We're on the record and sorry about that interruption, Mr. Sorey. Can you just start again?

MR. SOREY: Sure. No problem.

BY MR. SOREY:

Q Mr. Spears, do you know who was on Mr. Branch's disciplinary panel?

A With respect to this particular case, it was myself, Tom Sullivan and Tom Hilliard.

Q And Patrick Crain was not on that panel, was he?

A That is correct.

Q Okay. Now, what is your definition of self-defense?

A Self-defense would be a situation where there's retreat. There is not engaged, further engagement, not escalating the situation, trying to move away from the situation.

MR. SOREY: Okay, thank you.

BY MR. SOREY:

Q Now, do you feel Mr. Branch was guilty of fighting because he did not walk away? Is that correct?

A In the transcript that I read, there was no evidence of him trying to deescalate the situation.

Q Okay and that included walking away?

A It might, it might not have included walking away, but he did not deescalate the situation.

Q And how would you try to prevent the fight from going further or deescalate?

A Well, to your point, he could have walked away. He could have gone into a defensive posture, but he did not have to continue to swing or make contact with Mr. Melton.

Q Okay. Now, do you know the setup that was around the parking lot where these two gentlemen were located?

A I don't know the specific setup.

Q Okay. That didn't come up in the hearing then?

A It's not on the transcript.

Q Okay. Was Mr. Branch's past good working history discussed at all by the disciplinary panel?

A I don't recall whether or not Mr. Branch's or Mr. Melton's past history was brought up.

Q Okay. That's not something that was even considered in deciding whether to terminate an employee or not?

A In this particular case, what we're facing here is a Level 4 violation and it would not be something that would be important. A Level 4 violation is very serious and if proven, would lead to termination.

Q Is fighting an absolute dismissal offense?

A It has generally been the practice in my experience that it is a dismissible offense.

Q Now, that I see workplace violence policy uses the terms up to and including dismissal, does it not?

A I do recall that is what it states.

Q And that would indicate that there are penalties other than termination or dismissal, correct?

A There are penalties other than dismissal. However, there are also situations that fall within that policy that would help make that determination.

Q Okay. Is fighting mentioned at all in the workplace violence policy?

A I'm not sure. It does reference causing harm to another person.

Q Is there a definition for self-defense in the workplace violence policy?

A I do not believe there is a definition in the policy itself.

Q Do you know why?

A I did not write the policy so no, I do not know why.

Q Now, as senior officer as Human Resources manager, wouldn't that give you a position to make comments about the workplace violence policy?

A Again, my role in this particular case was to

review the transcript and the exhibits, present it during the hearing. I did not go outside of that. That is not my role. It is simply to review the transcript and determine whether or not based on the evidence presented that a violation of policy occurred.

Q Okay, then you did not consider it self-defense?

A I'm sorry. Could you repeat the question again?

Q I said then you did not consider self-defense?

A What we did was we looked at all the situation. The situation that came to us was there's a recommendation for a Level 4 violation for fighting. Within that policy, I mean, the transcript is reviewed and we sort of start there and then we look at mitigating circumstances for both employees. With Mr. Melton, it was obvious that he made the first physical contact. That sort of put him in the termination box if you would say. After that, we clearly looked at the situation that existed with Mr. Branch and this was not an easy decision. We recognize that the --- I should say the discipline review panel recognized that he did not start this situation. Apparently, it was started on the physical with Mr. Melton. So, we considered all that. We looked at the witness statements that were presented in the transcript as one of the exhibits. We looked at the testimony of Mr. Branch as well as Mr. Melton as well as anyone who was brought forth as a witness and we

determined that Mr. Branch did engage in that situation which led to our conclusion that he had violated --- this was a Level 4 violation.

Q Now, Mr. Spears, I believe you just said that this came with a recommendation for a Level 4 termination. Who gave the recommendation to you all?

A The department. I do not remember specifically and it wasn't for a Level 4. It was for a Level 4 violation, not a Level 4 termination.

Q Well, aren't they the same?

A Not necessarily.

Q When can you get a Level 4 violation and it not be termination?

A You're absolutely right with respect to a Level 4 violation. However, that's not the only type of violation that we encounter. That could lead to an employee's termination.

Q From whom did the recommendation for the Level 4 violation come from? You said the department. What department are we talking about?

A That was the department that he worked for and that would be the Engineering Department.

Q So, the Engineering, Department recommended that this be a Level 4 violation?

A The case came to the discipline review panel as a

Level 4 violation.

Q Okay and the case was not turned over to you all until the hearing was over?

A That is correct.

Q So, when you get the transcript, the department tells you, "Hey, handle this as a Level 4 violation"?

A That's not quite what happened. The transcript and exhibits come to us. The department will say, "We believe this is a Level 4 violation" and our job is to go through the transcript, look at the exhibits and determine whether or not the information contained in the transcript supports a Level 4 violation.

Q All right. Do we know or do you not know who from the Department of Engineering recommended it be looked at as a Level 4 violation?

A I don't remember specifically how that came to us.

Q Now, if you know that fighting equals a Level 4 violation, then why even have a workplace violence policy?

A I'm sorry. I don't understand our question.

Q Okay. What is the purpose of having the workplace violence policy when you say fighting equals a Level 4 termination?

A I can't tell you. I can only speculate that the policy itself is to let all the employees know what will be

and what will not be tolerated in the company.

Q Okay. Where does a Level 4 violation appear in documents at the Illinois Central Railroad?

A It appears as causing harm in the discipline review policy.

Q Okay and are you talking about in the workplace violence policy?

A No, I'm not. I'm talking about the discipline review policy. The discipline policy, I should say.

Q Does it specifically state fighting equals Level 4 termination?

A It references causing harm.

Q Okay. So, if you cause harm, what is the definition of causing harm?

A I don't have a specific definition for causing harm. It could be injury. It could be other things. It could be fighting. That would be within that category for me.

Q Does Illinois Central have definitions in any of its documents?

MS. FITZKE: Objection to the form of the question. It's argumentative. Judge, you're on mute.

JUDGE DONALDSON: Thank you. I'm going to sustain it in part on that and in part, to me, the question is very broad.

MR. SOREY: Okay.

JUDGE DONALDSON: So, if you could take another stab at that, Mr. Sorey.

MR. SOREY: Okay.

BY MR. SOREY:

Q Now earlier, you told us that Mr. Patrick Crain was not on the disciplinary panel, correct?

A That is correct.

Q Then why was Mr. Crain recommending that Mr. Branch be terminated?

MS. FITZKE: Objection. I states facts not in the record and foundation. This witness hasn't established foundation to talk about that.

JUDGE DONALDSON: That is sustained. I don't see the foundation, Mr. Sorey.

BY MR. SOREY:

Q Okay. Are you aware that Mr. Patrick Crain recommended to Mr. Tom Hilliard that Mr. Branch being terminated?

A I don't know if I knew that at the time. It might be in the course of being deposed, so on and so forth that I'm aware of that.

Q Are you aware of it now?

A I'm aware of it now.

Q Okay and does someone outside of the disciplinary

panel normally make recommendations for punishment?
A Yes.
Q Okay. That's the procedure for IC Railroad?
A That is the procedure that we use with respect to the discipline policy.
Q Okay. Mr. Spears, if you remember, I asked you in your deposition what you would do if a co-employee came up to you and knocked you to the ground. Do you recall your answer?
A I'm not sure if that's how you phrased the question, but I remember something similar to that. I don't know what I would do because that is a matter of anger. The adrenalin gets going and people do what they do.
Q Okay. Have you ever had any conversations with Mr. Patrick Crain concerning an altercation between Chris Day and a contractor?
A No.
Q Were you aware of that situation?
A Could you repeat the question because I believe you froze in the video?
Q Oh, I'm sorry.
A That's okay.
Q I said did Mr. Crain ever tell you that Chris Day had been involved in an altercation with a contractor in an

Illinois bar?
A No.
Q Have you ever been made aware of that by anyone else?
A No.
Q Normally, when an employee is reporting or it's reported that some type of altercation took place, would your department be notified?
A Not necessarily.
Q Okay. What does Human Resources do at Illinois Central? What are you responsible for?
A Are you asking what Human Resources is responsible for or are you asking me what am I responsible for?
Q Let's limit to what you're responsible for.
A I'm responsible for the diversity, equity and inclusion for our company.
Q Okay and that's your sole responsibility?
A That is my responsibility right now. That's my main responsibility. However, as a Human Resources manager, I might get involved in other situations.
Q Okay. Did you have the same responsibilities in June of 2022?
A No, I did not.
Q What were your responsibilities at that time?

A My responsibilities at that time included making sure that the various government reports such as the EEO1 and the VES 4212 were done, the affirmative action, investigating complaints of discrimination and harassment.
Q Well, then how did you get put on the disciplinary panel?
A I cannot tell you. It is written into the discipline policy.
Q That someone from Human Resources will be on the disciplinary panel?
A It is very specific about who that person is and it specifies, I do believe it specifies HR compliance and that was my title at the time.
Q HR compliance?
A Yes.
Q What does that mean?
A As I explained before, that means that I am the person that gets involved in matters of harassment, discrimination, various government reports.
MR. SOREY: I believe that's all the questions I have. Thank you.
JUDGE DONALSDON: All right, thank you. So, now your attorney for Respondent, since you're aware of the other witnesses, Mr. Spears, they can ask you questions. Please go ahead.

CROSS EXAMINATION

BY MS. FITZKE:
Q Mr. Spears, are you aware of the code of conduct for the company?
A Yes, I am.
Q And are you aware of the workplace violence policy?
A Yes, I am.
Q With respect to the code of conduct policy, do managers and employees receive training on that policy?
A I do believe so, yes.
Q And how often?
A Annually.
Q With respect to the workplace violence policy, does the company also provide training on that?
A Yes.
MS. FITZKE: Okay. Grace, can you pull up Exhibit 16 for us? There's a book of hard copy exhibits if you want to follow along in hard copy. Just let us know if you need Grace to make it a little bit bigger for you.
MR. SOREY: No, I can actually see this one.
MS. FITZKE: Okay, great.
BY MS. FITZKE:
Q Mr. Spears, can you tell us what Exhibit 16 is?
A Exhibit 16 is the CM workplace violence

prevention policy.

MS. FITZKE: With respect to the policy, Grace, if we could scroll down to the second page of the document? It gives some examples in the middle of the page what workplace violence might include.

BY MS. FITZKE:

Q Do you see that there?

A Yes.

Q Okay. Is this policy limited to addressing incidents of physical fighting?

A No, it covers several situations.

Q With respect to incidents of physical fighting that would violate the workplace violence prevention policy, are you aware of someone who has actually thrown a punch or engaged in a situation, an incident of workplace violence in that aspect, thrown a punch who was not terminated for violation of this policy?

A I'm not aware of anyone that has not been terminated.

Q Are you aware of any incidents of an employee throwing a punch at a co-worker that hasn't been reviewed as a potential Level 4 violation?

A I am not aware of such actions.

Q When the policy talks about the potential to discipline up to and including termination as Mr. Sorey

pointed out, there could be incidents of discipline for a violation of this policy that are less than termination, are you familiar with any kind of situations that have violated this policy, but have not resulted in termination?

A I'm not sure. Yes, I'm just not sure at this point.

Q None that you recall?

A None that I can recall.

MS. FITZKE: Okay. You can take that exhibit down.

BY MS. FITZKE:

Q How would employees if they had a question about what the company policy was, how could they access or find out what the policy says?

A Oh, the easiest thing would be to check with their managers. That's easier if they're not sure what the policy is, but everyone has access through the Internet. Any employee can see it. Sometimes it's even posted in various locations. So, there are several ways, but employees are responsible for knowing what the company policies are.

MS. FITZKE: Grace, can you bring up Exhibit 30? Just the first page for now.

WITNESS: It's kind of small.

MS. FITZKE: It's just catching up on my end.

Sorry. It should pop up in a second a little bigger. There we are.

BY MS. FITZKE:

Q Mr. Spears, can you tell us what Joint Exhibit 30 is?

A Exhibit 30 is the CM discipline policy for the Southern Region.

Q Okay and does that include employees working under the operating subsidiary Illinois Central?

A That is correct.

MS. FITZKE: And if we can scroll down just a little bit, Grace.

BY MS. FITZKE:

Q I see there's an effective date of this policy, 10-23-2017. Did you have another version of this policy in place before October of 2017?

A No.

Q Okay. Was this a new policy at that time?

A Yes.

MS. FITZKE: If we could go to the next page of the policy, please?

BY MS. FITZKE:

Q On the scope of this policy, it indicates that it applies to all union representative employees except those in their probationary period. Is that right?

A That is what the policy states.

Q Would this discipline policy apply to managers or supervisors of the company?

A No.

MS. FITZKE: On the next page of the policy which is the third page of the exhibit, but it's identified as page 2 of the policy. There is a section. There we go. Right there.

BY MS. FITZKE:

Q Does this policy then address and outline as you as a member of the company with responsibilities over discipline is to go about assessing discipline to the unionized workers?

A Yes.

MS. FITZKE: If we can look at the fifth page of the document which is the fourth page of this policy. There is toward the bottom of the page a section called Discipline Review Panel. Go down to that.

BY MS. FITZKE:

Q You mentioned earlier, Mr. Spears, that there is in the policy language about who must be included in the discipline review panel?

A Yes.

Q Is this the language that you were referring to?

A Yes.

Q And above that, there is some language about the review process. Did you --- with respect to the issuance of discipline in June of 2022 time frame, did you have any role in that review process to determine --- is that review process, let me back up, I'm sorry. That was a terrible question. The review process, is that the process that occurs after the transcript is made available?
A Yes.
Q Okay. For Mr. Branch and Mr. Melton and their discipline in June of 2022, can you describe for us your role in the discipline review panel and the review process for that discipline that was assessed?
A Yes. The first thing that happens is we receive the investigation hearing along with the exhibits and each member of the discipline review panel, we review it separately and then we come together to determine whether or not there's agreement as far as whether or not there has been a violation of company policy.
MS. FITZKE: And with respect to the level of discipline to be assessed, if we can look at page 7 of the exhibit, page 6 of the policy?
BY MS. FITZKE:
Q It talks about categories of violations.
A Yes.
Q Well, I'll ask you. Can you explain to us what

these levels of violation are and what they're intended to do?
A They're in the violation, level violations go from 1 to 4, 4 being the most, I'll say, egregious or the serious violations. So, it starts out with Level 1 and these are examples. The bullet points that you see on the screen are just examples of what this might include, what Level 1 violations might include and it does the same for Level 2 violations, Level 3 violations as well as Level 4 violations.
Q Let's look at Level 4 violations if we could. It's on page 9 of the exhibit, page 8 of the policy. As you mentioned, it indicates here that it is extremely serious and the third bullet point down indicates violence in the workplace. What do you understand that to be?
A Anything that coincides what the actual violence in the workplace policy. So, that's how we determine if there's violence.
Q And is that what you would typically consider physical fighting, an employee who punches another employee?
A Yes.
Q Before you received the investigation hearing transcripts, when did you first --- well, let me ask you this. Before you received the investigation hearing

transcript, had you been made aware that there was an incident that took place between Mr. Melton and Mr. Branch?
A Yes.
MS. FITZKE: Grace, you can take the exhibit down. Thank you.
BY MS. FITZKE:
Q How did you find out about it?
A There might have been conversations with myself, Tom Sullivan and perhaps Patrick Crain who report to Tom Sullivan.
Q Do you recall who specifically made you aware at this point?
A I don't remember. It might have been Tom. It could have been Patrick. I'm not sure.
Q And with respect to bringing you into discussions that there had been an incident that occurred, what would have been your role?
A My role as part of the discipline review panel is to advise whether or not they should proceed or what do you think about the case, should we proceed, how should we proceed.
Q And when you say, should we proceed, do you mean to proceed to an investigation hearing?
A To issue a Notice of Investigation. That is correct.

Q And do you know --- well, why are you weighing in at that point? What's the purpose of having a discipline review panel if you know as to whether to go forward to hearing?
A Well, it's generally the Labor Relations manager will come if they have a question about what's going on and they're just not sure about. So, they just need further guidance on what should happen.
Q And did you give some guidance in this case?
A I don't recall.
Q All right. Did you --- when you were asked to weigh in prior to the investigation hearing, do you recall if you had seen any of the written statements at that time?
A I've seen the statements so many times. I'm not sure when I first saw them.
Q Fair enough. Okay and you mentioned that after the hearing and reviewing the transcript and exhibits as part of your role on the discipline review panel. What do you recall about your conversations with other members of the discipline review panel about what level of discipline to access, if any, to Mr. Branch?
A Again, it comes to us as a Level 4 violation. So, that's why we're looking at it. So, that's sort of set in stone, but we reviewed it and went back and forth. Again, for Mr. Melton, it was sort of self-executing, I'll

say that, where he did the first physical contact with Mr. Branch. So, that was sort of we can put that to the side. Now, let's consider Mr. Branch and we looked at all the situation. We looked at the statements. We looked at Mr. Branch's statement, not only his written statement, but what he provided in the investigation during the investigation.

Q And was there discussion amongst members of the discipline review panel as to whether Mr. Branch was engaged in self-defense during this incident?

A I'm not sure specifically if we say it was self-defense or whatever. Our situation was we looked at whether or not Mr. Branch engaged. What was he doing during that time, was he in a defense posture? Was he trying to get away? Did he run? Did he cover up? What did he do during that time? That's how we looked at it.

Q And what facts that you read in the hearing transcript and in the statements were important to you in your role in concluding that termination of Mr. Branch was also appropriate here?

A One of the big things is that Mr. Branch admits that, "Yes, I swung and I engaged. I punched him. I touched him." Another part is they're on the ground where someone had to pull them apart. Had the employees that were around at the time not pulled them apart, they could

have continued with the fight. There didn't seem that either employee was willing to just take a breath and say enough.

Q When you participated in the decision to terminate Mr. Branch's employment, did you consider that or did you believe he had reported to the company a hazardous safety or security condition?

A Could you restate the question, please?

Q (Affirmative response). I understand that you made a recommendation that concurred with the decision to terminate Mr. Branch's employment. Is that right?

A Well, we believe that it was a Level 4 violation.

Q And you agreed with that? When you say we, that included you? You also agreed?

A Yes, yes.

Q And when you concluded that Mr. Branch had engaged in a Level 4 violation. Did you believe that Mr. Branch had engaged in conduct that was reporting a hazardous safety or security condition?

A I don't know if you would consider it safety, if it was an issue of safety with Mr. Branch. It was a matter of them fighting.

Q And Mr. Branch had submitted a statement that we looked at earlier in the testimony where he indicated that in his statement, he was referred to the language where he

said, "I fear for my life around him, Mr. Melton." Did you read that part of his statement too?

A Yes, that was part of it. Yes, I did read that.

Q And during the investigation hearing, did you also read the part where Mr. Melton asked Mr. Branch if he believed he was a threat to him and Mr. Branch said no?

A Yes.

Q When you were reviewing the transcript and the potential termination of Mr. Branch, what weight, if any, did you give to Mr. Branch's statements that he feared Mr. Melton?

A I did not give a lot of weight to that at one point early when he wrote his statement, he indicated that he was afraid for his life so that sort of neutralized the situation and then the focus because were the employees fighting.

Q And if you made a decision with the panel to return Mr. Branch to work, was Mr. Melton going to be there with him?

A At work, if he returned, no.

Q Would your recommendation with respect to the termination of Mr. Branch have been any different if Mr. Melton or another co-worker had reported the incident?

A It did not matter. The company knew about it so we had to move forward.

Q Would your decision to terminate Mr. Branch have been any different if Mr. Branch reported that there had been a fight, but hadn't indicated that he felt threatened or afraid of Mr. Melton?

A No. Again, we looked at what was in the transcript.

MS. FITZKE: Thank you, Mr. Spears. I don't have any --- wait, sorry. One more question that came up today.

BY MS. FITZKE:

Q Mr. Spears, did anybody ever make you aware before Mr. Branch and Mr. Melton were terminated that Mr. Melton was alleged to have had a gun at the Magnolia Inn or said he was going to go get his gun that night?

A Until this particular hearing, that was the first time I heard anything about a gun.

MS. FITZKE: Okay, thank you. I don't have any other questions for you, sir.

JUDGE DONALDSON: Okay. So, Mr. Sorey, why don't you go ahead? Do you have any questions? Are you---

MR. SOREY: I'm still writing them down.

JUDGE DONALDSON: You're still writing some questions down?

MR. SOREY: Yes, Your Honor.

JUDGE DONALDSON: Let's pause for a minute.

MR. SOREY: I got it.
JUDGE DONALDSON: You got it now? All right, let's go forward.

REDIRECT EXAMINATION

BY MR. SOREY:
Q Mr. Spears, do you think with Mr. Branch filing a statement about the altercation and then getting terminated, do you think that will encourage other employees to file?
A I'm not sure what other employees might do.
Q If an employee is involved in an altercation, does the IC normally hold an investigation of the facts?
MS. FITZKE: Object to the question. I'm not sure of the circumstances. Object to the form as vague. I can't understand it.
JUDGE DONALDSON: Overruled. I understood it, but if the witness doesn't, you can let us know.
WITNESS: Could you repeat the question again, please?
MR. SOREY: Sure.
BY MR. SOREY:
Q If an employee for the railroad, IC Railroad, is involved in an altercation, does the IC normally hold an investigation of the facts?
A It depends on what the situation is. It's a case

by case situation once the company knows.
Q So, you're saying one person involved in altercation might be investigated while another person involved in an altercation will not be investigated?
A What I'm saying is case by case situation and it depends upon the facts that lead to during the investigation.
Q How would IC know what the facts are without the investigation or a hearing?
A Without a formal hearing or investigation, they can ask people. They can take statements that might not be part of the investigation as you framed it.
Q Well, is that the normal policy for Illinois Central?
A There's no specific policy that says that it would be investigated or won't be investigated. We look into the situation as I mentioned on a case by case basis.
Q Does it make any difference if it's a union employee or a manager involved in the altercation?
A The way the investigation is done, it does make a difference whether it's a union represented employee or management employee. Management employers are not as I mentioned earlier are not subject to the discipline policy. So, would not necessarily go through those procedural methods.

Q Okay, the managerial people are part of the workplace violence policy, are they not?
A They are subject to the workplace violence policy, yes.
Q Does the IC Railroad normally just take the word of a supervisor about an altercation that they hadn't been involved with?
A I don't know.
Q Now, I noticed a while ago, we were looking at the code and it said for the Southern Region. What makes up the Southern Region for the IC?
A That is the United States.
Q All right, sir. So, everything in the United States is considered the Southern Region?
A That is correct.
Q Okay. It must have been written by the Canadians then.
A Is that a question?
MR. SOREY: No, it was a joke.
JUDGE DONALDSON: No, it's not.
BY MR. SOREY:
Q So, if I listen and I tried to listen to you carefully and I could be wrong so I'll give you a chance to tell me, but it seems like you said that you all did not consider self-defense?

A That's not exactly what I said and if I implied that, that's not true. We considered the actions of both employees. That's what we did and again, we have employees fighting. So, right away, we're at a Level 4. The next step is to determine whether or not there's some mitigating circumstances surrounding what happened, okay? The first thing that we noticed is that Mr. Melton did initiate the first contact. That's a given. Then we look at he's going to be terminated more likely than not. Yes, he's terminated. Now, let's look at Mr. Branch. We look at his statements. We look at the fact that earlier he said he was afraid for his life, but later on, he said, "No. No issue there." The next thing we look at is the witness statements as far as who swung and who made contact, so on and so forth. For me, what I did not see, I did not see any form of retreat or traying to get out of the way or take a defensive posture. Therefore, he was actively engaged. It was a tough decision. It wasn't the easiest decision that I ever made in my life, but that is the fact according to what I read in the transcript.
Q So, according to the disciplinary panel group, if you put up your arms to prevent being struck or you actually swing back in order to keep from being struck, you abandon self-defense?
A I can't tell what the disciplinary panel felt. I

can only speak for myself and I can say there was no evidence of trying to move away or try to not engage by Mr. Branch. That's how I saw it.

Q Now, if Mr. Branch did not report the altercation, IC would have never investigated this matter, would they?

A Not necessarily. If the company knew about it some other method, the company would have investigated.

Q Now, under the workplace violence policy, are employees required to report workplace violence?

A We would expect all employees to report any type of altercation that they get involved with or witness.

MR. SOREY: Okay. That's all the questions I have.

JUDGE DONALDSON: Okay. Ms. Fitzke, did you have any further questions for Mr. Spears?

MS. FITZKE: One moment, please. I don't have any other questions right now.

JUDGE DONALDSON: Okay. Thank you very much, Mr. Spears. The attorneys handled all the topics. I don't have any other questions for you myself. They handled everything very well and comprehensively. So, I understand you're going to stay a part of the hearing as the Respondent's representative?

WITNESS: That is correct.

JUDGE DONALDSON: Okay. All right, you can return to turn your camera off if you so choose which most people are doing if you're not speaking or engaging. So, thank you again for your participation as a witness.

WITNESS: You're welcome.

JUDGE DONALDSON: Mr. Sorey, what's the game plan? Who are you turning to next?

MR. SOREY: Well, it depends on our time period, Judge. Patrick Crain is going to take a good bit of time, I think. We have Mr. Tom Sullivan and Tom Hilliard and I don't think either one of those gentlemen would be very long. It depends on time-wise what you want to do.

JUDGE DONALDSON: Okay. Sounds like if they're not going to take long, it sounds feasible to have Mr. Sullivan and Mr. Hilliard to testify this afternoon. Same amount of time used holds true for these witnesses. It looks like that's doable and we can likely finish in a couple hours or less and then we can reserve the morning for Mr. Crain.

MR. SOREY: That would be fine, Your Honor.

JUDGE DONALDSON: -- if that's not an issue. Am I cutting out again?

MS. FITZKE: No.

JUDGE DONALDSON: That sounds feasible to me.

Does that sound feasible to you, Mr. Sorey?

MR. SOREY: Yes, it's fine. I'm sorry. I was reading.

JUDGE DONALDSON: Okay, that's fine. Ms. Fitzke, is there an issue of availability if we take Mr. Sullivan and Mr. Hilliard and then tomorrow take Mr. Crain?

MS. FITZKE: We'll just have to confirm. I know that Tom Sullivan is around. We had anticipated based on the prior order that Tom Hilliard would likely be tomorrow, but we'll reach out to him on the --- we can take a short break and just make sure he's going to be available yet this afternoon.

JUDGE DONALDSON: Okay.

MR. SOREY: We can do it in the morning if you want to. I think even though Mr. Crain is going to be longer, it's not going to take up all morning.

JUDGE DONALDSON: Okay. Let's take a 10-minute break. We'll actually just come back at 2:30. It's just easier to get timed that way and you can let us know, Ms. Fitzke, what works best for the party, the witnesses at that time. All right, I'll see you all back in about a little under than 15 minutes.

MS. FITZKE: Thank you.

MR. SOREY: Thank you, Your Honor.

(Off the record at 2:17 p.m., CST)

(On the record at 2:36 p.m., CST)

JUDGE DONALDSON: We have another witness before us. It is Tom Sullivan. Mr. Sullivan, you can hear and we can see you well so at this time, would you raise your right hand so I can swear you in?

Whereupon,

THOMAS SULLIVAN

having been duly sworn, was called as a witness herein and was examined and testified as follows:

WITNESS: I do.

JUDGE DONALDSON: All right, thank you. Mr. Sorey, please go ahead.

MR. SOREY: Okay.

DIRECT EXAMINATION

BY MR. SOREY:

Q Mr. Sullivan, during June of 2022, you were the director of Labor Relations for Illinois Central Railroad?

A That's correct, yes.

Q Now, in your deposition, you told us the process for setting up an investigation and I want to go through it to make sure I understand it. I think you said first when you were made aware of an incident, you'd do a review to determine whether or not there would be disciplinary consequences from it. If the disciplinary panel agrees, then the hearing is held and the panel decides if there is

sufficient facts to support the violation of a rule. Now, did I state that correctly?

A Fairly closely. The initial review to determine is a look to see based on initial evidence and facts that we've gathered to see if there is sufficient information to move forward with an investigation. We do that because under our discipline policy, the employees not facing a dismissible offense would be offered a waiver so they could waive the formal investigation and accept a record suspension. So, that's why we do that initial cursory review and if we move forward with the investigation, it's more a full development of facts.

MR. SOREY: Thank you.

BY MR. SOREY:

Q Now, you said in your deposition that you, Duane Spears and Patrick Crain decided that there should be a disciplinary hearing. Is that correct?

A Yes. The three of us consulted about that, yes.

Q Is the only discipline for fighting dismissal?

A Fighting is a dismissible offense, yes. I'm not aware of any example of a fight where it resulted in anything less than dismissal.

Q Okay. Is there any exception for self-defense in the workplace violence policy?

A There is, yes.

Q Okay. What is it?

A What's the exception?

MR. SOREY: Yes. I asked a poor question. I'm sorry.

BY MR. SOREY:

Q How does it define self-defense?

A I don't have the policy in front of me so I would have to read the policy to find out if there is a definition of self-defense. I can do that.

MR. SOREY: We can put it up for you if you would like.

JUDGE DONALDSON: Mr. Sorey, do you want us to --- is this putting up an exhibit for your witness?

MR. SOREY: No, I think James is pulling it up.

JUDGE DONALDSON: Okay.

MR. SOREY: It's just taking him a second.

MS. FITZKE: Are you pulling up Joint Exhibit 16, the policy?

MR. SOREY: Right.

JUDGE DONALDSON: 16? Okay.

MR. SOREY: Yes, we can see it there.

BY MR. SOREY:

Q Can you see that, Mr. Sullivan?

A I can, yes.

Q All right. Let us know when you want us to move

further down.

JUDGE DONALDSON: Have you directed him to a part of it yet or do you want him to review all of page 1?

MR. SOREY: I thought he wanted to review the whole thing. I didn't ---

JUDGE DONALDSON: Oh, okay.

WITNESS: I can review the whole thing. You asked me specifically about if there's a definition of self-defense and that's what I would look for in the policy.

MR. SOREY: He's slowly scrolling it down so if you see anything you want to stop, let us know.

WITNESS: So, if you move back the other way, this is where it speaks to, "Workplace violence as defined as any action, conduct or gesture of a person towards a CN employee in the workplace that can reasonably be expected to cause harm, injury or illness to the CN employee excluding situations justified self-defense."

BY MR. SOREY:

Q Is that the only place or you need to continue to look?

A I don't know. We can continue to see if there is any further --- it doesn't look to be --- keep scrolling down to see if there is any further mention of it. I didn't see anything further so it's the mention of self-defense is

in connection with that paragraph excluding situations of justified self-defense.

Q All right. So, the only thing that we can find in there states justified self-defense. Now, in your ruling that is part of the disciplinary panel, without a definition of self-defense, how do you rule on it?

A Well, we would apply what we would know to be what is perhaps a customary definition of what you would look to for self-defense and did the person --- there's a line, I suppose, that we would establish where it's self-defense and where it's not. So, we would apply some standard that we would talk through, did you cross that line or didn't you is what the conversation that we had.

Q And what is that standard?

A Well, what we look to is really what when it became more an incident of a fight versus somebody trying to defend oneself or avoid further confrontation is what we looked to in this case and other cases.

Q Do you all ever use the state definition of self-defense?

A We do not use a state definition of self-defense.

Q Are you aware of Mississippi's self-defense definition?

A I'm not.

Q Now, in your deposition, I asked you what would

you do if a co-employee hit you and knocked you to the ground and I believe your answer was, "I don't know." Is that correct?

A That's how I answered then, yes.

Q Okay. Is that still your statement on that?

A Yes.

Q If you don't know how you would react, how do you judge someone else for acting?

A I look solely at the action is what we looked here. I didn't judge anybody for the action. I looked at the actions and that's what we used to reach our determination. There's no judgment. It was just the facts developed and what took place through those facts as we saw them and reading the transcript from the investigation.

Q Well, I disagree with you on the judgment theory because I think it was a judgment and you judged that he was fighting and fired him, did you not?

A Did we judge? We came to a determination that the facts established that he was fighting. Judged that or how we can to that determination, I don't know if I'd call it judgment in other words.

Q Now, do you feel with Mr. Branch reporting the incident and then getting fired, do you think that's going to encourage other CN or IC employees from reporting workplace violence?

A I don't know. I don't know.

Q Now, when I asked you a question about Mr. Branch, basically all you said was, "Mr. Branch should not have engaged in fighting." Is that correct?

A That's correct. I don't remember the exact words I used. You're reading them so if I --- that's correct.

Q Okay. Now, Mr. Sullivan, are you aware of an altercation involving Mr. Chris Day, one of your managers with a contractor in an Illinois bar about a year ago?

A I am not, no.

Q Now, in your opinion, does the workplace violence policy apply to all employees of the IC Railroad?

A The workplace violence policy applies to all employees, all CN employees.

Q If Mr. Day testified that he reported this altercation to Mr. Patrick Crain and to Mr. Patrick Jones, his supervisor, would you normally expect them to have a hearing of the facts of that altercation?

MS. FITZKE: Object to the form of the question. Object on foundational grounds. He hasn't established what the altercation was or what was reported sufficient for Mr. Sullivan to respond.

JUDGE DONALDSON: That's sustained, Mr. Sorey.

MR. SOREY: Okay.

BY MR. SOREY:

Q Mr. Sullivan, if Mr. Day reported that he was having dinner and drinks with a contractor for the IC Railroad and at some point, "Out of the blue, the contract head butted him and then he left." Consider that hypothetical, but in that hypothetical, would you normally think that Illinois Central Railroad would have had a hearing to investigate the facts of that altercation?

A We would not have a hearing to investigate facts in that setting. Hypothetically, that setting, we would not have a hearing, no and there may be a follow-up with the contractor with regards to further following up as to what happened, but we would not have a hearing in that setting that I ever encountered. The hearings are reserved for union represented employees pursuant to the due process obligations under the collective bargaining agreement.

Q Okay. So, it doesn't apply to managers?

A We don't hold management hearings, no.

Q Do you all do investigations for manager problems?

A Yes.

Q Do you take statements?

A I think in the normal --- I've not participated n them. It's not my area of responsibility, but I do know that we do follow up and investigate on instances involving non-union employees, yes.

Q Did Mr. Crain tell you about the allegations concerning Mr. Chris Day advising him of an altercation?

A No, he did not.

Q Would you normally expect him to report that to you?

A No, I really wouldn't.

Q Did he report to you the problem of Mr. Branch and Mr. Melton?

A It came --- I don't know if it came directly from Patrick, but we were all involved in it. Whether it was him that brought it to me or we learned about it at the same time through whatever source, but he may have brought it to my attention, but it came to light in a group setting as I remember it.

MR. SOREY: Okay. I believe that's all the questions I have, Your Honor.

JUDGE DONALDSON: Okay, thank you. Ms. Fitzke, do you have any questions for this witness?

MS. FITZKE: I do. I do.

CROSS EXAMINATION

BY MS. FITZKE:

Q Mr. Sullivan, you told us a moment ago that you were the director of Labor Relations in the May/June 2022 time frame. How long have you held that position?

A I've held it since I joined CN in March of 2012.

Q And with respect to your role, can you just briefly tell us what your duties and responsibilities are?
A So, the director of Labor Relations, the principle responsibility is managing collective bargaining across all of the unions with which we have union representative employees. I also oversee the grievance and arbitration process, the negotiations, contract negotiations and then I also oversee the discipline policy.
Q It sounds like your responsibilities are primarily focused on the unionized workers?
A Almost exclusively, yes.
MS. FITZKE: I want to talk to you a little bit --- you mentioned overseeing the discipline policy. We can pull it up if it's helpful. Just let us know.
BY MS. FITZKE:
Q With respect to that policy, we looked at it earlier and it looks like it had an effective date in October of 2017. Was there a discipline policy like that in effect before October 2017?
A There was not, no.
Q Did you have any role in the creation of the discipline policy?
A I did, yes.
Q And what was that role?
A The role was we gathered examples of similar

policies across the industry and worked with many people to put together what was the final discipline policy.
Q So, with respect to, for example, determining what would be identified in the discipline policy as a Level 1, 2, 3 or 4 violation, who determined what would go in those buckets?
A So, that was a consultative effort. Labor Relations worked with field management to get to align what would be the appropriate response for the various rule violations.
Q And when you say field operations consultant with Labor Relations, were you the Labor Relations individual that was being consulted?
A Yes.
Q With respect to the discipline policy in specifically a Level 4 violations, what are Level 4 violations under the policy?
A A Level 4 violation under the policy is an incident that in and of itself would result in dismissal. The other levels all lead to some progressive step towards a less progressive response. Level 4 is in and of itself a dismissible event.
Q And with respect to the policy and the Level 4 violations which are identified to include violence in the workplace, have you had any other incidents of physical

fighting come up since October of 2017 when the policy was put in place that you had to adjudicate, if you will, under the discipline policy?
A I don't know right offhand, but I seem to recall, yes, that we have had instances of fighting, yes.
Q Do you recall any individual who was a participant in a fight in terms of throwing punches or engaging in other physically violent acts that during your time here at Illinois Central that wasn't terminated as result of their behavior?
A No, if we move forward with a response, it would be termination.
Q And with respect to the situation involving Mr. Branch, how did that situation come to your attention?
A As I said, there was a lot of discussion around that event, whether it was Patrick or a group. We very quickly were in discussion around it likely from Patrick, but it could have been also from the field and Patrick. There were a lot of people involved in the discussions with me.
Q And then after the investigation hearing was concluded, did you receive a copy of the transcripts?
A Yes.
Q Did you also receive the exhibits?
A The transcript and exhibits, yes.

Q And did you review them?
A I did.
Q As you reviewed them, with respect to Mr. Branch's conduct and the reasons that you supported --- well, let me ask you. Did you support termination of Mr. Branch based on the conduct identified in the investigation hearing transcript and exhibits?
A I did, yes.
Q When you reached that conclusion, did you rely upon anything not contained in the transcript and exhibits?
A It was all based on the transcript.
Q And what did you identify in the transcript that led you to the conclusion that Mr. Branch had committed a Level 4 violation and should be terminated?
A So, my review of this was based completely on, almost solely on was this self-defense or wasn't it? Did it move to a different level when he was engaged in actual fighting? So, the review was very much focused on statements and the statements as to what facts were determined based on those statements, what happened and it was through that that I came to the determination that this was beyond just a self-defense situation and it rose to the level of engaging and fighting.
Q And when you talk about the statements, there is both the written statements and then the individuals that

Exhibit D: Transcript of the February 13 and 14, 2024, hearing in front of the Office of Administrative Law Judges ("OALJ")

Case: 4:23-cv-00217-MPM-JMV Doc #: 83-1 Filed: 01/08/25 75 of 189 PageID #: 2652

Robert Branch 2023-FRS-00026 February 13, 2024

Page 181

testified in the investigation hearing that provided some testimony beyond the statements. Did you review and consider all of that?

A Al of that.

Q And did you review and consider the parts of the statements where the individuals testified or wrote in their statements that Mr. Branch struck Mr. Melton?

A I did, yes.

Q And did you review and rely upon the portion of the investigation hearing transcript where Mr. Branch indicated that he struck Mr. Melton?

A Yes.

Q And were there other facts in the investigation hearing transcript that you relied upon to conclude that Mr. Branch had engaged in incident of workplace violence that was not excusable or justifiable self-defense under the policy?

A No, it was pretty much the altercation that was almost exclusively what I relied on.

Q Have you ever had a circumstance in your time here where you had a situation where employees were engaged in --- had a mutual fight where someone started it, but someone else swung back? Had that happened before?

A That's usually what the fight is when we've encountered fighting. I mean, that's generally what we've

Page 182

dealt with. Since the discipline policy and certainly before, fighting has been a situation that we've dealt with, but it's usually that and somebody starts a fight and somebody else continues.

Q Have you --- with respect to this situation, do you recall directing Mr. Crain to get any further guidance looking for consistency from your peers in Canada?

A I do, yes.

Q Can you tell us about that, please?

A What I was trying to do was we didn't have a case that was directly on point in the U.S. where we had a situation like this with the self-defense. So, I did ask Patrick to follow up with our colleagues in Canada to see if they had any arbitral precedent or any case precedent with regard to similar circumstances.

Q And when you say a circumstance in self-defense, do you mean a circumstance where an individual was raising self-defense as a defense to their participation in the fight?

A That's right.

Q And what did you learn from your Canadian colleagues?

A I remember that the basic --- once there was engagement with physical contact that they held both individuals accountable in the Canadian rules.

Page 183

Q And by physical engagement, you mean when Mr. Branch hit back?

A Yes.

Q Under the discipline policy that we've been talking about, I understand that in cases of potential discipline, in cases of Level 4 violations, I should say that differently, in cases of Level 4 violations, a disciplinary review panel is formed?

A Right. The policy requires that the disciplinary review panel review any case that would result in dismissal.

Q Right. That happened here as I understand it?

A Yes.

Q Okay and who was the disciplinary review panel in this case?

A So, the disciplinary review panel in this case would have been me, Duane Spears and Tom Hilliard.

Q And Mr. Patick Sullivan, what was his role in conjunction with the situation involving Mr. Melton and Mr. Branch?

A Patrick Crain?

Q Yes.

A I'm Mr. Sullivan.

MS. FITZKE: Oh, I'm sorry.

WITNESS: Patrick Crain?

Page 184

MS. FITZKE: Sorry, Tom. I was looking right at you.

WITNESS: So, you're asking me what was Patrick's role?

MS. FITZKE: Let me just ask a new question again if I can. I've confused everyone.

WITNESS: Yes. Sure.

BY MS. FITZKE:

Q So, can you tell us what Mr. Patrick Crain's role was in conjunction with the review and assessment of discipline in this case?

A So, Patrick is a Labor Relations manager and his role would be to work with the field management to gather all the statements and to put together all that's needed to proceed to hold the investigation. So, he would do all of the leg work working with the field to put the case together if you will and facts together that would be introduced at the investigation hearing.

Q Would he provide advice to the function?

A Yes.

Q Did he also consult with you and Mr. Spears as part of your consultant process to get alignment on the level of discipline to be assessed?

A We certainly talked, yes.

Q With regard to Mr. Branch's work history, do you

Bayley Reporting, Inc.
(727) 585-0600

Exhibit D: Transcript of the February 13 and 14, 2024, hearing in front of the Office of Administrative Law Judges ("OALJ")

Case: 4:23-cv-00217-MPM-JMV Doc #: 83-1 Filed: 01/08/25 76 of 189 PageID #: 2653

Robert Branch 2023-FRS-00026 February 13, 2024

Page 185

understand that he had not previously been disciplined?
A I didn't know that, but I did not know that. I did not look at any work history in this case.
Q And why wouldn't you look at work history when you're considering a Level 4 violation?
A Because again, the disciplinary result for a Level 4 violation would be dismissal. You look at a work record and a work history if we're looking at progressive discipline to find out what the appropriate next step would be in the policy.
Q Right and if you conclude that both engaged in a physical fight and at some point in the process both had engaged, is there any level of discipline that you would assess other than termination?
A Not for fighting, no.
Q Was this a quick decision for you, Mr. Sullivan, to decide to terminate Mr. Branch?
A It was not, no. There was a lot of discussion, a lot of review. It's a dismissal so we always put a lot of attention and detail into our review, but this one was a lot because it was a very unusual case. As I said, we have not had a self-defense case like this so there was a lot of effort or part to make sure that we were aligned on the facts.
Q Did you --- you understood that in Mr. Branch's

Page 186

statement that he submitted prior to the investigation hearing, he indicated in his statement that he feared Mr. Melton, that he was afraid of what Mr. Melton might do, that --- I can just make sure that I don't misquote it here, that he feared for his life around Mr. Melton. Do you recall reading that statement?
A I do, yes.
Q When you were determining whether Mr. Branch should be terminated as part of the discipline assessed here, did that factor into your decision that he had made a report that he thought his co-worker was a dangerous condition?
A It did, but we reviewed the totality of all the facts introduced. So, certainly we took into consideration the statement and other evidence introduced.
Q Did that cause you to want to terminate Mr. Branch?
A Taking in all the information, that's where I reached the determination that I thought and felt that termination was appropriate.
Q And did you also read in the investigation hearing transcript a portion of the transcript where Mr. Melton questioned Mr. Branch about whether he viewed Mr. Melton as a threat and of June 7, 2022 before the decision to terminate was made, Mr. Branch said he did not? Did you

Page 187

read that?
A I did read that, yes.
Q And you recall that from the time?
A I do.
Q If Mr. Branch had not come forward to make this report, but another employee had reported this incident, would Mr. Branch still have been fired?
A We would have gone through the same process. We would have accumulated statements. We would have proceeded through much of the same process. I'm assuming that that would obviously just lead to the same type of determination. It would just depend on the facts and statements and all, but they likely would all be the same.
Q And you're saying that because you wouldn't have had Mr. Branch's ---
A We would have recreated the incident as we would when we are put on notice of any complaint.
MS. FITZKE: I don't have any other questions for you now, Tom. Thank you.
WITNESS: Okay.
JUDGE DONALDSON: Mr. Sorey, do you have any more questions?
MR. SOREY: I do.
REDIRECT EXAMINATION
BY MR. SOREY:

Page 188

Q Mr. Sullivan, since you're in charge of discipline policy, why is there no definition for self-defense in the workplace violence policy?
MS. FITZKE: Well, objection. Foundation. Those are two separate policies.
MR. SOREY: What specific policies?
MS. FITZKE: Workplace violence policy and the discipline policy, sir.
BY MR. SOREY:
Q Well, Mr. Sullivan, are you in charge of discipline policies?
A In my role, I oversee the application of that policy in charge of --- I don't know why I say that, but yes, I oversee the application of that policy.
Q And what all does that policy include?
A The policy includes --- it's a progressive discipline policy. So, it breaks out levels of discipline based on severity of the event and it also spells out the consequence for various disciplinary infractions and the steps that progress throughout the progressive discipline system outlined in the policy.
Q Does the Level 4 violation contain a definition of self-defense?
A It does not.
Q Now, did you have anything to do with the

Bayley Reporting, Inc.
(727) 585-0600
Exhibit D: Transcript of the February 13 and 14, 2024, hearing in front of the Office of Administrative Law Judges ("OALJ")

workplace violence policy in constructing it?
A I did not.
Q Okay. Do you know where it came from?
A It was --- I do not know. I know it's a collaborative effort across the company. I do not know who was responsible for the policy though.
Q Now, Mr. Spears told us in his statement, sir, in the hearing a while ago that the hearing transcript on Mr. Branch came with a recommendation for a Level 4 violation, but he could not remember who gave that recommendation. Do you know?
A I don't know.
Q Do you know that it came with a Level 4 recommendation?
A I never saw any recommendation. All that was sent to me was the transcript and exhibits and if it did come with a recommendation, I wouldn't have --- it was our review so the --- I don't recall any recommendations.
Q Between the discipline policy and the workplace violence policy, which controls the union employee?
A Both.
Q Both? So, you would have to consider both in coming up with a penalty?
A Correct. You consider both policies. What we generally do is we look at a policy that is potentially ---

where you find a violation. The discipline policy then would point us in the direction of what's the appropriate disciplinary response.
Q Now, would you agree with me that in the workplace violence policy under the penalty phase, it says, "Up to and including termination as a penalty for it." Is that correct?
A I could read it, but I'm familiar with that terminology and without looking at it, the policy likely says that, yes. If you want me to read it, look at it, I can confirm it, but I've heard that phrase and I wouldn't --- it would most likely be in that policy, yes.
Q Would that suggest to you that there's a lesser penalty for workplace violence than just termination?
A Yes, it would.
MR. SOREY: Okay. That's all the questions I have.

RECROSS EXAMINATION

BY MS. FITZKE:
Q Mr. Sorey, can you explain what forms of workplace violence that might violate the workplace violence policy could result in the level of discipline that was lesser than a Level 4?
A Examples, I would say verbal bullying, something along those lines where there isn't physical contact, but a

line was crossed in terms of workplace behavior. There could be a lot of --- it could be language. I would look more towards language events that would be something lesser than termination, but we've had anything threatening, fighting, those types of cases we've dealt with dismissal.
MS. FITZKE: Thank you. I don't have any other questions.
MR. SOREY: I don't have any other questions.
JUDGE DONALDSON: All right, thank you for confirming that. All right, so Mr. Sullivan, thanks for your testimony today.
WITNESS: Thank you.
JUDGE DONALDSON: We greatly appreciate your time and you can be excused at this time.
WITNESS: All right.
JUDGE DONALDSON: I appreciate it again. So, what do we think is feasible at this point, Ms. Fitzke?
MS. FITZKE: Mr. Hilliard is ready. We can get him in.
JUDGE DONALDSON: Mr. Sorey, how about that?
MR. SOREY: That'd be fine.
JUDGE DONALDSON: Okay. Let's see here. Let's go ahead and do that without a break unless you want a break, Mr. Sorey.
MR. SOREY: No, I'm ready.

JUDGE DONALDSON: You're ready, good. Okay. Let's hold on for Mr. Hilliard then to join us. Is he going to be sitting just where Mr. Sullivan was?
MS. FITZKE: No, he's not with us. He's going to be just joining on the platform here.
JUDGE DONALDSON: Okay. Good afternoon to you, Mr. Hilliard. Can you hear me fine?
MR. HILLIARD: Yes.
JUDGE DONALDSON: Good. I can hear you as well. Thank you again for joining this formal administrative hearing in progress. You are a witness in a complaint or administrative proceeding arising from a complaint of Robert Branch against Illinois Central. It is under the whistleblower protection provisions of the Federal Rail Safety Act and I'm Angela Donaldson in Covington, Louisiana. Let's see here. You are being called as a witness for Complainant, Mr. Branch's attorney, Mr. Sorey. He's the one that will first ask you questions here. Let me get you under oath first. Would you please raise your right hand?
Whereupon,

THOMAS HILLIARD

having been duly sworn, was called as a witness herein and was examined and testified as follows:
WITNESS: I do.

JUDGE DONALDSON: All right. Thank you. You can proceed.

MR. SOREY: Thank you, ma'am.

DIRECT EXAMINATION

BY MR. SOREY:

Q Mr. Hilliard, in June of 2022, you were in charge of the U.S. tracks of the Illinois Central Railroad, were you not?

A Yes, sir.

Q Okay. Now, your only connection to the hearing for employees I see is to read the transcript and converse with Labor Relations to determine an outcome for the employee?

A Yes, I don't read the entire transcript. I usually just kind of breeze through it and then I go by the recommendations of HR, LR or I ask questions if need be, but I'm usually briefed on it and then make a decision from there.

Q You say you just breeze through the transcripts?

A Yes, sir.

Q Okay and you rely on the facts of the transcript?

A I missed the first part of that.

Q Who do you rely upon for the facts of the hearing?

A That would be HR or the LR team, whoever I'm

working with.

Q Okay. Now, what is your definition of self-defense?

A Self-defense. In this circumstance you're saying or self-defense in general or ---

Q Let's start with self-defense in general.

A I would --- if I was in a fight, I would cover myself up or I would take myself away from the situation.

Q Okay. Do you know whether the disciplinary panel considered self-defense for Mr. Branch based on the affidavits of the witnesses to the incident?

A I'm not sure I know that Mr. Branch was let go because of fighting.

Q Okay. Did the panel consider self-defense with Mr. Branch and his decision?

A I'm not sure.

Q What, in your opinion, should Mr. Branch have done once he was attacked?

A Leave the situation.

Q Okay. Were you aware of the surroundings of the parking lot of the hotel in Columbia, Mississippi that night?

A I'm not sure what you mean by that.

Q Okay. Did you know that there was a barbecue with flames in it sitting in the back that a co-employee

truck while they were cooking steaks out or did you know that there were cars in the parking lot and did you know whether there was a fence surrounding the parking lot?

A No, I don't know exactly ---

MS. FITZKE: I'm sorry. Object. He's stating --- asking questions about facts that are not in the record. No foundation.

JUDGE DONALDSON: I do believe some --- well, I'm trying to recall myself whether some of this was spoken to by earlier witnesses. I'm going to sustain that in part. Mr. Sorey, are you trying to recite facts from Mr. Branch's testimony?

MR. SOREY: Yes.

JUDGE DONALDSON: He's the only person I believe would have recalled would have been speaking to this event, correct?

MR. SOREY: Yes, ma'am. He did testify to that.

JUDGE DONALDSON: All right. Can you just break down your question and just ask parts?

MR. SOREY: Okay.

BY MR. SOREY:

Q Mr. Hilliard, you said that he should walk away from the situation. What is your definition of walk away?

A Take yourself out of the situation.

Q Okay. Remove yourself from the area in which you're in?

A Take yourself out of the situation however you have to do that.

Q Okay. What is your definition of taking yourself out of the situation then?

A That's my definition. You take yourself out of the situation. Remove yourself from the situation.

Q Okay and that's what you consider self-defense in reviewing this transcript?

A From what I see in the transcript and what I was briefed on, yes.

Q Okay. Did you read the witness statements?

A I don't think I did. Probably not. I'm not sure.

Q What do you remember that influenced your decision to terminate Mr. Robert Branch?

A Employees were fighting.

Q Okay. As far as you know, Mr. Branch has never been in any trouble with IC, has he?

A I'm not --- off the top of my head, I'm not sure what his prior record was.

(Mr. Sorey and Witness speak at same time)

WITNESS: It would have been told to me when I was being briefed.

MR. SOREY: Okay. I didn't mean to interrupt you. I'm sorry.
WITNESS: I'm sorry.
BY MR. SOREY:
Q So, his record whether it be good or bad was not considered in making your decision?
A I can't recall that. I don't remember what they told me during the briefing.
Q Okay. Is there any distinction between a managerial employee and a union employee that's involved in any type of altercation?
A You mean as in fighting or ---
Q Yes. Let's say fighting.
A If we had two managers fighting, they would also be fired.
Q Okay. Were you aware that Mr. Christopher Day was involved in an altercation with a contractor at an Illinois bar when they were out eating and having drinks and he advised us that the contractor head butted him and he left?
A Know nothing about it.
Q Okay. Would Mr. Patrick Crain normally advise you of a situation that I just described to you?
A If it's reported by an employee or a contractor or the person involved, then I would be advised.

MR. SOREY: Okay. I believe that's all the questions I have.
JUDGE DONALDSON: All right, thank you, Mr. Sorey. Ms. Jacobson, does that mean you're the attorney handling the examination?
MS. JACOBSON: Yes. I do have some questions, Your Honor.
JUDGE DONALDSON: All right.

CROSS EXAMINATION

BY MS. JACOBSON:
Q Could you please tell us what your current role is?
MR. SOREY: I'm having a hard time hearing you.
MS. JACOBSON: Let me move my seat a little closer to my microphone.
JUDGE DONALDSON: Okay.
MS. JACOBSON: Is that better this time?
MR. SOREY: A little bit.
MS. JACOBSON: A little bit?
JUDGE DONALDSON: I think that's good.
MS. JACOBSON: Okay. Great.
BY MS. JACOBSON:
Q Tom, can you please tell us what your role is, your job title?
A I'm chief of signals for U.S. and Canada and

chief of track in the U.S.
Q And is that the same position that you held in May of 2022?
A Yes, ma'am.
Q What was your role on the discipline review panel in relation to Mr. Branch?
A I usually just have to approve any discipline that happens, anything that's under me and I just get briefed on the situation and go by what the recommendations are. If I have questions, I ask and most of the time, I make my decision from that.
Q So, in the case of Mr. Branch, what information did you have that led you to approve his termination of his employment?
A He was fighting.
Q And do you recall who you spoke with in reaching this approval determination?
A I don't remember exactly. It's usually --- I'd be speculating, but somebody usually from HR, LR. I don't remember exactly who it was.
Q Okay. When you approved Mr. Branch's termination of employment, did it matter to you that Mr. Branch had alleged that he had feared for his life or viewed Mr. Melton as a safety threat?
A I don't remember that discussion around that.

MS. JACOBSON: I think that is all of my questions. Thank you.
MR. SOREY: I don't have any further questions. Thank you for coming.
JUDGE DONALDSON: All right and thank you very much, Mr. Hilliard. Glad you could join us this afternoon. We thought you could be a short witness and I don't know from your perspective, but from our perspective, that was fairly short so thank you again.
WITNESS: I'm all done. I can leave the screen now?
JUDGE DONALDSON: You're done. If you're told you can leave, that's what that means.
WITNESS: Thank you.
JUDGE DONALDSON: Thank you.
WITNESS: You all have a good day. Thank you.
JUDGE DONALDSON: Okay, thank you. You too. All right. We're at 3:30, but we've already decided Patrick Crain is best left for the morning, I believe, right?
MR. SOREY: Yes.
MS. FITZKE: How long do you think you're going to take with him, Eddy? I mean he's here. It's earlier than I thought.
MR. SOREY: Let's see.

Case: 4:23-cv-00217-MPM-JMV Doc #: 83-1 Filed: 01/08/25 80 of 189 PageID #: 2657

Robert Branch 2023-FRS-00026 February 13, 2024

Page 201

MS. FITZKE: If we can finish, we can get him out. If we're not going to finish, then I agree, we should just wait until the morning.

MR. SOREY: I think he's going to be the longest witness.

MS. FITZKE: Let's just wait till the morning then if that's okay with the judge.

JUDGE DONALDSON: It's fine with me. Again, I've got much more time than that reserved for this case so that's fine with me and it sounds like that's probably best for everyone concerned then. Mr. Crain, as long as he can be available in the morning, it's fine.

MR. SOREY: I think we can easily finish by noon.

JUDGE DONALDSON: Okay. Yes, I think that's preferable to stopping potentially in the middle of his testimony this afternoon. I'd like to avoid that if it seems like we can. All right, that means we can wrap up for the day. Thanks to everyone's again skill, proficiency, efficiency. By my count, I think we did six witnesses. You did six witnesses today. That's really something else. Well done. So, I appreciate that. I'm sure you're pleased too. Is there anything you want to discuss before we adjourn for the day?

MR. SOREY: I don't think so.

Page 202

JUDGE DONALDSON: It doesn't --- you don't have to file anything tonight necessarily, but I show that remaining for the evidentiary record is the Gardener deposition which will be JX-49. There may be some deposition excerpts that have been used during the hearing, but we can circle back and talk about that when we're concluding tomorrow to make sure and I don't need the Gardener deposition before tomorrow. So, if you're ready to file it, that's fine. If you want to wait until we're done tomorrow, that's fine too. All right, so again, I appreciate everybody, your hard work that you've put into it and being so prepared. So, we will adjourn for today, go off the record and I'll see you at 9:00 a.m. tomorrow and you will use the same link that you got from Ms. Wynn. It applies for tomorrow morning too.

MS. FITZKE: Thank you.

MR. SOREY: Thank you, Your Honor.

JUDGE DONALDSON: All right. Thank you all very much. See you tomorrow.

[Whereupon, the hearing was concluded at 3:30 p.m., CST and will resume the following day.]

//

//

//

//

Page 203

C E R T I F I C A T E

Name: Robert Branch
Case Number: 2023-FRS-00026
Date: February 13, 2024
Location: Video Hearing

This is to certify that the attached proceedings before the United States Department of Labor, Office of Administrative Law Judges, were held according to the record and that this is the original, complete, true and accurate transcript that has been compared to the reporting or recording accomplished at the hearing.

/s/Jordan Bayley — February 13, 2024 (Date)

Bayley Reporting, Inc.
Official Federal Reporters
Building 1, Suite 14
12945 Seminole Boulevard
Seminole, FL 33778

Bayley Reporting, Inc.
(727) 585-0600

Exhibit D: Transcript of the February 13 and 14, 2024, hearing in front of the Office of Administrative Law Judges ("OALJ")

A

**Abandon** - 164:24
**Ability** - 65:1, 65:3, 66:14
**Able** - 15:24, 29:2, 30:15, 30:19, 57:24, 57:25, 58:8, 59:1, 61:19, 64:19, 65:25, 69:14, 70:19, 78:5, 78:6, 78:10, 87:10, 95:14
**Above** - 153:1
**Absence** - 8:6
**Absolute** - 138:25
**Accept** - 169:9
**Accepted** - 89:4, 89:5
**Access** - 150:13, 150:17, 156:21
**Accommodate** - 15:24
**Accompanying** - 9:10
**According** - 164:20, 164:21
**Account** - 30:17, 31:2
**Accountable** - 182:25
**Accumulated** - 187:9
**Accurate** - 29:9, 29:10, 56:1, 61:11
**Accurately** - 55:20, 66:3
**Accused** - 66:11, 110:20
**Across** - 16:9, 54:10, 177:5, 178:1, 189:5
**Act** - 4:5, 6:20, 6:23, 6:25, 10:20, 10:22, 12:23, 13:7, 13:11, 94:20, 120:11, 192:15
**Acted** - 106:18, 114:19
**Acting** - 173:8
**Action** - 8:3, 8:6, 12:25, 147:3, 171:15, 173:9, 173:10
**Actions** - 23:10, 149:23, 164:2, 173:11
**Activated** - 136:24, 136:25
**Active** - 107:15, 110:25
**Actively** - 45:6, 164:17
**Activity** - 8:2, 8:7, 12:23, 12:24, 13:4, 13:13, 13:15, 13:21
**Acts** - 179:8
**Actual** - 128:8, 154:16, 180:17
**Add** - 11:10, 67:15
**Addition** - 75:23
**Address** - 10:7, 17:24, 17:25, 18:5, 62:8, 152:10
**Addressed** - 43:18
**Addresses** - 5:17
**Addressing** - 13:6, 149:9
**Adequately** - 14:4
**Adjourn** - 201:24, 202:12
**Adjudicate** - 179:2
**Adjudicated** - 12:20
**Administrative** - 4:9, 4:11, 5:1, 7:20, 7:21, 11:9, 120:12, 192:11, 192:12
**Admit** - 9:18
**Admits** - 157:21
**Admitted** - 4:24, 10:4
**Adopt** - 4:17
**Adrenalin** - 145:13
**Advantage** - 83:5
**Adverse** - 8:3, 8:6, 12:25, 43:20
**Advice** - 109:15, 109:18, 109:25, 184:19
**Advise** - 155:19, 197:22
**Advised** - 48:13, 63:15, 67:22, 87:3, 104:20, 197:19, 197:25
**Advising** - 176:2
**Affect** - 48:14
**Affected** - 26:17, 26:18
**Affidavits** - 194:11
**Afraid** - 159:14, 160:4, 164:12, 186:3
**Afternoon** - 134:2, 166:16, 167:12, 192:6, 200:6, 201:17
**Against** - 41:9, 94:20, 120:9, 192:13
**Agency** - 4:14
**Aggressor** - 124:12
**Agree** - 12:5, 12:6, 12:10, 190:4, 201:2
**Agreed** - 158:13, 158:14
**Agreeing** - 90:1
**Agreement** - 9:6, 153:17, 175:15
**Agrees** - 168:24
**AIR** - 6:24
**Al** - 181:4
**Alert** - 17:4
**Align** - 178:8
**Aligned** - 185:23
**Alignment** - 184:22
**Allegations** - 176:1
**Alleged** - 11:25, 13:21, 100:3, 160:13, 199:23
**Allegedly** - 99:9, 99:22
**Alleges** - 13:14
**Alleging** - 8:4, 11:2
**Allowed** - 64:16
**Altercations** - 102:6, 103:13, 104:12, 104:16
**Alternative** - 69:5
**Amended** - 9:18
**Amongst** - 157:8
**Amount** - 28:16, 28:17, 31:11, 71:2, 71:8, 74:2, 78:14, 166:17
**Angela** - 4:9, 192:15
**Anger** - 145:13
**Annually** - 148:13
**Anticipate** - 118:22
**Anticipated** - 167:8
**Anxiety** - 26:24
**Anyway** - 16:5, 16:10, 84:14, 94:8
**Anywhere** - 41:14
**Apologies** - 11:18, 132:3
**Apologize** - 45:10, 96:5
**Apologized** - 89:3, 89:8, 89:25
**Apology** - 89:4, 89:5
**Apparently** - 140:20
**Appeals** - 11:23
**Appear** - 12:20, 47:12, 115:24, 116:9, 117:3, 143:2
**Appearance** - 5:18
**Appeared** - 64:12
**Appearing** - 16:11
**Appears** - 11:22, 103:23, 115:25, 143:4
**Application** - 7:18, 188:12, 188:14
**Applied** - 29:17, 29:20, 29:21, 43:25, 44:12, 68:16, 68:17, 68:21, 69:1, 69:10, 85:8, 85:12, 104:22
**Applies** - 122:21, 151:24, 174:13, 202:15
**Apply** - 7:1, 7:4, 7:5, 7:23, 96:20, 106:25, 152:2, 172:7, 172:11, 174:12, 175:16
**Applying** - 69:5
**Appreciate** - 15:5, 41:23, 58:6, 84:14, 95:21, 96:7, 118:10, 118:13, 119:14, 119:20, 133:2, 191:13, 191:16, 201:22, 202:11
**Appreciation** - 119:19
**Appreciative** - 16:11
**Approach** - 104:4, 104:10, 112:6
**Approached** - 112:14
**Appropriate** - 157:20, 178:9, 185:9, 186:20, 190:2
**Approval** - 199:17
**Approve** - 199:7, 199:13
**Approved** - 199:21
**Approximately** - 19:7, 28:14, 30:25, 75:16, 77:6, 78:15, 79:7
**Arbitral** - 182:14
**Arbitration** - 177:7
**Area** - 65:9, 84:5, 130:5, 175:23, 196:1
**Aren't** - 141:10
**Argument** - 48:9, 127:24
**Argumentative** - 143:22
**Arises** - 11:22
**Arising** - 192:12
**Arms** - 164:22
**Arose** - 122:3
**Arrived** - 18:24
**Aspect** - 149:16
**Assert** - 22:11
**Assess** - 52:11, 107:21, 108:20, 185:14
**Assessed** - 108:3, 108:13, 131:19, 153:12, 153:20, 184:23, 186:9
**Assessing** - 152:12
**Assessment** - 184:10
**Assist** - 57:23
**Assistance** - 62:2, 120:18
**Assistant** - 18:13, 21:18, 28:25, 55:18
**Assumed** - 51:17
**Attached** - 60:23, 61:1
**Attachment** - 60:23
**Attack** - 21:6, 24:11, 36:14, 38:6, 51:6
**Attacked** - 21:20, 21:21, 23:8, 24:1, 24:10, 34:18, 38:3, 96:25, 194:18
**Attacking** - 36:19, 38:5
**Attacks** - 45:24
**Attempting** - 103:25
**Attention** - 8:18, 93:8, 133:9, 176:13, 179:14, 185:20

**Attorney** - 16:9, 16:15, 16:17, 17:16, 59:10, 84:18, 147:23, 192:17, 198:4
**Attorneys** - 4:12, 5:4, 8:22, 72:18, 92:25, 133:2, 133:3, 133:10, 165:20
**Availability** - 167:5
**Available** - 94:3, 153:7, 167:11, 201:12
**Aviation** - 6:25
**Avoid** - 24:14, 172:17, 201:17
**Awarded** - 8:7
**Awkward** - 95:19

B

**Baby** - 31:12
**Backing** - 51:8, 51:10
**Backwards** - 51:11
**Balled** - 19:25, 20:11, 49:2, 49:16
**Bar** - 101:23, 106:14, 113:23, 123:25, 125:16, 125:20, 146:1, 174:9, 197:18
**Barbecue** - 19:2, 97:23, 194:24
**Barefoot** - 47:9
**Barely** - 20:10, 81:13
**Bargaining** - 175:15, 177:4
**Base** - 107:11
**Based** - 61:7, 78:3, 78:8, 106:19, 107:13, 110:24, 111:1, 133:25, 140:4, 167:8, 169:4, 180:6, 180:11, 180:15, 180:20, 188:18, 194:10
**Basic** - 10:18, 182:23
**Basing** - 29:11, 29:12, 29:14, 116:18
**Basis** - 162:17
**Became** - 172:16
**Become** - 45:23
**Behavior** - 46:9, 179:10, 191:1
**Behind** - 19:1, 21:6, 97:24
**Believed** - 92:15, 159:6
**Benefit** - 33:7, 33:8, 54:25, 69:15, 69:25, 83:3, 88:8, 95:23
**Benefits** - 8:24, 33:17, 69:14, 69:22, 70:2, 70:6, 70:11, 74:15, 75:7, 75:11, 75:13, 82:10, 82:13, 83:4, 85:15, 85:16, 88:5
**Big** - 39:22, 157:21
**Birthday** - 82:24, 82:25
**Bit** - 62:17, 71:15, 71:19, 86:23, 94:11, 94:13, 95:18, 119:11, 132:2, 134:14, 148:20, 151:12, 166:9, 177:12, 198:18, 198:19
**Biweekly** - 80:8, 80:16, 81:3
**Bless** - 90:13
**Block** - 51:18
**Blood** - 19:24, 25:10, 87:14
**Blow** - 39:23
**Blue** - 60:13, 126:16, 132:11, 175:3
**Bluff** - 18:16
**Board** - 31:15, 120:3
**Book** - 148:18
**Bottom** - 152:17
**Box** - 140:16
**Break** - 41:25, 42:2, 42:13, 84:19, 93:12, 94:8, 94:11, 94:13, 118:19, 119:3, 120:2, 133:21, 133:22, 134:21, 167:11, 167:18, 191:23, 191:24, 195:20
**Breaks** - 8:19, 8:23, 188:17
**Breath** - 158:2
**Breeze** - 193:15, 193:19
**Bridge** - 18:12, 18:14
**Brief** - 14:3
**Briefed** - 193:17, 196:12, 196:25, 199:9
**Briefing** - 14:4, 197:8
**Briefs** - 8:25
**Broad** - 143:25
**Broke** - 20:14, 20:15, 21:11
**Broken** - 43:15
**Brother** - 40:11
**Brought** - 26:5, 26:14, 41:9, 94:20, 105:2, 105:12, 117:13, 138:17, 140:25, 176:11, 176:12
**Bubbles** - 60:11
**Buckets** - 178:6
**Building** - 94:6
**Bullet** - 154:6, 154:14
**Bullying** - 190:24
**Burden** - 13:2, 13:5
**Burdens** - 12:20
**Buried** - 19:15
**Business** - 5:17, 68:1
**Busted** - 36:21
**Butt** - 125:21
**Butted** - 113:23, 126:17, 175:4, 197:19
**Butts** - 106:14
**Bystanders** - 97:2

C

**Calculate** - 78:16, 79:12, 81:15
**Calculated** - 79:13, 80:16, 81:14
**Calculation** - 81:19, 86:10
**Call** - 14:14, 37:16, 37:20, 42:7, 63:9, 63:13, 64:19, 70:10, 127:3, 127:5, 127:7, 127:12, 128:6, 128:7, 173:20
**Camera** - 5:10, 14:17, 136:25, 166:2
**Canada** - 182:7, 182:13, 198:25
**Canadian** - 182:21, 182:25
**Canadians** - 163:16
**Can't** - 17:15, 47:21, 59:2, 73:10, 76:4, 128:17, 142:24, 161:15, 164:25, 197:7
**Capacity** - 6:13, 6:16
**Car** - 28:1
**Care** - 27:21, 70:11, 70:17, 75:23, 77:23, 78:2
**Carefully** - 163:23
**Carpenter** - 31:25
**Carrier** - 6:8, 10:21, 91:2, 91:9
**Carries** - 119:25
**Carroll** - 18:2, 18:3, 85:4
**Carry** - 83:7
**Cars** - 98:2, 195:2
**Cases** - 45:2, 107:21, 172:18, 183:5, 183:6, 183:7, 191:5
**Cash** - 30:18, 31:5
**Catch** - 73:22, 82:10, 134:18
**Catching** - 150:25
**Categories** - 153:23
**Category** - 143:17
**Caught** - 21:6
**Cause** - 11:4, 25:23, 41:3, 143:13, 171:17, 186:16
**Causing** - 139:13, 143:4, 143:12, 143:14, 143:15
**Caution** - 58:12
**Central's** - 107:22
**Century** - 6:25
**Certain** - 76:21, 93:5, 95:22
**Certainly** - 134:10, 182:1, 184:24, 186:14
**CFR** - 7:2, 7:24
**Chain** - 102:15
**Chair** - 16:8
**Chance** - 9:8, 15:21, 23:1, 23:2, 23:5, 23:6, 23:15, 24:21, 24:22, 34:8, 34:14, 38:4, 53:16, 56:23, 59:7, 127:3, 163:23
**Change** - 92:5, 119:20
**Changed** - 25:4
**Charge** - 188:1, 188:10, 188:13, 193:6
**Charged** - 7:6, 41:8
**Charges** - 41:9
**Charging** - 25:25
**Cheaper** - 83:15, 83:16, 83:22
**Check** - 123:2, 150:15
**Chief** - 198:25, 199:1
**Chill** - 19:18, 48:13
**Choose** - 166:2
**Choosing** - 77:22
**Chose** - 50:8, 50:12, 50:13, 77:14, 83:21
**Christohper** - 120:7
**Christopher** - 15:1, 15:16, 35:13, 101:22, 102:21, 103:9, 103:20, 121:2, 197:16
**Chummy** - 16:2
**Church** - 40:14
**Circle** - 63:6, 202:6
**Circuit** - 11:23, 12:2
**Circumstance** - 181:20, 182:16, 182:17, 194:4
**Circumstances** - 140:13, 161:14, 164:6, 182:15
**Claim** - 4:14, 6:23, 13:15, 22:14, 48:16, 55:11, 69:25, 70:1, 79:11
**Claimant** - 4:7
**Claimed** - 131:12
**Claiming** - 50:16
**Claims** - 7:16

**Clarification** - 12:8, 12:15
**Clarify** - 53:17, 62:13, 79:10, 95:14
**Clarifying** - 84:15
**Clark's** - 118:23
**Clean** - 108:21
**Close** - 30:1
**Closed** - 4:22
**Closely** - 169:3
**Closer** - 16:9, 198:15
**CM** - 148:25, 151:6
**CN** - 171:15, 171:17, 173:24, 174:14, 176:25
**Co** - 6:4, 21:17, 26:6, 29:14, 54:24, 65:8, 145:7, 149:21, 159:23, 173:1, 186:11, 194:25
**Cobra** - 70:16, 73:5, 75:4, 85:21, 85:23, 88:6, 88:7
**Code** - 44:4, 44:9, 68:1, 148:3, 148:9, 163:10
**Coincides** - 154:16
**Colia** - 17:25
**Collaborative** - 189:5
**Colleague** - 6:6, 70:22
**Colleagues** - 182:13, 182:22
**Collect** - 130:13
**Collecting** - 130:4, 130:19
**Collective** - 175:15, 177:4
**Colonial** - 18:17, 19:4, 19:5
**Columbia** - 30:4, 30:9, 30:10, 30:12, 62:9, 194:21
**Columbus** - 30:7, 30:8, 62:8, 62:14
**Combined** - 71:3
**Comes** - 16:21, 116:21, 156:22
**Comfortable** - 54:24
**Coming** - 20:4, 36:5, 47:3, 87:14, 115:20, 189:23, 200:4
**Commentary** - 49:25
**Comments** - 48:4, 60:13, 139:23
**Committed** - 180:13
**Commoner** - 18:13
**Communicate** - 111:20
**Communicated** - 89:12
**Communication** - 24:18
**Communications** - 126:23
**Community** - 27:23, 40:9
**Company's** - 67:11, 68:8, 70:16
**Compassionate** - 90:4
**Compensation** - 63:21, 63:24
**Complainant** - 4:18, 5:6, 5:15, 8:1, 10:18, 10:23, 10:25, 11:1, 11:7, 12:10, 12:22, 13:5, 13:6, 13:9, 192:17
**Complainant's** - 14:8
**Complaint** - 11:1, 11:5, 187:17, 192:12, 192:13
**Complaints** - 43:21, 147:4
**Complete** - 93:4
**Completed** - 93:16
**Completely** - 32:17, 40:19, 80:5, 180:15
**Compliance** - 147:12, 147:14
**Comprehensively** - 165:22
**Computer** - 95:15
**Concerned** - 201:11
**Concerning** - 35:19, 145:16, 176:2
**Conclude** - 55:2, 181:14, 185:11
**Concluded** - 67:14, 107:14, 112:1, 131:17, 133:1, 158:16, 179:22, 202:20
**Concludes** - 41:21
**Concluding** - 107:9, 157:19, 202:7
**Conclusion** - 4:21, 67:17, 107:11, 107:13, 141:2, 180:9, 180:13
**Conclusions** - 4:17
**Concurred** - 158:10
**Condition** - 13:17, 77:1, 158:7, 158:19, 186:12
**Conditions** - 76:22, 93:6
**Conduct** - 11:24, 44:4, 44:9, 68:1, 106:7, 148:3, 148:9, 158:18, 171:15, 180:4, 180:6
**Conducted** - 117:9
**Conducting** - 42:4
**Confer** - 9:12
**Conference** - 4:6, 8:11, 54:10
**Confirm** - 58:6, 62:15, 88:4, 167:7, 190:11
**Confirmatory** - 58:22
**Confirmed** - 61:10
**Confirming** - 191:10
**Confrontation** - 101:7, 172:17
**Confused** - 184:6
**Confusion** - 59:14
**Conjunction** - 66:12, 77:11, 77:18, 110:21, 183:19, 184:10
**Connection** - 64:8, 172:1, 193:10
**Consequence** - 188:19
**Consequences** - 168:24
**Consideration** - 186:14
**Considered** - 89:15, 90:7, 138:19, 140:21, 163:14, 164:2, 194:10, 197:6
**Considering** - 185:5
**Consistency** - 182:7
**Consistent** - 81:10
**Constructing** - 189:1
**Consult** - 184:21
**Consultant** - 178:11, 184:22
**Consultative** - 178:7
**Consulted** - 169:18, 178:13
**Contact** - 138:8, 140:15, 157:1, 164:8, 164:14, 182:24, 190:25
**Contacted** - 99:4
**Contain** - 86:14, 188:22
**Contained** - 67:24, 73:17, 86:16, 142:11, 180:10
**Continuation** - 88:6, 88:7
**Continue** - 9:11, 77:13, 77:14, 84:18, 84:20, 138:8, 171:20, 171:22
**Continued** - 51:13, 51:16, 80:20, 158:1
**Continues** - 182:4
**Contract** - 28:17, 28:24, 29:3, 175:3, 177:7
**Contractor** - 114:23, 123:24, 125:13, 126:15, 132:11, 132:12, 145:17, 145:25, 174:9, 175:2, 175:11, 197:17, 197:19, 197:24
**Contributing** - 8:3, 12:24
**Control** - 8:12, 58:1
**Controls** - 189:20
**Conversation** - 34:7, 126:16, 128:16, 172:13
**Conversations** - 56:23, 90:25, 145:15, 155:8, 156:19
**Converse** - 193:11
**Convince** - 112:3
**Convincing** - 8:5, 13:3
**Cooked** - 40:13, 40:14
**Cooking** - 19:2, 19:8, 40:17, 195:1
**Copy** - 58:19, 65:23, 148:18, 148:19, 179:22
**Correctly** - 79:19, 169:2
**Cost** - 77:5
**Couldn't** - 11:14, 50:14, 92:5, 92:6
**Counsel** - 5:5, 5:8, 6:1, 6:4, 6:7, 6:8, 47:2, 54:24
**Count** - 201:20
**County** - 17:25, 18:2, 18:3, 85:4
**Couple** - 7:2, 12:21, 30:18, 50:15, 62:5, 66:18, 74:13, 166:19
**Course** - 4:23, 13:9, 15:20, 16:14, 93:1, 127:16, 131:9, 144:21
**Court** - 11:23, 23:18, 45:10, 88:21, 136:14, 136:18
**Court's** - 14:5
**Cover** - 6:22, 8:24, 10:13, 14:3, 84:3, 97:11, 97:18, 119:2, 157:15, 194:7
**Coverage** - 74:3, 74:9, 75:17
**Covered** - 8:10, 77:3, 84:4, 119:17
**Covering** - 96:25, 119:16
**Covers** - 149:11
**Covington** - 4:10, 192:16
**Cows** - 40:4
**Crain's** - 102:5, 184:9
**Creating** - 52:9
**Creation** - 177:21
**Credible** - 67:25
**Crew** - 53:8
**Cross** - 16:18,

41:25, 42:4, 42:18, 45:5, 88:2, 106:11, 126:9, 148:1, 172:12, 176:20, 198:9
**Crossed** - 191:1
**CST** - 4:2, 42:11, 42:12, 94:15, 94:16, 120:5, 120:6, 135:4, 135:5, 167:25, 168:1, 202:21
**Cumulative** - 102:13
**Current** - 198:11
**Currently** - 101:13
**Cursory** - 169:10
**Customary** - 172:8
**Cut** - 39:22, 39:23, 124:23, 128:18, 132:1, 136:4
**Cutting** - 166:23
**CX** - 9:3

D

**Dale** - 90:13, 90:18
**Damages** - 70:1
**Dancing** - 47:9
**Dangerous** - 186:11
**Date** - 11:14, 11:19, 18:7, 18:8, 26:12, 38:22, 39:16, 60:19, 81:15, 81:16, 81:17, 81:18, 151:14, 177:17
**Dated** - 11:6, 62:1
**Daughter** - 32:11, 32:14, 78:6, 83:17
**Daughter's** - 77:11, 78:1, 78:3
**Days** - 27:14, 46:13, 67:18
**Day's** - 37:14, 60:12, 102:21
**De** - 4:15
**Deal** - 30:17, 90:3
**Dealt** - 182:1, 182:2, 191:5
**December** - 80:22
**Decide** - 185:17
**Decided** - 169:16, 200:18
**Decides** - 168:25
**Deciding** - 57:1, 138:19
**Deescalate** - 107:16, 123:10, 126:22, 137:25, 138:3, 138:5
**Deescalated** - 124:12
**Defend** - 49:17, 109:20, 172:17
**Defenses** - 7:17
**Defensive** - 51:17, 53:6, 138:7, 164:17
**Defer** - 14:9
**Deferral** - 14:8
**Define** - 170:6
**Defined** - 171:14
**Definitely** - 115:8, 117:16
**Definitions** - 116:8, 143:19
**Delivered** - 40:14
**Dental** - 32:20, 33:24, 70:11, 70:17, 71:2, 72:7, 72:9, 73:4, 74:17, 75:11, 75:18, 75:23, 76:1, 76:3, 85:25, 88:5
**Deposed** - 54:8, 144:21
**Depression** - 26:24
**Describe** - 19:19, 47:3, 153:10
**Described** - 10:20, 197:23
**Describing** - 50:25, 53:23, 90:25
**Desk** - 58:20
**Detailed** - 58:23
**Determination** - 52:10, 139:10, 173:12, 173:18, 173:20, 180:21, 186:19, 187:12, 199:17
**Determine** - 107:20, 108:3, 125:7, 140:3, 142:10, 153:4, 153:16, 154:17, 164:5, 168:23, 169:3, 193:12
**Determined** - 125:9, 141:1, 178:5, 180:20
**Determining** - 108:13, 110:14, 130:12, 131:4, 131:17, 131:18, 178:3, 186:8
**Devastating** - 40:10
**Developed** - 173:13
**Development** - 169:12
**Diem** - 63:25, 64:1, 64:2, 64:4, 122:24
**Difference** - 72:19, 93:23, 103:25, 104:5, 162:18, 162:21
**Differentiate** - 72:21
**Differently** - 183:7
**Difficulties** - 8:16
**Dinner** - 175:2
**Directed** - 48:4, 171:2
**Directing** - 182:6
**Direction** - 20:2, 190:2
**Directly** - 96:14, 97:24, 99:13, 176:9, 182:11
**Director** - 168:17, 176:23, 177:3
**Disagree** - 173:15
**Disagreement** - 110:19
**Disagrees** - 79:2
**Disaster** - 40:5
**Disbelief** - 22:2
**Discharge** - 12:25
**Disciplined** - 185:1
**Discomfort** - 30:3
**Discourage** - 57:7, 121:22
**Discrimination** - 147:4, 147:19
**Discussing** - 111:12
**Discussions** - 110:17, 155:15, 179:19
**Dismissal** - 138:25, 139:4, 139:7, 139:8, 169:19, 169:22, 178:19, 183:11, 185:7, 185:19, 191:5
**Dismissed** - 11:4, 91:12
**Dismissible** - 139:2, 169:8, 169:20, 178:22
**Displaying** - 95:17
**Dissuade** - 57:7
**Distinction** - 197:9
**Distractions** - 8:15, 120:21
**District** - 136:8
**Diversity** - 146:16
**Division** - 104:13
**Divorce** - 32:12, 32:13
**Doable** - 166:18
**Docket** - 4:6
**Doctor** - 26:20, 26:21, 26:22, 26:23, 27:3, 39:2
**Doctor's** - 26:25
**Document** - 55:2, 62:19, 70:22, 72:1, 72:2, 116:8, 149:3, 152:16
**Documentary** - 65:4
**Documents** - 9:20, 10:1, 62:14, 120:21, 143:3, 143:20
**Doesn't** - 7:4, 8:21, 93:23, 102:4, 117:23, 161:17, 171:23, 175:16, 202:1
**DONALSDON** - 147:22
**Door** - 26:5, 26:15, 36:10, 47:5, 47:7
**Downplayed** - 28:8
**Dr** - 26:22
**Drew** - 19:24
**Drink** - 126:15, 132:13
**Drinking** - 36:15, 36:16, 36:17, 47:13, 47:14
**Drinks** - 175:2, 197:18
**Driver** - 10:24, 12:11, 12:13
**Drop** - 37:10, 37:17, 37:24, 37:25
**Dropped** - 79:7
**Drove** - 21:18
**Duane** - 6:9, 15:10, 133:18, 135:12, 169:15, 183:17
**Due** - 175:14
**Duly** - 17:11, 95:3, 121:3, 135:13, 168:8, 192:23
**Duration** - 42:3, 93:7
**Duties** - 177:2
**Duty** - 102:5, 123:24, 127:6

E

**Each** - 65:15, 74:8, 80:16, 81:3, 153:14
**Early** - 96:6, 159:13
**Earn** - 41:14
**Easier** - 150:16, 167:19
**Easiest** - 150:15, 164:18
**Easily** - 201:13
**Easy** - 140:18
**Eater** - 39:23
**Eating** - 126:15, 132:13, 197:18
**Eddy** - 59:4, 200:23
**Education** - 77:11, 78:1, 78:4
**EEO1** - 147:2
**Effect** - 177:19
**Effective** - 151:14, 177:17
**Efficiency** - 119:12, 201:20
**Efficient** - 133:1
**Effort** - 178:7, 185:23, 189:5
**Egregious** - 154:4
**Egypt** - 47:17, 47:19, 47:21, 47:25, 84:4, 84:7, 84:12
**Eight** - 26:6, 65:8
**Elderly** - 41:19
**Else's** - 28:8, 37:13
**Embarrassed** - 21:22, 28:6
**Emergency** - 39:3
**Employed** - 10:23, 12:11, 12:17
**Employee's** - 122:24, 141:16
**Employer** - 70:7, 74:4, 83:11, 84:4, 94:21
**Employers** - 162:22
**Employment** - 10:25, 11:2, 54:5, 67:19, 67:23, 69:6, 77:20, 83:4, 113:10, 158:5, 158:11, 199:14,

199:22
**Encompasses** - 98:18
**Encounter** - 141:16
**Encountered** - 129:20, 175:13, 181:25
**Encourage** - 161:8, 173:24
**Encouraged** - 117:21, 119:12
**Encouraging** - 119:15
**Engage** - 141:1, 165:2
**Engaged** - 8:2, 12:23, 45:4, 107:9, 112:23, 137:17, 149:15, 157:10, 157:13, 157:22, 158:17, 158:18, 164:18, 174:4, 180:17, 181:15, 181:21, 185:11, 185:13
**Engagement** - 137:17, 182:24, 183:1
**Engaging** - 45:5, 166:3, 179:8, 180:23
**Engineering** - 18:11, 141:22, 141:23, 142:14
**Enjoy** - 33:12
**Enlarge** - 59:17
**Enlarged** - 58:13
**Entered** - 4:17, 5:18, 60:2
**Entering** - 4:15, 4:20
**Entire** - 40:18, 98:18, 107:3, 193:14
**Entity** - 4:13
**Equals** - 142:18, 142:22, 143:10
**Equate** - 116:25
**Equity** - 146:16
**Erase** - 89:6
**Ere** - 91:19
**Errors** - 88:16
**Ers** - 48:1
**Escalating** - 137:18
**Establish** - 172:10
**Established** - 105:5, 144:12, 173:19, 174:21
**Estimate** - 76:13, 78:14, 80:12, 81:2
**Estimated** - 80:25, 81:14
**Evaluated** - 52:6
**Evening** - 35:15, 47:1
**Events** - 50:25, 53:23, 68:13, 191:3
**Everybody** - 38:15, 124:16, 130:14, 202:11
**Everyone** - 4:4, 8:24, 15:24, 16:11, 95:14, 95:25, 150:17, 184:6, 201:11
**Everyone's** - 93:9, 201:19
**Everything** - 129:19, 136:11, 163:13, 165:22
**Evidentiary** - 7:5, 202:3
**Examine** - 64:7
**Examined** - 17:12, 95:4, 121:4, 135:14, 168:9, 192:24
**Example** - 16:15, 77:18, 134:12, 169:21, 178:3
**Examples** - 149:4, 154:6, 154:7, 177:25, 190:24
**Except** - 44:23, 45:2, 151:24
**Exception** - 169:23, 170:2
**Excerpts** - 9:9, 202:5
**Exchange** - 60:3, 60:4, 60:7
**Excluding** - 7:6, 171:18, 172:1
**Exclusively** - 177:11, 181:19
**Excusable** - 181:16
**Excused** - 118:5, 133:3, 191:14
**Executing** - 156:25
**Exhaust** - 8:22
**Existed** - 140:17
**Expect** - 97:12, 118:17, 119:16, 134:15, 165:11, 174:17, 176:4
**Expected** - 118:5, 171:16
**Expecting** - 133:4
**Expenditure** - 72:3, 77:19
**Expense** - 119:18
**Expenses** - 31:8, 31:9, 31:11, 32:2, 32:10, 75:4, 75:5, 77:10, 77:12, 77:17, 77:25, 85:21, 85:22, 85:23
**Expensive** - 83:16
**Experience** - 43:20, 139:2
**Explain** - 45:18, 45:20, 45:22, 49:12, 153:25, 190:20
**Explained** - 147:17
**Explanation** - 95:22
**Express** - 119:19
**EXSAMINATION** - 106:11
**Eyes** - 19:23, 36:21

**F**

**Face** - 19:23, 20:8, 48:20, 51:18, 87:15, 126:17
**Facing** - 20:2, 138:21, 169:7
**Factored** - 80:24
**Fair** - 76:13, 76:16, 81:9, 156:16
**Fairly** - 7:21, 169:3, 200:9
**Faith** - 13:17, 92:8, 92:9
**Fall** - 116:13, 139:9
**Family** - 27:21, 38:9, 41:18, 74:3, 74:9, 74:10, 78:2, 83:7
**Farther** - 62:17
**Fatal** - 14:18
**Fear** - 159:1
**Feared** - 86:15, 87:2, 88:25, 89:8, 113:8, 159:10, 186:2, 186:5, 199:23
**Fearful** - 21:21, 21:22
**Feasible** - 166:15, 166:25, 167:1, 191:17
**February** - 4:2, 9:2, 9:16, 18:8, 28:12, 86:11
**Federal** - 4:4, 6:20, 7:20, 94:19, 120:10, 192:15
**Fedex** - 26:5, 26:14
**Feed** - 137:2
**Feel** - 21:20, 24:12, 27:18, 28:5, 34:20, 66:21, 91:24, 104:3, 119:17, 132:17, 137:22, 173:22
**Feeling** - 28:6, 30:3
**Feels** - 133:22
**Fell** - 20:24, 21:1, 51:11, 51:13
**Fellow** - 20:14
**Felt** - 21:21, 21:22, 23:9, 92:3, 160:3, 164:25, 186:19
**Fence** - 21:7, 98:3, 195:3
**Field** - 102:16, 178:8, 178:11, 179:18, 184:13, 184:16
**Fields** - 40:1
**Fifth** - 152:15
**Figure** - 80:3
**File** - 24:21, 130:20, 161:9, 202:2, 202:9
**Filed** - 10:16, 11:1, 11:5, 11:7
**Filing** - 24:8, 161:6
**Fill** - 82:2
**Final** - 80:11, 178:2
**Financial** - 32:15
**Find** - 79:20, 83:15, 103:21, 103:25, 115:7, 115:9, 150:13, 155:7, 170:8, 172:3, 185:9, 190:1
**Finding** - 11:4, 107:21
**Findings** - 4:15, 4:16, 4:18, 4:21, 11:6, 11:8
**Fine** - 7:11, 14:25, 27:11, 43:9, 59:3, 95:25, 119:5, 133:5, 133:20, 166:21, 167:2, 167:4, 191:21, 192:7, 201:8, 201:10, 201:12, 202:9, 202:10
**Fire** - 98:14, 99:5
**Firearm** - 55:12, 55:15, 92:15, 92:16, 131:12
**Fired** - 26:19, 27:13, 27:24, 28:20, 29:18, 32:19, 92:3, 173:17, 173:23, 187:7, 197:15
**Firing** - 26:17, 26:18
**Fist** - 19:25, 20:11
**Fists** - 49:1, 49:16
**FITKE** - 113:12
**Fitzke's** - 113:22
**Fix** - 137:3
**Fixes** - 137:2
**Flames** - 194:25
**Flexible** - 16:5
**Flight** - 118:7
**Focus** - 159:15
**Focused** - 177:10, 180:18
**Folks** - 63:5, 63:6
**Follow** - 148:19, 175:10, 175:24, 182:13
**Following** - 46:14, 63:9, 65:19, 72:4, 75:6, 80:5, 81:7, 109:5, 175:11, 202:21
**Follows** - 17:12, 95:4, 121:4, 135:14, 168:9, 192:24
**Food** - 40:13, 40:14
**Foot** - 36:7, 36:8
**Ford** - 6:24
**Forehead** - 87:15
**Foreman** - 18:13, 21:18, 22:5, 22:6, 22:20, 24:19, 55:17, 55:18
**Forget** - 89:6
**Form** - 4:23, 54:17, 114:2, 143:21, 161:14, 164:16,

174:19
**Formal** - 6:20, 7:1, 7:3, 7:18, 16:7, 16:10, 106:21, 162:10, 169:9, 192:10
**Formed** - 183:8
**Former** - 94:20
**Forms** - 190:20
**Forth** - 37:3, 140:25, 144:21, 156:24, 164:15
**Fortunate** - 40:13, 78:10
**Forums** - 7:20
**Forward** - 21:3, 25:5, 89:25, 99:4, 110:15, 112:4, 112:7, 112:16, 119:1, 156:3, 159:25, 161:3, 169:6, 169:11, 179:11, 187:5
**Fought** - 109:20, 126:18
**Found** - 6:24, 7:2, 84:16, 113:4, 121:15
**Foundation** - 105:4, 105:9, 144:12, 144:13, 144:15, 188:4, 195:7
**Foundational** - 174:20
**Fourth** - 152:16
**Frame** - 153:3, 176:24
**Framed** - 162:12
**Framework** - 7:12
**Free** - 118:12
**Friday** - 23:12, 23:16, 23:17, 26:2
**Fringe** - 33:17
**Front** - 51:17, 52:22, 59:9, 73:3, 73:19, 95:15, 111:13, 120:22, 170:7
**Froze** - 145:21
**Frozen** - 104:9
**FRS** - 4:7
**FRSA** - 10:20, 11:3
**Fuckers** - 19:15
**Fuel** - 10:24, 12:11, 12:12
**Full** - 17:22, 17:23, 33:7, 33:8, 37:6, 58:17, 61:15, 71:20, 92:11, 124:24, 129:1, 169:12
**Fully** - 67:10, 114:9
**Function** - 8:17, 184:19
**Funny** - 27:3
**Future** - 50:3

G

**Game** - 166:6
**Gang** - 23:3, 86:4, 86:5
**Gangs** - 121:13
**Gaps** - 82:3, 136:12
**Garden** - 40:1, 41:16
**Gardener** - 9:5, 15:21, 23:1, 23:2, 23:5, 23:6, 23:15, 23:23, 24:4, 34:8, 38:4, 56:24, 57:2, 57:4, 57:7, 127:3, 127:11, 202:3, 202:8
**Gathered** - 100:12, 100:24, 101:1, 169:5, 177:25
**Gave** - 24:23, 41:18, 42:15, 53:11, 77:9, 90:19, 98:19, 113:23, 114:14, 117:12, 119:10, 129:22, 129:23, 133:19, 141:6, 189:10
**General** - 8:9, 8:12, 74:20, 127:9, 194:5, 194:6
**Generally** - 9:4, 12:20, 139:1, 156:5, 181:25, 189:25
**Generated** - 106:24
**Gentleman** - 115:2
**Gentlemen** - 102:14, 109:3, 112:15, 114:10, 118:22, 124:19, 134:14, 138:10, 166:11
**Gesture** - 123:11, 171:15
**Gets** - 124:24, 145:13, 147:18
**Gillian** - 6:9
**Girl** - 31:12
**Gist** - 129:2
**Give** - 23:18, 25:13, 25:15, 34:23, 53:16, 59:7, 73:23, 115:19, 121:25, 122:13, 127:12, 129:1, 131:11, 139:23, 156:9, 159:10, 159:12, 163:23
**Given** - 11:23, 17:5, 25:24, 71:12, 85:1, 88:12, 92:11, 92:14, 129:2, 134:16, 164:8
**Gives** - 149:4
**Glad** - 200:6
**Gone** - 31:4, 31:7, 90:14, 138:7, 187:8
**Government** - 147:2, 147:19
**Grace** - 6:6, 56:3, 58:8, 60:17, 61:17, 62:16, 70:19, 72:23, 73:10, 148:17, 148:20, 149:2, 150:22, 151:12, 155:4
**Grand** - 31:13
**Grass** - 39:23
**Greatly** - 191:13
**Green** - 129:22
**Greenville** - 30:12
**Greenwood** - 85:11
**Grenada** - 85:13
**Grey** - 60:12
**Grievance** - 177:6
**Grill** - 19:2, 21:6
**Ground** - 20:10, 20:19, 20:25, 21:11, 36:22, 53:5, 119:2, 145:8, 157:23, 173:2
**Grounds** - 174:20
**Group** - 19:10, 20:17, 21:10, 71:3, 86:17, 164:21, 176:13, 179:16
**Guess** - 79:12, 91:11, 92:2, 106:22, 114:7, 114:9, 116:5
**Guest** - 95:8
**Guidance** - 109:22, 156:8, 156:9, 182:6
**Guilty** - 137:22
**Gun** - 21:14, 21:24, 23:9, 34:19, 38:7, 53:13, 53:14, 53:18, 54:6, 56:9, 91:23, 160:13, 160:14, 160:16
**Guys** - 38:16, 53:7, 71:18

H

**Hadn't** - 18:23, 160:3, 163:6
**Half** - 69:4, 69:11
**Hallucinating** - 48:25
**Hand** - 8:17, 17:7, 94:23, 120:25, 135:10, 168:5, 192:20
**Handle** - 7:22, 54:16, 55:2, 57:21, 134:23, 134:24, 142:6
**Handled** - 16:12, 115:4, 165:20, 165:21
**Handling** - 109:16, 109:18, 121:7, 198:5
**Hands** - 25:11, 37:13, 37:14, 50:11, 50:17, 51:2, 51:17, 112:15
**Handwritten** - 60:9, 61:1
**Happening** - 92:6
**Happy** - 78:6
**Harassment** - 147:4, 147:18
**Hard** - 19:22, 86:23, 148:18, 148:19, 198:13, 202:11
**Harm** - 21:19, 139:13, 143:4, 143:12, 143:13, 143:14, 143:16, 171:17
**Harvest** - 40:2
**Hasn't** - 105:4, 144:12, 149:21, 174:20
**Haven't** - 30:22, 41:10, 41:12, 50:16, 76:14, 105:9
**Hazardous** - 13:17, 158:6, 158:19
**Hazards** - 43:16
**Head** - 106:14, 111:3, 113:23, 125:21, 126:17, 175:4, 196:21, 197:19
**Health** - 32:20, 33:23, 70:11, 71:2, 72:13, 72:14, 72:16, 74:14, 75:19, 76:22, 83:3, 83:4, 86:1, 86:2
**Healthcare** - 70:24, 72:4, 72:10
**Hear** - 17:15, 92:4, 109:6, 120:19, 136:17, 168:3, 192:7, 192:9
**Heard** - 45:15, 50:16, 105:9, 128:4, 131:14, 135:7, 160:16, 190:11
**Hearings** - 175:13, 175:17
**Hearsay** - 7:10, 22:12
**Heart** - 13:11, 77:1
**Heaven** - 90:14
**He'd** - 25:9, 63:6
**Held** - 18:9, 63:20, 168:25, 176:24, 176:25, 182:24, 199:2
**Help** - 17:3, 82:1, 97:2, 97:11, 97:18, 139:10
**Helped** - 73:16
**Helper** - 18:13
**Helpful** - 58:24, 59:5, 65:4, 71:12, 72:22, 177:14
**Helping** - 40:3, 40:4
**Herein** - 17:11, 95:3, 121:3, 135:13, 168:8, 192:23
**Hey** - 142:6
**Higher** - 81:10, 83:19, 83:21
**Highest** - 79:14, 79:20, 79:22
**Hilliard** - 15:10, 98:20, 134:13, 137:11, 144:18,

166:11, 166:16, 167:6, 167:9, 183:17, 191:18, 192:2, 192:7, 192:8, 192:22, 193:6, 195:23, 200:6
**History -** 138:14, 138:17, 184:25, 185:3, 185:4, 185:8
**Hit -** 19:23, 19:25, 20:8, 36:14, 36:22, 48:19, 48:22, 49:2, 49:16, 50:11, 52:2, 52:3, 52:4, 52:5, 52:6, 173:1, 183:2
**Hold -** 82:4, 98:8, 136:9, 136:25, 161:12, 161:23, 175:17, 184:15, 192:2
**Holds -** 166:17
**Holiday -** 63:5, 127:2, 127:19, 128:9
**Home -** 28:3, 30:5, 31:14, 39:1, 77:10, 77:11, 77:18, 77:23
**Honest -** 73:21, 134:8
**Honestly -** 115:3, 123:7
**Honor's -** 22:13
**Hope -** 118:6, 133:10, 133:12
**Hopefully -** 73:15
**Hotel -** 18:24, 19:12, 21:8, 34:18, 46:19, 47:5, 47:7, 62:9, 97:21, 109:3, 109:12, 117:12, 122:24, 123:3, 131:12, 194:21
**Hour -** 28:20, 28:21, 29:1, 41:24, 119:2
**Hourly -** 79:24
**Hours -** 29:12, 80:13, 80:15, 80:19, 80:22, 80:25, 106:14, 166:19
**House -** 6:8, 31:14, 31:15, 31:25, 91:4
**Housekeeping -** 10:6
**Houses -** 40:10
**HR -** 38:1, 125:4, 134:13, 147:12, 147:14, 193:16, 193:25, 199:19
**Human -** 6:10, 55:14, 63:11, 82:11, 92:19, 135:22, 139:22, 146:10, 146:12, 146:20, 147:9
**Hundreds -** 79:8
**Hunsucker -** 21:17
**Hurt -** 21:22, 25:8, 25:10, 38:9
**Hurting -** 37:2, 39:2, 87:14
**Hypothetical -** 114:3, 114:14, 175:5
**Hypothetically -** 175:9

**I**

**I'd -** 28:25, 54:14, 81:24, 97:2, 133:23, 173:20, 199:18, 201:17
**Ideally -** 134:1
**Identification -** 9:21, 10:2
**Identified -** 8:8, 65:8, 68:5, 78:1, 152:6, 178:4, 178:24, 180:6
**Identity -** 62:15
**II -** 5:7
**ILA -** 28:16
**I'll -** 17:7, 17:14, 49:25, 134:25, 137:2, 153:25, 154:4, 156:25, 163:23, 167:21, 202:13
**Illness -** 171:17
**Immaterial -** 7:7, 7:14, 22:13, 40:19, 102:16, 103:15, 104:4
**Immediate -** 68:10, 125:11, 129:24, 129:25
**Immediately -** 117:19
**Impact -** 113:9
**Impeachment -** 54:17
**Implied -** 164:1
**Importance -** 43:4
**Important -** 4:22, 42:25, 138:23, 157:18
**Improper -** 114:3
**Improvements -** 31:15
**Incidents -** 107:19, 149:10, 149:12, 149:20, 150:1, 178:25
**Inclusion -** 146:17
**Incorrectly -** 88:22
**Increase -** 70:25, 71:7, 74:2
**Increased -** 74:5
**Incurred -** 75:5, 77:17
**Indicated -** 53:18, 54:5, 55:15, 56:23, 88:25, 90:9, 91:17, 92:20, 105:6, 109:19, 130:7, 158:24, 159:13, 160:3, 181:11, 186:2
**Indicating -** 53:12, 128:5
**Indication -** 131:11
**Industry -** 178:1
**Influenced -** 196:16
**Informed -** 22:25, 23:1
**Infractions -** 188:19
**Initial -** 169:3, 169:4, 169:10
**Initiate -** 164:7
**Injuries -** 36:23
**Injury -** 143:16, 171:17
**Inn -** 19:4, 46:23, 62:7, 160:13
**Inside -** 31:16
**Instruction -** 22:13
**Instructions -** 135:7
**Intellect -** 27:20
**Intended -** 154:1
**Intentional -** 136:19
**Interjected -** 48:13
**Internet -** 150:17
**Interpret -** 46:5
**Interrupt -** 136:10, 197:1
**Interruption -** 137:5
**Interviewed -** 30:4
**Interviews -** 30:1, 30:2
**Introduced -** 184:18, 186:14, 186:15
**Introduction -** 5:3
**Introductions -** 5:25
**Investigate -** 106:16, 112:21, 175:7, 175:8, 175:24
**Investigated -** 162:3, 162:4, 162:16, 165:5, 165:8
**Investigating -** 147:4
**Investigations -** 123:20, 175:18
**Investigative -** 52:22
**Investment -** 6:25
**Invoked -** 17:3
**Involvement -** 131:4, 131:8
**Irrelevant -** 7:7, 7:14, 40:19, 102:13, 102:16, 103:15
**Isn't -** 48:14, 190:25
**Issuance -** 153:2
**Issue -** 12:22, 13:11, 13:13, 112:15, 155:24, 158:21, 164:13, 166:22, 167:5
**Issued -** 9:1, 11:4
**Issues -** 10:13, 12:19, 43:14, 43:15, 43:18, 46:16, 108:8, 120:20, 137:2
**It'd -** 25:8
**Item -** 7:9
**I've -** 12:14, 27:16, 47:22, 110:24, 114:6, 156:14, 175:22, 176:25, 184:6, 190:11, 201:9

**J**

**Jacobson -** 6:7, 58:9, 73:9, 74:23, 74:25, 198:4, 198:6, 198:10, 198:14, 198:17, 198:19, 198:21, 198:22, 200:1
**James -** 5:14, 95:8, 170:14
**January -** 10:16, 10:17
**Jobs -** 29:17, 29:21, 69:2, 69:10, 69:11, 85:5, 85:7, 112:25
**Join -** 74:17, 120:3, 192:2, 200:6
**Joined -** 98:3, 176:25
**Joining -** 94:17, 118:9, 120:14, 133:8, 192:5, 192:10
**Joint -** 9:7, 9:22, 10:2, 17:4, 57:19, 60:2, 61:16, 70:20, 71:14, 151:4, 170:17
**Jointly -** 9:16
**Joke -** 163:19
**Jones -** 101:9, 101:15, 101:24, 103:23, 124:19, 125:4, 125:19, 125:23, 174:16
**Judged -** 173:16, 173:19
**Judges -** 4:11
**Judgment -** 173:12, 173:15, 173:16, 173:21
**July -** 31:19, 31:21
**Jurisdiction -** 11:22
**Justifiable -** 181:16
**Justified -** 45:2, 119:11, 171:18, 172:2, 172:4
**JX -** 9:13, 9:14, 9:18, 9:19, 54:19, 72:19, 72:23, 73:3, 73:18, 202:4

**K**

**Kill -** 19:16, 48:2
**Killed -** 19:15, 25:8, 25:10, 40:8, 40:9
**Killing -** 48:1
**Kinds -** 13:12
**Knee -** 36:25, 37:3, 37:4, 87:19
**Knocked -** 36:10, 36:22, 49:18, 145:8, 173:1

**Knowing** - 114:8, 150:20
**Knowledge** - 22:8, 29:8, 106:1, 117:13, 127:9
**Known** - 47:19, 47:22
**Knows** - 105:5, 162:1

L

**Laid** - 80:21
**Land** - 30:17, 31:5
**Language** - 152:21, 152:24, 153:1, 158:25, 191:2, 191:3
**Laptop** - 120:15
**Large** - 95:16, 95:23
**Lastly** - 13:4, 84:2
**Late** - 9:1, 33:7
**Later** - 40:2, 55:2, 62:14, 67:18, 103:22, 130:21, 164:12
**Latter** - 44:22
**Lead** - 5:5, 5:7, 6:1, 138:24, 141:16, 162:6, 178:20, 187:11
**Leads** - 22:19
**Learn** - 109:2, 182:21
**Learned** - 126:25, 127:8, 176:11
**Leave** - 15:3, 97:10, 137:1, 194:19, 200:10, 200:13
**Leaving** - 28:1
**Led** - 141:2, 180:13, 199:13
**Left** - 30:16, 30:23, 30:25, 31:1, 31:3, 31:14, 41:6, 76:20, 76:21, 77:14, 78:11, 94:5, 175:4, 197:20, 200:19
**Leg** - 87:16, 87:18, 87:19, 184:16
**Legal** - 5:2, 6:8
**Length** - 118:23
**Lesser** - 108:20, 115:19, 190:13, 190:23, 191:3
**Letter** - 26:15, 67:19, 91:11, 99:7, 99:12, 99:14, 99:15, 99:21, 100:5, 115:25
**Levels** - 154:1, 178:20, 188:17
**Light** - 14:8, 71:9, 129:22, 176:13
**Limine** - 9:3
**Limit** - 146:15
**Limited** - 87:23, 149:9
**Line** - 40:18, 45:5, 87:1, 172:10, 172:13, 191:1
**Lines** - 190:25
**Link** - 17:5, 202:14
**Lip** - 36:21
**List** - 6:12, 29:22, 133:16
**Listed** - 15:9, 130:15
**Literature** - 115:24
**Livelihood** - 33:14
**Located** - 19:3, 19:4, 20:17, 85:10, 138:10
**Location** - 11:24
**Locations** - 150:19
**Logistically** - 54:16, 57:21
**Long** - 27:15, 33:2, 85:21, 94:12, 118:18, 166:12, 166:15, 176:24, 200:22, 201:11
**Longer** - 89:8, 89:15, 91:17, 94:11, 94:13, 133:22, 167:16
**Longest** - 201:5
**Looking** - 29:15, 40:3, 60:1, 71:13, 73:11, 73:16, 83:23, 83:24, 91:7, 95:24, 109:22, 156:23, 163:9, 182:7, 184:1, 185:8, 190:9
**Loose** - 20:16
**Lose** - 32:17, 32:19, 85:14, 112:25
**Loss** - 70:1, 79:11, 80:25, 81:15
**Losses** - 70:2
**Lost** - 14:18, 28:7, 28:10, 40:10, 69:25, 78:14, 79:7, 85:16
**Loud** - 111:4
**Louisiana** - 4:10, 120:13, 192:16
**Lower** - 81:11
**LR** - 102:4, 109:15, 109:17, 109:23, 193:16, 193:25, 199:19
**Lucky** - 40:8
**Lunch** - 118:19, 133:22, 134:16

M

**Machine** - 12:13, 12:17, 18:12, 18:19, 23:7, 28:22, 36:4, 36:5, 36:10, 37:23
**Machines** - 43:15
**Magnolia** - 46:23, 62:7, 160:13
**Main** - 146:20
**Mainly** - 82:2
**Major** - 31:11, 32:2
**Making** - 28:20, 28:23, 28:25, 50:2, 54:4, 57:8, 108:5, 147:1, 197:6
**Man** - 37:3, 104:1
**Management** - 55:14, 56:14, 56:20, 91:14, 92:19, 106:25, 124:17, 162:22, 175:17, 178:8, 184:13
**Manager** - 6:9, 90:10, 96:11, 101:13, 102:3, 106:15, 129:24, 129:25, 135:22, 139:23, 146:21, 156:5, 162:19, 175:18, 184:12
**Managerial** - 163:1, 197:10
**Managers** - 106:14, 148:10, 150:16, 152:2, 174:8, 175:16, 197:14
**Managing** - 177:4
**Manufacturer** - 85:12
**Many** - 29:20, 85:5, 156:14, 178:1
**Maquire** - 90:13, 90:18, 91:1, 91:13
**March** - 176:25
**Mark** - 9:7, 55:1
**Marked** - 9:21, 10:1, 54:20, 60:1, 71:14
**Market** - 83:25, 84:1
**Marshall** - 6:9, 6:13
**Material** - 12:7, 22:17
**Materials** - 31:17
**Matters** - 8:14, 147:18
**May/June** - 176:23
**Means** - 118:4, 147:17, 200:13, 201:18
**Medical** - 70:11, 70:15, 74:9, 75:11
**Medication** - 26:19, 26:20, 26:23, 77:1
**Meet** - 54:9
**Meeting** - 8:12, 23:15, 94:14, 95:15, 119:7, 132:10, 137:1
**Meetings** - 48:9
**Melton's** - 23:10, 48:4, 138:17
**Member** - 56:14, 56:19, 91:13, 92:19, 152:11, 153:15
**Members** - 23:21, 156:19, 157:8
**Memo** - 71:14, 71:23, 72:8, 86:9
**Memorial** - 23:19, 24:25, 25:1, 34:5, 34:10, 38:11, 46:13, 56:24, 62:22, 62:23, 63:5, 131:10
**Memory** - 73:17
**Men** - 101:24, 101:25
**Mentally** - 26:18
**Mentions** - 7:3
**Message** - 60:4, 60:23, 60:25, 61:24, 128:19
**Messages** - 128:4
**Met** - 33:15
**Method** - 165:8
**Methods** - 162:25
**MF** - 48:1
**Microphone** - 198:15
**Microsoft** - 4:6
**Miles** - 85:9, 85:13
**Milwaukee** - 68:18, 68:22, 85:8
**Mislead** - 69:19, 79:10
**Misquote** - 186:4
**Miss** - 29:7
**Missed** - 11:18, 15:15, 77:16, 82:9, 124:23, 193:22
**Missing** - 15:19
**Mississippi** - 12:1, 18:1, 18:2, 18:3, 18:17, 19:5, 54:9, 62:8, 62:9, 84:3, 194:21
**Mississippi's** - 172:22
**Misstatement** - 69:19
**Misstates** - 99:11, 99:12
**Mistaken** - 26:2, 28:11, 37:22, 73:20, 80:20
**Mistakenly** - 88:22
**Misunderstood** - 136:7
**Mitigating** - 140:13, 164:5
**Mode** - 20:12
**Monday** - 24:24, 28:1, 34:5, 34:10, 62:23, 89:1, 128:8, 128:13, 128:15
**Money** - 33:15, 41:14, 77:22
**Monthly** - 71:8, 79:15
**Months** - 28:14, 30:14, 39:20, 40:2, 41:13, 69:1, 74:13, 78:15, 79:18, 79:24, 80:2, 80:3, 88:8, 88:10
**Morning** - 4:3, 8:11, 23:17, 23:23, 28:2, 67:7, 133:19, 166:19, 167:14, 167:16, 200:19, 201:3, 201:6,

Exhibit D: Transcript of the February 13 and 14, 2024, hearing in front of the Office of Administrative Law Judges ("OALJ")

201:12, 202:15
**Mother** - 19:15
**Motion** - 9:2
**Move** - 15:4, 15:23, 40:21, 97:1, 110:15, 112:4, 112:6, 112:16, 137:18, 159:25, 165:2, 169:6, 169:11, 170:25, 171:13, 179:11, 180:17, 198:14
**Moving** - 7:15, 37:2, 99:4, 119:15, 133:24
**Multiple** - 50:25, 52:24
**Multiplied** - 79:15, 79:16, 79:17, 79:18, 79:24, 79:25, 80:1, 80:3
**Mute** - 42:7, 94:14, 143:22
**Muted** - 8:14
**Mutual** - 181:22

N

**Named** - 48:2
**Near** - 56:10, 85:10
**Necessary** - 34:20, 34:21, 98:10, 133:23
**Needed** - 36:16, 36:17, 59:19, 110:4, 127:4, 127:12, 129:19, 137:3, 184:14
**Negligence** - 28:8
**Negotiations** - 177:7, 177:8
**Neighbor** - 27:25
**Neighbors** - 41:19
**Neither** - 26:20, 114:7
**Nerve** - 26:24
**Neutralized** - 159:14
**Nevertheless** - 67:9
**New** - 4:20, 28:16, 28:17, 28:24, 29:3, 127:3, 151:18, 184:5
**Nice** - 90:3, 90:11, 90:15, 90:17, 91:20
**Nick** - 34:25, 35:1
**Night** - 22:1, 51:1, 53:23, 109:3, 119:24, 160:14, 194:22
**Nobody** - 88:17, 128:10
**Non** - 49:4, 175:25
**Noon** - 94:12, 201:14
**Normal** - 31:8, 31:9, 162:13, 175:22
**Normally** - 86:4, 103:11, 104:15, 114:21, 115:6, 145:1, 146:6, 161:12, 161:23, 163:5, 174:17, 175:5, 176:4, 197:22
**Note** - 8:25, 88:20
**Noted** - 128:23
**Notes** - 78:19, 79:6
**Notice** - 5:18, 22:19, 25:24, 39:4, 64:5, 100:3, 155:24, 187:17
**Notified** - 146:8
**November** - 53:20, 55:23, 56:1, 56:7, 56:19, 68:20, 69:15, 69:23, 70:3, 85:18, 85:23
**Novo** - 4:15
**Numbers** - 72:25

O

**OALJ** - 4:7, 4:20, 7:24
**Object** - 7:10, 49:4, 71:1, 102:12, 103:14, 114:2, 161:13, 161:14, 174:19, 174:20, 195:5
**Objecting** - 7:14
**Objection** - 7:11, 22:11, 22:23, 40:18, 98:4, 98:10, 99:11, 100:6, 105:4, 143:21, 144:11, 188:4
**Objections** - 7:9, 9:3, 9:17, 11:8, 99:25
**Obligations** - 175:15
**Observation** - 43:6, 43:11
**Observations** - 47:8
**Observe** - 66:15
**Observed** - 42:25
**Observers** - 42:14
**Obtain** - 76:22, 130:9
**Obtained** - 72:4
**Obtaining** - 70:6
**Occupied** - 39:21
**Occur** - 35:18
**Occurred** - 8:4, 11:25, 12:1, 36:2, 109:12, 115:7, 140:5, 155:16
**Occurs** - 153:7
**October** - 11:6, 69:22, 73:25, 151:16, 177:18, 177:19, 179:1
**Odd** - 14:19
**Offense** - 138:25, 139:2, 169:8, 169:20
**Offered** - 169:8
**Offering** - 70:16
**Office** - 4:10, 59:5, 63:7, 128:10
**Officer** - 82:12, 139:22
**Often** - 95:22, 148:12
**Okra** - 39:24
**Old** - 27:17, 40:11, 82:17, 82:20
**Older** - 32:11, 32:14
**Ones** - 9:18, 26:8, 40:12
**Oneself** - 172:17
**Ongoing** - 89:24
**Open** - 83:24, 84:1
**Opening** - 13:8, 13:25, 14:3, 119:10
**Operating** - 44:3, 44:7, 151:9
**Operations** - 178:11
**Operator** - 12:13, 12:17, 18:12, 18:19
**Opinion** - 106:17, 131:21, 174:11, 194:17
**Opportunities** - 85:5
**Option** - 121:25, 122:13
**Order** - 9:1, 14:12, 15:14, 15:15, 33:8, 58:13, 133:19, 164:23, 167:9
**Ordinarily** - 16:7
**Organized** - 40:17
**Originally** - 4:14
**OSHA** - 4:14, 4:18, 11:2, 11:5
**Outcome** - 9:5, 43:20, 122:4, 122:15, 193:12
**Outline** - 152:10
**Outlined** - 89:13, 188:21
**Overheard** - 42:8
**Overrule** - 22:22, 102:22, 104:3
**Overruled** - 114:4, 161:16
**Oversee** - 177:6, 177:8, 188:12, 188:14
**Overseeing** - 177:13
**Overseen** - 120:11
**Overtime** - 29:12, 79:15, 79:22, 80:12, 80:15, 80:18, 80:19, 80:22, 80:25, 81:1, 81:8, 81:9, 81:13, 86:4, 86:6, 86:8, 86:9
**Own** - 16:8, 46:5, 46:9, 57:24, 93:9

P

**Pace** - 7:16, 119:15, 133:24
**Paid** - 33:15, 63:24, 64:1, 64:2, 64:4, 73:4, 74:10, 74:15, 77:3, 77:13, 85:23
**Pain** - 26:24
**Painting** - 31:15, 31:16
**Parents** - 39:22
**Parking** - 21:8, 97:21, 98:3, 112:13, 138:10, 194:21, 195:2, 195:3
**Participant** - 129:6, 179:7
**Participants** - 42:14, 110:25
**Participants'** - 115:9
**Participate** - 98:13, 113:25
**Participated** - 50:18, 51:23, 70:16, 107:17, 112:24, 158:4, 175:22
**Participating** - 8:13
**Participation** - 103:7, 118:11, 166:4, 182:18
**Particularly** - 118:18
**Parties** - 4:13, 4:24, 5:3, 9:6, 9:8, 12:10, 119:13
**Parts** - 133:7, 181:5, 195:20
**Party** - 93:1, 167:20
**Past** - 108:9, 138:14, 138:17
**Pat** - 124:18, 125:3, 131:1
**Patick** - 183:18
**Patrick's** - 184:4
**Pause** - 160:25
**Paycheck** - 64:3, 76:9
**Paying** - 32:11, 75:15, 75:20, 77:14, 82:15, 85:25
**Payment** - 76:6
**Pays** - 71:8
**Pdf** - 130:20
**Peas** - 39:24
**Peers** - 182:7
**Penalties** - 115:16, 139:6, 139:8
**Penalty** - 115:20, 189:23, 190:5, 190:6, 190:14
**Pending** - 63:21
**Perceived** - 101:7
**Percent** - 126:19
**Perhaps** - 7:8, 74:2, 118:19, 155:9, 172:8
**Period** - 23:18, 31:10, 63:22, 63:25, 70:10, 75:12, 77:3, 80:13, 88:7, 88:9, 151:25, 166:9

**Periods** - 80:16
**Person** - 16:7, 64:12, 97:4, 97:7, 99:3, 139:14, 147:11, 147:18, 162:2, 162:3, 171:15, 172:9, 195:14, 197:25
**Personal** - 76:22
**Personally** - 24:14, 48:5
**Perspective** - 59:9, 200:8
**Peterson** - 22:7, 22:25
**Ph** - 8:17, 21:17
**Phase** - 190:5
**Phone** - 24:23, 35:8, 63:12, 120:15, 120:16, 120:20, 127:3, 128:6, 128:7
**Phones** - 8:15
**Phrase** - 190:11
**Phrased** - 116:1, 145:10
**Physically** - 20:17, 87:10, 106:15, 119:6, 179:8
**Picked** - 79:20
**Pit** - 97:23
**Plan** - 14:14, 69:15, 70:15, 72:5, 74:10, 74:14, 75:7, 75:13, 76:6, 77:3, 77:5, 83:8, 83:10, 83:11, 83:13, 166:7
**Plane** - 134:18
**Planned** - 14:7, 31:23, 93:22
**Planning** - 33:2, 33:4
**Plantation** - 19:14, 47:17, 84:5, 84:8, 84:12
**Platform** - 8:18, 192:5
**Play** - 131:16
**Plays** - 27:19
**Pleased** - 201:23
**Pocket** - 32:4, 32:6, 72:3
**Pointed** - 150:1
**Points** - 154:6
**Policies** - 68:4, 150:21, 178:1, 188:5, 188:6, 188:11, 189:24
**Poor** - 130:23, 170:3
**Pop** - 151:1
**Portion** - 59:13, 75:10, 75:22, 88:5, 181:9, 186:22
**Portions** - 9:9
**Position** - 18:18, 78:10, 96:25, 97:17, 106:18, 107:16, 139:23, 176:24, 199:2
**Positions** - 18:9, 124:20
**Post** - 8:24, 14:4
**Posted** - 150:18
**Posture** - 51:17, 53:6, 138:7, 157:14, 164:17
**Potential** - 111:24, 131:5, 131:7, 149:22, 149:24, 159:9, 183:5
**Potentially** - 189:25 , 201:16
**Practice** - 139:1
**Precedent** - 182:14
**Preferable** - 201:16
**Prehearing** - 8:11, 10:14, 10:16, 14:3
**Preliminary** - 8:14, 16:12
**Premise** - 79:3
**Premium** - 74:17, 75:10, 75:22, 75:25, 76:2, 83:18
**Prepared** - 62:2, 65:20, 67:13, 71:23, 72:2, 75:4, 202:12
**Preponderance** - 8:1
**Prescriptions** - 76:21, 77:4
**Present** - 4:4, 4:5, 6:3, 6:5, 6:7, 6:13, 6:16, 7:8, 9:12, 16:21, 17:6, 26:8, 57:24, 65:3, 140:1
**Presented** - 6:23, 118:5, 140:4, 140:23
**Presenting** - 54:24, 59:17
**Prevent** - 138:4, 164:22
**Prevention** - 68:2, 111:18, 149:1, 149:13
**Previous** - 60:3
**Previously** - 47:8, 185:1
**Prevrium** - 8:17
**Principle** - 177:4
**Prior** - 20:1, 31:23, 57:6, 156:12, 167:9, 186:1, 196:22
**Probationary** - 151:25
**Problem** - 63:3, 73:1, 87:16, 87:18, 137:6, 176:7
**Problems** - 18:22, 41:4, 41:5, 41:6, 123:16, 175:19
**Procedural** - 10:5, 11:7, 162:24
**Procedure** - 7:23, 145:3, 145:4
**Proceed** - 58:1, 96:3, 130:7, 155:19, 155:20, 155:21, 155:22, 155:23, 184:15, 193:2
**Proceeded** - 187:9
**Proceedings** - 5:5
**Production** - 96:11, 101:13, 104:14, 121:13
**Professionalism** - 119:13
**Proficiency** - 201:20
**Progress** - 188:20, 192:11
**Progressive** - 178:20, 178:21, 185:8, 188:16, 188:20
**Property** - 46:22
**Protect** - 122:15
**Protected** - 8:2, 8:7, 12:23, 12:24, 13:4, 13:12, 13:14, 13:21
**Protecting** - 123:13
**Protection** - 6:21, 94:19, 120:10, 192:14
**Protections** - 6:22
**Proven** - 13:1, 138:24
**Provide** - 33:17, 50:21, 51:2, 51:3, 62:7, 92:18, 128:1, 148:15, 184:19
**Provided** - 7:5, 29:22, 47:8, 61:7, 61:23, 65:7, 65:12, 69:14, 70:2, 130:3, 157:6, 181:1
**Providing** - 111:15, 122:24
**Proving** - 67:25
**Provision** - 7:25
**Provisions** - 6:21, 7:12, 10:20, 13:16, 94:19, 120:10, 192:14
**Provoke** - 25:22
**Psychiatrist** - 26:23
**Pull** - 20:18, 53:8, 55:7, 58:8, 61:17, 70:19, 86:18, 86:20, 148:17, 157:24, 177:14
**Pulled** - 20:16, 38:18, 38:19, 39:1, 53:10, 53:12, 90:15, 157:25
**Pulling** - 18:19, 70:22, 170:14, 170:17
**Punch** - 149:15, 149:16, 149:21
**Punched** - 109:19, 157:22
**Punches** - 51:18, 154:20, 179:7
**Punishment** - 145:1
**Pursuant** - 175:14
**Push** - 20:8
**Pushed** - 19:22, 20:5, 20:7, 36:25, 48:17, 97:25
**Pushing** - 20:1
**Puts** - 22:18
**Putting** - 170:13

**Q**

**Questioned** - 186:23
**Questioner** - 78:20
**Questioning** - 55:10, 88:24, 121:7
**Quick** - 14:12, 52:7, 185:16
**Quickly** - 16:12, 118:10, 179:17
**Quit** - 36:16, 36:17
**Quoting** - 99:13

**R**

**Rail** - 4:4, 6:20, 23:3, 43:10, 86:5, 94:19, 120:11, 192:15
**Rails** - 43:15
**Railway** - 96:11
**Raise** - 8:17, 17:7, 39:24, 94:22, 98:10, 120:24, 135:9, 168:4, 192:20
**Raising** - 182:17
**Ramifications** - 38:14
**Rate** - 69:5, 81:3, 81:12
**Re** - 93:5
**Reach** - 118:19, 119:15, 134:4, 167:10, 173:11
**Reached** - 4:17, 180:9, 186:19
**Reaching** - 199:16
**React** - 173:7
**Reads** - 100:5
**Ready** - 16:12, 40:2, 49:16, 51:3, 191:18, 191:25, 192:1, 202:8
**Reality** - 92:5
**Realize** - 52:3
**Realized** - 37:4, 52:2, 52:4, 52:5, 52:6
**Reason** - 14:5, 38:3, 47:19, 52:19, 55:16, 56:3, 56:6, 99:16, 99:17, 105:1, 106:16, 114:13, 114:20
**Reasonable** - 11:4
**Reasonably** - 171:16
**Reasoning** - 101:5
**Reasons** - 180:4
**Recalled** - 118:5,

195:15
**Receive** - 39:4, 39:6, 110:9, 148:10, 153:13, 179:22, 179:24
**Received** - 4:23, 39:7, 44:17, 63:21, 64:5, 65:23, 65:25, 67:18, 88:15, 106:13, 109:13, 110:11, 111:2, 111:6, 127:2, 129:9, 129:12, 154:23, 154:25
**Recent** - 9:15
**Recite** - 195:11
**Recognize** - 61:21, 75:3, 140:18
**Recognized** - 140:19
**Recommend** - 118:25
**Recommendation** - 98:20, 108:6, 111:14, 111:15, 111:20, 113:2, 140:10, 141:5, 141:6, 141:18, 158:10, 159:21, 189:9, 189:10, 189:14, 189:15, 189:17
**Recommendations** - 145:1, 189:18, 193:16, 199:9
**Recommended** - 115:6, 141:23, 142:14, 144:18
**Recommending** - 144:9
**Recreated** - 187:16
**Recross** - 82:1, 190:18
**Redgrove** - 26:22
**Redirect** - 82:1, 82:5, 84:24, 113:20, 132:8, 161:4, 187:24
**References** - 143:12
**Referred** - 9:20, 158:25
**Reflecting** - 75:5
**Reflects** - 71:11
**Reform** - 6:25
**Regards** - 175:11
**Region** - 101:14, 151:7, 163:10, 163:11, 163:14
**Regular** - 8:19, 63:24
**Regularly** - 44:6
**Regulation** - 8:8
**Regulations** - 7:1, 7:6, 12:21, 13:7
**Regulatory** - 7:12, 7:25
**Rejoined** - 14:19
**Relation** - 199:6
**Relations** - 38:1, 63:11, 102:3, 104:15, 104:19, 109:23, 109:25, 124:21, 126:13, 134:14, 156:5, 168:17, 176:23, 177:3, 178:8, 178:12, 184:12, 193:12
**Relationship** - 46:15, 102:2
**Relied** - 181:14, 181:19
**Relief** - 8:7, 13:6
**Rely** - 16:14, 72:18, 180:9, 181:9, 193:21, 193:23
**Remain** - 42:15, 93:1
**Remainder** - 81:3
**Remained** - 75:13
**Remaining** - 202:3
**Remedies** - 6:23
**Removal** - 75:7
**Remove** - 8:15, 196:1, 196:8
**Removed** - 63:15, 63:16
**Renee** - 14:20, 136:11
**Renovation** - 77:12, 77:18
**Rep** - 35:2
**Repair** - 32:3
**Repeated** - 62:14
**Repetitious** - 7:7, 7:15
**Replace** - 32:23
**Replaced** - 32:3, 32:8
**Replacing** - 31:15
**Reporter** - 88:21, 136:14, 136:18
**Reporting** - 13:16, 22:20, 34:4, 104:18, 109:12, 113:24, 114:1, 121:23, 121:25, 122:13, 124:7, 125:11, 127:25, 129:13, 146:6, 158:18, 173:22, 173:24
**Reports** - 22:14, 112:20, 147:2, 147:19
**Representation** - 112:14
**Representative** - 6:17, 64:23, 64:25, 91:1, 151:24, 165:24, 177:6
**Representatives** - 5:2, 6:4, 119:14
**Represented** - 64:22, 162:21, 175:14
**REPRRTER** - 45:10
**Requested** - 4:19, 11:8
**Required** - 4:17, 117:22, 117:23, 122:8, 122:12, 165:10
**Requires** - 183:9
**Reserve** - 166:19
**Residence** - 11:23
**Resources** - 6:10, 55:14, 63:11, 82:12, 92:19, 135:22, 139:22, 146:10, 146:12, 146:20, 147:9
**Respond** - 19:17, 24:24, 106:15, 106:18, 174:22
**Respondent** - 4:8, 5:25, 6:2, 6:5, 6:7, 8:5, 13:5, 106:8, 147:23
**Respondents** - 13:2
**Respondent's** - 9:2, 9:3, 165:24
**Responding** - 59:14
**Response** - 37:8, 60:13, 99:14, 99:15, 102:17, 103:18, 158:9, 178:9, 178:21, 179:11, 190:3
**Responsibilities** - 146:22, 146:25, 147:1, 152:11, 177:2, 177:9
**Responsibility** - 146:18, 146:19, 146:20, 175:23, 177:4
**Responsible** - 46:8, 146:11, 146:13, 146:15, 146:16, 150:20, 189:6
**Responsive** - 49:5, 50:1
**Restates** - 100:3
**Result** - 26:10, 36:23, 43:21, 68:10, 68:13, 178:19, 179:10, 183:10, 185:6, 190:22
**Resulted** - 108:14, 150:4, 169:21
**Resume** - 202:21
**Retired** - 33:3
**Retirement** - 33:22, 33:23, 82:15, 82:16, 85:14, 85:16
**Retreat** - 96:25, 97:4, 97:8, 97:11, 97:17, 106:18, 107:16, 114:19, 137:17, 164:16
**Retreated** - 113:24
**Retrieve** - 58:20, 59:8
**Return** - 132:18, 133:4, 134:22, 159:18, 166:2
**Returned** - 89:2, 89:25, 159:20
**Returning** - 41:3, 123:11
**Reviewed** - 50:19, 61:10, 107:21, 111:7, 140:12, 149:21, 156:24, 180:3, 186:13
**Reviewing** - 107:19, 156:17, 159:8, 196:10
**Road** - 17:25, 84:10, 84:11
**Robert** - 4:7, 5:21, 17:10, 17:22, 17:23, 94:20, 120:9, 121:19, 127:5, 130:14, 192:13, 196:17
**Roles** - 115:9
**Rolled** - 69:23, 70:5, 72:5
**Roof** - 32:3
**Roofs** - 32:8
**Room** - 39:3, 54:10, 95:16, 106:22, 122:24
**Rose** - 180:22
**Rounded** - 79:8
**Rubric** - 116:13
**Rug** - 91:25
**Rule** - 8:12, 41:8, 45:22, 66:11, 110:20, 131:6, 131:7, 169:1, 172:6, 178:9
**Ruled** - 46:1
**Rules** - 7:1, 7:3, 7:4, 7:5, 7:18, 7:23, 8:9, 43:24, 43:25, 44:3, 44:4, 44:7, 46:5, 64:9, 92:8, 106:4, 116:12, 182:25
**Ruling** - 9:4, 98:13, 172:5
**Run** - 20:22, 21:4, 28:22, 77:16, 157:15
**Running** - 97:1
**Rural** - 18:5
**Rushed** - 19:21

S

**Safety** - 4:4, 6:20, 13:17, 42:25, 43:10, 43:14, 44:4, 44:7, 89:9, 92:3, 94:20, 120:11, 158:7, 158:19, 158:20, 158:21, 192:15, 199:24
**Salary** - 28:10, 78:14, 79:24
**Sale** - 31:5

**Sandwich** - 94:6, 96:5, 96:7
**Sat** - 54:10
**Saturday** - 24:3
**Saved** - 30:19
**Savings** - 30:17, 31:2
**Saw** - 36:4, 36:6, 53:1, 156:15, 165:3, 173:13, 189:15
**Scanned** - 130:19
**Scar** - 36:20
**Scene** - 97:10
**Scope** - 151:23
**Screen** - 54:18, 54:25, 71:21, 86:14, 95:16, 95:18, 95:23, 136:19, 136:20, 154:7, 200:10
**Scribe** - 62:3
**Scroll** - 58:17, 59:19, 60:16, 61:21, 62:16, 71:19, 72:23, 73:7, 73:8, 74:22, 149:3, 151:11
**Scrolling** - 171:11, 171:23
**Searched** - 83:21
**Seat** - 198:14
**Seated** - 5:9
**Second** - 8:25, 14:20, 15:7, 32:13, 45:15, 59:6, 98:8, 104:10, 137:1, 149:3, 151:1, 170:16
**Secretary** - 11:3, 11:8
**Security** - 13:17, 158:7, 158:19
**Seeing** - 26:20, 26:21, 26:22, 86:17
**Seeking** - 13:7
**Seen** - 12:14, 128:4, 156:13, 156:14
**Selected** - 30:2, 30:6
**Sell** - 30:15
**Sending** - 109:10
**Senior** - 6:9, 96:11, 101:13, 129:24, 129:25, 135:21, 139:22
**Seniority** - 18:7, 18:8
**Sent** - 35:15, 60:23, 61:1, 109:9, 109:11, 109:15, 109:17, 128:19, 130:20, 131:1, 131:3, 189:16
**Sentences** - 62:6
**Separate** - 4:13, 90:22, 188:5
**Separately** - 153:16
**Separation** - 75:6
**Sequestered** - 16:2 3
**Sequestration** - 17: 2
**Serious** - 68:10, 138:23, 154:5, 154:14
**Seriously** - 25:7, 43:11
**Service** - 38:18, 38:19, 39:1, 63:15, 63:16, 63:20
**Set** - 8:20, 87:23, 156:23
**Setting** - 16:5, 16:7, 16:10, 168:20, 175:9, 175:13, 176:13
**Settling** - 30:20
**Setup** - 16:4, 95:19, 138:9, 138:11
**Setups** - 95:23
**Several** - 149:11, 150:19
**Severity** - 116:2, 188:18
**Share** - 134:15
**She's** - 32:14, 73:11
**Shift** - 13:2
**Shoes** - 47:9
**Shook** - 112:15
**Shoot** - 23:9, 34:19, 38:7, 91:23
**Shortly** - 4:24, 112:12
**Shouldn't** - 24:9, 24:10, 38:8
**Show** - 8:1, 10:16, 13:8, 13:10, 42:1, 54:14, 57:20, 58:1, 58:3, 72:20, 202:2
**Showed** - 36:20, 36:21
**Showing** - 58:3
**Shown** - 58:15, 59:10, 86:13
**Shows** - 71:5
**Side** - 47:7, 64:16, 157:2
**Sign** - 84:10, 84:11
**Signals** - 198:25
**Significant** - 136:12
**Similar** - 110:17, 145:11, 177:25, 182:15
**Simply** - 8:18, 49:9, 140:3
**Sitting** - 192:3, 194:25
**Situations** - 139:9, 146:21, 149:11, 150:3, 171:18, 172:1
**Six** - 201:20, 201:21
**Skill** - 119:13, 201:19
**Slightly** - 88:19
**Slowly** - 171:11
**Small** - 150:24
**Sold** - 30:17
**Sole** - 146:18
**Solely** - 173:9, 180:16
**Soley** - 95:7, 95:8, 95:10
**Somewhat** - 16:10
**Sooner** - 94:3
**Sorey's** - 71:9
**Soul** - 90:13
**Sound** - 119:3, 167:1
**Sounds** - 84:13, 128:12, 166:14, 166:15, 166:25, 177:9, 201:10
**Source** - 113:5, 176:12
**Southern** - 101:14, 151:7, 163:10, 163:11, 163:14
**Speaks** - 171:14
**Specialist** - 32:15
**Specific** - 138:11, 143:15, 147:11, 162:15, 188:6
**Specifies** - 147:12
**Speculate** - 142:24
**Speculating** - 199:1 9
**Spell** - 26:25
**Spells** - 188:18
**Spend** - 32:16, 77:22
**Spent** - 30:21
**Spikes** - 18:20
**Spoken** - 195:9
**Squashed** - 112:15
**Stab** - 144:3
**Standard** - 172:12, 172:14
**Standby** - 118:9
**Standing** - 19:1, 20:11, 49:1, 49:15
**Staring** - 95:16
**Start** - 70:3, 94:12, 130:4, 134:2, 134:22, 137:5, 140:12, 140:20, 194:6
**Started** - 19:8, 30:3, 33:7, 33:9, 37:2, 42:21, 47:16, 48:23, 49:1, 49:10, 50:7, 51:7, 51:8, 70:6, 70:14, 83:5, 140:20, 181:22
**Starting** - 5:5, 14:13, 15:15
**Starts** - 154:5, 182:3
**State** - 7:20, 17:22, 31:12, 97:6, 143:10, 169:2, 172:19, 172:21
**Stating** - 26:15, 195:5
**Stay** - 17:4, 42:7, 69:15, 94:13, 123:2, 165:23
**Staying** - 46:22
**Steaks** - 195:1
**Step** - 164:5, 178:20, 185:9
**Steps** - 188:20
**Stipulated** - 10:13
**Stipulation** - 10:22, 10:24, 11:1, 11:3, 11:7, 11:13, 12:9, 12:15
**Stipulations** - 10:18 , 11:10, 12:9, 14:3
**Stock** - 30:20
**Stocks** - 30:15
**Stone** - 156:24
**Stood** - 49:10, 49:15
**Stop** - 92:6, 171:12
**Stopping** - 201:16
**Storage** - 32:9
**Storm** - 40:5, 40:16
**Story** - 64:16, 129:1
**Streamline** - 118:21
**Strict** - 7:18
**Strike** - 53:1, 124:12, 126:20
**Striking** - 123:14, 126:21
**Struck** - 51:21, 51:25, 52:1, 52:14, 87:9, 107:18, 123:14, 126:17, 128:24, 132:11, 164:22, 164:23, 181:7, 181:11
**Stub** - 76:15, 79:14, 79:20, 79:21, 80:11, 81:1, 81:2
**Stubs** - 79:14
**Submitted** - 9:6, 9:14, 9:16, 53:22, 57:14, 112:12, 117:8, 158:23, 186:1
**Submitting** - 15:20
**Subsequently** - 77: 4
**Subsidiary** - 151:9
**Substantial** - 67:25
**Substituted** - 9:19
**Substitution** - 9:14
**Succeeds** - 13:5
**Successful** - 29:25
**Sufficient** - 169:1, 169:5, 174:22
**Suites** - 19:4
**Summarize** - 72:2
**Summarized** - 12:2 1
**Summary** - 73:4, 75:4
**Sunday** - 24:22, 24:23, 127:18, 128:12
**Supervisor** - 22:20, 22:21, 23:1, 23:3, 24:21, 104:1, 104:14, 113:23, 114:16, 121:12,

Case: 4:23-cv-00217-MPM-JMV Doc #: 83-1 Filed: 01/08/25 93 of 189 PageID #: 2670

Robert Branch 2023-FRS-00026 February 13, 2024

125:5, 125:11, 126:12, 127:3, 163:6, 174:17
**Supervisors** - 23:22, 41:4, 41:6, 46:12, 96:21, 103:12, 104:22, 114:1, 124:14, 152:3
**Supervisory** - 102:15
**Supplies** - 40:11
**Supply** - 33:23
**Support** - 169:1, 180:5
**Supported** - 180:4
**Supports** - 142:12
**Suppose** - 45:8, 45:16, 172:10
**Supposed** - 105:12, 117:19
**Surrounded** - 101:6
**Surrounding** - 164:6, 195:3
**Surroundings** - 194:20
**Survive** - 30:19
**Survived** - 30:14
**Susa** - 6:1
**Susan** - 11:13, 15:2, 50:10, 91:21, 133:17, 134:11
**Suspended** - 41:11
**Suspension** - 169:10
**Sustain** - 98:10, 105:8, 143:24, 195:10
**Sustained** - 40:23, 144:14, 174:23
**Swear** - 16:20, 17:8, 120:14, 168:5
**Sweeny** - 19:16, 19:18, 48:2, 48:7, 48:8, 48:14
**Sweeping** - 91:25
**Swing** - 50:8, 50:12, 50:17, 51:3, 51:16, 138:8, 164:23
**Swinging** - 48:23, 49:1, 49:10, 49:14, 50:7, 51:7, 51:14, 51:20, 53:6
**Switch** - 94:1
**Swollen** - 36:25, 37:1, 37:3, 37:4, 87:19
**Sworn** - 17:11, 55:22, 55:25, 67:6, 95:3, 121:3, 135:13, 168:8, 192:23
**Swung** - 157:22, 164:14, 181:23
**System** - 188:21

**T**

**Taking** - 8:23, 27:21, 83:5, 96:5, 119:3, 170:16, 186:18, 196:5
**Team** - 193:25
**Teams** - 4:6
**Technical** - 8:16
**Technically** - 120:19, 124:11
**Telephone** - 128:25, 129:2
**Telling** - 32:1, 63:1, 63:4
**Tells** - 142:6
**Tendency** - 7:8
**Tendered** - 4:24
**Terminate** - 50:21, 101:5, 138:19, 158:5, 158:11, 160:1, 185:17, 186:16, 186:25, 196:17
**Terminating** - 67:19
**Terminations** - 68:10
**Terminology** - 190:9
**Terms** - 12:9, 69:25, 90:5, 131:16, 131:18, 139:4, 179:7, 191:1
**Terrible** - 153:5
**Terribly** - 94:12
**Terrific** - 58:4, 71:19
**Territories** - 84:3
**Tested** - 57:16
**Text** - 25:3, 59:17, 60:3, 60:4, 60:7, 60:25, 61:24, 71:20, 128:4, 128:19
**Texted** - 24:25, 25:4, 35:7, 35:9
**Thanks** - 42:10, 92:24, 118:15, 191:10, 201:19
**That'd** - 191:21
**Theory** - 173:15
**Therefore** - 116:21, 164:17
**These** - 8:10, 9:16, 9:17, 10:14, 10:15, 25:17, 25:18, 101:24, 101:25, 102:14, 104:16, 109:3, 118:22, 124:19, 131:22, 138:10, 154:1, 154:6, 166:17
**They'd** - 112:16
**They're** - 10:15, 10:16, 47:22, 105:13, 117:23, 150:16, 154:1, 154:3, 156:7, 157:23, 166:14
**They've** - 17:4
**Third** - 87:1, 152:6, 154:14
**Thomas** - 98:20, 168:7, 192:22
**Threat** - 38:7, 66:21, 89:15, 89:16, 89:18, 89:19, 89:24, 90:8, 91:18, 91:22, 113:8, 159:6, 186:24, 199:24
**Threaten** - 24:16
**Threatened** - 21:23, 23:10, 34:18, 86:16, 91:23, 92:16, 160:3
**Threatening** - 191:4
**Three** - 40:9, 98:24, 169:18
**Threw** - 18:4
**Throwed** - 50:10
**Throwing** - 149:21, 179:7
**Thrown** - 149:14, 149:16
**Thursday** - 23:13, 23:14, 38:21, 62:6
**Tied** - 116:20
**Tier** - 33:20, 33:21, 33:22, 82:9, 82:10, 82:15
**Tight** - 136:25
**Timed** - 167:19
**Times** - 50:15, 79:25, 80:2, 80:7, 156:14
**Tiny** - 71:19
**Title** - 147:13, 198:24
**Today's** - 5:5, 81:15, 81:17
**Todd** - 23:24, 23:25, 24:1, 25:6, 34:18, 55:14
**Tolerance** - 108:25
**Tolerated** - 143:1
**Tom** - 15:10, 98:20, 134:13, 137:11, 144:18, 155:9, 155:13, 166:10, 167:8, 167:9, 168:3, 183:17, 184:1, 187:19, 198:23
**Tomorrow** - 119:23, 134:2, 134:16, 167:6, 167:10, 202:7, 202:8, 202:10, 202:13, 202:15, 202:19
**Tonight** - 202:2
**Tools** - 68:18, 68:22, 85:8
**Top** - 20:19, 20:20, 20:21, 59:18, 61:22, 196:21
**Topics** - 165:20
**Tornado** - 40:7, 40:8
**Total** - 22:2, 71:3, 79:17, 80:12
**Totality** - 186:13
**Touched** - 157:23
**Tough** - 164:18
**Toward** - 122:24, 152:17
**Towards** - 36:5, 123:11, 171:15, 178:20, 191:3
**Town** - 84:7
**Towns** - 85:10
**Track** - 12:20, 36:4, 44:4, 44:7, 199:1
**Trackman** - 18:11
**Tracks** - 193:7
**Traditional** - 7:10, 22:12
**Trained** - 44:6, 44:9
**Training** - 44:17, 148:10, 148:15
**Transcripts** - 54:18, 108:5, 154:24, 179:22, 193:19
**Transferred** - 4:19
**Transmission** - 32:15
**Traveling** - 86:3
**Traying** - 164:16
**Trick** - 72:24, 79:10
**Triggered** - 13:15
**Trip** - 43:15
**Trouble** - 196:20
**Truthfully** - 66:25, 67:9, 125:8
**Tuesday** - 35:2, 35:17, 35:18, 38:11, 63:9, 89:2, 89:24, 109:5
**Turn** - 8:14, 14:10, 166:2
**Turned** - 14:18, 20:3, 38:1, 80:1, 80:2, 142:2
**Turning** - 166:7
**Twice** - 19:23, 20:8, 48:19, 48:23
**Twisted** - 87:19
**Two** - 8:20, 76:5, 76:9, 76:11, 76:12, 79:16, 80:2, 98:23, 99:2, 109:3, 131:22, 138:10, 188:5, 197:14
**Ty** - 22:7
**Types** - 13:20, 191:5
**Typical** - 7:21
**Typically** - 154:19

**U**

**Unacceptable** - 25:6
**Uncle** - 39:24, 40:4
**Undecided** - 129:16
**Undergo** - 124:6
**Undergone** - 124:9
**Underlying** - 11:24
**Understands** - 105:5
**Understood** - 44:19, 44:22, 44:25, 48:7,

Bayley Reporting, Inc.
(727) 585-0600
Exhibit D: Transcript of the February 13 and 14, 2024, hearing in front of the Office of Administrative Law Judges ("OALJ")

Case: 4:23-cv-00217-MPM-JMV Doc #: 83-1 Filed: 01/08/25 94 of 189 PageID #: 2671

Robert Branch 2023-FRS-00026 February 13, 2024

52:9, 56:16, 56:18, 63:10, 64:6, 66:25, 82:3, 83:2, 129:6, 161:16, 168:21, 185:25
**Unduly** - 7:7, 7:14
**Unfortunately** - 33:10
**Unionized** - 152:13, 177:10
**Unions** - 177:5
**United** - 104:14, 163:12, 163:13
**University** - 31:12
**Unless** - 27:6, 38:10, 86:8, 118:17, 133:22, 135:8, 191:23
**Unphysical** - 105:20
**Unusual** - 185:21
**Upkeep** - 77:23
**Used** - 7:19, 27:20, 51:5, 80:19, 80:20, 81:1, 86:8, 166:17, 173:11, 174:6, 202:5
**Uses** - 139:3
**Using** - 4:6

V

**Vague** - 161:14
**Valentine's** - 119:23
**Vegetables** - 39:24, 41:17
**Vehicle** - 90:14
**Vendor** - 106:14
**Verbal** - 99:9, 99:22, 100:4, 100:13, 100:24, 101:1, 101:7, 190:24
**Verbiage** - 45:1
**Version** - 9:15, 151:15
**Versus** - 172:16
**VES** - 147:3
**Via** - 128:19
**Video** - 4:5, 8:17, 9:10, 16:5, 16:11, 120:14, 136:23, 145:21
**View** - 58:17, 91:18
**Viewed** - 91:17, 113:7, 186:23, 199:23
**Violate** - 149:13, 190:21
**Violated** - 45:6, 64:8, 68:1, 107:12, 141:2, 150:4
**Violent** - 117:20, 179:8
**Vision** - 32:20, 33:24, 58:14, 70:11, 70:17, 71:3, 72:7, 72:9, 73:4, 75:11, 75:19, 75:23, 76:1, 76:2, 85:25, 88:5
**Visual** - 96:2

W

**Wade** - 15:2, 15:6, 95:2, 130:1, 131:1
**Wage** - 80:7, 80:8, 80:25, 81:15, 86:10
**Wait** - 14:19, 81:25, 119:11, 160:8, 201:3, 201:6, 202:9
**Waiting** - 59:8, 113:17
**Waiver** - 169:8
**Walk** - 50:8, 50:13, 50:14, 87:7, 87:10, 97:11, 123:10, 126:22, 137:23, 195:23, 195:24
**Walked** - 55:18, 87:7, 124:13, 138:6
**Walking** - 36:4, 97:1, 138:1, 138:2
**Wanting** - 84:16
**Waste** - 14:5
**Water** - 40:11
**Watermelons** - 39:25
**Ways** - 150:19
**Weed** - 39:23
**Week** - 81:3, 81:10
**Weekend** - 23:19, 46:13, 56:24, 62:23, 127:2, 127:16, 131:10
**Weeks** - 76:5, 76:10, 76:11, 76:13, 79:16, 81:10, 81:11
**Weigh** - 156:12
**Weighing** - 156:1
**Weight** - 120:1, 159:9, 159:12
**Welcome** - 57:25, 166:5
**Welfare** - 70:11
**Wendall** - 6:24
**Weren't** - 40:8, 48:4, 67:6, 102:15, 106:22
**We've** - 107:24, 112:20, 128:4, 169:5, 181:24, 181:25, 182:2, 183:4, 191:4, 191:5, 200:18
**What's** - 17:16, 60:1, 71:14, 73:3, 84:4, 99:14, 156:2, 156:6, 166:6, 170:2, 190:2
**Whereupon** - 9:20, 10:1, 17:9, 95:1, 121:1, 135:11, 168:6, 192:21, 202:20
**Whistleblower** - 4:5, 6:21, 13:15, 94:19, 120:10, 192:14
**White** - 18:16
**Whole** - 171:5, 171:7
**Who's** - 5:4, 5:21, 133:14
**Wife** - 36:16, 36:18, 61:4, 62:3, 83:3, 83:14, 83:18, 86:1, 86:2, 119:22
**Wife's** - 33:23, 70:7, 70:15, 74:3, 74:11, 74:14, 77:5, 82:15, 83:22
**Willing** - 15:4, 40:25, 158:2
**Winona** - 85:11
**Wise** - 166:12
**Won't** - 15:21, 162:16
**Woods** - 36:5
**Word** - 86:9, 113:25, 114:15, 117:2, 163:5
**Words** - 45:12, 48:13, 107:11, 173:21, 174:5
**Worked** - 27:15, 29:13, 43:23, 75:9, 75:11, 75:21, 77:2, 77:13, 81:8, 86:5, 101:17, 102:6, 141:21, 178:1, 178:8
**Worker** - 21:17, 149:21, 159:23, 186:11
**Workers** - 19:10, 40:15, 43:10, 65:8, 152:13, 177:10
**Working** - 18:15, 18:16, 25:1, 27:16, 27:18, 31:25, 40:1, 40:15, 41:16, 42:21, 46:15, 86:3, 138:14, 151:8, 184:16, 194:1
**Works** - 16:3, 32:14, 102:4, 120:17, 120:20, 167:20
**Wouldn't** - 24:23, 37:25, 90:22, 106:17, 114:20, 117:14, 139:23, 176:6, 185:4, 187:14, 189:17, 190:11
**Wound** - 38:25, 130:19
**Wrap** - 201:18
**Write** - 35:8, 35:9, 38:15, 38:16, 61:4, 128:5, 128:18, 139:20
**Writing** - 35:15, 116:11, 160:21, 160:22
**Written** - 50:24, 50:25, 53:22, 57:10, 65:7, 65:20, 147:7, 156:13, 157:5, 163:16, 180:25
**Wrote** - 38:3, 50:24, 57:13, 61:4, 61:23, 130:15, 159:13, 181:6
**Wynn** - 8:10, 202:14

X

**XX** - 83:1

Y

**Yard** - 28:1, 39:22
**Year** - 31:13, 31:21, 40:6, 74:4, 80:18, 81:4, 123:25, 174:9
**Years** - 27:17, 30:18, 33:9, 41:7
**Yell** - 97:11
**Yelling** - 47:16, 47:24
**Yesterday** - 9:2
**You'd** - 16:8, 54:17, 93:20, 96:7, 168:22
**You'll** - 82:4
**Yourselves** - 94:14
**Youth** - 27:14
**You've** - 5:17, 28:14, 29:20, 30:13, 41:7, 41:13, 58:2, 68:25, 69:1, 69:10, 73:4, 135:6, 202:11

Z

**Zoom** - 95:17

'

**'22** - 31:22
**'24** - 28:12

$

**$10,000** - 29:9, 29:11
**$15,000** - 31:17, 32:16
**$184,000** - 78:15, 78:16, 78:19, 79:7, 79:9
**$185,000** - 28:11, 28:16, 78:17, 78:24, 79:13, 79:23, 81:14
**$2,500** - 32:13
**$20,000** - 30:18, 31:6
**$228** - 75:20, 75:24
**$228.00** - 75:16
**$30.00** - 28:21, 77:6, 79:25
**$32,000** - 30:16
**$32,350** - 31:3
**$37.00** - 28:25
**$40.00** - 76:4, 76:8, 76:12
**$45,000** - 31:1
**$48.00** - 76:7
**$5,000** - 31:9
**$50,000** - 31:1

Bayley Reporting, Inc.
(727) 585-0600
Exhibit D: Transcript of the February 13 and 14, 2024, hearing in front of the Office of Administrative Law Judges ("OALJ")

Case: 4:23-cv-00217-MPM-JMV Doc #: 83-1 Filed: 01/08/25 95 of 189 PageID #: 2672

Robert Branch 2023-FRS-00026 February 13, 2024

**$50.00** - 77:4
**$6,000** - 32:4, 32:6
**$769** - 73:20, 73:21, 73:25
**$769.00** - 74:15
**$8,000** - 29:8, 29:11
**$80.00** - 77:7
**$814.00** - 74:5, 74:7, 74:10
**$854.00** - 74:6
**$966.00** - 70:25
**$966.36** - 70:23
**$966.38** - 33:1
**$97,000** - 30:21

/

**//** - 9:23, 9:24, 9:25, 94:24, 94:25, 202:22, 202:23, 202:24, 202:25

1

**1:05** - 135:4
**1:25** - 134:21
**1:27** - 135:5
**10** - 42:2, 42:6, 167:17
**10:14** - 42:1, 42:11
**10:25** - 42:1, 42:12
**10:36** - 14:21, 14:22
**100** - 126:19
**10-23-2017** - 151:15
**109** - 8:4
**11** - 18:8
**11:00** - 36:1
**11:43** - 94:12
**11:44** - 94:15
**12** - 27:16, 79:18, 80:3
**12:00** - 94:12
**12:02** - 94:16
**12:40** - 120:5
**12:45** - 120:6
**12th** - 9:2
**13** - 4:2
**143** - 17:25
**15** - 167:22
**16** - 10:17, 41:7, 148:18, 148:24, 148:25, 170:18, 170:20
**18** - 7:24, 9:14, 9:19, 88:7, 88:8, 88:10
**19** - 9:14, 9:19
**1982** - 7:2
**1982.107** - 7:3
**1982.109** - 7:25, 8:8

2

**2:17** - 167:25
**2:30** - 167:18
**2:36** - 168:1
**20** - 28:14, 30:14, 31:13, 39:20, 41:13, 53:20, 69:1, 78:15, 134:21, 134:25
**2008** - 18:8, 42:22
**20109** - 13:12
**2012** - 176:25
**2017** - 151:16, 177:18, 177:19, 179:1
**2023** - 4:7, 55:23, 56:1, 56:7, 56:19, 68:19, 68:21, 74:8, 80:18, 80:19, 80:23
**2024** - 4:2, 9:16, 10:17, 74:4, 86:11
**21** - 6:24
**21st** - 6:25
**23** - 12:9
**24** - 10:25, 11:20
**24th** - 26:15, 39:17, 67:18, 91:11
**25** - 29:21, 69:1
**26** - 4:7, 10:17, 10:23, 11:6, 12:10, 17:25, 18:21, 62:6, 66:12, 68:13, 89:20, 109:4, 126:24
**29** - 7:2, 7:24
**2nd** - 38:23, 63:16

3

**3:30** - 200:18, 202:20
**30** - 29:21, 33:9, 60:19, 62:1, 69:1, 85:9, 150:23, 151:4, 151:6
**31** - 69:22
**31st** - 89:2, 91:22
**38** - 71:14, 72:8, 72:19, 73:8, 73:16, 73:17, 73:18, 74:21
**38923** - 18:1
**39** - 70:20, 72:20, 72:23, 73:3, 73:16, 74:23, 74:24, 75:3
**3rd** - 26:3, 39:7, 39:9, 63:17

4

**4:00** - 15:4, 93:16
**40** - 85:9
**4212** - 147:3
**45** - 85:13
**48** - 9:13, 9:19, 9:22, 10:3, 57:19, 58:8, 60:2
**49** - 84:7, 202:4

5

**57** - 82:22
**58** - 82:19, 82:20
**59** - 83:1
**5th** - 11:23, 12:2

6

**60** - 33:9
**67** - 33:4, 33:5, 33:8, 33:11

7

**7:00** - 19:7
**7th** - 39:13, 89:17

8

**8:00** - 19:7, 60:19
**80** - 79:25, 80:1, 80:7

9

**9:00** - 19:8, 62:7, 202:13
**9:21** - 4:2
**96** - 55:7, 55:12

Bayley Reporting, Inc.
(727) 585-0600
Exhibit D: Transcript of the February 13 and 14, 2024, hearing in front of the Office of Administrative Law Judges ("OALJ")

# UNITED STATES DEPARTMENT OF LABOR
# OFFICE OF ADMINISTRATIVE LAW JUDGES

**In the Matter of:**

**ROBERT BRANCH,** )
)
**Complainant,** )
**v.** ) **Case No. 2023-FRS-00026**
)
**ILLINOIS CENTRAL RAILROAD,** )
)
**Respondent.** )
)

**Condensed Transcript and Key Word Index**

**PAGES:** **204 through 241**

**PLACE:** **Video Hearing**

**DATE:** **February 14, 2024**

**BAYLEY REPORTING, INC.**

***OFFICIAL FEDERAL REPORTERS***

**Florida**
**(727) 585-0600**

UNITED STATES DEPARTMENT OF LABOR
OFFICE OF ADMINISTRATIVE LAW JUDGES

In the Matter of:

ROBERT BRANCH,

Complainant,

v. Case No. 2023-FRS-00026

ILLINOIS CENTRAL RAILROAD,

Respondent.

Video Hearing
Wednesday,
February 14, 2024

The above-entitled matter came on for hearing pursuant to notice, at 9:00 a.m., CST.

BEFORE: ANGELA F. DONALDSON
Administrative Law Judge

Bayley Reporting, Inc.
(727)585-0600

A P E A R A N C E S

On behalf of the Complainant:
CHARLES EDWARD SOREY, II, ESQ.
Sherman & Lacey, LLP
1000 Highland Colony Parkway, Suite 5203
Ridgeland, Missouri 39157
(601) 341-6929
JAMES FERGUSON, ESQ.
201 West Broadway, Suite G12
North Little Rock, Arkansas 72114

On behalf of the Respondent:
SUSAN FITZKE, ESQ.
GRACE JACOBSON, ESQ.
Littler Mendelson
80 South 8th Street, Suite 1300
Minneapolis, Minnesota 55402

I N D E X

| COMPLAINANT'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Patrick Crain | 208 | 221 | 230 | |
| RESPONENT'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
| None | | | | |

E X H I B I T S

| EXHIBIT | IDENTIFIED | IN EVIDENCE | WITHDRAWN |
|---|---|---|---|
| COMPLAINANT'S | | | |
| None | | | |
| RESPONDENT'S | | | |
| None | | | |
| DIRECTOR'S | | | |
| None | | | |
| ALJ'S | | | |
| None | | | |

P R O C E E D I N G S

February 14, 2024 9:02 A.M., CST

JUDGE DONALDSON: Okay. So, we are reconvened for the FRSA whistleblower protection provision case brought by Robert Branch against Illinois Central and this is Day 2 of the hearing. I believe we have one witness remaining and that is Mr. Patrick Crane. Is it C-R-A-I-N?

MR. CRAIN: Yes, ma'am.

JUDGE DONALDSON: Okay. Mr. Crain, let me swear you in before you testify today. Would you raise your right hand?

Whereupon,

PATRICK CRAIN

having been duly sworn, was called as a witness herein and was examined and testified as follows:

WITNESS: Yes, ma'am.

JUDGE DONALDSON: All right, thank you and let me know, Mr. Crain or let the attorneys know if you have any issues with any questions, if you have any confusion about the proceeding. We'll be happy to answer those questions for you.

WITNESS: Thank you.

JUDGE DONALDSON: Let's go ahead and get started. Mr. Sorey, you can begin.

MR. SOREY: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. SOREY:

Q Mr. Crain, you are the Labor Relations manager for CNIC, are you not?

A Yes, sir.

Q And you've held that position since October of 2021?

A Yes, sir.

Q To get this hearing started for Mr. Branch and them, you heard from Mr. Wade Clark and he advised you of the incident and asked you what he should do, correct?

A Yes, sir. That's correct.

Q Okay and I believe you advised him to gather witness statements?

A Yes. Yes, sir. That's correct.

Q Now, after you reviewed these statements of the witnesses, you decided to have a formal investigation, did you not?

A I would classify that as a joint decision between myself and Mr. Clark.

Q Okay and why did you decide it was necessary to do a formal investigation?

A Because of the employees that were involved in the alleged incident, their employment terms are governed by a collective bargaining agreement. There was

preliminary evidence that there may have been violation of company rules or policy based on the statements we received and under this collective bargaining agreement, if you believe that there's an incident or rules violation that may result in a disciplinary event, the employees are granted the right to a fair and impartial hearing in which the company presents their evidence and they have the opportunity to present their defense.

Q Okay. Was there a disciplinary panel to judge the evidence from the hearing?

A Yes, sir.

Q Were you a member of that panel?

A I was not a member of the decision making part of the panel. I was a member as an advisor and participated in trying to gather additional facts or information that the panel needed to make their decision.

Q Tell us what all the disciplinary panel does, who they consist of and what other groups or interested people work with them?

A I'm not sure what you mean by other interested groups, sir.

Q Well, apparently you weren't a member of the disciplinary panel, but you said you worked with them or for them or helped them in some way. Let's start with the disciplinary panel. How are they selected?

A It depends on the case. It's Tom Sullivan, Duane Spears and an official from the employee's function or group. So, in this case, it would have been Tom Hilliard representing the Engineering Department. So, to assist them, I reviewed the record evidence and made a recommendation based on my analysis of the facts. I had multiple discussions with Tom Sullivan and Duane Spears to discuss the case.

Q So, basically you functioned as part of the disciplinary panel?

A Not under the discipline policy. No, sir.

Q Okay. I believe it was Mr. Sullivan that said yesterday that the hearing transcripts came to him with a recommendation for a Level 4 violation. Were you the one that made the recommendation for the Level 4 violation?

A Yes. The panel does not review cases unless it's for a Level 4 violation.

Q Okay. Now, the disciplinary committee after your recommendation concluded that Mr. Branch fought back and therefore was terminated. Is that correct?

A Yes, sir.

Q Okay. Now, we talked about in your deposition the definition of self-defense and I believe that we concluded that there was no definition of self-defense in the workplace violence policy. Is that correct?

A I believe so, yes.

Q Okay. Now, in the workplace violence policy, it does have a statement and I will quote, "Except excluding justified situations of self-defense." Is that correct?

A Yes, sir.

Q And to you, what does that statement mean?

A I think --- I don't have a definition for you. I think it would depend on the facts of the case that you were applying the policy to.

Q Well, give us some examples of what you mean by facts of the case.

A Well, the statements that people provided as evidence, could be photographs, could be video. I'd be speculating if I answered any further. I'm sorry. I don't understand your question.

Q Okay. What do you consider justified self-defense?

A I've never had a case in my career that I've had to make a judgment on justifying self-defense.

Q So, you never considered self-defense as a defense to this particular charge?

A That was considered in the discussions, yes.

Q Well, if you considered it, what facts were considered for justifying self-defense?

A Well, really the analysis turned on the evidence

Case: 4:23-cv-00217-MPM-JMV Doc #: 83-1 Filed: 01/08/25 99 of 189 PageID #: 2676

Robert Branch 2023-FRS-00026 February 14, 2024

Page 212

that was submitted by multiple witnesses including Mr. Branch that substantiated that both employees were swinging punches at each other. That is what tipped the scale.

Q Okay and by swinging at someone that's swinging at you, you're not trying to prevent them from hitting you or get an advantage on you?

A I can't make a determination on that. All we could determine is both employees engaged in punching each other.

Q Okay. So, for my question, you can't make a decision on justified self-defense?

MS. FITZKE: Objection. That misstates his testimony.

WITNESS: No, sir.

JUDGE DONALDSON: Overruled.

WITNESS: No, sir.

MR. SOREY: Okay. Thank you.

BY MR. SOREY:

Q And, Mr. Crain, in your deposition, you stated that you did not rule on self-defense at all. Is that correct?

A I don't specifically recall, Mr. Sorey.

Q Okay and you also said in your opinion, if Mr. Branch had a defense of self-defense that he had abandoned it. Is that correct?

Page 213

A Yes, I recall saying that, yes.

Q And when do you say he abandoned it?

A When he punched back.

Q Okay. You also said in your deposition that there was evidence that Mr. Branch and Mr. Melton were on the ground and you thought Mr. Branch could have removed himself from the situation at that time. Is that correct?

A I remember saying that, yes.

Q But you didn't know what the factors were surrounding the parking lot that these gentlemen were in, did you?

A I'm sorry. The connection glitched. Would you remind stating that?

MR. SOREY: Sure.

BY MR. SOREY:

Q I said, but you didn't know the situation of the parking lot that these gentlemen were in at the time the incident occurred, did you?

A No.

Q Okay. Did you not think that was important for your analysis that Mr. Branch could have run away or moved away?

A Possibly. The witness statements made it pretty clear what happened.

Q Okay. Were you aware of a barbecue pit that was

Page 214

lit in a truck behind Mr. Branch or were you aware of the fence around the parking lot or were you aware that there were other cars parked in the parking lot?

MS. FITZKE: Objection. States facts not in evidence.

JUDGE DONALDSON: Sustained.

MR. SOREY: Your Honor, I would just mention that Mr. Branch did testify to that.

JUDGE DONALDSON: I recall only part of what your question entails being stated by Mr. Branch. I could be wrong about that. Maybe the record will bear out differently. I don't mind if you restate it and I found the question more than compound as well. So, I don't know how the witness would answer all the different components. If you wanted to break it down, that would be fine.

MR. SOREY: Thank you.

BY MR. SOREY:

Q Mr. Crain, were you aware that there was a --- that Mr. Branch was cooking at a barbecue bit when Mr. Melton came out of the hotel?

MS. FITZKE: Objection. That also misstates the testimony.

JUDGE DONALDSON: In what way?

MS. FITZKE: There was testimony about a grill attached to a truck not a barbecue pit.

Page 215

MR. SOREY: Oh, excuse me.

JUDGE DONALDSON: That's sustained.

MR. SOREY: Okay. I'll restate it.

BY MR. SOREY:

Q Mr. Crain, were you aware of the fact that Mr. Branch was standing behind a pickup truck which had a barbecue pit or a barbecue, I call it pit, a barbecue something or other that cooks and had a fire in it at the time Mr. Melton came out of the hotel?

A There was reference to that in the witness statements, but there was no specific details offered on the layout as you're depicting it in the investigation transcript or the exhibits that I examined.

Q Well, Mr. Crain, I guess the point I'm getting to, in order to get to your definition of self-defense removing yourself from the situation, shouldn't you have been aware of the physical facts of the location in which this incident took place?

A Our analysis was focused on the conduct of the employees and that's the purpose of the investigation process under the collective bargaining agreement and for the employees to offer evidence in their side of the story and there was no information like that within the transcript or the exhibits that I examined.

Q In your definition of workplace violence in the

Bayley Reporting, Inc.
(727) 585-0600
Exhibit D: Transcript of the February 13 and 14, 2024, hearing in front of the Office of Administrative Law Judges ("OALJ")

workplace violence policy, is fighting included within the definition or is it a separate matter?

A I don't specifically recall. I could review it if you'd like me to.

Q Do you need to?

A I don't have this policy memorized, sir.

MR. SOREY: Okay. We'll put it up for you.

WITNESS: Okay.

MS. FITZKE: Exhibit 16. Is that what you're going to look at, 16? Mr. Crain also has a printed copy with him here with the exhibits he brought.

JUDGE DONALDSON: And, Mr. Crain, what we do in the hearings is also show --- the attorney will present a copy to you on the screen in front of you. If you have the hard copy and it looks the same, it should be the same, looks the same to you, you can look at that too, of course.

WITNESS: Thank you.

BY MR. SOREY:

Q Now, Mr. Crain, if you would, tell us when we should slowly start scrolling down the page?

A It's projecting. You can scroll.

Q Okay. Do you need to look through it again?

A I'm fine. I've got a copy here too, Mr. Sorey.

Q Okay. Is fighting included within the workplace violence or is it just separate?

A I don't see where the policy specifically identifies fighting.

Q Okay. Now, Mr. Crain, do you feel that Mr. Branch had a right to protect himself after Mr. Melton attached him?

A Yes.

Q Okay. Now and I think you would agree with me that Mr. Melton was obviously the aggressor in this particular situation?

A That's what the record evidence indicates. Yes, sir.

Q Okay. Now, in the workplace violence policy that we just showed you, down toward the bottom, it says, "Appropriate corrective measures will be found up to and including dismissal." What does the "up to and including dismissal" mean to you?

A That means that you review a case in which there were allegations that the policy has been violated based on the facts of the individual case involved.

Q Does that indicate that there are lesser punishments than termination?

A Depending on the facts of the case, yes.

Q Okay. Now, Mr. Crain, has Mr. Chris Day within the last year --- well, let me take that back. Let me start over. In Mr. Day's deposition in November of '23, he

told us that he had been involved in an altercation approximately a year before in a bar in Illinois in which a contractor head butted him. Now, did he report that to you?

A I don't recall having any conversations with him about that.

Q Okay. Mr. Day has told us that he did report it to you and he said he also reported it to Patrick Jones. Now, who is Mr. Patrick Jones?

A Patrick Jones took over as a senior manager of production from Wade Clark so that would be Chris Day's supervisor.

Q Okay. Did you and Mr. Patrick Jones at any time discuss the altercation of Mr. Chris Day?

A Not to my recollection.

Q Okay. So, are you telling us that Mr. Day fabricated the story that he reported it to you?

MS. FITZKE: Objection to the form of the question. It's argumentative.

JUDGE DONALDSON: Sustained.

BY MR. SOREY:

Q Mr. Crain, are you telling us that you've never had any conversation with Chris Day about the altercation that took place in the Illinois bar?

A Mr. Sorey, I don't recall that. That would not

be within my purview as a Labor Relations manager. I handle issues with employees that are covered by the collective bargaining agreement. So, I would have advised to contact the HR person and/or their supervisor.

Q Okay. Would you agree with me that the workplace violence policy was issued to enhance the safety of the employees of Illinois Central Railroad?

A Yes, sir.

Q Okay. Would you also agree with me that the decision on Mr. Branch's termination by the disciplinary panel and yourself was a close call?

A Yes, sir.

Q Okay. Now, let me ask you this. If this court finds that Mr. Branch should be reinstated, would that upset you?

MS. FRITZE: Objection. Relevance.

JUDGE DONALDSON: Overruled.

WITNESS: Upset me how? Could you restate the question, sir?

MR. SOREY: Sure.

MR. SOREY:

Q I said if this court should rule that Mr. Branch should be reinstated to his position at the Illinois Central Railroad, would you be upset with that decision?

A I don't have any emotional interest in the case,

sir. I don't know how to answer your question.
Q Okay. So, one way or another, you have no opinion?
A Correct.
Q Okay. In reviewing his matter, obviously it was within the state of Mississippi. Did you look to any of the statutes for the state of Mississippi on a definition of self-defense?
A I personally did not. My analysis was confined to the investigation hearing and transcript and the applicable company policies and rules in place at the time.
Q Now, Mr. Crain, after this case is over, do you intend to recommend to Illinois Central Railroad that they place a definition of self-defense in the workplace violence policy?
MS. FITZKE: Objection. Relevance.
JUDGE DONALDSON: What's the relevance, Mr. Sorey?
MR. SOREY: Well, it would indicate that there obviously is not a definition of self-defense in the workplace violence policy and it also would make it easier for the disciplinary panel to have an objective means of checking or checking off the list to see if the person should be granted a pass for self-defense.
JUDGE DONALDSON: Can you tie that into the

whistleblower protection and your burden or their burden here?
MR. SOREY: Well, it would affect the safety of the employees there to know what they can do under the workplace video, not video, excuse me, violence policy in protecting themselves if they get attacked at the Illinois Central Railroad. Right now, there's no guidance one way or the other.
JUDGE DONALDSON: I'm going to sustain the objection. I'm not seeing the relevance to this statutory framework.
MR. SOREY: Okay. I believe that's all the questions I have.
JUDGE DONALDSON: Okay. All right, Ms. Fitzke, you can proceed.
MS. FITZKE: Thank you.
CROSS EXAMINATION
BY MS. FITZKE:
Q Mr. Crain, can you please tell us just a broad overview what are your duties and responsibilities as a Labor Relations manager for Illinois Central?
A I field questions from managers, sometimes employees, payroll, HR, field managers on the interpretation of collective bargaining agreements that I handle for the company.

Q And do you have any responsibilities with respect to management or oversight of members of the company management or individuals who are not part of the bargaining units?
A No.
MS. FITZKE: We looked a moment ago --- Grace, could you pull up 16, Joint Exhibit 16? It's the workplace violence protection policy we just looked at. I'd like us to look at the second page of the exhibit once we get it up here. It'll just take a second. If we can scroll down just a little. There we go.
BY MS. FITZKE:
Q When you were asked some questions by Mr. Sorey about whether fighting is included separately within the policy and I just wanted to draw your attention under the examples of workplace violence to that first bullet point. Does the first bullet point in your view cover fighting, physical fighting?
A Yes, ma'am.
MS. FITZKE: And if we can scroll down a little bit further. Right there.
BY MS. FITZKE:
Q Does this policy give you any guidance as an employee of the company about what to do if you believe you are in risk of physical harm?

A Yes, ma'am.
Q And what does it tell you to do?
A It tells you to remain calm, move to safety, if warranted by the circumstances, immediately call 911 and then it gives you guidance on if you can, you should work with the local police service. You may also call the CM police for assistance and as soon as possible after the incident, report the situation to your direct supervisor.
MS. FITZKE: If we can, please, Grace, move to Exhibit 20, Joint Exhibit 20? Eddy and Jake, just let us know if you need that just a little bit better.
MR. SOREY: Yes, I can see it.
MS. FITZKE: Okay. Your Honor, can you read it?
JUDGE DONALDSON: Yes, thank you.
MS. FITZKE: Okay and it might help you if you flip it. You can see the whole page.
BY MS. FITZKE:
Q You mentioned in your testimony becoming aware of the situation by receiving word from Wade Clark. I'm showing you Exhibit 20. Is this the message that you received from Mr. Clark advising you of the situation?
A Yes, it is.
Q Did Mr. Clark tell you anything else at that time about what occurred?

A No, ma'am.

Q And I see that you gave Mr. Clark some guidance that the field operation should gather the witness statements?

A Yes.

Q Okay and why do you have the field folks do that?

A They are with their employees and they are present with them and there's urgency to gather information before evidence is lost or memories fade.

Q Before you received this message from Mr. Clark, did you know Robert Branch or Tracy Melton?

A No, ma'am.

Q And did Mr. Clark --- did the field folks go out and gather the statements that you requested?

A Yes, ma'am.

Q And did you receive them back?

A I believe I received them back from Wade Clark.

Q And what did you do with them after you got them?

A I read them and I think Wade and I may have had a telephone conversation that's very common to connect when there's things that we're looking into.

Q Did you participate in a determination to move forward with the formal investigation hearing?

A I recommended that they do so, yes.

MS. FITZKE: And why did you recommend moving

forward with an investigation with respect to --- you can take the exhibit down. Thank you.

BY MS. FITZKE:

Q Why did you recommend moving forward with an investigation hearing with respect to Mr. Branch in addition to Mr. Melton?

A Because there was preliminary evidence in the witness statements that both employees engaged in fighting and physical violence against each other.

Q It sounded like from your testimony that after the investigation hearing, you received a copy of the transcript and exhibits. Is that right?

A That's correct.

Q And I did want to ask just about the process for the investigation hearing itself. When an employee wants to claim self-defense, whose obligation is it to present at the investigation hearing the full records on all the facts on which they base their claim of self-defense?

A The employee charged at the investigation so it would have been Mr. Branch and Mr. Melton ---

Q Okay.

A -- respectively.

Q Was Mr. Melton claiming self-defense?

A Mr. Melton did not claim any --- he accepted responsibility for the incident.

Q And although he accepted responsibility for the incident, did that impact the decision about whether his employment would be terminated?

A Yes.

Q In what way?

A Well, it was very clear that Mr. Melton instigated the incident and what was more difficult to ascertain was whether Mr. Branch's conduct also violated the workplace violence policy.

Q Why is that more difficult to ascertain?

A Because we had the collective experience of the review panel, we had not had a case of similar fact pattern that this was a case of first impression.

Q And did you do anything to try to determine whether within the parent companies or sister companies whether the situation had come up before for them?

A I did connect with a colleague in Winnipeg, Manitoba and had a discussion with him to ascertain if corporately we had had similar cases.

Q What were you told?

A He told me that in cases where both employees engaged --- what he told me is if both employees swang, then we dismiss them both.

Q Did you consider that information that you received from your Canadian counterpart in making your

recommendations or determinations with respect to Mr. Branch's employment?

A Yes.

Q When you received and read the investigation hearing transcript, did you observe anything in the investigation hearing transcript or exhibits that would have indicated that there were any physical barriers to retreat for Mr. Branch?

A No.

MS. FITZKE: Can we look please at Joint Exhibit 23? Thank you, Grace.

BY MS. FITZKE:

Q If you can take a moment, sir, to take a look at Joint Exhibit 23. You were asked a moment ago in your testimony about a recommendation that was made that you participated in to terminate Mr. Branch and Mr. Melton for a Level 4 violation of the workplace violence policy. Does Exhibit 23 contain that recommendation?

A Yes, ma'am.

Q And I see you made that recommendation to Mr. Hilliard?

A Yes, ma'am.

Q Okay. Do you recall speaking to Mr. Hilliard by the phone as well or just was your communication with him limited to this email exchange?

Exhibit D: Transcript of the February 13 and 14, 2024, hearing in front of the Office of Administrative Law Judges ("OALJ")

Case: 4:23-cv-00217-MPM-JMV Doc #: 83-1 Filed: 01/08/25 103 of 189 PageID #: 2680

Robert Branch 2023-FRS-00026 February 14, 2024

Page 228

A I think it was limited to this email exchange.
Q And with respect to the recommendation itself, have you told us in the hearing here today the factors on which you base that recommendation?
A Yes.
Q When you were reviewing this situation and prior to Mr. Branch's termination, had anyone ever said anything to you or indicated to you that Mr. Melton claimed to have a firearm or that he was going to go get a gun that night out of his truck?
A I don't have any knowledge of that, no.
MS. FITZKE: If we can and just as a matter of sort of housekeeping, I'd like to look at Joint Exhibit 33, but just one page of this long document. Joint Exhibit 33 is the collective bargaining agreement and it's kind of a marked up copy, working agreement. If we can look at page 33 of 151 which contains the wage scale. It's my understanding this page contains one minor error that I'd just like to clarify with you. Okay. It's my understanding that --- we can make it a tiny bit bigger, Grace? Thank you. Perfect and if we can scroll down just a little bit.
BY MS. FITZKE:
Q It's my understanding that after the agreement was put in place, there have been subsequent contract

Page 229

negotiations and that you're working under an agreement in terms of what the folks out there are getting paid. Is that right?
A Correct.
Q All right and in the red text there is an updated wage scale where it looks like on July 1, 2020, 2021, 2022 and 2023, there's a scheduled increase?
A That is correct.
Q And the scheduled increase for 2024 or excuse me, it had the scheduled increase July 1, 2023 and then this document reflects another increase November 1, 2023 that my understanding is that should be also July 1, 2024. Is that right?
A That is correct.
Q Okay. As you made your recommendation with respect to Mr. Branch's termination, it's my understanding that recommendation was based on his physical contact with Mr. Melton. Is that right?
A Yes, ma'am.
Q In reviewing the hearing transcript, did you take note of Mr. Branch's testimony where he was asked by Mr. Melton if he considered Mr. Melton a threat and Mr. Branch responded that he had not?
A We were more focused on the conduct of the employees at the time of the incident rather than the make

Page 230

nice afterwards.
Q Did the fact that Mr. Branch had made statements in his written statement that he feared Mr. Melton or that he was afraid of what Mr. Melton might do or words to that affect, did that contribute to your decision that he should be fired?
A Yes.
Q In what way?
A It represented a potential continuing threat within the workplace for additional future incidents.
Q I'm sorry. Did it contribute to your decision that Mr. Branch should be fired?
A Oh, no. Sorry.
MS. FITZKE: Okay. Thank you, Mr. Crain. I don't have any other questions for you at this time.
JUDGE DONALDSON: All right. Mr. Sorey, anything further?
MR. SOREY: Yes, ma'am.
REDIRECT EXAMINATION
BY MR. SOREY:
Q Mr. Crain, in the exhibit that you reviewed, Number 16, in the things to do for an employee, at the end, I believe it said, "As soon as possible, report to your direct supervisor." Is that correct?
A I'm flipping my book, sir.

Page 231

Q Okay.
A Yes, that's correct, sir.
Q Okay. So, is it your opinion that the IC Railroad requires the employees to report any workplace violence?
A In my professional opinion, yes, it would.
Q Okay. So, anybody observing or seeing altercations are supposed to report it?
A Yes, sir.
Q And that would include managers and it would include union employees?
A This policy applies to all employees. Yes, sir.
Q Okay. Now, in listening to your testimony and I believe I heard it correctly and I wrote it down, it says the employee is required to prove it's self-defense. Is that what you said?
A What I meant was in the processes outlined in the collective bargaining agreement, the employee bears the burden of adding any additional information that the employee wishes to be considered in the review of the record.
Q Well, is this a fair statement, that the burden of proof is on Mr. Branch to prove his innocence rather than the burden being on the railroad to prove his violation of policy?

Bayley Reporting, Inc.
(727) 585-0600
Exhibit D: Transcript of the February 13 and 14, 2024, hearing in front of the Office of Administrative Law Judges ("OALJ")

MS. FITZKE: Objection. Argumentative.
JUDGE DONALDSON: Overruled. You can answer.
WITNESS: In the collective bargaining agreement, adjudication space, in a disciplinary matter, the burden of proof is the company's and I feel that the burden of proof was met that both employees engaged in a fight and that was what drove the decision to dismiss both of the employees.
BY MR. SOREY:
Q Mr. Crain, do you know approximately now many railroads there are in the United States?
MS. FITZKE: Objection. Relevance.
JUDGE DONALDSON: Overruled.
WITNESS: I know there's, I think, six Class 1 railroads now.
BY MR. SOREY:
Q Okay, but you had to go to Canada to try to find out a definition or policy on fighting and self-defense?
MS. FITZKE: Objection. Irrelevant. Argumentative.
MR. SOREY: Your Honor, this is what he testified to.
JUDGE DONALDSON: I'll allow it. I'm going to overrule that. I'm going to see how the relevance plays out in the next couple of questions. So, can you restate

the question? Just repeat it.
MR. SOREY: Yes, ma'am.
BY MR. SOREY:
Q So, with all the railroads in the United States handling cases such as Mr. Branch's, you felt it necessary to go to Canada to find out what the definition of violence and self-defense is for the Illinois Central Railroad?
MS. FITZKE: Objection. Assumes facts not in evidence that they apply similar policies.
JUDGE DONALDSON: I'll overrule it. Do you understand the question, Mr. Crain? Are you able to answer it?
WITNESS: I can answer why I called, who I called if that's what the question is.
MR. SOREY: That's good.
JUDGE DONALDSON: Wouldn't that work, Mr. Sorey?
MR. SOREY: Yes, ma'am.
JUDGE DONALDSON: Okay.
WITNESS: The reason I called who I called was because it's a common policy, U.S. and Canada and our operational footprint in Canada has about twice as many employees as we have in the U.S. and so we were looking for how the corporate policy had been applied across the company.

BY MR. SOREY:
Q Okay. Now, you told us that your superior told you, "If you swing, you are fired." Is that correct?
MS. FITZKE: Objection. Misstates his testimony. He did not say a superior said that.
JUDGE DONALDSON: Okay. I'm going to overrule it since Mr. Crain was asked specifically if he did in fact say something to that affect so that's overruled.
WITNESS: My colleague in Winnipeg told me that under the application of this policy, if both employees threw punches in a fight, then the corporate practice was to dismiss both employees.
BY MR. SOREY:
Q Okay and where is that written within the CM or IC Railroad policies?
A That specific verbiage?
MR. SOREY: Yes, sir.
WITNESS: It's encapsulated in the first bullet point, "Intentionally threatening or causing physical harm."
BY MR. SOREY:
Q No, that's not what I was talking about. A while ago, your testimony said if you swing, you are fired.
JUDGE DONALDSON: So, what is the question, Mr. Sorey?

BY MR. SOREY:
Q The question is where does that appear in the written policies of Illinois Central Railroad or CN Railroad?
A As specifically stated in that way, it's not there.
MR. SOREY: Okay. That's all the questions I have.
JUDGE DONALDSON: Do you have any follow-up, Ms. Fitzke?
MS. FITZKE: I do not.
JUDGE DONALDSON: Okay. I don't have any --- well, I do have a quick question. I don't know that it's going to have any bearing on my understanding of the facts in the case, but some policies that have been presented during the hearing, Southern Region of Illinois Central and it could be that another witness has addressed this, but what does that region cover?
WITNESS: Generally, in the corporate world here, the Southern Region is generally the United States region of the CN operation of which Illinois Central is a part, but there are other subsidiary railroads that comprise the Southern Region as well.
JUDGE DONALDSON: So, Southern in that terminology is the United States?

WITNESS: Yes, ma'am.

JUDGE DONALDSON: As opposed to the Southern Region within the United States which is how I typically see that play out. So, it means the United States region of which Illinois Central is one railroad part of a structure. I might be misstating that, but is that what you said?

WITNESS: Yes, ma'am.

JUDGE DONALDSON: Okay. All right, so that helps me understand a little bit because I was not clear and that's why I thought Mr. Sorey's question helped me understand why the consultation with Canada if there were other geographical regions of the United States that might be consulted, but you've explained to me that Southern Region did in fact encompass the United States, okay. All right and you agree with that, Ms. Fitzke, as counsel for Respondent. Would you add anything to that?

MS. FITZKE: No, I think you've hit it right on the nose.

JUDGE DONALDSON: Okay. All right, does anybody have a follow-up question based on my questions?

MR. SOREY: I don't.

MS. FITZKE: No.

JUDGE DONALDSON: Okay. Thank you, Mr. Crain, for your testimony this morning. Thanks for being on

standby throughout the hearing as to when you would be needed. I appreciate you being available first thing this morning and your testimony in this proceeding. We can go ahead and excuse you unless you want to remain. You might have other things to get to, I would imagine.

WITNESS: Yes, ma'am. Thank you very much.

JUDGE DONALDSON: All right, thank you. We'll let you go. Thanks. Okay, so you called the witnesses, Mr. Sorey and Mr. Ferguson, and I take it, is that the last witness you're calling?

MR. SOREY: Yes, ma'am.

JUDGE DONALDSON: Okay and Respondent has obviously been conducting examinations of the same witnesses that do appear to have material, relevant information about the case. Are there any other additional witnesses you're --- we haven't talked about any, but are there any you're planning to need to call during this live video hearing? Somehow you got muted.

MS. FITZKE: No additional witnesses. Thank you.

JUDGE DONALDSON: Okay. All right, let's talk about how I can close the evidentiary record. There's the Gardener deposition to mark as JX-49 and submit that. If you would do that by this Friday, February 16th, that would be appreciated. There were some deposition excerpts. I

think this was very limited. The only one I recall was Ms. Fitzke's use of some testimony from Complainant, Mr. Branch's deposition during his examination yesterday. I recommend marking that as JX-50 and submitting it. You probably need to send that to --- unless you plan on submitting the whole thing, but whatever you plan to tender and mark as JX-50, share with counsel for Mr. Branch in case they want to submit any other parts that they feel are necessary for completion or context. So, you all can do that under --- it's our Rule 29 CFR 1855 for submission of a deposition transcript that's been used during the formal hearing. The rule allows the opposing parties to submit some other portion that they believe is important for context.

Am I right, let's see, Mr. Sorey, Mr. Ferguson, is there any transcript that you --- I ruled earlier before the hearing about the transcripts not being submitted. Is there anything else you plan to submit or need to submit?

MR. SOREY: We don't think so. No, ma'am.

JUDGE DONALDSON: Okay. All right, so I'm going to ask for JX-50 that I described to be submitted by Friday, the 16th as well. If you need more time, just let me know. That's flexible time limit. Post-hearing briefs will be set by the --- the briefing schedule will be set by order. So, I follow fairly informal processes at first

when the transcript comes in from the court reporter. Sometimes I get it first, not by a lot, but I want to make sure everyone has it before we set a briefing schedule. So, we'll hear from Ms. Wynn to say we got it. It will be an email, nothing formal and when the last party has it and I'm sure we can go forward with briefing, we'll set the briefing schedule. I usually set just by routine or habit a 30-day schedule from the last party's receipt of the transcript, but if we've got a trial, if you've got some other conflict and you need more time, then that's --- I always grant more time if you request it. I don't do page limits on briefs. I do allow especially our rules allow it because you're filing simultaneous briefs, I allow replies to be filed within 14 days of the original brief and you'll get all of this in the scheduling order and I do set page limits on the reply brief just to make sure that they're tailored to true replies and that's it from my housekeeping list. Is there anything on your housekeeping list, Mr. Sorey or Mr. Ferguson?

MR. SOREY: No, ma'am.

JUDGE DONALDSON: No. Ms. Fitzke, Ms. Jacobson, anything on your list?

MS. FITZKE: Nothing I can think of.

JUDGE DONALDSON: Okay. So, what will happen is I'll sent you a very short order closing the evidentiary

record as well once everything is in and you know what the complete record is so that you'll know what the body of evidence is for the briefs. You'll have that confirmed.

So, my compliments again to all of the representatives for both parties for your preparation which was evident throughout the hearing and your professionalism. I think the witnesses greatly appreciated that as well and I'm going to call this adjourned now and go off the record.

[Whereupon, the hearing was concluded at 9:58 a.m., CST.]

//
//
//
//
//
//
//
//
//
//
//
//
//
//

C E R T I F I C A T E

Name: Robert Branch
Case Number: 2023-FRS-00026
Date: February 14, 2024
Location: Video Hearing

This is to certify that the attached proceedings before the United States Department of Labor, Office of Administrative Law Judges, were held according to the record and that this is the original, complete, true and accurate transcript that has been compared to the reporting or recording accomplished at the hearing.

/s/Jordan Bayley — February 14, 2024 (Date)
Bayley Reporting, Inc.
Official Federal Reporters
Building 1, Suite 14
12945 Seminole Boulevard
Seminole, FL 33778

A

**Abandoned** - 212:24, 213:2
**Able** - 233:11
**Accepted** - 225:24, 226:1
**Across** - 233:24
**Add** - 236:17
**Adding** - 231:19
**Addition** - 225:6
**Addressed** - 235:17
**Adjourned** - 240:8
**Adjudication** - 232:4
**Advantage** - 212:6
**Advised** - 208:10, 208:13, 219:3
**Advising** - 223:22
**Advisor** - 209:14
**Affect** - 221:3, 230:5, 234:8
**Afraid** - 230:4
**Against** - 207:5, 225:9
**Aggressor** - 217:8
**Agree** - 217:7, 219:5, 219:9, 236:16
**Agreement** - 208:25, 209:3, 215:21, 219:3, 228:15, 228:16, 228:24, 229:1, 231:18, 232:4
**Agreements** - 221:24
**Ahead** - 207:23, 237:4
**Allegations** - 217:18
**Alleged** - 208:24
**Allow** - 232:23, 239:12, 239:13
**Allows** - 238:12
**Altercation** - 218:1, 218:14, 218:23
**Altercations** - 231:8
**Analysis** - 210:6, 211:25, 213:21, 215:19, 220:9
**And/Or** - 219:4
**Apparently** - 209:22
**Appear** - 235:2, 237:14
**Applicable** - 220:11
**Application** - 234:10
**Applied** - 233:24
**Applies** - 231:12
**Apply** - 233:9
**Applying** - 211:9
**Appreciate** - 237:2
**Appreciated** - 237:25, 240:7
**Appropriate** - 217:14
**Approximately** - 218:2, 232:10
**Argumentative** - 218:19, 232:1, 232:20
**Ascertain** - 226:8, 226:10, 226:18
**Assist** - 210:4
**Assistance** - 223:7
**Attached** - 214:25, 217:5
**Attacked** - 221:6
**Attention** - 222:15
**Attorney** - 216:13
**Attorneys** - 207:18
**Available** - 237:2
**Aware** - 213:25, 214:1, 214:2, 214:18, 215:5, 215:17, 223:19

B

**Back** - 210:19, 213:3, 217:24, 224:16, 224:17
**Bar** - 218:2, 218:24
**Barbecue** - 213:25, 214:19, 214:25, 215:7
**Bargaining** - 208:25, 209:3, 215:21, 219:3, 221:24, 222:4, 228:15, 231:18, 232:3
**Barriers** - 227:7
**Base** - 225:18, 228:4
**Based** - 209:2, 210:6, 217:18, 229:17, 236:21
**Bear** - 214:11
**Bearing** - 235:14
**Bears** - 231:18
**Becoming** - 223:19
**Behind** - 214:1, 215:6
**Bit** - 214:19, 222:21, 223:11, 228:20, 228:22, 236:10
**Body** - 240:2
**Book** - 230:25
**Both** - 212:2, 212:8, 225:8, 226:21, 226:22, 226:23, 232:6, 232:7, 234:10, 234:12, 240:5
**Bottom** - 217:13
**Branch's** - 219:10, 226:8, 227:2, 228:7, 229:16, 229:21, 233:5, 238:3
**Break** - 214:15
**Brief** - 239:14, 239:16
**Briefing** - 238:24, 239:3, 239:6, 239:7
**Briefs** - 238:23, 239:12, 239:13, 240:3
**Broad** - 221:19
**Brought** - 207:5, 216:11
**Bullet** - 222:16, 222:17, 234:18
**Burden** - 221:1, 231:19, 231:22, 231:24, 232:5, 232:6
**Butted** - 218:3

C

**Call** - 215:7, 219:11, 223:4, 223:6, 237:17, 240:8
**Called** - 207:14, 233:13, 233:14, 233:20, 237:8
**Calling** - 237:10
**Calm** - 223:3
**Canada** - 232:17, 233:6, 233:21, 233:22, 236:12
**Canadian** - 226:25
**Can't** - 212:7, 212:10
**Career** - 211:18
**Cars** - 214:3
**Case** - 207:4, 210:1, 210:3, 210:8, 211:8, 211:11, 211:18, 217:17, 217:19, 217:22, 219:25, 220:12, 226:12, 226:13, 235:15, 237:15, 238:8
**Cases** - 210:16, 226:19, 226:21, 233:5
**Causing** - 234:19
**Central** - 207:5, 219:7, 219:24, 220:13, 221:7, 221:21, 233:7, 235:3, 235:16, 235:21, 236:5
**CFR** - 238:10
**Charge** - 211:21
**Charged** - 225:19
**Checking** - 220:23
**Chris** - 217:23, 218:11, 218:14, 218:23
**Circumstances** - 223:4
**Claim** - 225:16, 225:18, 225:24
**Claimed** - 228:8
**Claiming** - 225:23
**Clarify** - 228:19
**Clark** - 208:10, 208:20, 218:11, 223:20, 223:22, 223:24, 224:2, 224:10, 224:13, 224:17
**Class** - 232:14
**Classify** - 208:19
**Close** - 219:11, 237:22
**Closing** - 239:25
**CM** - 223:6, 234:14
**CN** - 235:3, 235:21
**CNIC** - 208:4
**Colleague** - 226:17, 234:9
**Collective** - 208:25, 209:3, 215:21, 219:3, 221:24, 226:11, 228:15, 231:18, 232:3
**Come** - 226:16
**Comes** - 239:1
**Committee** - 210:18
**Common** - 224:20, 233:21
**Communication** - 227:24
**Companies** - 226:15
**Company** - 209:2, 209:7, 220:11, 221:25, 222:2, 222:24, 233:25
**Company's** - 232:5
**Complainant** - 238:2
**Complete** - 240:2
**Completion** - 238:9
**Compliments** - 240:4
**Components** - 214:14
**Compound** - 214:13
**Comprise** - 235:23
**Concluded** - 210:19, 210:24, 240:10
**Conduct** - 215:19, 226:8, 229:24
**Conducting** - 237:13
**Confined** - 220:9
**Confirmed** - 240:3
**Conflict** - 239:10
**Confusion** - 207:19
**Connect** - 224:20, 226:17
**Connection** - 213:12
**Consider** - 211:16, 226:24
**Considered** - 211:20, 211:22, 211:23, 211:24, 229:22, 231:20
**Consist** - 209:18
**Consultation** - 236:12
**Consulted** - 236:14
**Contact** - 219:4, 229:17
**Contain** - 227:18
**Contains** - 228:17, 228:18
**Context** - 238:9, 238:14
**Continuing** - 230:9

**Contract** - 228:25
**Contractor** - 218:3
**Contribute** - 230:5, 230:11
**Conversation** - 218:23, 224:20
**Conversations** - 218:5
**Cooking** - 214:19
**Cooks** - 215:8
**Copy** - 216:10, 216:14, 216:15, 216:23, 225:11, 228:16
**Corporate** - 233:24, 234:11, 235:19
**Corporately** - 226:19
**Corrective** - 217:14
**Correctly** - 231:14
**Counsel** - 236:16, 238:7
**Counterpart** - 226:25
**Couple** - 232:25
**Course** - 216:16
**Court** - 219:13, 219:22, 239:1
**Cover** - 222:17, 235:18
**Covered** - 219:2
**Crane** - 207:7
**CROSS** - 221:17
**CST** - 207:2, 240:11

D

**Day** - 207:6, 217:23, 218:7, 218:14, 218:16, 218:23, 239:8
**Days** - 239:14
**Day's** - 217:25, 218:11
**Decide** - 208:21
**Decided** - 208:17
**Decision** - 208:19, 209:13, 209:16, 212:11, 219:10, 219:24, 226:2, 230:5, 230:11, 232:7
**Definition** - 210:23, 210:24, 211:7, 215:15, 215:25, 216:2, 220:7, 220:14, 220:20, 232:18, 233:6
**Department** - 210:4
**Depicting** - 215:12
**Deposition** - 210:22, 212:19, 213:4, 217:25, 237:23, 237:25, 238:3, 238:11
**Described** - 238:21
**Determination** - 212:7, 224:22
**Determinations** - 227:1
**Determine** - 212:8, 226:14
**Didn't** - 213:9, 213:16
**Different** - 214:14
**Differently** - 214:12
**Difficult** - 226:7, 226:10
**Disciplinary** - 209:5, 209:9, 209:17, 209:23, 209:25, 210:10, 210:18, 219:10, 220:22, 232:4
**Discipline** - 210:11
**Discussions** - 210:7, 211:22
**Dismiss** - 226:23, 232:7, 234:12
**Dismissal** - 217:15, 217:16
**Document** - 228:14, 229:11
**Don't** - 211:7, 211:14, 212:22, 214:12, 214:13, 216:3, 216:6, 217:1, 218:5, 218:25, 219:25, 220:1, 228:11, 230:15, 235:12, 235:13, 236:22, 238:19, 239:11
**Draw** - 222:15
**Drove** - 232:7
**Duane** - 210:1, 210:7
**Duly** - 207:14
**Duties** - 221:20

E

**Each** - 212:3, 212:8, 225:9
**Earlier** - 238:16
**Easier** - 220:21
**Eddy** - 223:10
**Email** - 227:25, 228:1, 239:5
**Emotional** - 219:25
**Employee** - 222:24, 225:15, 225:19, 230:22, 231:15, 231:18, 231:20
**Employee's** - 210:2
**Employment** - 208:24, 226:3, 227:2
**Encapsulated** - 234:18
**Encompass** - 236:15
**Engaged** - 212:8, 225:8, 226:22, 232:6
**Engineering** - 210:4
**Enhance** - 219:6
**Entails** - 214:10
**Error** - 228:18
**Everyone** - 239:3
**Everything** - 240:1
**Evidence** - 209:1, 209:7, 209:10, 210:5, 211:13, 211:25, 213:5, 214:5, 215:22, 217:10, 224:9, 225:7, 233:9, 240:3
**Evident** - 240:6
**Evidentiary** - 237:22, 239:25
**EXAMINATION** - 208:1, 221:17, 230:19, 238:3
**Examinations** - 237:13
**Examined** - 207:15, 215:13, 215:24
**Examples** - 211:10, 222:16
**Except** - 211:3
**Excerpts** - 237:25
**Exchange** - 227:25, 228:1
**Excluding** - 211:3
**Exhibit** - 216:9, 222:7, 222:9, 223:10, 223:21, 225:2, 227:10, 227:14, 227:18, 228:13, 228:14, 230:21
**Exhibits** - 215:13, 215:24, 216:11, 225:12, 227:6
**Experience** - 226:11
**Explained** - 236:14

F

**Fabricated** - 218:17
**Factors** - 213:9, 228:3
**Fade** - 224:9
**Fair** - 209:6, 231:22
**Fairly** - 238:25
**Feared** - 230:3
**February** - 207:2, 237:24
**Feel** - 217:3, 232:5, 238:8
**Felt** - 233:5
**Fence** - 214:2
**Ferguson** - 237:9, 238:15, 239:19
**Field** - 221:22, 221:23, 224:3, 224:6, 224:13
**Fight** - 232:7, 234:11
**Fighting** - 216:1, 216:24, 217:2, 222:14, 222:17, 222:18, 225:8, 232:18
**Filed** - 239:14
**Filing** - 239:13
**Find** - 232:17, 233:6
**Finds** - 219:14
**Fine** - 214:15, 216:23
**Fire** - 215:8
**Firearm** - 228:9
**Fired** - 230:6, 230:12, 234:3, 234:23
**First** - 222:16, 222:17, 226:13, 234:18, 237:2, 238:25, 239:2
**Fitzke's** - 238:2
**Flexible** - 238:23
**Flip** - 223:17
**Flipping** - 230:25
**Focused** - 215:19, 229:24
**Folks** - 224:6, 224:13, 229:2
**Follow** - 235:9, 236:21, 238:25
**Follows** - 207:15
**Footprint** - 233:22
**Form** - 218:18
**Formal** - 208:17, 208:22, 224:23, 238:11, 239:5
**Forward** - 224:23, 225:1, 225:4, 239:6
**Fought** - 210:19
**Found** - 214:12, 217:14
**Framework** - 221:11
**Friday** - 237:24, 238:22
**FRITZE** - 219:16
**Front** - 216:14
**FRSA** - 207:4
**Full** - 225:17
**Function** - 210:2
**Functioned** - 210:9
**Further** - 211:14, 222:21, 230:17
**Future** - 230:10

G

**Gardener** - 237:23
**Gave** - 224:2
**Generally** - 235:19, 235:20
**Gentlemen** - 213:10, 213:17
**Geographical** - 236:13
**Get** - 207:23, 208:9, 212:6, 215:15, 221:6, 222:9, 228:9, 237:5, 239:2, 239:15
**Give** - 211:10, 222:23
**Gives** - 223:5
**Glitched** - 213:12
**Go** - 207:23, 222:11, 224:13, 228:9, 232:17, 233:6,

237:3, 237:8, 239:6, 240:9
**Going** - 216:10, 221:9, 228:9, 232:23, 232:24, 234:6, 235:14, 238:21, 240:8
**Good** - 233:15
**Got** - 216:23, 224:18, 237:18, 239:4, 239:9
**Governed** - 208:24
**Grace** - 222:6, 223:9, 227:11, 228:21
**Grant** - 239:11
**Granted** - 209:6, 220:24
**Greatly** - 240:7
**Grill** - 214:24
**Ground** - 213:6
**Group** - 210:3
**Groups** - 209:18, 209:21
**Guess** - 215:14
**Guidance** - 221:7, 222:23, 223:5, 224:2
**Gun** - 228:9

H

**Habit** - 239:7
**Hand** - 207:11
**Handle** - 219:2, 221:25
**Handling** - 233:5
**Happy** - 207:20
**Hard** - 216:15
**Harm** - 222:25, 234:20
**Haven't** - 237:16
**Head** - 218:3
**Hear** - 239:4
**Heard** - 208:10, 231:14
**Hearings** - 216:13
**Held** - 208:6
**Help** - 223:16
**Helped** - 209:24, 236:11
**Helps** - 236:10
**Herein** - 207:14
**Hilliard** - 210:3, 227:21, 227:23
**Hit** - 236:18
**Hitting** - 212:5
**Honor** - 207:25, 214:7, 223:13, 232:21
**Hotel** - 214:20, 215:9
**Housekeeping** - 228:13, 239:17, 239:18
**HR** - 219:4, 221:23

I

**IC** - 231:3, 234:15
**I'd** - 211:13, 222:8, 228:13, 228:18
**Identifies** - 217:2
**I'll** - 215:3, 232:23, 233:10, 239:25
**Illinois** - 207:5, 218:2, 218:24, 219:7, 219:23, 220:13, 221:6, 221:21, 233:7, 235:3, 235:16, 235:21, 236:5
**I'm** - 209:20, 211:14, 213:12, 215:14, 216:23, 221:9, 221:10, 223:20, 230:11, 230:25, 232:23, 232:24, 234:6, 238:20, 239:6, 240:8
**Imagine** - 237:5
**Immediately** - 223:4
**Impact** - 226:2
**Impartial** - 209:6
**Important** - 213:20, 238:13
**Impression** - 226:13
**Incidents** - 230:10
**Increase** - 229:7, 229:9, 229:10, 229:11
**Indicated** - 227:7, 228:8
**Informal** - 238:25
**Innocence** - 231:23
**Instigated** - 226:7
**Intend** - 220:13
**Intentionally** - 234:19
**Interest** - 219:25
**Interpretation** - 221:24
**Investigation** - 208:17, 208:22, 215:12, 215:20, 220:10, 224:23, 225:1, 225:5, 225:11, 225:15, 225:17, 225:19, 227:4, 227:6
**Irrelevant** - 232:19
**Issued** - 219:6
**Issues** - 207:19, 219:2
**It'll** - 222:10
**It's** - 210:1, 210:16, 216:21, 218:19, 222:7, 228:15, 228:17, 228:19, 228:24, 229:16, 231:15, 233:21, 234:18, 235:5, 235:13, 238:10
**I've** - 211:18, 216:23

J

**Jacobson** - 239:22
**Jake** - 223:10
**Joint** - 208:19, 222:7, 223:10, 227:10, 227:14, 228:13, 228:14
**Jones** - 218:8, 218:9, 218:10, 218:13
**Judgment** - 211:19
**July** - 229:6, 229:10, 229:12
**Justified** - 211:4, 211:16, 212:11
**Justifying** - 211:19, 211:24
**JX** - 237:23, 238:4, 238:7, 238:21

K

**Knowledge** - 228:11

L

**Labor** - 208:3, 219:1, 221:21
**Layout** - 215:12
**Lesser** - 217:20
**Let's** - 207:23, 209:24, 237:21, 238:15
**Level** - 210:14, 210:15, 210:17, 227:17
**Limit** - 238:23
**Limited** - 227:25, 228:1, 238:1
**Limits** - 239:12, 239:16
**List** - 220:23, 239:18, 239:22
**Listening** - 231:13
**Lit** - 214:1
**Local** - 223:6
**Location** - 215:17
**Long** - 228:14
**Look** - 216:10, 216:16, 216:22, 220:6, 222:9, 227:10, 227:13, 228:13, 228:16
**Looked** - 222:6, 222:8
**Looking** - 224:21, 233:23
**Lost** - 224:9
**Lot** - 213:10, 213:17, 214:2, 214:3, 239:2

M

**Make** - 209:16, 211:19, 212:7, 212:10, 220:21, 228:20, 229:25, 239:2, 239:16
**Making** - 209:13, 226:25
**Management** - 222:2, 222:3
**Manager** - 208:3, 218:10, 219:1, 221:21
**Managers** - 221:22, 221:23, 231:10
**Manitoba** - 226:18
**Many** - 232:10, 233:22
**Mark** - 237:23, 238:7
**Marked** - 228:16
**Marking** - 238:4
**Material** - 237:14
**Means** - 217:17, 220:22, 236:4
**Meant** - 231:17
**Measures** - 217:14
**Melton** - 213:5, 214:20, 215:9, 217:4, 217:8, 224:11, 225:6, 225:20, 225:23, 225:24, 226:6, 227:16, 228:8, 229:18, 229:22, 230:3, 230:4
**Member** - 209:12, 209:13, 209:14, 209:22
**Members** - 222:2
**Memories** - 224:9
**Memorized** - 216:6
**Message** - 223:21, 224:10
**Met** - 232:6
**Minor** - 228:18
**Mississippi** - 220:6, 220:7
**Misstates** - 212:12, 214:21, 234:4
**Misstating** - 236:6
**Morning** - 236:25, 237:3
**Move** - 223:3, 223:9, 224:22
**Moved** - 213:21
**Moving** - 224:25, 225:4
**Much** - 237:6
**Multiple** - 210:7, 212:1
**Muted** - 237:18

N

**Necessary** - 208:21, 233:5, 238:9
**Needed** - 209:16, 237:2
**Negotiations** - 229:1
**Nice** - 230:1
**Night** - 228:9
**Nose** - 236:19
**Note** - 229:21
**November** - 217:25, 229:11

O

**Objection** - 212:12, 214:4, 214:21, 218:18, 219:16, 220:16, 221:10, 232:1, 232:12, 232:19, 233:8, 234:4
**Objective** - 220:22
**Obligation** - 225:16
**Observe** - 227:5
**Observing** - 231:7
**Occurred** - 213:18, 223:25
**October** - 208:6
**Offer** - 215:22
**Offered** - 215:11
**Official** - 210:2
**One** - 207:6, 210:14, 220:2, 221:7, 228:14, 228:18, 236:5, 238:1
**Operation** - 224:3, 235:21
**Operational** - 233:22
**Opinion** - 212:23, 220:3, 231:3, 231:6
**Opposed** - 236:2
**Opposing** - 238:12
**Order** - 215:15, 238:25, 239:15, 239:25
**Original** - 239:14
**Outlined** - 231:17
**Overrule** - 232:24, 233:10, 234:6
**Overruled** - 212:15, 219:17, 232:2, 232:13, 234:8
**Oversight** - 222:2
**Overview** - 221:20

P

**Paid** - 229:2
**Panel** - 209:9, 209:12, 209:14, 209:16, 209:17, 209:23, 209:25, 210:10, 210:16, 219:11, 220:22, 226:12
**Parent** - 226:15
**Parked** - 214:3
**Parking** - 213:10, 213:17, 214:2, 214:3
**Participate** - 224:22
**Participated** - 209:14, 227:16
**Parties** - 238:12, 240:5
**Parts** - 238:8
**Party** - 239:5
**Party's** - 239:8
**Pass** - 220:24
**Patrick** - 207:7, 207:13, 218:8, 218:9, 218:10, 218:13
**Pattern** - 226:12
**Payroll** - 221:23
**People** - 209:18, 211:12
**Perfect** - 228:21
**Person** - 219:4, 220:23
**Personally** - 220:9
**Phone** - 227:24
**Photographs** - 211:13
**Physical** - 215:17, 222:18, 222:25, 225:9, 227:7, 229:17, 234:19
**Pickup** - 215:6
**Pit** - 213:25, 214:25, 215:7
**Place** - 215:18, 218:24, 220:11, 220:14, 228:25
**Plan** - 238:5, 238:6, 238:18
**Planning** - 237:17
**Play** - 236:4
**Plays** - 232:24
**Police** - 223:6, 223:7
**Policies** - 220:11, 233:9, 234:15, 235:3, 235:15
**Portion** - 238:13
**Position** - 208:6, 219:23
**Post** - 238:23
**Potential** - 230:9
**Practice** - 234:11
**Preliminary** - 209:1, 225:7
**Preparation** - 240:5
**Present** - 209:8, 216:13, 224:8, 225:16
**Presented** - 235:15
**Presents** - 209:7
**Prevent** - 212:5
**Printed** - 216:10
**Prior** - 228:6
**Proceed** - 221:15
**Processes** - 231:17, 238:25
**Production** - 218:11
**Professional** - 231:6
**Professionalism** - 240:7
**Projecting** - 216:21
**Proof** - 231:23, 232:5, 232:6
**Protect** - 217:4
**Protecting** - 221:6
**Protection** - 207:4, 221:1, 222:8
**Provided** - 211:12
**Provision** - 207:4
**Pull** - 222:7
**Punched** - 213:3
**Punches** - 212:3, 234:11
**Punching** - 212:8
**Punishments** - 217:21
**Purview** - 219:1

Q

**Quick** - 235:13
**Quote** - 211:3

R

**Railroad** - 219:7, 219:24, 220:13, 221:7, 231:4, 231:24, 233:7, 234:15, 235:3, 235:4, 236:5
**Railroads** - 232:11, 232:15, 233:4, 235:22
**Raise** - 207:10
**Rather** - 229:25, 231:23
**Reason** - 233:20
**Receipt** - 239:8
**Receive** - 224:16
**Received** - 209:2, 223:22, 224:10, 224:17, 225:11, 226:25, 227:4
**Receiving** - 223:20
**Recommend** - 220:13, 224:25, 225:4, 238:4
**Recommendation** - 210:6, 210:14, 210:15, 210:19, 227:15, 227:18, 227:20, 228:2, 228:4, 229:15, 229:17
**Recommendations** - 227:1
**Recommended** - 224:24
**Reconvened** - 207:3
**Records** - 225:17
**Red** - 229:5
**REDIRECT** - 230:19
**Reflects** - 229:11
**Region** - 235:16, 235:18, 235:20, 235:21, 235:23, 236:3, 236:4, 236:15
**Regions** - 236:13
**Reinstated** - 219:14, 219:23
**Relations** - 208:3, 219:1, 221:21
**Relevance** - 219:16, 220:16, 220:17, 221:10, 232:12, 232:24
**Remain** - 223:3, 237:4
**Remaining** - 207:7
**Remind** - 213:13
**Removed** - 213:6
**Removing** - 215:16
**Replies** - 239:13, 239:17
**Reply** - 239:16
**Report** - 218:3, 218:7, 223:8, 230:23, 231:4, 231:8
**Reported** - 218:8, 218:17
**Reporter** - 239:1
**Representatives** - 240:5
**Represented** - 230:9
**Request** - 239:11
**Requested** - 224:14
**Required** - 231:15
**Requires** - 231:4
**Respect** - 222:1, 225:1, 225:5, 227:1, 228:2, 229:16
**Respectively** - 225:22
**Responded** - 229:23
**Respondent** - 236:17, 237:12
**Responsibilities** - 221:20, 222:1
**Responsibility** - 225:25, 226:1
**Result** - 209:5
**Retreat** - 227:8
**Reviewed** - 208:16, 210:5, 230:21
**Reviewing** - 220:5, 228:6, 229:20
**Risk** - 222:25
**Robert** - 207:5, 224:11
**Routine** - 239:7
**Rule** - 212:20, 219:22, 238:10, 238:12
**Ruled** - 238:16
**Rules** - 209:2, 209:4, 220:11, 239:12
**Run** - 213:21

S

**Safety** - 219:6, 221:3, 223:3
**Scale** - 212:3, 228:17, 229:6
**Schedule** - 238:24, 239:3, 239:7, 239:8
**Scheduled** - 229:7, 229:9, 229:10
**Scheduling** - 239:15
**Screen** - 216:14
**Scroll** - 216:21,

222:10, 222:20, 228:21
**Scrolling** - 216:20
**Second** - 222:9, 222:10
**See** - 217:1, 220:23, 223:12, 223:17, 224:2, 227:20, 232:24, 236:4, 238:15
**Seeing** - 221:10, 231:7
**Selected** - 209:25
**Senior** - 218:10
**Sent** - 239:25
**Separate** - 216:2, 216:25
**Separately** - 222:14
**Service** - 223:6
**Set** - 238:24, 239:3, 239:6, 239:7, 239:15
**Share** - 238:7
**Shouldn't** - 215:16
**Show** - 216:13
**Showed** - 217:13
**Showing** - 223:21
**Side** - 215:22
**Similar** - 226:12, 226:19, 233:9
**Simultaneous** - 239:13
**Sister** - 226:15
**Situation** - 213:7, 213:16, 215:16, 217:9, 223:8, 223:20, 223:22, 226:16, 228:6
**Situations** - 211:4
**Six** - 232:14
**Slowly** - 216:20
**Sorey's** - 236:11
**Sounded** - 225:10
**Southern** - 235:16, 235:20, 235:23, 235:24, 236:2, 236:14
**Space** - 232:4
**Spears** - 210:2, 210:7
**Specific** - 215:11, 234:16
**Speculating** - 211:14
**Standby** - 237:1
**Standing** - 215:6
**Start** - 209:24, 216:20, 217:25
**Started** - 207:24, 208:9
**State** - 220:6, 220:7
**Statement** - 211:3, 211:6, 230:3, 231:22
**Statements** - 208:14, 208:16, 209:2, 211:12, 213:23, 215:11, 224:4, 224:14, 225:8, 230:2
**Stating** - 213:13
**Statutes** - 220:7
**Statutory** - 221:10
**Story** - 215:22, 218:17
**Structure** - 236:6
**Submission** - 238:10
**Submitted** - 212:1, 238:17, 238:21
**Submitting** - 238:4, 238:6
**Subsequent** - 228:25
**Subsidiary** - 235:22
**Substantiated** - 212:2
**Sullivan** - 210:1, 210:7, 210:12
**Superior** - 234:2, 234:5
**Supervisor** - 218:12, 219:4, 223:8, 230:24
**Supposed** - 231:8
**Surrounding** - 213:10
**Sustain** - 221:9
**Sustained** - 214:6, 215:2, 218:20
**Swang** - 226:22
**Swear** - 207:10
**Swing** - 234:3, 234:23
**Swinging** - 212:2, 212:4
**Sworn** - 207:14

T

**Tailored** - 239:17
**Telephone** - 224:20
**Telling** - 218:16, 218:22
**Tells** - 223:3
**Tender** - 238:6
**Terminate** - 227:16
**Terminated** - 210:20, 226:3
**Termination** - 217:21, 219:10, 228:7, 229:16
**Terminology** - 235:25
**Terms** - 208:24, 229:2
**Testimony** - 212:13, 214:22, 214:24, 223:19, 225:10, 227:15, 229:21, 231:13, 234:5, 234:23, 236:25, 237:3, 238:2
**Text** - 229:5
**Thanks** - 236:25, 237:8
**Therefore** - 210:20
**There's** - 209:4, 221:7, 224:8, 224:21, 229:7, 232:14, 237:22
**These** - 208:16, 213:10, 213:17
**They're** - 239:16
**Threat** - 229:22, 230:9
**Threatening** - 234:19
**Threw** - 234:11
**Tie** - 220:25
**Time** - 213:7, 213:17, 215:9, 218:13, 220:11, 223:24, 229:25, 230:15, 238:22, 238:23, 239:10, 239:11
**Tiny** - 228:20
**Tipped** - 212:3
**Today** - 207:10, 228:3
**Tom** - 210:1, 210:3, 210:7
**Took** - 215:18, 218:10, 218:24
**Toward** - 217:13
**Tracy** - 224:11
**Transcript** - 215:13, 215:24, 220:10, 225:12, 227:5, 227:6, 229:20, 238:11, 238:16, 239:1, 239:9
**Transcripts** - 210:13, 238:17
**Trial** - 239:9
**Truck** - 214:1, 214:25, 215:6, 228:10
**Turned** - 211:25
**Twice** - 233:22
**Typically** - 236:3

U

**Union** - 231:11
**United** - 232:11, 233:4, 235:20, 235:25, 236:3, 236:4, 236:13, 236:15
**Units** - 222:4
**Unless** - 210:16, 237:4, 238:5
**Updated** - 229:5
**Upset** - 219:15, 219:18, 219:24
**Urgency** - 224:8
**Used** - 238:11

V

**Verbiage** - 234:16
**Video** - 211:13, 221:5, 237:18
**View** - 222:17
**Violated** - 217:18, 226:8
**Violation** - 209:1, 209:4, 210:14, 210:15, 210:17, 227:17, 231:25
**Violence** - 210:25, 211:2, 215:25, 216:1, 216:25, 217:12, 219:6, 220:15, 220:21, 221:5, 222:8, 222:16, 225:9, 226:9, 227:17, 231:5, 233:6

W

**Wade** - 208:10, 218:11, 223:20, 224:17, 224:19
**Wage** - 228:17, 229:6
**Wants** - 225:15
**Warranted** - 223:4
**We'll** - 207:20, 216:7, 237:7, 239:4, 239:6
**We're** - 224:21
**Weren't** - 209:22
**We've** - 239:9
**What's** - 220:17
**Whereupon** - 207:12, 240:10
**Whistleblower** - 207:4, 221:1
**Whole** - 223:17, 238:6
**Will** - 211:3, 214:11, 216:13, 217:14, 238:24, 239:4, 239:24
**Winnipeg** - 226:17, 234:9
**Wishes** - 231:20
**Witnesses** - 208:17, 212:1, 237:8, 237:14, 237:16, 237:19, 240:7
**Word** - 223:20
**Words** - 230:4
**Work** - 209:19, 223:5, 233:16
**Worked** - 209:23
**Working** - 228:16, 229:1
**Workplace** - 210:25, 211:2, 215:25, 216:1, 216:24, 217:12, 219:5, 220:14, 220:21, 221:5, 222:7, 222:16, 226:9, 227:17, 230:10, 231:4
**World** - 235:19
**Wouldn't** - 233:16
**Written** - 230:3, 234:14, 235:3
**Wrote** - 231:14
**Wynn** - 239:4

**Y**

**Year** - 217:24, 218:2
**Yesterday** - 210:13, 238:3
**You'd** - 216:4
**You'll** - 239:14, 240:2, 240:3
**You're** - 212:5, 215:12, 216:9, 229:1, 237:10, 237:16, 237:17, 239:13
**You've** - 208:6, 218:22, 236:14, 236:18, 239:9

**'**

**'23** - 217:25

**/**

**//** - 240:12, 240:13, 240:14, 240:15, 240:16, 240:17, 240:18, 240:19, 240:20, 240:21, 240:22, 240:23, 240:24, 240:25

**1**

**14** - 207:2, 239:14
**151** - 228:17
**16** - 216:9, 216:10, 222:7, 230:22
**16th** - 237:24, 238:22
**1855** - 238:10

**2**

**20** - 223:10, 223:21
**2020** - 229:6
**2021** - 208:7, 229:6
**2022** - 229:6
**2023** - 229:7, 229:10, 229:11
**2024** - 207:2, 229:9, 229:12
**23** - 227:11, 227:14, 227:18
**29** - 238:10

**3**

**30** - 239:8
**33** - 228:13, 228:14, 228:17

**4**

**49** - 237:23

**5**

**50** - 238:4, 238:7, 238:21

**9**

**9:02** - 207:2
**9:58** - 240:10
**911** - 223:4

# Exhibit E

**Emails dated November 3, 4, and 7, 2022 Branch submitted to the EEOC**

## ALICIA VICKERS

**From:** robert branch <(b)(7)(C)
**Sent:** Thursday, November 10, 2022 3:17 PM
**To:** DIEGO ZENT
**Subject:** Fwd: Racial discrimination slurs by CN Management along with intimidation & retaliation

**CAUTION:** The sender of this message is external to the EEOC network. Please use care when clicking on links and responding with sensitive information. Forward suspicious emails to phishing@eeoc.gov.

Sent from my iPhone

Begin forwarded message:

> **From:** robert branch <(b)(7)(C)
> **Date:** November 7, 2022 at 8:10:44 PM CST
> **To:** robert branch <(b)(7)(C)
> **Subject: Fwd: Racial discrimination slurs by CN Management along with intimidation & retaliation**
>
> Sent from my iPhone
>
> Begin forwarded message:
>
> > **From:** Omah West <showest81@gmail.com>
> > **Date:** November 7, 2022 at 3:32:35 PM CST
> > **To:** Jerome Daniels (b)(7)(C) >
> > **Cc:** (b)(7)(C) ,
> > James Corbin (b)(7)(C) >, Kenneth Hankerson
> > (b)(7)(C)



Exhibit E: Emails dated November 3, 4, and 7, 2022 Branch submitted to the EEOC



**Subject: Re: Racial discrimination slurs by CN Management along with intimidation & retaliation**

On Mon, Nov 7, 2022 at 1:48 PM Jerome Daniels (b)(7)(C) > wrote:

I vote yes.

Sent from Yahoo Mail for iPhone

On Monday, November 7, 2022, 12:13 PM, Kenneth Hankerson <(b)(7)(C) > wrote:

Grand rising kings,
I am sending you this on behalf of the "discrimination, intimidation,& wrongful termination" class action lawsuit. First of all, we are extremely grateful for the feedback we received and looking for more. We believe we need to have a committee of leadership who can communicate and navigate the next steps of this journey. The leaders we believe we need are as follows: James Jones, Mario Lacy, Pery Sharkey, Ronald Keasley, Michael Brown, Tredell Meeks, John Brown, Greg Green, Roosevelt Swinney, Patrick Addison, Eric Taylor, Andre George, Richard Slaughter, Keeven Hillie, Randall Durren, Jeff Vercher, Eric Dotson, Dee McBride, DeMond Murphy, Elton Ruben, Rudy Bolds, and Carlos Jones.
These men are highly recommended for their strengths and abilities, all in favor of these men being our leadership committee PUT A FIST UP OR A THUMBS DOWN. Timing is of the essence and your response is definitely appreciated and needed.

Thanks,
Hank

On Fri, Nov 4, 2022 at 4:41 PM Kenneth Hankerson <(b)(7)(C) > wrote:

Alright Corbin, I got you.

Thanks,
Hank

On Fri, Nov 4, 2022 at 4:15 PM James Corbin (b)(7)(C) > wrote:

I'm with what ever yall come up with if we don't stand for something we will always fall for anything. And here's a suggestion and its just a suggestion attorney BEN CRUMP. HE IS BIG TIME.

On Fri, Nov 4, 2022, 12:13 PM Kenneth Hankerson <(b)(7)(C) > wrote:

ATTENTION,
I'm asking for opinions on how we should take the next step. I believe we should seek legal counsel and not inform HR. I have confidential information that will put all this to rest in a legal manner steaming from higher ups who are willing to testify on our behalf about the racial discrimination, intimidation and retaliation and wrongful termination of black employees. I've been trying to contact Ronald Williams but he isn't available. He hasn't answered any of my calls. Looking for your thoughts.

Thank you,
Hank

On Thu, Nov 3, 2022 at 3:06 PM Kenneth Hankerson (b)(7)(C) > wrote:

This is the letter I sent to Ronald Willams and James Jones to send to corporate cocerning the issues at hand. When Ronald sends this email we all should receive a copy. I'm forwarding this to you to get your thoughts on what needs to be done to take the next step. We are all in this together.

*****************************************************
*****************************************************
*****************************************************
*************************

**WE ARE NOT MONKEYS, WE ARE NOT MONKEYS, WE ARE NOT MONKEYS!!!!!!!**
I am emailing you on behalf of every black man in the southern region who is being considered a monkey by CN management.
On Monday October 24, 2022, CN Supervisor Joe Girsch called Forman, Miles Moman for an update of the work being done.
Miles informed him of the progress, Joe Girsch was concerned if the men was being productive and replied, "I just don't want a bunch of monkeys screwing the same ball." for professional reasons I won't say the vulgar disgusting word he used, however, we are willing in an open forum or court to elaborate the actual words. It's so shocking the Mr. Girsch is so comfortable talking to Mr. Moman like this. However, it's disheartening that in 2022 black men are considered monkeys at CN by management.
I have never seen a white monkey and the men working on the project were 95-97% black. Mr. Girsch at the time of this email has not been pulled out of service or terminated or even reprimanded.

We as employees of CN deserve to be treated fairly and with respect and value and human decency.

The south is known for this ignorant behavior and classification of blacks. I didn't say respect because whenever a company allows any employee, especially management to directly, without any swift action, racially talk or describe/treat people like this what can you expect. The rules are totally different for white employees versus blacks as far as a white CN manger is totally allowed to call black employees monkeys via Mr. Girsch.

For example, a white employee can have a machine run-in, Mr. Heath Brown received no reprimand versus a black employee, Mr. DeMarcus Fontelroy gets terminated quickly. A white employee can threaten killing and make racial comments. Tear up a machine and then make the comment "You should have had my fuel truck on bid." and CN management laughs about it over the radio. Todd Melton threatened to kill Rosevelt Swinney by saying he was from an Egypt plantation where they kill and bury black people in front of union management. Todd Melton  brutally attacked Robert Branch, an upstanding employee who was trying to de-escalate the problem, Christopher Day did everything possible to hide what happened to the person being attacked, Todd Melton is white, Robert Branch is black. Christopher Day repeatedly told Robert Branch to let's handle this in-house with the union along with cn management telling and suggesting by calling other employees to convince Mr. Branch to talk to CN management. End result, Mr Robert Branch, an upstanding professional safety oriented 15 year dedicated employee fired while nothing is put in place on how we handle racial discrimination, racist comments, and violence in the work place. We are not **monkeys,** we are not **animals,** it continues. There's just so much going on with the racist comments, the unfair treatment, the ruling in investigations. Mr. Dylan Moak, who is a white Forman, was asked to check a switch because machine operator, Mr. Omah West, believed something happened once he traveled over the switch. Mr. Moak disregards what the veteran machine operator suggests and doesn't check the switch. Then a train travels over the switch in Louisiana and derails cars, destroying the switch causing over $800,000 in damages. Mr. Moak received no reprimand back pay and kept all bidded-rights. Mr. Leroy Purnell, Forman running a rail gang, is informed by management that his assistant Formans needs to get off the clock by Mr. Day. Meanwhile, Mr Purnell, with all his duties and responsibilities forgets to pick up a derail 1 car, 1 car, 1 car derails with punishment for 2 weeks no pay, receives a level 2, uncertain whether his rights are in question compared to Mr. Moak. (Dylan Moak is white, Leroy Purnell is black.) Todd Melton, a white employee tears wing off regulator almost goes off the cliff down in a ravine. Mr. Ray Gibson, hits a handrail on a bridge while running a regulator. His punishment was to sign a waiver and receive a level 2. (Todd Melton is white Ray Gibson is black) Trackman Heath Brown has a machine run-in with Sedwick Stoval that caused $14,000-$16,000 in damages on the glue machine. Supervisor

Chance Garner does not divulge the incident. Does not make sure form 475 is filled out. Mr. Stoval is now facing injuries. Mr. Stoval had been manipulated and Cohorsed to take a couple days off while being paid by Forman Todd Peterson who was instructed to falsify time by Mr. Garner. (Heath Brown, Todd Peterson, and Chance Garner are white, Sedwick Stoval is black). Meanwhile, on the system gang, Supervisor Garner and Forman Brent Rose are placing employees in danger by not having 2 operators on the machines that are required because of blind spots for tack traveling for more than 20-25 miles on the machine aiding and increasing the possibility of machine run-in. And **YES** there was a machine run-in on the curve with Mr. Akeem Jefferson. Mr. Jefferson's machine breaks down, not once but twice. Mr. Fontelroy, who is a young employee who was intimidated to run the spiker alone with no help. When he asked to get help his plea fell on deaf ears causing increasing chance for a machine accident and it happened on wet rail track traveling alone Mr. Fontelroy ran into Mr. Jefferson causing shock and injuries to Mr. Jefferson. Mr. Fontelroy was asked to submit a urine and blood test, which he passed both tests and was still terminated with no options or levels given. (DeMarcus Fondleroy and Akeem Jefferson are black)

Another example of discrimination, the System Gang is instructed by email to meet at a hotel and ride the bus Randell Duren doesn't read the email and gets to Crenshaw by his personal vehicle extremely early where the gang is supposed to meet Forman Ty Peterson sees this and sends Mr Duren home for the day with no pay bacause he didn't ride the bus. Trackman Will Dickerson who does the exact same thing, but arrives late and hides his personal vehicle in the bushes was allowed to work. (Randell Duren is black, Will Dickerson is white).

Another example of discrimination and unfair treatment, Piere Anderson is accused of cheating on the Tig test is forced to retake and is told if you passed the first time you can pass again. Piere Anderson retakes the test and fails. However, Mr. Dylan Moak openly admits to having Chris Campbell help him pass the test during an investigation. Mr Moak was not instructed to retake the test and kept Forman age. (Piere Anderson is black Dylan moak is white). There is So much more going on in the IC South Region.

**We are not monkeys, we are not monkeys, we are not monkeys**, we are human beings who deserve to be treated fairly and will conduct and follow all CN RULES And POLICIES. How come CN management or cn white employees are not held to the same standards.

# Exhibit F

**Public Law Board's Interim Award #450, dated August 19, 2024**

PUBLIC LAW BOARD NO. 6043

CASE NO. 450
AWARD NO. 450

Brotherhood of Maintenance of Way Employes
Division - IBT Rail Conference

and

Illinois Central Railroad Company

Claimant: R. Branch

---

STATEMENT OF CLAIM:

"Claim of the System Committee of the Brotherhood that:

1. The discipline (dismissal) imposed upon Mr. R. Branch for alleged violations of CN Code of Business Conduct and CN Workplace Violence Prevention Policy in connection with an incident that occurred on May 26, 2022 was entirely improper, arbitrary, excessive and in violation of the Agreement (System File DM-2233-IC-002/IC-BMWED-2022-00012 ICE).

2. As a consequence of the violation referred to in Part 1 above, Claimant R. Branch shall now be reimbursed for all wage loss sustained, including overtime because of the Carrier's action, returned to work with all benefits allowed per the agreement and this incident removed from all personal records."

---

INTERIM FINDINGS AND AWARD:

After investigation held June 7, 2022 and by letter dated June 23, 2022, Claimant – an employee in the Carrier's service for approximately 15 years – was dismissed on allegations that he was involved in a verbal and physical altercation with another employee in the presence of other employees on May 26, 2022.

After hearing before this Board on August 16, 2024 and to avoid further undue delay, a majority of this Board finds that Claimant shall be reinstated, subject to his passing required return to duty examinations and certification requirements, if any.

Claimant's reinstatement shall be under the following conditions:

First, Claimant's reinstatement shall be without loss of seniority.

Second, Claimant's dismissal shall be reduced to a long-term suspension.

Third, Claimant shall receive one year of backpay based on the rate(s) applicable for a one-year period prior to the date of this Interim Award. Under the specific circumstances of this case, there shall be no offsets against that backpay for earnings Claimant may have received from other employment.

Fourth, Claimant's reinstatement shall be on a last-chance basis with respect to similar conduct that caused the Carrier to discipline him in this case. Claimant was not the aggressor in the altercation involved in this matter, but he should have disengaged more than he did.

Fifth, this Board shall retain jurisdiction to resolve disputes which may arise under the terms of this Interim Award and the Full Award which shall issue in due course. In the event that it is alleged that Claimant has engaged in conduct after Claimant returns to duty in violation of the provisions of his last-chance reinstatement and if the Carrier finds after an investigation on the property that substantial evidence shows that Claimant engaged in conduct in violation of those last-chance provisions, upon appeal by the Organization to this Board, this Board shall have jurisdiction to determine if substantial evidence supports the Carrier's position that Claimant engaged in such conduct. If this Board finds substantial evidence in a record developed on the property supports the Carrier's position, Claimant shall be dismissed.

Sixth, should it be alleged by the Carrier that Claimant engaged in misconduct other than actions similar to the conduct that caused the Carrier to discipline him in this case, those allegations shall be handled in accord with the discipline and claims adjustment procedure found in the Agree-

Case: 4:23-cv-00217-MPM-JMV Doc #: 83-1 Filed: 01/08/25 122 of 189 PageID #: 2699

PLB No. 6043
Award No. 450

ment and (unless agreed otherwise by the parties) not before this Board.

Edwin H. Benn
Neutral Referee
Dated: August 19, 2024

Page **3** of **3**

Exhibit F: Public Law Board's Interim Award #450, dated August 19, 2024

# Exhibit G

**Branch's January 30, 2024, Pre-Discovery Disclosures.**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**GREENVILLE DIVISION**

**ROBERT L. BRANCH** **PLAINTIFF**

**v.** **CIVIL ACTION NO.: 4:23-cv-217-MPM-JMV**

**ILLINOIS CENTRAL RAILROAD COMPANY** **DEFENDANT**

**PLAINTIFF'S PRE-DISCOVERY DISCLOSURES**

Pursuant to Uniform Local Rules of the United States District Court for the Northern and Southern Districts of Mississippi 26.1 (a) and the Civil Justice Expense and Delay Reduction Plan adopted by this Court, the Plaintiff makes the following disclosures:

A. The name and, if known, the address and telephone number of each individual likely to have discoverable information relevant to the claims asserted. Plaintiff has to date identified the following persons:

1. Robert L. Branch is the Plaintiff in this case and may be reached through counsel.

2. Illinois Central Railroad Company is the Defendant in this case and may be reached through counsel.

3. Tracy "Todd" Melton, 17641 South Ashland Avenue, Homewood, Illinois 60430, (708) 332-3500. Mr. Melton was a Machine Operator during the time the Plaintiff was employed with the Defendant. Mr. Melton may have discoverable information of the allegations contained in Plaintiff's Complaint.

4.      Jerome Chance Garner, 17641 South Ashland Avenue, Homewood, Illinois 60430, (708) 332-3500.  Mr. Garner was one of Plaintiff's Supervisor's during the time the Plaintiff was employed with the Defendant. Mr. Garner may have discoverable information of the allegations contained in Plaintiff's Complaint.

5.      Christopher Day, 17641 South Ashland Avenue, Homewood, Illinois 60430, (708) 332-3500.  Mr. Day was a Production Manager during the time the Plaintiff was employed with the Defendant. Mr. Day may have discoverable information of the allegations contained in Plaintiff's Complaint.

6.      Nick Manojlovic, 17641 South Ashland Avenue, Homewood, Illinois 60430, (708) 332-3500.  Mr. Manojlovic was the Union Vice Chairman during the time the Plaintiff was employed with the Defendant. Mr. Manojlovic may have discoverable information of the allegations contained in Plaintiff's Complaint.

7.      Dr. Fawaz Abdrabbo, M. D., P. A., 576 Highland Colony Parkway, Suite 100, Ridgeland, Mississippi 39157, (601) 853-2676. Dr. Abdrabbo, M.D., P.A., began treating the Plaintiff for anxiety in July 2022 and continues his treatment to date.  Dr. Abdrabbo, M. D., P. A., continues to have psychiatric sessions with the Plaintiff and may have discoverable information of the allegations contained in Plaintiff's Complaint.

8.      Dr. Charles Nause, M.D., 105 East Market Street, Greenwood, Mississippi 38930,  (662) 453-5460.  Dr. Nause, M.D., is the Plaintiff's primary physician since 2018.  Dr. Nause, M.D., may have discoverable information of the allegations contained in Plaintiff's Complaint.

9.      Stephanie M Hornet, FNP., Greenwood Leflore Hospital, 1401 River Road, Greenwood, Mississippi 38930, (662) 459-7000.  Ms. Hornet, FNP., treated the Plaintiff

in June 2022 for anxiety. Ms. Hornet, FNP., may have discoverable information of the allegations contained in Plaintiff's Complaint.

      10.    Dr. Pande Ravi, M.D., 1317 River Road, Greenwood, Mississippi 38930, (662) 459-2520. Dr. Ravi, M.D., is the Plaintiff's Neurologist and has been treating him since 2017. Dr. Ravi, M.D., may have discoverable information of the allegations contained in Plaintiff's Complaint.

B.    A copy of, or a description by category and location of all documents, data compilations and tangible things that are in the possession, custody or control of the party that are relevant to the claims asserted. Based upon the information known to date, Plaintiff identifies the following:

      1.    Plaintiff's personnel file in Defendant's possession;

      2.    Plaintiff's pay records in Defendant's possession; and

      3.    Plaintiff's EEOC file which is available to Defendant.

    Plaintiff reserves the right to utilize any documentation produced by the Defendant and/or obtained through the discovery process.

C.    Computation of Damages:

Plaintiff's damage calculation is based upon the following: Plaintiff's date of termination with the Defendant 06.24.2022, with an hourly rate of pay of $29.94. $29.94 x 40 hours = $1,197.60 weekly x 52 weeks = $62,275.20 yearly, divided by 12 months = $5,189.60 monthly. Plaintiff has remained unemployed for 19 months since the date of termination until January 2024, despite his consistent employment sought. $5,189.60 x 19 = $98,602.40 + $62,275.20 = $160,877.60 Back Wages; Plaintiff's yearly salary with the Defendant's prior to his termination was $62,275.20 yearly x 3 years = $186,825.60 Future Wages; *See Compensatory/Punitive Damages below as C-2.

C-2. Computation of Damages:

| **DAMAGES** | **AMOUNT** |
|---|---|
| BACK WAGES UNTIL TRIAL | $160,877.60 |
| FUTURE WAGES (3 YEARS) | $186,825.60 |
| TOTAL DAMAGES EXCLUDING COMPENSATORY AND/OR PUNITIVE DAMAGES | $347,703.20 |

*Compensatory and punitive damages to be determined at trial by jury. Plaintiff cannot provide a computation for these damages as they are not amenable to a computation as contemplated by Rule 26 of the Federal Rules of Civil Procedure. *Williams v. Trader Pub. Co.,* 218 F.3d 481, 486 n.3 (5th Cir. 2000). Plaintiff is seeking the maximum amount of compensatory and punitive damages allowed under the claims asserted, which is $300,000.

** Plaintiff is also seeking attorney fees to be determined after trial by the Court and are not subject to Rule 26 disclosure requirements. *Antolini v. McCloskey,* 335 F.R.D. 361, 363 (S.D.N.Y. 2020); *Iguarta v. Mid-Century Insurance Company,* 2017 WL 1013869 *3 (D. Nev. March 14, 2017); *Smith v. AS America, Inc.,* 829 F.3d 616, 624 (8th Cir. 2016)

***Computations for back and/or future wages do not include any mitigation damages, as Plaintiff cannot determine the exact amount of monetary damages that may be mitigated until the time of trial."

D. Insurance

Plaintiff is unaware whether any insurance policies provide coverage for any claims asserted by Plaintiff.

THIS, the 30th day of January 2024.

Respectfully submitted,

/s Nick Norris
Nick Norris (MB# 101574)

Attorney for Plaintiff

OF COUNSEL:

WATSON & NORRIS, PLLC.
4209 Lakeland Drive #365
Flowood, MS 39232
Telephone: (601) 968-0000
Facsimile: (601) 968-0010
nick@watsonnorris.com

**CERTIFICATE OF SERVICE**

I, Nick Norris, attorney for the Plaintiff, do hereby certify that I have this day served via ECF filing or by United States mail, postage prepaid, a true and correct copy of the above and foregoing document to all counsel of record:

SO CERTIFIED, 30th day of January 2024.

/s Nick Norris
NICK NORRIS

# Exhibit H

**Branch's March 28, 2024, Response to IC's First Set of Interrogatories**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**GREENVILLE DIVISION**

| | |
|---|---|
| ROBERT BRANCH,<br><br>Plaintiff,<br><br>v.<br><br>ILLINOIS CENTRAL RAILROAD COMPANY,<br><br>Defendant. | CIVIL ACTION NO. 4:23-CV-217-MPM-JMV |

**PLAINTIFF'S RESPONSE TO INTERROGATORIES OF DEFENDANT'S (SET I)**

**INTERROGATORIES**

**INTERROGATORY NO. 1.** Identify every source of income you have had since May 1, 2022, and for each source of income identified, state the amount you received and the reason for the payment (e.g., wages, consultant's fee, etc.), and identify all Documents and ESI that refer or relate to the source of income.

**ANSWER NO. 1:** Plaintiff has produced herewith all documents not previously objected to, and which have been identified as responsive to this interrogatory are being produced contemporaneously with these responses. Please refer to Plaintiff's bates stamped documents as BRANCH 000704-000713 INCOME RECEIPTS. Plaintiff was employed by the Defendant until June 24, 2022. Plaintiff's employment file is in the possession of the Defendant, therefore, Defendant has knowledge of Plaintiff's employment from May 1, 2022, until his wrongful termination date of June 24, 2022. However, in Plaintiff's attempt to respond to interrogatory 1, he received the following income from the Defendant as follows:

May 20, 2022 - Gross $4,265.36 (2 weeks' pay) June 3, 2022- Gross $4,308.90 (2 weeks' pay);

June 17, 2022 - Gross $3,645.87 (2 weeks' pay) July I, 2022- Gross $3,065.20 (vacation pay) July;

15, 2022- Gross $3,309.76 (final check); and Railroad Retirement Board Unemployment -

$9,000.00 total for year 2022.

**INTERROGATORY NO. 2.** Identify every prospective employer or entity to whom you have applied for a job and/or independent contractor or consultant position since May 1, 2022, and for each state:

      a.      the date of your application;

      b.      the position applied for and its salary or hourly wage;

      c.      whether you had an interview, and if so, who was present;

      d.      the date of the interview(s);

      e.      whether or not you were offered a job;

      f.      if you were not offered a job, the reasons you were given;

      g.      if you were offered a job, whether you accepted or declined the job offer;

      h.      for any offer declined, the reason you did not accept the job; and

      i.      identify all Documents and ESI that refer or relate to the application process.

**ANSWER NO. 2:** Plaintiff has produced herewith all documents not previously objected to, and which have been identified as responsive to this interrogatory are being produced contemporaneously with these responses. Please refer to BRANCH 000714-000737 EMPLOYMENT SOUGHT.

Columbus and Greenville Railway Company, Track Laborer Interview on October 7, 2022, at 9 am with Garth Studstill-General Manager. I was not selected.

Biewer Lumber-Applied in August 2022. No interview. Applied online. Received no emails or phone calls.

Paper Mill Entry - Received email on 3/7/23. Salary $22.12 hr with potential earnings up to $46 hr. No interview.

Milwaukee Tool-Received email on 2/16/23. The salary was to start at $15.00 hr. No interview.

Grenada Railroad-Applied on November 15, 2023. No interview. Applied online. Received no

emails or phone calls.

**INTERROGATORY NO. 3.** Identify every person or entity with whom you have been employed or otherwise provided services during the period of May 1, 2022, and ongoing, including separately for each your dates of employment, positions held, compensation promised or received, benefits promised or received, any discipline and the reason stated for the same, reason(s) for separation, and immediate supervisor(s).

**ANSWER NO. 3:**    Plaintiff objects to this Interrogatory as overbroad, vague, unduly

burdensome. To the extent not objectionable, Plaintiff has not been employed since his termination

from the Defendant.

**INTERROGATORY NO. 4.** Identify each person that you intend to call as a trial witness in this matter and, for each, separately state the facts and observations to which the witness is expected to testify and the identity of each document on which the witness is expected to testify.

**ANSWER NO. 4:**    Objection to the extent this calls for speculation, overly broad and unduly

burdensome, calls for speculation, and is vague. Notwithstanding, and in the interest of

efficiency, I claim that all the individuals named throughout discovery, potentially have

discoverable information may also possibly be called as trial witnesses in this matter whether

disclosed by the Defense or by Plaintiffs. This is set forth based on reasonable information and

belief while necessarily deferring to the witnesses to verify and in case they may provide further

information. Notwithstanding, please refer to Plaintiff's Pre-Discovery Disclosure, filed on

January 30, 2024. Plaintiff also incorporates any persons whose names have been disclosed by

the Defense (or otherwise associated with the Defendant in any way) to the extent they are

truthful which I reserve the right to verify. Plaintiff incorporates anyone whom he may later

determine has discoverable information as this matter is ongoing. Plaintiff contends that

representatives of Defendant mentioned or stated in any way in this action potentially have such

information. This includes but is not limited to HR reps, supervisors, co-workers, managers,

owners or other Employees. The EEOC has such information and Plaintiff has identified and

produced same herewith as BRANCH 000000-000000 EEOC. Plaintiff may call any individual identified during the discovery process. This includes, but is not limited to, individuals identified in the parties' initial disclosures, interrogatory responses, response to document requests, document productions and depositions. Plaintiff will identify all "will call" and "may call" witnesses in the Pretrial Order when it is due, except witnesses only offering impeachment or rebuttal. Additionally, Plaintiff objects to this Interrogatory to the extent it can be construed as seeking information protected from disclosure by the attorney work production protection or attorney-client privilege. The Plaintiff objects to this Interrogatory on grounds that it is overbroad and unduly burdensome in seeking identification of “relevant knowledge” Plaintiff further objects on grounds that it is vague and ambiguous as it is unclear what “you expect to elicit”, means as this calls for speculation. Plaintiff objects to this Interrogatory as it calls for information falling under the attorney client privilege and work product doctrine. In addition, Plaintiff further objects as requests speculation of information not capable of being known with exact certainty, which is an overly broad range of information. Plaintiff reserves the right to supplement his response prior to trial or upon receipt of a more focused question. Furthermore, without waiving all objections herewith, please refer to BRANCH 000001-000703 EEOC, BRANCH 000738-000757 WITNESS STATEMENTS, BRANCH 000758-000760 GTS APPEAL, BRANCH 000790-000859 CNRR INVESTIGATION BRANCH 000761-000789 MEDICAL and BRANCH 000860-000862 TEXT MESSAGES. Said documents contain the names of individuals which may be called as trial witnesses, however, Plaintiff will supply said individuals at the appropriate time in accordance with the Federal Rules of Civil Procedure.

**INTERROGATORY NO. 5.** Identify each person known or believed by you to have personal knowledge of any of the facts at issue or involved in the above-captioned lawsuit or any of the events underlying the allegations in the Complaint, Answer, or any other pleading; and separately state the facts and observations within each such person’s knowledge.

**ANSWER: NO. 5:** Plaintiff may call any individual identified during the discovery process. This includes, but is not limited to, individuals identified in the parties' initial disclosures, interrogatory responses, response to document requests, document productions and depositions. Plaintiff will identify all "will call" and "may call" witnesses in the Pretrial Order when it is due, except witnesses only offering impeachment or rebuttal. Additionally, Plaintiff objects to this Interrogatory to the extent it can be construed as seeking information protected from disclosure by the attorney work production protection or attorney-client privilege. The Plaintiff further objects to this Interrogatory on grounds that it is overbroad and unduly burdensome in seeking identification of “each person known or believed by you”. Plaintiff further objects on grounds that it calls for speculation and is vague and ambiguous as it is unclear what “each person believed by you”, means. Without waiving these or any other objections, Plaintiff has produced herewith all documents not previously objected to, and which have been identified as responsive to this interrogatory are being produced contemporaneously with these responses. Please refer to Plaintiff’s Pre-Discovery Disclosures, BRANCH 000001-000703 EEOC, BRANCH 000738-000757 WITNESS STATEMENTS and BRANCH 000758-000760 GTS APPEAL, BRANCH 000790-000859 CNRR INVESTIGATION, BRANCH 000761-000789 MEDICAL, and BRANCH 000000-000000 TEXT MESSAGES. Also, Al B. Thomas, Ty Peterson, Darrell Hudson, Randall S Duren, Earl Honeysucker, Dylan Boutle, and William Yuille. Named individuals are employees of the Defendant and their information is listed in their witness statements included herewith.

**INTERROGATORY NO. 6.**Identify each person from whom written and signed (or otherwise adopted or approved), recorded or transcribed statements or reports have been secured with respect to any of the matters relating to the allegations in the Complaint or Answer, and for each person identified, identify all Documents or ESI that evidence such statements or reports.

**ANSWER NO. 6:** Plaintiff objects to this Interrogatory to the extent it can be construed as seeking information protected from disclosure by the attorney work production protection or attorney-client privilege. The Plaintiff further objects to this Interrogatory on grounds that it is overbroad and unduly burdensome. However, without waiving these or any other objections, Plaintiff has attached all documents of written communications which contain statements and have been identified as responsive to this interrogatory are being produced contemporaneously with these responses. Plaintiff has no recorded or transcribed statements or reports in his possession. Please refer to Plaintiff's bates stamped document as BRANCH 000738-000757 WITNESS STATEMENTS, BRANCH 000758-000760 GTS APPEAL, BRANCH 000001-000703 EEOC, BRANCH 000761-000789 MEDICAL, BRANCH 000790-000859 CNRR INVESTIGATION, BRANCH 000860-000862 TEXT MESSAGES.

**INTERROGATORY NO. 7.** Identify each person you intend to call as an expert witness at trial, and as to each such person:

      a.      state the subject matter on which the person is expected to testify;

      b.      state the substance of the person's testimony and the summary of the basis for the testimony;

      c.      identify any papers, articles, treatises or books which the person has wholly or partially authored, or to which the person has contributed; and

      d.      identify all prior proceedings in which the person has given any testimony.

**ANSWER NO. 7:** Plaintiff objects this Interrogatory on the grounds it is premature, as it has not yet determined the identity of expert witnesses Plaintiff may call at trial. Without waiving this objection, Plaintiff has no expert witnesses at this time. Further, Plaintiff will supplement this response as necessary at the appropriate time in accordance with the Federal Rules of Civil Procedure.

**INTERROGATORY NO. 8.** Identify any communications (either verbal or written) with any of Defendant's employees or agents, or former employees or agents, regarding any of the allegations which are at issue in this matter, including each and every employee or agent, or former employee or agent of Defendant with whom you communicated; the date of each communication; and all Documents and ESI which relates to said communication.

**ANSWER NO.8**: Plaintiff objects to this Interrogatory as it calls for information falling under the attorney client privilege and work product doctrine. In addition, Plaintiff further objects as requests speculation of information not capable of being known with exact certainty, which is an overly broad range of information. Plaintiff reserves the right to supplement his response prior to trial or upon receipt of a more focused question. However, without waiving these or any other objections Plaintiff has continued his friendship with his coworker Randall Duren since his wrongful termination, however, Plaintiff does not maintain a record of his verbal communications with Mr. Duren. Plaintiff has had no contact with any other of Defendant's employees, agents, or former employees.

**INTERROGATORY NO. 9.** State separately each and every item of pecuniary or monetary expense, damage, and/or loss, of any kind whatsoever, whether alleged in your Complaint or not, which you contend that you have incurred or sustained, or which you contend resulted by reason of the facts alleged in your Complaint, describing in detail:

    a.     a description of each type of damage claimed (for example, lost wages, medical expenses, etc.);

    b.     the specific dollar amount of each type of damage claimed and a complete explanation of how the dollar amount was determined;

    c.     the date or dates upon which the claimed damage was incurred;

    d.     each person with knowledge or information related to the claimed damage, including each person, if any, that you were required to pay for the item of expense, damage or loss; and

    e.     all Documents and ESI that contain information that refers to the claimed damage.

**ANSWER NO. 9**: Plaintiff objects to Interrogatory No. 9 as its, overly broad and unduly burdensome, compound and confusing. Notwithstanding, and while reserving objections, I

contend that I am entitled to non-economic damages at an amount to be determined at trial by jury. I reserve the right to later determine a specific amount I may ask for but at this time I intend to ask the jury to determine my non-economic losses referred to in the Complaint and incorporated here. Non-economic losses are supported by all matters raised in the Complaint and these discovery responses. I reserve the right to use all documents and things requested to be produced or actually produced by either party so as to support my claim for non-economic damages and any other damages. I reserve the right to claim all damages referred to in the Complaint. I reserve the right to claim economic losses as may be further determined in discovery. I reserve the right to calculate attorney's fees, costs and expenses of this case to the extent they may be recovered. Punitive damages are sought in an amount to be determined by jury. I claim compensation for all interest accrued, sums owed, expenses incurred, and costs however related to the actionable conduct. I claim all sums incurred or to be incurred as a result of my garden variety emotional damages, which may be recommended. I otherwise claim all recoverable amounts related to the actionable conduct. I reserve the right to supplement or amend a calculation of any part of my claim for damages as discovery is ongoing. I seek all damages outlined in my Complaint incorporated herein and a calculation of damages is ongoing when considering I need accurate wage information to arrive at a final calculation. I contend that I lost wages and I reserve the right to arrive at a final calculation as discovery is ongoing and dependent on information requested to be produced or actually produced in discovery. I therefore reserve the right to supplement or amend upon information produced by either party or requested by either party in Discovery relevant to lost pay or other things of value incurred, or which may be incurred as a result of the Defendant's wrongful termination of my employment. Further, please refer to my Pre-Discovery Disclosures which were filed on January 30, 2024.

**INTERROGATORY NO. 10.**During the past ten years, have you consulted with or received treatment from any health care provider including, but not limited to, physicians, psychiatrists, psychologists, counselors, and any other mental health or social service provider? If your answer is "yes," please identify the health care provider, including the provider's name, facility name, and address, and execute the attached Authorization for Release of Medical Information by completing the patient address, birth date, and social security number sections, and by signing the document. If you received treatment for psychological care from a mental health care provider, please identify the health care provider, including the provider's name, facility name, and address, and complete the specific Authorization for Release of Medical Information for psychotherapy records.

**ANSWER NO. 10:** Plaintiff has produced herewith all documents not previously objected to, and which have been identified as responsive to this interrogatory are being produced contemporaneously with these responses. Please refer to Plaintiff's bates stamped documents as BRANCH 000761-000789 MEDICAL. Furthermore, Plaintiff has been treated with the following medical providers:

Dr. Fawaz Abdrabbo, M.D, PA
General Psychiatry and Human Behavior
576 Highland Colony Parkway-Paragon Center-Suite 100
Ridgeland, MS 39157
Plaintiff began seeing Dr. Abdrabbo, M.D., PA on July 13, 2022, and continues his psychiatric treatment until the present date, monthly. The plaintiff has been diagnosed with depression and anxiety.

Dr. Charles Nause M.D. Primary Care Provider,
110 E. Market Street,
Greenwood, MS 38930
Dr. Nause has been Plaintiff primary physician from 2012 to the current date. Plaintiff sees Dr. Nause on an as needed basis.

Greenwood Leflore Hospital
1401 River Road
Greenwood, MS 38930
6/2/2022 - Stephanie M Hornet FNP

Dr. Pande Ravi, M.D
Neurologist
1317 River Road
Greenwood, MS 38930
The year of 2017

**INTERROGATORY NO. 11.** Have you ever been party to any other lawsuits, bankruptcy proceedings, or administrative proceedings? If your answer is "yes," identify the caption or title,

and the court number of each and every lawsuit, bankruptcy proceeding, or administrative proceeding; set forth a detailed summary of the nature of each action; and state the current status or ultimate disposition of each such action.

**ANSWER NO. 11:** Plaintiff objects to this Interrogatory as overbroad, vague, unduly burdensome. Plaintiff has produced herewith all documents not previously objected to, and which have been identified as responsive to this interrogatory are being produced contemporaneously with these responses. Please refer to Plaintiff's bates stamped documents as BRANCH 000758-000760 GTS APPEAL. Case No: 2023-FRS-00026; United States Department of Labor Office of Administrative Law Judges, Covington District Office.

**INTERROGATORY NO. 12.**Identify all personal e-mail addresses (such as Gmail, Yahoo!, Hotmail, AOL, AT&T, Blackberry, Comcast, Skype, etc.), social networking accounts (for services such as Facebook, Twitter, MySpace, Google+, Instagram, Picasa, Tumblr, Friendster, etc.), professional networking accounts (for services such as LinkedIn, Monster.com, CareerBuilder.com etc.), accounts with blogs or other on-line discussion or chat forums, accounts with internet- or "cloud"-based services that store documents and data (such as iCloud, Dropbox, SugarSync, Evernote, Google Documents, Google Drive, Zoho, etc.), accounts with services that provide internet- or "cloud"-based backups of data or devices (such as iCloud, BackBlaze, Crashplan, Mozy, etc.) or any other accounts with on-line sites, services, blogs, wikis or message boards, that you have used or maintained since May 1, 2022, and ongoing, and that you have used to create, store, or disseminate communications, documents, or any other information relating to the claims and defenses in this lawsuit.

**ANSWER NO. 12:** Plaintiff objects to this request as being grossly overbroad, outside the scope of permissible discovery, insufficiently descriptive of the documents sought as required by Rule 34(b) of the Federal Rules of Civil Procedure, seeking irrelevant and confidential information pertaining to persons not parties to this litigation, and beyond the issues framed by the pleadings in this cause. However, without waiving said objection, Plaintiff has no social media accounts. Plaintiff's email address is rbrtbranch20@vahoo.com.

**INTERROGATORY NO. 13.** Identify (by manufacturer, type, model number and phone-number, as applicable) each and every electronic computing, communication or data storage device, including those that are capable of sending or receiving emails, text messages, instant messages or similar communications, or storing documents or data, that you have owned or leased since May 1, 2022, and ongoing, including but not limited to the following examples and categories of devices: computers, tablets, cellular phones, iPhones, iPads, smartphones, personal digital

assistants, cameras, video recorders, or any other electronic computing, communication or data storage device, and that you have used to create, store, or disseminate communications, documents, or any other information relating to the claims and defenses in this lawsuit**.**

**ANSWER NO. 13:** Plaintiff objects to this request as being grossly overbroad, outside the scope of permissible discovery, insufficiently descriptive of the documents sought as required by Rule 34(b) of the Federal Rules of Civil Procedure, seeking irrelevant and confidential information pertaining to persons not parties to this litigation, and beyond the issues framed by the pleadings in this cause. However, without waiving said objection, (662) 392-8746 and rbrtbranch20@yahoo.com.

This, the 28th day of March 2024.

Respectfully submitted,

s/Nick Norris
Nick Norris (MSB #101574)
Attorney for Plaintiff

OF COUNSEL:

WATSON & NORRIS, PLLC.
4209 Lakeland Drive, # 365
Flowood, Mississippi 39232-9212
Telephone: (601) 968-0000
Facsimile: (601) 968-0010
nick@watsonnorris.com

**CERTIFICATE OF SERVICE**

I, NICK NORRIS, attorney for the Plaintiff, do hereby certify that I have this day served via ECF filing or by United States mail, postage prepaid, a true and correct copy of the above and foregoing document to all counsel of record.

SO CERTIFIED, this the 28th day of March 2024.

s/Nick Norris
NICK NORRIS

**VERIFICATION**

STATE OF MISSISSIPPI
COUNTY OF MADISON

Robert Branch, being first duly sworn, states that he is a plaintiff in this action, that he has read the foregoing questions and answers and knows their contents, and that they are true to the best of his knowledge, information, and belief.

RJB

**ROBERT BRANCH**

Sworn to and subscribed before me on this the 28th day of March, 2024.

Camille D. Morrison
NOTARY PUBLIC

My Commission Expires: 10/17/2025

CAMILLE D. MORRISON
Commission Expires 10-17-2025
NOTARY PUBLIC
ID 92669
Madison County
STATE OF MISSISSIPPI

# Exhibit I

**EEOC's activity log related to Branch's Charge**

**CHARGE NUMBER**: 440-2022-06771

| Date | Event | Name |
|---|---|---|
| Thu Oct 05 11:48:52 EDT 2023 | FOIA Request 420-2024-000237 received. | Foia User |
| Mon Oct 02 15:08:22 EDT 2023 | The Charging Party has Downloaded Document. Type: Evidence Provided by Charging Party, FileName:2023-03-30 CP evidence 440-2022-06771.msg | Publicportal User |
| Tue Sep 26 17:05:19 EDT 2023 | The Charging Party has Downloaded Document. Type: Letter of Determination, FileName:2023 08 04 LOD 440-2022-06771.pdf | Publicportal User |
| Tue Sep 26 17:04:57 EDT 2023 | The Charging Party has Downloaded Document. Type: Charge of Discrimination, FileName:440-2022-06771_ChargeOfDiscrimination.pdf | Publicportal User |
| Tue Sep 26 13:17:22 EDT 2023 | Downloaded Document. Type: Closure Notice/NRTS, FileName:2023 09 25 Closure Notice-NRTS (440-2022-06771).pdf | DIEGO ZENT |
| Tue Sep 26 13:17:11 EDT 2023 | Downloaded Document. Type: Correspondence with Charging Party, FileName:2023 09 25 Conciliation Failure Letter (440-2022-06771)(1).pdf | DIEGO ZENT |
| Tue Sep 26 13:16:44 EDT 2023 | Downloaded Document. Type: Conciliation Correspondence, FileName:2023 09 25 Conciliation Failure Letter (440-2022-06771).pdf | DIEGO ZENT |
| Tue Sep 26 08:50:59 EDT 2023 | Downloaded Document. Type: Closure Notice/NRTS, FileName:2023 09 25 Closure Notice-NRTS (440-2022-06771).pdf | Respondentportal User |
| Tue Sep 26 08:50:56 EDT 2023 | EEOC has completed the investigation of this charge. Please review the Notice of Right to Sue for details. | Respondentportal User |
| Tue Sep 26 08:50:53 EDT 2023 | Respondent logged in | Respondentportal User |
| Mon Sep 25 20:56:20 EDT 2023 | The Charging Party has Downloaded Document. Type: Closure Notice/NRTS, FileName:2023 09 25 Closure Notice-NRTS (440-2022-06771).pdf | Publicportal User |
| Mon Sep 25 20:51:23 EDT 2023 | The Charging Party has Downloaded Document. Type: Closure Notice/NRTS, FileName:2023 09 25 Closure Notice-NRTS (440-2022-06771).pdf | Publicportal User |
| Mon Sep 25 20:32:23 EDT 2023 | The Charging Party has Downloaded Document. Type: Correspondence with Charging Party, FileName:2023 | Publicportal User |

| Date | Event | Name |
|---|---|---|
| | 09 25 Conciliation Failure Letter (440-2022-06771)(1).pdf | |
| Mon Sep 25 20:32:13 EDT 2023 | The Charging Party has Downloaded Document. Type: Closure Notice/NRTS, FileName:2023 09 25 Closure Notice-NRTS (440-2022-06771).pdf | Publicportal User |
| Mon Sep 25 19:06:39 EDT 2023 | Emailed Stephanie Bryant Holland at cncharges@littler.com that a new document is available to download. | Arcapp User |
| Mon Sep 25 19:06:39 EDT 2023 | Emailed Angela Lee at angela.lee@cn.ca that a new document is available to download. | Arcapp User |
| Mon Sep 25 19:06:39 EDT 2023 | Emailed ILLINOIS CENTRAL RAILROAD COMPANY at duane.spears@cn.ca that a new document is available to download. | Arcapp User |
| Mon Sep 25 19:06:39 EDT 2023 | Emailed Robert L. Branch at (b)(7)(C) that a new document is available to download. | Arcapp User |
| Mon Sep 25 19:06:38 EDT 2023 | Closure Notice/NRTS (2023 09 25 Closure Notice-NRTS (440-2022-06771).pdf) released | ESZEAN MCDUFFEY |
| Mon Sep 25 19:06:32 EDT 2023 | Case status changed from Conciliation to Charge Closed. | ESZEAN MCDUFFEY |
| Mon Sep 25 19:06:32 EDT 2023 | Charge has been closed with reason Unsuccessful conciliation with closure date 09/25/2023. | ESZEAN MCDUFFEY |
| Mon Sep 25 19:06:32 EDT 2023 | Closure Supervisor review approved. | ESZEAN MCDUFFEY |
| Mon Sep 25 19:06:12 EDT 2023 | Uploaded Document. Type: Closure Notice/NRTS, FileName:2023 09 25 Closure Notice-NRTS (440-2022-06771).pdf | ESZEAN MCDUFFEY |
| Mon Sep 25 19:05:45 EDT 2023 | Uploaded Document. Type: Correspondence with Respondent Attorney, FileName:2023 09 25 Conciliation Failure Letter (2).pdf | ESZEAN MCDUFFEY |
| Mon Sep 25 19:05:22 EDT 2023 | Uploaded Document. Type: Correspondence with Charging Party, FileName:2023 09 25 Conciliation Failure Letter (440-2022-06771)(1).pdf | ESZEAN MCDUFFEY |
| Mon Sep 25 19:02:47 EDT 2023 | Uploaded Document. Type: Conciliation Correspondence, FileName:2023 09 25 Conciliation Failure Letter (440-2022-06771).pdf | ESZEAN MCDUFFEY |
| Mon Sep 25 18:47:07 EDT 2023 | Generated Document. Type: Closure Notice/NRTS, FileName:440-2022-06771_Closure Notice/NRTS.docx | MILDRED STUCKEY |

| Date | Event | Name |
|---|---|---|
| Mon Sep 25 18:43:52 EDT 2023 | Generated Document. Type: CNCLTNFAILLTRTHREEPRTY, FileName:440-2022-06771_CNCLTNFAILLTRTHREEPRTY.docx | MILDRED STUCKEY |
| Mon Sep 25 18:38:20 EDT 2023 | Assigned to ESZEAN MCDUFFEY for Supervisor Closure review | MILDRED STUCKEY |
| Mon Sep 25 18:25:57 EDT 2023 | Assigned to MILDRED STUCKEY for Supervisor Closure review | DIEGO ZENT |
| Mon Sep 25 18:25:20 EDT 2023 | Supporting Details for recommended charge closure added: Unsuccessful conciliation. | DIEGO ZENT |
| Mon Sep 25 18:25:20 EDT 2023 | Charge recommended for Unsuccessful conciliation closure. | DIEGO ZENT |
| Mon Sep 25 18:24:48 EDT 2023 | Title VII Retaliation-Opposition Discharge closed with Unsuccessful conciliation | DIEGO ZENT |
| Mon Sep 25 18:24:48 EDT 2023 | Title VII Race-Black/African American Discharge closed with Unsuccessful conciliation | DIEGO ZENT |
| Mon Sep 25 18:24:28 EDT 2023 | Respondent phone added as (708) 332-3543 | DIEGO ZENT |
| Mon Sep 25 18:24:28 EDT 2023 | Respondent naicsCode added as 482111 | DIEGO ZENT |
| Mon Sep 25 18:24:28 EDT 2023 | Respondent institutionType added as Private Employer | DIEGO ZENT |
| Mon Sep 25 18:24:28 EDT 2023 | Respondent emlState changed to Respondent must verify record. | DIEGO ZENT |
| Mon Sep 25 18:22:27 EDT 2023 | Uploaded Document. Type: Conciliation Notes, FileName:2023-09-25 Final Conciliation Summary FORM 156 440-2022-06771.pdf | DIEGO ZENT |
| Mon Sep 25 17:35:34 EDT 2023 | Downloaded Document. Type: Conciliation Correspondence, FileName:2023-08-23 R Conciliation Correspondence- Deadline Extension Request 440-2022-06771.msg | DIEGO ZENT |
| Mon Sep 25 17:22:22 EDT 2023 | Downloaded Document. Type: Correspondence with Respondent Attorney, FileName:2023-08-14 Branch_ Robert_ Response to Cause Finding and Request For Conciliation.pdf | DIEGO ZENT |
| Mon Sep 25 17:21:55 EDT 2023 | Uploaded Document. Type: Correspondence To/From Charging Party, FileName:2022-10-26 CP Corr 440-2022-06771.msg | DIEGO ZENT |

| Date | Event | Name |
|---|---|---|
| Mon Sep 25 14:44:21 EDT 2023 | Uploaded Document. Type: Request for Notice of Right to Sue, FileName:2023-09-25 CP RTS 440-2022-06771.msg | DIEGO ZENT |
| Mon Sep 25 14:42:54 EDT 2023 | Contact with Charging Party record added | DIEGO ZENT |
| Mon Sep 25 13:38:03 EDT 2023 | Contact with Charging Party record added | DIEGO ZENT |
| Mon Sep 25 10:43:59 EDT 2023 | The Charging Party has Downloaded Document. Type: Charge of Discrimination, FileName:440-2022-06771_ChargeOfDiscrimination.pdf | Publicportal User |
| Fri Sep 22 18:13:03 EDT 2023 | Contact with Charging Party record added | DIEGO ZENT |
| Fri Sep 22 17:19:40 EDT 2023 | Uploaded Document. Type: Conciliation Correspondence, FileName:2023-09-22 R Attorney Correspondence 440-2022-06771.msg | DIEGO ZENT |
| Wed Sep 20 17:47:04 EDT 2023 | Contact with Charging Party record added | DIEGO ZENT |
| Wed Sep 20 12:41:26 EDT 2023 | The Charging Party has Downloaded Document. Type: Amended Charge of Discrimination, FileName:440-2022-06771_AmendedChargeofDiscrimination_1.pdf | Publicportal User |
| Wed Sep 20 12:18:56 EDT 2023 | Uploaded Document. Type: Conciliation Correspondence, FileName:2023-09-19 R Attorney Correspondence 440-2022-06771.msg | DIEGO ZENT |
| Wed Sep 20 12:16:29 EDT 2023 | The Charging Party has Downloaded Document. Type: Charge of Discrimination, FileName:440-2022-06771_ChargeOfDiscrimination.pdf | Publicportal User |
| Tue Sep 19 14:19:27 EDT 2023 | The Charging Party has Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | Publicportal User |
| Tue Sep 19 10:36:01 EDT 2023 | Contact with Charging Party record updated | MILDRED STUCKEY |
| Tue Sep 19 10:34:43 EDT 2023 | Contact with Charging Party record added | MILDRED STUCKEY |
| Mon Sep 18 17:49:31 EDT 2023 | Downloaded Document. Type: Conciliation Correspondence, FileName:2023-09-18 R Attorney Correspondence3 440-2022-06771.msg | DIEGO ZENT |
| Mon Sep 18 17:49:23 EDT 2023 | Uploaded Document. Type: Conciliation Correspondence, FileName:2023-09-18 R Attorney Correspondence4 440-2022-06771.msg | DIEGO ZENT |

| Date | Event | Name |
|---|---|---|
| Mon Sep 18 17:38:52 EDT 2023 | Contact with Charging Party record added | DIEGO ZENT |
| Mon Sep 18 12:55:43 EDT 2023 | Contact with Charging Party record added | DIEGO ZENT |
| Mon Sep 18 12:51:08 EDT 2023 | Contact with Charging Party record updated | DIEGO ZENT |
| Mon Sep 18 12:50:43 EDT 2023 | Contact with Respondent Attorney record updated | DIEGO ZENT |
| Mon Sep 18 12:48:58 EDT 2023 | Contact with Charging Party record added | DIEGO ZENT |
| Mon Sep 18 11:49:10 EDT 2023 | Contact with Respondent Attorney record added | DIEGO ZENT |
| Mon Sep 18 10:57:36 EDT 2023 | Uploaded Document. Type: Conciliation Correspondence, FileName:2023-09-18 R Attorney Correspondence3 440-2022-06771.msg | DIEGO ZENT |
| Mon Sep 18 10:57:19 EDT 2023 | Uploaded Document. Type: Conciliation Correspondence, FileName:2023-09-18 R Attorney Correspondence2 440-2022-06771.msg | DIEGO ZENT |
| Mon Sep 18 10:50:52 EDT 2023 | Uploaded Document. Type: Conciliation Correspondence, FileName:2023-09-18 R Attorney Correspondence 440-2022-06771(1).msg | DIEGO ZENT |
| Mon Sep 18 10:45:24 EDT 2023 | Downloaded Document. Type: Conciliation Correspondence, FileName:2023-09-18 R Attorney Correspondence 440-2022-06771.msg | DIEGO ZENT |
| Mon Sep 18 10:45:18 EDT 2023 | Uploaded Document. Type: Conciliation Correspondence, FileName:2023-09-18 R Attorney Correspondence 440-2022-06771.msg | DIEGO ZENT |
| Fri Sep 15 17:46:17 EDT 2023 | Uploaded Document. Type: Conciliation Correspondence, FileName:2023-09-15 R Conciliation Correspondence 440-2022-06771.msg | DIEGO ZENT |
| Fri Sep 15 17:15:14 EDT 2023 | Uploaded Document. Type: Conciliation Correspondence, FileName:2023-09-15 R Attorney Automatic Reply 440-2022-06771.msg | DIEGO ZENT |
| Fri Sep 15 17:14:54 EDT 2023 | Uploaded Document. Type: Conciliation Correspondence, FileName:2023-09-15 R Attorney Conciliation Correspondence440-2022-06771.msg | DIEGO ZENT |
| Wed Sep 13 17:11:28 EDT 2023 | Contact with Charging Party record added | DIEGO ZENT |

| Date | Event | Name |
|---|---|---|
| Mon Sep 11 16:56:07 EDT 2023 | Contact with Charging Party record added | DIEGO ZENT |
| Mon Sep 11 16:47:58 EDT 2023 | Downloaded Document. Type: Conciliation Correspondence, FileName:2023-09-11 R Attorney Conciliation Correspondence 440-2022-06771.msg | DIEGO ZENT |
| Mon Sep 11 11:48:04 EDT 2023 | Uploaded Document. Type: Conciliation Correspondence, FileName:2023-09-11 R Attorney Conciliation Correspondence 440-2022-06771.msg | DIEGO ZENT |
| Thu Sep 07 17:50:47 EDT 2023 | Contact with Charging Party record updated | DIEGO ZENT |
| Thu Sep 07 17:50:07 EDT 2023 | Contact with Charging Party record added | DIEGO ZENT |
| Thu Aug 31 15:57:48 EDT 2023 | Uploaded Document. Type: Conciliation Notes, FileName:2023-08-31 Voice Mail from CP.msg | MILDRED STUCKEY |
| Thu Aug 31 15:53:15 EDT 2023 | Contact with Charging Party record added | MILDRED STUCKEY |
| Thu Aug 24 15:40:18 EDT 2023 | The Charging Party has Downloaded Document. Type: Letter of Determination, FileName:2023 08 04 LOD 440-2022-06771.pdf | Publicportal User |
| Thu Aug 24 15:21:13 EDT 2023 | Uploaded Document. Type: Correspondence To/From Charging Party, FileName:2023-08-24 CP C Correspondence 440-2022-06771.msg | DIEGO ZENT |
| Thu Aug 24 14:28:39 EDT 2023 | Downloaded Document. Type: Conciliation Correspondence, FileName:2023-08-15 R Conciliation Agreement Correspondence 440-2022-06771.msg | DIEGO ZENT |
| Thu Aug 24 14:28:21 EDT 2023 | Downloaded Document. Type: Conciliation Correspondence, FileName:2023-08-14 Respondent Conciliation Correspondence 440-2022-06771.msg | DIEGO ZENT |
| Thu Aug 24 14:27:49 EDT 2023 | Downloaded Document. Type: Conciliation Correspondence, FileName:2023-08-14 Respondent Conciliation Correspondence 440-2022-06771.msg | DIEGO ZENT |
| Thu Aug 24 13:56:38 EDT 2023 | Contact with Charging Party record added | DIEGO ZENT |
| Wed Aug 23 16:20:10 EDT 2023 | Downloaded Document. Type: Conciliation Correspondence, FileName:2023-08-23 R Conciliation Correspondence- Deadline Extension Request 440-2022-06771.msg | DIEGO ZENT |
| Wed Aug 23 16:20:05 EDT 2023 | Uploaded Document. Type: Conciliation Correspondence, FileName:2023-08-23 R Conciliation | DIEGO ZENT |

| Date | Event | Name |
|---|---|---|
| | Correspondence- Deadline Extension Request 440-2022-06771.msg | |
| Thu Aug 17 12:47:00 EDT 2023 | Contact with Charging Party record added | DIEGO ZENT |
| Thu Aug 17 12:22:37 EDT 2023 | Contact with Charging Party record added | DIEGO ZENT |
| Tue Aug 15 17:01:19 EDT 2023 | Downloaded Document. Type: Conciliation Correspondence, FileName:2023-08-15 R Conciliation Agreement Correspondence 440-2022-06771.msg | DIEGO ZENT |
| Tue Aug 15 16:26:26 EDT 2023 | Uploaded Document. Type: Conciliation Correspondence, FileName:2023-08-15 R Conciliation Agreement Correspondence 440-2022-06771.msg | DIEGO ZENT |
| Mon Aug 14 18:49:27 EDT 2023 | Downloaded Document. Type: Letter of Determination, FileName:2023 08 04 LOD 440-2022-06771.pdf | ESZEAN MCDUFFEY |
| Mon Aug 14 15:30:57 EDT 2023 | Downloaded Document. Type: Correspondence with Respondent Attorney, FileName:2023-08-14 Branch_ Robert_ Response to Cause Finding and Request For Conciliation.pdf | DIEGO ZENT |
| Mon Aug 14 15:29:57 EDT 2023 | Uploaded Document. Type: Conciliation Correspondence, FileName:2023-08-14 Respondent Conciliation Correspondence 440-2022-06771.msg | DIEGO ZENT |
| Mon Aug 14 15:19:26 EDT 2023 | Uploaded Document. Type: Correspondence with Respondent Attorney, FileName:2023-08-14 Branch_ Robert_ Response to Cause Finding and Request For Conciliation.pdf | Respondentportal User |
| Mon Aug 14 15:13:09 EDT 2023 | No Action is required from you at this time. | Respondentportal User |
| Mon Aug 14 15:13:03 EDT 2023 | Respondent logged in | Respondentportal User |
| Fri Aug 11 14:38:04 EDT 2023 | Contact with Respondent Attorney record added | DIEGO ZENT |
| Fri Aug 11 13:30:13 EDT 2023 | Contact with Respondent Attorney record added | DIEGO ZENT |
| Fri Aug 11 13:27:31 EDT 2023 | Downloaded Document. Type: Letter of Determination, FileName:2023 08 04 LOD 440-2022-06771.pdf | DIEGO ZENT |
| Thu Aug 10 18:41:04 EDT 2023 | Uploaded Document. Type: Interagency Correspondence, FileName:2023-08-10 IP 440-2022-06771.doc | DIEGO ZENT |

| Date | Event | Name |
|---|---|---|
| Thu Aug 10 18:25:00 EDT 2023 | Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | DIEGO ZENT |
| Thu Aug 10 18:24:34 EDT 2023 | Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | DIEGO ZENT |
| Thu Aug 10 18:22:19 EDT 2023 | Downloaded Document. Type: Request for Information (RFI) to Respondent, FileName:2023-05-25 RFI 440-2022-06771.msg | DIEGO ZENT |
| Thu Aug 10 12:33:33 EDT 2023 | Contact with Charging Party record updated | DIEGO ZENT |
| Wed Aug 09 19:54:40 EDT 2023 | Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | MILDRED STUCKEY |
| Wed Aug 09 18:08:31 EDT 2023 | Contact with Charging Party record added | DIEGO ZENT |
| Wed Aug 09 16:02:05 EDT 2023 | Uploaded Document. Type: Investigative Memorandum , FileName:2023-07-20 IM 440-2022-06771.docx | DIEGO ZENT |
| Wed Aug 09 15:41:26 EDT 2023 | Downloaded Document. Type: Letter of Determination, FileName:2023 08 04 LOD 440-2022-06771.pdf | DIEGO ZENT |
| Tue Aug 08 15:45:07 EDT 2023 | Downloaded Document. Type: Letter of Determination, FileName:2023 08 04 LOD 440-2022-06771.pdf | Respondentportal User |
| Tue Aug 08 15:44:43 EDT 2023 | No Action is required from you at this time. | Respondentportal User |
| Tue Aug 08 15:44:39 EDT 2023 | Respondent logged in | Respondentportal User |
| Tue Aug 08 15:19:07 EDT 2023 | Downloaded Document. Type: Letter of Determination, FileName:2023 08 04 LOD 440-2022-06771.pdf | Respondentportal User |
| Tue Aug 08 15:18:38 EDT 2023 | Downloaded Document. Type: Amended Charge of Discrimination, FileName:440-2022-06771_AmendedChargeofDiscrimination_1.pdf | Respondentportal User |
| Tue Aug 08 15:18:15 EDT 2023 | No Action is required from you at this time. | Respondentportal User |
| Tue Aug 08 15:18:12 EDT 2023 | Respondent logged in | Respondentportal User |

Exhibit I: EEOC's activity log related to Branch's Charge

| Date | Event | Name |
| --- | --- | --- |
| Sat Aug 05 23:33:14 EDT 2023 | The Charging Party has Downloaded Document. Type: Letter of Determination, FileName:2023 08 04 LOD 440-2022-06771.pdf | Publicportal User |
| Sat Aug 05 23:32:13 EDT 2023 | The Charging Party has Downloaded Document. Type: Letter of Determination, FileName:2023 08 04 LOD 440-2022-06771.pdf | Publicportal User |
| Sat Aug 05 23:09:36 EDT 2023 | The Charging Party has Downloaded Document. Type: Letter of Determination, FileName:2023 08 04 LOD 440-2022-06771.pdf | Publicportal User |
| Sat Aug 05 23:08:59 EDT 2023 | The Charging Party has Downloaded Document. Type: Letter of Determination, FileName:2023 08 04 LOD 440-2022-06771.pdf | Publicportal User |
| Sat Aug 05 23:08:32 EDT 2023 | The Charging Party has Downloaded Document. Type: Letter of Determination, FileName:2023 08 04 LOD 440-2022-06771.pdf | Publicportal User |
| Sat Aug 05 23:08:08 EDT 2023 | The Charging Party has Downloaded Document. Type: Letter of Determination, FileName:2023 08 04 LOD 440-2022-06771.pdf | Publicportal User |
| Sat Aug 05 23:07:42 EDT 2023 | The Charging Party has Downloaded Document. Type: Letter of Determination, FileName:2023 08 04 LOD 440-2022-06771.pdf | Publicportal User |
| Sat Aug 05 23:07:02 EDT 2023 | The Charging Party has Downloaded Document. Type: Letter of Determination, FileName:2023 08 04 LOD 440-2022-06771.pdf | Publicportal User |
| Sat Aug 05 23:06:37 EDT 2023 | The Charging Party has Downloaded Document. Type: Letter of Determination, FileName:2023 08 04 LOD 440-2022-06771.pdf | Publicportal User |
| Sat Aug 05 22:48:27 EDT 2023 | The Charging Party has Downloaded Document. Type: Letter of Determination, FileName:2023 08 04 LOD 440-2022-06771.pdf | Publicportal User |
| Sat Aug 05 22:48:09 EDT 2023 | The Charging Party has Downloaded Document. Type: Letter of Determination, FileName:2023 08 04 LOD 440-2022-06771.pdf | Publicportal User |
| Sat Aug 05 22:47:01 EDT 2023 | The Charging Party has Downloaded Document. Type: Letter of Determination, FileName:2023 08 04 LOD 440-2022-06771.pdf | Publicportal User |
| Sat Aug 05 22:46:56 EDT 2023 | The Charging Party has Downloaded Document. Type: Evidence Provided by Charging Party, FileName:2023-03-30 CP evidence 440-2022-06771.msg | Publicportal User |

| Date | Event | Name |
|---|---|---|
| Sat Aug 05 22:46:51 EDT 2023 | The Charging Party has Downloaded Document. Type: Letter of Determination, FileName:2023 08 04 LOD 440-2022-06771.pdf | Publicportal User |
| Sat Aug 05 22:46:29 EDT 2023 | The Charging Party has Downloaded Document. Type: Letter of Determination, FileName:2023 08 04 LOD 440-2022-06771.pdf | Publicportal User |
| Sat Aug 05 22:45:06 EDT 2023 | The Charging Party has Downloaded Document. Type: Letter of Determination, FileName:2023 08 04 LOD 440-2022-06771.pdf | Publicportal User |
| Sat Aug 05 22:44:16 EDT 2023 | The Charging Party has Downloaded Document. Type: Letter of Determination, FileName:2023 08 04 LOD 440-2022-06771.pdf | Publicportal User |
| Sat Aug 05 22:43:18 EDT 2023 | The Charging Party has Downloaded Document. Type: Letter of Determination, FileName:2023 08 04 LOD 440-2022-06771.pdf | Publicportal User |
| Sat Aug 05 22:42:05 EDT 2023 | The Charging Party has Downloaded Document. Type: Letter of Determination, FileName:2023 08 04 LOD 440-2022-06771.pdf | Publicportal User |
| Sat Aug 05 22:41:06 EDT 2023 | The Charging Party has Downloaded Document. Type: Letter of Determination, FileName:2023 08 04 LOD 440-2022-06771.pdf | Publicportal User |
| Sat Aug 05 22:40:23 EDT 2023 | The Charging Party has Downloaded Document. Type: Letter of Determination, FileName:2023 08 04 LOD 440-2022-06771.pdf | Publicportal User |
| Sat Aug 05 22:39:59 EDT 2023 | The Charging Party has Downloaded Document. Type: Letter of Determination, FileName:2023 08 04 LOD 440-2022-06771.pdf | Publicportal User |
| Fri Aug 04 19:35:25 EDT 2023 | Downloaded Document. Type: Letter of Determination, FileName:2023 08 04 LOD 440-2022-06771.pdf | DIEGO ZENT |
| Fri Aug 04 18:00:31 EDT 2023 | Contact with Charging Party record added | DIEGO ZENT |
| Fri Aug 04 17:07:44 EDT 2023 | Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | DIEGO ZENT |
| Fri Aug 04 16:44:40 EDT 2023 | Downloaded Document. Type: Letter of Determination, FileName:2023 08 04 LOD 440-2022-06771.pdf | Respondentportal User |
| Fri Aug 04 16:44:34 EDT 2023 | No Action is required from you at this time. | Respondentportal User |

Exhibit I: EEOC's activity log related to Branch's Charge

| Date | Event | Name |
|---|---|---|
| Fri Aug 04 16:44:32 EDT 2023 | Respondent logged in | Respondentportal User |
| Fri Aug 04 16:43:24 EDT 2023 | Emailed Stephanie Bryant Holland at cncharges@littler.com that a new document is available to download. | Arcapp User |
| Fri Aug 04 16:43:24 EDT 2023 | Emailed Angela Lee at angela.lee@cn.ca that a new document is available to download. | Arcapp User |
| Fri Aug 04 16:43:24 EDT 2023 | Emailed ILLINOIS CENTRAL RAILROAD COMPANY at duane.spears@cn.ca that a new document is available to download. | Arcapp User |
| Fri Aug 04 16:43:24 EDT 2023 | Emailed Robert L. Branch at (b)(7)(C) that a new document is available to download. | Arcapp User |
| Fri Aug 04 16:43:23 EDT 2023 | Letter of Determination (2023 08 04 LOD 440-2022-06771.pdf) released | ESZEAN MCDUFFEY |
| Fri Aug 04 16:42:41 EDT 2023 | Downloaded Document. Type: Letter of Determination, FileName:2023 08 04 LOD 440-2022-06771.pdf | ESZEAN MCDUFFEY |
| Fri Aug 04 16:42:32 EDT 2023 | Uploaded Document. Type: Letter of Determination, FileName:2023 08 04 LOD 440-2022-06771.pdf | ESZEAN MCDUFFEY |
| Fri Aug 04 16:41:39 EDT 2023 | Case status changed from Investigation to Conciliation. | ESZEAN MCDUFFEY |
| Fri Aug 04 16:41:39 EDT 2023 | Approved cause finding determination Supervisor review | ESZEAN MCDUFFEY |
| Fri Aug 04 16:41:19 EDT 2023 | Assigned case to ESZEAN MCDUFFEY for Supervisor cause review | ESZEAN MCDUFFEY |
| Fri Aug 04 16:40:59 EDT 2023 | LOD Supervisor review approved. | ESZEAN MCDUFFEY |
| Fri Aug 04 16:40:46 EDT 2023 | Assigned to ESZEAN MCDUFFEY for Supervisor LOD review | ESZEAN MCDUFFEY |
| Fri Aug 04 16:39:51 EDT 2023 | Added a cause finding determination to allegation: Title VII Race-Black/African American Discharge | ESZEAN MCDUFFEY |
| Fri Aug 04 16:39:51 EDT 2023 | Added a cause finding determination to allegation: Title VII Retaliation-Opposition Discharge | ESZEAN MCDUFFEY |
| Wed Aug 02 12:02:37 EDT 2023 | Contact with Charging Party record added | DIEGO ZENT |

| Date | Event | Name |
|---|---|---|
| Tue Aug 01 19:21:38 EDT 2023 | The Charging Party has Downloaded Document. Type: Charge of Discrimination, FileName:440-2022-06771_ChargeOfDiscrimination.pdf | Publicportal User |
| Tue Aug 01 18:32:38 EDT 2023 | Downloaded Document. Type: Amended Charge of Discrimination, FileName:440-2022-06771_AmendedChargeofDiscrimination_1.pdf | ESZEAN MCDUFFEY |
| Mon Jul 31 11:28:27 EDT 2023 | Downloaded Document. Type: Respondent Pre-determination/Determination Interview Notes, FileName:2023-07-28 PDI 440-2022-06771.doc | DIEGO ZENT |
| Fri Jul 28 12:46:38 EDT 2023 | Contact with Charging Party record added | DIEGO ZENT |
| Fri Jul 28 11:50:09 EDT 2023 | Downloaded Document. Type: Respondent Pre-determination/Determination Interview Notes, FileName:2023-07-28 PDI 440-2022-06771.doc | DIEGO ZENT |
| Fri Jul 28 11:50:01 EDT 2023 | Uploaded Document. Type: Respondent Pre-determination/Determination Interview Notes, FileName:2023-07-28 PDI 440-2022-06771.doc | DIEGO ZENT |
| Fri Jul 28 11:49:13 EDT 2023 | Contact with Respondent Attorney record added | DIEGO ZENT |
| Fri Jul 28 09:44:43 EDT 2023 | Contact with Respondent Attorney record added | DIEGO ZENT |
| Thu Jul 27 15:02:56 EDT 2023 | Contact with Respondent Attorney record added | DIEGO ZENT |
| Thu Jul 27 14:50:05 EDT 2023 | Downloaded Document. Type: Respondent Response to RFI, FileName:2023-06-23 Branch_ Robert_ Final Response to Request for Information and Exhibits.pdf | DIEGO ZENT |
| Thu Jul 27 13:17:55 EDT 2023 | Contact with Respondent Attorney record added | DIEGO ZENT |
| Wed Jul 26 10:33:49 EDT 2023 | The Charging Party has Downloaded Document. Type: Evidence Provided by Charging Party, FileName:2023-03-30 CP evidence 440-2022-06771.msg | Publicportal User |
| Wed Jul 26 10:32:30 EDT 2023 | The Charging Party has Downloaded Document. Type: Evidence Provided by Charging Party, FileName:2023-03-30 CP evidence 440-2022-06771.msg | Publicportal User |
| Wed Jul 26 10:31:56 EDT 2023 | The Charging Party has Downloaded Document. Type: Evidence Provided by Charging Party, FileName:2023-03-30 CP evidence 440-2022-06771.msg | Publicportal User |

| Date | Event | Name |
|---|---|---|
| Wed Jul 26 10:31:00 EDT 2023 | The Charging Party has Downloaded Document. Type: Evidence Provided by Charging Party, FileName:2023-03-30 CP evidence 440-2022-06771.msg | Publicportal User |
| Tue Jul 25 15:57:26 EDT 2023 | Downloaded Document. Type: Respondent Response to RFI, FileName:2023-06-23 Branch_ Robert_ Final Response to Request for Information and Exhibits.pdf | DIEGO ZENT |
| Tue Jul 25 14:44:11 EDT 2023 | Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | DIEGO ZENT |
| Tue Jul 25 14:30:52 EDT 2023 | Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | DIEGO ZENT |
| Tue Jul 25 11:18:34 EDT 2023 | Contact with Charging Party record updated | DIEGO ZENT |
| Mon Jul 24 16:11:57 EDT 2023 | Contact with Charging Party record added | DIEGO ZENT |
| Fri Jul 21 17:04:15 EDT 2023 | Downloaded Document. Type: Evidence Provided by Charging Party, FileName:2023-03-30 CP evidence 440-2022-06771.msg | DIEGO ZENT |
| Fri Jul 21 10:46:55 EDT 2023 | The Charging Party has Downloaded Document. Type: Evidence Provided by Charging Party, FileName:2023-03-30 CP evidence 440-2022-06771.msg | Publicportal User |
| Wed Jul 19 12:04:58 EDT 2023 | Downloaded Document. Type: Respondent Response to RFI, FileName:2023-06-23 Branch_ Robert_ Final Response to Request for Information and Exhibits.pdf | DIEGO ZENT |
| Tue Jul 18 07:23:03 EDT 2023 | Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | MILDRED STUCKEY |
| Mon Jul 17 15:18:51 EDT 2023 | Downloaded Document. Type: Respondent Response to RFI, FileName:2023-06-23 Branch_ Robert_ Final Response to Request for Information and Exhibits.pdf | MILDRED STUCKEY |
| Mon Jul 17 13:40:34 EDT 2023 | Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | MILDRED STUCKEY |
| Mon Jul 17 13:36:11 EDT 2023 | Downloaded Document. Type: Evidence Provided by Charging Party, FileName:2023-03-30 CP evidence 440-2022-06771.msg | MILDRED STUCKEY |

| Date | Event | Name |
| --- | --- | --- |
| Mon Jul 17 13:35:20 EDT 2023 | Downloaded Document. Type: Respondent Response to RFI, FileName:2023-06-23 Branch_ Robert_ Final Response to Request for Information and Exhibits.pdf | MILDRED STUCKEY |
| Mon Jul 17 13:35:05 EDT 2023 | Downloaded Document. Type: Respondent Response to RFI, FileName:2023-06-23 Branch_ Robert_ Final Response to Request for Information and Exhibits.pdf | MILDRED STUCKEY |
| Mon Jul 17 13:31:50 EDT 2023 | Downloaded Document. Type: Evidence Provided by Charging Party, FileName:2023-03-30 CP evidence 440-2022-06771.msg | MILDRED STUCKEY |
| Mon Jul 17 13:02:44 EDT 2023 | Downloaded Document. Type: Respondent Response to RFI, FileName:2023-06-23 Branch_ Robert_ Final Response to Request for Information and Exhibits.pdf | MILDRED STUCKEY |
| Mon Jul 17 10:52:06 EDT 2023 | Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | DIEGO ZENT |
| Mon Jul 17 07:57:17 EDT 2023 | Downloaded Document. Type: Evidence Provided by Charging Party, FileName:2023-03-30 CP evidence 440-2022-06771.msg | MILDRED STUCKEY |
| Thu Jul 13 18:08:43 EDT 2023 | Downloaded Document. Type: Respondent Response to RFI, FileName:2023-06-23 Branch_ Robert_ Final Response to Request for Information and Exhibits.pdf | MILDRED STUCKEY |
| Thu Jul 13 17:47:45 EDT 2023 | Downloaded Document. Type: Evidence Provided by Charging Party, FileName:2023-03-30 CP evidence 440-2022-06771.msg | MILDRED STUCKEY |
| Thu Jul 13 17:37:50 EDT 2023 | Downloaded Document. Type: Respondent Response to RFI, FileName:2023-06-23 Branch_ Robert_ Final Response to Request for Information and Exhibits.pdf | ESZEAN MCDUFFEY |
| Thu Jul 13 17:29:41 EDT 2023 | Downloaded Document. Type: Respondent Response to RFI, FileName:2023-06-23 Branch_ Robert_ Final Response to Request for Information and Exhibits.pdf | MILDRED STUCKEY |
| Thu Jul 13 17:24:43 EDT 2023 | Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | ESZEAN MCDUFFEY |
| Thu Jul 13 17:24:41 EDT 2023 | Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | MILDRED STUCKEY |
| Thu Jul 13 16:59:55 EDT 2023 | Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit Branch.msg | ESZEAN MCDUFFEY |

| Date | Event | Name |
| --- | --- | --- |
| Thu Jul 13 16:59:37 EDT 2023 | Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit B Branch.msg | ESZEAN MCDUFFEY |
| Thu Jul 13 16:54:52 EDT 2023 | Downloaded Document. Type: Evidence Provided by Charging Party, FileName:2023-03-30 CP evidence 440-2022-06771.msg | ESZEAN MCDUFFEY |
| Thu Jul 13 16:53:20 EDT 2023 | Downloaded Document. Type: Evidence Provided by Charging Party, FileName:2023-03-30 CP evidence 440-2022-06771.msg | ESZEAN MCDUFFEY |
| Thu Jul 13 16:36:26 EDT 2023 | Downloaded Document. Type: Respondent Response to RFI, FileName:2023-06-23 Branch_ Robert_ Final Response to Request for Information and Exhibits.pdf | ESZEAN MCDUFFEY |
| Thu Jul 13 16:33:42 EDT 2023 | Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | ESZEAN MCDUFFEY |
| Thu Jul 13 16:05:48 EDT 2023 | Downloaded Document. Type: Respondent Response to RFI, FileName:2023-06-23 Branch_ Robert_ Final Response to Request for Information and Exhibits.pdf | MILDRED STUCKEY |
| Thu Jul 13 15:10:48 EDT 2023 | Downloaded Document. Type: Respondent Response to RFI, FileName:2023-06-23 Branch_ Robert_ Final Response to Request for Information and Exhibits.pdf | MILDRED STUCKEY |
| Thu Jul 13 15:10:32 EDT 2023 | Downloaded Document. Type: Request for Information (RFI) to Respondent, FileName:2023-05-25 RFI 440-2022-06771.msg | MILDRED STUCKEY |
| Thu Jul 13 15:10:17 EDT 2023 | Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | MILDRED STUCKEY |
| Thu Jul 13 15:09:54 EDT 2023 | Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit Branch.msg | MILDRED STUCKEY |
| Thu Jul 13 14:42:30 EDT 2023 | Downloaded Document. Type: Respondent Response to RFI, FileName:2023-06-23 Branch_ Robert_ Final Response to Request for Information and Exhibits.pdf | MILDRED STUCKEY |
| Thu Jul 13 14:01:48 EDT 2023 | Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | MILDRED STUCKEY |
| Thu Jul 13 13:43:40 EDT 2023 | Downloaded Document. Type: Amended Charge of Discrimination, FileName:440-2022-06771_AmendedChargeofDiscrimination_1.pdf | MILDRED STUCKEY |

| Date | Event | Name |
|---|---|---|
| Thu Jul 13 13:37:29 EDT 2023 | Downloaded Document. Type: Charge of Discrimination, FileName:440-2022-06771_ChargeOfDiscrimination.pdf | MILDRED STUCKEY |
| Thu Jul 13 13:30:39 EDT 2023 | Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | MILDRED STUCKEY |
| Thu Jul 13 13:29:59 EDT 2023 | Downloaded Document. Type: Charge of Discrimination, FileName:440-2022-06771_ChargeOfDiscrimination.pdf | MILDRED STUCKEY |
| Thu Jul 13 13:28:41 EDT 2023 | Downloaded Document. Type: Charge of Discrimination, FileName:440-2022-06771_ChargeOfDiscrimination.pdf | MILDRED STUCKEY |
| Mon Jul 10 10:59:18 EDT 2023 | Downloaded Document. Type: Request for Information (RFI) to Respondent, FileName:2023-05-25 RFI 440-2022-06771.msg | DIEGO ZENT |
| Mon Jul 10 10:59:09 EDT 2023 | Downloaded Document. Type: Respondent RFI Extension Request, FileName:2023-06-02 Branch_ Robert_ RFI Extension Request Letter.pdf | DIEGO ZENT |
| Mon Jul 03 09:15:30 EDT 2023 | Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | MILDRED STUCKEY |
| Mon Jul 03 09:14:43 EDT 2023 | Downloaded Document. Type: Respondent Response to RFI, FileName:2023-06-23 Branch_ Robert_ Final Response to Request for Information and Exhibits.pdf | MILDRED STUCKEY |
| Wed Jun 28 11:40:55 EDT 2023 | Downloaded Document. Type: Respondent Response to RFI, FileName:2023-06-23 Branch_ Robert_ Final Response to Request for Information and Exhibits.pdf | DIEGO ZENT |
| Tue Jun 27 12:53:14 EDT 2023 | Downloaded Document. Type: Respondent Response to RFI, FileName:2023-06-23 Branch_ Robert_ Final Response to Request for Information and Exhibits.pdf | DIEGO ZENT |
| Tue Jun 27 12:53:03 EDT 2023 | Downloaded Document. Type: Respondent Response to RFI, FileName:2023-06-23 Branch_ Robert_ Final Response to Request for Information and Exhibits.pdf | DIEGO ZENT |
| Tue Jun 27 12:51:23 EDT 2023 | Downloaded Document. Type: Correspondence To/From Charging Party, FileName:2023-05-23 CPs Consent to Discuss Case with Supporters.pdf | DIEGO ZENT |
| Fri Jun 23 14:07:12 EDT 2023 | Uploaded Document. Type: Respondent Response to RFI, FileName:2023-06-23 Branch_ Robert_ Final Response to Request for Information and Exhibits.pdf | Respondentportal User |

| Date | Event | Name |
|---|---|---|
| Fri Jun 23 14:02:44 EDT 2023 | Please review the Request for Information located under the ?Documents? section, and provide a written response to it with any supporting documentation by the Response Deadline Date it stipulates. | Respondentportal User |
| Fri Jun 23 14:02:38 EDT 2023 | Respondent logged in | Respondentportal User |
| Thu Jun 22 17:51:56 EDT 2023 | Downloaded Document. Type: Request for Information (RFI) to Respondent, FileName:2023-05-25 RFI 440-2022-06771.msg | MILDRED STUCKEY |
| Thu Jun 22 17:51:22 EDT 2023 | Downloaded Document. Type: Respondent RFI Extension Request, FileName:2023-06-02 Branch_ Robert_ RFI Extension Request Letter.pdf | MILDRED STUCKEY |
| Thu Jun 22 17:49:22 EDT 2023 | Downloaded Document. Type: Respondent RFI Extension Request, FileName:2023-06-02 Branch_ Robert_ RFI Extension Request Letter.pdf | ESZEAN MCDUFFEY |
| Tue Jun 20 15:29:45 EDT 2023 | Downloaded Document. Type: Respondent RFI Extension Request, FileName:2023-06-02 Branch_ Robert_ RFI Extension Request Letter.pdf | DIEGO ZENT |
| Thu Jun 15 13:02:18 EDT 2023 | Please review the Request for Information located under the ?Documents? section, and provide a written response to it with any supporting documentation by the Response Deadline Date it stipulates. | Respondentportal User |
| Thu Jun 15 13:02:16 EDT 2023 | Respondent logged in | Respondentportal User |
| Thu Jun 15 12:57:51 EDT 2023 | Please review the Request for Information located under the ?Documents? section, and provide a written response to it with any supporting documentation by the Response Deadline Date it stipulates. | Respondentportal User |
| Thu Jun 15 12:57:50 EDT 2023 | Respondent logged in | Respondentportal User |
| Thu Jun 15 12:57:15 EDT 2023 | Added Respondent Contact Information. | Respondentportal User |
| Thu Jun 15 12:55:23 EDT 2023 | Please review the Request for Information located under the ?Documents? section, and provide a written response to it with any supporting documentation by the Response Deadline Date it stipulates. | Respondentportal User |
| Thu Jun 15 12:55:21 EDT 2023 | Respondent logged in | Respondentportal User |
| Thu Jun 15 12:55:19 EDT 2023 | Please review the Request for Information located under the ?Documents? section, and provide a written | Respondentportal User |

| Date | Event | Name |
|---|---|---|
| | response to it with any supporting documentation by the Response Deadline Date it stipulates. | |
| Thu Jun 15 12:55:17 EDT 2023 | Respondent logged in | Respondentportal User |
| Thu Jun 15 12:53:36 EDT 2023 | Please review the Request for Information located under the ?Documents? section, and provide a written response to it with any supporting documentation by the Response Deadline Date it stipulates. | Respondentportal User |
| Thu Jun 15 12:53:33 EDT 2023 | Respondent logged in | Respondentportal User |
| Thu Jun 08 17:16:11 EDT 2023 | Downloaded Document. Type: Correspondence To/From Charging Party, FileName:2023-05-23 CPs Consent to Discuss Case with Supporters.pdf | ESZEAN MCDUFFEY |
| Thu Jun 08 16:58:16 EDT 2023 | Downloaded Document. Type: Correspondence To/From Charging Party, FileName:2023-05-23 CPs Consent to Discuss Case with Supporters.pdf | ESZEAN MCDUFFEY |
| Thu Jun 08 07:51:28 EDT 2023 | Downloaded Document. Type: Request for Information (RFI) to Respondent, FileName:2023-05-25 RFI 440-2022-06771.msg | MILDRED STUCKEY |
| Thu Jun 08 07:50:48 EDT 2023 | Downloaded Document. Type: Respondent RFI Extension Request, FileName:2023-06-02 Branch_ Robert_ RFI Extension Request Letter.pdf | MILDRED STUCKEY |
| Thu Jun 08 07:49:42 EDT 2023 | Downloaded Document. Type: Request for Information (RFI) to Respondent, FileName:2023-05-25 RFI 440-2022-06771.msg | MILDRED STUCKEY |
| Tue Jun 06 14:26:03 EDT 2023 | Downloaded Document. Type: Respondent RFI Extension Request, FileName:2023-06-02 Branch_ Robert_ RFI Extension Request Letter.pdf | MILDRED STUCKEY |
| Mon Jun 05 14:53:23 EDT 2023 | Contact with Charging Party record added | DIEGO ZENT |
| Mon Jun 05 14:51:50 EDT 2023 | Downloaded Document. Type: Evidence Provided by Charging Party, FileName:2023-03-30 CP evidence 440-2022-06771.msg | DIEGO ZENT |
| Mon Jun 05 14:51:28 EDT 2023 | Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit B Branch.msg | DIEGO ZENT |
| Mon Jun 05 14:51:14 EDT 2023 | Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit Branch.msg | DIEGO ZENT |

| Date | Event | Name |
|---|---|---|
| Mon Jun 05 14:42:43 EDT 2023 | Downloaded Document. Type: Evidence Provided by Charging Party, FileName:2023-03-30 CP evidence 440-2022-06771.msg | DIEGO ZENT |
| Mon Jun 05 14:38:46 EDT 2023 | Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit Branch.msg | DIEGO ZENT |
| Mon Jun 05 14:35:12 EDT 2023 | Downloaded Document. Type: Request for Information (RFI) to Respondent, FileName:2023-05-25 RFI 440-2022-06771.msg | DIEGO ZENT |
| Mon Jun 05 14:34:49 EDT 2023 | Downloaded Document. Type: Respondent RFI Extension Request, FileName:2023-06-02 Branch_ Robert_ RFI Extension Request Letter.pdf | DIEGO ZENT |
| Fri Jun 02 11:46:37 EDT 2023 | Uploaded Document. Type: Respondent RFI Extension Request, FileName:2023-06-02 Branch_ Robert_ RFI Extension Request Letter.pdf | Respondentportal User |
| Fri Jun 02 11:43:19 EDT 2023 | Please review the Request for Information located under the ?Documents? section, and provide a written response to it with any supporting documentation by the Response Deadline Date it stipulates. | Respondentportal User |
| Fri Jun 02 11:43:17 EDT 2023 | Respondent logged in | Respondentportal User |
| Wed May 31 15:04:19 EDT 2023 | Uploaded Document. Type: Evidence Provided by Charging Party, FileName:2023-03-30 CP evidence 440-2022-06771.msg | DIEGO ZENT |
| Thu May 25 11:32:06 EDT 2023 | Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | DIEGO ZENT |
| Thu May 25 10:34:13 EDT 2023 | Downloaded Document. Type: Request for Information (RFI) to Respondent, FileName:2023-05-25 RFI 440-2022-06771.msg | Respondentportal User |
| Thu May 25 10:29:20 EDT 2023 | Downloaded Document. Type: Request for Information (RFI) to Respondent, FileName:2023-05-25 RFI 440-2022-06771.msg | MILDRED STUCKEY |
| Thu May 25 10:28:56 EDT 2023 | Please review the Request for Information located under the ?Documents? section, and provide a written response to it with any supporting documentation by the Response Deadline Date it stipulates. | Respondentportal User |
| Thu May 25 10:28:55 EDT 2023 | Respondent logged in | Respondentportal User |

| Date | Event | Name |
|---|---|---|
| Thu May 25 10:09:21 EDT 2023 | Downloaded Document. Type: Request for Information (RFI) to Respondent, FileName:2023-05-25 RFI 440-2022-06771.msg | Respondentportal User |
| Thu May 25 10:09:17 EDT 2023 | Please review the Request for Information located under the ?Documents? section, and provide a written response to it with any supporting documentation by the Response Deadline Date it stipulates. | Respondentportal User |
| Thu May 25 10:09:15 EDT 2023 | Respondent logged in | Respondentportal User |
| Thu May 25 10:00:56 EDT 2023 | Downloaded Document. Type: Correspondence To/From Charging Party, FileName:2023-05-23 CPs Consent to Discuss Case with Supporters.pdf | DIEGO ZENT |
| Thu May 25 10:00:53 EDT 2023 | Emailed Stephanie Bryant Holland at cncharges@littler.com that a new document is available to download. | Arcapp User |
| Thu May 25 10:00:53 EDT 2023 | Emailed ILLINOIS CENTRAL RAILROAD COMPANY at duane.spears@cn.ca that a new document is available to download. | Arcapp User |
| Thu May 25 10:00:52 EDT 2023 | Request for Information (RFI) to Respondent (2023-05-25 RFI 440-2022-06771.msg) released | DIEGO ZENT |
| Thu May 25 09:57:34 EDT 2023 | Uploaded Document. Type: Request for Information (RFI) to Respondent, FileName:2023-05-25 RFI 440-2022-06771.msg | DIEGO ZENT |
| Thu May 25 09:29:30 EDT 2023 | Contact with Charging Party record added | DIEGO ZENT |
| Wed May 24 19:37:17 EDT 2023 | Downloaded Document. Type: Amended Charge of Discrimination, FileName:440-2022-06771_AmendedChargeofDiscrimination_1.pdf | MILDRED STUCKEY |
| Wed May 24 08:49:29 EDT 2023 | Contact with Charging Party record updated | MILDRED STUCKEY |
| Wed May 24 08:48:54 EDT 2023 | Contact with Charging Party record updated | MILDRED STUCKEY |
| Wed May 24 08:47:15 EDT 2023 | Contact with Charging Party record added | MILDRED STUCKEY |
| Wed May 24 07:43:24 EDT 2023 | Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | MILDRED STUCKEY |
| Tue May 23 17:13:36 EDT 2023 | Contact with Charging Party record updated | MILDRED STUCKEY |

Exhibit I: EEOC's activity log related to Branch's Charge

| Date | Event | Name |
|---|---|---|
| Tue May 23 17:10:55 EDT 2023 | Uploaded Document. Type: Correspondence To/From Charging Party, FileName:2023-05-23 CPs Consent to Discuss Case with Supporters.pdf | MILDRED STUCKEY |
| Tue May 23 17:04:42 EDT 2023 | Contact with Charging Party record added | MILDRED STUCKEY |
| Tue May 23 14:06:13 EDT 2023 | Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | DIEGO ZENT |
| Tue May 23 14:05:09 EDT 2023 | Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | DIEGO ZENT |
| Mon May 22 11:43:50 EDT 2023 | Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit B Branch.msg | MILDRED STUCKEY |
| Mon May 22 11:42:43 EDT 2023 | Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit Branch.msg | MILDRED STUCKEY |
| Mon May 22 11:42:21 EDT 2023 | Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | MILDRED STUCKEY |
| Mon May 22 11:42:02 EDT 2023 | Downloaded Document. Type: Charge of Discrimination, FileName:440-2022-06771_ChargeOfDiscrimination.pdf | MILDRED STUCKEY |
| Mon May 22 11:41:32 EDT 2023 | Contact with Charging Party record added | MILDRED STUCKEY |
| Thu May 18 19:00:25 EDT 2023 | Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit B Branch.msg | MILDRED STUCKEY |
| Thu May 18 19:00:14 EDT 2023 | Contact with Charging Party record updated | MILDRED STUCKEY |
| Thu May 18 18:56:35 EDT 2023 | Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit Branch.msg | MILDRED STUCKEY |
| Thu May 18 18:56:23 EDT 2023 | Downloaded Document. Type: Position Statement Extension Request, FileName:2022-09-30 Branch_ Robert_ Mediation and SOP Extension Request Letter.pdf | MILDRED STUCKEY |
| Thu May 18 18:55:28 EDT 2023 | Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit Branch.msg | ESZEAN MCDUFFEY |

| Date | Event | Name |
|---|---|---|
| Thu May 18 18:55:25 EDT 2023 | Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | MILDRED STUCKEY |
| Thu May 18 18:55:04 EDT 2023 | Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit B Branch.msg | ESZEAN MCDUFFEY |
| Thu May 18 18:53:27 EDT 2023 | Contact with Charging Party record updated | MILDRED STUCKEY |
| Thu May 18 18:48:10 EDT 2023 | Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | ESZEAN MCDUFFEY |
| Thu May 18 18:43:03 EDT 2023 | Contact with Charging Party record added | MILDRED STUCKEY |
| Wed May 17 18:51:41 EDT 2023 | The Charging Party has Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit B Branch.msg | Publicportal User |
| Wed May 17 18:51:29 EDT 2023 | The Charging Party has Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit B Branch.msg | Publicportal User |
| Wed May 17 18:51:22 EDT 2023 | The Charging Party has Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit B Branch.msg | Publicportal User |
| Wed May 17 18:51:16 EDT 2023 | The Charging Party has Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit B Branch.msg | Publicportal User |
| Wed May 17 18:47:53 EDT 2023 | The Charging Party has Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit Branch.msg | Publicportal User |
| Wed May 17 18:47:48 EDT 2023 | The Charging Party has Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit Branch.msg | Publicportal User |
| Wed May 17 18:45:45 EDT 2023 | The Charging Party has Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | Publicportal User |
| Wed May 17 18:45:28 EDT 2023 | The Charging Party has Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | Publicportal User |
| Wed May 17 18:43:22 EDT 2023 | The Charging Party has Downloaded Document. Type: Charging Party Confidentiality Agreement, | Publicportal User |

| Date | Event | Name |
|---|---|---|
| | FileName:8523745_ConfidentialityAgreementSigned-CP.pdf | |
| Wed May 17 18:43:20 EDT 2023 | The Charging Party has Downloaded Document. Type: Charging Party Confidentiality Agreement, FileName:8523745_ConfidentialityAgreementSigned-CP.pdf | Publicportal User |
| Wed May 17 18:41:20 EDT 2023 | The Charging Party has Downloaded Document. Type: Charging Party Agreement to Mediate, FileName:8523745_AgreementToMediateSigned-CP.pdf | Publicportal User |
| Wed May 17 18:41:18 EDT 2023 | The Charging Party has Downloaded Document. Type: Charging Party Agreement to Mediate, FileName:8523745_AgreementToMediateSigned-CP.pdf | Publicportal User |
| Wed May 17 18:38:54 EDT 2023 | The Charging Party has Downloaded Document. Type: Amended Charge of Discrimination, FileName:440-2022-06771_AmendedChargeofDiscrimination_1.pdf | Publicportal User |
| Wed May 17 18:30:14 EDT 2023 | The Charging Party has Downloaded Document. Type: Charge of Discrimination, FileName:440-2022-06771_ChargeOfDiscrimination.pdf | Publicportal User |
| Wed May 17 18:29:01 EDT 2023 | The Charging Party has Downloaded Document. Type: Charge of Discrimination, FileName:440-2022-06771_ChargeOfDiscrimination.pdf | Publicportal User |
| Wed May 17 18:24:16 EDT 2023 | The Charging Party has Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | Publicportal User |
| Wed May 17 18:23:50 EDT 2023 | The Charging Party has Downloaded Document. Type: Charging Party Confidentiality Agreement, FileName:8523745_ConfidentialityAgreementSigned-CP.pdf | Publicportal User |
| Wed May 17 18:19:28 EDT 2023 | The Charging Party has Downloaded Document. Type: Charging Party Agreement to Mediate, FileName:8523745_AgreementToMediateSigned-CP.pdf | Publicportal User |
| Wed May 17 18:17:24 EDT 2023 | The Charging Party has Downloaded Document. Type: Amended Charge of Discrimination, FileName:440-2022-06771_AmendedChargeofDiscrimination_1.pdf | Publicportal User |
| Wed May 17 18:13:34 EDT 2023 | The Charging Party has Downloaded Document. Type: Charge of Discrimination, FileName:440-2022-06771_ChargeOfDiscrimination.pdf | Publicportal User |

| Date | Event | Name |
|---|---|---|
| Wed May 17 18:13:25 EDT 2023 | The Charging Party has Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit Branch.msg | Publicportal User |
| Wed May 17 18:13:15 EDT 2023 | The Charging Party has Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit Branch.msg | Publicportal User |
| Wed May 17 18:13:13 EDT 2023 | The Charging Party has Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit Branch.msg | Publicportal User |
| Wed May 17 18:13:11 EDT 2023 | The Charging Party has Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit Branch.msg | Publicportal User |
| Wed May 17 18:13:10 EDT 2023 | The Charging Party has Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit Branch.msg | Publicportal User |
| Wed May 17 18:13:00 EDT 2023 | The Charging Party has Downloaded Document. Type: Charge of Discrimination, FileName:440-2022-06771_ChargeOfDiscrimination.pdf | Publicportal User |
| Wed May 17 18:12:58 EDT 2023 | The Charging Party has Downloaded Document. Type: Charge of Discrimination, FileName:440-2022-06771_ChargeOfDiscrimination.pdf | Publicportal User |
| Wed May 17 18:12:53 EDT 2023 | The Charging Party has Downloaded Document. Type: Charge of Discrimination, FileName:440-2022-06771_ChargeOfDiscrimination.pdf | Publicportal User |
| Wed May 17 18:12:50 EDT 2023 | The Charging Party has Downloaded Document. Type: Charge of Discrimination, FileName:440-2022-06771_ChargeOfDiscrimination.pdf | Publicportal User |
| Wed May 17 18:12:41 EDT 2023 | The Charging Party has Downloaded Document. Type: Charge of Discrimination, FileName:440-2022-06771_ChargeOfDiscrimination.pdf | Publicportal User |
| Wed May 17 18:12:37 EDT 2023 | The Charging Party has Downloaded Document. Type: Charge of Discrimination, FileName:440-2022-06771_ChargeOfDiscrimination.pdf | Publicportal User |
| Wed May 17 18:12:30 EDT 2023 | The Charging Party has Downloaded Document. Type: Charge of Discrimination, FileName:440-2022-06771_ChargeOfDiscrimination.pdf | Publicportal User |
| Wed May 17 18:12:19 EDT 2023 | The Charging Party has Downloaded Document. Type: Charge of Discrimination, FileName:440-2022-06771_ChargeOfDiscrimination.pdf | Publicportal User |

| Date | Event | Name |
| --- | --- | --- |
| Wed May 17 18:12:17 EDT 2023 | The Charging Party has Downloaded Document. Type: Charge of Discrimination, FileName:440-2022-06771_ChargeOfDiscrimination.pdf | Publicportal User |
| Wed May 17 18:12:14 EDT 2023 | The Charging Party has Downloaded Document. Type: Charge of Discrimination, FileName:440-2022-06771_ChargeOfDiscrimination.pdf | Publicportal User |
| Wed May 17 18:11:58 EDT 2023 | The Charging Party has Downloaded Document. Type: Charge of Discrimination, FileName:440-2022-06771_ChargeOfDiscrimination.pdf | Publicportal User |
| Wed May 17 18:11:47 EDT 2023 | The Charging Party has Downloaded Document. Type: Charge of Discrimination, FileName:440-2022-06771_ChargeOfDiscrimination.pdf | Publicportal User |
| Wed May 17 18:11:44 EDT 2023 | The Charging Party has Downloaded Document. Type: Charge of Discrimination, FileName:440-2022-06771_ChargeOfDiscrimination.pdf | Publicportal User |
| Wed May 17 18:11:41 EDT 2023 | The Charging Party has Downloaded Document. Type: Charge of Discrimination, FileName:440-2022-06771_ChargeOfDiscrimination.pdf | Publicportal User |
| Wed May 17 18:11:35 EDT 2023 | The Charging Party has Downloaded Document. Type: Charge of Discrimination, FileName:440-2022-06771_ChargeOfDiscrimination.pdf | Publicportal User |
| Wed May 17 18:11:21 EDT 2023 | The Charging Party has Downloaded Document. Type: Charge of Discrimination, FileName:440-2022-06771_ChargeOfDiscrimination.pdf | Publicportal User |
| Wed May 17 18:10:49 EDT 2023 | The Charging Party has Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit Branch.msg | Publicportal User |
| Wed May 17 18:10:05 EDT 2023 | The Charging Party has Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit B Branch.msg | Publicportal User |
| Wed May 17 17:57:12 EDT 2023 | The Charging Party has Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | Publicportal User |
| Wed May 17 17:55:47 EDT 2023 | The Charging Party has Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | Publicportal User |
| Wed May 17 17:55:29 EDT 2023 | The Charging Party has Downloaded Document. Type: Amended Charge of Discrimination, FileName:440-2022-06771_AmendedChargeofDiscrimination_1.pdf | Publicportal User |

| Date | Event | Name |
| --- | --- | --- |
| Wed May 17 17:55:03 EDT 2023 | The Charging Party has Downloaded Document. Type: Amended Charge of Discrimination, FileName:440-2022-06771_AmendedChargeofDiscrimination_1.pdf | Publicportal User |
| Wed May 17 17:54:47 EDT 2023 | The Charging Party has Downloaded Document. Type: Charge of Discrimination, FileName:440-2022-06771_ChargeOfDiscrimination.pdf | Publicportal User |
| Wed May 17 17:43:35 EDT 2023 | The Charging Party has Downloaded Document. Type: Charge of Discrimination, FileName:440-2022-06771_ChargeOfDiscrimination.pdf | Publicportal User |
| Wed May 17 17:43:05 EDT 2023 | The Charging Party has Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit B Branch.msg | Publicportal User |
| Wed May 17 17:42:56 EDT 2023 | The Charging Party has Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit Branch.msg | Publicportal User |
| Wed May 17 17:42:37 EDT 2023 | The Charging Party has Downloaded Document. Type: Charging Party Confidentiality Agreement, FileName:8523745_ConfidentialityAgreementSigned-CP.pdf | Publicportal User |
| Wed May 17 17:42:25 EDT 2023 | The Charging Party has Downloaded Document. Type: Charging Party Agreement to Mediate, FileName:8523745_AgreementToMediateSigned-CP.pdf | Publicportal User |
| Wed May 17 17:42:15 EDT 2023 | The Charging Party has Downloaded Document. Type: Amended Charge of Discrimination, FileName:440-2022-06771_AmendedChargeofDiscrimination_1.pdf | Publicportal User |
| Wed May 17 17:41:56 EDT 2023 | The Charging Party has Downloaded Document. Type: Charge of Discrimination, FileName:440-2022-06771_ChargeOfDiscrimination.pdf | Publicportal User |
| Wed May 17 17:41:21 EDT 2023 | The Charging Party has Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit B Branch.msg | Publicportal User |
| Wed May 17 14:12:22 EDT 2023 | The Charging Party has Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | Publicportal User |
| Wed May 17 14:12:07 EDT 2023 | The Charging Party has Downloaded Document. Type: Charging Party Agreement to Mediate, FileName:8523745_AgreementToMediateSigned-CP.pdf | Publicportal User |

| Date | Event | Name |
|---|---|---|
| Wed May 17 14:11:29 EDT 2023 | The Charging Party has Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | Publicportal User |
| Wed May 17 14:10:41 EDT 2023 | The Charging Party has Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | Publicportal User |
| Wed May 17 14:10:35 EDT 2023 | The Charging Party has Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit Branch.msg | Publicportal User |
| Tue May 09 09:22:15 EDT 2023 | No Action is required from you at this time. You may be notified at a later date to respond to a Request for Information | Respondentportal User |
| Tue May 09 09:22:13 EDT 2023 | Respondent logged in | Respondentportal User |
| Wed Mar 29 14:15:53 EDT 2023 | Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | DIEGO ZENT |
| Wed Mar 29 14:15:07 EDT 2023 | Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit B Branch.msg | DIEGO ZENT |
| Wed Mar 29 14:11:32 EDT 2023 | Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit Branch.msg | DIEGO ZENT |
| Tue Mar 28 11:32:50 EDT 2023 | Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit Branch.msg | DIEGO ZENT |
| Mon Mar 06 14:35:57 EST 2023 | Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | DIEGO ZENT |
| Thu Mar 02 14:37:05 EST 2023 | Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | BENJAMIN CAIN |
| Tue Feb 21 19:15:32 EST 2023 | Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | ESZEAN MCDUFFEY |
| Tue Feb 21 18:57:25 EST 2023 | Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit B Branch.msg | ESZEAN MCDUFFEY |

| Date | Event | Name |
|---|---|---|
| Tue Feb 21 18:50:34 EST 2023 | Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit Branch.msg | ESZEAN MCDUFFEY |
| Tue Feb 21 18:49:02 EST 2023 | Downloaded Document. Type: Amended Charge of Discrimination, FileName:440-2022-06771_AmendedChargeofDiscrimination_1.pdf | ESZEAN MCDUFFEY |
| Tue Feb 21 18:47:57 EST 2023 | Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | ESZEAN MCDUFFEY |
| Mon Jan 23 16:36:23 EST 2023 | The Charging Party has Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | Publicportal User |
| Tue Jan 03 14:53:45 EST 2023 | Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | DIEGO ZENT |
| Tue Jan 03 14:53:33 EST 2023 | Downloaded Document. Type: Amended Charge of Discrimination, FileName:440-2022-06771_AmendedChargeofDiscrimination_1.pdf | DIEGO ZENT |
| Sun Dec 11 21:47:46 EST 2022 | The Charging Party has Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit B Branch.msg | Publicportal User |
| Sun Dec 11 21:45:40 EST 2022 | The Charging Party has Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit B Branch.msg | Publicportal User |
| Sun Dec 11 21:45:17 EST 2022 | The Charging Party has Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit B Branch.msg | Publicportal User |
| Sun Dec 11 21:44:37 EST 2022 | The Charging Party has Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit B Branch.msg | Publicportal User |
| Sun Dec 11 21:43:33 EST 2022 | The Charging Party has Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit Branch.msg | Publicportal User |
| Mon Nov 21 18:16:07 EST 2022 | The Charging Party has Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit Branch.msg | Publicportal User |
| Mon Nov 21 18:15:56 EST 2022 | The Charging Party has Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit Branch.msg | Publicportal User |

| Date | Event | Name |
|---|---|---|
| Mon Nov 21 18:15:50 EST 2022 | The Charging Party has Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit B Branch.msg | Publicportal User |
| Mon Nov 21 17:51:32 EST 2022 | The Charging Party has Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit B Branch.msg | Publicportal User |
| Mon Nov 21 17:51:07 EST 2022 | The Charging Party has Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit B Branch.msg | Publicportal User |
| Mon Nov 21 17:50:46 EST 2022 | The Charging Party has Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit B Branch.msg | Publicportal User |
| Mon Nov 21 17:48:53 EST 2022 | The Charging Party has Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit B Branch.msg | Publicportal User |
| Mon Nov 21 17:26:04 EST 2022 | The Charging Party has Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit B Branch.msg | Publicportal User |
| Mon Nov 21 17:25:37 EST 2022 | The Charging Party has Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit B Branch.msg | Publicportal User |
| Mon Nov 21 17:24:21 EST 2022 | The Charging Party has Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit B Branch.msg | Publicportal User |
| Mon Nov 21 17:23:01 EST 2022 | The Charging Party has Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit B Branch.msg | Publicportal User |
| Mon Nov 21 17:22:16 EST 2022 | The Charging Party has Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit Branch.msg | Publicportal User |
| Mon Nov 21 17:22:10 EST 2022 | The Charging Party has Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit B Branch.msg | Publicportal User |
| Mon Nov 21 17:21:28 EST 2022 | The Charging Party has Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit B Branch.msg | Publicportal User |
| Mon Nov 21 17:20:32 EST 2022 | The Charging Party has Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit B Branch.msg | Publicportal User |

| Date | Event | Name |
|---|---|---|
| Mon Nov 21 17:20:15 EST 2022 | The Charging Party has Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit Branch.msg | Publicportal User |
| Mon Nov 21 17:19:53 EST 2022 | The Charging Party has Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit B Branch.msg | Publicportal User |
| Mon Nov 21 17:19:25 EST 2022 | The Charging Party has Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit B Branch.msg | Publicportal User |
| Mon Nov 21 17:11:04 EST 2022 | The Charging Party has Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit B Branch.msg | Publicportal User |
| Mon Nov 21 17:02:53 EST 2022 | The Charging Party has Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit B Branch.msg | Publicportal User |
| Mon Nov 21 17:00:13 EST 2022 | The Charging Party has Downloaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit B Branch.msg | Publicportal User |
| Mon Nov 21 15:07:16 EST 2022 | Emailed Robert L. Branch at (b)(7)(C) that a new document is available to download. | Arcapp User |
| Mon Nov 21 15:07:16 EST 2022 | Correspondence To/From Charging Party (Exhibit B Branch.msg) released | DIEGO ZENT |
| Mon Nov 21 15:07:09 EST 2022 | Emailed Robert L. Branch at (b)(7)(C) that a new document is available to download. | Arcapp User |
| Mon Nov 21 15:07:09 EST 2022 | Correspondence To/From Charging Party (Exhibit Branch.msg) released | DIEGO ZENT |
| Mon Nov 21 14:48:17 EST 2022 | Uploaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit B Branch.msg | DIEGO ZENT |
| Mon Nov 21 14:43:09 EST 2022 | Uploaded Document. Type: Correspondence To/From Charging Party, FileName:Exhibit Branch.msg | DIEGO ZENT |
| Thu Nov 10 15:30:42 EST 2022 | The Charging Party has Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | Publicportal User |
| Thu Nov 10 15:29:45 EST 2022 | The Charging Party has Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | Publicportal User |

| Date | Event | Name |
|---|---|---|
| Thu Nov 10 15:25:15 EST 2022 | The Charging Party has Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | Publicportal User |
| Thu Nov 10 15:24:54 EST 2022 | The Charging Party has Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | Publicportal User |
| Thu Nov 10 15:24:01 EST 2022 | The Charging Party has Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | Publicportal User |
| Thu Nov 10 15:16:41 EST 2022 | The Charging Party has Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | Publicportal User |
| Thu Nov 10 15:13:48 EST 2022 | The Charging Party has Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | Publicportal User |
| Thu Nov 10 13:39:14 EST 2022 | Emailed Robert L. Branch at (b)(7)(C) that a new document is available to download. | Arcapp User |
| Thu Nov 10 13:39:13 EST 2022 | Position Statement (2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf) released | DIEGO ZENT |
| Thu Nov 10 13:30:15 EST 2022 | Downloaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | DIEGO ZENT |
| Wed Nov 09 17:15:43 EST 2022 | Downloaded Document. Type: Charge of Discrimination, FileName:440-2022-06771_ChargeOfDiscrimination.pdf | DIEGO ZENT |
| Mon Nov 07 15:00:31 EST 2022 | Charging Party Chose to receive the Position Statement | (b)(7)(C) |
| Mon Nov 07 15:00:31 EST 2022 | Used when email sent to PP CP to confirm they requested Position Statement | (b)(7)(C) |
| Mon Nov 07 15:00:30 EST 2022 | Position Statement requested for Charging Party on 11/07/2022 15:00:30 | (b)(7)(C) |
| Mon Nov 07 14:38:02 EST 2022 | Emailed Robert L. Branch at (b)(7)(C) that a new document is available to download. | Arcapp User |
| Mon Nov 07 14:38:02 EST 2022 | Position Statement received from Respondent on 11/07/2022 14:38:02 | Respondentportal User |

Exhibit I: EEOC's activity log related to Branch's Charge

| Date | Event | Name |
|---|---|---|
| Mon Nov 07 14:38:02 EST 2022 | Uploaded Document. Type: Position Statement, FileName:2022-11-07 Branch_ Robert_ Final SOP and Exhibits.pdf | Respondentportal User |
| Mon Nov 07 14:33:41 EST 2022 | Please provide a statement of your position on the issues covered in the amended charge, with any supporting documentation by November 07, 2022. For guidance on how to best prepare your Position Statement, please review Effective Position Statements, as EEOC has revised its procedures related to the content and release of position statements, effective January 1, 2016. You may be notified at a later date to respond to a Request for Information | Respondentportal User |
| Mon Nov 07 14:33:40 EST 2022 | Respondent logged in | Respondentportal User |
| Mon Nov 07 10:58:23 EST 2022 | Please provide a statement of your position on the issues covered in the amended charge, with any supporting documentation by November 07, 2022. For guidance on how to best prepare your Position Statement, please review Effective Position Statements, as EEOC has revised its procedures related to the content and release of position statements, effective January 1, 2016. You may be notified at a later date to respond to a Request for Information | Respondentportal User |
| Mon Nov 07 10:58:22 EST 2022 | Respondent logged in | Respondentportal User |
| Mon Oct 31 15:48:12 EDT 2022 | Position Statement data has been updated | DIEGO ZENT |
| Mon Oct 31 15:48:12 EDT 2022 | Position Statement Due Date 11/07/2022 06:00:00 updated. | DIEGO ZENT |
| Mon Oct 31 15:41:35 EDT 2022 | Downloaded Document. Type: Position Statement Extension Request, FileName:2022-09-30 Branch_ Robert_ Mediation and SOP Extension Request Letter.pdf | DIEGO ZENT |
| Mon Oct 31 15:36:09 EDT 2022 | Downloaded Document. Type: Position Statement Extension Request, FileName:2022-09-30 Branch_ Robert_ Mediation and SOP Extension Request Letter.pdf | DIEGO ZENT |
| Mon Oct 31 14:08:43 EDT 2022 | The Charging Party has Downloaded Document. Type: Charging Party Agreement to Mediate, FileName:8523745_AgreementToMediateSigned-CP.pdf | Publicportal User |

| Date | Event | Name |
|---|---|---|
| Wed Oct 26 15:15:47 EDT 2022 | Charge assignee DIEGO ZENT (EQUAL OPPORTUNITY INVESTIGATOR) viewed charge details. | DIEGO ZENT |
| Wed Oct 26 13:51:15 EDT 2022 | DIEGO ZENT designated as the primary assignee | MILDRED STUCKEY |
| Wed Oct 26 13:51:15 EDT 2022 | Mildred Stuckey removed as the primary assignee | MILDRED STUCKEY |
| Wed Oct 26 13:43:30 EDT 2022 | Charge assignee Mildred Stuckey (Enforcement Supervisor) viewed charge details. | MILDRED STUCKEY |
| Wed Oct 26 13:16:45 EDT 2022 | Please provide a statement of your position on the issues covered in the amended charge, with any supporting documentation by October 22, 2022. For guidance on how to best prepare your Position Statement, please review Effective Position Statements, as EEOC has revised its procedures related to the content and release of position statements, effective January 1, 2016. You may be notified at a later date to respond to a Request for Information | Respondentportal User |
| Wed Oct 26 13:16:43 EDT 2022 | Respondent logged in | Respondentportal User |
| Wed Oct 26 13:15:30 EDT 2022 | Downloaded Document. Type: Position Statement Extension Request, FileName:2022-09-30 Branch_ Robert_ Mediation and SOP Extension Request Letter.pdf | Respondentportal User |
| Wed Oct 26 13:14:16 EDT 2022 | Please provide a statement of your position on the issues covered in the amended charge, with any supporting documentation by October 22, 2022. For guidance on how to best prepare your Position Statement, please review Effective Position Statements, as EEOC has revised its procedures related to the content and release of position statements, effective January 1, 2016. You may be notified at a later date to respond to a Request for Information | Respondentportal User |
| Wed Oct 26 13:14:13 EDT 2022 | Respondent logged in | Respondentportal User |
| Wed Oct 26 09:46:29 EDT 2022 | Downloaded Document. Type: Position Statement Extension Request, FileName:2022-09-30 Branch_ Robert_ Mediation and SOP Extension Request Letter.pdf | Respondentportal User |
| Wed Oct 26 09:45:07 EDT 2022 | Please provide a statement of your position on the issues covered in the amended charge, with any supporting documentation by October 22, 2022. For guidance on how to best prepare your Position Statement, please review Effective Position | Respondentportal User |

| Date | Event | Name |
|---|---|---|
| | Statements, as EEOC has revised its procedures related to the content and release of position statements, effective January 1, 2016. You may be notified at a later date to respond to a Request for Information | |
| Wed Oct 26 09:45:06 EDT 2022 | Respondent logged in | Respondentportal User |
| Wed Oct 26 09:32:44 EDT 2022 | Mildred Stuckey designated as the primary assignee | CHARLOTTE WALKER |
| Wed Oct 26 09:32:44 EDT 2022 | CHARLOTTE WALKER removed as the primary assignee | CHARLOTTE WALKER |
| Wed Oct 26 09:32:00 EDT 2022 | Charge assignee CHARLOTTE WALKER (INVESTIGATOR SUPPORT ASSISTANT) viewed charge details. | CHARLOTTE WALKER |
| Wed Oct 26 09:03:42 EDT 2022 | CHARLOTTE WALKER designated as the primary assignee | LESTER HARRINGTON |
| Wed Oct 26 09:03:29 EDT 2022 | Case status changed from Charge is no longer eligible for ADR to Investigation. | LESTER HARRINGTON |
| Wed Oct 26 09:03:29 EDT 2022 | Unassigned ADR Representative ANNETTE GEORGE (ADR Mediator) | LESTER HARRINGTON |
| Wed Oct 26 09:03:29 EDT 2022 | Emailed Robert L. Branch at (b)(7)(C) that a new activity is posted. | LESTER HARRINGTON |
| Wed Oct 26 09:03:29 EDT 2022 | Emailed Stephanie Bryant Holland at cncharges@littler.com that a new activity is posted. | LESTER HARRINGTON |
| Wed Oct 26 09:03:29 EDT 2022 | Emailed ILLINOIS CENTRAL RAILROAD COMPANY at duane.spears@cn.ca that a new activity is posted. | LESTER HARRINGTON |
| Wed Oct 26 09:03:29 EDT 2022 | Case status changed from Charge is eligible for ADR to Charge is no longer eligible for ADR. | LESTER HARRINGTON |
| Mon Oct 24 15:46:51 EDT 2022 | Respondent mediation reply: Declined | Respondentportal User |
| Mon Oct 24 15:40:25 EDT 2022 | Please provide a statement of your position on the issues covered in the amended charge, with any supporting documentation by October 22, 2022. For guidance on how to best prepare your Position Statement, please review Effective Position Statements, as EEOC has revised its procedures related to the content and release of position statements, effective January 1, 2016. You may be notified at a later date to respond to a Request for Information | Respondentportal User |

| Date | Event | Name |
|---|---|---|
| Mon Oct 24 15:40:23 EDT 2022 | Respondent logged in | Respondentportal User |
| Mon Oct 24 09:37:40 EDT 2022 | Respondent reply to Mediation Invitation (Declined.Reason:No merit) selected | ANNETTE GEORGE |
| Mon Oct 24 09:37:40 EDT 2022 | Assigned ADR Representative ANNETTE GEORGE (ADR Mediator) | ANNETTE GEORGE |
| Mon Oct 24 09:37:40 EDT 2022 | Unassigned ADR Representative ANNETTE GEORGE (ADR Mediator) | ANNETTE GEORGE |
| Mon Oct 24 09:36:02 EDT 2022 | Assigned ADR Representative ANNETTE GEORGE (ADR Mediator) | ANNETTE GEORGE |
| Mon Oct 24 09:36:02 EDT 2022 | Unassigned ADR Representative ANNETTE GEORGE (ADR Mediator) | ANNETTE GEORGE |
| Mon Oct 24 09:35:54 EDT 2022 | GENERAL note added. Type:ADR and Non-Disclosable:No. | ANNETTE GEORGE |
| Fri Oct 14 16:19:25 EDT 2022 | The Charging Party has Downloaded Document. Type: Amended Charge of Discrimination, FileName:440-2022-06771_AmendedChargeofDiscrimination_1.pdf | Publicportal User |
| Fri Oct 14 16:18:00 EDT 2022 | The Charging Party has Downloaded Document. Type: Amended Charge of Discrimination, FileName:440-2022-06771_AmendedChargeofDiscrimination_1.pdf | Publicportal User |
| Tue Oct 11 21:52:27 EDT 2022 | The Charging Party has Downloaded Document. Type: Amended Charge of Discrimination, FileName:440-2022-06771_AmendedChargeofDiscrimination_1.pdf | Publicportal User |
| Tue Oct 11 21:49:09 EDT 2022 | The Charging Party has Downloaded Document. Type: Amended Charge of Discrimination, FileName:440-2022-06771_AmendedChargeofDiscrimination_1.pdf | Publicportal User |
| Sat Oct 01 13:09:56 EDT 2022 | Uploaded Document. Type: Charging Party Confidentiality Agreement, FileName:8523745_ConfidentialityAgreementSigned-CP.pdf | Publicportal User |
| Sat Oct 01 13:09:56 EDT 2022 | Generated Document. Type: Charging Party Confidentiality Agreement, FileName:8523745_ConfidentialityAgreementSigned-CP.pdf | (b)(7)(C) |
| Sat Oct 01 13:09:54 EDT 2022 | Uploaded Document. Type: Charging Party Agreement to Mediate, FileName:8523745_AgreementToMediateSigned-CP.pdf | Publicportal User |

Exhibit I: EEOC's activity log related to Branch's Charge

| Date | Event | Name |
|---|---|---|
| Sat Oct 01 13:09:54 EDT 2022 | Generated Document. Type: Charging Party Agreement to Mediate, FileName:8523745_AgreementToMediateSigned-CP.pdf | (b)(7)(C) |
| Sat Oct 01 13:00:35 EDT 2022 | Charging Party mediation reply: Accepted | (b)(7)(C) |
| Fri Sep 30 11:19:09 EDT 2022 | Assigned ADR Representative ANNETTE GEORGE (ADR Mediator) | ANNETTE GEORGE |
| Fri Sep 30 11:19:09 EDT 2022 | Unassigned ADR Representative ANNETTE GEORGE (ADR Mediator) | ANNETTE GEORGE |
| Fri Sep 30 11:19:02 EDT 2022 | GENERAL note added. Type:ADR and Non-Disclosable:No. | ANNETTE GEORGE |
| Fri Sep 30 11:17:08 EDT 2022 | Charge assignee ANNETTE GEORGE (ADR Mediator) viewed charge details. | ANNETTE GEORGE |
| Fri Sep 30 10:58:48 EDT 2022 | Uploaded Document. Type: Position Statement Extension Request, FileName:2022-09-30 Branch_ Robert_ Mediation and SOP Extension Request Letter.pdf | Respondentportal User |
| Fri Sep 30 10:56:03 EDT 2022 | Please select a response to the Mediation Offer on this page by October 07, 2022. If you choose ?No?, please provide a statement of your position on the issues covered in the amended charge, with any supporting documentation by October 22, 2022.For guidance on how to best prepare your Position Statement, please review Effective Position Statements, as EEOC has revised its procedures related to the content and release of position statements, effective January 1, 2016. You may be notified at a later date to respond to a Request for Information | Respondentportal User |
| Fri Sep 30 10:56:01 EDT 2022 | Respondent logged in | Respondentportal User |
| Thu Sep 29 18:22:50 EDT 2022 | Respondent Legal Representative title changed to Attorney | Respondentportal User |
| Thu Sep 29 18:22:50 EDT 2022 | Respondent Legal Representative phone changed to (816) 788-7115 | Respondentportal User |
| Thu Sep 29 18:22:50 EDT 2022 | Respondent Legal Representative organization changed to CN c/o Littler Mendelson, P.C. | Respondentportal User |
| Thu Sep 29 18:22:50 EDT 2022 | Respondent Legal Representative lastName changed to Bryant Holland | Respondentportal User |

| Date | Event | Name |
|---|---|---|
| Thu Sep 29 18:22:50 EDT 2022 | Respondent Legal Representative firstName changed to Stephanie | Respondentportal User |
| Thu Sep 29 18:22:50 EDT 2022 | Respondent Legal Representative fax changed to (816) 222-0685 | Respondentportal User |
| Thu Sep 29 18:21:01 EDT 2022 | Please select a response to the Mediation Offer on this page by October 07, 2022. If you choose ?No?, please provide a statement of your position on the issues covered in the amended charge, with any supporting documentation by October 22, 2022.For guidance on how to best prepare your Position Statement, please review Effective Position Statements, as EEOC has revised its procedures related to the content and release of position statements, effective January 1, 2016. You may be notified at a later date to respond to a Request for Information | Respondentportal User |
| Thu Sep 29 18:20:59 EDT 2022 | Respondent logged in | Respondentportal User |
| Thu Sep 29 15:42:58 EDT 2022 | Downloaded Document. Type: Notice of Charge, FileName:440-2022-06771_NoticeOfChargeOfDiscrimination.pdf | GERALD KUCIA |
| Thu Sep 29 15:42:27 EDT 2022 | Downloaded Document. Type: Notice of Amended Charge, FileName:440-2022-06771_Notice of Amended Charge of Discrimination_1.pdf | GERALD KUCIA |
| Thu Sep 29 15:40:59 EDT 2022 | Downloaded Document. Type: Amended Charge of Discrimination, FileName:440-2022-06771_AmendedChargeofDiscrimination_1.pdf | GERALD KUCIA |
| Wed Sep 28 16:15:52 EDT 2022 | ANNETTE GEORGE designated as the primary assignee | JACQUELINE ALLEN |
| Wed Sep 28 16:15:52 EDT 2022 | JACQUELINE ALLEN removed as the primary assignee | JACQUELINE ALLEN |
| Wed Sep 28 16:15:45 EDT 2022 | Charge assignee JACQUELINE ALLEN (ADR Coordinator) viewed charge details. | JACQUELINE ALLEN |
| Tue Sep 27 16:49:25 EDT 2022 | Please select a response to the Mediation Offer on this page by October 07, 2022. If you choose ?No?, please provide a statement of your position on the issues covered in the amended charge, with any supporting documentation by October 22, 2022.For guidance on how to best prepare your Position Statement, please review Effective Position Statements, as EEOC has revised its procedures related to the content and release of position statements, effective January 1, 2016. You may be notified at a later date to respond to a Request for Information | Respondentportal User |

| Date | Event | Name |
|---|---|---|
| Tue Sep 27 16:49:23 EDT 2022 | Respondent logged in | Respondentportal User |
| Tue Sep 27 16:47:44 EDT 2022 | JACQUELINE ALLEN designated as the primary assignee | CHARLOTTE WALKER |
| Tue Sep 27 16:47:44 EDT 2022 | CHARLOTTE WALKER removed as the primary assignee | CHARLOTTE WALKER |
| Tue Sep 27 16:47:01 EDT 2022 | Emailed Robert L. Branch at (b)(7)(C) that a new activity is posted. | CHARLOTTE WALKER |
| Tue Sep 27 16:47:01 EDT 2022 | Emailed Kate Mrkonich Wilson at cncharges@littler.com that a new activity is posted. | CHARLOTTE WALKER |
| Tue Sep 27 16:47:01 EDT 2022 | Emailed ILLINOIS CENTRAL RAILROAD COMPANY at duane.spears@cn.ca that a new activity is posted. | CHARLOTTE WALKER |
| Tue Sep 27 16:47:00 EDT 2022 | Case status changed from Charge filed to Charge is eligible for ADR. | CHARLOTTE WALKER |
| Tue Sep 27 16:36:55 EDT 2022 | Downloaded Document. Type: Notice of Amended Charge, FileName:440-2022-06771_Notice of Amended Charge of Discrimination_1.pdf | Respondentportal User |
| Tue Sep 27 16:35:55 EDT 2022 | Downloaded Document. Type: Amended Charge of Discrimination, FileName:440-2022-06771_AmendedChargeofDiscrimination_1.pdf | Respondentportal User |
| Tue Sep 27 16:34:38 EDT 2022 | Downloaded Document. Type: Charge of Discrimination, FileName:440-2022-06771_ChargeOfDiscrimination.pdf | Respondentportal User |
| Tue Sep 27 16:32:35 EDT 2022 | Downloaded Document. Type: Notice of Charge, FileName:440-2022-06771_NoticeOfChargeOfDiscrimination.pdf | Respondentportal User |
| Tue Sep 27 16:32:24 EDT 2022 | Added Respondent Legal Representative. | Respondentportal User |
| Tue Sep 27 16:31:32 EDT 2022 | Please provide a statement of your position on the issues covered in the amended charge, with any supporting documentation by October 22, 2022. For guidance on how to best prepare your Position Statement, please review Effective Position Statements, as EEOC has revised its procedures related to the content and release of position statements, effective January 1, 2016. You may be notified at a later date to respond to a Request for Information | Respondentportal User |
| Tue Sep 27 16:31:31 EDT 2022 | Respondent logged in | Respondentportal User |

| Date | Event | Name |
|---|---|---|
| Tue Sep 27 15:35:24 EDT 2022 | PCHP Supervisor review approved. | MICHAEL HOLLIS |
| Tue Sep 27 14:46:35 EDT 2022 | Downloaded Document. Type: Notice of Amended Charge, FileName:440-2022-06771_Notice of Amended Charge of Discrimination_1.pdf | Respondentportal User |
| Tue Sep 27 14:32:53 EDT 2022 | Downloaded Document. Type: Amended Charge of Discrimination, FileName:440-2022-06771_AmendedChargeofDiscrimination_1.pdf | Respondentportal User |
| Tue Sep 27 14:32:30 EDT 2022 | Downloaded Document. Type: Notice of Amended Charge, FileName:440-2022-06771_Notice of Amended Charge of Discrimination_1.pdf | Respondentportal User |
| Tue Sep 27 14:32:11 EDT 2022 | Changed Respondent Information | Respondentportal User |
| Tue Sep 27 14:32:11 EDT 2022 | Approved change to Respondent information: Respondent updated | Respondentportal User |
| Tue Sep 27 14:32:11 EDT 2022 | Respondent tradeName added as | Respondentportal User |
| Tue Sep 27 14:32:11 EDT 2022 | Respondent phone added as | Respondentportal User |
| Tue Sep 27 14:32:11 EDT 2022 | Respondent numberOfEmployees changed to 501+ Employees | Respondentportal User |
| Tue Sep 27 14:32:11 EDT 2022 | Respondent naicsCode added as | Respondentportal User |
| Tue Sep 27 14:32:11 EDT 2022 | Respondent fax added as | Respondentportal User |
| Tue Sep 27 14:32:11 EDT 2022 | Respondent emlState changed to Employer record verified. | Respondentportal User |
| Tue Sep 27 14:32:11 EDT 2022 | Respondent ein added as 362728842 | Respondentportal User |
| Tue Sep 27 14:32:11 EDT 2022 | Respondent duns added as | Respondentportal User |
| Tue Sep 27 14:32:11 EDT 2022 | Respondent city changed to Homewood | Respondentportal User |
| Tue Sep 27 14:32:11 EDT 2022 | Respondent cage added as | Respondentportal User |
| Tue Sep 27 14:31:45 EDT 2022 | Please provide a statement of your position on the issues covered in the amended charge, with any supporting documentation by October 22, 2022. For | Respondentportal User |

| Date | Event | Name |
|---|---|---|
| | guidance on how to best prepare your Position Statement, please review Effective Position Statements, as EEOC has revised its procedures related to the content and release of position statements, effective January 1, 2016. You may be notified at a later date to respond to a Request for Information | |
| Tue Sep 27 14:31:43 EDT 2022 | Respondent logged in | Respondentportal User |
| Tue Sep 27 13:41:18 EDT 2022 | Emailed Robert L. Branch at (b)(7)(C) that charge has been amended | Arcapp User |
| Tue Sep 27 13:41:17 EDT 2022 | Emailed ILLINOIS CENTRAL RAILROAD COMPANY at duane.spears@cn.ca that charge has been amended | Arcapp User |
| Tue Sep 27 13:41:17 EDT 2022 | Uploaded Document. Type: Notice of Amended Charge, FileName:440-2022-06771_Notice of Amended Charge of Discrimination_1.pdf | Arcapp User |
| Tue Sep 27 13:41:15 EDT 2022 | Generated Document. Type: Notice of Amended Charge, FileName:440-2022-06771_Notice of Amended Charge of Discrimination_1.pdf | Arcapp User |
| Tue Sep 27 13:41:15 EDT 2022 | Deleted Document. Type: Amended Charge of Discrimination-draft, FileName:440-2022-06771_AmendedChargeOfDiscrimination-Draft.pdf, Reason:NA | Arcapp User |
| Tue Sep 27 13:41:13 EDT 2022 | Uploaded Document. Type: Amended Charge of Discrimination, FileName:440-2022-06771_AmendedChargeofDiscrimination_1.pdf | Arcapp User |
| Tue Sep 27 13:41:13 EDT 2022 | Added Charge Particulars Amended - Finalized | Arcapp User |
| Tue Sep 27 13:41:10 EDT 2022 | Charging Party signed Amended Charge of Discrimination. | (b)(7)(C) |
| Tue Sep 27 13:30:08 EDT 2022 | The Charging Party has Downloaded Document. Type: Amended Charge of Discrimination-draft, FileName:440-2022-06771_AmendedChargeOfDiscrimination-Draft.pdf | Publicportal User |
| Tue Sep 27 13:30:08 EDT 2022 | Charging Party viewed Amended Charge draft | (b)(7)(C) |
| Tue Sep 27 12:51:46 EDT 2022 | PCHP Legal review approved. | MARSHA RUCKER |
| Tue Sep 27 12:51:34 EDT 2022 | Assigned to Michael Hollis for Supervisor PCHP review | MARSHA RUCKER |

Exhibit I: EEOC's activity log related to Branch's Charge

| Date | Event | Name |
|---|---|---|
| Tue Sep 27 12:48:47 EDT 2022 | Downloaded Document. Type: Charge of Discrimination, FileName:440-2022-06771_ChargeOfDiscrimination.pdf | MARSHA RUCKER |
| Tue Sep 27 11:39:31 EDT 2022 | Uploaded Document. Type: Amended Charge of Discrimination-draft, FileName:440-2022-06771_AmendedChargeOfDiscrimination-Draft.pdf | CHARLOTTE WALKER |
| Tue Sep 27 11:39:28 EDT 2022 | Generated Document. Type: Amended Charge of Discrimination-draft, FileName:440-2022-06771_AmendedChargeOfDiscrimination-Draft.pdf | CHARLOTTE WALKER |
| Tue Sep 27 11:39:28 EDT 2022 | Sent to Charging Party For Review | CHARLOTTE WALKER |
| Tue Sep 27 11:39:00 EDT 2022 | Allegation Title VII Retaliation-Opposition Discharge added to case | CHARLOTTE WALKER |
| Tue Sep 27 11:37:29 EDT 2022 | Added Charge Particulars Amended - Revised | CHARLOTTE WALKER |
| Tue Sep 27 11:23:41 EDT 2022 | Added Charge Particulars Amended - Draft | CHARLOTTE WALKER |
| Tue Sep 27 11:10:55 EDT 2022 | Respondent hrDirectorOwner added as Duane Spears | CHARLOTTE WALKER |
| Tue Sep 27 11:10:55 EDT 2022 | Respondent emailAddress added as duane.spears@cn.ca | CHARLOTTE WALKER |
| Tue Sep 27 11:09:13 EDT 2022 | Respondent numberOfEmployees changed to 15 - 100 Employees | CHARLOTTE WALKER |
| Tue Sep 27 11:09:13 EDT 2022 | Respondent institutionType added as Private Employer | CHARLOTTE WALKER |
| Tue Sep 27 11:09:13 EDT 2022 | Respondent emlState changed to Respondent must verify record. | CHARLOTTE WALKER |
| Tue Sep 27 11:09:13 EDT 2022 | Respondent emailAddress added as | CHARLOTTE WALKER |
| Tue Sep 27 11:07:12 EDT 2022 | Approved change to Respondent information: Respondent updated | CHARLOTTE WALKER |
| Tue Sep 27 11:07:12 EDT 2022 | Respondent eeo1UnitNbr changed to 0905236 | CHARLOTTE WALKER |
| Tue Sep 27 11:07:12 EDT 2022 | Respondent eeo1HQNbr changed to 0407783 | CHARLOTTE WALKER |
| Tue Sep 27 11:07:12 EDT 2022 | Respondent numberOfEmployees changed to Under 15 Employees | CHARLOTTE WALKER |

| Date | Event | Name |
|---|---|---|
| Tue Sep 27 11:07:12 EDT 2022 | Respondent name changed to ILLINOIS CENTRAL RAILROAD COMPANY | CHARLOTTE WALKER |
| Tue Sep 27 11:07:12 EDT 2022 | Respondent emlState changed to Employer record verified. | CHARLOTTE WALKER |
| Tue Sep 27 11:07:12 EDT 2022 | Respondent county added as Cook | CHARLOTTE WALKER |
| Tue Sep 27 11:07:12 EDT 2022 | Respondent addressLine1 changed to 17641 ASHLAND AVE | CHARLOTTE WALKER |
| Mon Sep 26 15:20:05 EDT 2022 | Downloaded Document. Type: Notice of Charge, FileName:440-2022-06771_NoticeOfChargeOfDiscrimination.pdf | GERALD KUCIA |
| Mon Sep 26 15:18:41 EDT 2022 | Downloaded Document. Type: Charge of Discrimination, FileName:440-2022-06771_ChargeOfDiscrimination.pdf | GERALD KUCIA |
| Mon Sep 26 13:29:37 EDT 2022 | Downloaded Document. Type: Charge of Discrimination, FileName:440-2022-06771_ChargeOfDiscrimination.pdf | Respondentportal User |
| Mon Sep 26 13:28:08 EDT 2022 | Downloaded Document. Type: Notice of Charge, FileName:440-2022-06771_NoticeOfChargeOfDiscrimination.pdf | Respondentportal User |
| Mon Sep 26 13:28:08 EDT 2022 | Downloaded Document. Type: Notice of Charge, FileName:440-2022-06771_NoticeOfChargeOfDiscrimination.pdf | Respondentportal User |
| Mon Sep 26 13:26:56 EDT 2022 | Downloaded Document. Type: Notice of Charge, FileName:440-2022-06771_NoticeOfChargeOfDiscrimination.pdf | Respondentportal User |
| Mon Sep 26 13:26:06 EDT 2022 | Changed Respondent Information | Respondentportal User |
| Mon Sep 26 13:17:49 EDT 2022 | Confirmed EEOC changes to Respondent Information. Changes saved to Respondent record. | Respondentportal User |
| Mon Sep 26 13:17:48 EDT 2022 | Respondent user proposed change to Respondent information | Respondentportal User |
| Mon Sep 26 13:17:48 EDT 2022 | Respondent emlState changed to EEOC Staff must review. | Respondentportal User |
| Mon Sep 26 13:17:48 EDT 2022 | Respondent emlEmployerId changed to 23307884 | Respondentportal User |
| Mon Sep 26 13:06:32 EDT 2022 | Please provide a statement of your position on the issues covered in the charge, with any supporting documentation by October 22, 2022. For guidance on | Respondentportal User |

| Date | Event | Name |
|---|---|---|
| | how to best prepare your Position Statement, please review Effective Position Statements, as EEOC has revised its procedures related to the content and release of position statements, effective January 1, 2016. You may be notified at a later date to respond to a Request for Information | |
| Mon Sep 26 13:06:30 EDT 2022 | Respondent logged in | Respondentportal User |
| Mon Sep 26 13:06:10 EDT 2022 | Respondent password changed | Respondentportal User |
| Thu Sep 22 20:06:51 EDT 2022 | Assigned to MARSHA RUCKER for Legal PCHP review | ESZEAN MCDUFFEY |
| Thu Sep 22 20:06:33 EDT 2022 | Emailed CANADIAN NATIONAL RAILROAD at duane.spears@cn.ca that charge has been perfected | ESZEAN MCDUFFEY |
| Thu Sep 22 20:06:32 EDT 2022 | Uploaded Document. Type: Notice of Charge, FileName:440-2022-06771_NoticeOfChargeOfDiscrimination.pdf | ESZEAN MCDUFFEY |
| Thu Sep 22 20:06:30 EDT 2022 | Generated Document. Type: Notice of Charge, FileName:440-2022-06771_NoticeOfChargeOfDiscrimination.pdf | ESZEAN MCDUFFEY |
| Thu Sep 22 20:06:29 EDT 2022 | PCHP Supervisor review approved. | ESZEAN MCDUFFEY |
| Wed Sep 21 10:52:10 EDT 2022 | Assigned to Eszean McDuffey for Supervisor PCHP review | CHARLOTTE WALKER |
| Wed Sep 21 10:51:40 EDT 2022 | (b)(5) | CHARLOTTE WALKER |
| Wed Sep 21 10:51:40 EDT 2022 | (b)(5) | CHARLOTTE WALKER |
| Wed Sep 21 10:51:40 EDT 2022 | (b)(5) | CHARLOTTE WALKER |
| Wed Sep 21 10:51:40 EDT 2022 | (b)(5) | CHARLOTTE WALKER |
| Wed Sep 21 10:51:40 EDT 2022 | (b)(5) | CHARLOTTE WALKER |
| Wed Sep 21 10:51:40 EDT 2022 | (b)(5) . | CHARLOTTE WALKER |
| Wed Sep 21 10:51:40 EDT 2022 | Processing category justification text is added as (b)(5) | CHARLOTTE WALKER |

Exhibit I: EEOC's activity log related to Branch's Charge

| Date | Event | Name |
|---|---|---|
| | (b)(5) . | |
| Wed Sep 21 10:51:40 EDT 2022 | (b)(5) | CHARLOTTE WALKER |
| Mon Sep 19 21:06:23 EDT 2022 | Deleted Document. Type: Charge of Discrimination-Draft, FileName:440-2022-06771_ChargeOfDiscrimination-Draft.pdf, Reason:NA | Publicportal User |
| Mon Sep 19 21:06:22 EDT 2022 | Uploaded Document. Type: Charge of Discrimination, FileName:440-2022-06771_ChargeOfDiscrimination.pdf | Publicportal User |
| Mon Sep 19 21:06:22 EDT 2022 | Emailed Robert L. Branch at (b)(7)(C) that charge has been Filed | (b)(7)(C) |
| Mon Sep 19 21:06:21 EDT 2022 | Case status changed from Charge Prepared to Charge filed. | (b)(7)(C) |
| Mon Sep 19 21:06:21 EDT 2022 | A charge is formalized | (b)(7)(C) |
| Mon Sep 19 21:06:21 EDT 2022 | Added Charge Particulars - Formalized | (b)(7)(C) |
| Mon Sep 19 21:02:50 EDT 2022 | The Charging Party has Downloaded Document. Type: Charge of Discrimination- Draft, FileName:440-2022-06771_ChargeOfDiscrimination-Draft.pdf | Publicportal User |
| Mon Sep 19 20:58:46 EDT 2022 | The Charging Party has Downloaded Document. Type: Charge of Discrimination- Draft, FileName:440-2022-06771_ChargeOfDiscrimination-Draft.pdf | Publicportal User |
| Mon Sep 19 20:51:57 EDT 2022 | Viewed Online Inquiry Report Information | (b)(7)(C) |
| Mon Sep 19 16:39:48 EDT 2022 | Document properties have been updated. Type: Charge of Discrimination- Draft, FileName:440-2022- | CHARLOTTE WALKER |

| Date | Event | Name |
|---|---|---|
| | 06771_ChargeOfDiscrimination-Draft.pdf, Reason:NA | |
| Mon Sep 19 16:39:45 EDT 2022 | Generated Document. Type: Charge of Discrimination- Draft, FileName:440-2022-06771_ChargeOfDiscrimination-Draft.pdf | CHARLOTTE WALKER |
| Mon Sep 19 16:39:44 EDT 2022 | Sent to Charging Party For Review | CHARLOTTE WALKER |
| Mon Sep 19 16:39:34 EDT 2022 | Added Charge Particulars - Revised | CHARLOTTE WALKER |
| Mon Sep 19 16:37:23 EDT 2022 | Uploaded Document. Type: Charge of Discrimination-Draft, FileName:440-2022-06771_ChargeOfDiscrimination-Draft.pdf | CHARLOTTE WALKER |
| Mon Sep 19 16:37:23 EDT 2022 | Case status changed from Inquiry Submitted to Charge Prepared. | CHARLOTTE WALKER |
| Mon Sep 19 16:37:21 EDT 2022 | Generated Document. Type: Charge of Discrimination- Draft, FileName:440-2022-06771_ChargeOfDiscrimination-Draft.pdf | CHARLOTTE WALKER |
| Mon Sep 19 16:37:21 EDT 2022 | Case status changed from Inquiry Submitted to Charge Prepared. | CHARLOTTE WALKER |
| Mon Sep 19 16:37:21 EDT 2022 | Prepared Charge of Discrimination for review, signature | CHARLOTTE WALKER |
| Mon Sep 19 16:37:20 EDT 2022 | Sent to Charging Party For Review | CHARLOTTE WALKER |
| Mon Sep 19 16:36:16 EDT 2022 | Respondent eeo1UnitNbr added as 040778 | CHARLOTTE WALKER |
| Mon Sep 19 16:36:16 EDT 2022 | Respondent eeo1HQNbr added as 040778 | CHARLOTTE WALKER |
| Mon Sep 19 16:36:16 EDT 2022 | Respondent hrDirectorOwner added as Duane Spears | CHARLOTTE WALKER |
| Mon Sep 19 16:36:16 EDT 2022 | Respondent phone added as (708) 332-3245 | CHARLOTTE WALKER |
| Mon Sep 19 16:36:16 EDT 2022 | Respondent numberOfEmployees added as 501+ Employees | CHARLOTTE WALKER |
| Mon Sep 19 16:36:16 EDT 2022 | Respondent name changed to CANADIAN NATIONAL RAILROAD | CHARLOTTE WALKER |
| Mon Sep 19 16:36:16 EDT 2022 | Respondent naicsCode added as 488210 | CHARLOTTE WALKER |

| Date | Event | Name |
|---|---|---|
| Mon Sep 19 16:36:16 EDT 2022 | Respondent institutionType added as Private Employer | CHARLOTTE WALKER |
| Mon Sep 19 16:36:16 EDT 2022 | Respondent fax added as | CHARLOTTE WALKER |
| Mon Sep 19 16:36:16 EDT 2022 | Respondent emlState added as Respondent must verify record. | CHARLOTTE WALKER |
| Mon Sep 19 16:36:16 EDT 2022 | Respondent emlEmployerId added as 23299880 | CHARLOTTE WALKER |
| Mon Sep 19 16:36:16 EDT 2022 | Respondent emailAddress added as Duane.Spears@cn.ca | CHARLOTTE WALKER |
| Mon Sep 19 16:36:16 EDT 2022 | Respondent ein added as 362728842 | CHARLOTTE WALKER |
| Mon Sep 19 16:36:16 EDT 2022 | Respondent county added as Cook | CHARLOTTE WALKER |
| Mon Sep 19 16:36:16 EDT 2022 | Respondent addressLine1 changed to 17650 ASHLAND AVE | CHARLOTTE WALKER |
| Mon Sep 19 16:32:17 EDT 2022 | Added Charge Particulars - Revised | CHARLOTTE WALKER |
| Mon Sep 19 16:30:26 EDT 2022 | Added Charge Particulars - Revised | CHARLOTTE WALKER |
| Mon Sep 19 16:00:31 EDT 2022 | Added Charge Particulars - Draft | CHARLOTTE WALKER |
| Sat Sep 17 10:39:08 EDT 2022 | Viewed Online Inquiry Report Information | (b)(7)(C) |
| Tue Sep 13 11:55:19 EDT 2022 | Allegation Title VII Race-Black/African American Discharge added to case | CHARLOTTE WALKER |
| Tue Sep 13 11:53:34 EDT 2022 | Intake Interview note added. Type:Intake Interview and Non-Disclosable:No. | CHARLOTTE WALKER |
| Tue Sep 13 08:31:47 EDT 2022 | Charge assignee CHARLOTTE WALKER (INVESTIGATOR SUPPORT ASSISTANT) viewed charge details. | CHARLOTTE WALKER |
| Tue Sep 13 08:30:09 EDT 2022 | CHARLOTTE WALKER designated as the primary assignee | CHARLOTTE WALKER |
| Tue Sep 13 08:23:24 EDT 2022 | Interview has been scheduled for 09/13/2022 10:30:00 CST at Jackson Area Office. | charlotte.walker@eeoc.gov |

| Date | Event | Name |
|---|---|---|
| Mon Sep 12 06:33:28 EDT 2022 | A 1-day reminder notice is emailed to the PCP.. | noreply@eeoc.gov |
| Tue Sep 06 11:52:29 EDT 2022 | A PCP confirms a scheduled appointment. | (b)(7)(C) |
| Tue Sep 06 06:18:44 EDT 2022 | A 5-day confirmation notice is emailed to the PCP. | noreply@eeoc.gov |
| Mon Aug 15 06:10:40 EDT 2022 | A 20-day reminder notice is emailed to the PCP. | noreply@eeoc.gov |
| Tue Jun 28 12:19:00 EDT 2022 | Interview has been scheduled for 09/13/2022 10:30:00 CST at Jackson Area Office. | (b)(7)(C) |
| Tue Jun 28 12:16:33 EDT 2022 | Supplemental text updated | (b)(7)(C) |
| Tue Jun 28 11:49:08 EDT 2022 | Interview has been scheduled for 09/13/2022 10:30:00 CST at Jackson Area Office. | (b)(7)(C) |
| Tue Jun 28 11:44:42 EDT 2022 | PP user confirms that the Preservation of Evidence has been reviewed | (b)(7)(C) |
| Tue Jun 28 11:43:35 EDT 2022 | Case data updated: accountabilityOfficeCode set to Jackson Area Office. | (b)(7)(C) |
| Tue Jun 28 11:42:39 EDT 2022 | An Inquiry has been created. | (b)(7)(C) |