**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**GREENVILLE DIVISION**

ROBERT BRANCH,

      Plaintiff,

    v.

ILLINOIS CENTRAL RAILROAD
COMPANY,

      Defendant.

CIVIL ACTION NO.  4:23-CV-217-MPM-JMV

---

## DECLARATION OF COUNSEL IN OPPOSITION TO PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE EVIDENCE OR TESTIMONY SUGGESTING THAT PLAINTIFF WAS AGGRESSIVE OR UNREASONABLE

*I, SUSAN K. FITZKE, hereby declare as follows:*

1.    I am one of the attorneys representing the Defendant Illinois Central Railroad Company ("IC") in the above-referenced action.  I submit this Declaration in support of IC's Response in Opposition to Plaintiff Robert Branch's Motion *in Limine* to Exclude Evidence and Testimony Suggesting that Plaintiff Was Aggressive or Unreasonable.

2.    Attached hereto as **Exhibit A** is a true and accurate copy of the transcript of the February 13 and 14, 2024, hearing in front of the Office of Administrative Law Judges ("OALJ") pursuant to Plaintiff Robert Branch lawsuit in which he alleged IC terminated his employment because Branch reported a safety concern (OALJ Case No. 2023FRS00026). IC was represented during this proceeding by myself and my colleague, Grace F. Jacobson.

3.    Attached hereto as **Exhibit B** is a true and correct copy of the handwritten statement Branch provided to IC describing the fight on May 26, 2022. This document has been authenticated by IC. *See* Declaration of Duane Spears in Support of IC's Motion for Summary Judgment (ECF Doc. 54-1, Exhibit G4).

4. Attached hereto as **Exhibit C** is a true and accurate copy of excerpts from the transcript of the deposition I took of Branch on August 6, 2024, pursuant to this lawsuit.

5. Attached hereto as **Exhibit D** is a true and accurate copy of excerpts from the transcript of the deposition I took of Branch on November 7, 2023, pursuant to his claims against IC in front of the OALJ.

6. Attached hereto as **Exhibit E** is a true and accurate copy of the transcript of the June 7, 2022, internal hearing held by IC regarding Branch's violation of IC policy. This document has been authenticated by IC. *See* Declaration of Duane Spears in Support of IC's Motion for Summary Judgment (ECF Doc. 54-1, Exhibit G).

7. Attached hereto as **Exhibit F** is a true and accurate copy of the handwritten statement of Dylan Boutte, eyewitness to the fight between Branch and his coworker. This document has been authenticated by IC. *See* Declaration of Duane Spears in Support of IC's Motion for Summary Judgment (ECF Doc. 54-1, Exhibit G5).

8. Attached hereto as **Exhibit G** is a true and accurate copy of the handwritten statement of Earl Honeysucker, eyewitness to the fight between Branch and his coworker. This document has been authenticated by IC. *See* Declaration of Duane Spears in Support of IC's Motion for Summary Judgment (ECF Doc. 54-1, Exhibit G9).

9. Attached hereto as **Exhibit H** is a true and accurate copy of the handwritten statement of Ty Peterson, eyewitness to the fight between Branch and his coworker. This document has been authenticated by IC. *See* Declaration of Duane Spears in Support of IC's Motion for Summary Judgment (ECF Doc. 54-1, Exhibit G10).

10. Attached hereto as **Exhibit I** is a true and accurate copy of the handwritten statement of Walker Yuille, eyewitness to the fight between Branch and his coworker. This

document has been authenticated by IC. *See* Declaration of Duane Spears in Support of IC's Motion for Summary Judgment (ECF Doc. 54-1, Exhibit G11).

11.     Attached hereto as **Exhibit J** is a true and accurate copy of the handwritten statement of Al B. Thomas, eyewitness to the fight between Branch and his coworker. This document has been authenticated by IC. *See* Declaration of Duane Spears in Support of IC's Motion for Summary Judgment (ECF Doc. 54-1, Exhibit G12).

**PURSUANT TO 28 U.S.C. § 1746, I VERIFY UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES THAT THE FOREGOING IS TRUE AND CORRECT.**

Signature: */s/ Susan K. Fitzke*                     Date: 01/14/2025

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and exact copy of the foregoing has been served, via electronic mail, through the Court's Electronic Case Filing System, this 14th day of January, 2025, upon the following:

Nick Norris (MB# 101574)
WATSON & NORRIS, PLLC
4209 Lakeland Drive # 365
Flowood, MS 39232-9212
Telephone: (601) 968-0000
Facsimile: (601) 968-0010
Email: nick@watsonnorris.com

***Attorneys for Plaintiff Robert Branch***

*/s/ Susan K. Fitzke*
Attorneys for Defendant

4

# Exhibit A

**Transcript of Office of Administrative Law Judges February 13 and 14, 2024, Hearing**

# UNITED STATES DEPARTMENT OF LABOR
# OFFICE OF ADMINISTRATIVE LAW JUDGES

In the Matter of:

ROBERT BRANCH,                    )
                                  )
   Complainant,               )
v.                                )     Case No.  2023-FRS-00026
                                  )
ILLINOIS CENTRAL RAILROAD,        )
                                  )
    Respondent.             )
                                  )

### Condensed Transcript and Key Word Index

PAGES:     1 through 203

PLACE:     Video Hearing

DATE:     February 13, 2024

# BAYLEY REPORTING, INC.
## *OFFICIAL FEDERAL REPORTERS*
### Florida
### (727) 585-0600

Robert Branch   2023-FRS-00026   February 13, 2024

| Page 1 |
| --- |

UNITED STATES DEPARTMENT OF LABOR
OFFICE OF ADMINISTRATIVE LAW JUDGES

In the Matter of:
ROBERT BRANCH,                    )
                                  )
        Complainant,              )
                                  )
v.                                )   Case No.   2023-FRS-00026
                                  )
ILLINOIS CENTRAL RAILROAD, )      )
                                  )
        Respondent.               )
                                  )

Video Hearing
Tuesday,
February 13, 2024
The above-entitled matter came on for hearing
pursuant to notice, at  9:00 a.m., CST.

BEFORE: ANGELA F. DONALDSON
        Administrative Law Judge

Bayley Reporting, Inc.
(727)585-0600

| Page 2 |
| --- |

A P E A R A N C E S
On behalf of the Complainant:
CHARLES EDWARD SOREY, II, ESQ.
Sherman & Lacey, LLP
1000 Highland Colony Parkway, Suite 5203
Ridgeland, Missouri 39157
(601) 341-6929
JAMES FERGUSON, ESQ.
201 West Broadway, Suite G12
North Little Rock, Arkansas 72114
On behalf of the Respondent:
SUSAN FITZKE, ESQ.
GRACE JACOBSON, ESQ.
Littler Mendelson
80 South 8th Street, Suite 1300
Minneapolis, Minnesota 55402

| Page 3 |
| --- |

I N D E X

COMPLAINANT'S WITNESSES:  DIRECT CROSS REDIRECT RECROSS
Robert Branch              17    42    84      88
Wade Clark                 96   106   113
Christopher Day           121   126   132
Duane Spears              135   145   161
Thomas Sullivan          168   175   181     190
Thomas Hilliard          193   198
RESPONENT'S WITNESSES:    DIRECT CROSS REDIRECT RECROSS
None

E X H I B I T S

EXHIBIT            IDENTIFIED  IN EVIDENCE  WITHDRAWN
COMPLAINANT'S
None
RESPONDENT'S
None
DIRECTOR'S
None
ALJ'S
None
JOINT
1 through 48          9           10

| Page 4 |
| --- |

1                   P R O C E E D I N G S
2   February 13, 2024                  9:21 A.M., CST
3          JUDGE DONALDSON:   All right.  Good morning
4   again, everyone.  We are present for a Federal Rail Safety
5   Act whistleblower proceeding.  We're present by video
6   conference using Microsoft Teams.  We are docket number
7   with OALJ of 2023-FRS-26.  Again, Claimant is Robert
8   Branch.  Respondent is Illinois Central Railroad Company.
9   My name is Angela Donaldson and I'm an administrative law
10  judge with the Covington, Louisiana Office of
11  Administrative Law Judges.  We are part of the U.S.
12  Department of Labor.  As the attorneys are aware, the
13  parties may not all be aware, we are a separate entity from
14  the OSHA agency which originally had the claim for review
15  investigation entering some findings.  This is a de novo
16  proceeding so there are no fact findings that have been
17  entered or conclusions reached that I am required to adopt
18  from the OSHA findings.  When the Complainant, Mr. Branch,
19  requested a hearing and that the matter be transferred to
20  OALJ, it is a new proceeding and I will be entering
21  findings of fact and conclusion of law once the record is
22  closed.  This is the important part of the record, of
23  course, the evidence received in the form of the exhibits
24  the parties have tendered which will be shortly admitted
25  and then the witnesses will be testifying in this

**Page 5**

1 administrative proceeding.
2         So, we have legal representatives for both
3 parties. Let's get an introduction from Mr. Branch's
4 attorneys and for the record, identify for the record who's
5 lead counsel for today's proceedings starting with
6 Complainant.
7         MR. SOREY:    I'm C. Sorey, II. I'm the lead
8 counsel for Mr. Branch.
9         JUDGE DONALDSON:    All right and you're seated
10 with Mr. Ferguson. You're just off camera right now, okay?
11         MR. SOREY:    Great.
12         JUDGE DONALDSON:    All right. Go ahead, Mr.
13 Ferguson.
14         MR. FERGUSON:    Yes, this is James Ferguson for
15 the Complainant.
16         JUDGE DONALDSON:    All right and are your
17 business addresses of record the same as what you've
18 entered in the Notice of Appearance?
19         MR. FERGUSON:    Yes, Your Honor.
20         JUDGE DONALDSON:    Okay and you have with you
21 Mr. Robert Branch, your client, who's going to be a witness
22 today. Is that right?
23         MR. FERGUSON:    That is correct.
24         JUDGE DONALDSON:    Okay, great. Let me do the
25 same and get introductions as well from Respondent.

**Page 6**

1         MS. FITZKE:    I'm Susa Fitzke, lead counsel for
2 Respondent.
3         JUDGE DONALDSON:    And who is present with you
4 as co-counsel and your representatives or other individuals
5 present for Respondent today?
6         MS. FITZKE:    Sure. My colleague, Grace
7 Jacobson, is also counsel for Respondent and she is present
8 with me along with in-house legal counsel for the Carrier,
9 Gillian Marshall, and Duane Spears, who is a senior manager
10 of Human Resources.
11         JUDGE DONALDSON:    All right, thank you and
12 since I'm aware of your witness list, we don't have Ms.
13 Marshall or Ms. Spears present in any testified capacity,
14 correct?
15         MS. FITZKE:    Mr. Spears will be a testifying
16 witness in the matter, but is present in his capacity as a
17 company representative.
18         JUDGE DONALDSON:    All right. I see his name
19 now. Okay, thank you. So, as I mentioned, we're here for
20 a formal hearing under the Federal Rail Safety Act
21 specifically under the whistleblower protection provisions.
22 I want to cover just very briefly that the protections and
23 remedies and the Act that the claim is presented under are
24 those found under AIR-21 which is the Wendall H. Ford
25 Aviation Investment and Reform Act for the 21st Century.

**Page 7**

1 The rules and regulations that will apply to our formal
2 hearing are found under Part 29 CFR Part 1982. A couple of
3 mentions here. Under 1982.107(d), Formal Rules of evidence
4 will not apply. It doesn't mean that no rules apply or no
5 evidentiary rules apply, but as provided in the
6 regulations, I am charged with excluding evidence that
7 would be immaterial, irrelevant or unduly repetitious.
8         So, I know the tendency is to present perhaps if
9 you have any objections to a question, to an item of
10 evidence, you may object as hearsay or other traditional
11 type of objection which is fine, but I will be keeping in
12 mind the framework of the regulatory provisions that were
13 under and maybe asking you to tell me what why the evidence
14 you're objecting to is immaterial, irrelevant or unduly
15 repetitious. I do want to keep us moving at the right
16 pace. I do want you to get the evidence in for the claims
17 and defenses that you need to have in, but we do not have
18 as quite a strict application of the formal Rules of
19 Evidence that you may be used to proceeding under in other
20 state or Federal forums other than administrative. This is
21 fairly typical for an administrative proceeding of the type
22 that we handle here.
23         The Rules of Procedure do apply under the rules
24 you're familiar with for OALJ 29 CFR Part 18 and that's a
25 regulatory provision as well. Under 1982.109(a), the

**Page 8**

1 Complainant here needs to show by a preponderance of the
2 evidence that protected activity that he engaged in was a
3 contributing factor to the adverse action that he is
4 alleging occurred and if that happens, under 109(b),
5 Respondent must prove by clear and convincing evidence that
6 it would have taken the same adverse action in the absence
7 of any protected activity. The relief that can be awarded
8 is also identified by regulation under 1982.109(d).
9         So, some general rules for the hearing itself.
10 Ms. Wynn probably covered these with you during your
11 prehearing conference maybe this morning as well. As a
12 general rule, we have control over meeting you as well.
13 All but those asking questions, participating with me in
14 the preliminary matters will be muted. Please turn off
15 other phones and remove any distractions of any kind. If
16 you have technical difficulties at any time, you can either
17 use their raise hand function in this video Prevrium (ph)
18 platform or just simply get my attention in some way.
19 We're going to take regular breaks. We have more than
20 today. We have a two-day hearing set aside. We have a lot
21 of witnesses to get through, but that doesn't mean that we
22 need to exhaust the attorneys and the witnesses by not
23 taking breaks. We're going to take those because I think
24 it benefits everyone to do so. We'll cover post-hearing
25 briefs in just a second and let me just note for the record

**Page 9**

1 that you're aware of the order that was issued late
2 yesterday, February 12th and on Respondent's Motion in
3 Limine and Respondent's objections to CX-1 through 8. I'm
4 not going to restate what the ruling is. Generally, the
5 outcome though is the deposition transcript of Mr. Gardener
6 is going to be submitted by agreement of the parties. We
7 discussed off-record to maybe, in fact, mark as Joint
8 Exhibit. The parties will have a chance to review the
9 excerpts portions you want to submit. Consider whether
10 there's a video that you say can be accompanying and you
11 want to submit that, but I'm going to let you all continue
12 to confer and then present to me what you want to do.
13        All right. Exhibits JX-1 through 48 have been
14 submitted. There was a substitution of JX-18 and JX-19.
15 We're going with the most recent version of those that were
16 submitted February 8, 2024. These are jointly submitted.
17 I don't have the objections to these exhibits including the
18 amended ones so I'm going to admit at this time JX-1
19 through 48 and the substituted JX-18 and JX-19.
20                (Whereupon, the documents referred
21                to were marked for identification
22                as Joint Exhibits 1 through 48.)
23 //
24 //
25 //

**Page 10**

1                (Whereupon, the documents marked
2                for identification as Joint
3                Exhibits 1 through 48 were
4                admitted into evidence.)
5        JUDGE DONALDSON:    Is there any procedural or
6 housekeeping matter, Mr. Ferguson, that you think we need
7 to address?
8        MR. FERGUSON:  I don't think so, Your Honor.
9        JUDGE DONALDSON:    All right.  Ms. Fitzke,
10 anything?
11        MS. FITZKE:    No.  Thank you, Your Honor.
12        JUDGE DONALDSON:      All right.  We can do ---
13 well, let me cover some issues that have been stipulated.
14 These are in the prehearing statement.  I'm going to try
15 not to get any of these wrong, but they're in the record
16 and they're prehearing statements filed, I show, January
17 16, but that might be January 26, 2024.  Let me review the
18 basic stipulations here.  We have (1) the Complainant was
19 an employee within the meaning of and subject to the
20 provisions of the FRSA, the Act that I described earlier,
21 (2) that Illinois Central is a railroad carrier within the
22 meaning of the same Act.  I have a stipulation that on May
23 26, 2022, Complainant, Mr. Branch, was employed by Illinois
24 Central as a fuel truck driver, a stipulation that the
25 employment of the Complainant was terminated June 24, 2022.

**Page 11**

1 We have a stipulation that Complainant filed a complaint
2 with OSHA alleging the termination of the employment was in
3 violation of FRSA.  We have a stipulation the Secretary of
4 Labor issued a no reasonable cause finding and dismissed
5 that complaint that had been filed with OSHA.  Those
6 findings are dated October 26, 2022 and another
7 stipulation, the only procedural one that Complainant filed
8 objections, to those findings of the Secretary and requested
9 a hearing before administrative law judge.  All right, are
10 there any stipulations that you would add, Mr. Ferguson or
11 Ms. Fitzke?
12        MR. FERGUSON:    The only one that I don't think
13 was in there, Susan, did we make a stipulation as to his
14 termination date?  I couldn't remember if that was read.
15        MS. FITZKE:    I believe that we did, yes.  Did I
16 not read that one?
17        MR. FERGUSON:    You may have.  I may have just
18 missed it.  My apologies.
19        MS. FITZKE:    Okay.  Yes, the termination date,
20 June 24, 2022.
21        JUDGE DONALDSON:    Okay.  All right, yes.  It
22 appears to me that this matter arises in the jurisdiction
23 of the 5th Circuit Court of Appeals given the residence of
24 Mr. Branch, underlying conduct, the location of that that
25 has alleged to have occurred and the investigation that

**Page 12**

1 occurred in Mississippi.  Mr. Ferguson, do you believe we
2 are in the 5th circuit here?
3        MR. FERGUSON:    Yes, Your Honor.
4        JUDGE DONALDSON:    Okay.  Ms. Fitzke, do you
5 agree?
6        MS. FITZKE:    I do agree and I was just as you
7 were reading those, I'm not sure if it's material, but I do
8 believe there is a point of clarification for the
9 stipulations in terms of stipulation number 23 where the
10 parties agree that on May 26, 2022, Complainant was
11 employed as a fuel truck driver.  I believe the other
12 individual involved in this incident was a fuel truck
13 driver and Mr. Branch was a machine operator and I think
14 I've seen Mr. Ferguson refer to with them and so I think
15 it's like clarification of that stipulation.
16        JUDGE DONALDSON:    Okay.  Mr. Branch was
17 employed as a machine operator?
18        MR. FERGUSON:    Yes, Your Honor.
19        JUDGE DONALDSON:    All right.  The issues to be
20 adjudicated appear to track generally what the burdens are
21 that I summarized from the regulations a couple of minutes
22 ago.  Issue 1 is whether the Complainant can prove that he
23 engaged in protected activity under the Act, whether he can
24 prove that protected activity was a contributing factor to
25 an adverse action.  Here, it's a discharge or termination.

Robert Branch    2023-FRS-00026    February 13, 2024

---

**Page 13**

1  Then we would have if those are proven, we would have a
2  shift to the burden to Respondents to prove by clear and
3  convincing evidence that the termination would have taken
4  place even without protected activity and then lastly, if
5  Complainant succeeds with the burden and Respondent does
6  not, I would be addressing any relief that Complainant is
7  seeking under the Act and regulations.
8       I show --- just briefly before we get to opening
9  statements, of course, Complainant would go first with
10  those.  Mr. Ferguson and Ms. Fitzke, I show that at the
11  heart of the Act, that is an issue here.  It's
12  20109(B)(1)(A).  There's different kinds of protected
13  activity that can be at issue here.  I want to make sure I
14  understand that Mr. Branch alleges the type of protected
15  activity that triggered his claim under the whistleblower
16  provisions is (B)(1)(A) which is the reporting in good
17  faith of a hazardous safety or security condition.  Is that
18  right?
19       MR. FERGUSON:    That is correct.
20       JUDGE DONALDSON:    Okay.  No other types of
21  protected activity are alleged here?
22       MR. FERGUSON:    They have not been throughout
23  this case.
24       JUDGE DONALDSON:    Okay.  All right.  Do you
25  want to make any opening statement, Mr. Sorey or Mr.

---

**Page 14**

1  Ferguson?
2       MR. FERGUSON:    Your Honor, I think that the
3  stipulations in the prehearing brief cover opening
4  statements adequately.  We'll be post-briefing so I don't
5  think there's any reason to waste the court's time on that.
6       JUDGE DONALDSON:    Okay.  Ms. Fitzke?
7       MS. FITZKE:    Well, I had a statement planned
8  for you.  I think in light of Complainant's deferral, we
9  can defer our statement as well.
10       JUDGE DONALDSON:    All right.  Let me turn to
11  the first witness today.  Actually, let's review the
12  witnesses real quick in the order that you want to go in.
13  We're starting with Mr. Branch and then who else do you
14  plan to call, Mr. Ferguson?
15       MR. SOREY:    This is Mr. Sorey.
16       JUDGE DONALDSON:    Mr. Sorey.  Can you get in
17  the camera while we're talking?  Great.  Thank you, Mr.
18  Sorey.  Oh, I lost you.  Well, that turned out to be fatal.
19  That's odd.  We're going to wait for them to be rejoined.
20  Renee, we can go off the record for a second.
21       (Off the record at 10:36 a.m.)
22       (On the record at 10:36 a.m.)
23       JUDGE DONALDSON:    Okay.
24       MR. SOREY:    Sorry about that.
25       JUDGE DONALDSON:    That's fine.

---

**Page 15**

1       MR. SOREY:    We would have Mr. Christopher Day
2  first and Susan had said that Mr. Wade Clark needs to be
3  out of here or need be somewhere and he has to leave before
4  4:00.  So, I'm willing to move him up if that's okay.
5       JUDGE DONALDSON:    I appreciate that.
6       MR. SOREY:    Okay.  So, we'll take Wade Clark
7  second then.
8       JUDGE DONALDSON:    All right.
9       MR. SOREY:    And then I think the other listed
10  are Duane Spears, Tom Sullivan, Tom Hilliard and Patrick
11  Crain.
12       JUDGE DONALDSON:    Okay.
13       MR. SOREY:    And that's all that we have.
14       JUDGE DONALDSON:    So, the order, I might have
15  missed something here.  The order, you are starting with
16  Christopher Day.  Is that right?
17       MR. SOREY:    After Mr. Branch.
18       JUDGE DONALDSON:    Got it.  Okay, that's what I
19  was missing, okay.
20       MR. SOREY:    And, of course, we're submitting
21  Chance Gardener.  He won't be here as a live witness.
22       JUDGE DONALDSON:    Right.  Okay.  All right.
23       MR. SOREY:    I'm going to move around to try to
24  accommodate everyone as far as being able to see me when
25  I'm asking questions.

---

**Page 16**

1       JUDGE DONALDSON:    Okay.
2       MR. SOREY:    Not to be too chummy here.
3       JUDGE DONALDSON:    All right.  That works for
4  me.  I know that's not a usual setup that you have in a
5  hearing setting.  We're video anyway so we're flexible
6  here.  We can do those.  All right.  So, Mr. Branch,
7  ordinarily in an in-person formal hearing setting,
8  obviously you'd be in your own chair and you'd be probably
9  closer to me and your attorney would be across from you,
10  but this is a somewhat less formal setting anyway as we're
11  appearing by video.  I'm very appreciative that everyone is
12  ready and handled all the preliminary so quickly.  We're
13  already getting to your testimony.  So, if you have any
14  questions, Mr. Branch, at any time, of course, you can rely
15  on --- let your attorney know, for example, if you don't
16  understand something that's being asked of you, but the
17  other attorney know when they have an opportunity to ask
18  you questions on cross-examination as well, you can also
19  let me know as well.  That goes for any of the witnesses
20  testifying today.  Before I swear you in, I don't see any
21  other witnesses that are present, but if this comes up
22  during the hearing today, does anybody want witnesses
23  sequestered?
24       MR. SOREY:    Yes, we do.
25       JUDGE DONALDSON:    You do?

---

Exhibit A: Transcript of Office of Administrative Law Judges February 13 and 14, 2024, Hearing

Robert Branch    2023-FRS-00026    February 13, 2024

Page 17

1          MR. SOREY:   Yes.
2          JUDGE DONALDSON:   Okay.  So, sequestration is
3   invoked and we're going to make sure --- please help me
4   stay alert in case any witnesses joint because they've been
5   given the link and we'll make sure that only the witness
6   testifying is the witness present at that time.  All right,
7   Mr. Branch, would you please raise your right hand?  I'll
8   swear you in.
9   Whereupon,
10                    ROBERT BRANCH
11  having been duly sworn, was called as a witness herein and
12  was examined and testified as follows:
13         WITNESS:   Yes, ma'am.  I do.
14         JUDGE DONALDSON:   Okay, great and I'll let you
15  know if we can't hear you at any time, but that's great.
16  So, your attorney is asking questions first on what's
17  called direct examination and I take it, that's Mr. Sorey,
18  so you can go ahead with your witness.
19         MR. SOREY:   Thank you, Your Honor.
20                  DIRECT EXAMINATION
21  BY MR. SOREY:
22    Q    Robert, would you state your full name, please?
23    A    My full name is Robert L. Branch.
24    Q    And your address?
25    A    My address is 26 County Road 143, Colia, that's

Page 18

1   C-O-L-I-A, Mississippi 38923.
2     Q    Is that in Carroll County, Mississippi?
3     A    Yes, sir.  It's Carroll County, Mississippi.
4          MR. SOREY:   Your Honor, I threw that in because
5   it's a very rural address.
6   BY MR. SOREY:
7     Q    What is your seniority date with the railroad?
8     A    My seniority date is 2008, February 11, 2008.
9     Q    Okay and what positions have you held with the
10  railroad?
11    A    In the Engineering Department, I was a trackman
12  and a machine operator and then in the Bridge Department, I
13  was assistant foreman, a commoner, commoner helper and a
14  bridge.
15    Q    In June of 2022, where were you working?
16    A    We were working in White Bluff working for
17  Colonial, Mississippi.
18    Q    And what was your position at that job?
19    A    At that time, I was a machine operator pulling
20  spikes.
21    Q    Okay.  Before May 26, 2022, had you had any
22  problems with Mr. Melton?
23    A    No, sir.  I hadn't.
24    Q    Before Mr. Melton arrived at the hotel, what were
25  you doing?

Page 19

1     A    I was standing behind the back of the truck
2   cooking on  barbecue grill.
3     Q    And where were you all located?
4     A    We were located at Colonial Inn and Suites in
5   Colonial Mississippi.
6     Q    And what time of day was this?
7     A    It was approximately 8:00, 7:00 or 8:00 when we
8   started cooking.  It was 9:00 when the incident took place.
9     Q    Who all was there?
10    A    It was myself and a group of railroad workers
11  from the railroad.
12    Q    Okay.  When Mr. Melton came out of the hotel,
13  what did he have to say?
14    A    Mr. Melton stated that he was from "a plantation
15  where they killed and buried mother-fuckers.  I'm going to
16  kill Mr. Sweeny."
17    Q    And how did you respond to that?
18    A    I said Sweeny wasn't here.  Chill out.
19    Q    After that statement by you, describe what Mr.
20  Melton did.
21    A    After the statement, Mr. Melton, he rushed over
22  to me and pushed me down as hard as he could.  When I got
23  up, Mr. Melton hit me in the face twice between my eyes
24  when he drew blood and the time I got up again, he had his
25  fist balled up to hit me again.

Page 20

1     Q    Prior to Mr. Melton pushing you down, what
2   direction were you facing?
3     A    I had my back turned to Mr. Melton.  I didn't
4   even see him coming.
5     Q    And after he pushed you down, exactly what took
6   place?
7     A    After he pushed me down, I got up and asked me
8   why did he push me and then he hit me in the face twice.
9     Q    And what did you do at that point?
10    A    At the point, I barely got up off the ground and
11  he was still standing over me with a fist balled up and I
12  went into defense mode.
13    Q    Okay and from there, what happened?
14    A    From there, what happened, a fellow broke us up.
15    Q    When you say broke you up, were you all ---
16    A    He pulled us loose.
17    Q    Where were you physically located when the group
18  came over to pull you all apart?
19    A    I was on the ground on top of him.
20    Q    Were you on top or he was on top?
21    A    I was on top.
22    Q    Okay.  Could you have run --- excuse me.  Go
23  ahead.
24    A    -- because we had fell.
25    Q    All right.  How did you all get on the ground?

Robert Branch    2023-FRS-00026    February 13, 2024

**Page 21**

1    A    We sort of fell.  Both of us fell.
2    Q    Okay.
3    A    -- going forward.
4    Q    Could you have run away from Mr. Melton?
5    A    No, because I didn't know Mr. Melton was going to
6  attack me.  I was behind the grill and was caught between
7  the truck and the fence next to us.
8    Q    Were you in the parking lot of the hotel?
9    A    Yes, sir.  I was.
10    Q    Now, after the group got Mr. Melton off of you
11  all or you all broke up from the ground, what happened
12  next?
13    A    Mr. Melton stated that he was going to the truck
14  to get his gun.
15    Q    And what did he actually do?  Do you know?
16    A    All I know is he went to his truck, but I don't
17  know what happened because a co-worker, Mr. Hunsucker (ph)
18  which was the assistant foreman drove him to his truck to
19  keep him to come back to do any more harm.
20    Q    After Mr. Melton attacked you, how did you feel?
21    A    After Mr. Melton attacked me, I felt fearful.  I
22  felt fearful.  I was embarrassed.  I was hurt and I was
23  threatened because of the fact that he was going to get his
24  gun.
25    Q    Did you do anything about the altercation that

**Page 22**

1  night?
2    A    No, I didn't.  I was in total disbelief because I
3  never actually really know that had in the truck with
4  anyone on the railroad and I didn't do anything because my
5  foreman said he was going to report it the next day.
6    Q    And who was your foreman?
7    A    Ty Peterson.
8    Q    And to your knowledge, did he report it?
9    A    Yes, he did.
10    Q    To whom did he report it?
11    MS. FITZKE:    I just want to assert an objection
12  that this is hearsay.  It's traditional hearsay.  I
13  understand Your Honor's instruction.  It's also immaterial.
14  This claim is about Mr. Branch's reports, not the reports
15  of any other employee.
16    JUDGE DONALDSON:    Mr. Sorey, how is it
17  material, the information you're asking for?
18    MR. SOREY:    Well, it puts the railroad on
19  notice of what took place and it leads to what took place
20  after that, the foreman reporting it to the supervisor and
21  then the supervisor getting involved.
22    JUDGE DONALDSON:    Okay.  I'm going to overrule
23  the objection.  You can go ahead.
24    BY MR. SOREY:
25    Q    Okay and Mr. Peterson informed who?

**Page 23**

1    A    He informed the supervisor, Chance Gardener.
2    Q    All right and who was Chance Gardener?
3    A    He was a supervisor on the rail gang.
4    Q    Did you discuss what had happened at the
5  altercation with Mr. Chance Gardener the day after?
6    A    Mr. Chance Gardener, I did.  Mr. Chance Gardener
7  came to my machine and asked me what happened and I told
8  him I was attacked by Mr. Melton and Mr. Melton went to the
9  truck to get his gun to come back and shoot.  I said I felt
10  threatened by Mr. Melton's actions.
11    Q    Okay.  All right, what took place next as far as
12  you --- you were at work on that Friday.  This took place
13  what, on a Thursday?  Is that correct?
14    A    The incident took place on a Thursday.
15    Q    And then the meeting with Mr. Chance Gardener was
16  on Friday?
17    A    Was on Friday morning.
18    Q    Just to give the court an idea of the time period
19  and stuff, this was Memorial Day weekend?
20    A    That is correct.
21    Q    All right.  As far as speaking with members of
22  the railroad or supervisors about it, what took place next?
23    A    When I talked to Mr. Gardener that morning, he
24  told me that he had to talk to Todd first.
25    Q    And who is Todd?

**Page 24**

1    A    Todd Melton, the employee who attacked me.
2    Q    And did that take place?
3    A    Well, all I know was on the Saturday, I called
4  Mr. Gardener and asked him did he speak to Mr. Melton and
5  he told me he did and he said that Mr. Melton said that he
6  didn't remember anything.
7    Q    What did you do next?
8    A    And I told him that I'm thinking about filing a
9  report because the way --- it shouldn't have happened.  He
10  shouldn't have attacked me.  He shouldn't have --- I did
11  nothing to him to attack me.
12    Q    How did you feel about being around Mr. Melton at
13  work?
14    A    Personally, I tried to avoid Mr. Melton when I
15  was at work because I didn't know what he would do next.
16    Q    Did Mr. Melton threaten you any more at work?
17    A    No, he did not.
18    Q    What took place next as far as communication
19  between you and the foreman?
20    A    What took place next between me and the
21  supervisor, I called Chance and I made my mind up to file
22  the incident report.  I called Chance on a Sunday.  He
23  wouldn't answer the phone so I gave him all day that Sunday
24  to respond to me so he didn't.  So, on that Monday which
25  was Memorial Day, I texted him.

Robert Branch    2023-FRS-00026    February 13, 2024

Page 25

1    Q    Were you all working on Memorial Day?
2    A    No, we wasn't.
3    Q    Okay.  What did you text?
4    A    I texted him that I had changed my mind.  I said,
5  I'm going to go forward with the incident because with what
6  Todd, what Mr. Melton had done was unacceptable and it
7  could have got --- somebody could have gotten seriously
8  hurt or killed.  I told him if I let it go, it'd be out if
9  he'd go out and do to something else like he did me and
10  somebody get hurt or killed, then the blood would be on my
11  hands.
12    Q    Were you and the witnesses that were there at the
13  altercation, were you all asked to give statements?
14    A    Yes, sir.  We did.
15    Q    Did all of you give statements?
16    A    Yes, sir.  They did.
17    Q    Now, do you know whether these witnesses or did
18  these witnesses testify in your investigation hearing?
19    A    Yes, sir.  They did.
20    Q    And do you know what they testified to?
21    A    All I know is they all had a statement and they
22  testified that I didn't do anything to provoke, anything to
23  cause the incident that happened.
24    Q    Do you recall the day that you were given notice
25  of an investigation charging you with a violation of the

Page 26

1  Illinois Central workplace violence policy?
2    A    If I'm not mistaken, I think it was that Friday
3  on the 3rd.
4    Q    Okay.
5    A    FedEx brought it to my door.
6    Q    Okay.  Did all eight co-employees read their
7  statements at the hearing?
8    A    All the ones that was there present.  Being a
9  witness, they read their statement.
10    Q    What happened as a result of the hearing?
11    A    I was terminated.
12    Q    Do you remember the date that you were
13  terminated?
14    A    To my recollection, it was --- FedEx brought
15  another letter to my door on June 24th stating that I was
16  terminated.
17    Q    Now, Mr. Branch, how has the firing affected you?
18    A    The firing has affected me mentally.  Here I am.
19  I'm on medication and before I got fired, I was not on any
20  medication.  I wasn't seeing a doctor neither.
21    Q    Well, what doctor are you seeing and why?
22    A    I'm seeing a doctor, Dr. Redgrove.  He's a
23  psychiatrist doctor and he has me on medication for
24  depression, anxiety and nerve pain.
25    Q    And do you know how to spell the doctor's name by

Page 27

1  the way for the record?
2    A    I think I got something with the name of the
3  doctor.  The doctor got a funny name.
4    Q    Well, we'll get to ---
5         JUDGE DONALDSON:    Yes.  Don't look at anything
6  unless you're asked to, Mr. Branch.
7         WITNESS:  Yes, ma'am.
8         JUDGE DONALDSON:    You may be asked to.  Thank
9  you.
10        WITNESS:  Yes, ma'am.  I'm sorry.
11        JUDGE DONALDSON:    That's fine.
12  BY MR. SOREY:
13    Q    Mr. Branch, had you ever been fired before?
14    A    One time, sir.  That was in my youth days.
15    Q    And how long have you worked?
16    A    Actually, I've been working ever since I was 12
17  years old.
18    Q    How did you feel about not working?
19    A    It sort of --- it plays with your mind.  It plays
20  with your intellect.  I'm used to getting up, going to
21  work, doing what I got to do, taking care of my family,
22  what I always did all my life.
23    Q    Did the people in your community know that you
24  were fired?
25    A    Some of them did because my neighbor, he don't

Page 28

1  see my car leaving out the yard.  I'm not there no Monday
2  morning, he know that I'm either at work.  I mean, he know
3  I'm mostly at work.  Whenever they see me at home, they
4  know something is wrong.
5    Q    And how did you feel about that?
6    A    Well, I was feeling a little embarrassed because
7  I didn't want to tell them that I had lost my job because
8  of somebody else's negligence.  So, I sort of downplayed
9  it.
10    Q    How much in salary have you lost?
11    A    If I'm not mistaken, I think it's like $185,000.
12    Q    Is that from February of '24?
13    A    Yes, sir.
14    Q    You've been off approximately 20 months?
15    A    Yes, sir.
16    Q    Does the amount of $185,000 include the new ILA
17  amount with the new union contract?
18    A    No, sir.
19    Q    At the time of the incident and altercation when
20  you got fired, how much per hour were you making?
21    A    Like it was --- I think it was $30.00 an hour
22  because I run a machine.
23    Q    All right and how much would you be making now
24  under the new contract?
25    A    If I'm an assistant now, I'd be making $37.00 an

Robert Branch    2023-FRS-00026    February 13, 2024

Page 29

1 hour.
2     Q    Okay.  Were you able to get the back pay from the
3 new union contract?
4     A    No, sir.  I wasn't.
5     Q    Why not?
6     A    Because I was terminated.
7     Q    How much did you miss out on?
8     A    Well, to my knowledge, I think it's about $8,000
9 to $10,000, but I'm not --- it's not accurate.  It's not
10 accurate.
11    Q    What are you basing that $8,000 to $10,000 on?
12    A    I'm basing it on overtime also, the hours that I
13 worked.
14    Q    Are you basing it upon your co-employees?
15    A    To some point, but I'm looking at the things I
16 put in at some point.  At some point, I'm not.
17    Q    Mr. Branch, have you applied for any other jobs
18 since you were fired?
19    A    Yes, sir.  I have.
20    Q    How many would you say you've applied for?
21    A    I applied for about 25 to 30 jobs.
22    Q    Okay and have you provided that list to the
23 railroad?
24    A    Yes, sir.  I have.
25    Q    Have you been successful in getting a job?

Page 30

1     A    I have some interviews.  I had some close
2 interviews.  Don't mean I had the job and I wasn't selected
3 and I started feeling a little discomfort and I had a job
4 with Columbia Railroad also.  I interviewed with Columbia
5 Railroad.  I thought I had it because I was at home, but I
6 wasn't selected.
7     Q    That's Columbus Railroad?
8     A    Yes, Columbus.
9     Q    Okay.  Not Columbia?
10    A    No, not Columbia.
11    Q    Okay.
12    A    Columbia is in Greenville.
13    Q    Now, Mr. Branch, you've been without a job for
14 some 20 months.  How have you survived?
15    A    I had railroad stocks which I was able to sell
16 them and when I left the railroad, I had $32,000 in my
17 savings account and I had a land deal that I sold right
18 before --- a couple years ago and I had $20,000 in cash
19 saved up.  So, that's how I was able to survive.
20    Q    Now, you mentioned settling your IC stock for
21 $97,000.  Have you spent all that?
22    A    No, sir.  I haven't.
23    Q    Do you have some left?
24    A    Yes, sir.  I do.
25    Q    Approximately how much do you have left?

Page 31

1     A    I have between $45,000 and $50,000 left.
2     Q    All right.  You mentioned a savings account of
3 $32,350.  Do you have any of that left?
4     A    All gone.
5     Q    What about the land, the cash from the land sale,
6 $20,000?
7     A    All gone.
8     Q    Okay.  What are your normal expenses per month?
9     A    My normal expenses are about $5,000 or more.
10    Q    Now, during this time period, have you had any
11 major expenses over that amount?
12    A    Yes.  My baby girl goes to the state university
13 which I pay 20 grand a year and I was in the process before
14 I left work, I was getting my house, doing some home
15 improvements.  I was replacing board, painting my house
16 inside, painting on the outside, things of that nature.
17 Materials and labor, it was $15,000 and also ---
18    Q    When did that take place?
19    A    That took place around July, somewhere along
20 there.
21    Q    July of what year?
22    A    '22.
23    Q    Okay.  Had you already planned this prior to you
24 being terminated?
25    A    The carpenter was working on my house doing what

Page 32

1 I was telling him.
2     Q    Have you had any other major expenses?
3     A    Yes, sir.  I had a roof repair, I mean replaced
4 and with out-of-pocket $6,000.
5     Q    How much?
6     A    Out-of-pocket, $6,000.
7     Q    Okay.
8     A    -- because they also replaced the roofs on my
9 storage too.
10    Q    Okay.  Have you had any other expenses?
11    A    Other than paying for --- I had my older daughter
12 living with us and she was going through a divorce.  So, I
13 had to pay for --- the divorce was for $2,500 and my second
14 older daughter who works for the railroad, she's the
15 financial specialist, her transmission went out and I had
16 to spend $15,000 more.
17    Q    We never lose them completely, do you?
18    A    No, we don't.
19    Q    Mr. Branch, when you were fired, did you lose
20 your health insurance, dental insurance and vision
21 insurance?
22    A    Yes, sir.  I did.
23    Q    And have you had to replace it?
24    A    Yes, sir.  I did.
25    Q    And how much is that a month?

Exhibit A: Transcript of Office of Administrative Law Judges February 13 and 14, 2024, Hearing

Robert Branch    2023-FRS-00026    February 13, 2024

---

**Page 33**

1    A    A month is $966.38.
2    Q    Okay. Mr. Branch, how long were you planning to
3  work for the IC before you retired?
4    A    I was planning to work till I'm 67.
5    Q    And why 67?
6    A    Because of the fact that I wanted to try to get
7  my full benefit because I started sort of late and I have
8  to work till I'm 67 in order to get the full benefit. If I
9  would have started earlier and got 30 years at 60, I could
10  go ahead. Unfortunately, it didn't happen and I got to go
11  to 67.
12    Q    Mr. Branch, did you enjoy your job with the
13  railroad?
14    A    Yes, I did. The railroad was my livelihood. It
15  paid great money. I mean, I met a lot of great people
16  there.
17    Q    Did they provide you fringe benefits too?
18    A    Yes, sir. They did.
19    Q    Such as what?
20    A    Such as Tier 1, Tier 2.
21    Q    What is Tier 1 and Tier 2?
22    A    Tier 1 is my retirement. Tier 2 is I pay for my
23  wife's retirement. They supply my retirement, health,
24  dental, vision insurance.
25    Q    Was it good insurance?

---

**Page 34**

1    A    Yes, sir. The railroad insurance is some of the
2  best insurance around, I must say.
3    Q    Now, a moment ago when we were talking about
4  reporting to the railroad and discussed it, I think we
5  ended up on Monday which was Memorial Day.
6    A    Yes, sir.
7    Q    And your conversation was with whom that day,
8  Chance Gardener?
9    A    It was with Chris Day.
10    Q    All right. It was with Chris on Monday, Memorial
11  Day?
12    A    Yes, sir.
13    Q    And what took place then?
14    A    Chris called me and he said Chance had called him
15  and said I wanted to report an incident and he asked me
16  have I talked to the union. I told him now and he asked me
17  what happened and I told him that what happened at the
18  hotel that Todd had attacked me and he threatened to go to
19  the truck to get a gun and come back and shoot me.
20    Q    All right. Why was it necessary or do you feel
21  it was necessary to talk to your union about what went on?
22    A    I mean, I asked him that question, but he didn't
23  give me an answer.
24    Q    Did you at any point then talk to the union?
25    A    Nick called me.

---

**Page 35**

1    Q    Who is Nick now?
2    A    The union rep. He just called me on Tuesday and
3  asked me what happened and that's about it. I told him the
4  same thing that I told Chris.
5    Q    Okay. After you talked with Chris Day, did you
6  do anything else?
7    A    Chris Day, he texted me back. I got off the
8  phone and he told me to write an incident report and then
9  he texted me again and said, "Don't type it. Write it."
10    Q    And did you do that?
11    A    Yes, sir.
12    Q    And who did you send that incident report to?
13    A    To Christopher Day.
14    Q    And when did you send that?
15    A    I sent it that evening when I got to writing it.
16    Q    Okay. Now, when did you all go back to work?
17    A    We went back to work on a Tuesday.
18    Q    Okay. Did anything occur on that Tuesday
19  concerning the altercation?
20    A    Not that I know of.
21    Q    All right. Did you talk with Mr. Melton at work?
22    A    Yes, I did.
23    Q    Did that take place then?
24    A    Yes, it took place.
25    Q    All right. When did that take place?

---

**Page 36**

1    A    It was around about 11:00.
2    Q    Tell us what occurred.
3    A    Mr. Day or I mean, Mr. Melton, when I was on the
4  machine on the track, I saw Mr. Melton walking through the
5  woods coming towards my machine.
6    Q    And how far was he away when you first saw him?
7    A    Probably about 5 foot, something like that, 5 or
8  6 foot.
9    Q    And what did he do next?
10    A    He came and knocked on my door on my machine.
11    Q    And what took place after that?
12    A    He asked me could he come in. I told him sure
13  and he came in and asked me --- told me that he was sorry,
14  that he didn't mean to hit me. He didn't mean to attack
15  me. He told me that he was drinking. He told me that he
16  needed to quit drinking. He told me that his wife told him
17  he needed to quit drinking and he also told me when he told
18  his wife about the incident, the wife told him that, "You
19  were wrong for attacking Mr. Branch. Mr. Branch didn't do
20  anything to you" and I showed him the scar that he had put
21  between my eyes and I showed him that he had busted my lip
22  when he hit me, when he knocked me to the ground.
23    Q    Did you have any other injuries as a result of
24  the altercation?
25    A    When he pushed me down, my knee was swollen and I

---

Exhibit A: Transcript of Office of Administrative Law Judges February 13 and 14, 2024, Hearing

Robert Branch    2023-FRS-00026    February 13, 2024

**Page 37**

1  actually didn't really know that it was swollen till when I
2  --- it kept hurting and then I sort of like started moving
3  it back and forth. I said, "Man, my knee is swollen." So,
4  that's when I realized my knee was swollen too from the
5  incident.
6       Q    All right. Have we discussed before the full
7  discussion with Mr. Melton?
8       A    (Affirmative response). As far as I know.
9       Q    Did Mr. Melton ask you to do anything?
10      A    He asked me would I drop the incident.
11      Q    And what did you tell him?
12      A    I told him that I would think about it, but I
13 told him it's not in my hands. It's in somebody else's
14 hands, Chris Day's hands.
15      Q    What did he ask you to do at that point?
16      A    He asked me to call Chris Day and have Chris Day
17 drop the incident report. I mean, yes, drop the report.
18      Q    And what did you tell him as far as what you
19 would do?
20      A    I told him that I might call him or I might not.
21      Q    All right. What happened after that?
22      A    So, if I'm not mistaken, Chris Day called me and
23 when Chris Day called me, I said, he came to my machine and
24 wanted me to drop that and I said no. "I tried to get you
25 to drop that incident earlier and you wouldn't drop it" so

**Page 38**

1  I turned it over to HR and Labor Relations. So, I told
2  him, I said, "Chris, I didn't do anything." I said, "He
3  attacked me." I said, "It's the reason why I wrote the
4  incident report because he's so --- he told Chance Gardener
5  that he didn't remember attacking me" and I said --- I told
6  Chris, "Not only did he attack me, he went to his truck to
7  get a gun" and I told him that was threat, threat to shoot.
8  I told him, "Things like that shouldn't happen." At the
9  railroad, we're a family and family don't hurt family
10 unless something is totally wrong.
11      Q    That was on Tuesday after Memorial Day?
12      A    Yes. Yes, sir.
13      Q    What took place next as far as any of the
14 ramifications from it?
15      A    All I know is that they asked everybody to write
16 an incident report. Had all the guys write as incident
17 report.
18      Q    Did you get pulled out of service?
19      A    Yes, I did get pulled out of service.
20      Q    When did that take place?
21      A    I think on a Thursday.
22      Q    What was the date?
23      A    It was June the 2nd.
24      Q    All right and then what took place next?
25      A    What took place next, I wound up going to ---

**Page 39**

1  when I got pulled out of service, when I got home, I went
2  to the doctor. I was hurting. I went to the doctor at the
3  emergency room.
4       Q    Did you receive notice of an investigation?
5       A    Yes, I did.
6       Q    When did you receive that?
7       A    I received it on the 3rd.
8       Q    June?
9       A    June the 3rd of 2022.
10      Q    And did you all have a hearing?
11      A    Yes, we did.
12      Q    And when did the hearing take place?
13      A    The hearing took place June the 7th.
14      Q    Okay and you were terminated?
15      A    Yes, sir. I was.
16      Q    On what date?
17      A    June the 24th.
18      Q    All right. 2022?
19      A    2022.
20      Q    Now, during the time of this 20 months, how have
21 you occupied your time?
22      A    I --- my parents got a big yard. I cut their
23 grass, weed eater, blow off. I cut my grass. I have my
24 uncle. We raise vegetables. We raise peas, okra,
25 watermelons. We have to work it. I was doing sometimes

**Page 40**

1  working in the garden, in the fields, then I had to go back
2  and harvest it in the later months when it's ready, then
3  sometimes when I was looking for a job, I was helping my
4  uncle. He's got cows. I was helping him with the cows and
5  stuff like that. When we had a disaster, we had a storm
6  last year.
7       Q    A tornado?
8       A    We had a tornado. We're lucky we weren't killed.
9  I think three people got killed in our community and a lot
10 of people lost their houses and it was devastating. So, my
11 brother took water and supplies around to people, old
12 people and different ones who didn't have or were less
13 fortunate, didn't have food or whatever, then we cooked ---
14 the church --- we cooked food and we delivered food to
15 people, the workers, people who were working during the
16 storm.
17      Q    Who did the cooking? Who had that organized?
18      MS. FITZKE:    Objection. This entire line of
19 testimony here is completely irrelevant and immaterial to
20 the case.
21      MR. SOREY:    Okay. We'll move it along, Your
22 Honor.
23      JUDGE DONALDSON:    Okay. Sustained then.
24 BY MR. SOREY:
25      Q    Mr. Branch, would you be willing to go back to

Robert Branch     2023-FRS-00026     February 13, 2024

Page 41

1 Illinois Central Railroad?
2     A     Yes, sir.  I would.
3     Q     Do you think returning to work would cause any
4 problems with your supervisors?
5     A     No, sir.  I didn't have any problems with the
6 supervisors.  Before I left, never had any problems.
7     Q     Now, during the 16 years that you've been with
8 the railroad, have you ever been charged with any rule
9 violations or have you had any charges brought against you?
10     A     No, sir.  I haven't.
11     Q     Have you ever been suspended?
12     A     No, sir.  I haven't.
13     Q     Now, during this 20 months that you've been off,
14 did you earn any money anywhere?
15     A     No, sir.  I didn't.
16     Q     When you talked about working in the garden and
17 all that, what did you all do with all those vegetables?
18     A     What we did, we gave them to family, family
19 people, neighbors, elderly people.  That's what we did and
20 along with the process also.
21     MR. SOREY:     Okay.  Your Honor, that concludes
22 our direct examination.
23     JUDGE DONALDSON:     I appreciate that, Mr. Sorey
24 and Mr. Branch.  That wasn't not quite an hour, but I do
25 want to take a break before we do cross-examination.  So,

Page 42

1 let's take ---- I show 10:14 Central.  Let's do to 10:25
2 Central, do a 10-minute break.  We'll go off the record for
3 that duration and then when we come back, Ms. Fitzke,
4 you're going to be conducting the cross-examination?
5     MS. FITZKE:     That's right.
6     JUDGE DONALDSON:     Okay.  We'll see you in 10
7 minutes.  Just stay on this call.  Mute yourself if you
8 don't want to be overheard.
9     MR. SOREY:     Thank you, Your Honor.
10     JUDGE DONALDSON:     Okay, thanks.
11     (Off the record at 10:14 a.m., CST)
12     (On the record at 10:25 a.m., CST)
13     JUDGE DONALDSON:     Back from break, we have all
14 the same participants and observers.  Ms. Fitzke, your
15 witness?  Mr. Branch, you remain under the oath that I gave
16 you earlier.
17     WITNESS:     Yes, ma'am.
18                 CROSS EXAMINATION
19 BY MS. FITZKE:
20     Q     Mr. Branch, I believe in your testimony you
21 mentioned you started working for Illinois Central in about
22 2008, correct?
23     A     Yes, ma'am.
24     Q     And throughout your time with Illinois Central,
25 you observed that safety on the railroad was important,

Page 43

1 correct?
2     A     Yes, ma'am.
3     Q     In fact, I think in your deposition, you told us
4 it was a number 1 importance, correct?
5     A     Yes, ma'am.
6     Q     And in your observation, IC, Illinois Central,
7 which I will refer to sometimes as IC if that's okay with
8 you?
9     A     Yes, ma'am.  That's fine.
10     Q     All right.  IC takes safety of its rail workers
11 seriously in your observation, correct?
12     A     Yes, ma'am.
13     Q     Before this incident with Mr. Melton in May of
14 2022, in fact, you had reported various safety issues to
15 the railroad, issues with machines, broken rails, trip
16 hazards, things of that nature, correct?
17     A     Yes, ma'am.
18     Q     And those issues were always addressed, correct?
19     A     Yes, ma'am.
20     Q     And you didn't experience any adverse outcome as
21 a result of having made those complaints?
22     A     No, ma'am.
23     Q     When you worked at Illinois Central, you worked
24 under a number of different rules.  There were a number of
25 different rules that applied to you as an employee of

Page 44

1 Illinois Central, correct?
2     A     That's correct.
3     Q     And some of those rules included the US operating
4 rules, on track safety rules, Code of Conduct, correct?
5     A     Yes, ma'am.
6     Q     And you were regularly trained on the US
7 operating rules and on track safety rules, correct?
8     A     That's correct.
9     Q     And you were trained on the Code of Conduct as
10 well, correct?
11     A     That's correct.
12     Q     Another policy that applied to you as an employee
13 of Illinois Central was the workplace violence policy,
14 correct?
15     A     Yes, ma'am.
16     Q     And that's another policy under which you
17 received training, correct?
18     A     Yes, ma'am.
19     Q     And you understood that physical fighting, that
20 was a violation of the workplace violence policy at
21 Illinois Central, correct?
22     A     What I understood was in the latter part of it,
23 it also said except in self-defense so ---
24     Q     And ---
25     A     That's what I understood also.

Robert Branch    2023-FRS-00026    February 13, 2024

Page 45

1    Q    Okay.  I believe the verbiage, Mr. Branch, says,
2  "Except in justified cases of self-defense", correct?
3    A    That is correct.
4    Q    Okay, but if you are not engaged in self-defense
5  or you cross the line from self-defense to engaging
6  actively in a physical fight, you have violated the
7  workplace violence policy, correct?
8    A    I suppose.
9    Q    Mr. Branch, you mentioned in your earlier ---
10          COURT REPRRTER:    I apologize, Your Honor.  I
11  didn't get that answer.
12          WITNESS:    In other words, what I was saying,
13  Your Honor ---
14          JUDGE DONALDSON:    But let me make sure we get
15  exactly what you said a second ago.  I heard it as I
16  suppose.  Is that what you said?
17          WITNESS:    Yes.  Yes, ma'am.
18          JUDGE DONALDSON:    Okay.  Do you need to explain
19  your answer?
20          WITNESS:    Yes, ma'am.  I need to explain that
21  because I don't know what their definition of self-defense
22  is.  It don't explain.  That rule don't explain what self-
23  defense is.  When do it become self-defense when someone
24  attacks you?
25          JUDGE DONALDSON:    Okay.

Page 46

1          WITNESS:    The railroad ruled under that
2  statement.
3    BY MS. FITZKE:
4    Q    And you understand that it's up to the railroad
5  to both make its own rules and interpret its work rules,
6  correct?
7    A    Yes, ma'am.  I do.  Correct.
8    Q    And you understand that you're responsible for
9  your own behavior, correct?
10    A    Yes, that is correct.
11    Q    Mr. Branch, you mentioned Chris Day in your
12  earlier testimony as one of the supervisors that you spoke
13  with over that Memorial Day weekend and in the days
14  following.  I understand that before this incident that you
15  had a good working relationship with Mr. Day, that you
16  didn't have any issues with him.  Is that true?
17    A    That is correct.
18          MS. FITZKE:    I want to talk to you about what
19  happened at the hotel.
20    BY MS. FITZKE:
21    Q    I understand from your testimony and from the
22  record in this case that you were staying at a property
23  called The Magnolia Inn.
24  Is that right?
25    A    That is correct.

Page 47

1    Q    And with regard to that evening, you mentioned
2  Mr. Melton.  Well, I think it was your counsel that talked
3  about Mr. Melton coming out, but why don't you describe for
4  us?  Where did Mr. Melton come from?
5    A    He came out the door of the hotel.
6    Q    And ---
7    A    The side door of the hotel.
8    Q    You previously provided some observations of Mr.
9  Melton that he had shoes off.  He was barefoot and dancing
10  as he came out.  Is that right?
11    A    Yes, at one point.
12    Q    And did Mr. Melton appear to you that he had been
13  drinking?
14    A    Yes, ma'am.  Drinking and I don't know what else.
15    Q    And when he came out, you mentioned Mr. Melton
16  started yelling and you testified a moment ago that he made
17  a statement about being from Little Egypt Plantation.  It's
18  my understanding from your deposition testimony that you
19  don't have any reason to believe that Little Egypt is known
20  for violence of any kind?
21    A    Ma'am, I never been to Little Egypt.  I can't
22  tell you what they're known for.  I don't know because I've
23  never been there.
24    Q    And when Mr. Melton was yelling and said
25  something about being from Little Egypt and something about

Page 48

1  killing the MF-ers, after that, he said he was going to
2  kill someone named Sweeny.  Is that right?
3    A    Yes, ma'am.  That's correct.
4    Q    So, Mr. Melton's comments, those weren't directed
5  at you personally, were they?
6    A    No, ma'am.  They wasn't.
7    Q    And Mr. Sweeny, you understood that just a very
8  short time earlier, Mr. Melton and Mr. Sweeny had had an
9  argument of some kind at one of your union meetings,
10  correct?
11    A    That is correct.
12    Q    And it was at that point, I understand, that you
13  interjected and advised Mr. Melton to chill out or words to
14  that affect because Sweeny isn't here, right?
15    A    That's correct.
16    Q    Okay.  It's at that point that you claim that Mr.
17  Melton pushed you down?
18    A    Yes, ma'am.  He did.
19    Q    And then I understand he hit you twice in the
20  face, correct?
21    A    Yes, ma'am.  He did.
22    Q    And it was at that point after he had hit you
23  twice in the fact that you started swinging, correct, Mr.
24  Branch?
25    A    I was hallucinating.  I was out of it.  When I

Robert Branch    2023-FRS-00026    February 13, 2024

Page 49

1  started swinging when I started standing up with his fists
2  balled and he hit me again so I had to --- it was at a
3  point of self-defense.
4      MS. FITZKE:    Okay. Mr. Branch, object as non-
5  responsive first of all. That's not my question.
6      JUDGE DONALDSON:    What was your question again,
7  Ms. Fitzke?
8      BY MS. FITZKE:
9      Q    My question was simply it was at that point, Mr.
10 Branch, that you stood up and started swinging?
11     JUDGE DONALDSON:    Please answer that question
12 first if you need to explain it, let me know.
13     WITNESS:    Yes, ma'am. At that point, I did get
14 up swinging, but I only got up, Your Honor, because of the
15 fact that when I stood up, he was still standing over me
16 with his fists balled ready to hit me again. So, what
17 point do I have to defend myself to keep from getting
18 knocked down again? Do I keep getting knocked down?
19     BY MS. FITZKE:
20     Q    Mr. Branch, can I ask another question, sir? Are
21 you done talking?
22     A    Yes, ma'am. You can.
23     Q    Okay.
24     JUDGE DONALDSON:    Ms. Fitzke, I don't need that
25 kind of commentary and I'll let Mr. Branch know if he's not

Page 50

1  being responsive at that point or going on too far, but Mr.
2  Branch, I got the point that you were making with your
3  statement and you don't have to repeat it in the future.
4      WITNESS:    Yes, ma'am.
5      JUDGE DONALDSON:    Okay.
6      BY MS. FITZKE:
7      Q    So, Mr. Branch, after you started swinging at Mr.
8  Melton, you chose not to walk away. You chose to swing at
9  him, correct?
10     A    Not really. Like I said, Ms. Susan, he threwed
11 his hands up. He had his hands to hit me again.
12     Q    And you chose to swing at Mr. Melton and you
13 chose not to walk away, correct?
14     A    I couldn't walk away.
15     Q    And, Mr. Branch, you said a couple times today
16 something I haven't heard before which is you're claiming
17 now that Mr. Melton had his hands up again to swing at you
18 again, but when you participated in the investigation
19 hearing with the company that was reviewed as part of the
20 process to discipline you and on which the decision was
21 made to terminate you, you didn't provide that information
22 to the company at that time, did you?
23     A    No, I did not.
24     Q    And when you wrote a written statement, a
25 multiple page written statement describing the events of

Page 51

1  that night to make your report to the company. You didn't
2  provide that information that Mr. Melton had his hands up
3  again ready to swing at you. You didn't provide that
4  information in that statement either, did you?
5      A    No, because I said I used the statement of
6  attack.
7      Q    And after you started swinging at Mr. Melton, Mr.
8  Melton started backing away from you, correct?
9      A    Yes.
10     Q    And in fact, if Mr. Melton was backing away from
11 you, he fell over backwards, correct?
12     A    I assume.
13     Q    And after Mr. Melton fell over, you continued
14 swinging at him, correct?
15     A    I assume.
16     Q    And as you continued to swing at Mr. Melton, he
17 assumed a defensive posture and put his hands up in front
18 of his face to block your punches, correct?
19     A    That is correct.
20     Q    And while you were swinging at Mr. Melton, you
21 struck him, correct?
22     A    No, I did not.
23     Q    When you participated in the investigation
24 hearing with the company, do you recall testifying that you
25 struck Mr. Melton?

Page 52

1      A    Like I said, when it happened, I thought I struck
2  him, but when I really realized, I didn't hit Mr. Melton.
3      Q    When did you realize you didn't hit Mr. Melton?
4      A    When I realized I didn't hit him. When I
5  realized I didn't hit him. I mean, when I went back and
6  evaluated the incident, that's when I realized I didn't hit
7  him. It was probably a month ago. It happened quick.
8      Q    But when you testified in the investigation
9  hearing, you understood you were creating the record on
10 which the company would make a determination as to whether
11 to assess discipline to you, correct?
12     A    Yes, I did. That's correct.
13     Q    And during that investigation hearing, you told
14 the company, "Yes, you can say I struck him." Did you tell
15 the company that?
16     A    I might have did during that time. I might have
17 did.
18     Q    If that's in the investigation hearing
19 transcript, do you have any reason to believe that you
20 didn't say that, sir?
21     A    I said I might have did. I don't have the
22 investigative report in front of me.
23     Q    And you're aware, sir, that the witnesses who
24 testified at the investigation hearing, multiple witnesses
25 who testified at the investigation hearing also testified

Robert Branch    2023-FRS-00026    February 13, 2024

Page 53

1  that they saw you strike Mr. Melton, correct?
2      A   Okay.  Okay, correct.
3      Q   Do you recall that, sir?
4      A   Yes, I recall that.
5      Q   All right and while Mr. Melton was on the ground
6  kind of in his defensive posture and you were swinging at
7  him, I think you then testified that the other guys from
8  your crew that were around had to pull you off Mr. Melton,
9  correct?
10     A   They pulled us apart.
11     Q   You gave some testimony here today about Mr.
12 Melton indicating after you were pulled apart something
13 about going to get a gun from a truck or going to get a
14 gun.  You also testified a moment ago that that's something
15 that when you spoke to Mr. Chris Day that you told Chris
16 Day and I just want to give you a chance, Mr. Branch, if
17 you need to clarify that statement.  Did you tell Mr.
18 Day that Mr. Melton indicated that he had a gun?
19     A   Yes, I did.
20     Q   Okay.  Do you recall in November of 20 --- well,
21 first of all, you didn't put that information in the
22 written statement that you submitted to the company
23 describing the events of that night?
24     A   No, I did not.  I did not.
25         MR. SOREY:  Let her finish.

Page 54

1         WITNESS:  Oh, okay.
2      BY MS. FITZKE:
3      Q   And you didn't say at any point during the
4  investigation hearing when the company was making a
5  decision as to your employment that Mr. Melton indicated
6  that he had a gun or was going to get a gun, did you?
7      A   No, I did not.
8      Q   Okay and you recall when you were deposed in this
9  case when I came down to Mississippi to meet with you and
10 we sat in a conference room across from one another and I
11 asked you some questions.  Do you recall that deposition in
12 this case?
13     A   Yes, I do.
14         MS. FITZKE:  Okay.  I'd like to show you, Mr.
15 Branch, a page of that deposition transcript and, Your
16 Honor, I'm not sure logistically you want to handle this
17 form of impeachment if you'd like.  I don't know if they
18 have transcripts or if we should put it up on the screen.
19         JUDGE DONALDSON:  Are you referring to a JX
20 marked --- ?
21         MS. FITZKE:  No, it's Mr. Branch's deposition in
22 this case.  It's not one of the exhibits.
23         JUDGE DONALDSON:  Okay.  What we can do is if
24 you or co-counsel are comfortable presenting that on the
25 screen, we can do that so I have the benefit of it as well

Page 55

1  and then you can, if you want to, also mark and submit it
2  as a document later, we can handle that before we conclude
3  today.
4          MS. FITZKE:  Great, great.  I think we would
5  like to do both of those things.
6          JUDGE DONALDSON:  Okay.
7          MS. FITZKE:  We're going to pull up page 96.
8      BY MS. FITZKE:
9      Q   All right.  So, Mr. Branch, in your deposition,
10 you did have some questioning around this statement that
11 Mr. Melton made about --- or that you claim that Mr. Melton
12 made about having a firearm.  On page 96, I asked you,
13 Question, "Okay, did you ever report to the railroad to
14 Illinois Central management or Human Resources that Todd
15 Melton indicated he had a firearm in his truck?"  Answer,
16 "No, I did not."  Question, "Is there any reason why you
17 didn't report that?"  Answer, "I thought maybe a foreman or
18 someone or an assistant foreman walked out there and he
19 said it wasn't in the truck so that's why I didn't report
20 it."  Did I read that accurately, sir?
21     A   Yes, you did.
22     Q   And was that your testimony sworn under oath in
23 November of 2023?
24     A   Yes, ma'am.  It was.
25     Q   And is it your sworn testimony that we just read

Page 56

1  into the record for November 2023?  Is that accurate, sir?
2      A   Yes, ma'am.
3          MS. FITZKE:  Is there any reason why --- Grace
4  you can take that down.
5      BY MS. FITZKE:
6      Q   Is there any reason why your testimony here today
7  is different from your testimony in November of 2023?
8      A   Well, my point is I didn't --- when he went to
9  the truck to get his gun, I didn't know whether the gun was
10 there or not because I didn't go near his truck.
11     Q   Okay.
12     A   He made those statements.
13     Q   And, Mr. Branch, you understand that Chris Day is
14 a member of Illinois Central management, correct?
15     A   That is correct.
16     Q   And you understood that in May and June of 2022?
17     A   Yes, ma'am.  I do.  I did.
18     Q   And you understood when I asked you that question
19 in November of 2023 that Mr. Day was a member of Illinois
20 Central management?
21     A   Yes, ma'am.
22     Q   I understand, Mr. Branch, that with the
23 conversations that you indicated having with Mr. Chance
24 Gardener over that Memorial Day weekend with regard to your
25 report about Mr. Melton or your thinking about it and then

Robert Branch    2023-FRS-00026    February 13, 2024

Page 57

1 deciding to make a report about Mr. Melton that Mr.
2 Gardener didn't do or say anything that you thought was
3 trying to not report the incident, correct?
4      A    Mr. Gardener, all he said was that he was going
5 to talk with Mr. Melton.
6      Q    And my understanding from your prior testimony
7 was that Mr. Gardener did not try to dissuade or discourage
8 you from making any kind of report, did he?
9      A    I don't recall.
10     Q    And Mr. Day, he asked that you submit a written
11 statement of the incident?
12     A    Yes, he did.
13     Q    And you, in fact, wrote that statement and
14 submitted it to Mr. Day?
15     A    Yes, ma'am. I did.
16     Q    All right and my understanding is that you tested
17 the statement to Mr. Day?
18     A    Yes, ma'am. I did.
19     MS. FITZKE:    We have Joint Exhibit 48 that I
20 would just like to show the witness and again, Your Honor,
21 I'm not sure logistically how you best like to handle this
22 right now.
23     JUDGE DONALDSON:    Well, we can assist you with
24 that, but it looks like you're able to present your own
25 exhibits. If you're able, I welcome that because you have

Page 58

1 control over what you want to show. So, you can proceed.
2 Do exactly what you've been doing and tell us what you're
3 showing before you show it.
4      MS. FITZKE:    Okay, terrific. I just didn't
5 know if it was different for the exhibits I want to
6 confirm. Appreciate that.
7      JUDGE DONALDSON:    No, it's good so far.
8      MS. FITZKE:    Grace, are you able to pull up 48?
9      MS. JACOBSON:    Yes.
10     MS. FITZKE:    Okay, great.
11     JUDGE DONALDSON:    The only thing I would
12 caution for the witness and right now, it's Mr. Branch. If
13 you need that enlarged in order to see it, you may not have
14 the vision I do, but just let us know if it needs to be a
15 bigger type so you can read what you're being shown.
16     MS. FITZKE:    And, Mr. Branch, if you need us to
17 scroll up or down at any point to get a full view, just let
18 us know.
19     MR. SOREY:    If you would like, I have a copy of
20 it on my desk. I could retrieve it.
21     MS. FITZKE:    We're just going to get just a
22 little confirmatory testimony here. If we get to something
23 that is a little more detailed, I think that would be
24 helpful.
25     BY MS. FITZKE:

Page 59

1      Q    Mr. Branch, are you able to see the exhibit?
2      A    I can't see it, but you can read it out. That
3 will be fine.
4      MS. FITZKE:    Maybe, Eddy, if you have the
5 exhibits in your office, that would be helpful.
6      MR. SOREY:    It will take a second.
7      JUDGE DONALDSON:    Let's give them a chance to
8 retrieve it and Mr. Branch, while we're waiting, just make
9 sure from your perspective that what you have in front of
10 you from your attorney looks like what you're being shown.
11     WITNESS:    Yes, ma'am.
12     JUDGE DONALDSON:    The exact page, the exact
13 portion of the page because I don't want there to be any
14 confusion about what you are responding to.
15     WITNESS:    Yes, ma'am.
16     JUDGE DONALDSON:    Okay. So, why don't we see
17 if you can enlarge the text that you're presenting?
18     MS. FITZKE:    This is the top of the exhibit.
19 Scroll as needed.
20     JUDGE DONALDSON:    Okay. That looks good to me.
21 How about you, Mr. Branch?
22     WITNESS:    Yes. Yes, ma'am.
23     JUDGE DONALDSON:    Okay.
24     MS. FITZKE:    Thank you.
25     BY MS. FITZKE:

Page 60

1      Q    So, Mr. Branch, we're looking at what's marked
2 and entered into the record as Joint Exhibit 48 which is a
3 text exchange. I understand from previous testimony that
4 this is a text message exchange that you had with Mr. Chris
5 Day. Is that right?
6      A    Yes, ma'am.
7      Q    And is this the text exchange that you spoke
8 about a moment ago with Mr. Day where he asked you to send
9 him a handwritten statement?
10     A    Yes, ma'am.
11     Q    All right and then he is --- the bubbles that are
12 in grey, my understanding is that those are Mr. Day's
13 comments and then the okay in blue, that's your response?
14 Is that right?
15     A    Yes, ma'am.
16     Q    All right. Can we scroll down,
17 Grace? All right and then --- oh, too far.
18     BY MS. FITZKE:
19     Q    Then there's a date there, May 30, 2022, at 8:00
20 p.m. Do you see that there?
21     A    Yes, ma'am.
22     Q    All right. Do you understand that's where you
23 sent the next message, the attachment that was attached?
24     A    Yes, ma'am.
25     Q    All right and is this the text message where you

Robert Branch    2023-FRS-00026    February 13, 2024

**Page 61**

1  attached and sent Mr. Day the handwritten statement?
2      A    Yes, ma'am.
3      Q    All right and it's my understanding that you did
4  not write this statement, that your wife wrote this
5  statement on your behalf?
6      A    Yes, ma'am.  She did.
7      Q    But she did it based on information you provided
8  and asked that she include?
9      A    Yes, ma'am.  That's correct.
10     Q    And you reviewed it and confirmed that it was
11  accurate and that this was what you wanted to say in your
12  statement to the railroad?
13     A    Yes, ma'am.
14         MS. FITZKE:    All right.  There is --- if we can
15  take this down.  I think we have the full statement as
16  another one of our Joint Exhibits.  It's Joint Exhibit
17  Number 5.  We'll have Grace pull that one up for us.
18     BY MS. FITZKE:
19     Q    Mr. Branch, are you able to see this exhibit?
20     A    Yes, ma'am.
21     Q    Okay.  Do you recognize and we can scroll through
22  it, but at least the top of this at the first page at
23  least of this statement that you wrote and provided to Mr.
24  Day in that text message we just looked at?
25     A    Yes, ma'am.

**Page 62**

1      Q    All right.  This statement is dated May 30, 2022.
2  Is that when you prepared this with the assistance of your
3  wife as your scribe so to speak?
4      A    Yes, ma'am.
5      Q    Okay and in the first paragraph, the first couple
6  sentences, you indicate that "On Thursday, May 26, 2022
7  around 9:00 p.m. at Magnolia Inn" and then you provide an
8  address in Columbus, Mississippi.  It's my understanding
9  that this hotel was in Columbia, Mississippi.  Is that
10  right?
11     A    That is correct.
12         MS. FITZKE:    Okay.  So, I just wanted to
13  clarify that.  I wanted to look and I think we see that,
14  Columbus, repeated in some of the other documents later.
15  So, I just wanted to confirm the identity of where it came
16  from.  Grace, can you scroll down on this first page of
17  this statement?  A little bit farther.  Actually, why don't
18  we take this down?  I don't have any other questions for
19  you right now on this document.  We may come back to it.
20     BY MS. FITZKE:
21     Q    When you spoke with Branch, Mr. Branch, I'm
22  sorry.  When you spoke with Mr. Day over that Memorial Day
23  weekend, I think you spoke with him on Monday on Memorial
24  Day.  Is that right?
25     A    That is correct.

**Page 63**

1      Q    And do you recall Mr. Branch telling you --- I
2  did it again, Mr. Branch.  I'm so sorry.
3      A    No problem.
4      Q    Do you recall Mr. Day telling you that a number
5  of folks were out because of the Memorial Day holiday and
6  he'd need to circle back with you the next day when folks
7  were back in the office?
8      A    Yes, ma'am.  I did.
9      Q    And following your call with Mr. Day on Tuesday,
10  you understood that Mr. Day had reported the incident along
11  to Illinois Central Human Resources and Labor Relations?
12     A    That's what he told me when we had the phone
13  call.
14     Q    When we talked a minute ago about you having been
15  removed from service on --- I think you were advised on
16  June 2nd that you were being removed from service so it's my
17  understanding June 3rd was your first day out of work of
18  2022.  Is that right?
19     A    That is correct.
20     Q    And while you were being held out of service
21  pending investigation, you received compensation from the
22  company during that period, correct?
23     A    Yes, ma'am.  I did.
24     Q    And you were paid both your regular compensation
25  and the per diem during that period of time?

**Page 64**

1      A    I wasn't paid per diem.
2      Q    You don't think you were paid your per diem?
3      A    I know I wasn't.  I have my paycheck.  I wasn't
4  paid per diem.
5      Q    All right.  When you received the Notice of
6  Investigation, you understood that you were also being
7  called to investigation to examine whether you in
8  connection with this incident had violated any company
9  rules, correct?
10     A    Correct.
11     Q    And you mentioned a moment ago the investigation
12  hearing was on June 7, 2022.  You appeared in person for
13  that hearing, correct?
14     A    Yes, ma'am.  I did.
15     Q    And during that investigation hearing, you were
16  allowed to make statements and tell your side of the story,
17  correct?
18     A    Yes, ma'am.  I did.
19     Q    Okay.  You were able to call witnesses on your
20  behalf, anyone you thought might have relevant information?
21     A    Yes, ma'am.
22     Q    You were also represented there by a union
23  representative.  Is that right?
24     A    Yes, ma'am.  I was.
25     Q    And your union representative also had the

Page 65

1 ability to question witnesses on your behalf?
2     A    Yes, ma'am.
3     Q    You had the ability to present or submit any
4 documentary evidence you thought might be helpful to your
5 case?
6     A    That's correct.
7     Q    And in your written statement that you provided
8 to the company, you identified eight co-workers that had
9 been in that area around the time that this altercation
10 with Mr. Melton took place. Is that right?
11    A    That is correct.
12    Q    And all of those individuals provided statements
13 to the company?
14    A    That is correct.
15    Q    And each of those witnesses came in and read
16 their statements into the record at the investigation
17 hearing?
18    A    That is correct.
19    Q    And following the investigation hearing or
20 written transcript of that investigation was prepared. Do
21 you recall that?
22    A    Yes, ma'am.
23    Q    And you received a copy of that transcript?
24    A    Yes, ma'am. I did.
25    Q    You were able to review it after your received

Page 66

1 it?
2     A    Yes, ma'am. I did.
3     Q    And that transcript accurately reported what
4 happened during the investigation hearing and what the
5 individual stated?
6     A    Yes, ma'am.
7     Q    During the investigation hearing, one of the ---
8 I understand you went to hearing along with Mr. Melton,
9 correct?
10    A    Yes, ma'am.
11    Q    He was also accused of rule violations in
12 conjunction with this altercation on May 26?
13    A    Yes, ma'am.
14    Q    So, Mr. Melton also had the ability to question
15 any of the witnesses at the hearing. Did you observe that?
16    A    Yes, ma'am.
17    Q    And Mr. Melton took that opportunity to ask you a
18 couple questions. Do you recall that?
19    A    Yes, ma'am. I did.
20    Q    And during the investigation hearing, Mr. Melton
21 asked you specifically, "Do you feel that I'm a threat to
22 you" and you answered, "No, I do not." Do you recall that?
23    A    Yes, I recall.
24    Q    And in the investigation hearing, you testified
25 truthfully to all the facts as you knew and understood them

Page 67

1 at the time, correct?
2     A    Repeat the question.
3     MS. FITZKE:    Sure.
4 BY MS. FITZKE:
5     Q    In the investigation hearing that you had with
6 the company, I understand you weren't sworn under oath like
7 you were here this morning, correct?
8     A    Correct.
9     Q    But you nevertheless testified truthfully and
10 fully as to the information that you thought pertinent to
11 the company's decision, correct?
12    A    Correct.
13    Q    And at no time after the transcript was prepared
14 or the hearing was concluded did you come back to the
15 company and try to add any additional information, correct?
16    A    No, ma'am. I didn't.
17    Q    At the conclusion of the investigation, you, some
18 days later, I think you mentioned on June 24th received a
19 letter from the company terminating your employment. Is
20 that right?
21    A    That is correct.
22    Q    And you were advised at that time that your
23 employment was being terminated because the record in that
24 investigation hearing record and exhibits contained
25 credible testimony and substantial evidence proving that

Page 68

1 you violated the IC Code of Business conduct and IC
2 workplace violence prevention policy, correct?
3     A    Right.
4     Q    And that the violation of those policies was
5 identified as a Level 4 violation. Do you understand what
6 a Level 4 violation at Illinois Central was?
7     A    Yes, ma'am. I do.
8     Q    Okay and you understand that under the company's
9 disciplinary policy, that Level 4 violations are the most
10 serious violations that result in immediate terminations?
11    A    Yes, ma'am.
12    Q    You understand, Mr. Melton was also terminated as
13 a result of the events of the events of May 26?
14    A    Yes, ma'am.
15    Q    Mr. Branch, what was the last job that you
16 applied for?
17    A    The last job I applied for, I applied for a job
18 at Milwaukee Tools.
19    Q    At the time of your deposition in May of 2023,
20 that was also the last job, because me, in November of
21 2023, that was also the last job that you had applied for,
22 a job with Milwaukee Tools. Is this the same job or a
23 different job?
24    A    Different job.
25    Q    Okay. I understand that you've been out of work

Robert Branch    2023-FRS-00026    February 13, 2024

**Page 69**

1  roughly 20 months and you've applied for roughly 25 to 30
2  jobs. Is that your testimony?
3      A    Yes, ma'am.
4      Q    Okay. So, right around a job, a job and a half a
5  month is the rate at which you're applying for alternative
6  employment?
7      A    Ma'am? Can you say that again?
8      MS. FITZKE:    Sure. Sorry.
9  BY MS. FITZKE:
10     Q    So, I'm asking, you've applied for jobs at about
11 one job to one and a half jobs a month if I'm ---
12     A    Maybe.
13     Q    It's my understanding that with respect to your
14 benefits, your company-provided benefits, you were able to
15 stay on the Illinois Central benefit plan through November
16 of 2022, correct?
17     A    Correct.
18     MS. FITZKE:    I'm sorry, Mr. Branch. I'm not
19 trying to mislead you. I made a misstatement.
20     WITNESS:  Yes, you did.
21 BY MS. FITZKE:
22     Q    You had company benefits until October 31, 2022.
23 So, you would have rolled off in November. Is that right?
24     A    Yes, ma'am.
25     Q    Okay. So, in terms of any lost benefit claim in

**Page 70**

1  this case, any damages you claim with respect to the loss
2  of your company-provided benefits, those losses would not
3  start until November of 2022, correct?
4      A    Correct.
5      Q    And then after you rolled off your Illinois
6  Central benefits, you started obtaining benefits through
7  your wife's employer, correct?
8      A    That is correct.
9      Q    And so it's my understanding that you did not
10 have an period of time where you went without what we call
11 health and welfare benefits, medical, dental, vision care.
12 Is that right?
13     A    That's correct.
14     Q    And then when you started, you went onto your
15 wife's plan for medical insurance and then I understand you
16 participated in the company's Cobra offering with respect
17 to dental and vision care. Is that right?
18     A    Yes, ma'am.
19     MS. FITZKE:    Grace, are we able to pull up,
20 please, Joint Exhibit 39?
21 BY MS. FITZKE:
22     Q    While my colleague is pulling up that document,
23 you mentioned a moment ago having to pay $966.36 a month
24 for healthcare insurance. When did your healthcare
25 insurance increase to $966.00 a month?

**Page 71**

1      MR. SOREY:    I'm going to object to that
2  question. He testified that amount to health, dental and
3  vision insurance. It was a total combined group.
4      JUDGE DONALDSON:    All right. So, that was the
5  testimony that you believe the record shows. I don't
6  recall exactly what he was answering at the time. Ms.
7  Fitzke wanted to know when there was an increase in his
8  amount that he pays monthly?
9      MS. FITZKE:    In light of Mr. Sorey's
10 statements, maybe I can ask the questions a different way.
11 I don't think the record reflects that, but I think I can
12 clear it up and I think Mr. Sorey has given some helpful
13 information to do that. So, Mr. Branch, we're looking at
14 what's been marked as Joint Exhibit 38 which is a memo.
15 So, can we make it just a little bit bigger? It looks like
16 I can --- I want to make sure Mr. Branch can read it.
17     WITNESS:  I can see it.
18     MS. FITZKE:    You guys can see it? Okay,
19 terrific. Can we scroll down just a tiny bit? Thank you.
20 I think that's the full text of the exhibit now on the
21 screen.
22 BY MS. FITZKE:
23     Q    Mr. Branch, is this a memo that you prepared,
24 sir?
25     A    Yes, ma'am.

**Page 72**

1      Q    Okay. My understanding of what this document is
2  is a document that you prepared to try to summarize what
3  you believe your or what your out-of-pocket expenditure was
4  for the healthcare insurance that you obtained following
5  the time that you rolled off the Illinois Central plan. Is
6  that right?
7      A    It's dental and vision.
8      Q    Is this though, sir, this memo, this Exhibit 38,
9  does this include dental and vision or is this just the
10 healthcare?
11     A    No, it's included.
12     Q    I'm sorry.
13     A    No, that's just the health. That's just the
14 health.
15     JUDGE DONALDSON:    Do you want ---
16     WITNESS:  I said just the health.
17     JUDGE DONALDSON:    Excuse me, Mr. Branch. I
18 want to rely on the attorneys to use the exhibits the way
19 they want to, but there's a difference between JX-38 and
20 39, correct? Do you want to just show them both so he can
21 differentiate?
22     MS. FITZKE:    That may be helpful. Can we
23 scroll, Grace, to JX-39 because I think, Mr. Branch, no one
24 is trying to trick you here. We want to get the correct
25 numbers into the record.

Robert Branch    2023-FRS-00026    February 13, 2024

Page 73

1    WITNESS:  Yes, ma'am.  No problem.
2    BY MS. FITZKE:
3    Q    So, is JX-39, what's in front of you now, is this
4  a summary of what you've paid for the dental and vision
5  through Cobra?
6    A    Yes, ma'am.
7    MS. FITZKE:    All right.  If we could scroll
8  back to 38?  Can you scroll back to 38?
9    MS. JACOBSON:    Yes.
10   MS. FITZKE:    You all can't see.  Grace was
11 looking at me in a way that I thought she's like, "I'm
12 done" and it was on there.  So, thank you.  Sorry.  So
13 sorry.
14   BY MS. FITZKE:
15   Q    All right.  Sir, I think we're all hopefully all
16 back to 38.  So, is that --- has looking at 39 helped
17 refresh your memory as to what is contained in Exhibit 38?
18 Can you tell, Mr. Branch, what JX-38, the one that's in
19 front of you now, what that's about?
20   A    If I'm not mistaken, I think the $769, I mean, to
21 be honest, I don't know the $769 ---
22   Q    I didn't catch that.  Can you say that again?
23   A    I'm thinking.  Give me a minute.
24   Q    Okay.  I understand.
25   A    $769, October.

Page 74

1    Q    Mr. Branch, can I ask a different question
2  perhaps?  Have you had any increase in the amount that you
3  have to pay for your family coverage through your wife's
4  employer in the year 2024?
5    A    Yes, ma'am.  It increased from $814.00 to
6  $854.00.
7    Q    All right and you mentioned $814.00 a moment ago.
8  Do you believe that in each month of 2023 that for your
9  family coverage just for the medical insurance that you
10 paid $814.00 a month for your family plan through your
11 wife's insurance?
12   A    Yes, ma'am.  I did.
13   Q    And in 2022, for the couple months of 2022
14 that you were on your wife's health plan, do you believe
15 that you paid $769.00 a month for those benefits?
16   A    I think I did because I think I had to pay --- it
17 was a premium to join it.  That would have the dental
18 insurance.
19   Q    And I understand ---
20   A    -- the general insurance.
21   MS. FITZKE:    If we can look again at 38?  If we
22 can scroll down again?
23   MS. JACOBSON:    I believe this one is 39.
24   MS. FITZKE:    I'm sorry, 39.
25   MS. JACOBSON:    Okay, got you.  I just want to

Page 75

1  make sure.
2    BY MS. FITZKE:
3    Q    And then Exhibit 39, Mr. Branch, do you recognize
4  this as a summary of the Cobra expenses that you prepared
5  reflecting the expenses you incurred while you ---
6  following your separation from Illinois Central and your
7  removal from their benefits plan?
8    A    Yes, ma'am.
9    Q    And while you worked for Illinois Central, you
10 did have to pay for an employee portion of your premium for
11 your medical, dental and vision benefits while you worked
12 for the company and for that period of time that you
13 remained on their benefits plan.  Do you recall that?
14   A    Yes, ma'am.
15   Q    And do you recall that you were paying
16 approximately $228.00 per month to the company for that
17 coverage?
18   A    Yes, ma'am.  That's correct, but dental and
19 vision, it was different.  That was just the health
20 insurance I was paying the $228 for.
21   Q    While you worked for the company, did you have to
22 pay a portion of the premium to the company that was in
23 addition to that for your vision and dental care?
24   A    Yes, ma'am.  It wasn't like --- the $228 wasn't
25 included.  No, ma'am.  They took out a different premium

Page 76

1  for vision and dental.
2    Q    And what was the additional premium for vision
3  and dental?
4    A    I really can't recall.  I know it was $40.00-some
5  a month or every two weeks.  Something like that.  It was
6  something like that for the payment plan.
7    Q    You think it was $48.00 a month or ---
8    A    It was $40.00-something.
9    Q    Did you say it was per paycheck then every two
10 weeks?
11   A    It was every two weeks.
12   Q    Okay.  So, around --- roughly $40.00 every two
13 weeks.  Is that a fair estimate?
14   A    I would say to my recollection, but I haven't
15 looked at my pay stub in a while.
16   MS. FITZKE:    All right, fair enough.  We can
17 take down the exhibit.  Thank you.
18   BY MS. FITZKE:
19   Q    I understand that part of what you have had to do
20 since you left the company --- well, while you were at the
21 company and when you left, you have certain prescriptions
22 that you obtain that for personal health conditions,
23 correct?
24   A    Yes, ma'am.
25   Q    And just to make our record on this, I understand

Robert Branch    2023-FRS-00026    February 13, 2024

**Page 77**

1 that you had some medication relating to a heart condition
2 that while you worked at Illinois Central and for the
3 period you were covered under their plan, you paid about
4 $50.00 a month for those prescriptions and subsequently
5 while under your wife's plan, they now cost you
6 approximately $30.00 a month more and you pay now around
7 $80.00 a month. Is that right?
8    A    That is correct.
9    Q    With respect to --- you gave some testimony
10 earlier with respect to your home expenses, expenses in
11 conjunction with your daughter's education or your home
12 renovation. Those are expenses that you both would have
13 paid if you worked for the company and had to continue to
14 --- and chose to continue paying after you left the
15 company, correct?
16    A    Run that by me again. I missed a part.
17    Q    Right. The expenses that you incurred in
18 conjunction with your home renovation, for example, you
19 didn't have to make that expenditure because your
20 employment was terminated, correct?
21    A    No.
22    Q    That was money that you were choosing to spend on
23 your home care and upkeep, correct?
24    A    That is correct.
25    Q    And the same is true with the expenses you

**Page 78**

1 identified with respect to your daughter's education or the
2 care of your family, correct?
3    A    Well, my job was based on my daughter's
4 education.
5    Q    That was something that you wanted to be able to
6 do and were happy you were able to do for your daughter,
7 correct?
8    A    Based on my job.
9    Q    And I think you also testified you kept doing it
10 after. You were fortunate to be in a position to be able
11 to do that after you left the company, correct?
12    A    That is correct.
13    Q    You mentioned a moment ago in your testimony that
14 you estimate that the amount you lost in salary to be
15 $184,000 over the last approximately 20 months since you
16 were terminated. How did you calculate that $184,000, sir?
17        MR. SOREY:    It was actually $185,000 in the
18 testimony.
19        MS. FITZKE:    Well, my notes say $184,000 and
20 I'm the questioner, Mr. Sorey.
21        WITNESS:    You're wrong.
22        JUDGE DONALDSON:    Let me just back up here so
23 we can ---
24        WITNESS:    It was actually $185,000.
25        JUDGE DONALDSON:    Just a moment, please. Mr.

**Page 79**

1 Sorey is trying to correct the record, but let's let the
2 witness answer the question if he disagrees with any
3 premise of it. Can you restate your question, Ms. Fitzke?
4        MS. FITZKE:    Yes.
5    BY MS. FITZKE:
6    Q    Mr. Branch, I had in my notes that you testified
7 that you lost approximately $184,000 and I may have dropped
8 off some hundreds that you said after that, but I rounded
9 to the $184,000. If I did get that wrong, again, I'm not
10 trying to trick or mislead you and please do clarify. What
11 I want to know is what number do you claim the loss was, I
12 guess, and how did you calculate it, sir?
13    A    It was actually $185,000 and I calculated from
14 one of my pay stubs. I looked at the highest pay stub that
15 I made with overtime and I multiplied it by monthly. Every
16 two weeks, I multiplied by 2 and then I came up with a
17 total and then I multiplied by the month and I took and
18 multiplied it by 12 months.
19    Q    Did I understand correctly that you said you
20 picked the highest pay stub that you could find?
21    A    Well, the last pay stub that I got during the
22 month of June. It was the highest and it had the overtime
23 and that's how I came up with the $185,000 and I also took
24 and multiplied my hourly months that I made, my salary I
25 made. Like I made $30.00 so I multiplied it times 80, then

**Page 80**

1 I turned around and took the 80 and multiplied the time for
2 months, I mean, two times, then I turned around and
3 multiplied that figure by 12 months.
4        MS. FITZKE:    Okay. So, I just want to make
5 sure I'm following because I'm not sure I completely am.
6    BY MS. FITZKE:
7    Q    So, I understand you took your last wage times 80
8 to get what your biweekly wage was. Do I have that right
9 so far?
10    A    Yes, ma'am.
11    Q    Okay and how did you use that final pay stub?
12 Was that just to try to estimate what your total overtime
13 hours in that one period were?
14    A    Sort of.
15    Q    Okay and did you assume the same overtime hours
16 to each of the biweekly periods then as you calculated
17 them?
18    A    I didn't use the overtime I was in the year 2023.
19 I didn't use --- in 2023, I used the overtime hours. Only
20 used them, if I'm not mistaken, I think continued in 2022
21 in June from the time I was laid off to the time I was ---
22 in December of 2022. I didn't use the overtime hours in
23 2023 at all.
24    Q    And do you recall how you factored in the
25 overtime hours to your estimated wage loss in 2022?

Robert Branch     2023-FRS-00026     February 13, 2024

Page 81

1      A    I just used the last pay stub with the overtime.
2      Q    And did you use that last pay stub to estimate
3  your biweekly rate for each week during the remainder of
4  the year?
5      A    I think I did, ma'am. I'm not for sure. I think
6  I did.
7      Q    I think I'm following and with respect to the
8  overtime that you worked while you worked for Illinois
9  Central, is it fair to say that the overtime wasn't
10 consistent every week, but would be higher some weeks and
11 lower other weeks or not at all in some weeks?
12     A    Well, it was plus the rate. We always got some
13 overtime. It was barely that I didn't get any.
14     Q    And when you calculated that $185,000 estimated
15 wage loss, did you calculate it through today's date or was
16 there a different end date?
17     A    Could you repeat that? Today's date or what?
18     Q    Or was there a different end date on your
19 calculation?
20     A    I don't recall. I don't recall.
21     MS. FITZKE:    Thank you, Mr. Branch. I don't
22 have any other questions for you at this moment.
23     WITNESS:    Okay.
24     JUDGE DONALDSON:    All right. I'd like to ask a
25 few questions. Usually I wait until the very end, but it

Page 82

1  might help if you have any redirect or recross. This is
2  mainly just sometimes I need information to fill in the
3  gaps to make sure I understood some things that you said so
4  if you'll hold off just a minute there, Mr. Sorey. Mr.
5  Sorey, do you, in fact, have some redirect?
6      MR. SOREY:    I have a few.
7      JUDGE DONALDSON:    Okay. Let me understand and
8  again, you may have answered some of this earlier, Mr.
9  Branch, and I just missed it. You were asked about Tier 1
10 and Tier 2 benefits. I didn't catch what you said about
11 them. Can you just --- I'm not asking you to be a Human
12 Resources officer for the company, but what is your
13 understanding of what those benefits are?
14     WITNESS:    Yes, ma'am. My understanding of
15 Tier 1 is my retirement and Tier 2 is I'm paying my wife's
16 retirement. That's my understanding.
17     JUDGE DONALDSON:    I see. How old are you
18 today?
19     WITNESS:    I am 58 today.
20     JUDGE DONALDSON:    58 today and how old were you
21 when you were terminated in June of 2022?
22     WITNESS:    I was 57.
23     JUDGE DONALDSON:    All right. What month is
24 your birthday in?
25     WITNESS:    I have a birthday next month. I will

Page 83

1  be 59 on XX-XX.
2      JUDGE DONALDSON:    Okay, understood. Did your
3  wife always take the benefit of having health insurance,
4  health benefits through her employment up to the time you
5  started taking advantage of it too?
6      WITNESS:    No, ma'am. I was always --- every
7  job I ever had, I would always carry the family insurance.
8      JUDGE DONALDSON:    So, she was on your plan?
9      WITNESS:    Yes, ma'am.
10     JUDGE DONALDSON:    Until you didn't have a plan
11 and then you went on her plan through her employer. Is
12 that right?
13     WITNESS:    Well, until I didn't have a plan.
14 Well, I actually looked for insurance other than my wife
15 because I was trying to find something cheaper, but the
16 fact of the matter was, it was expensive and it was cheaper
17 for me to ask her to place myself and our daughter and my
18 wife on her insurance and I would just pay her premium
19 because it was going to be more higher if I would have went
20 to another company. So, that's why I didn't go with
21 another --- I searched, but it was higher so I chose to go
22 with my wife's insurance which it was cheaper than the
23 insurance that I was looking at.
24     JUDGE DONALDSON:    You were looking in the open
25 market then? I understand.

Page 84

1      WITNESS:    Yes, ma'am. The open market, right.
2      JUDGE DONALDSON:    Yes. Okay. Lastly, I'm not
3  from Mississippi or this might cover other territories
4  covered by the Employer, but what's Little Egypt
5  Plantation? Is that an area?
6      WITNESS:    Ma'am, all I know is it's a little
7  town off of 49 and you can go through 49, you see Egypt
8  Plantation. That's all I know about it.
9      JUDGE DONALDSON:    Okay. So, there's actually a
10 road sign to this place?
11     WITNESS:    It's a road sign that says Little
12 Egypt Plantation so that's all I know.
13     JUDGE DONALDSON:    Okay. Sounds like it's not
14 much more than what I know, but anyway, I appreciate you
15 clarifying a few things for me. I don't know if any of the
16 answers matter, but I just found myself wanting the
17 information. So, Mr. Sorey --- well, Mr. Branch, can you
18 continue with some questions from your attorney? Do you
19 need a break?
20     WITNESS:    No, ma'am. I can continue.
21     JUDGE DONALDSON:    Okay. You can go ahead, Mr.
22 Sorey.
23     MR. SOREY:    Thank you, Your Honor.
24          REDIRECT EXAMINATION
25 BY MR. SOREY:

Robert Branch    2023-FRS-00026    February 13, 2024

Page 85

1  Q    Were you given any opportunity to correct the
2  investigation transcript?
3  A    No, sir.
4  Q    Now, where you live in Carroll County, are there
5  many opportunities around there for jobs?
6  A    No, sir.
7  Q    Just for instance, how far are the jobs you
8  applied for with Milwaukee Tools?
9  A    It's 30 to 40 miles.
10  Q    Okay and what towns are located near you?
11  A    Greenwood and Winona which they don't have any---
12  one manufacturer up there. I applied up there and you got
13  Grenada which is about 45 miles away.
14  Q    Now, when did you actually lose your retirement
15  benefits?
16  A    I lost my retirement benefits on June when I was
17  terminated.
18  Q    Okay. So, that didn't go over till November
19  2022?
20  A    No, sir.
21  Q    And on Cobra expenses, how long did you pay Cobra
22  expenses and what did you pay for?
23  A    I paid Cobra expenses from November to up to now.
24  Q    Okay.
25  A    And I was paying for dental and vision.

Page 86

1  Q    And your health insurance was through your wife?
2  A    My health insurance was through my wife.
3  Q    Okay. When you were working on the traveling
4  gang, did you normally get overtime?
5  A    When we worked on the rail gang, I always got
6  overtime.
7  Q    Okay.
8  A    Unless they say that overtime is --- they used
9  the word --- they put out a memo that said no overtime.
10  Q    Now, your wage calculation, did it go through
11  February of 2024?
12  A    Yes, sir.
13  Q    Now, in Exhibit 5 that you were shown a while ago
14  that was put up on the screen, did it contain the statement
15  that you feared for your life from Mr. Melton?
16  A    I believe it contained I was threatened, yes.
17  MR. SOREY:    We're seeing under our group thing
18  here if we could pull it up.
19  JUDGE DONALDSON:    Okay.
20  MR. SOREY:    Exhibit 5. Do you want her to pull
21  it up?
22  MR. FERGUSON:    Can you see it now?
23  MR. SOREY:    Yes. It's a little bit hard to
24  see.
25  BY MR. SOREY:

Page 87

1  Q    All right. Look at the third line down.
2  A    "I feared for my life."
3  Q    All right and you advised the railroad of that
4  particular situation?
5  A    That is correct.
6  Q    All right. Now, again, we got to talking a while
7  ago about walk away. Could you have walked away from the
8  situation?
9  A    I mean, I tried. I was until I was struck.
10  Q    Okay. Were you physically able to walk away at
11  that point?
12  A    Not really.
13  Q    Why not?
14  A    I was hurting and blood was coming down my
15  forehead and my face.
16  Q    Did you have any problem with your leg?
17  A    Yes, I did.
18  Q    What problem did you have with your leg?
19  A    My leg was swollen and my knee was twisted.
20  MR. SOREY:    That's all the questions we have,
21  Your Honor.
22  JUDGE DONALDSON:    All right. Anything further
23  that needs to be limited to that set of questions just now?
24  Ms. Fitzke, do you want to ask anything like that?
25  MS. FITZKE:    Yes, please.

Page 88

1  JUDGE DONALDSON:    Okay. Go ahead.
2  CROSS EXAMINATION
3  BY MS. FITZKE:
4  Q    Mr. Branch, just to confirm. With respect to the
5  portion of benefits, vision and dental that you had through
6  the Cobra continuation with the railroad, it's my
7  understanding that Cobra continuation is for a period of 18
8  months. Did you have that benefit for 18 months or did you
9  have it for a different period of time?
10  A    I had it for 18 months.
11  Q    And with respect to the --- you were asked a
12  question about whether you were given the opportunity to
13  correct the investigation hearing transcript. My
14  understanding of your testimony, sir, was that you had read
15  the transcript after you received it and that there were no
16  errors in the transcript, correct?
17  A    I read it, but nobody told me I could correct it.
18  That's my point.
19  Q    And my question was slightly different, sir. My
20  question was as you read the transcript, you didn't note
21  anything in there that was taken down by the court reporter
22  incorrectly or mistakenly, did you?
23  A    No, ma'am. I did not.
24  Q    Okay. With respect to the questioning about the
25  statement where you indicated that you feared for your life

Robert Branch    2023-FRS-00026    February 13, 2024

Page 89

1  around Mr. Melton, Mr. Melton came on Monday or excuse me,
2  Tuesday, May 31st when you returned to work and Mr. Melton
3  came to you and apologized.  It's my understanding you
4  accepted his apology, correct?
5      A    Yes, ma'am.  I accepted the apology, but it
6  didn't erase what --- I didn't forget what had happened.
7      Q    And it's my understanding that as of the time Mr.
8  Melton apologized to you that you no longer feared for your
9  safety around him.  Is that right?
10     A    I didn't say that.
11     Q    And it's my understanding that --- well, it's not
12 my understanding.  As you communicated to the company in
13 the June 7 investigation hearing as outlined in the
14 transcript, as of June 7 when Mr. Melton asked you if you
15 considered him to be a threat, you no longer considered him
16 to be a threat at that time.  Is that right.
17     A    That was on June 7th, but before when the incident
18 happened, he was a threat.  They only asked me about the
19 investigation without the threat, but he was a threat on
20 May 26, 2022.
21     Q    On the day of the fight, right?
22     A    Yes, ma'am.
23     Q    And after that day, you didn't consider Mr.
24 Melton to be an ongoing threat from the Tuesday when you
25 returned to work and he apologized going forward, correct?

Page 90

1      A    Actually, like I said, I was only agreeing with
2  him just to get him out of my way because I really didn't
3  want to deal with it at all, but I was trying to be nice
4  and be compassionate at the same time.
5      Q    And in terms of what you told the company, when
6  Mr. Branch, sorry, when Mr. Melton asked you, Mr. Branch,
7  in the investigation hearing whether you considered him to
8  be a threat and in the investigation hearing and in that
9  transcript and you indicated you did not, you didn't tell
10 the railroad at that time or any company manager that you
11 were just saying that to be nice to Mr. Melton, did you?
12     A    No, because of the fact that the day of the
13 investigation, the union, Dale Maquire, God bless his soul,
14 he had gone onto Heaven, he came to my vehicle when I
15 pulled up and asked me to say something nice about Mr.
16 Melton and he said that he was going to ask Mr. Melton to
17 say something nice about me.  So, I was just going with
18 what Mr. Dale Maquire asked me, but other than that, I
19 asked him, I don't know why that they gave at the hearing,
20 me and him the same hearing at the same time because I
21 asked for the hearing from --- my investigation to be
22 separate, but they wouldn't honor that.  They said that's
23 what the railroad wanted.  So, the railroad did what they
24 want.
25     Q    You're describing conversations you had with your

Page 91

1  union representative, correct, Mr. Maquire?
2      A    Right.  He also told me that the Carrier said
3  that I wasn't going to get terminated, but I'm at the
4  house.
5      Q    And ---
6      A    I am without a job.
7      Q    Sorry, sir.  I was looking away.  Were you
8  finished?
9      A    So, he also told me that the Carrier said that I
10 wasn't going to get terminated because I didn't do
11 anything, but guess what, June 24th, I got a letter saying
12 dismissed.
13     Q    And Mr. Maquire, he's not a member of company
14 management, correct?
15     A    No, he's not.
16     Q    And during the investigation hearing, when you
17 indicated that you no longer viewed or at that time, you
18 did not view Mr. Melton as a threat, you didn't tell anyone
19 from the railroad that you were just saying that to be
20 nice and that you didn't really mean it, correct?
21     A    Correct, but again, Ms. Susan, I also told Mr.
22 Day on June 31st that Mr. Melton was a threat.  He had a
23 gun, went to his truck to get a gun, threatened to shoot
24 me.  So, I feel like that until I said anything about the
25 incident, the railroad was sweeping it under the rug.  When

Page 92

1  I spoke about the incident, that's when they called me for
2  an investigation and did an investigation and guess what?
3  I was fired because I felt like I reported a safety matter
4  and that's when they wanted to hear what happened, but in
5  reality, I couldn't change the fact what happened.  What
6  happened happened and I couldn't stop it from happening.
7  All I could do is report it and now that's what they tell
8  us in the rules.  Report it in good faith so I reported it
9  in good faith and I got out.
10     Q    And in the investigation hearing, sir, you were
11 given a full opportunity to say anything that you wanted to
12 say about the incident with Mr. Melton, correct?
13     A    That's correct.
14     Q    You were given the opportunity to say on the
15 record that you believed Mr. Melton had a firearm or
16 threatened to go get a firearm, correct?
17     A    That's correct.
18     Q    And you did not provide that information to any
19 member of company management or Human Resources as
20 indicated in your deposition testimony, correct?
21     A    That's correct.
22     MS. FITZKE:    I don't have any other questions.
23 Thank you.
24     JUDGE DONALDSON:    All right.  Thanks to both
25 attorneys and thank you to Mr. Branch.  You're going to

Robert Branch    2023-FRS-00026    February 13, 2024

---

Page 93

1  remain, of course, part of our hearing as a party.
2          WITNESS:  Yes, ma'am.
3          JUDGE DONALDSON:    But as I understand, your
4  testimony is complete at this point.  There are instances
5  where someone is re-called to testify under certain
6  conditions.  We'll just have to see what happens there, but
7  for now and maybe for the duration of the hearing, your
8  testimony is over.  Thank you for your attention to
9  everyone's questions including my own.
10         WITNESS:  Thank you, Your Honor.
11         JUDGE DONALDSON:    Thank you.  Mr. Sorey, Mr.
12 Ferguson, we're going to take a short break, but who is the
13 next witness?
14         MR. SOREY:    Chris Day.
15         JUDGE DONALDSON:    Chris Day is?  Okay and then
16 we have a witness that needs to be completed by 4:00 p.m.
17 Central and that is Mr. Clark?
18         MR. SOREY:    Yes, ma'am.  We'll take his next.
19         JUDGE DONALDSON:    Okay.
20         MR. SOREY:    I could do him next if you'd like.
21         JUDGE DONALDSON:    It's --- when you have
22 planned for the witnesses ---
23         MR. SOREY:    It doesn't make any difference to
24 me.
25         JUDGE DONALDSON:    Okay.  Could ---

---

Page 94

1          MR. SOREY:    I will just switch pages.
2          JUDGE DONALDSON:    Okay.  Will Mr. Clark be
3  available sooner then?
4          MS. FITZKE:    He would be.  We thought Mr. Day
5  was being called next so Mr. Clark just left to get a
6  sandwich, I understand, but he is in the building here.
7          JUDGE DONALDSON:    Okay.  We're going to take a
8  break anyway.  So, let's see if you can have him ---
9          MS. FITZKE:    All right.
10         JUDGE DONALDSON:    -- take the place and go
11 next, but let's take a little bit longer break.  It's
12 11:43.  Let's start at 12:00 noon.  Not a terribly long
13 break, but a little bit longer, but please stay on the
14 meeting and mute yourselves and we'll go off the record.
15         (Off the record at 11:44 a.m., CST)
16         (On the record at 12:02 p.m., CST)
17         JUDGE DONALDSON:    Thank you for joining us, Mr.
18 Clark.  You are our next witness in a proceeding under the
19 whistleblower protection provisions of the Federal Rail
20 Safety Act brought by Robert Branch against his former
21 employer, Illinois Central.  Your testimony will be under
22 oath if you take the oath.  Would you please raise your
23 right hand?
24 //
25 //

---

Page 95

1  Whereupon,
2                  WADE CLARK
3  having been duly sworn, was called as a witness herein and
4  was examined and testified as follows:
5          WITNESS:  Yes.
6          JUDGE DONALDSON:    All right.  Thank you very
7  much.  So, the direct examination will be by Mr. Soley at
8  first and it says James Ferguson, guest, but Mr. Soley has
9  ---
10         MR. SOLEY:    Yes, I'm here.
11         JUDGE DONALDSON:    This is a --- yes, I think I
12 need to correct something on the --- go ahead, Ms. Fitzke.
13         MS. FITZKE:    Oh, I just wanted for purposes of
14 everyone to clarify that Mr. Clark is not able to see the
15 meeting on the computer in front of him.  So, if it looks
16 like he's staring off, we have a large screen in the room
17 that is displaying the Zoom so he's just trying to see.  I
18 just noticed that it's a bit at least on my screen a bit of
19 an awkward setup.  So, I just wanted to make sure you all
20 know as to why he's doing that.
21         JUDGE DONALDSON:    Yes, I appreciate that
22 explanation.  I often do the same myself with certain
23 setups and I take the benefit of a very large screen I
24 sometimes have and I'm usually looking over there so I can
25 see everyone really well.  So, that's fine.  You don't have

---

Page 96

1  to --- you can do whatever you need to do to have the best
2  visual of the hearing, Mr. Clark.  All right, so with that
3  said, Mr. Sorey, you can proceed.
4          MR. SOREY:    Thank you, Your Honor.  Mr. Clark,
5  I apologize for taking you away from your sandwich, but
6  we're trying to get you out of here early so we thought
7  you'd appreciate that more than the sandwich.
8                  DIRECT EXAMINATION
9  BY MR. SOREY:
10    Q    All right, Mr. Clark, in June of 2022, you were
11 senior manager of production for Illinois Central Railway,
12 correct?
13    A    Correct.
14    Q    And Mr. Chris Day directly reported to you in
15 June of 2022, did he not?
16    A    Yes.
17    Q    All right.  Now, the Illinois Central Railroad
18 has a workplace violence policy, does it not?
19    A    Yes.
20    Q    Does it apply to all employees of the Illinois
21 Central including supervisors and union employees?
22    A    Yes.
23    Q    What is your definition of self-defense?
24    A    Well, my definition of self-defense would be a
25 position of retreat so covering up if you're being attacked

---

Robert Branch    2023-FRS-00026    February 13, 2024

Page 97

1  or trying to move yourself away, running or walking away
2  from a situation, asking for help from any bystanders. I'd
3  say that would be my definition of self-defense.
4      Q    So, you would have the person to retreat. Is
5  that correct?
6      A    State that again.
7      Q    So, you would have a person involved in an
8  altercation to retreat?
9      A    Yes.
10     Q    Meaning leave the scene?
11     A    Retreat or cover up or walk away, yell for help.
12 Those would be the things that I would expect.
13     Q    If you had been in Mr. Branch's situation as you
14 discussed earlier and we discussed in your deposition, what
15 would you have done?
16     A    I would have done exactly what I just said. I
17 would have took a position of retreat, whether that be
18 cover myself up to ask for help, try to get away from the
19 situation he was in.
20     Q    Okay. Were you aware that this altercation took
21 place in the parking lot of a hotel?
22     A    Yes.
23     Q    And were you aware that there was a barbecue pit
24 and a truck directly behind Mr. Branch at the time he was
25 pushed down?

Page 98

1      A    No.
2      Q    Okay. Were you aware that there were other cars
3  in the parking lot and a fence that joined the parking lot?
4      MS. FITZKE:    Objection. States evidence not in
5  record.
6      WITNESS:    No.
7      MR. SOREY:    Okay.
8      JUDGE DONALDSON:    Hold on just a second. So,
9  you're saying the --- to the record already. I'm going to
10 sustain the objection and raise it as necessary.
11     MR. SOREY:    Thank you.
12 BY MR. SOREY:
13     Q    Mr. Clark, did you participate in the ruling to
14 fire Mr. Branch as part of the disciplinary panel?
15     A    Yes.
16     Q    Okay. Who all was on that disciplinary panel?
17     A    I'm not exactly sure. I know of a few people
18 that were on it. I don't know if it encompasses the entire
19 panel, but I know I read the transcript. I gave my
20 recommendation and then I believe Tom Hilliard, Thomas
21 Sullivan and I'm not exactly sure who the rest of the
22 people are on the panel, but I think there's maybe one or
23 two other people, but I'm not sure who they are.
24     Q    So, you think it was more than three people on
25 the disciplinary panel?

Page 99

1      A    I'm not sure. Yes, I would think it's more than
2  two. I know of two of them.
3      Q    Okay. Now, Mr. Patrick Crain is the person that
4  contacted you to tell you that the panel was moving forward
5  to fire Mr. Branch, was he not?
6      A    Yes.
7      Q    Now, in Mr. Branch's termination letter, it
8  stated, "You" and that's referring to Mr. Branch "were
9  allegedly involved in a verbal and a physical altercation.
10 Is that correct?
11     MS. FITZKE:    Objection. It misstates the
12 evidence. The evidence misstates the letter.
13     JUDGE DONALDSON:    Are you quoting directly from
14 the letter? What's your response to that, Mr. Sorey?
15     MR. SOREY:    My response is that the letter had
16 it in there. That's the reason I read it to him. That's
17 the reason I was asking him.
18     JUDGE DONALDSON:    Restate your question,
19 please. Can you restate your question?
20 BY MR. SOREY:
21     Q    In Mr. Branch's termination letter, it stated
22 that Mr. Branch was allegedly involved in a verbal and
23 physical altercation. Is that correct?
24     A    Yes.
25     JUDGE DONALDSON:    Did you have an objections to

Page 100

1  that, Ms. Fitzke?
2      MS. FITZKE:    No, that is a different question.
3  It restates the investigation notice where it was alleged
4  that they were involved in a verbal and physical
5  altercation which is what the termination letter reads.
6  So, I don't have an objection to that.
7      JUDGE DONALDSON:    All right and the witness,
8  Mr. Clark, answered yes to that question?
9      WITNESS:    Yes.
10     JUDGE DONALDSON:    Okay. Thank you.
11 BY MR. SOREY:
12     Q    Mr. Clark, you said that you gathered your
13 information of a verbal altercation from the transcript.
14 Is that correct?
15     A    No, I don't believe so.
16     Q    You don't believe ---
17     A    Mostly physical.
18     MR. SOREY:    Okay. Well, I don't understand
19 your answer. I'm sorry.
20     WITNESS:    Okay. Please restate the question.
21 I don't really understand what you're asking.
22 BY MR. SOREY:
23     Q    Okay. You stated in your deposition that you
24 gathered your information of a verbal altercation from the
25 transcript. Is that correct or not?

Robert Branch    2023-FRS-00026    February 13, 2024

Page 101

1    A    I gathered my information of a verbal and
2  physical altercation from the transcript.
3        MR. SOREY:    Okay, thank you.
4    BY MR. SOREY:
5    Q    And in your reasoning to terminate Mr. Branch,
6  part of it was involved, part of it was surrounded what you
7  perceived as a verbal confrontation.  Is that correct?
8    A    Yes.
9    Q    Okay.  Do you know who Patrick Jones is, Mr.
10 Clark?
11   A    Yes.
12   Q    Who is he?
13   A    He's currently the senior manager of production
14 for the Southern Region.
15   Q    Did Mr. Jones work for you in June of 2022?
16   A    No, sir.
17   Q    Has he worked for you at any time?
18   A    No, sir.
19       MR. SOREY:    Okay.  Thank you.
20   BY MR. SOREY:
21   Q    Now, we had asked you earlier whether or not you
22 were made aware that Mr. Christopher Day had reported an
23 altercation for him in an Illinois bar to Patrick Crain and
24 Patrick Jones.  Do either of these men or did either of
25 these men report to you at that time?

Page 102

1    A    No, they did not.
2    Q    What is your relationship to Patrick Crain?
3    A    Patrick Crain is the Labor Relations manager so
4  he doesn't work for me, but he works in the LR department.
5    Q    Would it be Mr. Crain's duty to report to you any
6  instances of altercations of employees that worked under
7  you at the time?
8    A    I don't know anything about ---
9        MS. FITZKE:    Well ---
10       JUDGE DONALDSON:    Just a moment.  Just a
11 moment.
12       MS. FITZKE:    Yes.  I need to object that this
13 is cumulative.  It's also irrelevant.  He's already
14 testified that these gentlemen didn't report to him and
15 weren't in his supervisory chain at the time so pretty far
16 field.  Immaterial and irrelevant.
17       JUDGE DONALDSON:    Your response, Mr. Sorey?
18       MR. SOREY:    He had stated that Patrick Crain
19 had told him about Mr. Branch's altercation and I was
20 asking him if he had Mr. Patrick Crain report to him Mr.
21 Christopher Day's altercation.
22       JUDGE DONALDSON:    I'm going to overrule it and
23 let's get the answer to that question and we'll just take
24 it one question at a time.
25       MR. SOREY:    Okay.

Page 103

1        JUDGE DONALDSON:    Mr. Clark, do you recall the
2  question?
3        WITNESS:    Can you ask again, please?
4        MR. SOREY:    Sure.
5    BY MR. SOREY:
6    Q    Patrick Crain reported to you Mr. Branch's
7  participation or the situation of the altercation.  Did
8  Patrick Crain ever report to you an altercation on behalf
9  of Christopher Day?
10   A    No.
11   Q    Okay.  Now, would Mr. Crain normally report to
12 you any of your employees, supervisors or union people that
13 were involved in altercations?
14       MS. FITZKE:    Yes, I'm going to object.
15 Immaterial and irrelevant.  Mr. Clark has already testified
16 that Mr. Day did not report to him at that time or at the
17 time of the incident Mr. Sorey is asking about.
18       JUDGE DONALDSON:    Mr. Sorey, your response?
19       MR. SOREY:    The point I'm trying to get to,
20 Your Honor, is that Christopher Day was involved in an
21 altercation and reported it, he says, and we'll find it
22 later in his deposition that he reported it to Patrick
23 Jones and Patrick Crain.  It appears that Patrick Crain
24 never reported this altercation to Mr. Clark and I'm
25 attempting to find out what the difference is between a

Page 104

1  supervisor being reported and a union man being reported.
2        JUDGE DONALDSON:    All right.  I'm going to
3  overrule it.  I do feel like we're --- it's relevant so
4  it's not totally immaterial, but let's --- maybe approach
5  it from a different way to get it that difference that
6  you're trying to understand.
7        MS. FITZKE:    Well ---
8        MR. SOREY:    Go ahead.
9        JUDGE DONALDSON:    You look like you're frozen
10 for a second, but just approach it in a different way.
11   BY MR. SOREY:
12   Q    Mr. Clark, when altercations take place on the
13 railroad within your division and at the time you were
14 production supervisor for Illinois Central for the United
15 States, did the Labor Relations Department normally report
16 these altercations to you?
17   A    No, it would be a situation where if anything
18 were to come up like this, it would be us reporting it to
19 Labor Relations.
20   Q    Okay.  Now, I believe you had advised us earlier
21 or at least in your deposition, you stated that the
22 workplace violence policy applied to all the supervisors
23 and all the labor people for the Illinois Central Railroad.
24 Is that correct?
25   A    Yes.

Robert Branch    2023-FRS-00026    February 13, 2024

Page 105

1    Q    Do you know of any reason why Mr. Day would not
2  have been brought before a disciplinary panel and have an
3  investigation like Mr. Branch for his altercation?
4         MS. FITZKE:    Objection. Foundation. He hasn't
5  established that this witness understands or even knows
6  what he's talking about.  The witness indicated it was
7  never reported to him.
8         JUDGE DONALDSON:    I'm going to sustain that,
9  Mr. Sorey.  I haven't heard a foundation yet.
10        MR. SOREY:    Okay.
11    BY MR. SOREY:
12    Q    Are all employees supposed to be brought before a
13  disciplinary panel or have an investigation if they're
14  involved in an altercation?
15    A    What type of altercation?
16    Q    A fight.
17    A    Fight?
18    Q    A fight, F-I-G-H-T.
19    A    Physical in nature?
20    Q    I don't know of an unphysical fight.
21    A    Okay.
22        JUDGE DONALDSON:    You're asking him about a
23  physical altercation, Mr. Sorey?
24        MR. SOREY:    Yes.
25        JUDGE DONALDSON:    Okay.

Page 106

1         WITNESS:    I would say if we had knowledge of
2  the event and then yes, there would be an investigation if
3  there was a physical altercation per the workplace violence
4  rules that we would have an investigation.
5         MR. SOREY:    Okay.  That's all the questions I
6  have.
7         JUDGE DONALDSON:    Who is going to conduct the
8  examination on behalf of Respondent, Ms. Fitzke?
9         MS. FITZKE:    I will.  Thank you.
10        JUDGE DONALDSON:    All right.
11             CROSS EXSAMINATION
12    BY MS. FITZKE:
13    Q    Mr. Clark, if the information received is that a
14  vendor head butts one of your managers after hours in a bar
15  and our manager does not respond physically, is there a
16  reason to investigate further?
17    A    No, there wouldn't be in my opinion.  If he
18  didn't respond or he acted in a position of retreat that
19  there would be an investigation based at least on the right
20  thing.
21    Q    And the formal investigation hearing process that
22  we were talking about, I guess you weren't in the room, but
23  Mr. Branch went through as part of his process that
24  generated the process that he read, does that same process
25  apply to management?

Page 107

1    A    I do not know how the process goes.
2    Q    With respect to Mr. Branch's investigation
3  hearing, did you read the entire transcript?
4    A    Yes.
5    Q    Did you review the exhibits that were part of the
6  record?
7    A    Yes.
8    Q    And when you --- did you consider --- what did
9  you consider in concluding that Mr. Branch had engaged in a
10  violation of the workplace violence policy?  In other
11  words, on what did you base your conclusion that he had
12  violated the policy?
13    A    So, I based my conclusion on a lot of the witness
14  testimony and the statements that concluded that Mr. Branch
15  had an active role in the fight, that he was not in a
16  position of retreat or trying to deescalate the situation
17  that he participated in the fight that witnesses had stated
18  he had struck the other employee.
19    Q    When reviewing incidents of workplace violence
20  and trying to determine the level of discipline to a
21  assess, how are cases of physical finding reviewed under
22  Illinois Central's discipline policy?
23    A    Well, the process would be to take statements.
24  Obviously, we've got to have a report and then we would
25  work through any witness statements, statements from anyone

Page 108

1  involved and then from there, we would have a discussion on
2  discipline level, go through an investigation and then
3  determine through the record what would be assessed.
4    Q    Did you consider anything outside of the
5  investigation hearing transcripts and exhibits in making
6  your recommendation that Mr. Branch should be terminated?
7    A    No.
8    Q    Before this incident, had you ever had any issues
9  with Mr. Melton of this nature in the past?
10    A    No.
11    Q    How about Mr. Branch?
12    A    No.
13    Q    In determining that this should be assessed as a
14  Level 4 violation which resulted in termination, did you
15  consider or could you consider Mr. Branch's work record?
16    A    Yes.
17    Q    And how did you consider it?
18    A    That was read into the record.
19    Q    Okay.  Outside of the fact that it made it in the
20  transcript, could you assess lesser discipline for physical
21  fighting because Mr. Branch had a clean work record before
22  this incident?
23    A    No.
24    Q    Why is that?
25    A    That's our discipline policy and our tolerance on

Robert Branch    2023-FRS-00026    February 13, 2024

Page 109

1  workplace violence.  It's termination.
2      Q    When did you first learn that there had been a
3  fight between these two gentlemen at the hotel on the night
4  of May 26?
5      A    I believe it was the following Tuesday.
6      Q    And who did you hear from?
7      A    Chris Day.
8      Q    What did Mr. Day tell you?
9      A    He sent me --- he called me and he told me he was
10 going to be sending me a statement from Mr. Branch so he
11 sent me that.  I read through it and Mr. Branch was
12 reporting a situation that occurred at the hotel.
13     Q    And what did you do after you received that
14 information?
15     A    I sent it to our LR department for advice for
16 handling.
17     Q    And when you sent it to the LR department for
18 advice and handling, did you tell them at the time that Mr.
19 Branch indicated that this other employee had punched him
20 and he fought back to defend himself?
21     A    Yes.
22     Q    And did you get the guidance you were looking for
23 from the LR department or Labor Relations?
24     A    Yes.
25     Q    And who in Labor Relations did you get advice

Page 110

1  from?
2      A    Patrick Crain.
3      Q    What did Mr. Crain tell you to do?
4      A    He told me that we needed to get statements from
5  any witnesses, statements from Mr. Branch and Mr. Melton
6  which we did and to get those in to him for review.
7      Q    Did you take the statements yourself?
8      A    No, I did not.
9      Q    And who did you receive them from?
10     A    I believe it was Chris Day.
11     Q    Did you read the statements when you received
12 them?
13     A    Yes.
14     Q    Did you have any role in determining that the
15 company should move forward with an investigation hearing
16 for both Mr. Melton and Mr. Branch?
17     A    I was involved in similar discussions about that,
18 yes.
19     Q    Did you have any disagreement as to whether Mr.
20 Branch should also be accused of rule violations in
21 conjunction with this incident?
22     A    No.
23     Q    Why was that?
24     A    Well, based on what I've read, they both were
25 active participants in the fight.

Page 111

1      Q    And that's based on what you read in the
2  statements you received?
3      A    (Witness nods head "yes")
4      Q    You have to answer out loud.
5      A    Yes.
6      Q    Thank you and then after you received and
7  reviewed the transcript and exhibits from the investigation
8  hearing, did you speak with anyone about it?
9      A    I did.
10     Q    And ---
11     A    Spoke with Patrick Crain.
12     Q    What do you recall discussing with Mr. Crain?
13     A    That the transcript would go in front of the
14 panel and they would come back with a recommendation.
15     Q    Do your recall providing your recommendation that
16 it should be a Level 4 violation, excuse me, a Level 4
17 discipline for violation for the workplace violence
18 prevention policy?
19     A    Yes.
20     Q    And did you communicate that recommendation to
21 Mr. Crain?
22     A    I did.
23     Q    Other than Mr. Crain, do you recall talking with
24 anyone else about that potential discipline or
25 investigation during or after the investigation was

Page 112

1  concluded?
2      A    No.
3      Q    Did you ever tell Mr. Day that he should convince
4  Mr. Branch not to move forward with the investigation?
5      A    No.
6      Q    Did anybody approach you and ask you to not move
7  forward with the investigation?
8      A    Yes.
9      Q    Who was that?
10     A    Mr. Branch's union.
11     Q    What did the union ask you to do?
12     A    Shortly after Mr. Branch had submitted the
13 statement to Chris Day about the altercation in the parking
14 lot, I was approached by the union, his representation,
15 that the gentlemen shook hands and squashed the issue and
16 they'd just like to move forward and go as if nothing
17 happened.
18     Q    And what did you tell the union at that time?
19     A    I told them that that was not going to happen
20 because we've already gotten the reports and we need to
21 investigate it.
22     Q    Are you aware of any other employees who have
23 engaged in a physical altercation at the railroad where
24 they were individuals who participated in a fight who did
25 not lose their jobs?

Robert Branch    2023-FRS-00026    February 13, 2024

Page 113

1    A    No.

2    Q    Would your recommendation that Mr. Branch be
3 terminated, would have been any different if Mr. Melton had
4 reported the fight or if you had found out about it from
5 another source?

6    A    No.

7    Q    Did Mr. Branch's statements that he viewed Mr.
8 Melton as a threat or that he feared him, did those
9 statements impact your decision with respect to the
10 termination of Mr. Branch's employment?

11    A    No.

12    MS. FITKE:    Thank you, Mr. Clark. I don't have
13 any other questions for you right now.

14    JUDGE DONALDSON:    Do you want me to go further,
15 Mr. Sorey?

16    MR. SOREY:    Yes, Your Honor. I do. I was
17 waiting to see if you had any questions.

18    JUDGE DONALDSON:    I don't this time. Thank
19 you. You go ahead.

20         REDIRECT EXAMINATION

21    BY MR. SOREY:

22    Q    Mr. Clark, in Ms. Fitzke's situation that she
23 gave you about a supervisor being head butted in a bar in
24 Illinois and reporting that he retreated or didn't
25 participate in it, does the railroad always take the word

Page 114

1 of the supervisors reporting about a fight?

2    MS. FITZKE:    Object to the form of the
3 question. Improper hypothetical.

4    JUDGE DONALDSON:    Overruled. Mr. Clark,
5 answer?

6    WITNESS:    I'm not sure. I've never been --- I
7 guess, Chris Day didn't work for me at the time, neither
8 did Mr. Crain so I had no way of even knowing about this
9 situation, I guess. So, I don't understand, I guess, fully
10 the question. The gentlemen didn't report to me at the
11 time.

12    BY MR. SOREY:

13    Q    Well, the reason I asked the question was because
14 Ms. Fitzke gave you that hypothetical, let's say, a few
15 minutes ago and you said well, you would take the word of
16 the supervisor and not have an investigation. Is that
17 correct?

18    A    I don't think so. I don't think I said that. I
19 think I said that if he acted in retreat, then there
20 wouldn't be a reason to have an investigation.

21    Q    Okay and normally the way you would make sure
22 that happened would be to have an investigation of the
23 facts and actually talk to the contractor too, would you
24 not?

25    A    I'm not exactly sure what took place. I don't

Page 115

1 know if that happened or if it did not happen because I
2 wasn't --- this gentleman didn't report to me at the time
3 so I was never made aware of that situation. So, honestly,
4 I don't know how it was handled. I'm not sure.

5    Q    Let's assume for the purpose of the question that
6 it took place, would you normally then have recommended
7 that an investigation take place to find out what occurred?

8    A    I would definitely have taken statements at the
9 time to find out exactly what the participants' roles were
10 and I'm not saying that didn't happen. I'm not sure, but
11 that's what I would have done.

12    Q    Okay. Is there a definition of self-defense in
13 the workplace violence policy?

14    A    No.

15    Q    Now, it he workplace violence policy talking
16 about penalties, it actually says up to and including
17 termination, does it not?

18    A    Yes.

19    Q    So, it indicates that you could give a lesser
20 penalty than termination if coming up with violations of
21 the workplace policy, correct?

22    A    Yes, I would probably read it that way.

23    Q    Now, where did you come up with a Level 4
24 statement? Where in IC literature does that appear?

25    A    I think it appears in the letter that you just

Page 116

1 phrased. It's up to termination so a Level 4 is
2 termination and that's what the severity of the incident
3 called for.

4    MR. SOREY:    Okay. That really wasn't my
5 question. My question, I guess I should have stated it
6 better and I'm sorry.

7    BY MR. SOREY:

8    Q    In what document do the definitions of Level 4
9 appear for IC?

10    A    There's a discipline policy that we have at IC.

11    Q    And it's in writing?

12    A    Yes, and it states violation level, rules,
13 violations and where they fall in that rubric of
14 discipline.

15    Q    And does it say that fighting is a Level 4
16 violation?

17    A    Yes.

18    Q    Okay and that's what you were basing your
19 decision on, not the workplace violence policy?

20    A    I think it had been fighting is tied to the
21 workplace violence, therefore, it comes as a Level 4.

22    Q    Does the workplace violence policy specifically
23 mention fighting?

24    A    When it says violence, I take that as fighting.

25    Q    Okay. So, you equate violence with fighting?

Robert Branch    2023-FRS-00026    February 13, 2024

Page 117

1    A    Yes.
2    Q    Okay, but the word itself, fighting, does not
3    appear in workplace violence?
4    A    No, I don't believe it does.
5         MR. SOREY:    Okay. Let me ask you one more
6    question here.
7    BY MR. SOREY:
8    Q    If Mr. Branch had not submitted a statement about
9    the altercation, IC would have never conducted an
10   investigation of the matter, would they?
11   A    I don't know. It would depend if anybody else
12   gave a statement or the hotel or anything like that. I
13   mean, if it was brought to our knowledge, then yes, I would
14   have had an investigation. I would have --- it wouldn't
15   have been something that we did not look into. We
16   definitely would have looked into that situation.
17   BY MR. SOREY:
18   Q    Under the workplace violence policy, are the
19   employees supposed to immediately report any type of
20   violent situation?
21   A    The employees are encouraged to.
22   Q    But not required?
23   A    Yes, I mean, it doesn't say they're required to.
24        MR. SOREY:    Okay. That's all the questions I
25   have, Your Honor.

Page 118

1         MS. FITZKE:    I don't have anything further.
2         JUDGE DONALDSON:    All right, thank you. Thank
3    you both. So, that mean --- I don't have any questions for
4    you, Mr. Clark. That means all the questions have been
5    presented. Can he be excused, not expected to be recalled?
6         MR. SOREY:    Yes, ma'am. I hope he makes his
7    flight.
8         JUDGE DONALDSON:    Okay. All right, thank you
9    very much for being on standby today and for joining us as
10   quickly as you could, Mr. Clark. I very much appreciate
11   your participation. I know you have other things to get to
12   so you're free to go.
13        WITNESS:    Thank you. Appreciate it.
14        JUDGE DONALDSON:    Thank you.
15        WITNESS:    Thanks.
16        JUDGE DONALDSON:    I think we can go ahead with
17   the next witness unless you expect that witness to be a
18   particularly long one. In that case, I would suggest
19   perhaps something of a lunch break before we reach the next
20   witness. So, Mr. Sorey, what are your thoughts on that?
21        MR. SOREY:    Your Honor, I tried to streamline
22   all my questions of these gentlemen and I anticipate most
23   of them to be about the length of Mr. Clark's deposition or
24   statement. I'm sorry.
25        JUDGE DONALDSON:    Yes. Okay, I would recommend

Page 119

1    that we just go ahead and go forward with that witness and
2    let's see how much ground we can cover in the next hour
3    before taking another break. Does that sound good to you
4    all?
5         MR. SOREY:    It's fine with me.
6         MS. FITZKE:    He's not here with me physically
7    so we'll see if we can get him onto the meeting as soon as
8    possible here.
9         JUDGE DONALDSON:    Okay. I do want to --- you
10   gave me an opening to say this, Mr. Sorey. I do usually
11   wait a little bit to make sure this is justified, but I do
12   want to say I am really encouraged by your efficiency, your
13   professionalism and your skill by both parties, all
14   representatives and I appreciate it. I think you are
15   moving at a pace that is very encouraging to reach the
16   witnesses. You're covering information that I would expect
17   to be covered. I don't feel like you're doing so at the
18   expense of doing so with the evidence you need to. I will
19   express my appreciation at this point because I don't have
20   any sense that that's going to change. So, I appreciate it
21   and keep up the good work.
22        MR. SOREY:    Your Honor, my wife told me
23   tomorrow is Valentine's and I better be through by tomorrow
24   night.
25        JUDGE DONALDSON:    Oh, well, I think she carries

Page 120

1    more weight than I do so I would listen to her. All right,
2    so we can take a break. Let's go off the record while we
3    get the next witness on board and make sure he can join us
4    within a few minutes.
5         (Off the record at 12:40 p.m., CST)
6         (On the record at 12:45 p.m., CST)
7         JUDGE DONALDSON:    Christopher Day is the next
8    witness in this proceeding. Mr. Day, you are testifying in
9    a proceeding by Mr. Robert Branch against Illinois Central
10   under whistleblower protection provisions of the Federal
11   Rail Safety Act which is overseen by the Department of
12   Labor and I'm the administrative law judge with the
13   Department of Labor in Louisiana. So, thank you for
14   joining our video hearing. I'm going to swear you in now.
15   Are you on a phone or a laptop?
16        MR. DAY:    I'm on my phone.
17        JUDGE DONALDSON:    Okay, good. So, that works
18   usually just as --- well, if you need any assistance
19   technically, if you need to see or hear someone or you have
20   any issues, let me know, but usually the phone works just
21   as well. You don't have any distractions or documents in
22   front of you?
23        MR. DAY:    No.
24        JUDGE DONALDSON:    Okay. Would you raise your
25   right hand?

Robert Branch    2023-FRS-00026    February 13, 2024

Page 121

1  Whereupon,
2                CHRISTOPHER DAY
3  having been duly sworn, was called as a witness herein and
4  was examined and testified as follows:
5          WITNESS:   I do.
6          JUDGE DONALDSON:   All right. Thank you very
7  much. Mr. Sorey, are you still handling the questioning?
8          MR. SOREY:   Yes, ma'am.
9          JUDGE DONALDSON:   All right. You can go ahead.
10                DIRECT EXAMINATION
11  BY MR. SOREY:
12     Q    Mr. Day, in June of 2022, you were the supervisor
13  for both IC production gangs, correct?
14     A    Yes, sir.
15     Q    Now, you found out from Mr. Branch about an
16  incident that took place between he and Mr. Melton. Is
17  that correct?
18     A    Yes.
19     Q    And Mr. Robert Branch wanted to report the
20  incident?
21     A    Yes.
22     Q    Okay. Did you try to discourage him from
23  reporting this incident?
24     A    I did not.
25     Q    Did you give him the option of not reporting it?

Page 122

1     A    I did.
2     Q    And why did you do that?
3     A    Because of the situation that had arose. I had
4  an idea of what the outcome may be for both employees.
5     Q    Okay. Now, Mr. Day, are you familiar with the IC
6  workplace violence policy?
7     A    Yes.
8     Q    Now, are the employees required under the
9  workplace violence policy to report any violence that they
10  know about?
11     A    Yes.
12     Q    Well, if they are required to report it, why did
13  you give Mr. Branch the option of not reporting it?
14     A    Because like I had just mentioned, I knew what
15  the outcome would be. I was trying to protect what was
16  going to happen to both employees. At the time, he had
17  told me that he wasn't sure if he wanted to go through with
18  it or not.
19     Q    Okay. Now, I believe you told us in your
20  deposition you believe the workplace violence policy
21  applies to all IC employees, correct?
22     A    Right.
23     Q    Now, at the time of the incident, IC was only
24  providing a per diem toward an employee's hotel room. Is
25  that correct?

Page 123

1     A    Yes, sir. That's correct.
2     Q    So, the employees had the right to check or stay
3  at any hotel they wanted to?
4     A    Yes, sir.
5     Q    Now, do you know whether or not the workplace
6  violence policy includes the definition of self-defense?
7     A    I do not honestly.
8     Q    Okay. What is your definition of self-defense?
9     A    My definition of self-defense is either to try
10  and deescalate the situation or walk away, but not
11  returning any sort of gesture or anything else towards
12  another employee.
13     Q    So, your idea of protecting yourself if you're
14  being struck is not striking back. Is that correct?
15     A    That's correct.
16     Q    Do you know whether Mr. Branch had any problems
17  at the IC as far as discipline or anything?
18     A    I did not at the time, no. As far as I knew, he
19  had nothing on his record.
20     Q    Had he ever been involved in any investigations
21  that you're aware of?
22     A    No, sir.
23     Q    Now, Mr. Day, in your deposition, we talked about
24  an off-duty altercation with a contractor at an Illinois
25  bar that you said took place a little over a year ago, did

Page 124

1  we not?
2     A    Yes, sir.
3     Q    And I asked if you reported this incident and
4  your answer was yes?
5     A    Yes.
6     Q    All right. I also asked you, "Did you undergo an
7  investigation for reporting this altercation" and what was
8  your answer?
9     A    No, I have not undergone an investigation.
10     Q    Why not?
11     A    Because technically it wasn't a fight. I wasn't
12  the aggressor. I didn't strike back. I deescalated the
13  situation and walked away.
14     Q    Okay. Are supervisors included in the workplace
15  violence policy?
16     A    I think everybody is included in the workplace
17  policy whether it's union or management.
18     Q    Okay. Now, you reported this altercation to Pat
19  Crain and Patrick Jones. Who are these gentlemen and what
20  positions were they in?
21     A    Patrick Crain was Labor Relations ---
22          JUDGE DONALDSON:   Can you just --- I think I
23  missed part of that question. I don't mean to cut you off,
24  Mr. Day, but I want to make sure the full question gets in
25  the record.

Page 125

1      MR. SOREY:   Okay.
2   BY MR. SOREY:
3      Q    Mr. Day, you reported this altercation to Pat
4   Crain and I believe he's with HR and Patrick Jones who I
5   believe was your supervisor.  Is that correct?
6      A    That's correct.
7      Q    Now, how did the railroad determine if you
8   truthfully reported this fight without an investigation?
9      A    I don't know they determined it.  I told them
10  about it and that's all --- I did my part as far as
11  reporting to my immediate supervisor.
12     Q    Do you know whether they took statements from the
13  contractor?
14     A    They did not.
15     Q    Do you know whether they took statements of the
16  railroad employees who were also in the bar?
17     A    No, I don't think they took statements from
18  anybody.
19     Q    Well, did you report to Mr. Jones and Mr. Crain
20  that there were other railroad employees in the bar at the
21  time the head butt took place?
22     A    I don't recall.
23     Q    Did Mr. Crain or Mr. Jones ever talk to you again
24  after you reported the incident to them about the incident?
25     A    No, they did not.

Page 126

1      MR. SOREY:    Okay.  I believe that's all the
2   questions I have, Your Honor.
3      JUDGE DONALDSON:    That's all you have, Mr.
4   Sorey?  Okay.
5      MR. SOREY:    Yes, ma'am.
6      JUDGE DONALDSON:    All right.  Ms. Fitzke, you
7   can go ahead.
8      MS. FITZKE:    Thank you.
9            CROSS EXAMINATION
10  BY MS. FITZKE:
11     Q    Mr. Day, what exactly did you report to your
12  supervisor and to Mr. Crain who I believe is in Labor
13  Relations?
14     A    I had told them that we were out at a place
15  eating and having a drink and me and the contractor  were
16  having a conversation and that out of the blue, he had
17  struck me with his face and head butted me.
18     Q    Did you ever tell them that you fought back?
19     A    I think I --- I'm not 100 percent sure, but I do
20  know I told them I did not strike back.  There's been
21  fighting and striking.  I never --- I told then I
22  deescalate it, I talk and I walk away.
23     Q    With respect to your communications with Mr.
24  Branch, tell me with respect to the May 26 incident how you
25  first learned that there had been an altercation between

Page 127

1   Mr. Branch and Mr. Melton?
2      A    Over the weekend of that holiday, I had received
3   a phone call from Chance Gardener who was a new supervisor
4   at the time and he had called me and told me that I needed
5   to call Mr. Robert Branch because of something that
6   happened not on duty, off duty.  He said, "Talk to him,
7   call him, see what the situation is."  I had called Mr.
8   Branch and that's why I kind of had learned just the
9   general knowledge that there was an altercation between him
10  and another employee.
11     Q    And did Mr. Gardener tell you what the
12  altercation was or why you needed to give Mr. Branch a call
13  specifically?
14     A    No, he did not.
15     Q    And when you spoke with Mr. Branch, do you recall
16  when it was over the course of that weekend that you spoke
17  with Mr. Branch?
18     A    I believe it was on that Sunday before the
19  holiday.
20     Q    And what, if --- can you tell us the best you can
21  recall what Mr. Branch reported to you at that time about
22  the incident?
23     A    He had told me that he and another employee had
24  gotten into an argument, had an altercation and that he was
25  thinking on reporting it.

Page 128

1      Q    And did he provide any other information or
2   details to you about the incident at that time?
3      A    No.
4      Q    And we've heard testimony and seen text messages
5   indicating that you asked Mr. Branch to write a statement.
6   When did you do that?  Was that the same phone call or a
7   different phone call?
8      A    I think it was on that Monday on the actual
9   holiday because I remember talking to him and there was
10  nobody in the office at the time.  So, there was nobody
11  that I could really talk to.
12     Q    So, it sounds like you talked to him on Sunday
13  and then you talked to him again on Monday.  Is that right?
14     A    Yes.
15     Q    Okay and on Monday, tell us what you can recall
16  about your conversation with Mr. Branch.
17     A    I know we had talked about it.  I can't remember
18  if we had gotten cut off.  I asked him to write a
19  statement.  He had sent me the statement via text message.
20  I had read through it and that was as far as it went for
21  that day.
22     Q    When you read through the statement, was there
23  anything that you noted in the statement that was different
24  or that you thought struck you as different from what Mr.
25  Branch told you on the telephone?

Robert Branch    2023-FRS-00026    February 13, 2024

Page 129

1    A    Well, he didn't give me the full story on the
2  telephone.  He only had given me kind of the gist of what
3  happened.  It was when I read that statement that I knew
4  they had gotten into a fight.
5    Q    So, was the statement the first time that you
6  understood that Mr. Branch was a participant in the
7  physical altercation?
8    A    Yes.
9    Q    Now, after you received the statement from Mr.
10  Branch, did you speak to him again?
11    A    I don't recall.
12    Q    And after you received the statement from Mr.
13  Branch, what did you do next with respect to reporting it
14  within the company, the incident within the company?
15    A    The very next day, I talked to Mr. Branch again
16  because as I mentioned, he was still undecided actually if
17  he wanted to report it or not report it, but after I had
18  gotten a statement from him the day before, I had
19  everything I needed or at least I thought that I needed
20  because I had never encountered a situation like this
21  before.  After I had talked to him, I kind of talked to the
22  union and after he gave me the green light to go ahead and
23  say that he wanted to report it, I went ahead and gave it
24  to my immediate senior manager.
25    Q    And who is your immediate senior manager?

Page 130

1    A    Mr. Wade Clark.
2    Q    What, if anything, did Mr. Clark say to you about
3  the incident or the statement you had provided to him?
4    A    He had wanted me to start collecting statements
5  from other employees that were around the area.
6    Q    Did Mr. Clark ever do or say anything to you that
7  indicated he didn't want you to proceed with the matter?
8    A    No, he did not.
9    Q    Did you obtain the statements that Mr. Clark
10  asked you to get?
11    A    Yes.
12    Q    And how did you go about determining which
13  statements to collect?
14    A    It was everybody that Mr. Robert Branch had
15  listed at his statement that he had wrote as witnesses.
16    Q    Did you read those statements?
17    A    I did not.
18    Q    What did you do with them?
19    A    I wound up collecting them.  I scanned them all
20  into a pdf file and sent them off for examination for what
21  was going to happen later on.
22        MS. FITZKE:    I'm sorry.  That might have been a
23  poor question on my part.
24    BY MS. FITZKE:
25    Q    Who did you send them to?

Page 131

1    A    I believe I sent them to Wade Clark and Mr. Pat
2  Crain.
3    Q    After you sent off the statements, did you have
4  any further involvement in determining whether the
5  employees would be called to investigation for potential
6  rule violations and in particular, whether Mr. Branch would
7  be called for investigation for potential rule violations?
8    A    No, I had no further involvement on that.
9    Q    When you spoke with Mr. Branch over the course of
10  that Memorial Day weekend, did he ever at any time ever
11  give you any indication that any of the --- that Mr. Melton
12  claimed to have a firearm with him at the hotel?
13    A    No, he did not.
14    Q    Have you ever heard that before, sir?
15    A    I have not.  Not until you said it right now.
16    Q    Did you play any role, Mr. Day, in terms of
17  determining after the investigation hearing was concluded
18  in terms of determining whether discipline or termination
19  would be assessed for Mr. Melton or Mr. Branch?
20    A    I did not, no.
21    Q    Did anybody ever ask your opinion as to what
22  should happen with these two?
23    A    No, they did not.
24        MS. FITZKE:    Thank you, sir.  I don't have any
25  other questions for you right now.

Page 132

1        JUDGE DONALDSON:    I think you cut out a little
2  bit.  Do you have any further questions, Ms. Fitzke?
3        MS. FITZKE:    Oh, apologies.  No further
4  questions right now.
5        JUDGE DONALDSON:    Okay.  I thought that's what
6  you said.  All right, anything further, Mr. Sorey?
7        MR. SOREY:    Yes, ma'am.
8              REDIRECT EXAMINATION
9    BY MR. SOREY:
10    Q    Mr. Day, you said you were meeting with the
11  contractor when out of the blue, you were struck by the
12  contractor.  Is that correct?
13    A    Yes, we were eating and having a drink, yes.
14    Q    Okay and basically, you were put in the same
15  situation Mr. Branch was put in, were you not?
16    A    I don't believe that was the same situation, no.
17    Q    How do you feel the situation was different?
18    A    Because I didn't return what had happened to me.
19    Q    Okay and that's what you reported to the
20  railroad?
21    A    Yes, sir.
22        MR. SOREY:    Okay.  That's all the questions I
23  have.
24        JUDGE DONALDSON:    All right.  I don't have any
25  questions for you, Mr. Day, so believe it or not, your

Robert Branch    2023-FRS-00026    February 13, 2024

---

**Page 133**

1  testimony is concluded.  That was very efficient as the
2  attorneys have been all day so I appreciate that.  Mr. Day
3  or to the attorneys, can he be excused at least at this
4  time, you're not expecting to ask him to return?
5        MR. SOREY:    It's fine with us.
6        MS. FITZKE:    Yes.
7        JUDGE DONALDSON:    All right, on both parts.
8  All right, thank you very much, Mr. Day, for joining us and
9  for your attention to all of the questions that the
10  attorneys had for you.  We're going to excuse you and hope
11  you have a good rest of your day.
12        WITNESS:    Okay.  I hope you all have a good day
13  too.  Thank you.
14        JUDGE DONALDSON:    Thank you very much.  Who's
15  the next witness, Mr. Sorey?
16        MR. SOREY:    I don't have my list.  Who do you
17  have, Susan?
18        MS. FITZKE:    I have Mr. Duane Spears next on
19  the order you gave us this morning.
20        MR. SOREY:    That's fine.
21        JUDGE DONALDSON:    I want to take a break.  I'm
22  not going to do a longer lunch break unless someone feels
23  it's really necessary.  Speak up now.  What I'd like to do
24  is since I think we are moving at a good pace, I don't know
25  who --- let's talk about this right now.  Based on how it's

---

**Page 134**

1  going so far, who do you ideally want to have testify this
2  afternoon and then who would we start with tomorrow?  So,
3  Mr. Sorey, we have Mr. Spears next.  Is there anybody else
4  you wanted to reach today?
5        MR. SOREY:    Probably Patrick Crain.
6        JUDGE DONALDSON:    Okay.
7        MR. SOREY:    We almost could finish today to be
8  honest.
9        JUDGE DONALDSON:    If you would like to try to
10  do that, we certainly can.
11        MR. SOREY:    What do you think, Susan?
12        MS. FITZKE:    I have a sense that, for example,
13  Tom Hilliard will be very short, but some of the other HR
14  and Labor Relations gentlemen will have a little bit more
15  information I think to share.  So, I do expect we'll be
16  done by lunch tomorrow given the way this is proceeding,
17  but I'm not quite sure that we're going to finish today.
18  Believe me, I would also like to catch a plane today, but I
19  don't think that's going to happen.
20        JUDGE DONALDSON:    Okay.  All right, so let's
21  take a 20-minute break till 1:25 p.m. Central.  When we
22  return, we'll start with Mr. Spears and then when he's
23  done, we'll just talk about how we want to handle --- just
24  think about how you want to handle the rest of the
25  witnesses and I'll see you back in 20 minutes.

---

**Page 135**

1        MR. SOREY:    Thank you.
2        MS. FITZKE:    Thank you.
3        JUDGE DONALDSON:    Thank you.
4        (Off the record at 1:05 p.m., CST)
5        (On the record at 1:27 p.m., CST)
6        JUDGE DONALDSON:    Okay.  Mr. Spears, you've
7  heard all the instructions and you see how the proceeding
8  is going so unless you have any questions, we're going to
9  go right into your testimony.  Could you raise your right
10  hand for me, please?
11  Whereupon,
12                DUANE SPEARS
13  having been duly sworn, was called as a witness herein and
14  was examined and testified as follows:
15        WITNESS:    Yes.
16        JUDGE DONALDSON:    Okay.  All right, so Mr.
17  Sorey, go ahead, please.
18        MR. SOREY:    Thank you, Your Honor.
19                DIRECT EXAMINATION
20  BY MR. SOREY:
21     Q    Mr. Spears, in June of 2022, you were senior
22  Human Resources manager for the IC Railroad?
23     A    That is correct.
24     Q    Do you know who was on Mr. Branch's disciplinary
25  panel?

---

**Page 136**

1     A    No, I do not.
2        JUDGE DONALDSON:    Can you say that again?
3        MR. SOREY:    Yes.
4        JUDGE DONALDSON:    The question cut out for me.
5        MR. SOREY:    Okay.  I asked him who was on Mr.
6  Branch's disciplinary panel.
7        WITNESS:    Oh, I misunderstood your question.  I
8  thought you said district.  When you say disciplinary ---
9        JUDGE DONALDSON:    Can we hold on for just a
10  moment?  I'm so sorry to interrupt you both, but I need to
11  make sure that Renee is hearing everything because this is
12  --- I'm getting significant gaps in the questions and
13  answers so far.
14        COURT REPORTER:    Yes, Your Honor.  I'm hearing
15  clearly.
16        JUDGE DONALDSON:    Oh, good.  So, it's just me.
17  Sorry about that.  I hear it too.
18        COURT REPORTER:    And I don't know if it's
19  intentional, but you are not on screen.
20        JUDGE DONALDSON:    I'm not on screen?
21        MR. SOREY:    That's why I was asking what
22  happened to the judge.
23        MS. FITZKE:    Yes, Judge, their video is off.
24        JUDGE DONALDSON:    Yes and I have it activated.
25  I have my camera activated.  If you all will hold tight a

---

Robert Branch    2023-FRS-00026    February 13, 2024

Page 137

1  second, I'm going to leave and come back into the meeting
2  and see if that fixes the feed issues on my end.  I'll be
3  right back.  Okay, that should fix it.  That needed to be
4  done.  We're on the record and sorry about that
5  interruption, Mr. Sorey.  Can you just start again?
6       MR. SOREY:  Sure.  No problem.
7  BY MR. SOREY:
8       Q    Mr. Spears, do you know who was on Mr. Branch's
9  disciplinary panel?
10      A    With respect to this particular case, it was
11 myself, Tom Sullivan and Tom Hilliard.
12      Q    And Patrick Crain was not on that panel, was he?
13      A    That is correct.
14      Q    Okay.  Now, what is your definition of self-
15 defense?
16      A    Self-defense would be a situation where there's
17 retreat.  There is not engaged, further engagement, not
18 escalating the situation, trying to move away from the
19 situation.
20      MR. SOREY:  Okay, thank you.
21 BY MR. SOREY:
22      Q    Now, do you feel Mr. Branch was guilty of
23 fighting because he did not walk away?  Is that correct?
24      A    In the transcript that I read, there was no
25 evidence of him trying to deescalate the situation.

Page 138

1       Q    Okay and that included walking away?
2       A    It might, it might not have included walking
3  away, but he did not deescalate the situation.
4       Q    And how would you try to prevent the fight from
5  going further or deescalate?
6       A    Well, to your point, he could have walked away.
7  He could have gone into a defensive posture, but he did not
8  have to continue to swing or make contact with Mr. Melton.
9       Q    Okay.  Now, do you know the setup that was around
10 the parking lot where these two gentlemen were located?
11      A    I don't know the specific setup.
12      Q    Okay.  That didn't come up in the hearing then?
13      A    It's not on the transcript.
14      Q    Okay.  Was Mr. Branch's past good working history
15 discussed at all by the disciplinary panel?
16      A    I don't recall whether or not Mr. Branch's or Mr.
17 Melton's past history was brought up.
18      Q    Okay.  That's not something that was even
19 considered in deciding whether to terminate an employee or
20 not?
21      A    In this particular case, what we're facing here
22 is a Level 4 violation and it would not be something that
23 would be important.  A Level 4 violation is very serious
24 and if proven, would lead to termination.
25      Q    Is fighting an absolute dismissal offense?

Page 139

1       A    It has generally been the practice in my
2  experience that it is a dismissible offense.
3       Q    Now, that I see workplace violence policy uses
4  the terms up to and including dismissal, does it not?
5       A    I do recall that is what it states.
6       Q    And that would indicate that there are penalties
7  other than termination or dismissal, correct?
8       A    There are penalties other than dismissal.
9  However, there are also situations that fall within that
10 policy that would help make that determination.
11      Q    Okay.  Is fighting mentioned at all in the
12 workplace violence policy?
13      A    I'm not sure.  It does reference causing harm to
14 another person.
15      Q    Is there a definition for self-defense in the
16 workplace violence policy?
17      A    I do not believe there is a definition in the
18 policy itself.
19      Q    Do you know why?
20      A    I did not write the policy so no, I do not know
21 why.
22      Q    Now, as senior officer as Human Resources
23 manager, wouldn't that give you a position to make comments
24 about the workplace violence policy?
25      A    Again, my role in this particular case was to

Page 140

1  review the transcript and the exhibits, present it during
2  the hearing.  I did not go outside of that.  That is not my
3  role.  It is simply to review the transcript and determine
4  whether or not based on the evidence presented that a
5  violation of policy occurred.
6       Q    Okay, then you did not consider it self-defense?
7       A    I'm sorry.  Could you repeat the question again?
8       Q    I said then you did not consider self-defense?
9       A    What we did was we looked at all the situation.
10 The situation that came to us was there's a recommendation
11 for a Level 4 violation for fighting.  Within that policy,
12 I mean, the transcript is reviewed and we sort of start
13 there and then we look at mitigating circumstances for both
14 employees.  With Mr. Melton, it was obvious that he made
15 the first physical contact.  That sort of put him in the
16 termination box if you would say.  After that, we clearly
17 looked at the situation that existed with Mr. Branch and
18 this was not an easy decision.  We recognize that the --- I
19 should say the discipline review panel recognized that he
20 did not start this situation.  Apparently, it was started
21 on the physical with Mr. Melton.  So, we considered all
22 that.  We looked at the witness statements that were
23 presented in the transcript as one of the exhibits.  We
24 looked at the testimony of Mr. Branch as well as Mr. Melton
25 as well as anyone who was brought forth as a witness and we

Robert Branch    2023-FRS-00026    February 13, 2024

---

**Page 141**

1  determined that Mr. Branch did engage in that situation
2  which led to our conclusion that he had violated --- this
3  was a Level 4 violation.
4      Q    Now, Mr. Spears, I believe you just said that
5  this came with a recommendation for a Level 4 termination.
6  Who gave the recommendation to you all?
7      A    The department.  I do not remember specifically
8  and it wasn't for a Level 4.  It was for a Level 4
9  violation, not a Level 4 termination.
10     Q    Well, aren't they the same?
11     A    Not necessarily.
12     Q    When can you get a Level 4 violation and it not
13  be termination?
14     A    You're absolutely right with respect to a Level 4
15  violation.  However, that's not the only type of violation
16  that we encounter.  That could lead to an employee's
17  termination.
18     Q    From whom did the recommendation for the Level 4
19  violation come from?  You said the department.  What
20  department are we talking about?
21     A    That was the department that he worked for and
22  that would be the Engineering Department.
23     Q    So, the Engineering, Department recommended that
24  this be a Level 4 violation?
25     A    The case came to the discipline review panel as a

---

**Page 142**

1  Level 4 violation.
2      Q    Okay and the case was not turned over to you all
3  until the hearing was over?
4      A    That is correct.
5      Q    So, when you get the transcript, the department
6  tells you, "Hey, handle this as a Level 4 violation"?
7      A    That's not quite what happened.  The transcript
8  and exhibits come to us.  The department will say, "We
9  believe this is a Level 4 violation" and our job is to go
10 through the transcript, look at the exhibits and determine
11 whether or not the information contained in the transcript
12 supports a Level 4 violation.
13     Q    All right.  Do we know or do you not know who
14 from the Department of Engineering recommended it be looked
15 at as a Level 4 violation?
16     A    I don't remember specifically how that came to
17 us.
18     Q    Now, if you know that fighting equals a Level 4
19 violation, then why even have a workplace violence policy?
20     A    I'm sorry.  I don't understand our question.
21     Q    Okay.  What is the purpose of having the
22 workplace violence policy when you say fighting equals a
23 Level 4 termination?
24     A    I can't tell you.  I can only speculate that the
25 policy itself is to let all the employees know what will be

---

**Page 143**

1  and what will not be tolerated in the company.
2      Q    Okay.  Where does a Level 4 violation appear in
3  documents at the Illinois Central Railroad?
4      A    It appears as causing harm in the discipline
5  review policy.
6      Q    Okay and are you talking about in the workplace
7  violence policy?
8      A    No, I'm not.  I'm talking about the discipline
9  review policy.  The discipline policy, I should say.
10     Q    Does it specifically state fighting equals Level
11 4 termination?
12     A    It references causing harm.
13     Q    Okay.  So, if you cause harm, what is the
14 definition of causing harm?
15     A    I don't have a specific definition for causing
16 harm.  It could be injury.  It could be other things.  It
17 could be fighting.  That would be within that category for
18 me.
19     Q    Does Illinois Central have definitions in any of
20 its documents?
21     MS. FITZKE:    Objection to the form of the
22 question.  It's argumentative.  Judge, you're on mute.
23     JUDGE DONALDSON:    Thank you.  I'm going to
24 sustain it in part on that and in part, to me, the question
25 is very broad.

---

**Page 144**

1      MR. SOREY:    Okay.
2      JUDGE DONALDSON:    So, if you could take another
3  stab at that, Mr. Sorey.
4      MR. SOREY:    Okay.
5  BY MR. SOREY:
6      Q    Now earlier, you told us that Mr. Patrick Crain
7  was not on the disciplinary panel, correct?
8      A    That is correct.
9      Q    Then why was Mr. Crain recommending that Mr.
10 Branch be terminated?
11     MS. FITZKE:    Objection.  I states facts not in
12 the record and foundation.  This witness hasn't established
13 foundation to talk about that.
14     JUDGE DONALDSON:    That is sustained.  I don't
15 see the foundation, Mr. Sorey.
16 BY MR. SOREY:
17     Q    Okay.  Are you aware that Mr. Patrick Crain
18 recommended to Mr. Tom Hilliard that Mr. Branch being
19 terminated?
20     A    I don't know if I knew that at the time.  It
21 might be in the course of being deposed, so on and so forth
22 that I'm aware of that.
23     Q    Are you aware of it now?
24     A    I'm aware of it now.
25     Q    Okay and does someone outside of the disciplinary

---

Exhibit A: Transcript of Office of Administrative Law Judges February 13 and 14, 2024, Hearing

Robert Branch    2023-FRS-00026    February 13, 2024

Page 145

1  panel normally make recommendations for punishment?
2      A    Yes.
3      Q    Okay.  That's the procedure for IC Railroad?
4      A    That is the procedure that we use with respect to
5  the discipline policy.
6      Q    Okay.  Mr. Spears, if you remember, I asked you
7  in your deposition what you would do if a co-employee came
8  up to you and knocked you to the ground.  Do you recall
9  your answer?
10     A    I'm not sure if that's how you phrased the
11 question, but I remember something similar to that.  I
12 don't know what I would do because that is a matter of
13 anger.  The adrenalin gets going and people do what they
14 do.
15     Q    Okay.  Have you ever had any conversations with
16 Mr. Patrick Crain concerning an altercation between Chris
17 Day and a contractor?
18     A    No.
19     Q    Were you aware of that situation?
20     A    Could you repeat the question because I believe
21 you froze in the video?
22     Q    Oh, I'm sorry.
23     A    That's okay.
24     Q    I said did Mr. Crain ever tell you that Chris Day
25 had been involved in an altercation with a contractor in an

Page 146

1  Illinois bar?
2      A    No.
3      Q    Have you ever been made aware of that by anyone
4  else?
5      A    No.
6      Q    Normally, when an employee is reporting or it's
7  reported that some type of altercation took place, would
8  your department be notified?
9      A    Not necessarily.
10     Q    Okay.  What does Human Resources do at Illinois
11 Central?  What are you responsible for?
12     A    Are you asking what Human Resources is
13 responsible for or are you asking me what am I responsible
14 for?
15     Q    Let's limit to what you're responsible for.
16     A    I'm responsible for the diversity, equity and
17 inclusion for our company.
18     Q    Okay and that's your sole responsibility?
19     A    That is my responsibility right now.  That's my
20 main responsibility.  However, as a Human Resources
21 manager, I might get involved in other situations.
22     Q    Okay.  Did you have the same responsibilities in
23 June of 2022?
24     A    No, I did not.
25     Q    What were your responsibilities at that time?

Page 147

1      A    My responsibilities at that time included making
2  sure that the various government reports such as the EEO1
3  and the VES 4212 were done, the affirmative action,
4  investigating complaints of discrimination and harassment.
5      Q    Well, then how did you get put on the
6  disciplinary panel?
7      A    I cannot tell you.  It is written into the
8  discipline policy.
9      Q    That someone from Human Resources will be on the
10 disciplinary panel?
11     A    It is very specific about who that person is and
12 it specifies, I do believe it specifies HR compliance and
13 that was my title at the time.
14     Q    HR compliance?
15     A    Yes.
16     Q    What does that mean?
17     A    As I explained before, that means that I am the
18 person that gets involved in matters of harassment,
19 discrimination, various government reports.
20          MR. SOREY:    I believe that's all the questions
21 I have.  Thank you.
22          JUDGE DONALDSON:    All right, thank you.  So,
23 now your attorney for Respondent, since you're aware of the
24 other witnesses, Mr. Spears, they can ask you questions.
25 Please go ahead.

Page 148

1                    CROSS EXAMINATION
2  BY MS. FITZKE:
3      Q    Mr. Spears, are you aware of the code of conduct
4  for the company?
5      A    Yes, I am.
6      Q    And are you aware of the workplace violence
7  policy?
8      A    Yes, I am.
9      Q    With respect to the code of conduct policy, do
10 managers and employees receive training on that policy?
11     A    I do believe so, yes.
12     Q    And how often?
13     A    Annually.
14     Q    With respect to the workplace violence policy,
15 does the company also provide training on that?
16     A    Yes.
17          MS. FITZKE:    Okay.  Grace, can you pull up
18 Exhibit 16 for us?  There's a book of hard copy exhibits if
19 you want to follow along in hard copy.  Just let us know if
20 you need Grace to make it a little bit bigger for you.
21          MR. SOREY:    No, I can actually see this one.
22          MS. FITZKE:    Okay, great.
23 BY MS. FITZKE:
24     Q    Mr. Spears, can you tell us what Exhibit 16 is?
25     A    Exhibit 16 is the CM workplace violence

Robert Branch   2023-FRS-00026   February 13, 2024

Page 149

1  prevention policy.
2        MS. FITZKE:    With respect to the policy, Grace,
3  if we could scroll down to the second page of the document?
4  It gives some examples in the middle of the page what
5  workplace violence might include.
6        BY MS. FITZKE:
7    Q    Do you see that there?
8    A    Yes.
9    Q    Okay.  Is this policy limited to addressing
10 incidents of physical fighting?
11   A    No, it covers several situations.
12   Q    With respect to incidents of physical fighting
13 that would violate the workplace violence prevention
14 policy, are you aware of someone who has actually thrown a
15 punch or engaged in a situation, an incident of workplace
16 violence in that aspect, thrown a punch who was not
17 terminated for violation of this policy?
18   A    I'm not aware of anyone that has not been
19 terminated.
20   Q    Are you aware of any incidents of an employee
21 throwing a punch at a co-worker that hasn't been reviewed
22 as a potential Level 4 violation?
23   A    I am not aware of such actions.
24   Q    When the policy talks about the potential to
25 discipline up to and including termination as Mr. Sorey

Page 150

1  pointed out, there could be incidents of discipline for a
2  violation of this policy that are less than termination,
3  are you familiar with any kind of situations that have
4  violated this policy, but have not resulted in termination?
5    A    I'm not sure.  Yes, I'm just not sure at this
6  point.
7    Q    None that you recall?
8    A    None that I can recall.
9        MS. FITZKE:    Okay.  You can take that exhibit
10 down.
11       BY MS. FITZKE:
12   Q    How would employees if they had a question about
13 what the company policy was, how could they access or find
14 out what the policy says?
15   A    Oh, the easiest thing would be to check with
16 their managers.  That's easier if they're not sure what the
17 policy is, but everyone has access through the Internet.
18 Any employee can see it.  Sometimes it's even posted in
19 various locations.  So, there are several ways, but
20 employees are responsible for knowing what the company
21 policies are.
22       MS. FITZKE:    Grace, can you bring up Exhibit
23 30?  Just the first page for now.
24       WITNESS:   It's kind of small.
25       MS. FITZKE:    It's just catching up on my end.

Page 151

1  Sorry.  It should pop up in a second a little bigger.
2  There we are.
3        BY MS. FITZKE:
4    Q    Mr. Spears, can you tell us what Joint Exhibit 30
5  is?
6    A    Exhibit 30 is the CM discipline policy for the
7  Southern Region.
8    Q    Okay and does that include employees working
9  under the operating subsidiary Illinois Central?
10   A    That is correct.
11       MS. FITZKE:    And if we can scroll down just a
12 little bit, Grace.
13       BY MS. FITZKE:
14   Q    I see there's an effective date of this policy,
15 10-23-2017.  Did you have another version of this policy in
16 place before October of 2017?
17   A    No.
18   Q    Okay.  Was this a new policy at that time?
19   A    Yes.
20       MS. FITZKE:    If we could go to the next page of
21 the policy, please?
22       BY MS. FITZKE:
23   Q    On the scope of this policy, it indicates that it
24 applies to all union representative employees except those
25 in their probationary period.  Is that right?

Page 152

1    A    That is what the policy states.
2    Q    Would this discipline policy apply to managers or
3  supervisors of the company?
4    A    No.
5        MS. FITZKE:    On the next page of the policy
6  which is the third page of the exhibit, but it's identified
7  as page 2 of the policy.  There is a section.  There we go.
8  Right there.
9        BY MS. FITZKE:
10   Q    Does this policy then address and outline as you
11 as a member of the company with responsibilities over
12 discipline is to go about assessing discipline to the
13 unionized workers?
14   A    Yes.
15       MS. FITZKE:    If we can look at the fifth page
16 of the document which is the fourth page of this policy.
17 There is toward the bottom of the page a section called
18 Discipline Review Panel.  Go down to that.
19       BY MS. FITZKE:
20   Q    You mentioned earlier, Mr. Spears, that there is
21 in the policy language about who must be included in the
22 discipline review panel?
23   A    Yes.
24   Q    Is this the language that you were referring to?
25   A    Yes.

Robert Branch    2023-FRS-00026    February 13, 2024

Page 153

1    Q    And above that, there is some language about the
2  review process.  Did you --- with respect to the issuance
3  of discipline in June of 2022 time frame, did you have any
4  role in that review process to determine --- is that review
5  process, let me back up, I'm sorry.  That was a terrible
6  question.  The review process, is that the process that
7  occurs after the transcript is made available?
8    A    Yes.
9    Q    Okay.  For Mr. Branch and Mr. Melton and their
10  discipline in June of 2022, can you describe for us your
11  role in the discipline review panel and the review process
12  for that discipline that was assessed?
13    A    Yes.  The first thing that happens is we receive
14  the investigation hearing along with the exhibits and each
15  member of the discipline review panel, we review it
16  separately and then we come together to determine whether
17  or not there's agreement as far as whether or not there has
18  been a violation of company policy.
19    MS. FITZKE:    And with respect to the level of
20  discipline to be assessed, if we can look at page 7 of the
21  exhibit, page 6 of the policy?
22    BY MS. FITZKE:
23    Q    It talks about categories of violations.
24    A    Yes.
25    Q    Well, I'll ask you.  Can you explain to us what

Page 154

1  these levels of violation are and what they're intended to
2  do?
3    A    They're in the violation, level violations go
4  from 1 to 4, 4 being the most, I'll say, egregious or the
5  serious violations.  So, it starts out with Level 1 and
6  these are examples.  The bullet points that you see on the
7  screen are just examples of what this might include, what
8  Level 1 violations might include and it does the same for
9  Level 2 violations, Level 3 violations as well as Level 4
10  violations.
11    Q    Let's look at Level 4 violations if we could.
12  It's on page 9 of the exhibit, page 8 of the policy.  As
13  you mentioned, it indicates here that it is extremely
14  serious and the third bullet point down indicates violence
15  in the workplace.  What do you understand that to be?
16    A    Anything that coincides what the actual violence
17  in the workplace policy.  So, that's how we determine if
18  there's violence.
19    Q    And is that what you would typically consider
20  physical fighting, an employee who punches another
21  employee?
22    A    Yes.
23    Q    Before you received the investigation hearing
24  transcripts, when did you first --- well, let me ask you
25  this.  Before you received the investigation hearing

Page 155

1  transcript, had you been made aware that there was an
2  incident that took place between Mr. Melton and Mr. Branch?
3    A    Yes.
4    MS. FITZKE:    Grace, you can take the exhibit
5  down.  Thank you.
6    BY MS. FITZKE:
7    Q    How did you find out about it?
8    A    There might have been conversations with myself,
9  Tom Sullivan and perhaps Patrick Crain who report to Tom
10  Sullivan.
11    Q    Do you recall who specifically made you aware at
12  this point?
13    A    I don't remember.  It might have been Tom.  It
14  could have been Patrick.  I'm not sure.
15    Q    And with respect to bringing you into discussions
16  that there had been an incident that occurred, what would
17  have been your role?
18    A    My role as part of the discipline review panel is
19  to advise whether or not they should proceed or what do you
20  think about the case, should we proceed, how should we
21  proceed.
22    Q    And when you say, should we proceed, do you mean
23  to proceed to an investigation hearing?
24    A    To issue a Notice of Investigation.  That is
25  correct.

Page 156

1    Q    And do you know --- well, why are you weighing in
2  at that point?  What's the purpose of having a discipline
3  review panel if you know as to whether to go forward to
4  hearing?
5    A    Well, it's generally the Labor Relations manager
6  will come if they have a question about what's going on and
7  they're just not sure about.  So, they just need further
8  guidance on what should happen.
9    Q    And did you give some guidance in this case?
10    A    I don't recall.
11    Q    All right.  Did you --- when you were asked to
12  weigh in prior to the investigation hearing, do you recall
13  if you had seen any of the written statements at that time?
14    A    I've seen the statements so many times.  I'm not
15  sure when I first saw them.
16    Q    Fair enough.  Okay and you mentioned that after
17  the hearing and reviewing the transcript and exhibits as
18  part of your role on the discipline review panel.  What do
19  you recall about your conversations with other members of
20  the discipline review panel about what level of discipline
21  to access, if any, to Mr. Branch?
22    A    Again, it comes to us as a Level 4 violation.
23  So, that's why we're looking at it.  So, that's sort of set
24  in stone, but we reviewed it and went back and forth.
25  Again, for Mr. Melton, it was sort of self-executing, I'll

Robert Branch    2023-FRS-00026    February 13, 2024

Page 157

1  say that, where he did the first physical contact with Mr.
2  Branch.  So, that was sort of we can put that to the side.
3  Now, let's consider Mr. Branch and we looked at all the
4  situation.  We looked at the statements.  We looked at Mr.
5  Branch's statement, not only his written statement, but
6  what he provided in the investigation during the
7  investigation.
8      Q    And was there discussion amongst members of the
9  discipline review panel as to whether Mr. Branch was
10 engaged in self-defense during this incident?
11     A    I'm not sure specifically if we say it was self-
12 defense or whatever.  Our situation was we looked at
13 whether or not Mr. Branch engaged.  What was he doing
14 during that time, was he in a defense posture?  Was he
15 trying to get away?  Did he run?  Did he cover up?  What
16 did he do during that time?  That's how we looked at it.
17     Q    And what facts that you read in the hearing
18 transcript and in the statements were important to you in
19 your role in concluding that termination of Mr. Branch was
20 also appropriate here?
21     A    One of the big things is that Mr. Branch admits
22 that, "Yes, I swung and I engaged.  I punched him.  I
23 touched him."  Another part is they're on the ground where
24 someone had to pull them apart.  Had the employees that
25 were around at the time not pulled them apart, they could

Page 158

1  have continued with the fight.  There didn't seem that
2  either employee was willing to just take a breath and say
3  enough.
4      Q    When you participated in the decision to
5  terminate Mr. Branch's employment, did you consider that or
6  did you believe he had reported to the company a hazardous
7  safety or security condition?
8      A    Could you restate the question, please?
9      Q    (Affirmative response).  I understand that you
10 made a recommendation that concurred with the decision to
11 terminate Mr. Branch's employment.  Is that right?
12     A    Well, we believe that it was a Level 4 violation.
13     Q    And you agreed with that?  When you say we, that
14 included you?  You also agreed?
15     A    Yes, yes.
16     Q    And when you concluded that Mr. Branch had
17 engaged in a Level 4 violation.  Did you believe that Mr.
18 Branch had engaged in conduct that was reporting a
19 hazardous safety or security condition?
20     A    I don't know if you would consider it safety, if
21 it was an issue of safety with Mr. Branch.  It was a matter
22 of them fighting.
23     Q    And Mr. Branch had submitted a statement that we
24 looked at earlier in the testimony where he indicated that
25 in his statement, he was referred to the language where he

Page 159

1  said, "I fear for my life around him, Mr. Melton."  Did you
2  read that part of his statement too?
3      A    Yes, that was part of it.  Yes, I did read that.
4      Q    And during the investigation hearing, did you
5  also read the part where Mr. Melton asked Mr. Branch if he
6  believed he was a threat to him and Mr. Branch said no?
7      A    Yes.
8      Q    When you were reviewing the transcript and the
9  potential termination of Mr. Branch, what weight, if any,
10 did you give to Mr. Branch's statements that he feared Mr.
11 Melton?
12     A    I did not give a lot of weight to that at one
13 point early when he wrote his statement, he indicated that
14 he was afraid for his life so that sort of neutralized the
15 situation and then the focus because were the employees
16 fighting.
17     Q    And if you made a decision with the panel to
18 return Mr. Branch to work, was Mr. Melton going to be there
19 with him?
20     A    At work, if he returned, no.
21     Q    Would your recommendation with respect to the
22 termination of Mr. Branch have been any different if Mr.
23 Melton or another co-worker had reported the incident?
24     A    It did not matter.  The company knew about it so
25 we had to move forward.

Page 160

1      Q    Would your decision to terminate Mr. Branch have
2  been any different if Mr. Branch reported that there had
3  been a fight, but hadn't indicated that he felt threatened
4  or afraid of Mr. Melton?
5      A    No.  Again, we looked at what was in the
6  transcript.
7          MS. FITZKE:  Thank you, Mr. Spears.  I don't
8  have any --- wait, sorry.  One more question that came up
9  today.
10         BY MS. FITZKE:
11     Q    Mr. Spears, did anybody ever make you aware
12 before Mr. Branch and Mr. Melton were terminated that Mr.
13 Melton was alleged to have had a gun at the Magnolia Inn or
14 said he was going to go get his gun that night?
15     A    Until this particular hearing, that was the first
16 time I heard anything about a gun.
17         MS. FITZKE:  Okay, thank you.  I don't have any
18 other questions for you, sir.
19         JUDGE DONALDSON:  Okay.  So, Mr. Sorey, why
20 don't you go ahead?  Do you have any questions?  Are you---
21         MR. SOREY:  I'm still writing them down.
22         JUDGE DONALDSON:  You're still writing some
23 questions down?
24         MR. SOREY:  Yes, Your Honor.
25         JUDGE DONALDSON:  Let's pause for a minute.

Page 161

1    MR. SOREY:    I got it.
2    JUDGE DONALDSON:    You got it now?  All right,
3 let's go forward.
4        REDIRECT EXAMINATION
5  BY MR. SOREY:
6    Q    Mr. Spears, do you think with Mr. Branch filing a
7 statement about the altercation and then getting
8 terminated, do you think that will encourage other
9 employees to file?
10    A    I'm not sure what other employees might do.
11    Q    If an employee is involved in an altercation,
12 does the IC normally hold an investigation of the facts?
13    MS. FITZKE:    Object to the question.  I'm not
14 sure of the circumstances.  Object to the form as vague.  I
15 can't understand it.
16    JUDGE DONALDSON:    Overruled.  I understood it,
17 but if the witness doesn't, you can let us know.
18    WITNESS:    Could you repeat the question again,
19 please?
20    MR. SOREY:    Sure.
21  BY MR. SOREY:
22    Q    If an employee for the railroad, IC Railroad, is
23 involved in an altercation, does the IC normally hold an
24 investigation of the facts?
25    A    It depends on what the situation is.  It's a case

Page 162

1 by case situation once the company knows.
2    Q    So, you're saying one person involved in
3 altercation might be investigated while another person
4 involved in an altercation will not be investigated?
5    A    What I'm saying is case by case situation and it
6 depends upon the facts that lead to during the
7 investigation.
8    Q    How would IC know what the facts are without the
9 investigation or a hearing?
10    A    Without a formal hearing or investigation, they
11 can ask people.  They can take statements that might not be
12 part of the investigation as you framed it.
13    Q    Well, is that the normal policy for Illinois
14 Central?
15    A    There's no specific policy that says that it
16 would be investigated or won't be investigated.  We look
17 into the situation as I mentioned on a case by case basis.
18    Q    Does it make any difference if it's a union
19 employee or a manager involved in the altercation?
20    A    The way the investigation is done, it does make a
21 difference whether it's a union represented employee or
22 management employee.  Management employers are not as I
23 mentioned earlier are not subject to the discipline policy.
24 So, would not necessarily go through those procedural
25 methods.

Page 163

1    Q    Okay, the managerial people are part of the
2 workplace violence policy, are they not?
3    A    They are subject to the workplace violence
4 policy, yes.
5    Q    Does the IC Railroad normally just take the word
6 of a supervisor about an altercation that they hadn't been
7 involved with?
8    A    I don't know.
9    Q    Now, I noticed a while ago, we were looking at
10 the code and it said for the Southern Region.  What makes
11 up the Southern Region for the IC?
12    A    That is the United States.
13    Q    All right, sir.  So, everything in the United
14 States is considered the Southern Region?
15    A    That is correct.
16    Q    Okay.  It must have been written by the Canadians
17 then.
18    A    Is that a question?
19    MR. SOREY:    No, it was a joke.
20    JUDGE DONALDSON;    No, it's not.
21  BY MR. SOREY:
22    Q    So, if I listen and I tried to listen to you
23 carefully and I could be wrong so I'll give you a chance to
24 tell me, but it seems like you said that you all did not
25 consider self-defense?

Page 164

1    A    That's not exactly what I said and if I implied
2 that, that's not true.  We considered the actions of both
3 employees.  That's what we did and again, we have employees
4 fighting.  So, right away, we're at a Level 4.  The next
5 step is to determine whether or not there's some mitigating
6 circumstances surrounding what happened, okay?  The first
7 thing that we noticed is that Mr. Melton did initiate the
8 first contact.  That's a given.  Then we look at he's going
9 to be terminated more likely than not.  Yes, he's
10 terminated.  Now, let's look at Mr. Branch.  We look at his
11 statements.  We look at the fact that earlier he said he
12 was afraid for his life, but later on, he said, "No.  No
13 issue there."  The next thing we look at is the witness
14 statements as far as who swung and who made contact, so on
15 and so forth.  For me, what I did not see, I did not see
16 any form of retreat or traying to get out of the way or
17 take a defensive posture.  Therefore, he was actively
18 engaged.  It was a tough decision.  It wasn't the easiest
19 decision that I ever made in my life, but that is the fact
20 according to what I read in the transcript.
21    Q    So, according to the disciplinary panel group, if
22 you put up your arms to prevent being struck or you
23 actually swing back in order to keep from being struck, you
24 abandon self-defense?
25    A    I can't tell what the disciplinary panel felt.  I

Robert Branch     2023-FRS-00026     February 13, 2024

Page 165

1 can only speak for myself and I can say there was no
2 evidence of trying to move away or try to not engage by Mr.
3 Branch. That's how I saw it.
4        Q    Now, if Mr. Branch did not report the
5 altercation, IC would have never investigated this matter,
6 would they?
7        A    Not necessarily. If the company knew about it
8 some other method, the company would have investigated.
9        Q    Now, under the workplace violence policy, are
10 employees required to report workplace violence?
11       A    We would expect all employees to report any type
12 of altercation that they get involved with or witness.
13       MR. SOREY:    Okay. That's all the questions I
14 have.
15       JUDGE DONALDSON:    Okay. Ms. Fitzke, did you
16 have any further questions for Mr. Spears?
17       MS. FITZKE:    One moment, please. I don't have
18 any other questions right now.
19       JUDGE DONALDSON:    Okay. Thank you very much,
20 Mr. Spears. The attorneys handled all the topics. I don't
21 have any other questions for you myself. They handled
22 everything very well and comprehensively. So, I understand
23 you're going to stay a part of the hearing as the
24 Respondent's representative?
25       WITNESS:    That is correct.

Page 166

1        JUDGE DONALDSON:    Okay. All right, you can
2 return to turn your camera off if you so choose which most
3 people are doing if you're not speaking or engaging. So,
4 thank you again for your participation as a witness.
5        WITNESS:    You're welcome.
6        JUDGE DONALDSON:    Mr. Sorey, what's the game
7 plan? Who are you turning to next?
8        MR. SOREY:    Well, it depends on our time
9 period, Judge. Patrick Crain is going to take a good bit
10 of time, I think. We have Mr. Tom Sullivan and Tom
11 Hilliard and I don't think either one of those gentlemen
12 would be very long. It depends on time-wise what you want
13 to do.
14       JUDGE DONALDSON:    Okay. Sounds like if they're
15 not going to take long, it sounds feasible to have Mr.
16 Sullivan and Mr. Hilliard to testify this afternoon. Same
17 amount of time used holds true for these witnesses. It
18 looks like that's doable and we can likely finish in a
19 couple hours or less and then we can reserve the morning
20 for Mr. Crain.
21       MR. SOREY:    That would be fine, Your Honor.
22       JUDGE DONALDSON:    -- if that's not an issue.
23 Am I cutting out again?
24       MS. FITZKE:    No.
25       JUDGE DONALDSON:    That sounds feasible to me.

Page 167

1 Does that sound feasible to you, Mr. Sorey?
2        MR. SOREY:    Yes, it's fine. I'm sorry. I was
3 reading.
4        JUDGE DONALDSON:    Okay, that's fine. Ms.
5 Fitzke, is there an issue of availability if we take Mr.
6 Sullivan and Mr. Hilliard and then tomorrow take Mr. Crain?
7        MS. FITZKE:    We'll just have to confirm. I
8 know that Tom Sullivan is around. We had anticipated based
9 on the prior order that Tom Hilliard would likely be
10 tomorrow, but we'll reach out to him on the --- we can take
11 a short break and just make sure he's going to be available
12 yet this afternoon.
13       JUDGE DONALDSON:    Okay.
14       MR. SOREY:    We can do it in the morning if you
15 want to. I think even though Mr. Crain is going to be
16 longer, it's not going to take up all morning.
17       JUDGE DONALDSON:    Okay. Let's take a 10-minute
18 break. We'll actually just come back at 2:30. It's just
19 easier to get timed that way and you can let us know, Ms.
20 Fitzke, what works best for the party, the witnesses at
21 that time. All right, I'll see you all back in about a
22 little under than 15 minutes.
23       MS. FITZKE:    Thank you.
24       MR. SOREY:    Thank you, Your Honor.
25       (Off the record at 2:17 p.m., CST)

Page 168

1        (On the record at 2:36 p.m., CST)
2        JUDGE DONALDSON:    We have another witness
3 before us. It is Tom Sullivan. Mr. Sullivan, you can hear
4 and we can see you well so at this time, would you raise
5 your right hand so I can swear you in?
6 Whereupon,
7                THOMAS SULLIVAN
8 having been duly sworn, was called as a witness herein and
9 was examined and testified as follows:
10       WITNESS:    I do.
11       JUDGE DONALDSON:    All right, thank you. Mr.
12 Sorey, please go ahead.
13       MR. SOREY:    Okay.
14       DIRECT EXAMINATION
15 BY MR. SOREY:
16       Q    Mr. Sullivan, during June of 2022, you were the
17 director of Labor Relations for Illinois Central Railroad?
18       A    That's correct, yes.
19       Q    Now, in your deposition, you told us the process
20 for setting up an investigation and I want to go through it
21 to make sure I understood it. I think you said first when
22 you were made aware of an incident, you'd do a review to
23 determine whether or not there would be disciplinary
24 consequences from it. If the disciplinary panel agrees,
25 then the hearing is held and the panel decides if there is

Robert Branch    2023-FRS-00026    February 13, 2024

Page 169

1 sufficient facts to support the violation of a rule. Now,
2 did I state that correctly?
3     A    Fairly closely. The initial review to determine
4 is a look to see based on initial evidence and facts that
5 we've gathered to see if there is sufficient information to
6 move forward with an investigation. We do that because
7 under our discipline policy, the employees not facing a
8 dismissible offense would be offered a waiver so they could
9 waive the formal investigation and accept a record
10 suspension. So, that's why we do that initial cursory
11 review and if we move forward with the investigation, it's
12 more a full development of facts.
13        MR. SOREY:    Thank you.
14    BY MR. SOREY:
15     Q    Now, you said in your deposition that you, Duane
16 Spears and Patrick Crain decided that there should be a
17 disciplinary hearing. Is that correct?
18     A    Yes. The three of us consulted about that, yes.
19     Q    Is the only discipline for fighting dismissal?
20     A    Fighting is a dismissible offense, yes. I'm not
21 aware of any example of a fight where it resulted in
22 anything less than dismissal.
23     Q    Okay. Is there any exception for self-defense in
24 the workplace violence policy?
25     A    There is, yes.

Page 170

1     Q    Okay. What is it?
2     A    What's the exception?
3        MR. SOREY:    Yes. I asked a poor question. I'm
4 sorry.
5    BY MR. SOREY:
6     Q    How does it define self-defense?
7     A    I don't have the policy in front of me so I would
8 have to read the policy to find out if there is a
9 definition of self-defense. I can do that.
10        MR. SOREY:    We can put it up for you if you
11 would like.
12        JUDGE DONALDSON:    Mr. Sorey, do you want us to
13 --- is this putting up an exhibit for your witness?
14        MR. SOREY:    No, I think James is pulling it up.
15        JUDGE DONALDSON:    Okay.
16        MR. SOREY:    It's just taking him a second.
17        MS. FITZKE:    Are you pulling up Joint Exhibit
18 16, the policy?
19        MR. SOREY:    Right.
20        JUDGE DONALDSON:    16? Okay.
21        MR. SOREY:    Yes, we can see it there.
22    BY MR. SOREY:
23     Q    Can you see that, Mr. Sullivan?
24     A    I can, yes.
25     Q    All right. Let us know when you want us to move

Page 171

1 further down.
2        JUDGE DONALDSON:    Have you directed him to a
3 part of it yet or do you want him to review all of page 1?
4        MR. SOREY:    I thought he wanted to review the
5 whole thing. I didn't ---
6        JUDGE DONALDSON:    Oh, okay.
7        WITNESS:    I can review the whole thing. You
8 asked me specifically about if there's a definition of
9 self-defense and that's what I would look for in the
10 policy.
11        MR. SOREY:    He's slowly scrolling it down so if
12 you see anything you want to stop, let us know.
13        WITNESS:    So, if you move back the other way,
14 this is where it speaks to, "Workplace violence as defined
15 as any action, conduct or gesture of a person towards a CN
16 employee in the workplace that can reasonably be expected
17 to cause harm, injury or illness to the CN employee
18 excluding situations justified self-defense."
19    BY MR. SOREY:
20     Q    Is that the only place or you need to continue to
21 look?
22     A    I don't know. We can continue to see if there is
23 any further --- it doesn't look to be --- keep scrolling
24 down to see if there is any further mention of it. I didn't
25 see anything further so it's the mention of self-defense is

Page 172

1 in connection with that paragraph excluding situations of
2 justified self-defense.
3     Q    All right. So, the only thing that we can find
4 in there states justified self-defense. Now, in your
5 ruling that is part of the disciplinary panel, without a
6 definition of self-defense, how do you rule on it?
7     A    Well, we would apply what we would know to be
8 what is perhaps a customary definition of what you would
9 look to for self-defense and did the person --- there's a
10 line, I suppose, that we would establish where it's self-
11 defense and where it's not. So, we would apply some
12 standard that we would talk through, did you cross that
13 line or didn't you is what the conversation that we had.
14     Q    And what is that standard?
15     A    Well, what we look to is really what when it
16 became more an incident of a fight versus somebody trying
17 to defend oneself or avoid further confrontation is what we
18 looked to in this case and other cases.
19     Q    Do you all ever use the state definition of self-
20 defense?
21     A    We do not use a state definition of self-defense.
22     Q    Are you aware of Mississippi's self-defense
23 definition?
24     A    I'm not.
25     Q    Now, in your deposition, I asked you what would

Page 173

1  you do if a co-employee hit you and knocked you to the
2  ground and I believe your answer was, "I don't know." Is
3  that correct?
4      A    That's how I answered then, yes.
5      Q    Okay. Is that still your statement on that?
6      A    Yes.
7      Q    If you don't know how you would react, how do you
8  judge someone else for acting?
9      A    I look solely at the action is what we looked
10  here.  I didn't judge anybody for the action. I looked at
11  the actions and that's what we used to reach our
12  determination.  There's no judgment. It was just the facts
13  developed and what took place through those facts as we saw
14  them and reading the transcript from the investigation.
15      Q    Well, I disagree with you on the judgment theory
16  because I think it was a judgment and you judged that he
17  was fighting and fired him, did you not?
18      A    Did we judge?  We came to a determination that
19  the facts established that he was fighting.  Judged that or
20  how we can to that determination, I don't know if I'd call
21  it judgment in other words.
22      Q    Now, do you feel with Mr. Branch reporting the
23  incident and then getting fired, do you think that's going
24  to encourage other CN or IC employees from reporting
25  workplace violence?

Page 174

1      A    I don't know.  I don't know.
2      Q    Now, when I asked you a question about Mr.
3  Branch, basically all you said was, "Mr. Branch should not
4  have engaged in fighting." Is that correct?
5      A    That's correct.  I don't remember the exact words
6  I used.  You're reading them so if I --- that's correct.
7      Q    Okay.  Now, Mr. Sullivan, are you aware of an
8  altercation involving Mr. Chris Day, one of your managers
9  with a contractor in an Illinois bar about a year ago?
10      A    I am not, no.
11      Q    Now, in your opinion, does the workplace violence
12  policy apply to all employees of the IC Railroad?
13      A    The workplace violence policy applies to all
14  employees, all CN employees.
15      Q    If Mr. Day testified that he reported this
16  altercation to Mr. Patrick Crain and to Mr. Patrick Jones,
17  his supervisor, would you normally expect them to have a
18  hearing of the facts of that altercation?
19      MS. FITZKE:    Object to the form of the
20  question.  Object on foundational grounds. He hasn't
21  established what the altercation was or what was reported
22  sufficient for Mr. Sullivan to respond.
23      JUDGE DONALDSON:    That's sustained, Mr. Sorey.
24      MR. SOREY:    Okay.
25  BY MR. SOREY:

Page 175

1      Q    Mr. Sullivan, if Mr. Day reported that he was
2  having dinner and drinks with a contractor for the IC
3  Railroad and at some point, "Out of the blue, the contract
4  head butted him and then he left." Consider that
5  hypothetical, but in that hypothetical, would you normally
6  think that Illinois Central Railroad would have had a
7  hearing to investigate the facts of that altercation?
8      A    We would not have a hearing to investigate facts
9  in that setting.  Hypothetically, that setting, we would
10  not have a hearing, no and there may be a follow-up with
11  the contractor with regards to further following up as to
12  what happened, but we would not have a hearing in that
13  setting that I ever encountered.  The hearings are reserved
14  for union represented employees pursuant to the due process
15  obligations under the collective bargaining agreement.
16      Q    Okay.  So, it doesn't apply to managers?
17      A    We don't hold management hearings, no.
18      Q    Do you all do investigations for manager
19  problems?
20      A    Yes.
21      Q    Do you take statements?
22      A    I think in the normal --- I've not participated n
23  them.  It's not my area of responsibility, but I do know
24  that we do follow up and investigate on instances involving
25  non-union employees, yes.

Page 176

1      Q    Did Mr. Crain tell you about the allegations
2  concerning Mr. Chris Day advising him of an altercation?
3      A    No, he did not.
4      Q    Would you normally expect him to report that to
5  you?
6      A    No, I really wouldn't.
7      Q    Did he report to you the problem of Mr. Branch
8  and Mr. Melton?
9      A    It came --- I don't know if it came directly from
10  Patrick, but we were all involved in it.  Whether it was
11  him that brought it to me or we learned about it at the
12  same time through whatever source, but he may have brought
13  it to my attention, but it came to light in a group setting
14  as I remember it.
15      MR. SOREY:    Okay.  I believe that's all the
16  questions I have, Your Honor.
17      JUDGE DONALDSON:    Okay, thank you.  Ms. Fitzke,
18  do you have any questions for this witness?
19      MS. FITZKE:    I do.  I do.
20          CROSS EXAMINATION
21  BY MS. FITZKE:
22      Q    Mr. Sullivan, you told us a moment ago that you
23  were the director of Labor Relations in the May/June 2022
24  time frame.  How long have you held that position?
25      A    I've held it since I joined CN in March of 2012.

Robert Branch    2023-FRS-00026    February 13, 2024

Page 177

1    Q    And with respect to your role, can you just
2 briefly tell us what your duties and responsibilities are?
3    A    So, the director of Labor Relations, the
4 principle responsibility is managing collective bargaining
5 across all of the unions with which we have union
6 representative employees.  I also oversee the grievance and
7 arbitration process, the negotiations, contract
8 negotiations and then I also oversee the discipline policy.
9    Q    It sounds like your responsibilities are
10 primarily focused on the unionized workers?
11    A    Almost exclusively, yes.
12        MS. FITZKE:    I want to talk to you a little bit
13 --- you mentioned overseeing the discipline policy.  We can
14 pull it up if it's helpful.  Just let us know.
15    BY MS. FITZKE:
16    Q    With respect to that policy, we looked at it
17 earlier and it looks like it had an effective date in
18 October of 2017.  Was there a discipline policy like that
19 in effect before October 2017?
20    A    There was not, no.
21    Q    Did you have any role in the creation of the
22 discipline policy?
23    A    I did, yes.
24    Q    And what was that role?
25    A    The role was we gathered examples of similar

Page 178

1 policies across the industry and worked with many people to
2 put together what was the final discipline policy.
3    Q    So, with respect to, for example, determining
4 what would be identified in the discipline policy as a
5 Level 1, 2, 3 or 4 violation, who determined what would go
6 in those buckets?
7    A    So, that was a consultative effort.  Labor
8 Relations worked with field management to get to align what
9 would be the appropriate response for the various rule
10 violations.
11    Q    And when you say field operations consultant with
12 Labor Relations, were you the Labor Relations individual
13 that was being consulted?
14    A    Yes.
15    Q    With respect to the discipline policy in
16 specifically a Level 4 violations, what are Level 4
17 violations under the policy?
18    A    A Level 4 violation under the policy is an
19 incident that in and of itself would result in dismissal.
20 The other levels all lead to some progressive step towards
21 a less progressive response.  Level 4 is in and of itself a
22 dismissible event.
23    Q    And with respect to the policy and the Level 4
24 violations which are identified to include violence in the
25 workplace, have you had any other incidents of physical

Page 179

1 fighting come up since October of 2017 when the policy was
2 put in place that you had to adjudicate, if you will, under
3 the discipline policy?
4    A    I don't know right offhand, but I seem to recall,
5 yes, that we have had instances of fighting, yes.
6    Q    Do you recall any individual who was a
7 participant in a fight in terms of throwing punches or
8 engaging in other physically violent acts that during your
9 time here at Illinois Central that wasn't terminated as
10 result of their behavior?
11    A    No, if we move forward with a response, it would
12 be termination.
13    Q    And with respect to the situation involving Mr.
14 Branch, how did that situation come to your attention?
15    A    As I said, there was a lot of discussion around
16 that event, whether it was Patrick or a group.  We very
17 quickly were in discussion around it likely from Patrick,
18 but it could have been also from the field and Patrick.
19 There were a lot of people involved in the discussions with
20 me.
21    Q    And then after the investigation hearing was
22 concluded, did you receive a copy of the transcripts?
23    A    Yes.
24    Q    Did you also receive the exhibits?
25    A    The transcript and exhibits, yes.

Page 180

1    Q    And did you review them?
2    A    I did.
3    Q    As you reviewed them, with respect to Mr.
4 Branch's conduct and the reasons that you supported ---
5 well, let me ask you.  Did you support termination of Mr.
6 Branch based on the conduct identified in the investigation
7 hearing transcript and exhibits?
8    A    I did, yes.
9    Q    When you reached that conclusion, did you rely
10 upon anything not contained in the transcript and exhibits?
11    A    It was all based on the transcript.
12    Q    And what did you identify in the transcript that
13 led you to the conclusion that Mr. Branch had committed a
14 Level 4 violation and should be terminated?
15    A    So, my review of this was based completely on,
16 almost solely on was this self-defense or wasn't it?  Did
17 it move to a different level when he was engaged in actual
18 fighting?  So, the review was very much focused on
19 statements and the statements as to what facts were
20 determined based on those statements, what happened and it
21 was through that that I came to the determination that this
22 was beyond just a self-defense situation and it rose to the
23 level of engaging and fighting.
24    Q    And when you talk about the statements, there is
25 both the written statements and then the individuals that

Page 181

1 testified in the investigation hearing that provided some
2 testimony beyond the statements.  Did you review and
3 consider all of that?
4    A  Al of that.
5    Q  And did you review and consider the parts of the
6 statements where the individuals testified or wrote in
7 their statements that Mr. Branch struck Mr. Melton?
8    A  I did, yes.
9    Q  And did you review and rely upon the portion of
10 the investigation hearing transcript where Mr. Branch
11 indicated that he struck Mr. Melton?
12    A  Yes.
13    Q  And were there other facts in the investigation
14 hearing transcript that you relied upon to conclude that
15 Mr. Branch had engaged in incident of workplace violence
16 that was not excusable or justifiable self-defense under
17 the policy?
18    A  No, it was pretty much the altercation that was
19 almost exclusively what I relied on.
20    Q  Have you ever had a circumstance in your time
21 here where you had a situation where employees were engaged
22 in --- had a mutual fight where someone started it, but
23 someone else swung back?  Had that happened before?
24    A  That's usually what the fight is when we've
25 encountered fighting.  I mean, that's generally what we've

Page 182

1 dealt with.  Since the discipline policy and certainly
2 before, fighting has been a situation that we've dealt
3 with, but it's usually that and somebody starts a fight and
4 somebody else continues.
5    Q  Have you --- with respect to this situation, do
6 you recall directing Mr. Crain to get any further guidance
7 looking for consistency from your peers in Canada?
8    A  I do, yes.
9    Q  Can you tell us about that, please?
10    A  What I was trying to do was we didn't have a case
11 that was directly on point in the U.S. where we had a
12 situation like this with the self-defense.  So, I did ask
13 Patrick to follow up with our colleagues in Canada to see
14 if they had any arbitral precedent or any case precedent
15 with regard to similar circumstances.
16    Q  And when you say a circumstance in self-defense,
17 do you mean a circumstance where an individual was raising
18 self-defense as a defense to their participation in the
19 fight?
20    A  That's right.
21    Q  And what did you learn from your Canadian
22 colleagues?
23    A  I remember that the basic --- once there was
24 engagement with physical contact that they held both
25 individuals accountable in the Canadian rules.

Page 183

1    Q  And by physical engagement, you mean when Mr.
2 Branch hit back?
3    A  Yes.
4    Q  Under the discipline policy that we've been
5 talking about, I understand that in cases of potential
6 discipline, in cases of Level 4 violations, I should say
7 that differently, in cases of Level 4 violations, a
8 disciplinary review panel is formed?
9    A  Right.  The policy requires that the disciplinary
10 review panel review any case that would result in
11 dismissal.
12    Q  Right.  That happened here as I understand it?
13    A  Yes.
14    Q  Okay and who was the disciplinary review panel in
15 this case?
16    A  So, the disciplinary review panel in this case
17 would have been me, Duane Spears and Tom Hilliard.
18    Q  And Mr. Patick Sullivan, what was his role in
19 conjunction with the situation involving Mr. Melton and Mr.
20 Branch?
21    A  Patrick Crain?
22    Q  Yes.
23    A  I'm Mr. Sullivan.
24    MS. FITZKE:   Oh, I'm sorry.
25    WITNESS:   Patrick Crain?

Page 184

1    MS. FITZKE:   Sorry, Tom.  I was looking right
2 at you.
3    WITNESS:   So, you're asking me what was
4 Patrick's role?
5    MS. FITZKE:   Let me just ask a new question
6 again if I can.  I've confused everyone.
7    WITNESS:   Yes.  Sure.
8 BY MS. FITZKE:
9    Q  So, can you tell us what Mr. Patrick Crain's role
10 was in conjunction with the review and assessment of
11 discipline in this case?
12    A  So, Patrick is a Labor Relations manager and his
13 role would be to work with the field management to gather
14 all the statements and to put together all that's needed to
15 proceed to hold the investigation.  So, he would do all of
16 the leg work working with the field to put the case
17 together if you will and facts together that would be
18 introduced at the investigation hearing.
19    Q  Would he provide advice to the function?
20    A  Yes.
21    Q  Did he also consult with you and Mr. Spears as
22 part of your consultant process to get alignment on the
23 level of discipline to be assessed?
24    A  We certainly talked, yes.
25    Q  With regard to Mr. Branch's work history, do you

Page 185

1  understand that he had not previously been disciplined?
2      A    I didn't know that, but I did not know that.  I
3  did not look at any work history in this case.
4      Q    And why wouldn't you look at work history when
5  you're considering a Level 4 violation?
6      A    Because again, the disciplinary result for a
7  Level 4 violation would be dismissal.  You look at a work
8  record and a work history if we're looking at progressive
9  discipline to find out what the appropriate next step would
10  be in the policy.
11      Q    Right and if you conclude that both engaged in a
12  physical fight and at some point in the process both had
13  engaged, is there any level of discipline that you would
14  assess other than termination?
15      A    Not for fighting, no.
16      Q    Was this a quick decision for you, Mr. Sullivan,
17  to decide to terminate Mr. Branch?
18      A    It was not, no.  There was a lot of discussion, a
19  lot of review.  It's a dismissal so we always put a lot of
20  attention and detail into our review, but this one was a
21  lot because it was a very unusual case.  As I said, we have
22  not had a self-defense case like this so there was a lot of
23  effort or part to make sure that we were aligned on the
24  facts.
25      Q    Did you --- you understood that in Mr. Branch's

Page 186

1  statement that he submitted prior to the investigation
2  hearing, he indicated in his statement that he feared Mr.
3  Melton, that he was afraid of what Mr. Melton might do,
4  that --- I can just make sure that I don't misquote it
5  here, that he feared for his life around Mr. Melton.  Do
6  you recall reading that statement?
7      A    I do, yes.
8      Q    When you were determining whether Mr. Branch
9  should be terminated as part of the discipline assessed
10  here, did that factor into your decision that he had made a
11  report that he thought his co-worker was a dangerous
12  condition?
13      A    It did, but we reviewed the totality of all the
14  facts introduced.  So, certainly we took into consideration
15  the statement and other evidence introduced.
16      Q    Did that cause you to want to terminate Mr.
17  Branch?
18      A    Taking in all the information, that's where I
19  reached the determination that I thought and felt that
20  termination was appropriate.
21      Q    And did you also read in the investigation
22  hearing transcript a portion of the transcript where Mr.
23  Melton questioned Mr. Branch about whether he viewed Mr.
24  Melton as a threat as of June 7, 2022 before the decision
25  to terminate was made, Mr. Branch said he did not?  Did you

Page 187

1  read that?
2      A    I did read that, yes.
3      Q    And you recall that from the time?
4      A    I do.
5      Q    If Mr. Branch had not come forward to make this
6  report, but another employee had reported this incident,
7  would Mr. Branch still have been fired?
8      A    We would have gone through the same process.  We
9  would have accumulated statements.  We would have proceeded
10  through much of the same process.  I'm assuming that that
11  would obviously just lead to the same type of
12  determination.  It would just depend on the facts and
13  statements and all, but they likely would all be the same.
14      Q    And you're saying that because you wouldn't have
15  had Mr. Branch's ---
16      A    We would have recreated the incident as we would
17  when we are put on notice of any complaint.
18      MS. FITZKE:    I don't have any other questions
19  for you now, Tom.  Thank you.
20      WITNESS:    Okay.
21      JUDGE DONALDSON:    Mr. Sorey, do you have any
22  more questions?
23      MR. SOREY:    I do.
24              REDIRECT EXAMINATION
25  BY MR. SOREY:

Page 188

1      Q    Mr. Sullivan, since you're in charge of
2  discipline policy, why is there no definition for self-
3  defense in the workplace violence policy?
4      MS. FITZKE:    Well, objection.  Foundation.
5  Those are two separate policies.
6      MR. SOREY:    What specific policies?
7      MS. FITZKE:    Workplace violence policy and the
8  discipline policy, sir.
9  BY MR. SOREY:
10      Q    Well, Mr. Sullivan, are you in charge of
11  discipline policies?
12      A    In my role, I oversee the application of that
13  policy in charge of --- I don't know why I say that, but
14  yes, I oversee the application of that policy.
15      Q    And what all does that policy include?
16      A    The policy includes --- it's a progressive
17  discipline policy.  So, it breaks out levels of discipline
18  based on severity of the event and it also spells out the
19  consequence for various disciplinary infractions and the
20  steps that progress throughout the progressive discipline
21  system outlined in the policy.
22      Q    Does the Level 4 violation contain a definition
23  of self-defense?
24      A    It does not.
25      Q    Now, did you have anything to do with the

Robert Branch    2023-FRS-00026    February 13, 2024

Page 189

1 workplace violence policy in constructing it?
2    A    I did not.
3    Q    Okay.  Do you know where it came from?
4    A    It was --- I do not know.  I know it's a
5 collaborative effort across the company.  I do not know who
6 was responsible for the policy though.
7    Q    Now, Mr. Spears told us in his statement, sir, in
8 the hearing a while ago that the hearing transcript on Mr.
9 Branch came with a recommendation for a Level 4 violation,
10 but he could not remember who gave that recommendation.  Do
11 you know?
12    A    I don't know.
13    Q    Do you know that it came with a Level 4
14 recommendation?
15    A    I never saw any recommendation.  All that was
16 sent to me was the transcript and exhibits and if it did
17 come with a recommendation, I wouldn't have --- it was our
18 review so the --- I don't recall any recommendations.
19    Q    Between the discipline policy and the workplace
20 violence policy, which controls the union employee?
21    A    Both.
22    Q    Both?  So, you would have to consider both in
23 coming up with a penalty?
24    A    Correct.  You consider both policies.  What we
25 generally do is we look at a policy that is potentially ---

Page 190

1 where you find a violation.  The discipline policy then
2 would point us in the direction of what's the appropriate
3 disciplinary response.
4    Q    Now, would you agree with me that in the
5 workplace violence policy under the penalty phase, it says,
6 "Up to and including termination as a penalty for it."  Is
7 that correct?
8    A    I could read it, but I'm familiar with that
9 terminology and without looking at it, the policy likely
10 says that, yes.  If you want me to read it, look at it, I
11 can confirm it, but I've heard that phrase and I wouldn't
12 --- it would most likely be in that policy, yes.
13    Q    Would that suggest to you that there's a lesser
14 penalty for workplace violence than just termination?
15    A    Yes, it would.
16       MR. SOREY:    Okay.  That's all the questions I
17 have.
18       RECROSS EXAMINATION
19    BY MS. FITZKE:
20    Q    Mr. Sorey, can you explain what forms of
21 workplace violence that might violate the workplace
22 violence policy could result in the level of discipline
23 that was lesser than a Level 4?
24    A    Examples, I would say verbal bullying, something
25 along those lines where there isn't physical contact, but a

Page 191

1 line was crossed in terms of workplace behavior.  There
2 could be a lot of --- it could be language.  I would look
3 more towards language events that would be something lesser
4 than termination, but we've had anything threatening,
5 fighting, those types of cases we've dealt with dismissal.
6       MS. FITZKE:    Thank you.  I don't have any other
7 questions.
8       MR. SOREY:    I don't have any other questions.
9       JUDGE DONALDSON:    All right, thank you for
10 confirming that.  All right, so Mr. Sullivan, thanks for
11 your testimony today.
12       WITNESS:    Thank you.
13       JUDGE DONALDSON:    We greatly appreciate your
14 time and you can be excused at this time.
15       WITNESS:    All right.
16       JUDGE DONALDSON:    I appreciate it again.  So,
17 what do we think is feasible at this point, Ms. Fitzke?
18       MS. FITZKE:    Mr. Hilliard is ready.  We can get
19 him in.
20       JUDGE DONALDSON:    Mr. Sorey, how about that?
21       MR. SOREY:    That'd be fine.
22       JUDGE DONALDSON:    Okay.  Let's see here.  Let's
23 go ahead and do that without a break unless you want a
24 break, Mr. Sorey.
25       MR. SOREY:    No, I'm ready.

Page 192

1       JUDGE DONALDSON:    You're ready, good.  Okay.
2 Let's hold on for Mr. Hilliard then to join us.  Is he
3 going to be sitting just where Mr. Sullivan was?
4       MS. FITZKE:    No, he's not with us.  He's going
5 to be just joining on the platform here.
6       JUDGE DONALDSON:    Okay.  Good afternoon to you,
7 Mr. Hilliard.  Can you hear me fine?
8       MR. HILLIARD:    Yes.
9       JUDGE DONALDSON:    Good.  I can hear you as
10 well.  Thank you again for joining this formal
11 administrative hearing in progress.  You are a witness in a
12 complaint or administrative proceeding arising from a
13 complaint of Robert Branch against Illinois Central.  It is
14 under the whistleblower protection provisions of the
15 Federal Rail Safety Act and I'm Angela Donaldson in
16 Covington, Louisiana.  Let's see here.  You are being
17 called as a witness for Complainant, Mr. Branch's attorney,
18 Mr. Sorey.  He's the one that will first ask you questions
19 here.  Let me get you under oath first.  Would you please
20 raise your right hand?
21 Whereupon,
22       THOMAS HILLIARD
23 having been duly sworn, was called as a witness herein and
24 was examined and testified as follows:
25       WITNESS:    I do.

Page 193

1    JUDGE DONALDSON:   All right. Thank you. You
2 can proceed.
3    MR. SOREY:   Thank you, ma'am.
4    DIRECT EXAMINATION
5 BY MR. SOREY:
6    Q    Mr. Hilliard, in June of 2022, you were in charge
7 of the U.S. tracks of the Illinois Central Railroad, were
8 you not?
9    A    Yes, sir.
10   Q    Okay. Now, your only connection to the hearing
11 for employees I see is to read the transcript and converse
12 with Labor Relations to determine an outcome for the
13 employee?
14   A    Yes, I don't read the entire transcript. I
15 usually just kind of breeze through it and then I go by the
16 recommendations of HR, LR or I ask questions if need be,
17 but I'm usually briefed on it and then make a decision from
18 there.
19   Q    You say you just breeze through the transcripts?
20   A    Yes, sir.
21   Q    Okay and you rely on the facts of the transcript?
22   A    I missed the first part of that.
23   Q    Who do you rely upon for the facts of the
24 hearing?
25   A    That would be HR or the LR team, whoever I'm

Page 194

1 working with.
2    Q    Okay. Now, what is your definition of self-
3 defense?
4    A    Self-defense. In this circumstance you're saying
5 or self-defense in general or ---
6    Q    Let's start with self-defense in general.
7    A    I would --- if I was in a fight, I would cover
8 myself up or I would take myself away from the situation.
9    Q    Okay. Do you know whether the disciplinary panel
10 considered self-defense for Mr. Branch based on the
11 affidavits of the witnesses to the incident?
12   A    I'm not sure I know that Mr. Branch was let go
13 because of fighting.
14   Q    Okay. Did the panel consider self-defense with
15 Mr. Branch and his decision?
16   A    I'm not sure.
17   Q    What, in your opinion, should Mr. Branch have
18 done once he was attacked?
19   A    Leave the situation.
20   Q    Okay. Were you aware of the surroundings of the
21 parking lot of the hotel in Columbia, Mississippi that
22 night?
23   A    I'm not sure what you mean by that.
24   Q    Okay. Did you know that there was a barbecue
25 with flames in it sitting in the back that a co-employee

Page 195

1 truck while they were cooking steaks out or did you know
2 that there were cars in the parking lot and did you know
3 whether there was a fence surrounding the parking lot?
4    A    No, I don't know exactly ---
5    MS. FITZKE:   I'm sorry. Object. He's stating
6 --- asking questions about facts that are not in the
7 record. No foundation.
8    JUDGE DONALDSON:   I do believe some --- well,
9 I'm trying to recall myself whether some of this was spoken
10 to by earlier witnesses. I'm going to sustain that in
11 part. Mr. Sorey, are you trying to recite facts from Mr.
12 Branch's testimony?
13   MR. SOREY:   Yes.
14   JUDGE DONALDSON:   He's the only person I
15 believe would have recalled would have been speaking to
16 this event, correct?
17   MR. SOREY:   Yes, ma'am. He did testify to
18 that.
19   JUDGE DONALDSON:   All right. Can you just
20 break down your question and just ask parts?
21   MR. SOREY:   Okay.
22 BY MR. SOREY:
23   Q    Mr. Hilliard, you said that he should walk away
24 from the situation. What is your definition of walk away?
25   A    Take yourself out of the situation.

Page 196

1    Q    Okay. Remove yourself from the area in which
2 you're in?
3    A    Take yourself out of the situation however you
4 have to do that.
5    Q    Okay. What is your definition of taking yourself
6 out of the situation then?
7    A    That's my definition. You take yourself out of
8 the situation. Remove yourself from the situation.
9    Q    Okay and that's what you consider self-defense in
10 reviewing this transcript?
11   A    From what I see in the transcript and what I was
12 briefed on, yes.
13   Q    Did you read the witness statements?
14   A    I don't think I did. Probably not. I'm not
15 sure.
16   Q    What do you remember that influenced your
17 decision to terminate Mr. Robert Branch?
18   A    Employees were fighting.
19   Q    Okay. As far as you know, Mr. Branch has never
20 been in any trouble with IC, has he?
21   A    I'm not --- off the top of my head, I'm not sure
22 what his prior record was.
23   (Mr. Sorey and Witness speak at same time)
24   WITNESS:   It would have been told to me when I
25 was being briefed.

Robert Branch    2023-FRS-00026    February 13, 2024

Page 197

1      MR. SOREY:   Okay.  I didn't mean to interrupt
2  you.  I'm sorry.
3      WITNESS:   I'm sorry.
4  BY MR. SOREY:
5      Q   So, his record whether it be good or bad was not
6  considered in making your decision?
7      A   I can't recall that.  I don't remember what they
8  told me during the briefing.
9      Q   Okay.  Is there any distinction between a
10  managerial employee and a union employee that's involved in
11  any type of altercation?
12     A   You mean as in fighting or ---
13     Q   Yes.  Let's say fighting.
14     A   If we had two managers fighting, they would also
15  be fired.
16     Q   Okay.  Were you aware that Mr. Christopher Day
17  was involved in an altercation with a contractor at an
18  Illinois bar when they were out eating and having drinks
19  and he advised us that the contractor head butted him and
20  he left?
21     A   Know nothing about it.
22     Q   Okay.  Would Mr. Patrick Crain normally advise
23  you of a situation that I just described to you?
24     A   If it's reported by an employee or a contractor
25  or the person involved, then I would be advised.

Page 198

1      MR. SOREY:   Okay.  I believe that's all the
2  questions I have.
3      JUDGE DONALDSON:   All right, thank you, Mr.
4  Sorey.  Ms. Jacobson, does that mean you're the attorney
5  handling the examination?
6      MS. JACOBSON:   Yes.  I do have some questions,
7  Your Honor.
8      JUDGE DONALDSON:   All right.
9           CROSS EXAMINATION
10  BY MS. JACOBSON:
11     Q   Could you please tell us what your current role
12  is?
13     MR. SOREY:   I'm having a hard time hearing you.
14     MS. JACOBSON:   Let me move my seat a little
15  closer to my microphone.
16     JUDGE DONALDSON:   Okay.
17     MS. JACOBSON:   Is that better this time?
18     MR. SOREY:   A little bit.
19     MS. JACOBSON:   A little bit?
20     JUDGE DONALDSON:   I think that's good.
21     MS. JACOBSON:   Okay.  Great.
22  BY MS. JACOBSON:
23     Q   Tom, can you please tell us what your role is,
24  your job title?
25     A   I'm chief of signals for U.S. and Canada and

Page 199

1  chief of track in the U.S.
2      Q   And is that the same position that you held in
3  May of 2022?
4      A   Yes, ma'am.
5      Q   What was your role on the discipline review panel
6  in relation to Mr. Branch?
7      A   I usually just have to approve any discipline
8  that happens, anything that's under me and I just get
9  briefed on the situation and go by what the recommendations
10  are.  If I have questions, I ask and most of the time, I
11  make my decision from that.
12     Q   So, in the case of Mr. Branch, what information
13  did you have that led you to approve his termination of his
14  employment?
15     A   He was fighting.
16     Q   And do you recall who you spoke with in reaching
17  this approval determination?
18     A   I don't remember exactly.  It's usually --- I'd
19  be speculating, but somebody usually from HR, LR.  I don't
20  remember exactly who it was.
21     Q   Okay.  When you approved Mr. Branch's termination
22  of employment, did it matter to you that Mr. Branch had
23  alleged that he had feared for his life or viewed Mr.
24  Melton as a safety threat?
25     A   I don't remember that discussion around that.

Page 200

1      MS. JACOBSON:   I think that is all of my
2  questions.  Thank you.
3      MR. SOREY:   I don't have any further questions.
4  Thank you for coming.
5      JUDGE DONALDSON:   All right and thank you very
6  much, Mr. Hilliard.  Glad you could join us this afternoon.
7  We thought you could be a short witness and I don't know
8  from your perspective, but from our perspective, that was
9  fairly short so thank you again.
10     WITNESS:   I'm all done.  I can leave the screen
11  now?
12     JUDGE DONALDSON:   You're done.  If you're told
13  you can leave, that's what that means.
14     WITNESS:   Thank you.
15     JUDGE DONALDSON:   Thank you.
16     WITNESS:   You all have a good day.  Thank you.
17     JUDGE DONALDSON:   Okay, thank you.  You too.
18  All right.  We're at 3:30, but we've already decided
19  Patrick Crain is best left for the morning, I believe,
20  right?
21     MR. SOREY:   Yes.
22     MS. FITZKE:   How long do you think you're going
23  to take with him, Eddy?  I mean he's here.  It's earlier
24  than I thought.
25     MR. SOREY:   Let's see.

Robert Branch    2023-FRS-00026    February 13, 2024

---

Page 201

1        MS. FITZKE:   If we can finish, we can get him
2   out.  If we're not going to finish, then I agree, we should
3   just wait until the morning.
4        MR. SOREY:   I think he's going to be the
5   longest witness.
6        MS. FITZKE:   Let's just wait till the morning
7   then if that's okay with the judge.
8        JUDGE DONALDSON:   It's fine with me.  Again,
9   I've got much more time than that reserved for this case so
10  that's fine with me and it sounds like that's probably best
11  for everyone concerned then.  Mr. Crain, as long as he can
12  be available in the morning, it's fine.
13       MR. SOREY:   I think we can easily finish by
14  noon.
15       JUDGE DONALDSON:   Okay.  Yes, I think that's
16  preferable to stopping potentially in the middle of his
17  testimony this afternoon.  I'd like to avoid that if it
18  seems like we can.  All right, that means we can wrap up
19  for the day.  Thanks to everyone's again skill,
20  proficiency, efficiency.  By my count, I think we did six
21  witnesses.  You did six witnesses today.  That's really
22  something else.  Well done.  So, I appreciate that.  I'm
23  sure you're pleased too.  Is there anything you want to
24  discuss before we adjourn for the day?
25       MR. SOREY:   I don't think so.

---

Page 202

1        JUDGE DONALDSON:   It doesn't --- you don't have
2   to file anything tonight necessarily, but I show that
3   remaining for the evidentiary record is the Gardener
4   deposition which will be JX-49.  There may be some
5   deposition excerpts that have been used during the hearing,
6   but we can circle back and talk about that when we're
7   concluding tomorrow to make sure and I don't need the
8   Gardener deposition before tomorrow.  So, if you're ready
9   to file it, that's fine.  If you want to wait until we're
10  done tomorrow, that's fine too.  All right, so again, I
11  appreciate everybody, your hard work that you've put into
12  it and being so prepared.  So, we will adjourn for today,
13  go off the record and I'll see you at 9:00 a.m. tomorrow
14  and you will use the same link that you got from Ms. Wynn.
15  It applies for tomorrow morning too.
16       MS. FITZKE:   Thank you.
17       MR. SOREY:   Thank you, Your Honor.
18       JUDGE DONALDSON:   All right.  Thank you all
19  very much.  See you tomorrow.
20       [Whereupon, the hearing was concluded at 3:30
21  p.m., CST and will resume the following day.]
22  //
23  //
24  //
25  //

---

Page 203

C E R T I F I C A T E

Name:      Robert Branch
Case Number: 2023-FRS-00026
Date:      February 13, 2024
Location:    Video Hearing
          This is to certify that the attached proceedings
before the United States Department of Labor, Office of
Administrative Law Judges, were held according to the
record and that this is the original, complete, true and
accurate transcript that has been compared to the reporting
or recording accomplished at the hearing.


/s/Jordan Bayley               February 13, 2024
Bayley Reporting, Inc.              Date
Official Federal Reporters
Building 1, Suite 14
12945 Seminole Boulevard
Seminole, FL  33778

---

Robert Branch   2023-FRS-00026   February 13, 2024

## A

**Abandon** - 164:24
**Ability** - 65:1, 65:3, 66:14
**Able** - 15:24, 29:2, 30:15, 30:19, 57:24, 57:25, 58:8, 59:1, 61:19, 64:19, 65:25, 69:14, 70:19, 78:5, 78:6, 78:10, 87:10, 95:14
**Above** - 153:1
**Absence** - 8:6
**Absolute** - 138:25
**Accept** - 169:9
**Accepted** - 89:4, 89:5
**Access** - 150:13, 150:17, 156:21
**Accommodate** - 15:24
**Accompanying** - 9:10
**According** - 164:20, 164:21
**Account** - 30:17, 31:2
**Accountable** - 182:25
**Accumulated** - 187:9
**Accurate** - 29:9, 29:10, 56:1, 61:11
**Accurately** - 55:20, 66:3
**Accused** - 66:11, 110:20
**Across** - 16:9, 54:10, 177:5, 178:1, 189:5
**Act** - 4:5, 6:20, 6:23, 6:25, 10:20, 10:22, 12:23, 13:7, 13:11, 94:20, 120:11, 192:15
**Acted** - 106:18, 114:19
**Acting** - 173:8
**Action** - 8:3, 8:6, 12:25, 147:3, 171:15, 173:9, 173:10
**Actions** - 23:10, 149:23, 164:2,

173:11
**Activated** - 136:24, 136:25
**Active** - 107:15, 110:25
**Actively** - 45:6, 164:17
**Activity** - 8:2, 8:7, 12:23, 12:24, 13:4, 13:13, 13:15, 13:21
**Acts** - 179:8
**Actual** - 128:8, 154:16, 180:17
**Add** - 11:10, 67:15
**Addition** - 75:23
**Address** - 10:7, 17:24, 17:25, 18:5, 62:8, 152:10
**Addressed** - 43:18
**Addresses** - 5:17
**Addressing** - 13:6, 149:9
**Adequately** - 14:4
**Adjourn** - 201:24, 202:12
**Adjudicate** - 179:2
**Adjudicated** - 12:20
**Administrative** - 4:9, 4:11, 5:1, 7:20, 7:21, 11:9, 120:12, 192:11, 192:12
**Admit** - 9:18
**Admits** - 157:21
**Admitted** - 4:24, 10:4
**Adopt** - 4:17
**Adrenalin** - 145:13
**Advantage** - 83:5
**Adverse** - 8:3, 8:6, 12:25, 43:20
**Advice** - 109:15, 109:18, 109:25, 184:19
**Advise** - 155:19, 197:22
**Advised** - 48:13, 63:15, 67:22, 87:3, 104:20, 197:19, 197:25
**Advising** - 176:2
**Affect** - 48:14
**Affected** - 26:17, 26:18
**Affidavits** - 194:11

**Afraid** - 159:14, 160:4, 164:12, 186:3
**Afternoon** - 134:2, 166:16, 167:12, 192:6, 200:6, 201:17
**Against** - 41:9, 94:20, 120:9, 192:13
**Agency** - 4:14
**Aggressor** - 124:12
**Agree** - 12:5, 12:6, 12:10, 190:4, 201:2
**Agreed** - 158:13, 158:14
**Agreeing** - 90:1
**Agreement** - 9:6, 153:17, 175:15
**Agrees** - 168:24
**AIR** - 6:24
**AI** - 181:4
**Alert** - 17:4
**Align** - 178:8
**Aligned** - 185:23
**Alignment** - 184:22
**Allegations** - 176:1
**Alleged** - 11:25, 13:21, 100:3, 160:13, 199:23
**Allegedly** - 99:9, 99:22
**Alleges** - 13:14
**Alleging** - 8:4, 11:2
**Allowed** - 64:16
**Altercations** - 102:6, 103:13, 104:12, 104:16
**Alternative** - 69:5
**Amended** - 9:18
**Amongst** - 157:8
**Amount** - 28:16, 28:17, 31:11, 71:2, 71:8, 74:2, 78:14, 166:17
**Angela** - 4:9, 192:15
**Anger** - 145:13
**Annually** - 148:13
**Anticipate** - 118:22
**Anticipated** - 167:8
**Anxiety** - 26:24
**Anyway** - 16:5, 16:10, 84:14, 94:8
**Anywhere** - 41:14
**Apologies** - 11:18, 132:3

**Apologize** - 45:10, 96:5
**Apologized** - 89:3, 89:8, 89:25
**Apology** - 89:4, 89:5
**Apparently** - 140:20
**Appeals** - 11:23
**Appear** - 12:20, 47:12, 115:24, 116:9, 117:3, 143:2
**Appearance** - 5:18
**Appeared** - 64:12
**Appearing** - 16:11
**Appears** - 11:22, 103:23, 115:25, 143:4
**Application** - 7:18, 188:12, 188:14
**Applied** - 29:17, 29:20, 29:21, 43:25, 44:12, 68:16, 68:17, 68:21, 69:1, 69:10, 85:8, 85:12, 104:22
**Applies** - 122:21, 151:24, 174:13, 202:15
**Apply** - 7:1, 7:4, 7:5, 7:23, 96:20, 106:25, 152:2, 172:7, 172:11, 174:12, 175:16
**Applying** - 69:5
**Appreciate** - 15:5, 41:23, 58:6, 84:14, 95:21, 96:7, 118:10, 118:13, 119:14, 119:20, 133:2, 191:13, 191:16, 201:22, 202:11
**Appreciation** - 119:19
**Appreciative** - 16:1
**Approach** - 104:4, 104:10, 112:6
**Approached** - 112:14
**Appropriate** - 157:20, 178:9, 185:9, 186:20, 190:2
**Approval** - 199:17
**Approve** - 199:7, 199:13

**Approved** - 199:21
**Approximately** - 19:7, 28:14, 30:25, 75:16, 77:6, 78:15, 79:7
**Arbitral** - 182:14
**Arbitration** - 177:7
**Area** - 65:9, 84:5, 130:5, 175:23, 196:1
**Aren't** - 141:10
**Argument** - 48:9, 127:24
**Argumentative** - 14:3:22
**Arises** - 11:22
**Arising** - 192:12
**Arms** - 164:22
**Arose** - 122:3
**Arrived** - 18:24
**Aspect** - 149:16
**Assert** - 22:11
**Assess** - 52:11, 107:21, 108:20, 185:14
**Assessed** - 108:3, 108:13, 131:19, 153:12, 153:20, 184:23, 186:9
**Assessing** - 152:12
**Assessment** - 184:10
**Assist** - 57:23
**Assistance** - 62:2, 120:18
**Assistant** - 18:13, 21:18, 28:25, 55:18
**Assumed** - 51:17
**Attached** - 60:23, 61:1
**Attachment** - 60:23
**Attack** - 21:6, 24:11, 36:14, 38:6, 51:6
**Attacked** - 21:20, 21:21, 23:8, 24:1, 24:10, 34:18, 38:3, 96:25, 194:18
**Attacking** - 36:19, 38:5
**Attacks** - 45:24
**Attempting** - 103:25
**Attention** - 8:18, 93:8, 133:9, 176:13, 179:14, 185:20

Robert Branch    2023-FRS-00026    February 13, 2024

**Attorney** - 16:9, 16:15, 16:17, 17:16, 59:10, 84:18, 147:23, 192:17, 198:4
**Attorneys** - 4:12, 5:4, 8:22, 72:18, 92:25, 133:2, 133:3, 133:10, 165:20
**Availability** - 167:5
**Available** - 94:3, 153:7, 167:11, 201:12
**Aviation** - 6:25
**Avoid** - 24:14, 172:17, 201:17
**Awarded** - 8:7
**Awkward** - 95:19

| B |
| --- |

**Baby** - 31:12
**Backing** - 51:8, 51:10
**Backwards** - 51:11
**Balled** - 19:25, 20:11, 49:2, 49:16
**Bar** - 101:23, 106:14, 113:23, 123:25, 125:16, 125:20, 146:1, 174:9, 197:18
**Barbecue** - 19:2, 97:23, 194:24
**Barefoot** - 47:9
**Barely** - 20:10, 81:13
**Bargaining** - 175:15, 177:4
**Base** - 107:11
**Based** - 61:7, 78:3, 78:8, 106:19, 107:13, 110:24, 111:1, 133:25, 140:4, 167:8, 169:4, 180:6, 180:11, 180:15, 180:20, 188:18, 194:10
**Basic** - 10:18, 182:23
**Basing** - 29:11, 29:12, 29:14, 116:18
**Basis** - 162:17
**Became** - 172:16
**Become** - 45:23

**Behavior** - 46:9, 179:10, 191:1
**Behind** - 19:1, 21:6, 97:24
**Believed** - 92:15, 159:6
**Benefit** - 33:7, 33:8, 54:25, 69:15, 69:25, 83:3, 88:8, 95:23
**Benefits** - 8:24, 33:17, 69:14, 69:22, 70:2, 70:6, 70:11, 74:15, 75:7, 75:11, 75:13, 82:10, 82:13, 83:4, 85:15, 85:16, 88:5
**Big** - 39:22, 157:21
**Birthday** - 82:24, 82:25
**Bit** - 62:17, 71:15, 71:19, 86:23, 94:11, 94:13, 95:18, 119:11, 132:2, 134:14, 148:20, 151:12, 166:9, 177:12, 198:18, 198:19
**Biweekly** - 80:8, 80:16, 81:3
**Bless** - 90:13
**Block** - 51:18
**Blood** - 19:24, 25:10, 87:14
**Blow** - 39:23
**Blue** - 60:13, 126:16, 132:11, 175:3
**Bluff** - 18:16
**Board** - 31:15, 120:3
**Book** - 148:18
**Bottom** - 152:17
**Box** - 140:16
**Break** - 41:25, 42:2, 42:13, 84:19, 93:12, 94:8, 94:11, 94:13, 118:19, 119:3, 120:2, 133:21, 133:22, 134:21, 167:11, 167:18, 191:23, 191:24, 195:20
**Breaks** - 8:19, 8:23, 188:17

**Breath** - 158:2
**Breeze** - 193:15, 193:19
**Bridge** - 18:12, 18:14
**Brief** - 14:3
**Briefed** - 193:17, 196:12, 196:25, 199:9
**Briefing** - 14:4, 197:8
**Briefs** - 8:25
**Broad** - 143:25
**Broke** - 20:14, 20:15, 21:11
**Broken** - 43:15
**Brother** - 40:11
**Brought** - 26:5, 26:14, 41:9, 94:20, 105:2, 105:12, 117:13, 138:17, 140:25, 176:11, 176:12
**Bubbles** - 60:11
**Buckets** - 178:6
**Building** - 94:6
**Bullet** - 154:6, 154:14
**Bullying** - 190:24
**Burden** - 13:2, 13:5
**Burdens** - 12:20
**Buried** - 19:15
**Business** - 5:17, 68:1
**Busted** - 36:21
**Butt** - 125:21
**Butted** - 113:23, 126:17, 175:4, 197:19
**Butts** - 106:14
**Bystanders** - 97:2

| C |
| --- |

**Calculate** - 78:16, 79:12, 81:15
**Calculated** - 79:13, 80:16, 81:14
**Calculation** - 81:19, 86:10
**Call** - 14:14, 37:16, 37:20, 42:7, 63:9, 63:13, 64:19, 70:10, 127:3, 127:5, 127:7, 127:12, 128:6,

128:7, 173:20
**Camera** - 5:10, 14:17, 136:25, 166:2
**Canada** - 182:7, 182:13, 198:25
**Canadian** - 182:21, 182:25
**Canadians** - 163:16
**Can't** - 17:15, 47:21, 59:2, 73:10, 76:4, 128:17, 142:24, 161:15, 164:25, 197:7
**Capacity** - 6:13, 6:16
**Car** - 28:1
**Care** - 27:21, 70:11, 70:17, 75:23, 77:23, 78:2
**Carefully** - 163:23
**Carpenter** - 31:25
**Carrier** - 6:8, 10:21, 91:2, 91:9
**Carries** - 119:25
**Carroll** - 18:2, 18:3, 85:4
**Carry** - 83:7
**Cars** - 98:2, 195:2
**Cases** - 45:2, 107:21, 172:18, 183:5, 183:6, 183:7, 191:5
**Cash** - 30:18, 31:5
**Catch** - 73:22, 82:10, 134:18
**Catching** - 150:25
**Categories** - 153:23
**Category** - 143:17
**Caught** - 21:6
**Cause** - 11:4, 25:23, 41:3, 143:13, 171:17, 186:16
**Causing** - 139:13, 143:4, 143:12, 143:14, 143:15
**Caution** - 58:12
**Central's** - 107:22
**Century** - 6:25
**Certain** - 76:21, 93:5, 95:22
**Certainly** - 134:10, 182:1, 184:24, 186:14
**CFR** - 7:2, 7:24

**Chain** - 102:15
**Chair** - 16:8
**Chance** - 9:8, 15:21, 23:1, 23:2, 23:5, 23:6, 23:15, 24:21, 24:22, 34:8, 34:14, 38:4, 53:16, 56:23, 59:7, 127:3, 163:23
**Change** - 92:5, 119:20
**Changed** - 25:4
**Charge** - 188:1, 188:10, 188:13, 193:6
**Charged** - 7:6, 41:8
**Charges** - 41:9
**Charging** - 25:25
**Cheaper** - 83:15, 83:16, 83:22
**Check** - 123:2, 150:15
**Chief** - 198:25, 199:1
**Chill** - 19:18, 48:13
**Choose** - 166:2
**Choosing** - 77:22
**Chose** - 50:8, 50:12, 50:13, 77:14, 83:21
**Christohper** - 120:7
**Christopher** - 15:1, 15:16, 35:13, 101:22, 102:21, 103:9, 103:20, 121:2, 197:16
**Chummy** - 16:2
**Church** - 40:14
**Circle** - 63:6, 202:6
**Circuit** - 11:23, 12:2
**Circumstance** - 181:20, 182:16, 182:17, 194:4
**Circumstances** - 140:13, 161:14, 164:6, 182:15
**Claim** - 4:14, 6:23, 13:15, 22:14, 48:16, 55:11, 69:25, 70:1, 79:11
**Claimant** - 4:7
**Claimed** - 131:12
**Claiming** - 50:16
**Claims** - 7:16

Robert Branch 2023-FRS-00026 February 13, 2024

Clarification - 12:8, 12:15
Clarify - 53:17, 62:13, 79:10, 95:14
Clarifying - 84:15
Clark's - 118:23
Clean - 108:21
Close - 30:1
Closed - 4:22
Closely - 169:3
Closer - 16:9, 198:15
CM - 148:25, 151:6
CN - 171:15, 171:17, 173:24, 174:14, 176:25
Co - 6:4, 21:17, 26:6, 29:14, 54:24, 65:8, 145:7, 149:21, 159:23, 173:1, 186:11, 194:25
Cobra - 70:16, 73:5, 75:4, 85:21, 85:23, 88:6, 88:7
Code - 44:4, 44:9, 68:1, 148:3, 148:9, 163:10
Coincides - 154:16
Colia - 17:25
Collaborative - 189:5
Colleague - 6:6, 70:22
Colleagues - 182:13, 182:22
Collect - 130:13
Collecting - 130:4, 130:19
Collective - 175:15, 177:4
Colonial - 18:17, 19:4, 19:5
Columbia - 30:4, 30:9, 30:10, 30:12, 62:9, 194:21
Columbus - 30:7, 30:8, 62:8, 62:14
Combined - 71:3
Comes - 16:21, 116:21, 156:22
Comfortable - 54:24
Coming - 20:4, 36:5, 47:3, 87:14,

115:20, 189:23, 200:4
Commentary - 49:25
Comments - 48:4, 60:13, 139:23
Committed - 180:13
Commoner - 18:13
Communicate - 111:20
Communicated - 89:12
Communication - 24:18
Communications - 126:23
Community - 27:23, 40:9
Company's - 67:11, 68:8, 70:16
Compassionate - 90:4
Compensation - 63:21, 63:24
Complainant - 4:18, 5:6, 5:15, 8:1, 10:18, 10:23, 10:25, 11:1, 11:7, 12:10, 12:22, 13:5, 13:6, 13:9, 192:17
Complainant's - 14:8
Complaint - 11:1, 11:5, 187:17, 192:12, 192:13
Complaints - 43:21, 147:4
Complete - 93:4
Completed - 93:16
Completely - 32:17, 40:19, 80:5, 180:15
Compliance - 147:12, 147:14
Comprehensively - 165:22
Computer - 95:15
Concerned - 201:11
Concerning - 35:19, 145:16, 176:2
Conclude - 55:2, 181:14, 185:11
Concluded - 67:14, 107:14, 112:1, 131:17, 133:1,

158:16, 179:22, 202:20
Concludes - 41:21
Concluding - 107:9, 157:19, 202:7
Conclusion - 4:21, 67:17, 107:11, 107:13, 141:2, 180:9, 180:13
Conclusions - 4:17
Concurred - 158:10
Condition - 13:17, 77:1, 158:7, 158:19, 186:12
Conditions - 76:22, 93:6
Conduct - 11:24, 44:4, 44:9, 68:1, 106:7, 148:3, 148:9, 158:18, 171:15, 180:4, 180:6
Conducted - 117:9
Conducting - 42:4
Confer - 9:12
Conference - 4:6, 8:11, 54:10
Confirm - 58:6, 62:15, 88:4, 167:7, 190:11
Confirmatory - 58:22
Confirmed - 61:10
Confirming - 191:10
Confrontation - 101:7, 172:17
Confused - 184:6
Confusion - 59:14
Conjunction - 66:12, 77:11, 77:18, 110:21, 183:19, 184:10
Connection - 64:8, 172:1, 193:10
Consequence - 188:19
Consequences - 168:24
Consideration - 18:6:14
Considered - 89:15, 90:7, 138:19, 140:21, 163:14, 164:2, 194:10, 197:6

Considering - 185:5
Consistency - 182:7
Consistent - 81:10
Constructing - 189:1
Consult - 184:21
Consultant - 178:11, 184:22
Consultative - 178:7
Consulted - 169:18, 178:13
Contact - 138:8, 140:15, 157:1, 164:8, 164:14, 182:24, 190:25
Contacted - 99:4
Contain - 86:14, 188:22
Contained - 67:24, 73:17, 86:16, 142:11, 180:10
Continuation - 88:6, 88:7
Continue - 9:11, 77:13, 77:14, 84:18, 84:20, 138:8, 171:20, 171:22
Continued - 51:13, 51:16, 80:20, 158:1
Continues - 182:4
Contract - 28:17, 28:24, 29:3, 175:3, 177:7
Contractor - 114:23, 123:24, 125:13, 126:15, 132:11, 132:12, 145:17, 145:25, 174:9, 175:2, 175:11, 197:17, 197:19, 197:24
Contributing - 8:3, 12:24
Control - 8:12, 58:1
Controls - 189:20
Conversation - 34:7, 126:16, 128:16, 172:13
Conversations - 56:23, 90:25, 145:15, 155:8, 156:19

Converse - 193:11
Convince - 112:3
Convincing - 8:5, 13:3
Cooked - 40:13, 40:14
Cooking - 19:2, 19:8, 40:17, 195:1
Copy - 58:19, 65:23, 148:18, 148:19, 179:22
Correctly - 79:19, 169:2
Cost - 77:5
Couldn't - 11:14, 50:14, 92:5, 92:6
Counsel - 5:5, 5:8, 6:1, 6:4, 6:7, 6:8, 47:2, 54:24
Count - 201:20
County - 17:25, 18:2, 18:3, 85:4
Couple - 7:2, 12:21, 30:18, 50:15, 62:5, 66:18, 74:13, 166:19
Course - 4:23, 13:9, 15:20, 16:14, 93:1, 127:16, 131:9, 144:21
Court - 11:23, 23:18, 45:10, 88:21, 136:14, 136:18
Court's - 14:5
Cover - 6:22, 8:24, 10:13, 14:3, 84:3, 97:11, 97:18, 119:2, 157:15, 194:7
Coverage - 74:3, 74:9, 75:17
Covered - 8:10, 77:3, 84:4, 119:17
Covering - 96:25, 119:16
Covers - 149:11
Covington - 4:10, 192:16
Cows - 40:4
Crain's - 102:5, 184:9
Creating - 52:9
Creation - 177:21
Credible - 67:25
Crew - 53:8
Cross - 16:18,

Robert Branch   2023-FRS-00026   February 13, 2024

41:25, 42:4, 42:18, 45:5, 88:2, 106:11, 126:9, 148:1, 172:12, 176:20, 198:9
**Crossed** - 191:1
**CST** - 4:2, 42:11, 42:12, 94:15, 94:16, 120:5, 120:6, 135:4, 135:5, 167:25, 168:1, 202:21
**Cumulative** - 102:13
**Current** - 198:11
**Currently** - 101:13
**Cursory** - 169:10
**Customary** - 172:8
**Cut** - 39:22, 39:23, 124:23, 128:18, 132:1, 136:4
**Cutting** - 166:23
**CX** - 9:3

**D**

**Dale** - 90:13, 90:18
**Damages** - 70:1
**Dancing** - 47:9
**Dangerous** - 186:11
**Date** - 11:14, 11:19, 18:7, 18:8, 26:12, 38:22, 39:16, 60:19, 81:15, 81:16, 81:17, 81:18, 151:14, 177:17
**Dated** - 11:6, 62:1
**Daughter** - 32:11, 32:14, 78:6, 83:17
**Daughter's** - 77:11, 78:1, 78:3
**Days** - 27:14, 46:13, 67:18
**Day's** - 37:14, 60:12, 102:21
**De** - 4:15
**Deal** - 30:17, 90:3
**Dealt** - 182:1, 182:2, 191:5
**December** - 80:22
**Decide** - 185:17
**Decided** - 169:16, 200:18
**Decides** - 168:25
**Deciding** - 57:1, 138:19

**Deescalate** - 107:16, 123:10, 126:22, 137:25, 138:3, 138:5
**Deescalated** - 124:12
**Defend** - 49:17, 109:20, 172:17
**Defenses** - 7:17
**Defensive** - 51:17, 53:6, 138:7, 164:17
**Defer** - 14:9
**Deferral** - 14:8
**Define** - 170:6
**Defined** - 171:14
**Definitely** - 115:8, 117:16
**Definitions** - 116:8, 143:19
**Delivered** - 40:14
**Dental** - 32:20, 33:24, 70:11, 70:17, 71:2, 72:7, 72:9, 73:4, 74:17, 75:11, 75:18, 75:23, 76:1, 76:3, 85:25, 88:5
**Deposed** - 54:8, 144:21
**Depression** - 26:24
**Describe** - 19:19, 47:3, 153:10
**Described** - 10:20, 197:23
**Describing** - 50:25, 53:23, 90:25
**Desk** - 58:20
**Detailed** - 58:23
**Determination** - 52:10, 139:10, 173:12, 173:18, 173:20, 180:21, 186:19, 187:12, 199:17
**Determine** - 107:20, 108:3, 125:7, 140:3, 142:10, 153:4, 153:16, 154:17, 164:5, 168:23, 169:3, 193:12
**Determined** - 125:9, 141:1, 178:5, 180:20
**Determining** - 108:13, 110:14, 130:12, 131:4, 131:17, 131:18, 178:3, 186:8
**Devastating** - 40:10

**Developed** - 173:13
**Development** - 169:12
**Diem** - 63:25, 64:1, 64:2, 64:4, 122:24
**Difference** - 72:19, 93:23, 103:25, 104:5, 162:18, 162:21
**Differentiate** - 72:21
**Differently** - 183:7
**Difficulties** - 8:16
**Dinner** - 175:2
**Directed** - 48:4, 171:2
**Directing** - 182:6
**Direction** - 20:2, 190:2
**Directly** - 96:14, 97:24, 99:13, 176:9, 182:11
**Director** - 168:17, 176:23, 177:3
**Disagree** - 173:15
**Disagreement** - 110:19
**Disagrees** - 79:2
**Disaster** - 40:5
**Disbelief** - 22:2
**Discharge** - 12:25
**Disciplined** - 185:1
**Discomfort** - 30:3
**Discourage** - 57:7, 121:22
**Discrimination** - 14:7:4, 147:19
**Discussing** - 111:12
**Discussions** - 110:17, 155:15, 179:19
**Dismissal** - 138:25, 139:4, 139:7, 139:8, 169:19, 169:22, 178:19, 183:11, 185:7, 185:19, 191:5
**Dismissed** - 11:4, 91:12
**Dismissible** - 139:2, 169:8, 169:20, 178:22
**Displaying** - 95:17
**Dissuade** - 57:7
**Distinction** - 197:9
**Distractions** - 8:15,

120:21
**District** - 136:8
**Diversity** - 146:16
**Division** - 104:13
**Divorce** - 32:12, 32:13
**Doable** - 166:18
**Docket** - 4:6
**Doctor** - 26:20, 26:21, 26:22, 26:23, 27:3, 39:2
**Doctor's** - 26:25
**Document** - 55:2, 62:19, 70:22, 72:1, 72:2, 116:8, 149:3, 152:16
**Documentary** - 65:4
**Documents** - 9:20, 10:1, 62:14, 120:21, 143:3, 143:20
**Doesn't** - 7:4, 8:21, 93:23, 102:4, 117:23, 161:17, 171:23, 175:16, 202:1
**DONALSDON** - 147:22
**Door** - 26:5, 26:15, 36:10, 47:5, 47:7
**Downplayed** - 28:8
**Dr** - 26:22
**Drew** - 19:24
**Drink** - 126:15, 132:13
**Drinking** - 36:15, 36:16, 36:17, 47:13, 47:14
**Drinks** - 175:2, 197:18
**Driver** - 10:24, 12:11, 12:13
**Drop** - 37:10, 37:17, 37:24, 37:25
**Dropped** - 79:7
**Drove** - 21:18
**Duane** - 6:9, 15:10, 133:18, 135:12, 169:15, 183:17
**Due** - 175:14
**Duly** - 17:11, 95:3, 121:3, 135:13, 168:8, 192:23
**Duration** - 42:3,

93:7
**Duties** - 177:2
**Duty** - 102:5, 123:24, 127:6

**E**

**Each** - 65:15, 74:8, 80:16, 81:3, 153:14
**Early** - 96:6, 159:13
**Earn** - 41:14
**Easier** - 150:16, 167:19
**Easiest** - 150:15, 164:18
**Easily** - 201:13
**Easy** - 140:18
**Eater** - 39:23
**Eating** - 126:15, 132:13, 197:18
**Eddy** - 59:4, 200:23
**Education** - 77:11, 78:1, 78:4
**EEO1** - 147:2
**Effect** - 177:19
**Effective** - 151:14, 177:17
**Efficiency** - 119:12, 201:20
**Efficient** - 133:1
**Effort** - 178:7, 185:23, 189:5
**Egregious** - 154:4
**Egypt** - 47:17, 47:19, 47:21, 47:25, 84:4, 84:7, 84:12
**Eight** - 26:6, 65:8
**Elderly** - 41:19
**Else's** - 28:8, 37:13
**Embarrassed** - 21:22, 28:6
**Emergency** - 39:3
**Employed** - 10:23, 12:11, 12:17
**Employee's** - 122:24, 141:16
**Employer** - 70:7, 74:4, 83:11, 84:4, 94:21
**Employers** - 162:22
**Employment** - 10:25, 11:2, 54:5, 67:19, 67:23, 69:6, 77:20, 83:4, 113:10, 158:5, 158:11, 199:14,

Robert Branch 2023-FRS-00026 February 13, 2024

199:22
**Encompasses** - 98:18
**Encounter** - 141:16
**Encountered** - 129:20, 175:13, 181:25
**Encourage** - 161:8, 173:24
**Encouraged** - 117:21, 119:12
**Encouraging** - 119:15
**Engage** - 141:1, 165:2
**Engaged** - 8:2, 12:23, 45:4, 107:9, 112:23, 137:17, 149:15, 157:10, 157:13, 157:22, 158:17, 158:18, 164:18, 174:4, 180:17, 181:15, 181:21, 185:11, 185:13
**Engagement** - 137:17, 182:24, 183:1
**Engaging** - 45:5, 166:3, 179:8, 180:23
**Engineering** - 18:11, 141:22, 141:23, 142:14
**Enjoy** - 33:12
**Enlarge** - 59:17
**Enlarged** - 58:13
**Entered** - 4:17, 5:18, 60:2
**Entering** - 4:15, 4:20
**Entire** - 40:18, 98:18, 107:3, 193:14
**Entity** - 4:13
**Equals** - 142:18, 142:22, 143:10
**Equate** - 116:25
**Equity** - 146:16
**Erase** - 89:6
**Ere** - 91:19
**Errors** - 88:16
**Ers** - 48:1
**Escalating** - 137:18
**Establish** - 172:10
**Established** - 105:5, 144:12, 173:19, 174:21

**Estimate** - 76:13, 78:14, 80:12, 81:2
**Estimated** - 80:25, 81:14
**Evaluated** - 52:6
**Evening** - 35:15, 47:1
**Events** - 50:25, 53:23, 68:13, 191:3
**Everybody** - 38:15, 124:16, 130:14, 202:11
**Everyone** - 4:4, 8:24, 15:24, 16:11, 95:14, 95:25, 150:17, 184:6, 201:11
**Everyone's** - 93:9, 201:19
**Everything** - 129:19, 136:11, 163:13, 165:22
**Evidentiary** - 7:5, 202:3
**Examine** - 64:7
**Examined** - 17:12, 95:4, 121:4, 135:14, 168:9, 192:24
**Example** - 16:15, 77:18, 134:12, 169:21, 178:3
**Examples** - 149:4, 154:6, 154:7, 177:25, 190:24
**Except** - 44:23, 45:2, 151:24
**Exception** - 169:23, 170:2
**Excerpts** - 9:9, 202:5
**Exchange** - 60:3, 60:4, 60:7
**Excluding** - 7:6, 171:18, 172:1
**Exclusively** - 177:11, 181:19
**Excusable** - 181:16
**Excused** - 118:5, 133:3, 191:14
**Executing** - 156:25
**Exhaust** - 8:22
**Existed** - 140:17
**Expect** - 97:12, 118:17, 119:16,

134:15, 165:11, 174:17, 176:4
**Expected** - 118:5, 171:16
**Expecting** - 133:4
**Expenditure** - 72:3, 77:19
**Expense** - 119:18
**Expenses** - 31:8, 31:9, 31:11, 32:2, 32:10, 75:4, 75:5, 77:10, 77:12, 77:17, 77:25, 85:21, 85:22, 85:23
**Expensive** - 83:16
**Experience** - 43:20, 139:2
**Explain** - 45:18, 45:20, 45:22, 49:12, 153:25, 190:20
**Explained** - 147:17
**Explanation** - 95:22
**Express** - 119:19
**EXSAMINATION** - 106:11
**Eyes** - 19:23, 36:21

| **F** |

**Face** - 19:23, 20:8, 48:20, 51:18, 87:15, 126:17
**Facing** - 20:2, 138:21, 169:7
**Factored** - 80:24
**Fair** - 76:13, 76:16, 81:9, 156:16
**Fairly** - 7:21, 169:3, 200:9
**Faith** - 13:17, 92:8, 92:9
**Fall** - 116:13, 139:9
**Family** - 27:21, 38:9, 41:18, 74:3, 74:9, 74:10, 78:2, 83:7
**Farther** - 62:17
**Fatal** - 14:18
**Fear** - 159:1
**Feared** - 86:15, 87:2, 88:25, 89:8, 113:8, 159:10, 186:2, 186:5, 199:23
**Fearful** - 21:21, 21:22

**Feasible** - 166:15, 166:25, 167:1, 191:17
**February** - 4:2, 9:2, 9:16, 18:8, 28:12, 86:11
**Federal** - 4:4, 6:20, 7:20, 94:19, 120:10, 192:15
**Fedex** - 26:5, 26:14
**Feed** - 137:2
**Feel** - 21:20, 24:12, 27:18, 28:5, 34:20, 66:21, 91:24, 104:3, 119:17, 132:17, 137:22, 173:22
**Feeling** - 28:6, 30:3
**Feels** - 133:22
**Fell** - 20:24, 21:1, 51:11, 51:13
**Fellow** - 20:14
**Felt** - 21:21, 21:22, 23:9, 92:3, 160:3, 164:25, 186:19
**Fence** - 21:7, 98:3, 195:3
**Field** - 102:16, 178:8, 178:11, 179:18, 184:13, 184:16
**Fields** - 40:1
**Fifth** - 152:15
**Figure** - 80:3
**File** - 24:21, 130:20, 161:9, 202:2, 202:9
**Filed** - 10:16, 11:1, 11:5, 11:7
**Filing** - 24:8, 161:6
**Fill** - 82:2
**Final** - 80:11, 178:2
**Financial** - 32:15
**Find** - 79:20, 83:15, 103:21, 103:25, 115:7, 115:9, 150:13, 155:7, 170:8, 172:3, 185:9, 190:1
**Finding** - 11:4, 107:21
**Findings** - 4:15, 4:16, 4:18, 4:21, 11:6, 11:8
**Fine** - 7:11, 14:25, 27:11, 43:9, 59:3,

95:25, 119:5, 133:5, 133:20, 166:21, 167:2, 167:4, 191:21, 192:7, 201:8, 201:10, 201:12, 202:9, 202:10
**Fire** - 98:14, 99:5
**Firearm** - 55:12, 55:15, 92:15, 92:16, 131:12
**Fired** - 26:19, 27:13, 27:24, 28:20, 29:18, 32:19, 92:3, 173:17, 173:23, 187:7, 197:15
**Firing** - 26:17, 26:18
**Fist** - 19:25, 20:11
**Fists** - 49:1, 49:16
**FITKE** - 113:12
**Fitzke's** - 113:22
**Fix** - 137:3
**Fixes** - 137:2
**Flames** - 194:25
**Flexible** - 16:5
**Flight** - 118:7
**Focus** - 159:15
**Focused** - 177:10, 180:18
**Folks** - 63:5, 63:6
**Follow** - 148:19, 175:10, 175:24, 182:13
**Following** - 46:14, 63:9, 65:9, 65:19, 72:4, 75:6, 80:5, 81:7, 109:5, 175:11, 202:21
**Follows** - 17:12, 95:4, 121:4, 135:14, 168:9, 192:24
**Food** - 40:13, 40:14
**Foot** - 36:7, 36:8
**Ford** - 6:24
**Forehead** - 87:15
**Foreman** - 18:13, 21:18, 22:5, 22:6, 22:20, 24:19, 55:17, 55:18
**Forget** - 89:6
**Form** - 4:23, 54:17, 114:2, 143:21, 161:14, 164:16,

Robert Branch   2023-FRS-00026   February 13, 2024

174:19
**Formal** - 6:20, 7:1, 7:3, 7:18, 16:7, 16:10, 106:21, 162:10, 169:9, 192:10
**Formed** - 183:8
**Former** - 94:20
**Forms** - 190:20
**Forth** - 37:3, 140:25, 144:21, 156:24, 164:15
**Fortunate** - 40:13, 78:10
**Forums** - 7:20
**Forward** - 21:3, 25:5, 89:25, 99:4, 110:15, 112:4, 112:7, 112:16, 119:1, 156:3, 159:25, 161:3, 169:6, 169:11, 179:11, 187:5
**Fought** - 109:20, 126:18
**Found** - 6:24, 7:2, 84:16, 113:4, 121:15
**Foundation** - 105:4, 105:9, 144:12, 144:13, 144:15, 188:4, 195:7
**Foundational** - 174:20
**Fourth** - 152:16
**Frame** - 153:3, 176:24
**Framed** - 162:12
**Framework** - 7:12
**Free** - 118:12
**Friday** - 23:12, 23:16, 23:17, 26:2
**Fringe** - 33:17
**Front** - 51:17, 52:22, 59:9, 73:3, 73:19, 95:15, 111:13, 120:22, 170:7
**Froze** - 145:21
**Frozen** - 104:9
**FRS** - 4:7
**FRSA** - 10:20, 11:3
**Fuckers** - 19:15
**Fuel** - 10:24, 12:11, 12:12

**Full** - 17:22, 17:23, 33:7, 33:8, 37:6, 58:17, 61:15, 71:20, 92:11, 124:24, 129:1, 169:12
**Fully** - 67:10, 114:9
**Function** - 8:17, 184:19
**Funny** - 27:3
**Future** - 50:3

---
G
---

**Game** - 166:6
**Gang** - 23:3, 86:4, 86:5
**Gangs** - 121:13
**Gaps** - 82:3, 136:12
**Garden** - 40:1, 41:16
**Gardener** - 9:5, 15:21, 23:1, 23:2, 23:5, 23:6, 23:15, 23:23, 24:4, 34:8, 38:4, 56:24, 57:2, 57:4, 57:7, 127:3, 127:11, 202:3, 202:8
**Gathered** - 100:12, 100:24, 101:1, 169:5, 177:25
**Gave** - 24:23, 41:18, 42:15, 53:11, 77:9, 90:19, 98:19, 113:23, 114:14, 117:12, 119:10, 129:22, 129:23, 133:19, 141:6, 189:10
**General** - 8:9, 8:12, 74:20, 127:9, 194:5, 194:6
**Generally** - 9:4, 12:20, 139:1, 156:5, 181:25, 189:25
**Generated** - 106:24
**Gentleman** - 115:2
**Gentlemen** - 102:14, 109:3, 112:15, 114:10, 118:22, 124:19, 134:14, 138:10, 166:11
**Gesture** - 123:11, 171:15
**Gets** - 124:24, 145:13, 147:18

**Gillian** - 6:9
**Girl** - 31:12
**Gist** - 129:2
**Give** - 23:18, 25:13, 25:15, 34:23, 53:16, 59:7, 73:23, 115:19, 121:25, 122:13, 127:12, 129:1, 131:11, 139:23, 156:9, 159:10, 159:12, 163:23
**Given** - 11:23, 17:5, 25:24, 71:12, 85:1, 88:12, 92:11, 92:14, 129:2, 134:16, 164:8
**Gives** - 149:4
**Glad** - 200:6
**Gone** - 31:4, 31:7, 90:14, 138:7, 187:8
**Government** - 147:2, 147:19
**Grace** - 6:6, 56:3, 58:8, 60:17, 61:17, 62:16, 70:19, 72:23, 73:10, 148:17, 148:20, 149:2, 150:22, 151:12, 155:4
**Grand** - 31:13
**Grass** - 39:23
**Greatly** - 191:13
**Green** - 129:22
**Greenville** - 30:12
**Greenwood** - 85:11
**Grenada** - 85:13
**Grey** - 60:12
**Grievance** - 177:6
**Grill** - 19:2, 21:6
**Ground** - 20:10, 20:19, 20:25, 21:11, 36:22, 53:5, 119:2, 145:8, 157:23, 173:2
**Grounds** - 174:20
**Group** - 19:10, 20:17, 21:10, 71:3, 86:17, 164:21, 176:13, 179:16
**Guess** - 79:12, 91:11, 92:2, 106:22, 114:7, 114:9, 116:5
**Guest** - 95:8
**Guidance** - 109:22, 156:8, 156:9, 182:6
**Guilty** - 137:22

**Gun** - 21:14, 21:24, 23:9, 34:19, 38:7, 53:13, 53:14, 53:18, 54:6, 56:9, 91:23, 160:13, 160:14, 160:16
**Guys** - 38:16, 53:7, 71:18

---
H
---

**Hadn't** - 18:23, 160:3, 163:6
**Half** - 69:4, 69:11
**Hallucinating** - 48:25
**Hand** - 8:17, 17:7, 94:23, 120:25, 135:10, 168:5, 192:20
**Handle** - 7:22, 54:16, 55:2, 57:21, 134:23, 134:24, 142:6
**Handled** - 16:12, 115:4, 165:20, 165:21
**Handling** - 109:16, 109:18, 121:7, 198:5
**Hands** - 25:11, 37:13, 37:14, 50:11, 50:17, 51:2, 51:17, 112:15
**Handwritten** - 60:9, 61:1
**Happening** - 92:6
**Happy** - 78:6
**Harassment** - 147:4, 147:18
**Hard** - 19:22, 86:23, 148:18, 148:19, 198:13, 202:11
**Harm** - 21:19, 139:13, 143:4, 143:12, 143:13, 143:14, 143:16, 171:17
**Harvest** - 40:2
**Hasn't** - 105:4, 144:12, 149:21, 174:20
**Haven't** - 30:22, 41:10, 41:12, 50:16, 76:14, 105:9
**Hazardous** - 13:17,

158:6, 158:19
**Hazards** - 43:16
**Head** - 106:14, 111:3, 113:23, 125:21, 126:17, 175:4, 196:21, 197:19
**Health** - 32:20, 33:23, 70:11, 71:2, 72:13, 72:14, 72:16, 74:14, 75:19, 76:22, 83:3, 83:4, 86:1, 86:2
**Healthcare** - 70:24, 72:4, 72:10
**Hear** - 17:15, 92:4, 109:6, 120:19, 136:17, 168:3, 192:7, 192:9
**Heard** - 45:15, 50:16, 105:9, 128:4, 131:14, 135:7, 160:16, 190:11
**Hearings** - 175:13, 175:17
**Hearsay** - 7:10, 22:12
**Heart** - 13:11, 77:1
**Heaven** - 90:14
**He'd** - 25:9, 63:6
**Held** - 18:9, 63:20, 168:25, 176:24, 176:25, 182:24, 199:2
**Help** - 17:3, 82:1, 97:2, 97:11, 97:18, 139:10
**Helped** - 73:16
**Helper** - 18:13
**Helpful** - 58:24, 59:5, 65:4, 71:12, 72:22, 177:14
**Helping** - 40:3, 40:4
**Herein** - 17:11, 95:3, 121:3, 135:13, 168:8, 192:23
**Hey** - 142:6
**Higher** - 81:10, 83:19, 83:21
**Highest** - 79:14, 79:20, 79:22
**Hilliard** - 15:10, 98:20, 134:13, 137:11, 144:18,

Robert Branch   2023-FRS-00026   February 13, 2024

166:11, 166:16, 167:6, 167:9, 183:17, 191:18, 192:2, 192:7, 192:8, 192:22, 193:6, 195:23, 200:6
**History** - 138:14, 138:17, 184:25, 185:3, 185:4, 185:8
**Hit** - 19:23, 19:25, 20:8, 36:14, 36:22, 48:19, 48:22, 49:2, 49:16, 50:11, 52:2, 52:3, 52:4, 52:5, 52:6, 173:1, 183:2
**Hold** - 82:4, 98:8, 136:9, 136:25, 161:12, 161:23, 175:17, 184:15, 192:2
**Holds** - 166:17
**Holiday** - 63:5, 127:2, 127:19, 128:9
**Home** - 28:3, 30:5, 31:14, 39:1, 77:10, 77:11, 77:18, 77:23
**Honest** - 73:21, 134:8
**Honestly** - 115:3, 123:7
**Honor's** - 22:13
**Hope** - 118:6, 133:10, 133:12
**Hopefully** - 73:15
**Hotel** - 18:24, 19:12, 21:8, 34:18, 46:19, 47:5, 47:7, 62:9, 97:21, 109:3, 109:12, 117:12, 122:24, 123:3, 131:12, 194:21
**Hour** - 28:20, 28:21, 29:1, 41:24, 119:2
**Hourly** - 79:24
**Hours** - 29:12, 80:13, 80:15, 80:19, 80:22, 80:25, 106:14, 166:19
**House** - 6:8, 31:14, 31:15, 31:25, 91:4
**Housekeeping** - 10:6
**Houses** - 40:10
**HR** - 38:1, 125:4,

134:13, 147:12, 147:14, 193:16, 193:25, 199:19
**Human** - 6:10, 55:14, 63:11, 82:11, 92:19, 135:22, 139:22, 146:10, 146:12, 146:20, 147:9
**Hundreds** - 79:8
**Hunsucker** - 21:17
**Hurt** - 21:22, 25:8, 25:10, 38:9
**Hurting** - 37:2, 39:2, 87:14
**Hypothetical** - 114:3, 114:14, 175:5
**Hypothetically** - 175:9

---

**I**

**I'd** - 28:25, 54:14, 81:24, 97:2, 133:23, 173:20, 199:18, 201:17
**Ideally** - 134:1
**Identification** - 9:21, 10:2
**Identified** - 8:8, 65:8, 68:5, 78:1, 152:6, 178:4, 178:24, 180:6
**Identity** - 62:15
**II** - 5:7
**ILA** - 28:16
**I'll** - 17:7, 17:14, 49:25, 134:25, 137:2, 153:25, 154:4, 156:25, 163:23, 167:21, 202:13
**Illness** - 171:17
**Immaterial** - 7:7, 7:14, 22:13, 40:19, 102:16, 103:15, 104:4
**Immediate** - 68:10, 125:11, 129:24, 129:25
**Immediately** - 117:19
**Impact** - 113:9
**Impeachment** - 54:17

**Implied** - 164:1
**Importance** - 43:4
**Important** - 4:22, 42:25, 138:23, 157:18
**Improper** - 114:3
**Improvements** - 31:15
**Incidents** - 107:19, 149:10, 149:12, 149:20, 150:1, 178:25
**Inclusion** - 146:17
**Incorrectly** - 88:22
**Increase** - 70:25, 71:7, 74:2
**Increased** - 74:5
**Incurred** - 75:5, 77:17
**Indicated** - 53:18, 54:5, 55:15, 56:23, 88:25, 90:9, 91:17, 92:20, 105:6, 109:19, 130:7, 158:24, 159:13, 160:3, 181:11, 186:2
**Indicating** - 53:12, 128:5
**Indication** - 131:11
**Industry** - 178:1
**Influenced** - 196:16
**Informed** - 22:25, 23:1
**Infractions** - 188:19
**Initial** - 169:3, 169:4, 169:10
**Initiate** - 164:7
**Injuries** - 36:23
**Injury** - 143:16, 171:17
**Inn** - 19:4, 46:23, 62:7, 160:13
**Inside** - 31:16
**Instruction** - 22:13
**Instructions** - 135:7
**Intellect** - 27:20
**Intended** - 154:1
**Intentional** - 136:19
**Interjected** - 48:13
**Internet** - 150:17
**Interpret** - 46:5
**Interrupt** - 136:10, 197:1
**Interruption** - 137:5

**Interviewed** - 30:4
**Interviews** - 30:1, 30:2
**Introduced** - 184:18, 186:14, 186:15
**Introduction** - 5:3
**Introductions** - 5:25
**Investigate** - 106:16, 112:21, 175:7, 175:8, 175:24
**Investigated** - 162:3, 162:4, 162:16, 165:5, 165:8
**Investigating** - 147:4
**Investigations** - 123:20, 175:18
**Investigative** - 52:22
**Investment** - 6:25
**Invoked** - 17:3
**Involvement** - 131:4, 131:8
**Irrelevant** - 7:7, 7:14, 40:19, 102:13, 102:16, 103:15
**Isn't** - 48:14, 190:25
**Issuance** - 153:2
**Issue** - 12:22, 13:11, 13:13, 112:15, 155:24, 158:21, 164:13, 166:22, 167:5
**Issued** - 9:1, 11:4
**Issues** - 10:13, 12:19, 43:14, 43:15, 43:18, 46:16, 108:8, 120:20, 137:2
**It'd** - 25:8
**Item** - 7:9
**I've** - 12:14, 27:16, 47:22, 110:24, 114:6, 156:14, 175:22, 176:25, 184:6, 190:11, 201:9

---

**J**

**Jacobson** - 6:7, 58:9, 73:9, 74:23, 74:25, 198:4, 198:6, 198:10, 198:14, 198:17, 198:19, 198:21, 198:22,

200:1
**James** - 5:14, 95:8, 170:14
**January** - 10:16, 10:17
**Jobs** - 29:17, 29:21, 69:2, 69:10, 69:11, 85:5, 85:7, 112:25
**Join** - 74:17, 120:3, 192:2, 200:6
**Joined** - 98:3, 176:25
**Joining** - 94:17, 118:9, 120:14, 133:8, 192:5, 192:10
**Joint** - 9:7, 9:22, 10:2, 17:4, 57:19, 60:2, 61:16, 70:20, 71:14, 151:4, 170:17
**Jointly** - 9:16
**Joke** - 163:19
**Jones** - 101:9, 101:15, 101:24, 103:23, 124:19, 125:4, 125:19, 125:23, 174:16
**Judged** - 173:16, 173:19
**Judges** - 4:11
**Judgment** - 173:12, 173:15, 173:16, 173:21
**July** - 31:19, 31:21
**Jurisdiction** - 11:22
**Justifiable** - 181:16
**Justified** - 45:2, 119:11, 171:18, 172:2, 172:4
**JX** - 9:13, 9:14, 9:18, 9:19, 54:19, 72:19, 72:23, 73:3, 73:18, 202:4

---

**K**

**Kill** - 19:16, 48:2
**Killed** - 19:15, 25:8, 25:10, 40:8, 40:9
**Killing** - 48:1
**Kinds** - 13:12
**Knee** - 36:25, 37:3, 37:4, 87:19
**Knocked** - 36:10, 36:22, 49:18, 145:8, 173:1

Robert Branch   2023-FRS-00026   February 13, 2024

**Knowing** - 114:8, 150:20
**Knowledge** - 22:8, 29:8, 106:1, 117:13, 127:9
**Known** - 47:19, 47:22
**Knows** - 105:5, 162:1

### L

**Laid** - 80:21
**Land** - 30:17, 31:5
**Language** - 152:21, 152:24, 153:1, 158:25, 191:2, 191:3
**Laptop** - 120:15
**Large** - 95:16, 95:23
**Lastly** - 13:4, 84:2
**Late** - 9:1, 33:7
**Later** - 40:2, 55:2, 62:14, 67:18, 103:22, 130:21, 164:12
**Latter** - 44:22
**Lead** - 5:5, 5:7, 6:1, 138:24, 141:16, 162:6, 178:20, 187:11
**Leads** - 22:19
**Learn** - 109:2, 182:21
**Learned** - 126:25, 127:8, 176:11
**Leave** - 15:3, 97:10, 137:1, 194:19, 200:10, 200:13
**Leaving** - 28:1
**Led** - 141:2, 180:13, 199:13
**Left** - 30:16, 30:23, 30:25, 31:1, 31:3, 31:14, 41:6, 76:20, 76:21, 77:14, 78:11, 94:5, 175:4, 197:20, 200:19
**Leg** - 87:16, 87:18, 87:19, 184:16
**Legal** - 5:2, 6:8
**Length** - 118:23
**Lesser** - 108:20, 115:19, 190:13, 190:23, 191:3
**Letter** - 26:15,

67:19, 91:11, 99:7, 99:12, 99:14, 99:15, 99:21, 100:5, 115:25
**Levels** - 154:1, 178:20, 188:17
**Light** - 14:8, 71:9, 129:22, 176:13
**Limine** - 9:3
**Limit** - 146:15
**Limited** - 87:23, 149:9
**Line** - 40:18, 45:5, 87:1, 172:10, 172:13, 191:1
**Lines** - 190:25
**Link** - 17:5, 202:14
**Lip** - 36:21
**List** - 6:12, 29:22, 133:16
**Listed** - 15:9, 130:15
**Literature** - 115:24
**Livelihood** - 33:14
**Located** - 19:3, 19:4, 20:17, 85:10, 138:10
**Location** - 11:24
**Locations** - 150:19
**Logistically** - 54:16, 57:21
**Long** - 27:15, 33:2, 85:21, 94:12, 118:18, 166:12, 166:15, 176:24, 200:22, 201:11
**Longer** - 89:8, 89:15, 91:17, 94:11, 94:13, 133:22, 167:16
**Longest** - 201:5
**Looking** - 29:15, 40:3, 60:1, 71:13, 73:11, 73:16, 83:23, 83:24, 91:7, 95:24, 109:22, 156:23, 163:9, 182:7, 184:1, 185:8, 190:9
**Loose** - 20:16
**Lose** - 32:17, 32:19, 85:14, 112:25
**Loss** - 70:1, 79:11, 80:25, 81:15
**Losses** - 70:2
**Lost** - 14:18, 28:7,

28:10, 40:10, 69:25, 78:14, 79:7, 85:16
**Loud** - 111:4
**Louisiana** - 4:10, 120:13, 192:16
**Lower** - 81:11
**LR** - 102:4, 109:15, 109:17, 109:23, 193:16, 193:25, 199:19
**Lucky** - 40:8
**Lunch** - 118:19, 133:22, 134:16

### M

**Machine** - 12:13, 12:17, 18:12, 18:19, 23:7, 28:22, 36:4, 36:5, 36:10, 37:23
**Machines** - 43:15
**Magnolia** - 46:23, 62:7, 160:13
**Main** - 146:20
**Mainly** - 82:2
**Major** - 31:11, 32:2
**Making** - 28:20, 28:23, 28:25, 50:2, 54:4, 57:8, 108:5, 147:1, 197:6
**Man** - 37:3, 104:1
**Management** - 55:14, 56:14, 56:20, 91:14, 92:19, 106:25, 124:17, 162:22, 175:17, 178:8, 184:13
**Manager** - 6:9, 90:10, 96:11, 101:13, 102:3, 106:15, 129:24, 129:25, 135:22, 139:23, 146:21, 156:5, 162:19, 175:18, 184:12
**Managerial** - 163:1, 197:10
**Managers** - 106:14, 148:10, 150:16, 152:2, 174:8, 175:16, 197:14
**Managing** - 177:4
**Manufacturer** - 85:12
**Many** - 29:20, 85:5,

156:14, 178:1
**Maquire** - 90:13, 90:18, 91:1, 91:13
**March** - 176:25
**Mark** - 9:7, 55:1
**Marked** - 9:21, 10:1, 54:20, 60:1, 71:14
**Market** - 83:25, 84:1
**Marshall** - 6:9, 6:13
**Material** - 12:7, 22:17
**Materials** - 31:17, 147:18
**Matters** - 8:14, 147:18
**May/June** - 176:23
**Means** - 118:4, 147:17, 200:13, 201:18
**Medical** - 70:11, 70:15, 74:9, 75:11
**Medication** - 26:19, 26:20, 26:23, 77:1
**Meet** - 54:9
**Meeting** - 8:12, 23:15, 94:14, 95:15, 119:7, 132:10, 137:1
**Meetings** - 48:9
**Melton's** - 23:10, 48:4, 138:17
**Member** - 56:14, 56:19, 91:13, 92:19, 152:11, 153:15
**Members** - 23:21, 156:19, 157:8
**Memo** - 71:14, 71:23, 72:8, 86:9
**Memorial** - 23:19, 24:25, 25:1, 34:5, 34:10, 38:11, 46:13, 56:24, 62:22, 62:23, 63:5, 131:10
**Memory** - 73:17
**Men** - 101:24, 101:25
**Mentally** - 26:18
**Mentions** - 7:3
**Message** - 60:4, 60:23, 60:25, 61:24, 128:19
**Messages** - 128:4
**Met** - 33:15
**Method** - 165:8
**Methods** - 162:25
**MF** - 48:1

**Microphone** - 198:15
**Microsoft** - 4:6
**Miles** - 85:9, 85:13
**Milwaukee** - 68:18, 68:22, 85:8
**Mislead** - 69:19, 79:10
**Misquote** - 186:4
**Miss** - 29:7
**Missed** - 11:18, 15:15, 77:16, 82:9, 124:23, 193:22
**Missing** - 15:19
**Mississippi** - 12:1, 18:1, 18:2, 18:3, 18:17, 19:5, 54:9, 62:8, 62:9, 84:3, 194:21
**Mississippi's** - 172:22
**Misstatement** - 69:19
**Misstates** - 99:11, 99:12
**Mistaken** - 26:2, 28:11, 37:22, 73:20, 80:20
**Mistakenly** - 88:22
**Misunderstood** - 136:7
**Mitigating** - 140:13, 164:5
**Mode** - 20:12
**Monday** - 24:24, 28:1, 34:5, 34:10, 62:23, 89:1, 128:8, 128:13, 128:15
**Money** - 33:15, 41:14, 77:22
**Monthly** - 71:8, 79:15
**Months** - 28:14, 30:14, 39:20, 40:2, 41:13, 69:1, 74:13, 78:15, 79:18, 79:24, 80:2, 80:3, 88:8, 88:10
**Morning** - 4:3, 8:11, 23:17, 23:23, 28:2, 67:7, 133:19, 166:19, 167:14, 167:16, 200:19, 201:3, 201:6,

Robert Branch   2023-FRS-00026   February 13, 2024

201:12, 202:15
**Mother** - 19:15
**Motion** - 9:2
**Move** - 15:4, 15:23,
40:21, 97:1, 110:15,
112:4, 112:6,
112:16, 137:18,
159:25, 165:2,
169:6, 169:11,
170:25, 171:13,
179:11, 180:17,
198:14
**Moving** - 7:15, 37:2,
99:4, 119:15, 133:24
**Multiple** - 50:25,
52:24
**Multiplied** - 79:15,
79:16, 79:17, 79:18,
79:24, 79:25, 80:1,
80:3
**Mute** - 42:7, 94:14,
143:22
**Muted** - 8:14
**Mutual** - 181:22

| N |
|---|

**Named** - 48:2
**Near** - 56:10, 85:10
**Necessary** - 34:20,
34:21, 98:10, 133:23
**Needed** - 36:16,
36:17, 59:19, 110:4,
127:4, 127:12,
129:19, 137:3,
184:14
**Negligence** - 28:8
**Negotiations** - 177:
7, 177:8
**Neighbor** - 27:25
**Neighbors** - 41:19
**Neither** - 26:20,
114:7
**Nerve** - 26:24
**Neutralized** - 159:1
4
**Nevertheless** - 67:9
**New** - 4:20, 28:16,
28:17, 28:24, 29:3,
127:3, 151:18, 184:5
**Nice** - 90:3, 90:11,
90:15, 90:17, 91:20
**Nick** - 34:25, 35:1
**Night** - 22:1, 51:1,
53:23, 109:3,

119:24, 160:14,
194:22
**Nobody** - 88:17,
128:10
**Non** - 49:4, 175:25
**Noon** - 94:12,
201:14
**Normal** - 31:8, 31:9,
162:13, 175:22
**Normally** - 86:4,
103:11, 104:15,
114:21, 115:6,
145:1, 146:6,
161:12, 161:23,
163:5, 174:17,
175:5, 176:4, 197:22
**Note** - 8:25, 88:20
**Noted** - 128:23
**Notes** - 78:19, 79:6
**Notice** - 5:18,
22:19, 25:24, 39:4,
64:5, 100:3, 155:24,
187:17
**Notified** - 146:8
**November** - 53:20,
55:23, 56:1, 56:7,
56:19, 68:20, 69:15,
69:23, 70:3, 85:18,
85:23
**Novo** - 4:15
**Numbers** - 72:25

| O |
|---|

**OALJ** - 4:7, 4:20,
7:24
**Object** - 7:10, 49:4,
71:1, 102:12,
103:14, 114:2,
161:13, 161:14,
174:19, 174:20,
195:5
**Objecting** - 7:14
**Objection** - 7:11,
22:11, 22:23, 40:18,
98:4, 98:10, 99:11,
100:6, 105:4,
143:21, 144:11,
188:4
**Objections** - 7:9,
9:3, 9:17, 11:8,
99:25
**Obligations** - 175:1
5
**Observation** - 43:6,

43:11
**Observations** - 47:
8
**Observe** - 66:15
**Observed** - 42:25
**Observers** - 42:14
**Obtain** - 76:22,
130:9
**Obtained** - 72:4
**Obtaining** - 70:6
**Occupied** - 39:21
**Occur** - 35:18
**Occurred** - 8:4,
11:25, 12:1, 36:2,
109:12, 115:7,
140:5, 155:16
**Occurs** - 153:7
**October** - 11:6,
69:22, 73:25,
151:16, 177:18,
177:19, 179:1
**Odd** - 14:19
**Offense** - 138:25,
139:2, 169:8, 169:20
**Offered** - 169:8
**Offering** - 70:16
**Office** - 4:10, 59:5,
63:7, 128:10
**Officer** - 82:12,
139:22
**Often** - 95:22,
148:12
**Okra** - 39:24
**Old** - 27:17, 40:11,
82:17, 82:20
**Older** - 32:11, 32:14
**Ones** - 9:18, 26:8,
40:12
**Oneself** - 172:17
**Ongoing** - 89:24
**Open** - 83:24, 84:1
**Opening** - 13:8,
13:25, 14:3, 119:10
**Operating** - 44:3,
44:7, 151:9
**Operations** - 178:11
**Operator** - 12:13,
12:17, 18:12, 18:19
**Opinion** - 106:17,
131:21, 174:11,
194:17
**Opportunities** - 85:
5
**Option** - 121:25,

122:13
**Order** - 9:1, 14:12,
15:14, 15:15, 33:8,
58:13, 133:19,
164:23, 167:9
**Ordinarily** - 16:7
**Organized** - 40:17
**Originally** - 4:14
**OSHA** - 4:14, 4:18,
11:2, 11:5
**Outcome** - 9:5,
43:20, 122:4,
122:15, 193:12
**Outline** - 152:10
**Outlined** - 89:13,
188:21
**Overheard** - 42:8
**Overrule** - 22:22,
102:22, 104:3
**Overruled** - 114:4,
161:16
**Oversee** - 177:6,
177:8, 188:12,
188:14
**Overseeing** - 177:
3
**Overseen** - 120:11
**Overtime** - 29:12,
79:15, 79:22, 80:12,
80:15, 80:18, 80:19,
80:22, 80:25, 81:1,
81:8, 81:9, 81:13,
86:4, 86:6, 86:8,
86:9
**Own** - 16:8, 46:5,
46:9, 57:24, 93:9

| P |
|---|

**Pace** - 7:16, 119:15,
133:24
**Paid** - 33:15, 63:24,
64:1, 64:2, 64:4,
73:4, 74:10, 74:15,
77:3, 77:13, 85:23
**Pain** - 26:24
**Painting** - 31:15,
31:16
**Parents** - 39:22
**Parking** - 21:8,
97:21, 98:3, 112:13,
138:10, 194:21,
195:2, 195:3
**Participant** - 129:6,
179:7

**Participants** - 42:14
, 110:25
**Participants'** - 115:
9
**Participate** - 98:13,
113:25
**Participated** - 50:18
, 51:23, 70:16,
107:17, 112:24,
158:4, 175:22
**Participating** - 8:13
**Participation** - 103:
7, 118:11, 166:4,
182:18
**Particularly** - 118:1
8
**Parties** - 4:13, 4:24,
5:3, 9:6, 9:8, 12:10,
119:13
**Parts** - 133:7,
181:5, 195:20
**Party** - 93:1, 167:20
**Past** - 108:9,
138:14, 138:17
**Pat** - 124:18, 125:3,
131:1
**Patick** - 183:18
**Patrick's** - 184:4
**Pause** - 160:25
**Paycheck** - 64:3,
76:9
**Paying** - 32:11,
75:15, 75:20, 77:14,
82:15, 85:25
**Payment** - 76:6
**Pays** - 71:8
**Pdf** - 130:20
**Peas** - 39:24
**Peers** - 182:7
**Penalties** - 115:16,
139:6, 139:8
**Penalty** - 115:20,
189:23, 190:5,
190:6, 190:14
**Pending** - 63:21
**Perceived** - 101:7
**Percent** - 126:19
**Perhaps** - 7:8, 74:2,
118:19, 155:9, 172:8
**Period** - 23:18,
31:10, 63:22, 63:25,
70:10, 75:12, 77:3,
80:13, 88:7, 88:9,
151:25, 166:9

Robert Branch 2023-FRS-00026 February 13, 2024

Periods - 80:16
Person - 16:7, 64:12, 97:4, 97:7, 99:3, 139:14, 147:11, 147:18, 162:2, 162:3, 171:15, 172:9, 195:14, 197:25
Personal - 76:22
Personally - 24:14, 48:5
Perspective - 59:9, 200:8
Peterson - 22:7, 22:25
Ph - 8:17, 21:17
Phase - 190:5
Phone - 24:23, 35:8, 63:12, 120:15, 120:16, 120:20, 127:3, 128:6, 128:7
Phones - 8:15
Phrase - 190:11
Phrased - 116:1, 145:10
Physically - 20:17, 87:10, 106:15, 119:6, 179:8
Picked - 79:20
Pit - 97:23
Plan - 14:14, 69:15, 70:15, 72:5, 74:10, 74:14, 75:7, 75:13, 76:6, 77:3, 77:5, 83:8, 83:10, 83:11, 83:13, 166:7
Plane - 134:18
Planned - 14:7, 31:23, 93:22
Planning - 33:2, 33:4
Plantation - 19:14, 47:17, 84:5, 84:8, 84:12
Platform - 8:18, 192:5
Play - 131:16
Plays - 27:19
Pleased - 201:23
Pocket - 32:4, 32:6, 72:3
Pointed - 150:1
Points - 154:6
Policies - 68:4,

150:21, 178:1, 188:5, 188:6, 188:11, 189:24
Poor - 130:23, 170:3
Pop - 151:1
Portion - 59:13, 75:10, 75:22, 88:5, 181:9, 186:22
Portions - 9:9
Position - 18:18, 78:10, 96:25, 97:17, 106:18, 107:16, 139:23, 176:24, 199:2
Positions - 18:9, 124:20
Post - 8:24, 14:4
Posted - 150:18
Posture - 51:17, 53:6, 138:7, 157:14, 164:17
Potential - 111:24, 131:5, 131:7, 149:22, 149:24, 159:9, 183:5
Potentially - 189:25, 201:16
Practice - 139:1
Precedent - 182:14
Preferable - 201:16
Prehearing - 8:11, 10:14, 10:16, 14:3
Preliminary - 8:14, 16:12
Premise - 79:3
Premium - 74:17, 75:10, 75:22, 75:25, 76:2, 83:18
Prepared - 62:2, 65:20, 67:13, 71:23, 72:2, 75:4, 202:12
Preponderance - 8:1
Prescriptions - 76:21, 77:4
Present - 4:4, 4:5, 6:3, 6:5, 6:7, 6:13, 6:16, 7:8, 9:12, 16:21, 17:6, 26:8, 57:24, 65:3, 140:1
Presented - 6:23, 118:5, 140:4, 140:23
Presenting - 54:24,

59:17
Prevent - 138:4, 164:22
Prevention - 68:2, 111:18, 149:1, 149:13
Previous - 60:3
Previously - 47:8, 185:1
Prevrium - 8:17
Principle - 177:4
Prior - 20:1, 31:23, 57:6, 156:12, 167:9, 186:1, 196:22
Probationary - 151:25
Problem - 63:3, 73:1, 87:16, 87:18, 137:6, 176:7
Problems - 18:22, 41:4, 41:5, 41:6, 123:16, 175:19
Procedural - 10:5, 11:7, 162:24
Procedure - 7:23, 145:3, 145:4
Proceed - 58:1, 96:3, 130:7, 155:19, 155:20, 155:21, 155:22, 155:23, 184:15, 193:2
Proceeded - 187:9
Proceedings - 5:5
Production - 96:11, 101:13, 104:14, 121:13
Professionalism - 119:13
Proficiency - 201:20
Progress - 188:20, 192:11
Progressive - 178:20, 178:21, 185:8, 188:16, 188:20
Property - 46:22
Protect - 122:15
Protected - 8:2, 8:7, 12:23, 12:24, 13:4, 13:12, 13:14, 13:21
Protecting - 123:13
Protection - 6:21, 94:19, 120:10, 192:14

Protections - 6:22
Proven - 13:1, 138:24
Provide - 33:17, 50:21, 51:2, 51:3, 62:7, 92:18, 128:1, 148:15, 184:19
Provided - 7:5, 29:22, 47:8, 61:7, 61:23, 65:7, 65:12, 69:14, 70:2, 130:3, 157:6, 181:1
Providing - 111:15, 122:24
Proving - 67:25
Provision - 7:25
Provisions - 6:21, 7:12, 10:20, 13:16, 94:19, 120:10, 192:14
Provoke - 25:22
Psychiatrist - 26:23
Pull - 20:18, 53:8, 55:7, 58:8, 61:17, 70:19, 86:18, 86:20, 148:17, 157:24, 177:14
Pulled - 20:16, 38:18, 38:19, 39:1, 53:10, 53:12, 90:15, 157:25
Pulling - 18:19, 70:22, 170:14, 170:17
Punch - 149:15, 149:16, 149:21
Punched - 109:19, 157:22
Punches - 51:18, 154:20, 179:7
Punishment - 145:1
Pursuant - 175:14
Push - 20:8
Pushed - 19:22, 20:5, 20:7, 36:25, 48:17, 97:25
Pushing - 20:1
Puts - 22:18
Putting - 170:13

Q

Questioned - 186:23
Questioner - 78:20

Questioning - 55:10, 88:24, 121:7
Quick - 14:12, 52:7, 185:16
Quickly - 16:12, 118:10, 179:17
Quit - 36:16, 36:17
Quoting - 99:13

R

Rail - 4:4, 6:20, 23:3, 43:10, 86:5, 94:19, 120:11, 192:15
Rails - 43:15
Railway - 96:11
Raise - 8:17, 17:7, 39:24, 94:22, 98:10, 120:24, 135:9, 168:4, 192:20
Raising - 182:17
Ramifications - 38:14
Rate - 69:5, 81:3, 81:12
Re - 93:5
Reach - 118:19, 119:15, 134:4, 167:10, 173:11
Reached - 4:17, 180:9, 186:19
Reaching - 199:16
React - 173:7
Reads - 100:5
Ready - 16:12, 40:2, 49:16, 51:3, 191:18, 191:25, 192:1, 202:8
Reality - 92:5
Realize - 52:3
Realized - 37:4, 52:2, 52:4, 52:5, 52:6
Reason - 14:5, 38:3, 47:19, 52:19, 55:16, 56:3, 56:6, 99:16, 99:17, 105:1, 106:16, 114:13, 114:20
Reasonable - 11:4
Reasonably - 171:16
Reasoning - 101:5
Reasons - 180:4
Recalled - 118:5,

Robert Branch   2023-FRS-00026   February 13, 2024

195:15
**Receive** - 39:4, 39:6, 110:9, 148:10, 153:13, 179:22, 179:24
**Received** - 4:23, 39:7, 44:17, 63:21, 64:5, 65:23, 65:25, 67:18, 88:15, 106:13, 109:13, 110:11, 111:2, 111:6, 127:2, 129:9, 129:12, 154:23, 154:25
**Recent** - 9:15
**Recite** - 195:11
**Recognize** - 61:21, 75:3, 140:18
**Recognized** - 140:19
**Recommend** - 118:25
**Recommendation** - 98:20, 108:6, 111:14, 111:15, 111:20, 113:2, 140:10, 141:5, 141:6, 141:18, 158:10, 159:21, 189:9, 189:10, 189:14, 189:15, 189:17
**Recommen-dations** - 145:1, 189:18, 193:16, 199:9
**Recommended** - 115:6, 141:23, 142:14, 144:18
**Recommending** - 144:9
**Recreated** - 187:16
**Recross** - 82:1, 190:18
**Redgrove** - 26:22
**Redirect** - 82:1, 82:5, 84:24, 113:20, 132:8, 161:4, 187:24
**References** - 143:12
**Referred** - 9:20, 158:25
**Reflecting** - 75:5
**Reflects** - 71:11

**Reform** - 6:25
**Regards** - 175:11
**Region** - 101:14, 151:7, 163:10, 163:11, 163:14
**Regular** - 8:19, 63:24
**Regularly** - 44:6
**Regulation** - 8:8
**Regulations** - 7:1, 7:6, 12:21, 13:7
**Regulatory** - 7:12, 7:25
**Rejoined** - 14:19
**Relation** - 199:6
**Relations** - 38:1, 63:11, 102:3, 104:15, 104:19, 109:23, 109:25, 124:21, 126:13, 134:14, 156:5, 168:17, 176:23, 177:3, 178:8, 178:12, 184:12, 193:12
**Relationship** - 46:15, 102:2
**Relied** - 181:14, 181:19
**Relief** - 8:7, 13:6
**Rely** - 16:14, 72:18, 180:9, 181:9, 193:21, 193:23
**Remain** - 42:15, 93:1
**Remainder** - 81:3
**Remained** - 75:13
**Remaining** - 202:3
**Remedies** - 6:23
**Removal** - 75:7
**Remove** - 8:15, 196:1, 196:8
**Removed** - 63:15, 63:16
**Renee** - 14:20, 136:11
**Renovation** - 77:12, 77:18
**Rep** - 35:2
**Repair** - 32:3
**Repeated** - 62:14
**Repetitious** - 7:7, 7:15
**Replace** - 32:23

**Replaced** - 32:3, 32:8
**Replacing** - 31:15
**Reporter** - 88:21, 136:14, 136:18
**Reporting** - 13:16, 22:20, 34:4, 104:18, 109:12, 113:24, 114:1, 121:23, 121:25, 122:13, 124:7, 125:11, 127:25, 129:13, 146:6, 158:18, 173:22, 173:24
**Reports** - 22:14, 112:20, 147:2, 147:19
**Representation** - 112:14
**Representative** - 6:17, 64:23, 64:25, 91:1, 151:24, 165:24, 177:6
**Representatives** - 5:2, 6:4, 119:14
**Represented** - 64:22, 162:21, 175:14
**REPRRTER** - 45:10
**Requested** - 4:19, 11:8
**Required** - 4:17, 117:22, 117:23, 122:8, 122:12, 165:10
**Requires** - 183:9
**Reserve** - 166:19
**Residence** - 11:23
**Resources** - 6:10, 55:14, 63:11, 82:12, 92:19, 135:22, 139:22, 146:10, 146:12, 146:20, 147:9
**Respond** - 19:17, 24:24, 106:15, 106:18, 174:22
**Respondent** - 4:8, 5:25, 6:2, 6:5, 6:7, 8:5, 13:5, 106:8, 147:23
**Respondents** - 13:2
**Respondent's** - 9:2, 9:3, 165:24
**Responding** - 59:14

**Response** - 37:8, 60:13, 99:14, 99:15, 102:17, 103:18, 158:9, 178:9, 178:21, 179:11, 190:3
**Responsibilities** - 146:22, 146:25, 147:1, 152:11, 177:2, 177:9
**Responsibility** - 14 6:18, 146:19, 146:20, 175:23, 177:4
**Responsible** - 46:8, 146:11, 146:13, 146:15, 146:16, 150:20, 189:6
**Responsive** - 49:5, 50:1
**Restates** - 100:3
**Result** - 26:10, 36:23, 43:21, 68:10, 68:13, 178:19, 179:10, 183:10, 185:6, 190:22
**Resulted** - 108:14, 150:4, 169:21
**Resume** - 202:21
**Retired** - 33:3
**Retirement** - 33:22, 33:23, 82:15, 82:16, 85:14, 85:16
**Retreat** - 96:25, 97:4, 97:8, 97:11, 97:17, 106:18, 107:16, 114:19, 137:17, 164:16
**Retreated** - 113:24
**Retrieve** - 58:20, 59:8
**Return** - 132:18, 133:4, 134:22, 159:18, 166:2
**Returned** - 89:2, 89:25, 159:20
**Returning** - 41:3, 123:11
**Reviewed** - 50:19, 61:10, 107:21, 111:7, 140:12, 149:21, 156:24, 180:3, 186:13
**Reviewing** - 107:19,

156:17, 159:8, 196:10
**Road** - 17:25, 84:10, 84:11
**Robert** - 4:7, 5:21, 17:10, 17:22, 17:23, 94:20, 120:9, 121:19, 127:5, 130:14, 192:13, 196:17
**Roles** - 115:9
**Rolled** - 69:23, 70:5, 72:5
**Roof** - 32:3
**Roofs** - 32:8
**Room** - 39:3, 54:10, 95:16, 106:22, 122:24
**Rose** - 180:22
**Rounded** - 79:8
**Rubric** - 116:13
**Rug** - 91:25
**Rule** - 8:12, 41:8, 45:22, 66:11, 110:20, 131:6, 131:7, 169:1, 172:6, 178:9
**Ruled** - 46:1
**Rules** - 7:1, 7:3, 7:4, 7:5, 7:18, 7:23, 8:9, 43:24, 43:25, 44:3, 44:4, 44:7, 46:5, 64:9, 92:8, 106:4, 116:12, 182:25
**Ruling** - 9:4, 98:13, 172:5
**Run** - 20:22, 21:4, 28:22, 77:16, 157:15
**Running** - 97:1
**Rural** - 18:5
**Rushed** - 19:21

| S |
| --- |

**Safety** - 4:4, 6:20, 13:17, 42:25, 43:10, 43:14, 44:4, 44:7, 89:9, 92:3, 94:20, 120:11, 158:7, 158:19, 158:20, 158:21, 192:15, 199:24
**Salary** - 28:10, 78:14, 79:24
**Sale** - 31:5

Robert Branch   2023-FRS-00026   February 13, 2024

**Sandwich** - 94:6, 96:5, 96:7
**Sat** - 54:10
**Saturday** - 24:3
**Saved** - 30:19
**Savings** - 30:17, 31:2
**Saw** - 36:4, 36:6, 53:1, 156:15, 165:3, 173:13, 189:15
**Scanned** - 130:19
**Scar** - 36:20
**Scene** - 97:10
**Scope** - 151:23
**Screen** - 54:18, 54:25, 71:21, 86:14, 95:16, 95:18, 95:23, 136:19, 136:20, 154:7, 200:10
**Scribe** - 62:3
**Scroll** - 58:17, 59:19, 60:16, 61:21, 62:16, 71:19, 72:23, 73:7, 73:8, 74:22, 149:3, 151:11
**Scrolling** - 171:11, 171:23
**Searched** - 83:21
**Seat** - 198:14
**Seated** - 5:9
**Second** - 8:25, 14:20, 15:7, 32:13, 45:15, 59:6, 98:8, 104:10, 137:1, 149:3, 151:1, 170:16
**Secretary** - 11:3, 11:8
**Security** - 13:17, 158:7, 158:19
**Seeing** - 26:20, 26:21, 26:22, 86:17
**Seeking** - 13:7
**Seen** - 12:14, 128:4, 156:13, 156:14
**Selected** - 30:2, 30:6
**Sell** - 30:15
**Sending** - 109:10
**Senior** - 6:9, 96:11, 101:13, 129:24, 129:25, 135:21, 139:22
**Seniority** - 18:7, 18:8

**Sent** - 35:15, 60:23, 61:1, 109:9, 109:11, 109:15, 109:17, 128:19, 130:20, 131:1, 131:3, 189:16
**Sentences** - 62:6
**Separate** - 4:13, 90:22, 188:5
**Separately** - 153:16
**Separation** - 75:6
**Sequestered** - 16:23
**Sequestration** - 17:2
**Serious** - 68:10, 138:23, 154:5, 154:14
**Seriously** - 25:7, 43:11
**Service** - 38:18, 38:19, 39:1, 63:15, 63:16, 63:20
**Set** - 8:20, 87:23, 156:23
**Setting** - 16:5, 16:7, 16:10, 168:20, 175:9, 175:13, 176:13
**Settling** - 30:20
**Setup** - 16:4, 95:19, 138:9, 138:11
**Setups** - 95:23
**Several** - 149:11, 150:19
**Severity** - 116:2, 188:18
**Share** - 134:15
**She's** - 32:14, 73:11
**Shift** - 13:2
**Shoes** - 47:9
**Shook** - 112:15
**Shoot** - 23:9, 34:19, 38:7, 91:23
**Shortly** - 4:24, 112:12
**Shouldn't** - 24:9, 24:10, 38:8
**Show** - 8:1, 10:16, 13:8, 13:10, 42:1, 54:14, 57:20, 58:1, 58:3, 72:20, 202:2
**Showed** - 36:20, 36:21
**Showing** - 58:3

**Shown** - 58:15, 59:10, 86:13
**Shows** - 71:5
**Side** - 47:7, 64:16, 157:2
**Sign** - 84:10, 84:11
**Signals** - 198:25
**Significant** - 136:12
**Similar** - 110:7, 145:11, 177:25, 182:15
**Simply** - 8:18, 49:9, 140:3
**Sitting** - 192:3, 194:25
**Situations** - 139:9, 146:21, 149:11, 150:3, 171:18, 172:1
**Six** - 201:20, 201:21
**Skill** - 119:13, 201:19
**Slightly** - 88:19
**Slowly** - 171:11
**Small** - 150:24
**Sold** - 30:17
**Sole** - 146:18
**Solely** - 173:9, 180:16
**Soley** - 95:7, 95:8, 95:10
**Somewhat** - 16:10
**Sooner** - 94:3
**Sorey's** - 71:9
**Soul** - 90:13
**Sound** - 119:3, 167:1
**Sounds** - 84:13, 128:12, 166:14, 166:15, 166:25, 177:9, 201:10
**Source** - 113:5, 176:12
**Southern** - 101:14, 151:7, 163:10, 163:11, 163:14
**Speaks** - 171:14
**Specialist** - 32:15
**Specific** - 138:11, 143:15, 147:11, 162:15, 188:6
**Specifies** - 147:12
**Speculate** - 142:24
**Speculating** - 199:19

**Spell** - 26:25
**Spells** - 188:18
**Spend** - 32:16, 77:22
**Spent** - 30:21
**Spikes** - 18:20
**Spoken** - 195:9
**Squashed** - 112:15
**Stab** - 144:3
**Standard** - 172:12, 172:14
**Standby** - 118:9
**Standing** - 19:1, 20:11, 49:1, 49:15
**Staring** - 95:16
**Start** - 70:3, 94:12, 130:4, 134:2, 134:22, 137:5, 140:12, 140:20, 194:6
**Started** - 19:8, 30:3, 33:7, 33:9, 37:2, 42:21, 47:16, 48:23, 49:1, 49:10, 50:7, 51:7, 51:8, 70:6, 70:14, 83:5, 140:20, 181:22
**Starting** - 5:5, 14:13, 15:15
**Starts** - 154:5, 182:3
**State** - 7:20, 17:22, 31:12, 97:6, 143:10, 169:2, 172:19, 172:21
**Stating** - 26:15, 195:5
**Stay** - 17:4, 42:7, 69:15, 94:13, 123:2, 165:23
**Staying** - 46:22
**Steaks** - 195:1
**Step** - 164:5, 178:20, 185:9
**Steps** - 188:20
**Stipulated** - 10:13
**Stipulation** - 10:22, 10:24, 11:1, 11:3, 11:7, 11:13, 12:9, 12:15
**Stipulations** - 10:18, 11:10, 12:9, 14:3
**Stock** - 30:20
**Stocks** - 30:15

**Stone** - 156:24
**Stood** - 49:10, 49:15
**Stop** - 92:6, 171:12
**Stopping** - 201:16
**Storage** - 32:9
**Storm** - 40:5, 40:16
**Story** - 64:16, 129:1
**Streamline** - 118:21
**Strict** - 7:18
**Strike** - 53:1, 124:12, 126:20
**Striking** - 123:14, 126:21
**Struck** - 51:21, 51:25, 52:1, 52:14, 87:9, 107:18, 123:14, 126:17, 128:24, 132:11, 164:22, 164:23, 181:7, 181:11
**Stub** - 76:15, 79:14, 79:20, 79:21, 80:11, 81:1, 81:2
**Stubs** - 79:14
**Submitted** - 9:6, 9:14, 9:16, 53:22, 57:14, 112:12, 117:8, 158:23, 186:1
**Submitting** - 15:20
**Subsequently** - 77:4
**Subsidiary** - 151:9
**Substantial** - 67:25
**Substituted** - 9:19
**Substitution** - 9:14
**Succeeds** - 13:5
**Successful** - 29:25
**Sufficient** - 169:1, 169:5, 174:22
**Suites** - 19:4
**Summarize** - 72:2
**Summarized** - 12:21
**Summary** - 73:4, 75:4
**Sunday** - 24:22, 24:23, 127:18, 128:12
**Supervisor** - 22:20, 22:21, 23:1, 23:3, 24:21, 104:1, 104:14, 113:23, 114:16, 121:12,

Robert Branch   2023-FRS-00026   February 13, 2024

125:5, 125:11, 126:12, 127:3, 163:6, 174:17
**Supervisors** - 23:22, 41:4, 41:6, 46:12, 96:21, 103:12, 104:22, 114:1, 124:14, 152:3
**Supervisory** - 102:15
**Supplies** - 40:11
**Supply** - 33:23
**Support** - 169:1, 180:5
**Supported** - 180:4
**Supports** - 142:12
**Suppose** - 45:8, 45:16, 172:10
**Supposed** - 105:12, 117:19
**Surrounded** - 101:6
**Surrounding** - 164:6, 195:23
**Surroundings** - 194:20
**Survive** - 30:19
**Survived** - 30:14
**Susa** - 6:1
**Susan** - 11:13, 15:2, 50:10, 91:21, 133:17, 134:11
**Suspended** - 41:11
**Suspension** - 169:10
**Sustain** - 98:10, 105:8, 143:24, 195:10
**Sustained** - 40:23, 144:14, 174:23
**Swear** - 16:20, 17:8, 120:14, 168:5
**Sweeny** - 19:16, 19:18, 48:2, 48:7, 48:8, 48:14
**Sweeping** - 91:25
**Swing** - 50:8, 50:12, 50:17, 51:3, 51:16, 138:8, 164:23
**Swinging** - 48:23, 49:1, 49:10, 49:14, 50:7, 51:7, 51:14, 51:20, 53:6
**Switch** - 94:1
**Swollen** - 36:25,

37:1, 37:3, 37:4, 87:19
**Sworn** - 17:11, 55:22, 55:25, 67:6, 95:3, 121:3, 135:13, 168:8, 192:23
**Swung** - 157:22, 164:14, 181:23
**System** - 188:21

| T |
| --- |

**Taking** - 8:23, 27:21, 83:5, 96:5, 119:3, 170:16, 186:18, 196:5
**Team** - 193:25
**Teams** - 4:6
**Technical** - 8:16
**Technically** - 120:19, 124:11
**Telephone** - 128:25, 129:2
**Telling** - 32:1, 63:1, 63:4
**Tells** - 142:6
**Tendency** - 7:8
**Tendered** - 4:24
**Terminate** - 50:21, 101:5, 138:19, 158:5, 158:11, 160:1, 185:17, 186:16, 186:25, 196:17
**Terminating** - 67:19
**Terminations** - 68:10
**Terminology** - 190:9
**Terms** - 12:9, 69:25, 90:5, 131:16, 131:18, 139:4, 179:7, 191:1
**Terrible** - 153:5
**Terribly** - 94:12
**Terrific** - 58:4, 71:19
**Territories** - 84:3
**Tested** - 57:16
**Text** - 25:3, 59:17, 60:3, 60:4, 60:7, 60:25, 61:24, 71:20, 128:4, 128:19
**Texted** - 24:25, 25:4, 35:7, 35:9

**Thanks** - 42:10, 92:24, 118:15, 191:10, 201:19
**That'd** - 191:21
**Theory** - 173:15
**Therefore** - 116:21, 164:17
**These** - 8:10, 9:16, 9:17, 10:14, 10:15, 25:17, 25:18, 101:24, 101:25, 102:14, 104:16, 109:3, 118:22, 124:19, 131:22, 138:10, 154:1, 154:6, 166:17
**They'd** - 112:16
**They're** - 10:15, 10:16, 47:22, 105:13, 117:23, 150:16, 154:1, 154:3, 156:7, 157:23, 166:14
**They've** - 17:4
**Third** - 87:1, 152:6, 154:14
**Thomas** - 98:20, 168:7, 192:22
**Threat** - 38:7, 66:21, 89:15, 89:16, 89:18, 89:19, 89:24, 90:8, 91:18, 91:22, 113:8, 159:6, 186:24, 199:24
**Threaten** - 24:16
**Threatened** - 21:23, 23:10, 34:18, 86:16, 91:23, 92:16, 160:3
**Threatening** - 191:4
**Three** - 40:9, 98:24, 169:18
**Threw** - 18:4
**Throwed** - 50:10
**Throwing** - 149:21, 179:7
**Thrown** - 149:14, 149:16
**Thursday** - 23:13, 23:14, 38:21, 62:6
**Tied** - 116:20
**Tier** - 33:20, 33:21, 33:22, 82:9, 82:10, 82:15
**Tight** - 136:25

**Timed** - 167:19
**Times** - 50:15, 79:25, 80:2, 80:7, 156:14
**Tiny** - 71:19
**Title** - 147:13, 198:24
**Today's** - 5:5, 81:15, 81:17
**Todd** - 23:24, 23:25, 24:1, 25:6, 34:18, 55:14
**Tolerance** - 108:25
**Tolerated** - 143:1
**Tom** - 15:10, 98:20, 134:13, 137:11, 144:18, 155:9, 155:13, 166:10, 167:8, 167:9, 168:3, 183:17, 184:1, 187:19, 198:23
**Tomorrow** - 119:23, 134:2, 134:16, 167:6, 167:10, 202:7, 202:8, 202:10, 202:13, 202:15, 202:19
**Tonight** - 202:2
**Tools** - 68:18, 68:22, 85:8
**Top** - 20:19, 20:20, 20:21, 59:18, 61:22, 196:21
**Topics** - 165:20
**Tornado** - 40:7, 40:8
**Total** - 22:2, 71:3, 79:17, 80:12
**Totality** - 186:13
**Touched** - 157:23
**Tough** - 164:18
**Toward** - 122:24, 152:17
**Towards** - 36:5, 123:11, 171:15, 178:20, 191:3
**Town** - 84:7
**Towns** - 85:10
**Track** - 12:20, 36:4, 44:4, 44:7, 199:1
**Trackman** - 18:11
**Tracks** - 193:7
**Traditional** - 7:10, 22:12

**Trained** - 44:6, 44:9
**Training** - 44:17, 148:10, 148:15
**Transcripts** - 54:18, 108:5, 154:24, 179:22, 193:19
**Transferred** - 4:19
**Transmission** - 32:15
**Traveling** - 86:3
**Traying** - 164:16
**Trick** - 72:24, 79:10
**Triggered** - 13:15
**Trip** - 43:15
**Trouble** - 196:20
**Truthfully** - 66:25, 67:9, 125:8
**Tuesday** - 35:2, 35:17, 35:18, 38:11, 63:9, 89:2, 89:24, 109:5
**Turn** - 8:14, 14:10, 166:2
**Turned** - 14:18, 20:3, 38:1, 80:1, 80:2, 142:2
**Turning** - 166:7
**Twice** - 19:23, 20:8, 48:19, 48:23
**Twisted** - 87:19
**Two** - 8:20, 76:5, 76:9, 76:11, 76:12, 79:16, 80:2, 98:23, 99:2, 109:3, 131:22, 138:10, 188:5, 197:14
**Ty** - 22:7
**Types** - 13:20, 191:5
**Typical** - 7:21
**Typically** - 154:19

| U |
| --- |

**Unacceptable** - 25:6
**Uncle** - 39:24, 40:4
**Undecided** - 129:16
**Undergo** - 124:6
**Undergone** - 124:9
**Underlying** - 11:24
**Understands** - 105:5
**Understood** - 44:19, 44:22, 44:25, 48:7,

Robert Branch  2023-FRS-00026  February 13, 2024

52:9, 56:16, 56:18, 63:10, 64:6, 66:25, 82:3, 83:2, 129:6, 161:16, 168:21, 185:25
**Unduly** - 7:7, 7:14
**Unfortunately** - 33:10
**Unionized** - 152:13, 177:10
**Unions** - 177:5
**United** - 104:14, 163:12, 163:13
**University** - 31:12
**Unless** - 27:6, 38:10, 86:8, 118:17, 133:22, 135:8, 191:23
**Unphysical** - 105:20
**Unusual** - 185:21
**Upkeep** - 77:23
**Used** - 7:19, 27:20, 51:5, 80:19, 80:20, 81:1, 86:8, 166:17, 173:11, 174:6, 202:5
**Uses** - 139:3
**Using** - 4:6

| V |
|---|

**Vague** - 161:14
**Valentine's** - 119:23
**Vegetables** - 39:24, 41:17
**Vehicle** - 90:14
**Vendor** - 106:14
**Verbal** - 99:9, 99:22, 100:4, 100:13, 100:24, 101:1, 101:7, 190:24
**Verbiage** - 45:1
**Version** - 9:15, 151:15
**Versus** - 172:16
**VES** - 147:3
**Via** - 128:19
**Video** - 4:5, 8:17, 9:10, 16:5, 16:11, 120:14, 136:23, 145:21
**View** - 58:17, 91:18
**Viewed** - 91:17, 113:7, 186:23, 199:23

**Violate** - 149:13, 190:21
**Violated** - 45:6, 64:8, 68:1, 107:12, 141:2, 150:4
**Violent** - 117:20, 179:8
**Vision** - 32:20, 33:24, 58:14, 70:11, 70:17, 71:3, 72:7, 72:9, 73:4, 75:11, 75:19, 75:23, 76:1, 76:2, 85:25, 88:5
**Visual** - 96:2

| W |
|---|

**Wade** - 15:2, 15:6, 95:2, 130:1, 131:1
**Wage** - 80:7, 80:8, 80:25, 81:15, 86:10
**Wait** - 14:19, 81:25, 119:11, 160:8, 201:3, 201:6, 202:9
**Waiting** - 59:8, 113:17
**Waiver** - 169:8
**Walk** - 50:8, 50:13, 50:14, 87:7, 87:10, 97:11, 123:10, 126:22, 137:23, 195:23, 195:24
**Walked** - 55:18, 87:7, 124:13, 138:6
**Walking** - 36:4, 97:1, 138:1, 138:2
**Wanting** - 84:16
**Waste** - 14:5
**Water** - 40:11
**Watermelons** - 39:25
**Ways** - 150:19
**Weed** - 39:23
**Week** - 81:3, 81:10
**Weekend** - 23:19, 46:13, 56:24, 62:23, 127:2, 127:16, 131:10
**Weeks** - 76:5, 76:10, 76:11, 76:13, 79:16, 81:10, 81:11
**Weigh** - 156:12
**Weighing** - 156:1
**Weight** - 120:1, 159:9, 159:12

**Welcome** - 57:25, 166:5
**Welfare** - 70:11
**Wendall** - 6:24
**Weren't** - 40:8, 48:4, 67:6, 102:15, 106:22
**We've** - 107:24, 112:20, 128:4, 169:5, 181:24, 181:25, 182:2, 183:4, 191:4, 191:5, 200:18
**What's** - 17:16, 60:1, 71:14, 73:3, 84:4, 99:14, 156:2, 156:6, 166:6, 170:2, 190:2
**Whereupon** - 9:20, 10:1, 17:9, 95:1, 121:1, 135:11, 168:6, 192:21, 202:20
**Whistleblower** - 4:5, 6:21, 13:15, 94:19, 120:10, 192:14
**White** - 18:16
**Whole** - 171:5, 171:7
**Who's** - 5:4, 5:21, 133:14
**Wife** - 36:16, 36:18, 61:4, 62:3, 83:3, 83:14, 83:18, 86:1, 86:2, 119:22
**Wife's** - 33:23, 70:7, 70:15, 74:3, 74:11, 74:14, 77:5, 82:15, 83:22
**Willing** - 15:4, 40:25, 158:2
**Winona** - 85:11
**Wise** - 166:12
**Won't** - 15:21, 162:16
**Woods** - 36:5
**Word** - 86:9, 113:25, 114:15, 117:2, 163:5
**Words** - 45:12, 48:13, 107:11, 173:21, 174:5
**Worked** - 27:15, 29:13, 43:23, 75:9, 75:11, 75:21, 77:2,

77:13, 81:8, 86:5, 101:17, 102:6, 141:21, 178:1, 178:8
**Worker** - 21:17, 149:21, 159:23, 186:11
**Workers** - 19:10, 40:15, 43:10, 65:8, 152:13, 177:10
**Working** - 18:15, 18:16, 25:1, 27:16, 27:18, 31:25, 40:1, 40:15, 41:16, 42:21, 46:15, 86:3, 138:14, 151:8, 184:16, 194:1
**Works** - 16:3, 32:14, 102:4, 120:17, 120:20, 167:20
**Wouldn't** - 24:23, 37:25, 90:22, 106:17, 114:20, 117:14, 139:23, 176:6, 185:4, 187:14, 189:17, 190:11
**Wound** - 38:25, 130:19
**Wrap** - 201:18
**Write** - 35:8, 35:9, 38:15, 38:16, 61:4, 128:5, 128:18, 139:20
**Writing** - 35:15, 116:11, 160:21, 160:22
**Written** - 50:24, 50:25, 53:22, 57:10, 65:7, 65:20, 147:7, 156:13, 157:5, 163:16, 180:25
**Wrote** - 38:3, 50:24, 57:13, 61:4, 61:23, 130:15, 159:13, 181:6
**Wynn** - 8:10, 202:14

| X |
|---|

**XX** - 83:1

| Y |
|---|

**Yard** - 28:1, 39:22
**Year** - 31:13, 31:21,

40:6, 74:4, 80:18, 81:4, 123:25, 174:9
**Years** - 27:17, 30:18, 33:9, 41:7
**Yell** - 97:11
**Yelling** - 47:16, 47:24
**Yesterday** - 9:2
**You'd** - 16:8, 54:17, 93:20, 96:7, 168:22
**You'll** - 82:4
**Yourselves** - 94:14
**Youth** - 27:14
**You've** - 5:17, 28:14, 29:20, 30:13, 41:7, 41:13, 58:2, 68:25, 69:1, 69:10, 73:4, 135:6, 202:11

| Z |
|---|

**Zoom** - 95:17

| ' |
|---|

**'22** - 31:22
**'24** - 28:12

| $ |
|---|

**$10,000** - 29:9, 29:11
**$15,000** - 31:17, 32:16
**$184,000** - 78:15, 78:16, 78:19, 79:7, 79:9
**$185,000** - 28:11, 28:16, 78:17, 78:24, 79:13, 79:23, 81:14
**$2,500** - 32:13
**$20,000** - 30:18, 31:6
**$228** - 75:20, 75:24
**$228.00** - 75:16
**$30.00** - 28:21, 77:6, 79:25
**$32,000** - 30:16
**$32,350** - 31:3
**$37.00** - 28:25
**$40.00** - 76:4, 76:8, 76:12
**$45,000** - 31:1
**$48.00** - 76:7
**$5,000** - 31:9
**$50,000** - 31:1

Exhibit A: Transcript of Office of Administrative Law Judges February 13 and 14, 2024, Hearing

Robert Branch   2023-FRS-00026   February 13, 2024

**$50.00** - 77:4
**$6,000** - 32:4, 32:6
**$769** - 73:20, 73:21, 73:25
**$769.00** - 74:15
**$8,000** - 29:8, 29:11
**$80.00** - 77:7
**$814.00** - 74:5, 74:7, 74:10
**$854.00** - 74:6
**$966.00** - 70:25
**$966.36** - 70:23
**$966.38** - 33:1
**$97,000** - 30:21

---
/
---

**//** - 9:23, 9:24, 9:25, 94:24, 94:25, 202:22, 202:23, 202:24, 202:25

---
1
---

**1:05** - 135:4
**1:25** - 134:21
**1:27** - 135:5
**10** - 42:2, 42:6, 167:17
**10:14** - 42:1, 42:11
**10:25** - 42:1, 42:12
**10:36** - 14:21, 14:22
**100** - 126:19
**10-23-2017** - 151:15
**109** - 8:4
**11** - 18:8
**11:00** - 36:1
**11:43** - 94:12
**11:44** - 94:15
**12** - 27:16, 79:18, 80:3
**12:00** - 94:12
**12:02** - 94:16
**12:40** - 120:5
**12:45** - 120:6
**12th** - 9:2
**13** - 4:2
**143** - 17:25
**15** - 167:22
**16** - 10:17, 41:7, 148:18, 148:24, 148:25, 170:18, 170:20
**18** - 7:24, 9:14, 9:19, 88:7, 88:8,

88:10
**19** - 9:14, 9:19
**1982** - 7:2
**1982.107** - 7:3
**1982.109** - 7:25, 8:8

---
2
---

**2:17** - 167:25
**2:30** - 167:18
**2:36** - 168:1
**20** - 28:14, 30:14, 31:13, 39:20, 41:13, 53:20, 69:1, 78:15, 134:21, 134:25
**2008** - 18:8, 42:22
**20109** - 13:12
**2012** - 176:25
**2017** - 151:16, 177:18, 177:19, 179:1
**2023** - 4:7, 55:23, 56:1, 56:7, 56:19, 68:19, 68:21, 74:8, 80:18, 80:19, 80:23
**2024** - 4:2, 9:16, 10:17, 74:4, 86:11
**21** - 6:24
**21st** - 6:25
**23** - 12:9
**24** - 10:25, 11:20
**24th** - 26:15, 39:17, 67:18, 91:11
**25** - 29:21, 69:1
**26** - 4:7, 10:17, 10:23, 11:6, 12:10, 17:25, 18:21, 62:6, 66:12, 68:13, 89:20, 109:4, 126:24
**29** - 7:2, 7:24
**2nd** - 38:23, 63:16

---
3
---

**3:30** - 200:18, 202:20
**30** - 29:21, 33:9, 60:19, 62:1, 69:1, 85:9, 150:23, 151:4, 151:6
**31** - 69:22
**31st** - 89:2, 91:22
**38** - 71:14, 72:8, 72:19, 73:8, 73:16, 73:17, 73:18, 74:21

**38923** - 18:1
**39** - 70:20, 72:20, 72:23, 73:3, 73:16, 74:23, 74:24, 75:3
**3rd** - 26:3, 39:7, 39:9, 63:17

---
4
---

**4:00** - 15:4, 93:16
**40** - 85:9
**4212** - 147:3
**45** - 85:13
**48** - 9:13, 9:19, 9:22, 10:3, 57:19, 58:8, 60:2
**49** - 84:7, 202:4

---
5
---

**57** - 82:22
**58** - 82:19, 82:20
**59** - 83:1
**5th** - 11:23, 12:2

---
6
---

**60** - 33:9
**67** - 33:4, 33:5, 33:8, 33:11

---
7
---

**7:00** - 19:7
**7th** - 39:13, 89:17

---
8
---

**8:00** - 19:7, 60:19
**80** - 79:25, 80:1, 80:7

---
9
---

**9:00** - 19:8, 62:7, 202:13
**9:21** - 4:2
**96** - 55:7, 55:12

# UNITED STATES DEPARTMENT OF LABOR
# OFFICE OF ADMINISTRATIVE LAW JUDGES

In the Matter of:

ROBERT BRANCH,  )
                               )
    Complainant,  )
v.                       )   Case No. 2023-FRS-00026
                               )
ILLINOIS CENTRAL RAILROAD,  )
                               )
    Respondent.  )
                               )

**Condensed Transcript and Key Word Index**

PAGES:    204 through 241

PLACE:    Video Hearing

DATE:    February 14, 2024

# BAYLEY REPORTING, INC.
## *OFFICIAL FEDERAL REPORTERS*
### Florida
### (727) 585-0600

Robert Branch    2023-FRS-00026    February 14, 2024

---

**Page 204**

UNITED STATES DEPARTMENT OF LABOR
OFFICE OF ADMINISTRATIVE LAW JUDGES

In the Matter of:
ROBERT BRANCH,                    )
                                  )
    Complainant,                  )
                                  )
v.                                )    Case No.  2023-FRS-00026
                                  )
ILLINOIS CENTRAL RAILROAD,        )
                                  )
    Respondent.                   )
                                  )

Video Hearing
Wednesday,
February 14, 2024
The above-entitled matter came on for hearing
pursuant to notice, at 9:00 a.m., CST.

BEFORE: ANGELA F. DONALDSON
Administrative Law Judge

Bayley Reporting, Inc.
(727)585-0600

---

**Page 205**

A P E A R A N C E S
On behalf of the Complainant:
CHARLES EDWARD SOREY, II, ESQ.
Sherman & Lacey, LLP
1000 Highland Colony Parkway, Suite 5203
Ridgeland, Missouri 39157
(601) 341-6929
JAMES FERGUSON, ESQ.
201 West Broadway, Suite G12
North Little Rock, Arkansas 72114
On behalf of the Respondent:
SUSAN FITZKE, ESQ.
GRACE JACOBSON, ESQ.
Littler Mendelson
80 South 8th Street, Suite 1300
Minneapolis, Minnesota 55402

---

**Page 206**

I N D E X
COMPLAINANT'S WITNESSES:  DIRECT CROSS REDIRECT RECROSS
Patrick Crain              208   221    230
RESPONENT'S WITNESSES:    DIRECT CROSS REDIRECT RECROSS
None
                        E X H I B I T S
EXHIBIT             IDENTIFIED  IN EVIDENCE  WITHDRAWN
COMPLAINANT'S
None
RESPONDENT'S
None
DIRECTOR'S
None
ALJ'S
None

---

**Page 207**

1                P R O C E E D I N G S
2  February 14, 2024                  9:02 A.M., CST
3          JUDGE DONALDSON:    Okay.  So, we are reconvened
4  for the FRSA whistleblower protection provision case
5  brought by Robert Branch against Illinois Central and this
6  is Day 2 of the hearing.  I believe we have one witness
7  remaining and that is Mr. Patrick Crane.  Is it C-R-A-I-N?
8          MR. CRAIN:    Yes, ma'am.
9          JUDGE DONALDSON:    Okay.  Mr. Crain, let me
10 swear you in before you testify today.  Would you raise
11 your right hand?
12 Whereupon,
13                  PATRICK CRAIN
14 having been duly sworn, was called as a witness herein and
15 was examined and testified as follows:
16         WITNESS:    Yes, ma'am.
17         JUDGE DONALDSON:    All right, thank you and let
18 me know, Mr. Crain or let the attorneys know if you have
19 any issues with any questions, if you have any confusion
20 about the proceeding.  We'll be happy to answer those
21 questions for you.
22         WITNESS:    Thank you.
23         JUDGE DONALDSON:    Let's go ahead and get
24 started.  Mr. Sorey, you can begin.
25         MR. SOREY:    Thank you, Your Honor.

---

Robert Branch    2023-FRS-00026    February 14, 2024

Page 208

1          DIRECT EXAMINATION
2    BY MR. SOREY:
3      Q  Mr. Crain, you are the Labor Relations manager
4  for CNIC, are you not?
5      A  Yes, sir.
6      Q  And you've held that position since October of
7  2021?
8      A  Yes, sir.
9      Q  To get this hearing started for Mr. Branch and
10 them, you heard from Mr. Wade Clark and he advised you of
11 the incident and asked you what he should do, correct?
12     A  Yes, sir.  That's correct.
13     Q  Okay and I believe you advised him to gather
14 witness statements?
15     A  Yes.  Yes, sir.  That's correct.
16     Q  Now, after you reviewed these statements of the
17 witnesses, you decided to have a formal investigation, did
18 you not?
19     A  I would classify that as a joint decision between
20 myself and Mr. Clark.
21     Q  Okay and why did you decide it was necessary to
22 do a formal investigation?
23     A  Because of the employees that were involved in
24 the alleged incident, their employment terms are governed
25 by a collective bargaining agreement.  There was

Page 209

1  preliminary evidence that there may have been violation of
2  company rules or policy based on the statements we received
3  and under this collective bargaining agreement, if you
4  believe that there's an incident or rules violation that
5  may result in a disciplinary event, the employees are
6  granted the right to a fair and impartial hearing in which
7  the company presents their evidence and they have the
8  opportunity to present their defense.
9      Q  Okay.  Was there a disciplinary panel to judge
10 the evidence from the hearing?
11     A  Yes, sir.
12     Q  Were you a member of that panel?
13     A  I was not a member of the decision making part of
14 the panel.  I was a member as an advisor and participated
15 in trying to gather additional facts or information that
16 the panel needed to make their decision.
17     Q  Tell us what all the disciplinary panel does, who
18 they consist of and what other groups or interested people
19 work with them?
20     A  I'm not sure what you mean by other interested
21 groups, sir.
22     Q  Well, apparently you weren't a member of the
23 disciplinary panel, but you said you worked with them or
24 for them or helped them in some way.  Let's start with the
25 disciplinary panel.  How are they selected?

Page 210

1      A  It depends on the case.  It's Tom Sullivan, Duane
2  Spears and an official from the employee's function or
3  group.  So, in this case, it would have been Tom Hilliard
4  representing the Engineering Department.  So, to assist
5  them, I reviewed the record evidence and made a
6  recommendation based on my analysis of the facts.  I had
7  multiple discussions with Tom Sullivan and Duane Spears to
8  discuss the case.
9      Q  So, basically you functioned as part of the
10 disciplinary panel?
11     A  Not under the discipline policy.  No, sir.
12     Q  Okay.  I believe it was Mr. Sullivan that said
13 yesterday that the hearing transcripts came to him with a
14 recommendation for a Level 4 violation.  Were you the one
15 that made the recommendation for the Level 4 violation?
16     A  Yes.  The panel does not review cases unless it's
17 for a Level 4 violation.
18     Q  Okay.  Now, the disciplinary committee after your
19 recommendation concluded that Mr. Branch fought back and
20 therefore was terminated.  Is that correct?
21     A  Yes, sir.
22     Q  Okay.  Now, we talked about in your deposition
23 the definition of self-defense and I believe that we
24 concluded that there was no definition of self-defense in
25 the workplace violence policy.  Is that correct?

Page 211

1      A  I believe so, yes.
2      Q  Okay.  Now, in the workplace violence policy, it
3  does have a statement and I will quote, "Except excluding
4  justified situations of self-defense."  Is that correct?
5      A  Yes, sir.
6      Q  And to you, what does that statement mean?
7      A  I think --- I don't have a definition for you.  I
8  think it would depend on the facts of the case that you
9  were applying the policy to.
10     Q  Well, give us some examples of what you mean by
11 facts of the case.
12     A  Well, the statements that people provided as
13 evidence, could be photographs, could be video.  I'd be
14 speculating if I answered any further.  I'm sorry.  I don't
15 understand your question.
16     Q  Okay.  What do you consider justified self-
17 defense?
18     A  I've never had a case in my career that I've had
19 to make a judgment on justifying self-defense.
20     Q  So, you never considered self-defense as a
21 defense to this particular charge?
22     A  That was considered in the discussions, yes.
23     Q  Well, if you considered it, what facts were
24 considered for justifying self-defense?
25     A  Well, really the analysis turned on the evidence

Robert Branch    2023-FRS-00026    February 14, 2024

Page 212

1  that was submitted by multiple witnesses including Mr.
2  Branch that substantiated that both employees were swinging
3  punches at each other.  That is what tipped the scale.
4      Q    Okay and by swinging at someone that's swinging
5  at you, you're not trying to prevent them from hitting you
6  or get an advantage on you?
7      A    I can't make a determination on that.  All we
8  could determine is both employees engaged in punching each
9  other.
10     Q    Okay.  So, for my question, you can't make a
11 decision on justified self-defense?
12          MS. FITZKE:    Objection.  That misstates his
13 testimony.
14          WITNESS:    No, sir.
15          JUDGE DONALDSON:    Overruled.
16          WITNESS:    No, sir.
17          MR. SOREY:    Okay.  Thank you.
18     BY MR. SOREY:
19     Q    And, Mr. Crain, in your deposition, you stated
20 that you did not rule on self-defense at all.  Is that
21 correct?
22     A    I don't specifically recall, Mr. Sorey.
23     Q    Okay and you also said in your opinion, if Mr.
24 Branch had a defense of self-defense that he had abandoned
25 it.  Is that correct?

Page 213

1      A    Yes, I recall saying that, yes.
2      Q    And when do you say he abandoned it?
3      A    When he punched back.
4      Q    Okay.  You also said in your deposition that
5  there was evidence that Mr. Branch and Mr. Melton were on
6  the ground and you thought Mr. Branch could have removed
7  himself from the situation at that time.  Is that correct?
8      A    I remember saying that, yes.
9      Q    But you didn't know what the factors were
10 surrounding the parking lot that these gentlemen were in,
11 did you?
12     A    I'm sorry.  The connection glitched.  Would you
13 remind stating that?
14          MR. SOREY:    Sure.
15     BY MR. SOREY:
16     Q    I said, but you didn't know the situation of the
17 parking lot that these gentlemen were in at the time the
18 incident occurred, did you?
19     A    No.
20     Q    Okay.  Did you not think that was important for
21 your analysis that Mr. Branch could have run away or moved
22 away?
23     A    Possibly.  The witness statements made it pretty
24 clear what happened.
25     Q    Okay.  Were you aware of a barbecue pit that was

Page 214

1  lit in a truck behind Mr. Branch or were you aware of the
2  fence around the parking lot or were you aware that there
3  were other cars parked in the parking lot?
4          MS. FITZKE:    Objection.  States facts not in
5  evidence.
6          JUDGE DONALDSON:    Sustained.
7          MR. SOREY:    Your Honor, I would just mention
8  that Mr. Branch did testify to that.
9          JUDGE DONALDSON:    I recall only part of what
10 your question entails being stated by Mr. Branch.  I could
11 be wrong about that.  Maybe the record will bear out
12 differently.  I don't mind if you restate it and I found
13 the question more compound as well.  So, I don't know
14 how the witness would answer all the different components.
15 If you wanted to break it down, that would be fine.
16          MR. SOREY:    Thank you.
17     BY MR. SOREY:
18     Q    Mr. Crain, were you aware that there was a ---
19 that Mr. Branch was cooking at a barbecue bit when Mr.
20 Melton came out of the hotel?
21          MS. FITZKE:    Objection.  That also misstates
22 the testimony.
23          JUDGE DONALDSON:    In what way?
24          MS. FITZKE:    There was testimony about a grill
25 attached to a truck not a barbecue pit.

Page 215

1          MR. SOREY:    Oh, excuse me.
2          JUDGE DONALDSON:    That's sustained.
3          MR. SOREY:    Okay.  I'll restate it.
4     BY MR. SOREY:
5      Q    Mr. Crain, were you aware of the fact that Mr.
6  Branch was standing behind a pickup truck which had a
7  barbecue pit or a barbecue, I call it pit, a barbecue
8  something or other that cooks and had a fire in it at the
9  time Mr. Melton came out of the hotel?
10     A    There was reference to that in the witness
11 statements, but there was no specific details offered on
12 the layout as you're depicting it in the investigation
13 transcript or the exhibits that I examined.
14     Q    Well, Mr. Crain, I guess the point I'm getting
15 to, in order to get to your definition of self-defense
16 removing yourself from the situation, shouldn't you have
17 been aware of the physical facts of the location in which
18 this incident took place?
19     A    Our analysis was focused on the conduct of the
20 employees and that's the purpose of the investigation
21 process under the collective bargaining agreement and for
22 the employees to offer evidence in their side of the story
23 and there was no information like that within the
24 transcript or the exhibits that I examined.
25     Q    In your definition of workplace violence in the

Page 216

1  workplace violence policy, is fighting included within the
2  definition or is it a separate matter?
3      A    I don't specifically recall.  I could review it
4  if you'd like me to.
5      Q    Do you need to?
6      A    I don't have this policy memorized, sir.
7      MR. SOREY:    Okay.  We'll put it up for you.
8      WITNESS:    Okay.
9      MS. FITZKE:    Exhibit 16.  Is that what you're
10  going to look at, 16?  Mr. Crain also has a printed copy
11  with him here with the exhibits he brought.
12      JUDGE DONALDSON:    And, Mr. Crain, what we do in
13  the hearings is also show --- the attorney will present a
14  copy to you on the screen in front of you.  If you have the
15  hard copy and it looks the same, it should be the same,
16  looks the same to you, you can look at that too, of course.
17      WITNESS:    Thank you.
18  BY MR. SOREY:
19      Q    Now, Mr. Crain, if you would, tell us when we
20  should slowly start scrolling down the page?
21      A    It's projecting.  You can scroll.
22      Q    Okay.  Do you need to look through it again?
23      A    I'm fine.  I've got a copy here too, Mr. Sorey.
24      Q    Okay.  Is fighting included within the workplace
25  violence or is it just separate?

Page 217

1      A    I don't see where the policy specifically
2  identifies fighting.
3      Q    Okay.  Now, Mr. Crain, do you feel that Mr.
4  Branch had a right to protect himself after Mr. Melton
5  attached him?
6      A    Yes.
7      Q    Okay.  Now and I think you would agree with me
8  that Mr. Melton was obviously the aggressor in this
9  particular situation?
10      A    That's what the record evidence indicates.  Yes,
11  sir.
12      Q    Okay.  Now, in the workplace violence policy that
13  we just showed you, down toward the bottom, it says,
14  "Appropriate corrective measures will be found up to and
15  including dismissal."  What does the "up to and including
16  dismissal" mean to you?
17      A    That means that you review a case in which there
18  were allegations that the policy has been violated based on
19  the facts of the individual case involved.
20      Q    Does that indicate that there are lesser
21  punishments than termination?
22      A    Depending on the facts of the case, yes.
23      Q    Okay.  Now, Mr. Crain, has Mr. Chris Day within
24  the last year --- well, let me take that back.  Let me
25  start over.  In Mr. Day's deposition in November of '23, he

Page 218

1  told us that he had been involved in an altercation
2  approximately a year before in a bar in Illinois in which a
3  contractor head butted him.  Now, did he report that to
4  you?
5      A    I don't recall having any conversations with him
6  about that.
7      Q    Okay.  Mr. Day has told us that he did report it
8  to you and he said he also reported it to Patrick Jones.
9  Now, who is Mr. Patrick Jones?
10      A    Patrick Jones took over as a senior manager of
11  production from Wade Clark so that would be Chris Day's
12  supervisor.
13      Q    Okay.  Did you and Mr. Patrick Jones at any time
14  discuss the altercation of Mr. Chris Day?
15      A    Not to my recollection.
16      Q    Okay.  So, are you telling us that Mr. Day
17  fabricated the story that he reported it to you?
18      MS. FITZKE:    Objection to the form of the
19  question.  It's argumentative.
20      JUDGE DONALDSON:    Sustained.
21  BY MR. SOREY:
22      Q    Mr. Crain, are you telling us that you've never
23  had any conversation with Chris Day about the altercation
24  that took place in the Illinois bar?
25      A    Mr. Sorey, I don't recall that.  That would not

Page 219

1  be within my purview as a Labor Relations manager.  I
2  handle issues with employees that are covered by the
3  collective bargaining agreement.  So, I would have advised
4  to contact the HR person and/or their supervisor.
5      Q    Okay.  Would you agree with me that the workplace
6  violence policy was issued to enhance the safety of the
7  employees of Illinois Central Railroad?
8      A    Yes, sir.
9      Q    Okay.  Would you also agree with me that the
10  decision on Mr. Branch's termination by the disciplinary
11  panel and yourself was a close call?
12      A    Yes, sir.
13      Q    Okay.  Now, let me ask you this.  If this court
14  finds that Mr. Branch should be reinstated, would that
15  upset you?
16      MS. FRITZE:    Objection.  Relevance.
17      JUDGE DONALDSON:    Overruled.
18      WITNESS:    Upset me how?  Could you restate the
19  question, sir?
20      MR. SOREY:    Sure.
21      MR. SOREY:
22      Q    I said if this court should rule that Mr. Branch
23  should be reinstated to his position at the Illinois
24  Central Railroad, would you be upset with that decision?
25      A    I don't have any emotional interest in the case,

Robert Branch    2023-FRS-00026    February 14, 2024

Page 220

1  sir. I don't know how to answer your question.
2      Q    Okay. So, one way or another, you have no
3  opinion?
4      A    Correct.
5      Q    Okay. In reviewing his matter, obviously it was
6  within the state of Mississippi. Did you look to any of
7  the statutes for the state of Mississippi on a definition
8  of self-defense?
9      A    I personally did not. My analysis was confined
10 to the investigation hearing and transcript and the
11 applicable company policies and rules in place at the time.
12     Q    Now, Mr. Crain, after this case is over, do you
13 intend to recommend to Illinois Central Railroad that they
14 place a definition of self-defense in the workplace
15 violence policy?
16         MS. FITZKE:    Objection. Relevance.
17         JUDGE DONALDSON:    What's the relevance, Mr.
18 Sorey?
19         MR. SOREY:    Well, it would indicate that there
20 obviously is not a definition of self-defense in the
21 workplace violence policy and it also would make it easier
22 for the disciplinary panel to have an objective means of
23 checking or checking off the list to see if the person
24 should be granted a pass for self-defense.
25         JUDGE DONALDSON:    Can you tie that into the

Page 221

1  whistleblower protection and your burden or their burden
2  here?
3          MR. SOREY:    Well, it would affect the safety of
4  the employees there to know what they can do under the
5  workplace video, not video, excuse me, violence policy in
6  protecting themselves if they get attacked at the Illinois
7  Central Railroad. Right now, there's no guidance one way
8  or the other.
9          JUDGE DONALDSON:    I'm going to sustain the
10 objection. I'm not seeing the relevance to this statutory
11 framework.
12         MR. SOREY:    Okay. I believe that's all the
13 questions I have.
14         JUDGE DONALDSON:    Okay. All right, Ms. Fitzke,
15 you can proceed.
16         MS. FITZKE:    Thank you.
17                 CROSS EXAMINATION
18     BY MS. FITZKE:
19     Q    Mr. Crain, can you please tell us just a broad
20 overview what are your duties and responsibilities as a
21 Labor Relations manager for Illinois Central?
22     A    I field questions from managers, sometimes
23 employees, payroll, HR, field managers on the
24 interpretation of collective bargaining agreements that I
25 handle for the company.

Page 222

1      Q    And do you have any responsibilities with respect
2  to management or oversight of members of the company
3  management or individuals who are not part of the
4  bargaining units?
5      A    No.
6          MS. FITZKE:    We looked a moment ago --- Grace,
7  could you pull up 16, Joint Exhibit 16? It's the workplace
8  violence protection policy we just looked at. I'd like us
9  to look at the second page of the exhibit once we get it up
10 here. It'll just take a second. If we can scroll down
11 just a little. There we go.
12     BY MS. FITZKE:
13     Q    When you were asked some questions by Mr. Sorey
14 about whether fighting is included separately within the
15 policy and I just wanted to draw your attention under the
16 examples of workplace violence to that first bullet point.
17 Does the first bullet point in your view cover fighting,
18 physical fighting?
19     A    Yes, ma'am.
20         MS. FITZKE:    And if we can scroll down a little
21 bit further. Right there.
22     BY MS. FITZKE:
23     Q    Does this policy give you any guidance as an
24 employee of the company about what to do if you believe you
25 are in risk of physical harm?

Page 223

1      A    Yes, ma'am.
2      Q    And what does it tell you to do?
3      A    It tells you to remain calm, move to safety, if
4  warranted by the circumstances, immediately call 911 and
5  then it gives you guidance on if you can, you should work
6  with the local police service. You may also call the CM
7  police for assistance and as soon as possible after the
8  incident, report the situation to your direct supervisor.
9          MS. FITZKE:    If we can, please, Grace, move to
10 Exhibit 20, Joint Exhibit 20? Eddy and Jake, just let us
11 know if you need that just a little bit better.
12     MR. SOREY:    Yes, I can see it.
13     MS. FITZKE:    Okay. Your Honor, can you read
14 it?
15     JUDGE DONALDSON:    Yes, thank you.
16     MS. FITZKE:    Okay and it might help you if you
17 flip it. You can see the whole page.
18     BY MS. FITZKE:
19     Q    You mentioned in your testimony becoming aware of
20 the situation by receiving word from Wade Clark. I'm
21 showing you Exhibit 20. Is this the message that you
22 received from Mr. Clark advising you of the situation?
23     A    Yes, it is.
24     Q    Did Mr. Clark tell you anything else at that time
25 about what occurred?

Robert Branch    2023-FRS-00026    February 14, 2024

---

**Page 224**

1    A    No, ma'am.

2    Q    And I see that you gave Mr. Clark some guidance
3    that the field operation should gather the witness
4    statements?

5    A    Yes.

6    Q    Okay and why do you have the field folks do that?

7    A    They are with their employees and they are
8    present with them and there's urgency to gather information
9    before evidence is lost or memories fade.

10    Q    Before you received this message from Mr. Clark,
11    did you know Robert Branch or Tracy Melton?

12    A    No, ma'am.

13    Q    And did Mr. Clark --- did the field folks go out
14    and gather the statements that you requested?

15    A    Yes, ma'am.

16    Q    And did you receive them back?

17    A    I believe I received them back from Wade Clark.

18    Q    And what did you do with them after you got them?

19    A    I read them and I think Wade and I may have had a
20    telephone conversation that's very common to connect when
21    there's things that we're looking into.

22    Q    Did you participate in a determination to move
23    forward with the formal investigation hearing?

24    A    I recommended that they do so, yes.

25    MS. FITZKE:    And why did you recommend moving

---

**Page 225**

1    forward with an investigation with respect to --- you can
2    take the exhibit down. Thank you.

3    BY MS. FITZKE:

4    Q    Why did you recommend moving forward with an
5    investigation hearing with respect to Mr. Branch in
6    addition to Mr. Melton?

7    A    Because there was preliminary evidence in the
8    witness statements that both employees engaged in fighting
9    and physical violence against each other.

10    Q    It sounded like from your testimony that after
11    the investigation hearing, you received a copy of the
12    transcript and exhibits. Is that right?

13    A    That's correct.

14    Q    And I did want to ask just about the process for
15    the investigation hearing itself. When an employee wants
16    to claim self-defense, whose obligation is it to present at
17    the investigation hearing the full records on all the facts
18    on which they base their claim of self-defense?

19    A    The employee charged at the investigation so it
20    would have been Mr. Branch and Mr. Melton ---

21    Q    Okay.

22    A    -- respectively.

23    Q    Was Mr. Melton claiming self-defense?

24    A    Mr. Melton did not claim any --- he accepted
25    responsibility for the incident.

---

**Page 226**

1    Q    And although he accepted responsibility for the
2    incident, did that impact the decision about whether his
3    employment would be terminated?

4    A    Yes.

5    Q    In what way?

6    A    Well, it was very clear that Mr. Melton
7    instigated the incident and what was more difficult to
8    ascertain was whether Mr. Branch's conduct also violated
9    the workplace violence policy.

10    Q    Why is that more difficult to ascertain?

11    A    Because we had the collective experience of the
12    review panel, we had not had a case of similar fact pattern
13    that this was a case of first impression.

14    Q    And did you do anything to try to determine
15    whether within the parent companies or sister companies
16    whether the situation had come up before for them?

17    A    I did connect with a colleague in Winnipeg,
18    Manitoba and had a discussion with him to ascertain if
19    corporately we had had similar cases.

20    Q    What were you told?

21    A    He told me that in cases where both employees
22    engaged --- what he told me is if both employees swang,
23    then we dismiss them both.

24    Q    Did you consider that information that you
25    received from your Canadian counterpart in making your

---

**Page 227**

1    recommendations or determinations with respect to Mr.
2    Branch's employment?

3    A    Yes.

4    Q    When you received and read the investigation
5    hearing transcript, did you observe anything in the
6    investigation hearing transcript or exhibits that would
7    have indicated that there were any physical barriers to
8    retreat for Mr. Branch?

9    A    No.

10    MS. FITZKE:    Can we look please at Joint Exhibit
11    23? Thank you, Grace.

12    BY MS. FITZKE:

13    Q    If you can take a moment, sir, to take a look at
14    Joint Exhibit 23. You were asked a moment ago in your
15    testimony about a recommendation that was made that you
16    participated in to terminate Mr. Branch and Mr. Melton for
17    a Level 4 violation of the workplace violence policy. Does
18    Exhibit 23 contain that recommendation?

19    A    Yes, ma'am.

20    Q    And I see you made that recommendation to Mr.
21    Hilliard?

22    A    Yes, ma'am.

23    Q    Okay. Do you recall speaking to Mr. Hilliard by
24    the phone as well or just was your communication with him
25    limited to this email exchange?

---

Robert Branch    2023-FRS-00026    February 14, 2024

Page 228

1    A    I think it was limited to this email exchange.
2    Q    And with respect to the recommendation itself,
3  have you told us in the hearing here today the factors on
4  which you base that recommendation?
5    A    Yes.
6    Q    When you were reviewing this situation and prior
7  to Mr. Branch's termination, had anyone ever said anything
8  to you or indicated to you that Mr. Melton claimed to have
9  a firearm or that he was going to go get a gun that night
10 out of his truck?
11   A    I don't have any knowledge of that, no.
12       MS. FITZKE:    If we can and just as a matter of
13 sort of housekeeping, I'd like to look at Joint Exhibit 33,
14 but just one page of this long document. Joint Exhibit 33
15 is the collective bargaining agreement and it's kind of a
16 marked up copy, working agreement. If we can look at page
17 33 of 151 which contains the wage scale. It's my
18 understanding this page contains one minor error that I'd
19 just like to clarify with you. Okay. It's my
20 understanding that --- we can make it a tiny bit bigger,
21 Grace? Thank you. Perfect and if we can scroll down just
22 a little bit.
23       BY MS. FITZKE:
24   Q    It's my understanding that after the agreement
25 was put in place, there have been subsequent contract

Page 229

1  negotiations and that you're working under an agreement in
2  terms of what the folks out there are getting paid. Is
3  that right?
4    A    Correct.
5    Q    All right and in the red text there is an updated
6  wage scale where it looks like on July 1, 2020, 2021, 2022
7  and 2023, there's a scheduled increase?
8    A    That is correct.
9    Q    And the scheduled increase for 2024 or excuse me,
10 it had the scheduled increase July 1, 2023 and then this
11 document reflects another increase November 1, 2023 that my
12 understanding is that should be also July 1, 2024. Is that
13 right?
14   A    That is correct.
15   Q    Okay. As you made your recommendation with
16 respect to Mr. Branch's termination, it's my understanding
17 that recommendation was based on his physical contact with
18 Mr. Melton. Is that right?
19   A    Yes, ma'am.
20   Q    In reviewing the hearing transcript, did you take
21 note of Mr. Branch's testimony where he was asked by Mr.
22 Melton if he considered Mr. Melton a threat and Mr. Branch
23 responded that he had not?
24   A    We were more focused on the conduct of the
25 employees at the time of the incident rather than the make

Page 230

1  nice afterwards.
2    Q    Did the fact that Mr. Branch had made statements
3  in his written statement that he feared Mr. Melton or that
4  he was afraid of what Mr. Melton might do or words to that
5  affect, did that contribute to your decision that he should
6  be fired?
7    A    Yes.
8    Q    In what way?
9    A    It represented a potential continuing threat
10 within the workplace for additional future incidents.
11   Q    I'm sorry. Did it contribute to your decision
12 that Mr. Branch should be fired?
13   A    Oh, no. Sorry.
14       MS. FITZKE:    Okay. Thank you, Mr. Crain. I
15 don't have any other questions for you at this time.
16       JUDGE DONALDSON:    All right. Mr. Sorey,
17 anything further?
18       MR. SOREY:    Yes, ma'am.
19              REDIRECT EXAMINATION
20 BY MR. SOREY:
21   Q    Mr. Crain, in the exhibit that you reviewed,
22 Number 16, in the things to do for an employee, at the end,
23 I believe it said, "As soon as possible, report to your
24 direct supervisor." Is that correct?
25   A    I'm flipping my book, sir.

Page 231

1    Q    Okay.
2    A    Yes, that's correct, sir.
3    Q    Okay. So, is it your opinion that the IC
4  Railroad requires the employees to report any workplace
5  violence?
6    A    In my professional opinion, yes, it would.
7    Q    Okay. So, anybody observing or seeing
8  altercations are supposed to report it?
9    A    Yes, sir.
10   Q    And that would include managers and it would
11 include union employees?
12   A    This policy applies to all employees. Yes, sir.
13   Q    Okay. Now, in listening to your testimony and I
14 believe I heard it correctly and I wrote it down, it says
15 the employee is required to prove it's self-defense. Is
16 that what you said?
17   A    What I meant was in the processes outlined in the
18 collective bargaining agreement, the employee bears the
19 burden of adding any additional information that the
20 employee wishes to be considered in the review of the
21 record.
22   Q    Well, is this a fair statement, that the burden
23 of proof is on Mr. Branch to prove his innocence rather
24 than the burden being on the railroad to prove his
25 violation of policy?

Robert Branch    2023-FRS-00026    February 14, 2024

---

Page 232

1    MS. FITZKE:    Objection. Argumentative.
2    JUDGE DONALDSON:    Overruled. You can answer.
3    WITNESS:    In the collective bargaining
4  agreement, adjudication space, in a disciplinary matter,
5  the burden of proof is the company's and I feel that the
6  burden of proof was met that both employees engaged in a
7  fight and that was what drove the decision to dismiss both
8  of the employees.
9    BY MR. SOREY:
10    Q    Mr. Crain, do you know approximately now many
11  railroads there are in the United States?
12    MS. FITZKE:    Objection. Relevance.
13    JUDGE DONALDSON:    Overruled.
14    WITNESS:    I know there's, I think, six Class 1
15  railroads now.
16    BY MR. SOREY:
17    Q    Okay, but you had to go to Canada to try to find
18  out a definition or policy on fighting and self-defense?
19    MS. FITZKE:    Objection. Irrelevant.
20  Argumentative.
21    MR. SOREY:    Your Honor, this is what he
22  testified to.
23    JUDGE DONALDSON:    I'll allow it. I'm going to
24  overrule that. I'm going to see how the relevance plays
25  out in the next couple of questions. So, can you restate

---

Page 233

1  the question? Just repeat it.
2    MR. SOREY:    Yes, ma'am.
3    BY MR. SOREY:
4    Q    So, with all the railroads in the United States
5  handling cases such as Mr. Branch's, you felt it necessary
6  to go to Canada to find out what the definition of violence
7  and self-defense is for the Illinois Central Railroad?
8    MS. FITZKE:    Objection. Assumes facts not in
9  evidence that they apply similar policies.
10    JUDGE DONALDSON:    I'll overrule it. Do you
11  understand the question, Mr. Crain? Are you able to answer
12  it?
13    WITNESS:    I can answer why I called, who I
14  called if that's what the question is.
15    MR. SOREY:    That's good.
16    JUDGE DONALDSON:    Wouldn't that work, Mr.
17  Sorey?
18    MR. SOREY:    Yes, ma'am.
19    JUDGE DONALDSON:    Okay.
20    WITNESS:    The reason I called who I called was
21  because it's a common policy, U.S. and Canada and our
22  operational footprint in Canada has about twice as many
23  employees as we have in the U.S. and so we were looking for
24  how the corporate policy had been applied across the
25  company.

---

Page 234

1    BY MR. SOREY:
2    Q    Okay. Now, you told us that your superior told
3  you, "If you swing, you are fired." Is that correct?
4    MS. FITZKE:    Objection. Misstates his
5  testimony. He did not say a superior said that.
6    JUDGE DONALDSON:    Okay. I'm going to overrule
7  it since Mr. Crain was asked specifically if he did in fact
8  say something to that affect so that's overruled.
9    WITNESS:    My colleague in Winnipeg told me that
10  under the application of this policy, if both employees
11  threw punches in a fight, then the corporate practice was
12  to dismiss both employees.
13    BY MR. SOREY:
14    Q    Okay and where is that written within the CM or
15  IC Railroad policies?
16    A    That specific verbiage?
17    MR. SOREY:    Yes, sir.
18    WITNESS:    It's encapsulated in the first bullet
19  point, "Intentionally threatening or causing physical
20  harm."
21    BY MR. SOREY:
22    Q    No, that's not what I was talking about. A while
23  ago, your testimony said if you swing, you are fired.
24    JUDGE DONALDSON:    So, what is the question, Mr.
25  Sorey?

---

Page 235

1    BY MR. SOREY:
2    Q    The question is where does that appear in the
3  written policies of Illinois Central Railroad or CN
4  Railroad?
5    A    As specifically stated in that way, it's not
6  there.
7    MR. SOREY:    Okay. That's all the questions I
8  have.
9    JUDGE DONALDSON:    Do you have any follow-up,
10  Ms. Fitzke?
11    MS. FITZKE:    I do not.
12    JUDGE DONALDSON:    Okay. I don't have any ---
13  well, I do have a quick question. I don't know that it's
14  going to have any bearing on my understanding of the facts
15  in the case, but some policies that have been presented
16  during the hearing, Southern Region of Illinois Central and
17  it could be that another witness has addressed this, but
18  what does that region cover?
19    WITNESS:    Generally, in the corporate world
20  here, the Southern Region is generally the United States
21  region of the CN operation of which Illinois Central is a
22  part, but there are other subsidiary railroads that
23  comprise the Southern Region as well.
24    JUDGE DONALDSON:    So, Southern in that
25  terminology is the United States?

---

Exhibit A: Transcript of Office of Administrative Law Judges February 13 and 14, 2024, Hearing

Page 236

1  WITNESS:  Yes, ma'am.
2  JUDGE DONALDSON:    As opposed to the Southern
3  Region within the United States which is how I typically
4  see that play out.  So, it means the United States region
5  of which Illinois Central is one railroad part of a
6  structure.  I might be misstating that, but is that what
7  you said?
8  WITNESS:  Yes, ma'am.
9  JUDGE DONALDSON:    Okay.  All right, so that
10 helps me understand a little bit because I was not clear
11 and that's why I thought Mr. Sorey's question helped me
12 understand why the consultation with Canada if there were
13 other geographical regions of the United States that might
14 be consulted, but you've explained to me that Southern
15 Region did in fact encompass the United States, okay.  All
16 right and you agree with that, Ms. Fitzke, as counsel for
17 Respondent.  Would you add anything to that?
18 MS. FITZKE:    No, I think you've hit it right on
19 the nose.
20 JUDGE DONALDSON:    Okay.  All right, does
21 anybody have a follow-up question based on my questions?
22 MR. SOREY:    I don't.
23 MS. FITZKE:    No.
24 JUDGE DONALDSON:    Okay.  Thank you, Mr. Crain,
25 for your testimony this morning.  Thanks for being on

Page 237

1  standby throughout the hearing as to when you would be
2  needed.  I appreciate you being available first thing this
3  morning and your testimony in this proceeding.  We can go
4  ahead and excuse you unless you want to remain.  You might
5  have other things to get to, I would imagine.
6  WITNESS:  Yes, ma'am.  Thank you very much.
7  JUDGE DONALDSON:    All right, thank you.  We'll
8  let you go.  Thanks.  Okay, so you called the witnesses,
9  Mr. Sorey and Mr. Ferguson, and I take it, is that the last
10 witness you're calling?
11 MR. SOREY:    Yes, ma'am.
12 JUDGE DONALDSON:    Okay and Respondent has
13 obviously been conducting examinations of the same
14 witnesses that do appear to have material, relevant
15 information about the case.  Are there any other additional
16 witnesses you're --- we haven't talked about any, but are
17 there any you're planning to need to call during this live
18 video hearing?  Somehow you got muted.
19 MS. FITZKE:    No additional witnesses.  Thank
20 you.
21 JUDGE DONALDSON:    Okay.  All right, let's talk
22 about how I can close the evidentiary record.  There's the
23 Gardener deposition to mark as JX-49 and submit that.  If
24 you would do that by this Friday, February 16th, that would
25 be appreciated.  There were some deposition excerpts.  I

Page 238

1  think this was very limited.  The only one I recall was Ms.
2  Fitzke's use of some testimony from Complainant, Mr.
3  Branch's deposition during his examination yesterday.  I
4  recommend marking that as JX-50 and submitting it.  You
5  probably need to send that to --- unless you plan on
6  submitting the whole thing, but whatever you plan to tender
7  and mark as JX-50, share with counsel for Mr. Branch in
8  case they want to submit any other parts that they feel are
9  necessary for completion or context.  So, you all can do
10 that under --- it's our Rule 29 CFR 1855 for submission of
11 a deposition transcript that's been used during the formal
12 hearing.  The rule allows the opposing parties to submit
13 some other portion that they believe is important for
14 context.
15 Am I right, let's see, Mr. Sorey, Mr. Ferguson,
16 is there any transcript that you --- I ruled earlier before
17 the hearing about the transcripts not being submitted.  Is
18 there anything else you plan to submit or need to submit?
19 MR. SOREY:    We don't think so.  No, ma'am.
20 JUDGE DONALDSON:    Okay.  All right, so I'm
21 going to ask for JX-50 that I described to be submitted by
22 Friday, the 16th as well.  If you need more time, just let
23 me know.  That's flexible time limit.  Post-hearing briefs
24 will be set by the --- the briefing schedule will be set by
25 order.  So, I follow fairly informal processes at first

Page 239

1  when the transcript comes in from the court reporter.
2  Sometimes I get it first, not by a lot, but I want to make
3  sure everyone has it before we set a briefing schedule.
4  So, we'll hear from Ms. Wynn to say we got it.  It will be
5  an email, nothing formal and when the last party has it and
6  I'm sure we can go forward with briefing, we'll set the
7  briefing schedule.  I usually set just by routine or habit
8  a 30-day schedule from the last party's receipt of the
9  transcript, but if we've got a trial, if you've got some
10 other conflict and you need more time, then that's --- I
11 always grant more time if you request it.  I don't do page
12 limits on briefs.  I do allow especially our rules allow it
13 because you're filing simultaneous briefs, I allow replies
14 to be filed within 14 days of the original brief and you'll
15 get all of this in the scheduling order and I do set page
16 limits on the reply brief just to make sure that they're
17 tailored to true replies and that's it from my housekeeping
18 list.  Is there anything on your housekeeping list, Mr.
19 Sorey or Mr. Ferguson?
20 MR. SOREY:    No, ma'am.
21 JUDGE DONALDSON:    No.  Ms. Fitzke, Ms.
22 Jacobson, anything on your list?
23 MS. FITZKE:    Nothing I can think of.
24 JUDGE DONALDSON:    Okay.  So, what will happen
25 is I'll sent you a very short order closing the evidentiary

Robert Branch    2023-FRS-00026    February 14, 2024

| Page 240 | Page 241 |
|---|---|
| 1 record as well once everything is in and you know what the | C E R T I F I C A T E |
| 2 complete record is so that you'll know what the body of | |
| 3 evidence is for the briefs. You'll have that confirmed. | Name:    Robert Branch |
| 4     So, my compliments again to all of the | Case Number: 2023-FRS-00026 |
| 5 representatives for both parties for your preparation which | Date:    February 14, 2024 |
| 6 was evident throughout the hearing and your | Location:    Video Hearing |
| 7 professionalism. I think the witnesses greatly appreciated | This is to certify that the attached proceedings |
| 8 that as well and I'm going to call this adjourned now and | before the United States Department of Labor, Office of |
| 9 go off the record. | Administrative Law Judges, were held according to the |
| 10     [Whereupon, the hearing was concluded at 9:58 | record and that this is the original, complete, true and |
| 11 a.m., CST.] | accurate transcript that has been compared to the reporting |
| 12 // | or recording accomplished at the hearing. |
| 13 // | |
| 14 // | |
| 15 // | /s/Jordan Bayley                      February 14, 2024 |
| 16 // | Bayley Reporting, Inc.                      Date |
| 17 // | Official Federal Reporters |
| 18 // | Building 1, Suite 14 |
| 19 // | 12945 Seminole Boulevard |
| 20 // | Seminole, FL  33778 |
| 21 // | |
| 22 // | |
| 23 // | |
| 24 // | |
| 25 // | |

Robert Branch   2023-FRS-00026   February 14, 2024

| A |
|---|

Abandoned - 212:24, 213:2
Able - 233:11
Accepted - 225:24, 226:1
Across - 233:24
Add - 236:17
Adding - 231:19
Addition - 225:6
Addressed - 235:17
Adjourned - 240:8
Adjudication - 232:4
Advantage - 212:6
Advised - 208:10, 208:13, 219:3
Advising - 223:22
Advisor - 209:14
Affect - 221:3, 230:5, 234:8
Afraid - 230:4
Against - 207:5, 225:9
Aggressor - 217:8
Agree - 217:7, 219:5, 219:9, 236:16
Agreement - 208:25, 209:3, 215:21, 219:3, 228:15, 228:16, 228:24, 229:1, 231:18, 232:4
Agreements - 221:24
Ahead - 207:23, 237:4
Allegations - 217:18
Alleged - 208:24
Allow - 232:23, 239:12, 239:13
Allows - 238:12
Altercation - 218:1, 218:14, 218:23
Altercations - 231:8
Analysis - 210:6, 211:25, 213:21, 215:19, 220:9
And/Or - 219:4
Apparently - 209:22
Appear - 235:2, 237:14
Applicable - 220:11
Application - 234:1

0
Applied - 233:24
Applies - 231:12
Apply - 233:9
Applying - 211:9
Appreciate - 237:2
Appreciated - 237:25, 240:7
Appropriate - 217:14
Approximately - 218:2, 232:10
Argumentative - 218:19, 232:1, 232:20
Ascertain - 226:8, 226:10, 226:18
Assist - 210:4
Assistance - 223:7
Attached - 214:25, 217:5
Attacked - 221:6
Attention - 222:15
Attorney - 216:13
Attorneys - 207:18
Available - 237:2
Aware - 213:25, 214:1, 214:2, 214:18, 215:5, 215:17, 223:19

| B |
|---|

Back - 210:19, 213:3, 217:24, 224:16, 224:17
Bar - 218:2, 218:24
Barbecue - 213:25, 214:19, 214:25, 215:7
Bargaining - 208:25, 209:3, 215:21, 219:3, 221:24, 222:4, 228:15, 231:18, 232:3
Barriers - 227:7
Base - 225:18, 228:4
Based - 209:2, 210:6, 217:18, 229:17, 236:21
Bear - 214:11
Bearing - 235:14
Bears - 231:18
Becoming - 223:19
Behind - 214:1,

215:6
Bit - 214:19, 222:21, 223:11, 228:20, 228:22, 236:10
Body - 240:2
Book - 230:25
Both - 212:2, 212:8, 225:8, 226:21, 226:22, 226:23, 232:6, 232:7, 234:10, 234:12, 240:5
Bottom - 217:13
Branch's - 219:10, 226:8, 227:2, 228:7, 229:16, 229:21, 233:5, 238:3
Break - 214:15
Brief - 239:14, 239:16
Briefing - 238:24, 239:3, 239:6, 239:7
Briefs - 238:23, 239:12, 239:13, 240:3
Broad - 221:19
Brought - 207:5, 216:11
Bullet - 222:16, 222:17, 234:18
Burden - 221:1, 231:19, 231:22, 231:24, 232:5, 232:6
Butted - 218:3

| C |
|---|

Call - 215:7, 219:11, 223:4, 223:6, 237:17, 240:8
Called - 207:14, 233:13, 233:14, 233:20, 237:8
Calling - 237:10
Calm - 223:3
Canada - 232:17, 233:6, 233:21, 233:22, 236:12
Canadian - 226:25
Can't - 212:7, 212:10
Career - 211:18
Cars - 214:3
Case - 207:4, 210:1, 210:3, 210:8, 211:8,

211:11, 211:18, 217:17, 217:19, 217:22, 219:25, 220:12, 226:12, 226:13, 235:15, 237:15, 238:8
Cases - 210:16, 226:19, 226:21, 233:5
Causing - 234:19
Central - 207:5, 219:7, 219:24, 220:13, 221:7, 221:21, 233:7, 235:3, 235:16, 235:21, 236:5
CFR - 238:10
Charge - 211:21
Charged - 225:19
Checking - 220:23
Chris - 217:23, 218:11, 218:14, 218:23
Circumstances - 223:4
Claim - 225:16, 225:18, 225:24
Claimed - 228:8
Claiming - 225:23
Clarify - 228:19
Clark - 208:10, 208:20, 218:11, 223:20, 223:22, 223:24, 224:2, 224:10, 224:13, 224:17
Class - 232:14
Classify - 208:19
Close - 219:11, 237:22
Closing - 239:25
CM - 223:6, 234:14
CN - 235:3, 235:21
CNIC - 208:4
Colleague - 226:17, 234:9
Collective - 208:25, 209:3, 215:21, 219:3, 221:24, 226:11, 228:15, 231:18, 232:3
Come - 226:16
Comes - 239:1
Committee - 210:18

Common - 224:20, 233:21
Communication - 227:24
Companies - 226:15
Company - 209:2, 209:7, 220:11, 221:25, 222:2, 222:24, 233:25
Company's - 232:5
Complainant - 238:2
Complete - 240:2
Completion - 238:9
Compliments - 240:4
Components - 214:14
Compound - 214:13
Comprise - 235:23
Concluded - 210:19, 210:24, 240:10
Conduct - 215:19, 226:8, 229:24
Conducting - 237:13
Confined - 220:9
Confirmed - 240:3
Conflict - 239:10
Confusion - 207:19
Connect - 224:20, 226:17
Connection - 213:12
Consider - 211:16, 226:24
Considered - 211:20, 211:22, 211:23, 211:24, 229:22, 231:20
Consist - 209:18
Consultation - 236:12
Consulted - 236:14
Contact - 219:4, 229:17
Contain - 227:18
Contains - 228:17, 228:18
Context - 238:9, 238:14
Continuing - 230:9

Robert Branch   2023-FRS-00026   February 14, 2024

Contract - 228:25
Contractor - 218:3
Contribute - 230:5, 230:11
Conversation - 218:23, 224:20
Conversations - 218:5
Cooking - 214:19
Cooks - 215:8
Copy - 216:10, 216:14, 216:15, 216:23, 225:11, 228:16
Corporate - 233:24, 234:11, 235:19
Corporately - 226:19
Corrective - 217:14
Correctly - 231:14
Counsel - 236:16, 238:7
Counterpart - 226:25
Couple - 232:25
Course - 216:16
Court - 219:13, 219:22, 239:1
Cover - 222:17, 235:18
Covered - 219:2
Crane - 207:7
CROSS - 221:17
CST - 207:2, 240:11

**D**

Day - 207:6, 217:23, 218:7, 218:14, 218:16, 218:23, 239:8
Days - 239:14
Day's - 217:25, 218:11
Decide - 208:21
Decided - 208:17
Decision - 208:19, 209:13, 209:16, 212:11, 219:10, 219:24, 226:2, 230:5, 230:11, 232:7
Definition - 210:23, 210:24, 211:7, 215:15, 215:25, 216:2, 220:7,

220:14, 220:20, 232:18, 233:6
Department - 210:4
Depicting - 215:12
Deposition - 210:22, 212:19, 213:4, 217:25, 237:23, 237:25, 238:3, 238:11
Described - 238:21
Determination - 212:7, 224:22
Determinations - 227:1
Determine - 212:8, 226:14
Didn't - 213:9, 213:16
Different - 214:14
Differently - 214:12
Difficult - 226:7, 226:10
Disciplinary - 209:5, 209:9, 209:17, 209:23, 209:25, 210:10, 210:18, 219:10, 220:22, 232:4
Discipline - 210:11
Discussions - 210:7, 211:22
Dismiss - 226:23, 232:7, 234:12
Dismissal - 217:15, 217:16
Document - 228:14, 229:11
Don't - 211:7, 211:14, 212:22, 214:12, 214:13, 216:3, 216:6, 217:1, 218:5, 218:25, 219:25, 220:1, 228:11, 230:15, 235:12, 235:13, 236:22, 238:19, 239:11
Draw - 222:15
Drove - 232:7
Duane - 210:1, 210:7
Duly - 207:14
Duties - 221:20

**E**

Each - 212:3, 212:8, 225:9
Earlier - 238:16
Easier - 220:21
Eddy - 223:10
Email - 227:25, 228:1, 239:5
Emotional - 219:25
Employee - 222:24, 225:15, 225:19, 230:22, 231:15, 231:18, 231:20
Employee's - 210:2
Employment - 208:24, 226:3, 227:2
Encapsulated - 234:18
Encompass - 236:15
Engaged - 212:8, 225:8, 226:22, 232:6
Engineering - 210:4
Enhance - 219:6
Entails - 214:10
Error - 228:18
Everyone - 239:3
Everything - 240:1
Evidence - 209:1, 209:7, 209:10, 210:5, 211:13, 211:25, 213:5, 214:5, 215:22, 217:10, 224:9, 225:7, 233:9, 240:3
Evident - 240:6
Evidentiary - 237:22, 239:25
EXAMINATION - 208:1, 221:17, 230:19, 238:3
Examinations - 237:13
Examined - 207:15, 215:13, 215:24
Examples - 211:10, 222:16
Except - 211:3
Excerpts - 237:25
Exchange - 227:25, 228:1
Excluding - 211:3
Exhibit - 216:9, 222:7, 222:9,

223:10, 223:21, 225:2, 227:10, 227:14, 227:18, 228:13, 228:14, 230:21
Exhibits - 215:13, 215:24, 216:11, 225:12, 227:6
Experience - 226:11
Explained - 236:14

**F**

Fabricated - 218:17
Factors - 213:9, 228:3
Fade - 224:9
Fair - 209:6, 231:22
Fairly - 238:25
Feared - 230:3
February - 207:2, 237:24
Feel - 217:3, 232:5, 238:8
Felt - 233:5
Fence - 214:2
Ferguson - 237:9, 238:15, 239:19
Field - 221:22, 221:23, 224:3, 224:6, 224:13
Fight - 232:7, 234:11
Fighting - 216:1, 216:24, 217:2, 222:14, 222:17, 222:18, 225:8, 232:18
Filed - 239:14
Filing - 239:13
Find - 232:17, 233:6
Finds - 219:14
Fine - 214:15, 216:23
Fire - 215:8
Firearm - 228:9
Fired - 230:6, 230:12, 234:3, 234:23
First - 222:16, 222:17, 226:13, 234:18, 237:2, 238:25, 239:2
Fitzke's - 238:2

Flexible - 238:23
Flip - 223:17
Flipping - 230:25
Focused - 215:19, 229:24
Folks - 224:6, 224:13, 229:2
Follow - 235:9, 236:21, 238:25
Follows - 207:15
Footprint - 233:22
Form - 218:18
Formal - 208:17, 208:22, 224:23, 238:11, 239:5
Forward - 224:23, 225:1, 225:4, 239:6
Fought - 210:19
Found - 214:12, 217:14
Framework - 221:11
Friday - 237:24, 238:22
FRITZE - 219:16
Front - 216:14
FRSA - 207:4
Full - 225:17
Function - 210:2
Functioned - 210:9
Further - 211:14, 222:21, 230:17
Future - 230:10

**G**

Gardener - 237:23
Gave - 224:2
Generally - 235:19, 235:20
Gentlemen - 213:10, 213:17
Geographical - 236:13
Get - 207:23, 208:9, 212:6, 215:15, 221:6, 222:9, 228:9, 237:5, 239:2, 239:15
Give - 211:10, 222:23
Gives - 223:5
Glitched - 213:12
Go - 207:23, 222:11, 224:13, 228:9, 232:17, 233:6,

Robert Branch   2023-FRS-00026   February 14, 2024

237:3, 237:8, 239:6, 240:9
**Going** - 216:10, 221:9, 228:9, 232:23, 232:24, 234:6, 235:14, 238:21, 240:8
**Good** - 233:15
**Got** - 216:23, 224:18, 237:18, 239:4, 239:9
**Governed** - 208:24
**Grace** - 222:6, 223:9, 227:11, 228:21
**Grant** - 239:11
**Granted** - 209:6, 220:24
**Greatly** - 240:7
**Grill** - 214:24
**Ground** - 213:6
**Group** - 210:3
**Groups** - 209:18, 209:21
**Guess** - 215:14
**Guidance** - 221:7, 222:23, 223:5, 224:2
**Gun** - 228:9

### H

**Habit** - 239:7
**Hand** - 207:11
**Handle** - 219:2, 221:25
**Handling** - 233:5
**Happy** - 207:20
**Hard** - 216:15
**Harm** - 222:25, 234:20
**Haven't** - 237:16
**Head** - 218:3
**Hear** - 239:4
**Heard** - 208:10, 231:14
**Hearings** - 216:13
**Held** - 208:6
**Help** - 223:16
**Helped** - 209:24, 236:11
**Helps** - 236:10
**Herein** - 207:14
**Hilliard** - 210:3, 227:21, 227:23
**Hit** - 236:18

**Hitting** - 212:5
**Honor** - 207:25, 214:7, 223:13, 232:21
**Hotel** - 214:20, 215:9
**Housekeeping** - 228:13, 239:17, 239:18
**HR** - 219:4, 221:23

### I

**IC** - 231:3, 234:15
**I'd** - 211:13, 222:8, 228:13, 228:18
**Identifies** - 217:2
**I'll** - 215:3, 232:23, 233:10, 239:25
**Illinois** - 207:5, 218:2, 218:24, 219:7, 219:23, 220:13, 221:6, 221:21, 233:7, 235:3, 235:16, 235:21, 236:5
**I'm** - 209:20, 211:14, 213:12, 215:14, 216:23, 221:9, 221:10, 223:20, 230:11, 230:25, 232:23, 232:24, 234:6, 238:20, 239:6, 240:8
**Imagine** - 237:5
**Immediately** - 223:4
**Impact** - 226:2
**Impartial** - 209:6
**Important** - 213:20, 238:13
**Impression** - 226:13
**Incidents** - 230:10
**Increase** - 229:7, 229:9, 229:10, 229:11
**Indicated** - 227:7, 228:8
**Informal** - 238:25
**Innocence** - 231:23
**Instigated** - 226:7
**Intend** - 220:13
**Intentionally** - 234:19
**Interest** - 219:25
**Interpretation** - 221

:24
**Investigation** - 208:17, 208:22, 215:12, 215:20, 220:10, 224:23, 225:1, 225:5, 225:11, 225:15, 225:17, 225:19, 227:4, 227:6
**Irrelevant** - 232:19
**Issued** - 219:6
**Issues** - 207:19, 219:2
**It'll** - 222:10
**It's** - 210:1, 210:16, 216:21, 218:19, 222:7, 228:15, 228:17, 228:19, 228:24, 229:16, 231:15, 233:21, 234:18, 235:5, 235:13, 238:10
**I've** - 211:18, 216:23

### J

**Jacobson** - 239:22
**Jake** - 223:10
**Joint** - 208:19, 222:7, 223:10, 227:10, 227:14, 228:13, 228:14
**Jones** - 218:8, 218:9, 218:10, 218:13
**Judgment** - 211:19
**July** - 229:6, 229:10, 229:12
**Justified** - 211:4, 211:16, 212:11
**Justifying** - 211:19, 211:24
**JX** - 237:23, 238:4, 238:7, 238:21

### K

**Knowledge** - 228:11

### L

**Labor** - 208:3, 219:1, 221:21
**Layout** - 215:12
**Lesser** - 217:20
**Let's** - 207:23,

209:24, 237:21, 238:15
**Level** - 210:14, 210:15, 210:17, 227:17
**Limit** - 238:23
**Limited** - 227:25, 228:1, 238:1
**Limits** - 239:12, 239:16
**List** - 220:23, 239:18, 239:22
**Listening** - 231:13
**Lit** - 214:1
**Local** - 223:6
**Location** - 215:17
**Long** - 228:14
**Look** - 216:10, 216:16, 216:22, 220:6, 222:9, 227:10, 227:13, 228:13, 228:16
**Looked** - 222:6, 222:8
**Looking** - 224:21, 233:23
**Lost** - 224:9
**Lot** - 213:10, 213:17, 214:2, 214:3, 239:2

### M

**Make** - 209:16, 211:19, 212:7, 212:10, 220:21, 228:20, 229:25, 239:2, 239:16
**Making** - 209:13, 226:25
**Management** - 222:2, 222:3
**Manager** - 208:3, 218:10, 219:1, 221:21
**Managers** - 221:22, 221:23, 231:10
**Manitoba** - 226:18
**Many** - 232:10, 233:22
**Mark** - 237:23, 238:7
**Marked** - 228:16
**Marking** - 238:4
**Material** - 237:14

**Means** - 217:17, 220:22, 236:4
**Meant** - 231:17
**Measures** - 217:14
**Melton** - 213:5, 214:20, 215:9, 217:4, 217:8, 224:11, 225:6, 225:20, 225:23, 225:24, 226:6, 227:16, 228:8, 229:18, 229:22, 230:3, 230:4
**Member** - 209:12, 209:13, 209:14, 209:22
**Members** - 222:2
**Memories** - 224:9
**Memorized** - 216:6
**Message** - 223:21, 224:10
**Met** - 232:6
**Minor** - 228:18
**Mississippi** - 220:6, 220:7
**Misstates** - 212:12, 214:21, 234:4
**Misstating** - 236:6
**Morning** - 236:25, 237:3
**Move** - 223:3, 223:9, 224:22
**Moved** - 213:21
**Moving** - 224:25, 225:4
**Much** - 237:6
**Multiple** - 210:7, 212:1
**Muted** - 237:18

### N

**Necessary** - 208:21, 233:5, 238:9
**Needed** - 209:16, 237:2
**Negotiations** - 229:1
**Nice** - 230:1
**Night** - 228:9
**Nose** - 236:19
**Note** - 229:21
**November** - 217:25, 229:11

Robert Branch  2023-FRS-00026  February 14, 2024

## O

**Objection** - 212:12, 214:4, 214:21, 218:18, 219:16, 220:16, 221:10, 232:1, 232:12, 232:19, 233:8, 234:4
**Objective** - 220:22
**Obligation** - 225:16
**Observe** - 227:5
**Observing** - 231:7
**Occurred** - 213:18, 223:25
**October** - 208:6
**Offer** - 215:22
**Offered** - 215:11
**Official** - 210:2
**One** - 207:6, 210:14, 220:2, 221:7, 228:14, 228:18, 236:5, 238:1
**Operation** - 224:3, 235:21
**Operational** - 233:2 2
**Opinion** - 212:23, 220:3, 231:3, 231:6
**Opposed** - 236:2
**Opposing** - 238:12
**Order** - 215:15, 238:25, 239:15, 239:25
**Original** - 239:14
**Outlined** - 231:17
**Overrule** - 232:24, 233:10, 234:6
**Overruled** - 212:15, 219:17, 232:2, 232:13, 234:8
**Oversight** - 222:2
**Overview** - 221:20

## P

**Paid** - 229:2
**Panel** - 209:9, 209:12, 209:14, 209:16, 209:17, 209:23, 209:25, 210:10, 210:16, 219:11, 220:22, 226:12
**Parent** - 226:15
**Parked** - 214:3

**Parking** - 213:10, 213:17, 214:2, 214:3
**Participate** - 224:22
**Participated** - 209:1 4, 227:16
**Parties** - 238:12, 240:5
**Parts** - 238:8
**Party** - 239:5
**Party's** - 239:8
**Pass** - 220:24
**Patrick** - 207:7, 207:13, 218:8, 218:9, 218:10, 218:13
**Pattern** - 226:12
**Payroll** - 221:23
**People** - 209:18, 211:12
**Perfect** - 228:21
**Person** - 219:4, 220:23
**Personally** - 220:9
**Phone** - 227:24
**Photographs** - 211: 13
**Physical** - 215:17, 222:18, 222:25, 225:9, 227:7, 229:17, 234:19
**Pickup** - 215:6
**Pit** - 213:25, 214:25, 215:7
**Place** - 215:18, 218:24, 220:11, 220:14, 228:25
**Plan** - 238:5, 238:6, 238:18
**Planning** - 237:17
**Play** - 236:4
**Plays** - 232:24
**Police** - 223:6, 223:7
**Policies** - 220:11, 233:9, 234:15, 235:3, 235:15
**Portion** - 238:13
**Position** - 208:6, 219:23
**Post** - 238:23
**Potential** - 230:9
**Practice** - 234:11
**Preliminary** - 209:1, 225:7

**Preparation** - 240:5
**Present** - 209:8, 216:13, 224:8, 225:16
**Presented** - 235:15
**Presents** - 209:7
**Prevent** - 212:5
**Printed** - 216:10
**Prior** - 228:6
**Proceed** - 221:15
**Processes** - 231:17 , 238:25
**Production** - 218:11
**Professional** - 231: 6
**Professionalism** - 2 40:7
**Projecting** - 216:21
**Proof** - 231:23, 232:5, 232:6
**Protect** - 217:4
**Protecting** - 221:6
**Protection** - 207:4, 221:1, 222:8
**Provided** - 211:12
**Provision** - 207:4
**Pull** - 222:7
**Punched** - 213:3
**Punches** - 212:3, 234:11
**Punching** - 212:8
**Punishments** - 217: 21
**Purview** - 219:1

## Q

**Quick** - 235:13
**Quote** - 211:3

## R

**Railroad** - 219:7, 219:24, 220:13, 221:7, 231:4, 231:24, 233:7, 234:15, 235:3, 235:4, 236:5
**Railroads** - 232:11, 232:15, 233:4, 235:22
**Raise** - 207:10
**Rather** - 229:25, 231:23
**Reason** - 233:20

**Receipt** - 239:8
**Receive** - 224:16
**Received** - 209:2, 223:22, 224:10, 224:17, 225:11, 226:25, 227:4
**Receiving** - 223:20
**Recommend** - 220: 13, 224:25, 225:4, 238:4
**Recommendation** - 210:6, 210:14, 210:15, 210:19, 227:15, 227:18, 227:20, 228:2, 228:4, 229:15, 229:17
**Recommen- dations** - 227:1
**Recommended** - 22 4:24
**Reconvened** - 207: 3
**Records** - 225:17
**Red** - 229:5
**REDIRECT** - 230:19
**Reflects** - 229:11
**Region** - 235:16, 235:18, 235:20, 235:21, 235:23, 236:3, 236:4, 236:15
**Regions** - 236:13
**Reinstated** - 219:14 , 219:23
**Relations** - 208:3, 219:1, 221:21
**Relevance** - 219:16, 220:16, 220:17, 221:10, 232:12, 232:24
**Remain** - 223:3, 237:4
**Remaining** - 207:7
**Remind** - 213:13
**Removed** - 213:6
**Removing** - 215:16
**Replies** - 239:13, 239:17
**Reply** - 239:16
**Report** - 218:3, 218:7, 223:8, 230:23, 231:4, 231:8
**Reported** - 218:8, 218:17

**Reporter** - 239:1
**Representatives** - 2 40:5
**Represented** - 230: 9
**Request** - 239:11
**Requested** - 224:14
**Required** - 231:15
**Requires** - 231:4
**Respect** - 222:1, 225:1, 225:5, 227:1, 228:2, 229:16
**Respectively** - 225: 22
**Responded** - 229:2 3
**Respondent** - 236:1 7, 237:12
**Responsibilities** - 2 21:20, 222:1
**Responsibility** - 22 5:25, 226:1
**Result** - 209:5
**Retreat** - 227:8
**Reviewed** - 208:16, 210:5, 230:21
**Reviewing** - 220:5, 228:6, 229:20
**Risk** - 222:25
**Robert** - 207:5, 224:11
**Routine** - 239:7
**Rule** - 212:20, 219:22, 238:10, 238:12
**Ruled** - 238:16
**Rules** - 209:2, 209:4, 220:11, 239:12
**Run** - 213:21

## S

**Safety** - 219:6, 221:3, 223:3
**Scale** - 212:3, 228:17, 229:6
**Schedule** - 238:24, 239:3, 239:7, 239:8
**Scheduled** - 229:7, 229:9, 229:10
**Scheduling** - 239:1 5
**Screen** - 216:14
**Scroll** - 216:21,

Robert Branch   2023-FRS-00026   February 14, 2024

| | | | |
|---|---|---|---|
| 222:10, 222:20, 228:21 | Standing - 215:6 | Telling - 218:16, 218:22 | Tracy - 224:11 |

222:10, 222:20, 228:21
**Scrolling** - 216:20
**Second** - 222:9, 222:10
**See** - 217:1, 220:23, 223:12, 223:17, 224:2, 227:20, 232:24, 236:4, 238:15
**Seeing** - 221:10, 231:7
**Selected** - 209:25
**Senior** - 218:10
**Sent** - 239:25
**Separate** - 216:2, 216:25
**Separately** - 222:14
**Service** - 223:6
**Set** - 238:24, 239:3, 239:6, 239:7, 239:15
**Share** - 238:7
**Shouldn't** - 215:16
**Show** - 216:13
**Showed** - 217:13
**Showing** - 223:21
**Side** - 215:22
**Similar** - 216:12, 226:19, 233:9
**Simultaneous** - 239:13
**Sister** - 226:15
**Situation** - 213:7, 213:16, 215:16, 217:9, 223:8, 223:20, 223:22, 226:16, 228:6
**Situations** - 211:4
**Six** - 232:14
**Slowly** - 216:20
**Sorey's** - 236:11
**Sounded** - 225:10
**Southern** - 235:16, 235:20, 235:23, 235:24, 236:2, 236:14
**Space** - 232:4
**Spears** - 210:2, 210:7
**Specific** - 215:11, 234:16
**Speculating** - 211:14
**Standby** - 237:1

**Standing** - 215:6
**Start** - 209:24, 216:20, 217:25
**Started** - 207:24, 208:9
**State** - 220:6, 220:7
**Statement** - 211:3, 211:6, 230:3, 231:22
**Statements** - 208:14, 208:16, 209:2, 211:12, 213:23, 215:11, 224:4, 224:14, 225:8, 230:2
**Stating** - 213:13
**Statutes** - 220:7
**Statutory** - 221:10
**Story** - 215:22, 218:17
**Structure** - 236:6
**Submission** - 238:1
**Submitted** - 212:1, 238:17, 238:21
**Submitting** - 238:4, 238:6
**Subsequent** - 228:25
**Subsidiary** - 235:22
**Substantiated** - 212:2
**Sullivan** - 210:1, 210:7, 210:12
**Superior** - 234:2, 234:5
**Supervisor** - 218:12, 219:4, 223:8, 230:24
**Supposed** - 231:8
**Surrounding** - 213:10
**Sustain** - 221:9
**Sustained** - 214:6, 215:2, 218:20
**Swang** - 226:22
**Swear** - 207:10
**Swing** - 234:3, 234:23
**Swinging** - 212:2, 212:4
**Sworn** - 207:14

| T |
|---|

**Tailored** - 239:17
**Telephone** - 224:20

**Telling** - 218:16, 218:22
**Tells** - 223:3
**Tender** - 238:6
**Terminate** - 227:16
**Terminated** - 210:20, 226:3
**Termination** - 217:21, 219:10, 228:7, 229:16
**Terminology** - 235:25
**Terms** - 208:24, 229:2
**Testimony** - 212:13, 214:22, 214:24, 223:19, 225:10, 227:15, 229:21, 231:13, 234:5, 234:23, 236:25, 237:3, 238:2
**Text** - 229:5
**Thanks** - 236:25, 237:8
**Therefore** - 210:20
**There's** - 209:4, 221:7, 224:8, 224:21, 229:7, 232:14, 237:22
**These** - 208:16, 213:10, 213:17
**They're** - 239:16
**Threat** - 229:22, 230:9
**Threatening** - 234:19
**Threw** - 234:11
**Tie** - 220:25
**Time** - 213:7, 213:17, 215:9, 218:13, 220:11, 223:24, 229:25, 230:15, 238:22, 238:23, 239:10, 239:11
**Tiny** - 228:20
**Tipped** - 212:3
**Today** - 207:10, 228:3
**Tom** - 210:1, 210:3, 210:7
**Took** - 215:18, 218:10, 218:24
**Toward** - 217:13

**Tracy** - 224:11
**Transcript** - 215:13, 215:24, 220:10, 225:12, 227:5, 227:6, 229:20, 238:11, 238:16, 239:1, 239:9
**Transcripts** - 210:13, 238:17
**Trial** - 239:9
**Truck** - 214:1, 214:25, 215:6, 228:10
**Turned** - 211:25
**Twice** - 233:22
**Typically** - 236:3

| U |
|---|

**Union** - 231:11
**United** - 232:11, 233:4, 235:20, 235:25, 236:3, 236:4, 236:13, 236:15
**Units** - 222:4
**Unless** - 210:16, 237:4, 238:5
**Updated** - 229:5
**Upset** - 219:15, 219:18, 219:24
**Urgency** - 224:8
**Used** - 238:11

| V |
|---|

**Verbiage** - 234:16
**Video** - 211:13, 221:5, 237:18
**View** - 222:17
**Violated** - 217:18, 226:8
**Violation** - 209:1, 209:4, 210:14, 210:15, 210:17, 227:17, 231:25
**Violence** - 210:25, 211:2, 215:25, 216:1, 216:25, 217:12, 219:6, 220:15, 220:21, 221:5, 222:8, 222:16, 225:9, 226:9, 227:17, 231:5, 233:6

| W |
|---|

**Wade** - 208:10, 218:11, 223:20, 224:17, 224:19
**Wage** - 228:17, 229:6
**Wants** - 225:15
**Warranted** - 223:4
**We'll** - 207:20, 216:7, 237:7, 239:4, 239:6
**We're** - 224:21
**Weren't** - 209:22
**We've** - 239:9
**What's** - 220:17
**Whereupon** - 207:12, 240:10
**Whistleblower** - 207:4, 221:1
**Whole** - 223:17, 238:6
**Will** - 211:3, 214:11, 216:13, 217:14, 238:24, 239:4, 239:24
**Winnipeg** - 226:17, 234:9
**Wishes** - 231:20
**Witnesses** - 208:17, 212:1, 237:8, 237:14, 237:16, 237:19, 240:7
**Word** - 223:20
**Words** - 230:4
**Work** - 209:19, 223:5, 233:16
**Worked** - 209:23
**Working** - 228:16, 229:1
**Workplace** - 210:25, 211:2, 215:25, 216:1, 216:24, 217:12, 219:5, 220:14, 220:21, 221:5, 222:7, 222:16, 226:9, 227:17, 230:10, 231:4
**World** - 235:19
**Wouldn't** - 233:16
**Written** - 230:3, 234:14, 235:3
**Wrote** - 231:14
**Wynn** - 239:4

Robert Branch   2023-FRS-00026   February 14, 2024

| Y | 3 |
|---|---|
| **Year -** 217:24, 218:2<br>**Yesterday -** 210:13, 238:3<br>**You'd -** 216:4<br>**You'll -** 239:14, 240:2, 240:3<br>**You're -** 212:5, 215:12, 216:9, 229:1, 237:10, 237:16, 237:17, 239:13<br>**You've -** 208:6, 218:22, 236:14, 236:18, 239:9 | **30 -** 239:8<br>**33 -** 228:13, 228:14, 228:17 |

| ' | 4 |
|---|---|
| **'23 -** 217:25 | **49 -** 237:23 |

| / | 5 |
|---|---|
| **// -** 240:12, 240:13, 240:14, 240:15, 240:16, 240:17, 240:18, 240:19, 240:20, 240:21, 240:22, 240:23, 240:24, 240:25 | **50 -** 238:4, 238:7, 238:21 |

| 1 | 9 |
|---|---|
| **14 -** 207:2, 239:14<br>**151 -** 228:17<br>**16 -** 216:9, 216:10, 222:7, 230:22<br>**16th -** 237:24, 238:22<br>**1855 -** 238:10 | **9:02 -** 207:2<br>**9:58 -** 240:10<br>**911 -** 223:4 |

| 2 |
|---|
| **20 -** 223:10, 223:21<br>**2020 -** 229:6<br>**2021 -** 208:7, 229:6<br>**2022 -** 229:6<br>**2023 -** 229:7, 229:10, 229:11<br>**2024 -** 207:2, 229:9, 229:12<br>**23 -** 227:11, 227:14, 227:18<br>**29 -** 238:10 |

# Exhibit B

**Branch's Handwritten Statement**



EXHIBIT
4

To: Mangement at CN Railroad
From: Robert Branch
Date: May 30, 2022

On Thursday, May 26, 2022 around 9:00 PM at Magnolia Inn, 816 US98, Columbus, MS 39421. My co-workers and I was grilling after work peacefully and relaxing time. When Stacey (Todd) Melton approached us with no shirt and no shoes and started acting and speaking belligerent. He was speaking about a situation at a union meeting I attended. He and another employee had a disturbing violent confrontation while Todd was saying racial slurs calling the CN employee BOY. He proceeded to approach the group. I said you need to let that go. Todd said he was from Egypt Plantation. Todd pushed me in the chest and I felled to the ground. I got back up and he hit me twice in the mouth and nose. I was in shock, my head bounced off the pavement in shock and disbelief. I was being attacked so I attempted to protect myself by fighting back. I have several witness that was in total disbelief of what had just transpired. I am a mild mannered man. I come to work and conduct myself in a safe and professional manner. I am extremely grateful I survived this attack however my mind will not stop wondering what did I do.

Handwritten Statement



I am emotionally depressed and fearful for what Todd Melton has planned for me. I fear for my life around him. All I said was this is not the place and next thing I know I am being attacked. I have not gotten a full night rest. I keep tossing and turning thinking this man could have killed me. I spoke to Supervisor Gardner about the attack on Friday morning and he asked me what do you want to do. This was embarrassing and Unacceptable. A person with that attitude can hurt or kill somebody. CN have a Conduct Policy with zero tolerance for that kind of behavior. I talked to my wife about it, she is worried and scared. I fear for my life around Todd.

Witness:
Randall S. Duren
Daniel Hudson
Ty Peterson
Carl Honeycucker
AL Thomas
Dylan Boutte
Walker Young
Rashard Brown

**EXHIBIT**

5

Exhibit B: Branch's Handwritten Statement

# Exhibit C

**Excerpts from the August 6, 2024, deposition of Plaintiff Robert Branch**

Page 1

1           IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF MISSISSIPPI
2                  GREENVILLE DIVISION

3

4    ROBERT BRANCH,

5         Plaintiff,

6

7    v.              CIVIL ACTION NO. 4:23-CV-217-MPM-JMV

8

9    ILLINOIS CENTRAL RAILROAD
     COMPANY,

10

         Defendant.

11

12

13              DEPOSITION OF ROBERT BRANCH

14

15

16

17    Taken at the instance of the Respondent at the
       offices of Wise Carter Child & Caraway, P.A.,
18       401 East Capitol Street, Suite 600, Jackson,
     Mississippi on Tuesday, August 6, 2024, beginning at
19                      9:00 a.m.

20

21

22

23          * * * * * * * * * * * *
             REPORTED STENOGRAPHICALLY BY:
24       LORI W. BUSICK, CVR-S #7510, CCR #1677

25

Exhibit C: Excerpts from the August 6, 2024, deposition of Plaintiff Robert Branch

Page 2

1  APPEARANCES:
2    NICK NORRIS, ESQ.
      WATSON & NORRIS, PLLC,
3    4209 Lakeland Drive, #365
      Flowood, Mississippi 39232
4
      COUNSEL FOR PLAINTIFF
5
6    SUSAN K. FITZKE, ESQ.
      LITTLER MENDELSON, P.C.
7    1300 IDS Center
      80 South 8th Street
8    Minneapolis, MN 55402.2136
      Telephone: 612.630.1000
9    Facsimile: 612.630.9626
      Email: sfitzke@littler.com
10
      COUNSEL FOR DEFENDANT
11
12  ALSO PRESENT: Matt Gallagher, Esq. (Via telephone)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1              INDEX
2  Style and Appearances............................1
3  Certificate of Deponent.......................162
4  Certificate of Court Reporter.................163
5
6          EXAMINATIONS
7  Examination by Ms. Fitzke........................4
8
9            EXHIBITS
10  EXHIBIT 1  Training ............................15
11  EXHIBIT 2  Policy ..............................16
12  EXHIBIT 3  Coaching History ...................21
13  EXHIBIT 4  Drawing .............................53
14  EXHIBIT 5  Statement ..........................53
15  EXHIBIT 6  Text Message .......................64
16  EXHIBIT 7  Text exchange ......................67
17  EXHIBIT 8  EEOC Charge ........................86
18  EXHIBIT 9  Racial Discrimination Letter .......114
19  EXHIBIT 10 Interrogatories ...................144
20  EXHIBIT 11 Application .......................147
21  EXHIBIT 12 Application .......................149
22
23
24
25

Page 4

1          Robert Branch,
2  having been first duly sworn, was examined and
3  testified as follows:
4
5  EXAMINATION BY MS. FITZKE:
6      Q.  Mr. Branch, thank you for coming down
7  today.  You and I have met on a couple of past
8  occasions --
9      A.  That's -- that is correct.
10     Q.  So you understand the oath that you were
11  just given this morning is the same oath you were
12  given in your last deposition and in the OALJ trial
13  that we had together?
14     A.  Yes, ma'am.
15     Q.  Because we've been through this together
16  before, if it's okay with you, I'll just give you a
17  couple of quick reminders?
18     A.  It's okay.
19     Q.  Just for purposes of our record, I want to
20  make sure that we have only one of us speaking at a
21  time, so if you can try to remember to let me finish
22  my full question before you start answering, I'll
23  try to afford you the same courtesy with respect to
24  your answers; okay?
25     A.  Yes, it's okay.

Page 5

1      Q.  We both are probably going to mess up with
2  that a little bit today, so if I need a reminder and
3  you need to let me know you're not done with your
4  answer, you just let me know that; all right?
5      A.  Yes, I will.
6      Q.  We're going to take regular breaks today.
7  Hopefully we won't be here too terribly long, given
8  that we've done this before, but if you find that
9  you need a break for any reason, as long as there's
10  not a question pending, just let me know that and
11  we'll be happy to accommodate you, okay?
12     A.  I will.
13     Q.  We also have to remember that -- to
14  provide a verbal answer, a yes or a no or whatever
15  other verbal answer might be appropriate.  We're not
16  going to be able to understand or read later the
17  uh-huhs (affirmative response) or uh-uhs (negative
18  response) or head shakes that we might all
19  understand in the room or think we understand.
20  Those don't translate real well to the transcript;
21  all right?
22     A.  Yes.
23     Q.  It's also important to me still in this
24  deposition that you answer, excuse me, that you
25  understand my question before you answer it.  So if

2 (Pages 2 - 5)

Veritext Legal Solutions
www.veritext.com                                                                    888-391-3376
Exhibit Excerpt from October 16, 2024, deposition of Plaintiff Robert Branch

Page 46

1  Q.  Okay.  What happened next?
2     A.  He stated that, you on Sweeney's side.  I
3  said, I'm not -- I'm not into all that.  And next
4  thing I know, I was on the ground.  He had came and
5  pushed me.
6     Q.  And he pushed you in chest, right, from
7  the front?
8     A.  No, he pushed me from the back.  I mean --
9  yeah, I wasn't facing him when he pushed me down.
10    Q.  But he pushed you from the chest; correct?
11    A.  No, ma'am.  He pushed me from the side.  I
12  wasn't facing him.  That's what I'm trying to say.
13  I wasn't facing him when he pushed me down.
14    Q.  I'll find that in a minute.  I'm not going
15  to take your time.
16       So after you were pushed down, then you
17  got back up; right?
18    A.  Yes, ma'am.
19    Q.  And then I understand Mr. Melton hit you
20  again?
21    A.  Yes, ma'am, he did.
22    Q.  And after you had hit -- after you had
23  been pushed down and after Mr. Melton hit you again,
24  at no time did you lose consciousness; correct?
25    A.  When you say lose consciousness, I was

Page 47

1  dizzy.  You know what I mean?  When somebody hit you
2  with all they might twice right in the face, it was
3  like I was stunned.  I was, you know, knocked out
4  of --
5     Q.  You got your bell rung a little bit?
6     A.  Yeah.  Yes, ma'am.  You know, it was like
7  a quick (snapping), what you say when somebody hit
8  you?  You know, you out of it for a few seconds.  So
9  that's what I meant by, you know, unconscious.
10  Because it was -- I saw more than stars.
11    Q.  Okay.  But you weren't lying there on the
12  pavement out cold; correct?
13    A.  No, ma'am.  And it was unexpected, you
14  know what I'm saying?  It was something, you know --
15  I was not there for that.
16    Q.  And you don't have any reason to believe
17  that Mr. Melton hit you because you're black;
18  correct?
19    A.  I don't feel like Mr. Melton hit me
20  because I'm black.  I feel like Mr. Melton was -- he
21  was still angry or mad about what happened at the
22  union meeting.  I mean, why, you -- you took it out
23  on me.  You took it out on me, and you was into
24  it -- y'all was into around on the other end.  You
25  and a few guys was into it, you was talking about

Page 48

1  fighting on the other end.  But you bring your
2  frustration around with my group on our end and you
3  take your -- it was more than me.  I was like the
4  smaller guy there.  So you took your frustration out
5  on a small person.
6     Q.  I think you mentioned it was at the
7  barbecue on the other side of the building where
8  some of the guys were talking about fighting?
9     A.  Right.
10    Q.  And with regard to Mr. Melton, I think you
11  testified previously you thought he was inebriated
12  and just not like in his right mind; correct?
13    A.  Something like that.  Because I feel like
14  that you had no right to take your frustration out
15  on me because I didn't do anything to you.
16    Q.  Now, Mr. Melton engaged you over here
17  behind the grill; correct?
18    A.  Right.
19    Q.  That's where he hit you those two times;
20  correct?
21    A.  Right.
22    Q.  And then I understand that when you, after
23  he hit you the second time, that you started
24  swinging at Mr. Melton; correct?
25    A.  Right.

Page 49

1     Q.  And that Mr. Melton started backing up and
2  fell over backwards; correct?
3     A.  Right.
4     Q.  Where was Mr. Melton on this sort of
5  rudimentary map we have here when he fell over
6  backwards?
7     A.  It was somewhere along in here.
8     Q.  Okay.  So I'm going to put a 2, and I'll
9  put Melton by the 2.  Did I mark correctly where you
10  identified with the 2 where Mr. Melton fell over
11  backwards?
12    A.  Yes, ma'am.
13    Q.  Okay.  Now, after Mr. Melton had fallen
14  over backwards, why did you not leave the situation?
15    A.  I did.  They pulled me off of him.  They
16  pulled us apart.
17    Q.  I think, sir, after Mr. Melton fell over
18  backwards, your prior testimony indicated that you
19  went down after Mr. Melton on the ground and
20  continued swinging at him; correct?
21    A.  That is correct.
22    Q.  And in my question to you, sir, is why
23  when Mr. Melton had fallen over backwards, instead
24  of going down after him to continue swinging at him,
25  why did you not retreat and walk away from

13 (Pages 46 - 49)

Veritext Legal Solutions
Exhibit Exd Taken on August 6, 2024, deposition of Plaintiff Robert Branch

Page 50

1  Mr. Melton?
2      A.  Why?  Because he was still -- even though
3  he was going down, he was still swinging at me.  So
4  I need to retreat when someone -- I'm fighting --
5  I'm defending myself.  That's what I was doing; I
6  was defending myself.
7      Q.  Sir, when Mr. Melton was on the ground,
8  your prior testimony is that Mr. Melton was like
9  this, with his two arms up over his face; correct?
10     A.  Before he fell to the ground, he was still
11 swinging is what I'm saying.
12     Q.  Okay.  And Mr. Melton is now on the ground
13 with his arms up over his face.  Why did you keep
14 swinging at that man instead of walking away?
15     A.  I didn't hit him.  I swung, but I didn't
16 hit him.  That's the time Earl Honeysuckle came and
17 pulled us apart.
18     Q.  Well, that's not my question, sir.  I do
19 have prior sworn testimony from you indicating that
20 you did, in fact, hit Mr. Melton.
21         My question for you is not who broke you
22 up.  My question for you is Mr. Melton is on the
23 ground.  Mr. Melton has his hands in front of his
24 face in what you described as a defensive posture.
25 Why did you not walk away at that point?

Page 51

1      A.  Why I didn't walk away?  Because blood was
2  running down my face, and that's what -- my attitude
3  had changed.  Know why it changed?  Because I was
4  hit and attacked for no reason at all.
5      Q.  And you were going to strike back;
6  correct?
7      A.  I had no -- what choice did I have when
8  someone had attacked you?
9      Q.  The choice I'm just giving you, sir, is to
10 leave the situation.
11     A.  Okay.  What I'm saying is -- let me put it
12 to you this way.  So what you're telling me is that
13 if I sit there and hit you, you're going to --
14         MR. NORRIS:  You can't ask her questions.
15 Just give your answer.
16         THE WITNESS:  Okay.
17     Q.  (By Ms. Fitzke) I think that was part of
18 his answer, so I would like to hear it, sir.
19     A.  So you're telling me that you're going to
20 sit there if I attack you for no reason, so you're
21 going to sit there and not do anything?
22     Q.  And you agree with me, sir, that if
23 Mr. Melton is where the 2 is, that there's nothing
24 behind you at that point preventing you from leaving
25 the situation; correct?  Physically leaving the

Page 52

1  situation?
2      A.  I'm not going to say that.
3      Q.  Well, Mr. Melton -- Mr. Branch, if
4  Mr. Melton is where the 2 is, correct?  You
5  identified that he's where the 2 is on this
6  document; correct?
7      A.  Uh-huh (affirmative response).
8      Q.  Behind that, is there any barrier to your
9  either going into the door in the hotel or exiting
10 back this direction toward the other cars?  Like
11 toward the front of the building, I should say.  Is
12 there any physical barrier that's preventing you
13 from getting out of that area?
14     A.  I did get out the area when they broke us
15 up.
16     Q.  Right.  And before that, before they broke
17 you up, after Mr. Melton fell backwards on the
18 ground and assumed a defensive posture, is there
19 anything preventing you from either going into the
20 hotel on the side door here or departing around the
21 front of the hotel?
22     A.  No, it's not.
23     Q.  Any physical barrier?
24     A.  The fence or the barbecue grill.
25     Q.  The fence is over here; correct, away from

Page 53

1  the front of the hotel?
2      A.  Right.
3      Q.  So my question is:  Is there any physical
4  barrier preventing you from leaving Mr. Melton on
5  the ground in a defensive posture and getting to the
6  front to the hotel?
7      A.  No, it's not.
8          MS. FITZKE:  I'll go ahead and mark this
9  drawing as an exhibit.
10         (Exhibit 4 marked for identification.)
11         THE WITNESS:  Not saying that I'm going to
12 hit you, Susan, just making --
13         MS. FITZKE:  Sir, I understand.  I do not
14 feel threatened in any way.  Thank you.
15         THE WITNESS:  I was just trying to make my
16 point across.
17         (Exhibit 5 marked for identification.)
18     Q.  (By Ms. Fitzke) Mr. Melton [sic], I'm
19 showing you Exhibit 5 to your deposition.  And this
20 is a statement that we've seen before.  I understand
21 that this is the statement that you submitted to
22 Illinois Central following the May 26, 2022
23 altercation; correct?
24     A.  Yes, ma'am.
25     Q.  And I'm just going to read part of this

14 (Pages 50 - 53)

Veritext Legal Solutions
Exhibit Excerpts from August 6, 2024, deposition of Plaintiff Robert Branch
www.veritext.com                                                                                      888-391-3376

# Exhibit D

**Excerpts from the November 7, 2023, deposition of Plaintiff Robert Branch**

Page 1

1        U.S. DEPARTMENT OF LABOR - OSHA
            OFFICE OF ADMINISTRATIVE LAW JUDGES

2

3

4   Robert Branch,

5        Complainant,

6

7   vs.                        OSHA Case No. 301002724

8

9   Illinois Central Railroad Company,

10       Respondent.

11

12

13

14            DEPOSITION OF ROBERT BRANCH

15

16

17

18   Taken at the instance of the Respondent at the
         offices of Wise Carter Child & Caraway, P.A.,
19       401 East Capitol Street, Suite 600, Jackson,
     Mississippi on Tuesday, November 7, 2023, beginning
20                      at 9:08 a.m.

21

22

23

24        * * * * * * * * * * * * *

         REPORTED STENOGRAPHICALLY BY:
25       LORI W. BUSICK, CVR-S #7510, CCR #1677

Exhibit D: Excerpts from the November 7, 2023, deposition of Plaintiff Robert Branch

Page 2

1 APPEARANCES:
2   CHARLES EDWARD SOREY, II, ESQ.
    Attorney at Law
3   1000 Highland Colony Pkwy Ste 5203
    Ridgeland, Mississippi 39157-2079
4   Phone: (601) 341-6929
    Email: eddysorey@gmail.com
5
      COUNSEL FOR COMPLAINANT
6
7   SUSAN K. FITZKE, ESQ.
    LITTLER MENDELSON, P.C.
8   1300 IDS Center
    80 South 8th Street
9   Minneapolis, MN 55402.2136
    Telephone: 612.630.1000
10  Facsimile: 612.630.9626
    Email: sfitzke@littler.com
11
      COUNSEL FOR RESPONDENT
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1            INDEX
2 Style and Appearances............................1
3 Certificate of Deponent.......................189
4 Certificate of Court Reporter.................190
5
6            EXAMINATIONS
7 Examination by Ms. Fitzke......................4
8
9            EXHIBITS
10 EXHIBIT 1  Handwritten Report ................97
11 EXHIBIT 2  Letter ...........................108
12 EXHIBIT 3  Termination Letter ...............114
13 EXHIBIT 4  Transcript .......................122
14 EXHIBIT 5  Termination Letter ...............133
15 EXHIBIT 6  Job Search Records ...............145
16 EXHIBIT 7  Medical Record ...................147
17 EXHIBIT 8  Collection Letter ................150
18 EXHIBIT 9  Healthcare Payments ..............152
19 EXHIBIT 10 Cobra ............................153
20 EXHIBIT 11 Psychiatrist Receipt .............154
21 EXHIBIT 12 Interrogatories ..................157
22 EXHIBIT 13 Prescription .....................183
23
24
25

Page 4

1        Robert Branch,
2 having been first duly sworn, was examined and
3 testified as follows:
4
5 EXAMINATION BY MS. FITZKE:
6    Q.  Good morning, Mr. Branch.
7    A.  Hey, good morning.  How are you doing?
8    Q.  My name is Susan Fitzke and I represent
9 Illinois Central in conjunction with the retaliation
10 claim that you filed with the US Department of
11 Labor.
12   A.  Yes, ma'am.
13   Q.  We've asked you to come down today to give
14 a deposition.
15       Have you ever given a deposition before?
16   A.  No, ma'am.
17   Q.  Okay.  So I'm going to give you a few
18 ground rules that will hopefully help today go
19 smoothly, but also help make sure that our court
20 reporter here gets down the best record of our
21 discussion today as possible, okay?
22   A.  Yes, ma'am.
23   Q.  So because she is typing down everything
24 that you and I or your lawyer might say here in the
25 room today, it's important that we have only one

Page 5

1 person speaking at a time.
2       In normal conversation you might think you
3 understand my full question before I finish it or I
4 might think I understand your full answer before you
5 finish it and we kind of tend to talk and listen at
6 the same time, but if we try to do that today
7 there's no way for her to keep up, okay?
8    A.  Yes, ma'am.
9    Q.  For purposes of our record, I'd also ask
10 if you can please give a yes or a no or whatever
11 other verbal answer might be appropriate to the
12 questioning.  The uh-huhs (affirmative response) and
13 huh-huhs (negative response), everyone in the room
14 might understand, but when we try to read it back
15 later --
16   A.  Yes, ma'am.
17   Q.  -- it won't make any sense.
18   A.  Right.
19       MR. SOREY:  You've got to let her finish
20 before you start answering.  You already started.
21 We talked about this yesterday.
22   Q.  (By Ms. Fitzke) And to be fair, sir,
23 everybody does tend to need reminders of that
24 particular rule.  So if I give you reminders or your
25 lawyer does, it's nothing personal, it's very

Exhibit 1 to the December 7, 2023, deposition of Plaintiff Robert Branch
Veritext Legal Solutions
www.veritext.com                                                 888-391-3376

# Exhibit E

**Transcript of IC's June 7, 2022, investigation hearing**

Page 1

CNRR FORMAL INVESTIGATION


TRACY MELTON, MACHINE OPERATOR - 104462

ROBERT BRANCH, TRACKMAN - 150680

JOSHUA GLAUSE, HEARING OFFICER



Investigation held at 2151 North Mill Street,
Jackson, Mississippi
Jackson Conference Room
Tuesday, June 7, 2022
Commencing at 9:00 a.m.


APPEARANCES

Darrell McGuire, Brotherhood of Maintenance
   Of Way
William Walker Yuille, Witness
Al B. Thomas, Witness
Ty Peterson, Witness
Darrell Hudson, Witness
Randall S. Duren, Witness
Earl Honeysucker, Witness
Dylan Boutte, Witness
Christopher Day, Witness
Barry Bishop, Silent Observer



REPORTED BY:  THERESA S. LUMLEY, CSR, RPR
              EMM, INC. REPORTING
              EMMREPORTING@GMAIL.COM

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000441

Page 2

1                               INDEX

                                              PAGE
2      TITLE                                  1
       APPEARANCES                            1
3      INDEX                                  2

4      EXAMINATION OF TODD MELTON
            BY THE HEARING OFFICER            11
5
       EXAMINATION OF ROBERT BRANCH
6           BY THE HEARING OFFICER            14

7      EXAMINATION OF CHRISTOPHER DAY
            BY THE HEARING OFFICER            16
8           BY MR. McGUIRE                    36
            BY MR. BRANCH                     42
9           BY MR. MELTON                     46

10     EXAMINATION OF DYLAN BOUTTE
            BY THE HEARING OFFICER            48
11          BY MR. McGUIRE                    50

12     EXAMINATION OF DARRELL HUDSON
            BY THE HEARING OFFICER            51
13          BY MR. McGUIRE                    52

14     EXAMINATION OF RANDALL DUREN
            BY THE HEARING OFFICER            54
15          BY MR. McGUIRE                    57
            BY MR. BRANCH                     57
16          BY MR. MELTON                     57

17     EXAMINATION OF EARL HONEYSUCKER
            BY THE HEARING OFFICER            59
18          BY MR. McGUIRE                    60
            BY MR. BRANCH                     61
19
       EXAMINATION OF TY PETERSON
20          BY THE HEARING OFFICER            62
            BY MR. McGUIRE                    63
21          BY MR. BRANCH                     64
            BY MR. MELTON                     64
22
       EXAMINATION OF WALKER YUILLE
23          BY THE HEARING OFFICER            65
            BY MR. McGUIRE                    67
24          BY MR. BRANCH                     67
            BY MR. MELTON                     68
25

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                                    CN-Branch 000442

```
                                                        Page 3

  1    INDEX:  (Continued)

  2    EXAMINATION OF AL THOMAS
            BY THE HEARING OFFICER                   69
  3         BY MR. McGUIRE                           71
            BY MR. BRANCH                            71
  4         BY MR. MELTON                            72

  5    EXAMINATION OF ROBERT BRANCH
            BY THE HEARING OFFICER                   73
  6         BY MR. McGUIRE                           77
            BY MR. MELTON                            80
  7         BY THE HEARING OFFICER                   82

  8    EXAMINATION OF TODD MELTON
            BY THE HEARING OFFICER                   86
  9         BY MR. McGUIRE                           90
            BY MR. BRANCH                            91
 10
       EXAMINATION OF CHRISTOPHER DAY
 11         BY THE HEARING OFFICER                   93
            BY MR. McGUIRE                           94
 12
       EXAMINATION OF EARL HONEYSUCKER
 13         BY THE HEARING OFFICER                   96
            BY MR. McGUIRE                           97
 14         BY MR. BRANCH                            97
            BY MR. MELTON                            98
 15         BY MR. MCGUIRE                           98

 16    EXAMINATION OF TY PETERSON
            BY THE HEARING OFFICER                   99
 17         BY MR. McGUIRE                          100
            BY MR. BRANCH                           102
 18
       EXAMINATION OF CHRISTOPHER DAY
 19         BY THE HEARING OFFICER                  103

 20    EXAMINATION OF TODD MELTON
            BY MR. McGUIRE                          105
 21
       EXAMINATION OF ROBERT BRANCH
 22         BY MR. McGUIRE                          106

 23    EXAMINATION OF CHRISTOPHER DAY
            BY THE HEARING OFFICER                  108
 24
       CLOSING STATEMENT BY MR. McGUIRE            112
 25
```

EMM, INC. REPORTING  601.506.8261
EMMREPORTING@GMAIL.COM

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000443

Page 4

```
 1   CERTIFICATE OF COURT REPORTER                    45

 2   EXHIBITS:

 3   EXHIBIT 1   NOTICE OF INVESTIGATION               7
     EXHIBIT 2   NOTICE OF INVESTIGATION               7
 4   EXHIBIT 3   LETTER DATED 6/26/09                  9
     EXHIBIT 4   BRANCH STATEMENT                     18
 5   EXHIBIT 5   BRANCH STATEMENT PAGE 2              13
     EXHIBIT 6   BOUTTE STATEMENT                     19
 6   EXHIBIT 7   MELTON STATEMENT                     20
     EXHIBIT 8   HUDSON STATEMENT                     21
 7   EXHIBIT 9   DUREN STATEMENT                      21
     EXHIBIT 10  HONEYSUCKER STATEMENT                21
 8   EXHIBIT 11  PETERSON STATEMENT                   21
     EXHIBIT 12  YUILLE STATEMENT                     22
 9   EXHIBIT 13  THOMAS STATEMENT                     22
     EXHIBIT 14  CN USOR RULES                        24
10   EXHIBIT 15  "SAFE SECURE AND VIOLENCE FREE"      26
     EXHIBIT 16  "DOING THE RIGHT THING"              26
11   EXHIBIT 17  CN WORKPLACE VIOLENCE PREVENTION     28
                     POLICY
12   EXHIBIT 18  PAGE 2 OF THE CN WORKPLACE VIOLENCE  28
                     PREVENTION POLICY
13   EXHIBIT 19  PAGE 3 OF THE CN WORKPLACE VIOLENCE  28
                     PREVENTION POLICY
14   EXHIBIT 20  GREENWOOD LEFLORE HOSPITAL RECORD    82

15

16

17

18

19

20

21

22

23

24

25
```

EMM, INC. REPORTING   601.506.8261
EMMREPORTING@GMAIL.COM

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                      CN-Branch 000444

Page 5

1          **HEARING OFFICER:**  Let the record show

2    that the time is 9 o'clock a.m., June 7, 2022.

3    And this investigation is herewith called to

4    order.

5               My name is Joshua Glause, and my

6    title is senior manager of engineering, and I

7    will be conducting these proceedings as the

8    hearing officer.

9               Persons present at this time are as

10   follows.  I'm going to start with you, Robert.

11          **MR. BRANCH:**  Robert L. Branch.

12          **HEARING OFFICER:**  And your purpose of

13   attending this investigation is charged

14   employee?

15          **MR. BRANCH:**  Yes, sir.

16          **MR. McGUIRE:**  Darrell McGuire,

17   Brotherhood of Maintenance of Way.  I'm the

18   union rep that will be representing these two

19   gentlemen today.

20          **MR. MELTON:**  Todd Melton, charged

21   employee.

22          **MR. YUILLE:**  Walker Yuille, witness.

23          **MR. THOMAS:**  Al Thomas, witness.

24          **MR. PETERSON:**  Todd Peterson,

25   witness.

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                    CN-Branch 000445

Page 6

1          **MR. HUDSON:**  Darrell Hudson, witness.

2          **MR. BISHOP:**  Barry Bishop, silent

3    observer.

4          **MR. HONEYSUCKER:**  Earl Honeysucker,

5    witness.

6          **MR. DAY:**  Chris Day, supervisor,

7    witness.

8          **MR. BOUTTE:**  Dylan Boutte, witness.

9          **HEARING OFFICER:**  All right.  So this

10   investigation is being held to develop all the

11   facts relative to the charges set forth in the

12   following Notices of Investigation.  I won't

13   read the entire notice into the record, but I

14   will identify the document by date and I'll read

15   the charged paragraph into the record.

16              There's two investigation notices.

17   They are identical except for the mailing info

18   is all that's different.

19              So I have a notice of investigation

20   dated June 2nd, 2022, to Mr. Robert Branch and

21   Mr. Tracy Melton.  "You're hereby notified to

22   attend a formal investigation to be held as

23   directed below:  Tuesday June 7, 2022.  0900,

24   Conference Room in Jackson, Mississippi.

25              "The investigation is being held to

EMM, INC. REPORTING   601.506.8261
EMMREPORTING@GMAIL.COM

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                    CN-Branch 000446

Page 7

1   develop the facts and to determine your

2   responsibility, if any, in connection with an

3   incident that occurred at approximately

4   2100 hours, May 26th, 2022, at or near the

5   Magnolia Inn located at 816 US 98 in Columbus,

6   Mississippi 39429, in which the two of you were

7   allegedly involved in a verbal and physical

8   altercation in the presence of other employees

9   and whether you violated any company rules,

10  regulations and/or policies in connection with

11  the incident.

12          "You may, without expense to the

13  company, arrange for representation as provided

14  under the applicable provisions of your

15  collective bargaining agreement and to call

16  witnesses to testify on your behalf.  A copy of

17  your personal work record may be reviewed at

18  this investigation."

19          Signed by Wade Clark, senior manager

20  of production.  And I'll enter these as

21  Exhibits 1 and 2 into the record.

22          (Exhibit No. 1, Notice of

23  Investigation, and Exhibit No. 2, Notice of

24  Investigation, were marked.)

25          **HEARING OFFICER:**  I would like to

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                                  CN-Branch 000447

Page 8

1    outline the procedures to be followed.  I ask

2    that you do not interrupt while an individual is

3    being questioned.  Please save your questions

4    until after the testimony has been fully

5    completed.  You will be given full opportunity

6    to cross-examine any person giving testimony and

7    you will be given full opportunity to present

8    testimony and evidence before these proceedings

9    are closed.  If anyone has a cell phone, I ask

10   that you turn it off or turn it to vibrate.  It

11   is also requested, for the benefit of all

12   present, especially the court reporter, that

13   each of you speak slowly and distinctly so that

14   the court reporter can be assured of placing all

15   remarks in the transcript accurately and without

16   difficulty.

17           **MR. McGUIRE:**  The organization has an

18   objection to the hearing.  First of all, the

19   organization states that due to the collective

20   bargaining agreement violation that the carrier

21   has committed, I would like to introduce this

22   into the record.  It's a side agreement between

23   the carrier and the organization which states

24   that you must have the hearing within five days

25   of being taken out of service.  This is day six.

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                          CN-Branch 000448

Page 9

1    These gentlemen were removed Thursday morning

2    before shift.  So Thursday, Friday, Saturday,

3    Sunday, Monday.  Monday would be your last day

4    to contractually have the hearing.  And we would

5    like to have the whole hearing squashed due to

6    the collective bargaining agreement violation by

7    the carrier.

8              **HEARING OFFICER:**  Okay.  I'm going to

9    mark this as Exhibit Number 3, and with your

10   objection, we are going to proceed with this

11   hearing.

12             (Exhibit No. 3, Letter dated June 25,

13   2009, was marked.)

14             **HEARING OFFICER:**  From my

15   understanding, the five days was why we were

16   having it today, but it will be noted in the

17   transcript and it will be on the record for

18   those who review the transcript.

19             **MR. McGUIRE:**  Thank you.  And I do

20   have a follow-up objection.  First off, the

21   organization feels that the carrier has no

22   jurisdiction here.  This happened off property,

23   off company time.  No police were called, you

24   know.  Whatever happened between these two

25   gentlemen, they've settled it.  And we feel the

Page 10

1   carrier just has no jurisdiction in this area

2   because it was not a company-provided hotel

3   room, it was not company property, it was not

4   company time.  They were on their own dime.

5           **HEARING OFFICER:**  And just from the

6   charged paragraph, I did ask the same question

7   myself.  But what I am told is it was a

8   work-related matter due to it being them

9   traveling for work.  Even though it was off

10  property, they are on per diem traveling for

11  work.  Your objection is noted in the record,

12  and, again, it will be reviewed -- when they

13  review the transcript, it will be noted in the

14  transcript, your objection.

15          **MR. McGUIRE:**  Understood.  And I have

16  a last follow-up objection.  The organization,

17  when we found out about this hearing, we

18  requested to have the hearing separate.  We feel

19  in situations like this, in order to gain

20  knowledge of truth and justice of what happened

21  and to give a fair and impartial hearing, that

22  the hearings should have been separate.  The

23  organization was denied, so that's our third

24  objection there.  And to have a fair and

25  impartial hearing, we feel it's not conductive

Confidential

Page 11

1    to get a fair and impartial hearing when the two

2    charged employees have the hearing together in

3    this situation.

4         **HEARING OFFICER:**  Understood.  Again,

5    with this objection, it's noted in the

6    transcript and it will be reviewed at the time

7    of review of the transcript.

8         **MR. McGUIRE:**  Thank you.  No further

9    objections.

10        **HEARING OFFICER:**  And with all the

11   objections, we're going to proceed with this

12   investigation.

13        Okay.  So next I'm going to call Todd

14   Melton to the witness stand first just for

15   preliminary questions only.

16             TODD MELTON,

17   EXAMINATION BY THE HEARING OFFICER:

18   **Q.**   Todd, please state your full name.

19   **A.**   Tracy Todd Melton.

20   **Q.**   How long have you been employed by

21   the IC Railroad?

22   **A.**   Over 21 years.

23   **Q.**   And what is your current occupation?

24   **A.**   Machine operator over the fuel truck.

25   **Q.**   What was your occupation on the date

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000451

Page 12

1    of the incident stated in the Notice of

2    Investigation?

3        **A.**    On the fuel truck.

4        **Q.**    And how long have you worked this

5    position?

6        **A.**    This round, probably I been on it

7    four or five months.

8        **Q.**    And can you state what other

9    positions you filled besides fuel truck

10   operator?

11       **A.**    I've held section foreman, track

12   inspector, machine operator, welder helper,

13   bridge foreman, bridge assistant foreman,

14   carpenter, bridgeman.

15       **Q.**    Okay.  Did you receive the notice of

16   investigation that was previously identified for

17   the transcript?

18       **A.**    Yes, sir.

19       **Q.**    Do you understand that you have the

20   right to be present during the entire

21   investigation and that you or your

22   representative may question any person who may

23   testify and to present witnesses and evidence in

24   your own behalf?

25       **A.**    Yes, sir.

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                                CN-Branch 000452

Page 13

1    **Q.**    Do you have any witnesses present on

2  your behalf today?

3    **A.**    No, sir.

4    **Q.**    Are you qualified on the U. S.

5  Operating and Safety Rules?

6    **A.**    Yes, sir.

7    **Q.**    Do you know when you last attended a

8  class of instruction on Operating and Safety

9  Rules?

10    **A.**    I can't remember exactly the last

11  time I have taken it.

12    **Q.**    Sometime within the past year?

13    **A.**    Yeah.

14    **Q.**    And please identify your

15  representative for the record.

16    **A.**    Darrell McGuire.

17    **Q.**    And are you ready to proceed with

18  this investigation?

19    **A.**    Yes, sir.

20    **HEARING OFFICER:**  Okay.  I have no

21  further questions for Mr. Melton at this time.

22  I release Mr. Melton subject to recall, and I

23  would next call Mr. Branch for the same

24  preliminary questions.

25                  ROBERT BRANCH

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000453

Page 14

EXAMINATION BY THE HEARING OFFICER:

1

2     **Q.**     Mr. Branch, please state your full

3     name.

4     **A.**     Robert Louis Branch.

5     **Q.**     And how long have you been employed

6     by the IC Railroad?

7     **A.**     Almost 15 years.

8     **Q.**     What is your current occupation?

9     **A.**     Trackman on the rail gain.

10    **Q.**     How long have you worked the position

11    of trackman on the rail gain?

12    **A.**     For the last four or five months.

13    **Q.**     And have you worked any other

14    positions besides trackman?

15    **A.**     Yes, sir, machine operator, worked in

16    the bridge department for six years, assistant

17    foreman, carpenter, carpenter helper, bridge.

18    **Q.**     All right.  Did you receive the

19    Notice of Investigation that I previously

20    identified for the transcript?

21    **A.**     Yes, sir, I did.

22    **Q.**     Do you understand that you have the

23    right to be present during the entire

24    investigation and that you or your

25    representative may question any person who may

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000454

Page 15

1    testify and to present witnesses and evidence in

2    your own behalf?

3        **A.**    Yes, sir.

4        **Q.**    Do you have any witnesses present on

5    your behalf today?

6        **A.**    Yes, sir.

7        **Q.**    Are you qualified on the U. S.

8    Operating and Safety Rules?

9        **A.**    Yes, I am.

10       **Q.**    And when did you last attend a class

11   of instruction on the Operating and Safety

12   Rules?

13       **A.**    Last year, in August or either

14   September, in Memphis.

15       **Q.**    Please identify your representative

16   for the record.

17       **A.**    Mr. Darrell McGuire.

18       **Q.**    Are you ready to proceed with this

19   investigation?

20       **A.**    Yes, I am.

21       **HEARING OFFICER:**  Okay.  I have no

22   further questions for Mr. Branch at this time.

23   I release Mr. Branch subject to recall.  And I

24   am next going to call Mr. Day to the stand.  And

25   this is where I will be sequestering everyone

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                                    CN-Branch 000455

Page 16

1    else, the other witnesses.

2              (All witnesses leave conference

3    room.)

4                   CHRISTOPHER DAY,

5    EXAMINATION BY THE HEARING OFFICER:

6       **Q.**    Mr. Day, please state your name.

7       **A.**    Christopher Day.

8       **Q.**    And how long have you been employed

9    by the IC Railroad?

10      **A.**    Eleven years.

11      **Q.**    Please state your occupation at the

12   time of the incident that is the subject of this

13   investigation.

14      **A.**    Production supervisor.

15      **Q.**    And how long have you worked the

16   position of production supervisor?

17      **A.**    Four years.

18      **Q.**    Please state, for the record, what

19   other positions you have held.

20      **A.**    Track foreman, machine operator and

21   trackman.

22      **Q.**    Please state what knowledge you have

23   of the incident that is the subject of this

24   investigation.

25      **A.**    I was called on Memorial Day, Monday,

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000456

Page 17

1    during our off time, and Mr. Robert Branch

2    notified Supervisor Chance Gardner that there

3    was an incident that happened the Thursday prior

4    to that Monday, and that there was an

5    altercation and some argument that he would like

6    to proceed with talking to somebody about, you

7    know, what the possibilities were, that they

8    could do for this not to happen again.

9         **MR. BRANCH:**  Can I object to

10   something he said?

11   BY THE HEARING OFFICER:

12     **Q.**    Okay.  And then from there -- so you

13   -- I'm sorry, so it was reported that there was

14   an altercation or argument that had happened and

15   that Mr. Branch wanted to make sure or wanted to

16   prevent this type thing from happening again.

17   So what did you do from there?

18     **A.**    I had spoke with Mr. Branch.  There

19   was no one that I could call on the day since

20   most of everybody was off work that day for

21   observing the holiday, and I told him that, you

22   know, once I got into the office the following

23   day on that Tuesday, that I would arrange to

24   make some phone calls to find out, you know, the

25   situation that had happened.  When I got in the

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000457

Page 18

1   office on Tuesday, I had talked to Wade Clark.

2   I had already got a statement from Mr. Branch as

3   to what happened, and I talked to him to see if

4   he still wanted to proceed with it, and I went

5   ahead and sent the information and talked to my

6   peers and sent the information over to them to

7   see how we could go about handling what had

8   happened.

9      **Q.**    Okay.  Do you have -- so you took a

10  statement from Mr. Branch?

11      **A.**    I did.

12      **Q.**    Do you have that available?

13      **A.**    I do.  The statement from Mr. Branch

14  is on the very top.

15      **HEARING OFFICER:**  We're going to mark

16  the statement from Mr. Branch as Exhibit

17  Number 4.

18      (Exhibit No. 4, Branch Statement, was

19  marked.)

20  BY THE HEARING OFFICER:

21      **MR. McGUIRE:**  May I cut in here?  Do

22  you have copies for everybody?

23      **MR. DAY:**  I probably can get more

24  printed out, but I've got another copy.  I

25  couldn't get a fourth one printed out.

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000458

Page 19

1           **MR. McGUIRE:**  I think the two parties

2    involved need to have one.

3           **HEARING OFFICER:**  I guess should we

4    take a quick break and make another copy?

5           **MR. McGUIRE:**  Sure.

6           **HEARING OFFICER:**  The time is 9:18.

7    We're going to take a couple minute break to

8    make another set of copies here.

9           (A short break was taken.)

10          **HEARING OFFICER:**  The time is now

11   9:25 and we're back from a recess and back on

12   the record at this time.

13   BY THE HEARING OFFICER:

14       **Q.**     So we have copies now for everyone.

15   Can you tell me what this next statement is?

16       **A.**     The first two pages is Mr. Branch's

17   statement of the incident that took place on

18   Thursday and -- yeah, it's two pages for the

19   first one.

20          **HEARING OFFICER:**  So I'm going to

21   mark the second page of Mr. Branch's statement

22   as Exhibit Number 5.

23          **MR. MELTON:**  I don't have but one

24   page Branch.  Okay.  Thank you.

25          (Exhibit No. 5, Page 2 of Branch

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                                      CN-Branch 000459

Page 20

1    Statement, was marked.)

2        **A.**      And the first two pages of

3    Mr. Branch's statement, do you want me to read

4    through it?

5    BY THE HEARING OFFICER:

6        **Q.**      No, I'll have Mr. Branch read his own

7    statement into the record.

8        **A.**      The rest of the statements are from

9    the other employees.  I was given direction to

10   get statements from everybody as far as what had

11   happened, so all the witnesses that were listed

12   on Mr. Branch's statement, everyone had wrote a

13   statement out and they were given to Chance

14   Gardner and then sent to myself and Wade Clark.

15           **HEARING OFFICER:**  So the next one I

16   have here is Dylan Boutte.  It will be marked as

17   Exhibit Number 6.

18           (Exhibit No. 6, Boutte Statement, was

19   marked.)

20   BY THE HEARING OFFICER:

21       **Q.**      Can you tell me who this next one is

22   from?

23       **A.**      What's the -- Darrell Hudson.

24       **Q.**      I just want to make sure I have the

25   correct one here.  This one is Darrell Hudson.

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000460

Page 21

1    I can't read this one.

2         **A.**      I believe that is Todd Melton.

3              **HEARING OFFICER:**  Next I'll mark as

4    Exhibit Number 7 the statement from Todd Melton.

5              **MR. McGUIRE:**  Hold on one second.  I

6    don't think these are in order because I can't

7    find Todd Melton's statement.

8              (Off the record.)

9              (Exhibit No. 7, Todd Melton's

10   Statement, was marked.)

11             **HEARING OFFICER:**  Next I'll mark the

12   statement from Darrell Hudson as Exhibit

13   Number 8.

14             **MR. McGUIRE:**  I don't have that one

15   either.  Okay.

16             **HEARING OFFICER:**  Exhibit Number 8.

17             (Exhibit No. 8, Hudson Statement, was

18   marked.)

19             **HEARING OFFICER:**  Next is Randall

20   Duren marked as Exhibit Number 9.

21             (Exhibit No. 9, Duren Statement, was

22   marked.)

23             **HEARING OFFICER:**  Earl Honeysucker

24   will be Exhibit Number 10.

25             (Exhibit No. 10, Honeysucker

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000461

Page 22

1    Statement, was marked.)

2              **HEARING OFFICER:**  Statement from Ty

3    Peterson will be Exhibit Number 11.

4              (Exhibit No. 11, Peterson Statement,

5    was marked.)

6              **HEARING OFFICER:**  Statement from

7    Walker Yuille will be Exhibit Number 12.

8              (Exhibit No. 12, Yuille Statement,

9    was marked.)

10             **HEARING OFFICER:**  Then I have a

11   statement from Al Thomas will be marked as

12   Exhibit Number 13.

13             (Exhibit No. 13, Thomas Statement,

14   was marked.)

15   BY THE HEARING OFFICER:

16       **Q.**    Is that all the statements?

17       **A.**    Yes.

18             **HEARING OFFICER:**  Just for

19   clarification, we'll have the witnesses read

20   their own statement in the essence of time here.

21             **MR. McGUIRE:**  Sure.

22   BY THE HEARING OFFICER:

23       **Q.**    Okay.  Is there anything else about

24   the incident that you have knowledge of, Mr.

25   Day?

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                          CN-Branch 000462

Page 23

1      **A.**     I do not.

2      **Q.**     Based on your knowledge of this

3    incident, do you believe Mr. Branch or Mr.

4    Melton violated any CN rules, policies and

5    procedures?

6      **A.**     I'm only a witness.  I don't have an

7    opinion on the incident.  Based on the

8    altercation at the hotel and withholding the

9    information, I do believe that there was a rule

10   broken as far as furnishing the information and

11   giving some time.  This is a sheet, it's USOR

12   Rule H, "Furnishing Information and Conduct."

13   The rule states, "USOR Rule H, Furnishing

14   Information and Conduct.  Dishonesty,

15   disloyalty, insubordination, willful neglect,

16   making false reports, or statements, concealing

17   facts concerning matters under investigation,

18   immoral conduct, including but not limited to

19   conduct of any employee leading to the

20   conviction of any felony, and serious violations

21   of the law are prohibited.  Employees must not

22   be quarrelsome, vicious or enter into disputes,

23   arguments, or fights with any person, regardless

24   of provocation.  Any incidents are to be

25   reported to the proper authority.

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                                            CN-Branch 000463

1          "As a CN employee, you are expected

2   to be familiar with, read and be governed by the

3   company's code of business conduct and policies,

4   and understand how they apply to you and your

5   job.  Company policies are accessible on CN's

6   electronic portal in the Employee Self-Service

7   section under Policies and Guidelines.

8          "Any employee convicted of a felony

9   or other serious violation of the law must

10   notify their supervisor no later than the end of

11   the first day immediately following the day the

12   employee received notice of the conviction.

13          "Employees must not withhold

14   information or, or fail to provide all the facts

15   to those authorized to receive information

16   regarding accidents, injuries, rule violations,

17   breaches of company security, or unusual events.

18   This duty to furnish information includes but is

19   not limited to accident and injury reports,

20   recorded statements, full cooperation in injury

21   investigations, and safety rules violations.

22   Employees must also take all reasonable measures

23   to protect and preserve evidence where it is

24   within their control and ability to do so."

25   That is USOR Rule H.

Confidential

CN-Branch 000464

Page 25

1      **HEARING OFFICER:**  Okay.  USOR Rule H,

2  Furnishing Information and Conduct, will be

3  marked as Exhibit 14.

4           (Exhibit No. 14, USOR Rule H, was

5  marked.)

6      **A.**      This is for the conduct, pages 14 and

7  15, work environment, "Safe, Secure and Violence

8  Free.  At CN, nothing is more important than

9  safety.  It is everyone's responsibility.  In

10  the performance of your job, you must safeguard

11  yourself, your colleagues, our customers and the

12  communities where we operate.

13           "Do your job according to company

14  policies, rules and procedures as well as the

15  law.  If in doubt, consult your supervisor."

16           Bullet 2, "Take the necessary steps

17  to deal with any situation that could endanger

18  you, your fellow employees, customers, the

19  general public or CN's assets."

20           Bullet 3, "Be aware of your

21  surroundings as you know best who belongs in

22  your office, on your train, on any given

23  right-of-way or in a restricted area."

24           Bullet 4, "Report trespassers or

25  suspicious persons or activities immediately to

Confidential                                                     CN-Branch 000465

Page 26

1    your supervisor or the CN police.

2             "CN will not tolerate any action,

3    conduct, threat or gesture towards a CN employee

4    in the workplace that can reasonably be expected

5    to cause harm, injury or illness to the CN

6    employee.  For more information, refer to CN's

7    Workplace Violence Prevention Policy."

8             Statement underneath, I'll just go

9    through it, "Firearms, loaded or empty, are not

10   permitted on CN property, except for CN police

11   officers and other designated persons performing

12   authorized work and when authorized to do so by

13   law.  In all cases, any firearms must be

14   accompanied with a written authorization from

15   the chief of CN police and the person should

16   have in his/her possession all pertinent

17   government permits at all times."

18            Page 15 of the code of business

19   conduct.

20            **HEARING OFFICER:**  Hang on one second,

21   Chris.  I'm going to mark Page 14 as Exhibit 15.

22   And then we'll do Page 15 as Exhibit 16.

23            (Exhibit No. 15, "Safe, Secure, and

24   Violence Free," and Exhibit No. 16, "Doing the

25   Right Thing," were marked.)

Page 27

BY THE HEARING OFFICER:

   **Q.**    All right.  You can proceed, Mr. Day.

   **A.**    Page 15 from the code of business
conduct, "Doing the Right Thing.  Safety and a
willingness to obey policies, rules and
procedures are most important when at work or
otherwise performing your duties.  If in doubt,
the safe course must be taken.

        "Safe behavior takes many forms, such
as:  Being aware of, and complying with, all
company health and safety policies, rules and
procedures at all times; reporting suspected
hazards as quickly as possible; making sure you
have the proper personal protective equipment,
tools, and training for the job at hand; keeping
fire and emergency exits clear and walking
surfaces in good condition; driving safely,
wearing seat belts and following traffic laws
when operating a company vehicle or other
vehicle as part of your job; expecting the
movement of trains, cars, or track equipment, on
any track at any time in either direction.

        "At CN everyone is responsible for
safety, their own and their coworkers'.  Their
supervisor is wrong to ignore the safety rule.

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000467

Page 28

1   The employees should continue to observe all

2   safety rules and remind the supervisor of the

3   safety rules.  If necessary, the employees

4   should report the supervisor's actions to

5   management or their human resources

6   representative as soon as practicable.  Taking

7   action could prevent someone from being

8   injured."

9           That is the code of business conduct.

10  The next thing we have is the --

11          **HEARING OFFICER:**  Before you get into

12  this one, I'm going to mark this 17, 18 and 19

13  in order, the three pages here.  So 17 says "CN

14  Workplace Violence Prevention Policy" up at the

15  top.  18 starts with "2.  Definitions."  And 19

16  says, "Allegation of workplace violence" are the

17  first three words on it.

18          (Exhibits No. 17, 18 and 19, CN

19  Workplace Violence Prevention Policy, were

20  marked.)

21      **A.**     "CN Workplace Violence Prevention

22  Policy.  CN is committed in providing a safe,

23  healthy and violence-free workplace for all

24  employees.  The objective of this policy is to

25  reiterate the prohibition of workplace violence

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

Page 29

1    at CN and set out how threats, acts or risks of

2    workplace violence are to be reported and

3    addressed.

4              "This policy applies to all CN

5    employees.

6              "Complete policy.  Number 1, Policy

7    Statement and Objective:

8              "CN will not tolerate workplace

9    violence and is committed to making reasonable

10   efforts to:

11             "Provide its employees with a safe,

12   healthy and violence-free workplace; dedicate

13   sufficient attention, resources and time to

14   address factors that contribute to workplace

15   violence and to prevent and protect against it;

16   communicate to its employees information in its

17   possession about factors that can contribute to

18   workplace violence; and provide assistance to

19   employees who have been subject to workplace

20   violence.

21             "All employees are encouraged to

22   identify and promptly report threats, acts, or

23   risks of workplace violence.

24             "CN will promptly investigate and

25   address allegations of workplace violence and

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000469

Page 30

1    will impose appropriate corrective measures, up

2    to and including dismissal, against any employee

3    who has engaged in workplace violence.

4           "While CN acknowledges that violence

5    can occur in its workplace, as it can in any

6    workplace, CN cannot foresee specific acts of

7    workplace violence.  In promulgating this

8    policy, CN does not intend to enlarge the scope

9    of duties imposed by law.  This policy is not

10   intended to create any individual right or cause

11   of action not already existing and recognized

12   under applicable federal, provincial or state

13   law."

14          The second page, "Number 2.

15   Definitions.

16          "For purposes of this policy, a

17   'workplace' is any location where CN employees

18   are currently performing work-related activities

19   while in the scope of their employment.

20   Examples include CN-owned or controlled

21   buildings, parking lots, rail yards, railroad

22   tracks, trains, machinery, company vehicles, and

23   any other location where CN business or

24   sponsored activity is being conducted.

25          "For purposes of this policy,

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000470

1   'workplace violence' is defined as any action,

2   conduct, threat or gesture of a person towards a

3   CN employee in a workplace that can reasonably

4   be expected to cause harm, injury or illness to

5   the CN employee, excluding situations of

6   justified self-defense.

7         "Example of workplace violence

8   include:  Intentionally threatening or causing

9   physical harm; communications threatening

10   violent acts, made verbally or in writing

11   (through bulletin boards, email, blogs, etc.);

12   intentionally causing property damage for the

13   purpose of intimidation; possession, display or

14   use of a weapon; possession, display or use of

15   an object in a threatening or harmful manner;

16   bullying involving violent behavior and other

17   abusive and aggressive behavior.

18         "Number 3.  Reporting threats, acts

19   or risks of workplace violence.

20         "If you are subjected to or witness

21   threats, acts or risks of workplace violence,

22   immediately report the matter to your direct

23   supervisor, a human resources representative or

24   the CN ombudsman.  If the conduct involves your

25   direct supervisor, immediately report the

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000471

Page 32

1    situation to your supervisor's manager, a human

2    resources representative, or to the CN

3    ombudsman.  If you are unsure who your human

4    resources representative is, call the HR call

5    center at the number below.

6              "Reports can be made anonymously.

7    Reports or incidents warranting confidentiality

8    will be handled appropriately and information

9    will be disclosed to others only on a

10   need-to-know basis, or as required by law.

11             "If you believe that you or another

12   person is at immediate risk of physical harm:

13   Remain calm.  Move to safety.  If warranted by

14   the circumstances, immediately call 911.

15   Although you should first seek any immediate

16   assistance from your local police service, you

17   may also reach the CN police for assistance at

18   1-800-465-9239.  As soon as possible after the

19   incident, report the situation to your direct

20   supervisor.

21             "Number 4.  Investigation.

22   Allegations of workplace violence reported to CN

23   will be investigated.  All information relating

24   to the investigation will be kept confidential

25   to the extent possible.

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000472

Page 33

1          "However, information may be

2    disclosed in certain circumstances, including

3    the following:  Where consent is given by a

4    person to disclose his or her involvement in the

5    investigation, when required as part of the

6    investigation or discipline process or in the

7    implementation of corrective measures, or as

8    required by law.

9          "If CN determines that an employee

10   has engaged in workplace violence, CN will take

11   appropriate remedial action, which may include

12   disciplinary action, up to and including

13   termination.  If appropriate, proper law

14   enforcement officials will be notified and the

15   action will be fully prosecuted as a criminal

16   matter.

17         "Where the risk of workplace violence

18   is brought to CN's attention, CN will provide

19   information, instruction or training, where

20   appropriate, in order to prevent or minimize the

21   risk of workplace violence.

22         "CN offers its employees an Employee

23   & Family Assistance Program, EFAP, which can be

24   reached at the following numbers.  However,

25   please note that complaints under this policy

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000473

Page 34

1  must be directed to CN management, as described

2  in the policy."

3          And it lists the numbers for Canada

4  and the U.S.

5      Q.    Is that all you have?

6      A.    That is all I have.

7      Q.    So you stated earlier that you

8  weren't a witness to the incident, correct?

9      A.    No, I was not physically there,

10  correct.

11      Q.    So you took statements or coordinated

12  the statements, to get the statements from all

13  the employees involved who witnessed it.  With

14  that, you entered rules into the investigation.

15  We're going to start with Exhibit Number 14,

16  USOR Rule H.  Are you charging both employees

17  with Rule H, both Mr. Branch and Mr. Melton?  I

18  just want to clarify what the employees are

19  being charged with here because there is a lot

20  of information here.

21      A.    Both employees are being charged with

22  Rule H because of the incident that happened.

23  No one -- no direct management employee was

24  contacted on the day of or the following day, I

25  should say, at the end of the business day.

Page 35

1      Q.      Okay.  And that would be it with
2  Exhibit 14?
3      A.      That's correct, USOR Rule H.
4      Q.      For Exhibit 15, are both Mr. Branch
5  and Mr. Melton charged with this exhibit?
6      A.      Yes.
7      Q.      And how would that -- how are they
8  being charged on this one?
9      A.      Because according to the incident,
10  they weren't complying with the rules and the
11  code of business conduct.
12      Q.      Exhibit Number 15 is actually
13  Page 14?
14      A.      Yes.  14 and 15 are both under the
15  same -- both the code of business conduct.
16  Those actually go together.
17      Q.      So Exhibit 15 and 16, you said it's
18  both in the Code of Conduct?
19      A.      That's correct.
20      Q.      I'm asking how are they charged?
21  Like, what is the charge from this rule on
22  Exhibit 15 and 16?
23      A.      Safety and a willingness to obey
24  policies, rules and procedures.  If this is to
25  be considered, you know, a workplace incident,

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                    CN-Branch 000475

Page 36

1    then it wasn't -- you know, safety was being

2    ignored and rules weren't being followed when it

3    comes to safety.

4        **Q.**    All right.  And then next, I guess,

5    we'll -- it will be 17, 18 and 19, Workplace

6    Violence Prevention Policy.  Are both employees

7    charged with violating this?

8        **A.**    Yes.

9        **Q.**    And can you explain your reasoning?

10       **A.**    There's no tolerance for workplace

11   violence.  As far as even with the Workplace

12   Violence Prevention Policy, both employees

13   engaged and goes against everything that the

14   policy defines listed on all three pages.

15              **HEARING OFFICER:**  I have no questions

16   at this time, but I would like to take a recess.

17   The time is now -- did you have any questions

18   before we take a recess?

19              **MR. McGUIRE:**  After the recess.

20              **HEARING OFFICER:**  Okay.  The time is

21   now 9:52.  Let's take about a five- or

22   ten-minute recess here and we'll reconvene.

23              (A short break was taken.)

24              **HEARING OFFICER:**  The time is now

25   10:02.  We took a recess.  That recess is done

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                    CN-Branch 000476

Page 37

1   and we're back on the record now.  I don't have

2   any further questions for Mr. Day at this time.

3           **MR. McGUIRE:**  I do, yes, sir.

4   EXAMINATION BY MR. McGUIRE:

5       **Q.**     I would like you guys to take a look

6   at the CN Workplace Violence Prevention Policy.

7   I've got it marked as Exhibit 17, 18 and 19.

8   Both are being charged with this rule, according

9   to your earlier testimony.  I would like to

10  direct your attention to the second page,

11  Exhibit 18, Number 2, Definitions.  And it

12  defines what a workplace is with CN.  And it

13  says, "For purposes of this policy, a workplace

14  is any location where CN employees are currently

15  performing work-related activities while in the

16  scope of their employment.  Examples include CN

17  owned or controlled buildings, parking lots,

18  rail yards, CN tracks, trains, machinery,

19  company vehicles and any other locations where

20  CN business or sponsored activity is being

21  conducted."

22          This hotel in question, does CN own

23  that property?

24      **A.**     No.

25      **Q.**     Do they conduct business there?

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000477

Page 38

1      **A.**     No.

2      **Q.**     Well, based on CN's own policy of

3  what a workplace is, I think that stands to

4  strengthen my objection that this is an

5  off-property incident, not controlled by CN, and

6  therefore, they have no jurisdiction there.  I

7  would just like to point that out for you.

8           "For purposes of this policy,

9  'workplace violence' is defined as any action,

10  conduct, threat or gesture of a person towards a

11  CN employee in a workplace that can reasonably

12  be expected to cause harm, injury or illness to

13  the CN employee, excluding situations of

14  justified self-defense."

15           I would like to also -- let's talk

16  about Exhibit 14, "H.  Furnishing Information

17  and Conduct."

18           You stated earlier that both are

19  being charged for not reporting the situation

20  that day.  Can you show me anywhere in that rule

21  where it has to be reported that day?  Is there

22  a time limit of any sort?

23      **A.**     The only thing that's specified is a

24  felony or other serious violation, no later than

25  the end of the day --

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                                                CN-Branch 000478

Page 39

1    **Q.**     Where does it say that, sir?  I'm

2    sorry?

3    **A.**     It's more towards the bottom.  The

4    second small paragraph in the very bottom.

5    **Q.**    Sure.  Understood.  Do you feel that

6    that paragraph applies here?

7    **A.**     If two employees are obviously

8    violating a CN rule and there was an altercation

9    -- I'm sorry, an altercation that was conducted

10   in an appropriate manner and the employee

11   brought it to my attention, then I do believe

12   that would be a serious violation because the

13   employees are breaking CN rules.

14   **Q.**     The rule states or the rule states

15   any employee convicted of a felony or other

16   serious violation.  Are either one of these two

17   convicted of a felony or other serious

18   violation?

19   **A.**     No, sir, were not convicted.

20   **Q.**     I'm going to go ahead and read the

21   rest of the rule.  "Any employee convicted of a

22   felony or other serious violation of the law

23   must notify their supervisor no later than the

24   end of the first day immediately following the

25   day the employee received notice of the

Page 40

1    conviction."

2          I would just like to point out for

3    the record that neither one of these employees

4    were convicted of anything, and we feel this

5    portion of the rule does not apply.

6          It also states, "Employees must not

7    withhold information or fail to provide all the

8    facts to those authorized to receive information

9    regarding accidents, injuries, rule violations,

10   breaches of company security or unusual events.

11   This duty to furnish information -- this duty to

12   furnish information includes, but is not limited

13   to, accident and injury reports, recorded

14   statements, full cooperation in injury

15   investigations and safety rules violations.

16   Employees must also take all reasonable measures

17   to protect and preserve evidence where it is

18   within their control and ability to do so."

19         Do you feel they violated that

20   portion of the rule?

21   **A.**     I believe that -- that specific rule,

22   I believe that if there was an incident related

23   to one of my employees and they did not bring it

24   to me, I believe that it's something violated

25   because we're here today because one of the

EMM, INC. REPORTING   601.506.8261
EMMREPORTING@GMAIL.COM

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                                    CN-Branch 000480

Page 41

1    employees wanted to bring this to measure.  So I

2    do believe that, you know, the CN that conducts

3    the rules as far as safety and responsibility of

4    each employee, I do believe that in general, a

5    safety rule violation was, you know, what

6    happened with the altercation with these

7    employees, but this specific -- employees must

8    not withhold information.  You know, they would

9    have held it over the weekend.  No one was

10   notified, and I feel like if this was truly

11   something serious, trying to protect one

12   employee against another, they should have

13   brought it to my attention earlier.

14       **Q.**     But when they brought it to your

15   attention, did they withhold information?  Did

16   any of them withhold information?

17       **A.**     I don't know.  I wasn't physically

18   there.

19       **Q.**     All right.  How do employees receive

20   these policies?

21       **A.**     Through the CN INET and then when

22   employees are hired, usually they have a

23   week-long training of going over CN standards,

24   policies, rules, regulations, and each employee

25   is given a black book with all the rules and all

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000481

Page 42

1    that, USOR, OTS, CWR.  So as far as this, USOR,

2    an employee is -- you know, they have to have

3    this every two years, and this is in their

4    handbook that employees are required to keep on

5    them at all times.

6        Q.    Now, specify the policy -- the

7    Exhibit 17, 18 and 19, CN Workplace Violence

8    Prevention Policy, how do they receive that

9    training?

10       A.    Workplace Violence Prevention Policy,

11   this is a class that we actually have on a

12   program called My360.  Every employee is

13   required to take it.  I'm not sure as far as

14   like how long, how far apart, but there is a

15   prevention policy within 360 that every employee

16   is required to take, whether you're a manager or

17   unionized.

18            **MR. McGUIRE:**  No further questions,

19   subject to recall.

20            **HEARING OFFICER:**  Okay.  I don't have

21   any further questions for Mr. Day either.

22            **MR. BRANCH:**  I have a question.

23            **HEARING OFFICER:**  Go ahead.

24   EXAMINATION BY MR. BRANCH:

25       Q.    Mr. Day, you said you didn't know

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                               CN-Branch 000482

Page 43

1    anything about the incident until you -- I

2    notified you.  You knew about it because Chance

3    knew about it Friday because Chance came to my

4    machine and spoke with me about the incident.

5    So what position do Chance have under you?

6        **A.**    I mean, he's a supervisor.  He's the

7    same level as I am.

8        **Q.**    So you tell me that Chance is a

9    supervisor like you and you are over the rail

10   gain, so Chance is not going to come tell you

11   what happened?

12       **A.**    He would tell me, but I specifically

13   asked Chance, and he said you directly didn't

14   tell him.

15       **Q.**    What now?

16       **A.**    I was told by Mr. Gardner that you

17   did not directly talk to him about the incident,

18   that everything was rumor.

19       **Q.**    Everything was rumor when his foreman

20   was out there, Ty Peterson, and the assistant

21   foreman was out there, and they all reported to

22   him so how you saying --

23       **A.**    Did you speak to him, though?

24       **Q.**    Yes, sir.  He came to my machine.  He

25   asked me did I want to take action.  He also

EMM, INC. REPORTING  601.506.8261
EMMREPORTING@GMAIL.COM

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                                   CN-Branch 000483

Page 44

1    asked me, I can change my mind.  So in this

2    incident, I had an opportunity to change my

3    mind, so you can't say that you didn't know

4    about it.  You knew about it.

5        **A.**    I really did not.

6        **Q.**    Then you also on Tuesday, June 1st,

7    did I have a conversation with you when I asked

8    about dropping it and you said that you were

9    trying to squash it earlier?  You are biased.

10   You're very biased.

11            **MR. McGUIRE:**  Just ask questions.

12   BY MR. BRANCH:

13       **Q.**    You told me that you tried to squash

14   it earlier.  Did you not try to tell me that?

15       **A.**    I asked you did you want to continue

16   --

17       **Q.**    Did you not tell me that, yes or no?

18       **A.**    Repeat the question.

19       **Q.**    Did you not tell me you tried to

20   squash the incident?

21       **A.**    By talking to you, yes, I wanted to

22   let it go.  You asked me if I could let it.

23       **Q.**    No, you told me earlier you were

24   trying to squash it because you told me on

25   Sunday when I spoke with you on the phone, you

EMM, INC. REPORTING  601.506.8261
EMMREPORTING@GMAIL.COM

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000484

Page 45

1      told me have I talked to the union and I --

2          **A.**      And I told you I would talk to HR.

3          **Q.**      And I told you -- no, I said I'm

4      going to talk to the union.  I'm supposed to go

5      through the chain of command.  Did I not tell

6      you that?  Then you did not tell me -- you text

7      me and told me to write a statement.  You did

8      not tell me to write a statement.  I got it on

9      my phone.

10         **A.**      You're right.  I did text you.

11         **Q.**      But you could have -- when I spoke to

12     you on the phone, why not tell me to write a

13     statement then?

14         **A.**      Because I was trying to gather the

15     information and what happened.  It was a

16     holiday.  We were on the last day.  I was

17     visiting --

18         **Q.**      And another thing, when I spoke to

19     you, I did not tell you that Todd and I had a

20     verbal altercation.  I did not tell you that.  I

21     said we was involved in an incident.  I did not

22     tell you that we were involved in a verbal

23     altercation.  I did not tell you that.  You

24     throwed that in there.  You wasn't there, just

25     like you said.

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                              CN-Branch 000485

Page 46

1    **A.**    I wasn't there.

2    **Q.**    Thank you.

3         **MR. BRANCH:**  No further questions.

4         **HEARING OFFICER:**  Do you have any

5  questions for Mr. Day?

6         **MR. MELTON:**  No, not at this time.

7         **MR. McGUIRE:**  No further questions

8  for Mr. Day at this time, subject to recall.

9         **HEARING OFFICER:**  Okay.  Mr. Day -- I

10  have no further questions for Mr. Day at this

11  time.

12         **MR. MELTON:**  Could I change my mind

13  about that?

14         **HEARING OFFICER:**  Yes.

15  EXAMINATION BY MR. MELTON:

16    **Q.**    The only thing, Mr. Day, is you

17  brought up when you were reading this policy,

18  company procedure policy down here, I don't know

19  what -- down here in the note -- your statement

20  was, it was your opinion about the way we broke

21  the rule.  Then you said it was your opinion

22  that your employees broke the rule.  Was that

23  true?  You said it was your opinion?

24    **A.**    I'm not here to answer based on my

25  opinion.  I'm only here based on --

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                    CN-Branch 000486

1    **Q.**    But did you not say it was your

2  opinion that we broke the rule?

3    **A.**    No, I said it was not based on my

4  opinion.  All I'm here for is to present

5  evidence and facts, what information you guys

6  have given me.

7          **MR. MELTON:**  All right.  No further

8  questions.

9          **HEARING OFFICER:**  Any other questions

10  before we release him?

11          **MR. McGUIRE:**  No, sir.

12          **HEARING OFFICER:**  Okay.  There being

13  no further questions for Mr. Day at this time,

14  I'm going to release Mr. Day subject to recall.

15  Mr. Day, please step out of the room.  You may

16  be recalled for additional questioning.  Please

17  do not discuss this case while you're outside of

18  the room.

19          (Christopher Day leaves room.)

20          **HEARING OFFICER:**  Next I'm going to

21  -- I'm going to start calling the witnesses that

22  have written statements, besides the two charged

23  employees.  So we'll start with Mr. Dylan

24  Boutte.

25          At 10:16, we're off the record.

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000487

Page 48

1           (Off the record.)

2           **HEARING OFFICER:**  The time is now

3     10:20.  We're back on the record.  And we have

4     Mr. Dylan Boutte.

5                     DYLAN BOUTTE,

6     EXAMINATION BY THE HEARING OFFICER:

7       **Q.**     Mr. Boutte, please state your name.

8       **A.**     Dylan Boutte.

9       **Q.**     How long have you been employed by

10    the IC Railroad?

11      **A.**     One year.

12      **Q.**     Please state your occupation at the

13    time of the incident that is the subject of this

14    investigation.

15      **A.**     Trackman rail gain.

16      **Q.**     And how long have you worked the

17    position of trackman on the rail gain?

18      **A.**     Four or five months this time around.

19      **Q.**     And please state, for the record,

20    what other positions you've held.

21      **A.**     Only trackman, sir.

22      **Q.**     Okay.  And then we have a statement

23    here that was presented by Mr. Day, Exhibit

24    Number 6, and I have a copy of it there in front

25    of you.  Could you read your statement into the

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                          CN-Branch 000488

Page 49

1   record and then I'm going to ask you a couple

2   questions after that, I suppose.

3       **A.**      Yes, sir.  "On May 26, 2022, a couple

4   of co-workers and I were grilling outside the

5   hotel when I witnessed Todd Melton come outside.

6   Todd immediately began talking about a situation

7   that seemed to have happened months prior to May

8   26, 2022.  Robert Branch" -- and in parentheses

9   it says, "One of my co-workers present at the

10  grill" -- "asked Todd Melton to leave the

11  situation alone and reminded him whoever the

12  conversation was about wasn't there and to leave

13  it in the past.  Todd Melton became aggressive.

14  I witnessed him shove Robert Branch, which then

15  led to the two men wrestling on the ground.  The

16  two men were quickly broken apart and calmed

17  down by the co-workers present."

18              That's it.

19      **Q.**      Do you have any other knowledge of

20  the incident that you would like to state?

21      **A.**      No, sir.

22          **HEARING OFFICER:**  I really don't have

23  any other questions at this time.  Mr. McGuire,

24  do you have any?

25          **MR. McGUIRE:**  I have no further

EMM, INC. REPORTING   601.506.8261
EMMREPORTING@GMAIL.COM

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                                                    CN-Branch 000489

Page 50

1    questions, subject to recall.

2              **HEARING OFFICER:**  Mr. Branch, any

3    questions?

4              **MR. BRANCH:**  No, sir.

5              **MR. MELTON:**  No, sir.

6              **HEARING OFFICER:**  All right.

7              **MR. McGUIRE:**  I'm sorry, I do have

8    one question.

9    EXAMINATION BY MR. McGUIRE:

10       **Q.**    This is your statement, correct?

11       **A.**    Yes, sir.

12       **Q.**    Which this is from your own words.

13   You weren't coerced on how to write anything?

14       **A.**    No, sir.

15             **MR. McGUIRE:**  Thank you.  No further

16   questions.

17             **HEARING OFFICER:**  All right.  With no

18   further questions -- with there being no further

19   questions of Mr. Boutte at this time, I'm going

20   to release Mr. Boutte subject to recall.  Again,

21   you cannot discuss this case outside of this

22   room.  As we talked before -- so we're done with

23   the initial interrogation of you or your

24   testimony.  So, like, if you want to go out to

25   your car or something like that.  You just can't

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000490

Page 51

1    leave.

2              (Dylan Boutte leaves room.)

3              **HEARING OFFICER:**  All right.  And

4    next we will recall Mr. Darrell Hudson.  The

5    time is 10:24.  We'll go on recess again while

6    we wait.

7              (Off the record.)

8              **HEARING OFFICER:**  The time is now

9    10:26.  We're back on the record, and we have

10   Mr. Darrell Hudson.

11              DARRELL HUDSON,

12   EXAMINATION BY THE HEARING OFFICER:

13       **Q.**    Mr. Hudson, please state your name.

14       **A.**    Darrell Michael Hudson.

15       **Q.**    How long have you been employed by

16   the IC Railroad?

17       **A.**    Four years.

18       **Q.**    Please state your occupation at the

19   time of the incident that is the subject of this

20   investigation.

21       **A.**    Trackman on rail gain.

22       **Q.**    And how long have you worked on that

23   position?

24       **A.**    Four or five months.

25       **Q.**    And please state, for the record,

EMM, INC. REPORTING   601.506.8261
EMMREPORTING@GMAIL.COM

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                           CN-Branch 000491

Page 52

1    what other positions you have held.

2        **A.**    Assistant foreman and briefly welder

3    helper for a short period of time.

4        **Q.**    I have a copy of Exhibit Number 8,

5    which is a statement from you is what it appears

6    to be here.

7        **A.**    Yes.

8        **Q.**    Is this a statement that you wrote?

9        **A.**    Yes.

10       **Q.**    Could you read that statement into

11   the record?

12       **A.**    "We were outside listening to music

13   when Todd walked out of the hotel shouting

14   talking about stuff that happened at a union

15   meeting between him and another CN employee.

16   Robert Branch told Todd to leave it alone.  Todd

17   then rushed Branch pushing and hitting him in

18   the face."

19       **Q.**    Okay.  Do you have any other

20   additional information that is the subject of

21   this investigation that's not brought out in

22   this statement?

23       **A.**    No.

24       **HEARING OFFICER:**  Okay.  I have no

25   further questions for Mr. Hudson at this time.

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                    CN-Branch 000492

Page 53

1    Mr. McGuire?

2    EXAMINATION BY MR. McGUIRE:

3        **Q.**    Were you coerced in any way, shape or

4    form when you developed this statement?

5        **A.**    Was I coerced?

6        **Q.**    Yeah.  Did anybody help you write the

7    statement?

8        **A.**    No.

9        **Q.**    This statement is from on your own

10   words and your own records of actually what

11   happened?

12       **A.**    Yes.

13           **MR. McGUIRE:**  I have no further

14   questions, subject to recall.

15           **HEARING OFFICER:**  Mr. Branch, any

16   questions?

17           **MR. BRANCH:**  No questions.

18           **MR. MELTON:**  Can we take a quick

19   recess?

20           **HEARING OFFICER:**  Time is 10:29.

21   We'll take a brief recess.

22           (Off the record.)

23           **HEARING OFFICER:**  The time is now

24   10:31.  The brief recess is over.  And we still

25   have Mr. Hudson for questioning.  Is there any

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000493

Page 54

1   other additional questions for Mr. Hudson at

2   this time?

3           **MR. McGUIRE:**  I have no further

4   questions, subject to recall.

5           **MR. BRANCH:**  I have no further

6   questions.

7           **MR. MELTON:**  No.

8           **HEARING OFFICER:**  I am going to

9   release Mr. Hudson at this time subject to

10  recall.  And, Mr. Hudson, again, can't discuss

11  this case outside of this room.  You can go to

12  your vehicle or something if you would or hang

13  out in the break room downstairs.  It's up to

14  you.

15          (Mr. Hudson leaves room.)

16          **HEARING OFFICER:**  I'm next going to

17  recall Mr. Randall Duren, if you'll grab him.

18  And we'll go on recess.  It is 10:32.

19          (Off the record.)

20          **HEARING OFFICER:**  The time is now

21  10:34 and we have Mr. Randall Duren.  And we're

22  back on the record.

23                  RANDALL DUREN,

24  EXAMINATION BY THE HEARING OFFICER:

25    Q.    Mr. Duren, please state your full

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000494

Page 55

1    name.

2        **A.**      Randall Semarj Duren.

3        **Q.**      How long have you been employed by

4    the IC Railroad?

5        **A.**      Nine years.

6        **Q.**      Please state your occupation at the

7    time of the incident that is the subject of this

8    investigation.

9        **A.**      Speed swing operator.

10       **Q.**      And how long have you been in the

11   position of speed swing operator?

12       **A.**      I guess about 20 days, 25 days,

13   something like that.

14       **Q.**      And please state, for the record,

15   what other positions you have held.

16       **A.**      Trackman, carpenter helper,

17   bridgeman.

18       **Q.**      Okay.  I have a -- you have a copy of

19   a statement.  This is Exhibit Number 9.  Is this

20   your handwritten statement?

21       **A.**      Yeah.

22       **Q.**      Could you read it into the record?

23       **A.**      All right.  "On Thursday the 26th, we

24   were barbecuing on the back of my truck.  Later

25   that evening, Ty Peterson and two other

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                                      CN-Branch 000495

Page 56

1    employees came out to join us.  Todd came out

2    the side door talking reckless about he was from

3    Egypt Plantation and went on to bring up

4    Sweeney, and that's when Robert Earl told him to

5    chill out and that we wasn't on that and that we

6    had nothing to do with it.  Todd got into Robert

7    Earl's personal space still talking about the

8    Sweeney thing, and he pushed Robert Earl and

9    punched him twice."

10    **Q.**    Okay.  And Robert Earl, is that in

11    reference to Robert Branch?

12    **A.**    Yeah.

13    **Q.**    Okay.  Do you have anything -- do you

14    have any other knowledge of this incident that

15    you would like to bring up in this

16    investigation?

17    **A.**    Knowledge as of like what?  Like what

18    do you mean, knowledge of?

19    **Q.**    Do you have any other information

20    that's not in your statement that you would like

21    to present?

22    **A.**    Yeah, Robert Earl, it wasn't no

23    verbal confrontation between them.  Robert Earl

24    didn't raise his voice, didn't cuss, just told

25    him, "Chill out.  We ain't -- we ain't on that."

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000496

Page 57

1    That's when Todd got aggressive with him.  He

2    was the aggressor.

3              **HEARING OFFICER:**  Mr. McGuire, do you

4    have any questions?

5              **MR. McGUIRE:**  Just my basic question.

6    EXAMINATION BY MR. McGUIRE:

7       **Q.**    Is this your statement written with

8    your own thoughts and no one helped you write

9    it?

10      **A.**    No.

11      **Q.**    This is your eye witness statement?

12      **A.**    Yes, sir.

13             **MR. McGUIRE:**  Thank you, sir.

14   EXAMINATION BY MR. BRANCH:

15      **Q.**    I've got a question.  For the record,

16   I would like for you to restate that I did not

17   have a verbal altercation with Mr. Melton there.

18      **A.**    No, he did not have no verbal

19   altercation with him.

20             **MR. BRANCH:**  Thank you.  No further

21   questions.

22             **HEARING OFFICER:**  Hang on a second.

23   I've got to release you.  Mr. Melton, do you

24   have any questions for Mr. Duren?

25             **MR. MELTON:**  Yeah.

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000497

Page 58

EXAMINATION BY MR. MELTON:

1

2      **Q.**     So did not have a verbal altercation,

3    so he was not discussing it with me about what

4    happened?

5      **A.**     No, he didn't discuss it.  He asked

6    you -- he told you to chill out.

7      **Q.**     Did he discuss it or not?

8      **A.**     He didn't.

9         **MR. MELTON:**  No more questions.

10        **HEARING OFFICER:**  Okay.  Nobody else

11   has any further questions for Mr. Duren?

12        **MR. McGUIRE:**  No further questions,

13   subject to recall.

14        **HEARING OFFICER:**  So I'm going to

15   release Mr. Duren subject to recall.  Mr. Duren,

16   again, you're sequestered so you can't discuss

17   this case outside this room.  You are welcome to

18   go to your vehicle or something like that.

19   We'll come and get you if we do need you for

20   further questioning.  And we'll let you know

21   when the investigation is complete as well.  I

22   forgot to tell that to the other guys.  You

23   can't leave.  You've got to stay somewhere close

24   by.

25              (Mr. Duren leaves room.)

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000498

Page 59

1    **HEARING OFFICER:**  The time is 10:39.

2    We'll take a brief recess.

3             (A short break was taken.)

4    **HEARING OFFICER:**  The time is now

5    10:42.  Back on the record.  And we have Mr.

6    Earl Honeysucker as our witness.

7                   EARL HONEYSUCKER

8    EXAMINATION BY THE HEARING OFFICER:

9    **Q.**    Mr. Honeysucker, please state your

10   full name.

11   **A.**    Earl Honeysucker, Jr.

12   **Q.**    And how long have you been employed

13   by the IC Railroad?

14   **A.**    A little over eight years.

15   **Q.**    Please state your occupation at the

16   time of the incident that is the subject of this

17   investigation.

18   **A.**    Assistant track foreman.

19   **Q.**    And how long have you worked the

20   position of assistant track foreman?

21   **A.**    It would have been rail gain for a

22   couple of months, three or four months maybe.

23   **Q.**    And can you please state, for the

24   record, what other positions you have held?

25   **A.**    Trackman, welder helper, foreman.  I

EMM, INC. REPORTING  601.506.8261
EMMREPORTING@GMAIL.COM

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000499

Page 60

1    think that's it.  Assistant foreman.

2        Q.    Okay.  I have a copy of a statement

3    from you, I assume.

4        A.    Yes.

5        Q.    And if you could, read -- it's

6    Exhibit Number 10, for the record.  But could

7    you read that for the record?

8        A.    "On May 26, 2022, we were outside the

9    hotel just having a good time when Todd Melton

10   came outside of the hotel and started yelling,

11   'I'm from Little Egypt where we bury MFs.'"  Do

12   you want me to use the profanity?

13       Q.    No, that's fine.

14       A.    "'And I'm going to bury Sweeney.'

15   Robert Branch told him to leave that alone, and

16   Todd asked him, 'So you're backing Sweeney.'

17   And Robert Branch said, 'No, just leave that

18   alone.'  And Todd charged Robert and pushed him

19   and hit him twice and then they exchanged a

20   couple licks back and forth and fell on the

21   ground, and then I, Earl Honeysucker, stepped in

22   to help break it up."

23       Q.    Okay.  And do you have anything else

24   about the incident that you would like to state?

25       A.    No, not really.  That's it.

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000500

Page 61

1          **HEARING OFFICER:**  Okay.  I have no

2     further questions at this time.  Mr. McGuire, do

3     you have any questions for Mr. Honeysucker?

4     EXAMINATION BY MR. McGUIRE:

5       **Q.**     Yes.  Just for the record, this is

6     your handwritten statement?  You were not

7     coerced in any way to write it?  This is your

8     free thoughts and what you witnessed?

9       **A.**     Yes, sir.

10         **MR. McGUIRE:**  No further questions,

11    subject to recall.

12    EXAMINATION BY MR. BRANCH:

13      **Q.**     Yeah, I got a question.  For the

14    record, Mr. Honeysucker, did I in any form,

15    shape, or fashion provoke Mr. Melton to attack

16    me?

17      **A.**     No.

18         **MR. BRANCH:**  Thank you.  No further

19    questions.

20         **HEARING OFFICER:**  Mr. Melton, do you

21    have any questions?

22         **MR. MELTON:**  No.

23         **HEARING OFFICER:**  Okay.  There being

24    no further questions for Mr. Honeysucker at this

25    time, I'm going to release Mr. Honeysucker

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000501

Page 62

1    subject to recall.  Again, please step out of

2    the room.  You are free to go to your vehicle.

3    You can't leave the property.  But if you want

4    to go to your vehicle or back down to the break

5    room, and we'll let you know when the

6    investigation is complete.

7                  (Mr. Honeysucker leaves the room.)

8              **HEARING OFFICER:**  Next we're going to

9    bring in Mr. Ty Peterson.  We're still on the

10   record here.  We have Mr. Ty Peterson.

11                  TY PETERSON,

12   EXAMINATION BY THE HEARING OFFICER:

13       **Q.**    Mr. Peterson, please state your full

14   name.

15       **A.**    Ty Peterson.

16       **Q.**    And how long have you been employed

17   by the IC railroad?

18       **A.**    Three years, a couple months.

19       **Q.**    Please state your occupation at the

20   time of the incident that is the subject of this

21   investigation.

22       **A.**    Foreman on the rail gain.

23       **Q.**    And how long have you been in that

24   position?

25       **A.**    Four to five months.

EMM, INC. REPORTING  601.506.8261
EMMREPORTING@GMAIL.COM

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                          CN-Branch 000502

Page 63

1    Q.    And please state, for the record,
2  what other positions you have held.

3    A.    Welder, assistant foreman, and
4  machine, boom truck.

5    Q.    Okay.  In front of you is a copy of
6  your statement.  It's Exhibit Number 11 for the
7  record.  Could you read your statement into the
8  record?

9    A.    "On Thursday, the 26th of May, me and
10  a group of guys were outside the hotel talking
11  about work when Todd Melton walked out the door
12  intoxicated and confronted Robert Branch about a
13  sore subject that happened in the past.  Robert
14  Branch responded, 'Leave that subject alone.'
15  After that, Todd Melton went out after Branch
16  and struck him with his fist which resulted in
17  both of them fighting with each other.  After a
18  brief amount of time, it was broken up and
19  separated."

20    Q.    Do you have -- do you know anything
21  else about this incident that you would like to
22  say other than what's in your statement?

23    A.    I do not.

24    **HEARING OFFICER:**  Mr. McGuire, do you
25  have any questions for Mr. Peterson?

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000503

Page 64

1   EXAMINATION BY MR. McGUIRE:

2      **Q.**     Mr. Peterson, this is your

3   handwritten statement?  Were you coerced in any

4   way to write it?  This is your free thinking and

5   your thoughts?

6      **A.**     That's correct.

7          **MR. McGUIRE:**  No further questions,

8   subject to recall.

9          **HEARING OFFICER:**  Mr. Branch.

10  EXAMINATION BY MR. BRANCH:

11     **Q.**     Mr. Peterson, on May 26, was I in any

12  way, form or fashion provoking Mr. Todd to hit

13  me or attack me in any --

14     **A.**     No, like I said in my statement, you

15  just said, "leave this sore subject alone."

16         **MR. BRANCH:**  Thank you.  No further

17  questions.

18         **HEARING OFFICER:**  Mr. Melton, do you

19  have any questions?

20  EXAMINATION BY MR. MELTON:

21     **Q.**     Yeah.  Here in your statement, you

22  said Mr. Todd Melton walked out the door

23  intoxicated.

24     **A.**     That was just my opinion.

25     **Q.**     You got to have a -- opinions don't

EMM, INC. REPORTING  601.506.8261
EMMREPORTING@GMAIL.COM

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000504

Page 65

1    mean anything when we're in here, so --

2        **A.**    No, I don't have any truth or

3    anything like that.  That was just my opinion.

4            **MR. MELTON:**  Thank you.

5            **HEARING OFFICER:**  Any other questions

6    for Mr. Peterson?  There being no further

7    questions for Mr. Peterson at this time, I'm

8    going to release Mr. Peterson subject to recall.

9    Again, step out of the room.  You are being

10   sequestered, so you can't discuss this case

11   outside the room.  You are free to go to your

12   vehicle or back down to the break room.  We will

13   let you know when the investigation is all over.

14           (Mr. Peterson leaves the room.)

15           **HEARING OFFICER:**  And next we're

16   going to call in Mr. Walker.  You can send him

17   in.

18           We now have Mr. Walker Yuille in the

19   room.

20                   WALKER YUILLE,

21   EXAMINATION BY THE HEARING OFFICER:

22       **Q.**    Mr. Yuille, please state your full

23   name.

24       **A.**    William Walker Yuille.

25       **Q.**    Yuille?

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                    CN-Branch 000505

Page 66

1    **A.**    Yes, sir.

2         **MR. McGUIRE:**  I'm sorry, which

3    exhibit is that?

4         **HEARING OFFICER:**  It's Exhibit

5    Number 12.

6    BY THE HEARING OFFICER:

7    **Q.**    Mr. Yuille, how long have you been

8    employed by the IC Railroad?

9    **A.**    A year.

10   **Q.**    And please state your occupation at

11   the time of the incident that is the subject of

12   this investigation.

13   **A.**    Trackman on the rail gain.

14   **Q.**    And how long have you worked that

15   position?

16   **A.**    Two months.

17   **Q.**    And please state, for the record,

18   what other positions you have held.

19   **A.**    Just trackman on the rail gain.

20   That's about it.

21   **Q.**    Okay.  In front of you is a written

22   statement, Exhibit 12, for the record.  Could

23   you read that statement into the record?

24   **A.**    Yes, sir.  "Thursday, on the 26th of

25   May, me and some of my co-workers were out

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                    CN-Branch 000506

Page 67

1   cooking at the hotel in Columbia [sic],

2   Mississippi.  One of the guys came out and

3   engaged into an argument with Robert Branch.

4   Todd Melton approached Robert about something

5   that happened in the past and Robert told him to

6   leave it alone.  That's when Todd pushed him and

7   hit him in the face.  They immediately went to

8   the ground and were broke apart."

9       Q.     And this is your statement?

10      A.     Yes, sir.

11      Q.     Do you have anything else about the

12  incident that you would like to state?

13      A.     No, sir.

14          **HEARING OFFICER:**  Mr. McGuire, do you

15  have any questions for Mr. Yuille?

16  EXAMINATION BY MR. McGUIRE:

17      Q.     This is your handwritten statement.

18  You were not coerced in any way to write this?

19  This is your free will and thoughts?

20      A.     Yes, sir.

21          **MR. McGUIRE:**  No further questions,

22  subject to recall.

23  EXAMINATION BY MR. BRANCH:

24      Q.     Mr. Yuille, in your statement you

25  spoke about an argument.  Was Todd and I

EMM, INC. REPORTING   601.506.8261
EMMREPORTING@GMAIL.COM

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                               CN-Branch 000507

Page 68

1    arguing?

2        **A.**      No.

3        **Q.**      But your statement stated we was

4    arguing.  Can you justify that?

5        **A.**      Okay.  When Mr. Todd walked out, he

6    was speaking about a past event that happened at

7    a union meeting between him and Roosevelt

8    Sweeney, and all Mr. Branch said was to leave it

9    alone.

10            **MR. BRANCH:**  Thank you.  No further

11   questions.

12            **HEARING OFFICER:**  Mr. Melton, any

13   questions?

14   EXAMINATION BY MR. MELTON:

15       **Q.**      In here you said I hit Mr. Branch in

16   the face.

17       **A.**      Yes, sir.

18       **Q.**      Did Mr. Branch ever strike me?

19       **A.**      Yes, sir, when they got to the ground

20   before it was broke up, it was a cluster, but

21   Mr. Branch did swing.

22            **MR. MELTON:**  Thank you.

23            **HEARING OFFICER:**  Anyone have any

24   further questions for Mr. Yuille at this time?

25            **MR. BRANCH:**  No further questions.

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000508

Page 69

1           **MR. McGUIRE:**  No further questions.

2           **HEARING OFFICER:**  Okay.  Mr. Yuille,

3    I'm going to release you, subject to recall.

4    Again, you're still sequestered.  You can't

5    discuss this case outside of this room until

6    this investigation is over.  You can go either

7    back to the break room or downstairs, out to

8    your vehicle.  We'll find you if we have further

9    questions for you.  And we'll let you know when

10   the investigation is complete.

11           (Mr. Yuille leaves room.)

12           **HEARING OFFICER:**  And next will be

13   recalling Mr. Al Thomas, if you can send him in.

14           We now have Mr. Al Thomas for

15   questioning.

16              AL THOMAS,

17   EXAMINATION BY THE HEARING OFFICER:

18      **Q.**    Mr. Thomas, please state your full

19   name.

20      **A.**    Al B. Thomas.

21      **Q.**    And how long have you been employed

22   by the IC Railroad?

23      **A.**    15 years.

24      **Q.**    15 years you said?

25      **A.**    Yes, sir.

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                    CN-Branch 000509

Page 70

1    **Q.**    And what was your occupation at the

2    time of the incident that is the subject of this

3    investigation?

4    **A.**    Machine operator.

5    **Q.**    And how long have you been on this

6    position?

7    **A.**    About four weeks.

8    **Q.**    And please state, for the record,

9    what other positions you have held.

10    **A.**    Machine operator, trackman, welder

11    helper, bridge gain.  That's it.

12    **Q.**    All right.  And in front of you is

13    Exhibit Number 13, for the record.  Is this your

14    written statement?

15    **A.**    Yes, it is.

16    **Q.**    Could you please read it into the

17    record?

18    **A.**    "On Thursday, May 26, Todd Melton

19    came around the corner and was talking and made

20    a statement about Roosevelt Sweeney and what

21    happened at the union meeting, and Robert Branch

22    told Todd to leave the union mess alone, so Todd

23    walked up to Robert Earl and shoved him, and he

24    shoved him back, and Todd drawed back and hit

25    Robert, and Robert fell, and Todd hit him again,

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000510

Page 71

1    and somehow they both ended up on the ground.

2    And we broke them up and Earl Honeysucker pulled

3    Todd away, and Todd went one way and Robert Earl

4    went another."

5        Q.    And do you have any other information

6    about this incident that you would like to say

7    other than what's in your statement?

8        A.    No.  That pretty well sums it up.

9            HEARING OFFICER:  Mr. McGuire, do you

10   have any questions for Mr. Thomas?

11   EXAMINATION BY MR. McGUIRE:

12       Q.    This statement here was written by

13   you, your own thoughts?  No one coerced you into

14   saying anything?

15       A.    No.

16           MR. McGUIRE:  No further questions,

17   subject to recall.

18           HEARING OFFICER:  Mr. Branch, do you

19   have any questions for Mr. Thomas?

20   EXAMINATION BY MR. BRANCH:

21       Q.    Mr. Thomas, on Thursday, May 26, did

22   I, Robert Earl Branch, initiate the incident?

23       A.    No.

24       Q.    You have on your statement here, it

25   reads, "'Todd leave that union mess alone.'  So

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

Page 72

1  Todd walked up to Robert Earl Branch and shoved

2  him.  He shoved him back."  I don't recall

3  shoving him back, Mr. Thomas.

4      **A.**    It all happened so fast.  I know

5  that, as I can recall, Todd just came up on you,

6  and I thought maybe y'all bumped and you kind of

7  like pushed him.

8      **Q.**    No.

9      **A.**    But, I mean, it happened so fast, but

10  I do remember that when he walked up on him, it

11  was like he just -- Todd just drawed off and hit

12  him.  I mean, I could have it wrong as far as

13  the shoving part, but I know it happened so fast

14  to -- I mean, wasn't nobody looking for it to

15  happen, I mean, just being honest.

16          **MR. BRANCH:**  Thank you.  No further

17  questions.

18          **HEARING OFFICER:**  Mr. Melton, do you

19  have any questions for Mr. Thomas at this time?

20  EXAMINATION BY MR. MELTON:

21      **Q.**    Now, you said I shoved him and he

22  shoved me back.  Now at any time did Mr. Branch

23  strike me?

24      **A.**    No, sir, he did not.

25      **Q.**    You didn't see him strike me?

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000512

Page 73

1      **A.**     No, I did not.

2           **MR. MELTON:**  No further questions.

3           **HEARING OFFICER:**  Does anyone have

4     any further questions for Mr. Thomas at this

5     time?

6           **MR. McGUIRE:**  No further questions.

7           **HEARING OFFICER:**  Okay.  There being

8     no further questions for Mr. Thomas at this

9     time, I'm going to release Mr. Thomas subject to

10    recall.  Again, you're still sequestered.  You

11    can't discuss this case outside this room.  You

12    are welcome to go back down to the break room or

13    out to your vehicle.  We'll get you if we need

14    you for further questioning.

15           (Mr. Thomas leaves room.)

16           **HEARING OFFICER:**  I think that's all.

17           **MR. McGUIRE:**  That's all the

18    witnesses.

19           **HEARING OFFICER:**  Would you guys like

20    a recess before we --

21           **MR. McGUIRE:**  We can move right into

22    it.

23           **HEARING OFFICER:**  I'm going to go

24    with Mr. Branch next.  We now have Mr. Branch on

25    the witness stand.

Page 74

```
 1                    ROBERT BRANCH

 2   EXAMINATION BY THE HEARING OFFICER:

 3      Q.      Mr. Branch, please look at Exhibit

 4   Number 4 and 5, which is your written statement.

 5   Is everything that you wrote in your statement

 6   true and accurate?

 7      A.      Yes, sir.

 8      Q.      Okay.  Mr. Branch, you've heard the

 9   testimony and you've seen the exhibits up to

10   this point.  Would you like to comment on

11   anything that has been said?

12      A.      Only thing I wanted to say is that

13   even though me and Mr. Melton had an incident --

14   but I truly think on Mr. Melton's part, it was a

15   mistake.  I mean, I don't think it was

16   intentional.  I mean, it wasn't his intention to

17   hit me or anything because he came back on

18   Tuesday and he apologized.  And I think he

19   apologized to me from his heart.  And, you know,

20   I'm not here to try to take Mr. Melton's job and

21   not even trying to give my job away.  It's just

22   things happen in the workplace.  We have to get

23   somebody's attention because things are going

24   around in the world, and I think we should

25   always act professionally and conduct ourself in
```

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000514

Page 75

1    a professional way.  I don't have nothing

2    against Todd then; I don't have nothing against

3    him today.  That's all I want to say.

4        **Q.**    Okay.  I'm going to have you read

5    your statement into the record and then I may

6    have a couple questions for you, but if you

7    could do that, please.

8        **A.**    Yes, sir.  "To the management at CN

9    Railroad.  From Robert Branch.  Dated May 30,

10   2022.  On Thursday, May 26, 2022, around

11   9:00 p.m. at Magnolia Inn, 816 US 98, Columbus,

12   Mississippi, 39429, my co-worker and I was

13   grilling afterward peacefully and relaxing time

14   when Todd Tracy Melton approached us with no

15   shirt, no shoes and started acting and speaking

16   belligerent.  He was speaking about a situation

17   at a union meeting I attended.  He and another

18   employee had a disturbing, violent confrontation

19   while Todd was saying racial slurs, calling the

20   CN employee 'Boy.'

21           "He proceeded to approach the group.

22   I said, 'You need to let that go.'  Todd said he

23   was from Egypt Plantation.  Todd pushed me in

24   the chest and I fell to the ground, got back up,

25   and he hit me twice in the mouth and in the

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000515

Page 76

1   nose.  I was in shock.  My head bounced off the

2   pavement in shock and disbelief.  I was being

3   attacked.  So I attempted to protect myself by

4   fighting back.  I have several witnesses that I

5   was in totally disbelief of what had just

6   transpired.

7           "I'm a mild-mannered man.  I come to

8   work and conduct myself in a safe and

9   professional manner.  I am extremely grateful I

10  survived his attack; however, my mind would not

11  stop wondering what did I do.  I am emotionally

12  depressed and fearful for what Todd Melton has

13  planned for me.  I fear for my life when I'm

14  around him.  All I said was 'This is not the

15  place,' and the next thing I know I am being

16  attacked.  I have not gotten a full night's

17  rest.  I keep tossing and turning, thinking this

18  man could have killed me.  I spoke to Supervisor

19  Gardner about the attack on Friday morning and

20  he asked me what do you want to do.

21          "This was embarrassing and

22  unacceptable.  A person with that attitude can

23  hurt or kill someone -- somebody.  CN has a

24  conduct policy with zero tolerance for that kind

25  of behavior.  I talked to my wife about it.  She

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000516

Page 77

1    is worried and scared.  I fear for my life

2    around Todd.

3              "Witness:  Randall S. Duren, Darrell

4    Hudson, Ty Peterson, Earl Honeysucker, Al

5    Thomas, Dylan Boutte, Walker Young [sic] and

6    Rashard Brown."

7      Q.     Do you have any other information

8    that you would like to bring out at this time?

9      A.       Only information that I have, Todd

10   did come to me on Tuesday around about 11:30.

11   He came to my machine and he apologized and told

12   me he was sorry.  And I did accept his apology.

13             **HEARING OFFICER:**  I don't have any

14   questions at this time.  Mr. McGuire, do you

15   have any further questions?

16             **MR. McGUIRE:**  Yes, I do.  I have a

17   couple here.

18   EXAMINATION BY MR. McGUIRE:

19     Q.     I think we covered this earlier in

20   testimony from Supervisor Day.  Did you have --

21   just to refresh my memory and refresh the

22   record, did you object to his statement when he

23   presented it in any way, shape or form, the

24   information that he presented?

25     A.     Yes, I did.

EMM, INC. REPORTING  601.506.8261
EMMREPORTING@GMAIL.COM

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                                    CN-Branch 000517

1 **Q.** Can you elaborate a little bit?

2 **A.** Mr. Day, he stated that he didn't

3 know anything about the incident. Well, Gardner

4 came to me on Friday and spoke to me about the

5 incident and asked me -- he said he wanted to

6 talk to Todd about it also. He said he was

7 going to call Todd because Todd was on the case.

8 So I knew if Gardner knew, Mr. Day knew. Mr.

9 Day trying to say that he did not know. But

10 Gardner also told me that he was going to tell

11 Chris about the incident.

12 **Q.** You are being charged with rule

13 violation H, Furnishing Information and Conduct.

14 Do you feel like you violated that rule?

15 **A.** No, sir.

16 **Q.** Did you furnish all the information

17 that you had on hand about the incident?

18 **A.** Yes, sir.

19 **Q.** Was you convicted of a felony or

20 other serious violation of the law?

21 **A.** No, sir.

22 **Q.** Exhibit Number 15, you're being

23 charged with "Safe, Secure, And Violent-Free

24 Workplace. Item 2, Do your job according to

25 company policies, rules and procedures as well

Confidential

CN-Branch 000518

Page 79

1    as the law.  If in doubt, consult your

2    supervisor."  Did you do your job according to

3    company policies, rules and procedures?

4         **A.**     Yes, sir.

5         **Q.**     When you reported everything, you

6    didn't withhold any information or anything?

7         **A.**     No, sir.

8         **Q.**     And then Exhibit 16, second page

9    here, "Doing the Right Thing.  Safety and a

10   willingness to obey policies, rules and

11   procedures are most important when at work and

12   otherwise performing your duties.  If in doubt,

13   the safe course must be taken."

14             Did you feel you took the safest

15   course?

16        **A.**     Yes, sir.

17        **Q.**     Exhibit 17, 18 and 19 is the CN

18   Workplace Violence Prevention Policy.  Are you

19   familiar with that policy?

20        **A.**     Somewhat.

21        **Q.**     How are you familiar with it?  Did

22   you take a course?

23        **A.**     It's been a while.

24        **Q.**     But you do remember taking a course

25   on this?  You just don't know when?

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000519

Page 80

1    **A.**     I just don't know when.  It could

2    have been years ago.  I don't know.

3    **Q.**     There's actually no date on -- oh,

4    effective date, February 2014.  Does that seem

5    about a right time period when you would have

6    gotten this policy?

7    **A.**     Somewhat.

8    **Q.**     And you've had no retraining on this

9    policy whatsoever since 2014?

10   **A.**     No, sir.

11          **MR. McGUIRE:**  I have no further

12   questions, subject to recall.

13          **HEARING OFFICER:**  Mr. Melton, do you

14   have any questions for Mr. Branch?

15          **MR. MELTON:**  Yeah, I got a couple if

16   you don't mind.

17   EXAMINATION BY MR. MELTON:

18   **Q.**     All right.  Mr. Branch, here's a

19   statement I don't remember saying and I haven't

20   heard anybody else say it.  You said, "Todd was

21   making racial slurs calling the CN employee

22   'boy.'"  Who did I make that statement towards?

23   **A.**     Mr. Sweeney.

24   **Q.**     Was that statement -- did that have

25   anything to do with the incident you and I had?

EMM, INC. REPORTING   601.506.8261
EMMREPORTING@GMAIL.COM

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                                    CN-Branch 000520

Page 81

 1    **A.**    No, sir.

 2    **Q.**    And --

 3        **MR. McGUIRE:**    The organization would

 4    like to object on the grounds that that portion

 5    should be remitted from the record because that

 6    has nothing to do with the date of the incident

 7    involved.

 8        **HEARING OFFICER:**    Okay.  I'll make

 9    note of that.  So you're objecting to the

10    sentence that says, "Todd was saying racial

11    slurs and calling the CN employee 'boy'"?

12        **MR. McGUIRE:**    Anything to do with the

13    date outside of the date of the incident.

14    That's referring to something that happened

15    maybe a month ago, and in these investigations

16    we're here to discuss what happened on the date

17    in question, and anything in the past or in the

18    future is irrelevant to this investigation.

19        **HEARING OFFICER:**    It's noted and I

20    would agree with that.

21    BY MR. MELTON:

22    **Q.**    All right.  And now, I mean, I know

23    things are said when we're angry and we're

24    upset.  The statement you made that you were

25    fearful of your life that I was going to do

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                                    CN-Branch 000521

Page 82

1   something to you.  Did I ever do anything -- I

2   mean, in your statement it just says that.  I

3   mean, is that your personal opinion?  Is that

4   the way you felt?  Or did I say something?

5        **A.**    That was my personal opinion, Todd.

6        **Q.**    Do you feel at this time that I'm a

7   threat to you?

8        **A.**    No, I do not.

9        **MR. MELTON:**  I have no further

10  questions.

11       **HEARING OFFICER:**  Okay.  I do have a

12  couple questions here.

13  EXAMINATION BY THE HEARING OFFICER:

14       **Q.**    Mr. Branch, were you struck by Mr.

15  Melton?

16       **A.**    Yes, sir.

17       **Q.**    On the day in question?

18       **A.**    Yes, sir.  I mean, for the record --

19       **Q.**    You would like to enter this into the

20  record?

21       **A.**    Yes, sir.

22       **Q.**    This is -- can you explain what this

23  is?

24       **A.**    It's a statement from the doctor when

25  I went to the emergency room.

EMM, INC. REPORTING   601.506.8261
EMMREPORTING@GMAIL.COM

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

Page 83

1          **HEARING OFFICER:**  Mark this as

2     Exhibit Number 20.  It's from Greenwood Leflore

3     Hospital.

4               (Exhibit No. 20, Medical Record, was

5     marked.)

6          **MR. McGUIRE:**  Can we request a copy

7     of that?  I don't know if we can, but I need to

8     -- that is something that's possibly under HIPAA

9     laws.  I don't really know if we should --

10          **HEARING OFFICER:**  Well, he's entering

11     it as a -- into the record, into an

12     investigation, so it's -- yeah, you can get a

13     copy of it and it will be included in the

14     transcript.  You can look at it if you'd like.

15     You both are free.

16     BY THE HEARING OFFICER:

17        Q.    So with that exhibit, you've seen a

18     physician then?

19        A.    Yes, sir.

20        Q.    After the -- after you were in this

21     altercation?

22        A.    Yes, sir.

23        Q.    Can you tell me how many times you

24     were struck?

25        A.    Mr. Todd Melton struck me here and he

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                                              CN-Branch 000523

Page 84

1    struck me here and my skin was lacerated.

2        **Q.**    So in the jaw and like near your eye?

3        **A.**    Yeah, between both my eyes.

4        **Q.**    And at any time did you strike Mr.

5    Melton?

6        **A.**    Of course, I got him and I defended

7    myself, yes.

8        **Q.**    So you would say you struck him or...

9        **A.**    Yeah, you can say I struck him.

10        **Q.**    And when this incident started to

11    happen, did you have -- did you provoke it in

12    any way?

13        **A.**    No, sir.

14        **Q.**    Did you -- was there anything said by

15    you that could have been construed as being as

16    provoking the incident?

17        **A.**    No, sir.  I mean, telling him to

18    leave me alone.  I don't think that would

19    provoke any argument.  I'm not that type of

20    person.

21        **HEARING OFFICER:**  Okay.  I have no

22    further questions at this time.  Mr. McGuire, do

23    you have any further questions?

24        **MR. McGUIRE:**  Yes, I do have a

25    statement.  I'm going to have to object to this

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                                    CN-Branch 000524

Page 85

1   exhibit just for the sole purpose that he was

2   seen by the doctor on 6/2, over a week past the

3   incident.  And it alleges he was attacked.

4   There's no -- we haven't proven that yet.  As a

5   whole, I've got to object to this completely

6   because it says headaches from being attacked on

7   5/26/22, and he waited until 6/2 to go see the

8   doctor.

9            **HEARING OFFICER:**  I'll make note of

10  your objection.

11           **MR. McGUIRE:**  As of right now, I feel

12  that, you know, we haven't gathered all the

13  information yet.  A decision hadn't been made.

14  And that could be leaning someone towards a

15  false decision on this.

16           **HEARING OFFICER:**  So for the record,

17  there is an objection by the union

18  representative for Exhibit Number 20 on the

19  basis of it being appointment -- I'm sorry,

20  being seen on 6/2/2022, from an incident that

21  happened on May 26, 2022.

22           And I have no further questions for

23  Mr. Branch.  Mr. Melton, do you have any further

24  questions before we release him?

25           **MR. MELTON:**  No, I do not.

Page 86

1    **HEARING OFFICER:** Okay. There being

2  no further questions for Mr. Branch at this

3  time, you're released from the stand, subject to

4  recall, and we'll next recall Mr. Melton to the

5  witness stand. Does anybody need a recess

6  before we get into this?

7    **MR. McGUIRE:** I'm fine.

8    **HEARING OFFICER:** Okay.

9       TODD MELTON,

10 EXAMINATION BY THE HEARING OFFICER:

11   **Q.** Mr. Melton, please look at Exhibit

12 Number 7. Is this a copy of your written

13 statement?

14   **A.** Yes, sir.

15   **Q.** Is everything you wrote in your

16 statement true and accurate?

17   **A.** Yes, sir.

18   **Q.** Could you please read the statement

19 into the record?

20   **A.** "Robert Branch and I had a

21 disagreement about a union meeting in the

22 parking lot of the Magnolia. Turned into a

23 slight altercation. Then cooled off and

24 returned to our rooms, and this incident

25 happened off the clock and off company

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                   CN-Branch 000526

Page 87

1    property."

2        Q.    Okay.  Mr. Melton, you have heard the

3    testimony and you have seen the exhibits up to

4    this point.  Would you like to comment on

5    anything that has been said so far?

6        A.    No, sir.

7        Q.    And would you like to state anything

8    else you know about this incident at this time?

9        A.    No, sir.

10       Q.    I have a couple questions for you.

11   Mr. Branch stated you struck him twice; is that

12   correct?

13       A.    Well, I mean, we -- I don't know that

14   I struck him twice.  I know we swang.  We shoved

15   each other and it was -- we went to the ground

16   and it was some swinging.  As far as contacting

17   people, breaking things up, I don't remember who

18   making contact.

19       Q.    And did Mr. Branch strike you at any

20   time during the altercation?

21       A.    Like I just said, we were all being

22   broken up.  I mean, we were -- I was struck and

23   by who -- who all I was struck by in the middle

24   of breaking everything up, I don't know.

25       Q.    Okay.  And leading up to the physical

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000527

Page 88

1    altercation, was there anything that Mr. Branch

2    did to provoke you?

3         **A.**     We were just -- you know, we were

4    having words about the union meeting and that

5    led into the altercation -- that led into the

6    argument.

7         **Q.**     So for USOR Rule H, Exhibit

8    Number 14, do you feel that you violated this

9    rule in any way, Furnishing Information and

10   Conduct?

11        **A.**     No, sir.

12        **Q.**     Would you like to elaborate on that

13   at all?

14        **A.**     Nothing really to elaborate on.

15        **Q.**     As far as Exhibit 15 and 16, from the

16   code of business conduct, do you feel you

17   violated this code in any way?

18        **A.**     No, sir, and code of conduct, I don't

19   believe I violated it because we were not on

20   company property as this reads what company

21   property is.  And as far as my per diem, per

22   diem doesn't pay for the hotel, and I don't

23   believe we were -- you know, it was after hours.

24   What happened with me and Mr. Branch was between

25   us.

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                              CN-Branch 000528

Page 89

1     **Q.**    And as far as the CN Workplace

2  Violence Prevention Policy, Exhibit 17, 18, and

3  19, do you feel that you were in violation of

4  this policy in any way?

5     **A.**    No, sir.

6     **Q.**    So just to clarify, for the record,

7  to clarify, you were at the hotel in Columbus,

8  Mississippi; is that correct?

9     **A.**    That is correct.

10     **Q.**    And this happened at approximately

11  what time?

12     **A.**    Between 8:00 and 9:00.

13     **Q.**    Between 8:00 and 9:00 p.m.?

14     **A.**    P.m.

15     **Q.**    And do you know approximately what

16  time you got off of work that day?

17     **A.**    No, I really can't.  I can't recall.

18     **Q.**    Hours prior to the incident or --

19     **A.**    We had been -- yeah, we had been off

20  several hours.

21     **Q.**    And why were you staying at the

22  hotel?

23     **A.**    For lodging.

24     **Q.**    And you stated that the per diem does

25  not cover your hotel?

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000529

Page 90

1      **A.**      No.  Per diem does not cover your

2  hotel expenses and meals.

3      **Q.**      What is per diem for?

4      **A.**      It's money you're paid for your job.

5  I mean, that money is not necessarily for -- I

6  mean, you could be staying at home.  I mean,

7  people draw per diem staying at home.

8      **Q.**      Is it to offset the cost of travel?

9      **A.**      I don't know that I would say that.

10  Like I said, I mean, how does it offset travel

11  when you're saying that and you've got people

12  that are at home every day driving CN trucks

13  back and forth home and drawing a per diem, and

14  so how does that -- how does that offset them?

15  How does it offset them?

16      **Q.**      And just for the record, I'm trying

17  to just clarify a few questions here just to

18  make it a little more clear when someone is

19  reviewing the transcript.

20      **A.**      Yes, sir.

21           **HEARING OFFICER:**  I think that's all

22  I have for questions at this time for Mr.

23  Melton.  Mr. McGuire, do you have any questions

24  for Mr. Melton at this time?

25  EXAMINATION BY MR. McGUIRE:

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                                          CN-Branch 000530

Page 91

1    **Q.**    Mr. Melton, this policy here starting

2  out on Exhibit 17, 18 and 19, CN Workplace

3  Violence Prevention Policy.  Are you familiar

4  with that policy?

5    **A.**    Not that I know of.  I've never, as

6  far as I know, been given that policy.

7    **Q.**    As far as you know, you've never been

8  given it, never seen it, never had classroom

9  training on it?

10    **A.**    No, sir.

11          **MR. McGUIRE:**  I have no further

12  questions, subject to recall.

13          **HEARING OFFICER:**  Okay.  Mr. Branch,

14  do you have any questions for Mr. Melton?

15          **MR. BRANCH:**  Yes, sir.  I don't have

16  a copy of Mr. Melton's statement.

17          **MR. MELTON:**  I'm a man of few words.

18  It wasn't very long.

19          **MR. BRANCH:**  I understand.

20  EXAMINATION BY MR. BRANCH:

21    **Q.**    Mr. Melton, on May 26, when you

22  stepped out of the hotel, did I not provoke you

23  to hit me?

24    **A.**    Well, as we were having a

25  conversation, we got closer to each other.

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000531

Page 92

1   Whether that's provoking or not, we were in each

2   other's face.

3       **Q.**     No, no, no.

4           **MR. McGUIRE:**  Just ask questions.

5   BY MR. BRANCH:

6       **Q.**     Okay.  So you're saying that I

7   provoked you to attack me?

8       **A.**     I'm saying we were in each other's

9   face.  I never said the word "provoke."  We were

10  just in each other's face.

11          **MR. BRANCH:**  No further questions.

12          **HEARING OFFICER:**  I have no further

13  questions.  No further questions from you,

14  Mr. McGuire?

15          **MR. McGUIRE:**  No further questions.

16          **HEARING OFFICER:**  I would like to

17  take a recess here just to kind of go through

18  everything and make sure we're not missing

19  something and see if there's anybody else that

20  needs to be recalled for further questioning.

21  The time is now 11:29.  I'm going to say

22  probably about 15 minutes here just to kind of

23  go through things.

24          **MR. MELTON:**  Do we get a chance to

25  make a closing statement?

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000532

Page 93

1        **HEARING OFFICER:** Yes. You'll still

2    have an opportunity for that.

3             (A short break was taken.)

4        **HEARING OFFICER:** The time is now

5    11:49. We're done with our recess there. And I

6    have recalled Mr. Chris Day back to the witness

7    stand.

8             CHRISTOPHER DAY,

9    EXAMINATION BY THE HEARING OFFICER:

10     **Q.** Mr. Day, just a couple questions for

11   you here. Mr. Day, what is per diem for?

12     **A.** Per diem is for any expenses for the

13   employees to accommodate while traveling for

14   hotel, meals and such.

15     **Q.** So does a per diem cover hotel

16   expense or is it to help offset the cost of it?

17     **A.** Well, it's supposed to cover the

18   expense, but I can't control what hotels charge,

19   you know, for where the guys stay at.

20     **Q.** And the altercation or the incident

21   in question on the investigation here happened

22   around between 8 and 9 o'clock p.m. I'm told.

23   Do you know approximately what time the shift

24   ended?

25     **A.** I don't know the proximate time, but

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000533

Page 94

1    it was between 1500 and 1530.

2              **HEARING OFFICER:**  Okay.  I guess the

3    purpose of my questioning here for you guys, so

4    you'll understand as well, just asking what the

5    company's position is on -- what the company's

6    witness' position is on whether or not they were

7    at work.

8              **MR. McGUIRE:**  I understand.

9    BY THE HEARING OFFICER:

10   **Q.**     So you would -- Mr. Day, you would

11   agree that the incident happened at the hotel

12   after hours; is that correct?

13   **A.**     That's right.

14   **Q.**     And the company's position is that

15   it's work related due to the per diem that they

16   are paid or --

17   **A.**     Yes.  CN gives money to help

18   accommodate CN employees when traveling, and

19   they are representing CN at the hotels that we

20   help accommodate them to pay for.

21             **HEARING OFFICER:**  And do you guys

22   have any questions for Mr. Day at this time?

23             **MR. McGUIRE:**  Yes, I do.

24   EXAMINATION BY MR. McGUIRE:

25   **Q.**     The per diem rule that's in the

EMM, INC. REPORTING   601.506.8261
EMMREPORTING@GMAIL.COM

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                      CN-Branch 000534

Page 95

1   collective bargaining agreement, does it require

2   the employee to stay in a motel?

3       **A.**     Honestly, I do not know.  I don't

4   believe I have read anything that requires an

5   employee that has to necessarily stay at a

6   hotel.

7       **Q.**     So an employee can stay at home, stay

8   in his car, and the company doesn't have a

9   problem with that as long as they're giving him

10  a per diem?

11      **A.**     To my understanding, yeah, they can

12  stay wherever they are -- they're a mobile

13  employee, so they're required to be -- report

14  for duty wherever we tell them to the following

15  day.

16      **Q.**     So with saying that, you stated

17  earlier -- I think -- I just want to clear it up

18  for the record.  The per diem is to offset the

19  cost.  Would you agree with that statement?

20      **A.**     Well, I wouldn't say offset, but with

21  the way prices are, then, yes, it would probably

22  help offset the cost.

23      **Q.**     He wanted the carrier's position on

24  the per diem.  I would like to know the

25  carrier's position on an employee getting a per

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                          CN-Branch 000535

Page 96

1    diem who's staying at home who enters into a

2    verbal conflict with his child.  Would that be a

3    violation of the CN policy?

4        **A.**    I don't believe so because they're at

5    their own residence.

6            **MR. McGUIRE:**  Thank you.  No further

7    questions, subject to recall.

8            **HEARING OFFICER:**  Mr. Melton, do you

9    have any further questions for Mr. Day?

10           **MR. MELTON:**  No, sir.

11           **HEARING OFFICER:**  Mr. Branch, do you

12   have any further questions for Mr. Day?

13           **MR. BRANCH:**  No, sir.

14           **HEARING OFFICER:**  I have no further

15   -- there being no further questions for Mr. Day,

16   I'm going to again release Mr. Day subject to

17   recall.  Do not discuss this case outside of the

18   investigation.  And next I am going to recall

19   Mr. Honeysucker for a couple of questions.

20           (Mr. Day leaves room.)

21           EARL HONEYSUCKER,

22   EXAMINATION BY THE HEARING OFFICER:

23       **Q.**    Mr. Honeysucker, I just had one or

24   two followup questions here.  In your statement

25   and in your testimony, you testified that -- it

EMM, INC. REPORTING  601.506.8261
EMMREPORTING@GMAIL.COM

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000536

Page 97

1    says, "Todd charged Robert and pushed and hit

2    him twice and then they exchanged a couple licks

3    back and forth and fell on the ground."  Then

4    you stepped in to help break it up.  Did you

5    witness Mr. Melton strike Mr. Branch?

6        **A.**    Yes.

7        **Q.**    And did you witness -- did Mr. Branch

8    strike Mr. Melton?

9        **A.**    Yes.

10           **HEARING OFFICER:**  That's all the

11   questions I have at this time.  Mr. McGuire, do

12   you have any further questions for Mr.

13   Honeysucker?

14           **MR. McGUIRE:**  Judging from his

15   statement -- let me think for a minute here.

16   EXAMINATION BY MR. McGUIRE:

17       **Q.**    Who struck the first blow?

18       **A.**    Todd hit Mr. Branch.

19           **MR. McGUIRE:**  No further questions,

20   subject to recall.

21           **HEARING OFFICER:**  Mr. Branch, do you

22   have any further questions for Mr. Honeysucker?

23           **MR. BRANCH:**  Yes.

24   EXAMINATION BY MR. BRANCH:

25       **Q.**    Mr. Honeysucker, were I in Mr. Todd's

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                            CN-Branch 000537

Page 98

1    face or did Mr. Todd rush you?

2        **A.**     He approached you and rushed you.

3            **MR. BRANCH:**  Thank you.  No further

4    questions.

5            **HEARING OFFICER:**  Mr. Melton, do you

6    have any further questions?

7            **MR. MELTON:**  Yes.

8    EXAMINATION BY MR. MELTON:

9        **Q.**     The statement you just made, what's

10   the difference between approach and rush?

11       **A.**     Okay.  Well, when you come out --

12       **Q.**     How do you do an approach and a rush?

13       **A.**     Okay.  When you come out, you was

14   talking and you were slowly walking, but the

15   closer you got, he lunged at him.  That's why I

16   said he approached him and he rushed him.

17           **MR. MELTON:**  That's all I got.

18           **HEARING OFFICER:**  Okay.  Any --

19           **MR. McGUIRE:**  I got one more followup

20   question.

21           **HEARING OFFICER:**  Go ahead.

22   EXAMINATION BY MR. McGUIRE:

23       **Q.**     Are you familiar with the CN

24   Workplace Violence Prevention Policy dated 2014?

25       **A.**     I have looked over it before.  I

EMM, INC. REPORTING   601.506.8261
EMMREPORTING@GMAIL.COM

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                                           CN-Branch 000538

Page 99

1    haven't read it.

2        Q.    Where did you look it over at?

3        A.    I had been to an investigation

4    before.  But I'm not sure if they had that, but

5    I have seen it before.

6        Q.    Do you recall where you seen it at?

7    Was you provided any training on it?

8        A.    No, not as I know of.  I don't think

9    anybody trained me on it.

10       Q.    How long have you been here?

11       A.    Eight years.  Over eight years.

12       **MR. McGUIRE:**  Okay.  Thank you.  No

13   further questions, subject to recall.

14       **HEARING OFFICER:**  Okay.  There being

15   no further questions for Mr. Honeysucker at this

16   time, I'll release Mr. Honeysucker subject to

17   recall.  If you could, send Ty Peterson in.

18           (Mr. Honeysucker leaves the room.)

19               TY PETERSON,

20   EXAMINATION BY THE HEARING OFFICER:

21       Q.    We now have Mr. Ty Peterson on the

22   witness stand again.  Mr. Peterson, in your

23   statement, you stated that after the verbal

24   altercation, Todd Melton went after Branch and

25   struck him with his fist which resulted in both

EMM, INC. REPORTING  601.506.8261
EMMREPORTING@GMAIL.COM

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                                    CN-Branch 000539

Page 100

1    of them fighting with each other.  I guess the

2    two questions I have is:  Did you see Mr. Melton

3    strike Mr. Branch?

4        **A.**    After words were said, he went

5    towards him.  I didn't physically see -- I mean,

6    I didn't see him hit his face.  I mean, I know

7    that's what he was going for, but I kept my

8    distance.  So, yeah.

9        **Q.**    And did you -- your statement says

10   both of them were fighting with each other.  Did

11   Mr. Branch --

12       **A.**    What I saw is they both went to the

13   ground.  I stepped back.  I kept my distance.

14   And everybody else pretty much was around them,

15   so I really didn't see anything after they went

16   to the ground.

17       **Q.**    And about how long do you think the

18   physical altercation lasted?

19       **A.**    Not long.  Ten seconds.  Fifteen

20   maybe.

21       **HEARING OFFICER:**  Okay.  That's all

22   the questions I have for Mr. Peterson.

23   Mr. McGuire, any further questions?

24       **MR. McGUIRE:**  Yes, I have a couple.

25   EXAMINATION BY MR. McGUIRE:

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000540

Page 101

1    **Q.**    Did you witness the incident from the

2  beginning to end?

3    **A.**    Yes.  I mean, it didn't last very

4  long.

5    **Q.**    Can you elaborate, explain from

6  beginning to the end?  Sometimes these

7  statements, they get a little blurry.

8    **A.**    What I saw, Todd came out of the

9  door, words were mentioned, like my statement

10  said, and he responded to them, and right after

11  that, it started.  And --

12    **Q.**    Who threw the first punch?

13    **A.**    That would have been Todd.

14    **Q.**    One more question for you.  Are you

15  familiar with this CN Workplace Violence

16  Prevention Policy?

17    **A.**    If I had, I haven't seen it in a

18  while.

19    **Q.**    So you don't recall ever being

20  trained on this or made to sign for this policy

21  or anything like that?

22    **A.**    No.

23    **Q.**    Would you consider the motel that you

24  stay at company property?

25    **A.**    Considering we don't even get enough

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000541

Page 102

1    money to pay for the hotel, I don't think so.

2        **Q.**    How long have you been here, sir?

3        **A.**    Three years.

4            **MR. McGUIRE:**  No further questions,

5    subject to recall.

6            **HEARING OFFICER:**  Mr. Melton, do you

7    have any further questions for Mr. Peterson?

8            **MR. MELTON:**  No, sir.

9            **HEARING OFFICER:**  Mr. Branch, any

10   further questions?

11           **MR. BRANCH:**  I have got one question.

12   EXAMINATION BY MR. BRANCH:

13       **Q.**    Peterson, did you see me rush Mr.

14   Melton first?

15       **A.**    Did I see you hit him first?

16       **Q.**    Did you see me rush towards him?

17       **A.**    No, it was the other way around.

18           **MR. BRANCH:**  Thank you.  No further

19   questions.

20           **HEARING OFFICER:**  Okay.  No further

21   questions.

22           **MR. McGUIRE:**  No further questions.

23           **HEARING OFFICER:**  There being no

24   further questions for Mr. Peterson at this time,

25   I'm going to release Mr. Peterson subject to

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000542

Page 103

1    recall, so sequester, and you can't discuss this

2    case outside of the room.

3                (Mr. Peterson leaves the room.)

4                **HEARING OFFICER:** And I'm going to

5    grab Mr. Day again.

6                CHRISTOPHER DAY,

7    EXAMINATION BY THE HEARING OFFICER:

8        **Q.**     Mr. Day, I've just got a couple

9    questions about the Workplace Violence

10   Prevention Policy. I don't recall what you said

11   earlier in your testimony, but are CN employees

12   trained on the CN Work Violence Prevention

13   Policy?

14       **A.**     That's correct. There's -- in My360,

15   every employee is required to take certain, more

16   or less, online courses, and every employee --

17   as far as I know, this is one of them that we're

18   supposed to be taking, code of business conduct

19   and Workplace Violence Prevention, I believe

20   these are two of the courses in My360 that

21   employees are required to take every so often.

22       **Q.**     Do you know when the last time that

23   that was required?

24       **A.**     I do not. Everyone, as far as I know

25   and from what I've been told, everyone is

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

1 responsible for -- they all get e-mails. I

2 don't know if it's through their personal or

3 whatever e-mails they get through the company to

4 let them know they've got so long to take these

5 courses.

6     **Q.**     Okay.  But this isn't something

7 that's covered in a rules class.  It's online

8 training; is that correct?

9     **A.**     That I'm unsure of.  I would have to

10 talk to a trainer.  This might be something,

11 more or less, that they bring up in the

12 beginning.  Maybe from time to time, depending

13 on who's teaching the class, it would all depend

14 if they implement this into the class not.  I

15 know every trainer is a little bit different.

16          **HEARING OFFICER:**  I think that's all

17 the questions I have.

18          **MR. McGUIRE:**  No questions, subject

19 to recall.

20          **HEARING OFFICER:**  Mr. Branch?

21     **MR. BRANCH:**  No questions.

22          **HEARING OFFICER:**  Mr. Melton?

23     **MR. MELTON:**  No, sir.

24          **HEARING OFFICER:**  Release Mr. Day

25 subject to recall and you're still sequestered.

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000544

Page 105

1          **MR. McGUIRE:**  I would like to recall

2  Mr. Melton, if that's okay, to ask just a couple

3  of preliminary questions to both of them.

4          **HEARING OFFICER:**  Okay.

5              TODD MELTON,

6  EXAMINATION BY MR. McGUIRE:

7      **Q.**    Explain to me what Workplace 360 is.

8  Do you know what that is?

9      **A.**    No idea.  I don't have a work

10  computer and they changed up the e-mails where

11  you can't hardly get on them and I can't get on

12  them on my phone.

13     **Q.**    Okay.  So you have no clue what the

14  360 is?  And you have no company computer to get

15  this training?

16     **A.**    No, sir.

17     **Q.**    Nobody has ever approached you during

18  work hours and say, hey, you need to take this

19  training?

20     **A.**    No, sir.  I've been approached one

21  time, I can't remember how many years ago it's

22  been, to take training online with an OTS or

23  something, but that's --

24     **Q.**    When you did that, did the company

25  provide you a computer?

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                          CN-Branch 000545

Page 106

1      **A.**      They made -- we went to the depot,

2    the whole section gang went to the depot and

3    took the OT -- I can't remember if it's OTS.  It

4    was one of them.  That's been a year and a half.

5    It's been a while back.

6           **MR. McGUIRE:**  No further questions,

7    subject to recall.

8           **HEARING OFFICER:**  I have no further

9    questions.

10          **MR. McGUIRE:**  I would like to recall

11   Mr. Branch.

12          **HEARING OFFICER:**  I'll release Mr.

13   Melton, subject to recall, and we'll recall Mr.

14   Branch for further questioning.

15                ROBERT BRANCH,

16   EXAMINATION BY MR. McGUIRE:

17     **Q.**      Mr. Branch, I'm going to ask you the

18   same question.  Do you know what CN360 is or

19   what he was talking about, the supervisor?

20     **A.**      Well, I know what CN360 is.  It's got

21   a lot of, what you'll say, classes or whatever

22   because I had to go online back here when we was

23   down in New Orleans, they had us go through that

24   -- something dealing with -- some kind of class.

25   I can't really recall, but I think I did go on

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000546

Page 107

1    360, but the company had to advise me, sent out

2    an e-mail, and the supervisor told the foreman

3    to make sure we fill it out because it's

4    mandatory, but they haven't gave me a mandatory

5    Workplace Violence Policy.  Do you understand?

6    I haven't had that mandatory.

7        **Q.**    So CN approached you and told you

8    that you needed to go online and take some

9    classes off of this CN360?

10       **A.**    Right.

11       **Q.**    Did you perform that on company time?

12       **A.**    Yes, we did.

13       **Q.**    With a company computer?

14       **A.**    Yes, we did.

15       **MR. McGUIRE:**  All right.  Thank you.

16   No further questions, subject to recall.

17       **HEARING OFFICER:**  Okay.  I have no

18   further questions for Mr. Branch at this time.

19   I release Mr. Branch subject to recall.  I think

20   I'm going to need another recess here, be a

21   quick one, maybe five minutes here just to

22   gather my thoughts, make sure I'm not missing

23   something.  The time is now 12:10.  Let's take a

24   10-minute break here.

25           (A short break was taken.)

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                      CN-Branch 000547

Page 108

1        **HEARING OFFICER:**  The time is 12:15,

2   and we're back on the record after a recess.  We

3   have Mr. Day back on the witness stand.

4              CHRISTOPHER DAY,

5   EXAMINATION BY THE HEARING OFFICER:

6     **Q.**     Mr. Day, in the Notice of

7   Investigation, it states that a copy of Mr.

8   Branch's and Mr. Melton's personal work record

9   may be reviewed at this investigation.  Do you

10  have a copy of their personal work record?

11    **A.**     I do not.  The website could not pull

12  it up.

13             **HEARING OFFICER:**  I think that's the

14  only question I had there.  There's nothing to

15  enter in.  That's all I needed from you.  Any

16  further questions from anyone else before I

17  release him?

18             **MR. McGUIRE:**  No further questions.

19             **HEARING OFFICER:**  Okay.  Mr. Day,

20  you're released, subject to recall.

21             (Mr. Day leaves room.)

22             Okay.  If there are no further

23  questions for anyone at this investigation, it

24  is my intention to start closing out the

25  investigation.

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000548

Page 109

1          Mr. Branch, is there anyone who has

2    testified at this investigation that you would

3    like recalled for further questions?

4          **MR. BRANCH:**  No, sir.

5          **HEARING OFFICER:**  And Mr. Melton?

6          **MR. MELTON:**  No, sir.

7          **HEARING OFFICER:**  Okay.  Mr. McGuire,

8    is there anyone who has testified at this

9    investigation that you would like recalled for

10   further questions?

11         **MR. McGUIRE:**  No, sir.

12         **HEARING OFFICER:**  And, again, do you

13   guys need a recess at all before we proceed to

14   close out?

15         **MR. McGUIRE:**  No, sir, we're ready

16   with our closing statements.

17         **HEARING OFFICER:**  Okay.  So for

18   closing questions, I'll go with you first, Mr.

19   Branch.  Mr. Branch, is there anything that you

20   wish to state in regard to the incident that has

21   not already been brought out?

22         **MR. BRANCH:**  Only thing I would like

23   to say is that before this -- before the

24   incident happened, I didn't have anything

25   against Mr. Melton.  I feel like that we're two

EMM, INC. REPORTING  601.506.8261
EMMREPORTING@GMAIL.COM

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                          CN-Branch 000549

Page 110

1    grown adults.  I mean, we should conduct ourself

2    in a professional manner not only for me and

3    him, but for our peers, our supervisors, upper

4    management.

5                I am a deacon in the church.  I try

6    to carry myself in a respectful way at all

7    times.  I try to not involve myself in

8    situations like this because I've never been to

9    -- this is my first being to an investigation.

10   I see how it go.  I see how things can be

11   against you even when you in the right.

12               But I got a lot of respect for Mr.

13   Melton and I always have, and I'm not here to

14   try to deter his demeanor.  I just want to see

15   we as people live in this world, love one

16   another, respect one another, and treat one

17   another right.  That's it.

18               **HEARING OFFICER:**  Do you admit any

19   responsibility in regard to the incident?

20               **MR. BRANCH:**  If telling Mr. Melton

21   "leave the situation alone," if that cause

22   harmful -- you know, if I knew he was going to

23   escalate for me and him to get into any kind of

24   confrontation, I would have never even opened my

25   mouth because I'm the type of person to try to

Confidential                                                  CN-Branch 000550

Page 111

1    deescalate a situation, not enhance it.

2              **HEARING OFFICER:**  And are you

3    satisfied with the manner in which this

4    investigation has been conducted?

5              **MR. BRANCH:**  Yes, sir.

6              **HEARING OFFICER:**  Next, Mr. Melton,

7    is there anything that you wish to state in

8    regard to the incident that has not already been

9    brought out?

10             **MR. MELTON:**  Everything has been

11   brought out.  No, sir.

12             **HEARING OFFICER:**  Do you admit any

13   responsibility in regard to the incident?

14             **MR. MELTON:**  Yes, sir.

15             **HEARING OFFICER:**  Do you wish to

16   expand on that?

17             **MR. MELTON:**  Things just -- I mean,

18   certain things get out of hand sometimes.

19   People do things in anger when they're upset,

20   whatever may caused it or not.  I'm sorry for

21   what happened and the way things did turn out.

22   I have no trouble -- me and Mr. Branch have no

23   hard feelings toward each other, and, you know,

24   I don't want to see him lose his job and I

25   surely don't want to lose mine.  I need my job.

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000551

Page 112

1    I have things that happened.  I can honestly say

2    that I hate it happened, and I can honestly say

3    that if they do give me an opportunity to come

4    back, it will never, ever happen again.

5            **HEARING OFFICER:**  Okay.  Are you

6    satisfied with the manner in which this

7    investigation has been conducted?

8            **MR. MELTON:**  Yes, sir.

9            **HEARING OFFICER:**  Okay.  Mr. McGuire,

10   do you have --

11           **MR. McGUIRE:**  I'm considering these

12   are closing statements, correct?

13           **HEARING OFFICER:**  Yes.

14           **MR. McGUIRE:**  Yeah, the organization

15   will stand by the record.  I think we've got

16   enough in the record to show that to the

17   carrier's own policies, statements, information,

18   that this is not considered a workplace.  They

19   were at a motel.  That's covered.  Your per diem

20   is to be used to help offset the cost of gas,

21   fuel, meals, and lodging.  It's not you have to

22   stay there.  You have to eat.  It's to just help

23   you compensate.  It's something that's

24   collectively bargained for to help offset the

25   cost.

EMM, INC. REPORTING  601.506.8261
EMMREPORTING@GMAIL.COM

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                      CN-Branch 000552

Page 113

1            We feel that once they're off their

2     shift, they're grown men, they go wherever they

3     went to, and the carrier has no jurisdiction to

4     reach out into someone's off time, whether it be

5     at a hotel, a house or ditch or car and control

6     what these gentlemen do.

7            You've got two very good long-term

8     employees here who I can imagine are some of the

9     greatest workers you've got.  I mean, they've

10    got nothing on their work record that would

11    dispute otherwise.  Everyone we've talked to

12    respects both these employees.

13           I think the record shows that an

14    altercation happened.  It happened off property,

15    off company time.  In the heat of the moment,

16    things happen, and I don't think anyone should

17    lose their job over this incident.

18           They both apologized to each other.

19    I sincerely feel that it's sincere.  If that's

20    -- whatever.  The point is to lose your job over

21    a heated moment or to be disciplined so harshly

22    that you can't survive, I don't think that is

23    the cure here.

24           I think we've proven through

25    testimony that the carrier may hold a little bit

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                                CN-Branch 000553

1   of liability here with their training policies.

2   Our men are not trained on this stuff.  I think

3   if we had more awareness of how important

4   violence in the workplace can be -- I mean, look

5   around you in the news and how it escalates and

6   it tends -- you know, the damage it does to

7   people.

8              This was, in my opinion, a squabble

9   between two grown men.  It should have never

10  escalated to this point.  They handled it like

11  men by apologizing to each other.  They didn't

12  violate any of these rules.  They reported it

13  like they were supposed to and they reported it

14  in a timely fashion, even though he says it's

15  not -- the supervisor says it's not a timely

16  fashion.  They reported it the next day.  I

17  think there's evidence to that in statements,

18  and if you would examine the other supervisor

19  who took it, he'll probably corroborate your

20  story.

21             The point is, they didn't violate any

22  rules.  They got into a little squabble off

23  property, off time, and I don't think they

24  should be terminated for something like this for

25  whoever is reviewing the record.

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential

CN-Branch 000554

Page 115

1          I would like to outline, again, the

2    objections that the organization had with the

3    time limits.  We feel that that collective

4    bargaining agreement is the Bible, and if the

5    carrier cannot hold the investigation within a

6    timely fashion, then that's a direct violation

7    of contract which should moot this whole

8    investigation completely.  Whoever is reviewing

9    that, I hope they understand that, and if not,

10   we'll have an arbitrator decide on that.  But in

11   the interim, I can't express enough, the two

12   gentlemen come here -- this is very hard to do,

13   to sit here in this room and talk like this and

14   tell what happened, and these gentlemen were

15   very diligent, they were very polite, they told

16   the truth.  They weren't trying to hide nothing,

17   and I hope they take that into consideration.

18   Thank you.

19          **MR. MELTON:**  Can I make one more

20   statement?  I mean, in the closing --

21          **HEARING OFFICER:**  This is Mr. Melton

22   for the record.

23          **MR. MELTON:**  In the closing I just

24   want to point out I've been on the railroad

25   going on 22 years, and I have never had any

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                                     CN-Branch 000555

Page 116

1    altercation with anyone I've worked with or

2    worked for.  And I want my work record to stand,

3    you know.

4          I don't want to lose my job.  You

5    know, I hope they will see the sincerity in

6    realizing that what we did, even though we were

7    off company time and property, it was still two

8    men who had a little altercation that should

9    have never progressed into that, and for that, I

10   am sincerely sorry.  Thank you.

11          **HEARING OFFICER:**  Mr. Branch,

12   anything more before we close out?

13          **MR. BRANCH:**  I'm finished.

14          **HEARING OFFICER:**  Okay.  There being

15   no further questions or testimony to be entered

16   into the record, this investigation is closed at

17   12:25 on June 7, 2022.

18

19

20

21

22

23

24

25

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                    CN-Branch 000556

Page 117

1          CERTIFICATE OF COURT REPORTER

2          I, THERESA S. LUMLEY, C.S.R., Court

3    Reporter and Notary Public, in and for the County

4    of Copiah, State of Mississippi, hereby certify

5    that the foregoing pages contain a true and

6    correct transcript of the testimony of the

7    witnesses, as taken by me at the time and place

8    heretofore stated, and later reduced to

9    typewritten form by computer-aided transcription

10   under the supervision, to the best of my skill

11   and ability.

12          I further certify that I am not in the

13   employ, or related to, any counsel or party in

14   this matter, and have no interest, monetary or

15   otherwise, in the final outcome of the

16   proceedings.

17          Witness my signature and seal, this the

18   _____ day of _____, 2022.

19

20          _____

21               Theresa S. Lumley, CSR #1231

22

23

24

25

EMM, INC. REPORTING   601.506.8261
EMMREPORTING@GMAIL.COM

Exhibit E: Transcript of IC's June 7, 2022, investigation hearing

Confidential                                          CN-Branch 000557

# Exhibit F

**Dylan Boutte's handwritten statement**

On May 26th 2022 a couple coworkers & I were grilling outside the hotel when I witnessed Todd Melton come outside. Todd immediately began talking about a situation that seemed to have happened a month prior to May 26th 2022. Robert Branch (one of my coworkers present at the grill) had asked Todd Melton to leave the situation alone & reminded him that whoever the conversation was about wasn't there, & to leave it in the past. Todd Melton became aggressive as I witnessed him shove Robert Branch which then led to the two men wrestling on the ground. The two men were quickly broken apart & calmed down by the co-workers present.

Dylan Boutte
05-31-2022

Exhibit F: Dylan Boutte's handwritten

EXHIBIT
6

# Exhibit G

**Earl Honeysucker's handwritten statement**

Earl Honeysucker #169428
On may 26.2022 we were outside
the hotel just having a goodtime
when Todd melton come out of the hotel
and started yelling im From lil Egypt
where we bury mf! and ima bury Sweeny.
Robert Bronch told him. to leave that
alone. And Todd asked him so you backing
Sweeny and Robert Bronch said no just
leave that alone. And Todd Charged Robert
and pushed and hitt him twice and
Then they exchanged a couple licks back and
forth and Fell on the ground then I
Earl Honeysucker stepped in to help break it
up!

EXHIBIT

10

Exhibit G: Earl Honeysucker's handwritten statement

# Exhibit H

**Ty Peterson's handwritten statement**

On Thursday the 26th of May me and a group of guys was outside of the hotel talking about Work when Todd Melton Walked out the door intoxicated and Confronted Robert Branch about a sore subject that happened in the past and Robert Branch responded "Leave that Subject alone" and after that Todd Melton went after Branch and Struck him with his fist which resulted in both of them fighting With each other. After a brief amount of time it was broken up and Separated.

Ty Peterson
5/31/22

*[signature: Ty P]*

EXHIBIT
11

Exhibit H: Ty Peterson's handwritten statement

Confidential

# Exhibit I

**Walker Yuille's handwritten statement**

Thursday on the 26th of May me and some of my coworkers were at cookers at the hotel in Columbia, MS. One of our sups come out and engaged into an argument with Robert Branch. Todd Melton approached Robert about something that had happened in the past then Robert told him to leave that alone. Thats when Todd pushed him and hit him in the face. They immediatly went to the ground and were broke apart.

Walker Yuille

5-31-22

EXHIBIT

12

CN-Branch 000381

# Exhibit J

**Al B. Thomas's handwritten
statement**

On Thursday May 26 Todd Melton
came around the corner and was talking
And made a statement about Roosevelt Swinney
And what happen at the union meeting
and Robert Branch said Todd leave
that Union Mess alone so Todd walk
up to Robert Earl Branch shoulved him
He shoulved him Back and Todd drawed
back and Hit Robert and Robert fell
and Todd hit him again and somehow
they both end up on the ground and we
Broke them up And Earl Honeysucker
pulled Todd away And Todd went
one way and Robert Earl went another

Al B. Thomas
Al B Thomas
148814
5-31-22

**EXHIBIT**

13

Exhibit J: Al B. Thomas's handwritten statement

Confidential