IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

**ROBERT BRANCH**                                                                    **PLAINTIFF**

**v.**                                        **CIVIL ACTION NO: 4:23-cv-00217-MPM-JMV**

**ILLINOIS CENTRAL RAILROAD COMPANY**                    **DEFENDANT**

**ORDER**

This cause comes before the court on the motion of defendant Illinois Central Railroad Company ("ICRC") for summary judgment, pursuant to Fed. R. Civ. P. 56. Plaintiff Robert Branch has filed his own motion for partial summary judgment, seeking for this court to rule in his favor with respect to his retaliation claim and as to certain affirmative defenses raised by defendant. This court, having considered the memoranda and submissions of the parties, is prepared to rule.

This is a Title VII race discrimination and retaliation action arising out of plaintiff's June 22, 2022 firing from his position as a trackman at ICRC. The parties agree that this firing occurred after plaintiff, an African-American, was involved in a fight with a white co-worker, Tracy Todd Melton. Defendant concedes in its briefing that Melton started the fight by making an unprovoked attack on plaintiff, but it contends that, at some point in the fight, plaintiff crossed the line from simply defending himself to becoming the aggressor. [Brief at 13]. For his part, plaintiff contends that the real reason for his firing was racial discrimination and/or retaliation for having reported an incident of racial harassment and violence by a co-worker. In support of that argument, plaintiff notes that the fight started after his disagreement with Melton over a prior

1

incident in which Melton had allegedly attacked another African-American co-worker after calling him "boy." [Plaintiff's written report to management at 1]. Plaintiff claims that Melton similarly made racist statements to him in starting their fight, namely by proclaiming that "I'm from Little Egypt plantation, where we kill and bury motherfuckers." [Complaint at 3]. Plaintiff contends that Melton's "plantation" remark was a race-related comment on his part, a contention which defendant denies.

Defendant has presently moved for summary judgment, arguing that there is no genuine issue of fact with regard to its potential liability in this case and that it is entitled to judgment as a matter of law. As usual when applying Title VII's provisions on summary judgment, this court will do so within the context of the *McDonnel-Douglas* burden-shifting framework. Under Title VII it is "an unlawful employment practice for an employer ... to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 200e-2(a)(1). The plaintiff can prove discrimination through either direct or circumstantial evidence. *Salinas v. AT&T Corp.*, 314 F. App'x 696, 698 (5th Cir. 2009). If the plaintiff can prove Title VII discrimination only through circumstantial evidence, then the *McDonnell Douglas* burden-shifting framework is deployed. *Id.* (*citing McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 892 (1973)). Under *McDonnell Douglas*, the plaintiff has a *prima facie* case if she demonstrates that she "(1) is a member of a protected class; (2) was qualified for [her] position; (3) was subject to an adverse employment action; and (4) was replaced by someone outside the protected class, or in the case of disparate treatment, that others similarly situated were treated more favorably." *Id.* (quoting *Okeye v. Univ. of Tex. Houston Health Sci. Ctr.,* 245 F.3d 507, 612-13 (5th Cir. 2001)).

2

Under the *McDonnell Douglas* framework, once the plaintiff has established a prima facie case of discrimination, the burden shifts to the defendant-employer to "articulate a legitimate, non-discriminatory reason for its action." *Auguster v. Vermilion Parish Sch. Bd.,* 249 F.3d 400, 402 (5th Cir. 2001) (citing *Shakelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 (5th Cir. 1999)). In the final shift of the *McDonnell Douglas* framework, after the employer demonstrates evidence of legitimate reasons for termination, the plaintiff-employee is afforded the "opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons but were a pretext for discrimination." *Tex. Dept. of Cmty. Affs. v. Burdine,* 450 U.S. 248, 253 (1981). The question is not whether the employer made a reasonable decision, but rather "whether, viewing all of the evidence in a light most favorable to the plaintiff, a reasonable factfinder could infer discrimination." *Owens v. Circassia Pharms., Inc*., 33 F.4th 814, 826 (5th Cir. 2022).

Title VII makes it unlawful for "an employer to discriminate against any of its employees ... because [the employee] has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation using circumstantial evidence, the plaintiff must show that "(1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action." *Saketkoo v. Administrators of Tulane Educ. Fund,* 31 F.4th 990, 1000 (5th Cir. 2022). With these standards in mind, this court will proceed to a discussion of defendant's summary judgment motion.

As with any summary judgment motion, this court must view the facts in the light most favorable to the plaintiff, and, as such, it must show a certain degree of deference to plaintiff's version of the facts of this case in ruling upon this motion. The applicable standard of review aside, this court notes that this case involves an additional factor which, it believes, militates in favor of granting plaintiff certain benefits of the doubt regarding whether he is able to meet his burden of proof. In particular, this court notes that, in considering the charge of discrimination and retaliation filed by plaintiff, the EEOC, through its Area Director Eszean McDuffey, issued a right to sue letter in which it concluded that "there is reasonable cause to believe that [plaintiff] was discriminated against in violation of Title VII…because of his race, African-American, and in retaliation." [EEOC Letter of Determination at 2].

It is, in this court's experience, somewhat unusual for the EEOC to issue a Letter of Determination in which it expressly endorses the plaintiff's theory of the case in such a manner, and, while such a determination is clearly not binding upon this court, defendant offers no authority suggesting that this court is required to ignore it either. This court notes that the EEOC's determination closely tracks plaintiff's own allegations regarding the fight which led to his termination, and, ultimately, this lawsuit. In his brief, plaintiff describes the confrontation which gave rise to the instant lawsuit as follows:

> On May 26, 2022, while outside a company-provided hotel, the Magnolia Hotel in Columbus, Plaintiff was accosted by Machine Operator Tracy "Todd" Melton (white male), who was apparently intoxicated. [Complaint at 2]. Without any provocation whatsoever, Mr. Melton began by cursing at Plaintiff, then he used racially charged and threatening language (i.e., Mr. Melton stated, "I'm from Little Egypt plantation, where we kill and bury motherfuckers. I'm going to kill …"), then finally Mr. Melton began physically assaulting Plaintiff. *Id.* at p. 3.
> As the situation began, Plaintiff initially attempted to de-escalate Mr. Melton and to calm him down, yet he was unsuccessful. *Id.* Only after Mr. Melton had pushed Plaintiff to the ground, and then punched Plaintiff twice in the face and knocked him to the ground did Plaintiff strike back, to defend himself. *Id.*

4

[Brief at 2]. In describing defendant's reaction to this fight, plaintiff writes that:

> On May 27, 2022, Plaintiff reported the incident, including the racially discriminatory and harassing comments, to Supervisor Jerome Chance Garner (white male). *Id.* On May 28, 2022, Plaintiff reached out to Mr. Garner, but Mr. Garner said he needed to talk to Mr. Melton before any decision was made about how to proceed. *Id.* On May 29, 2022, Plaintiff texted Mr. Garner and stated that he was going to draft an incident report and he planned to report the matter further. *Id.* On May 30, 2022, Mr. Day called Plaintiff and instructed him to draft an incident report and email it to him. *Id.*
> On May 31, 2022, Union Vice Chairman Nick Manojlovic (white male) called Plaintiff and badgered him about escalating the incident and tried to dissuade him from escalating it further. *Id.* Later that same day, May 31, 2022, Production Manager Christopher Day phoned Plaintiff and stated, "I had Nick to call you to get you to drop the matter", i.e., not file the incident report. *Id.* at p. 4.
> On June 2, 2022, Mr. Garner informed Plaintiff that he was being placed on administrative leave pending an investigation into the matter. *Id.* Subsequently, an investigation was conducted. *Id.* On June 24, 2022, Plaintiff was informed that he was terminated, allegedly for violation of ICRC's Workplace Violence Prevention Policy. *Id.*

[Brief at 2-3].

In setting forth its own evaluation of the facts, the EEOC, through its Area Director McDuffey, wrote that:

> It is undisputed [that] the Charging Party and his Caucasian co-worker were terminated. It is also undisputed that witnesses to the incident agree that the co-worker, and not the Charging Party, was the aggressor in the situation, the Charging Party tried to calm the attacker, and only struck back after he was verbally and physically punched and knocked to the ground. The evidence shows that based on the co-worker's prior history, the Respondent was aware of his disruptive, alcoholic, and abusive conduct, which he had recently exhibited during a union meeting.
> During the instant incident, the co-worker, while intoxicated and unprovoked, hurled murderous threats laced with profanity and levied racially charged comments against another African American co-worker before pouncing upon and physically attacking the Charging Party. A complete opposite, the Charging Party had no prior adverse work incidents during his fourteen years of employment, did nothing to provoke his Caucasian co-worker during this attack, tried to deescalate the situation, and only struck by in defense and protection of himself.
> Finally, the evidence shows the Charging Party correctly reported the incident – including the racially abusive threats and comments; but Respondent's management official sought to dissuade him, instead seeking to "squash" the matter. When the Charging Party persisted, an investigation was conducted, and he was ultimately discharged because of his race and in retaliation without regard to Respondent's policy exemption of justified self-defense and his admirable work history.

>Accordingly, I have concluded that there is reasonable cause to believe that Charging Party was discriminated against in violation of Title VII of the Civil Rights Act of 1964, as amended, because of his race, African-American, and in retaliation.

[EEOC Letter of Determination at 2].

For its part, this court agrees with the EEOC that the basic facts of this case, considered in the light most favorable to plaintiff, are more than sufficient to create triable jury issues regarding defendant's liability under Title VII, in particular that statute's retaliation provisions. In so stating, this court notes its agreement with the EEOC that firing a long-time employee with an unblemished work record for defending himself in a fight does not appear to be a reasonable punishment for any offense he might arguably have committed. In its brief, defendant concedes that Melton started the fight, but it contends that, at some point in the fight, plaintiff became the aggressor. Specifically, defendant argues that:

>[W]hile it was clear to the DRP that Branch did not start the fight, it was equally clear that at a certain point in the fight, Branch became the aggressor and was in a position of offense or attack. As Spears further explained:
>>One of the big things is that Branch admits that, "Yes, I swung and I engaged. I punched him. I touched him." Another part is they're on the ground where someone had to pull them apart. Had the employees that were around at the time not pulled them apart, they could have continued with the fight. There didn't seem that either employee was willing to just take a breath and say enough. *** For me, what I did not see, I did not see any form of retreat or trying to get out of the way or take a defensive posture. Therefore, he was actively engaged.

[Brief at 12].

This court will leave it to jurors to evaluate the logic behind defendant's argument, but it suspects that they will look with some skepticism upon the notion that an individual who is physically attacked by a co-worker in an unprovoked manner may somehow be transformed into the aggressor merely because he became "actively engaged" in the fight once it started. Indeed, this court frankly suspects that most Mississippi jurors would conclude that an individual who physically attacks someone else in an unprovoked manner has "earned a butt-whipping" and that

6

the victim in the attack should not be punished for providing it to him. This court therefore suspects that jurors will conclude that defendant's decision to fire plaintiff for being "actively engaged" in a fight which was forced upon him was not a reasonable one.

Clearly, when the employment action taken by a company in response to an alleged offense does not appear to be a reasonable one, this inherently makes it more plausible to argue that some unlawful motivation was the real reason for its action. This court does note its belief that plaintiff's retaliation claim appears stronger than his discrimination claim since, to state the obvious, defendant was well aware that Branch was an African-American when it hired him and retained him as an employee for fourteen years. There is, however, a close temporal proximity between plaintiff's firing and his reporting the attack which he allegedly suffered from a white co-worker, which renders his retaliation clause a stronger one in this court's eyes.

This court further agrees with the EEOC that plaintiff's retaliation claims are strengthened by the fact that defendant allegedly sought to dissuade him from proceeding with his complaint against his co-worker. In his complaint and brief, plaintiff describes the pressure he received in this regard as follows:

> On May 31, 2022, Union Vice Chairman Nick Manojlovic (white male) called Plaintiff and badgered him about escalating the incident and tried to dissuade him from escalating it further. [Complaint at 3-4]. Later that same day, May 31, 2022, Production Manager Christopher Day phoned Plaintiff and stated, "I had Nick to call you to get you to drop the matter", i.e., not file the incident report. *Id.* at p. 4. On June 2, 2022, Mr. Garner informed Plaintiff that he was being placed on administrative leave pending an investigation into the matter. Id. Subsequently, an investigation was conducted. *Id.* On June 24, 2022, Plaintiff was informed that he was terminated, allegedly for violation of ICRC's Workplace Violence Prevention Policy. *Id.*

[Plaintiff's brief at 2-3].

In seeking summary judgment, defendant argues that its action in firing plaintiff was consistent with its policy of firing employees involved in workplace fights and that it was simply

7

following that policy in firing plaintiff and his alleged attacker. In the court's view, however, defendant's argument in this regard is weakened by plaintiff's contention that he was urged to drop the matter, since this suggests that defendant was less concerned with the fight itself than with the negative *perception* which might arise from a report of an attack by a white employee on a black co-worker. It seems quite plausible to this court that an employer would wish to bury a report of such an attack, which was allegedly made while the attacker was making vague statements about a "plantation," since this is the kind of report which can lead to adverse publicity for a company and also to workplace tensions among black and white co-workers.

In a footnote in its brief, defendant concedes that plaintiff testified in his deposition that "[i]n late April 2022, Melton got into an argument with a different IC employee at a union meeting outside of work" and "[d]uring this verbal disagreement, Melton allegedly referred to the other IC employee and union member as 'boy.'" [Brief at 6, n. 5, citing plaintiff's deposition at 27]. In its brief, defendant maintains that "[t]he details of this incident were not reported to IC," [*id.*] but, even if this were the case, this court believes that the prior alleged incident involving Melton strengthens plaintiff's argument that the attack he suffered was, in fact, racial in nature. This court further notes that defendant's own exhibits refute the notion that plaintiff never reported the earlier "boy" altercation involving Melton. To the contrary, defendant's exhibit G-4, which is to be found on page 256 of a stack of exhibits which it submitted in support of its motion for summary judgment,[1] is a hand-written complaint from plaintiff addressed to railroad management in which he describes his altercation with Melton as follows:

---

[1] This court notes that defendant's numerous exhibits were submitted in an extremely unhelpful manner, namely a voluminous "dump" of documents with no index. Submitting evidence in such a manner runs the risk of creating the impression that the litigant does not wish for certain evidence to be found and reviewed by the court.

8

> On Thursday, May 26, 2022 around 9:00 PM at Magnolia Inn … my co-workers and I was grilling after work peacefully and relaxing time when Tracey (Todd) Melton approached us with no shirt and no shoes and started acting and speaking belligerent. He was speaking about a situation at a union meeting he attended. He and another employee had a disturbing violent confrontation while Todd was saying racial slurs calling the CN employee BOY. He proceeded to approach the group. I said you need to let that go. Todd said he was from Egypt Plantation. Todd pushed me in the chest and I felled to the ground. I got back up and he hit me twice and the mouth and nose. I was in shock, my head bounced off the pavement in shock and disbelief. I was being attacked so I attempted to protect myself by fighting back. I have several witness.

[Defendant's exhibit G-4].

Defendant's own exhibits thus refute its contention that the details of Melton's alleged "boy" incident were not reported to it, in such a manner as to give rise to genuine fact issues regarding whether its stated reason for firing plaintiff is pretextual. Defendant's brief is replete with attempts to persuade this court that the altercation between plaintiff and Melton was a simple fight with no racial overtones, such as its assertion that "when reporting the fight to IC, Branch did not report – nor did he believe he was reporting – conduct motivated by race or race discrimination." [Brief at 9]. Once again, however, defendant's own exhibit clearly indicates that plaintiff issued a written report to it in which he stated that an employee who had earlier attacked a co-worker while making "racial slurs" committed an attack against him while proclaiming that he came from "Egypt Plantation." These words in a written report cannot simply be wished out of existence after the fact, and they are sufficient to create fact issues regarding whether defendant believed at the time that, by making the report, plaintiff was "opposing" an act of racial harassment by a co-worker. If so, then there is very serious doubt regarding the legality of any decision to fire plaintiff on this basis.

In its brief, defendant seeks to deny any racial overtones from Melton's alleged choice of words used in his attack on plaintiff, writing that:

> Branch admits the only thing Melton said on May 26, 2022, that he alleges is race related is that he is from Little Egypt Plantation. Branch 2024 Dep., 57:23–58:2. Branch admits

9

> Little Egypt Plantation is a real place, and he does not know if Melton is from there. *Id.*, 34:24 – 35:7. Branch further admits his only basis for concluding this relates to race is because plantations generally have a negative racial history. *Id.*, at 58:3-7. Branch has no knowledge as to whether Little Egypt Plantation is known for violence and admits Melton did not address the comments to him. Tr. 47:18 – 48:6; Branch 2023 Dep., 64:7-13. In short, when reporting the fight to IC, Branch did not report – nor did he believe he was reporting – conduct motivated by race or race discrimination. Branch 2024 Dep., 61:3-7, 61:16-23, 62:5-8.

[Defendant's brief at 9]. For its part, this court believes that Melton's alleged "plantation" remark must be read in the context which defendant was notified of it, namely plaintiff's written report to management. Once again, plaintiff noted Melton's "plantation" remark directly after he accused him of having attacked an African-American co-worker while using a "racial slur," namely calling him "boy." *Id.* This court submits that, considering these accusations together, no reasonable employer reading plaintiff's written report to management could have doubted that it was being confronted with an accusation of an attack suffered by plaintiff which, at the very least, had heavy racial overtones. Moreover, this court's conclusion in this regard is only strengthened by defendant's alleged reaction to the report, namely having encouraged plaintiff to drop the matter.

In seeking summary judgment, defendant relies heavily upon plaintiff's deposition testimony, in which defense counsel managed to elicit testimony from plaintiff that he did not report that the attack by Melton upon him was racially motivated. [Deposition transcript at 62]. In the court's view, defendant's argument on this issue would be more compelling if not for the fact that plaintiff's report to management was in the form of a *written statement*, discussed above, which indisputably accused Melton of having attacked a co-worker while making "racial slurs" against him. It was that written report which formed the basis of defendant's employment decisions in this case, and not plaintiff's characterization of that report months after the fact in his deposition. Indeed, this court notes that the hearing officer who heard plaintiff's complaint

10

had him read his written statement out loud during the hearing, [hearing transcript at 75-76], and it is thus exceedingly clear that, at the time defendant fired plaintiff, it was well aware of the totality of his accusations against Melton, including his having allegedly attacked another black employee while making "racial slurs."

In the court's view, a reasonable employer reading plaintiff's written report would conclude that he was alleging that he was attacked by Melton after taking his black co-worker's side in a racially-charged dispute, which makes his allegation that he was fired for "opposing" racial harassment at the workplace that much stronger. Indeed, even if this court is to assume that Melton did not attack plaintiff simply because he was black, a reasonable employer reading his written report would likely conclude that plaintiff was reporting that he suffered an unjustified physical attack by Melton after he opposed an act of racial harassment towards a co-worker. This court believes that Title VII's retaliation provisions are likely broad enough to offer protection to such acts of "opposition,"[2] since a holding otherwise would seemingly serve to dissuade employees from opposing acts of racial harassment by co-workers. Title VII's retaliation provision was enacted to prevent such a result. Moreover, it seems clear that the ultimate issue in any discrimination or retaliation case is the employer's *motive* in firing or otherwise punishing a worker, and, that being the case, the crucial issue is the facts and allegations which defendant had before it *at the time*.

It does appear that defendant managed to elicit some helpful testimony from plaintiff at his deposition, and it seems entirely possible that this testimony will lead jurors to decide in its favor at trial. Still, nothing in plaintiff's deposition testimony can alter the words which he wrote

---

[2] Even assuming that this is not the case, this court still believes that a reasonable employer reading the totality of plaintiff's report (including Melton's alleged "boy" and "plantation" remarks) would conclude that plaintiff was alleging that race was a very significant factor in the attack upon him.

in his statement to management, and it was that written report which defendant had before it in deciding whether to fire plaintiff. In the court's view, defendant's argument that it was confronted with allegations of a simple fight with no racial overtones are cast into serious doubt by this report, and, as such, this court has little difficulty in concluding that genuine fact issues exist regarding whether defendant's basic position in this case is disingenuous and pretextual within the meaning of the *McDonnell Douglas* framework. Once again, this court believes that plaintiff's evidence is more supportive of a retaliation claim than a discrimination one, but, out of an abundance of caution, it will reserve a final ruling on plaintiff's discrimination claim until after the presentation of the evidence at trial.

While this court thus regards plaintiff's retaliation claim as being a potentially strong one, it is nevertheless not prepared to grant his partial summary judgment motion as to **this** claim. In so stating, this court emphasizes that, in considering plaintiff's own summary judgment motion, it must interpret the facts in the light most favorable to defendant, just as it did with plaintiff in considering his response to defendant's summary judgment motion. Considering the facts in this light, this court believes that defendant has a reasonable jury argument that it had a zero tolerance policy regarding workplace fights and that it simply applied that policy in firing plaintiff. Moreover, plaintiff clearly did not help his case with some of the above-discussed testimony at his deposition, and this testimony puts him in a poor position to seek summary judgment as to his retaliation claim. At the end of the day, the retaliation issues in this case come down to defendant's *motivation* in firing plaintiff, and subjective issues such as motive are ones which jurors are best equipped to resolve. This court will therefore deny both parties' summary judgment motions, and it will reserve ruling on all liability issues in this case until the directed verdict and/or jury instruction phase of trial. This approach will allow this court to rule

upon those liability issues at the time when it has the greatest knowledge of the facts of the case, namely after the presentation of the evidence at trial.

It is therefore ordered that defendant's motion for summary judgment is denied, and plaintiff's motion for partial summary judgment is likewise denied.

This, the 15th day of January, 2025.

                                           /s/Michael P. Mills
                                           UNITED STATES DISTRICT JUDGE
                                           NORTHERN DISTRICT OF MISSISSIPPI